# UNITED STATES DISTRICT COURT
# DISTRICT OF COLUMBIA

| | |
|---|---|
| LIV GOLF, INC.,<br><br>        Movant,<br><br>v.<br><br>CLOUT PUBLIC AFFAIRS, LLC,<br><br>        Respondent. | Misc. Case No.<br><br>Underlying Case, *LIV Golf, Inc., et al. v. PGA Tour, Inc.*, pending in the United States District Court for the Northern District of California:<br><br>Case No. 5:22-cv-04486-BLF |

## MEMORANDUM OF LAW IN SUPPORT OF MOTION TO COMPEL CLOUT PUBLIC AFFAIRS, LLC TO COMPLY WITH SUBPOENA TO PRODUCE DOCUMENTS

## PRELIMINARY STATEMENT

This motion concerns compliance with a third-party subpoena to Clout Public Affairs, LLC ("Clout"), a public relations firm that describes itself as specializing in "grassroots campaigns to influence policy makers."[1]  In the underlying action, *LIV Golf, Inc., et al. v. PGA Tour* (N.D. Cal.), LIV Golf, Inc. ("LIV"),[2] a new entrant professional golf league, is suing the PGA Tour, Inc. (the "Tour") for illegally maintaining a monopoly and monopsony over men's professional golf and colluding with others in what the Tour euphemistically terms the "golf ecosystem" to block LIV's entry.  A key part of the Tour's anticompetitive scheme was to threaten to ban (and in fact ban) Tour member golfers *for life* if they played in LIV events.  The Tour knew (as the Tour's Commissioner, Jay Monahan, stated in internal strategy documents) that if it could choke off LIV's supply of elite golfers, LIV would either not survive or be so hobbled it could not effectively challenge the Tour's dominance.  To justify this egregiously anticompetitive behavior, the Tour claimed it was protecting the Tour's reputation from the "taint" of the Kingdom of Saudi Arabia; LIV's principal investor is Saudi Arabia's sovereign wealth fund, the Public Investment Fund ("PIF").  According to the Tour, its anticompetitive policies, including player bans, on LIV and its players are justified to insulate the Tour from anti-Saudi public sentiment associated with LIV. *See infra* BACKGROUND Part B-D.

As it turns out, the PGA Tour itself has been secretly fomenting the very anti-Saudi sentiment that it now uses to justify its illegal conduct.  The Tour has been running a clandestine

---

[1]   *See* Declaration of Dominic Surprenant dated December 12, 2022 ("Surprenant Decl.") Ex. 2 at 3.

[2]   The Tour insists on referring to LIV as "SGL," the "Saudi Golf League." *See* Surprenant Decl. Ex. 3 at 2 (████████████████████████████████████████████████████████████████████████████████████████████████████████████████).

public relations campaign to smear LIV for its Saudi funding and to oppose "Saudi Golf." The Tour hired Clout to front this campaign, insisting that Clout conceal the Tour's orchestration of this effort. The Tour has produced evidence in the underlying lawsuit of its scheme, including evidence that it organized and likely funded 9/11 protests at LIV Golf tournaments and ran adjacent media campaigns against LIV. The PGA Tour launched this campaign not to help 9/11 associations (which received hundreds of thousands of dollars before the anti-Saudi protests at LIV tournaments), but to support its campaign against LIV. The Tour has secretly directed, coordinated, and funded public protest, defamatory advertising, and other tactics to stir up anti-Saudi sentiment directed at its first-ever global competitor, all in an effort to maintain its unlawful monopoly. The Tour knew how bad it would look if its fingerprints were on the campaign to link LIV Golf to the tragedy of the September 11th attacks, so the Tour hid behind Clout.

LIV describes and quotes below documents produced by the Tour that indicate the scope and depth of Clout's role in organizing this astroturf campaign and manufacturing anti-Saudi sentiment against LIV. However, critical evidence of the scheme resides solely with Clout. Evidence from Clout of the Tour's scheme to create the very anti-Saudi "taint" that the Tour uses to justify banning its own members for daring to play in a LIV event is highly relevant to the claims and defenses in the underlying action and to the Tour's credibility (and perfidy). This evidence goes directly to the issue of pretext. LIV respectfully requests that its targeted, seven-request subpoena be enforced in full.[3]

---

[3]  Exhibit 1 to the Surprenant Decl. is a true and correct copy of the subpoena.

# BACKGROUND

### A.    Plaintiffs' Relevant Allegations

LIV's Amended Complaint describes in detail the Tour's schemes to block LIV's effective entry into the relevant markets.    Plaintiffs allege that the Tour "is a monopolist and/or a monopsonist in two relevant product markets: (1) the market for the services of professional golfers for elite golf events, and (2) the market for the promotion of elite professional golf events." ECF No. 83 ¶ 263.[4]    Specifically, the Tour has illegally sought to maintain its monopolies by:

> (1) unreasonably restrictive regulations [on PGA Tour member golfers], (2) threats of and now imposition of career-threatening bans [on golfers who play LIV Golf events], (3) multi-year suspensions of the Player Plaintiffs and other members who played at LIV Golf events, (4) the promise it will visit the 'same fate' on any [PGA Tour] member who follows their example, (5) the Tour's threats and punishments to non-members who participate in LIV events and a wide range of other businesses who aspired to do business with LIV Golf ….

*Id.* ¶ 287.    Further, LIV alleges that the PGA Tour:

> has threatened Tour members' agents and business partners with punishment if the players joined LIV Golf. In addition, the Tour has threatened numerous vendors and small companies in the golf and sports production industry that they will be blacklisted from working with the Tour if they work with LIV Golf.
> …
>
> The Tour has also threatened sponsors and broadcasters that they must sever their relationships with players who join LIV Golf, or be cut off from having any opportunities with the PGA Tour….

*Id.* ¶ 11.

The Tour also conspired with the European Tour and others to exclude LIV and other new entrants in violation of Section 1 of the Sherman Act. *See id.* ¶¶ 11.c., 98, 131-51, 341-53 (alleging Section 1 conspiracy).

---

[4]    Docket citations are to those in the underlying action *LIV Golf, Inc., et al. v. PGA Tour, Inc.*, Case No. 5:22-cv-04486-BLF (N.D. Cal.).

**B.      The Tour's Defense That It Is Protecting Itself from Supposed Saudi "Taint"**

A primary Tour defense to these claims is that LIV is funded by PIF, the sovereign wealth fund of Saudi Arabia.  The Tour contends that it had no choice but to ban its own members if they play in a single LIV event, because it "will suffer irreparable reputational damage if it is forced to give a stage to players engaged with LIV and to associate the PGA TOUR brand with the Saudi government's ... deplorable reputation."  ECF No. 50 at 23.  The Tour defends itself by pointing to anti-Saudi protests and sentiment associated with LIV and its tournaments.  *See* ECF No. 169 at 18:16-20 (raising "the TOUR's defenses ... that Saudi Arabia's reputation—not [the Tour's] anticompetitive conduct—is the reason why sponsors, broadcasters, and others have distanced themselves from LIV"); ECF No. 148 at 19 (arguing that the Tour properly "seeks evidence that its enforcement of its Regulations serves the pro-competitive purpose of protecting the TOUR's reputation from association with LIV and LIV players' controversial Saudi Arabian backers").

**C.      The Tour's Defense Is Based on Protests and Opposition It Funded and Fomented**

At the outset of this case, several LIV golfers sought a temporary restraining order to prohibit the Tour from blocking them from playing in the FedEx Cup, the Tour's season-ending playoffs for which those LIV golfers had qualified.  The Tour opposed that motion in part on the ground that it was justified in not associating with LIV golfers because of Saudi taint:

> The *public outrage* and *political backlash* aimed at golfers who have joined LIV reinforces the TOUR's concerns. After Pumpkin Ridge Golf Club (outside Portland, Oregon) announced that it would host a LIV tournament on July 1–3, eleven mayors in Washington County (where Pumpkin Ridge is located) signed an open letter opposing the tournament, numerous members of the club protested the decision, and an estimated forty club members resigned. U.S. Senator Ron Wyden, spoke out against the Oregon LIV event, citing a hit-and-run accident that killed an Oregon teen and how the Saudi-national defendant was shuttled out of the U.S. by the Saudi government before he could stand trial. In addition, several protesters, including members of 9/11 survivor families, gathered outside Pumpkin Ridge and again at the Trump resort in Bedminster, New Jersey, to protest LIV events.

ECF No. 50 at 23 (emphasis added; citations omitted).  However, the Tour failed to disclose that *each* of these instances of "public outrage" and "political backlash" stemmed from the Tour's and Clout's own clandestine campaign.

    *First*, the Tour and Clout orchestrated opposition to the initial LIV Portland event, including a letter from eleven mayors and members of the host club:



Surprenant Decl. Ex. 3 (emphasis added);  *id.* Ex. 4 (emphasis added) (███
█████);
*id.* Ex. 5 (█████
███); *id.* Ex. 6 (███
████).

    *Second*, the Tour and Clout cynically exploited a tragic hit-and-run story from 2019 to generate anti-Saudi press:



*Id.* Ex. 3 at 3; *id.* Ex. 7 (████
███); *id.* Ex. 8 at 3 (████

███████████████████████████████████████████████████████
█████████████████████████████████████ ).

*Third*, and incredibly, the Tour and Clout orchestrated 9/11 protests outside of LIV's tournaments. They apparently did so through, among other things, organizing 501(c)(4) tax-exempt organizations to funnel resources to this effort. Well before that event, Clout had been "██████████████████████████████████████████████." *Id.* Ex. 9 at 2. ████████████████

███████████████████████████████████████████████████████
███████████████████████████████████████████████████████
███████████████████████████████████████████████████████
██████████████████████████ *Id.* Ex. 10 (emphasis added); *id.* Ex. 11 at 2 (██████
██████████████████████████████████████ ); *id.* Ex. 12 at 2 (██████
██████████████████████████████████████ ); *id.* Ex. 3 at 2 (██████
███████████████████████████████████████████████████████
████████████████████████████████████ ). These efforts apparently included Clout orchestrating the involvement of others through 501(c)(4) entities. *Id.* Ex. 10 (██████████
████████████████ ).

## D.  Clout's Other Activities to Generate "Outrage"

The Tour initially envisioned using Clout for a widespread "████████████████████████."
Surprenant Decl. Ex. 13 at 5. The Tour's clandestine campaign soon broadened to encompass additional lines of attack on LIV.

### *Clout Engages with Local Organizations and Entities to Generate "Public Outrage" and with Elected Officials to Generate "Political Backlash"*

At each U.S. LIV tournament site, the Tour and Clout engaged in furtive efforts to hamper the tournament's success, and ultimately LIV's viability. *See* Surprenant Decl. Ex. 14 at 2 (████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

█████████████████████ ).

The Tour and Clout also targeted the highest levels of government and the media to foment anti-LIV sentiment. *See Id.* Ex. 15 at 2 (███████████████████████████

█████████████████████████████████████████████████████ ); *id.*

Ex. 16 (██████████████████████████████ ); *id.* Ex. 17 at 2 (█████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

██████████████████████████████████████████ ).

In opposition to the players' motion for a TRO, the Tour said nothing of its clandestine efforts when it emphasized to the court that "[f]ans and community members have … protested LIV's events, including, organizations seeking justice for the victims and families affected by the 9/11 attacks." ECF No. 50 at 13.

### *The Tour and Clout Incite Opposition Through Sports and Political Media – Television, Social, Podcasts, Op-Eds, Online Golf Forums, Etc.*

The Tour and Clout engaged additional media to further their anti-Saudi narratives. *See, e.g.,* Surprenant Decl. Ex. 18 (████████████████████████████████ ); *id.*

Ex. 4 at 2-3 (████████████████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████████████

█████████████████████████████████████████████████████ ); *id.*

Ex. 19 (████████████████████████████████████████████████



); *id.* Ex. 20 (

); *id.* Ex. 21 (

).

Yet the Tour remained silent on its prominent role in these stealth efforts to amplify an anti-Saudi narrative when it argued to the Court that "LIV has already been a constant distraction at recent TOUR events," and that "at the recent 150th Open Championship, one of professional golf's most historic tournaments, prominent TOUR members expressed frustration with the unwanted media focus on LIV rather than the tournament." ECF No. 50 at 22.

### The Tour Targets Players' and Tournaments' Sponsors

Clout also advised the Tour on how to use the Tour's negative publicity campaigns to push sponsors away from LIV:



Surprenant Decl. Ex. 22 at 4; *see also id.* Ex. 23 at 2 (

); *id.*

Ex. 6 at 2 (

). However, the Tour was silent again on its role in creating this pressure when it told the Court that "[a] temporary restraining order would … force the TOUR's partners and sponsors to be associated with LIV and its backers. Many of the TOUR's partners and sponsors have made independent decisions to have no relationship with LIV but would be forced into an affiliation with them." ECF No. 50 at 23.

### *The Tour's Illegal Player Bans*

Clout even framed the public narrative for the Tour's bans of players.  One email recounted a meeting between ███████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████████████████████

████████████████████: 



Surprenant Decl. Ex. 3 at 2; *see also id.* Ex. 24 (████████████████████████████████████

███████████████); *id.* Ex. 25 (██████████████████████████████████████████████████████

████████████████████████████████).

### E.      The PGA Tour's Public Stance

Hiding  behind  Clout's  stealth  campaign,  the  Tour  pretended  that  these  anti-Saudi sentiments had emerged organically.  Two examples make the point.

Days before LIV's Portland event, PGA Tour Commissioner Jay Monahan appeared on national television during the RBC Canadian Open.  During his extended interview, Monahan went to lengths to allude to anti-Saudi sentiment, including the protests and opposition from 9/11 organizations.  What Monahan concealed from millions of viewers is that the PGA Tour itself— aided and abetted by Clout—was working feverishly behind the scenes to generate this very anti-

Saudi sentiment.[5]  *See generally* https://www.pgatour.com/video/2022/06/12/jay-monahan-joins-cbs-booth-to-discuss-state-of-pga-tour-at-rbc-.html.

PGA Tour Commissioner Monahan also was working this issue at the highest levels of government.  A PGA Tour document reveals ████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████████

████████████████  Surprenant Decl. Ex. 32.  Monahan does not mention that the PGA Tour itself was fomenting these protests.

## ARGUMENT

### I.    LIV's Requests Seek Relevant Documents

Rule 26 permits "discovery regarding any nonprivileged matter that is relevant to any party's claim or defense and proportional to the needs of the case." Fed. R. Civ. P. 26(b)(1).  The scope of production in response to a subpoena is governed by the same relevancy standard.  *See AF Holdings LLC v. Does 1-1,058*, 286 F.R.D. 39, 46 (D.D.C. 2012).  Under that rule, "[p]arties may obtain discovery regarding any non-privileged matter that is relevant to any party's claim or defense." Fed. R. Civ. P. 26(b)(1).  This standard "has been construed broadly to encompass any matter that bears on, or that reasonably could lead to other matter that could bear on, any issue that is or may be in the case." *Oppenheimer Fund, Inc. v. Sanders*, 437 U.S. 340, 351 (1978).  If a non-party refuses to provide relevant information in response to a subpoena, the requesting party may move to compel compliance. *See* Fed. R. Civ. P. 37(a) & 45(d)(2)(B)(i).

---

[5]  In deconstructing the interview, ██████████████████████████ when Commissioner Monahan talked about " ████████████████████████ " and that this story " ████████ ." Surprenant Decl. Ex. 35 at 2.

Clout concedes that most of LIV's requests seek relevant documents. Clout's relevance objections for the other categories are specious.

To begin, Clout's objections are premised on the unfounded proposition that LIV may *only* seek evidence from Clout in relation to a single paragraph (Paragraph 11) of the complaint. *See* Surprenant Decl. Ex. 26, Clout's Objection Letter at *passim* (limiting any production to "public communications … described in Paragraph 11 of the Amended Complaint"; agreeing to produce communications "to the extent … made on behalf of the PGA Tour and are described in Paragraph 11"; arguing that certain documents are "utterly irrelevant" and solely citing in support "Paragraph 11"). That is obviously wrong. LIV's discovery relates in significant part to the Tour's *defenses* in the litigation. LIV's discovery efforts and Clout's discovery obligations are not limited to isolated allegations of the complaint but "broadly [ ] encompass any matter that bears on, or that reasonably could lead to another matter that could bear on, any issue that is or may be in the case." *Mannina v. District of Columbia*, 2022 WL 971205, at *5 (D.D.C. Mar. 31, 2022) (citation omitted).

### *Request No. 1*

Request No. 1 seeks relevant communications between the Tour and Clout. In response to this request, Clout argues that "all communications" between Clout and the Tour "are not necessarily relevant." Surprenant Decl. Ex. 26 at 4. But LIV does not seek all communications. Instead, request No. 1 seeks Clout's communications with the Tour related to specific subject matters that formed the basis of the Tour and Clout's campaign, e.g., LIV Golf, Saudi Arabia, and September 11.

***Request No. 2***

Request No 2 seeks documents "related to [Clout's] consulting services provided to the PGA Tour" for the same subjects identified in Request 1.   On this request, Clout objects to producing "Clout's internal communications."   Clout asserts, without explanation, that "a public relations firm's internal, deliberative, unshared work product and discussion cannot possibly be relevant to Plaintiffs' antitrust claims." Surprenant Decl. Ex. 26 at 5. Clout then seeks to limit the universe of relevance to one aspect of one paragraph of the Amended Complaint: "'threats' directed to various golfers, vendors, and organizations outside of the PGA Tour."   *Id.*   This objection is meritless.

*First*, Clout's internal documents are highly relevant.   Clout was hired by the Tour to formulate and execute strategies to defeat LIV and manufacture pretextual justifications for its anticompetitive actions.   Clout's internal documents are needed to obtain a complete picture of what this strategy entailed—for example, what precisely Clout did and what its reasoning and purpose were, as well as how its efforts fit into the Tour's overall strategy.   For example, Clout provided the Tour with ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓ ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓. Surprenant Decl. Exs. 27, 28.   Such "internal documents" are relevant and discoverable.

Clout's internal communications will also reflect its oral communications with the Tour. For example, the Tour's documents show that ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓ ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓.   *See* Surprenant Decl. Ex. 29 at 2, Ex. 30 at 3 (▓▓▓▓▓▓▓▓ ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓ ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓ ▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓▓).   Clout doubtlessly made notes during the meeting and sent internal

emails or other documents about this "███████████████████████████████

███████████." The same is true of Clout's other regular meetings with the Tour. LIV is entitled

to the notes and documents resulting from these meetings.

Clout's internal documents regarding its strategies to orchestrate LIV's demise with anti-

Saudi taint are central to the case. The Tour itself has put supposedly anti-Saudi sentiment at issue.

These documents are relevant because they will expose that the Tour's supposed justification for

certain of its anticompetitive conduct is pretextual. *See, e.g.*, *Image Tech. Services, Inc. v. Eastman*

*Kodak*, 125 F.3d 1195, 1219 (9th Cir. 1997) (finding evidence relevant to "show pretext, when

such evidence suggests that the proffered business justification played no part in the decision to

act" and that "the aims of … the antitrust laws [do not] justify allowing a monopolist to rely upon

a pretextual business justification to mask anticompetitive conduct"); *High Tech. Careers v. San*

*Jose Mercury*, 996 F.2d 987, 991 (9th Cir. 1993) (finding evidence of pretext where the

defendant's "proffered business justification [was] suspect" because it "appear[ed] inconsistent

with" defendant's other actions).

Clout's internal documents are also necessary because Clout and the Tour attempted to

conceal the Tour's participation in the scheme. *See* Surprenant Decl. Ex. 3 at 3 (emphasis added)

(███████████████████████████████████████████████

█████████████████████████████████████); *id.* Ex. 4 at 2 (emphasis

added) (██████████████████████████████████████

█████████████████████████████████████████████

████████████████████). Clout proposes to limit the subpoena only to *external*

communications made "on behalf of" the Tour. But a central part of Clout's role was to engage in

*clandestine* actions—actions "███████████████████." LIV is entitled to all of Clout's documents—whether "internal" or "external"—on these crucial subjects.

Further, the evidence shows that Clout was the Tour's public relations agent, such that Clout's actions and statements are attributable to the Tour. The Tour's documents show that Clout and the Tour regularly communicated on the Tour's public relations schemes, and that Clout made recommendations to the Tour on what to do and how to do it. The Tour controls Clout's action in detail. *See, e.g.*, Surprenant Decl. Ex. 3 at 2-3 (████████████████████████); *id*. Ex. 4 at 2 (██████████████████████); *id*. Ex. 24 (████████ ███████████████); *id*. Ex. 25 at 2 (███████████ ████████████████████"); *id*. Ex. 31 at 3 (██████████ ████████████████). Such a relationship is one of principal and agent. *See Palmer v. Gotta Have It Golf Collectibles, Inc.*, 106 F. Supp. 2d 1289, 1301 (S.D. Fla. 2000) (recognizing a "public relations manager" was an agent of a golfer such that the golfer could not have conspired with said manager); *Rojas v. Fed. Aviation Admin.*, 927 F.3d 1046, 1063 (9th Cir. 2019) (J. Christen, concurring) (stating that the Ninth Circuit has "recognized that consultants are agents whose statements can bind their paying clients") (citing *Reid Bros. Logging Co. v. Ketchikan Pulp Co.*, 699 F.2d 1292, 1306 (9th Cir. 1983)) *vacated on rehearing*, 989 F.3d 666 (9th Cir. 2021); *Beck v. Haik*, 377 F.3d 624, 638-40 (6th Cir. 2004) (holding that a consultant's statements that "dealt directly with the subject matter" of the consultancy and were "expressed during the course of that relationship" were admissible under Fed. R. Evid. 801(d)(2)(D) as statements of the party through its agent) *overruled on other grounds by Adkins v. Wolever*, 554 F.3d 650, 651 (6th Cir. 2009). Clout has admittedly offered to produce documents of external acts taken "on behalf of the Tour," an admission that Clout acted as the Tour's agent. *See Henderson*

*v. Charles E. Smith Mgmt., Inc.*, 567 A.2d 59, 62 (D.C. 1989) ("[A]n agency relationship results when one person authorizes another to act on his [or her] behalf subject to his [or her] control, and the other consents to do so." (quoting *Smith v. Jenkins*, 452 A.2d 333, 335 (D.C. 1982)).

At a minimum, LIV is entitled to explore whether Clout was an agent of the Tour whose statements could bind the Tour.  Clout's internal documents are discoverable for this purpose because they will confirm whether the Tour controlled Clout's actions and whether Clout viewed itself as an agent of the Tour.

*Second*, Clout cannot unilaterally limit relevance to its involvement with "'threats' directed to various golfers, vendors, and organizations outside of the PGA Tour." Surprenant Decl. Ex. 26 at 5.  While Clout's admission that it was involved in these threats underscores the need for Clout's documents, the relevance of Clout's activities goes far beyond this one aspect of the underlying lawsuit.  On the contrary, discovery of Clout is relevant to counter the Tour's proffered procompetitive justifications and the Tour's use of Clout to block the entry of the Tour's most significant competitor. *See, e.g.*, *E. R. R. Presidents Conference v. Noerr Motor Freight, Inc.*, 365 U.S. 127, 144 (1961) (stating that the Sherman Act applied to "a publicity campaign … [that is] an attempt to interfere directly with the business relationships of a competitor"); *Trucking Unlimited v. Cal. Motor Transp. Co.*, 432 F.2d 755, 757 (9th Cir. 1970) (holding that the plaintiff alleged an antitrust violation by the defendants which used a "widely publicized program" to eliminate potential competitors); *Int'l Wood Processors v. Power Dry*, 593 F. Supp. 710, 721-22 (D.S.C. 1984) (affirming that actions to exclude the defendant's only competitor from the relevant market was an unreasonable restraint of trade despite the defendant's argument that its actions were necessary to "overcome" "the unsavory reputation" to the product at issue that was caused by the plaintiff).

***Request Nos. 3, 4, 5, and 6***

Request Nos. 3, 4, 5, and 6 respectively seek documents and communications related to "any public affairs campaign," "any coalition development," "any strategic and crisis communications," or "any competitive research" Clout "conducted related to LIV Golf, any golfer who has participated in a LIV Golf tournament, or this lawsuit."

Remarkably, Clout claims these requests seek documents irrelevant to the underlying lawsuit, because it supposedly took these actions for clients other than the PGA Tour.  LIV is entitled to explore the veracity of the claim that Clout was doing anti-LIV work for any entity other than the Tour.[6]  For example, ███████████████████████████████████████ ████████████████████████████████████████████████████████████████ ████████████████████████████████████████ Surprenant Decl. Ex. 9 at 2.  Clout cannot undertake acts in connection with its smear campaign on behalf of the Tour and then hide evidence of those acts behind the claim that it was supposedly acting for a different nominal "client."  Clout's work for these "other" clients—if there are any—*on the same subject matters* and ***to the same ends*** as Clout's work for the Tour is therefore discoverable.

Finally, LIV is entitled to explore what acts can be attributed to the Tour and which—if any—cannot because they were supposedly taken on behalf of another Clout client.  LIV cannot do so without Clout's documents on the subject matter.  The degree of relevance of these documents is underscored by evidence that Clout subversively manufactured evidence for the Tour by engaging in attack campaigns against LIV ██████████████████████████████ ████████████████████████████████████████████████████████ Surprenant Decl.

---

[6]  Indeed, LIV has alleged a Tour-lead group boycott of LIV.  *See, e.g.*, ECF No. 83 ¶¶ 3, 341-53.  If others who were part of that boycott directed or funded this work, it is equally relevant.

Ex. 3 at 3; *id.* Ex. 4 at 2; *id.* Ex. 10 at 2.  And, if—as Clout suggests—there are co-conspirators or

intermediaries that Clout engaged with as part of its effort to accomplish the Tour's goals but

without the Tour's fingerprints, LIV is entitled to the evidence showing this effort, including

organizing 501(c)(4) entities to conceal and funnel resources to wage this campaign.  Again, Clout

cannot limit relevance to a specific paragraph of the complaint.

### *Request No. 7*

Request No. 7 requests communications by Clout with certain anti-Saudi groups related to

the subject matter set forth in Requests Nos. 1 and 2.  Clout objects to this request as "utterly

irrelevant" because certain groups listed in the request "are never mentioned or even alluded to in

the Plaintiffs' sprawling Amended Complaint."  Clout again improperly attempts to limit discovery

to a single cherry-picked paragraph of the complaint.  This request seeks relevant evidence beyond

that paragraph, i.e., evidence regarding Clout's (and, by extension, the Tour's) use of the identified

groups as part of the smear campaign orchestrated against LIV and its players, which the Tour uses

to justify its wrongful acts.  *See* Surprenant Decl. Ex. 9 at 2 (███████████████████

███████████████████████████████); *id.* Ex. 32 at 2 (███████████

███████████████████████████████████████████████

███████████████████████████████████████████████

███████████████████████████); *id.* Ex. 10 (███████████

███████████████████████); *id.* Ex. 11 at 2 (███████████████

███████████); *id.* Ex. 12 at 2 (███████████████████████

███████████████████).

## II.    **Clout's First Amendment Objection Is Meritless**

Clout asserts a First Amendment claim of *other persons* to prevent a *private actor*, LIV,

from discovering Clout's *commercial activity*.  This argument fails.

On its website, Clout boasts that it is a public relations hired gun.  Surprenant Decl. Ex. 2

at 3 ("Clout Public Affairs is a full-service public strategy and consulting firm that brings together

expertise in communications, policy and politics to execute winning strategies for our clients…

we do what it takes to win.").  As a commercial actor, Clout cannot use the First Amendment to

shield its own documents from discovery.  *See, e.g.*, *Bean LLC v. John Doe Bank*, 291 F. Supp. 3d

34, 46 (D.D.C. 2018) ("While the opposition research Fusion conducted on behalf of its clients

may have been political in nature, Fusion's commercial relationship with those clients was not,

and thus that relationship does not provide Fusion with some special First Amendment protection

from subpoenas."); *Fed. Election Comm'n v. Automated Bus. Services*, 888 F. Supp. 539, 542

(S.D.N.Y. 1995) (citation omitted) ("The mere vending of goods or services to a political

association neither evinces support for that association, nor makes the vendor a member of that

association.  Thus, the First Amendment clearly affords no such protection to vendors of goods or

services to political associations.").

All of the cases that Clout cited in its objections and during the meet and confer concern

***the government*** attempting to compel identities of persons associated with certain groups—facts

not at issue here.  *See NAACP v. Alabama ex rel. Patterson*, 357 U.S. 449, 460 (1958) (blocking

"compelled disclosure of the [NAACP's] membership lists" to the state of Alabama); *Int'l Action*

*Ctr. v. United States*, 207 F.R.D. 1, 3 (D.D.C. 2002) (blocking discovery by the U.S. of political

groups' "membership and volunteer lists, contributor lists, and past political activities of plaintiffs

and of those persons with whom they have been affiliated"); *Black Panther Party v. Smith*, 661

F.2d 1243, 1269-70 (D.C. Cir. 1981) (vacating order permitting disclosure to government officials

of identifies of members of Black Panther Party), *judgment vacated sub nom. Moore v. Black*

*Panther Party*, 458 U.S. 1118 (1982).  LIV is not seeking membership lists, nor is LIV the government.

Even if Clout could point to a single factually similar case, it does not have standing to invoke the purported rights of other unidentified "clients." *Elec. Privacy Info. Ctr. v. U.S. Dep't of Homeland Sec.,* 653 F.3d 1, 9-10 (D.C. Cir. 2011) (explaining a "litigant 'generally must assert his own legal rights and interests, and cannot rest his claim to relief on the legal rights or interests of third parties'" (quoting *Warth v. Seldin,* 422 U.S. 490, 499, (1975)); *cf. NAACP*, 357 U.S. at 458-60 (permitting NAACP to assert constitutional rights *of its members* to block disclosure of its members' association with the NAACP).

## III.   The Subpoena Does Not Place an Undue Burden on Clout

To avoid the requirements of Rule 45, Clout must demonstrate that its burden of responding to the subpoena is "undue."  There are several factors courts look to in making this determination, including "the needs of the case, the amount in controversy, the parties' resources, the importance of the issues at stake in the litigation, and the importance of the proposed discovery in resolving the issues." *Phillips & Cohen, LLP v. Thorpe,* 300 F.R.D. 16, 18 (D.D.C. 2013).  Clout argues that compliance with the subpoena presents an "undue burden" because it has "what appears to be a few thousand [responsive] documents" and that "the cost of production is, therefore, also substantial." Surprenant Decl. Ex. 26 at 5.  Even if Clout detailed the costs of production (instead of its conclusory statement), the costs of processing "a few thousand documents" are heavily outweighed by factors favoring production.

Clout was hired by the Tour, which generates revenue of over $1.5 billion a year, *see* Surprenant Decl. Ex. 36 at 3, to devise and execute a surreptitious public relations and grassroots campaign to drum up evidence to justify the Tour's efforts to exclude the Tour's only serious competitor in its existence, and to do so without the Tour's fingerprints.  This evidence is central

to LIV's case, and LIV's subpoena is narrowly-tailored with seven requests tied to the issues in which Clout was undisputedly involved. *See Am. Standard Inc. v. Pfizer Inc.*, 828 F.2d 734, 743 (Fed. Cir. 1987) ("Need is enhanced when information is uniquely available from the party from whom it is sought."). The subject matter of the underlying lawsuit is so serious that the Antitrust Division of the Department of Justice has launched an investigation into the Tour's anticompetitive conduct. *See generally* Surprenant Decl. Exs. 33, 34. A simple Google search shows that the underlying lawsuit is of national (and international) importance. In the underlying matter, LIV has produced over 110,000 documents in the span of a few months. Surprenant Decl. ¶ 2. Put in proper perspective, the burden on Clout is minimal.

## CONCLUSION

For these reasons, LIV respectfully requests the Court to compel Clout to comply with the subpoena in full.

Dated: December 13, 2022

Keith H. Forst (DC Bar No. 478775)
QUINN EMANUEL URQUHART & SULLIVAN LLP
1300 I Street NW, Suite 900
Washington, District of Columbia 20005
Tel: (202) 538-8000
Fax: (202) 538-8100
keithforst@quinnemanuel.com

DOMINIC SURPRENANT *pro hac vice forthcoming*
QUINN EMANUEL URQUHART & SULLIVAN LLP
865 South Figueroa Street, 10th Floor
Los Angeles, California 90017
Telephone: (213) 443-3000
dominicsurprenant@quinnemmanuel.com

RYAN SWINDALL *pro hac vice forthcoming*
QUINN EMANUEL URQUHART & SULLIVAN LLP
1200 Abernathy Road, Suite 1500
Atlanta, GA 30328
Telephone: (404) 482-3502
ryanswindall@quinnemmanuel.com

*Attorneys for LIV Golf, Inc.*

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on December 13, 2022, a true and correct copy of the foregoing and all related notices, declarations, and exhibits to which Clout is entitled under the protective order in the underlying action, were served on counsel for Clout Public Affairs, LLC using the below email addresses:

Edward D. Greim:          edgreim@gravesgarrett.com

Additionally, I HEREBY CERTIFY that on December 13, 2022, I caused a true and correct copy of the foregoing and all related notices, declarations, and exhibits to which Clout is entitled under the protective order in the underlying action, to be served on counsel for Clout Public Affairs, LLC by mail via first class mail on:

Clout Public Affairs, LLC
c/o Edward D. Greim
Graves Garrett LLC
1100 Main Street, Suite 2700
Kansas City, MO 10017
United States

Keith H. Forst