# EXHIBIT 1

AO 88B (Rev. 02/14) Subpoena to Produce Documents, Information, or Objects or to Permit Inspection of Premises in a Civil Action

# UNITED STATES DISTRICT COURT
### for the
Northern District of California   [▼]

|  |  |
|---|---|
| Mickelson, et al., | ) |
| _Plaintiff_ | ) |
| v. | ) |
| PGA Tour, Inc. | ) |
| _Defendant_ | ) |

Civil Action No. 5:22-cv-04486-BLF

## SUBPOENA TO PRODUCE DOCUMENTS, INFORMATION, OR OBJECTS
## OR TO PERMIT INSPECTION OF PREMISES IN A CIVIL ACTION

To:   Clout Public Affairs, LLC, c/o: David C. Polyansky, 411 First St SE, Washington, DC 20003

_(Name of person to whom this subpoena is directed)_

✔ ☐ _Production:_ **YOU ARE COMMANDED** to produce at the time, date, and place set forth below the following documents, electronically stored information, or objects, and to permit inspection, copying, testing, or sampling of the material: Those set forth in the attached rider.

| Place: Quinn Emanuel Urquhart & Sullivan, LLP, 1300 U St NW #900, Washington, DC 20005 | Date and Time: 11/30/2022 5:00 pm |
|---|---|

☐ _Inspection of Premises:_ **YOU ARE COMMANDED** to permit entry onto the designated premises, land, or other property possessed or controlled by you at the time, date, and location set forth below, so that the requesting party may inspect, measure, survey, photograph, test, or sample the property or any designated object or operation on it.

| Place: | Date and Time: |
|---|---|

The following provisions of Fed. R. Civ. P. 45 are attached – Rule 45(c), relating to the place of compliance; Rule 45(d), relating to your protection as a person subject to a subpoena; and Rule 45(e) and (g), relating to your duty to respond to this subpoena and the potential consequences of not doing so.

Date:   11/2/2022

_CLERK OF COURT_

                                        OR

_____              _Kevin Teruya_____
_Signature of Clerk or Deputy Clerk_          _Attorney's signature_

The name, address, e-mail address, and telephone number of the attorney representing _(name of party)_  Plaintiff LIV Golf, Inc
_____, who issues or requests this subpoena, are:
Kevin Teruya, 865 S. Figueroa St., 10th Fl., L.A., CA 90017, kevinteruya@quinnemanuel.com 213-443-3000

### Notice to the person who issues or requests this subpoena
If this subpoena commands the production of documents, electronically stored information, or tangible things or the inspection of premises before trial, a notice and a copy of the subpoena must be served on each party in this case before it is served on the person to whom it is directed. Fed. R. Civ. P. 45(a)(4).

AO 88B  (Rev.  02/14) Subpoena to Produce Documents, Information, or Objects or to Permit Inspection of Premises in a Civil Action (Page 2)

Civil Action No. 5:22-cv-04486-BLF

## PROOF OF SERVICE
### *(This section should not be filed with the court unless required by Fed. R. Civ. P. 45.)*

I received this subpoena for *(name of individual and title, if any)* _____

on *(date)* _____ .

❒ I served the subpoena by delivering a copy to the named person as follows: _____

_____ on *(date)* _____ ; or

❒ I returned the subpoena unexecuted because: _____

_____ .

Unless the subpoena was issued on behalf of the United States, or one of its officers or agents, I have also
tendered to the witness the fees for one day's attendance, and the mileage allowed by law, in the amount of

$ _____ .

My fees are $ _____ for travel and $ _____ for services, for a total of $   0.00   .

I declare under penalty of perjury that this information is true.

Date: _____

_____
*Server's signature*

_____
*Printed name and title*

_____
*Server's address*

Additional information regarding attempted service, etc.:

Print      Save As...      Add Attachment                    Reset

AO 88B  (Rev. 02/14) Subpoena to Produce Documents, Information, or Objects or to Permit Inspection of Premises in a Civil Action(Page 3)

## Federal Rule of Civil Procedure 45 (c), (d), (e), and (g) (Effective 12/1/13)

**(c) Place of Compliance.**

**(1)** *For a Trial, Hearing, or Deposition.* A subpoena may command a person to attend a trial, hearing, or deposition only as follows:
  **(A)** within 100 miles of where the person resides, is employed, or regularly transacts business in person; or
  **(B)** within the state where the person resides, is employed, or regularly transacts business in person, if the person
    **(i)** is a party or a party's officer; or
    **(ii)** is commanded to attend a trial and would not incur substantial expense.

**(2)** *For Other Discovery.* A subpoena may command:
  **(A)** production of documents, electronically stored information, or tangible things at a place within 100 miles of where the person resides, is employed, or regularly transacts business in person; and
  **(B)** inspection of premises at the premises to be inspected.

**(d) Protecting a Person Subject to a Subpoena; Enforcement.**

**(1)** *Avoiding Undue Burden or Expense; Sanctions.* A party or attorney responsible for issuing and serving a subpoena must take reasonable steps to avoid imposing undue burden or expense on a person subject to the subpoena. The court for the district where compliance is required must enforce this duty and impose an appropriate sanction—which may include lost earnings and reasonable attorney's fees—on a party or attorney who fails to comply.

**(2)** *Command to Produce Materials or Permit Inspection.*
  **(A)** *Appearance Not Required.* A person commanded to produce documents, electronically stored information, or tangible things, or to permit the inspection of premises, need not appear in person at the place of production or inspection unless also commanded to appear for a deposition, hearing, or trial.
  **(B)** *Objections.* A person commanded to produce documents or tangible things or to permit inspection may serve on the party or attorney designated in the subpoena a written objection to inspecting, copying, testing, or sampling any or all of the materials or to inspecting the premises—or to producing electronically stored information in the form or forms requested. The objection must be served before the earlier of the time specified for compliance or 14 days after the subpoena is served. If an objection is made, the following rules apply:
    **(i)** At any time, on notice to the commanded person, the serving party may move the court for the district where compliance is required for an order compelling production or inspection.
    **(ii)** These acts may be required only as directed in the order, and the order must protect a person who is neither a party nor a party's officer from significant expense resulting from compliance.

**(3)** *Quashing or Modifying a Subpoena.*
  **(A)** *When Required.* On timely motion, the court for the district where compliance is required must quash or modify a subpoena that:
    **(i)** fails to allow a reasonable time to comply;
    **(ii)** requires a person to comply beyond the geographical limits specified in Rule 45(c);
    **(iii)** requires disclosure of privileged or other protected matter, if no exception or waiver applies; or
    **(iv)** subjects a person to undue burden.
  **(B)** *When Permitted.* To protect a person subject to or affected by a subpoena, the court for the district where compliance is required may, on motion, quash or modify the subpoena if it requires:
    **(i)** disclosing a trade secret or other confidential research, development, or commercial information; or

    **(ii)** disclosing an unretained expert's opinion or information that does not describe specific occurrences in dispute and results from the expert's study that was not requested by a party.
  **(C)** *Specifying Conditions as an Alternative.* In the circumstances described in Rule 45(d)(3)(B), the court may, instead of quashing or modifying a subpoena, order appearance or production under specified conditions if the serving party:
    **(i)** shows a substantial need for the testimony or material that cannot be otherwise met without undue hardship; and
    **(ii)** ensures that the subpoenaed person will be reasonably compensated.

**(e) Duties in Responding to a Subpoena.**

**(1)** *Producing Documents or Electronically Stored Information.* These procedures apply to producing documents or electronically stored information:
  **(A)** *Documents.* A person responding to a subpoena to produce documents must produce them as they are kept in the ordinary course of business or must organize and label them to correspond to the categories in the demand.
  **(B)** *Form for Producing Electronically Stored Information Not Specified.* If a subpoena does not specify a form for producing electronically stored information, the person responding must produce it in a form or forms in which it is ordinarily maintained or in a reasonably usable form or forms.
  **(C)** *Electronically Stored Information Produced in Only One Form.* The person responding need not produce the same electronically stored information in more than one form.
  **(D)** *Inaccessible Electronically Stored Information.* The person responding need not provide discovery of electronically stored information from sources that the person identifies as not reasonably accessible because of undue burden or cost. On motion to compel discovery or for a protective order, the person responding must show that the information is not reasonably accessible because of undue burden or cost. If that showing is made, the court may nonetheless order discovery from such sources if the requesting party shows good cause, considering the limitations of Rule 26(b)(2)(C). The court may specify conditions for the discovery.

**(2)** *Claiming Privilege or Protection.*
  **(A)** *Information Withheld.* A person withholding subpoenaed information under a claim that it is privileged or subject to protection as trial-preparation material must:
    **(i)** expressly make the claim; and
    **(ii)** describe the nature of the withheld documents, communications, or tangible things in a manner that, without revealing information itself privileged or protected, will enable the parties to assess the claim.
  **(B)** *Information Produced.* If information produced in response to a subpoena is subject to a claim of privilege or of protection as trial-preparation material, the person making the claim may notify any party that received the information of the claim and the basis for it. After being notified, a party must promptly return, sequester, or destroy the specified information and any copies it has; must not use or disclose the information until the claim is resolved; must take reasonable steps to retrieve the information if the party disclosed it before being notified; and may promptly present the information under seal to the court for the district where compliance is required for a determination of the claim. The person who produced the information must preserve the information until the claim is resolved.

**(g) Contempt.**
The court for the district where compliance is required—and also, after a motion is transferred, the issuing court—may hold in contempt a person who, having been served, fails without adequate excuse to obey the subpoena or an order related to it.

For access to subpoena materials, see Fed. R. Civ. P. 45(a) Committee Note (2013).

JOHN B. QUINN, SBN 90378
  johnquinn@quinnemanuel.com
DOMINIC SURPRENANT, SBN 165861
  dominicsurprenant@quinnemmanuel.com
KEVIN TERUYA, SBN 235916
  kevinteruya@quinnemanuel.com
QUINN EMANUEL URQUHART & SULLIVAN
LLP
865 South Figueroa Street, 10th Floor
Los Angeles, California 90017
Telephone: 213.443.3000

ROBERT P. FELDMAN, SBN 69602
  bobfeldman@quinnemanuel.com
555 Twin Dolphin Dr., 5th Floor
Redwood Shores, California 94065
Telephone: 650.801.5000
Facsimile:  650.801.5100

*Attorneys for Plaintiffs Matt Jones, Bryson
  DeChambeau, Peter Uihlein, and LIV Golf, Inc.*

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF CALIFORNIA
SAN JOSE DIVISION

| | |
|---|---|
| PHIL MICKELSON, TALOR GOOCH, HUDSON SWAFFORD, MATT JONES, BRYSON DECHAMBEAU, IAN POULTER, PETER UIHLEIN, and LIV Golf, INC., | Civil action NO. 5:22-cv-04486-BLF **RIDER TO SUBPOENA TO PRODUCE DOCUMENTS IN A CIVIL ACTION TO CLOUT PUBLIC AFFAIRS, LLC** |
| Plaintiffs, | |
| v. | |
| PGA TOUR, INC., | |
| Defendant. | |

Plaintiff LIV Golf, Inc., by and through its attorneys, hereby causes the attached subpoena to be served on Clout Public Affairs, LLC ("Clout"), commanding that all documents and tangible things that are in Clout's possession, custody, or control and responsive to the following Requests be produced for inspection and/or copying by November 30, 2022, at 5:00 pm to Quinn Emanuel Urquhart & Sullivan, LLP, 1300 U St NW #900, Washington, DC 20005.

This subpoena for documents relates to the above-captioned action, a lawsuit pending in the United States District Court for the Northern District of California.  Attached as Exhibit A is the Amended Complaint.

10710-00001/13713454.1  1

Each of the following Requests is to be read in accordance with the Definitions and Instructions that follow.

## DEFINITIONS

1.     For purposes of these Requests and the instructions thereto, the following definitions apply:

2.     "**Clout**," "**You**," "**Your**" or any variant thereof means Clout Public Affairs, LLC; its predecessors and successors; its past and present officers, employees, and representatives; and individuals and entities who act, have acted, or have purported to act on Your behalf.

3.     "**Communication**," or any variant thereof, means any contact between two or more persons by which any information or knowledge is transmitted or conveyed, or is attempted to be transmitted or conveyed, between two or more persons and shall include, without limitation, written contact by means such as emails, text messages, iMessages, WhatsApp messages, Slack messages, Facebook Messenger, Google Chat, Viber, Signal, Line, WeChat, Snapchat, Telegram, Microsoft Teams, Zoom, social media direct messages, instant messages, letters, memoranda, telegrams, telecopies, telexes, or any other document, and any oral contact, such as face-to-face meetings or telephone conversations.

4.     "**Document**" includes the original and each non-identical copy of any written, printed, typed, filmed, recorded (electronically or otherwise), or other graphic matter of any kind or description, photographic matter, sound recordings, or reproductions, however produced or reproduced, whether draft or final, as well as any summarization, compilation, or index of any documents. The term "document" includes, but is not limited to, letters, memoranda, reports, evaluations, x-rays, work records, studies, analyses, tabulations, graphs, logs, work sheets, work papers, medical records, correspondence, photographs, videotapes, films, slides, negatives, summaries, files, records, Communications, agreements, contracts, invoices, checks, journals, ledgers, telegrams, telexes, hand-written notes, periodicals, pamphlets, computer or business machine printouts, accountants' work papers, accountants' statements and writings, notations or records of meetings, printers' galleys, books, papers, speeches, public relations issues, advertising, materials filed with government agencies, office manuals, employee manuals or office rules and regulations, reports of experts, and any other written

matter. A draft or non-identical copy is a separate document within the meaning of this term. Documents shall include any Communication memorialized in written, electronic, or recorded means.

5.     "**Lawsuit**" means the above-captioned action pending in the U.S. District Court for the Northern District of California.

6.     "**LIV Golf**" means Plaintiff LIV Golf, Inc., LIV Golf, Ltd., LIV Golf, Holdings Ltd., LIV Golf Investments Ltd., LIV Golf, LIV Golf International Series, LIV Golf Invitational Series, and includes its past and present directors, officers, agents, predecessors, successors, assigns, legal representatives, non-legal representatives, personal representatives, investors, general partners, limited partners, employees, subsidiaries and parent companies, sister companies, and affiliated entities, and also includes individuals and entities who act, have acted, purport to act, or have purported to act on behalf of LIV Golf Inc. "LIV Golf" also includes any term, nickname, codename, project name or abbreviation that relate to LIV Golf or are used by You or Your agents to refer to LIV Golf.

7.     "**Person**" means any natural person or any legal entity, including, without limitation, any business or governmental entity or association.

8.     "**PGA Tour**" or any variant thereof, means Defendant PGA Tour, Inc., and includes its past and present directors, officers, agents, commissioners, predecessors, successors, assigns, legal representatives, non-legal representatives, personal representatives, attorneys, general partners, limited partners, employees, subsidiaries and parent companies, sister companies, and affiliated entities, and also includes individuals and entities who act, have acted, purport to act, or have purported to act on behalf of PGA Tour, Inc.

9.     "**Saudi Arabia**" or any variant thereof, means the Kingdom of Saudi Arabia; its government; officials; branches; and individuals and entities who act, have acted, purport to act, or have purported to act on behalf of the Kingdom of Saudi Arabia, such as the Public Investment Fund of Saudi Arabia.

10.     The phrases "**relate to**," "**related to**," and "**relating to**," or any variant thereof, include, but are not limited to, the following meanings:  referring to, supporting, located in, considered in connection with, bearing, bearing on, evidencing, indicating, reporting on, recording, alluding to, responding to, concerning, opposing, favoring, connected with, commenting on, in respect of, about,

regarding, discussing, showing, describing, reflecting, analyzing, constituting, and being.

11.    **"9/11 Families United"** or any variant thereof, means the organization comprised of the coalition of families demanding legislative action and disclosure of information regarding the 9/11 attacks and includes its past and present directors during the period in which they were directors, officers, agents, predecessors, successors, assigns, legal representatives, nonlegal representatives, personal representatives, general partners, limited partners, employees, subsidiaries and parent companies, sister companies, and affiliated entities, and also includes individuals and entities who act, have acted, purport to act, or have purported to act on behalf of 9/11 Families United. "9/11 Families United" also includes any term, nickname, codename, project name, or abbreviation that relate to 9/11 Families United or are used by You or Your agents to refer to 9/11 Families United.

12.    **"9/11 Justice"** or any variant thereof, means 9/11 Justice, Inc. and the organization comprised of the coalition of families demanding legislative action and disclosure of information regarding the 9/11 attacks and includes its past and present directors during the period in which they were directors, officers, agents, predecessors, successors, assigns, legal representatives, nonlegal representatives, personal representatives, general partners, limited partners, employees, subsidiaries and parent companies, sister companies, and affiliated entities, and also includes individuals and entities who act, have acted, purport to act, or have purported to act on behalf of 9/11 Justice. "9/11 Justice" also includes any term, nickname, codename, project name, or abbreviation that relate to 9/11 Justice or are used by You or Your agents to refer to 9/11 Justice.

13.    For purposes of interpreting or construing the scope of the Requests contained herein, the terms contained in such Requests shall be given their most expansive and inclusive interpretation. In order to bring within the scope of these Requests all information that might otherwise be construed to be outside of their scope, the following rules of construction apply:

      a.    the singular shall include the plural and vice versa;

      b.    the masculine, feminine or neuter pronoun shall not exclude other genders;

      c.    the connectives "and" and "or" shall be construed either disjunctively or conjunctively as necessary to bring within the scope of the Request all responses that might otherwise be construed to be outside its scope;

RIDER TO SUBPOENA TO PRODUCE DOCUMENTS TO CLOUT PUBLIC AFFAIRS, LLC
CASE NO. 5:22-cv-04486-BLF

d.   the terms "any," "all," and "each" shall each be construed as encompassing any and all;

e.   the word "including" shall be read to mean including without limitation;

f.   the present term shall be construed to include the past term and vice versa; and

g.   references to employees, officers, directors, or agents shall include both current and former employees, officers, directors, and agents.

14.   Notwithstanding the above, for any undefined term which You reasonably and on a good faith basis contend is vague or ambiguous, You shall apply the ordinary, dictionary definition of said term. Vagueness or ambiguity in this respect shall not be a basis for You to withhold or otherwise fail to search for and produce otherwise responsive Documents.

## **INSTRUCTIONS**

1.   All Documents requested herein must be produced in their entirety, with all attachments and enclosures, regardless of whether You consider the attachments and enclosures to be relevant or responsive to the Request, and regardless of whether the Document has already been produced by a different party in this Lawsuit.

2.   In responding to these Requests, You shall produce all documents and information in Your possession, custody, or control, and all documents reasonably available to You, including those in the possession, custody, or control of Your present and former attorneys, consultants, investigators, accountants, agents, representatives, or other persons acting on Your behalf.

3.   These Requests shall not be deemed to call for identical copies of documents. "Identical" means precisely the same in all respects; for example, a document with handwritten notes or editing marks shall not be deemed identical to one without such notes or marks.

4.   Responsive Documents and Communications are to be clearly designated so as to reflect their owner and/or custodian and the location from where they were produced.

5.   In the event You are able to produce only some of the Documents called for in a particular Request, You shall produce all the Documents available and state the reason(s) for inability to produce the remainder.

6.      If there are no Documents responsive all or part of a Request, You shall so state in writing.  If a Document requested is no longer existing or available, You shall so state in writing, and identify in detail why such Documents are unavailable.

7.      If You object to a portion of any Request, You shall produce all Documents called for by that portion of the Request to which You do not object.

8.      No paragraph contained in these Requests shall be construed with reference to any other paragraph for purposes of limitation.

9.      Documents and Communications responsive to a Request shall be produced as they have been kept in the ordinary course of business, including the file labels and other identifying information concerning the source or custodian of the Document or Communication.

10.     If any Document or Communication requested herein is withheld from production under a claim of privilege or legal protection against disclosure, state for each Document or Communication not produced:

a.      The nature of the privilege or other ground for protection against disclosure (including work product) that is being claimed and, if the privilege is governed by state law, the state privilege rule being invoked; and

b.      The following information:

i.      the type of Document or Communication withheld (e.g., letter or memorandum);

ii.     the general subject matter of the Document or Communication sufficient to support and explain the basis for the privilege claimed;

iii.    the date of the Document or Communication;

iv.     the author of the Document or Communication, the addressees of the Document or Communication, and any other recipients, and, where not apparent, the relationship of the author, addressees and recipients to each other; and

v.      the relationship of the author to each addressee and recipient.

11.     If information is redacted from a Document or Communication produced in response to a Request, identify the redaction by stamping the word "Redacted" on the Document or Communication at each place where information has been redacted and by separately logging each

redaction on a privilege log or other written statement of the grounds for assertion of privilege or other legal protection against disclosure.

12.     All objections to any category of Documents and Communications to be produced pursuant to this Request must be made in a written response served on counsel for LIV Golf, Inc. For each item or category as to which You object in whole or in part, the response must state with specificity the grounds for objecting to the Request, including the reasons, and state whether any responsive materials are being withheld on the basis of that objection. An objection to part of a Request must specify the part and permit inspection of the rest. An objection may state that a Request is overbroad, but if the objection recognizes that some part of the Request is appropriate, the objection shall state the scope that is not overbroad.

13.     Copies of all electronic media, computer tapes, disks (hard or floppy), cards, files, CD-ROMs, DVDs or other storage media containing information or data responsive to the Requests herein must be made (and, if necessary, translated by the respondent into reasonably usable form) and produced.

14.     In producing responsive Documents and Communications, paper Documents and Communications should be scanned at a resolution of 300 dots per inch, producing the following:

a.     Single-page ".TIF" image files with Group IV compression. Each .TIF image will be endorsed in the lower-right corner with a unique production number and each .TIF file name will be identical to that production number.

b.     An IPRO ".LFP" image load file containing the physical document boundaries of the original paper documents.

c.     A ".TXT" file containing the OCR (optical character recognition) text of either each imaged page or each document. Each .TXT file will be named the same as its corresponding .TIF file or as the corresponding .TIF file of the first page of the relevant document.

15.     In producing responsive Documents and Communications, electronically-stored information (including, but not limited to, e-mail, web pages, and .html files) should be retrieved in its native format or formats and produced either in the native format or formats in which it is ordinarily

maintained or in a reasonably usable form in accordance with ESI Production Specifications to be agreed among the parties.

16.     Restate in Your written responses and objections to these Requests each specific Request immediately prior to stating Your answer to that specific Request.

17.     Where any Request seeks Documents relating to an allegation in the Amended Complaint, You shall produce such Documents regardless of whether they predate or postdate the date of the allegation.

18.     These Requests are to be deemed continuing Requests, and documents and information that are responsive but are discovered subsequent to an initial production should nevertheless be promptly produced in the same manner, and at the same address, as the initial production.

19.     Unless otherwise specified in a particular Request, the time period relevant for these Requests is January 1, 2019 to the present.

RIDER TO SUBPOENA TO PRODUCE DOCUMENTS TO CLOUT PUBLIC AFFAIRS, LLC
CASE NO. 5:22-cv-04486-BLF

# REQUESTS FOR PRODUCTION

## REQUEST FOR PRODUCTION NO. 1:

All Communications with the PGA Tour related to Saudi Arabia, LIV Golf, the September 11, 2001 terrorist attacks, Phil Mickelson, 9/11 Families United, 9/11 Justice, or this lawsuit.

## REQUEST FOR PRODUCTION NO. 2:

All Documents, Communications, bills, and invoices related to consulting services provided to the PGA Tour, whether formal or informal, paid or unpaid, related to Saudi Arabia, LIV Golf, the September 11, 2001 terrorist attacks, Phil Mickelson, 9/11 Families United, 9/11 Justice, or this lawsuit.

## REQUEST FOR PRODUCTION NO. 3:

All Documents and Communications related to any public affairs campaign you have conducted related to LIV Golf, any golfer who has participated in a LIV Golf tournament, or this lawsuit.

## REQUEST FOR PRODUCTION NO. 4:

All Documents and Communications related to any coalition development you have conducted related to LIV Golf, any golfer who has participated in a LIV Golf tournament, or this lawsuit.

## REQUEST FOR PRODUCTION NO. 5:

All Documents and Communications related to any strategic & crisis communications you have conducted related to LIV Golf, any golfer who has participated in a LIV Golf tournament, or this lawsuit.

## REQUEST FOR PRODUCTION NO. 6:

All Documents related to any competitive research you have conducted related to LIV Golf, any golfer who has participated in a LIV Golf tournament, or this lawsuit.

RIDER TO SUBPOENA TO PRODUCE DOCUMENTS TO CLOUT PUBLIC AFFAIRS, LLC
CASE NO. 5:22-cv-04486-BLF

**REQUEST FOR PRODUCTION NO. 7:**

All Communications with 9/11 Families United, 9/11 Justice, or anyone associated with either (e.g., agents, members, officers, directors, employees, or associates) related to Saudi Arabia, the PGA Tour, LIV Golf, the September 11, 2001 terrorist attacks, Phil Mickelson, protests, or this lawsuit.

DATED: November 1, 2022

Respectfully submitted,

*/s/ Kevin Teruya*

Kevin Teruya
Quinn Emanuel Urquhart & Sullivan LLP

COUNSEL FOR PLAINTIFF LIV GOLF INC.

RACHEL S. BRASS, SBN 219301
    rbrass@gibsondunn.com
GIBSON, DUNN & CRUTCHER LLP
555 Mission Street, Suite 3000
San Francisco, California 94105-0921
Telephone: 415.393.8200
Facsimile:  415.393.8306

ROBERT C. WALTERS, *pro hac vice*
    rwalters@gibsondunn.com
GIBSON, DUNN & CRUTCHER LLP
2001 Ross Avenue, Suite 2100
Dallas, Texas 75201-2911
Telephone: 214.698.3100

JOHN B. QUINN, SBN 90378
    johnquinn@quinnemanuel.com
QUINN EMANUEL URQUHART & SULLIVAN LLP
865 South Figueroa Street, 10th Floor
Los Angeles, California 90017
Telephone: 213.443.3000

ROBERT P. FELDMAN, SBN 69602
    bobfeldman@quinnemanuel.com
QUINN EMANUEL URQUHART & SULLIVAN LLP
555 Twin Dolphin Dr., 5th Floor
Redwood Shores, California 94065
Telephone: 650.801.5000
Facsimile:  650.801.5100

*Attorneys for Plaintiffs Talor Gooch, Hudson Swafford, Matt Jones, Bryson DeChambeau, Ian Poulter, Peter Uihlein, and LIV Golf Inc.*

WILLIAM V. ROPPOLO, *pro hac vice*
    william.roppolo@bakermckenzie.com
BAKER McKENZIE LLP
1111 Brickell Avenue, Suite 1700
Miami, Florida 33131 USA
Telephone:  305.789.8900

*Attorneys for Phil Mickelson*

*(additional counsel on signature page)*

IN THE UNITED STATES DISTRICT COURT
FOR THE NORTHERN DISTRICT OF CALIFORNIA
SAN JOSE DIVISION

| | |
|---|---|
| PHIL MICKELSON, TALOR GOOCH, HUDSON SWAFFORD, MATT JONES, BRYSON DECHAMBEAU, IAN POULTER, PETER UIHLEIN, and LIV GOLF INC.<br><br>Plaintiffs,<br><br>v.<br><br>PGA TOUR, INC.,<br><br>Defendant. | CASE  NO. 5:22-cv-04486-BLF<br><br>**AMENDED COMPLAINT**<br><br>**JURY TRIAL DEMANDED** |

With knowledge as to their own conduct and on information and belief as to all other matters, Plaintiffs Phil Mickelson, Talor Gooch, Hudson Swafford, Matt Jones, Bryson DeChambeau, Ian Poulter, Peter Uihlein, and LIV Golf Inc. ("LIV Golf") (collectively, "Plaintiffs") allege:

## INTRODUCTION

1.      The PGA Tour, Inc. (sometimes "the Tour") began when Jack Nicklaus, Arnold Palmer, and other elite golfers in the 1960s determined the PGA of America was not compensating them their market value; they split off the Players Tournament Division and formed the Tour, a tax-exempt entity organized ostensibly to "promote the common interests of professional tournament golfers." From that seemingly laudable origin, the Tour has evolved into an entrenched monopolist with a vice-grip on professional golf. As the Tour's monopoly power has grown, it has employed its dominance to craft an arsenal of anticompetitive restraints to protect its long-standing monopoly. Now, threatened by the entry of LIV Golf, and opposed to its founding mission, the Tour has ventured to harm the careers and livelihoods of any golfers, including Plaintiffs Phil Mickelson, Talor Gooch, Hudson Swafford, Matt Jones, Bryson DeChambeau, Ian Poulter, and Peter Uihlein ("Player Plaintiffs"), who have the temerity to defy the Tour and play in tournaments sponsored by the new entrant. The Tour has done so to crush nascent competition before it threatens the Tour's monopoly.

2.      Before LIV Golf's entry, golfers who sold their services in the elite professional golf services market had no meaningful option but to play on the Tour if they wanted to pursue their profession at the highest levels. This provided the Tour with enormous power over the players, including the ability to force players into restrictive terms that foreclose them from playing in competing events and the ability to suppress player compensation below competitive levels. Members of the Tour receive a lower percentage of the Tour's revenues than professional athletes in other major sports, even though the Tour is a tax-exempt non-profit corporation and other major sports leagues are for-profit enterprises. This control has also given the Tour the power to impose restrictions on players—who are independent contractors but are denied independence by the Tour—that make it risky and costly for players to affiliate with another promoter and prohibitively difficult for any would-be entrant to challenge the Tour's monopoly. And, in its response to LIV Golf's competitive challenge, the Tour has exercised this power by punishing the players to choke off the supply of elite professional

golfers—an essential input to LIV Golf's competitive challenge—and cement its dominance over the sport. The Tour's monopoly power has also allowed it to weaken golf itself, by its failure to innovate and broaden the game's appeal and bring the game into the 21st century.

3.     As part of its orchestrated plan to defeat competition, the Tour has threatened lifetime bans on players who play in even a single LIV Golf event. It has backed up these threats by imposing unprecedented suspensions on players (including the Player Plaintiffs) that threaten irreparable harm to the players and their ability to pursue their profession. It has threatened sponsors, vendors, broadcasters, and agents to coerce players to abandon opportunities to play in LIV Golf events. And it has orchestrated a group boycott with the European Tour,[1] which is unlawful under either the *per se* rule or the Rule of Reason, to amplify the Tour's anticompetitive attacks and foreclose LIV Golf from having access to players. The PGA Tour also has leaned on other entities in the so-called golf "ecosystem," including certain entities that put on golf's "Majors," to do its bidding in its effort to maximize the threats and harm to any golfer who defies the Tour's monopsonistic requirements and plays in LIV Golf events.

4.     The Tour's unlawful strategy has been both harmful to the players and harmful to LIV Golf in threatening its otherwise-promising launch. For example, the Tour's conduct caused LIV Golf to cancel its 2022 business plan to launch its full competing League. LIV Golf was not deterred, however, and it changed its 2022 strategy and launched a smaller version of its concept—the LIV Golf Invitational Series—with no League, no franchises, no broadcast deal, fewer elite players, and fewer tournaments. Some players (including Player Plaintiffs) were interested nonetheless. So, in response, the Tour ratcheted up its strategy and doubled-down on its efforts to punish Plaintiffs and to protect its monopoly. The Tour (1) enforced its unlawful player restrictions that deny players (including Player Plaintiffs) the ability to sell their services to others, (2) imposed lengthy suspensions on players for exercising their right as independent contractors to play in a competing promoter's events, and (3)

---

[1]   The European Tour recently changed its name to DP World Tour, but, because it was called European Tour for most of the time period relevant to this case and in most of the relevant documents, it is referred to herein as the European Tour for consistency and clarity.

AMENDED COMPLAINT – DEMAND FOR JURY TRIAL
CASE NO. 5:22-cv-04486-BLF

ramped up its threats targeting Player Plaintiffs and others. The Tour has likewise threatened and blacklisted numerous other third parties with whom LIV Golf has sought to contract, in its effort to defeat LIV Golf's entry and entrench its monopoly.

5.      The Tour's conduct serves no purpose other than to cause harm to players and LIV Golf, and foreclose the entry of the most meaningful competitive threat the Tour has ever faced. Banning Player Plaintiffs and other top professional golfers from its own events degrades the Tour's strength of field and diminishes the quality of the product that it offers to golf fans by depriving them from seeing many top golfers participate in Tour events. The only conceivable benefit to the Tour from degrading its own product in this manner is the destruction of competition. Indeed, the Tour has conceded its anticompetitive purpose in attacking and injuring the players. When the Tour adjusted its rules to render them more effective in defeating competitive entry, a memorandum authored by PGA Tour Commissioner Jay Monahan made clear that the rule change was expressly designed to enable the Tour to foreclose competition. And when the Tour imposed unprecedented punishments on the players for playing in LIV Golf events, the Tour explained to the players that it was doing so precisely because LIV Golf is attempting to compete with the Tour.

6.      Player Plaintiffs have devoted the bulk of their professional careers to growing the PGA Tour. Yet the Tour has repaid them of late with suspensions, punishments, threats, and disparagement for merely playing professional golf for another promoter and embracing competition for their services. The Tour has denied them income-earning opportunities, attacked their goodwill and reputation, interfered with their businesses, attacked their business partners, threatened them with multiple punishments—including threats to deny them from participating in golf's marquee events, even when they have earned placement or exemptions to participate in those tournaments—and unlawfully prevented them from exercising their independent contractor rights. And, at every step, the Tour has repeatedly admitted that it has done this to destroy nascent competition.

7.      The Tour long stood alone as the only tour anywhere in the world that features the best golfers in the world. The PGA Tour Commissioner Jay Monahan boasted on June 22, 2022 that the "Tour is doing everything it possibly can . . . [to] mak[e] certain that the best players in the world are competing on the best Tour in the world, the PGA Tour." The Tour has ensured that remains the case

through its anticompetitive PGA Tour Player Regulations. First, the Tour's Conflicting Events Regulation prohibits its members from participating "in any other golf tournament or event" in North America, without exception, if a Tour-sanctioned event is scheduled in the same week, regardless of whether the players would otherwise have any plans to participate in the Tour's sanctioned event. The Tour has a sanctioned event almost every week of the year, hence the Conflicting Event Regulation effectively prohibits Tour members from playing in any non-Tour golf event in North America. The effect is both a naked restraint on competition and a reduction in output, as Tour members are foreclosed from playing anywhere else when they are not playing in Tour events. For international tours or events, a player may request up to three exemptions a year, but the Tour Commissioner has complete discretion whether to grant these exemptions, something he has refused to do for each of the LIV Golf events. The Conflicting Events Regulation thus invests the leader of the incumbent monopolist with unbridled discretion to foreclose players from participating in any competing events. And while the Tour has historically granted releases to players that allow them to compete in other events throughout the world, Tour Commissioner Monahan has taken a different stance regarding LIV Golf, denying event releases even for LIV Golf events overseas. As Commissioner Monahan admitted, he has departed from past practice in prohibiting members from participating in LIV Golf events outside North America *because* LIV Golf plans to compete with the Tour. And he has enforced the Conflicting Events Regulation to deny players permission to participate in LIV Golf events in North America *because* LIV Golf's North American events compete with the Tour.

8.      Second, the Tour uses its Media Rights Regulation as an additional means of foreclosing players from participating in competing events. This regulation prohibits any members from appearing in any "golf program" ("any golf contest, exhibition or play") that takes place "***anywhere in the world***" and is shown on any media of any type. It is fundamental for any organizer of elite-level professional golf tournaments to broadcast the tournament on television and other media, yet the Tour contends no PGA Tour members may participate in any such televised non-Tour golf event anywhere in the world. This broad prohibition is no accident, as the PGA Tour specifically broadened this provision to prevent competitive entry of leagues such as LIV Golf. The provision serves no procompetitive purpose nor benefits consumers, but rather restricts output and forecloses competition, as it prevents all Tour

members from playing golf, even casually, if it is recorded for distribution over any media anywhere in the world during weeks when they are not participating in PGA Tour events.

9.      In short, these regulations—the Media Rights Regulation and the Conflicting Event Regulation—foreclose the players, who are independent contractors, from participating in any golf event that the PGA Tour deems to be a competitive threat.  These provisions limit output by keeping golfers on the sidelines when not playing on the Tour.  And these provisions, in turn, foreclose competition and entrench the PGA Tour's monopoly power.  If these provisions are not enjoined, they will foreclose LIV Golf's nascent entry into the markets and prevent LIV Golf from fulfilling its competitive promise, thus harming LIV Golf, the Player Plaintiffs, golf fans, the game of golf, and competition itself.

10.     It is no secret that the PGA Tour is targeting players in order to defeat the threat of competitive entry.  The PGA Tour has been clear since the threat of competitive entry emerged that its most powerful weapon to defeat competition is to target its members—who comprise virtually all of the elite professional golfers in the world—to prevent them from playing on a competing tour.  For example, PGA Tour Commissioner Monahan wrote in a January 2020 strategy memorandum that the best way to prevent a competitor from emerging is to prevent PGA Tour members (including Player Plaintiffs) from supporting the new promoter:

> The impact that [the new league] could have on the PGA TOUR is dependent on the level of support it may receive from these players.  Without this support, [the new league's] ability to attract media and corporate partners will be significantly marginalized and its impact on the TOUR diminished.

A nascent golf league without the golfers necessary to put on elite events is no threat at all.  Deprive the new league of access to virtually all of the top golfers in the world, and it will pose no challenge to the Tour's dominance.

11.     Accordingly, the Tour set out to destroy competition in its infancy by doing everything in its power to lock up its members (including Player Plaintiffs) and deny them the opportunity for sustained competition for their services.  The Tour's conduct has included at least seven practices, each of which is exclusionary, anticompetitive and unlawful under the Sherman Act:

a.      The Tour has repeatedly threatened its members (including Player Plaintiffs) with

devasting consequences if they join LIV Golf.  On multiple occasions, the Tour threatened a *lifetime ban* for any player who joins or participates in LIV Golf.  Then, in June and July 2022, the Tour imposed a *career-threatening ban* on Player Plaintiffs (and others) for playing in LIV Golf events.  For other golfers who resigned their Tour membership because they did not want to be subject to the Tour's punishments, the Tour responded by actually imposing a *lifetime ban*.

b. The Tour amended and expanded its Media Rights and Conflicting Events Regulations in response to the threat of competitive entry.  And it then enforced these unlawful provisions to foreclose members from participating in LIV Golf events.

c. The Tour orchestrated a group boycott with the European Tour to ensure that any golfer who considers defying the Tour's threats by playing in any LIV Golf events (including Player Plaintiffs) cannot pursue his career and livelihood anywhere in the global golf "ecosystem."  The Tour's agreement is established through the statements of its partners.  For example, during a meeting in Malta in July 2021, representatives of the entity that sponsored LIV Golf met with the CEO and other representatives of the European Tour to seek a partnership with the European Tour in launching the new league.  The minutes from that meeting prepared by the European Tour's title sponsor state that the CEO of the European Tour, Mr. Keith Pelley, "Confirmed new series appeal and fit, however, stated main issue is US PGA mighty power and need to avoid a collision course between ET [European Tour] and PGA."  Under pressure from the "mighty power" of the PGA Tour, the European Tour agreed to boycott and rejected the opportunity to partner with the new entrant, and instead strengthened its strategic alliance with the PGA Tour.  As part of this illegal partnership, the PGA Tour pressured the European Tour to amend its Regulations to restrict European Tour golfers from playing in LIV Golf events, and it pressured the European Tour to punish its members who played in LIV Golf events with ~$125,000 fines and suspension from any tournaments the PGA Tour and the

AMENDED COMPLAINT – DEMAND FOR JURY TRIAL
CASE NO. 5:22-cv-04486-BLF

European Tour co-sanction. The European Tour agreed to all of the PGA Tour's demands to implement the group boycott.

d.   Similarly, the PGA Tour has encouraged the PGA of America (a separate entity) to threaten to disallow LIV Golf players from playing both in the Major tournament it sponsors (the PGA Championship) and the Ryder Cup, one of golf's marquee events. And it has leaned on other golfing entities to do its bidding. The Tour leaned on Augusta National to pressure golfers against joining LIV Golf. The Tour has also leaned on the Royal & Ancient ("R&A") (sponsor of The Open) to publicly question whether LIV Golf players could play in their respective tournaments. And the Tour has leaned on the Official World Golf Ranking ("OWGR") to call into question whether LIV Golf tournaments would be eligible for OWGR ranking points. This conduct serves no beneficial purpose, but rather serves to harm the careers of the players (including Player Plaintiffs) who play in LIV Golf events, and to deter other players from joining LIV Golf to avoid career destruction at the hands of the Tour.

e.   At various points, the Tour has threatened Tour members' agents and business partners with punishment if the players joined LIV Golf. In addition, the Tour has threatened numerous vendors and small companies in the golf and sports production industry that they will be blacklisted from working with the Tour if they work with LIV Golf.

f.   The Tour has threatened non-member golfers with exclusion from the golf "ecosystem" if they participate in any LIV Golf events. For example, the Tour threatened college golfers (who are not PGA Tour members and have no obligation to conform to the Tour's rules for its members) that if they played in any LIV Golf events they would be banned from entry into the PGA Tour University program, which provides top college golfers entry into the Tour's developmental tour (Korn Ferry Tour).

g.   The Tour has also threatened sponsors and broadcasters that they must sever their

relationships with players who join LIV Golf, or be cut off from having any opportunities with the PGA Tour. Based on these threats, several sponsors have cut ties with players who have joined LIV Golf (including the Player Plaintiffs), sometimes ending years-long relationships. The Tour has also intimidated sponsors and vendors into not doing business with LIV Golf, lest they lose the opportunity to do business with the dominant golf tour in North America, the PGA Tour.

12.    These restraints have damaged competition and harmed Plaintiffs. They have harmed Player Plaintiffs by, for example, (1) diminishing competition for their services and reinforcing the Tour's monopsony power in the markets in which the Plaintiffs sell those services; (2) denying them income-earning opportunities, tournament performance opportunities (including denying them opportunities to participate in tournaments in which they have qualified), sponsorship revenue, and independent contractor rights; and (3) harming their reputations, goodwill, and brands. These restraints have likewise proved effective at harming competition in the relevant markets by preventing other players from joining LIV Golf who would have joined the new league but for these competitive restraints, thus threatening the competitive viability of LIV Golf and any other potential competitor by protecting the PGA Tour's monopoly power and monopsony power over the purchase of services from professional golfers to participate in elite golf events. The Tour's restraints have harmed LIV Golf by, for example, (i) raising to supracompetitive levels its costs to recruit players who are subject to the Tour's threats; (ii) completely preventing LIV Golf from securing the services of many players who have been subjected to the Tour's threats of severe punishments should they participate in LIV Golf events; (iii) forcing LIV Golf to scrap its launch plans for 2022, and instead launch a smaller-scale series; and (iv) preventing LIV Golf from entering into agreements with third parties and raising to supracompetitive levels its costs for contracting with those third parties who are willing to defy the Tour's threats, thus raising LIV Golf's costs and degrading its product offerings. The impacts of the Tour's continuing restraints threaten LIV Golf's competitive viability and existence.

13.    Without fair process, PGA Tour Commissioner Monahan—who is necessarily partial— imposed a 21-month Tour suspension on some Player Plaintiffs, through March 31, 2024 (other Player Plaintiffs' suspensions are indefinite or 9 months as of this Complaint), for exercising their independent

contractor rights to play in the first two LIV Golf events. After imposing these suspensions, the Tour followed its procedurally and substantively unconscionable appeals process to maintain the suspension without giving Player Plaintiffs fair proceedings to be heard by neutral and independent decision-makers. Plaintiffs Gooch, Swafford and Jones (among other Player Plaintiffs) had earned the right to play in the FedEx Cup Playoffs (a series of lucrative and high-profile events scheduled at the end of the PGA Tour's 2022 season) through strong performance and dedication to the Tour, but the Tour banned them from playing in those tournaments, diminishing the strength of its own fields and harming these Plaintiffs. The injury to these players extended beyond mere foreclosure from these tournaments (itself a substantial and irreparable injury), but also crippled their chances of qualifying for both the Majors and the Tour's premier invitationals in future seasons. The punishment that accrued to these players from not being able to play in the FedEx Cup Playoffs is substantial, and involves both monetary injury (as the Tour has maintained) as well as irreparable injuries.

14.     The Tour has argued that the Player Plaintiffs have already been fully compensated by LIV Golf for all suspensions the Tour might impose and all of the consequential harms that may flow from those suspensions (including exclusions from the Majors and other important professional golf tournaments and lost sponsorship opportunities). That is simply not true. While the supracompetitive payments LIV Golf was required to make in order to attract players in the face of the Tour's anticompetitive threats were in many cases above the compensation levels that would have been required in the absence of the Tour's anticompetitive conduct, it is also true that (a) many of the injuries the players will suffer are not compensable through money, (b) the monetary injuries the players have suffered and/or will suffer have exceeded and will exceed substantially the amounts they have been paid by LIV Golf, and (c) the negotiated amounts reflect a mutual understanding by the parties that at some point the PGA Tour would adjust its position and allow fair competition from LIV Golf. None of these Player Plaintiffs has agreed to a potential ban from the Majors or other important tournaments, or a long-term ban from the Tour should the Tour succeed in blocking successful long-term entry by LIV Golf.

15.     Without injunctive relief prohibiting the PGA Tour's anticompetitive conduct, the Tour's antitrust violations will continue. Without injunctive relief prohibiting the PGA Tour's

AMENDED COMPLAINT – DEMAND FOR JURY TRIAL
CASE NO. 5:22-cv-04486-BLF

1   anticompetitive conduct, Player Plaintiffs will be irreparably harmed, including by the Tour's unlawful

2   suspensions that have denied and will continue to deny them income earning opportunities, tournament

3   performance opportunities, sponsorship revenue, and independent contractor rights that they have

4   earned, as well as by the actions of the Tour and the European Tour that deny them the opportunity to

5   participate in events sponsored by others throughout the golf "ecosystem."   LIV Golf will also be

6   irreparably harmed if the Tour's anticompetitive conduct is not abated.   While LIV Golf has been able

7   to pursue the launch of its business in the face of supracompetitive costs and artificially reduced access

8   to supply (i.e. players), facing headwinds of this nature is not sustainable.   As a result, if the Tour's

9   anticompetitive conduct is not enjoined, LIV Golf's entry will be thwarted and its ability to maintain a

10  meaningful competitive presence in the markets will be destroyed, which will harm not only LIV Golf,

11  but also competition.     The Tour will continue to enforce its unlawful Regulations and take

12  anticompetitive actions unless and until a Court enjoins the Tour's unenforceable Regulations and

13  unlawful conduct.   Moreover, the Player Plaintiffs will be irreparably harmed in that the Tour's

14  unreasonable control over their media rights and their participation in non-Tour events will continue

15  unless enjoined permanently.   And, if LIV Golf's entry into the relevant markets is thwarted by the

16  PGA Tour's anticompetitive conduct, Player Plaintiffs' careers will be detrimentally impacted, they

17  will lose the most significant avenue to gain entry into the Majors, they will lose the platform to display

18  their craft, and they will lose the opportunity to sell their advertising and sponsorship space and sell or

19  license their name image and likeness for their branding, reputation and businesses.   On the other hand,

20  with an injunction, the anticompetitive conduct of the PGA Tour will be lifted, LIV Golf will have the

21  opportunity to compete on the merits, and Player Plaintiffs and other professional tournament golfers

22  will enjoy the benefits of competition for their services that the antitrust and other laws protect.

23                                                  **PARTIES**

24          16.     Plaintiff Phil Mickelson is a Hall of Fame American professional golfer who resides in

25  San Diego, California.   Mr. Mickelson was a three-time NCAA Champion at Arizona State University.

26  In 1991, he won the Northern Telecom Open, which was the last time an amateur won a tournament

27  on the PGA Tour.   He is a 30-year veteran of the PGA Tour who has won 57 worldwide professional

28  events, including six Majors—the most recent in 2021, which earned him the title of the oldest Major

1    winner in the game's history.  He spent over 26 consecutive years in the top 50 of the Official World

2    Golf Ranking (the only player in the history of the sport to ever do so), including over 700 weeks

3    ranked in the top 10 in the world.  Mr. Mickelson has represented the United States as a professional

4    golfer in 24 team tournaments, which includes 12 Presidents Cups and 12 Ryder Cups, both American

5    records.  He participated as a vice captain in additional United States team tournaments, and played in

6    the Dunhill Cup, World Amateur Team Championship and two Walker Cups for the United States as

7    an amateur.  Mr. Mickelson also has a strong commitment to giving back through the Phil and Amy

8    Mickelson Foundation.  Since its inception in 2004, the Foundation has focused primarily on supporting

9    a variety of youth and family initiatives.  He also founded Birdies for the Brave, the PGA Tour's

10   national military outreach initiative, which raises money for a variety of charities supporting veterans

11   and military families.  Mr. Mickelson dedicated his entire professional career, 30 years, to the PGA

12   Tour.  He has hosted tournaments on the Tour and engaged in countless endeavors to advance the Tour,

13   its purpose, and the game of golf.  Mr. Mickelson has invested in himself and his investment has

14   benefited the Tour's business tremendously over the last 30 years.  As a lifetime member—a hard-

15   earned accomplishment and honor, requiring 20 PGA Tour wins and 15 years of membership on the

16   Tour—Mr. Mickelson desires to continue being a member of the Tour and to play in events on the

17   Tour.

18         17.    Plaintiff Talor Gooch is a 30-year-old professional golfer who resides in Texas.  He is

19   a member of the Tour.  Mr. Gooch played golf at Oklahoma State University until 2014 when he began

20   his professional career.  He joined the PGA Tour Canada in 2015 and earned his way onto the Korn

21   Ferry Tour in 2016.  In 2017, Mr. Gooch won the News Sentinel Open (which later became the Visit

22   Knoxville Open on the Korn Ferry Tour) and then earned his way onto the PGA Tour in 2018.  In 2021,

23   he won his first PGA Tour tournament at the RSM Classic.  Mr. Gooch was on top of the PGA Tour's

24   FedEx Cup Rankings for the 2021-22 season following the RSM Classic.  Mr. Gooch has played in

25   over one hundred PGA Tour events.  As of the filing of the Complaint in this Action, he was the 20th

26   ranked golfer on the FedEx Cup rankings.  Mr. Gooch played in 21 PGA Tour events in the 2021-22

27   PGA Tour season and qualified for the FedEx Cup Playoffs, but was denied the opportunity to compete

28   in the Playoffs by the Tour's anticompetitive conduct.  Mr. Gooch desires to continue to be a member

11

of the Tour and to play in events on the Tour.

18.      Plaintiff Hudson Swafford is a 34-year-old professional golfer who resides in Georgia. He is a member of the Tour. He started his professional golf career in 2011 after graduating with a B.S. in Consumer Economics from the University of Georgia. Mr. Swafford joined the Nationwide Tour in 2012, and, that same year, won the Stadion Classic at UGA, a golf tournament on the Web.com Tour (which became known as the Korn Ferry Tour in 2019). In 2013, Mr. Swafford finished 21st in the Web.Com Tour Finals to earn his PGA Tour card for 2014. Mr. Swafford won his first PGA Tour victory in 2017 at the CareerBuilder Challenge. In 2018, Mr. Swafford suffered a rib injury and then, in 2019, Mr. Swafford had to undergo a surgery to remove a small bone from the bottom of his foot, forcing him to miss four months of play. In September 2020, Mr. Swafford won his second PGA Tour victory at the Corales Puntacana Resort and Club Championship. In 2022, Mr. Swafford earned his third PGA Tour victory at the American Express. Since the start of his career, Mr. Swafford has played in over 250 Tour events. Mr. Swafford played in 21 PGA Tour events in the 2021-22 season, and as of the filing of the Complaint in this Action was 67th in the FedEx Cup rankings, and qualified for the FedEx Cup Playoffs. Mr. Swafford was denied the opportunity to compete in the Playoffs by the Tour's anticompetitive conduct. Mr. Swafford desires to continue to be a member of the Tour and to play in events on the Tour.

19.      Plaintiff Matt Jones is a 42-year-old professional golfer who resides in Arizona. He is a member of the Tour. He was born in Sydney, Australia, and upon meeting fellow Australian Greg Norman at six years old became determined to become a professional golfer. Mr. Jones moved to the United States to attend Arizona State University where he was a first-team All-American golfer. Mr. Jones joined the Nationwide Tour in 2004 and earned his PGA Tour card in 2008. In 2014, Mr. Jones won the PGA Tour's Shell Houston Open. In 2015, and again in 2019, he won the Emirates Australian Open on the PGA Tour of Australasia. In 2021, Mr. Jones won the PGA Tour Honda Classic. Mr. Jones has played in over 350 Tour events. Mr. Jones played in 20 PGA Tour events in the 2021-22 season, and as of the filing of the Complaint in this Action was ranked 65th in the FedEx Cup rankings, and qualified for the FedEx Cup Playoffs. Mr. Jones was denied the opportunity to compete in the Playoffs by the Tour's anticompetitive conduct. Mr. Jones desires to continue to be a member of the

1   Tour and to play in events on the Tour.

2       20.    Plaintiff Bryson DeChambeau is a 28-year-old professional golfer who resides in Texas.

3   He is a member of the Tour. Mr. DeChambeau grew up in California and played golf at Southern

4   Methodist University while majoring in physics. In 2015, Mr. DeChambeau became just the fifth

5   person to win both the NCAA individual championship and the U.S. Amateur title. He made his PGA

6   tour debut in 2015 at the FedEx St. Jude Classic. In 2015, while still an amateur, he was the runner-up

7   in the Australian Masters. He began his professional career in 2016 at the RBC Heritage event,

8   finishing fourth. That year, Mr. DeChambeau won the Korn Ferry DAP Championship, earning his

9   Tour card. In 2017, Mr. DeChambeau won his first PGA Tour event at the John Deere Classic. In

10   2018, Mr. DeChambeau won the Memorial Tournament. He then won the first two FedEx Cup Playoff

11   events at the Northern Trust and Dell Technologies Championship. Mr. DeChambeau was picked for

12   the U.S. team in the 2018 Ryder Cup. In 2019, Mr. DeChambeau won the Shriners Hospitals for

13   Children Open and the Omega Dubai Desert Classic. In 2020, Mr. DeChambeau won the Rocket

14   Mortgage Classic and won the U.S. Open, his first Major. In 2021, he won the Arnold Palmer

15   Invitational and played on the winning U.S. team at the 2021 Ryder Cup. In 2022, Mr. DeChambeau

16   underwent surgery on his left wrist from a fracture. Mr. DeChambeau desires to continue to be a

17   member of the Tour and to play in events on the Tour.

18       21.    Plaintiff Ian Poulter is a 46-year-old professional golfer who splits his residence

19   between Florida and England. He is a member of the Tour. He was born in England, and began playing

20   golf at just four years old before turning professional in 1994. Mr. Poulter won the 1999 Open de Côte

21   d'Ivoire on the Challenge Tour and was promoted to the European Tour. He was a member of the

22   victorious 2004 European Ryder Cup team and then joined the PGA Tour in 2005. In addition to his

23   many international victories, Mr. Poulter won the 2010 World Golf Championship-Accenture Match

24   Play Championship, the 2012 World Golf Championships-HSBC Champions, and the 2018 Houston

25   Open. Mr. Poulter has played in over 300 Tour events. Mr. Poulter played in 16 PGA Tour events in

26   the 2021-22 season and, as of the filing of the Complaint in this Action, was ranked 168th in the FedEx

27   Cup rankings. Mr. Poulter desires to continue to be a member of the Tour and to play in events on the

28   Tour.

AMENDED COMPLAINT – DEMAND FOR JURY TRIAL
CASE NO. 5:22-cv-04486-BLF

1        22.     Plaintiff Peter Uihlein is a 32-year-old professional golfer.  He is a member of the Korn

2 Ferry Tour, which is owned and controlled by the Tour.  Mr. Uihlein was born in New Bedford,

3 Massachusetts, played golf at Oklahoma State, and resides in Florida.  Mr. Uihlein has two professional

4 victories on the Korn Ferry Tour—the Nationwide Children's Hospital Championship in 2017 and the

5 MGM Resorts Championship in 2021.  Mr. Uihlein has also won on the European Tour in 2013 at the

6 Madeira Islands Open.  Mr. Uihlein has represented the United States in two Walker Cups (2009 and

7 2011) and won the 2010 Eisenhower Trophy.  Mr. Uihlein won the 2010 U.S. Amateur Championship.

8 As of the filing of the Complaint in this Action, Mr. Uihlein ranked 59th on the Korn Ferry Tour regular

9 season points list.  Mr. Uihlein desires to be a member of the Tour and/or continue to be a member of

10 the Korn Ferry Tour, and to play in events on the Tour and the Korn Ferry Tour.

11        23.     LIV Golf is a Delaware corporation with its principal place of business in New York,

12 New York.  LIV Golf is the sponsor of the LIV Golf Invitational Series, an eight-event series of golf

13 tournaments, a majority of which have been or will be set in the United States, from June to October

14 2022.  LIV Golf also is the sponsor of a planned season-long golf tour, the League, which the PGA

15 Tour's anticompetitive conduct thwarted and which LIV Golf was forced to delay in 2022.

16        24.     Defendant PGA Tour is a Maryland non-profit corporation, with its principal place of

17 business in Ponte Vedra Beach, Florida.  The PGA Tour sponsors a season-long series of golf

18 tournaments throughout the calendar year called the PGA Tour.  Those events occur primarily in the

19 United States.  In the 2021-22 PGA Tour season, the Tour sponsored events in twenty states, including

20 six events in California.  The Tour is engaged in interstate commerce.

21                           **JURISDICTION AND VENUE**

22        25.     Plaintiffs' action arises under Sections 1 and 2 of the Sherman Antitrust Act, 15 U.S.C.

23 §§ 1, 2.  Plaintiffs seek injunctive relief under 15 U.S.C. § 26 and damages under 15 U.S.C. § 15(a).

24 This Court has subject matter jurisdiction over the federal antitrust claims under 28 U.S.C. § 1331

25 (federal question) and 28 U.S.C. § 1337 (commerce and antitrust regulation); this Court has jurisdiction

26 over the related state-law claims under 28 U.S.C. § 1367 (supplemental jurisdiction).

27        26.     This Court may exercise personal jurisdiction over the PGA Tour under Section 12 of

28 the Clayton Act, 15 U.S.C. § 22.  The PGA Tour manages or operates two golf courses (TPC Harding

Park and TPC Stonebrae) in this District and employs dozens of individuals who work there. It organizes and promotes annually at least six golf tournaments throughout California (Fortinet Championship, The American Express, Farmers Insurance Open, AT&T Pebble Beach Open, The Genesis Invitational, and the Barracuda Championship), two of which are within the Northern District of California. California hosts more PGA Tour golf tournaments than any other state. The Tour issued the first of its known anticompetitive threats to Player Plaintiffs and other players that is at issue in this lawsuit in La Jolla, California in January 2020. The PGA Tour also threatened Player Plaintiffs and other players with lifetime bans in Los Angeles, California in February 2022. The Tour has unlawfully restricted Player Plaintiffs from participating in events that compete against the PGA Tour, and its conduct has already hindered—and threatens to irrevocably harm—LIV Golf's ability to compete in the market.

27.     This Court also may exercise personal jurisdiction over the PGA Tour under California Code of Civil Procedure § 410.10. The Tour operated, conducted, engaged in, and carried on a business venture in this state; committed tortious acts within this state that harmed Plaintiffs; and is engaged in substantial and not isolated activity within this state.

28.     Venue is proper in this district under Sections 4 and 12 of the Clayton Act (15 U.S.C. §§ 15, 22) because the Tour may be found in this District and transacts business in this District through the management or operation of two golf courses, hosting and promoting two golf tournaments, and employing individuals in this District.

### BACKGROUND AND FACTS

### Overview of Professional Golf

29.     The business and sport of professional golf are organized around tours and tournaments that combine players of comparable skill levels. These tours and tournaments bring golf competition to fans, financially compensate players, and provide opportunities for sponsors and advertisers to market their products to golf fans of these events.

30.     The elite level of men's professional golf is comprised of (1) the PGA Tour, which sponsors and co-sponsors a series of tournaments scheduled from September to September each season; (2) four annual standalone "Major" tournaments sponsored by entities other than the Tour: the Masters,

1    the U.S. Open, The Open (or The British Open), and the PGA Championship; (3) two bi-annual team

2    events (Ryder Cup and the Presidents Cup); (4) quadrennial Olympic competition; and (5) a handful

3    of standalone events in which Tour members are only permitted to compete if they are given permission

4    by the Tour Commissioner.

5        31.    Until LIV Golf's nascent entry, the Tour was the sole elite golf tour in the United States

6    and the world. Other elite professional golf events are standalone events (such as the Majors) that are

7    not part of an organized tour that extends throughout a season. Professional golfers who qualify for

8    membership on the Tour invariably compete on it, as it offers by far the largest tournament purses, the

9    greatest opportunities to qualify for the Majors, the greatest opportunities for exposure in the golf world

10   and beyond, and the most expansive opportunities to secure large endorsements from sponsors. As of

11   the filing of the Complaint in this Action, all of the top 30 golfers in the world were active members of

12   the Tour, except those golfers whom PGA Commissioner Monahan suspended or forced to resign. No

13   other golf tour in the world is a reasonable competitive substitute for the PGA Tour. For example, the

14   average purse of a PGA Tour event is roughly two-and-a-half times the average purse of a European

15   Tour event, roughly nine times the average purse of an Asian Tour event, and 13 times the average

16   purse of a Korn Ferry Tour event. The PGA Tour is the only golf tour shown regularly on broadcast

17   television in the United States, and it earns vastly more in sponsorship, advertising, and broadcast

18   revenue than any other golf tour.

19       32.    The Tour and the four Majors are complements, not competitors. The Tour schedules

20   no events during the weeks of three of the Majors and schedules only a minor event with a lower prize

21   pool the week of The Open. Conversely, the Majors do not compete with the Tour; rather, they

22   encourage and incentivize players to participate on certain tours (the PGA Tour in particular) by

23   adopting eligibility requirements that open playing spots to golfers who have performed well on those

24   tours. Similarly, LIV Golf does not compete with the Majors, as it schedules its Series and will

25   schedule its League around the Majors.

26       33.    The European Tour is a purchaser of professional golfers' services and a promoter of

27   professional golf events, but it is effectively a feeder into and only a potential competitor to the PGA

28   Tour. In the 1980s and early 1990s, the European Tour exerted some competitive pressure on the Tour

for certain star international players, including Seve Ballesteros, Nick Faldo, and Bernhard Langer, but that has not been the case for many years. Instead, when European Tour members qualify for Tour membership, they almost invariably elect to immediately become PGA Tour members. None of the Top 30 golfers in the world are only members of the European Tour. PGA Tour superstar Rory McIlroy, originally from Northern Ireland who began his career on the European Tour, has described the European Tour as "a stepping stone," explaining "you can go to America and play for more money and more ranking points. I think as well with the world ranking points, everyone out here, all of their contracts with sponsors, it's all about world ranking points. If players are getting paid more and earning more world ranking points, why would you play over there [European Tour]?" The actions of other European players who qualify for the Tour are consistent with McIlroy's views: they join the PGA Tour when they qualify.

34.     European Tour Board Member Paul McGinley told *The Independent* that "the [European] Tour has accepted it is a junior partner to the PGA Tour now and will act as a feeder tour with more and more co-sanctioned events on both sides of the pond." McGinley continued: "We are there to enhance that and enable the PGA Tour to become the premier golf tour in the world. We realise that the [European] Tour will not be that, but we want to be very much . . . a kind of international arm and create pathways for players to come into the ecosystem via the European Tour and perhaps the Korn Ferry Tour and then graduate onto the premier tour in the world which is the PGA Tour." Likewise, European Tour Commissioner Keith Pelley told *The New York Times* that the European Tour agreed not to compete with the PGA Tour for player services as of November 2020.

35.     Nonetheless, the European Tour remained a potential competitor to the PGA Tour, particularly as a potential partner of a new entrant that could challenge the Tour's dominance. Recognizing this potential competition from the European Tour and the substantial threat that a new entrant partnered with the European Tour would pose, the Tour entered into an illegal agreement with the European Tour as part of its scheme to ensure that the European Tour does not partner with any entrant (including LIV Golf) that might seek to become part of the golf "ecosystem." In a January 2020 strategy memorandum describing the PGA Tour's plan to foreclose new entry, Commissioner Monahan explained that this alliance with the European Tour was aimed at removing the European

Tour as a potential partner for a new entrant: "We have continued discussions with the European Tour about the potential to work more closely together, thereby removing the European Tour as a potential partner of" a new entrant. The Tour's strategy was thus designed to ensure no new potential competitor could emerge to challenge its monopoly.

36.     The Tour executed Monahan's plan in November 2020, when it announced that it had purchased a minority stake in the European Tour's media production company, and that the two tours would work in concert with one another. As detailed below, since that alliance was formed, the European Tour has joined the PGA Tour in a group boycott aimed at punishing players to foreclose LIV Golf's entry. As set forth in more detail below, that group boycott violates Section 1 of the Sherman Act, under either a *per se* analysis or a Rule of Reason analysis, because it has harmed (and will continue to harm) competition and has no redeeming procompetitive virtue.

37.     There are also a number of more limited lower-level tours that operate in the U.S. and throughout the world, but none is a meaningful competitor to the Tour. In fact, the Tour owns, operates, or controls a number of these lower-level tours, ensuring that they do not become meaningful competitors to the PGA Tour and that any bans imposed by the PGA Tour (and its co-conspirator, the European Tour) have a widespread impact on any affected players. These tours include:

- PGA Tour Champions -- A tour for players over the age of 50, organized and managed by the Tour;
- Korn Ferry Tour – The PGA Tour's development tour in North America, through which players (like Plaintiff Uihlein) can qualify for the PGA Tour; organized and managed by the PGA Tour and described by the Tour as "the path to the PGA Tour";
- PGA Tour Latinoamerica – A tour with events in Latin America, through which players can qualify for promotion to the Tour, organized and managed by the Tour;
- Mackenzie Tour-PGA Tour Canada – A tour with events in Canada, through which players can qualify for promotion to the Tour, organized and managed by the Tour;
- PGA Tour Series-China – A tour with events in China, organized and managed by the Tour;
- Asian Tour – A tour with events principally in Asia;

- Japan Tour – A tour with events in Japan;
- Sunshine Tour – A tour with events in Africa; and
- KPGA Korean Tour – A tour with events in South Korea.

38.     These tours offer considerably lower levels of competition, far lower prize pools, far smaller sponsorship and income opportunities, and far less, if any, broadcast exposure and viewership throughout most of the world.  As a result, players who qualify for the PGA Tour join the PGA Tour. Simply put, until LIV Golf's entry, the PGA Tour had no competition as the premier professional golf tour in the United States and the world.  If the PGA Tour succeeds in thwarting LIV Golf's entry, it will once again face no meaningful competition in the United States or the world.

39.     While the on-course competition among participants in the elite professional golf services market is intense, the Tour itself faces no meaningful competition in the relevant markets. Until LIV Golf arrived on the scene, no other tour came close to the PGA Tour in terms of the money, exposure, quality of on-course competition for players, fan interest, advertising or sponsorship opportunities.

40.     In addition, players in Tour events have a significantly greater opportunity than players in the lower-tier tours to qualify for spots in the Majors, Ryder Cup, Presidents Cup, and the Olympics by winning tournaments that provide entry into the Majors and that provide greater opportunity to earn more points in the world golf ranking system.  A common way for players to qualify for the Majors is by being ranked within the Top 50 of the OWGR.  While players in any tournament recognized by the OWGR can qualify for points, the OWGR awards points based on a tournament's competitive strength and the player's finishing position.  Thus, players on the Tour are eligible to earn far more points than players on lower-tier tours.  In addition, OWGR points are often used to determine the amount of money players receive from sponsors.  Qualification for the Olympics is determined solely by OWGR rankings.  Again, as PGA Tour player Rory McIlroy explained "it's all about world ranking points," and players can earn the most points on the PGA Tour.

41.     The OWGR's Governing Board includes PGA Tour Commissioner Monahan, as well as the top executives from a number of the other bodies: the CEO of the European Tour (Keith Pelley), the General Counsel of the European Tour (Ben Bye), the COO of the European Tour (Keith Waters),

19

1  the CEO of the PGA of America (Seth Waugh), the Executive Director of the United States Golf

2  Association (Mike Whan), the Senior Director of the Masters Tournament of the Augusta National

3  Golf Club (Will Jones), the CEO of the R&A (Martin Slumbers), and the former CEO of the R&A

4  (Peter Dawson).  As set forth in detail below, the PGA Tour has entered into an unlawful agreement

5  with the European Tour to foreclose competitive entry by locking arms in a group boycott to exclude

6  from the world golf "ecosystem" LIV Golf, any players who play in LIV Golf events (including the

7  Plaintiffs), and any other vendor, tour promoter, or other entity that partners with LIV Golf.  And the

8  Tour has leaned on the other world golfing bodies that have representatives on the OWGR Governing

9  Board to do its bidding to heighten threats for associating with LIV Golf.

**PGA Tour Structure**

10

11  42.    The Tour's charter promises it will act to "promote the common interests of professional

12  tournament golfers."  The Tour certified to the Internal Revenue Service that its non-profit purpose is

13  to promote the sport of professional golf and the common interests of touring golf professionals.

14  43.    The professional golfers who have earned the right to compete on the Tour are the most

15  skilled and popular professional golfers in the United States and the world.  Player Plaintiffs were

16  active members of the Tour until they were given lengthy suspensions for playing in LIV Golf events.

17  Players from the United States who are members of the Tour include Tiger Woods, Plaintiff Mickelson

18  (now suspended), Justin Thomas, Jordan Spieth, Plaintiff DeChambeau (now suspended), Dustin

19  Johnson (now resigned), Scottie Scheffler, Bubba Watson, and Brooks Koepka (now suspended).  The

20  PGA Tour's Media Guide also states that its membership includes 94 international players from 29

21  countries and territories outside the United States, including Justin Rose, Rory McIlroy, Sergio Garcia

22  (now resigned), Jon Rahm, Adam Scott, Henrik Stenson (now suspended), Louis Oosthuizen (now

23  resigned), Hideki Matsuyama, and Cameron Smith.  They include some of the biggest names in sports

24  and popular culture in the United States and the world.

25  44.    All member golfers on the Tour are independent contractors, not employees of the Tour.

26  There is no team or other employer to cover their many and substantial expenses as a professional

27  athlete (e.g., coaches, caddies, trainers, therapists, travel, and lodging).

28  45.    The Tour is managed by its Commissioner, Jay Monahan, who assumed the role on

January 2, 2017. Commissioner Monahan sits on the Board of the European Tour, the Governing Board of the OWGR, and the Board of Directors and Executive Committee of the International Golf Federation. Through these various roles, Commissioner Monahan assures that the Tour controls what it terms the world golf "ecosystem." Being blacklisted by the PGA Tour means effective expulsion from the golf "ecosystem" anywhere in the world.

**Elite Professional Golf Has Stagnated Under the PGA Tour's Monopoly**

46.     As Commissioner Monahan acknowledged in a memorandum to the PGA Tour Policy Board (the "January 2020 Monahan Memorandum"), the PGA Tour is "the world's leading professional golf tour" and "is second to none due to the strength of its members." Thus, not surprisingly, virtually every golfer of public prominence worldwide is a member of the PGA Tour.

47.     While the quality of play on the PGA Tour continues to flourish, the business of professional golf has stagnated under the Tour's monopoly. In the age of social media, the accessibility and relatability of elite professional golfers should lend itself to a boom in fan interest and viewership, as it has with other sports. The opposite has happened. Without any meaningful competition (prior to LIV Golf's entry), the Tour has failed to innovate and its product has grown stale. At the same time, the Tour's fanbase has shrunk and continues to age (the *average* age of a PGA Tour fan is 64), a trend sharply at odds with other major sports. Likewise, the Tour's compensation to its members fell behind compensation to other professional athletes, as measured by the share of revenue the players receive, reflecting the Tour's monopsony power over players' services.

48.     Despite offering a stagnant product with a shrinking and aging fanbase, the Tour has used its monopoly position to extract substantially increased revenues from broadcasters and advertisers. As a monopsonist, however, the Tour has not passed those increased revenues through to its members. For example, the Tour's revenue has increased between 2011 and 2019 by 163 percent, yet the share of revenue it provided its members fell substantially. This is because there is no competition for players' services, allowing the Tour to direct its increased revenues into its bloated bureaucracy, extravagant facilities, and multimillion-dollar compensation and lavish perks for Commissioner Monahan and the other executives who run the monopoly, rather than sharing them with players. Tour data shows that average Tour purses grew an anemic 2.5 percent per year on average

from 2014 through 2019—from \$6.62 million in 2014 to \$7.47 million in 2019.  By comparison, the total salary pool for other major professional sports leagues grew at much stronger rates over the same period—15 percent per year for the NFL, eight percent per year for the NBA, and four percent per year for the NHL, even though the 2014 base levels for the other professional sports were substantially higher.

49.     The Tour has failed to offer its members compensation on par with professional athletes in other sports.  The number one player on the Tour money list in 2019 was Brooks Koepka, with \$9.68 million in tournament winnings.  His winnings were the equivalent to the 129th highest paid NFL player, the 121st highest paid NBA player, and the 128th highest paid MLB player.

50.     It is incongruous that Tour members' share of revenue lags so significantly behind those of players in other sports over the same period, because the Tour is a nonprofit entity that does not compensate players for their travel and other expenses, while the other major professional sports are for-profit enterprises with franchise owners.  Unlike those other sports, however, which have free-agency systems that establish competition among franchise owners for players' services, the PGA Tour faced no viable competition before LIV Golf's entry.  If LIV Golf's entry is foreclosed, the Tour will once again face no viable competition.  As a monopolist, the PGA Tour does not compete for players' services, and the Player Plaintiffs' earnings have been and are suppressed.

51.     The lagging compensation the Tour pays to its members is also striking in light of the expenses and risks that the players bear.  Unlike professional athletes in other sports, professional golfers have to pay out-of-pocket to play on the Tour.  Tour members pay for their own travel to and lodging at Tour events, and they pay for their coaches, therapists, trainers, and caddies.  In addition, the players have no guarantees from the Tour—they earn nothing if they get injured, and they get nothing if they miss the cut.  As a result, Tour members can end up with *negative* earnings for the year.

52.     For example, Pat Perez described a fellow Tour member that "one year ma[d]e \$22,000 on the Tour.  He lost, he was in the hole about 90 grand.  Mind you, he didn't play well and I get it, but how can he be out money?  He earned his card and he was out like \$90 grand that year."

53.     A Tour player agent was quoted as saying: "What I think the average fan doesn't know is how much a player spends to go to work. . . .  [T]hey spend so much money or reinvest so much

money in themselves and what they pay their team and what they spend on private airfare, renting homes and [paying] chefs and trainers and physical therapists and everything that goes into it. It's a very lucrative sport, but it's also a very expensive sport for them, unlike team-sport athletes who are flown around every place and supplied all those things." But without competition, elite professional golfers have historically had no option other than the Tour.

54.     The Tour's monopoly (and monopsony) hold over elite professional golf is also reflected in its failure to innovate or retain (let alone expand) its audience. The Tour's television ratings have struggled. Out of 27 PGA Tour tournaments for which data are available, 16 tournaments (almost 60 percent) had viewership in 2019 that was below the five-year average for that tournament. In 2020 (before the COVID outbreak shut down the Tour), six out of seven tournaments had viewership that was below the five-year average for that tournament. The PGA Tour's fanbase is aging faster than any other sport, because it has failed to capture the attention of younger viewers. As Rory McIlroy (a PGA Tour Member, President of the Players Advisory Council, and PGA Tour Board Member) recognized, "competition is a good thing" and "any business needs competition for things to progress and move on." But the PGA Tour has faced no competition for many years, it has had no reason to innovate and grow its fan base, and its product has grown stale.

55.     LIV Golf promises to bring competition and innovation to the market for the promotion of elite professional golf, which will benefit fans, broadcasters, advertisers, players, and all other stakeholders. As the long-standing monopolist facing competition for the first time in at least decades, the Tour has responded not by competing on the merits, but rather by engaging in a course of anticompetitive conduct designed to choke off LIV Golf's nascent competition, to the detriment of LIV Golf, the players (including Player Plaintiffs), fans, broadcasters, advertisers, and others.

### Anticompetitive PGA Tour Player Regulations

56.     Membership on the Tour is governed by the PGA Tour Player Regulations & Tournament Regulations ("Regulations"). Exhibit 1. Several interrelated provisions of the Regulations unreasonably restrict the independent contractor-players' ability to participate in competing events.

57.     **Media Rights Regulation.** The Regulations contain two provisions relevant to this case that govern players' media rights. First, Section V.B.1.a. of the Regulations purports to grant to

the PGA Tour the media rights for players when they are participating in Tour-sponsored tournaments. Plaintiffs do not challenge that provision on the understanding that the Tour interprets it to apply to golfers only when they are playing in Tour-sponsored events. However, if the Tour relies on that provision to support its position that it can control Tour members' golf media rights even when they are not participating in a Tour event, the Plaintiffs would challenge that provision as being anticompetitive.

58.     A second provision in the Regulations, Section V.B.1.b. (the "Media Rights Regulation") provides that "[n]o PGA Tour member shall participate in any live or recorded golf program without the prior written approval of the Commissioner, except that this requirement shall not apply to PGA Tour cosponsored, coordinated or approved tournaments, wholly instructional programs or personal appearances on interview or guest shows." Exhibit 1. The Tour broadly defines "golf program" to cover "any golf contest, exhibition or play that is shown anywhere in the world in any form of media now known or hereinafter developed." *Id.* According to the PGA Tour, this provision prevents all Tour members from participating in any golf program anywhere in the world, during any time of the year, *even when they are not participating in a Tour event.* According to the PGA Tour, the effect is a year-round prohibition on all Tour-member independent contractors from participating in any competing golf event anywhere in the world that is broadcast on any media. For example, when the Player Plaintiffs participated in a LIV Golf event in London that was streamed on the Internet (but not shown on any television network in the United States), the PGA Tour declared that the Player Plaintiffs had violated this rule.

59.     The global prohibition on playing in competing events is not needed to create or improve any product or offering by the Tour, or to improve any aspect of any product for fans. For example, other provisions purportedly grant the Tour the media rights for Tour events in which the players are participating. The global prohibition serves only to prohibit the Tour's independent contractor players from playing in any competing events during weeks when they are not playing in Tour events.

60.     The Media Rights Regulation is fundamentally inconsistent with the rights of the Player Plaintiffs as independent contractors, denying them the right to sell their own media rights to other bidders for their services. As a result, the Tour has deprived and continues to deprive the Player

Plaintiffs of the opportunity to pursue their profession, thus depriving them of income-earning, marketing, branding, and charitable opportunities.

61.     Furthermore, this provision has injured and foreclosed entry by LIV Golf at its planned scale and harmed LIV Golf by imposing on it a cost basis that the Tour itself describes as "irrational." In addition, and critically, the Tour has compromised LIV Golf's ability to secure a television broadcast contract, a critical component of any sustainable elite golf tour. Even though LIV Golf has been able to convince some players to defy the Tour's threatened lifetime bans and to participate in LIV Golf events, the Media Rights Regulation has precluded LIV Golf from securing agreements to broadcast its tournaments because United States platforms are disinclined to sign a broadcast contract with LIV Golf while the Tour claims to control the media rights of the players participating in LIV Golf tournaments. As the PGA Tour has maintained, the Media Rights Regulation purportedly denies any competing tour the opportunity to broadcast tournaments to fans, an essential element of the business plan of LIV Golf or any other elite professional golf promoter. Unless it is enjoined, this provision will threaten the competitive entry of LIV Golf or any other potential competitor, which would both harm LIV Golf and also the Player Plaintiffs by denying them the opportunity to sell their services in a competitive market.

62.     The anticompetitive intent of the Media Rights Regulation is exposed by the Tour's amendment of the definition of "golf program" in the provision in November 2019 in response to rumors of potential competitive entry. Whereas the prohibition had previously applied to "any golf contest, exhibition or play that is shown *in the United States*," the prohibition was expanded to cover "any golf contest, exhibition or play that is shown *anywhere in the world*." Exhibit 1 (emphasis added). Commissioner Monahan admitted this anticompetitive purpose in his January 2020 Memorandum: "Our current Tournament Regulations provide a significant hurdle for PGA Tour members with respect to contracting with Private Equity Golf under its proposed structure. . . In particular, the Tournament Regulations governing Conflicting Events and Media Rights/Releases would be applicable. . . .[I]n November 2019 the Policy Board ratified a revised Media Rights/Release regulation to ensure that all golf events are unequivocally covered on a global basis." The Tour did not negotiate with the Player Plaintiffs or any other Tour Member over its unilateral expansion of the Media Rights Regulation and

AMENDED COMPLAINT – DEMAND FOR JURY TRIAL
CASE NO. 5:22-cv-04486-BLF

does not compensate them for the Tour's purported exclusionary control over their year-round global media rights. The expansion ensures that players are restricted from participating with a competing golf tour anywhere in the world.

63.    The anticompetitive purpose of the Media Rights Regulation is further illustrated by comparison with the European Tour. The European Tour does not prohibit its independent contractor golfers from using their media rights when they are not playing in European Tour events. Rather, the European Tour's rules make clear that the players' grant of media rights applies *only* when they participate in European Tour events. During other weeks of the year, that grant of media rights "does not otherwise affect the Member's rights as an independent contractor in respect of their own image except as set out in these Regulations, including Regulation E5(c) [Ryder Cup] below." The European Tour also "recognises the individual rights of all Members operating as independent contractors. . . and will not unreasonably seek to restrain its Members from Participating in certain golf tournaments or events which are not sanctioned by the European Tour. . . ."

64.    Some Player Plaintiffs requested releases from the Media Rights Regulation to play in the LIV Golf London Invitational. The PGA Tour denied their request (as well as those of other Tour members) and instead imposed lengthy suspensions on all players who participated in the event.

65.    The Tour's anticompetitive use of the Media Rights Regulation is further demonstrated through its selective enforcement of the provision against other events that it does not deem to be competitive threats. For example, the Tour did not require members to obtain releases to participate in a Pro-Am golf competition called the JP McManus held in the Republic of Ireland from July 4–5, 2022, even though the event was broadcast in the United States, Europe, and throughout the world. In contrast, days earlier the Tour enforced the provision with draconian punishments when the Player Plaintiffs and others played in the LIV Golf Portland Invitational from June 30 – July 2, 2022. The key difference between the LIV Golf event and the JP McManus event is that the Tour views only LIV Golf as a competitive threat.

66.    The anticompetitive purpose and effect of the Media Rights Regulation is clear. The incumbent monopolist has granted itself the right to foreclose the best golfers in the world from playing in events that create real competition, at its own discretion. And if golfers defy the Tour's threats, the

1    competitor that is able to secure the players' services is nonetheless foreclosed from securing contracts

2    to broadcast the event on television or any other media.

3        67.    **Conflicting Events Regulation.**  A second exclusionary provision in the Regulations

4    (Section V.A.2–3, the "Conflicting Events Regulation") grants Tour Commissioner Monahan with the

5    discretion to prohibit the Player Plaintiffs and all other Tour members from playing in any other golf

6    tournament anywhere in the world.  Exhibit 1.  Commissioner Monahan has exercised his discretion to

7    foreclose competition from LIV Golf by preventing any Tour members from participating in any LIV

8    Golf events, under penalty of career-threatening suspensions.

9        68.    The Conflicting Events Regulation contains two components, each of which the Tour

10   has employed to attack the Player Plaintiffs in its effort to foreclose LIV Golf's entry.  First, the

11   provision prohibits any Tour member from playing in any other golf tournament in North America

12   during any week when the Tour sponsors or co-sponsors an event—without exception, even when the

13   player is not playing in the Tour event.  Because the Tour typically sponsors or co-sponsors events

14   approximately 48 weeks per year, the Conflicting Events Regulation effectively prevents independent

15   contractor Tour members from ever playing in non-PGA Tour events in North America.  Second, the

16   Regulations also prohibit the Player Plaintiffs and all other Tour members from playing in any events

17   *outside* North America during weeks in which the Tour is sponsoring or co-sponsoring an event, unless

18   the Commissioner grants a release.  These releases are limited to three per year, and the Commissioner

19   has complete discretion to deny them.

20       69.    The releases the Commissioner can choose to grant do not permit meaningful

21   competition by other tours.  No releases are permitted for any event in North America.  Even as to

22   international events, the Commissioner retains "sole discretion" to deny a release.  Exhibit 1.  While

23   the Tour has historically granted releases for international events, the Tour changed its practice once

24   the threat of potential competitive entry became evident.  For the LIV Golf London Invitational, the

25   Tour denied releases for all members.  In doing so, Commissioner Monahan clarified that the Tour

26   denied the requested relief because LIV Golf is organizing a tour that competes with the PGA Tour in

27   North America.  The Commissioner's vice president wrote, "While releases have been granted in

28   limited circumstances for one-off events outside North America or for events outside of North America

                                           27
                    AMENDED COMPLAINT – DEMAND FOR JURY TRIAL
                           CASE NO. 5:22-cv-04486-BLF

on tours based exclusively outside of North America, the event for which you have requested a release is the first in an eight-event "2022 LIV Golf Invitational Series" season, and more than half of them will be held in the United States." Furthermore, even if the Commissioner did not exercise his discretion to attack competition, the Regulation provides that a player may obtain only three Conflicting Event releases per season, and may do so only if he also plays in a minimum of 15 Tour cosponsored or approved tournaments. Also, the PGA Tour Commissioner is only required to give a player a decision 30 days in advance of the event, which makes it difficult for those planning international events to know which players will be permitted by the Tour Commissioner to play in the field.

70.     The scope of this Conflicting Events Regulation is expanded by another provision in the Regulations which provides that in any week in which a Tour, PGA Tour Champions, Korn Ferry Tour, PGA Tour *Latinoamerica*, PGA Tour Canada, or PGA Tour China cosponsored tournament is scheduled, no Tour member may participate in any golf activity (including public exhibitions, clinics, and pro-ams) in the same geographic area without the prior approval of the Commissioner.

71.     The Tour has made clear that it will weaponize the Conflicting Events and the Media Rights Regulation to attack competition. In January 2020, Commissioner Monahan told a meeting of PGA Tour members that the Tour will impose "strict enforcement of the Conflicting Event and Media Rights/Release rules" on players to prevent them from playing golf on a competing tour. When Player Plaintiffs participated in the LIV Golf London Invitational, Commissioner Monahan summarily suspended them within an hour of tee-off. Then, to expand the *in terrorem* effect of the suspension on all other Tour members, Commissioner Monahan immediately notified all PGA Tour members of his action.

72.     The Tour has forced members of the Korn Ferry Tour—the developmental tour—like Plaintiff Uihlein, to be bound by the same Regulations and has enforced them to punish young developing professional golfers who play in LIV Golf events.

73.     Furthermore, the Tour's argument that it is merely enforcing its membership rules and its assertion that there is some legitimate justification for those rules in preventing simultaneous Tour membership and participation in LIV Golf events are betrayed as mere pretext by the Tour's attacks on

AMENDED COMPLAINT – DEMAND FOR JURY TRIAL
CASE NO. 5:22-cv-04486-BLF

1   golfers who play in LIV Golf events but are not PGA Tour members. For example, The PGA Tour has

2   even banned golfers who are members in good-standing of the European Tour from the European Tour

3   events it co-sanctions with the PGA Tour simply because they played in a LIV Golf event, including

4   members of the European Tour who were granted permission to play in the LIV Golf event. Those

5   golfers were not bound by the PGA Tour's membership rules (because they were not Tour members)

6   and did not violate any Tour rule, and yet they were punished by the Tour for playing in a LIV Golf

7   event. Similarly, the Tour has threatened college golfers—who are not Tour members and are not

8   bound by any Tour rule—that they will not be permitted to participate in the pathway onto the Korn

9   Ferry Tour or the PGA Tour if they play in any LIV Golf events.

10      74.     The Tour's attack on LIV Golf is not the first time the Tour has used the Media Rights

11  and Conflicting Events Regulations to attack nascent competitive entry. Before LIV Golf, the last

12  meaningful threat of competitive entry to challenge the PGA Tour was the World Golf Tour, led by

13  Greg Norman, which attempted to launch in 1994. In response, then-Tour Commissioner Tim Finchem

14  wrote to Mr. Norman that the Tour would not grant conflicting event releases for "events held within

15  the United States" and that it would only grant a media rights release if the World Golf Tour would

16  pay a prohibitive sum to the PGA Tour. And even then, the Tour's releases would only be granted for

17  events held on a Monday, Tuesday, or Wednesday. The Commissioner also threatened Tour members

18  that they would lose PGA Tour membership cards if they joined the competing tour. Within days, the

19  World Golf Tour collapsed. No other meaningful competitive threat emerged for more than a quarter

20  century.

21      75.     The Player Plaintiffs are members of the Tour (albeit now subject to lengthy

22  suspensions) and remain subject to the Regulations. They requested releases from the Media Rights

23  and Conflicting Events Regulations to participate in one or more LIV Golf events. The Tour denied

24  their requests and imposed severe punishment when they exercised their rights as independent

25  contractors to play in the LIV Golf events (detailed further below). While the PGA Tour's charter

26  requires that the PGA Tour's acquisition of players' media rights be used "to promote the common

27  interests of professional golfers," the Tour uses its acquisition of players' media rights to prevent other

28  promoters from competing for its members' services.

76.     Furthermore, after dozens of Tour members (including the Player Plaintiffs) sought Conflicting Events releases to participate in a LIV Golf event in London, the Tour amended its Conflicting Events Release request form to require its members to verify the event would not be shown on any medium in the United States—an impossible verification given modern technology.  As the sequence of events makes clear, the Tour added that provision (the Contractual Assurance Confirmation) in response to LIV Golf's attempted competitive entry.  This amendment makes it even harder for the Player Plaintiffs to exercise their independent contractor right to play for other promoters during their off-weeks.

**The PGA Tour's Anticompetitive Response to Potential Competitive Entry in 2020**

77.     After the PGA Tour used its Media Rights and Conflicting Events Regulations to deter entry by the World Golf Tour in 1994, there was no attempted entry into professional golf for over 25 years.  Then, in late 2019 and into 2020, a number of individuals and entities, some of whom later became involved with LIV Golf, attempted to launch a competing tour known as the Premier Golf League ("PGL").  The Tour orchestrated an anticompetitive response that blocked PGL's attempted entry.

78.     PGL was a venture involving the Raine Investor Group SPV, World Golf Group ("WGG"), the Public Investment Fund of Saudi Arabia, and Performance 54.  PGL developed a proposal for a new golf league, and it approached various golf stakeholders as part of its effort to launch a new elite professional golf tour to compete with the Tour.

79.     PGL had discussions with player representatives in the fourth quarter of 2019 and began offering contracts to players in January 2020.

80.     In January 2020, the Tour obtained copies of PGL's marketing materials and the packages the PGL offered Tour players.

81.     In response, Commissioner Monahan distributed his January 2020 Memorandum acknowledging that the PGL "would be competitive to the PGA TOUR," and detailed the PGA Tour's "response" to "mitigate any impact" from this potential competitive threat.

82.     In his January 2020 Memorandum, Commissioner Monahan explained that the principal means to defeat the threat of competition was to prevent players from joining the new league.  As

Commissioner Monahan wrote, "[t]he impact that [the new league] can have on the PGA TOUR is dependent on the level of support it may receive from these players. Without this support, [the new league's] ability to attract media and corporate partners will be significantly marginalized and its impact on the TOUR diminished."

83.   Commissioner Monahan pointed out that PGA Tour members would have "a significant hurdle" to join the new league because the Regulations prohibit players from joining a competing tour. In addition, Commissioner Monahan pointed to a rule he claimed would prevent players from competing in the team format proposed by the new league (based on a rule prohibiting "players having a financial interest in another player") and prevent players from competing in "conflicting events" except under limited circumstances.

84.   In the 2020 memorandum, Commissioner Monahan also informed the Tour Policy Board that in November 2019, in response to rumors about potential competitive entry of an upstart international golf tour, the Tour had amended the Regulations to expand the Media Rights Regulation "to ensure that all golf events are unequivocally covered on a global basis." He also detailed plans to "further crystallize[] these restrictions."

85.   Commissioner Monahan proposed two additional revisions to the Regulations, one that would tighten restrictions on conflicting events and a second that would prohibit players from having an equity interest in another's performance, a direct response to the PGL's team concept. On information and belief, these revisions were later adopted.

86.   In addition, Commissioner Monahan stated that the PGA Tour has "communicated with key members of the Tournament Advisory Council," a group of PGA Tour tournament directors who advise the PGA Tour on its business conditions, "to prepare for a possible entrance of the [new league] to the marketplace." Commissioner Monahan similarly detailed that the PGA Tour has "liaised with each [Major Championships and Governing Bodies] organization to learn of its position regarding [the new league]." And the PGA Tour communicated with the OWGR regarding the new league's eligibility for OWGR ranking points.

87.   The January 2020 Monahan Memorandum described the PGA Tour's efforts to secure commitments from across the global golf ecosystem to foreclose potential competitive entry.

Recognizing that the competitive threat from the new league would be greatly strengthened through a partnership with the European Tour, Commissioner Monahan stated that the PGA Tour has "continued discussions with the European Tour about the potential to work more closely together, thereby removing the European Tour as a potential partner of [the upstart competitor]." As described, the PGA Tour did in fact partner with the European Tour to prevent competitive entry.

88.     Commissioner Monahan and the PGA Tour executed this anticompetitive plan to prevent players from joining the PGL and "remov[e]" others in the ecosystem as potential partners of the PGL, ensuring that the competitive threat from the PGL was thwarted before it could launch.

**The PGA Tour Threatens Players Considering Joining The PGL**

89.     At a Tour players' meeting in January 2020 at Torrey Pines in La Jolla, California, Commissioner Monahan read aloud a message to Tour players similarly detailing some of his messages from his January 2020 Memorandum.   In that meeting, Commissioner Monahan told PGA Tour players, "[t]he schedule for the [PGL] is designed to directly compete and conflict with the PGA Tour's FedExCup schedule, and to not conflict with [and be in addition to] the Masters, PGA Championship, U.S. Open and The Open Championship."   Then, Commissioner Monahan threatened the Tour members with a ban from the PGA Tour if they joined the PGL or any other new league, stating: "If the Team Golf Concept or another iteration of this structure becomes a reality in 2022 or at any time before or after, our members will have to decide whether they want to continue to be a member of the PGA Tour or play on a new series."

90.     As Commissioner Monahan made clear, the Tour demanded exclusivity from its independent contractor members, under penalty of a ban from the Tour.

91.     In March 2020, Monahan repeated his threats to the players, stating that the Tour would "vigilantly protect [the Tour's] business model" from the competitive entrance of a new league.

92.     The Tour's threats to the players' livelihoods had their intended effect.   As one player was quoted anonymously in a leading golf publication in early 2020, "the risk of getting banned by the PGA Tour has to be an obvious concern."   Many other Tour Members felt the same.   As of 2020, the potential harm to the Player Plaintiffs resulting from a ban from the Tour made the idea of signing on to a new start-up too risky to bear.   Nonetheless, many Tour members—recognizing that they were

1   disadvantaged by the Tour's monopsonistic control over the market—remained very interested in new

2   playing opportunities in addition to the Tour.

### The Tour Induces The European Tour Into a Group Boycott

4   93.     As Commissioner Monahan admitted in his January 2020 Memorandum, the PGA Tour

5   agreed with the European Tour to remove the European Tour as a potential partner of any new entrant.

6   94.     Throughout 2020, the PGL had been negotiating with the European Tour to develop a

7   partnership to co-sponsor events, which would have been a key step toward enabling the PGL to launch.

8   95.     The co-sponsorship was important because it would have assured that PGL events

9   would qualify players to earn points under the OWGR system. OWGR rankings are used to determine

10  qualification for the Majors. Professional golfers are reluctant to join any tour that does not provide a

11  path to qualify for the Majors.

12  96.     Under the rules of the OWGR (on whose board Commissioner Monahan sits), a brand

13  new tour purportedly cannot qualify for OWGR points for at least three years and must be sponsored

14  by one of the six full members of the International Federation of PGA Tours (PGA Tour, European

15  Tour, Asian Tour, Japan Tour, Australasia Tour, and Sunshine Tour). This establishes a barrier to the

16  entry of any new tour: No elite professional tour can sustain in the long-term unless it provides players

17  with a path to earn OWGR points, but no professional tour can secure points until it has existed for at

18  least three years (absent an OWGR waiver of that requirement) and has sponsorship from one of the

19  established International Federation members. To navigate through this Catch-22, the PGL sought to

20  partner with the European Tour as part of its plan to enter and obtain a sponsor for its OWGR

21  application.

22  97.     Recognizing the PGL's need for a partnership with the European Tour, the PGA Tour

23  forged an alliance with the European Tour through threats and financial incentives to put a bearhug

24  around the European Tour and cut off a potential partner of the PGL. To obtain this agreement, the

25  Tour threatened rule changes that would have made it more difficult for top European players who

26  participate on the PGA Tour to play in European Tour events.

27  98.     The PGA Tour's approach proved highly effective. In November 2020, the European

28  Tour announced that it would not partner with the PGL, but instead it would enter into an alliance with

the PGA Tour. One condition of the agreement was that the European Tour not partner with or sponsor the PGL, thereby removing a key partner for the PGL's planned entry. Additionally, through the alliance with the European Tour, PGA Tour Commissioner Monahan secured a seat on the Board of Directors of the European Tour and the PGA Tour made a massive investment in the European Tour and its subsidiaries. The Tour's illegal alliance with the European Tour enabled it to require the European Tour to work in concert with the PGA Tour to prevent competitive entry. The Tour used its strategic alliance with the European Tour throughout the next two years to carry out its anticompetitive scheme to thwart LIV Golf's entry. The Tour entered into the illegal agreement with the illegal purpose to eliminate a competitor and future potential entrants.

99. The PGA Tour's efforts to thwart the PGL's entry were successful. The PGL never got off the ground, the venture as it existed disbanded, and the PGL was left with no real prospect of viability. In 2022, the PGL offered to partner with the PGA Tour, but under the Tour's control. The Tour summarily rejected the proposal.

100. And through its campaign to destroy the PGL, the PGA Tour had secured an anticompetitive agreement with the European Tour to foreclose any future potential competitive entrants.

### LIV Golf Promises Long-Needed Competition

101. After the Tour destroyed PGL's viability and the venture disbanded, LIV Golf formed in 2021. LIV Golf is a new golf company whose goal is to improve professional golf for all stakeholders: fans, players, broadcasters, sponsors, and tournament hosts. It seeks to offer more of what fans, broadcasters, and sponsors want, including an exciting new format that will ensure heightened competition among golf's star players. LIV Golf seeks to modernize the professional game by allowing the game's superstars to realize their true market potential, while enhancing the professional golf marketplace with a dynamic, team-inspired format that will complement individual competition.

102. LIV Golf developed a new golf tour (the League) that would include 48 top golfers who would compete both as individuals and on 12 teams of four. The LIV Golf League's format is inspired

by the globally successful format for Formula 1 racing.[2] Twelve headline players would be player-owners, each holding an equity interest in their team and having substantial opportunities to guide their team to on-course and commercial success. Each LIV Golf League team of four was also set to have two substitute players, thereby offering 72 total players the opportunity to play. The player-owner of each team was to select four of the six players to play in a given week. By introducing an innovative format highlighting weekly head-to-head competition among the top players in the game, LIV Golf League's format would have created a more desirable product offering than the PGA Tour format, which has not changed for decades and has the lowest youth viewership of any North American major sport. LIV Golf League was going to include 54-hole tournaments with shotgun starts[3] and no cut, offering a faster-paced format with high levels of competition in every tournament, dramatically improving the fan experience.

103.    The LIV Golf League format was designed as a fan-friendly alternative to the PGA Tour. The proposed "shotgun" format would reduce the number of hours required to watch a tournament and increase the excitement of the viewer experience. The team format would provide opportunities for team allegiances among fans and lead to multiple levels of competition within any given tournament. The LIV Golf League would also benefit sponsors, advertisers, and other stakeholders, as each team was to be independently commercialized with freedom to develop and select team sponsors and a home city or region. LIV Golf had strategies for improved broadcast output and an entertainment experience with more storylines and content.

104.    The LIV Golf League was also set to improve conditions for players. In contrast to the PGA Tour's stagnating tournament purses (until LIV Golf emerged), with about half the players not making the cut and earning nothing in any given tournament, LIV Golf League was set to introduce the benefits of competition to players, including offering players greater economic benefits more

---

[2] Formula 1 is the world's premier international auto racing series.

[3] Shotgun starts are when all golfers in a tournament tee off of different holes at the same time so that they finish their rounds around the same time, as compared to tournaments where all golfers tee off of the first hole and proceed to the eighteenth hole in consecutive fashion.

35

commensurate with their ability to attract revenue, equity ownership opportunities in their own success, and guaranteed income for every tournament in which they participated. LIV Golf would not require players to sign away their name, image and likeness rights for non-LIV Golf events. LIV Golf also would not foreclose players from playing in other tournaments during weeks in which LIV Golf is not playing, which would respect players' independent contractor status and allow them to participate in other tournaments and tours (to the extent not banned by the Tour).

105.   The introduction of competition from the LIV Golf League would provide new and improved options for players, fans, and other stakeholders. Innovation would replace stagnation. Players, fans, sponsors, advertisers, and broadcasters would all benefit. The introduction of the LIV Golf franchise model to the sport of golf—with city, country, and regional affiliations—would engage more fans and increase commercial opportunities.

106.   The LIV Golf League also aspired to enhance player opportunities more broadly and add meaningfully to the playing opportunities for professional golfers worldwide. It planned to provide qualification opportunities for players not initially selected and to embrace other tours, providing their players with pathways into the League. This format was designed to ensure a high level of competition throughout each season, as well as a fair and inclusive platform for golfers throughout the world, including younger development golfers.

107.   If not for the anticompetitive conduct of the Tour, the LIV Golf League would have launched in 2022. LIV Golf had developed a ground-breaking business plan. It secured a chief executive officer and Commissioner—Greg Norman, a giant in the world of golf and a highly successful businessman in multiple industries—hired an experienced team of executives, assembled a board, and built out a full front office with dozens of employees and numerous industry consultants and contractors. LIV Golf partnered with the Asian Tour and invested several hundred million dollars in the Asian Tour to sponsor marquee events throughout the world and develop the sport at multiple levels on a worldwide basis. LIV Golf negotiated with broadcast companies, sponsors, venues, advertisers, vendors, and several other business partners who expressed interest in LIV Golf League. All these successful stakeholders indicated, however, that they would commit only when LIV Golf League had signed up the players needed to launch LIV Golf *and*, critically, secured the players' media

1    rights.

2    108.    LIV Golf also sought to cultivate relationships with other tours in the existing golf

3    "ecosystem," in order to ensure that there were further player pathways into and out of LIV Golf events

4    (both within and across seasons) and to ensure that LIV Golf's entry would be additive and beneficial

5    to the sport of golf throughout the world.  For example, LIV Golf made offers to the Ladies European

6    Tour and the LPGA, which rejected those offers due to the PGA Tour's opposition to LIV Golf, and

7    due to the PGA Tour's board seats in those organizations and its control over the golfing world.  As

8    described below, the PGA Tour has thwarted LIV Golf's efforts by spearheading a group boycott

9    designed to exclude LIV Golf from the "ecosystem" and punish any player who plays in any LIV Golf

10   events.

**The Tour's Anticompetitive Response to the Potential Entry of LIV Golf**

11

12   109.    In response to the potential entry of LIV Golf, the PGA Tour has used a carrot-and-stick

13   approach to prevent the Player Plaintiffs and other PGA Tour Members from playing with LIV Golf.

14   110.    The carrot is a loosening of the PGA Tour's purse strings to make somewhat greater

15   compensation available to players than the Tour historically provided.  This increased compensation to

16   players in response to competitive entry is direct proof of the PGA Tour's monopsony power and the

17   anticompetitive effects on players (including the Player Plaintiffs) from excluding competition.  When

18   the PGA Tour faced the meaningful threat of competitive entry for the first time in a quarter-century,

19   it suddenly and substantially increased player compensation, thus providing direct proof of the Tour's

20   monopsony power in suppressing player compensation below competitive levels.[4]  These changes in

21   the Tour's practices made only in response to nascent competitive entry are also indicative of the

22   anticompetitive effects that will be imposed on the markets if the Tour is successful in defeating LIV

23   Golf's nascent entry—once the Tour is free from competitive pressures, it will have both the ability

24   and incentive to suppress player payments, as it did for many years before LIV Golf's nascent entry.

25   111.    The stick used by the Tour is an array of anticompetitive actions by the PGA Tour to

26

27   _____

28   [4]  Despite these increases in compensation in response to LIV Golf's entry, PGA Tour compensation
     for players remains well below competitive levels.

AMENDED COMPLAINT – DEMAND FOR JURY TRIAL
CASE NO. 5:22-cv-04486-BLF

destroy the careers and livelihood of players who participate in any LIV Golf events (including the Player Plaintiffs), their business partners and agents, and anyone who associates with LIV Golf or its players. It is particularly notable that as LIV Golf's threat of entry grew, and as the press reported increased player interest and player signings, the Tour ramped up the intensity of its punishment and threats. As Commissioner Monahan made clear in his January 2020 Memorandum, the Tour knew that if it could deter players from joining a new league, the new league's "ability to attract media and corporate partners will be significantly marginalized" and "its impact on the [Tour] diminished." Particularly for a 501(c)(6) organization that is required to further the interests of its members, the Tour's commitment to attack and destroy the careers of its members in order to defeat competition is striking. The Tour's conduct is also blatantly anticompetitive, serves no purpose but to harm competition, and cannot be justified under the antitrust laws.

112. **The carrot.** In April 2021, in direct response to rumors of LIV Golf's potential entry into the marketplace, the PGA Tour announced the "Player Impact Program," a $40 million bonus pool for the top 10 players on the PGA Tour who drive engagement with sponsors and fans. This new bonus pool, announced by the PGA Tour in response to potential competitive entry, is a clear indicator of the benefits of competition for players. As the PGA Tour recognized, competition in the labor market from LIV Golf will force it to raise compensation to the players or it will lose its talent to the new entrant. The PGA Tour's "Player Impact Program," however, was a half-measure, and offered far less than the compensation the players would earn in a competitive labor market.

113. In August 2021, in response to reports that LIV Golf's efforts to secure player commitments were gaining momentum and that the new entrant would offer substantially greater compensation, the Tour announced it would increase the purse sizes for tournaments and bonus pools for the 2021–2022 PGA Tour season by 18 percent compared to the purse size and bonus pools for the 2020–2021 PGA Tour season. As noted above, PGA Tour purse sizes had grown at an anemic low-single-digit rate for years, but when competitive entry was rumored, the Tour responded with an 18 percent increase for the next season. This is clear and direct proof of the Tour's monopsony power, the benefits of LIV Golf's competitive entry, and the harm to competition and the Player Plaintiffs if the Tour is permitted to destroy LIV Golf's nascent entry.

114.   In October 2021, the Tour announced it would increase the purse size for the Players Championship by $5 million (from $15 to $20 million) and would provide players with a $50,000 bonus if they compete in 15 PGA Tour events.

115.   In December 2021, the Tour published its increased purse size for 2022 (increasing from $367 million to $427 million in aggregate) including: (1) increasing FedEx Cup bonus pool from $60 million to $75 million; (2) increasing Top 10 Comcast Business Tour bonus from $10 million to $20 million; (3) increasing the Player Impact Program prize pool from $40 million to $50 million; and (4) making official the October 2021 compensation announcements.

116.   In December 2021, the Tour also disclosed initial plans to copy LIV Golf's team-golf, international, prestigious, exclusive, no-cut, high purse, tournament format. Whereas the Tour and its spokespersons had previously used LIV Golf's new format as an excuse for justifying their opposition to the new entrant, the Tour's announcement that it planned to knock off LIV Golf's format revealed that any opposition based on the new format was merely pretext. And again, the Tour's response to LIV Golf's innovations demonstrates the benefits of competition.

117.   In February 2022, the Tour leaked further information about its plan to copy LIV Golf's ideas in creating a fall series of team events with high purses and no cuts. With that announcement, the Tour also discussed further plans to increase player compensation, reflecting further competitive benefits of LIV Golf's nascent entry.

118.   The increased purses and bonuses that the Tour offered in response to LIV Golf's anticipated entry were, however, a half-measure. They are materially less than the compensation the players would earn in a competitive labor market. In a nutshell: before LIV Golf's anticipated entry, the Tour's market power and the barriers to entry it had created allowed the Tour to compensate its players at levels substantially below what would exist in a competitive market. In response to LIV Golf's attempted entry, the Tour increased player compensation on numerous occasions, but still at less than competitive levels. For example, LIV Golf offers tournament purses between 200 percent to 300 percent higher than PGA Tour's purses, including guaranteed income to all participants. The lowest purse on the LIV Golf tour is millions of dollars greater than the largest purse ever offered by the PGA Tour. The point at which compensation becomes competitive will be determined only when the Tour

is enjoined from using its anticompetitive threats, retaliations, and restrictive contractual provisions, and has to compete on a level playing field with LIV Golf to secure players' services.

119.   Nonetheless, even the early effects of the threat of competitive entry were striking. The Tour increased player compensation several times in response to the potential competitive entry of LIV Golf, totaling *$135 million* in a matter of a few months. This is clear and direct evidence of the Tour's monopsony power and the benefits of competition from LIV Golf. It is also direct evidence of the harm to competition that will result if LIV Golf's competitive entry is thwarted. Without the threat of competition from LIV Golf, the Tour would again face neither competition nor any reasonable likelihood of competition in the future. The Tour would then have both the ability and incentive to suppress player compensation to the sub-competitive levels that existed in the decades before LIV Golf launched.

120.   In response to the increased compensation from the PGA Tour, players recognized that the threat of competitive entry prompted the changes:

   i.   Plaintiff Mickelson: "I'm appreciative of the fact that there is competition, and that leverage has allowed for a much better environment on the PGA Tour, meaning we would not have an incentive program like the PIP [Player Impact Program] for the top players without this type of competition. We would not have the increase in the FedEx Cup money. We would not have the increase in the Players Championship to $20 million this year if it wasn't for this threat."

   ii.   Joel Dahmen: "The PGA Tour . . . magically come up with $40 million for PIP and then there paying us all 50 grand to play 15 events, which is another X million dollars. That's like, $50 million they just magically found laying around overnight. The money is there. There's a way to do it."

   iii.   Jason Kokrak: "I'm curious to see if the PGA Tour would've ever increased any of that without this competition."

121.   As PGA Tour Member and then-PGA Tour Policy Board Member Jordan Spieth said, "I think as a player overall it [competition from LIV Golf] will benefit us . . . . I can only say from my point of view I think that it's been beneficial to the players to have competition." PGA Tour member

Rickie Fowler said, "I think competition is a good thing, and in business, whatever it may be. . . . if you're trying to be the best, you want to find ways that you can be better than your competitors. It goes through sport, business, tours, whatever it may be." And Mr. Fowler noted that these new tours are coming about because the PGA Tour's stale product left players frustrated: "These tours or leagues, however you want to classify or call them, they wouldn't really be coming up if they didn't see that there was more opportunity out there. I've always looked at competition being a good thing. It's the driving force of our game."

122.    Then, after LIV Golf had achieved some success with its first LIV Golf Invitational Series event and contracting with some popular golfers, the Tour managed to come up with yet more money to try to deter golfers from leaving the Tour for LIV Golf. On June 21, 2022, just days after LIV Golf London Invitational, the Tour copied LIV Golf's concept of limited field, no cut, team events with high purses, and announced its version of the events to begin in 2023. In that announcement, the Tour announced another increase of approximately $54 million to existing events and, in total, over $100 million purse increases across all of its events. In its announcement to its players, the Tour admitted the increase came from its "reserves." The Tour had the money, but didn't compensate the athletes or seek to offer innovative tournament ideas until LIV Golf introduced actual—albeit fragile—competition in the relevant market. On August 1, 2022, the Tour announced the purse amounts for the entire 2022–2023 schedule, which totaled a record $415 million in prize money in official events and another $145 million in bonuses—further showing how competition from LIV Golf caused the Tour to increase compensation for players.

123.    **The stick.** The Tour's increased purses were not successful in deterring player interest in LIV Golf. As noted, the Player Plaintiffs and other players recognized that competition was good for the game of golf and for them, and the promise of true competition for their services fueled player interest in LIV Golf, which offered a more desirable format, more favorable terms for the Player Plaintiffs and other players (such as owning their media rights), and far greater compensation than the Tour was offering even with the recent increases in compensation. As a result, in a desperate effort to thwart competitive entry and protect its monopoly position, the Tour launched a campaign of threats against its own members, including the Player Plaintiffs, that promised career destruction for any

players who joined LIV Golf.

124.     After news broke in April 2021 that LIV Golf made formal offers to a number of the top players in the world, on May 4, 2021, Commissioner Monahan addressed a meeting of Tour players (including the Player Plaintiffs) and informed the players that any golfer who joined LIV Golf would immediately lose their status as a PGA Tour member and face *a lifetime ban from the PGA Tour*. The players, including the Player Plaintiffs, were understandably intimidated by the Tour's threat.

125.     The Tour intended its threat of lifetime ban to be a serious deterrent.  It was.  The prospect of leaving the Tour for an upstart golf promoter that could not guarantee its long-term existence, under threat of a lifetime ban from the incumbent monopsonist, was prohibitively risky.  If banned from the Tour, the player would face a serious risk of being foreclosed from pursuing his chosen profession, a harrowing prospect for any golfer, and particularly younger golfers capable of 20 or more years of elite play.

126.     In the 24 hours after the Tour announced that it would impose a lifetime ban on players who join LIV Golf, and after the Tour leaned on them for support, other entities in the golf "ecosystem" issued public statements reinforcing and expanding the Tour's threat:

- Seth Waugh, the CEO of the PGA of America, which sponsors the PGA Championship, publicly indicated the PGA of America's support for the PGA Tour and the European Tour in excluding competition from the "ecosystem of the professional game." He stated: "We are in full support of the PGA Tour and the European Tour regarding the current ecosystem of the professional game."

- Augusta National, which sponsors the Masters, issued a statement that "[t]he PGA Tour and European Tour have each served the global game of golf with honor and distinction. . . .  As it has for many decades, the Masters Tournament proudly supports both organizations in their pursuit to promote the game and world's best players."

- A spokesperson for the R&A, which sponsors The Open, stated, "we have deep relationships with the [PGA Tour and the European Tour] and are supportive of them."

127. When the Tour learned that LIV Golf was continuing to talk with players' representatives (including the Player Plaintiffs' representatives) despite the threat of lifetime bans, the Tour threatened certain of the players' representatives, saying that it would harm the representatives' and the players' business interests if they continued to engage in discussions with LIV Golf. These threats to players' representatives highlight the pretext in the Tour's assertions that it is merely enforcing its own rules. No Tour rule grants it the authority to threaten the business of a player's agent or representative if a player participates in a LIV Golf tournament. And there is no conceivable procompetitive justification that could support such bullying. The Tour's actions are transparently anticompetitive, as they are aimed purely at kneecapping competition from LIV Golf before it can get off the ground and threaten the Tour's monopoly.

128. Furthermore, the Tour threatened—without basis—the Player Plaintiffs, their representatives, and other players and their representatives, that the Tour would withhold players' vested retirement funds if they were to join LIV Golf. Again, this threat is not justified under any Tour rule, but rather is targeted purely at undermining LIV Golf's competitive entry.

129. Several player representatives, including those of the Plaintiffs, were threatened that the Tour would use its connections to pressure their sponsors to revoke sponsorship agreements were they to join LIV Golf. Upon information and belief, the Tour successfully pressured sponsors to revoke player sponsorships. This conduct is not justifiable as the enforcement of any Tour rule, but instead is a transparent use of the Tour's muscle to attack players in order to undermine LIV Golf's competitive entry.

130. Through all of these actions, the Tour has harmed both the Player Plaintiffs and LIV Golf. Furthermore, the Tour's continued anticompetitive bullying aimed at any players or other parties who do business with LIV Golf (including the Player Plaintiffs) presents a severe threat of thwarting LIV Golf's nascent competitive entry. If not enjoined by the Court, the Tour's ongoing anticompetitive conduct threatens to irreparably harm LIV Golf, the Player Plaintiffs (both as direct targets of the Tour's anticompetitive conduct and as sellers into the market in which the Tour aims to secure its monopsony power), and competition itself.

**The Tour Uses Its Strategic Alliance with the European Tour to Exclude LIV Golf and Its Partners from the "Ecosystem"**

131.    Before the PGA Tour formed an illegal alliance with the European Tour, the European Tour was a willing partner for prospective innovators and entrants into the global golf ecosystem. This included Golf Saudi and the Saudi investors who ultimately sponsored LIV Golf. For example, in a panel discussion in 2019, European Tour CEO Keith Pelley asserted that Saudi Arabia "are at the forefront of helping us develop the game." In fact, the European Tour partnered with Golf Saudi in launching the Saudi International, co-sanctioning the tournament for three years from 2019 to 2021.

132.    While the Tour and those it has leaned on now use the Saudi sponsorship of LIV Golf as a weapon to smear LIV Golf and the golfers (including the Player Plaintiffs) who play in LIV Golf events and justify their attacks on the golfers, Mr. Pelley's statements reveal that attacks on the Saudi sponsorship of LIV Golf are pure pretext. The Tour had no problem entering into a partnership with the European Tour at the same time that the European Tour co-sanctioned the Saudi International and while Mr. Pelley gushed about the prospect of partnering with Golf Saudi to grow the sport. And the Tour has no problem accepting its own sponsorship money from companies that do billions of dollars in business with Saudi Arabia each year. An estimated 23 PGA Tour sponsors conduct regular business with Saudi Arabia each year—an estimated $40 billion dollars of business with Saudi Arabia. That the PGA Tour eagerly does business with these companies while criticizing golfers for playing on a tour primarily sponsored by the Public Investment Fund of Saudi Arabia is simply hypocrisy. And it exposes as pretext any notion that the Tour is orchestrating an attack on the players because the Tour is somehow unable to do business with anyone who has business connections to Saudi Arabia. The Tour's campaign to destroy these players is about defeating competition even at the cost of punishing its own members.

133.    The European Tour's support for Golf Saudi changed starkly once the European Tour entered into its alliance with the PGA Tour and when Golf Saudi supported a potential competitive entrant to the PGA Tour.

134.    The Tour's agreement with the European Tour to form a group boycott to block competitive entry that could challenge the PGA Tour's dominance is a matter of public record. For example, on May 4, 2021, the European Tour released a statement that "we are aligned with the PGA

44

1  Tour in opposing an alternative golf league, in the strongest possible terms."

2      135.    Just over a week later, on May 12, 2021, European Tour Commissioner Keith Pelley

3  wrote to representatives of Golf Saudi, noting its understanding that "Golf Saudi appears to be leading

4  the current pursuit of a new golfing enterprise, referred to widely as the Super Golf League or [LIV

5  Golf]." Commissioner Pelley wrote that the European Tour believed Golf Saudi was "talking to our

6  members about joining this **rebel enterprise**." In an effort to deter Golf Saudi from supporting a new

7  entrant, Commissioner Pelley threatened that the European Tour would refuse to co-sanction the Saudi

8  International (which the European Tour had co-sanctioned since 2019) unless Golf Saudi "publicly

9  denounce[d] [LIV Golf]."

10      136.    Commissioner Pelley also made clear that his threats to Golf Saudi were in furtherance

11  of the European Tour's anticompetitive agreement with the Tour to lock arms in a global "ecosystem"

12  to foreclose LIV Golf's entry:

13          We had, and indeed still have, aspirations of working with Golf Saudi in
continuing to build the Saudi International into a world class event, and indeed
14          look for other opportunities and have shared this view with our Strategic
Alliance partners at the PGA TOUR.
15

16          It is, however, impossible for us to continue those discussions while Golf Saudi
is championing an alternative Tour that we believe is detrimental to both the
European Tour, the PGA TOUR and global professional golf.  I know PGA
17          TOUR Commissioner Jay Monahan feels the same.

18          We would therefore encourage you in the strongest possible terms to publicly
denounce SGL as soon as possible which would allow us to reopen dialogue
19          about the Saudi International and how Golf Saudi, operating *inside* the
ecosystem, could resume the joint vision we began in 2017.[5]
20

21      137.    The Tour and the European Tour also threatened other prospective partners of LIV Golf,

22  making clear that they will seek to punish those who support LIV Golf by excluding them from the so-

23  called world golf "ecosystem."  For example, LIV Golf sought to enter into a relationship with the

24  Asian Tour to co-sanction LIV Golf's tournaments to ensure that players would qualify for OWGR

25  points (which, as described above, is essential to the long-term success of an elite level tour) and to

26  establish a broader relationship for investment in the Asian Tour to grow the sport globally.  In

27   

28  [5] "SGL" in Commissioner Pelley's email stands for Super Golf League and refers to the entity and
potential entrant that is now known as LIV Golf.

response, the European Tour sent a list of "Consequences" to the CEO of the Asian Tour—under the logos of the European Tour and the PGA Tour—that the Asian Tour would suffer if it entered into any partnership with LIV Golf. Those consequences included (1) eliminating a "[p]athway for Asian Tour members onto European Tour," (2) taking away "[e]xisting tournaments we co-sanction, totaling in excess of US$10m of prize money and 250 playing opportunities," (3) eliminating all future "co-sanctioned tournaments between the European Tour/PGA TOUR and Asian Tour" and (4) the Asian Tour would lose its "[p]osition within existing global golf ecosystem." Notably, the European Tour and Tour threatened not only to punish the Asian Tour directly, but to punish golfers on the Asian Tour by eliminating a "pathway for Asian Tour members onto [the] European Tour" and by removing prize money that had previously been available to Asian Tour members. Despite these threats, LIV Golf was able to offer constructive collaboration and investment in the Asian Tour sufficient to convince the Asian Tour to partner with LIV Golf in the face of the threats from the European Tour and Tour.

138.  Despite these threats, LIV Golf and its sponsors continued in the effort to work constructively with existing golfing bodies to grow the sport. For example, on July 5, 2021, representatives of the entities that would sponsor LIV Golf met in Malta with leaders of European Tour. They presented an offer that would have made the European Tour a partner in innovating in the sport worth up to $1 billion for the European Tour. As reflected in the meeting minutes provided by a representative of the European Tour's title sponsor (DP World), the representatives from European Tour were "[g]rateful for the detailed work and preparation" and "[c]onfirmed" the LIV Golf series had "appeal and fit." However, the European Tour representatives "**stated main issue is US PGA mighty power and need to avoid a collision course between ET and PGA**." Simply put, partnering with LIV Golf was good for the European Tour, its members, and the sport of golf, but the European Tour feared the "mighty power" of the PGA Tour, turning down the opportunity to partner with LIV Golf because of its "need to avoid a collision course between ET and PGA."

139.  When Golf Saudi did not yield to Commissioner Pelley's May 2021 demand that it "publicly denounce" LIV Golf, the European Tour followed through on its threat to refuse to continue sanctioning the Saudi International. Then, in August 2021, the Tour announced through the press that it would not grant any PGA Tour members conflict releases for the Saudi International as it had done

1    since 2019, because the Saudi International was no longer sanctioned by the European Tour.

2        140.   In response to the PGA Tour's threats to deny releases to play in the Saudi International,

3    the players expressed their concerns:

4           a.   Sergio Garcia: "When you get banned from playing, or whatever, it hurts the game. . . .

5               People want to see us play all around the world and enjoy us wherever we go."

6           b.   Rory McIlroy: "My view as a professional golfer is I'm an independent contractor, I

7               should be able to play where I want if I have the credentials and I have the eligibility to

8               do so. . . . Just the one thing I would worry about is if guys want to go to Saudi and they

9               are going to make ten percent of their yearly income just by going and playing and [the

10               PGA Tour is] restricting them from doing that, punishing them, that creates resentment

11               for the players and that creates a problem between the tours."

12           c.   Xander Schauffele: "I feel like there just needs to be some sort of counter in the way

13               certain things work. I'll try and do what I need to do, and they'll tell me what I can and

14               can't do at a certain point, but I feel like they need to counter. They can't just tell me

15               no, you can't do this and then just kick rocks, kid. That's not really how I'd want to do

16               things."

17        141.   Despite the Tour's threat, the demand from the Tour members to play in this non-Tour-

18    sanctioned event was so strong that over 30 players (including Plaintiffs Mickelson and DeChambeau)

19    sought releases to play in the Saudi International. In response to this pressure from the players, the

20    Tour granted the release requests under the Conflicting Events and Media Rights Regulations, but

21    imposed conditions on the players (including Plaintiffs). The Tour informed players that the

22    Regulations fully supported the denial of the players' requests but that it would permit players to play

23    in the Saudi International provided that: (1) players who have not played in the AT&T Pebble Beach

24    Pro-Am (a PGA Tour event that takes place annually in this district) at least once in the last five years

25    must commit to playing Pebble Beach at least twice in the next three years; and (2) players who have

26    played Pebble Beach at least once in the last five years must commit to play Pebble Beach at least once

27    in the next two years. The Tour did not impose these conditions and restrictions when it granted past

28    releases—it did so only after Golf Saudi refused the threat to denounce and boycott LIV Golf.

142.    In a message to European Tour members, Commissioner Pelley made clear that the opposition to having players participate in the Saudi International, which the European Tour had co-sanctioned from 2019 to 2021, was an attack on competition from LIV Golf, which he described as "a clear existential threat." As Commissioner Pelley stated, "we have done everything we can to encourage the Asian Tour and LIV Investments to play within our ecosystem," letting golfers play for a partner of LIV Golf would "damage" our business. Commissioner Pelley was blunt in conceding that the tours are acting to protect their own business interests, which diverge from the interests of the players whom they are supposed to support: "We want the best for our members but at the same time will vehemently do everything we can to protect your Tour."

143.    Similarly, on December 16, 2021, the PGA Tour and European Tour flexed the muscle of their group boycott and made good on their threats to the Asian Tour. After the Asian Tour accepted investment and partnership with LIV Golf, Asian Tour CEO Cho Minn Thant received a call from Martin Slumbers, the CEO of the R&A, which hosts The Open. Mr. Slumbers told Mr. Thant that the R&A would end its years-long practice of giving the Asian Tour Order of Merit winner entry into The Open because the PGA Tour and European Tour, with whom the R&A was aligned, were displeased about LIV Golf's investment in the Asian Tour. Days later, the media confirmed the R&A would revoke the Asian Tour Order of Merit winner's entry into the Open, identifying punishment of LIV Golf as the basis for harming individual Asian Tour players. Once again, the Tour and those it was pressuring were attacking LIV Golf and its partners by punishing golfers who had any association with LIV Golf.

144.    As LIV Golf's player recruitment efforts continued, the Tour encouraged the European Tour to tighten its grip on its members and ensure they would not leave the "ecosystem" to play with LIV Golf. In threatening and imposing punishment on European Tour members, Commissioner Pelley made clear that it was doing so (1) pursuant to its agreement with the PGA Tour, (2) in an effort to thwart competition from LIV Golf, and (3) that the punishments were aimed at coercing players to act contrary to their individual interests. For example, on April 19, 2022, Commissioner Pelley wrote to European Tour members, reminding them of the European Tour's Conflicting Events Regulation. He stated: "Conflicting events, regardless of how attractive they might appear to you personally,

potentially compromise our efforts in these areas and could significantly hurt your Tour in both the short and long term." He continued: "Please, therefore, continue to bear this bigger picture in mind, particularly considering some of these conflicting events in 2022 are scheduled directly opposite some of our most prestigious 'heritage events.'" He also stated: "We are unwavering in our belief that working together with PGA Tour . . . will make our sport less fractured and benefit global golf."

145.    As part of their concerted efforts to tighten the reins, on June 24, 2022, the PGA Tour and European Tour suspended golfers who participated in the initial LIV Golf tournament from their three co-sanctioned events—the Scottish Open, Barbasol, and Barracuda Championships—and fined the suspended golfers €100,000. They further threatened to double the sanctions for future violations (which all participants in the second LIV Golf tournament in Portland, Oregon had already committed).

146.    Just four days later, on June 28, 2022, the PGA Tour and the European Tour announced a further agreement to solidify their strategic alliance whereby: (1) the PGA Tour invested more in the European Tour Productions (the European Tour's media arm) to take a 40 percent share; and (2) the PGA Tour arranged for the European Tour to be a direct feeder tour into the PGA Tour, with the top 10 performing golfers on the European Tour earning PGA Tour cards. In a press conference announcing the agreement, when asked whether players who play in LIV Golf events could earn the tour cards, European Tour Commissioner Pelley and PGA Tour Commissioner Monahan both struggled to answer, until Commissioner Pelley conceded their plan to impose total bans on golfers who participate in LIV Golf events: "This won't come into place until next year and I honestly don't think we'll have that problem by then" because LIV Golf players will not be permitted to play on the European Tour to earn a PGA Tour card.

147.    The PGA Tour's agreement with the European Tour to form a group boycott against LIV Golf and its players is further reflected in the punishments the European Tour imposed on its members who participated in LIV Golf events. The European Tour has historically considered playing in a competing event without a release to be a minor breach of its Regulations, with a punishment of €12,000 for a violation. In contrast, when its members participated in the first LIV Golf event, the European Tour issued punitive sanctions at the behest of the Tour, including fines of approximately €100,000 and suspensions from the three events the European Tour co-sanctions with the PGA Tour

AMENDED COMPLAINT – DEMAND FOR JURY TRIAL
CASE NO. 5:22-cv-04486-BLF

1   (but not other European Tour events not co-sanctioned by the PGA Tour), and threatened that

2   participating in further LIV Golf events would lead to double fines and suspensions. To engineer these

3   punishments, the European Tour first amended its regulations twice—after entering into the illegal

4   alliance with the PGA Tour—to make the relevant violation of the European Tour's Regulation a

5   "Serious Breach," which would give the Commissioner discretion to punish players and expand the

6   scope of the Regulation.

7      148.   On July 1, 2022 three of the golfers suspended from the co-sanctioned events, Ian

8   Poulter, Adrian Otaegui, and Justin Harding, sued the European Tour to stay their suspensions and

9   allow them to participate in the Scottish Open. The players challenged the European Tour's sanction

10  process as unfair and partial, and challenged the legality of its regulations. They also challenged the

11  sanctions as contrary to the European Tour's interest, as it was clear the European Tour was acting in

12  concert with the PGA Tour.

13     149.   The matter was referred to an arbitrator (pursuant to European Tour rules and an

14  agreement between the players and the European Tour to stay the players' suit), who granted the

15  players' request to stay their suspension from the Scottish Open until the merits of their appeal could

16  be heard before an independent panel.  The arbitrator reasoned that European Tour CEO and

17  Commissioner Keith Pelley undertook "no process . . . close to replicating the guidelines for a

18  disciplinary hearing" and "was on record as having made strong adverse public statements on LIV,"

19  and, as the European Tour stated itself, he was "'necessarily partial.'"

20     150.   On July 1, 2022, the PGA Tour demonstrated its power over the European Tour, and

21  laid bare its anticompetitive motives in banning participants in LIV Golf events from its tournaments,

22  by banning from the co-sanctioned events in the United States (the Barbasol and the Barracuda) all

23  European Tour golfers in good standing who had played in the LIV Golf London Invitational. These

24  golfers were not members of the PGA Tour, and thus could not have violated any PGA Tour rule. And

25  even though they are members of the European Tour, they had not violated any European Tour rule

26

27

28

50
AMENDED COMPLAINT – DEMAND FOR JURY TRIAL
CASE NO. 5:22-cv-04486-BLF

because they were permitted by the European Tour to participate in the LIV Golf event.[6] Nonetheless, the PGA Tour barred these golfers from playing in co-sanctioned events, because the PGA Tour has a policy of total foreclosure of LIV Golf players from any of its events.

151.    On July 20, 2022, in furtherance of its agreement with the Tour to boycott LIV Golf and those who associate with it, the European Tour removed Henrik Stenson as the European Team's 2023 Ryder Cup Captain because he joined LIV Golf.

### PGA Tour Leans on the Majors to Do Its Bidding Against LIV Golf

152.    The Tour's threats to impose bans on players who join LIV Golf are vastly strengthened if the ban encompasses not only PGA Tour events, but also the four annual Major Championships— the PGA Championship, the Masters, the Open, and the U.S. Open—as well as the biannual Ryder Cup.  Participating in and winning the Majors and the Ryder Cup are the ultimate goal of most top professional golfers.  And, in turn, one of the goals of playing on a tour each year is to secure qualification to the Majors and the Ryder Cup.  The Tour is aware that if it can foreclose LIV Golf players from having access to these events—or even create enough credible doubt about whether participation in LIV Golf will end a player's chance of playing in those events—LIV Golf will find it prohibitively difficult to sign and sustain a critical mass of players to field a competitive elite-level tour.  Accordingly, the Tour has pressured and encouraged the Major organizations to join its group boycott and to prevent LIV Golf from entering the global golf ecosystem.

153.    For example, PGA Tour Commissioner Jay Monahan wrote in his January 2020 Memorandum: "We have liaised with each [Major] organization to learn of its position regarding Private Equity Golf."

154.    As with the Tour's ramping up of its player threats over time as the threat of LIV Golf's competitive entry has grown, the Tour's pressure on the Major organizations has grown over time as well. For example, as part of its strategy to pressure the Majors into doing its bidding, in July 2022, the Tour had its 2022 Presidents Cup Captain and Hall of Fame Golfer Davis Love III use his position

---

[6]  The golfers did not need a release from the European Tour to play in the LIV Golf London event because they had not qualified for the conflicting event on the European Tour. Thus, the golfers had not breached any European Tour rule and were not subject to any discipline from the European Tour.

AMENDED COMPLAINT – DEMAND FOR JURY TRIAL
CASE NO. 5:22-cv-04486-BLF

1   and influence to publicly encourage Tour members to enter into a group boycott of the Majors if the

2   Majors do not ban all players who have played in LIV Golf. As Mr. Love stated, in encouraging a *per*

3   *se* unlawful group boycott among Tour members: "Well, here's the biggest lever; and it's not the nice

4   lever. But if a group of veterans and a group of top current players align with 150 guys on the Tour,

5   and we say, 'Guess what? We're not playing,' that solves it, right? If LIV guys play in the U.S. Open,

6   we're not playing. If they sue in court, and they win, well, we're not playing. You know, there won't

7   be a U.S. Open. It's just like a baseball strike." As Mr. Love's comments make clear, the Tour and its

8   representatives view themselves as being above the law, exempt from the requirements of the Sherman

9   Act, and free to engineer a self-help group boycott aimed at frustrating any injunction entered by this

10  Court.

11          155.    *The PGA Championship and the Ryder Cup.* The PGA of America is a separate entity

12  from the PGA Tour, which organizes the PGA Championship and co-organizes the Ryder Cup along

13  with the European Tour. The PGA of America has a representative, President Jim Richerson, on the

14  PGA Tour Policy Board. On May 4, 2021, during a time when LIV Golf was gaining momentum in

15  attracting players' interest and on the eve of the PGA Championship in South Carolina, the CEO of the

16  PGA of America, Seth Waugh, stated publicly that the PGA of America was aligned with the Tour in

17  opposing LIV Golf's competitive entry. Specifically, he said, "We [PGA of America] are in full

18  support of the PGA Tour and the European Tour regarding the current ecosystem of the professional

19  game." Then, two weeks later, Mr. Waugh said that the PGA of America would ban players from

20  future PGA Championships and the Ryder Cup if they joined LIV Golf. Specifically, Mr. Waugh said,

21  "If someone wants to play on a Ryder Cup for the U.S., they're going to need to be a member of the

22  PGA TOUR—excuse me, a member of the PGA of America, and they get that membership through

23  being a member of the TOUR. . . . It's a little murkier in our championship, but to play from a U.S.

24  perspective you also have to be a member of the TOUR and the PGA of America to play in our

25  championship, and we don't see that changing." Mr. Waugh went on to state, "I believe the Europeans

26  feel the same way. And so I don't know that we can be more clear than that." Mr. Waugh's public

27  threat inaccurately characterized the PGA of America's Constitution, as there are many ways to be a

28  member of the PGA of America beyond being a member on the PGA Tour.

AMENDED COMPLAINT – DEMAND FOR JURY TRIAL
CASE NO. 5:22-cv-04486-BLF

156.     At the September 2021 Ryder Cup, PGA of America representatives privately threatened golfers and their representatives that they would be banned from future Ryder Cups and the PGA Championship if they joined LIV Golf.

157.     Mr. Waugh repeated the threat a year later at the 2022 PGA Championship. He said, "As I said, we're a fan of the current ecosystem and world golf ranking system and everything else that goes into creating the best field in golf. Right now we really—I don't know what it'll look like next year. We don't think this [LIV Golf] is good for the game and we are supportive of that ecosystem. We have our own bylaws that we will follow towards those fields." He was then asked by the media, "I'm sorry do your bylaws preclude letting those players [players who played in LIV Golf] play?" Mr. Waugh responded, "Not specifically, but our bylaws do say that you have to be a recognized member of a recognized Tour in order to be a PGA member somewhere, and therefore eligible to play."

158.     And then, in June 2022, the 2023 PGA of America Ryder Cup Captain Zach Johnson repeated the same unfounded threat and expanded it to suggest that Plaintiffs will not be eligible for the 2023 Ryder Cup. When he was asked by the media whether a player who plays in LIV Golf will be eligible for his 2023 Captain Picks, he responded, "The way that we're members of the PGA of America is through the PGA Tour. I'll let you connect the dots from there."

159.     *The Open.* The R&A, the global golf rules organization and promoter of The Open Championship, has taken multiple actions to support the PGA Tour's efforts to exclude LIV Golf. For example, the R&A has taken away the Asian Tour's Order of Merit winner's entry into the Open Championship in order to deter the Asian Tour from partnering with LIV Golf. Similarly, the CEO of the R&A (Martin Slumbers) and the Chairman of Augusta National (Fred Ridley) called the CEO of the Asian Tour (Cho Minn Thant) to threaten consequences relating to the Asian Tour's position in the current "ecosystem" if the Asian Tour continued to support LIV Golf and its LIV Golf Invitational Series. More recently, in July 2022, the R&A demonstrated its alignment with the PGA Tour by publicly disinviting two-time Open Championship winner Greg Norman from champions events at the 150th Open Championship because he is the CEO of LIV Golf. The R&A also informed Mr. Mickelson he was not welcome. And, at the Open Championship in July 2022, R&A CEO Martin Slumbers suggested that players who play in LIV Golf may not be eligible or qualify for future Open

Championships, and that it would be harder for them to make it in the tournaments.

160.    *The Masters.*  Augusta National, the promoter of The Masters, has taken multiple actions to indicate its alignment with the PGA Tour, thus seeding doubt among top professional golfers whether they would be banned from future Masters Tournaments.  As an initial matter, the links between the PGA Tour and Augusta National run deep.  The actions by Augusta National indicate that the PGA Tour has used these channels to pressure Augusta National to do its bidding.  For example, in February, 2022 Augusta National representatives threatened to disinvite players from The Masters if they joined LIV Golf.  In addition, Augusta National Chairman Fred Ridley personally instructed a number of participants in the 2022 Masters not to play in the LIV Golf Invitational Series.  Plainly, these threats to top players served no beneficial purpose, as they would only serve to weaken the field in the Masters.

161.    In May, 2022 the PGA Tour also encouraged Augusta National representatives to attend Tour Player Advisory Council meetings to discuss ramifications for players participating in LIV Golf events, further demonstrating how the Tour has leaned on Augusta National to aid it in dissuading golfers from joining LIV Golf.

162.    And, when LIV Golf CEO Greg Norman asked Mr. Ridley if he would meet with him to understand LIV Golf's business model and discuss how LIV Golf could operate in the existing professional golf world, Mr. Ridley declined the invitation—another example of LIV Golf trying to work with existing golfing entities and being turned away before even getting an opportunity to show them what LIV Golf is about.

163.    In addition, the Tour and others are utilizing their positions on the Governing Board of the OWGR to create enough credible doubt about whether LIV Golf will be eligible for OWGR points and whether players who participate in OWGR will be able to earn points playing in LIV Golf tournaments.

**The Tour Announces Policy to Permanently Ban Players Who Join LIV Golf**

164.    Between January 2020 and February 2022, the Tour increased the severity of its threats of punishment to any player who would consider joining LIV Golf, as well as threats to the players' representatives and entities involved in golf sponsorship and advertisement.  These threats, both individually and in combination, were anticompetitive acts that harmed Plaintiffs and tortiously

1   interfered with the Plaintiffs' business relationships.

2       165.   With multiple press reports in early 2022 describing LIV Golf's forward momentum
3   and reporting that LIV Golf was nearing the critical mass needed to launch its tour, the Tour once again
4   increased its threats to the players. In February 2022, the Tour gathered the agents of players (including
5   the Player Plaintiffs' agents) who were assembled for a Tour event in Los Angeles, California and
6   informed them that the Tour would impose a lifetime ban on any player who signed with LIV Golf.
7   This threat was a significant deterrent for players to take the risk to join LIV Golf. At that time, LIV
8   Golf had not held its first tournament, and there was simply too great of a risk of career destruction in
9   the face of such unlawful and brazen threats. For example, one star player, who had been in favor of
10   joining the LIV Golf League before the threat, stated that younger players were "s***ting in [their]
11   pants" in response to this threat, and that he was not sure how LIV Golf could get the players it needed
12   with the Tour's lifetime ban threat.

13       166.   On February 22, 2022, Commissioner Monahan addressed a meeting of Tour players at
14   the Honda Classic and reiterated that any player who joined LIV Golf would receive a lifetime ban
15   from the Tour. According to an article quoting an anonymous player present at the meeting,
16   Commissioner Monahan told players that if they were going to play in the league operated by LIV Golf
17   to "walk out that door now" and "made the ban seem like it was in all capital letters."

18       167.   The Tour's threats of punishment and career destruction greatly affected LIV Golf's
19   ability to sign enough elite professional golfers to fill out its League. Some players (including Plaintiff
20   DeChambeau) who had previously signed contracts with LIV Golf were forced to publicly profess
21   loyalty to the Tour. Other players who had previously agreed in principle to all terms with LIV Golf
22   informed LIV Golf that they now could not sign, and instead publicly professed loyalty to the Tour.
23   Players who had been enthusiastic about joining LIV Golf informed LIV Golf that they regrettably
24   could not join in light of these threats. Just as Commissioner Monahan had predicted in his 2020
25   Memorandum outlining the PGA Tour's plan to attack a new entrant, a competing tour without player
26   support would prove unable to pose a competitive threat to the PGA Tour.

27       168.   The Tour's lifetime ban policy had its desired effect, as LIV Golf League's 2022 launch
28   plan died. LIV Golf was injured by having its launch plans derailed. And Player Plaintiffs were injured

by losing the opportunity for increased playing and income opportunities and sustained competition for their services.

### LIV Golf Invitational Series

169.    Forced to scrap its plans for a 2022 launch of the League, LIV Golf regrouped and developed a substantially scaled-down launch plan that became known as the LIV Golf Invitational Series. The Invitational Series did not include franchised teams or other planned League features, and promised two fewer events in 2022.  Instead, on March 16, 2022, LIV Golf announced that the Invitational Series would feature an eight-event series showcasing a new golf format starting in June 2022.  The format features both individual and team play, and offers more than $250 million in prize purses. The first seven LIV Golf Invitational Series events each carry a purse of $25 million, comprised of $20 million in individual prizes (all players in the field earn a share) and $5 million, split among the top three teams. Following the first seven LIV Golf Invitational Series events, an Individual Champion will be crowned and a $30 million bonus prize will be split among the top three individual performers throughout the series.  The eighth LIV Golf Invitational Series event will be a Team Championship that will provide an additional $50 million in total prize funds.  The LIV Golf Invitational 2022 schedule started with the LIV Golf London Invitational on June 9–11, 2022, the LIV Golf Portland Invitational at the Pumpkin Ridge Golf Club on June 30–July 2, 2022, and the LIV Golf New York Invitational in Bedminster, New Jersey on July 29–31, 2022. The remaining LIV Golf scheduled events are:

- Sept. 2–4:  The International – Boston, Massachusetts
- Sept. 16–18:  Rich Harvest Farms – Chicago, Illinois
- Oct. 7–9:  Stonehill Golf Club – Bangkok, Thailand
- Oct. 14–16:  Royal Greens Golf Club – Jeddah, Saudi Arabia
- Oct. 28–30:  Trump Doral Golf Course – Miami, Florida

170.    During weeks in which there is no LIV Golf Invitational Series tournament, LIV Golf encourages players to play wherever they choose, including Tour events, other events on other tours, or events that might be created in the future (and which are currently prevented from developing because of the Tour's restrictive rules).

171.    While LIV Golf has moved forward with its scaled-down plans for the Invitational

AMENDED COMPLAINT – DEMAND FOR JURY TRIAL
CASE NO. 5:22-cv-04486-BLF

Series, it has incurred financial losses that were far more severe than it would have incurred if its original launch plans had not been derailed by the Tour's anticompetitive conduct. These losses are partly due to the supracompetitive increases to player-acquisition costs it has incurred in light of the Tour's anticompetitive conduct, and partly due to the loss in revenue-generating opportunities as a result of the scaled-down nature of the Invitational Series in comparison to the original plans for the League.

## Efforts to Prevent and Harm LIV Golf's Invitational Series

172.    On March 15, 2022, LIV Golf Commissioner and CEO Greg Norman sent emails regarding the LIV Golf Invitational Series to approximately 250 top professional golfers (including Plaintiffs). The Player Plaintiffs were excited that LIV Golf was going to host tournaments despite the obstacles the Tour put in its path. On March 23, 2022, LIV Golf formally invited the same group of players to participate in the LIV Golf Invitational Series. Several players (including the Player Plaintiffs) reached out to LIV Golf to say that they were interested in playing in the Invitationals, but they were concerned about doing so in light of the Tour's threats to players. The Player Plaintiffs remained interested in LIV Golf and continued discussions, as did others.

173.    The Player Plaintiffs and many other players (at least 170 golfers) filed entry applications for LIV Golf Invitational Series' first event. The Player Plaintiffs and, on information and belief, some 80 Tour members sought conflicting events and media rights releases from the PGA Tour under the Conflicting Events and Media Rights Regulations.

174.    In furtherance of its monopoly and its monopsony and its illegal agreement with the European Tour, on May 10, 2022, the Tour denied *all* requests from Tour members to participate in LIV Golf Invitational Series events. The denials were striking, because the Tour has historically granted releases to players to permit them to participate in events outside the U.S., but in this case the Tour issued an across-the-board denial for an event taking place in London. In its letter to the players denying the release requests, the Tour made clear that the reason it was departing from past practice was that LIV Golf planned to compete against the PGA Tour in North America:

> While releases have been granted in limited circumstances for one off-events outside North America or for events outside of North America on tours based exclusively outside of North America, the event for which you have requested

a release is the first in an eight-event "2022 LIV Golf Invitational Series" season, and more than half of them will be held in the United States.

175.    There is no possible procompetitive justification for the denial, particularly because—as the Tour acknowledged—it would have granted the release for another event or tour that was not trying to compete against the Tour. This was simply an effort to defeat competition.

176.    Then, unsatisfied with prohibiting all current Tour members from participating in LIV Golf events, the Tour extended its threat college golfers, explaining that if they played in any LIV Golf events they would be banned from entry into the PGA Tour University program, which provides top college golfers entry into the Tour's developmental tour (Korn Ferry Tour). Again, this action served no procompetitive purpose, nor could it plausibly be justified as an enforcement of any Tour member regulations, because the college golfers threatened by the Tour are not Tour members and are not bound by any Tour rules or regulations. Instead, this was simply aimed at thwarting competition by preventing LIV Golf from being able to secure top golfers to participate in its tournaments.

177.    On May 17, 2022, the European Tour acted in concert with the Tour and sent notices to its members denying them permission to participate in the LIV Golf Invitational Series event in London. The European Tour stated that the basis for the denial is that the LIV Golf Invitational Series event will compete with its European Tour event. Notably, however, the European Tour historically did not deny golfers' requests to participate in conflicting events.

178.    In response to these threats, LIV Golf was forced to commit to substantial up-front payments to a number of top golfers to convince the players to take on the risk of punishment from the Tour, as well as the risk of lost sponsorships and other injuries orchestrated by the Tour. These substantial payments have greatly increased LIV Golf's costs of launching its Invitational Series, and, if the Tour's conduct is not enjoined, the ongoing cash outlays significantly threaten the long-term viability of LIV Golf. Notably, however, while the increased payments have harmed LIV Golf, they also have not fully compensated the Player Plaintiffs for all of the injuries they have suffered as a result of the Tour's anticompetitive conduct, including both uncompensated monetary injury and ongoing irreparable injury in the form of lost professional playing and other opportunities that cannot be compensated through monetary relief. As such, both the Player Plaintiffs and LIV Golf have been injured and continue to suffer irreparable injury as a result of the Tour's anticompetitive conduct.

179.    On May 31, 2022, LIV Golf announced the field for its London Invitational.  In that announcement, the field included 16 PGA Tour players, 22 European Tour players, three promising young amateurs, and a number of other top players from across the world.  Players were very interested in the product.  But it was not the quality of field LIV Golf set out to have and was not the field of players LIV Golf would have had but for the PGA Tour's unlawful regulations and threats.

180.    Tour members who agreed to participate in the LIV Golf London Invitational publicly expressed the difficulty of doing so in light of the Tour's conduct.

    a.    For example, the agent for PGA Tour member Dustin Johnson released a statement that:  "Dustin has been contemplating this opportunity off-and-on for the past couple of years.  Ultimately, he decided it was in his and his family's best interest to pursue it.  Dustin has never had any issue with the PGA Tour and is grateful for all it has given him, but in the end felt this was too compelling to pass up."

    b.    Plaintiff Matt Jones averred that participating in the LIV Golf Invitational Series "was a good business opportunity for me and my family.  I like the concept, the idea of the three-day tournaments, [and] the team format aspect of things is great.  I have thought about that [threat of punishment from the PGA Tour], which is something I had to weigh.  I don't think banning players is a good look for the PGA Tour, or for golf in general."

    c.    PGA Tour member Graeme McDowell stated, "[t]he perceived consequences are definitely concerning.  It was an exceedingly difficult decision.  It is a difficult decision as a player when there's so many unknowns.  We do not know what the reaction is going to be. It just boils down to the fact that I am a business and I have operated all over the world for 20 years.  This is a compelling opportunity."

181.    Other Tour members who agreed to compete in the LIV Golf London Invitational welcomed the innovations LIV Golf brought to the game.  Player Plaintiff Swafford stated that LIV Golf's "[s]chedule is very enticing to a guy who has two small kids.  I think the format, the team aspect,

is going to be incredible. Look at Zurich [the Zurich Classic of New Orleans, which is a two-man team event], putting teams together turned an event that was in a tough part of the schedule into one that gets some incredible fields. I'm really looking forward to seeing how that works."

182.   After the LIV Golf field was announced, the PGA Tour Player Advisory Council held an emergency meeting with representatives from Augusta National present. They informed the golfers in attendance that the PGA Tour and Augusta National had agreed to work together to address LIV Golf. As described above, the threat of exclusion from the Masters (and the other Majors) is a powerful weapon in the Tour's arsenal to deter players from joining LIV Golf.

183.   On information and belief, the Tour also ramped up its pressure on sponsors to prevent them from doing business with players who join LIV Golf, including pressuring a number of sponsors to sever longstanding relationships with players.

184.   The Tour also continued its campaign of direct pressure on players to seek to convince them to withdraw from the LIV Golf event. The Tour sent letters to all Tour members listed in LIV Golf's May 31, 2022 press release, notifying them they were in violation of the PGA Tour Member Regulations and that the Tour Commissioner would take "appropriate course of action" against the players unless they withdrew from the LIV Golf Invitational Series event "in a manner reasonably satisfactory to the [PGA] Tour within forty-eight (48) hours." The European Tour sent similar notices to its members who were included in the LIV Golf Invitational Series field.

185.   The PGA Tour also enforced its Regulations on players agreeing to participate in LIV Golf Invitational Series who had not even qualified for the Tour but are members of the developmental Korn Ferry Tour owned by the PGA Tour (and subject to nearly identical Regulations). For example, the PGA Tour applied its Regulations to prohibit Korn Ferry Tour members Mr. Uihlein and Turk Pettit from participating in LIV Golf Invitational Series.

186.   The PGA Tour also sent a letter to Andy Ogletree, a Korn Ferry Tour Member, threatening him with punishment if he played in the LIV Golf event. In response, Mr. Ogletree reached out to Tour Vice President of Competition Administration Kristen Burgess regarding the Tour's denial of his release request. Mr. Ogletree explained that he had not qualified for the conflicting event on the Korn Ferry Tour taking place the same weekend as the London LIV Golf Invitational Series. Thus, his

60
AMENDED COMPLAINT – DEMAND FOR JURY TRIAL
CASE NO. 5:22-cv-04486-BLF

participation in the London LIV Golf Invitational Series event did not keep him from otherwise participating in a Korn Ferry Tour event (or, for that matter, a PGA Tour events). Mr. Ogletree informed the Tour that he had "spent thousands and thousands of dollars" in his unsuccessful effort to play in Korn Ferry Tour and PGA Tour events. He asked the PGA Tour: "Should I just sit at home on my couch next week and not make any money? It seems like this is your stance." Mr. Ogletree also noted the inconsistency of the Tour's stance since it had given Mr. Ogletree a release to participate in the Asian Tour International Series event from June 2–5, 2022 sponsored by LIV Golf. In response, the Tour cited the fact the LIV Golf Invitational Series will host events in the United States— specifically, that the LIV Golf Invitational Series competes with the Tour—as the basis for his event release denial.

187.     This episode highlights that there is no conceivable procompetitive justification for the Tour's punishment of players for participating in LIV Golf events. Mr. Ogletree was not going to play in any PGA Tour or Korn Ferry Tour event that weekend, because he was not qualified by those tours to participate in their events. The LIV Golf event thus did not pull Mr. Ogletree away from any PGA Tour event. Instead, it simply provided an opportunity for a player to pursue his trade and earn compensation, along with increasing overall output in the market. And yet the PGA Tour denied a release for Mr. Ogletree and subjected him to discipline for the offense of playing in a tournament when he otherwise would have been "just sit[ting] at home on [his] couch."

188.     It also demonstrates that the PGA Tour's opposition to LIV Golf is not based on the source of capital for LIV Golf events. The Tour granted a release to Mr. Ogletree to play in the Asian Tour event that was funded by LIV Golf, because the Asian Tour is not competing with the PGA Tour. But when Mr. Ogletree sought to participate in an event that the PGA Tour deemed a competitive threat, the Tour denied the release and threatened punishment against him.

189.     The Tour then went further to contact individually players who had chosen to play in the LIV Golf Invitational Series. Among them was Player Plaintiff Gooch. PGA Tour Chief Tournament & Competitions Officer Andy Pazder texted Mr. Gooch on June 2: "Just want to make sure you understand the implications of playing without an approved conflicting event release." Mr. Gooch responded, "Davis [Love III] called yesterday and said jay [Monahan, PGA Tour

Commissioner] is going to suspend, is this true?" In response, Mr. Pazder told Mr. Gooch that he would be banned from the Tour for life if he played in *one* LIV Golf Invitational Series event: "Our position has been that a player may choose to be a member of the Tour or to play in the Saudi/LIV events, but he can't do both. If the player chooses the latter, he should not expect to be welcomed back."

190.    On June 3, 2022, the PGA Tour sent an additional letter to all its members who had agreed to participate in the LIV Golf London Invitational, informing them: "pursuant to Article VII, Section C, you are being placed on probation until further notice. Specifically, as reflected in the Notice of Disciplinary Inquiry to you dated June 1, 2022, the rule infraction triggering your probation is violation of Article V, Section A.2 of the PGA Tour Player Handbook & Tournament Regulations ("Regulations"). Accordingly, if you violate any other rule of the PGA Tour while on probation including, but not limited to, violating Article V, Section B.1, which prohibits your participation in a live or recorded golf program, such as the LIV Golf Invitational London, for which a media release has been denied, the Commissioner may immediately suspend your playing privileges." Article VII, Section C of the PGA Tour Regulations relates to "conduct unbecoming a professional." Thus, the Tour told its members that the act of playing in a professional golf tournament constituted "conduct unbecoming a professional golfer."

191.    Simply put, the Tour's position that merely playing professional golf for another promoter constitutes "conduct unbecoming a professional" golfer is breathtaking. And it reveals the threat to competition that underlies the PGA Tour's Regulations giving the PGA Tour Commissioner absolute discretion to interpret the Regulations and punish its Members.

192.    On June 4, 2022, former Tour member Kevin Na resigned his PGA Tour membership due to the PGA Tour's refusal to permit him to participate in the LIV Golf Invitational Series. Mr. Na expressed his desire as an independent contractor to "exercise[e] my right as a free agent" to have "the freedom to play wherever I want," noting that he "cannot remain a PGA Tour member" and exercise his independent contractor rights due to the Tour's Regulations and threats. He expressed his "sad[ness]" and his desire that PGA Tour Regulations change to enable him to play on the PGA Tour again.

193.    In total, 10 Tour members who agreed to participate in the LIV Golf London Invitational resigned from the PGA Tour in response to these threats to avoid Tour punishment.

194.    When the Tour learned that members were considering resignation to avoid the punishments it had threatened, it informed them that "should a member resign in an effort to avoid disciplinary action for future violations of the Regulations, the member would still be subject to disciplinary actions for violations prior to the date of Resignation.  In addition, a player should not expect that he will be able to rejoin membership or play in any events without membership at any particular time, as such matters would be governed by the Regulations and event requirements in effect at the time, as they may be amended from time to time."  Most PGA Tour tournaments are managed by other nonprofit organizations and offer sponsorship exemptions to PGA Tour and non-PGA Tour golfers.  Thus, in order for the PGA Tour's written threat to play out it requires agreement from other economic actors (the sponsors and tournament hosts).

195.    Minutes after the golfers teed off at the LIV Golf London Invitational on June 9, 2022, the Tour distributed letters to its current and former members immediately suspending them and promising "the same fate [would] hold" for any Tour member playing in future LIV Golf events.

196.    Also on June 9, 2022, Commissioner Monahan sent a letter to all PGA Tour Members and released the letter to the public identifying the golfers the PGA Tour was punishing.  Contrary to its historical practices, the Tour sought to expose and malign these golfers for pursuing their profession. In particular, the PGA Tour Commissioner wrote:

        a.    Tour members, including the Player Plaintiffs and former members "are suspended or otherwise no longer eligible to participate in PGA Tour tournament play, including the Presidents Cup;"

        b.    The suspension applies to all tours sanctioned by the PGA Tour (Korn Ferry, Champions, Canada, Latinoamerica);

        c.    The golfers participating in the LIV Golf London Invitational Series "did not receive the necessary conflicting events and media rights releases—or did not apply for releases at all—and their participation . . . is in violation" of the Regulations;

d.   The Tour Commissioner made clear that any players "who participate in future [LIV Golf Invitational Series] events in violation of our Regulations" will suffer the "same fate" of suspension;

e.   Non-PGA Tour members who participated in LIV Golf Invitational Series "will not be permitted to play in PGA Tour tournaments as a non-member via a sponsor exemption or any other eligibility category;"

f.   The Commissioner tried to embarrass the Player Plaintiffs by claiming that they and others made "their own financial-based" choice and they cannot demand the same "PGA Tour membership benefits" as other golfers;

g.   The Commissioner further acknowledged that "there are true consequences for every shot" taken on the PGA Tour where a golfer could earn no compensation while paying for his travel to the event, whereas LIV Golf compensates its participants; and

h.   The Commissioner embraced the notion that the PGA Tour is the "preeminent organization in the world of professional golf."

197.   Also on June 9, 2022, the PGA Tour Vice President of Competition Administration, Kristen Burgess, sent letters to all former PGA Tour Members who participated in the LIV Golf London Invitational Series but had resigned from the Tour, informing them they "remain subject to disciplinary action for violations prior to the date of resignation" and they "should not expect that [they] will be able to rejoin membership or play in any events without membership at any particular time."

198.   The Tour expanded its punishments by threatening to revoke the agency credentials for agencies that represent golfers who join LIV Golf—thereby threatening to injure the agents' business for merely representing golfers who chose to join LIV Golf.

199.   The Tour also enlisted Tiger Woods to do its bidding and publicly criticize golfers—particularly younger golfers—for joining LIV Golf by suggesting they would never play in The Masters, The Open, or other Majors and would not earn OWGR points: "Some of these players may not ever get a chance to play in major championships. That is a possibility. We don't know that for sure yet. It's up to all the major championship bodies to make that determination. But that is a

possibility, that some players will never, ever get a chance to play in a major championship, never get a chance to experience this right here, walk down the fairways at Augusta National. . . , especially if the LIV organization doesn't get world-ranking points and the major championship change their criteria for entering the events." Mr. Woods' comments echoed earlier evidence indicating that the Tour was continuing to pressure the Majors to join the Tour's unlawful group boycott to exclude LIV Golf and punish any players who played in any LIV events.

## PGA Tour Disciplinary Process

200.    On June 9, 2022, PGA Tour Senior Vice President of Tournament Administration Andy Levinson sent letters to all PGA Tour Members who participated in the LIV Golf London Invitational Series event, including the Player Plaintiffs. In that Letter, Mr. Levinson informed golfers that (1) the PGA Tour considered them in violation of the Media Rights Regulation (V.B.1.b), (2) the PGA Tour considered them in violation of a PGA Tour Regulation against Public Attacks (VI.E.), (3) they were suspended immediately from playing in PGA Tour events "until further notice," and (4) they had 14 days to submit written statements and/or evidence that the PGA Tour Commissioner should consider "before determining an appropriate course of action separate from your current suspension."

201.    The PGA Tour's Regulations detail its Disciplinary Procedures and Appeals, which provide an unconscionable and unfair process by which the players have no legitimate chance of getting fair treatment as it relates to punishments having anything to do with LIV Golf. Exhibit 1. The Tour's Regulations provide that the Commissioner has discretion to hear the appeal in the first instance. The Commissioner can also transfer the appeal to a panel of three Tour policy board members. The procedures do not give the player a hearing as a matter of right. After the procedures conclude, the Regulations provide that a player has released any and all claims against "the PGA TOUR Policy Board, the Commissioner or the Appeals Committee, PGA TOUR, Inc., the Professional Golfers' Association of America, and each director, officer, member, employee, agent or representative of any of the foregoing." Thus, the Tour's Regulations are set up as follows:  (1) the Tour sets the Regulations which bind any player member, including changing those Regulations from time to time without input or consent from the player members, (2) the Regulations give the Commissioner the sole authority to interpret the Regulations in his discretion, (3) the Regulations demand that the biased Commissioner

serve as judge, (4) the Regulations allow that same biased Commissioner to hear any appeals, (5) the Regulations provide no independent review process, as the Tour Board is put in the position of reviewing a Tour commercial policy that it approved and executed over the last few years, and (6) at the end of it all, the Regulations purportedly provide that the player has no right to challenge the punishment having released all involved.   That release is unenforceable and the Regulations' Disciplinary Procedures are procedurally and substantively unconscionable.

202.   Several golfers submitted letters to the Tour challenging the Tour's indefinite suspension and objecting to any further course of action punishing the golfers.

203.   On June 29, 2022, and various other dates, the PGA Tour suspended the Player Plaintiffs until March 31, 2023, issued threats to extend the suspensions based on further violations of the Regulations, including (in the Tour's view) continuing to play in LIV Golf events or even to talk favorably about LIV Golf.   Commissioner Monahan considered the golfers in violation of the Conflicting Events Regulation and Media Rights Regulation.   Additionally, Commissioner Monahan considered the golfers in violation of the PGA Tour's Regulation Section VI.E ("Public Comments, Public Attacks") provision which provides that:

> The favorable public reputation of PGA TOUR, its players and its tournaments are valuable assets and create tangible benefits for all PGA TOUR members. Accordingly, it is an obligation of membership to refrain from making comments that unreasonably attack or disparage others, including, but not limited to tournaments, sponsors, fellow members/players and/ or PGA TOUR. Speech that could be reasonably viewed as hateful, abusive, obscene and/ or divisive is expressly prohibited. Responsible expressions of legitimate disagreement with PGA TOUR policies are not prohibited. However, public comments that a member knows, or should reasonably know, will harm the reputation or financial best interest of PGA TOUR, a fellow member/player, a tournament sponsor or a charity are expressly covered by this section. Any violation of this section shall be considered conduct unbecoming a professional.

Commissioner Monahan deemed the golfers' reasonable statements of opinion and compliments of LIV Golf in violation of this provision merely because favorable comments regarding a competitor to the PGA Tour supposedly could cause the Tour financial harm.

204.   The Tour's punishments put the players in an untenable position:   They were banned for roughly nine months, which prevents them from playing in PGA Tour events (and its subsidiary tours) and they have been told that if they play in any LIV Golf events while the suspensions are in

AMENDED COMPLAINT – DEMAND FOR JURY TRIAL
CASE NO. 5:22-cv-04486-BLF

1  effect, the Tour will deem that an additional violation and impose event greater punishments.  In effect,

2  the Tour's punishments amount to a lifetime ban, because the only chance for a player to be clear of

3  the PGA Tour's suspensions is to refrain from playing in any elite professional events—and thus

4  essentially drop out of his profession.

5      205.    On July 6, 2022, PGA Tour Board Member and President of the PGA Player Advisory

6  Council Rory McIlroy said that golfers who join LIV Golf are "basically leaving all [their] peers behind

7  to go make more money, which is fine.  But just go over there.  Don't try and come back and play over

8  here again."  Several years ago, Mr. McIlroy left the European Tour to play predominantly on the PGA

9  Tour, and was still permitted by the PGA Tour to remain a European Tour member through his

10  participation in the minimum number of events required by each tour.

11      206.    On July 13, 2022, the Player Plaintiffs appealed their nine-month suspension (and career

12  threatening ban from the PGA Tour).  The grounds for the players' appeals were:

13          a.    Provisions of Sections V.A.2, V.A.3, and V.B.1.b are plainly unlawful restraints

14              of trade that violate Section 2 of the Sherman Act, 15 U.S.C. § 2, and various

15              state laws, and therefore (1) no punishment for purportedly violating those

16              unlawful provisions may issue and (2) any purported agreement by any person

17              to adhere to those unlawful provisions is void and unenforceable;

18          b.    Commissioner Monahan and the PGA Tour (the "Tour") violate Section 2 of the

19              Sherman Act by applying Sections VII.E. and VII.C to unlawfully punish golfers

20              to thwart LIV Golf's competitive entry, and therefore no punishment for

21              purportedly violating those provisions may issue;

22          c.    Provisions of Sections V.A.2, V.A.3, and V.B.1.b enable Commissioner

23              Monahan to unlawfully control what independent contractor-golfers do when

24              they are not playing on the PGA Tour (the "Tour"), and thus no punishment for

25              purportedly violating those provisions may issue;

26          d.    The Tour has unlawfully agreed with other entities in the purported golf

27              "ecosystem," including the European Tour, to establish a group boycott to

28              prevent LIV Golf from succeeding and has targeted its Regulations to

AMENDED COMPLAINT – DEMAND FOR JURY TRIAL
CASE NO. 5:22-cv-04486-BLF

impermissibly punish golfers to carry out its coordinated dealings with others in violation of Section 1 of the Sherman Act, 15 U.S.C. § 1;

e.   Commissioner Monahan has violated the Tour's purported nonprofit purpose and violated his fiduciary duties to the Tour and its members by punishing golfers in this way;

f.   There was patent injustice and a lack of fair process because Commissioner Monahan cannot be impartial in his determination whether to sanction golfers because he has engaged in a two-year vendetta against prospective and new competitor professional golf promoter(s) and golfers are being punished for participating in a competitive promoter's events;

g.   There was injustice and a lack of fair process because the Regulations' Disciplinary Process is procedurally and substantively unconscionable; and

h.   In the alternative, the sanction imposed by Commissioner Monahan is grossly disproportionate to the seriousness of the alleged breaches of the Regulations that the Tour contends the players committed.

i.   In their appeal letters, Player Plaintiffs indicated their belief that their suspensions would be abated pending appeal of their suspensions.

207.   While some of the Player Plaintiffs' appeals of the Commissioner's disciplinary action were pending, on July 23, 2022, Mr. Levinson sent them a letter informing that: (1) the PGA Tour Commissioner believed they violated the Conflicting Events and Media Rights Regulations (Article V, Sections A.2 and B.1) by participating in the June 30 – July 2, 2022 LIV Golf Invitational Portland event; (2) the PGA Tour Commissioner imposed a Major Penalty of suspension from participation in any PGA Tour-affiliated tournaments, including PGA Tour, PGA Tour Champions, Korn Ferry Tour, PGA Tour Latinoamérica, and PGA Tour Canada, and a suspension of their privileges at Tournament Players Clubs, for a period ending no earlier than March 31, 2024 (an additional year suspension), at which time they may seek in writing to have their suspension lifted; (3) the PGA Tour Commissioner may impose further disciplinary action for any additional violation of the Regulations; and (4) they may appeal the sanctions by written notice to the PGA Tour Commissioner within 14 days of the letter.

AMENDED COMPLAINT – DEMAND FOR JURY TRIAL
CASE NO. 5:22-cv-04486-BLF

In other words, the PGA Tour Commissioner unilaterally imposed further sanctions—a full additional year of suspension for playing in a second LIV Golf tournament—while the appeal of the first Notice of Disciplinary Action was still pending.

208.    On July 25, 2022, the Tour informed the Player Advisory Council that golfers who were suspended for playing in LIV Golf would not be permitted to play in the FedEx Cup, even though some of their appeals of the suspensions were pending and should have been abated under the Tour's Regulations.

209.    On July 27, 2022, Commissioner Monahan referred some of the Player Plaintiffs' appeals to the Appeals Committee and requested that any materials in support of appeal be submitted by August 10, 2022.  In response, Plaintiff Gooch requested confirmation that the Tour would abate their suspensions pending appeal to the Appeals Committee.  In response, Commissioner Monahan indicated he would not abate the Player Plaintiffs' suspensions pending appeal.

210.    On July 29, 2022, Mr. Levinson informed some Player Plaintiffs that the Tour would no longer send them Notice of Disciplinary Inquiry letters for "ongoing violations."  The Tour thus chose to abandon its disciplinary process.

211.    And, then on August 2, 2022, the Tour informed Mr. Gooch that the Tour would not abate suspensions pending appeals in violation of the Tour's regulations.

212.    The Tour historically abated players' suspensions pending their appeal of their suspensions, consistent with Section VII.E.2 of the Regulations.

213.    The Player Plaintiffs' suspensions were a critical means employed by the Tour to achieve its anticompetitive end.  Punishing the players is essential to the scheme to eliminate competition in the market.  Absent participants in elite professional golf events, no nascent league can enter the market.  By suspending the Player Plaintiffs and threatening to suspend other players, the Tour endeavored to eliminate competition.

### Specific Player Plaintiffs' PGA Tour Disciplinary Proceedings and Harm

214.    **Phil Mickelson:** The Tour's anticompetitive scheme is apparent from the disciplinary action levied against Plaintiff Mickelson.  On March 22, 2022, the Commissioner suspended Plaintiff Mickelson (with the opportunity to apply for reinstatement in May of 2022) for, among other alleged

reasons, "attempting to recruit players to join [LIV Golf]." Following an appeal, the appeals committee (a three-person committee comprised of members of the Tour Policy Board) affirmed the Commissioner's two-month suspension. On June 20, 2022, Mr. Mickelson applied for reinstatement from the two-month suspension. The Tour denied his request, stating that Plaintiff Mickelson violated Tour regulations by participating in the LIV Golf London Invitational. In addition to denying his request for reinstatement, the Tour extended Plaintiff Mickelson's suspension, forbidding him from seeking reinstatement to play professional golf with the Tour until March 31, 2023. While Plaintiff Mickelson was suspended from tournament play, the Tour continued to levy suspensions. On July 23, 2022, the Tour imposed additional sanctions on him for participating in the LIV Golf Invitational in Portland. Specifically, the Tour extended Plaintiff Mickelson's suspension once again, deferring even the mere opportunity to apply for reinstatement until after March 31, 2024.

215.    Mr. Mickelson's unlawful two-year suspension from the PGA Tour has caused him irreparable professional harm, as well as financial, and commercial harm. The Tour's unlawful suspensions are denying Mr. Mickelson the right he has earned to play in events on the Tour, to earn compensation playing on the Tour, and to have the opportunities that come with such play. The Tour's suspension has denied Mr. Mickelson the right to the platform and the public exposure provided by playing on the Tour. The Tour's suspension has denied Mr. Mickelson the opportunity to hone and maintain his golf game by playing professional golf in the tournaments that he would choose to play. The Tour's suspension has denied Mr. Mickelson access to play professional golf before his fans via live attendance and video broadcast of Tour events. The Tour's unlawful conduct cost Plaintiff Mickelson endorsement deals and sponsorships. Notably, the Tour is the only golf tour shown regularly on broadcast television in the United States, and it earns vastly more in sponsorship, advertising, and broadcast revenue than any other golf tour. The Tour's unlawful conduct eliminated Plaintiff Mickelson's opportunity to earn up to $10 million annually in the Player Impact Program, a program that measures player impact by, among other things, calculating the player's Nielsen score (how often a player is featured during PGA Tour tournament broadcasts). The Tour's suspension has denied Mr. Mickelson the opportunity to earn FedEx Cup rankings and OWGR rankings. The Tour's suspensions have denied Mr. Mickelson the opportunity to earn deferred compensation pursuant to the

PGA Tour Player Retirement Plan—which is his right as a member of the Tour and which he earns for each tournament cut he makes. The Tour's unlawful suspensions have damaged Mr. Mickelson's goodwill and caused him substantial reputational harm. The Tour's unlawful Conflicting Events and Media Rights Regulations have denied Mr. Mickelson competition for his services for years, have depressed his earnings, and have decreased output of professional golf earning opportunities. The Tour's unlawful Conflicting Events and Media Rights Regulations Tour's unlawful control of Mr. Mickelson and his use of his media rights are causing him irreparable, financial and commercial harm that have denied him income and playing opportunities in the past and as long as the Regulations that give the Tour such purported control remain in place, Mr. Mickelson will be financially and irreparably harmed. As a lifetime member of the Tour, Mr. Mickelson is particularly harmed by the Tour wrongfully taking away what he has rightfully earned—opportunity to play in Tour events for the remainder of his golfing career.

216. The Tour's unlawful conduct has also denied Mr. Mickelson the opportunity to play in PGL tournaments and to earn compensation he foreseeably would have received competing in PGL tournaments.

217. The Tour's unlawful conduct has harmed Mr. Mickelson by denying him access to fans, viewers and playing opportunities in Tour events.

218. **Talor Gooch.** On June 9, 2022, the Tour unlawfully suspended Mr. Gooch on an indefinite basis from playing on the Tour. On June 30, 2022, the Tour unlawfully suspended Mr. Gooch from playing on the Tour (or any affiliated tours) through at least March 31, 2023. On July 23, 2022, the Tour unlawfully extended Mr. Gooch's suspension through at least March 31, 2024. The PGA Tour has threatened to impose further disciplinary sanction on Mr. Gooch if he continues to play in LIV Golf events when he is not playing on the Tour.

219. Mr. Gooch's unlawful two-year suspension from the PGA Tour has caused him irreparable professional harm, as well as financial, and commercial harm. The Tour's unlawful suspensions are denying Mr. Gooch the right he has earned to play in events on the Tour, to earn compensation playing on the Tour, and to have the opportunities that come with such play. The Tour's suspension has denied Mr. Gooch the strong chance to qualify for the 2023 Major Championships by

placing in the Top 30 of the 2022 FedEx Cup Rankings. The Tour's suspension has denied Mr. Gooch

the right to the platform and the public exposure provided by playing on the Tour. The Tour's

suspension has denied Mr. Gooch the opportunity to hone and maintain his golf game by playing

professional golf in the tournaments that he would choose to play. The Tour's suspension has denied

Mr. Gooch access to play professional golf before his fans via live attendance and video broadcast of

Tour events. The Tour's unlawful conduct cost Plaintiff Gooch endorsement deals and sponsorships.

Notably, the Tour is the only golf tour shown regularly on broadcast television in the United States,

and it earns vastly more in sponsorship, advertising, and broadcast revenue than any other golf tour.

The Tour's unlawful conduct eliminated Plaintiff Gooch's opportunity to earn up to $10 million

annually in the Player Impact Program, a program that measures player impact by, among other things,

calculating the player's Nielsen score (how often a player is featured during PGA Tour tournament

broadcasts). The Tour's suspension has denied Mr. Gooch the opportunity to earn FedEx Cup rankings

and OWGR rankings. The Tour's suspensions have denied Mr. Gooch the opportunity to earn deferred

compensation pursuant to the PGA Tour Player Retirement Plan—which is his right as a member of

the Tour and which he earns for each tournament cut he makes. The Tour's unlawful suspensions have

damaged Mr. Gooch's goodwill and caused him substantial reputational harm. The Tour's unlawful

Conflicting Events and Media Rights Regulations have denied Mr. Gooch competition for his services

for years, have depressed his earnings, and have decreased output of professional golf earning

opportunities. The Tour's unlawful Conflicting Events and Media Rights Regulations Tour's unlawful

control of Mr. Gooch and his use of his media rights are causing him irreparable, financial and

commercial harm that have denied him income and playing opportunities in the past and as long as the

Regulations that give the Tour such purported control remain in place, Mr. Gooch will be financially

and irreparably harmed.

220.    The Tour's unlawful conduct has also denied Mr. Gooch the opportunity to play in PGL

tournaments and to earn compensation he foreseeably would have received competing in PGL

tournaments.

221.    The Tour's unlawful conduct has harmed Mr. Gooch by denying him access to fans,

viewers and playing opportunities in Tour events.

222.   **Hudson Swafford.** On June 9, 2022, the Tour unlawfully suspended Mr. Swafford on an indefinite basis from playing on the Tour.  On June 29, 2022, the Tour unlawfully suspended Mr. Swafford from playing on the Tour (or any affiliated tours) through at least March 31, 2023.  On July 23, 2022, the Tour unlawfully extended Mr. Swafford's suspension through at least March 31, 2024.  The PGA Tour has threatened to impose further disciplinary sanction on Mr. Swafford if he continues to play in LIV Golf events when he is not playing on the Tour.

223.   Mr. Swafford's unlawful two-year suspension from the PGA Tour has caused him irreparable professional harm, as well as financial, and commercial harm.  The Tour's unlawful suspensions are denying Mr. Swafford the right he has earned to play in events on the Tour, to earn compensation playing on the Tour, and to have the opportunities that come with such play.  The Tour's suspension has denied Mr. Swafford the chance to qualify for the 2023 Major Championships by placing in the Top 30 of the 2022 FedEx Cup Rankings.  The Tour's suspension has denied Mr. Swafford the strong chance to qualify for the 2023 premier Invitationals on the Tour by placing in the Top 70 of the 2022 FedEx Cup Rankings.  The Tour's suspension has denied Mr. Swafford the right to the platform and the public exposure provided by playing on the Tour.  The Tour's suspension has denied Mr. Swafford the opportunity to hone and maintain his golf game by playing professional golf in the tournaments that he would choose to play.  The Tour's suspension has denied Mr. Swafford access to play professional golf before his fans via live attendance and video broadcast of Tour events.  The Tour's unlawful conduct cost Plaintiff Swafford endorsement deals and sponsorships.  Notably, the Tour is the only golf tour shown regularly on broadcast television in the United States, and it earns vastly more in sponsorship, advertising, and broadcast revenue than any other golf tour.  The Tour's unlawful conduct eliminated Plaintiff Swafford's opportunity to earn up to $10 million annually in the Player Impact Program, a program that measures player impact by, among other things, calculating the player's Nielsen score (how often a player is featured during PGA Tour tournament broadcasts).  The Tour's suspension has denied Mr. Swafford the opportunity to earn FedEx Cup rankings and OWGR rankings.  The Tour's suspensions have denied Mr. Swafford the opportunity to earn deferred compensation pursuant to the PGA Tour Player Retirement Plan—which is his right as a member of the Tour and which he earns for each tournament cut he makes.  The Tour's unlawful suspensions have

damaged Mr. Swafford's goodwill and caused him substantial reputational harm. The Tour's unlawful Conflicting Events and Media Rights Regulations have denied Mr. Swafford competition for his services for years, have depressed his earnings, and have decreased output of professional golf earning opportunities. The Tour's unlawful Conflicting Events and Media Rights Regulations Tour's unlawful control of Mr. Swafford and his use of his media rights are causing him irreparable, financial and commercial harm that have denied him income and playing opportunities in the past and as long as the Regulations that give the Tour such purported control remain in place, Mr. Swafford will be financially and irreparably harmed.

224.    The Tour's unlawful conduct has also denied Mr. Swafford the opportunity to play in PGL tournaments and to earn compensation he foreseeably would have received competing in PGL tournaments.

225.    The Tour's unlawful conduct has harmed Mr. Swafford by denying him access to fans, viewers and playing opportunities in Tour events.

226.    **Matt Jones.** On June 9, 2022, the Tour unlawfully suspended Mr. Jones on an indefinite basis from playing on the Tour. On June 30, 2022, the Tour unlawfully suspended Mr. Jones from playing on the Tour (or any affiliated tours) through at least March 31, 2023. On July 23, 2022, the Tour unlawfully extended Mr. Jones's suspension through at least March 31, 2024. The PGA Tour has threatened to impose further disciplinary sanction on Mr. Jones if he continues to play in LIV Golf events when he is not playing on the Tour.

227.    Mr. Jones's unlawful two-year suspension from the PGA Tour has caused him irreparable professional harm, as well as financial, and commercial harm. The Tour's unlawful suspensions are denying Mr. Jones the right he has earned to play in events on the Tour, to earn compensation playing on the Tour, and to have the opportunities that come with such play. The Tour's suspension has denied Mr. Jones the chance to qualify for the 2023 Major Championships by placing in the Top 30 of the 2022 FedEx Cup Rankings. The Tour's suspension has denied Mr. Jones the strong chance to qualify for the 2023 premier Invitationals on the Tour by placing in the Top 70 of the 2022 FedEx Cup Rankings. The Tour's suspension has denied Mr. Jones the right to the platform and the public exposure provided by playing on the Tour. The Tour's suspension has denied Mr. Jones the

opportunity to hone and maintain his golf game by playing professional golf in the tournaments that he would choose to play. The Tour's suspension has denied Mr. Jones access to play professional golf before his fans via live attendance and video broadcast of Tour events. The Tour's unlawful conduct cost Plaintiff Jones endorsement deals and sponsorships. Notably, the Tour is the only golf tour shown regularly on broadcast television in the United States, and it earns vastly more in sponsorship, advertising, and broadcast revenue than any other golf tour. The Tour's unlawful conduct eliminated Plaintiff Jones's opportunity to earn up to $10 million annually in the Player Impact Program, a program that measures player impact by, among other things, calculating the player's Nielsen score (how often a player is featured during PGA Tour tournament broadcasts). The Tour's suspension has denied Mr. Jones the opportunity to earn FedEx Cup rankings and OWGR rankings. The Tour's suspensions have denied Mr. Jones the opportunity to earn deferred compensation pursuant to the PGA Tour Player Retirement Plan—which is his right as a member of the Tour and which he earns for each tournament cut he makes. The Tour's unlawful suspensions have damaged Mr. Jones's goodwill and caused him substantial reputational harm. The Tour's unlawful Conflicting Events and Media Rights Regulations have denied Mr. Jones competition for his services for years, have depressed his earnings, and have decreased output of professional golf earning opportunities. The Tour's unlawful Conflicting Events and Media Rights Regulations Tour's unlawful control of Mr. Jones and his use of his media rights are causing him irreparable, financial and commercial harm that have denied him income and playing opportunities in the past and as long as the Regulations that give the Tour such purported control remain in place, Mr. Jones will be financially and irreparably harmed.

228.    The Tour's unlawful conduct has also denied Mr. Jones the opportunity to play in PGL tournaments and to earn compensation he foreseeably would have received competing in PGL tournaments.

229.    The Tour's unlawful conduct has harmed Mr. Jones by denying him access to fans, viewers and playing opportunities in Tour events.

230.    **Bryson DeChambeau.** On June 30, 2022, the Tour unlawfully suspended Mr. DeChambeau on an indefinite basis from playing on the Tour. On July 8, 2022, the Tour unlawfully suspended Mr. DeChambeau from playing on the Tour (or any affiliated tours) through at least March

31, 2023. The PGA Tour has threatened to impose further disciplinary sanction on Mr. DeChambeau if he continues to play in LIV Golf events when he is not playing on the Tour. On July 29, 2022, the Tour sent notice to Mr. DeChambeau that it was sanctioning him for talking to other Tour members about the positive experience he had had with LIV Golf.

231.    Mr. DeChambeau's unlawful suspension from the PGA Tour has caused him irreparable professional harm, as well as financial, and commercial harm. The Tour's unlawful suspensions are denying Mr. DeChambeau the right he has earned to play in events on the Tour, to earn compensation playing on the Tour, and to have the opportunities that come with such play. The Tour's suspension has denied Mr. DeChambeau the right to the platform and the public exposure provided by playing on the Tour. The Tour's suspension has denied Mr. DeChambeau the opportunity to hone and maintain his golf game by playing professional golf in the tournaments that he would choose to play. The Tour's suspension has denied Mr. DeChambeau access to play professional golf before his fans via live attendance and video broadcast of Tour events.   The Tour's unlawful conduct cost Plaintiff DeChambeau endorsement deals and sponsorships.  Notably, the Tour is the only golf tour shown regularly on broadcast television in the United States, and it earns vastly more in sponsorship, advertising, and broadcast revenue than any other golf tour. The Tour's unlawful conduct eliminated Plaintiff DeChambeau's opportunity to earn up to $10 million annually in the Player Impact Program, a program that measures player impact by, among other things, calculating the player's Nielsen score (how often a player is featured during PGA Tour tournament broadcasts). The Tour's suspension has denied Mr. DeChambeau the opportunity to earn FedEx Cup rankings and OWGR rankings.   The Tour's suspensions have denied Mr. DeChambeau the opportunity to earn deferred compensation pursuant to the PGA Tour Player Retirement Plan—which is his right as a member of the Tour and which he earns for each tournament cut he makes. The Tour's unlawful suspensions have damaged Mr. DeChambeau's goodwill and caused him substantial reputational harm.  The Tour's unlawful Conflicting Events and Media Rights Regulations have denied Mr. DeChambeau competition for his services for years, have depressed his earnings, and have decreased output of professional golf earning opportunities. The Tour's unlawful Conflicting Events and Media Rights Regulations Tour's unlawful control of Mr. DeChambeau and his use of his media rights are causing him irreparable, financial and

commercial harm that have denied him income and playing opportunities in the past and as long as the Regulations that give the Tour such purported control remain in place, Mr. DeChambeau will be financially and irreparably harmed.

232.   The Tour's unlawful conduct has also denied Mr. DeChambeau the opportunity to play in PGL tournaments and to earn compensation he foreseeably would have received competing in PGL tournaments.

233.   The Tour's unlawful conduct has harmed Mr. DeChambeau by denying him access to fans, viewers and playing opportunities in Tour events.

234.   **Ian Poulter**.  On June 9, 2022, the Tour unlawfully suspended Mr. Poulter on an indefinite basis from playing on the Tour.  On June 30, 2022, the Tour unlawfully suspended Mr. Jones from playing on the Tour (or any affiliated tours) through at least March 31, 2023.  On July 23, 2022, the Tour unlawfully extended Mr. Poulter's suspension through at least March 31, 2024.  The PGA Tour has threatened to impose further disciplinary sanction on Mr. Poulter if he continues to play in LIV Golf events when he is not playing on the Tour.

235.   Mr. Poulter's unlawful two-year suspension from the PGA Tour has caused him irreparable professional harm, as well as financial, and commercial harm.  The Tour's unlawful suspensions are denying Mr. Poulter the right he has earned to play in events on the Tour, to earn compensation playing on the Tour, and to have the opportunities that come with such play.  The Tour's suspension has denied Mr. Poulter the opportunity to participate in events that would have permitted him the chance to qualify for the Tour in 2023.  The Tour's suspension has denied Mr. Poulter the right to the platform and the public exposure provided by playing on the Tour.  The Tour's suspension has denied Mr. Poulter the opportunity to hone and maintain his golf game by playing professional golf in the tournaments that he would choose to play.  The Tour's suspension has denied Mr. Poulter access to play professional golf before his fans via live attendance and video broadcast of Tour events.  The Tour's unlawful conduct cost Plaintiff Poulter endorsement deals and sponsorships.  Notably, the Tour is the only golf tour shown regularly on broadcast television in the United States, and it earns vastly more in sponsorship, advertising, and broadcast revenue than any other golf tour.  The Tour's unlawful conduct eliminated Plaintiff Poulter's opportunity to earn up to $10 million annually in the Player

Impact Program, a program that measures player impact by, among other things, calculating the player's Nielsen score (how often a player is featured during PGA Tour tournament broadcasts). The Tour's suspension has denied Mr. Poulter the opportunity to earn FedEx Cup rankings and OWGR rankings. The Tour's suspensions have denied Mr. Poulter the opportunity to earn deferred compensation pursuant to the PGA Tour Player Retirement Plan—which is his right as a member of the Tour and which he earns for each tournament cut he makes. The Tour's unlawful suspensions have damaged Mr. Poulter's goodwill and caused him substantial reputational harm. The Tour's unlawful Conflicting Events and Media Rights Regulations have denied Mr. Poulter competition for his services for years, have depressed his earnings, and have decreased output of professional golf earning opportunities. The Tour's unlawful Conflicting Events and Media Rights Regulations Tour's unlawful control of Mr. Poulter and his use of his media rights are causing him irreparable, financial and commercial harm that have denied him income and playing opportunities in the past and as long as the Regulations that give the Tour such purported control remain in place, Mr. Poulter will be financially and irreparably harmed.

236. The Tour's unlawful conduct has also denied Mr. Poulter the opportunity to play in PGL tournaments and to earn compensation he foreseeably would have received competing in PGL tournaments.

237. The Tour's unlawful conduct has harmed Mr. Poulter by denying him access to fans, viewers and playing opportunities in Tour events.

238. **Peter Uihlein**. On June 9, 2022, the Tour unlawfully suspended Mr. Uihlein on an indefinite basis from playing on the Tour, the Korn Ferry Tour and any affiliated tours. On June 30, 2022, the Tour unlawfully suspended Mr. Uihlein from playing on the Tour, the Korn Ferry Tour, (or any affiliated tours) through at least March 31, 2023. On July 23, 2022, the Tour unlawfully extended Mr. Uihlein's suspension through at least March 31, 2024. The PGA Tour has threatened to impose further disciplinary sanction on Mr. Uihlein if he continues to play in LIV Golf events when he is not playing on the Tour or the Korn Ferry Tour.

239. Mr. Uihlein's unlawful two-year suspension from the PGA Tour and its affiliated tours, including but not limited to the Korn Ferry Tour, has caused him irreparable professional harm, as well

as financial, and commercial harm. The Tour's unlawful suspensions are denying Mr. Uihlein the right he has earned to play in events on the Korn Ferry Tour, to earn compensation playing on the Korn Ferry Tour, and to have the opportunities that come with such play. The Tour's suspension has denied Mr. Uihlein the opportunity to hone and maintain his golf game by playing professional golf in the tournaments that he would choose to play. The Tour's unlawful suspensions are denying Mr. Uihlein to the right he has earned to participate in the Korn Ferry Tour Championship Series finals (three events) to have a chance to earn a PGA Tour card for the 2022-2023 season. If Mr. Uihlein is prohibited from playing that series then he will have no other way to qualify for the PGA Tour next season. The Tour's suspension has denied Mr. Uihlein the right to the platform and the public exposure provided by playing on the Korn Ferry Tour (and possibly the Tour). The Tour's suspension has denied Mr. Uihlein access to play professional golf before his fans via live attendance and video broadcast of Korn Ferry Tour events (and possibly the Tour events). The Tour's suspension has denied Mr. Uihlein the opportunity to earn Korn Ferry season rankings (and possibly FedEx Cup rankings next season).and OWGR rankings. The Tour's unlawful suspensions have damaged Mr. Uihlein's goodwill and caused him substantial reputational harm. The Tour's unlawful Conflicting Events and Media Rights Regulations, which apply to Korn Ferry Tour members just as they apply to Tour member, have denied Mr. Uihlein competition for his services for years, have depressed his earnings, and have decreased output of professional golf earning opportunities. The Tour's unlawful Conflicting Events and Media Rights Regulations Tour's unlawful control of Mr. Uihlein and his use of his media rights are causing him irreparable, financial and commercial harm that have denied him income and playing opportunities in the past and as long as the Regulations that give the Tour such purported control remain in place, Mr. Uihlein will be financially and irreparably harmed.

240.   The Tour's unlawful conduct has also denied Mr. Uihlein the opportunity to play in PGL tournaments and to earn compensation he foreseeably would have received competing in PGL tournaments.

241.   The Tour's unlawful conduct has harmed Mr. Uihlein by denying him access to fans, viewers and playing opportunities in Tour events.

**Tour Threatens Small Businesses and Vendors To Boycott LIV Golf**

AMENDED COMPLAINT – DEMAND FOR JURY TRIAL
CASE NO. 5:22-cv-04486-BLF

242.    As part of its efforts to foreclose competition from LIV Golf and to foreclose competition for Plaintiffs' services, the Tour has also threatened companies and individuals in the golf and sports production industry that they will be blacklisted from working with the Tour if they work with LIV Golf. As a result of these unlawful threats, LIV Golf has suffered (and will continue to suffer) financial injuries because its offerings in the marketplace have been impaired and because it has been denied the opportunity to work with the third parties of its choice on terms that could be reached in a fair and open marketplace. Furthermore, this conduct threatens ongoing and irreparable harm to LIV Golf, as the headwinds created by the Tour's anticompetitive conduct threaten LIV Golf's competitive viability.

243.    In January 2022, LIV Golf was negotiating with a tent vendor, Arena Americas, about providing tents for LIV Golf events. Arena Americas indicated that it was interested in working with LIV Golf, and LIV Golf engaged Arena Americas for its LIV Golf Invitational Series. However, Arena Americas subsequently informed LIV Golf that it could not work with LIV Golf because the Tour had told Arena Americas that it would cease doing business with Arena Americas if it worked with LIV Golf.

244.    LIV Golf had contracted with a technology company to provide live scoring during LIV Golf events for fans watching and following along on the Internet. On March 23, 2022, LIV Golf received an email from that technology company that it needed to rescind the contract with LIV Golf due to a business issue and needed to discuss the issue with its attorney. The company later represented to LIV Golf that representatives from the PGA Tour had threatened that the Tour would cease doing business with it if it provided LIV Golf with support. The company also told LIV Golf that the PGA Tour has a "blacklist" for any vendor that works with LIV Golf. A Tour representative called the company and threatened to blacklist the company if it worked with LIV Golf.

245.    LIV Golf was in negotiation with Top Tracer to license its shot-tracing technology for use during LIV Golf broadcasts. The Chief Executive Officer of Top Tracer was engaged with LIV Golf on multiple calls, expressed major interest in providing LIV Golf with a license to Top Tracer technology and developing a broader relationship to deploy and develop innovative products. Suddenly, however, Top Tracer ceased communication with LIV Golf. After a period of radio silence,

Top Tracer informed LIV Golf that it would not be putting itself up for the potential business with LIV Golf.

246.    LIV Golf was in negotiation with Levelwear athletic apparel for LIV Golf volunteer apparel for LIV Golf Invitational Series event staffing.  On March 25, 2022, Levelwear informed LIV that it would not sell LIV Golf any apparel because it did not want to jeopardize its relationship with the Tour.

247.    LIV Golf reached out to numerous producer candidates, many of whom are independent contractors, who have communicated to LIV Golf that NBC and Golf Channel personnel have informed all producers that they will not be hired or renewed for any work with NBC or Golf Channel moving forward if they work with LIV Golf.

248.    Senior programming executives at CBS revealed to LIV Golf that they cannot touch LIV Golf even for consideration due to its relationship with the PGA Tour.

249.    LIV Golf tried to retain the Endeavor Company, which includes IMG, IMG Arena, IMG Media and WME, and despite interest in working with LIV Golf, they have told LIV Golf they cannot work with it because Tour Commissioner Monahan has impressed upon Ari Emmanuel (Endeavor CEO) and Mark Shapiro (Endeavor President) that Endeavor cannot work with LIV Golf.

250.    Other vendors, like Intersport (event management company) and Aggreko (Power/HVAC) engaged with LIV Golf but backed out without explanation, likely indicating that they were subjected to pressure from the PGA Tour similar to that expressed by other third-party vendors.

251.    LIV Golf negotiated with Provision Events, an event management company.  On February 15, 2020 Provision Events told LIV Golf, "we feel like we can provide exactly what you need and our ambition would be to become your activation partner."  Provision Events and LIV Golf corresponded regarding scope and arranged for a meeting to occur in March 2022. On March 10, 2022, Provision Events emailed LIV Golf and informed LIV Golf without explanation that it could no longer work with LIV Golf.

252.    To supply drug testing procedures for the competing athletes, LIV Golf contacted Drug Free Sport. A Drug Free Sport representative informed LIV Golf that it would have to take the prospect of doing business with LIV Golf to his boss because of Drug Free Sport's involvement with the Tour,

but stated that "we do business with other organizations, not sure why this would be any different." After checking with the "boss," the Drug Free Sport representative responded to LIV Golf, "I've spoken to our CEO and given current headwinds in our space, we won't be able to engage at this time."

253.   LIV Golf tried to negotiate with a golf shot technology company, Hawk Eye. Chris Wary of Hawk Eye emailed LIV Golf that "[u]pon careful consideration and following internal discussions, regrettably, at this point in time, we are not in a position to proceed any further with the potential delivery of these technologies due to conflict of interest with our existing relationships." The Tour is a Hawk Eye client.

254.   LIV Golf tried to schedule events at a premier golf course, Sentosa Golf Club. Bob Tan, Chairman of Sentosa Golf Club, informed LIV Golf that Dominic Wall of the R&A called him and informed him that Sentosa Golf Club would be excluded and shunned by the rest of the world of golf if it worked with LIV Golf.

255.   LIV Golf tried to engage Ticketmaster for ticketing at its events. Ticketmaster was prepared to work with LIV Golf until Ticketmaster pulled out of helping LIV Golf with ticket sales in response to pressure from the PGA Tour.

256.   LIV Golf tried to engage Pro Secrets, a yardage book company. Michael Etherington of Pro Secrets informed LIV Golf that the PGA Tour had asked Pro Secrets to not work with LIV Golf.

257.   LIV Golf tried to engage a company known as Cueto to provide software for organizing event volunteers. Cueto was prepared to work with LIV Golf until Cueto informed LIV Golf that it cannot work with LIV Golf "because of the threat it received from the PGA Tour."

258.   LIV Golf tried to order custom hats through American Needle hat company, and American needle informed LIV Golf that it does not want to do business with LIV Golf because of its relationship with the PGA Tour and Augusta National.

259.   LIV Golf tried to enter into a business relationship with Dick's Sporting Goods. In response, Dick's Sporting Goods informed LIV Golf that "[g]iven our relationship with the PGA Tour and our Tournament [PGA Tour Champions tournament], [] [Dick's Sporting Goods representatives] agree it's best to pass right now."

260.   The PGA Tour threatened numerous golf courses with adverse consequences if they

1  hosted LIV Golf events. LIV Golf secured commitments from pristine high level courses, but the PGA

2  Tour and the R&A retaliated against the owners of the venues with which LIV Golf contracted. The

3  R&A punished one golf course owner by adopting a policy that it would not host The Open at his

4  course in the future because he is giving LIV Golf "a platform," and as the R&A is "firmly on the side

5  of the traditional Tours [PGA Tour and European Tour]." The Tour informed the same golf course

6  owner that it would never work with the Tour again because it had worked with LIV Golf.

7       261.    In July 2022, LIV Golf's branding team, Czarnowski, terminated its relationship with

8  LIV Golf due to pressure from the PGA Tour.

9       262.    The Tour threatened sponsors that they would lose opportunities to partner with the

10  Tour if they worked with LIV Golf.

11                    **Relevant Markets and the PGA Tour's Monopoly Position**

12       263.    The PGA Tour is a monopolist and/or a monopsonist in two relevant product markets:

13  (1) the market for the services of professional golfers for elite golf events, and (2) the market for the

14  promotion of elite professional golf events.

15       264.    The relevant geographic market for each product market is national; in the alternative,

16  the market for each product market is global in scope.

17                    **The Market for Services of Professional Golfers for Elite Golf Events**

18       265.    The first relevant product market is the services of professional golfers for elite golf

19  events. A hypothetical monopsonist in this product market would have the power to suppress

20  compensation for golfers substantially below competitive levels for a sustained period of time, because

21  professional golfers who sell their services for elite golf events have no reasonable substitute to which

22  they could plausibly turn in the event of a suppression of compensation below competitive levels. For

23  example, non-elite golf events do not offer the level of purse sizes, Major qualifying opportunities,

24  public platforms, sponsorship opportunities, OWGR ranking opportunities, or the other attributes of

25  elite events that would make them viable options for professional golfers in the event that a hypothetical

26  monopsonist controlled the market for the purchase of services of elite golf events. This is

27  demonstrated in the evidence surrounding the PGA Tour, which has been able to impose sub-

28  competitive compensation for elite golf events without losing a meaningful number of golfers to

another type of sport or event.

266.    The relevant geographic market for the product market is national; in the alternative, the market for each product is global in scope. A hypothetical monopsonist in the purchase of services of professional golfers for elite events in the United States would have the power to suppress compensation for golfers substantially below competitive levels for a sustained period of time, because professional golfers would be unlikely to leave the country to pursue their profession in sufficient numbers to make sub-competitive compensation unprofitable for a hypothetical monopsonist in the United States. This is also demonstrated in the evidence surrounding the PGA Tour, which has been able to impose sub-competitive compensation for its elite golf events in the United States without losing a meaningful number of golfers to golf tours in other countries. In the alternative, the relevant geographic market is global. Under either formulation, the Tour has unquestioned monopsony power.

267.    Until LIV Golf's nascent entry, the Tour was the only viable buyer of professional golfer services in the relevant market for the purchase of services of professional golfers for elite golf events because there is no reasonable substitute for playing on the Tour. The European Tour's participation in the market is limited to events it co-sanctions with the Tour and thus, while it could be a purchaser of services of professional golfers for elite events in the United States, it has entered into an agreement with the Tour to not even try to compete with it. And, in the alternative global market, the European Tour is not a viable alternative to the Tour because it cannot compete with the Tour on purse size, Major qualifying opportunities, OWGR rankings, public platforms, sponsorship opportunities and other benefits, and, regardless, it has entered into an agreement not to compete with the Tour.

268.    Until LIV Golf's nascent entry, the Tour offered earnings opportunities for professional golfers that are many times greater than any other tour in the world through far greater prize pools and opportunities to secure sponsorships. The Tour offers far greater opportunities for recognition and exposure, on-course competition, and opportunity to accrue OWGR points than any other tour in the world. Until LIV Golf's nascent entry, virtually every golfer who qualifies for membership on the PGA Tour joined it. Until LIV Golf's nascent entry, all of the top 50 golfers in the world were members of the PGA Tour.

269.    The Tour's monopsony control of the purchase of services of professional golfers for

AMENDED COMPLAINT – DEMAND FOR JURY TRIAL
CASE NO. 5:22-cv-04486-BLF

1   elite golf events allows it to compensate players at substantially lower levels than professional golfers

2   would earn in a competitive market, without risk of losing players to other promoters.

3        270.    The Tour has used its monopsony power to impose anticompetitive regulations, notably

4   the Media Rights and Conflicting Events Regulations, which it forces on all of its Members and which

5   have the intent and effect of excluding competition.

6        271.    Until LIV Golf's nascent entry, the Tour controlled the overwhelming share of the

7   relevant market, as nearly all of the elite professional golfers in the United States (and the world) were

8   members of the Tour. Even after LIV Golf's entry—which the Tour's Commissioner has characterized

9   as "irrational"—the Tour's share of the relevant market is dominant, as measured by the Tour's share

10  of purchases in the services market for elite professional golf events. Indeed, all of the top golfers in

11  the world, other than those whom the Tour suspended, are locked into the PGA Tour. The Tour's

12  monopsony power is also reflected in the bonus pool, increased purses, new marquee high-purse events

13  that the Tour established in response to the threat of entry by LIV Golf. The bonus pool and increased

14  purses are direct evidence of the Tour's monopsony power, as the Tour significantly raised its prices

15  in response to LIV Golf's competitive entry.   This evidence also shows that compensation for

16  professional golfers for elite events would be significantly greater in a competitive labor market.

17       272.    The Tour excludes competition for independent contractor players to sell their services

18  to others and manage their own name, image, and likeness because the Tour uses its market power to

19  prohibit them from doing so. The Tour's Media Rights and Conflicting Events Regulations prevent

20  competitors from acquiring the services of Tour members. And even when a rival is able to get Tour

21  members to play in its events, the Media Rights Regulation excludes competition because it prevents

22  the competing event from securing broadcast partners for its events. That the Tour is able to require

23  Player Plaintiffs and the Tour's other members to agree to these rules without guaranteed compensation

24  for doing so is powerful evidence of the Tour's monopsony power.

25       273.    The Majors are not substitutes for the PGA Tour in the market for services of elite

26  professional golfers.   The Tour schedules its tournaments around the Majors and most qualifying

27  opportunities for the Majors are derived from the players' play in the Tour.

28                  **The Market for the Promotion of Elite Professional Golf**

274.    The second relevant product market is the market for the promotion of elite professional golf events.  A hypothetical monopolist in this product market would have the power to raise prices substantially above competitive levels for a sustained period of time, because advertisers, sponsors, broadcasters, and fans would not be able to turn to reasonable substitutes in sufficient volumes to make it unprofitable for the hypothetical monopolist to charge prices above competitive levels.  This is because the promotion of elite professional golf is uniquely attractive to fans of professional golf and it is uniquely valuable for sponsors, advertisers, broadcast partners, venues, and others who seek to market to fans of elite professional golf.

275.    The Tour represents to prospective advertisers that it offers the "most valuable audience in sports."  According to its Tour's marketing materials, its audience of golf fans is (a) "affluent," in that it is "55% more likely to have household net worth of $1M+"; (b) "educated," in that it is "43% more likely to have a master's degree"; and (c) comprised of "influencers," in that it is "63% more likely to be top management or C-level."  The Tour is differentiated from other sports or entertainment products by the access it offers to such a valuable audience.  Because elite golf events offer a unique opportunity to reach this valuable audience, TV advertisers and event sponsors would be expected to continue purchasing elite golf events even with a small but significant nontransitory monopoly premium in the cost of doing so.

276.    Furthermore, because the high degree of elite-level competition draws fans to watch elite golf events, the sponsors and TV broadcasters that pay for those events will not be able to reach those fans through events that do not provide similar elite-level competition.  Thus, a hypothetical monopolist supplier of elite events (of the sort provided by the Tour) would not be expected to see a material diversion of sponsor or TV network money to other types of golf events in response to a monopoly premium for elite golf events.

277.    Similarly, a substantial proportion of golf fans have a particular affinity for the sport, which is often tied to their participation in the sport.  As players of the sport themselves, golf fans have a particular connection with golf broadcasts, which cannot readily be replicated by broadcasts of other sports or entertainment events.  For the same reason, golf enthusiasts are a particular target of many advertisers on elite golf events, who seek to sell particular products and services (such as golf apparel

and equipment) to golf enthusiasts. Accordingly, a golf broadcaster, its golf advertisers, and the event sponsors cannot simply substitute coverage of another sport and expect the same golf fans to tune in. Thus, replacement of a golf telecast with a baseball game, automobile race, or other sporting event would likely retain some golf fans, but a substantial portion of golf fans—particularly the golf enthusiasts who will be the most loyal viewers and the primary targets for advertisers seeking to advertise to golf enthusiasts—would be lost by substituting to another type of programming.

278.    From a geographic perspective, the events organized by the PGA Tour occur mostly in the United States, and the fans who attend those events in person are mostly in the United States. These events and their live network broadcasts are scheduled to provide convenient time slots for fans in the United States, and therefore are focused on generating viewership in the United States. Furthermore, elite golf events taking place in the United States capture the overwhelming share of viewership in the United States, indicating that elite golf events taking place elsewhere in the world are not a substitute for events in the United States for fans, broadcasters, and advertisers. The Tour itself has recognized the national dimension of competition, as it has informed players that they would ordinarily be granted releases for playing in conflicting events taking place outside the United States, but because LIV Golf has plans to organize a tour with events taking place in the United States it has denied releases to the players. This indicates that the Tour itself has far greater concern with competing events in the United States than for events taking place in other countries, which underscores that the United States represents a separate geographic market. In the alternative, however, the only other plausible relevant geographic market would be global. In either potential geographic market, the Tour maintains monopoly power.

279.    For all of these reasons, a hypothetical monopolist in the supply of elite golf events in the United States would be able to profitably raise prices above competitive levels, indicating that the promotion of elite golf events in the United States is a relevant market.

### Barriers To Entry To The Relevant Markets

280.    The Tour's monopsony power in the market for the services of professional golfers for elite golf events and its monopoly power in the market for the promotion of elite professional golf events are protected by high barriers to entry. To enter these markets, a competing elite professional

golf promoter needs to raise at least hundreds of millions of dollars in capital, recruit a sufficient number of elite professional golfers to comprise a credible competing tour, arrange venues and tournaments, arrange for television coverage of tournaments, recruit sponsors and advertisers, and overcome the Tour's antitrust violations.  It also needs to offer OWGR ranking points.

281.    As the facts giving rise to this litigation attest, the Tour's Media Rights and Conflicting Events Regulations restrict a competitor's ability to contract for the services of professional golfers for elite golf events.   Despite offering far greater prize money, and guaranteed compensation for participating players, LIV Golf was only able to attract a minority of elite golf professionals and had to pay excessively higher guaranteed payments to recruit a number of marquee players than would be required in a competitive market. And LIV Golf has been able to capture only a tiny share in the market for the promotion of elite golf events, as the viewership for LIV Golf events has been dwarfed by that of the PGA Tour's events, despite the more fan-friendly format and superior fan experience LIV Golf offers.

282.    The Tour's threats to the Player Plaintiffs, its members, agencies, small businesses, and others, and the threats of those acting in concert with it, erect an additional and substantial barrier to entry. Any entity looking to enter the markets relevant to this litigation now knows what it will face. As Commissioner Monahan put it, the Tour will impose costs on any potential entrant such that there will be "no possibility of a return" on the enormous investment it would take to attempt to enter the market.

283.    The last prospective entrant before LIV Golf to garner any meaningful support from players was the World Golf Tour in the mid-1990s. The Tour's Media Rights and Conflicting Events Regulations precluded its entry in short order.   After the World Golf Tour folded, there was no meaningful threat of competitive entry for roughly a quarter-century. If the Tour's naked exercise of its market power renders LIV Golf unable to sustain its efforts to enter the market, it would be unreasonable to expect any attempt at competitive entry for the foreseeable future.

284.    LIV Golf was able and prepared to enter the markets before the anticompetitive conduct of the Tour diminished its entry to what Commissioner Monahan dismissed as "exhibition matches" that were acquired with a cost structure that offered "no possibility of a return." LIV Golf is as serious

a nascent entrant as the PGA Tour has ever encountered. And despite all of LIV Golf's attributes and efforts, the Tour's ongoing anticompetitive conduct threatens LIV Golf's competitive viability. If LIV Golf fails, there will be no alternatives for the participants in elite professional golf events, fans, and sponsors of the game. They will be left with whatever the Tour chooses to offer.

285.    Absent the Tour's anticompetitive conduct, LIV Golf would be an established and healthy competitor to the Tour in the markets for the services of professional golfers for elite golf events and the promotion of elite professional golf events. The Tour recognizes that LIV Golf "would be competitive to the PGA Tour." It denied LIV Golf access to the Player Plaintiffs' and its other members' services because it viewed LIV Golf as a competitor. But because of the Tour's anticompetitive conduct, LIV Golf is faced with a risk that it will not be able to remain competitively viable. As such, LIV Golf risks irreparable harm to its business and there is a severe risk of irreparable harm to competition if the Tour's conduct is not enjoined.

286.    The Player Plaintiffs, other professional golfers and Tour members are participants in the restrained markets because they sell their services to the PGA Tour and are thus subject to its monopsony power. In addition, the Player Plaintiffs, other professional golfers, and Tour members are the target of the Tour's anticompetitive scheme to destroy LIV Golf and monopolize the market.

**Anticompetitive Effects of the Tour's Conduct, Antitrust Injury, and Irreparable Harm**

287.    The Tour's conduct, including (1) unreasonably restrictive regulations, (2) threats of and now imposition of career-threatening bans, (3) suspensions of the Player Plaintiffs and other members who played at LIV Golf events, (4) the promise it will visit the "same fate" on any member who follows their example, (5) the Tour's threats and punishments to non-members who participate in LIV events and a wide range of other businesses who do business with LIV Golf, and (6) its exclusionary group boycott with other golfing bodies in the "ecosystem," all serve no purpose other than to thwart competitive entry and preserve the Tour's entrenched monopoly power. Faced with punishments of this nature, which could cause incalculable damage to players' careers, the Player Plaintiffs have been denied their right as independent contractors to sell their services to buyers other than the PGA Tour. And they have been directly and irreparably harmed by being prevented from participating in events in which they have already qualified, including the FedEx Cup Playoffs. While

some Player Plaintiffs have received higher payments from LIV Golf as a result of the risks they took by playing in LIV Golf events, they have not been compensated in full for the financial injuries they have already suffered and will continue to suffer. Nor have the Player Plaintiffs been compensated for the substantial irreparable injuries they have suffered and will continue to suffer if the Tour's attacks on them are allowed to continue unabated. Many other players are effectively prevented from playing in LIV Golf events due to fear of punishment from the PGA Tour.

288.    LIV Golf has also suffered and will continue to suffer severe financial injuries as well as irreparable harms to its business from the Tour's anticompetitive conduct. The fields LIV Golf has been able to attract are weaker than would have been the case in the absence of the punishments from the PGA Tour, because many golfers are simply unwilling to take on the risks of playing in even a single LIV Golf event. This threatens irreparable harm to all of the Plaintiffs because it threatens to thwart LIV Golf's nascent entry and permanently entrench the PGA Tour's monopsony and monopoly power.

289.    The punishments from the PGA Tour and others have forced LIV Golf to concentrate funds towards increasing upfront payments, and they have caused LIV Golf to scale down its entry plans and offer fewer tournaments in 2022. This has caused LIV Golf to suffer severe financial injuries as a result of the Tour's anticompetitive conduct.

290.    Furthermore, while LIV Golf has the financial resources to make initial cash outlays to launch its product, the ongoing cash outlays significantly impact long-term viability of LIV Golf. Specifically, if the Tour's anticompetitive conduct continues unabated, it will threaten the competitive viability of LIV Golf.

291.    The risk that LIV Golf could be driven out of the marketplace only serves to make it more difficult for players (including the Player Plaintiffs) to overcome the threat of punishments from the PGA Tour. It has been suggested that the actions of the PGA Tour and others have simply presented Plaintiffs with a "choice"—stay within the existing "*ecosystem*" or choose to switch to the LIV Golf series. But this is a false choice for several reasons.

292.    As Commissioner Monahan admitted in his 2020 Memorandum, the Tour's Media Rights and Conflicting Events Regulations are intended to restrict its member players from offering

their services to others.  The Tour's amendments of its Regulations and the procedures for members being released from them underscore the obvious: the Tour uses these provisions to create a roadblock to competition.  The Conflicting Events and Media Rights Regulation serve no legitimate business purpose.

293.    The Tour's unlawful conduct has depressed professional golfer wages, denied the Player Plaintiffs labor mobility, blunted the effective entry of the potential entrants into the markets that could challenge the Tour's monopoly, decreased the output of elite professional golf events and tours, decreased opportunities for broadcast of elite professional golf, decreased opportunities for advertising and sponsoring surrounding professional golf, decreased output of elite professional golf entertainment for fans, and diluted LIV Golf's opportunity to compete in the elite professional golf marketplace.  The Tour's unlawful conduct has likewise caused severe financial injuries to LIV Golf in the form of higher costs and lost revenue, while also threatening to impose irreparable injuries to LIV Golf.

294.    The Tour's punishments have deprived the Player Plaintiffs' opportunities to continue playing on the Tour, earning deserved compensation, earning opportunities into Majors, sponsorship relationships and revenue, and future opportunities to play and earn on the Tour.  The Tour's punishments have also caused irreparable harm to the Player Plaintiffs' goodwill, reputation, and brand. The Tour denied Player Plaintiff Gooch, Swafford and Jones entry into the FedEx Cup Playoffs, which they earned through their performance, which has caused and will continue to cause severe injuries to these Plaintiffs.

295.    LIV Golf sought to secure commitments from players by March 2022 to establish its League for the summer 2022.  The Tour's anticompetitive conduct caused top professional golfers not to sign up.  The Tour's conduct thus caused severe financial injury to LIV Golf, and it denied the Player Plaintiffs and other Tour members compensation they would earned from the LIV Golf League.  Its anticompetitive conduct diminished competition, reduced marketwide output, and put LIV Golf League on the shelf for 2022.

296.    Moreover, the Tour's threats of possible punishment for violating its Regulations and its actual punishments have caused even further foreclosure and have caused LIV Golf to employ a cost structure that significantly impacts its long-term viability.

297.    The Tour's Regulations, unilateral and coordinated threats of lifetime bans, and imposition of career-threatening punishment have scared off the large majority of elite professional golfers and other participants in elite professional golf events and have caused LIV Golf to employ a cost structure that significantly impacts its long-term viability.

298.    The Tour's conduct has substantially diminished and impaired the entry of the promoters that could meaningfully threaten the PGA Tour's monopoly, which has stood unchallenged for decades.  Its conduct has denied LIV Golf the opportunity to pursue its innovative business model in 2022.  Its conduct decreased elite professional golf tournaments in 2022 and 2023 as LIV Golf was required to change its model and allocate further capital to try to overcome the Tour's Regulations and threats.

299.    The Tour's conduct has harmed the Player Plaintiffs as they have been suspended from what the Tour calls the "preeminent" golf association in the world for exercising their right as independent contractors to pursue their livelihood, sell their services to buyers other than the incumbent monopolist, and expand their sponsorship opportunities.

300.    The Tour's conduct has also harmed the Player Plaintiffs as they have lost sponsorship opportunities and other business opportunities as a result of the Tour's pressure on sponsors and other entities with which the Plaintiffs do business.

301.    The Tour's conduct has harmed consumers, giving them less choice, less output, and less innovation.  Fans are unable to watch Player Plaintiffs in Tour events.  Fans are unable to watch LIV Golf on television or other streaming services.  Fans suffer from reduced output of elite professional golf events and suffer from getting fewer opportunities to watch Player Plaintiffs, Dustin Johnson, Brooks Koepka and many others whom the Tour has excommunicated from its events.

302.    If the Tour's unlawful conduct is not enjoined, the harm to Plaintiffs will be permanent and irreparable.  While LIV Golf has partially entered the markets at great expense, it has done so on terms that the Tour recognizes are "irrational."  If the Tour's unlawful conduct is not enjoined, LIV Golf faces a risk that it will not be competitive in the long run.  For competition for the Player Plaintiffs' services, the Tour's anticompetitive Regulations and other conduct frustrating the labor mobility of its members and tying up their media rights must be enjoined.

AMENDED COMPLAINT – DEMAND FOR JURY TRIAL
CASE NO. 5:22-cv-04486-BLF

303.    If the Tour can force LIV Golf out of the relevant markets altogether and/or foreclose LIV Golf from offering a set of products and services that provides a meaningful competitive constraint on the Tour, the Tour's monopoly and monopsony power will be cemented for many years to come, and immune to even attempted entry.   Injunctive relief is necessary to restore competition for Tour members' services and to innovate the game that the Tour, only in theory, promises to support.  All of the equities and the public interest support such relief.  Otherwise, the harm to competition will be irreversible and permanent.

### The PGA Tour's Alleged Procompetitive Defenses Are Pretextual

304.    To assert a procompetitive justification for its conduct under the antitrust laws, the Tour must, at a minimum, offer a nonpretextual claim that its conduct is a form of competition on the merits. As set forth in detail above, the Tour cannot make such a showing, because its conduct is aimed at foreclosing the only meaningful competitive threat it has faced in a quarter century.   Rather than competing on the merits, the Tour's conduct is aimed at kneecapping LIV Golf to foreclose nascent competition.

305.    The Tour's purported justifications for its conduct are pretextual.  For example, the Tour asserts that it is merely enforcing its membership rules that have some benign purposes.  This argument is betrayed as pretextual in multiple respects.  First, as detailed in the 2020 Monahan Memorandum, the Tour expressly expanded its membership rules for the purpose of defeating competition from a new entrant such as LIV Golf.  Second, the Tour only enforces its rules to deny releases to players when they are playing in *competing* events, demonstrating that these rules are aimed at defeating competition. Third, the Tour has threatened and imposed punishments on a variety of golfers who are not even Tour members (and therefore are not subject to the Tour's rules at all), including European Tour members, college golfers, and Asian Tour members.   Instead of enforcing its rules on its members, the Tour threatens and imposes punishments on any golfer anywhere in the world who participates in LIV Golf events.   There is nothing *pro*competitive about the Tour's actions—they are aimed at thwarting the only competition it has faced in decades.

306.    Similarly, the Tour's conduct reveals as pretextual its claim that it is acting to prevent some sort of "free-riding" on investments the Tour supposedly makes in players.  As noted, the Tour's

attacks are not limited to those players in whom it has supposedly made some sort of investment, but instead extend to all golfers anywhere, including college players and members of other tours who have never been members of the PGA Tour.  At the other end of the spectrum, the Tour's "free-riding" claim is absurd when applied to golfers such as Plaintiff Mickelson, who has devoted 30 years of his Hall of Fame career to playing on the Tour, providing massive benefits to the Tour throughout his career.  And any punishments meted out by the Tour to players like Mr. Mickelson (and others) are disproportionate to the unspecified investments the Tour claims to make in the early stages of golfers' careers.

307.    The Tour's words and conduct also betray as mere pretext its assertion that it is attacking LIV Golf and any players who participate in its events because the Tour does not want to be associated with any player who participates in a league that is majority funded by the Public Investment Fund of Saudi Arabia.  Commissioner Monahan's 2020 Memorandum outlining the Tour's attacks on a new entrant says nothing about Saudi Arabia.  Instead, it is focused on the competitive threat that the new entrant—which Commissioner Monahan labeled "Private Equity Golf"—presented to the Tour.  The Tour's pretextual arguments about Saudi funding are further betrayed by its willingness to do business with dozens of sponsors who do billions of dollars of business each year in Saudi Arabia.  Furthermore, the Tour's pretext is exposed by its willingness to have the PGA Tour Fan Shop operated by Fanatics, which has received substantial funding from the Public Investment Fund of Saudi Arabia—the same fund that the Tour supposedly finds so objectionable when it sponsors LIV Golf.

308.    The Tour's own actions also reveal that the Tour's various objections to LIV Golf's innovative format are pretextual.  While the Tour has suggested that there is something about LIV Golf's no-cut, high purse tournaments and its team-golf format that justify its opposition to the new entrant, the Tour itself has disclosed plans to copy LIV Golf's format.

309.    Furthermore, the Tour and its spokespersons have asserted that they object to LIV Golf because LIV Golf is supposedly operating outside the "ecosystem" and is not cooperating with other existing tours or sanctioning bodies.  The facts, however, demonstrate the pretext in any such argument.  For example, the sponsors of LIV Golf sought to work with the European Tour, but in the meeting in Malta in July 2021, the European Tour revealed that although it recognized the "appeal and fit" of the new tour, it feared the "mighty power" of the PGA Tour and therefore had to reject the proposed

partnership. LIV Golf has likewise sought to partner with others in the golf "ecosystem" and grow the game at multiple levels, including through proposed partnerships with entities ranging from the Asian Tour, to the LPGA, to the Ladies European Tour. At every turn, the PGA Tour has either directly foreclosed LIV Golf's efforts or exerted extreme pressure on other golfing bodies to exclude LIV Golf. For example, the PGA Tour and the European Tour threatened severe consequences on the Asian Tour and have punished golfers on the Asian Tour in their effort to prevent the Asian Tour from partnering with LIV Golf. The Tour prevented the LPGA and the Ladies European Tour from partnering with LIV Golf, thus harming countless women professional golfers by denying them additional playing opportunities and much-needed funding for their tours—all for the purpose of foreclosing LIV Golf from the "ecosystem." And, as detailed above, the Tour has leaned on the bodies that sponsor the Majors and the OWGR to lock arms with the Tour in excluding LIV Golf. Thus, having used every tool at its disposal to prevent LIV Golf from working with other bodies in the golf "ecosystem," and punishing those who make the choice to partner with LIV Golf, it is pure pretext for the Tour to suggest that it is somehow justified in opposing LIV Golf because LIV Golf has been left to operate largely outside the "ecosystem."

## CLAIMS FOR RELIEF

**COUNT I:**     **Unlawful Monopsonization of the market for ELITE GOLF EVENT SERVICES in Violation of Sherman Act § 2 (15 U.S.C. § 2)**

310.     Plaintiffs incorporate by reference the allegations of all preceding paragraphs as though fully set forth in this Count I.

311.     At all relevant times, the Tour has had monopsony power over the market for the services of professional golfers for elite golf events in the United States (or, alternatively, in the world).

312.     The Tour has willfully maintained and abused its monopsony power through anticompetitive conduct, including, among other things, by: (1) threatening to expel and impose a lifetime ban on all players who contract with LIV Golf—including both members and non-members of the Tour; (2) imposing unreasonable and anticompetitive restrictions on players' ability to sell their independent contractor services, including the Media Rights Regulation and Conflicting Events Regulation in the Regulations, which have the effect of foreclosing competition; (3) threatening to

enforce the terms of the Regulations beyond their meaning to deny players the freedom to play in competing tours; (4) enforcing the terms of the Regulations to deny Plaintiffs' competitive opportunities; (5) threatening to harm other agencies, businesses or individuals who would otherwise work with Plaintiffs and/or LIV Golf; and (6) suspending and punishing the Player Plaintiffs for playing in LIV Golf and supporting it, all in order to punish and harm Plaintiffs, to prevent competition for the players' services, and to prevent LIV Golf from launching a competitive elite professional golf tour.

313.   The anticompetitive actions of the PGA Tour do not further any procompetitive goals and are not reasonably necessary to achieve any legitimate procompetitive benefits.

314.   The PGA Tour's exclusionary conduct has unreasonably restrained competition in the market for services of professional golfers for elite golf events, including by:

- Preventing vigorous competition for services of professional golfers for elite golf events;
- Suspending the Player Plaintiffs for playing professional golf;
- Preventing LIV Golf from contracting with agencies, vendors, sponsors, advertisers and players needed to offer an elite professional golf entertainment product;
- Impacting competition in contracting for the services of elite professional golfers;
- Depressing compensation for the services of professional golfers for elite golf events below competitive levels;
- Decreasing the output of opportunities for professional golfers for elite golf events;
- Denying the Player Plaintiffs the right to have free agency for their independent contractor services;
- Interfering with the Player Plaintiffs' and others' contractual negotiations with LIV Golf;
- Interfering with LIV Golf's contractual negotiations with agencies, sponsors, venues, vendors, broadcasters, and partners to work with LIV Golf; and
- Preventing LIV Golf from promoting elite professional golf to fans.

315.   As a result of the PGA Tour's anticompetitive conduct, Plaintiffs have been and will continue to be harmed in their business or property; competition in the relevant market will be harmed;

AMENDED COMPLAINT – DEMAND FOR JURY TRIAL
CASE NO. 5:22-cv-04486-BLF

the PGA Tour will unlawfully maintain its monopsony position; and players, consumers, and other stakeholders will be harmed. Each of the injuries suffered by Plaintiffs is of the type the antitrust laws were intended to prevent, and each flows from Tour's unlawful conduct. Such conduct is inherently and manifestly anticompetitive and has an injurious effect on competition.

316.   Plaintiffs have been and will continue to be irreparably harmed by the PGA Tour's unlawful conduct such that Plaintiffs need injunctive relief in order to stop immediately the PGA Tour's threats and imposition of onerous punishments on professional athletes to thwart LIV Golf's entry and maintain the PGA Tour's monopsony and an order enjoining enforcement of the PGA Tour's anticompetitive Regulations.

317.   The PGA Tour's anticompetitive acts violate Section 2 of the Sherman Act. Plaintiffs seek injunctive relief, monetary damages, treble damages, costs of this suit, reasonable attorney's fees, and interest pursuant to 15 U.S.C. §§ 15(a), 26 and any other relief this Court deems just and proper under Count I.

**COUNT II:   Unlawful Monopolization of the market for the PROMOTION OF ELITE PROFESSIONAL GOLF EVENTS in Violation of Sherman Act § 2 (15 U.S.C. § 2)**

318.   Plaintiffs incorporate by reference the allegations of all preceding paragraphs as though fully set forth in this Count II.

319.   At all relevant times, the PGA Tour has had monopoly power over the market for the promotion of elite professional golf events in the United States (or, alternatively, in the world). The only viable competitor to the PGA Tour's dominant market position in this market is LIV Golf.

320.   The PGA Tour has willfully maintained and abused its monopoly power through anticompetitive conduct, including by: (1) threatening to expel and impose a lifetime ban on all players who contract with LIV Golf—including both members and non-members of the Tour; (2) imposing unreasonable and anticompetitive restrictions on players' ability to sell their independent contractor services, including the Media Rights Regulation and Conflicting Events Regulation in the Regulations, which have the effect of foreclosing competition; (3) threatening to enforce the terms of the Regulations beyond their meaning to deny players the freedom to play in competing tours; (4) enforcing the terms of the Regulations to deny Plaintiffs' competitive opportunities; (5) threatening to harm other agencies,

businesses or individuals who would otherwise work with Plaintiffs and/or LIV Golf; and (6) suspending and punishing the Player Plaintiffs for playing in LIV Golf and supporting it, all in order to punish and harm Plaintiffs, to prevent competition for the players' services, and to prevent LIV Golf from launching a competitive elite professional golf tour.

321.   The anticompetitive actions of the PGA Tour do not further any procompetitive goals and are not reasonably necessary to achieve any procompetitive benefits.

322.   The PGA Tour's exclusionary conduct has unreasonably constrained competition in the market for the promotion of elite professional golf events, including by:

- Preventing vigorous competition for the promotion of elite professional golf entertainment;
- Preventing LIV Golf from contracting with players regarding their own media rights needed to promote elite professional golf tournaments;
- Preventing Player Plaintiffs from contracting with LIV Golf and others regarding their own media rights;
- Decreasing the output of elite professional golf tournaments;
- Suspending Player Plaintiffs and other golfers for playing professional golf;
- Preventing LIV Golf from contracting with agencies, vendors, sponsors, advertisers and players need to offer elite professional golf entertainment product;
- Impacting competition in contracting for the play of elite professional golfers;
- Depressing compensation for the services of professional golfers in elite events below competitive levels;
- Interfering with LIV Golf's contractual negotiations with players to join LIV Golf;
- Interfering with LIV Golf's contractual negotiations with agencies, sponsors, venues, vendors, broadcasters and partners to work with LIV Golf; and
- Preventing LIV Golf from promoting elite professional golf to fans.

323.   As a result of the PGA Tour's anticompetitive conduct, LIV Golf and Player Plaintiffs have been and will continue to be harmed in their business or property; competition in the relevant market will be harmed; the PGA Tour will unlawfully maintain its monopoly position; and players,

consumers, and other stakeholders will be harmed. Each of the injuries suffered by Plaintiffs is of the type the antitrust laws were intended to prevent, and each flows from Tour's unlawful conduct.  Such conduct is inherently and manifestly anticompetitive and has an injurious effect on competition.

324.   Plaintiffs have been and will continue to be irreparably harmed by the PGA Tour's unlawful conduct such that they need injunctive relief stopping immediately the PGA Tour's threats and imposition of onerous punishments on professional athletes designed to thwart LIV Golf's entry and maintain the PGA Tour's monopoly and enjoining enforcement of the PGA Tour's anticompetitive player Regulations.

325.   The PGA Tour's anticompetitive acts violate Section 2 of the Sherman Act.  Plaintiffs seek injunctive relief, monetary damages, treble damages, costs of this suit, reasonable attorney's fees, and interest pursuant to 15 U.S.C. §§ 15(a), 26 and any other relief this Court deems just and proper under Count II.

**COUNT III:  Unlawful Attempted Monopolization in Violation of Sherman Act § 2
(15 U.S.C. § 2)**

326.   Plaintiffs incorporate by reference the allegations of all preceding paragraphs as though fully set forth in this Count III.

327.   In the event that the PGA Tour's position in the relevant markets does not amount to monopoly and/or monopsony power, either by virtue of LIV Golf's nascent entry or otherwise, Plaintiffs plead in the alternative that the Tour's conduct constitutes unlawful attempted monopolization and monopsonization in violation of Section 2 of the Sherman Act.

328.   The Tour has unlawfully attempted to monopolize and monopsonize the relevant markets.

329.   At all relevant times, the Tour has had monopoly and/or monopsony power or, at a minimum, a dangerous probability of success in acquiring (or re-acquiring) monopoly and/or monopsony power, over the relevant markets in the United States (or, alternatively, in the world).

330.   The PGA Tour has engaged in anticompetitive conduct to try to monopolize the relevant markets, including by: (1) threatening to expel and impose a lifetime ban on all players who contract with LIV Golf—including both members and non-members of the Tour; (2) imposing unreasonable

and anticompetitive restrictions on players' ability to sell their independent contractor services, including the Media Rights Regulation and Conflicting Events Regulation in the Regulations, which have the effect of foreclosing competition; (3) threatening to enforce the terms of the Regulations beyond their meaning to deny players the freedom to play in competing tours; (4) enforcing the terms of the Regulations to deny Plaintiffs' competitive opportunities; (5) threatening to harm other agencies, businesses or individuals who would otherwise work with Plaintiffs and/or LIV Golf; and (6) suspending and punishing the Player Plaintiffs for playing in LIV Golf and supporting it, all in order to punish and harm Plaintiffs, to prevent competition for the players' services, and to prevent LIV Golf from launching a competitive elite professional golf tour.

331.    As set forth in detail above, the Tour's conduct carries a dangerous probability of destroying the competitive viability of LIV Golf. The Tour's anticompetitive conduct forced LIV Golf to change its commercial strategy for 2022. LIV Golf was forced to announce a substantially scaled-down version of its League concept by offering 8 invitationals in 2022 (the LIV Golf Invitational Series). The Tour then attacked LIV Golf's Invitational Series events. Furthermore, because of the Tour's anticompetitive conduct, LIV Golf has been unable to broadcast its events in the United States—an encumbrance that threatens its long-term viability.

332.    Furthermore, the Tour's conduct has denied and will continue to deny LIV Golf access to many top players. The Tour's Regulations and unilateral and conspiratorial threats of punishment have scared off the large majority of elite players as well as the pipeline of future elite players. And for those players whom LIV Golf has been able to sign, it has had to offer supracompetitive compensation well above the levels that would prevail in a market not polluted by the Tour's anticompetitive conduct. This has forced LIV Golf into an unsustainable business model. If the Tour's anticompetitive conduct is not enjoined, LIV Golf will be unable to sustain a competitively viable tour.

333.    And, the Tour's attempted monopolization and unlawful exclusionary conduct presents a dangerous probability that the Tour will succeed, to the extent it has not already, in its attempt to monopolize the relevant markets, as shown by its willful and intentional efforts and success in:

- Preventing vigorous competition;

- Preventing the PGL from entering the markets;

- Suspending Player Plaintiffs;

- Preventing Plaintiff LIV Golf from contracting with agencies, vendors, sponsors, advertisers and players needed to offer an elite professional golf entertainment product;

- Impacting competition in contracting for the services of elite professional golfers;

- Depressing compensation for the services of elite professional golfers below competitive levels;

- Decreasing the output of elite professional golfer services opportunities;

- Denying Player Plaintiffs the right to have free agency for their independent contractor services;

- Interfering with Plaintiffs' and others' contractual negotiations;

- Preventing Plaintiff LIV Golf from promoting elite professional golf to fans;

- Encouraging other golfing entities to pressure golfers against joining LIV Golf, including by threatening to disallow LIV Golf players from playing in various tournaments; and

- Orchestrating a group boycott of LIV Golf with the European Tour in furtherance of their agreement to boycott LIV Golf and golfers who would play for a competitive tour.

334.   Absent injunctive relief halting the Tour's anticompetitive conduct, LIV Golf will be unable to sustain a competitively viable business, and it will be unable to meaningfully constrain the Tour's monopoly power.

335.   The Tour's conduct has substantially diminished and impaired the entry of the only entrant that could meaningfully threaten the PGA Tour's monopoly and monopsony power in the relevant markets, which has stood unchallenged for decades.  And if it not enjoined, the Tour's conduct will forever destroy the competitive viability of the only potential challenger to the Tour's monopoly

101

1 and monopsony power.

2 336. The Tour has acted with the specific intent to monopolize and monopsonize the relevant

3 markets. The Tour's actions are irrational but for its anticompetitive effect, including by degrading its

4 own offerings. The Tour's specific intent to monopolize and monopsonize the relevant markets is

5 shown through its statements and actions, including: (1) the PGA Tour Commissioner's statements in

6 the January 2020 Monahan Memorandum, (2) the Tour's public and private statements since 2020

7 related to the Tour's desire to "protect this business model" and prevent a new entrant from contracting

8 with Tour members through threats and enforcement of unlawful Regulation provisions, (3) statements

9 of Tour officials and Members related to the Tour's desire to destroy LIV Golf, (4) the Tour's May 10,

10 2022 denial of Tour members' requests to participate in the LIV Golf London Invitational, (5) the

11 Tour's coordinated efforts to get others to support its boycott of LIV Golf and those who associate with

12 LIV Golf, (6) the Tour pressuring small businesses not to work with LIV Golf or be blacklisted by the

13 Tour, (7) the Tour's application of its Regulations to impose irreparable punishment on Player Plaintiffs

14 and others for playing professional golf.

15 337. As a result of the PGA Tour's anticompetitive conduct, LIV Golf and the Player

16 Plaintiffs have been and will continue to be harmed in their business or property; competition in the

17 relevant markets will be harmed; the PGA Tour will unlawfully monopolize and monopsonize the

18 relevant markets; and players, consumers, and other stakeholders will be harmed.

19 338. Plaintiffs have been and will continue to be irreparably harmed by the PGA Tour's

20 unlawful conduct such that they need injunctive relief stopping immediately the PGA Tour's threats

21 and imposition of onerous punishments on professional athletes designed to thwart LIV Golf's entry

22 and maintain the PGA Tour's monopoly and enjoining enforcement of the PGA Tour's anticompetitive

23 player Regulations. Each of the injuries suffered by Plaintiffs is of the type the antitrust laws were

24 intended to prevent, and each flows from Tour's unlawful conduct. Such conduct is inherently and

25 manifestly anticompetitive and has an injurious effect on competition.

26 339. Accordingly, to the extent the Tour argues that LIV Golf's nascent entry means the Tour

27 is not presently a monopolist, the Tour's anticompetitive conduct carriers a dangerous probability of

28 restoring and maintaining the Tour's monopoly and monopsony power in the relevant markets, in

violation of Section 2 of the Sherman Act.

340.     Plaintiffs seek injunctive relief, monetary damages, treble damages, costs of this suit, reasonable attorney's fees, and interest pursuant to 15 U.S.C. §§ 15(a), 26 and any other relief this Court deems just and proper under Count III.

### Count IV:     Unlawful Restraint of Trade in Violation of Sherman Act § 1 (15 U.S.C. § 1) [Group Boycott]

341.     Plaintiffs incorporate by reference the allegations of all preceding paragraphs as though fully set forth in this Count IV.

342.     The PGA Tour has unlawfully reached an agreement, with the purpose to eliminate competition, with the European Tour, a potential horizontal competitor, (and possibly others) to not compete for players' services and to prevent the entry and competitive viability of LIV Golf into the relevant markets.  Specifically, the PGA Tour and the European Tour have agreed to engage in a group boycott of LIV Golf, other potential competitors, golfers (like Player Plaintiffs) who agree to play in LIV Golf's events, and any other person or entity who seeks to partner with LIV Golf, to harm competition for the services of professional golfers for elite golf events and for the promotion of elite golf events.

343.     The actions of the Tour and the European Tour make clear that they had a conscious commitment to a common scheme: to prevent the entry of new competitors into the market.  The unlawful agreement is evidenced by the actions and statements of the Tour and the European Tour, as set forth in this Complaint, including:

- The Tour admitted the existence of an unlawful agreement with the European Tour. In his January 2020 Memorandum describing the PGA Tour's plan to foreclose new entry, Commissioner Monahan explained that this alliance with the European Tour was aimed at removing the European Tour as a potential horizontal competitor through its potential to partner with a new entrant: "We have continued discussions with the European Tour about the potential to work more closely together, thereby removing the European Tour as a potential partner of" a new entrant;

- As Mr. Pelley detailed, in November 2020 the European Tour and the PGA Tour

ceased competing with each other for players' services, and instead formed an illegal alliance to eliminate new competition for players' services;

- Following the agreement, in November 2020, the European Tour announced it would not partner with PGL;

- Pursuant to its illegal alliance, the European Tour agreed not to partner with LIV Golf despite recognizing the "fit and appeal" of partnering with LIV Golf because the European Tour had contracted with the Tour and could not upset the "US PGA mighty power;"

- The Tour and the European Tour then took steps in furtherance of their scheme, including threatening all players with lifetime bans if they competed in the PGL and, later, LIV Golf tournaments; and

- In addition, the Tour and European Tour agreed to suspend players who competed in LIV Golf tournaments.

344.    The Tour used its Regulations to implement the unlawful agreement and achieve the anticompetitive purpose of the agreement, harming Plaintiffs and competition.

345.    After the agreement was reached, the Tour enforced its unlawful Regulations and proceeded to suspend the Player Plaintiffs for violating the Regulations.  Further evidencing the agreement that was in fact reached, the Tour enforced the Regulations in a way that they had not been enforced previously.  Historically, the Tour permitted members to associate with multiple tours simultaneously and routinely granted releases for golfers to compete in non-Tour affiliated tournaments. In contrast, the Tour denied all releases for LIV Golf events and imposed effective career-ending suspensions on Plaintiffs. The Tour made clear its enforcement of these Regulations is intended to destroy the entry of LIV Golf, harming the Plaintiffs and competition as a whole in the process. Likewise, as detailed in this Complaint, the European Tour has departed from its longstanding practices regarding conflicting events to align with the Tour in furtherance of their agreement to act jointly to exclude LIV Golf and punish the Player Plaintiffs and other golfers who play in LIV Golf events.

346.    Professional golfers (including the Player Plaintiffs) are essential to the Tour's scheme to eliminate competition in the market.  As Commissioner Monahan admitted: "The impact that [the

AMENDED COMPLAINT – DEMAND FOR JURY TRIAL
CASE NO. 5:22-cv-04486-BLF

new league] could have on the PGA TOUR is dependent on the level of support it may receive from these players. Without this support, [the new league's] ability to attract media and corporate partners will be significantly marginalized and its impact on the TOUR diminished."

347.   The Player Plaintiffs are the pawns (and targets) used to effectuate the group boycott and eliminate competition in the markets; the Player Plaintiffs' suspensions are a necessary means to accomplish the Tour's anticompetitive scheme.

348.   ***Per se* violation:**   The agreements constitute unreasonable restraints of trade that are *per se* illegal under Section 1 of the Sherman Act, 15 U.S.C. § 1.  The agreement constitutes a group boycott orchestrated by a monopolist and joined by a potential competitor that is expressly aimed at foreclosing the entry of the only viable alternative to the Tour into the relevant market.  No elaborate analysis is required to demonstrate the anticompetitive character of this group boycott.

349.   **Rule of Reason violation:**   The agreements are also unreasonable restraints of trade that are unlawful under Section 1 of the Sherman Act, 15 U.S.C. § 1, under the rule of reason analytical framework.  The principal tendency of the agreement is to restrain competition, reinforce the market power of the PGA Tour, defeat the nascent entry of LIV Golf, and eliminate competition in the relevant markets.  This harmed the Player Plaintiffs and other professional golfers by eliminating competition in the market for their services and also restricted competition in the market generally.  It has also harmed LIV Golf and competition in the relevant markets by hindering LIV Golf's entry and threatening to destroy its competitive viability.  The agreement between the Tour and the European Tour to lock arms in a joint effort to foreclose competitive entry lacks any legitimate procompetitive justifications.

350.   As a result of the PGA Tour's anticompetitive conduct, Plaintiffs have been and will continue to be harmed in their business or property; competition in the relevant markets will be harmed; the PGA Tour will unlawfully maintain its monopoly position; and Plaintiffs, consumers, and other stakeholders will be harmed.  Each of the injuries suffered by Plaintiffs is of the type the antitrust laws were intended to prevent, and each flows from Tour's unlawful conduct.  Such conduct is inherently and manifestly anticompetitive and has an injurious effect on competition.

351.   Plaintiffs have been and will continue to be irreparably harmed by the PGA Tour's

1   unlawful conduct such that Plaintiffs need injunctive relief in order to stop the PGA Tour's unlawful

2   conduct.

3        352.   The PGA Tour's anticompetitive acts violate Section 1 of the Sherman Act.

4        353.   Plaintiffs seek injunctive relief, monetary damages, treble damages, costs of this suit,

5   reasonable attorney's fees, and interest pursuant to 15 U.S.C. §§ 15(a) and 26, and any other relief this

6   Court deems just and proper under Count IV.

7     **Count V:**    **Unlawful Agreement to Restrain Trade in Violation of the Cartwright Act**

8                **(Cal. Bus. & Prof. Code §§ 16720(a), 16726) [Group Boycott]**

9        354.   Plaintiffs incorporate by reference the allegations of all preceding paragraphs as though

10   fully set forth in this Count V.

11        355.   The PGA Tour has unlawfully agreed with the European Tour (and potentially others)

12   "[t]o create or carry out restrictions in trade or commerce." Cal. Bus. & Prof. Code §§ 16720(a), 16726.

13   Moreover, the Tour's violation of Section 1 of the Sherman Act necessarily constitutes a violation of

14   the Cartwright Act.

15        356.   The Tour operates six annual tournaments in the state of California, owns golf courses

16   in California, committed multiple acts in furtherance of its unlawful group boycott in California, co-

17   hosted a tournament with the European Tour in California from which it banned any golfers who

18   participated in a LIV Golf event, harmed California resident golfers (including Plaintiff Mickelson),

19   and harmed competition for professional golfers' services for elite events in California. Moreover, the

20   law and public policy of other affected states is materially similar to the law of California.

21        357.   The Tour has unlawfully agreed with the European Tour to not compete for players'

22   services and to act jointly to prevent the entry of LIV Golf into the relevant markets. Specifically, the

23   PGA Tour and the European Tour agreed to boycott LIV Golf, players who work with LIV Golf, and

24   any other person or entity that seeks to partner with LIV Golf. The Tour entered an agreement with

25   the European Tour so as to—as Commissioner Monahan vowed—"remov[e] the European Tour as a

26   potential partner" of a new entrant like LIV Golf.

27        358.   The PGA Tour and the European Tour have taken acts in furtherance of their unlawful

28   boycott. For instance, the European Tour has agreed to suspend and punish golfers for playing in LIV

AMENDED COMPLAINT – DEMAND FOR JURY TRIAL
CASE NO. 5:22-cv-04486-BLF

Golf, to no longer compete with the PGA Tour for players' services, and to not partner with LIV Golf or other potential entrants. The two tours have unlawfully agreed to deny (and taken steps to deny) golfers who play in LIV Golf events the opportunity to play in the tours' co-sanctioned events (including the event they co-sanctioned in California), and to unfairly punish independent contractors for playing with a competitor promoter.

359.    The Tour's agreement with the European Tour has the illegal purpose to eliminate a competitor and future potential entrants. In particular, the Tour seeks to deny LIV Golf access to the services of professional golfers for elite golf events along with the other partners and inputs necessary to compete for the services of professional golfers for elite golf events. The two tours have also unlawfully agreed to not compete for players' services in order to suppress wages and decrease output of opportunities.

360.    The tours' agreement constitutes an unreasonable restraint of trade that is *per se* illegal under California Business and Professions Code §§ 16720(a), 16726. The agreement constitutes a group boycott orchestrated by a monopolist that is expressly aimed at foreclosing the entry of the only viable alternative to the Tour into the relevant markets. No elaborate analysis is required to demonstrate the anticompetitive character of this group boycott.

361.    The agreement also constitutes an unreasonable restraint of trade that is unlawful under California Business and Professions Code §§ 16720(a), 16726, under a rule-of-reason analysis. The principal tendency of the agreements is to restrain competition, reinforce the market power of the PGA Tour, and seriously hamper (or outright defeat) the competitive effectiveness and prospective entry of LIV Golf—by harming professional golfers like the Player Plaintiffs and thus eliminating competition for their services—the only viable alternative in the relevant market, and thereby harm competition in the relevant markets. This harmed the Player Plaintiffs and other professional golfers by eliminating competition in the market for their services and also restricted competition in the markets generally. It has also harmed LIV Golf and competition in the market for the promotion of elite events by hindering LIV Golf's entry and threatening to destroy its competitive viability. The agreement lacks any legitimate procompetitive justifications, because, among other things, the group boycott deprives Plaintiff Mickelson and other Player Plaintiffs of means to practice their profession that are so essential

1  that they are necessary to compete effectively in the sport of professional golf.

2  362.   As a result of the PGA Tour's anticompetitive conduct, Plaintiffs have been and will

3  continue to be harmed in their business or property; competition in the relevant markets will be harmed;

4  the PGA Tour will unlawfully maintain its monopoly position and unlawful boycott; and Plaintiffs,

5  LIV Golf, consumers, and other stakeholders will be harmed. Each of the injuries suffered by Plaintiffs

6  is of the type the antitrust laws were intended to prevent, and each flows from Tour's unlawful conduct.

7  Such conduct is inherently and manifestly anticompetitive and has an injurious effect on competition.

8  363.   As a result of the PGA Tour's anticompetitive conduct, Plaintiffs have been and will

9  continue to be irreparably harmed such that they need injunctive relief in order to stop immediately the

10  PGA Tour's unlawful conduct.

11  364.   The PGA Tour's anticompetitive acts violate the Cartwright Act. Cal. Bus. & Prof.

12  Code §§ 16720(a), 16726.

13  365.   Plaintiffs seek injunctive relief, monetary damages, treble damages, costs of this suit,

14  reasonable attorney's fees, and interest pursuant to Cal. Bus. & Prof. Code § 16750(a), and any other

15  relief this Court deems just and proper under Count V.

16  **Count VI:   Breach of Contract (Player Plaintiffs)**

17  366.   Player Plaintiffs incorporate by reference the allegations of all preceding paragraphs as

18  though fully set forth in this Count VI.

19  367.   On various dates, Player Plaintiffs and the Tour entered into a contract when the

20  Plaintiffs submitted their respective membership applications and membership renewal applications

21  and agreed to be bound by the Tour's Regulations. The Regulations (other than those described in this

22  Complaint that violate the antitrust laws and therefore are unenforceable) are a legally binding

23  agreement by and between Player Plaintiffs, respectively and individually, and the Tour.  Player

24  Plaintiffs maintain that provisions within the Regulations are not enforceable, but the provision the

25  Tour has breached is not one of those provisions.

26  368.   Player Plaintiffs performed all enforceable provisions in the Tour's Regulations and

27  have complied with all obligations under the Tour's Disciplinary Process detailed in the Tour's

28  Regulations.

369.     The Tour breached Section VII.E.2 of the Regulations because it failed to abate Plaintiffs' suspensions pending their appeals of the Tour's Disciplinary Actions.  Section VII.E.2 provides that "[a]n appeal shall operate to stay the effective date of any penalty, except suspension from a tournament then in progress or scheduled for the calendar week in which the alleged violation occurred, until after the final decision on the appeal." Exhibit 1.  The Tour was thus required to honor some Player Plaintiffs' requests to participate in Tour events, including the FedEx Cup Playoff events, occurring while Player Plaintiffs' appeals to the Tour's Appeals Committees remained pending.

370.     The Tour's breach caused Player Plaintiffs to incur substantial damages in the form of irreparable harm (in the form of loss of FedEx Cup ranking points, loss of OWGR ranking points, loss of career opportunities, loss of goodwill, and reputational harm), loss of income-earning opportunities, loss of retirement-plan payments, consequential damages, expenses, and costs.

**Count VII:     Tortious Interference with LIV Golf's Contractual Relationships (LIV Golf)**

371.     LIV Golf incorporates by reference the allegations of all preceding paragraphs as though fully set forth in this Count VII.

372.     LIV Golf has entered into contractual relationships with professional golfers and other third parties, such as vendors, sponsors, and broadcasters.

373.     The PGA Tour knew that LIV Golf had entered into contractual relationships with professional golfers and other third parties.

374.     The PGA Tour's unlawful actions detailed herein were intended to prevent professional golfers and other third parties from performing their contracts with LIV Golf.

375.     The professional golfers and other third parties have been unable to perform under their contracts with LIV Golf as a result of the PGA Tour's actions described herein.

376.     There was no legal justification for the PGA Tour's anticompetitive conduct.

377.     As a result of the PGA Tour's anticompetitive and wrongful conduct, LIV Golf has suffered significant and irreparable harm to its business.

378.     LIV Golf has been and will continue to be irreparably harmed by the PGA Tour's unlawful conduct such that LIV Golf needs expedited injunctive relief stopping immediately the PGA Tour's unlawful conduct.

379.    LIV Golf seeks injunctive relief, economic damages, including compensatory damages, special damages, and consequential damages, costs of this suit, and interest and any other relief this Court deems just and proper under Count VII. LIV Golf also seeks punitive damages against the PGA Tour for its tortious interference with LIV Golf's business relationships.

**Count VIII:   Tortious Interference with LIV Golf's Prospective Business Relationships**
**(LIV Golf)**

380.    LIV Golf incorporates by reference the allegations of all preceding paragraphs as though fully set forth in this Count VIII.

381.    LIV Golf has been on the verge of entering business relationships with professional golfers and other third parties, such as vendors, sponsors, and broadcasters.

382.    The PGA Tour knew that LIV Golf was contacting players and other third parties about entering into a business relationship.

383.    The PGA Tour's actions detailed herein were independently tortious as detailed herein and were intended to prevent professional golfers and other third parties from entering into a business relationship with LIV Golf.

384.    Several professional golfers and other third parties have not entered into such business relationships with LIV Golf to-date as a result of the PGA's Tours anticompetitive actions and restrictions.

385.    There was no legal justification for the PGA Tour's anticompetitive conduct.

386.    As a result of the PGA Tour's anticompetitive and wrongful conduct, LIV Golf has suffered significant and irreparable harm to its business.

387.    LIV Golf has been and will continue to be irreparably harmed by the PGA Tour's unlawful conduct such that LIV Golf needs expedited injunctive relief stopping immediately the PGA Tour's unlawful conduct.

388.    LIV Golf seeks injunctive relief, economic damages, including compensatory damages, special damages, and consequential damages, costs of this suit, and interest and any other relief this Court deems just and proper under Count VIII. LIV Golf also seeks punitive damages against the PGA Tour for its tortious interference with LIV Golf's prospective business relationships..

**JURY DEMAND**

389.   Plaintiffs demand a trial by jury of all issues so triable.

**RELIEF REQUESTED**

WHEREFORE, Plaintiffs hereby request that the Honorable Court award the following preliminary injunctive relief against the PGA TOUR:

a.   Stay and enjoin the PGA Tour's suspension and sanctions imposed on the Player Plaintiffs;

b.   Prevent the PGA Tour from banning or threatening to ban from the PGA Tour (and its affiliated Tour) players who talk to, contract with, play in, or associate with LIV Golf;

c.   Prevent the PGA Tour from expelling players from the PGA Tour (and its affiliated Tours) or PGA Tour tournaments who talk to, contract with, play in, or associate with LIV Golf;

d.   Prevent the PGA Tour from threatening or imposing any other punishments or otherwise harming or threatening to harm anyone who talks to, contracts with, or associates with LIV Golf;

e.   Prevent the PGA Tour from conspiring or unlawfully agreeing with the European Tour to ban or threaten to ban players from participating in European Tour events or participating in the Ryder Cup for talking to, contracting with, playing in, or associating with LIV Golf;

f.   Prevent the PGA Tour from pressuring or coordinating with the R&A, Masters, and/or PGA of America (or others), to punish, exclude or threaten to exclude players otherwise eligible under current eligibility rules from participating in golf events (including the Majors);

g.   Prevent the PGA Tour from amending its rules to prevent players otherwise eligible from playing in PGA Tour events or co-sponsored events, such as the FedEx Cup, the WGC tournaments, the Tournament of Champions, the Players,

1  the Memorial, the Arnold Palmer Invitational, the Genesis Invitational, AT&T

2  Pebble Beach Open, and the Presidents Cup;

3  h.  Prevent the PGA Tour from enforcing its unlawful restrictions on independent-

4  contractor golfers, including the Media Rights Regulation and the Conflicting

5  Events Regulation;

6  i.  Prevent the PGA Tour from amending its rules to prevent players otherwise

7  eligible from playing in PGA Tour events or co-sponsored events;

8  j.  Prevent the PGA Tour from applying rules beyond their meaning to punish

9  players who associate with LIV Golf, or otherwise to thwart competition; and

10  k.  Prevent the PGA Tour from taking any other actions intended to undermine

11  competition on the merits from LIV Golf.

12  WHEREFORE, Plaintiffs hereby request that the Honorable Court award the following

13  permanent injunctive relief against the PGA TOUR:

14  a.  Stay and enjoin the PGA Tour's suspension and sanctions imposed on the Player

15  Plaintiffs;

16  b.  Enjoin the PGA Tour from banning or threatening to ban from the PGA Tour

17  (and its affiliated Tour) players who talk to, contract with, play in, or associate

18  with LIV Golf;

19  c.  Enjoin the PGA Tour from expelling players from the PGA Tour (and its

20  affiliated Tour) or PGA Tour tournaments who talk to, contract with, play in, or

21  associate with LIV Golf;

22  d.  Enjoin the PGA Tour from threatening or imposing any other punishments or

23  otherwise harming or threatening to harm anyone who talks to, contracts with,

24  or associates with LIV Golf;

25  e.  Enjoin the PGA Tour from conspiring or unlawfully agreeing with the European

26  Tour to ban or threaten to ban players from participating in European Tour

27  events or participating in the Ryder Cup for talking to, contracting with, playing

28  in, or associating with LIV Golf;

f.   Enjoin the PGA Tour from agreeing, contracting or threatening the R&A, Masters, and/or PGA of America (or others), to punish, exclude or threaten to exclude players otherwise eligible under current eligibility rules from participating in golf events (including the Majors);

g.   Enjoin the PGA Tour from amending its rules to prevent players otherwise eligible from playing in PGA Tour events or co-sponsored events, such as the FedEx Cup, the WGC tournaments, the Tournament of Champions, the Players, the Memorial, the Arnold Palmer Invitational, the Genesis Invitational, AT&T Pebble Beach Open, and the Presidents Cup;

h.   Enjoin the PGA Tour from enforcing its unlawful restrictions on independent-contractor golfers, including the Media Rights Regulation and the Conflicting Events Regulation;

i.   Enjoin the PGA Tour from amending its rules to prevent players otherwise eligible from playing in PGA Tour events or co-sponsored events;

j.   Enjoin the PGA Tour from applying rules beyond their meaning to punish players who associate with LIV Golf, or otherwise to thwart competition; and

k.   Enjoin the PGA Tour from taking any other actions intended to undermine competition on the merits from LIV Golf.

WHEREFORE, Plaintiffs request that this Honorable Court:

a.   Adjudge and decree that the PGA Tour is unlawfully maintaining its monopoly over the market for the services of professional golfers for elite golf events in violation of Section 2 of the Sherman Act;

b.   Adjudge and decree that the PGA Tour is unlawfully maintaining its monopoly over the market for the promotion of elite golf events in violation of Section 2 of the Sherman Act;

c.   In the alternative, adjudge and decree that the PGA Tour is attempting to monopolize the market for the services of professional golfers for elite golf

AMENDED COMPLAINT – DEMAND FOR JURY TRIAL
CASE NO. 5:22-cv-04486-BLF

events and the market for the promotion of elite golf events in violation of Section 2 of the Sherman Act;

d.   Adjudge and decree that the PGA Tour unreasonably restrained trade in violation of Section 1 of the Sherman Act when it entered agreement with the European Tour to boycott LIV Golf and potential competitors and those who associate with LIV Golf to try to foreclose competition from LIV Golf in the relevant markets;

e.   Adjudge and decree that the PGA Tour breached its Regulations when it refused to abate Player Plaintiffs' suspensions pending their respective appeals;

f.   Adjudge and decree that the PGA Tour unlawfully and tortiously interfered with LIV Golf's contractual and prospective business relationships;

g.   Award Plaintiffs monetary damages, treble damages, and economic damages;

h.   Award LIV Golf punitive damages for the PGA Tour's bad faith and egregious interference with LIV Golf's contractual and prospective business relationships;

i.   Award Plaintiffs their costs in this action, including attorneys' fees; and

j.   Award Plaintiffs any further relief as may be just and proper.

AMENDED COMPLAINT – DEMAND FOR JURY TRIAL
CASE NO. 5:22-cv-04486-BLF

1    DATED: August 26, 2022              Respectfully submitted,

2                              By:     */s/ Rachel S. Brass*

3
4                              RACHEL S. BRASS, SBN 219301
                               rbrass@gibsondunn.com
5                              GIBSON, DUNN & CRUTCHER LLP
                             555 Mission Street, Suite 3000
6                              San Francisco, California 94105-0921
                             Telephone: 415.393.8200
7                              Facsimile:  415.393.8306

8                              ROBERT C. WALTERS, *pro hac vice*
                             rwalters@gibsondunn.com

RACHEL S. BRASS, SBN 219301
rbrass@gibsondunn.com
GIBSON, DUNN & CRUTCHER LLP
555 Mission Street, Suite 3000
San Francisco, California 94105-0921
Telephone: 415.393.8200
Facsimile:  415.393.8306

ROBERT C. WALTERS, *pro hac vice*
rwalters@gibsondunn.com
SCOTT K. HVIDT, *pro hac vice*
shvidt@gibsondunn.com
GIBSON, DUNN & CRUTCHER LLP
2001 Ross Avenue, Suite 2100
Dallas, Texas 75201-2911
Telephone: 214.698.3100

JOSHUA LIPTON, *pro hac vice*
jlipton@gibsondunn.com
KRISTEN C. LIMARZI, *pro hac vice*
klimarzi@gibsondunn.com
GIBSON, DUNN & CRUTCHER LLP
1050 Connecticut Avenue, N.W.
Washington, DC  20036-5306
Telephone: 202.955.8500

JOHN B. QUINN, SBN 90378
johnquinn@quinnemanuel.com
DOMINIC SURPRENANT, SBN 165861
dominicsurprenant@quinnemmanuel.com
KEVIN TERUYA, SBN 235916
kevinteruya@quinnemanuel.com
QUINN EMANUEL URQUHART & SULLIVAN LLP
865 South Figueroa Street, 10th Floor
Los Angeles, California 90017
Telephone: 213.443.3000

ROBERT P. FELDMAN, SBN 69602
  bobfeldman@quinnemanuel.com
QUINN EMANUEL URQUHART & SULLIVAN LLP
555 Twin Dolphin Dr., 5th Floor
Redwood Shores, California 94065
Telephone:  650.801.5000
Facsimile:    650.801.5100

*Attorneys for Plaintiffs Talor Gooch, Hudson Swafford,
Matt Jones, Bryson DeChambeau, Ian Poulter, Peter
Uihlein, and LIV Golf Inc.*

DATED:  August 26, 2022

BAKER McKENZIE LLP


By:      */s/ William V. Roppolo*
         William V. Roppolo

WILLIAM V. ROPPOLO, *pro hac vice*
  william.roppolo@bakermckenzie.com
JODI A. AVILA, *pro hac vice*
  jodi.avila@bakermckenzie.com
BAKER McKENZIE LLP
1111 Brickell Avenue, Suite 1700
Miami, Florida 33131 USA
Telephone:  305.789.8900

JEFFREY MARTINO, SBN 222805
  jeffrey.martino@bakermckenzie.com
BAKER McKENZIE LLP
452 Fifth Avenue
New York, NY 10018
Telephone:  212.626.4100

*Attorneys for Phil Mickelson*

AMENDED COMPLAINT – DEMAND FOR JURY TRIAL
CASE NO. 5:22-cv-04486-BLF

## ATTESTATION PURSUANT TO CIVIL LOCAL RULE 5-1

Pursuant to Civil Local Rule 5-1(h)(3) of the Northern District of California, I attest that concurrence in the filing of the document has been obtained from each of the other signatories to this document.

DATED:  August 26, 2022                    GIBSON, DUNN & CRUTCHER LLP


By:         /s/ Rachel S. Brass
                    Rachel S. Brass

AMENDED COMPLAINT – DEMAND FOR JURY TRIAL
CASE NO. 5:22-cv-04486-BLF

# EXHIBIT 2

`

Clout Public Affairs | We Do What It Takes To Win.



One of the nation's premier Public Affairs firms, Clout has the experience, relationships and innovative style to help any industry, association or company navigate the most challenging matters they face.

In today's political environment, moving the needle requires changing the narrative. Clout Public Affairs is a full-service public strategy and consulting firm that brings together expertise in communications, policy and politics to execute winning strategies for our clients. We offer an integrated, efficient approach tailored to each client's needs – we do what it takes to win.

# What We Do

Clout Public Affairs is a full-service shop that provides integrated, creative and tailored strategic solutions to some of the nation's largest corporations, associations and industries. Our entire team has a proven record of helping secure victories through some of the most public and challenging policy and political battles over the past decade.

We help achieve these outcomes in a variety of ways — ranging from strategic and crisis communications assistance, advancement of competitive research, or building and executing grassroots campaigns to influence policymakers and regulators. We look to frame a public policy debate, a proposed merger or even the subject of a legislative or regulatory hearing in terms that are favorable to our clients.

Clout will proudly serve as your teammate, trusted advisor and partner with a singular focus on your success.

## The Clout Difference: We Do What It Takes To Win.

Clout Public Affairs | We Do What It Takes To Win.

# EXHIBIT 3
# (FILED UNDER SEAL)

# EXHIBIT 4
# (FILED UNDER SEAL)

# EXHIBIT 5
# (FILED UNDER SEAL)

# EXHIBIT 6
# (FILED UNDER SEAL)

# EXHIBIT 7
# (FILED UNDER SEAL)

# EXHIBIT 8
# (FILED UNDER SEAL)

# EXHIBIT 9
# (FILED UNDER SEAL)

# EXHIBIT 10
# (FILED UNDER SEAL)

# EXHIBIT 11
# (FILED UNDER SEAL)

# EXHIBIT 12
# (FILED UNDER SEAL)

# EXHIBIT 13
# (FILED UNDER SEAL)

# EXHIBIT 14
# (FILED UNDER SEAL)

# EXHIBIT 15
# (FILED UNDER SEAL)

# EXHIBIT 16
# (FILED UNDER SEAL)

# EXHIBIT 17
# (FILED UNDER SEAL)

# EXHIBIT 18
# (FILED UNDER SEAL)

# EXHIBIT 19
# (FILED UNDER SEAL)

# EXHIBIT 20
# (FILED UNDER SEAL)

# EXHIBIT 21
# (FILED UNDER SEAL)

# EXHIBIT 22
# (FILED UNDER SEAL)

# EXHIBIT 23
# (FILED UNDER SEAL)

# EXHIBIT 24
# (FILED UNDER SEAL)

# EXHIBIT 25
# (FILED UNDER SEAL)

# EXHIBIT 26



Graves Garrett LLC

Edward D. Greim
816.256.4144 phone
816.817.0864 fax
edgreim@gravesgarrett.com

November 21, 2022

**Via Electronic Mail**
Kevin Teruya
Quinn Emanuel Urquhart
& Sullivan, LLP
1300 U St. NW, #900
Washington, DC 20005
kevinteruya@quinnemanuel.com

Re:   **Subpoena to Clout Public Affairs, LLC by Plaintiffs in *Mickelson, et al.
v. PGA Tour, Inc.*, Case No. 5:22-cv-04486-BLF (N.D. Cal.)**

Dear Mr. Teruya:

On behalf of Clout Public Affairs, LLC ("Clout"), we write to object to the subpoena duces tecum for which this firm accepted e-mailed service effective Monday, November 7, 2022 (the "Subpoena"). *See* Fed. R. Civ. P. 45(d)(2)(B).

### Introduction

Based on our initial review, the Subpoena's seven distinct document requests would require Clout to produce thousands of documents. Clout, however, is a public relations firm that is not a party to your client's underlying antitrust litigation against the PGA Tour. *See* Rule 45(d)(1) (duty to "avoid imposing undue burden or expense" on non-parties). "The Rule 45 'undue burden' standard requires district courts to be generally sensitive to the costs imposed on third parties." *Watts v. S.E.C.*, 482 F.3d 501, 509 (D.C. Cir. 2017).

Here, most of the materials can be easily requested from the parties, including the PGA Tour. *In re Motion to Compel Compliance with Subpoena Direct to Dep't of Veterans Affs.*, 257 F.R.D. 12, 19 (D.D.C. 2009) ("DVA") ("Until [the requesting party] at least makes the effort and fails for some reason not attributable to its own fault, this Court cannot possibly

1100 Main Street, Suite 2700  Kansas City, MO 64105  **ph** 816.256.3181  www.gravesgarrett.com



Graves Garrett LLC

November 21, 2022
Page 2 of 8

determine whether any subpoena to [the non-party], no matter how limited, is still unduly burdensome because the information sought 'can be obtained from some other source that is more convenient, less burdensome, or less expensive.' Fed.R.Civ.P. 26(b)(2)(C)(I)."). Indeed, those materials have likely already been requested from, and perhaps are already being provided by, the PGA Tour.

Further, the Subpoena calls for materials that cannot possibly be relevant to any party's claim or defense; and even if some materials lie on the outer margins of relevance, the burden of producing them is not proportional to the needs of the case. *See* Rule 26(b)(1); *Watts*, 482 F.3d at 509 (explaining that all Rule 26(b)(1) and (2) factors must be considered with respect to Rule 45 subpoenas).

Finally, the Subpoena is objectionable because it reaches well beyond the allegedly anticompetitive conduct apparently at issue in the case. Based on our review, it seems to be an effort to use U.S. courts to obtain political intelligence against American opponents of one of the Saudi regime's American-based enterprises. This includes materials relating to any work Clout may have done to advance the political speech of non-parties to the case who are mentioned nowhere in the pleadings, including groups of families whose loved ones were victims of the worst terrorist attack on American soil, and who came together to engage in political advocacy and to petition their own government to hold foreign states and other actors accountable. Compelled disclosure of those efforts is not an appropriate use of legal process in an antitrust case. Indeed, those materials would be protected by the First Amendment Privilege, which generally protects from discovery information about groups' "political activities and... those persons with whom they have been affiliated." *International Action Center v. United States*, 207 F.R.D. 1, 3 (D.D.C. 2002).

These objections are more fully detailed below. Without waiving them, Clout does agree to produce any public communications it has made on behalf of the PGA Tour, which are otherwise responsive to Requests 2 through 5, and which are described in Paragraph 11 of the Amended Complaint. Because of the burden of searching for and producing these materials, we would respectfully ask that you grant an extension to December 14, 2022, for this production.



Graves Garrett LLC

## Responses to Specific Requests

**REQUEST FOR PRODUCTION NO. 1:**
All Communications with the PGA Tour related to Saudi Arabia, LIV Golf, the September 11, 2001 terrorist attacks, Phil Mickelson, 9/11 Families United, 9/11 Justice, or this lawsuit.

**Clout's Response:**

All of Clout's communications with the PGA Tour should already be in the possession of the PGA Tour, a party to this case. Absent some showing that the PGA Tour is unwilling or unable to produce those documents, the burden of party discovery cannot be shifted to Clout, a non-party. *See DVA*, 257 F.R.D. at 19; *Education Finance Council v. Oberg*, 2010 WL 3719921 *3 (U.S. Dist. Ct. D.C., March 8, 2010) ("Oberg's request imposes an undue burden on EFC because it appears that many, if not all, of EFC's communications with the defendants are available from the defendants to the underlying litigation themselves," and there was no "indication that the defendants cannot or will not provide all of these communications with EFC"); *Diamond Services Mgmt. Co., LLC v. Knobbe*, 339 F.R.D. 334, 339-340 (D.D.C. 2021) (Directing party issuing subpoena to pursue "at least three more convenient sources" instead of the subpoenaed party, and observing that "[w]here potentially important legal rights are implicated by a subpoena and alternative sources are 'more convenient [or] less burdensome,' those alternatives should be explored first.") (citing *In re Subpoena to Goldberg*, 693 F.Supp.2d 81, 88 (D.D.C. 2010)).

Even if it were not for the issue of burden, "all communications" between Clout and the PGA Tour regarding these topics are not necessarily relevant in the underlying antitrust proceeding. To the extent the PGA's public communications are alleged to have advanced other anticompetitive behavior (see Doc. 83, Plaintiffs' Amended Complaint, ¶11, subparagraphs a through g, which exclusively allege "threats" directed to various golfers, vendors, and organizations outside of the PGA Tour), those communications themselves are what is relevant, not the Tour's internal communications with Clout.

**REQUEST FOR PRODUCTION NO. 2:**
All Documents, Communications, bills, and invoices related to consulting services provided to the PGA Tour, whether formal or informal, paid or unpaid, related to Saudi Arabia, LIV Golf, the September 11, 2001 terrorist attacks, Phil Mickelson, 9/11 Families United, 9/11 Justice, or this lawsuit.



Graves Garrett LLC

**Clout's Response:**

To begin, Clout incorporates its response to Request 1, as this second request is, in part, a subset of Request 1. Request 2, though, is broader than Request 1 in two respects.

First, it seeks "All Documents…related to consulting services provided to the PGA Tour" on various topics. This encompasses even Clout's internal communications which were reduced to "Document" form, regardless of whether Clout ever shared them with the PGA Tour or with any third party and regardless of if they resulted in advice given to the PGA Tour, or work undertaken on behalf of the PGA Tour. That part of the request is objectionable for two reasons. First, a public relations firm's internal, deliberative, unshared work product and discussion cannot possibly be relevant to Plaintiffs' antitrust claims. As noted above, Paragraph 11 of the Amended Complaint exclusively alleges that the PGA Tour directed "threats" directed to various golfers, vendors, and organizations outside of the PGA Tour. What is relevant here are those threats themselves—not a non-party's information, opinions, or miscellaneous communications that were never shared with the PGA Tour. Accordingly, this part of Request 2 seeks information that is irrelevant. The volume of internal materials is also substantial—what appears to be a few thousand documents—and the cost of production is, therefore, also substantial.

Second, Request 2 seeks "Communications…related to consulting services provided to the PGA Tour" on that same set of topics. To the extent any of these Communications were made on behalf of the PGA Tour and are described in Paragraph 11 of the Amended Complaint, Clout will produce them.

**REQUEST FOR PRODUCTION NO. 3:**
All Documents and Communications related to any public affairs campaign you have conducted related to LIV Golf, any golfer who has participated in a LIV Golf tournament, or this lawsuit.

**Clout's Response:**

This Request logically calls for five categories of documents, and this Response will be organized with respect to each category.



November 21, 2022
Page 5 of 8

Graves Garrett llc

Category 1: Clout's communications with the PGA Tour. Clout incorporates its response to Request 1.

Category 2: Clout's internal documents and communications, shared with no outside person or individual. Clout incorporates its response to Request 2, and, in part, its response to Categories 3 and 5.

Category 3: Clout's communications with any Clout client other than the PGA Tour that hired Clout to engage in "any public affairs campaign you have conducted related to LIV Golf, [or] any golfer who has participated in a LIV Golf tournament."[1] Clout has several objections to this category. First, this calls for Clout's communications with any client that has engaged in *its own* First Amendment-protected political speech, and that has petitioned its own government, relating to LIV Golf due to LIV Golf's ties to the Kingdom of Saudi Arabia and past terrorist attacks on American soil. Those are not at all relevant to Plaintiffs' antitrust claims. Clout will not disclose its clients here, but the Subpoena explicitly recognizes the existence of groups that have engaged in protected speech and petitioned the government relating to the 9/11 terrorist attacks. Definitions 11 and 12 identify two such groups, "9/11 Families United" and "9/11 Justice," and defines each group as an "organization comprised of the coalition of families demanding legislative action and disclosure of information regarding the 9/11 attacks."

Any advocacy that Clout fosters on behalf of such groups of aggrieved American citizens is protected speech and petitioning activity that lies at the core of the First Amendment. *International Action Center v. United States*, 207 F.R.D. 1, 3 (D.D.C. 2002). Private communications and association between parties in preparation for political speech, or in preparation for and in furtherance of the exercise of the right to petition their government, is protected from compelled disclosure absent some specific need that "goes to the heart of the matter." *Id.* (citing *Black Panther Party v. Smith*, 661 F.2d 1243, 1268 (D.C. Cir. 1981)). Here, the Amended Complaint makes no reference at all to groups of 9/11 families or other citizens as somehow harming the Plaintiffs; instead, it references only "threats" by the PGA Tour and other golf-related bodies that the Tour allegedly influenced. LIV Golf and its fellow Plaintiffs claim no injury from outside groups who have a long history of criticizing Saudi influence in American politics and who criticize,

---

[1] No entity outside of the PGA Tour has hired Clout to engage in a public affairs campaign relating to "this lawsuit." Further, no other golf-related entity has hired Clout to engage in a public affairs campaign relating to LIV or its golfers.

November 21, 2022
Page 6 of 8



es Garrett LLC

on political grounds, the LIV's recent efforts. Therefore, to the extent the Subpoena seeks to aid Plaintiffs, their backers, and any foreign state in uncovering Clout's communications with 9/11 families or their political associations, it is unenforceable as a violation of the First Amendment.

Category 4: Clout's public communications with any outside party on behalf of the PGA Tour related to LIV Golf, any golfer who has participated in a LIV Golf tournament, or this lawsuit. Clout will produce such communications to the extent they are described in Paragraph 11 of the Amended Complaint.

Category 5: Clout's public communications with any outside party on behalf of another client (i.e., not on behalf of the PGA Tour) related to LIV Golf, any golfer who has participated in a LIV Golf tournament, or this lawsuit. Clout objects to this request for the same reasons outlined in its discussion of Category 3.

REQUEST FOR PRODUCTION NO. 4:
All Documents and Communications related to any coalition development you have conducted related to LIV Golf, any golfer who has participated in a LIV Golf tournament, or this lawsuit.

Clout's Response:
This Request appears to be a subset of Request 3. Regardless of precisely what Plaintiff means by "coalition development," the same objections and responses apply, and Clout therefore incorporates its response to Request 3.

REQUEST FOR PRODUCTION NO. 5:
All Documents and Communications related to any strategic & crisis communications you have conducted related to LIV Golf, any golfer who has participated in a LIV Golf tournament, or this lawsuit.

Clout's Response:
This Request appears to be a subset of Request 3. Regardless of precisely what Plaintiff means by "strategic & crisis communications," the same objections and responses apply, and Clout therefore incorporates its response to Request 3.



Graves Garrett LLC

November 21, 2022
Page **7** of **8**

**REQUEST FOR PRODUCTION NO. 6:**

All Documents related to any competitive research you have conducted related to LIV Golf, any golfer who has participated in a LIV Golf tournament, or this lawsuit.

**Clout's Response:**

This Request appears to be a subset of Request 3. Regardless of precisely what Plaintiff means by "competitive research," the same objections and responses apply, and Clout therefore incorporates its response to Request 3.

**REQUEST FOR PRODUCTION NO. 7:**

All Communications with 9/11 Families United, 9/11 Justice, or anyone associated with either (e.g., agents, members, officers, directors, employees, or associates) related to Saudi Arabia, the PGA Tour, LIV Golf, the September 11, 2001 terrorist attacks, Phil Mickelson, protests, or this lawsuit.

**Clout's Response:**

This Request is objectionable for several reasons. First, it is utterly irrelevant to this proceeding. The 9/11 families' groups are never mentioned or even alluded to in the Plaintiffs' sprawling Amended Complaint. That is because the Plaintiffs' injuries come from alleged "threats" the PGA Tour is alleged to have made to various golf-related individuals and entities. *See* Amended Complaint, Paragraph 11. Clout's communications with the 9/11 groups—if any—could logically support neither a claim nor a defense in the underlying case. Second, for the reasons Clout laid out above (Request for Production 3, Category 3), any such communications—if they exist—would be subject to the First Amendment Privilege. Plaintiffs and their backers cannot use their litigation with the PGA Tour as an excuse to chill political speech and advocacy by families who were brought together by the worst terrorist attack ever to occur on American soil.

**Conclusion**

Clout believes it has thousands of documents that are potentially responsive to the Subpoena; reviewing and producing these materials will be a substantial and expensive



Graves Garrett LLC

November 21, 2022
Page **8** of **8**

undertaking. Few, if any, of these materials are relevant to the Amended Complaint or the Defendant's response, but if they are, it is only because the PGA Tour was itself a part of the communication. Of course, those are the very materials that Plaintiffs can access (and likely are accessing) directly from the Tour. Given this state of affairs, the Subpoena is likely unenforceable.

However, in order to avoid the additional expense of litigation, Clout is willing to agree to produce any of its own communications with third parties on behalf of the PGA Tour that Plaintiffs allege constitute the various "threats" summarized in Paragraph 11 of the Amended Complaint as the gravamen of the Plaintiffs' case. Because of the volume of materials that must be searched, we respectfully request an extension of time to December 14, 2022, to make this production.

Finally, we recognize that it is possible we have misconstrued the Subpoena, or that you have inadvertently made broader requests than you intended. We are willing to meet and confer with you in the coming days to clear up any misunderstandings and to discuss our respective positions.

Sincerely,

Edward D. Greim

# EXHIBIT 27
# (FILED UNDER SEAL)

# EXHIBIT 28
# (FILED UNDER SEAL)

# EXHIBIT 29
# (FILED UNDER SEAL)

# EXHIBIT 30
# (FILED UNDER SEAL)

# EXHIBIT 31
# (FILED UNDER SEAL)

# EXHIBIT 32
# (FILED UNDER SEAL)

# EXHIBIT 33

12/5/22, 9:03 AM                    Justice Department Is Investigating PGA Tour Over Potential Antitrust Violations in LIV Golf Battle - WSJ

This copy is for your personal, non-commercial use only. Distribution and use of this material are governed by our Subscriber Agreement and by copyright law. For
non-personal use or to order multiple copies, please contact Dow Jones Reprints at 1-800-843-0008 or visit www.djreprints.com.

https://www.wsj.com/articles/pga-tour-antitrust-liv-department-of-justice-investigation-11657557177

◆ WSJ NEWS EXCLUSIVE**GOLF**

# Justice Department Is Investigating PGA Tour Over Potential Antitrust Violations in LIV Golf Battle

The probe shows that the DOJ is watching the PGA Tour's fight to retain players in the face of new competition from the Saudi-backed LIV Golf circuit



The FedEx Cup Trophy on display during the 2021 Tour Championship golf tournament.
PHOTO: ERIK S LESSER/SHUTTERSTOCK

*By Louise Radnofsky*  ⊕  *and Andrew Beaton*  ⊕
Updated July 11, 2022 4:28 pm ET

The Department of Justice is investigating whether the PGA Tour engaged in anticompetitive behavior as it battles the upstart, Saudi-backed LIV Golf circuit, the PGA Tour confirmed to The Wall Street Journal.

Players' agents have received inquiries from the DOJ's antitrust division involving both the PGA Tour's bylaws governing players' participation in other golf events, and the PGA Tour's actions in recent months relating to LIV Golf, according to a person familiar with those inquiries.

The questions send a clear signal that the Justice Department is watching the fight that has divided professional golf, which both sides expect to end up in U.S. courts at some point. Such an investigation would ordinarily include the subject being instructed to freeze all relevant communications, both internal and with third parties.

A spokesman for the PGA Tour said it was aware of the investigation—and was confident it would prevail. The Department of Justice declined to comment.

Since the debut of LIV Golf, which is financed by Saudi Arabia's sovereign-wealth fund, the PGA Tour has suspended players who have chosen to participate—a punishment that LIV has assailed as anticompetitive. Some of those players have opted to resign from the PGA Tour.

The emergence of LIV Golf and the extraordinary money behind it has plunged the sport into tumult and financial upheaval. LIV offers $25 million in prize money at its tournaments—far more than is currently offered on the PGA Tour—in addition to the seemingly massive sums the top pros are receiving for simply signing on.

The PGA Tour has responded by upping its purses at select tournaments and creating alternate routes, including new proposed international events, in order to further line players' pockets. But even the Tour's boss concedes it can't match the Saudis' coffers.

"If this is an arms race and if the only weapons here are dollar bills, the PGA Tour can't compete," PGA Tour commissioner Jay Monahan said in June. "The PGA Tour, an American institution, can't compete with a foreign monarchy that is spending billions of dollars in [an] attempt to buy the game of golf."

That money could also become part of an antitrust case, said people familiar with LIV Golf's thinking, if LIV Golf were to argue that they had been forced by the PGA Tour's rules to spend more in order to do business.

This isn't the first federal probe into the PGA Tour's practices. In 1994, the Federal Trade Commission was pursuing two PGA rules—one barring golfers from playing in a non-PGA event without the commissioner's permission, and the other relating to their appearance on televised golf programs. By 1995, the FTC had backed off.

"This was not unexpected," the PGA Tour spokesman said of the new probe. "We went through this in 1994 and we are confident in a similar outcome."



The PGA Tour's bylaws suggest that players are still not allowed to participate in other televised golf events without the approval of the commissioner.

**PHOTO:** FRED KFOURY III/ZUMA PRESS

The scrutiny over the Tour's policies has typically focused on the areas that were examined back in the mid-1990s—both of which relate to the current battle with LIV. The PGA Tour's bylaws suggest that players are still not allowed to participate in other televised golf events without the approval of the commissioner.

There is also the set of rules that requires players to request a release to play in tournaments that conflict with PGA Tour events. Players are eligible for up to three such releases a season, and no such releases are granted for events in North America. When players requested those releases to play in the first LIV event outside of London last month, they were denied—leading to the suspensions of those who participated nonetheless.

Critics have called those practices anticompetitive. And LIV Golf CEO and commissioner Greg Norman has boasted of bringing "free agency" to golf. A LIV spokeswoman didn't have an immediate comment.

As LIV Golf has tried to woo players, it also raised the possibility of a scenario such as this one. Earlier this year, LIV had sent a letter to players and agents accusing the PGA Tour of monopolistic behavior, writing that if the PGA Tour followed through on banning players who joined LIV that it would "likely cause the federal government to investigate and punish the PGA Tour's unlawful practices."

"There is simply no recognized justification for banning independent contractor professional golfers for simply contracting to play professional golf," the letter said.

The DOJ's investigation presages what may become a prolonged and multi-pronged legal battle inside professional golf. The LIV Golf circuit, or the players who left the PGA Tour, could bring an antitrust suit in the U.S. The Justice Department could weigh in with a statement of interest in such a case, or keep pursuing its own action.



PGA Tour commissioner Jay Monahan looks on during the Scottish Open.
**PHOTO:** KEVIN C. COX/GETTY IMAGES

One of the notable developments in that space unfolded just last week when a handful of LIV golfers challenged their suspensions from an event—and won a stay. The DP World Tour, also known as the European tour, had suspended LIV players from participating in the Genesis Scottish Open, which it co-sanctions with the PGA Tour.

But days before the event, a judge hearing the golfers' complaint through a dispute resolution service said those bans should be temporarily enjoined.

LIV Golf—and the money behind it—has generated considerable controversy and tumult inside the sport this year. The circuit has offered record prize money, in addition to lucrative appearance fees, in order to attract top pros.

Superstar Phil Mickelson faced considerable backlash earlier this year after the publication of comments in which he said he would be willing to do business with the Saudis despite the country's record on human rights, because of his dissatisfaction with how the PGA Tour operates.

Mickelson spent months away from golf following the firestorm. When he re-emerged, it was at LIV's debut event outside London.

He is one of a growing list of big names who have signed on with LIV, including Dustin Johnson, Bryson DeChambeau, Brooks Koepka and Patrick Reed. Many of these players have faced consequences from not just the PGA Tour, which suspended them, but also their own sponsors who have in some instances stopped working with them.

Their involvement with the Saudis has also drawn the criticism of activists, including the families of 9/11 victims.

—*Mark Maremont contributed to this article.*

Write to Louise Radnofsky at louise.radnofsky@wsj.com and Andrew Beaton at andrew.beaton@wsj.com



Dustin Johnson and Phil Mickelson during a LIV Golf event.
PHOTO: STEVEN PASTON/ZUMA PRESS

*Appeared in the July 12, 2022, print edition as 'PGA Tour Faces DOJ Inquiry Into Fight With Saudi Rival'.*

# EXHIBIT 34

This copy is for your personal, non-commercial use only. Distribution and use of this material are governed by our Subscriber Agreement and by copyright law. For non-personal use or to order multiple copies, please contact Dow Jones Reprints at 1-800-843-0008 or visit www.djreprints.com.

https://www.wsj.com/articles/augusta-national-investigation-masters-liv-golf-doj-usga-11666792047



◆ WSJ NEWS EXCLUSIVE

*By Louise Radnofsky*  ⊕    *and Andrew Beaton*  ⊕

Oct. 26, 2022 10:00 am ET

The Justice Department's antitrust investigation into professional golf includes the powerhouse bodies Augusta National Golf Club and the United States Golf Association, in addition to the PGA Tour, according to people familiar with the matter.

The PGA Tour is battling the upstart, Saudi-backed LIV Golf's bid to establish a rival golf tour that has already lured away a number of star players. The DOJ antitrust division's scrutiny of the PGA Tour was first reported by The Wall Street Journal in July. Players' agents have received inquiries about the Tour's bylaws as they pertain to players' participation in non-PGA Tour events, and the Tour's actions relating to LIV Golf.

The DOJ investigation, however, is wider than was previously known, extending to some of the other most important bodies in golf. People familiar with the matter said those groups include Augusta National, which oversees the iconic Masters tournament each spring. The famously secretive club has produced documents for the Justice Department probe, these people said.

A spokeswoman for Augusta National declined to comment. Craig Waldman, a lawyer at Jones Day representing Augusta National in the matter, had no comment.

The USGA, which governs the sport in the U.S. and oversees the U.S. Open, is also a subject of the investigation, a USGA spokeswoman confirmed. The USGA intends to fully comply with any and all requests, the spokeswoman said.

The PGA of America, which is distinct from the PGA Tour and runs the PGA Championship, is another body whose actions are being examined as part of the probe, people familiar with the matter said. The PGA of America also declined to comment.

A Justice Department spokeswoman declined to comment.



Scottie Scheffler tees off during the final round of the 2022 Masters.
PHOTO: JONATHAN ERNST/REUTERS

The Justice Department's interest is only one of the legal battles surrounding the warring golf circuits, as other fights have also drawn in the most significant institutions in the sport's establishment.

LIV Golf is pursuing an antitrust lawsuit against the PGA Tour in the U.S. District Court for the Northern District of California, in a case initially brought by LIV players, but now largely being handled now by the circuit itself.

LIV is arguing that the Tour has acted illegally in suspending LIV players from its events, in an attempt to squash a rival. The PGA Tour has countersued, alleging that LIV harmed the Tour by interfering in its deals with golfers.

The Tour has said it is confident it will prevail over LIV, and in the DOJ matter. There has also been public skepticism about the merits of the antitrust probe. Members of Congress have raised objections to the DOJ pursuing the golf inquiry at all, accusing the federal agency of helping the Saudis.

Augusta National has featured prominently in LIV's complaint against the Tour, as LIV accuses the Tour of leaning on the famed club to pressure players against joining LIV. The LIV

suit also says that Augusta National has taken steps to align with the PGA Tour.



Fred Ridley is the chairman of Augusta National Golf Club.
PHOTO: BRIAN SNYDER/REUTERS

Augusta National representatives, the complaint says, threatened to disinvite players from the Masters if they joined LIV. The club's chairman Fred Ridley personally instructed a number of participants in last year's Masters to not sign on with LIV, it added. Ridley didn't respond to an email seeking comment.

The PGA Tour, in court documents, has denied pressuring Augusta National to do its bidding. It has also broadly disputed the veracity of many of LIV's claims.

In an early filing, seeking to block LIV players' application for a temporary restraining order that would have allowed them to play in the FedEx Cup Playoffs, lawyers for the PGA Tour wrote: "The Tour does not have the space to correct all of [plaintiffs'] half-truths and falsehoods in this brief, and instead has created a separate chart identifying an exemplary set of them."

LIV's legal filing also portrayed Ridley as playing a central role in the situation. It says he, along with the chairman of the R&A, threatened consequences to the CEO of the Asian Tour, which has a partnership with LIV, if it continued to support LIV. The R&A, another international golf governing body, oversees the British Open.

It also says Ridley declined an invitation from Greg Norman, the former golf star who's the commissioner of LIV Golf, when he attempted to set up a meeting to explain how "LIV Golf could operate in the existing professional golf world."

Augusta National Golf Club Under Investigation in DOJ Antitrust Probe - WSJ



Greg Norman, right, is the LIV Golf commissioner.
PHOTO: STEVE DYKES/GETTY IMAGES

LIV is waging an additional campaign to persuade the Official World Golf Ranking to award points for its events, a fight that could trigger further litigation on this specific issue in Europe, or a push to get the majors to accept alternative rankings.

Other than the brief period every year when it opens its doors to television cameras and throngs of fans, Augusta National is one of the most tight-lipped bodies around. The club rarely comments on its business or on public issues and is closely guarded about even the smallest details of its operation.

Its membership, however, contains some of the most prominent public figures in the country. Members of the club, which was exclusively male until 2012, include business titans and prominent sports power players such as NFL commissioner Roger Goodell and MLB commissioner Rob Manfred. When the club first admitted women a decade ago, former Secretary of State Condoleezza Rice gained admission.

Write to Louise Radnofsky at louise.radnofsky@wsj.com and Andrew Beaton at andrew.beaton@wsj.com

# EXHIBIT 35
# (FILED UNDER SEAL)

# EXHIBIT 36

12/11/22, 4:56 PM                     PGA TOUR INC - Full Filing- Nonprofit Explorer - ProPublica

Protect Independent Journalism  Make a year-end donation to ProPublica.    DONATE

**PROPUBLICA**                    f    y    ✉ SIGN UP                              Donate

## Nonprofit Explorer

Research Tax-Exempt Organizations

# PGA TOUR INC

PONTE VEDRA, FL 32082-2826 | TAX-EXEMPT SINCE FEB. 1977

## Full text of "Full Filing" for fiscal year ending Dec. 2019

Tax returns filed by nonprofit organizations are public records. The Internal Revenue Service releases them in two formats: page images and raw data in XML. The raw data is more useful, especially to researchers, because it can be extracted and analyzed more easily. The pages below are a reconstruction of a tax document using raw data from the IRS.

*Source: Data and stylesheets from the Internal Revenue Service. E-file viewer adapted from IRS e-File Viewer by Ben Getson.*

← Back to main page for PGA TOUR INC

12/11/22, 4:56 PM

PGA TOUR INC - Full Filing- Nonprofit Explorer - ProPublica

Jump to Schedule: | Form 990 ▾ |

| efile Public Visual Render | ObjectId: 202023219349309777 - Submission: 2020-11-16 | TIN: 52-0999206 |

Form **990**

Department of the Treasury
Internal Revenue Service

### Return of Organization Exempt From Income Tax

Under section 501(c), 527, or 4947(a)(1) of the Internal Revenue Code (except private foundations)
▶ Do not enter social security numbers on this form as it may be made public.
▶ Go to *www.irs.gov/Form990* for instructions and the latest information.

OMB No. 1545-0047

**2019**

Open to Public
Inspection

**A** For the 2019 calendar year, or tax year beginning 01-01-2019 , and ending 12-31-2019

| **B** Check if applicable: | **C** Name of organization | **D** Employer identification number |
|---|---|---|
| ○ Address change | PGA TOUR INC | 52-0999206 |
| ○ Name change | % JEANNE LIGHTCAP | |
| ○ Initial return | Doing business as | |
| ○ Final return/terminated | | |
| ○ Amended return | Number and street (or P.O. box if mail is not delivered to street address) Room/suite | **E** Telephone number |
| ○ Application pending | 100 PGA TOUR BOULEVARD | (904) 285-3700 |
| | City or town, state or province, country, and ZIP or foreign postal code | |
| | PONTE VEDRA BEACH, FL 32082 | **G** Gross receipts $ 2,220,358,992 |

| **F** Name and address of principal officer: | **H(a)** Is this a group return for |
|---|---|
| Joseph W Monahan | subordinates? ○ Yes ☒ No |
| 100 PGA TOUR BOULEVARD | **H(b)** Are all subordinates |
| PONTE VEDRA BEACH, FL 32082 | included? ○ Yes ○ No |

**I** Tax-exempt status: ○ 501(c)(3)  ☒ 501(c) ( 6 ) ◀(insert no.)  ○ 4947(a)(1) or  ○ 527

If "No," attach a list. (see instructions)

**J** Website: ▶ PGATOUR.COM

**H(c)** Group exemption number ▶

**K** Form of organization: ☒ Corporation  ○ Trust  ○ Association  ○ Other ▶ | **L** Year of formation: 1974 | **M** State of legal domicile: MD

| Part I | Summary |
|---|---|

**1** Briefly describe the organization's mission or most significant activities:
TO PROMOTE THE SPORT OF PROFESSIONAL GOLF AND THE COMMON INTERESTS AND THE COMMON INTERESTS OF TOURING GOLF PROFESSIONALS.

**2** Check this box ▶ ○

| | | | |
|---|---|---|---:|
| **3** Number of voting members of the governing body (Part VI, line 1a) . . . . . | | **3** | 9 |
| **4** Number of independent voting members of the governing body (Part VI, line 1b) . . | | **4** | 5 |
| **5** Total number of individuals employed in calendar year 2019 (Part V, line 2a) . . . . | | **5** | 959 |
| **6** Total number of volunteers (estimate if necessary) . . . . . . . . . | | **6** | 17,432 |
| **7a** Total unrelated business revenue from Part VIII, column (C), line 12 . . . . . . | | **7a** | 17,704,991 |
| **b** Net unrelated business taxable income from Form 990-T, line 39 . . . . . . . | | **7b** | 3,535,196 |

| | | Prior Year | Current Year |
|---|---|---:|---:|
| **8** Contributions and grants (Part VIII, line 1h) . . . . . . . . . | | 0 | 0 |
| **9** Program service revenue (Part VIII, line 2g) . . . . . . . . | | 1,076,557,060 | 1,167,400,356 |
| **10** Investment income (Part VIII, column (A), lines 3, 4, and 7d ) . . . | | 122,488,571 | 137,044,843 |
| **11** Other revenue (Part VIII, column (A), lines 5, 6d, 8c, 9c, 10c, and 11e) | | 216,906,243 | 229,576,682 |
| **12** Total revenue—add lines 8 through 11 (must equal Part VIII, column (A), line 12) | | 1,415,951,874 | 1,534,021,881 |
| **13** Grants and similar amounts paid (Part IX, column (A), lines 1–3 ) . . . | | 42,745,978 | 50,051,841 |
| **14** Benefits paid to or for members (Part IX, column (A), line 4) . . . . | | 0 | 0 |
| **15** Salaries, other compensation, employee benefits (Part IX, column (A), lines 5–10) | | 141,294,696 | 146,491,395 |
| **16a** Professional fundraising fees (Part IX, column (A), line 11e) . . . . . | | 0 | 0 |
| **b** Total fundraising expenses (Part IX, column (D), line 25) ▶0 | | | |
| **17** Other expenses (Part IX, column (A), lines 11a–11d, 11f–24e) . . . . | | 1,161,504,407 | 1,264,706,071 |
| **18** Total expenses. Add lines 13–17 (must equal Part IX, column (A), line 25) | | 1,345,545,081 | 1,461,249,307 |
| **19** Revenue less expenses. Subtract line 18 from line 12 . . . . . . . | | 70,406,793 | 72,772,574 |

| | | Beginning of Current Year | End of Year |
|---|---|---:|---:|
| **20** Total assets (Part X, line 16) . . . . . . . . . . . | | 2,934,026,162 | 3,384,025,893 |
| **21** Total liabilities (Part X, line 26) . . . . . . . . . . | | 1,780,766,622 | 2,149,896,019 |
| **22** Net assets or fund balances. Subtract line 21 from line 20 . . . . | | 1,153,259,540 | 1,234,129,874 |

| Part II | Signature Block |
|---|---|

Under penalties of perjury, I declare that I have examined this return, including accompanying schedules and statements, and to the best of my knowledge and belief, it is true, correct, and complete. Declaration of preparer (other than officer) is based on all information of which preparer has any knowledge.

12/11/22, 4:56 PM                    PGA TOUR INC - Full Filing- Nonprofit Explorer - ProPublica

| Sign Here | Signature of officer | | | 2020-11-14 Date |
|---|---|---|---|---|
| | KENNETH SHARKEY EVP/CFO | | | |
| | Type or print name and title | | | |

| Paid Preparer Use Only | Print/Type preparer's name | Preparer's signature | Date | Check ☐ if self-employed | PTIN P00059252 |
|---|---|---|---|---|---|
| | Firm's name ▶ GRANT THORNTON LLP | | | Firm's EIN ▶ | |
| | Firm's address ▶ 200 S ORANGE AVE SUITE 2050 | | | Phone no. (407) 481-5100 | |
| | ORLANDO, FL 32801 | | | | |

May the IRS discuss this return with the preparer shown above? (see instructions) . . . . . . . . . .  ☐ Yes ☐ No

**For Paperwork Reduction Act Notice, see the separate instructions.**          Cat. No. 11282Y          Form **990** (2019)

---

Page 2

Form 990 (2019)                                                                                                    Page **2**

### Part III    Statement of Program Service Accomplishments

Check if Schedule O contains a response or note to any line in this Part III . . . . . . . . . . . . . ☑

1  Briefly describe the organization's mission:
THE PRINCIPAL MISSION OF PGA TOUR, INC. IS TO PROMOTE THE SPORT OF PROFESSIONAL GOLF THROUGH SANCTIONING AND ADMINISTERING GOLF TOURNAMENTS AND PROMOTING THE COMMON INTERESTS OF TOURING GOLF PROFESSIONALS. THIS IS ACCOMPLISHED BY PROVIDING COMPETITIVE EARNINGS OPPORTUNITIES FOR MEMBERS OF THE PGA TOUR, PGA TOUR CHAMPIONS, KORN FERRY TOUR, PGA TOUR LATINOAMERICA, MACKENZIE TOUR-PGA TOUR CANADA, AND PGA TOUR SERIES-CHINA; PROTECTING THE INTEGRITY OF THE GAME; AND HELPING GROW THE REACH OF THE GAME IN THE U.S. AND AROUND THE WORLD.

2  Did the organization undertake any significant program services during the year which were not listed on
the prior Form 990 or 990-EZ? . . . . . . . . . . . . . . . . . . . . . . . . .  ☐ Yes ☑ No
If "Yes," describe these new services on Schedule O.

3  Did the organization cease conducting, or make significant changes in how it conducts, any program
services? . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .  ☐ Yes ☑ No
If "Yes," describe these changes on Schedule O.

4  Describe the organization's program service accomplishments for each of its three largest program services, as measured by expenses.
Section 501(c)(3) and 501(c)(4) organizations are required to report the amount of grants and allocations to others, the total expenses, and revenue, if any, for each program service reported.

4a  (Code: _____ ) (Expenses $ _____ including grants of $ _____ ) (Revenue $ _____ )
THE PRINCIPAL MISSION OF PGA TOUR, INC. IS THE PROMOTION OF THE SPORT OF PROFESSIONAL GOLF AND THE COMMON INTERESTS OF THE TOURING PROFESSIONAL GOLFER AS WELL AS GROWTH OF THE GAME. THIS IS PRIMARILY ACCOMPLISHED THROUGH MANAGING AND CO-SPONSORING PROFESSIONAL GOLF TOURNAMENTS, SECURING CORPORATE SPONSORSHIP OF TOURNAMENTS AND OTHER PROGRAMS, AND SECURING TELEVISION EXPOSURE FOR ITS PROFESSIONAL GOLF TOURNAMENTS. BY MANAGING AND CO-SPONSORING SIX DIFFERENT PROFESSIONAL GOLF TOURNAMENT DIVISIONS (PGA TOUR, PGA TOUR CHAMPIONS, KORN FERRY TOUR, PGA TOUR LATINOAMERICA, MACKENZIE TOUR-PGA TOUR CANADA, AND PGA TOUR SERIES-CHINA - COLLECTIVELY THE PGA TOUR), PGA TOUR, INC. PROVIDES OPPORTUNITIES FOR THE TOURING PROFESSIONAL GOLFER TO COMPETE AND EARN PRIZE MONEY AND BENEFITS WHILE GROWING THE GAME BY EXPOSING IT TO THE GENERAL PUBLIC THROUGH THEIR ATTENDANCE AND TELEVISION VIEWING. IN 2019, THE SIX TOURS COLLECTIVELY HELD 142 TOURNAMENTS. TOTAL PRIZE MONEY AND BENEFITS EARNED THROUGH COMPETITION BY PROFESSIONAL GOLFERS ACROSS THE SIX TOURS IN 2019 EXCEEDED $775 MILLION. THESE TOURNAMENTS WERE PLAYED IN AT LEAST 34 U.S. STATES AND 19 DIFFERENT COUNTRIES IN 2019, ALLOWING PEOPLE THROUGHOUT THE WORLD THE OPPORTUNITY TO EXPERIENCE FIRST-HAND THE SPORT OF PROFESSIONAL GOLF. PGA TOUR, INC. SECURES TELEVISION COVERAGE FOR ITS TOURNAMENTS THROUGH AGREEMENTS WITH NATIONAL AND INTERNATIONAL BROADCASTERS AND CABLE CHANNELS. IN 2019, PGA TOUR, INC. TELEVISION COVERAGE REACHED 226 COUNTRIES AND TERRITORIES AND IN 23 LANGUAGES. PGA TOUR, INC. AND DISCOVERY FORMED AN ALLIANCE AND UNVEILED GOLFTV IN 2019 TO PROVIDE 2,000 HOURS OF LIVE GOLF COVERAGE TO MULTIPLE COUNTRIES TO FURTHER PROMOTE THE SPORT OF GOLF WORLDWIDE. PGA TOUR, INC. AND THE LADIES PROFESSIONAL GOLF ASSOCIATION MAINTAIN A STRATEGIC ALLIANCE DESIGNED TO FURTHER PROMOTE THE GROWTH OF PROFESSIONAL GOLF, INCLUDING AREAS SUCH AS SCHEDULE COORDINATION, JOINT MARKETING, TELEVISION REPRESENTATION, DIGITIAL MEDIA, AND THE POSSIBILITY OF FUTURE DEVELOPMENT OF JOINT EVENTS. IN ADDITION TO TELEVISION COVERAGE, THE PGA TOUR IS EMBRACING DIGITAL MEDIA ACROSS MULTIPLE PLATFORMS, INCLUDING A SUBSIDIARY'S WEBSITE, PGATOUR.COM. THE PGA TOUR CONTINUES TO GROW ITS PRESENCE ON SOCIAL MEDIA CHANNELS SUCH AS FACEBOOK, INSTAGRAM, AND TWITTER THROUGH A SUBSIDIARY TO BRING THE PLAYERS CLOSER TO THE GENERAL PUBLIC, VOLUNTEERS, AND SPONSORS. IN 2019, TWITTER BROADCASTED MORE THAN 140 HOURS OF FREE, EXCLUSIVE, LIVE TOURNAMENT COVERAGE ACROSS MULTIPLE EVENTS TO BROADEN THE APPEAL OF GOLF TO YOUNGER VIEWERS. THE MISSION OF GROWING THE GAME OF GOLF IS ENHANCED THROUGH TELEVISION, CORPORATE SPONSORSHIPS AND THE PROMOTIONAL ACTIVITIES ASSOCIATED WITH PROMOTING THE SPORT OF PROFESSIONAL GOLF. PGA TOUR, INC. AND INTEL HAVE AN EXCLUSIVE RELATIONSHIP TO PRODUCE AND GLOBALLY DISTRIBUTE LIVE VIRTUAL REALITY AND LIVE 360 VIDEO AT VARIOUS PGA TOUR EVENTS. THE QUALIFIED SPONSORSHIP PAYMENTS RECEIVED BY PGA TOUR, INC., AS DEFINED IN INTERNAL REVENUE CODE SECTION 513(I), PROMOTE THE SPORT THROUGH FUNDS UTILIZED IN PART TO INCREASE PURSE AMOUNTS AND EARNINGS OPPORTUNITIES FOR PROFESSIONAL GOLFERS ON THE PGA TOUR, PGA TOUR CHAMPIONS, KORN FERRY TOUR, PGA TOUR LATINOAMERICA, MACKENZIE TOUR-PGA TOUR CANADA, AND PGA TOUR SERIES-CHINA IN PART TO ACHIEVE PGA TOUR, INC.'S GOAL OF GIVING BACK, AS SET FORTH IN PART III, LINE 4B.

4b  (Code: _____ ) (Expenses $ _____ including grants of $ _____ ) (Revenue $ _____ )
IN ADDITION TO PROMOTING AND BUILDING THE SPORT OF PROFESSIONAL GOLF, PGA TOUR, INC. IS COMMITTED TO GENERATING SUBSTANTIAL CHARITABLE CONTRIBUTIONS IN THE COMMUNITIES WHERE ITS TOURNAMENTS ARE PLAYED, EVEN THOUGH PGA TOUR, INC. IS NOT A CHARITABLE IRC SECTION 501(C)(3) ORGANIZATION. A MAJORITY OF THE TOURNAMENTS ARE OPERATED BY CHARITABLE ORGANIZATIONS THAT GIVE 100% OF THE NET PROCEEDS FROM THE TOURNAMENT TO LOCAL CHARITIES. AREAS OF SUPPORT INCLUDE, BUT ARE NOT LIMITED TO: HEALTHCARE, EDUCATION, YOUTH DEVELOPMENT, DISASTER RELIEF, FOOD BANKS, MILITARY AND ENVIRONMENT. IN 2019, PGA TOUR, INC. AND ITS TOURNAMENTS GENERATED MORE THAN $200 MILLION OF CHARITABLE DONATIONS IN THE COMMUNITIES WHERE THE EVENTS WERE PLAYED, BENEFITTING MORE THAN 3,000 CHARITIES. INCLUDED IN THIS AMOUNT IS $50 MILLION OF DIRECT CONTRIBUTIONS MADE BY PGA TOUR, INC. THIS BRINGS PGA TOUR, INC.'S TOTAL CHARITABLE DONATIONS TO MORE THAN $3 BILLION SINCE THE FIRST $10,000 CONTRIBUTION WAS MADE IN 1938. ALSO, A SUBSTANTIAL AMOUNT OF ADDITIONAL CHARITY DOLLARS ARE RAISED EACH YEAR BY PGA TOUR, INC. MEMBERS THROUGH THEIR INDIVIDUAL FOUNDATIONS AND FUNDRAISERS.

4c  (Code: _____ ) (Expenses $ _____ including grants of $ _____ ) (Revenue $ _____ )

© Copyright 2021 Pro Publica Inc.

PGA TOUR, INC. INCLUDES, AS PART OF ITS MISSION STATEMENT, THE DEDICATION TO PROTECT THE INTEGRITY OF THE GAME OF PROFESSIONAL GOLF. THE TOURING PROFESSIONAL GOLFER HAS AN UNWAVERING ADHERENCE TO GOLF'S INHERENT VALUES, SUCH AS HONESTY, INTEGRITY, AND SPORTSMANSHIP. GOLF IS A SPORT IN WHICH PLAYERS CALL PENALTIES ON THEMSELVES, WHETHER AN INFRACTION IS VISIBLE TO OTHERS OR NOT. IT IS A SPORT IN WHICH COMPETITORS SHAKE HANDS AND CONGRATULATE ONE ANOTHER AT THE CONCLUSION OF EACH AND EVERY ROUND, TOURNAMENT OR MATCH, WITHOUT FAIL. IT IS ALSO A SPORT THAT FAITHFULLY TEACHES EACH GENERATION OF PARTICIPANTS FROM THE EARLIEST AGE THAT ITS RULES ARE UNCOMPROMISABLE. THESE ARE VALUES THAT PGA TOUR, INC.'S TOURING PROFESSIONAL GOLFERS LIVE BY AND DEMONSTRATE EVERY ROUND OF EVERY TOURNAMENT.

| | | |
|---|---|---|
| **4d** | Other program services (Describe in Schedule O.) | |
| | (Expenses $                including grants of $                ) (Revenue $                ) | |
| **4e** | **Total program service expenses ▶** | |

Form **990** (2019)

---

Page 3

---

Form 990 (2019)                                                                                     Page **3**

| Part IV | **Checklist of Required Schedules** | | | |
|---|---|---|---|---|
| | | | **Yes** | **No** |
| **1** | Is the organization described in section 501(c)(3) or 4947(a)(1) (other than a private foundation)? If "Yes," complete Schedule A  .  .  .  .  .  .  .  . | **1** | | No |
| **2** | Is the organization required to complete Schedule B, Schedule of Contributors (see instructions)?  .  .  . | **2** | | |
| **3** | Did the organization engage in direct or indirect political campaign activities on behalf of or in opposition to candidates for public office?If "Yes," complete Schedule C, Part I 🔄 .  .  .  .  .  .  . | **3** | | No |
| **4** | **Section 501(c)(3) organizations.** Did the organization engage in lobbying activities, or have a section 501(h) election in effect during the tax year? If "Yes," complete Schedule C, Part II  .  .  .  .  .  .  . | **4** | | |
| **5** | Is the organization a section 501(c)(4), 501(c)(5), or 501(c)(6) organization that receives membership dues, assessments, or similar amounts as defined in Revenue Procedure 98-19? If "Yes," complete Schedule C, Part III 🔄 .  . | **5** | Yes | |
| **6** | Did the organization maintain any donor advised funds or any similar funds or accounts for which donors have the right to provide advice on the distribution or investment of amounts in such funds or accounts?If "Yes," complete Schedule D,Part I 🔄. | **6** | | No |
| **7** | Did the organization receive or hold a conservation easement, including easements to preserve open space, the environment, historic land areas, or historic structures?If "Yes," complete Schedule D, Part II 🔄 .  .  . | **7** | | No |
| **8** | Did the organization maintain collections of works of art, historical treasures, or other similar assets? If "Yes," complete Schedule D, Part III 🔄 .  .  .  .  .  . | **8** | | No |
| **9** | Did the organization report an amount in Part X, line 21 for escrow or custodial account liability; serve as a custodian for amounts not listed in Part X; or provide credit counseling, debt management, credit repair, or debt negotiation services?  If "Yes," complete Schedule D, Part IV 🔄 .  .  .  .  .  .  . | **9** | | No |
| **10** | Did the organization, directly or through a related organization, hold assets in temporarily restricted endowments, permanent endowments, or quasi endowments? If "Yes," complete Schedule D, Part V 🔄 .  .  .  .  . | **10** | | No |
| **11** | If the organization's answer to any of the following questions is "Yes," then complete Schedule D, Parts VI, VII, VIII, IX, or X as applicable. | | | |
| **a** | Did the organization report an amount for land, buildings, and equipment in Part X, line 10? If "Yes," complete Schedule D, Part VI. 🔄 .  .  .  .  .  . | **11a** | Yes | |
| **b** | Did the organization report an amount for investments—other securities in Part X, line 12 that is 5% or more of its total assets reported in Part X, line 16? If "Yes," complete Schedule D, Part VII 🔄 .  .  .  . | **11b** | Yes | |
| **c** | Did the organization report an amount for investments—program related in Part X, line 13 that is 5% or more of its total assets reported in Part X, line 16? If "Yes," complete Schedule D, Part VIII 🔄 .  .  .  . | **11c** | | No |
| **d** | Did the organization report an amount for other assets in Part X, line 15 that is 5% or more of its total assets reported in Part X, line 16? If "Yes," complete Schedule D, Part IX 🔄 .  .  .  . | **11d** | | No |
| **e** | Did the organization report an amount for other liabilities in Part X, line 25? If "Yes," complete Schedule D, Part X 🔄 | **11e** | Yes | |
| **f** | Did the organization's separate or consolidated financial statements for the tax year include a footnote that addresses the organization's liability for uncertain tax positions under FIN 48 (ASC 740)? If "Yes," complete Schedule D, Part X 🔄 | **11f** | Yes | |
| **12a** | Did the organization obtain separate, independent audited financial statements for the tax year? If "Yes," complete Schedule D, Parts XI and XII 🔄 .  .  .  .  .  . | **12a** | | No |
| **b** | Was the organization included in consolidated, independent audited financial statements for the tax year? If "Yes," and if the organization answered "No" to line 12a, then completing Schedule D, Parts XI and XII is optional 🔄 | **12b** | Yes | |
| **13** | Is the organization a school described in section 170(b)(1)(A)(ii)? If "Yes," complete Schedule E | **13** | | No |
| **14a** | Did the organization maintain an office, employees, or agents outside of the United States?  .  .  .  .  . | **14a** | | No |
| **b** | Did the organization have aggregate revenues or expenses of more than $10,000 from grantmaking, fundraising, business, investment, and program service activities outside the United States, or aggregate foreign investments valued at $100,000 or more? If "Yes," complete Schedule F, Parts I and IV 🔄 .  .  .  . | **14b** | Yes | |
| **15** | Did the organization report on Part IX, column (A), line 3, more than $5,000 of grants or other assistance to or for any foreign organization? If "Yes," complete Schedule F, Parts II and IV  .  .  .  . | **15** | Yes | |
| **16** | Did the organization report on Part IX, column (A), line 3, more than $5,000 of aggregate grants or other assistance to or for foreign individuals? If "Yes," complete Schedule F, Parts III and IV  .  .  .  . | **16** | | No |
| **17** | Did the organization report a total of more than $15,000 of expenses for professional fundraising services on Part IX, column (A), lines 6 and 11e? If "Yes," complete Schedule G, Part I (see instructions)  .  .  .  . | **17** | | No |

| | | | | Yes | No |
|---|---|---|---|---|---|
| 18 | Did the organization report more than $15,000 total of fundraising event gross income and contributions on Part VIII, lines 1c and 8a? *If "Yes," complete Schedule G, Part II* . . . . . . . | **18** | | | No |
| 19 | Did the organization report more than $15,000 of gross income from gaming activities on Part VIII, line 9a? *If "Yes," complete Schedule G, Part III* . . . . . . | **19** | | | No |
| 20a | Did the organization operate one or more hospital facilities? *If "Yes," complete Schedule H* . . . . . | **20a** | | | No |
| b | If "Yes" to line 20a, did the organization attach a copy of its audited financial statements to this return? | **20b** | | | |
| 21 | Did the organization report more than $5,000 of grants or other assistance to any domestic organization or domestic government on Part IX, column (A), line 1? *If "Yes," complete Schedule I, Parts I and II* . . . . . | **21** | | Yes | |

Form **990** (2019)

─────────── Page 4 ───────────

Form 990 (2019)                                                                                         Page **4**

**Part IV**  **Checklist of Required Schedules** *(continued)*

| | | | | Yes | No |
|---|---|---|---|---|---|
| 22 | Did the organization report more than $5,000 of grants or other assistance to or for domestic individuals on Part IX, column (A), line 2? *If "Yes," complete Schedule I, Parts I and III* . . . . | **22** | | | No |
| 23 | Did the organization answer "Yes" to Part VII, Section A, line 3, 4, or 5 about compensation of the organization's current and former officers, directors, trustees, key employees, and highest compensated employees? *If "Yes," complete Schedule J* . . . . . . . . . . . . | **23** | | Yes | |
| 24a | Did the organization have a tax-exempt bond issue with an outstanding principal amount of more than $100,000 as of the last day of the year, that was issued after December 31, 2002? *If "Yes," answer lines 24b through 24d and complete Schedule K. If "No," go to line 25a* . . . . | **24a** | | | No |
| b | Did the organization invest any proceeds of tax-exempt bonds beyond a temporary period exception? . . . | **24b** | | | |
| c | Did the organization maintain an escrow account other than a refunding escrow at any time during the year to defease any tax-exempt bonds? . . . . . | **24c** | | | |
| d | Did the organization act as an "on behalf of" issuer for bonds outstanding at any time during the year? . . . | **24d** | | | |
| 25a | **Section 501(c)(3), 501(c)(4), and 501(c)(29) organizations.** Did the organization engage in an excess benefit transaction with a disqualified person during the year? *If "Yes," complete Schedule L, Part I* . . . . | **25a** | | | |
| b | Is the organization aware that it engaged in an excess benefit transaction with a disqualified person in a prior year, and that the transaction has not been reported on any of the organization's prior Forms 990 or 990-EZ? *If "Yes," complete Schedule L, Part I* . . . . . | **25b** | | | |
| 26 | Did the organization report any amount on Part X, line 5 or 22 for receivables from or payables to any current or former officer, director, trustee, key employee, creator or founder, substantial contributor, or 35% controlled entity or family member of any of these persons? *If "Yes,"complete Schedule L, Part II* . . . . . | **26** | | | No |
| 27 | Did the organization provide a grant or other assistance to any current or former officer, director, trustee, key employee, creator or founder, substantial contributor, or employee thereof, a grant selection committee member, or to a 35% controlled entity (including an employee thereof) or family member of any of these persons? *If "Yes," complete Schedule L,Part III* . . . . | **27** | | | No |
| 28 | Was the organization a party to a business transaction with one of the following parties (see Schedule L, Part IV instructions for applicable filing thresholds, conditions, and exceptions): | | | | |
| a | A current or former officer, director, trustee, key employee, creator or founder, or substantial contributor? *If "Yes," complete Schedule L, Part IV* . . . . | **28a** | | | No |
| b | A family member of any individual described in line 28a? *If "Yes," complete Schedule L, Part IV* . . . . | **28b** | | Yes | |
| c | A 35% controlled entity of one or more individuals and/or organizations described in lines 28a or 28b? *If "Yes," complete Schedule L, Part IV* . . . . | **28c** | | | No |
| 29 | Did the organization receive more than $25,000 in non-cash contributions? *If "Yes," complete Schedule M* . . | **29** | | | No |
| 30 | Did the organization receive contributions of art, historical treasures, or other similar assets, or qualified conservation contributions? *If "Yes," complete Schedule M* . . . . | **30** | | | No |
| 31 | Did the organization liquidate, terminate, or dissolve and cease operations? *If "Yes," complete Schedule N, Part I* | **31** | | | No |
| 32 | Did the organization sell, exchange, dispose of, or transfer more than 25% of its net assets? *If "Yes," complete Schedule N, Part II* . . . . | **32** | | | No |
| 33 | Did the organization own 100% of an entity disregarded as separate from the organization under Regulationssections 301.7701-2 and 301.7701-3? *If "Yes," complete Schedule R, Part I* . . . . | **33** | | Yes | |
| 34 | Was the organization related to any tax-exempt or taxable entity? *If "Yes," complete Schedule R, Part II, III, or IV, and Part V, line 1* . . . . | **34** | | Yes | |
| 35a | Did the organization have a controlled entity within the meaning of section 512(b)(13)? | **35a** | | Yes | |
| b | If 'Yes' to line 35a, did the organization receive any payment from or engage in any transaction with a controlled entity within the meaning of section 512(b)(13)? *If "Yes," complete Schedule R, Part V, line 2* . . . . | **35b** | | Yes | |
| 36 | **Section 501(c)(3) organizations.** Did the organization make any transfers to an exempt non-charitable related organization? *If "Yes," complete Schedule R, Part V, line 2* . . . . | **36** | | | |
| 37 | Did the organization conduct more than 5% of its activities through an entity that is not a related organization and that is treated as a partnership for federal income tax purposes?*If "Yes," complete Schedule R, Part VI* . . . . | **37** | | | No |
| 38 | Did the organization complete Schedule O and provide explanations in Schedule O for Part VI, lines 11b and 19? **Note.** All Form 990 filers are required to complete Schedule O | **38** | | Yes | |

| | | | | Yes | No |
|---|---|---|---|---|---|

### Part V — Statements Regarding Other IRS Filings and Tax Compliance

Check if Schedule O contains a response or note to any line in this Part V . . . . . . . . . . . ☑

| | | | | Yes | No |
|---|---|---|---|---|---|
| **1a** | Enter the number reported in Box 3 of Form 1096. Enter -0- if not applicable . . | **1a** | 3,317 | | |
| **b** | Enter the number of Forms W-2G included in line 1a. Enter -0- if not applicable . | **1b** | 1 | | |
| **c** | Did the organization comply with backup withholding rules for reportable payments to vendors and reportable gaming (gambling) winnings to prize winners? . . . . . . . . . . . . . . . . . . . . . | | | **1c** | Yes | |

Form **990** (2019)

--- Page 5 ---

Form 990 (2019)                                                                                        Page **5**

### Part V — Statements Regarding Other IRS Filings and Tax Compliance *(continued)*

| | | | | Yes | No |
|---|---|---|---|---|---|
| **2a** | Enter the number of employees reported on Form W-3, Transmittal of Wage and Tax Statements, filed for the calendar year ending with or within the year covered by this return . . . . . . . . . . . . . . . . . . . . . . | **2a** | 959 | | | |
| **b** | If at least one is reported on line 2a, did the organization file all required federal employment tax returns? **Note.** If the sum of lines 1a and 2a is greater than 250, you may be required to e-file (see instructions) | | | **2b** | Yes | |
| **3a** | Did the organization have unrelated business gross income of $1,000 or more during the year? | | | **3a** | Yes | |
| **b** | If "Yes," has it filed a Form 990-T for this year?*If "No" to line 3b, provide an explanation in Schedule O* . . . | | | **3b** | Yes | |
| **4a** | At any time during the calendar year, did the organization have an interest in, or a signature or other authority over, a financial account in a foreign country (such as a bank account, securities account, or other financial account)? . . | | | **4a** | Yes | |
| **b** | If "Yes," enter the name of the foreign country: ▶AS , CA , KS , MY , UK | | | | | |
| | See instructions for filing requirements for FinCEN Form 114, Report of Foreign Bank and Financial Accounts (FBAR). | | | | | |
| **5a** | Was the organization a party to a prohibited tax shelter transaction at any time during the tax year? . . | | | **5a** | | No |
| **b** | Did any taxable party notify the organization that it was or is a party to a prohibited tax shelter transaction? | | | **5b** | | No |
| **c** | If "Yes," to line 5a or 5b, did the organization file Form 8886-T? | | | **5c** | | |
| **6a** | Does the organization have annual gross receipts that are normally greater than $100,000, and did the organization solicit any contributions that were not tax deductible as charitable contributions? . . . . . . . | | | **6a** | Yes | |
| **b** | If "Yes," did the organization include with every solicitation an express statement that such contributions or gifts were not tax deductible? . . . . . . . . . . . . . . . . . . . . . . . . | | | **6b** | Yes | |
| **7** | **Organizations that may receive deductible contributions under section 170(c).** | | | | | |
| **a** | Did the organization receive a payment in excess of $75 made partly as a contribution and partly for goods and services provided to the payor? . . . . . . . . . . . . . . . . . . . . . . | | | **7a** | | |
| **b** | If "Yes," did the organization notify the donor of the value of the goods or services provided? . . . . . | | | **7b** | | |
| **c** | Did the organization sell, exchange, or otherwise dispose of tangible personal property for which it wasrequired to file Form 8282? . . . . . . . . . . . . . . . . . . . . . . . . . . . | | | **7c** | | |
| **d** | If "Yes," indicate the number of Forms 8282 filed during the year . . . . | **7d** | | | | |
| **e** | Did the organization receive any funds, directly or indirectly, to pay premiums on a personal benefit contract? | | | **7e** | | |
| **f** | Did the organization, during the year, pay premiums, directly or indirectly, on a personal benefit contract? . . | | | **7f** | | |
| **g** | If the organization received a contribution of qualified intellectual property, did the organization file Form 8899 as required? . . . . . . . . . . . . . . . . . . . . . . . . . . . . | | | **7g** | | |
| **h** | If the organization received a contribution of cars, boats, airplanes, or other vehicles, did the organization file a Form 1098-C? . . . . . . . . . . . . . . . . . . . . . . . . . . . . . | | | **7h** | | |
| **8** | **Sponsoring organizations maintaining donor advised funds.** Did a donor advised fund maintained by the sponsoring organization have excess business holdings at any time during the year? . . . . . . . . | | | **8** | | |
| **9** | **Sponsoring organizations maintaining donor advised funds.** | | | | | |
| **a** | Did the sponsoring organization make any taxable distributions under section 4966? . . . . . . . . | | | **9a** | | |
| **b** | Did the sponsoring organization make a distribution to a donor, donor advisor, or related person? . . . | | | **9b** | | |
| **10** | **Section 501(c)(7) organizations.** Enter: | | | | | |
| **a** | Initiation fees and capital contributions included on Part VIII, line 12 . . . | **10a** | | | | |
| **b** | Gross receipts, included on Form 990, Part VIII, line 12, for public use of club facilities | **10b** | | | | |
| **11** | **Section 501(c)(12) organizations.** Enter: | | | | | |
| **a** | Gross income from members or shareholders . . . . . . . . . . . | **11a** | | | | |
| **b** | Gross income from other sources (Do not net amounts due or paid to other sources against amounts due or received from them.) . . . . . . . . . | **11b** | | | | |
| **12a** | **Section 4947(a)(1) non-exempt charitable trusts.** Is the organization filing Form 990 in lieu of Form 1041? | | | **12a** | | |
| **b** | If "Yes," enter the amount of tax-exempt interest received or accrued during the year. | **12b** | | | | |
| **13** | **Section 501(c)(29) qualified nonprofit health insurance issuers.** | | | | | |
| **a** | Is the organization licensed to issue qualified health plans in more than one state? . . . . . . . | | | | | |

12/11/22, 4:56 PM                                      PGA TOUR INC - Full Filing- Nonprofit Explorer - ProPublica

| | | | Yes | No |
|---|---|---|---|---|
| | **Note.** See the instructions for additional information the organization must report on Schedule O. | 13a | | |
| b | Enter the amount of reserves the organization is required to maintain by the states in which the organization is licensed to issue qualified health plans . . . . . . . | 13b | | |
| c | Enter the amount of reserves on hand . . . . . . . . | 13c | | |
| 14a | Did the organization receive any payments for indoor tanning services during the tax year? . . . . . | 14a | | No |
| b | If "Yes," has it filed a Form 720 to report these payments?If "No," provide an explanation in Schedule O . . | 14b | | |
| 15 | Is the organization subject to the section 4960 tax on payment(s) of more than $1,000,000 in remuneration or excess parachute payment(s) during the year? . . . . . . If "Yes," see instructions and file Form 4720, Schedule N. | 15 | Yes | |
| 16 | Is the organization an educational institution subject to the section 4968 excise tax on net investment income? . . If "Yes," complete Form 4720, Schedule O. | 16 | | No |

Form **990** (2019)

---

Page 6

---

Form 990 (2019)                                                                                                    Page **6**

| Part VI | **Governance, Management, and Disclosure** For each "Yes" response to lines 2 through 7b below, and for a "No" response to lines 8a, 8b, or 10b below, describe the circumstances, processes, or changes in Schedule O. See instructions. |
|---|---|

Check if Schedule O contains a response or note to any line in this Part VI . . . . . . . . . . . ☑

### Section A. Governing Body and Management

| | | | | | Yes | No |
|---|---|---|---|---|---|---|
| 1a | Enter the number of voting members of the governing body at the end of the tax year | 1a | | 9 | | |
| | If there are material differences in voting rights among members of the governing body, or if the governing body delegated broad authority to an executive committee or similar committee, explain in Schedule O. | | | | | |
| b | Enter the number of voting members included in line 1a, above, who are independent | 1b | | 5 | | |
| 2 | Did any officer, director, trustee, or key employee have a family relationship or a business relationship with any other officer, director, trustee, or key employee? . . . . . . . . . . . . . . . | | | 2 | Yes | |
| 3 | Did the organization delegate control over management duties customarily performed by or under the direct supervision of officers, directors or trustees, or key employees to a management company or other person? . | | | 3 | | No |
| 4 | Did the organization make any significant changes to its governing documents since the prior Form 990 was filed? . | | | 4 | | No |
| 5 | Did the organization become aware during the year of a significant diversion of the organization's assets? . . | | | 5 | | No |
| 6 | Did the organization have members or stockholders? . . . . . . . . . . . . . | | | 6 | Yes | |
| 7a | Did the organization have members, stockholders, or other persons who had the power to elect or appoint one or more members of the governing body? . . . . . . . . . . . . . . . . | | | 7a | Yes | |
| b | Are any governance decisions of the organization reserved to (or subject to approval by) members, stockholders, or persons other than the governing body? . . . . . . . . . . . . . . . | | | 7b | | No |
| 8 | Did the organization contemporaneously document the meetings held or written actions undertaken during the year by the following: | | | | | |
| a | The governing body? . . . . . . . . . . . . . . . . . . . . | | | 8a | Yes | |
| b | Each committee with authority to act on behalf of the governing body? . . . . . . . . . | | | 8b | Yes | |
| 9 | Is there any officer, director, trustee, or key employee listed in Part VII, Section A, who cannot be reached at the organization's mailing address? If "Yes," provide the names and addresses in Schedule O . . . . . | | | 9 | | No |

### Section B. Policies (This Section B requests information about policies not required by the Internal Revenue Code.)

| | | | Yes | No |
|---|---|---|---|---|
| 10a | Did the organization have local chapters, branches, or affiliates? . . . . . . . . | 10a | | No |
| b | If "Yes," did the organization have written policies and procedures governing the activities of such chapters, affiliates, and branches to ensure their operations are consistent with the organization's exempt purposes? | 10b | | |
| 11a | Has the organization provided a complete copy of this Form 990 to all members of its governing body before filing the form? . . . . . . . . . . . . . . . . . . . . . | 11a | Yes | |
| b | Describe in Schedule O the process, if any, used by the organization to review this Form 990. . . . . . . | | | |
| 12a | Did the organization have a written conflict of interest policy? If "No," go to line 13 . . . . . . | 12a | Yes | |
| b | Were officers, directors, or trustees, and key employees required to disclose annually interests that could giverise to conflicts? . . . . . . . . . . . . . . . . . . . . . | 12b | Yes | |
| c | Did the organization regularly and consistently monitor and enforce compliance with the policy? If "Yes,"describe in Schedule O how this was done . . . . . . . . . . . . . . . . | 12c | Yes | |
| 13 | Did the organization have a written whistleblower policy? . . . . . . . . . . . | 13 | Yes | |
| 14 | Did the organization have a written document retention and destruction policy? . . . . . . . | 14 | Yes | |
| 15 | Did the process for determining compensation of the following persons include a review and approval by independent persons, comparability data, and contemporaneous substantiation of the deliberation and decision? | | | |
| a | The organization's CEO, Executive Director, or top management official . . . . . . . . | 15a | Yes | |
| b | Other officers or key employees of the organization . . . . . . . . . . . . | 15b | Yes | |
| | If "Yes" to line 15a or 15b, describe the process in Schedule O (see instructions). | | | |
| 16a | Did the organization invest in, contribute assets to, or participate in a joint venture or similar arrangement with a taxable entity during the year? . . . . . . . . . . . . . . . . | 16a | | No |

| | | | |
|---|---|---|---|
| b | If Yes, did the organization follow a written policy or procedure requiring the organization to evaluate its participation in joint venture arrangements under applicable federal tax law, and take steps to safeguard the organization's exempt status with respect to such arrangements? . . . . . . . . . . . . | 16b | |

**Section C. Disclosure**

**17**  List the states with which a copy of this Form 990 is required to be filed▶
AL , AZ , CA , CT , FL , GA , HI , IL , LA , MD , MA , MN , NJ , NY , OH , TN , TX , VA

**18**  Section 6104 requires an organization to make its Form 1023 (or 1024-A if applicable), 990, and 990-T (501(c)(3)s only)available for public inspection. Indicate how you made these available. Check all that apply.
☐ Own website   ☐ Another's website   ☑ Upon request   ☐ Other (explain in Schedule O)

**19**  Describe in Schedule O whether (and if so, how) the organization made its governing documents, conflict of interest policy, and financial statements available to the public during the tax year.

**20**  State the name, address, and telephone number of the person who possesses the organization's books and records:
▶JEANNE LIGHTCAP 100 PGA TOUR BOULEVARD     PONTE VEDRA BEACH, FL 32082 (904) 285-3700

Form <strong>990</strong> (2019)

---

Page 7

Form 990 (2019)                                                                                                          Page **7**

| Part VII | **Compensation of Officers, Directors,Trustees, Key Employees, Highest Compensated Employees, and Independent Contractors** |
|---|---|

Check if Schedule O contains a response or note to any line in this Part VII  .  .  .  .  .  .  .  .  .  .  .  .  .   ☑

**Section A. Officers, Directors, Trustees, Key Employees, and Highest Compensated Employees**

**1a** Complete this table for all persons required to be listed. Report compensation for the calendar year ending with or within the organization's tax year.

● List all of the organization's **current** officers, directors, trustees (whether individuals or organizations), regardless of amount of compensation. Enter -0- in columns (D), (E), and (F) if no compensation was paid.

● List all of the organization's **current** key employees, if any. See instructions for definition of "key employee."

● List the organization's five **current** highest compensated employees (other than an officer, director, trustee or key employee) who received reportable compensation (Box 5 of Form W-2 and/or Box 7 of Form 1099-MISC) of more than $100,000 from the organization and any related organizations.

● List all of the organization's **former** officers, key employees, or highest compensated employees who received more than $100,000 of reportable compensation from the organization and any related organizations.

● List all of the organization's **former directors or trustees** that received, in the capacity as a former director or trustee of the organization, more than $10,000 of reportable compensation from the organization and any related organizations.

See instructions for the order in which to list the persons above.

☐ Check this box if neither the organization nor any related organization compensated any current officer, director, or trustee.

| (A)<br>Name and title | (B)<br>Average hours per week (list any hours for related organizations below dotted line) | (C) Position (do not check more than one box, unless person is both an officer and a director/trustee) | | | | | | (D)<br>Reportable compensation from the organization (W-2/1099-MISC) | (E)<br>Reportable compensation from related organizations (W-2/1099-MISC) | (F)<br>Estimated amount of other compensation from the organization and related organizations |
|---|---|---|---|---|---|---|---|---|---|---|
| | | Individual trustee or director | Institutional Trustee | Officer | Key employee | Highest compensated employee | Former | | | |
| (1) Monahan Joseph W<br>.......................<br>Commissioner | 40.0<br>.............<br>20.0 | | | X | | | | 5,378,295 | 3,466,390 | 36,122 |
| (2) Price Ronald E<br>.......................<br>Chief Operating Officer | 40.0<br>.............<br>20.0 | | | X | | | | 1,600,089 | 3,954,643 | 130,156 |
| (3) Wade Thomas E<br>.......................<br>Chief Commercial Officer | 40.0<br>.............<br>20.0 | | | X | | | | 1,505,733 | 1,659,683 | 944,027 |
| (4) Anderson Richard D<br>.......................<br>Chief Media Officer | 40.0<br>.............<br>20.0 | | | X | | | | 1,264,650 | 1,035,222 | 40,555 |
| (5) Streelman Kevin<br>.......................<br>Player Director | 1.0<br>.............<br>1.0 | X | | | | | | 2,033,174 | 0 | 198,358 |
| (6) Spieth Jordan<br>.......................<br>Player Director | 1.0<br>.............<br>1.0 | X | | | | | | 1,850,775 | 0 | 286,543 |
| (7) Brown Leonard<br>.......................<br>EVP Licenses & Chief Legal Ofc | 40.0<br>.............<br>20.0 | | | X | | | | 953,069 | 1,123,811 | 41,009 |
| (8) Keller Allison W | 40.0<br>............. | | | X | | | | 1,249,543 | 721,957 | 27,191 |

| Name and title | (B) | Ind. trustee | Inst. Trustee | Officer | Key emp. | Highest comp. | Former | (D) | (E) | (F) |
|---|---|---|---|---|---|---|---|---|---|---|
| Chief Administrative Officer | 20.0 | | | | | | | | | |
| | 40.0 | | | | | | | | | |
| (9) Pazder James A | 40.0 | | | X | | | | 1,279,811 | 658,316 | 27,586 |
| Chief Tourn & Competition Ofc | 20.0 | | | | | | | | | |
| (10) Sharkey Kenneth J | 40.0 | | | X | | | | 880,970 | 880,970 | 46,800 |
| EVP & Chief Financial Officer | 20.0 | | | | | | | | | |
| (11) Votaw Ty M | 40.0 | | | | X | | | 1,079,350 | 539,692 | 64,532 |
| EVP INTERNATIONAL | 20.0 | | | | | | | | | |
| (12) Hoffman Charles L | 1.0 | X | | X | | | | 1,484,503 | 0 | 177,568 |
| Player Director / Treasurer | 1.0 | | | | | | | | | |
| (13) Monday Jeff | 40.0 | | | | | X | | 958,203 | 0 | 382,434 |
| President Mackenzie Tour | 20.0 | | | | | | | | | |
| (14) Oliver Brian M | 40.0 | | | | | X | | 1,101,216 | 0 | 32,000 |
| EVP Corporate Partnership | 20.0 | | | | | | | | | |
| (15) Lightcap Jeanne F | 40.0 | | | | | X | | 759,784 | 253,261 | 25,956 |
| EVP Finance | 20.0 | | | | | | | | | |
| (16) Pascal Thierry | 40.0 | | | | | X | | 198,091 | 792,362 | 24,911 |
| SVP International Media | 20.0 | | | | | | | | | |
| (17) Ohno Robert K | 40.0 | | | | | X | | 767,442 | 0 | 53,867 |
| SVP INTERNATIONAL TOURS | 20.0 | | | | | | | | | |

Form 990 (2019)

Page 8

Form 990 (2019)     Page **8**

Part VII    **Section A. Officers, Directors, Trustees, Key Employees, and Highest Compensated Employees** *(continued)*

| (A) Name and title | (B) Average hours per week (list any hours for related organizations below dotted line) | Individual trustee or director | Institutional Trustee | Officer | Key employee | Highest compensated employee | Former | (D) Reportable compensation from the organization (W-2/1099-MISC) | (E) Reportable compensation from related organizations (W-2/1099-MISC) | (F) Estimated amount of other compensation from the organization and related organizations |
|---|---|---|---|---|---|---|---|---|---|---|
| (18) Finchem Timothy W | 40.0 | | | | | | X | 815,919 | 0 | 0 |
| Former Commissioner | 0.0 | | | | | | | | | |
| (19) Wagner M Johnson | 1.0 | X | | X | | | | 522,181 | 0 | 137,568 |
| Player Director / Secretary | 1.0 | | | | | | | | | |
| (20) Baldwin Alexandra C | 40.0 | | | | X | | | 511,579 | 0 | 29,500 |
| President Korn Ferry Tour | 20.0 | | | | | | | | | |
| (21) Arcuri Joseph | 40.0 | | | | | | X | 517,450 | 0 | 5,125 |
| Former Chief Marketing Officer | 0.0 | | | | | | | | | |
| (22) Brady Jack M | 40.0 | | | | X | | | 479,998 | 0 | 27,120 |
| President Champions Tour | 20.0 | | | | | | | | | |
| (23) Zink Charles | 40.0 | | | | | | X | 166,667 | 0 | 0 |
| FMR Chairman, Presidents Cup | 0.0 | | | | | | | | | |
| (24) Herlihy Edward D | 1.0 | X | | X | | | | 0 | 0 | 0 |
| Chairman / President | 1.0 | | | | | | | | | |
| (25) Ganzi Victor F | 1.0 | X | | | | | | 0 | 0 | 0 |
| Independent Director | 0.0 | | | | | | | | | |
| (26) Stephenson Randall L | 1.0 | X | | | | | | 0 | 0 | 0 |
| Independent Director | 0.0 | | | | | | | | | |
| (27) Meeker Mary | 1.0 | X | | | | | | 0 | 0 | 0 |
| Independent Director | 0.0 | | | | | | | | | |

12/11/22, 4:56 PM                          PGA TOUR INC - Full Filing- Nonprofit Explorer - ProPublica

| | | | | | | | | | |
|---|---|---|---|---|---|---|---|---|---|
| (28) Whaley Suzy | | 1.0 | | | | | | | |
| PGA of America Director | | 1.0 | X | | | | 0 | 0 | 0 |
| | | | | | | | | | |
| | | | | | | | | | |

| | | | | | |
|---|---|---|---|---|---|
| **1b** Sub-Total . . . . . . . . . . . | ▶ | | | | |
| **c** Total from continuation sheets to Part VII, Section A . . . . | ▶ | | | | |
| **d** Total (add lines 1b and 1c) . . . . . . . | ▶ | 27,358,492 | 15,086,307 | | 2,738,928 |

**2** Total number of individuals (including but not limited to those listed above) who received more than $100,000 of reportable compensation from the organization ▶ 336

| | | | | Yes | No |
|---|---|---|---|---|---|
| **3** | Did the organization list any **former** officer, director or trustee, key employee, or highest compensated employee on line 1a? *If "Yes," complete Schedule J for such individual* . . . . . . . . . . . | | **3** | Yes | |
| **4** | For any individual listed on line 1a, is the sum of reportable compensation and other compensation from the organization and related organizations greater than $150,000? *If "Yes," complete Schedule J for such individual* . . . . . . . . . . . | | **4** | Yes | |
| **5** | Did any person listed on line 1a receive or accrue compensation from any unrelated organization or individual for services rendered to the organization? *If "Yes," complete Schedule J for such person* . . . . . . . . | | **5** | | No |

**Section B. Independent Contractors**

**1** Complete this table for your five highest compensated independent contractors that received more than $100,000 of compensation from the organization. Report compensation for the calendar year ending with or within the organization's tax year.

| (A) Name and business address | (B) Description of services | (C) Compensation |
|---|---|---|
| CLARK CONSTRUCTION GROUP LLC, 2502 N ROCKY POINT DR 200 TAMPA BAY, FL  33607 | CONSTRUCTION SERVICE | 33,596,390 |
| RORY MCILROY ENTERPRISES INC, 100 PGA TOUR BOULEVARD PONTE VEDRA BEACH, FL  32082 | PLAYER EARNINGS | 25,589,893 |
| AZTECSHAFFER LLC, 601 W STREET HOUSTON, TX  77007 | CONSTRUCTION SERVICE | 15,264,623 |
| JUSTIN THOMAS LLC, 100 PGA TOUR BOULEVARD PONTE VEDRA BEACH, FL  32082 | PLAYER EARNINGS | 9,480,892 |
| BROOKS KOEPKA GOLF LLC, 100 PGA TOUR BLVD PONTE VEDRA BEACH, FL  32082 | PLAYER EARNINGS | 9,283,953 |

**2** Total number of independent contractors (including but not limited to those listed above) who received more than $100,000 of compensation from the organization ▶ 506

Form **990** (2019)

───────────────── Page 9 ─────────────────

Form 990 (2019)                                                                                              Page **9**

Part VIII     **Statement of Revenue**

Check if Schedule O contains a response or note to any line in this Part VIII . . . . . . . . . . . . . . ☑

| | | (A) Total revenue | (B) Related or exempt function revenue | (C) Unrelated business revenue | (D) Revenue excluded from tax under sections 512 - 514 |
|---|---|---|---|---|---|
| **Contributions, Gifts, Grants and Other Similar Amounts** | erated campaigns . . **1a** | | | | |
| | nbership dues . . **1b** | | | | |
| | draising events . . **1c** | | | | |
| | ted organizations **1d** | | | | |
| | ernment grants (contributions) **1e** | | | | |
| | ther contributions, gifts, grants, and similar amounts not included above **1f** | | | | |
| | **g** Noncash contributions included in lines 1a - 1f:$ **1g** | | | | |

| | | | Business Code | | | | |
|---|---|---|---|---|---|---|---|
| **h Total.** Add lines 1a-1f . . . . . . . . ▶ | | | | 0 | | | |
| **2a** MEDIA RIGHTS | | | 515100 | 551,196,491 | 543,157,093 | 8,039,398 | |
| **b** TOURNAMENTS MANAGED | | | 711300 | 208,599,431 | 207,869,241 | 730,190 | |
| **c** TOURNAMENTS CO-SPONSORED | | | 711300 | 189,725,118 | 189,725,118 | | |
| **d** PROGRAM SPONSORSHIP | | | 711300 | 184,633,407 | 184,633,407 | | |
| **e** PRODUCTION REVENUE | | | 515100 | 13,977,994 | 6,988,997 | 6,988,997 | |
| **f** All other program service revenue. | | | | 19,267,915 | 18,183,967 | 1,083,948 | |
| **g Total.** Add lines 2a–2f. . . . ▶ | | | | 1,167,400,356 | | | |
| **3** Investment income (including dividends, interest, and other similar amounts) . . . . . . . ▶ | | | | 102,782,755 | | 804,755 | 101,978,000 |
| **4** Income from investment of tax-exempt bond proceeds . . ▶ | | | | 0 | | | |
| **5** Royalties . . . . . . . . . ▶ | | | | 224,061,902 | | | 224,061,902 |

| | | (i) Real | (ii) Personal | | | | |
|---|---|---|---|---|---|---|---|
| **6a** Gross rents | **6a** | 297,510 | | | | | |
| **b** Less: rental expenses | **6b** | 242,097 | | | | | |
| **c** Rental income or (loss) | **6c** | 55,413 | 0 | | | | |
| **d** Net rental income or (loss) . . . . . . . ▶ | | | | 55,413 | | 57,703 | -2,290 |

| | | (i) Securities | (ii) Other | | | | |
|---|---|---|---|---|---|---|---|
| **7a** Gross amount from sales of assets other than inventory | **7a** | 718,657,215 | 0 | | | | |
| **b** Less: cost or other basis and sales expenses | **7b** | 682,430,100 | 1,965,027 | | | | |
| **c** Gain or (loss) | **7c** | 36,227,115 | -1,965,027 | | | | |
| **d** Net gain or (loss) . . . . . . . . ▶ | | | | 34,262,088 | | | 34,262,088 |
| **8a** Gross income from fundraising events (not including $_____ of contributions reported on line 1c). See Part IV, line 18 . . . | **8a** | | 0 | | | | |
| **b** Less: direct expenses . . . | **8b** | | 0 | | | | |
| **c** Net income or (loss) from fundraising events . . | | | | 0 | | | |
| **9a** Gross income from gaming activities. See Part IV, line 19 . . . | **9a** | | 0 | | | | |
| **b** Less: direct expenses . . . | **9b** | | 0 | | | | |
| **c** Net income or (loss) from gaming activities . . | | | | 0 | | | |
| **10a** Gross sales of inventory, less returns and allowances | **10a** | | 2,619,308 | | | | |
| **b** Less: cost of goods sold . . | **10b** | | 1,699,887 | | | | |
| **c** Net income or (loss) from sales of inventory . . ▶ | | | | 919,421 | 919,421 | | |

| Miscellaneous Revenue | | | Business Code | | | | |
|---|---|---|---|---|---|---|---|
| **11a** MISCELLANEOUS OTHER REVENUE | | | 711300 | 3,923,004 | 1,548,297 | | 2,374,707 |
| **b** MEMBERSHIP DUES - NON CONTRIBUTION | | | 711300 | 616,942 | 616,942 | | |
| **c** | | | | | | | |
| **d** All other revenue . . . . . | | | | | | | |
| **e Total.** Add lines 11a–11d . . ▶ | | | | 4,539,946 | | | |

12/11/22, 4:56 PM                          PGA TOUR INC - Full Filing- Nonprofit Explorer - ProPublica

| | | | | |
|---|---|---|---|---|
| **12 Total revenue.** See instructions . . . . . ▶ | 1,534,021,881 | 1,153,642,483 | 17,704,991 | 362,674,407 |

Form **990** (2019)

─────────────── Page 10 ───────────────

Form 990 (2019)                                                                                      Page **10**

| Part IX | **Statement of Functional Expenses** |
|---|---|

Section 501(c)(3) and 501(c)(4) organizations must complete all columns. All other organizations must complete column (A).

Check if Schedule O contains a response or note to any line in this Part IX . . . . . . . . . . . . . . . . . ☑

| *Do not include amounts reported on lines 6b, 7b, 8b, 9b, and 10b of Part VIII.* | **(A)** Total expenses | **(B)** Program service expenses | **(C)** Management and general expenses | **(D)** Fundraising expenses |
|---|---|---|---|---|
| **1** Grants and other assistance to domestic organizations and domestic individuals. See Part IV, line 21 . . . | 47,448,570 | | | |
| **2** Grants and other assistance to domestic individuals. See Part IV, line 22 . . . . . . . | 0 | | | |
| **3** Grants and other assistance to foreign organizations, foreign governments, and foreign individuals. See Part IV, lines 15 and 16. . . . . . . . . . . . | 2,603,271 | 0 | | |
| **4** Benefits paid to or for members . . . . . | 0 | | | |
| **5** Compensation of current officers, directors, trustees, and key employees . . . . . . . . . | 27,500,490 | | | |
| **6** Compensation not included above, to disqualified persons (as defined under section 4958(f)(1)) and persons described in section 4958(c)(3)(B) . . . . | 1,505,161 | | | |
| **7** Other salaries and wages . . . . . . | 94,266,037 | | | |
| **8** Pension plan accruals and contributions (include section 401(k) and 403(b) employer contributions) . . . . | 1,204,463 | | | |
| **9** Other employee benefits . . . . . . | 15,394,191 | | | |
| **10** Payroll taxes . . . . . . . . | 6,621,053 | | | |
| **11** Fees for services (non-employees): | | | | |
| **a** Management . . . . . . . . | 0 | | | |
| **b** Legal . . . . . . . . . . | 1,185,056 | | | |
| **c** Accounting . . . . . . . . | 708,908 | | | |
| **d** Lobbying . . . . . . . . . | 1,552,668 | | | |
| **e** Professional fundraising services. See Part IV, line 17 | 0 | | | |
| **f** Investment management fees . . . . . . | 1,340,503 | | | |
| **g** Other (If line 11g amount exceeds 10% of line 25, column (A) amount, list line 11g expenses on Schedule O.) | 569,932,842 | | | |
| **12** Advertising and promotion . . . . . | 32,708,453 | | | |
| **13** Office expenses . . . . . . . | 6,043,043 | | | |
| **14** Information technology . . . . . . | 5,460,991 | | | |
| **15** Royalties . . | 339,298 | | | |
| **16** Occupancy . . . . . . . . | 5,531,166 | | | |
| **17** Travel . . . . . . . . . . | 21,803,354 | | | |
| **18** Payments of travel or entertainment expenses for any federal, state, or local public officials . . . | 0 | | | |
| **19** Conferences, conventions, and meetings . . | 1,192,736 | | | |
| **20** Interest . . . . . . . . . | 5,405,200 | | | |
| **21** Payments to affiliates . . . . . . | 0 | | | |
| **22** Depreciation, depletion, and amortization . . | 16,730,092 | | | |
| **23** Insurance . . . . . | 2,142,729 | | | |
| **24** Other expenses. Itemize expenses not covered above (List miscellaneous expenses in line 24e. If line 24e amount exceeds 10% of line 25, column (A) amount, list line 24e expenses on Schedule O.) | | | | |
| **a** TV/PRODUCTION/BROADCAST | 217,805,702 | | | |
| **b** ALLOCATION TO SPONSORS | 108,978,604 | | | |
| **c** PLAYER RETIREMENT EARNINGS | 73,068,231 | | | |
| **d** TOURNAMENT OPERATIONS | 62,371,073 | | | |
| **e** All other expenses | 130,405,422 | | | |
| **25 Total functional expenses.** Add lines 1 through 24e | 1,461,249,307 | 0 | | |

12/11/22, 4:56 PM

PGA TOUR INC - Full Filing- Nonprofit Explorer - ProPublica

| 26 | Joint costs. Complete this line only if the organization reported in column (B) joint costs from a combined educational campaign and fundraising solicitation.<br>Check here ▶ ☐ if following SOP 98-2 (ASC 958-720). | | | | | |

Form **990** (2019)

---- Page 11 ----

Form 990 (2019)                                                                                                          Page **11**

| Part X | **Balance Sheet** |

Check if Schedule O contains a response or note to any line in this Part IX . . . . . . . . . . . . . ☑

| | | | **(A)**<br>Beginning of year | | **(B)**<br>End of year |
|---|---|---|---|---|---|
| **1** | Cash–non-interest-bearing . . . . . . . | | 3,884,310 | **1** | 8,553,942 |
| **2** | Savings and temporary cash investments . . . . | | 140,402,877 | **2** | 139,647,643 |
| **3** | Pledges and grants receivable, net . . . . . | | 0 | **3** | 0 |
| **4** | Accounts receivable, net . . . . . . . | | 40,605,314 | **4** | 58,268,149 |
| **5** | Loans and other payables to any current or former officer, director, trustee, key employee, creator or founder, substantial contributor, or 35% controlled entity or family member of any of these persons . . . . | | 0 | **5** | 0 |
| **6** | Loans and other receivables from other disqualified persons (as defined under section 4958(f)(1)), and persons described in section 4958(c)(3)(B) . . . | | 0 | **6** | 0 |
| **7** | Notes and loans receivable, net . . . . . . | | 430,595,378 | **7** | 505,676,112 |
| **8** | Inventories for sale or use . . . . . . . | | 208,211 | **8** | 243,606 |
| **9** | Prepaid expenses and deferred charges . . . . | | 25,568,713 | **9** | 26,378,478 |
| **10a** | Land, buildings, and equipment: cost or other basis. Complete Part VI of Schedule D | **10a** | 254,991,322 | | |
| **b** | Less: accumulated depreciation | **10b** | 90,362,964 | 97,400,569 **10c** | 164,628,358 |
| **11** | Investments—publicly traded securities . | | 1,479,533,606 | **11** | 1,738,865,693 |
| **12** | Investments—other securities. See Part IV, line 11 . . . . | | 694,330,384 | **12** | 705,123,082 |
| **13** | Investments—program-related. See Part IV, line 11 . | | 0 | **13** | 0 |
| **14** | Intangible assets . . . . . . . . . . | | 1,992,345 | **14** | 1,977,133 |
| **15** | Other assets. See Part IV, line 11 . . . . . | | 19,504,455 | **15** | 33,663,697 |
| **16** | **Total assets.** Add lines 1 through 15 (must equal line 33) . . . | | 2,934,026,162 | **16** | 3,384,025,893 |
| **17** | Accounts payable and accrued expenses . . . | | 159,532,016 | **17** | 179,217,907 |
| **18** | Grants payable . . . . | | | **18** | 0 |
| **19** | Deferred revenue . . . . . . . . . | | 209,341,782 | **19** | 220,947,286 |
| **20** | Tax-exempt bond liabilities . . . . . . . | | 0 | **20** | 0 |
| **21** | Escrow or custodial account liability. Complete Part IV of Schedule D | | 0 | **21** | 0 |
| **22** | Loans and other payables to any current or former officer, director, trustee, key employee, creator or founder, substantial contributor, or 35% controlled entity or family member of any of these persons . . . . | | 0 | **22** | 0 |
| **23** | Secured mortgages and notes payable to unrelated third parties . . | | 119,424,315 | **23** | 122,431,656 |
| **24** | Unsecured notes and loans payable to unrelated third parties . . | | 0 | **24** | 0 |
| **25** | Other liabilities (including federal income tax, payables to related third parties, and other liabilities not included on lines 17 - 24). Complete Part X of Schedule D | | 1,292,468,509 | **25** | 1,627,299,170 |
| **26** | **Total liabilities.** Add lines 17 through 25 . . | | 1,780,766,622 | **26** | 2,149,896,019 |
| | **Organizations that follow FASB ASC 958, check here ▶ ☐ and complete lines 27, 28, 32, and 33.** | | | | |
| **27** | Net assets without donor restrictions . . . . . | | | **27** | |
| **28** | Net assets with donor restrictions . . . . . | | | **28** | |
| | **Organizations that do not follow FASB ASC 958, check here ▶ ☑ and complete lines 29 through 33.** | | | | |
| **29** | Capital stock or trust principal, or current funds . . . . . | | 0 | **29** | 0 |
| **30** | Paid-in or capital surplus, or land, building or equipment fund . . | | 33,750 | **30** | 33,750 |
| **31** | Retained earnings, endowment, accumulated income, or other funds . | | 1,153,225,790 | **31** | 1,234,096,124 |
| **32** | Total net assets or fund balances . . . . . . . | | 1,153,259,540 | **32** | 1,234,129,874 |
| **33** | Total liabilities and net assets/fund balances . . . . . . | | 2,934,026,162 | **33** | 3,384,025,893 |

*Left margin labels: Assets (rows 1–16), Liabilities (rows 17–26), Net Assets or Fund Balances (rows 27–33)*

Form **990** (2019)

---- Page 12 ----

12/11/22, 4:56 PM                          PGA TOUR INC - Full Filing- Nonprofit Explorer - ProPublica

Form 990 (2019)                                                                              Page **12**

| Part XI | **Reconcilliation of Net Assets** | | |
|---|---|---|---|

Check if Schedule O contains a response or note to any line in this Part XI . . . . . . . . . . . . . . . ☑

| | | | |
|---|---|---|---|
| 1 | Total revenue (must equal Part VIII, column (A), line 12) . . . . . . . . . | **1** | 1,534,021,881 |
| 2 | Total expenses (must equal Part IX, column (A), line 25) . . . . . . . . . | **2** | 1,461,249,307 |
| 3 | Revenue less expenses. Subtract line 2 from line 1 . . . . . . . . . . . | **3** | 72,772,574 |
| 4 | Net assets or fund balances at beginning of year (must equal Part X, line 32, column (A)) . . | **4** | 1,153,259,540 |
| 5 | Net unrealized gains (losses) on investments . . . . . . . . . . . . . | **5** | 20,217,350 |
| 6 | Donated services and use of facilities . . . . . . . . . . . . . . . | **6** | |
| 7 | Investment expenses . . . . . . . . . . . . . . . . . . . . | **7** | |
| 8 | Prior period adjustments . . . . . . . . . . . . . . . . . . . | **8** | |
| 9 | Other changes in net assets or fund balances (explain in Schedule O) . . . . . . | **9** | -12,119,590 |
| 10 | Net assets or fund balances at end of year. Combine lines 3 through 9 (must equal Part X, line 32, column (B)) | **10** | 1,234,129,874 |

| Part XII | **Financial Statements and Reporting** | | | |
|---|---|---|---|---|

Check if Schedule O contains a response or note to any line in this Part XII . . . . . . . . . . . . . . ☐

| | | **Yes** | **No** |
|---|---|---|---|
| 1 | Accounting method used to prepare the Form 990:   ☐ Cash  ☑ Accrual  ☐ Other _____ | | |
| | If the organization changed its method of accounting from a prior year or checked "Other," explain in Schedule O. | | |
| 2a | Were the organization's financial statements compiled or reviewed by an independent accountant? | **2a** | No |
| | If 'Yes,' check a box below to indicate whether the financial statements for the year were compiled or reviewed on a separate basis, consolidated basis, or both: | | |
| | ☐ Separate basis    ☐ Consolidated basis    ☐ Both consolidated and separate basis | | |
| b | Were the organization's financial statements audited by an independent accountant? | **2b** | Yes |
| | If 'Yes,' check a box below to indicate whether the financial statements for the year were audited on a separate basis, consolidated basis, or both: | | |
| | ☐ Separate basis    ☑ Consolidated basis    ☐ Both consolidated and separate basis | | |
| c | If "Yes," to line 2a or 2b, does the organization have a committee that assumes responsibility for oversight of the audit, review, or compilation of its financial statements and selection of an independent accountant? | **2c** | Yes |
| | If the organization changed either its oversight process or selection process during the tax year, explain in Schedule O. | | |
| 3a | As a result of a federal award, was the organization required to undergo an audit or audits as set forth in the Single Audit Act and OMB Circular A-133? | **3a** | No |
| b | If "Yes," did the organization undergo the required audit or audits? If the organization did not undergo the required audit or audits, explain why in Schedule O and describe any steps taken to undergo such audits. | **3b** | |

Form **990** (2019)

---

Form 990 (2019)

## Additional Data

| | Return to Form |
|---|---|

**Software ID:**

**Software Version:**

**Form 990, Special Condition Description:**

| Special Condition Description |
|---|

↑ Back to Top

| efile Public Visual Render | ObjectId: 202023219349309777 - Submission: 2020-11-16 | TIN: 52-0999206 |
|---|---|---|

OMB No. 1545-0047

**SCHEDULE C**
**(Form 990 or 990-EZ)**

Department of the Treasury
Internal Revenue Service

# Political Campaign and Lobbying Activities

**For Organizations Exempt From Income Tax Under section 501(c) and section 527**

►**Complete if the organization is described below.** ►**Attach to Form 990 or Form 990-EZ.**
►**Go to** *www.irs.gov/Form990* **for instructions and the latest information.**

**2019**

Open to Public
Inspection

**If the organization answered "Yes" on Form 990, Part IV, Line 3, or Form 990-EZ, Part V, line 46 (Political Campaign Activities), then**
 • Section 501(c)(3) organizations: Complete Parts I-A and B. Do not complete Part I-C.
 • Section 501(c) (other than section 501(c)(3)) organizations: Complete Parts I-A and C below. Do not complete Part I-B.
 • Section 527 organizations: Complete Part I-A only.
**If the organization answered "Yes" on Form 990, Part IV, Line 4, or Form 990-EZ, Part VI, line 47 (Lobbying Activities), then**

PGA TOUR INC - Full Filing- Nonprofit Explorer - ProPublica

- ● Section 501(c)(3) organizations that have filed Form 5768 (election under section 501(h)): Complete Part II-A. Do not complete Part II-B.
- ● Section 501(c)(3) organizations that have NOT filed Form 5768 (election under section 501(h)): Complete Part II-B. Do not complete Part II-A.
- **If the organization answered "Yes" on Form 990, Part IV, Line 5 (Proxy Tax) (see separate instructions) or Form 990-EZ, Part V, line 35c (Proxy Tax) (see separate instructions), then**
- ● Section 501(c)(4), (5), or (6) organizations: Complete Part III.

| Name of the organization | Employer identification number |
|---|---|
| PGA TOUR INC | 52-0999206 |

### Part I-A   Complete if the organization is exempt under section 501(c)or is a section 527 organization.

| | | |
|---|---|---|
| 1 | Provide a description of the organization's direct and indirect political campaign activities in Part IV (see instructions for definition of "political campaign activities") | |
| 2 | Political campaign activity expenditures (see instructions) ................................................ ► | $ _____ |
| 3 | Volunteer hours for political campaign activities (see instructions) ................................................... | |

### Part I-B   Complete if the organization is exempt under section 501(c)(3).

| | | | |
|---|---|---|---|
| 1 | Enter the amount of any excise tax incurred by the organization under section 4955 ........ ► | $ _____ | |
| 2 | Enter the amount of any excise tax incurred by organization managers under section 4955 .......... ► | $ _____ | |
| 3 | If the organization incurred a section 4955 tax, did it file Form 4720 for this year?...................... | ☐ Yes | ☐ No |
| 4a | Was a correction made? .................................................. | ☐ Yes | ☐ No |
| b | If "Yes," describe in Part IV. | | |

### Part I-C   Complete if the organization is exempt under section 501(c),except section 501(c)(3).

| | | | |
|---|---|---|---|
| 1 | Enter the amount directly expended by the filing organization for section 527 exempt functionactivities..... ► | $ _____ | |
| 2 | Enter the amount of the filing organization's funds contributed to other organizations for section 527 exempt function activities ...................................................... ► | $ _____ | |
| 3 | Total exempt function expenditures. Add lines 1 and 2. Enter here and on Form 1120-POL, line 17b.......... ► | $ _____ | |
| 4 | Did the filing organization file **Form 1120-POL** for this year?................................................ | ☐ Yes | ☐ No |
| 5 | Enter the names, addresses and employer identification number (EIN) of all section 527 political organizations to which the filing organization made payments. For eachorganization listed, enter the amount paid from the filing organization's funds. Alsoenter the amount of political contributions received that were promptly and directlydelivered to a separate political organization, such as a separate segregated fund or apolitical action committee (PAC). If additional space is needed, provide information in Part IV. | | |

| (a) Name | (b) Address | (c) EIN | (d) Amount paid from filing organization's funds. If none, enter -0-. | (e) Amount of political contributions received and promptly and directly delivered to a separate political organization. If none, enter -0-. |
|---|---|---|---|---|
| 1 | | | | |
| 2 | | | | |
| 3 | | | | |
| 4 | | | | |
| 5 | | | | |
| 6 | | | | |

For Paperwork Reduction Act Notice, see the instructions for Form 990 or 990-EZ.    Cat. No. 50084S    **Schedule C (Form 990 or 990-EZ) 2019**

--- Page 2 ---

Schedule C (Form 990 or 990-EZ) 2019    Page **2**

### Part II-A   Complete if the organization isexempt under section 501(c)(3) and filed Form 5768 (election under section 501(h)).

A   Check ► ☐ if the filing organization belongs to an affiliated group (and list in Part IV each affiliated group member's name, address, EIN, expenses, and share of excess lobbying expenditures).

B   Check ► ☐ if the filing organization checked box A and "limited control" provisions apply.

| **Limits on Lobbying Expenditures**<br>(The term "expenditures" means amounts paid or incurred.) | (a) Filing organization's totals | (b) Affiliated group totals |
|---|---|---|
| 1a Total lobbying expenditures to influence public opinion (grass roots lobbying) ...................... | | |
| b Total lobbying expenditures to influence a legislative body (direct lobbying) ...................... | | |
| c Total lobbying expenditures (add lines 1a and 1b) ...................................................... | | |
| d Other exempt purpose expenditures ...................................................... | | |
| e Total exempt purpose expenditures (add lines 1c and 1d) ...................................................... | | |
| f Lobbying nontaxable amount. Enter the amount from the following table in both columns. | | |
| **If the amount on line 1e, column (a) or (b) is:** \| **The lobbying nontaxable amount is:** | | |

| | |
|---|---|
| Not over $500,000 | 20% of the amount on line 1e. |
| Over $500,000 but not over $1,000,000 | $100,000 plus 15% of the excess over $500,000. |
| Over $1,000,000 but not over $1,500,000 | $175,000 plus 10% of the excess over $1,000,000. |
| Over $1,500,000 but not over $17,000,000 | $225,000 plus 5% of the excess over $1,500,000. |
| Over $17,000,000 | $1,000,000. |

**g** Grassroots nontaxable amount (enter 25% of line 1f) ...............................................

**h** Subtract line 1g from line 1a. If zero or less, enter -0-. ........................................

**i** Subtract line 1f from line 1c. If zero or less, enter -0-. .........................................

**j** If there is an amount other than zero on either line 1h or line 1i, did the organization file Form 4720 reporting section 4911 tax for this year?..............................................................................     ☐ **Yes** ☐ **No**

### 4-Year Averaging Period Under Section 501(h)
**(Some organizations that made a section 501(h) election do not have to complete all of the five columns below. See the separate instructions for lines 2a through 2f.)**

**Lobbying Expenditures During 4-Year Averaging Period**

| Calendar year (or fiscal year beginning in) | (a) 2016 | (b) 2017 | (c) 2018 | (d) 2019 | (e) Total |
|---|---|---|---|---|---|
| **2a** Lobbying nontaxable amount | | | | | |
| **b** Lobbying ceiling amount (150% of line 2a, column(e)) | | | | | |
| **c** Total lobbying expenditures | | | | | |
| **d** Grassroots nontaxable amount | | | | | |
| **e** Grassroots ceiling amount (150% of line 2d, column (e)) | | | | | |
| **f** Grassroots lobbying expenditures | | | | | |

**Schedule C (Form 990 or 990-EZ) 2019**

— Page 3 —

Schedule C (Form 990 or 990-EZ) 2019                                              Page **3**

**Part II-B    Complete if the organization is exempt under section 501(c)(3) and has NOT filed Form 5768 (election under section 501(h)).**

*For each "Yes" response on lines 1a through 1i below, provide in Part IV a detailed description of the lobbying activity.*

| | | (a) | | (b) |
|---|---|---|---|---|
| | | Yes | No | Amount |
| **1** | During the year, did the filing organization attempt to influence foreign, national, state or local legislation, including any attempt to influence public opinion on a legislative matter or referendum, through the use of: | | | |
| **a** | Volunteers? ....................................................................... | | | |
| **b** | Paid staff or management (include compensation in expenses reported on lines 1c through 1i)? ....... | | | |
| **c** | Media advertisements? .......................................................... | | | |
| **d** | Mailings to members, legislators, or the public? ........................... | | | |
| **e** | Publications, or published or broadcast statements? ...................... | | | |
| **f** | Grants to other organizations for lobbying purposes? ...................... | | | |
| **g** | Direct contact with legislators, their staffs, government officials, or a legislative body? ..................... | | | |
| **h** | Rallies, demonstrations, seminars, conventions, speeches, lectures, or any similar means? ................ | | | |
| **i** | Other activities? ................................................................. | | | |
| **j** | Total. Add lines 1c through 1i .................................................. | | | |
| **2a** | Did the activities in line 1 cause the organization to be not described in section 501(c)(3)? ..... | | | |
| **b** | If "Yes," enter the amount of any tax incurred under section 4912 | | | |
| **c** | If "Yes," enter the amount of any tax incurred by organization managers under section 4912 .................. | | | |
| **d** | If the filing organization incurred a section 4912 tax, did it file Form 4720 for this year? ...................... | | | |

**Part III-A    Complete if the organization is exempt undersection 501(c)(4), section 501(c)(5), or section 501(c)(6).**

| | | | Yes | No |
|---|---|---|---|---|
| **1** | Were substantially all (90% or more) dues received nondeductible by members? ............................... | **1** | | No |
| **2** | Did the organization make only in-house lobbying expenditures of $2,000 or less? .......................... | **2** | | No |
| **3** | Did the organization agree to carry over lobbying and political expenditures from the prior year? .............. | **3** | | No |

**Part III-B    Complete if theorganization is exempt under section 501(c)(4), section 501(c)(5), or section 501(c)**

PGA TOUR INC - Full Filing- Nonprofit Explorer - ProPublica

**(6)and if either (a) BOTH Part III-A, lines 1 and 2, are answered "No" OR (b) Part III-A, line 3, isanswered "Yes."**

| | | | |
|---|---|---|---|
| 1 | Dues, assessments and similar amounts from members ................................................ | 1 | 616,942 |
| 2 | Section 162(e) nondeductible lobbying and political expenditures **(do not include amounts of political expenses for which the section 527(f) tax was paid).** | | |
| a | Current year ................................................................................ | 2a | 1,552,668 |
| b | Carryover from last year .................................................................... | 2b | |
| c | Total ...................................................................................... | 2c | 1,552,668 |
| 3 | Aggregate amount reported in section 6033(e)(1)(A) notices of nondeductible section 162(e) dues . | 3 | |
| 4 | If notices were sent and the amount on line 2c exceeds the amount on line 3, what portion of the excess does the organization agree to carryover to the reasonable estimate of nondeductible lobbying and political expenditure next year? ............................................................... | 4 | |
| 5 | Taxable amount of lobbying and political expenditures (seeinstructions) ........................ | 5 | 616,942 |

**Part IV    Supplemental Information**

Provide the descriptions required for Part I-A, line 1; Part I-B, line 4; Part I-C, line 5; Part II-A (affiliated group list); Part II-A, lines 1 and 2 (see instructions), and Part II-B, line 1. Also, complete this part for any additional information.

| Return Reference | Explanation |
|---|---|
| | |

Schedule C (Form 990 or 990EZ) 2019

---

## Additional Data

[ Return to Form ]

**Software ID:**

**Software Version:**

↑ Back to Top

| efile Public Visual Render | ObjectId: 202023219349309777 - Submission: 2020-11-16 | TIN: 52-0999206 |
|---|---|---|

**SCHEDULE D**
(Form 990)

Department of the Treasury
Internal Revenue Service

**Supplemental Financial Statements**

► **Complete if the organization answered "Yes," on Form 990, Part IV, line 6, 7, 8, 9, 10, 11a, 11b, 11c, 11d, 11e, 11f, 12a, or 12b.**
► **Attach to Form 990.**
► **Go to www.irs.gov/Form990 for instructions and the latest information.**

OMB No. 1545-0047

**2019**

Open to Public Inspection

| Name of the organization | Employer identification number |
|---|---|
| PGA TOUR INC | 52-0999206 |

**Part I    Organizations Maintaining Donor Advised Funds or Other Similar Funds or Accounts.**
Complete if the organization answered "Yes" on Form 990, Part IV, line 6.

| | | **(a)** Donor advised funds | **(b)** Funds and other accounts |
|---|---|---|---|
| 1 | Total number at end of year . . . . . . . . . | | |
| 2 | Aggregate value of contributions to (during year) | | |
| 3 | Aggregate value of grants from (during year) | | |
| 4 | Aggregate value at end of year . . . . . . . . | | |

5  Did the organization inform all donors and donor advisors in writing that the assets held in donor advised funds are the organization's property, subject to the organization's exclusive legal control?. . . . . . . . . . . . .   ☐ Yes ☐ No

6  Did the organization inform all grantees, donors, and donor advisors in writing that grant funds can be used only for charitable purposes and not for the benefit of the donor or donor advisor, or for any other purpose conferring impermissible private benefit?. . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . .   ☐ Yes ☐ No

**Part II    Conservation Easements.**
Complete if the organization answered "Yes" on Form 990, Part IV, line 7.

1  Purpose(s) of conservation easements held by the organization (check all that apply).

☐ Preservation of land for public use (e.g., recreation or education)       ☐ Preservation of an historically important land area

☐ Protection of natural habitat       ☐ Preservation of a certified historic structure

☐ Preservation of open space

2  Complete lines 2a through 2d if the organization held a qualified conservation contribution in the form of a conservation easement on the last day of the tax year.

| | | Held at the End of the Year |
|---|---|---|
| a | Total number of conservation easements . . . . . . . . . . . . . . . . . . . . . . . | 2a |  |
| b | Total acreage restricted by conservation easements . . . . . . . . . . . . . . . . . | 2b |  |
| c | Number of conservation easements on a certified historic structure included in (a) . . . . . | 2c |  |
| d | Number of conservation easements included in (c) acquired after 7/25/06, and not on a historic structure listed in the National Register . . . | 2d |  |

3  Number of conservation easements modified, transferred, released, extinguished, or terminated by the organization during the tax year ►

Number of states where property subject to conservation easement is located ►

**4**  Number of states where property subject to conservation easement is located ▶

**5**  Does the organization have a written policy regarding the periodic monitoring, inspection, handling of violations, and enforcement of the conservation easements it holds?. . . . . . . . . . .  ☐ Yes  ☐ No

**6**  Staff and volunteer hours devoted to monitoring, inspecting, handling of violations, and enforcing conservation easements during the year
▶ _____

**7**  Amount of expenses incurred in monitoring, inspecting, handling of violations, and enforcing conservation easements during the year
▶ $ _____

**8**  Does each conservation easement reported on line 2(d) above satisfy the requirements of section 170(h)(4)(B)(i) and section 170(h)(4)(B)(ii)?. . . . . . . . . . . . . . . . . . . . . . . . . . . .  ☐ Yes  ☐ No

**9**  In Part XIII, describe how the organization reports conservation easements in its revenue and expense statement, and balance sheet, and include, if applicable, the text of the footnote to the organization's financial statements that describes the organization's accounting for conservation easements.

| Part III | **Organizations Maintaining Collections of Art, Historical Treasures, or Other Similar Assets.** |
|---|---|

Complete if the organization answered "Yes" on Form 990, Part IV, line 8.

**1a**  If the organization elected, as permitted under FASB ASC 958, not to report in its revenue statement and balance sheet works of art, historical treasures, or other similar assets held for public exhibition, education, or research in furtherance of public service, provide, in Part XIII, the text of the footnote to its financial statements that describes these items.

**b**  If the organization elected, as permitted under FASB ASC 958, to report in its revenue statement and balance sheet works of art, historical treasures, or other similar assets held for public exhibition, education, or research in furtherance of public service, provide the following amounts relating to these items:

**(i)** Revenue included on Form 990, Part VIII, line 1 . . . . . . . . . . . . . . . ▶ $ _____

**(ii)** Assets included in Form 990, Part X . . . . . . . . . . . . . . . . . . . ▶ $ _____

**2**  If the organization received or held works of art, historical treasures, or other similar assets for financial gain, provide the following amounts required to be reported under FASB ASC 958 relating to these items:

**a**  Revenue included on Form 990, Part VIII, line 1 . . . . . . . . . . . . . . . . ▶ $ _____

**b**  Assets included in Form 990, Part X . . . . . . . . . . . . . . . . . . . . . ▶ $ _____

**For Paperwork Reduction Act Notice, see the Instructions for Form 990.**      Cat. No. 52283D      **Schedule D (Form 990) 2019**

───── Page 2 ─────

Schedule D (Form 990) 2019                                                                                     Page **2**

| Part III | **Organizations Maintaining Collections of Art, Historical Treasures, or Other Similar Assets** *(continued)* |
|---|---|

**3**  Using the organization's acquisition, accession, and other records, check any of the following that are a significant use of its collection items (check all that apply):

**a**  ☐  Public exhibition       **d**  ☐  Loan or exchange programs

**b**  ☐  Scholarly research       **e**  ☐  Other _____

**c**  ☐  Preservation for future generations

**4**  Provide a description of the organization's collections and explain how they further the organization's exempt purpose in Part XIII.

**5**  During the year, did the organization solicit or receive donations of art, historical treasures or other similar assets to be sold to raise funds rather than to be maintained as part of the organization's collection?. . .  ☐ Yes  ☐ No

| Part IV | **Escrow and Custodial Arrangements.** |
|---|---|

Complete if the organization answered "Yes" on Form 990, Part IV, line 9, or reported an amount on Form 990, Part X, line 21.

**1a**  Is the organization an agent, trustee, custodian or other intermediary for contributions or other assets not included on Form 990, Part X? . . . . . . . . . . . . . . . . . . . . . . . .  ☐ Yes  ☐ No

**b**  If "Yes," explain the arrangement in Part XIII and complete the following table:

|  |  | **Amount** |
|---|---|---|
| **c**  Beginning balance . . . . . . . . . . . . . . . | **1c** |  |
| **d**  Additions during the year . . . . . . . . . . . . | **1d** |  |
| **e**  Distributions during the year . . . . . . . . . . . | **1e** |  |
| **f**  Ending balance . . . . . . . . . . . . . . . | **1f** |  |

**2a**  Did the organization include an amount on Form 990, Part X, line 21, for escrow or custodial account liability? . . . ☐ Yes  ☐ No

**b**  If "Yes," explain the arrangement in Part XIII. Check here if the explanation has been provided in Part XIII . . . . ☐

| Part V | **Endowment Funds.** |
|---|---|

Complete if the organization answered "Yes" on Form 990, Part IV, line 10.

|  | **(a)** Current year | **(b)** Prior year | **(c)** Two years back | **(d)** Three years back | **(e)** Four years back |
|---|---|---|---|---|---|
| **1a** Beginning of year balance . . . . |  |  |  |  |  |
| **b** Contributions . . . . |  |  |  |  |  |
| **c** Net investment earnings, gains, and losses |  |  |  |  |  |
| **d** Grants or scholarships . . . |  |  |  |  |  |
| **e** Other expenditures for facilities and programs . . . |  |  |  |  |  |
| **f** Administrative expenses . . . |  |  |  |  |  |
| **g** End of year balance . . . . . . |  |  |  |  |  |

**2**  Provide the estimated percentage of the current year end balance (line 1g, column (a)) held as:

12/11/22, 4:56 PM      PGA TOUR INC - Full Filing- Nonprofit Explorer - ProPublica

**a** Board designated or quasi-endowment ▶ .................................

**b** Permanent endowment ▶ .................................

**c** Term endowment ▶ .................................

The percentages on lines 2a, 2b, and 2c should equal 100%.

**3a** Are there endowment funds not in the possession of the organization that are held and administered for the organization by:

|  |  | Yes | No |
|---|---|---|---|
| **(i)** Unrelated organizations . . . . . . . . . . . . . . . | **3a(i)** | | |
| **(ii)** Related organizations . . . . . . . . . . . . . . . | **3a(ii)** | | |
| **b** If "Yes" on 3a(ii), are the related organizations listed as required on Schedule R? . . . . . . . . . | **3b** | | |

**4** Describe in Part XIII the intended uses of the organization's endowment funds.

**Part VI**    **Land, Buildings, and Equipment.**
Complete if the organization answered "Yes" on Form 990, Part IV, line 11a. See Form 990, Part X, line 10.

| Description of property | **(a)** Cost or other basis (investment) | **(b)** Cost or other basis (other) | **(c)** Accumulated depreciation | **(d)** Book value |
|---|---|---|---|---|
| **1a** Land . . . . . . | | 6,352,555 | | 6,352,555 |
| **b** Buildings . . . . . | | 13,755,740 | 6,767,901 | 6,987,839 |
| **c** Leasehold improvements | | 2,715,074 | 1,600,160 | 1,114,914 |
| **d** Equipment . . . . . | | 116,594,294 | 71,108,665 | 45,485,629 |
| **e** Other . . . . . | | 115,573,659 | 10,886,238 | 104,687,421 |
| **Total.** Add lines 1a through 1e. *(Column (d) must equal Form 990, Part X, column (B), line 10(c).)* . . ▶ | | | | 164,628,358 |

**Schedule D (Form 990) 2019**

──────────── Page 3 ────────────

Schedule D (Form 990) 2019                                                   Page **3**

**Part VII**    **Investments   Other Securities.**
Complete if the organization answered "Yes" on Form 990, Part IV, line 11b. See Form 990, Part X, line 12.

| **(a)** Description of security or category (including name of security) | **(b)** Book value | **(c)** Method of valuation: Cost or end-of-year market value |
|---|---|---|
| **(1)** Financial derivatives . . . . . . . . | | |
| **(2)** Closely-held equity interests . . . . . . | | |
| **(3)** Other _____ | | |
| (A) PGA TOUR HOLDINGS, INC. & SUBS | 585,819,877 | C |
| (B) INVESTMENT PARTNERSHIPS | 38,920,996 | F |
| (C) ANNUITIES | 80,382,209 | F |
| (D) | | |
| (E) | | |
| (F) | | |
| (G) | | |
| (H) | | |
| (I) | | |
| **Total.** *(Column (b) must equal Form 990, Part X, col. (B) line 12.)* ▶ | 705,123,082 | |

**Part VIII**    **Investments   Program Related.**
Complete if the organization answered 'Yes' on Form 990, Part IV, line 11c. See Form 990, Part X, line 13.

| **(a)** Description of investment | **(b)** Book value | **(c)** Method of valuation: Cost or end-of-year market value |
|---|---|---|
| **(2)** | | |
| **(3)** | | |
| **(4)** | | |
| **(5)** | | |
| **(6)** | | |
| **(7)** | | |
| **(8)** | | |
| **(9)** | | |
| **(10)** | | |
| **Total.** *(Column (b) must equal Form 990, Part X, col (B) line 13.)* | | |

## Part IX  Other Assets.
Complete if the organization answered 'Yes' on Form 990, Part IV, line 11d. See Form 990, Part X, line 15.

| (a) Description | (b) Book value |
|---|---|
| (2) | |
| (3) | |
| (4) | |
| (5) | |
| (6) | |
| (7) | |
| (8) | |
| (9) | |
| (10) | |
| **Total.** *(Column (b) must equal Form 990, Part X, col.(B) line 15.)* ▸ | |

## Part X  Other Liabilities.
Complete if the organization answered 'Yes' on Form 990, Part IV, line 11e or 11f.See Form 990, Part X, line 25.

| 1. (a) Description of liability | (b) Book value |
|---|---|
| (1) Federal income taxes | 0 |
| (5) | |
| (6) | |
| (7) | |
| (8) | |
| (9) | |
| **Total.** *(Column (b) must equal Form 990, Part X, col.(B) line 25.)* ▸ | 1,627,299,170 |

**2.** Liability for uncertain tax positions. In Part XIII, provide the text of the footnote to the organization's financial statements that reports the organization's liability for uncertain tax positions under FIN 48 (ASC 740). Check here if the text of the footnote has been provided in Part XIII ☑

**Schedule D (Form 990) 2019**

——— Page 4 ———

Schedule D (Form 990) 2019                                                                 Page **4**

## Part XI  Reconciliation of Revenue per Audited Financial Statements With Revenue per Return.
Complete if the organization answered 'Yes' on Form 990, Part IV, line 12a.

| | | | | |
|---|---|---|---|---|
| 1 | Total revenue, gains, and other support per audited financial statements . . . . . . | | **1** | |
| 2 | Amounts included on line 1 but not on Form 990, Part VIII, line 12: | | | |
| a | Net unrealized gains (losses) on investments . . . . . | **2a** | | |
| b | Donated services and use of facilities . . . . . . | **2b** | | |
| c | Recoveries of prior year grants . . . . . . . . | **2c** | | |
| d | Other (Describe in Part XIII.) . . . . . . . . | **2d** | | |
| e | Add lines **2a** through **2d** . . . . . . . . . . . . | | **2e** | |
| 3 | Subtract line **2e** from line **1** . . . . . . . . . . | | **3** | |
| 4 | Amounts included on Form 990, Part VIII, line 12, but not on line 1: | | | |
| a | Investment expenses not included on Form 990, Part VIII, line 7b . | **4a** | | |
| b | Other (Describe in Part XIII.) . . . . . . . . . | **4b** | | |
| c | Add lines **4a** and **4b** . . . . . . . . . . . | | **4c** | |
| 5 | Total revenue. Add lines **3** and **4c.** (This must equal Form 990, Part I, line 12.) . . . . . . | | **5** | |

## Part XII  Reconciliation of Expenses per Audited Financial Statements With Expenses per Return.
Complete if the organization answered 'Yes' on Form 990, Part IV, line 12a.

| | | | | |
|---|---|---|---|---|
| 1 | Total expenses and losses per audited financial statements . . . . . . . | | **1** | |
| 2 | Amounts included on line 1 but not on Form 990, Part IX, line 25: | | | |
| a | Donated services and use of facilities . . . . . . . | **2a** | | |
| b | Prior year adjustments . . . . . . . . . | **2b** | | |
| c | Other losses . . . . . . . . . . | **2c** | | |
| d | Other (Describe in Part XIII.) . . . . . . . . | **2d** | | |
| e | Add lines **2a** through **2d** . . . . . . . . . . | | **2e** | |
| 3 | Subtract line **2e** from line **1** . . . . . . . . . | | **3** | |
| 4 | Amounts included on Form 990, Part IX, line 25, but not on line **1:** | | | |

12/11/22, 4:56 PM                                PGA TOUR INC - Full Filing- Nonprofit Explorer - ProPublica

| | | | | |
|---|---|---|---|---|
| a | Investment expenses not included on Form 990, Part VIII, line 7b . . | 4a | | |
| b | Other (Describe in Part XIII.) . . . . . . . . . . | 4b | | |
| c | Add lines 4a and 4b . . . . . . . . . . . . . . . | | | 4c |
| 5 | Total expenses. Add lines 3 and 4c. (This must equal Form 990, Part I, line 18.) . . . . . . . | | | 5 |

**Part XIII    Supplemental Information**

Provide the descriptions required for Part II, lines 3, 5, and 9; Part III, lines 1a and 4; Part IV, lines 1b and 2b; Part V, line 4; Part X, line 2; Part XI, lines 2d and 4b; and Part XII, lines 2d and 4b. Also complete this part to provide any additional information.

| Return Reference | Explanation |
|---|---|
| PART X, LINE 2 - ASC 740 FOOTNOTE | THE TOUR AND ITS SUBSIDIARIES FOLLOW AUTHORITATIVE GUIDANCE WHICH PRESCRIBES A MINIMUM PROBABILITY RECOGNITION THRESHOLD AND MEASUREMENT PROCESS OF TAX BENEFIT(S) ARISING FROM AN UNCERTAIN TAX POSITION ONLY IF IT MEETS A MORE LIKELY THAN NOT SUSTAINABILITY UNDER EXAMINATION THRESHOLD, INCLUDING APPEALS AND LITIGATION. THE CURRENT YEAR'S EXAMINATION RESULTED IN NO RECOGNITION OF ANY BENEFIT OR LIABILITY ASSOCIATED WITH AN UNCERTAIN TAX POSITION. |

**Schedule D (Form 990) 2019**

---

## Additional Data

[Return to Form]

**Software ID:**

**Software Version:**

↑ Back to Top

| efile Public Visual Render | ObjectId: 202023219349309777 - Submission: 2020-11-16 | TIN: 52-0999206 |
|---|---|---|

| SCHEDULE F (Form 990) | **Statement of Activities Outside the United States** | OMB No. 1545-0047 |
|---|---|---|
| | ► Complete if the organization answered "Yes" to Form 990, Part IV, line 14b, 15, or 16. | **2019** |
| Department of the Treasury Internal Revenue Service | ► Attach to Form 990.  ► Go to www.irs.gov/Form990 for instructions and the latest information. | Open to Public Inspection |

| Name of the organization | Employer identification number |
|---|---|
| PGA TOUR INC | 52-0999206 |

**Part I    General Information on Activities Outside the United States.** Complete if the organization answered "Yes" on Form 990, Part IV, line 14b.

1  For grantmakers. Does the organization maintain records to substantiate the amount of its grants and other assistance, the grantees' eligibility for the grants or assistance, and the selection criteria used to award the grants or assistance?  . . . . . . . . . . . . . . . . . . .  ☑ Yes  ☐ No

2  For grantmakers. Describe in Part V the organization's procedures for monitoring the use of its grants and other assistance outside the United States.

3  Activites per Region. (The following Part I, line 3 table can be duplicated if additional space is needed.)

| (a) Region | (b) Number of offices in the region | (c) Number of employees, agents, and independent contractors in the region | (d) Activities conducted in region (by type) (such as, fundraising, program services, investments, grants to recipients located in the region) | (e) If activity listed in (d) is a program service, describe specific type of service(s) in the region | (f) Total expenditures for and investments in the region |
|---|---|---|---|---|---|
| Central America and the Caribbean | 0 | 0 | Program Services | TELEVISION RIGHTS | 0 |
| East Asia and the Pacific | 0 | 0 | Program Services | TELEVISION RIGHTS | 0 |
| Europe (Including Iceland and Greenland) | 0 | 0 | Program Services | TELEVISION RIGHTS | 0 |
| Middle East and North Africa | 0 | 0 | Program Services | TELEVISION RIGHTS | 0 |
| North America | 0 | 0 | Program Services | TELEVISION RIGHTS | 0 |
| Sub-Saharan Africa | 0 | 0 | Program Services | TELEVISION RIGHTS | 0 |
| East Asia and the Pacific | 3 | 11 | Program Services | TOURNAMENT MANAGED | 3,605,168 |
| North America | 1 | 6 | Program Services | TOURNAMENT MANAGED | 574,158 |
| Europe (Including Iceland and Greenland) | 1 | 6 | Program Services | CONSULTING | 1,389,472 |
| Europe (Including Iceland and Greenland) | 0 | 0 | Investments | | 10,000,000 |
| East Asia and the Pacific | 0 | 0 | Grantmaking | | 1,298,197 |
| Europe (Including Iceland and Greenland) | 0 | 0 | Grantmaking | | 15,000 |
| North America | 0 | 0 | Grantmaking | | 1,231,741 |
| South America | 0 | 0 | Grantmaking | | 58,333 |
| | | | | | |
| | | | | | |
| 3a  Sub-total . . . . | 5 | 23 | | | 18,172,069 |
| b  Total from continuation sheets to Part I . . | | | | | |
| c  Totals (add lines 3a and 3b) | 5 | 23 | | | 18,172,069 |

For Paperwork Reduction Act Notice, see the Instructions for Form 990.          Cat. No. 50082W          Schedule F (Form 990) 2019

Schedule F (Form 990) 2019                                                                                                    Page 2

Part IV   Grants and Other Assistance to Organizations or Entities Outside the United States. Complete if the organization answered "Yes" on Form 990,

↑ Back to Top

| efile Public Visual Render | ObjectId: 202023219349309777 - Submission: 2020-11-16 | | TIN: 52-0999206 |
|---|---|---|---|

**Note: To capture the full content of this document, please select landscape mode (11" x 8.5") when printing.**

OMB No. 1545-0047

**Schedule I (Form 990)**

**Grants and Other Assistance to Organizations, Governments and Individuals in the United States**

Complete if the organization answered "Yes," on Form 990, Part IV, line 21 or 22.
▶ Attach to Form 990.
▶ Go to *www.irs.gov/Form990* for the latest information.

**2019**

Open to Public Inspection

Department of the Treasury
Internal Revenue Service

Name of the organization
PGA TOUR INC

Employer identification number
52-0999206

**Part I   General Information on Grants and Assistance**

1   Does the organization maintain records to substantiate the amount of the grants or assistance, the grantees' eligibility for the grants or assistance, and
     the selection criteria used to award the grants or assistance? . . . . . . . . . . . . . . . . . . . . . . . . . . . . . . ☒ Yes   ☐ No

2   Describe in Part IV the organization's procedures for monitoring the use of grant funds in the United States.

**Part II   Grants and Other Assistance to Domestic Organizations and Domestic Governments.** Complete if the organization answered "Yes" on Form 990, Part IV, line 21, for any recipient
that received more than $5,000. Part II can be duplicated if additional space is needed.

| (a) Name and address of organization or government | (b) EIN | (c) IRC section (if applicable) | (d) Amount of cash grant | (e) Amount of non-cash assistance | (f) Method of valuation (book, FMV, appraisal, other) | (g) Description of noncash assistance | (h) Purpose of grant or assistance |
|---|---|---|---|---|---|---|---|
| (1) 100 BLACK MEN OF AMERICA INC 141 AUBURN AVE NE ATLANTA, GA 30303 | 58-1974429 | 501(C)(3) | 10,000 | | | | General Support |
| (2) 3M OPEN FUND 11074 RADISSON RD NE BLAINE, MN 55449 | 83-0995816 | 501(C)(3) | 175,000 | | | | General Support |
| (3) ABACO RESCUE FUND NON-PROFIT CORPORATION 2 SAN DIEGO RD PONTE VEDRA, FL 32082 | 84-2977702 | 501(C)(3) | 10,000 | | | | General Support |
| (4) ADVOCATES USA INC 4859 SLAUSON AVENUE LOS ANGELES, CA 90056 | 20-8922261 | 501(C)(3) | 25,000 | | | | General Support |
| (5) AIR CAPITAL CHARITIES INC 9727 E SHANNON WOODS CIR STE 100 WICHITA, KS 67226 | 46-2001743 | 501(C)(3) | 10,000 | | | | General Support |
| (6) AKRON-CANTON REGIONAL FOODBANK 350 OPPORTUNITY PKWY AKRON, OH 44307 | 34-1369388 | 501(C)(3) | 100,000 | | | | General Support |
| (7) ALICE B LANDRUM MIDDLE SCHOOL PTO INC 230 LANDRUM LN PONTE VEDRA, FL 32082 | 59-3074608 | 501(C)(3) | 7,900 | | | | General Support |
| (8) ALLIANCE OF FAMILIES FIGHTING PANCREATIC CANCER 11768 CALLA LILLY CT PALM BCH GDNS, FL 33418 | 80-0874948 | 501(C)(3) | 15,000 | | | | General Support |
| (9) ALZHEIMERS DISEASE AND RELATED DISORDERS ASSOCIATI 225 N MICHIGAN AVE STE 1700 CHICAGO, IL 60601 | 13-3039601 | 501(C)(3) | 16,320 | | | | General Support |
| (10) AMERICAN ASSOCIATES OF THE NATIONAL THEATRE INC 247 WEST 30TH ST NEW YORK, NY 10001 | 13-4140412 | 501(C)(3) | 25,000 | | | | General Support |
| (11) AMERICAN AUSTRALIAN ASSOCIATION INC 50 BROADWAY STE 2003 NEW YORK, NY 10004 | 13-6151807 | 501(C)(3) | 491,000 | | | | General Support |
| (12) AMERICAN CANCER SOCIETY INC 250 WILLIAMS ST STE 400 ATLANTA, GA 30303 | 13-1788491 | 501(C)(3) | 66,000 | | | | General Support |
| (13) AMERICAN HEART ASSOCIATION INC 7272 GREENVILLE AVE DALLAS, TX 75231 | 13-5613797 | 501(C)(3) | 10,000 | | | | General Support |
| (14) AMERICAN JUNIOR GOLF ASSOCIATION 1980 SPORTS CLUB DR BRASELTON, GA 30517 | 58-1433914 | 501(C)(3) | 100,000 | | | | General Support |
| (15) AMERICAN NATIONAL RED CROSS 431 18TH ST NW WASHINGTON, DC 20006 | 53-0196605 | 501(C)(3) | 25,500 | | | | General Support |
| (16) AMERICAS PROMISE-THE ALLIANCE FOR YOUTH 1110 VERMONT AVE NW STE 900 WASHINGTON, DC 20005 | 54-1848713 | 501(C)(3) | 7,500 | | | | General Support |
| (17) ANGELES VIVIENTES INC URB COSTA DE ORO COSTA DE ORO C-3 DORADO, PR 00646 | 66-0846412 | 501(C)(3) | 8,850 | | | | General Support |

12/11/22, 4:56 PM                                      PGA TOUR INC - Full Filing- Nonprofit Explorer - ProPublica

| Name / Address | EIN | IRS Code | Amount | | | | Purpose |
|---|---|---|---|---|---|---|---|
| (18) ANGELWOOD INC 5600 SPRING PARK RD STE 200 JACKSONVILLE, FL 32216 | 59-3212078 | 501(C)(3) | 15,775 | | | | General Support |
| (19) ARIZONA COMMUNITY FOUNDATION 2201 E CAMELBACK RD NO 405B PHOENIX, AZ 85016 | 86-0348306 | 501(C)(3) | 14,205 | | | | General Support |
| (20) ARNIES ARMY CHARITABLE EVENTS FOUNDATION INC 9000 BAY HILL BLVD ORLANDO, FL 32819 | 81-3305976 | 501(C)(3) | 150,000 | | | | General Support |
| (21) ARNOLD & WINNIE PALMER FOUNDATION INC 9000 BAY HILL BLVD ORLANDO, FL 32819 | 46-5468220 | 501(C)(3) | 225,000 | | | | General Support |
| (22) ASTROS GOLF FOUNDATION 501 CRAWFORD ST STE 500 HOUSTON, TX 77002 | 83-1791157 | 501(C)(3) | 175,000 | | | | General Support |
| (23) AUGUSTINE LITERACY PROJECT-CHARLOTTE 115 W 7TH ST CHARLOTTE, NC 28202 | 83-0822641 | 501(C)(3) | 12,000 | | | | General Support |
| (24) AUSTIN PARKS FOUNDATION 1023 SPRINGDALE RD SUITE 4B AUSTIN, TX 78721 | 74-2648803 | 501(C)(3) | 118,750 | | | | General Support |
| (25) BAPTIST HEALTH SYSTEM FOUNDATION INC 1660 PRUDENTIAL DR STE 203 JACKSONVILLE, FL 32207 | 59-2487135 | 501(C)(3) | 476,500 | 391 | FMV | MISC | General Support |
| (26) BARBARA BUSH FOUNDATION FOR FAMILY LITERACY INC 516 N ADAMS ST TALLAHASSEE, FL 32301 | 26-0587238 | 501(C)(3) | 10,000 | | | | General Support |
| (27) BARTRAM BEARS ATHLETIC BOOSTER CLUB 7399 LONGLEAF PINE PKWY ST JOHNS, FL 32259 | 38-3652548 | 501(C)(3) | 20,910 | | | | General Support |
| (28) BASCA INC 352 STOWE AVE ORANGE PARK, FL 32073 | 59-3318252 | 501(C)(3) | 7,500 | | | | General Support |
| (29) BATON ROUGE AREA KIDS FORE GOLF FOUNDATION 427 HIDDEN LAKE CT BATON ROUGE, LA 70810 | 82-1941767 | 501(C)(3) | 10,000 | | | | General Support |
| (30) BEACHES EMERGENCY ASSISTANCE MINISTRY INC 850 6TH AVE S STE 400 JAX BCH, FL 32250 | 59-2564222 | 501(C)(3) | 6,000 | | | | General Support |
| (31) BEACHES FINE ARTS SERIES INC 416 12TH AVE N JAX BCH, FL 32250 | 59-2989136 | 501(C)(3) | 10,000 | | | | General Support |
| (32) BEATITUDES CAMPUS FOUNDATION 1610 W GLENDALE AVE PHOENIX, AZ 85021 | 86-0649306 | 501(C)(3) | 7,500 | | | | General Support |
| (33) BEGIN AGAIN FOUNDATION PO BOX 6029 VIRGINIA BCH, VA 23456 | 47-5223416 | 501(C)(3) | | 70,000 | FMV | MISC | General Support |
| (34) BELOVED COMMUNITY CHARTER SCHOOL INC 508 GRAND ST JERSEY CITY, NJ 07302 | 45-3689749 | 501(C)(3) | 12,000 | | | | General Support |
| (35) BIG BROTHERS BIG SISTERS OF NORTHEAST FLORIDA INC 40 EAST ADAMS ST 200 JACKSONVILLE, FL 32202 | 59-0683256 | 501(C)(3) | 17,000 | | | | General Support |
| (36) BLESSINGS IN A BACKPACK INC PO BOX 7725 LOUISVILLE, KY 40257 | 26-1964620 | 501(C)(3) | 56,333 | | | | General Support |
| (37) BOARD OF TRUSTEES FOR THE FLORIDA SCHOOL FOR THE D 207 SAN MARCO AVE ST AUGUSTINE, FL 32084 | 59-3206619 | 501(C)(3) | 7,800 | | | | General Support |
| (38) BOBBY JONES GOLF COURSE FOUNDATION INC 2560 BROOKDALE DR NW ATLANTA, GA 30305 | 81-0778972 | 501(C)(3) | 10,000 | | | | General Support |
| (39) BOROUGH OF KINNELON RECREATION DEPARTMENT 1 ALPINE DR KINNELON, NJ 07405 | 22-6002565 | 115 | 12,256 | | | | General Support |
| (40) BOY SCOUTS OF AMERICA 1325 W WALNUT HILL LN IRVING, TX 75038 | 22-1576300 | 501(C)(3) | 43,200 | | | | General Support |
| (41) BOYS & GIRLS CLUBS OF AMERICA 1275 PEACHTREE STREET NW ATLANTA, GA 30309 | 13-5562976 | 501(C)(3) | 10,000 | | | | General Support |
| (42) BOYS & GIRLS CLUBS OF METROPOLITAN PHOENIX INC 4309 E BELLEVIEW ST PHOENIX, AZ 85008 | 86-0107639 | 501(C)(3) | 20,600 | | | | General Support |
| (43) BOYS AND GIRLS CLUBS OF AUSTIN AND TRAVIS COUNTY I 6648 ED BLUESTEIN BLVD AUSTIN, TX 78723 | 74-6087356 | 501(C)(3) | 118,750 | | | | General Support |

12/11/22, 4:56 PM

PGA TOUR INC - Full Filing- Nonprofit Explorer - ProPublica

| | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| (44) BOYS AND GIRLS CLUBS OF NORTHEAST FLORIDA INC 555 W 25TH ST JACKSONVILLE, FL 32206 | 59-6167630 | 501(C)(3) | 38,910 | | | | | General Support |
| (45) BOYS CLUB OF NEW YORK INC 287 E 10TH ST NEW YORK, NY 10009 | 13-5591750 | 501(C)(3) | 25,000 | | | | | General Support |
| (46) BRIGHTER DAYS FOUNDATION PO BOX 2903 N CANTON, OH 44720 | 45-3601700 | 501(C)(3) | | 32,000 | FMV | MISC | | General Support |
| (47) BROOME COUNTY COMMUNITY CHARITIES INC PO BOX 5571 ENDICOTT, NY 13763 | 23-7379949 | 501(C)(3) | 105,000 | | | | | General Support |
| (48) BRYSON DECHAMBEAU FOUNDATION 276 5TH AVE RM 711 NEW YORK, NY 10001 | 83-2520590 | 501(C)(3) | 65,000 | | | | | General Support |
| (49) CAF AND CNL CHARITY GOLF TOURNAMENT 136 SAWMILL LAKES BLVD PONTE VEDRA, FL 32082 | 45-3268049 | 501(C)(3) | 10,000 | | | | | General Support |
| (50) CANCER SUPPORT COMMUNITY-ARIZONA 360 E PALM LN PHOENIX, AZ 85004 | 86-0897810 | 501(C)(3) | 11,880 | | | | | General Support |
| (51) CARIBBEAN 12 STEP INC 1569 CALLE ALDA SAN JUAN, PR 00926 | 66-0797311 | 501(C)(3) | 15,000 | | | | | General Support |
| (52) CARIBE GIRL SCOUTS COUNCIL INC 590 CALLE ELISA COLBERG SAN JUAN, PR 00907 | 66-0200470 | 501(C)(3) | 8,850 | | | | | General Support |
| (53) CASA DE NINOS MANUEL FERNANDEZ JUNCOS INC SANTURCE SAN JUAN, PR 00912 | 66-0191935 | 501(C)(3) | 6,000 | | | | | General Support |
| (54) CASA LA PROVIDENCIA INC PO BOX 902061 SAN JUAN, PR 00902 | 66-0276597 | 501(C)(3) | 6,000 | | | | | General Support |
| (55) CATHEDRAL ARTS PROJECT INC 207 N LAURA ST STE 300 JACKSONVILLE, FL 32202 | 59-3672453 | 501(C)(3) | 7,500 | | | | | General Support |
| (56) CENTURY CLUB CHARITIES INC 285 MARKETRIDGE DR RIDGELAND, MS 39157 | 64-0843787 | 501(C)(3) | 175,000 | | | | | General Support |
| (57) CENTURY CLUB OF SAN DIEGO 9404 GENESEE AVE STE 310 LA JOLLA, CA 92037 | 95-2145967 | 501(C)(3) | 175,000 | | | | | General Support |
| (58) CF FOUNDATION INC 3445 PEACHTREE RD NE STE 175 ATLANTA, GA 30326 | 58-1743909 | 501(C)(3) | 3,064,000 | | | | | General Support |
| (59) CHAMPIONS FOR EDUCATION INC 3700 GLENEAGLES RD CHARLOTTE, NC 28210 | 02-0615986 | 501(C)(3) | 180,000 | | | | | General Support |
| (60) CHARLEY HOFFMAN FOUNDATION 3914 MURPHY CANYON RD STE A170 SAN DIEGO, CA 92123 | 27-0878940 | 501(C)(3) | 14,000 | | | | | General Support |
| (61) CHARLOTTE FAMILY HOUSING INC 300 HAWTHORNE LANE 3RD FLOOR CHARLOTTE, NC 28204 | 58-1599120 | 501(C)(3) | 10,000 | | | | | General Support |
| (62) CHARRO FOUNDATION 10533 E LAKEVIEW DR SCOTTSDALE, AZ 85258 | 51-0168210 | 501(C)(3) | 50,100 | | | | | General Support |
| (63) CHILD CANCER FUND INC 4720 SALISBURY RD JACKSONVILLE, FL 32256 | 59-3359840 | 501(C)(3) | 5,560 | | | | | General Support |
| (64) CHILDRENS GOLF FOUNDATION INC 7301 N HAVERHILL RD RIVIERA BEACH, FL 33407 | 65-0262208 | 501(C)(3) | 10,000 | | | | | General Support |
| (65) CHILDRENS HEALTHCARE CHARITY INC C/O 1MG 3300 PGA BLVD NO 800 PALM BEACH GARDENS, FL 33410 | 20-4394654 | 501(C)(3) | 180,000 | | | | | General Support |
| (66) CHILDRENS HOME SOCIETY OF FLORIDA 482 S KELLER RD 3RD FLOOR ORLANDO, FL 32810 | 59-0192430 | 501(C)(3) | 40,000 | | | | | General Support |
| (67) CHILDRENS MIRACLE NETWORK 205 W 700 S SALT LAKE CTY, UT 84101 | 87-0387205 | 501(C)(3) | 11,290 | | | | | General Support |
| (68) CHRISTIAN HEALTH CARE CENTER 301 SICOMAC AVENUE BLDG 1 WYCKOFF, NJ 07481 | 22-1546163 | 501(C)(3) | 15,219 | | | | | General Support |
| (69) CITY HARVEST INC 6 EAST 32ND STREET 5TH FL NEW YORK, NY 10016 | 13-3170676 | 501(C)(3) | 10,000 | | | | | General Support |
| (70) CITY YEAR INC 287 COLUMBUS AVENUE BOSTON, MA 02116 | 22-2882549 | 501(C)(3) | 50,000 | | | | | General Support |
| (71) COACHART ORG 312 ARIZONA AVE | 94-3389547 | 501(C)(3) | 10,000 | | | | | General Support |

12/11/22, 4:56 PM                         PGA TOUR INC - Full Filing- Nonprofit Explorer – ProPublica

SANTA MONICA, CA  90401

| | | | | | | |
|---|---|---|---|---|---|---|
| (72) COASTAL CENTER FOR DEVELOPMENTAL SERVICES INC<br>PO BOX 13607<br>SAVANNAH, GA  31416 | 58-1401456 | 501(C)(3) | 5,023 | | | General Support |
| (73) COLLEGE GOLF FELLOWSHIP<br>5098 FOOTHILL BLVD 3 UNIT 138<br>ROSEVILLE, CA  95747 | 55-0798282 | 501(C)(3) | 17,778 | | | General Support |
| (74) COMMUNITIES IN SCHOOLS OF JACKSONVILLE<br>6261 DUPONT STATION CT E<br>JACKSONVILLE, FL  32217 | 59-3027895 | 501(C)(3) | 20,000 | | | General Support |
| (75) COMMUNITY HOSPICE OF NORTHEAST FLORIDA FOUNDATION<br>4266 SUNBEAM ROAD<br>JACKSONVILLE, FL  32257 | 59-3583920 | 501(C)(3) | 131,620 | | | General Support |
| (76) COPPERHEAD CHARITIES INC<br>36750 US HIGHWAY 19 N<br>PALM HARBOR, FL  34684 | 59-2319162 | 501(C)(3) | 180,000 | | | General Support |
| (77) CROHNS & COLITIS FOUNDATION INC<br>733 3RD AVE STE 510<br>NEW YORK, NY  10017 | 13-6193105 | 501(C)(3) | 10,506 | | | General Support |
| (78) CVS HEALTH CHARITY CLASSIC INC<br>1 CVS DR<br>WOONSOCKET, RI  02895 | 05-0508742 | 501(C)(3) | 250,000 | | | General Support |
| (79) DAILYS FOUNDATION INC<br>7014 A C SKINNER PKWY STE 290<br>JACKSONVILLE, FL  32256 | 84-2438612 | 501(C)(3) | 10,000 | | | General Support |
| (80) DAVIS LOVE III FOUNDATION<br>100 RETREAT RD<br>ST SIMONS IS, GA  31522 | 20-2920597 | 501(C)(3) | 375,000 | 25,000 FMV | MISC | General Support |
| (81) DEPAUL SCHOOL OF NORTH EAST FLORIDA INC<br>3044 SAN PABLO RD S<br>JACKSONVILLE, FL  32224 | 59-2112091 | 501(C)(3) | 5,660 | | | General Support |
| (82) DESERT CLASSIC CHARITIES<br>78080 CALLE AMIGO<br>LA QUINTA, CA  92253 | 33-0826474 | 501(C)(3) | 875,000 | | | General Support |
| (83) DESERT RECREATION FOUNDATION<br>45305 OASIS ST<br>INDIO, CA  92201 | 91-2143285 | 501(C)(3) | 30,000 | | | General Support |
| (84) DETROIT GOLF FOUNDATION<br>PO BOX 21728<br>DETROIT, MI  48221 | 46-3655916 | 501(C)(3) | 10,000 | | | General Support |
| (85) DJ FOUNDATION INC<br>1097 TPC BLVD<br>MURRELLS INLT, SC  29576 | 81-3501480 | 501(C)(3) | 30,000 | | | General Support |
| (86) DOWNTOWN ECUMENICAL SERVICES COUNCIL INC<br>215 N OCEAN ST<br>JACKSONVILLE, FL  32202 | 59-2437003 | 501(C)(3) | 10,000 | | | General Support |
| (87) DREAMS COME TRUE OF JACKSONVILLE INC<br>6803 SOUTHPOINT PKWY<br>JACKSONVILLE, FL  32216 | 59-2967803 | 501(C)(3) | 62,850 | | | General Support |
| (88) ELEVATE PHOENIX<br>3750 W INDIAN SCHOOL RD<br>PHOENIX, AZ  85019 | 90-0451740 | 501(C)(3) | 10,000 | | | General Support |
| (89) ELS FOR AUTISM FOUNDATION<br>18370 LIMESTONE CREEK RD<br>JUPITER, FL  33458 | 26-3520396 | 501(C)(3) | 15,000 | 35,000 FMV | MISC | General Support |
| (90) EVANS SCHOLARS FOUNDATION<br>1 BRIAR RD<br>GOLF, IL  60029 | 36-2518129 | 501(C)(3) | 177,500 | | | General Support |
| (91) EXECUTIVE COUNCIL CHARITIES<br>4114 E INDIAN SCHOOL RD<br>PHOENIX, AZ  85018 | 27-3923417 | 501(C)(3) | 166,500 | | | General Support |
| (92) EXTRA BASES INC<br>PO BOX 4996<br>AGUADILLA, PR  00605 | 66-0594469 | 501(C)(3) | 8,850 | | | General Support |
| (93) EXTRA SPECIAL PEOPLE INC<br>PO BOX 615<br>WATKINSVILLE, GA  30677 | 58-1710803 | 501(C)(3) | 50,000 | | | General Support |
| (94) FELLOWSHIP OF CHRISTIAN ATHLETES<br>8701 LEEDS RD<br>KANSAS CITY, MO  64129 | 44-0610626 | 501(C)(3) | 21,270 | | | General Support |
| (95) FIRST COAST WOMENS SERVICES<br>11215 SAN JOSE BLVD<br>JACKSONVILLE, FL  32223 | 59-3200240 | 501(C)(3) | 35,000 | | | General Support |
| (96) FIRST TEE NEW YORK INC<br>3545 JEROME AVE<br>BRONX, NY  10467 | 31-1724122 | 501(C)(3) | 62,813 | | | General Support |
| (97) FIRST TEE OF ATLANTA INC<br>1053 CASCADE CIR SW<br>ATLANTA, GA  30311 | 58-2414794 | 501(C)(3) | 210,000 | | | General Support |
| (98) FIRST TEE OF CENTRAL FLORIDA<br>1326 PALMETTO AVE<br>WINTER PARK, FL  32789 | 27-0149539 | 501(C)(3) | 60,000 | | | General Support |
| (99) FIRST TEE OF GREATER | 56-2245026 | 501(C)(3) | 25,000 | | | General Support |

PGA TOUR INC - Full Filing- Nonprofit Explorer - ProPublica

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| CHARLOTTE<br>2661 BARRINGER DR<br>CHARLOTTE, NC 28208 | | | | | | | |
| (100) FIRST TEE OF LOS ANGELES<br>3631 MOTOR AVE STE 110<br>LOS ANGELES, CA 90034 | 95-6051006 | 501(C)(3) | 6,875 | | | | General Support |
| (101) FIRST TEE OF MIAMI-DADE FOUNDATION INC<br>2800 PONCE DE LEON BLVD STE 1160<br>CORAL GABLES, FL 33134 | 46-1112090 | 501(C)(3) | 25,000 | | | | General Support |
| (102) FIRST TEE OF NORTH FLORIDA INC<br>475 W TOWN PL STE 115<br>ST AUGUSTINE, FL 32092 | 59-3577327 | 501(C)(3) | 288,106 | | | | General Support |
| (103) FIRST TEE OF THE QUAD CITIES<br>201 W 2ND ST STE 601<br>DAVENPORT, IA 52801 | 42-1510940 | 501(C)(3) | 10,000 | | | | General Support |
| (104) FIVE STAR VETERANS CENTER INC<br>40 ACME ST<br>JACKSONVILLE, FL 32211 | 45-3545974 | 501(C)(3) | 85,000 | 30,000 | FMV | MISC | General Support |
| (105) FLAGLER HEALTH CARE FOUNDATION INC<br>400 HEALTH PARK BLVD<br>ST AUGUSTINE, FL 32086 | 59-2440537 | 501(C)(3) | 200,000 | | | | General Support |
| (106) FLORIDA PROTON THERAPY INSTITUTE INC<br>2015 JEFFERSON ST<br>JACKSONVILLE, FL 32206 | 01-0554709 | 501(C)(3) | 10,000 | 1,040 | FMV | MISC | General Support |
| (107) FLORIDA STATE COLLEGE AT JACKSONVILLE FOUNDATION I<br>501 WEST STATE ST NO 104<br>JACKSONVILLE, FL 32202 | 23-7168438 | 501(C)(3) | 50,000 | | | | General Support |
| (108) FOLDS OF HONOR ARIZONA CHAPTER<br>7225 W OAKLAND ST STE 1<br>CHANDLER, AZ 85226 | 30-1007297 | 501(C)(3) | 11,449 | | | | General Support |
| (109) FOLDS OF HONOR FOUNDATION<br>8551 N 125TH EAST AVE STE 100<br>OWASSO, OK 74055 | 75-3240683 | 501(C)(3) | 60,000 | | | | General Support |
| (110) FOODSHARE INC<br>4156 SOUTHBANK RD<br>OXNARD, CA 93036 | 77-0018162 | 501(C)(3) | 23,663 | | | | General Support |
| (111) FORE KIDS FOUNDATION INC<br>11005 LAPALCO BLVD<br>AVONDALE, LA 70094 | 58-1940111 | 501(C)(3) | 175,000 | | | | General Support |
| (112) FORT WORTH COLONIAL CHARITIES INC<br>3735 COUNTRY CLUB CIR<br>FORT WORTH, TX 76109 | 46-3211083 | 501(C)(3) | 175,000 | | | | General Support |
| (113) FORT WORTH JUNIOR GOLF FOUNDATION INCORPORATED<br>1900 ROCKWOOD PARK DR N<br>FORT WORTH, TX 76114 | 20-5545252 | 501(C)(3) | 10,000 | | | | General Support |
| (114) FOUNDATION FOR YOUTH INITIATIVES IN KENTUCKY INC<br>4725 WILLMAN WAY<br>LEXINGTON, KY 40509 | 84-2222743 | 501(C)(3) | 10,000 | | | | General Support |
| (115) FRESH START SURGICAL GIFTS<br>2011 PALOMAR AIRPORT RD STE 206<br>CARLSBAD, CA 92011 | 33-0460177 | 501(C)(3) | 25,000 | | | | General Support |
| (116) FRIENDS OF HAWAII CHARITIES INC<br>1001 BISHOP ST<br>HONOLULU, HI 96813 | 99-0334032 | 501(C)(3) | 175,000 | | | | General Support |
| (117) FRIENDS OF THE CHILDRENS JUSTICE CENTER OF MAUI IN<br>1773 WILI PA LOOP STE A<br>WAILUKU, HI 96793 | 99-0281559 | 501(C)(3) | 42,075 | | | | General Support |
| (118) FRIENDS OF WASHOE COUNTY CHILD ADVOCACY CENTER<br>3983 S MCCARRAN BLVD BOX 455<br>RENO, NV 89502 | 81-2733506 | 501(C)(3) | 6,000 | | | | General Support |
| (119) FUNDACION AGENDA CIUDADANA INC<br>EL NUEVO DIA BUILDING1ST FLOOR<br>GUAYNABO, PR 00968 | 66-0774675 | 501(C)(3) | 20,000 | | | | General Support |
| (120) FUNDACION CAP INC<br>PO BOX 10807<br>SAN JUAN, PR 00922 | 66-0826249 | 501(C)(3) | 50,000 | | | | General Support |
| (121) FUNK - ZITIELLO FOUNDATION<br>830-13 A1A NORTH 187 SUITE 13<br>PONTE VEDRA BEACH, FL 32082 | 81-3204321 | 501(C)(3) | 30,000 | | | | General Support |
| (122) GENERATION W INC<br>2320 3RD ST S STE 5<br>JAX BCH, FL 32250 | 46-4832199 | 501(C)(3) | 8,500 | | | | General Support |
| (123) GEORGIA STATE GOLF ASSOCIATION INC<br>121 VILLAGE PKWY BLDG 3<br>MARIETTA, GA 30067 | 58-1145042 | 501(C)(3) | 6,000 | | | | General Support |
| (124) GIRLS INCORPORATED OF JACKSONVILLE | 59-1317196 | 501(C)(3) | 7,500 | | | | General Support |

12/11/22, 4:56 PM

PGA TOUR INC - Full Filing- Nonprofit Explorer - ProPublica

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| 100 FESTIVAL PARK AVE<br>JACKSONVILLE, FL  32202 | | | | | | | |
| (125) GLOBALGIVING<br>FOUNDATION INC<br>1110 VERMONT AVE NW STE<br>550<br>WASHINGTON, DC  20005 | 30-0108263 | 501(C)(3) | 175,000 | | | | General Support |
| (126) GOLDEN ISLES<br>LEADERSHIP FOUNDATION INC<br>3528 DARIEN HWY STE 232<br>BRUNSWICK, GA  31525 | 46-1057428 | 501(C)(3) | 10,000 | | | | General Support |
| (127) GOLDEN PANTHER<br>BOOSTER CLUB INC<br>10550 RAY RD<br>PONTE VEDRA, FL  32081 | 59-2846616 | 501(C)(3) | 10,570 | | | | General Support |
| (128) GOLF CHARITIES<br>FOUNDATION INC<br>5671 SW ARCTIC DR<br>BEAVERTON, OR  97005 | 46-2580975 | 501(C)(3) | 175,000 | | | | General Support |
| (129) GOLF FIGHTS CANCER<br>INC<br>300 ARNOLD PALMER BLVD<br>NORTON, MA  02766 | 34-1987772 | 501(C)(3) | 25,175 | 600 | FMV | MISC | General Support |
| (130) GOLF FORE FUN INC<br>PO BOX 236<br>CLEMMONS, NC  27012 | 20-8114680 | 501(C)(3) | 15,000 | | | | General Support |
| (131) GOODWILL ENDOWMENT<br>INC<br>4527 LENOX AVE<br>JACKSONVILLE, FL  32205 | 59-3387329 | 501(C)(3) | 25,000 | | | | General Support |
| (132) GREATER AUSTIN FIRST<br>TEE<br>5501 ED BLUESTEIN BLVD<br>AUSTIN, TX  78723 | 74-2930567 | 501(C)(3) | 305,000 | | | | General Support |
| (133) GREATER HARTFORD<br>COMMUNITY FOUNDATION<br>90 STATE HOUSE SQ<br>HARTFORD, CT  06103 | 06-0639832 | 501(C)(3) | 305,000 | | | | General Support |
| (134) GREATER JACKSONVILLE<br>AREA USO COUNCIL INC<br>PO BOX 108<br>JACKSONVILLE, FL  32212 | 59-1052424 | 501(C)(3) | 15,000 | | | | General Support |
| (135) HABITAT FOR HUMANITY<br>INTERNATIONAL INC<br>797 MAYPORT RD<br>ATLANTIC BCH, FL  32233 | 65-0234544 | 501(c)(3) | 199,750 | | | | General Support |
| (136) HACKENSACK MERIDIAN<br>HEALTH INC<br>160 ESSEX ST STE 101<br>LODI, NJ  07644 | 22-2339534 | 501(C)(3) | 128,700 | | | | General Support |
| (137) HALE MAKUA HEALTH<br>SERVICES<br>472 KAULANA ST<br>KAHULUI, HI  96732 | 99-0080460 | 501(C)(3) | 62,425 | | | | General Support |
| (138) HANDA FOUNDATION<br>INC<br>4609 CLOUDCREST DR<br>PLANO, TX  75074 | 45-4516515 | 501(C)(3) | 125,000 | | | | General Support |
| (139) HAWAII STATE JUNIOR<br>GOLF ASSOCIATION INC<br>4330 KUKUI GROVE ST<br>LIHUE, HI  96766 | 99-0335776 | 501(C)(3) | 14,000 | | | | General Support |
| (140) HEAL FOUNDATION INC<br>PO BOX 140<br>PONTE VEDRA, FL  32004 | 20-1944817 | 501(C)(3) | 5,600 | | | | General Support |
| (141) HELPING HAND HOME<br>FOR CHILDREN<br>3804 AVENUE B<br>AUSTIN, TX  78751 | 74-1144638 | 501(C)(3) | 118,750 | | | | General Support |
| (142) HERITAGE CLASSIC<br>FOUNDATION<br>PO BOX 3244<br>HILTON HEAD, SC  29938 | 57-0835114 | 501(C)(3) | 175,000 | | | | General Support |
| (143) HOGAR FORJADORES DE<br>ESPERANZA INC<br>PO BOX 4181<br>BAYAMON, PR  00958 | 66-0481158 | 501(C)(3) | 9,000 | | | | General Support |
| (144) HOUSTON GOLF<br>ASSOCIATION<br>7000 CAPITOL ST<br>HOUSTON, TX  77011 | 74-1486171 | 501(C)(3) | 1,000,000 | | | | General Support |
| (145) HUBBARD HOUSE INC<br>PO BOX 4909<br>JACKSONVILLE, FL  32201 | 59-1814635 | 501(C)(3) | 5,150 | | | | General Support |
| (146) HV3 FOUNDATION<br>255 W MLK BLVD STE 1306<br>CHARLOTTE, NC  28202 | 83-1779871 | 501(C)(3) | 30,000 | | | | General Support |
| (147) HYDE LEADERSHIP<br>CHARTER SCHOOL<br>730 BRYANT AVENUE 4TH<br>FLOOR<br>BRONX, NY  10474 | 74-3162136 | 501(C)(3) | 25,000 | | | | General Support |
| (148) I M SULZBACHER<br>CENTER FOR THE HOMELESS<br>INC<br>611 E ADAMS ST<br>JACKSONVILLE, FL  32202 | 59-3229898 | 501(C)(3) | 6,130 | | | | General Support |
| (149) IAEVI-INSTITUTO DE<br>ADIESTRAMIENTO EMPLEO Y<br>VIDA I<br>PASEO 5 300 ALTURAS DE<br>BAYAMON<br>BAYAMON, PR  00956 | 66-0617512 | | 8,850 | | | | General Support |
| (150) INSTITUTE FOR<br>EDUCATIONAL ACHIEVEMENT<br>INC<br>381 MADISON AVE<br>NEW MILFORD, NJ  07646 | 22-3391706 | 501(C)(3) | 25,000 | | | | General Support |
| (151) INTERNATIONAL CENTER | 52-1967802 | 501(C)(3) | 12,500 | | | | General Support |

| | | | | | | |
|---|---|---|---|---|---|---|
| FOR RESPONSIBLE GAMING 900 CUMMINGS CENTER SUITE 321-U BEVERLY, MA  01915 | | | | | | |
| (152) J A G A CHARITABLE TRUST 6817 SOUTHPOINT PKY JACKSONVILLE, FL  32216 | 23-7369497 | 501(C)(3) | 20,000 | | | General Support |
| (153) J WALTER CAMERON CENTER 95 MAHALANI STREET WAILUKU, HI  96793 | 99-0140273 | 501(C)(3) | 32,100 | | | General Support |
| (154) JACK NICKLAUS MUSEUM INC 2355 OLENTANGY RIVER RD COLUMBUS, OH  43210 | 65-0220781 | 501(C)(3) | 27,500 | | | General Support |
| (155) JACKSONVILLE ALUMNI CHAPTER OF KAPPA ALPHA PSI GUI 1751 UNIVERSITY BLVD S JACKSONVILLE, FL  32216 | 59-3503848 | 501(C)(3) | 20,000 | | | General Support |
| (156) JACKSONVILLE BEACH GOLF ASSOCIATION INC 13500 SUTTON PARK DR S STE 801 JACKSONVILLE, FL  32224 | 82-4835047 | 501(C)(3) | 5,900 | | | General Support |
| (157) JACKSONVILLE CHILDRENS CHORUS INC 225 E DUVAL ST JACKSONVILLE, FL  32202 | 59-3583678 | 501(C)(3) | 10,000 | | | General Support |
| (158) JACKSONVILLE EPISCOPAL HIGH SCHOOL FOUNDATION INC 4455 ATLANTIC BLVD JACKSONVILLE, FL  32207 | 23-7003394 | 501(C)(3) | 20,000 | | | General Support |
| (159) JACKSONVILLE JAGUARS FOUNDATION INC 1 TIAA BANK FIELD DR JACKSONVILLE, FL  32202 | 59-3249687 | 501(C)(3) | 22,500 | | | General Support |
| (160) Fraternal Order of Police Jacksonville Lodge 5-30 501 E BAY ST STE 204 JACKSONVILLE, FL  32202 | 59-3164354 | 501(C)(3) | 8,000 | | | General Support |
| (161) JACKSONVILLE SYMPHONY ASSOCIATION 300 WATER ST STE 200 JACKSONVILLE, FL  32202 | 59-6002520 | 501(C)(3) | 31,500 | | | General Support |
| (162) JACKSONVILLE UNIVERSITY 2800 UNIVERSITY BLVD N JACKSONVILLE, FL  32211 | 59-0624412 | 501(C)(3) | 39,000 | | | General Support |
| (163) JACKSONVILLE WOLFSON CHILDRENS HOSPITAL INC 1660 PRUDENTIAL DR STE 203 JACKSONVILLE, FL  32207 | 59-1452787 | 501(C)(3) | 8,130 | 1,074 FMV | MISC | General Support |
| (164) IDRF INTERNATIONAL 200 VESEY STREET NEW YORK, NY  10281 | 23-1907729 | 501(C)(3) | 33,600 | | | General Support |
| (165) JERSEY CITY EMPLOYMENT & TRAINING PROGRAM INC 398 MARTIN LUTHER KING JR DR JERSEY CITY, NJ  07305 | 22-2602714 | 501(C)(3) | 45,000 | | | General Support |
| (166) JOHNNY MILLER JUNIOR GOLF FOUNDATION PO BOX 970488 OREM, UT  84097 | 94-3208323 | 501(C)(3) | 10,000 | | | General Support |
| (167) JORDAN SPIETH FAMILY FOUNDATION 10719 BRIDGE HOLLOW CT DALLAS, TX  75229 | 47-1894945 | 501(C)(3) | 15,000 | 48,000 FMV | MISC | General Support |
| (168) JUNIOR ACHIEVEMENT USA 4049 WOODCOCK DR STE 200 JACKSONVILLE, FL  32207 | 59-1021800 | 501(C)(3) | 50,420 | | | General Support |
| (169) JUNIOR GOLF ASSOCIATION OF ARIZONA INC 10888 N 19TH AVE PHOENIX, AZ  85029 | 86-0464216 | 501(C)(3) | 60,000 | | | General Support |
| (170) JUNIOR LEAGUE OF JACKSONVILLE INC 2165 PARK ST JACKSONVILLE, FL  32204 | 59-0540916 | 501(C)(3) | 6,180 | | | General Support |
| (171) K9S FOR WARRIORS INC 114 CAMP K9 RD PONTE VEDRA, FL  32081 | 27-5219467 | 501(C)(3) | 10,225 | | | General Support |
| (172) KA LIMA O MAUI LTD 95 MAHALANI STREET WAILUKU, HI  96793 | 99-0105491 | 501(C)(3) | 27,275 | | | General Support |
| (173) KEEP AUSTIN BEAUTIFUL INC 55 NORTH IH-35 SUITE 215 NO 215 AUSTIN, TX  78702 | 74-2387541 | 501(C)(3) | 118,750 | | | General Support |
| (174) KEVIN & BRITTANY KISNER FOUNDATION PO BOX 256 GRANITEVILLE, SC  29829 | 81-1444661 | 501(C)(3) | 765,000 | | | General Support |
| (175) KEVIN NA FOUNDATION 2560 MONTESSOURI ST STE 208 LAS VEGAS, NV  89117 | 47-4287124 | 501(C)(3) | 15,000 | | | General Support |
| (176) KIDS ACROSS AMERICA FOUNDATION 2036 TIMBERLAKE RD BRANSON, MO  65616 | 43-1348373 | 501(C)(3) | 105,000 | | | General Support |
| (177) KNIGHTS OF COLUMBUS | 22-2324817 | 501(C)(3) | 8,000 | | | General Support |

12/11/22, 4:56 PM                                    PGA TOUR INC - Full Filing- Nonprofit Explorer - ProPublica

| | | | | | | |
|---|---|---|---|---|---|---|
| (177) KNIGHTS OF COLUMBUS DELAWARE VALLEY COUNCIL 7581 PO BOX 21 BAPTISTOWN, NJ 08803 | 22-2924017 | 501(C)(10) | 8,000 | | | General Support |
| (178) KYLE PALMIERI FOUNDATION 65 MONROE AVE STE C PITTSFORD, NY 14534 | 82-3386658 | 501(C)(3) | 13,850 | | | General Support |
| (179) L ARCHE JACKSONVILLE INC 700 ARLINGTON RD N JACKSONVILLE, FL 32211 | 59-3117677 | 501(C)(3) | 8,000 | | | General Support |
| (180) LAHAINA JUNIOR GOLF ASSOCIATION PO BOX 10701 LAHAINA, HI 96761 | 27-3780968 | 501(C)(3) | 6,275 | | | General Support |
| (181) LAHAINALUNA HIGH SCHOOL FOUNDATION PO BOX 11617 LAHAINA, HI 96761 | 99-0348748 | 501(C)(3) | 65,425 | | | General Support |
| (182) LENS FRIENDS FOUNDATION INC 4745 SUTTON PARK CT JACKSONVILLE, FL 32224 | 59-3625461 | 501(C)(3) | 10,000 | | | General Support |
| (183) MALIVAI WASHINGTON KIDS FOUNDATION INC 1098 W 6TH ST JACKSONVILLE, FL 32209 | 59-3559150 | 501(C)(3) | 134,640 | | | General Support |
| (184) MANDARIN PRESBYTERIAN CHURCH 11844 MANDARIN RD JACKSONVILLE, FL 32223 | 59-0978265 | 501(C)(3) | 5,490 | | | General Support |
| (185) MARCH OF DIMES INC 1550 CRYSTAL DR STE 1300 ARLINGTON, VA 22202 | 13-1846366 | 501(C)(3) | 23,500 | | | General Support |
| (186) MAYO CLINIC 4500 SAN PABLO RD S JACKSONVILLE, FL 32224 | 59-0714831 | 501(C)(3) | 50,000 | | | General Support |
| (187) MBA OPEN DOORS FOUNDATION 1919 M STREET NW 5TH FLOOR WASHINGTON, DC 20036 | 32-0355086 | 501(C)(3) | 50,000 | | | General Support |
| (188) MCGUIRE RESEARCH INSTITUTE INC 1201 BROAD ROCK BLVD RICHMOND, VA 23249 | 54-1522206 | 501(C)(3) | 20,000 | | | General Support |
| (189) MCKENZIE NOELLE WILSON FOUNDATION MARK BAUM JACKSONVILLE, FL 32250 | 27-3388916 | 501(C)(3) | 50,000 | | | General Support |
| (190) MINNESOTA MINORITY JUNIOR GOLF ASSOCIATION INC 331 2ND AVE S STE 230 MINNEAPOLIS, MN 55401 | 41-1969601 | 501(C)(3) | 10,000 | | | General Support |
| (191) MISSISSIPPI JUNIOR GOLF FOUNDATION 400 CLUBHOUSE DR JACKSON, MS 39208 | 64-0943460 | 501(C)(3) | 10,000 | | | General Support |
| (192) MOMENTOUS INSTITUTE 106 EAST 10TH STREET SUITE 200 DALLAS, TX 75203 | 75-1855620 | 501(C)(3) | 30,000 | | | General Support |
| (193) MONIQUE BURR FOUNDATION FOR CHILDREN INC 7807 BAYMEADOWS RD E STE 205 JACKSONVILLE, FL 32256 | 59-3482715 | 501(C)(3) | 10,000 | | | General Support |
| (194) MONTEREY PENINSULA FOUNDATION 1 LOWER RAGSDALE DR BUILDING 3 MONTEREY, CA 93940 | 94-2541783 | 501(C)(3) | 180,000 | | | General Support |
| (195) MORGAN STANLEY GLOBAL IMPACT FUNDING TRUST INC 8910 PURDUE RD STE 500 INDIANAPOLIS, IN 46268 | 52-7082731 | 501(C)(3) | 50,000 | | | General Support |
| (196) MORTON FOUNDATION 7309 E LIVINGSTON AVE REYNOLDSBURG, OH 43068 | 31-1676188 | 501(C)(3) | 16,300 | | | General Support |
| (197) MUSEUM OF SCIENCE & HISTORY OF JACKSONVILLE INC 1025 MUSEUM CIR JACKSONVILLE, FL 32207 | 59-0651090 | 501(C)(3) | 10,000 | | | General Support |
| (198) MV JUNIOR GOLF FOUNDATION INC PO BOX 5455 TWIN FALLS, ID 83303 | 46-3584336 | 501(C)(3) | 15,000 | | | General Support |
| (199) NATIONAL CHRISTIAN CHARITABLE FOUNDATION INC 11625 RAINWATER DR STE 500 ALPHARETTA, GA 30009 | 58-1493949 | 501(C)(3) | 26,000 | | | General Support |
| (200) NATIONAL MULTIPLE SCLEROSIS SOCIETY 733 THIRD AVE 3RD FLOOR NEW YORK, NY 10017 | 13-5661935 | 501(C)(3) | 83,700 | | | General Support |
| (201) NATIONWIDE CHILDRENS HOSPITAL FOUNDATION 700 CHILDRENS DR COLUMBUS, OH 43205 | 31-1036370 | 501(C)(3) | 52,700 | | | General Support |
| (202) NATURAL HERITAGE TRUST 625 BROADWAY 2ND FLOOR ALBANY, NY 12207 | 16-1019635 | 501(C)(3) | 250,000 | | | General Support |

| | | | | | | |
|---|---|---|---|---|---|---|
| (203) NCSO CHARITIES INC<br>77151 CITIZENS CIR<br>YULEE, FL 32097 | 46-3800036 | 501(C)(3) | 8,000 | | | General Support |
| (204) NEVADA DISCOVERY<br>MUSEUM<br>490 S CENTER ST<br>RENO, NV 89501 | 61-1474845 | 501(C)(3) | 15,000 | | | General Support |
| (205) NEW HEIGHTS OF<br>NORTHEAST FLORIDA INC<br>3311 BEACH BLVD<br>JACKSONVILLE, FL 32207 | 59-0718304 | 501(C)(3) | 10,000 | | | General Support |
| (206) NEW HOPE EDUCATION<br>AND ADDICTION SERVICES<br>INC<br>8825 PERIMETER PARK BLVD<br>STE 301<br>JACKSONVILLE, FL 32216 | 47-3436523 | 501(C)(3) | 30,000 | | | General Support |
| (207) NEW JERSEY CITY<br>UNIVERSITY FOUNDATION INC<br>2039 JOHN F KENNEDY BLVD<br>JERSEY CITY, NJ 07305 | 23-7261698 | 501(C)(3) | 8,000 | | | General Support |
| (208) NEW JERSEY GOLF<br>FOUNDATION INCORPORATED<br>811 RATTLESNAKE BRIDGE RD<br>BEDMINSTER, NJ 07921 | 20-1213527 | 501(C)(3) | 35,900 | | | General Support |
| (209) NEW JERSEY YMCA<br>STATE ALLIANCE INC<br>407 GREENWOOD AVE<br>TRENTON, NJ 08609 | 56-2467563 | 501(C)(3) | 8,000 | | | General Support |
| (210) NEW JERSEY YOUTH<br>DEVELOPMENT FOUNDATION<br>1 GOLF DR THE LEARNING<br>CENTER<br>KENILWORTH, NJ 07033 | 11-3826837 | 501(C)(3) | 45,438 | | | General Support |
| (211) NICKLAUS CHILDRENS<br>HEALTH CARE FOUNDATION<br>INC<br>11770 US HIGHWAY 1 STE 30B<br>N PALM BEACH, FL 33408 | 57-1154352 | 501(C)(3) | 70,000 | | | General Support |
| (212) NIGHT TO SHINE<br>JACKSONVILLE INC<br>14286 BEACH BLVD STE 2<br>JACKSONVILLE, FL 32250 | 82-2071663 | 501(C)(3) | 7,000 | | | General Support |
| (213) NORTH FLORIDA JUNIOR<br>GOLF FOUNDATION INC<br>PO BOX 49163<br>JAX BCH, FL 32240 | 59-2876904 | 501(C)(3) | 79,770 | | | General Support |
| (214) NORTH FLORIDA<br>SCHOOL OF SPECIAL<br>EDUCATION<br>223 MILL CREEK RD<br>JACKSONVILLE, FL 32211 | 59-3126545 | 501(C)(3) | 5,540 | | | General Support |
| (215) NORTHEAST FLORIDA<br>REGIONAL STEM2 HUB INC<br>139 PONTE VEDRA BLVD<br>PONTE VEDRA, FL 32082 | 47-4302882 | 501(C)(3) | 25,000 | | | General Support |
| (216) NORTHERN NEVADA<br>CHILDRENS CANCER<br>FOUNDATION INC<br>3550 BARRON WAY STE 9A<br>RENO, NV 89511 | 20-8623503 | 501(C)(3) | 6,000 | | | General Support |
| (217) NORTHERN NEVADA<br>YOUTH GOLF FOUNDATION<br>3550 BARRON WAY STE 10B<br>RENO, NV 89511 | 88-0444732 | 501(C)(3) | 10,000 | | | General Support |
| (218) NORTHERN OHIO GOLF<br>CHARITIES FOUNDATION INC<br>440 E WARNER RD<br>AKRON, OH 44319 | 34-1712857 | 501(C)(3) | 300,000 | | | General Support |
| (219) NORTHERN TEXAS PGA<br>FOUNDATION<br>15150 PRESTON RD STE 250<br>DALLAS, TX 75248 | 75-2216940 | 501(C)(3) | 55,000 | | | General Support |
| (220) OAKLAND A S<br>COMMUNITY FUND<br>7000 COLISEUM<br>OAKLAND, CA 94621 | 94-2826655 | 501(C)(3) | 10,000 | | | General Support |
| (221) OAKS CHARLOTTE<br>338 S SHARON AMITY RD NO<br>326<br>CHARLOTTE, NC 28211 | 82-3073175 | 501(C)(3) | 30,000 | | | General Support |
| (222) OHIOHEALTH<br>CORPORATION<br>180 EAST BROAD STREET<br>33RD FL<br>COLUMBUS, OH 43215 | 23-7446919 | 501(C)(3) | 20,000 | | | General Support |
| (223) OPERATION HEALING<br>FORCES INC<br>380 PARK PLACE BOULEVARD<br>SUITE 17<br>CLEARWATER, FL 33759 | 45-3798803 | 501(C)(3) | 7,000 | | | General Support |
| (224) OPERATION NEW HOPE<br>1830 N MAIN ST<br>JACKSONVILLE, FL 32206 | 59-3590360 | 501(C)(3) | 10,000 | | | General Support |
| (225) OPERATION NEW<br>UNIFORM INC<br>8825 PERIMETER PARK BLVD<br>STE 503<br>JACKSONVILLE, FL 32216 | 80-0962807 | 501(C)(3) | 15,000 | | | General Support |
| (226) OPERATION SHOWER<br>7382 PERSHING AVE APT 1E<br>SAINT LOUIS, MO 63130 | 26-1244512 | 501(C)(3) | 33,500 | | | General Support |
| (227) ORANGE PARK HIGH<br>SCHOOL<br>2300 KINGSLEY AVE<br>ORANGE PARK, FL 32073 | 59-6000552 | 115 | 7,500 | | | General Support |
| (228) PALM VALLEY ACADEMY<br>PTO<br>700 BOBCAT LN | 82-4873549 | 501(C)(3) | 7,490 | | | General Support |

| | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| PONTE VEDRA, FL 32081 | | | | | | | | |
| (229) PARTNERSHIP FOR CLEAN COMPETITION RESEARCH COLLABO ONE OLYMPIC PLAZA COLORADO SPRINGS, CO 80909 | 42-1763805 | 501(C)(3) | 125,000 | | | | | General Support |
| (230) PGA TOUR CHARITIES INC 100 PGA TOUR BLVD PONTE VEDRA, FL 32082 | 59-2774423 | 501(C)(3) | 4,425,295 | | | | | General Support |
| (231) PGA TOUR EMPLOYEES EMERGENCY RELIEF FUND INC 100 PGA TOUR BLVD PONTE VEDRA, FL 32082 | 20-3580191 | 501(C)(3) | 9,000 | | | | | General Support |
| (232) PGA TOUR FIRST TEE FOUNDATION INC 425 SOUTH LEGACY TRAIL ST AUGUSTINE, FL 32092 | 83-4186070 | 501(C)(3) | 20,000 | | | | | General Support |
| (233) PHOENIX CHILDRENS HOSPITAL 1919 E THOMAS RD PHOENIX, AZ 85016 | 86-0422559 | 501(C)(3) | 60,000 | | | | | General Support |
| (234) PIEDMONT TRIAD CHARITABLE FOUNDATION 416 GALLIMORE DAIRY RD STE M GREENSBORO, NC 27409 | 56-6085407 | 501(C)(3) | 180,000 | | | | | General Support |
| (235) PINE CASTLE INC 4911 SPRING PARK RD JACKSONVILLE, FL 32207 | 59-0704733 | 501(C)(3) | 25,000 | | | | | General Support |
| (236) PLAYERS PHILANTHROPY FUND 1122 KENILWORTH DR STE 502 TOWSON, MD 21204 | 27-6601178 | 501(C)(3) | 50,000 | 16,000 | FMV | | MISC | General Support |
| (237) PONTE VEDRA BEACH ROTARY FOUNDATION INC PO BOX 70 PONTE VEDRA, FL 32004 | 59-2566435 | 501(C)(3) | 27,670 | | | | | General Support |
| (238) PONTE VEDRA PUBLIC EDUCATION FOUNDATION INC 100 PGA TOUR BLVD PONTE VEDRA, FL 32082 | 59-3333907 | 501(C)(3) | 40,000 | | | | | General Support |
| (239) PONTE VEDRA-PALM VALLEY PARENT TEACHER STUDENT ORG 630 A1A N PONTE VEDRA, FL 32082 | 59-3075683 | 501(C)(3) | 13,380 | | | | | General Support |
| (240) PRO KIDS GOLF ACADEMY INC 4085 52ND ST SAN DIEGO, CA 92105 | 33-0617741 | 501(C)(3) | 15,000 | | | | | General Support |
| (241) PROFESSIONAL CADDIES ASSISTANCE FOUNDATION INC 100 PGA TOUR BLVD PONTE VEDRA, FL 32082 | 59-3266465 | 501(C)(3) | 50,000 | | | | | General Support |
| (242) PROVIDENCE SCHOOLS OF JACKSONVILLE INC 2701 HODGES BLVD JACKSONVILLE, FL 32224 | 59-3391416 | 501(C)(3) | 6,840 | | | | | General Support |
| (243) PUERTO RICO GOLF ASSOCIATION 262 CALLE MATADERO PUERTO NUEVO, PR 00920 | 66-0276473 | 501(C)(3) | 10,000 | | | | | General Support |
| (244) PUERTO RICO YOUTH AT RISK INC 112 CALLE ARZUAGA STE 1201 SAN JUAN, PR 00925 | 66-0491142 | 501(C)(3) | 8,850 | | | | | General Support |
| (245) PV SHARKS BOOSTER CLUB INC PO BOX 3518 PONTE VEDRA, FL 32004 | 26-1906104 | 501(C)(3) | 45,115 | | | | | General Support |
| (246) QUAD CITIES GOLF CLASSIC CHARITABLE FOUNDATION 15623 COALTOWN RD EAST MOLINE, IL 61244 | 93-1332421 | 501(C)(3) | 705,000 | | | | | General Support |
| (247) QUALITY EDUCATION FOR KIDS INC 7 SYLVAN WAY PARSIPPANY, NJ 07054 | 81-3843828 | 501(C)(3) | 25,000 | | | | | General Support |
| (248) REGIONAL FOOD BANK OF NORTHEAST FLORIDA INC 1116 EGEWD AV N UNIT DE JACKSONVILLE, FL 32254 | 46-5014769 | 501(C)(3) | 107,500 | | | | | General Support |
| (249) RENO-TAHOE OPEN FOUNDATION ONE EAST FIRST STREET 16TH FLOOR RENO, NV 89501 | 88-0412314 | 501(C)(3) | 178,000 | | | | | General Support |
| (250) RETHREADED INC 820 BARNETT ST JACKSONVILLE, FL 32209 | 45-3036999 | 501(C)(3) | 10,000 | | | | | General Support |
| (251) RICHMOND ANIMAL LEAGUE INC 11401 INTERNATIONAL DR N CHESTERFLO, VA 23236 | 51-0240493 | 501(C)(3) | 7,000 | | | | | General Support |
| (252) RICHMOND FIRST TEE 9211 FOREST HILL AVE STE 104 RICHMOND, VA 23235 | 54-1886298 | 501(C)(3) | 7,000 | | | | | General Support |
| (253) RICHMOND FISHER HOUSE FOUNDATION 300 ARBORETUM PL STE 660 N CHESTERFLD, VA 23236 | 27-3852276 | 501(C)(3) | 90,031 | | | | | General Support |
| (254) RICKIE FOWLER FOUNDATION 170 WEST MAIN STREET | 27-3490792 | 501(C)(3) | 15,000 | | | | | General Support |

PGA TOUR INC - Full Filing- Nonprofit Explorer - ProPublica

| | | | | | | |
|---|---|---|---|---|---|---|
| PURCELLVILLE, VA 20132 | | | | | | |
| (255) ROAD RUNNERS CLUB OF AMERICA PO BOX 24667 JACKSONVILLE, FL 32241 | 59-1829543 | 501(C)(3) | 25,000 | | | General Support |
| (256) RONALD MCDONALD HOUSE CHARITIES OF JACKSONVILLE IN 824 CHILDRENS WAY JACKSONVILLE, FL 32207 | 59-2625008 | 501(C)(3) | 53,740 | | | General Support |
| (257) ROTARY CLUB OF KONA COMMUNITY FOUNDATION PO BOX 3750 KAILUA KONA, HI 96745 | 99-0330726 | 501(C)(3) | 62,500 | | | General Support |
| (258) SAINT ANDREWS LIGHTHOUSE INC 1797 BEACH BLVD JAX BCH, FL 32250 | 31-1489868 | 501(C)(3) | 7,180 | | | General Support |
| (259) SALESMANSHIP CLUB CHARITABLE GOLF OF DALLAS INC 106 E TENTH ST 260 DALLAS, TX 75203 | 86-1118804 | 501(C)(3) | 175,000 | | | General Support |
| (260) SAN ANTONIO GOLF ASSOCIATION INC 915 E MULBERRY AVE SAN ANTONIO, TX 78212 | 74-1364915 | 501(C)(3) | 10,000 | | | General Support |
| (261) SAN DIEGO COUNTY JUNIOR GOLF ASSOCIATION INC 3914 MURPHY CANYON RD STE A170 SAN DIEGO, CA 92123 | 95-6095411 | 501(C)(3) | 10,000 | | | General Support |
| (262) SAN JORGE CHILDRENS FOUNDATION INC PO BOX 6719 SAN JUAN, PR 00914 | 66-0531105 | 501(C)(3) | 8,850 | | | General Support |
| (263) SAN JOSE CATHOLIC SCHOOL 4460 KINCARDINE DR JACKSONVILLE, FL 32257 | 59-2891494 | 501(C)(3) | 8,160 | | | General Support |
| (264) SCHWAB CHARITABLE FUND DBA CHAMP FAMILY GIVING FUN 211 MAIN STREET SAN FRANCISCO, CA 94105 | 31-1640316 | 501(C)(3) | 15,000 | | | General Support |
| (265) SECOND BAPTIST CHURCH OF RICHMOND 9614 RIVER RD RICHMOND, VA 23229 | 54-0524506 | 501(C)(3) | 8,000 | | | General Support |
| (266) SHANDS JACKSONVILLE MEDICAL CENTER INC 655 W 8TH ST JACKSONVILLE, FL 32209 | 59-2142859 | 501(C)(3) | 6,200 | | | General Support |
| (267) SHARK SHOOTOUT CHARITIES INC 2041 VISTA PKWY FL 2 WEST PALM BCH, FL 33411 | 65-0736877 | 501(C)(3) | 475,000 | | | General Support |
| (268) SHERWOOD COUNTRY CLUB CHARITABLE FOUNDATION INC 320 W STAFFORD RD THOUSAND OAKS, CA 91361 | 36-4766803 | 501(C)(3) | 25,000 | | | General Support |
| (269) SHRINERS HOSPITALS FOR CHILDREN 2900 N ROCKY POINT DR TAMPA, FL 33607 | 36-2193608 | 501(C)(3) | 250,000 | | | General Support |
| (270) SIGMA PI PHI FRATERNITY SCHOLARSHIP & DEVELOPMENT 12267 HAWKSTOWE LN JACKSONVILLE, FL 32225 | 45-5547005 | 501(C)(3) | 20,000 | | | General Support |
| (271) SOCIEDAD DE EDUCACION Y REHABILITACION SER DE P R 500 CALLE BAEZ URB PEREZ MORIS SAN JUAN, PR 00917 | 66-0207947 | 501(C)(3) | 8,850 | | | General Support |
| (272) SOUTHERN TEXAS PROFESSIONAL GOLFERS ASSOCIATION FO 22305 GOSLING RD SPRING, TX 77389 | 76-0466150 | 501(C)(3) | 15,000 | | | General Support |
| (273) SPECIAL OLYMPICS INC 1133 19TH STREET NW WASHINGTON, DC 20036 | 52-0889518 | 501(C)(3) | 25,000 | | | General Support |
| (274) SPECIAL OLYMPICS NORTHERN CALIFORNIA INC 3480 BUSKIRK AVE STE 340 PLEASANT HILL, CA 94523 | 68-0363121 | 501(C)(3) | 15,000 | | | General Support |
| (275) SPORTS MUSEUM OF NE INC ONE HUNDRED LEGENDS WAY NO 200 BOSTON, MA 02114 | 04-2637109 | 501(C)(3) | 5,500 | | | General Support |
| (276) ST AUGUSTINE SOCIETY INC PO BOX 1775 ST AUGUSTINE, FL 32085 | 59-2475614 | 501(C)(3) | 6,500 | | | General Support |
| (277) ST AUGUSTINE YOUTH SERVICES INC 201 SIMONE WAY ST AUGUSTINE, FL 32086 | 59-2925271 | 501(C)(3) | 10,000 | | | General Support |
| (278) ST JOHNS COUNTY EDUCATION FOUNDATION INC 40 ORANGE ST ST AUGUSTINE, FL 32084 | 59-3221115 | 501(C)(3) | 50,000 | | | General Support |
| (279) ST JUDE CHILDRENS RESEARCH HOSPITAL INC 262 DANNY THOMAS PL | 62-0646012 | 501(C)(3) | 50,500 | | | General Support |

12/11/22, 4:56 PM

PGA TOUR INC - Full Filing- Nonprofit Explorer - ProPublica

MEMPHIS, TN  38105

| | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| (280) ST LOUIS CHILDRENS HOSPITAL FOUNDATION 1001 HIGHLANDS PLAZA DR W STE 160 SAINT LOUIS, MO  63110 | 43-1626863 | 501(C)(3) | 60,000 | | | | | General Support |
| (281) ST VINCENTS FOUNDATION INC 4205 BELFORT RD STE 4020 JACKSONVILLE, FL  32216 | 59-2219923 | 501(C)(3) | 125,000 | 1,074 | FMV | | MISC | General Support |
| (282) ST JOHNS COUNTY SCHOOL DISTRICT 40 ORANGE ST ST AUGUSTINE, FL  32084 | 59-6000824 | 115 | 162,720 | | | | | General Support |
| (283) STEWART FAMILY FOUNDATION INC 1900 SUMMIT TOWER BLVD STE 260 ORLANDO, FL  32810 | 59-3531198 | 501(C)(3) | 100,000 | | | | | General Support |
| (284) TEACH FOR AMERICA INC 25 BROADWAY 12TH FLOOR NEW YORK, NY  10004 | 13-3541913 | 501(C)(3) | 61,490 | 6,349 | FMV | | MISC | General Support |
| (285) TERRY PARKER HIGH SCHOOL 7301 PARKER HIGH SCHOOL JACKSONVILLE, FL  32211 | 59-6000589 | 115 | 8,010 | | | | | General Support |
| (286) TESORI FAMILY FOUNDATION INC 101 MARKETSIDE AVE STE 404 345 PONTE VEDRA, FL  32081 | 27-1153318 | 501(C)(3) | 32,310 | 1,581 | FMV | | MISC | General Support |
| (287) THE ALBERTSONS COMPANIES FOUNDATION 5858 STONERIDGE MALL RD PLEASANTON, CA  94588 | 91-2144510 | 501(C)(3) | 775,000 | | | | | General Support |
| (288) THE CONNECTICUT GOLF FOUNDATION INC 55 GOLF CLUB RD CROMWELL, CT  06416 | 06-1510744 | 501(C)(3) | 10,000 | | | | | General Support |
| (289) THE DONNA FOUNDATION INC 11762 MARCO BEACH DR STE 6 JACKSONVILLE, FL  32224 | 26-2736601 | 501(C)(3) | 22,650 | | | | | General Support |
| (290) THE FIRST TEE OF PHOENIX 3837 E WIER AVE STE 7 PHOENIX, AZ  85040 | 52-2103204 | 501(C)(3) | 10,060 | | | | | General Support |
| (291) THE FLORIDA THEATRE PERFORMING ARTS 128 E FORSYTH STREET JACKSONVILLE, FL  32202 | 59-2850579 | 501(C)(3) | 25,100 | | | | | General Support |
| (292) THE GIVING KITCHEN INITIATIVE INC 513 EDGEWOOD AVE SE STE 100 ATLANTA, GA  30312 | 46-2176788 | 501(C)(3) | 10,000 | | | | | General Support |
| (293) THE HISTORIC ST JOHNS COUNTY POLICE ATHLETIC LEAGU PO BOX 2240 ST AUGUSTINE, FL  32085 | 59-3169967 | 501(C)(3) | 8,000 | | | | | General Support |
| (294) THE JIM AND TABITHA FURYK FOUNDATION INC PO BOX 2867 PONTE VEDRA, FL  32004 | 30-0659382 | 501(C)(3) | 17,260 | 100,000 | FMV | | MISC | General Support |
| (295) THE LPGA FOUNDATION 100 INTERNATIONAL GOLF DR DAYTONA BEACH, FL  32124 | 59-3085528 | 501(C)(3) | 25,000 | | | | | General Support |
| (296) THE NEMOURS FOUNDATION 10140 CENTURION PKWY N JACKSONVILLE, FL  32256 | 59-0634433 | 501(C)(3) | 253,800 | | | | | General Support |
| (297) THE PAUL AND PHYLLIS FIREMAN CHARITABLE FOUNDATION 800 SOUTH ST STE 610 WALTHAM, MA  02453 | 22-2677986 | 501(C)(3) | 100,000 | | | | | General Support |
| (298) THE QUELL FOUNDATION 28 HIGHWOOD LN EAST FALMOUTH, MA  02536 | 47-5127883 | 501(C)(3) | 50,000 | | | | | General Support |
| (299) THE RED SOX FOUNDATION INC 4 JERSEY ST BOSTON, MA  02215 | 33-1007984 | 501(C)(3) | 50,000 | | | | | General Support |
| (300) THE SANCTUARY OF THE NORTHEAST FLORIDA INC 120 E 8TH ST JACKSONVILLE, FL  32206 | 59-3108041 | 501(C)(3) | 27,000 | | | | | General Support |
| (301) THE SAVANNAH COMMUNITY FOUNDATION INC 2225 NORWOOD AVENUE SUITE B SAVANNAH, GA  31406 | 58-6033468 | 501(C)(3) | 15,173 | | | | | General Support |
| (302) THE SNEDEKER FOUNDATION PO BOX 158187 NASHVILLE, TN  37215 | 46-1172912 | 501(C)(3) | 15,000 | | | | | General Support |
| (303) THE TOM COUGHLIN JAY FUND FOUNDATION INC PO BOX 50798 JACKSONVILLE, FL  32240 | 59-3426937 | 501(C)(3) | 107,600 | | | | | General Support |
| (304) THE UNIVERSITY OF NORTH FLORIDA FOUNDATION INC 1 UNF DRIVE HICKS HALL NO JACKSONVILLE, FL  32224 | 23-7167701 | 501(C)(3) | 168,600 | | | | | General Support |
| (305) THE US CHARITABLE GIFT TRUST | 31-1663020 | 501(C)(3) | 200,000 | | | | | General Support |

PGA TOUR INC - Full Filing- Nonprofit Explorer - ProPublica

| Name / Address | EIN | Code | Amount | FMV Amount | FMV | Type | Purpose |
|---|---|---|---|---|---|---|---|
| GIFT TRUST TWO INTERNATIONAL PLACE BOSTON, MA 02110 | | | | | | | |
| (306) THE YOUNG MENS CHRISTIAN ASSOCIATION OF FLORIDAS F 40 E ADAMS ST STE 210 JACKSONVILLE, FL 32202 | 59-0638514 | 501(C)(3) | 37,400 | | | | General Support |
| (307) THE YOUNG MENS CHRISTIAN ASSOCIATION OF SAN JUAN 800 BLV SAGRADO CORAZON ESQ LOS AN SAN JUAN, PR 00909 | 66-0190784 | 501(C)(3) | 8,850 | | | | General Support |
| (308) THE YOUNG MENS CHRISTIAN ASSOCIATION OF THE TRIANG 801 CORPORATE CENTER DR STE 200 RALEIGH, NC 27607 | 56-0591307 | 501(C)(3) | 30,000 | | | | General Support |
| (399) THUNDERBIRDS CHARITIES 7226 N 16TH ST STE 100 PHOENIX, AZ 85020 | 86-0560664 | 501(C)(3) | 180,000 | | | | General Support |
| (310) TIGER WOODS CHARITY EVENT CORP 121 INNOVATION DR STE 150 IRVINE, CA 92617 | 06-1554474 | 501(C)(3) | 1,680,000 | | | | General Support |
| (311) TIGER WOODS FOUNDATION INC 121 INNOVATION DR STE 150 IRVINE, CA 92617 | 20-0677815 | 501(C)(3) | 25,000 | | | | General Support |
| (312) TONY FINAU FOUNDATION PO BOX 103 LEHI, UT 84043 | 47-2111415 | 501(C)(3) | 20,000 | 16,000 | FMV | MISC | General Support |
| (313) TRANSLATIONAL GENOMICS RESEARCH INSTITUTE 445 N 5TH ST STE 600 PHOENIX, AZ 85004 | 75-3065445 | 501(C)(3) | 60,000 | | | | General Support |
| (314) TRIUMPH OVER KID CANCER FOUNDATION 723 COLEMAN AVE CORP CHRISTI, TX 78401 | 27-2224984 | 501(C)(3) | 50,000 | | | | General Support |
| (315) UNITED SERVICE ORGANIZATIONS INC 2111 WILSON BLVD ARLINGTON, VA 22201 | 13-1610451 | 501(C)(3) | 2,210 | 400,000 | FMV | MISC | General Support |
| (316) UNIVERSITY OF FLORIDA FOUNDATION INC PO BOX 14425 GAINESVILLE, FL 32604 | 59-0974739 | 501(C)(3) | 8,000 | | | | General Support |
| (317) US ADAPTIVE GOLF ASSOCIATION 594 BURR RIDGE CLUB DR BURR RIDGE, IL 60527 | 47-3613721 | 501(C)(3) | 10,000 | | | | General Support |
| (318) VALERO ENERGY FOUNDATION PO BOX 696000 SAN ANTONIO, TX 78269 | 74-2904514 | 501(C)(3) | 180,000 | | | | General Support |
| (319) VETERANS OF FOREIGN WARS OF THE UNITED STATES DEPT 98 OAK ST JERSEY CITY, NJ 07304 | 22-6077852 | 115 | 30,771 | | | | General Support |
| (320) VIRGINIA COMMONWEALTH UNIVERSITY SCHOOL OF BUSINES PO BOX 844000 RICHMOND, VA 23284 | 20-2661802 | 501(C)(3) | 10,000 | | | | General Support |
| (321) VIRGINIA VETERANS SERVICES FOUNDATION 101 N 14TH STREET 17 FLOOR RICHMOND, VA 23219 | 46-2744762 | 501(C)(3) | 90,031 | | | | General Support |
| (322) VISION IS PRICELESS COUNCIL INC 4615 PHILIPS HWY JACKSONVILLE, FL 32207 | 59-3386495 | 501(C)(3) | 7,500 | | | | General Support |
| (323) VOLUNTEERS IN MEDICINE JACKSONVILLE INC 41 E DUVAL ST JACKSONVILLE, FL 32202 | 75-3002172 | 501(C)(3) | 10,000 | | | | General Support |
| (324) WALK-OFF CHARITIES OF JAX INC 12620-3 BEACH BLVD STE 325 JACKSONVILLE, FL 32246 | 82-1119696 | 501(C)(3) | 25,000 | | | | General Support |
| (325) WARREN WASHINGTON COUNTY HOMELESS YOUTH COALITION PO BOX 3252 GLENS FALLS, NY 12801 | 14-1826963 | 501(C)(3) | 10,000 | | | | General Support |
| (326) WEST VIRGINIA GOLF ASSOCIATION 2115 CHARLESTON TOWN CTR CHARLESTOWN, WV 25389 | 55-0592904 | 501(C)(3) | 10,000 | | | | General Support |
| (327) WESTERN GOLF ASSOCIATION 2501 PATRIOT BLVD GLENVIEW, IL 60026 | 36-6002857 | 501(C)(4) | 15,920 | | | | General Support |
| (328) WISH FOR OUR HEROES INC 164 S PARK BLVD GREENWOOD, IN 46143 | 27-0483869 | 501(C)(3) | 10,000 | | | | General Support |
| (329) WJCT INC 100 FESTIVAL PARK AVE JACKSONVILLE, FL 32202 | 59-0711482 | 501(C)(3) | 16,360 | | | | General Support |
| (330) WOLFE ASSOCIATES INC 34 S THIRD ST STE 600 COLUMBUS, OH 43215 | 23-7303111 | 501(C)(3) | 15,500 | | | | General Support |

12/11/22, 4:56 PM                              PGA TOUR INC - Full Filing- Nonprofit Explorer - ProPublica

| | | | | | | | |
|---|---|---|---|---|---|---|---|
| (331) XANDER SCHAUFFELE FOUNDATION 11625 WILLS CREEK RD SAN DIEGO, CA  92131 | 84-3868542 | 501(C)(3) | 50,000 | | | | General Support |
| (332) YOUNG BLACK LEADERSHIP ALLIANCE 10130 MALLARD CREEK RD STE 300 CHARLOTTE, NC  28262 | 26-2984776 | 501(C)(3) | 13,000 | | | | General Support |
| (333) YOUNG LIFE 420 N CASCADE AVE COLORADO SPGS, CO  80903 | 84-0385934 | 501(C)(3) | 8,000 | | | | General Support |
| (334) YOUTH PROGRAMS INC 3325 CLUB AT SOUTHWIND MEMPHIS, TN  38125 | 62-0676258 | 501(C)(3) | 2,324,017 | | | | General Support |
| (335) WORLD GOLF FOUNDATION INC 1 WORLD GOLF PL ST AUGUSTINE, FL  32092 | 59-2998925 | 501(C)(3) | 8,215,346 | 4,430,262 FMV | | PSA | General Support |
| (336) VARIOUS ACCRUALS VARIOUS LOCATIONS, FL  00000 | | | 428,203 | 2,278 FMV | | MISC | General Support |

2  Enter total number of section 501(c)(3) and government organizations listed in the line 1 table . . . . . . . . . . . . . . . ▶      332

3  Enter total number of other organizations listed in the line 1 table . . . . . . . . . . . . . . . . . . . . . ▶      4

For Paperwork Reduction Act Notice, see the Instructions for Form 990.                Cat. No. 50055P                      Schedule I (Form 990) 2019

──────────── Page 2 ────────────

Schedule I (Form 990) 2019                                                                                       Page **2**

**Part III**  **Grants and Other Assistance to Domestic Individuals.** Complete if the organization answered "Yes" on Form 990, Part IV, line 22.
Part III can be duplicated if additional space is needed.

| (a) Type of grant or assistance | (b) Number of recipients | (c) Amount of cash grant | (d) Amount of noncash assistance | (e) Method of valuation (book, FMV, appraisal, other) | (f) Description of noncash assistance |
|---|---|---|---|---|---|
| (1) | | | | | |
| (2) | | | | | |
| (3) | | | | | |
| (4) | | | | | |
| (5) | | | | | |
| (6) | | | | | |
| (7) | | | | | |

**Part IV**  **Supplemental Information.** Provide the information required in Part I, line 2; Part III, column (b); and any other additional information.

| Return Reference | Explanation |
|---|---|
| Schedule I, Part I in 2 | PGA TOUR, INC. ENSURES THAT ORGANIZATIONS RECEIVING GRANTS ARE EXEMPT ORGANIZATIONS OR AN ORGANIZATION WHOSE PURPOSE IS IN LINE WITH PGA TOUR'S EXEMPT PURPOSE PRIOR TO DISTRIBUTING ANY GRANTS. GRANTS ARE NOT MONITORED AFTER ISSUANCE BECAUSE OF INITIAL DUE DILIGENCE. |

Schedule I (Form 990) 2019

**Additional Data**                                                                         ┌──────────────┐
                                                                                             │ Return to Form │
                                                                                             └──────────────┘

                                          Software ID:
                                     Software Version:

↑ Back to Top

| efile Public Visual Render | ObjectId: 202023219349309777 - Submission: 2020-11-16 | **TIN: 52-0999206** |
|---|---|---|

| Schedule J (Form 990) | **Compensation Information** | OMB No. 1545-0047 |
|---|---|---|
| | For certain Officers, Directors, Trustees, Key Employees, and Highest Compensated Employees ▶ Complete if the organization answered "Yes" on Form 990, Part IV, line 23. ▶ Attach to Form 990. | **2019** |
| Department of the Treasury Internal Revenue Service | ▶ Go to www.irs.gov/Form990 for instructions and the latest information. | Open to Public Inspection |
| Name of the organization PGA TOUR INC | | Employer identification number 52-0999206 |

**Part I**  **Questions Regarding Compensation**

| | | | Yes | No |
|---|---|---|---|---|
| 1a | Check the appropriate box(es) if the organization provided any of the following to or for a person listed on Form 990, Part VII, Section A, line 1a. Complete Part III to provide any relevant information regarding these items. | | | |

☑ First-class or charter travel       ☐ Housing allowance or residence for personal use
☑ Travel for companions             ☐ Payments for business use of personal residence
☑ Tax indemnification and gross-up payments    ☑ Health or social club dues or initiation fees
☐ Discretionary spending account       ☐ Personal services (e.g., maid, chauffeur, chef)

| | | | | |
|---|---|---|---|---|
| b | If any of the boxes on Line 1a are checked, the organization follow a written policy regarding payment or reimbursement or provision of all of the expenses described above? If "No," complete Part III to explain . . . . . . . . . . . . . . . . | **1b** | Yes | |
| 2 | Did the organization require substantiation prior to reimbursing or allowing expenses incurred by all directors, trustees, officers, including the CEO/Executive Director, regarding the items checked on Line 1a? . | **2** | Yes | |
| 3 | Indicate which, if any, of the following the filing organization used to establish the compensation of the organization's CEO/Executive Director. Check all that apply. Do not check any boxes for methods used by a related organization to establish compensation of the CEO/Executive Director, but explain in Part III. | | | |

12/11/22, 4:56 PM

PGA TOUR INC - Full Filing- Nonprofit Explorer - ProPublica

| | | |
|---|---|---|
| ☑ Compensation committee | ☐ Written employment contract |
| ☑ Independent compensation consultant | ☑ Compensation survey or study |
| ☑ Form 990 of other organizations | ☑ Approval by the board or compensation committee |

**4** During the year, did any person listed on Form 990, Part VII, Section A, line 1a, with respect to the filing organization or a related organization:

| | | |
|---|---|---|
| **a** Receive a severance payment or change-of-control payment? . . . . . . . . . . | **4a** | Yes |
| **b** Participate in, or receive payment from, a supplemental nonqualified retirement plan? . . . . | **4b** | Yes |
| **c** Participate in, or receive payment from, an equity-based compensation arrangement? . . . . | **4c** | No |
| If "Yes" to any of lines 4a-c, list the persons and provide the applicable amounts for each item in Part III. | | |

**Only 501(c)(3), 501(c)(4), and 501(c)(29) organizations must complete lines 5-9.**

**5** For persons listed on Form 990, Part VII, Section A, line 1a, did the organization pay or accrue any compensation contingent on the revenues of:

| | | |
|---|---|---|
| **a** The organization? . . . . . . . . . . . . . . . . . . . . | **5a** | |
| **b** Any related organization? . . . . . . . . . . . . . . . . . | **5b** | |
| If "Yes," on line 5a or 5b, describe in Part III. | | |

**6** For persons listed on Form 990, Part VII, Section A, line 1a, did the organization pay or accrue any compensation contingent on the net earnings of:

| | | |
|---|---|---|
| **a** The organization? . . . . . . . . . . . . . . . . . . . . | **6a** | |
| **b** Any related organization? . . . . . . . . . . . . . . . . . | **6b** | |
| If "Yes," on line 6a or 6b, describe in Part III. | | |

**7** For persons listed on Form 990, Part VII, Section A, line 1a, did the organization provide any nonfixed payments not described in lines 5 and 6? If "Yes," describe in Part III. | **7** |

**8** Were any amounts reported on Form 990, Part VII, paid or accrued pursuant to a contract that was subject to the initial contract exception described in Regulations section 53.4958-4(a)(3)? If "Yes," describe in Part III. | **8** |

**9** If "Yes" on line 8, did the organization also follow the rebuttable presumption procedure described in Regulations section 53.4958-6(c)? | **9** |

For Paperwork Reduction Act Notice, see the Instructions for Form 990.      Cat. No. 50053T      Schedule J (Form 990) 2019

— Page 2 —

Schedule J (Form 990) 2019                                                                                                                 Page **2**

**Part II   Officers, Directors, Trustees, Key Employees, and Highest Compensated Employees.** Use duplicate copies if additional space is needed.

For each individual whose compensation must be reported on Schedule J, report compensation from the organization on row (i) and from related organizations, described in the instructions, on row (ii). Do not list any individuals that are not listed on Form 990, Part VII.
**Note.** The sum of columns (B)(i)-(iii) for each listed individual must equal the total amount of Form 990, Part VII, Section A, line 1a, applicable column (D) and (E) amounts for that individual.

| (A) Name and Title | | (B) Breakdown of W-2 and/or 1099-MISC compensation | | | (C) Retirement and other deferred compensation | (D) Nontaxable benefits | (E) Total of columns (B)(i)-(D) | (F) Compensation in column (B) reported as deferred on prior Form 990 |
|---|---|---|---|---|---|---|---|---|
| | | (i) Base compensation | (ii) Bonus & incentive compensation | (iii) Other reportable compensation | | | | |
| 1 Spieth Jordan<br>Player Director | (i) | 0 | 1,850,775 | 0 | 286,543 | 0 | 2,137,318 | 0 |
| | (ii) | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| 2 Streelman Kevin<br>Player Director | (i) | 0 | 2,033,174 | 0 | 198,358 | 0 | 2,231,532 | 0 |
| | (ii) | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| 3 Hoffman Charles L<br>Player Director / Treasurer | (i) | 0 | 1,484,503 | 0 | 177,568 | 0 | 1,662,071 | 0 |
| | (ii) | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| 4 Wagner M Johnson<br>Player Director / Secretary | (i) | 0 | 522,181 | 0 | 137,568 | 0 | 659,749 | 0 |
| | (ii) | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| 5 Monahan Joseph W<br>Commissioner | (i) | 1,262,092 | 4,052,028 | 64,175 | 6,442 | 20,650 | 5,405,387 | 819,522 |
| | (ii) | 420,697 | 1,282,383 | 1,763,310 | 2,147 | 6,883 | 3,475,420 | 204,881 |
| 6 Price Ronald E<br>Chief Operating Officer | (i) | 390,129 | 1,170,099 | 39,951 | 49,655 | 15,423 | 1,665,167 | 343,314 |
| | (ii) | 390,129 | 1,170,099 | 2,394,415 | 49,655 | 15,423 | 4,019,721 | 343,314 |
| 7 Wade Thomas E<br>Chief Commercial Officer | (i) | 919,062 | 935,438 | 51,233 | 0 | 11,550 | 1,917,283 | 0 |
| | (ii) | 129,766 | 233,859 | 1,296,058 | 929,589 | 2,688 | 2,592,160 | 0 |
| 8 Anderson Richard D<br>Chief Media Officer | (i) | 398,809 | 845,403 | 20,438 | 10,395 | 22,049 | 1,297,094 | 152,742 |
| | (ii) | 99,702 | 325,907 | 609,613 | 2,599 | 5,512 | 1,043,333 | 152,742 |
| 9 Brown Leonard<br>EVP Licenses & Chief Legal Ofc | (i) | 323,193 | 589,994 | 39,882 | 11,873 | 22,985 | 987,927 | 182,765 |
| | (ii) | 57,034 | 132,786 | 933,991 | 2,095 | 4,056 | 1,129,962 | 60,922 |
| 10 Keller Allison W<br>Chief Administrative Officer | (i) | 398,173 | 838,953 | 12,417 | 0 | 21,753 | 1,271,296 | 208,185 |
| | (ii) | 99,543 | 209,738 | 412,676 | 0 | 5,438 | 727,395 | 52,046 |
| 11 Pazder James A<br>Chief Tourn & Competition Ofc | (i) | 387,436 | 873,348 | 19,027 | 0 | 24,827 | 1,304,638 | 256,709 |
| | (ii) | 43,048 | 97,038 | 518,230 | 0 | 2,759 | 661,075 | 28,523 |
| 12 Sharkey Kenneth J<br>EVP & Chief Financial Officer | (i) | 284,056 | 589,303 | 7,611 | 21,088 | 2,312 | 904,370 | 0 |
| | (ii) | 284,056 | 589,303 | 7,611 | 21,088 | 2,312 | 904,370 | 0 |
| 13 Votaw Ty M<br>EVP INTERNATIONAL | (i) | 364,792 | 687,895 | 26,663 | 33,162 | 18,464 | 1,130,976 | 231,656 |
| | (ii) | 91,198 | 268,498 | 179,996 | 8,290 | 4,616 | 552,598 | 154,438 |
| 14 Brady Jack M<br>President Champions Tour | (i) | 245,218 | 232,184 | 2,596 | 0 | 27,120 | 507,118 | 0 |
| | (ii) | | | | | | | |
| 15 Baldwin Alexandra C<br>President Korn Ferry Tour | (i) | 268,544 | 234,170 | 8,865 | 24,972 | 4,528 | 541,079 | 0 |
| | (ii) | | | | | | | |

12/11/22, 4:56 PM                      PGA TOUR INC - Full Filing- Nonprofit Explorer - ProPublica

| | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| **16** Oliver Brian M<br>EVP Corporate Partnership | (i) | 370,287 | 710,692 | 20,237 | 11,474 | 20,526 | 1,133,216 | 152,676 |
| | (ii) | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| **17** Lightcap Jeanne F<br>EVP Finance | (i) | 273,685 | 469,168 | 16,931 | | 19,467 | 779,251 | 127,243 |
| | (ii) | 91,228 | 156,389 | 5,644 | | 6,489 | 259,750 | 42,414 |
| **18** Pascal Thierry<br>SVP International Media | (i) | 64,773 | 31,984 | 101,334 | 4,147 | 836 | 203,074 | 0 |
| | (ii) | 259,092 | 127,934 | 405,336 | 16,586 | 3,342 | 812,290 | 0 |
| **19** Monday Jeff<br>President Mackenzie Tour | (i) | 221,973 | 152,371 | 583,859 | 358,204 | 24,230 | 1,340,637 | 0 |
| | (ii) | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| **20** Ohno Robert K<br>SVP INTERNATIONAL TOURS | (i) | 351,847 | 400,104 | 15,491 | 25,772 | 28,095 | 821,309 | 161,619 |
| | (ii) | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| **21** Arcum Joseph<br>Former Chief Marketing Officer | (i) | 44,480 | 464,002 | 8,968 | | 5,125 | 522,575 | 0 |
| | (ii) | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| **22** Finchem Timothy W<br>Former Commissioner | (i) | 800,000 | 0 | 15,919 | | | 815,919 | 0 |
| | (ii) | 0 | 0 | 0 | 0 | 0 | 0 | 0 |
| **23** Zink Charles<br>FMR Chairman, Presidents Cup | (i) | 166,667 | 0 | 0 | 0 | 0 | 166,667 | 0 |
| | (ii) | 0 | 0 | 0 | 0 | 0 | 0 | 0 |

Schedule J (Form 990) 2019

— Page 3 —

Schedule J (Form 990) 2019                                                                                               Page **3**

**Part XII   Supplemental Information**

Provide the information, explanation, or descriptions required for Part I, lines 1a, 1b, 3, 4a, 4b, 4c, 5a, 5b, 6a, 6b, 7, and 8, and for Part II. Also complete this part for any additional information.

| Return Reference | Explanation |
|---|---|
| SCHEDULE J PART I LINE 1A | In limited cases, listed TOUR employees may utilize charter or first-class travel for business based upon security concerns, privacy concerns, timing concerns, and length of trip. In limited situations, chartered travel referenced above is available for companions. In conjunction with events that provide non-cash benefits, tax gross up payments are provided to make executives whole. All listed employees were provided access to health or social facilities and any personal use is reported as taxable income to the employee. Above listed fringe benefits have been included in taxable income of recipient in accordance with applicable internal revenue code sections. |
| SCHEDULE J PART I LINE 4B | Certain executives participate in a supplemental nonqualified retirement plan. THE SUPPLEMENTAL NONQUALIFIED RETIREMENT PLAN IS A PLAN OF THE RELATED ORGANIZATION AND NOT PGA TOUR, INC. During employment, actuarial changes are reported by participant as other wages in part 2 column bili of Schedule J. When distributions are made, the reportable amount is the excess of the total payment received less actuarial amounts previously reported. The payments made out of the plan totaled $7,352,926 in 2019. The plan participants were Richard D. Anderson, Joseph W. Monahan, Ronald E. Price, Ty M. Votaw, Thomas E. Wade, Allison W. Keller, James A. Pazder, and Leonard Brown. |
| SCHEDULE J PART I LINE 4A | THE PGA TOUR, INC. OR A RELATED ORGANIZATION MADE SEVERANCE PAYMENTS IN CALENDAR YEAR 2019 TO THE FOLLOWING INDIVIDUALS: JEFFREY R. MONDAY 570,000 |

Schedule J (Form 990) 2019

---

**Additional Data**

[ Return to Form ]

Software ID:

Software Version:

↑ Back to Top

| efile Public Visual Render | ObjectId: 202023219349309777 - Submission: 2020-11-16 | TIN: 52-0999206 |
|---|---|---|

**Schedule L**
(Form 990 or 990-EZ)

**Transactions with Interested Persons**
►Complete if the organization answered "Yes" on Form 990, Part IV, lines 25a, 25b, 26, 27, 28a, 28b, or 28c, or Form 990-EZ, Part V, line 38a or 40b.
► Attach to Form 990 or Form 990-EZ.
►Go to *www.irs.gov/Form990* for instructions and the latest information.

OMB No. 1545-0047

**2019**

Open to Public
Inspection

Department of the Treasury
Internal Revenue Service

| Name of the organization<br>PGA TOUR INC | Employer identification number<br>52-0999206 |
|---|---|

**Part I    Excess Benefit Transactions** (section 501(c)(3), section 501(c)(4), and section 501(c)(29) organizations only).
Complete if the organization answered "Yes" on Form 990, Part IV, line 25a or 25b, or Form 990-EZ, Part V, line 40b.

| 1 | **(a)** Name of disqualified person | **(b)** Relationship between disqualified person and organization | **(c)** Description of transaction | **(d)** Corrected? | |
|---|---|---|---|---|---|
| | | | | Yes | No |
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |

**2** Enter the amount of tax incurred by the organization managers or disqualified persons during the year under section 4958 . . . . . . . . . . . . . . . . . . . . ► $ _____
**3** Enter the amount of tax, if any, on line 2, above, reimbursed by the organization . . . . . . . . . ► $ _____

**Part II    Loans to and/or From Interested Persons.**
Complete if the organization answered "Yes" on Form 990-EZ, Part V, line 38a or Form 990, Part IV, line 26; or if the organization reported an amount on Form 990, Part X, line 5, 6, or 22.

12/11/22, 4:56 PM | PGA TOUR INC - Full Filing- Nonprofit Explorer - ProPublica

| (a) Name of interested person | (b) Relationship with organization | (c) Purpose of loan | (d) Loan to or from the organization? | | (e) Original principal amount | (f) Balance due | (g) In default? | | (h) Approved by board or committee? | | (i) Written agreement? | |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | To | From | | | Yes | No | Yes | No | Yes | No |
| | | | | | | | | | | | | |
| | | | | | | | | | | | | |
| | | | | | | | | | | | | |
| | | | | | | | | | | | | |
| | | | | | | | | | | | | |
| **Total** | . . . . . . . . . . . . . . . ▶ | $ | | | | | | | | | | |

**Part III    Grants or Assistance Benefiting Interested Persons.**
Complete if the organization answered "Yes" on Form 990, Part IV, line 27.

| (a) Name of interested person | (b) Relationship between interested person and the organization | (c) Amount of assistance | (d) Type of assistance | (e) Purpose of assistance |
|---|---|---|---|---|
| | | | | |
| | | | | |
| | | | | |
| | | | | |
| | | | | |

For Paperwork Reduction Act Notice, see the Instructions for Form 990 or 990-EZ.      Cat. No. 50056A      Schedule L (Form 990 or 990-EZ) 2019

─── Page 2 ───

Schedule L (Form 990 or 990-EZ) 2019                                                                                     Page **2**

**Part IV    Business Transactions Involving Interested Persons.**
Complete if the organization answered "Yes" on Form 990, Part IV, line 28a, 28b, or 28c.

| (a) Name of interested person | (b) Relationship between interested person and the organization | (c) Amount of transaction | (d) Description of transaction | (e) Sharing of organization's revenues? | |
|---|---|---|---|---|---|
| | | | | Yes | No |
| (1) STEPHENIE FINCHEM | FAMILY MEMBER OF TIMOTHY W. FINCHEM FORMER OFFICER | 68,851 | EMPLOYMENT | | No |
| (2) WHITNEY CALFEE | FAMILY MEMBER OF WORTH W. CALFEE FORMER KEY EMPLOYEE | 37,291 | EMPLOYMENT | | No |
| (3) ERIC BALDWIN | FAMILY MEMBER OF ALEXANDRA BALDWIN KEY EMPLOYEE | 220,067 | EMPLOYMENT | | No |
| (4) WILLIAM WHALEY | FAMILY MEMBER OF SUZY WHALEY DIRECTOR | 333,496 | EMPLOYMENT | | No |
| | | | | | |

**Part V    Supplemental Information**
Provide additional information for responses to questions on Schedule L (see instructions).

| Return Reference | Explanation |
|---|---|
| | |

Schedule L (Form 990 or 990-EZ) 2019

**Additional Data**                                                                        [ Return to Form ]

**Software ID:**

**Software Version:**

↑ Back to Top

| efile Public Visual Render | ObjectId: 202023219349309777 - Submission: 2020-11-16 | TIN: 52-0999206 |
|---|---|---|

|  |  | OMB No. 1545-0047 |
|---|---|---|
| **SCHEDULE O** (Form 990 or 990-EZ) | **Supplemental Information to Form 990 or 990-EZ**  Complete to provide information for responses to specific questions on Form 990 or 990-EZ or to provide any additional information. | **2019** |

12/11/22, 4:56 PM                      PGA TOUR INC - Full Filing- Nonprofit Explorer - ProPublica

~~Form 990 or 990-EZ or to provide any additional information.~~

| Department of the Treasury<br>Internal Revenue Service | ▶ Attach to Form 990 or 990-EZ.<br>▶ Go to **www.irs.gov/Form990** for the latest information. | Open to Public<br>Inspection |
|---|---|---|

| Name of the organization<br>PGA TOUR INC | **Employer identification number**<br>52-0999206 |
|---|---|

| Return<br>Reference | Explanation |
|---|---|
| FORM 990, PART VI, LINE 2 | EDWARD D. HERLIHY, M. JOHNSON WAGNER, CHARLES L. HOFFMAN, JAY W. MONAHAN, RONALD E. PRICE, SUZY WHALEY - BUSINESS RELATIONSHIP |
| FORM 990, PART VI, LINE 2 | EDWARD D. HERLIHY, M. JOHNSON WAGNER, CHARLES L. HOFFMAN, JAY W. MONAHAN, RONALD E. PRICE, SUZY WHALEY, LEONARD D. BROWN JR., KENNETH J. SHARKEY, ALLISON W. KELLER - BUSINESS RELATIONSHIP |
| FORM 990, PART VI, LINE 2 | JAY W. MONAHAN, RONALD E. PRICE, LEONARD D. BROWN JR., KENNETH J. SHARKEY, ALLISON W. KELLER - BUSINESS RELATIONSHIP |
| FORM 990, PART VI, LINE 2 | EDWARD D. HERLIHY, JAY W. MONAHAN, RONALD E. PRICE, THOMAS E. WADE, LEONARD D. BROWN JR., RICHARD D. ANDERSON, ANDREW J. PAZDER, KENNETH J. SHARKEY, ALLISON W. KELLER, JAMES C. TRIOLA BUSINESS RELATIONSHIP |
| FORM 990, PART VI, LINE 2 | RONALD E. PRICE, THOMAS E. WADE - BUSINESS RELATIONSHIP |
| FORM 990, PART VI, LINE 6 | PGA TOUR, INC. IS A NOT-FOR-PROFIT CORPORATION ORGANIZATION FORMED UNDER IRC SECTION 501(C)(6) WHICH HAS ONE CLASS OF MEMBERS - PROFESSIONAL GOLFERS. THE MEMBERS HAVE THE RIGHT TO ELECT PLAYER DIRECTORS WHO SIT ON THE BOARD OF DIRECTORS OF THE ORGANIZATION. CURRENTLY, FOUR MEMBERS SIT ON THE BOARD OF DIRECTORS AS ELECTED BY THE MAJORITY OF THE ORGANIZATION'S MEMBERS. ONLY THE ELECTED MEMBER DIRECTORS HAVE THE RIGHT TO VOTE IN DECISIONS OF THE GOVERNING BODY. |
| FORM 990, PART VI, LINE 7A | THE MEMBERS DESCRIBED IN QUESTION 6 OF FORM 990, PART VI HAVE THE RIGHT TO ELECT PLAYER DIRECTORS WHO SIT ON THE BOARD OF DIRECTORS OF THE ORGANIZATION. CURRENTLY, FOUR MEMBERS SIT ON THE BOARD OF DIRECTORS AS ELECTED BY THE MAJORITY OF THE ORGANIZATION MEMBERS. ONLY THE ELECTED MEMBER DIRECTORS HAVE THE RIGHT TO VOTE IN DECISIONS OF THE GOVERNING BODY. THE EARNINGS OF THE PLAYER DIRECTORS FROM PARTICIPATION IN VARIOUS GOLF TOURNAMENTS HAVE BEEN REPORTED AS COMPENSATION ON PART VII A AND SCHEDULE J AS DIRECTED BY THE IRS FORM 990 INTRUCTIONS. |
| FORM 990, PART VI, LINE 11A | PGA TOUR, INC.'S FORM 990 WAS REVIEWED BY AN OUTSIDE SERVICE PROVIDER AND PGA TOUR, INC.'S CHIEF FINANCIAL OFFICER. ADDITIONALLY, AN ELECTRONIC COPY OF FORM 990 WAS PROVIDED TO ALL BOARD MEMBERS PRIOR TO THE FILING OF THE FORM WITH THE INTERNAL REVENUE SERVICE. |
| FORM 990, PART VI, LINE 12 A, B, C | PGA TOUR, INC. MAINTAINS A CONFLICT OF INTEREST POLICY FOR EMPLOYEES AND A SEPERATE CONFLICT OF INTEREST POLICY FOR THE MEMBERS OF THE BOARD OF DIRECTORS. EACH EMPLOYEE AND MEMBER OF THE BOARD IS ANNUALLY REQUIRED TO PROVIDE THE COMPANY A STATEMENT CONFIRMING THEY RECEIVED A COPY OF THE POLICY, READ THE POLICY, AND AGREED TO COMPLY WITH THE POLICY. EACH EMPLOYEE AND DIRECTOR ARE REQUIRED ANNUALLY TO DISCLOSE ANY RELATIONSHIP, TRANSACTION, OR POSITION THEY HOLD THAT COULD GIVE RISE TO A CONFLICT AND TO NOTIFY THE ORGANIZATION IF SUCH A RELATIONSHIP EXISTS AT ANY TIME DURING THE YEAR. |
| FORM 990, PART VI, LINE 15A AND 15B | THE COMPENSATION COMMITTEE ("THE COMMITTEE") OF THE PGA TOUR, INC. ("THE TOUR") IS COMPRISED OF UNCOMPENSATED INDEPENDENT MEMBERS OF THE PGA TOUR POLICY BOARD. THE COMMITTEE IS RESPONSIBLE FOR REVIEWING AND APPROVING THE COMPENSATION PROGRAM FOR THE CEO, SENIOR MANAGEMENT, AND KEY EMPLOYEES OF THE TOUR AND ITS SUBSIDIARIES. THE MEMBERS OF THE COMMITTEE ARE UNRELATED TO AND NOT SUBJECT TO CONTROL BY MEMBERS OF SENIOR MANAGEMENT OF THE TOUR. THE COMMITTEE ESTABLISHES SALARY LEVELS, REVIEWS PERFORMANCE OF SENIOR MANAGEMENT, APPROVES INCENTIVE PAYMENTS, AND ESTABLISHES MANAGEMENT BENEFITS AND PREREQUISITES. THE COMMITTEE BELIEVES THE ATTRACTION, RETENTION, MOTIVATION, AND REWARD OF EXECUTIVE AND KEY EMPLOYEES IS VITAL TO THE FUTURE OF THE TOUR AND CREATION OF MAXIMUM MEMBER VALUE. AS PART OF CARRYING OUT ITS RESPONSIBILITIES, THE COMMITTEE UTILIZES THE SERVICES OF A NATIONAL COMPENSATION CONSULTING FIRM ANNUALLY TO OBTAIN COMPENSATION LEVELS PAID BY SIMILARLY SITUATED ORGANIZATIONS, BOTH TAXABLE AND TAX-EXEMPT, FOR FUNCTIONALLY COMPARABLE POSITIONS. PERFORMANCE EVALUATIONS ARE UTILIZED IN THE DETERMINATION OF THE COMPENSATION LEVELS OF INDIVIDUAL MEMBERS OF SENIOR MANAGEMENT. |
| FORM 990, PART VI, LINE 19 | THE ORGANIZATION MAKES ITS FORM 990 AVAILABLE TO THE PUBLIC UPON REQUEST. ITS GOVERNING DOCUMENTS AND FINANCIAL STATEMENTS ARE NOT MADE AVAILABLE TO THE GENERAL PUBLIC. |
| FORM 990, PART IX, LINE 24E | THE AMOUNT OF FEDERAL INCOME TAX ON UNRELATED BUSINESS INCOME INCLUDED ON LINE 24e IS $851,725. |
| FORM 990, PART XI, LINE 9 | RECONCILIATION OF NET ASSETS - OTHER CHANGES IN FUND BALANCE INCREASE (DECREASE) FUNDS RESERVED FOR DESIGNATED PURPOSES (5,362,357) PENSION AND POST RETIREMENT RELATED CHANGES (10,172,790) INTERCOMPANY ADJUSTMENT 3,415,557 TOTAL OTHER CHANGES IN FUND BALANCE (12,119,590) |
| FORM 990 PART IX LINE 11G | DESCRIPTION:PLAYER PRIZE AND OTHER BENEFIT TOTAL FEES:XXX-XX-XXXX |
| FORM 990 | DESCRIPTION:PLAYER RETIREMENT TOTAL FEES:XXXXXXXX |

12/11/22, 4:56 PM                                    PGA TOUR INC - Full Filing- Nonprofit Explorer - ProPublica

| FORM 990 PART IX LINE 11G | DESCRIPTION:PLAYER RETIREMENT TOTAL FEES:58099965 |
| FORM 990 PART IX LINE 11G | DESCRIPTION:CONTRACTOR FEES TOTAL FEES:21111559 |
| FORM 990 PART IX LINE 11G | DESCRIPTION:OTHER FEES - TOURNAMENT SVC TOTAL FEES:6089563 |
| FORM 990 PART IX LINE 11G | DESCRIPTION:TOURNAMENT STAFF TOTAL FEES:2438801 |

For Paperwork Reduction Act Notice, see the Instructions for Form 990 or 990-EZ.        Cat. No. 51056K        Schedule O (Form 990 or 990-EZ) 2019

## Additional Data

[ Return to Form ]

Software ID:

Software Version:

↑ Back to Top

efile Public Visual Render   ObjectId: 202023219349309777 - Submission: 2020-11-16                    TIN: 52-0999206

| SCHEDULE R (Form 990) | Related Organizations and Unrelated Partnerships | OMB No. 1545-0047 |
|---|---|---|
| | ► Complete if the organization answered "Yes" on Form 990, Part IV, line 33, 34, 35b, 36, or 37. | **2019** |
| Department of the Treasury Internal Revenue Service | ► Attach to Form 990. ► Go to *www.irs.gov/Form990* for instructions and the latest information. | Open to Public Inspection |

Name of the organization
PGA TOUR INC

Employer identification number
52-0999206

**Part I   Identification of Disregarded Entities.** Complete if the organization answered "Yes" on Form 990, Part IV, line 33.

| (a) Name, address, and EIN (if applicable) of disregarded entity | (b) Primary activity | (c) Legal domicile (state or foreign country) | (d) Total income | (e) End-of-year assets | (f) Direct controlling entity |
|---|---|---|---|---|---|
| (1) FEDERATION EVENT MANAGEMENT LLC 100 PGA TOUR BOULEVARD PONTE VEDRA BEACH, FL 32082 65-0896401 | EVENT MGMT | FL | 0 | 0 | PGA TOUR INC |
| (2) EVENT MANAGEMENT INTERNATIONAL LLC 100 PGA TOUR BOULEVARD PONTE VEDRA BEACH, FL 32082 59-3715539 | EVENT MGMT | FL | 707,024 | 285,394 | PGA TOUR INC |
| (3) TPC LICENSE COMPANY LLC 100 PGA TOUR BOULEVARD PONTE VEDRA BEACH, FL 32082 20-4042445 | LICENSING | FL | 1,942,710 | 8,703,402 | PGA TOUR INC |
| (4) PGA TOUR INTERNATIONAL LLC 100 PGA TOUR BOULEVARD PONTE VEDRA BEACH, FL 32082 27-1162142 | ADMIN SUPPORT | FL | 1,648,057 | 4,199,292 | PGA TOUR INC |
| (5) THE PRESIDENTS CUP LLC 100 PGA TOUR BOULEVARD PONTE VEDRA BEACH, FL 32082 26-4316834 | INACTIVE | FL | 0 | 0 | PGA TOUR INC |
| (6) PGA TOUR LATINOAMERICA LLC 100 PGA TOUR BOULEVARD PONTE VEDRA BEACH, FL 32082 45-4567499 | EVENT MGMT | FL | 2,349 | 0 | PGA TOUR INC |
| (7) EVENT MGMT INT'L SO KOREA LTD CO C) THE CENTER 12 SOWOL-RO 2-GIL JUNGGU SEOUL KS                98-1188259 | EVENT MGMT | KS | 1,253 | 1,105,178 | PGA TOUR INC |
| (8) INTERNATIONAL GOLF EVENT MANAGEMENT PTY PWC 17 ONE INTERNATIONAL TOWERS W BARANGAROO, NSW  2000 AS              98-1207110 | EVENT MGMT | AS | 19,162,224 | 13,536,109 | PGA TOUR INC |
| (9) PGA TOUR International Malaysia Sdn Bhd SUITE 13A01 LEVEL 13A WISMA GOLD XUALA LUMPUR    50200 MY                98-1412018 | EVENT MGMT | MY | 3,840 | 1,329,453 | PGA TOUR INC |

**Part II   Identification of Related Tax-Exempt Organizations.** Complete if the organization answered "Yes" on Form 990, Part IV, line 34 because it had one or more related tax-exempt organizations during the tax year.

| (a) Name, address, and EIN of related organization | (b) Primary activity | (c) Legal domicile (state or foreign country) | (d) Exempt Code section | (e) Public charity status (if section 501(c)(3)) | (f) Direct controlling entity | (g) Section 512(b) (13) controlled entity? Yes | No |
|---|---|---|---|---|---|---|---|
| (1) PGA TOUR CHARITABLE & EDUCATIONAL FUND 100 PGA TOUR BOULEVARD PONTE VEDRA BEACH, FL 32082 52-1070271 | CHARITY | MD | 501(c)(3) | LN 12 TYP I | PGA TOUR INC | Yes | |
| (2) PGA TOUR CHARITIES INC 100 PGA TOUR BOULEVARD PONTE VEDRA BEACH, FL 32082 59-2774422 | CHARITY | FL | 501(c)(3) | LN 7 | PGA TOUR INC | Yes | |
| (3) PGA TOUR EMPLOYEES EMERGENCY RELIEF FUND 100 PGA TOUR BOULEVARD PONTE VEDRA BEACH, FL 32082 20-3580191 | CHARITY | FL | 501(c)(3) | LN 7 | PGA TOUR INC | Yes | |
| (4) PRO CADDIES ASSISTANCE FOUNDATION INC 100 PGA TOUR BOULEVARD PONTE VEDRA BEACH, FL 32082 99-3266465 | CHARITY | FL | 501(c)(3) | LN 7 | PGA TOUR INC | Yes | |

12/11/22, 4:56 PM

PGA TOUR INC - Full Filing- Nonprofit Explorer - ProPublica

| | | | | | |
|---|---|---|---|---|---|
| | | | | | |
| | | | | | |
| | | | | | |
| | | | | | |

**For Paperwork Reduction Act Notice, see the Instructions for Form 990.**     Cat. No. 50135Y     **Schedule R (Form 990) 2019**

Page 2

Schedule R (Form 990) 2019     Page **2**

**Part III**   **Identification of Related Organizations Taxable as a Partnership.** Complete if the organization answered "Yes" on Form 990, Part IV, line 34, because it had one or more related organizations treated as a partnership during the tax year.

| (a) Name, address, and EIN of related organization | (b) Primary activity | (c) Legal domicile (state or foreign country) | (d) Direct controlling entity | (e) Predominant income(related, unrelated, excluded from tax under sections 512-514) | (f) Share of total income | (g) Share of end-of-year assets | (h) Disproportionate allocations? | | (i) Code V-UBI amount in box 20 of Schedule K-1 (Form 1065) | (j) General or managing partner? | | (k) Percentage ownership |
|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | Yes | No | | Yes | No | |
| **(1)** TPC OF BOSTON AT GREATWOODS LLC<br>100 PGA TOUR BOULEVARD<br>PONTE VEDRA BEACH, FL 32082<br>52-2266419 | GOLF OPERATIO | DE | TPC OF MASS | | 0 | 0 | | No | 0 | | | 62,450 % |
| **(2)** TPC OF ILLINOIS LLC<br>100 PGA TOUR BOULEVARD<br>PONTE VEDRA BEACH, FL 32082<br>02-0676368 | GOLF OPERATIO | DE | TPC OF ILLINOIS | | 0 | 0 | | No | 0 | | | 89,500 % |
| **(3)** ACADEMY ASSETS LLC<br>1960 STONEGATE DR<br>BIRMINGHAM, AL 35242<br>63-1277599 | PROMOTION OF | FL | TPC GOLF SCHOOL | | 0 | 0 | | No | 0 | | | 50,003 % |
| **(4)** SUGARLOAF PARKING LOT LLC<br>100 PGA TOUR BOULEVARD<br>PONTE VEDRA BEACH, FL 32082<br>58-2584916 | RENTAL | GA | TPC AT SUGARLOA | | 0 | 0 | | No | 0 | | | 50,000 % |
| **(5)** EZLINKS GOLF HOLDINGS LLC<br>401 S LA SALLE STREET<br>CHICAGO, IL 60605<br>47-4275427 | GOLF RESERVAT | DE | PGA TOUR GCP | | 0 | 0 | | No | 0 | | | 0 % |

**Part IV**   **Identification of Related Organizations Taxable as a Corporation or Trust.** Complete if the organization answered "Yes" on Form 990, Part IV, line 34, because it had one or more related organizations treated as a corporation or trust during the tax year.

| (a) Name, address, and EIN of related organization | (b) Primary activity | (c) Legal domicile (state or foreign country) | (d) Direct controlling entity | (e) Type of entity (C corp, S corp, or trust) | (f) Share of total income | (g) Share of end-of-year assets | (h) Percentage ownership | (i) Section 512(b) (13) controlled entity? | |
|---|---|---|---|---|---|---|---|---|---|
| | | | | | | | | Yes | No |
| **(1)** PGA TOUR HOLDINGS INC AND SUBSIDIARIES<br>100 PGA TOUR BOULEVARD<br>PONTE VEDRA BEACH, FL 32082<br>59-3159885 | HOLDING COMPA | FL | PGA TOUR INC | C CORP | -58,598,101 | 361,194,448 | 100.000 % | Yes | |
| **(2)** PGA TOUR GOLF COURSE PROPERTIES INC<br>100 PGA TOUR BOULEVARD<br>PONTE VEDRA BEACH, FL 32082<br>59-3009946 | GOLF OPERATIO | FL | PGA TOUR HOLDIN | C CORP | | | 100.000 % | Yes | |
| **(3)** PGA TOUR PUBLIC GOLF INC<br>100 PGA TOUR BOULEVARD<br>PONTE VEDRA BEACH, FL 32082<br>59-2951523 | GOLF OPERATIO | FL | PGA TOUR GOLF C | C CORP | | | 100.000 % | Yes | |
| **(4)** TPC GOLF SCHOOLS INC<br>100 PGA TOUR BOULEVARD<br>PONTE VEDRA BEACH, FL 32082<br>59-3174936 | GOLF OPERATIO | FL | PGA TOUR GOLF C | C CORP | | | 100.000 % | Yes | |
| **(5)** PGA TOUR INVESTMENTS FINANCE INC<br>100 PGA TOUR BOULEVARD<br>PONTE VEDRA BEACH, FL 32082<br>59-3057625 | FINANCING | FL | PGA TOUR GOLF C | C CORP | | | 100.000 % | Yes | |
| **(6)** PGA TOUR MEDIA CENTER INC<br>100 PGA TOUR BOULEVARD<br>PONTE VEDRA BEACH, FL 32082<br>59-3184058 | MEDIA OPERATI | FL | PGA TOUR GOLF C | C CORP | | | 100.000 % | Yes | |
| **(7)** PARK INVESTMENTS INC<br>100 PGA TOUR BOULEVARD<br>PONTE VEDRA BEACH, FL 32082<br>59-3053071 | INACTIVE | FL | PGA TOUR GOLF C | C CORP | | | 0 % | Yes | |
| **(8)** PGA TOUR CONSTRUCTION SERVICES INC<br>100 PGA TOUR BOULEVARD<br>PONTE VEDRA BEACH, FL 32082<br>59-2551330 | CONSTRUCTION | FL | PGA TOUR GOLF C | C CORP | | | 100.000 % | Yes | |
| **(9)** PGA TOUR DESIGN SERVICES INC<br>100 PGA TOUR BOULEVARD<br>PONTE VEDRA BEACH, FL 32082<br>59-2904716 | DESIGN SERVIC | FL | PGA TOUR CONSTR | C CORP | | | 100.000 % | Yes | |
| **(10)** TOURNAMENT PLAYERS CLUB AT SAWGRASS INC<br>100 PGA TOUR BOULEVARD<br>PONTE VEDRA BEACH, FL 32082<br>59-2964624 | GOLF OPERATIO | FL | PGA TOUR INVEST | C CORP | | | 100.000 % | Yes | |
| **(11)** TOURNAMENT PLAYERS CLUB AT EAGLE TRACE I<br>100 PGA TOUR BOULEVARD<br>PONTE VEDRA BEACH, FL 32082<br>59-2241195 | GOLF OPERATIO | FL | PGA TOUR GOLF C | C CORP | | | 100.000 % | Yes | |
| **(12)** TOURNAMENT PLAYERS CLUB OF CONNECTICUT I | GOLF OPERATIO | CT | PGA TOUR INVEST | C CORP | | | 100.000 % | Yes | |

PGA TOUR INC - Full Filing- Nonprofit Explorer - ProPublica

| Name / Address | Activity | State | Primary | Type | | | % | |
|---|---|---|---|---|---|---|---|---|
| 100 PGA TOUR BOULEVARD PONTE VEDRA BEACH, FL 32082 06-1104329 | | | | | | | | |
| (13)TOURNAMENT PLAYERS CLUB AT PRESTANCIA IN | GOLF OPERATIO | FL | PGA TOUR GOLF C | C CORP | | | 100.000 % | Yes |
| 100 PGA TOUR BOULEVARD PONTE VEDRA BEACH, FL 32082 59-2457513 | | | | | | | | |
| (14)TOURNAMENT PLAYERS CLUB AT AVENEL INC | GOLF OPERATIO | MD | PGA TOUR INVEST | C CORP | | | 100.000 % | Yes |
| 100 PGA TOUR BOULEVARD PONTE VEDRA BEACH, FL 32082 52-1364289 | | | | | | | | |
| (15)TOURNAMENT PLAYERS CLUB OF TUCSON INC | INACTIVE | AZ | PGA TOUR GOLF C | C CORP | | | 0 % | Yes |
| 100 PGA TOUR BOULEVARD PONTE VEDRA BEACH, FL 32082 86-0518769 | | | | | | | | |
| (16)TOURNAMENT PLAYERS CLUB OF SCOTTSDALE IN | GOLF OPERATIO | AZ | PGA TOUR GOLF C | C CORP | | | 100.000 % | Yes |
| 100 PGA TOUR BOULEVARD PONTE VEDRA BEACH, FL 32082 86-0518768 | | | | | | | | |
| (17)TOURNAMENT PLAYERS CLUB OF SOUTHWIND INC | GOLF OPERATIO | TN | PGA TOUR GOLF C | C CORP | | | 100.000 % | Yes |
| 100 PGA TOUR BOULEVARD PONTE VEDRA BEACH, FL 32082 58-1664497 | | | | | | | | |
| (18)TOURNAMENT PLAYERS CLUB AT PIPER GLEN IN | GOLF OPERATIO | NC | PGA TOUR GOLF C | C CORP | | | 100.000 % | Yes |
| 100 PGA TOUR BOULEVARD PONTE VEDRA BEACH, FL 32082 59-2935526 | | | | | | | | |
| (19)TOURNAMENT PLAYERS CLUB OF MICHIGAN INC | GOLF OPERATIO | FL | PGA TOUR GOLF C | C CORP | | | 100.000 % | Yes |
| 100 PGA TOUR BOULEVARD PONTE VEDRA BEACH, FL 32082 38-2809309 | | | | | | | | |
| (20)TOURNAMENT PLAYERS CLUB AT CHEVAL INC | INACTIVE | FL | PGA TOUR GOLF C | C CORP | | | 100.000 % | Yes |
| 100 PGA TOUR BOULEVARD PONTE VEDRA BEACH, FL 32082 59-2633623 | | | | | | | | |
| (21)TOURNAMENT PLAYERS CLUB AT SUMMERLIN INC | GOLF OPERATIO | NV | PGA TOUR GOLF C | C CORP | | | 100.000 % | Yes |
| 100 PGA TOUR BOULEVARD PONTE VEDRA BEACH, FL 32082 59-2956933 | | | | | | | | |
| (22)TOURNAMENT PLAYERS CLUB OF LOUISIANA INC | GOLF OPERATIO | LA | PGA TOUR GOLF C | C CORP | | | 100.000 % | Yes |
| 100 PGA TOUR BOULEVARD PONTE VEDRA BEACH, FL 32082 72-1425678 | | | | | | | | |
| (23)TOURNAMENT PLAYERS CLUB OF MASSACHUSETTS | GOLF OPERATIO | MA | PGA TOUR GOLF C | C CORP | | | 100.000 % | Yes |
| 100 PGA TOUR BOULEVARD PONTE VEDRA BEACH, FL 32082 04-3474477 | | | | | | | | |
| (24)TOURNAMENT PLAYERS CLUB OF CINCINNATI IN | GOLF OPERATIO | OH | PGA TOUR GOLF C | C CORP | | | 100.000 % | Yes |
| 100 PGA TOUR BOULEVARD PONTE VEDRA BEACH, FL 32082 31-1648529 | | | | | | | | |
| (25)TOURNAMENT PLAYERS CLUB OF MCKINNEY INC | GOLF OPERATIO | FL | PGA TOUR GOLF C | C CORP | | | 100.000 % | Yes |
| 100 PGA TOUR BOULEVARD PONTE VEDRA BEACH, FL 32082 75-2951502 | | | | | | | | |
| (26)TOURNAMENT PLAYERS CLUB OF PRINCETON INC | GOLF OPERATIO | NJ | PGA TOUR GOLF C | C CORP | | | 100.000 % | Yes |
| 100 PGA TOUR BOULEVARD PONTE VEDRA BEACH, FL 32082 59-3309245 | | | | | | | | |
| (27)TOURNAMENT PLAYERS CLUB AT HERON BAY INC | INACTIVE | FL | PGA TOUR GOLF C | C CORP | | | 100.000 % | Yes |
| 100 PGA TOUR BOULEVARD PONTE VEDRA BEACH, FL 32082 59-3143532 | | | | | | | | |
| (28)TOURNAMENT PLAYERS CLUB AT SUGARLOAF INC | GOLF OPERATIO | GA | PGA TOUR GOLF C | C CORP | | | 100.000 % | Yes |
| 100 PGA TOUR BOULEVARD PONTE VEDRA BEACH, FL 32082 59-3338909 | | | | | | | | |
| (29)TOURNAMENT PLAYERS CLUB OF SOUTH CAROLIN | INACTIVE | SC | PGA TOUR GOLF C | C CORP | | | 100.000 % | Yes |
| 100 PGA TOUR BOULEVARD PONTE VEDRA BEACH, FL 32082 59-3401600 | | | | | | | | |
| (30)TOURNAMENT PLAYERS CLUB OF ILLINOIS INC | GOLF OPERATIO | IL | PGA TOUR GOLF C | C CORP | | | 100.000 % | Yes |
| 100 PGA TOUR BOULEVARD PONTE VEDRA BEACH, FL 32082 58-2323689 | | | | | | | | |
| (31)TOURNAMENT PLAYERS CLUB OF VIRGINIA INC | INACTIVE | VA | PGA TOUR GOLF C | C CORP | | | 100.000 % | Yes |
| 100 PGA TOUR BOULEVARD PONTE VEDRA BEACH, FL 32082 59-3466225 | | | | | | | | |
| (32)TOURNAMENT PLAYERS CLUB OF MINNESOTA INC | GOLF OPERATIO | MN | PGA TOUR GOLF C | C CORP | | | 100.000 % | Yes |
| 100 PGA TOUR BOULEVARD PONTE VEDRA BEACH, FL 32082 41-1900252 | | | | | | | | |
| (33)TOURNAMENT PLAYERS CLUB OF NORTH CAROLIN | GOLF OPERATIO | NC | PGA TOUR GOLF C | C CORP | | | 100.000 % | Yes |
| 100 PGA TOUR BOULEVARD PONTE VEDRA BEACH, FL 32082 65-1714690 | | | | | | | | |
| (34)TOURNAMENT PLAYERS CLUB OF CALIFORNIA IN | GOLF OPERATIO | CA | PGA TOUR GOLF C | C CORP | | | 100.000 % | Yes |
| 100 PGA TOUR BOULEVARD PONTE VEDRA BEACH, FL 32082 59-3162770 | | | | | | | | |
| (35)PGA TOUR GLOBAL CONSULTING INC | CONSULTING | FL | PGA TOUR HOLDIN | C CORP | | | 100.000 % | Yes |
| 100 PGA TOUR BOULEVARD PONTE VEDRA BEACH, FL 32082 59-2551341 | | | | | | | | |
| (36)PGA TOUR PUBLIC GOLF (DADE) INC | INACTIVE | FL | PGA TOUR PUBLIC | C CORP | | | 100.000 % | Yes |
| 100 PGA TOUR BOULEVARD PONTE VEDRA BEACH, FL 32082 59-2951527 | | | | | | | | |
| (37)PGA TOUR TRAVEL INC | TRAVEL ARRANG | FL | PGA TOUR HOLDIN | C CORP | | | 100.000 % | Yes |

12/11/22, 4:56 PM                    PGA TOUR INC - Full Filing- Nonprofit Explorer - ProPublica

| | | | | | | | | |
|---|---|---|---|---|---|---|---|---|
| 100 PGA TOUR BOULEVARD PONTE VEDRA BEACH, FL 32082 59-2548789 | | | | | | | | |
| (38)PGA TOUR PUBLISHING INC | INACTIVE | FL | PGA TOUR HOLDIN | C CORP | | | 100.000 % | Yes |
| 100 PGA TOUR BOULEVARD PONTE VEDRA BEACH, FL 32082 59-3174939 | | | | | | | | |
| (39)PGA TOUR LICENSED PROPERTIES INC | LICENSING | FL | PGA TOUR HOLDIN | C CORP | | | 100.000 % | Yes |
| 100 PGA TOUR BOULEVARD PONTE VEDRA BEACH, FL 32082 59-3077293 | | | | | | | | |
| (40)PGA TOUR MANAGEMENT SERVICES INC | MANAGEMENT | FL | PGA TOUR HOLDIN | C CORP | | | 100.000 % | Yes |
| 100 PGA TOUR BOULEVARD PONTE VEDRA BEACH, FL 32082 59-3254892 | | | | | | | | |
| (41)TOUR AIR INC | AIR TRANSPORT | FL | PGA TOUR GOLF C | C CORP | | | 100.000 % | Yes |
| 100 PGA TOUR BOULEVARD PONTE VEDRA BEACH, FL 32082 59-2072218 | | | | | | | | |
| (42)SELECT TICKETS INC | COMMISSION SA | FL | PGA TOUR HOLDIN | C CORP | | | 100.000 % | Yes |
| 100 PGA TOUR BOULEVARD PONTE VEDRA BEACH, FL 32082 32-0429300 | | | | | | | | |

Schedule R (Form 990) 2019

— Page 3 —

Schedule R (Form 990) 2019                                                                 Page **3**

**Part V**   **Transactions With Related Organizations.** Complete if the organization answered "Yes" on Form 990, Part IV, line 34, 35b, or 36.

Note. Complete line 1 if any entity is listed in Parts II, III, or IV of this schedule.

| | | Yes | No |
|---|---|---|---|
| 1 During the tax year, did the organization engage in any of the following transactions with one or more related organizations listed in Parts II–IV? | | | |
| a   Receipt of (i) interest, (ii)annuities, (iii) royalties, or (iv) rent from a controlled entity . . . . . . . . . | 1a | Yes | |
| b   Gift, grant, or capital contribution to related organization(s) . . . . . . . . . . . . . . | 1b | Yes | |
| c   Gift, grant, or capital contribution from related organization(s) . . . . . . . . . . . . | 1c | | No |
| d   Loans or loan guarantees to or for related organization(s) . . . . . . . . . . . . . | 1d | Yes | |
| e   Loans or loan guarantees by related organization(s) . . . . . . . . . . . . . . | 1e | Yes | |
| f   Dividends from related organization(s) . . . . . . . . . . . . . . . . . . | 1f | | No |
| g   Sale of assets to related organization(s) . . . . . . . . . . . . . . . . | 1g | Yes | |
| h   Purchase of assets from related organization(s) . . . . . . . . . . . . . . | 1h | | No |
| i   Exchange of assets with related organization(s) . . . . . . . . . . . . . | 1i | | No |
| j   Lease of facilities, equipment, or other assets to related organization(s) . . . . . . . . | 1j | | No |
| k   Lease of facilities, equipment, or other assets from related organization(s) . . . . . . . | 1k | Yes | |
| l   Performance of services or membership or fundraising solicitations for related organization(s) . . . | 1l | Yes | |
| m   Performance of services or membership or fundraising solicitations by related organization(s) . . . | 1m | Yes | |
| n   Sharing of facilities, equipment, mailing lists, or other assets with related organization(s) . . . | 1n | Yes | |
| o   Sharing of paid employees with related organization(s) . . . . . . . . . . . . | 1o | Yes | |
| p   Reimbursement paid to related organization(s) for expenses . . . . . . . . . . . | 1p | | No |
| q   Reimbursement paid by related organization(s) for expenses . . . . . . . . . . . | 1q | Yes | |
| r   Other transfer of cash or property to related organization(s) . . . . . . . . . . . | 1r | Yes | |
| s   Other transfer of cash or property from related organization(s) . . . . . . . . . . | 1s | Yes | |

2   If the answer to any of the above is "Yes," see the instructions for information on who must complete this line, including covered relationships and transaction thresholds.

| (a) Name of related organization | (b) Transaction type (a-s) | (c) Amount involved | (d) Method of determining amount involved |
|---|---|---|---|
| (1)PGA TOUR GOLF COURSE PROPERTIES INC | a(i) | 6,455,439 | AFR |
| (2)PGA TOUR MEDIA CENTER INC | a(i) | 20,593 | AFR |
| (3)PGA TOUR CONSTRUCTION SERVICES INC | a(i) | 226,882 | AFR |
| (4)PGA TOUR DESIGN SERVICES INC | a(i) | 95,189 | AFR |
| (5)TOURNAMENT PLAYERS CLUB AT SAWGRASS INC | a(i) | 595,156 | AFR |
| (6)TOURNAMENT PLAYERS CLUB OF CONNECTICUT INC | a(i) | 688,736 | AFR |
| (7)TOURNAMENT PLAYERS CLUB AT SOUTHWIND INC | a(i) | 140,079 | AFR |
| (8)TOURNAMENT PLAYERS CLUB AT SUMMERLIN INC | a(i) | 292,827 | AFR |
| (9)TOURNAMENT PLAYERS CLUB OF CINCINNATI INC | a(i) | 99,760 | AFR |
| (10)TOURNAMENT PLAYERS CLUB OF PRINCETON INC | a(i) | 706 | AFR |
| (11)TOURNAMENT PLAYERS CLUB AT SUGARLOAF INC | a(i) | 464,205 | AFR |
| (12)TOURNAMENT PLAYERS CLUB OF ILLINOIS INC | a(i) | 126,764 | AFR |
| (13)TOURNAMENT PLAYERS CLUB OF MINNESOTA INC | a(i) | 309,951 | AFR |
| (14)TOURNAMENT PLAYERS CLUB OF NORTH CAROLINA INC | a(i) | 59,186 | AFR |
| (15)TOURNAMENT PLAYERS CLUB OF CALIFORNIA INC | a(i) | 24,469 | AFR |
| (16)PGA TOUR HOLDINGS INC | a(i) | 108,607 | AFR |
| (17)PGA TOUR TRAVEL INC | a(i) | 94,171 | AFR |
| (18)PGA TOUR LICENSED PROPERTIES INC | a(i) | 321,951 | AFR |
| (19)PGA TOUR MANAGEMENT SERVICES INC | a(i) | 1,196 | AFR |
| (20)TOURNAMENT PLAYERS CLUB OF BOSTON AT GREATWOO | a(ii) | 173,939 | ARMS LENGTH |

PGA TOUR INC - Full Filing- Nonprofit Explorer - ProPublica

| | | | |
|---|---|---|---|
| (21)TOURNAMENT PLAYERS CLUB OF ILLINOIS LLC | a(iii | 136,176 | ARMS LENGTH |
| (22)PGA TOUR GOLF COURSE PROPERTIES INC | a(iii | 8,753,343 | ARMS LENGTH |
| (23)TOURNAMENT PLAYERS CLUB OF CONNECTICUT INC | a(iii | 34,500 | ARMS LENGTH |
| (24)TOURNAMENT PLAYERS CLUB AT AVENEL INC | a(iii | 117,260 | ARMS LENGTH |
| (25)TOURNAMENT PLAYERS CLUB AT SOUTHWIND INC | a(iii | 35,540 | ARMS LENGTH |
| (26)TOURNAMENT PLAYERS CLUB AT SUMMERLIN INC | a(iii | 62,285 | ARMS LENGTH |
| (27)TOURNAMENT PLAYERS CLUB OF CINCINNATI INC | a(iii | 165,676 | ARMS LENGTH |
| (28)TOURNAMENT PLAYERS CLUB AT SUGARLOAF INC | a(iii | 34,185 | ARMS LENGTH |
| (29)TOURNAMENT PLAYERS CLUB OF MINNESOTA INC | a(iii | 151,756 | ARMS LENGTH |
| (30)PGA TOUR GOLF COURSE PROPERTIES INC | a(iv) | 205,032 | ARMS LENGTH |
| (31)PGA TOUR CONSTRUCTION SERVICES INC | a(iv) | 33,150 | ARMS LENGTH |
| (32)PGA TOUR DESIGN SERVICES INC | a(iv) | 33,150 | ARMS LENGTH |
| (33)PGA TOUR CHARITIES INC | b | 4,425,295 | CASH VALUE |
| (34)PGA TOUR GOLF COURSE PROPERTIES INC | d | 26,221,761 | CASH VALUE |
| (35)PGA TOUR MEDIA CENTER INC | d | 1,222,084 | CASH VALUE |
| (36)PGA TOUR CONSTRUCTION SERVICES INC | d | 1,493,567 | CASH VALUE |
| (37)PGA TOUR DESIGN SERVICES INC | d | 103,777 | CASH VALUE |
| (38)TOURNAMENT PLAYERS CLUB AT SAWGRASS INC | d | 3,221,084 | CASH VALUE |
| (39)TOURNAMENT PLAYERS CLUB OF CONNECTICUT INC | d | 13,677,625 | CASH VALUE |
| (40)TOURNAMENT PLAYERS CLUB AT SOUTHWIND INC | d | 3,264,426 | CASH VALUE |
| (41)TOURNAMENT PLAYERS CLUB AT SUMMERLIN INC | d | 2,766,732 | CASH VALUE |
| (42)TOURNAMENT PLAYERS CLUB OF CINCINNATI INC | d | 1,793,835 | CASH VALUE |
| (43)TOURNAMENT PLAYERS CLUB OF PRINCETON INC | d | 312,835 | CASH VALUE |
| (44)TOURNAMENT PLAYERS CLUB AT SUGARLOAF INC | d | 8,280,944 | CASH VALUE |
| (45)TOURNAMENT PLAYERS CLUB OF ILLINOIS INC | d | 1,892,790 | CASH VALUE |
| (46)TOURNAMENT PLAYERS CLUB OF MINNESOTA INC | d | 1,682,469 | CASH VALUE |
| (47)TOURNAMENT PLAYERS CLUB OF NORTH CAROLINA INC | d | 130,006 | CASH VALUE |
| (48)TOURNAMENT PLAYERS CLUB OF CALIFORNIA INC | d | 410,895 | CASH VALUE |
| (49)PGA TOUR HOLDINGS INC | d | 10,172,014 | CASH VALUE |
| (50)PGA TOUR TRAVEL INC | d | 780,214 | CASH VALUE |
| (51)PGA TOUR GOLF COURSE PROPERTIES INC | e | 67,780,841 | CASH VALUE |
| (52)PGA TOUR INVESTMENTS FINANCE INC | e | 10,946,951 | CASH VALUE |
| (53)TOUR AIR INC | e | 938,806 | CASH VALUE |
| (54)TOURNAMENT PLAYERS CLUB AT AVENEL INC | e | 361,480 | CASH VALUE |
| (55)TOURNAMENT PLAYERS CLUB OF SCOTTSDALE INC | e | 2,746,701 | CASH VALUE |
| (56)TOURNAMENT PLAYERS CLUB OF MASSACHUSETTS INC | e | 937,696 | CASH VALUE |
| (57)TOURNAMENT PLAYERS CLUB OF MCKINNEY INC | e | 909,131 | CASH VALUE |
| (58)PGA TOUR GOLF COURSE PROPERTIES INC | g | 3,800,000 | ARMS LENGTH |
| (59)TOURNAMENT PLAYERS CLUB AT SAWGRASS INC | k | 5,947,403 | ARMS LENGTH |
| (60)TOURNAMENT PLAYERS CLUB OF LOUISIANA INC | k | 760,000 | ARMS LENGTH |
| (61)PGA TOUR GOLF COURSE PROPERTIES INC | l | 6,738,007 | ARMS LENGTH |
| (62)TOURNAMENT PLAYERS CLUB OF BOSTON AT GREATWOO | m | 77,244 | ARMS LENGTH |
| (63)PGA TOUR GOLF COURSE PROPERTIES INC | m | 6,813,577 | ARMS LENGTH |
| (64)TOUR AIR INC | m | 3,771,590 | ARMS LENGTH |
| (65)TOURNAMENT PLAYERS CLUB AT SAWGRASS INC | m | 4,419,027 | ARMS LENGTH |
| (66)TOURNAMENT PLAYERS CLUB OF CONNECTICUT INC | m | 165,393 | ARMS LENGTH |
| (67)TOURNAMENT PLAYERS CLUB AT AVENEL INC | m | 71,949 | ARMS LENGTH |
| (68)TOURNAMENT PLAYERS CLUB OF SCOTTSDALE INC | m | 113,852 | ARMS LENGTH |
| (69)TOURNAMENT PLAYERS CLUB AT SOUTHWIND INC | m | 328,765 | ARMS LENGTH |
| (70)TOURNAMENT PLAYERS CLUB OF PRINCETON INC | m | 121,269 | ARMS LENGTH |
| (71)PGA TOUR HOLDINGS INC | m | 3,334,487 | ARMS LENGTH |
| (72)PGA TOUR TRAVEL INC | m | 497,736 | ARMS LENGTH |
| (73)PGA TOUR GOLF COURSE PROPERTIES INC | q | 1,076,534 | COST |
| (74)PGA TOUR GOLF COURSE PROPERTIES INC | r | 786,263 | CASH VALUE |
| (75)PGA TOUR INVESTMENTS FINANCE INC | r | 2,289,607 | CASH VALUE |
| (76)PARK INVESTMENTS INC | r | 131,436 | CASH VALUE |
| (77)TOURNAMENT PLAYERS CLUB AT AVENEL INC | r | 114,755 | CASH VALUE |

| | | | |
|---|---|---|---|
| (78)TOURNAMENT PLAYERS CLUB OF SCOTTSDALE INC | r | 172,769 | CASH VALUE |
| (79)TOURNAMENT PLAYERS CLUB OF LOUISIANA INC | r | 1,502,996 | CASH VALUE |
| (80)TOURNAMENT PLAYERS CLUB OF MASSACHUSETTS INC | r | 274,257 | CASH VALUE |
| (81)TOURNAMENT PLAYERS CLUB OF PRINCETON INC | r | 129,969 | CASH VALUE |
| (82)PGA TOUR HOLDINGS INC | r | 1,346,725 | CASH VALUE |
| (83)SELECT TICKETS | r | 249,311 | CASH VALUE |
| (84)GOLF COURSE PROPERTIES INC | s | 79,597 | CASH VALUE |
| (85)TOURNAMENT PLAYERS CLUB AT SUMMERLIN INC | s | 90,032 | CASH VALUE |
| (86)PGA TOUR LICENSED PROPERTIES INC | s | 1,863,522 | CASH VALUE |
| (87)PGA TOUR GLOBAL CONSULTING INC | s | 285,460 | CASH VALUE |

Schedule R (Form 990) 2019

—————— Page 4 ——————

Schedule R (Form 990) 2019 — — — — — — — — — — — — — — — — — — — — — — — Page **4**

**Part VI    Unrelated Organizations Taxable as a Partnership.** Complete if the organization answered "Yes" on Form 990, Part IV, line 37.

Provide the following information for each entity taxed as a partnership through which the organization conducted more than five percent of its activities (measured by total assets or gross revenue) that was not a related organization. See instructions regarding exclusion for certain investment partnerships.

| (a)<br>Name, address, and EIN of entity | (b)<br>Primary activity | (c)<br>Legal domicile (state or foreign country) | (d)<br>Predominant income (related, unrelated, excluded from tax under sections 512-514) | (e)<br>Are all partners section 501(c)(3) organizations? | | (f)<br>Share of total income | (g)<br>Share of end-of-year assets | (h)<br>Disproportionate allocations? | | (i)<br>Code V-UBI amount in box 20 of Schedule K-1 (Form 1065) | (j)<br>General or managing partner? | | (k)<br>Percentage ownership |
|---|---|---|---|---|---|---|---|---|---|---|---|---|---|
| | | | | Yes | No | | | Yes | No | | Yes | No | |
| | | | | | | | | | | | | | |
| | | | | | | | | | | | | | |
| | | | | | | | | | | | | | |
| | | | | | | | | | | | | | |
| | | | | | | | | | | | | | |
| | | | | | | | | | | | | | |
| | | | | | | | | | | | | | |
| | | | | | | | | | | | | | |
| | | | | | | | | | | | | | |
| | | | | | | | | | | | | | |
| | | | | | | | | | | | | | |
| | | | | | | | | | | | | | |
| | | | | | | | | | | | | | |
| | | | | | | | | | | | | | |

Schedule R (Form 990) 2019

—————— Page 5 ——————

Schedule R (Form 990) 2019 — — — — — — — — — — — — — — — — — — — — — — — Page **5**

**Part VII    Supplemental Information**

Provide additional information for responses to questions on Schedule R. (see instructions).

| Return Reference | Explanation |
|---|---|
| | |

Schedule R (Form 990) 2019

**Additional Data**

[ Return to Form ]

Software ID:
Software Version: