## UNITED STATES DISTRICT COURT
## DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| **LIV GOLF, INC,** | ) | |
| | ) | **Case No. 1:22-mc-00126-CJN** |
| **Movant,** | ) | |
| | ) | Underlying Case, LIV Golf, Inc., et |
| **v.** | ) | al. v. PGA Tour, Inc., pending in the |
| | ) | United States District Court for the |
| **CLOUT PUBLIC AFFAIRS, LLC,** | ) | Northern District of California: |
| | ) | |
| **Respondent.** | ) | Case No. 5:22-cv-04486-BLF |
| | ) | |

## RESPONDENT'S RESPONSE IN OPPOSITION
## TO MOVANT'S MOTION TO COMPEL

**Table of Contents**

INTRODUCTION ........................................................................................ 1

BACKGROUND ...................................................................................... 4

    I.    LIV Was Conceived by the Kingdom of Saudi Arabi as a Political
        Strategy for Manipulating Americans to Forget Their Revulsion
        for the Saudi Regime. ........................................................................ 4

        A.  LIV Was Conceived by the Saudis' Consultants as a Political Vehicle .. 5

        B.  The American Public's "Revulsion" of Saudi Activities Long
           Predated, and Caused the Creation of, LIV _____. ........................ 6

             1.  The Murder of Journalist-Dissident Jamal Khashoggi to
                Silence His Political Activities in the United States. ................... 6

             2.  Allegations Regarding the Kingdom's Relationship to the
                September 11, 2001 Terror Attacks ........................................ 8

             3.  The Kingdom's Human Rights Record ..................................... 11

             4.  Oil production and gas prices ............................................... 12

        C.  LIV Jumped in to the American Political Debate Surrounding the
           Kingdom Without Any Effort by the Tour or Clout. ..................... 13

    II.   Clout Was Hired to Advise and Consult the Tour ............................ 14

    III.  Clout's Was Hired to Work for 9/11 Justice, its Client ..................... 17

ARGUMENT .......................................................................................... 20

    I.    Legal Standard for Motions to Compel Under Rule 45 ..................... 20

    II.   The Subpoena Imposes an Undue Burden on Clout .......................... 21

        A.  LIV Refused to Explain Why the Trove of Documents Being
           Produced by the PGA Tour Is Insufficient, Which Was Essential
           to Rebutting Clout's "Undue Burden" Objection. ..................... 21

        B.  LIV Cannot Trivialize Clout's Burden by Citing Itself as the
           Measuring Stick ............................................................. 24

    III.  The Requests Seek Political Intelligence Against Saudi Opponents
        That Is Largely Irrelevant to the Antitrust Litigation ..................... 25

A.  Categories 1 and 3: Clout Communications with the PGA Tour, or to Outsiders on the PGA Tour's Behalf ................................27

    1.  These materials are only conditionally relevant, and LIV cannot show that anti-Saudi sentiment traces to the Tour, rather than the Saudis' widely reported and unpopular conduct ..27

    2.  LIV's Relevance Claims Fail on Their Own Terms ................29

B.  Category 2: Clout's Exclusively Internal Communications about the Tour ................................30

C.  Categories 4, 5, and 6: another Clout Client, 9/11 Justice ................32

IV.  The First Amendment Protects Clout's Communications and Work With 9/11 Justice ................................34

A.  The First Amendment Privilege Applies to Civil Discovery Subpoenas ..35

B.  The Privilege Applies to Protect Clout ................................37

    1.  Clout Has a Substantial First Amendment Privilege Claim ................37

        (a) LIV Seeks Communications Made in Preparation for Political Advocacy ................................37

        (b) Deliberations that Are Internal to Political Association Receive Special Protection ................................38

        (c) Clout Can Assert First Amendment Rights in it Political Associations With 9/11 Justice ................................39

        (d) Disclosure Threatens to Chill Clout and 9/11 Justice's Association ................................42

    2.  LIV Does Not Have a Legitimate Litigation Need for Clout's Communications with 9/11 Justice ................................44

        (a) Heart of the Lawsuit ................................44

        (b) Alternative Sources and Reasonable Attempts to Locate the Information Elsewhere ................................45

CONCLUSION ................................45

## INTRODUCTION

LIV Golf's Motion to Compel Compliance with its Subpoena to Clout Public Affairs fails the most fundamental test of Rule 45: it fails to show that relevant materials (if any) cannot be had directly from LIV's opponent, the PGA Tour. Clout is a public relations boutique that cannot be forced to duplicate party discovery. It cannot command the resources of the Tour. It certainly cannot match LIV's owner, the $620 billion sovereign wealth fund of the Kingdom of Saudi Arabia, which has sunk economically insensible sums into an entity that fronts as a "golf league," but that (as shown below) was conceived and operated as a PR vehicle to manipulate the American public into forgetting their persistent abhorrence of the Kingdom's actions.

Through dozens of exhibits it has freely received from the Tour, LIV's filings show that what it thinks it needs, it has.[1] The Subpoena to Clout is really an effort to build an intelligence file on another Clout client: 9/11 Justice, an entity composed of 9/11 families who continue to advance their own Multi-District Litigation against the Kingdom in New York and who have joined with other critics of the Saudi regime to call for full disclosure of the Kingdom's ties to the September 11 terrorist attacks and other atrocities. These include the heirs of Jamal Khashoggi, a murdered Washington Post journalist, dissident, and potential witness in the 9/11 families' litigation. As shown below, U.S. intelligence believes the Saudis lured Mr. Khashoggi from Virginia to their consulate in Turkey, where he was brutally murdered and dismembered in an effort to stop his U.S. political activities. The families also work with many U.S. reporters who have covered the Kingdom (some of whom report having been hacked), and work in this District and elsewhere for legislation and executive action to help them in holding the Saudis accountable. Now, LIV has brazenly hired a firm in the United States to track and monitor the activities of these

---

[1] This includes a supplemental LIV filing over the holidays. (Doc. 9).

9/11 victims and families, while simultaneously, through the underlying lawsuit, using antitrust discovery to now sift Clout's communications with these families, even if they have nothing to do with LIV, golf, or golfers. This not only violates Rules 45 and 26, it abridges the First Amendment Privilege Clout shares with 9/11 Justice. The Court should reject this overreach.

LIV also seeks all of Clout's communications with, messages on behalf of, and internal notes regarding its work for, the PGA Tour. As shown in Argument Point II, *infra*, this presents an undue burden because any documents that could be relevant are necessarily in the Tour's possession, and are being produced by it *en masse*. LIV knew Clout had raised this objection, but its brief failed to show that the Tour was failing to turn over responsive documents. Under Rules 26 and 45, the Tour must be the first stop (and, unless it fails in its obligation) the last stop.

LIV presses further, however, asserting that the Tour may lack records of any Clout communications with third parties on behalf of the Tour, and by definition cannot have Clout's internal notes, drafts, and thoughts that were shared solely among Clout staff. This argument founders on the shoals of relevance and logic.

First, what Clout thought and never shared with the Tour or anyone else cannot be attributed to the Tour, as if Clout's thoughts were the Tour's thoughts. Second, LIV posits that Clout's work is relevant at all because it shows the Tour's "pretext," that is, conduct by the Tour that is inconsistent with neutral justifications it asserts for allegedly anticompetitive conduct. Thus, LIV says, the PGA Tour's reasons for opposing players' links with LIV were not because the Tour truly wished to avoid a Saudi taint. LIV says it aims to prove this by showing that the Tour itself helped to make golfers and the public aware of Saudi links to LIV, and that it did so in part by confidentially aiding groups who already had longstanding and just grievances against the Saudis. But this theory of relevance makes no sense. If the PGA Tour truly cared about the reputation of

professional golf and golfers, one would expect it to do just what it did, making every effort to ensure that golfers and the public are aware of Saudi atrocities and its sports-washing scheme now, not later when it is too late. The Tour's conduct was fully consistent with its stated position.

But LIV's argument is wrong on an even more fundamental ground. It assumes as a matter of fact that LIV's and the Saudis' reputations were pristine until the Tour criticized them, as if the firestorm from across the media and political spectrum would have been gentle murmurs of support had it not been for Clout's advice to the Tour and the Tour's ensuing media work. LIV even references "*purported* anti-Saudi sentiment," as if the long-held, passionately articulated advocacy of 9/11 families and victims of Saudi atrocities, and the intense revulsion by the American public that actually caused the creation of LIV, are fantasies. In LIV's dream world, the American public has been pro-Saudi and was only recently manipulated into asking questions about LIV by the Tour. But LIV's Brief—where it should have proved this foundational premise—is utterly silent on this point. It could not be otherwise. As shown in the Background, *infra*, LIV's casual assumption that it is a simple golf league that was suddenly smeared with an unexpected political attack is utterly false. LIV was conceived as a PR vehicle by Kingdom consultants as a last-ditch effort to dull the massive public backlash from the Khashoggi murder and other current events. LIV then committed a series of egregious errors—or, rather, made a series of admissions, during its launch. Key LIV spokesman Phil Mickelson—reportedly paid $200 million—candidly admitted to the public that his new bosses were "scary mother****ers" and had killed Khashoggi. LIV Commissioner Greg Norman elicited howls of outrage when he called the brutal, planned murder of a U.S.-based journalist a "mistake" that anyone can make and "learn from." The American press, public and political class took notice. LIV lobbying and press efforts backfired spectacularly. These failures were not "astroturf" laid down by Clout or the Tour, they were the

3

inevitable result of the Kingdom's miscalculation that Americans would dully and mindlessly accept LIV as a new, benign face for a brutal regime.

LIV's factually and logically deficient "pretext" argument is itself a pretext for intimidating and punishing Clout and its other clients. To the extent LIV wants to paint a full picture of the Tour's publicity campaign and the Tour's own thinking, the Tour holds the documents. To the extent LIV can show that Clout actually did work on its own with the Tour's direction or approval (something that LIV's large and growing documentary record does not show), then again, the documents referencing that direction and approval must reside with the Tour. A full review and production of tens of thousands of documents regarding every thought Clout has ever had regarding the Tour, and regarding any advice Clout has ever given 9/11 groups outside of LIV or golf issues, is pure harassment. The Court should deny LIV's Motion to Compel.

## BACKGROUND

### I. LIV Was Conceived by the Kingdom of Saudi Arabia as a Political Strategy for Manipulating Americans to Forget Their Revulsion for the Saudi Regime.

Movant LIV was created by the Kingdom of Saudi Arabia as a political and public relations vehicle to counteract years of negative publicity in the United States. As shown below, American public opinion began to turn against the Saudis in the 2000s after federal intelligence assessments detailed the Kingdom's alleged role in the September 11, 2001, terror attacks, and groups of 9/11-impacted families began to publicly call for government action against the Saudis. Public opinion continued to plummet after the brutal 2018 murder of Washington Post journalist Jamal Khashoggi, which American intelligence analysts attributed to the Saudi leadership. It sank lower in 2022 when the Kingdom indicated it was unwilling to increase oil production to counteract price shocks resulting from Russia's invasion of Ukraine. These events, in addition to the Saudis' well-known record on human rights abuses, had become their established international brand.

**A. LIV Was Conceived by the Saudis' Consultants as a Political Vehicle**

Against this backdrop of reputational demise, LIV was conceived in 2021 under the code name, "Project Wedge." [2] McKinsey & Company, the Saudis' longtime management consultants, analyzed the financial viability of Project Wedge for the Public Investment Fund ("PIF"), Saudi Arabia's $620 billion-plus sovereign wealth fund. *Id*. McKinsey was uncertain that PIF's multibillion dollar investment in LIV would turn a profit. *Id*. Yet the Saudis persisted, given LIV's purpose to "establish[] the legitimacy" of the Kingdom with Western policymakers. *Id*.

Consistent with that plan, LIV quickly launched a massive PR and lobbying effort in the United States. It focused on building legitimacy by developing the appearance of third-party support from individuals and firms with credibility on both sides of the political aisle. It hired former White House Press Secretary Ari Fleischer, a man closely identified with the response of President George W. Bush to the September 11 terror attacks, in part, to preside over two difficult press conferences at LIV's first events in June 2022.[3] LIV also hired well-known lobbyists and sent its chief executive and commissioner, Greg Norman, to Washington, DC, to lobby members of both parties while also trying to drive their narrative through the press.[4] Finally, LIV even stooped to the level of hiring consultants to "monitor and track" 9/11 families who were advocating against it within the United States.[5] American news outlets reported that at least as of October 2022, even though LIV was created and funded by the Kingdom's Public Investment Fund, none

---

[2] Ex. C, ¶ 29, Alan Blinder and Sarah Hurtes, *Confidential Records Show a Saudi Golf Tour Built on Far-Fetched Assumptions*, New York Times, Dec. 11, 2022.

[3] Ex. C, ¶ 31, Dave Zirin, *Everybody Has a Price: Ari Fleischer, the LIV Golf Tour, and the House of Saud*, The Nation, Sept. 13, 2022; Ex. C, ¶ 32, Ewan Larkin, *LIV Golf Hires Fleischer Communications*, PR Week, June 9, 2022.

[4] Ex. C, ¶ 33, Matt Bonesteel and Rick Maese, *Greg Norman to Lobby on Behalf of LIV Golf*, Washington Post, Sept. 19, 2022.

[5] Ex. C, ¶ 23, Hailey Fuchs, *LIV Golf Enlists NRA-tied Firm as Consultants*, Politico, Oct. 11, 2022.

of these lobbyists and spokesmen had registered under the Foreign Agents Registration Act, 22 U.S.C. § 611, which generally requires registrations of individuals who engage in political, public relations, and other activities on behalf of foreign principals in the United States.[6] LIV instead sought—contrary to its original planning documents and the intentions of those hired to help it— to portray itself as sports-focused, unconnected to the political goals of its Saudi controllers.

### B. The American Public's "Revulsion" of Saudi Activities Long Predated, and Caused the Creation of, LIV.

#### 1. The Murder of Journalist-Dissident Jamal Khashoggi to Silence His Political Activities in the United States

The Saudis' publicity push was necessary because the Kingdom's standing in both American politics and general public opinion had been very recently and severely damaged. For years, Americans had debated responsibility for the September 11 terrorist attacks, the Kingdom's human rights record, and its oil production policies. But in 2018, the Kingdom's image took a severe hit with the 2018 murder of Washington Post journalist and Saudi dissident Jamal Khashoggi in the Kingdom's Istanbul consulate.[7] It was widely reported, including at the highest levels of the United States government's intelligence apparatus, that Khashoggi, a Virginia resident, was invited to the Saudis' Istanbul consulate under a promise of guaranteed safety by none other than Khalid bin Salman, the Saudi Ambassador to the United States and brother of the

---

[6] *Id.*

[7] Ex. C, ¶ 4, Shane Harris, Greg Miller, and Josh Dawsey, *CIA Concludes Saudi Crown Prince Ordered Jamal Khashoggi*, Washington Post, Nov. 16, 2018.

Kingdom's *de facto* ruler, Crown Prince Mohammed bin Salman.[8] Khashoggi was murdered shortly after entering the consulate; his body was allegedly dismembered and disposed of.[9]

The incident "caused widespread revulsion, causing the crown prince to be given the cold shoulder by the international community." [10] The ramifications of this historic act were not limited to the international community. In domestic American politics, too, the culpability of the highest levels of the Saudi government became a key issue, including in the 2020 election. The Biden-Harris ticket vociferously criticized the Trump Administration for not taking a harder line against the Saudis, calling for "consequences" for Khashoggi being "butchered" in a "flat-out murder." [11]

The debate continued to rage after President Biden took office. Dozens of Saudis, including some government officials, were sanctioned, but the degree of sanction—and whether it matched President Biden's earlier rhetoric—became a new point of contention.[12] The controversy continued to build around a widely-publicized meeting between President Biden and the Crown Prince in July 2022, in which the President claimed to have told the Crown Prince directly that he held him responsible for the Khashoggi murder.[13]

While the international community has not wavered from its position that the Kingdom was responsible for the planning and execution of this event, as 2022 came to a close, the Biden

---

[8] *Id.*

[9] Ex. C, ¶ 5, Andrew Kaczynski and Em Steck, *Biden and his Top Officials Slammed Trump's Lack of Action Against Saudi Arabia, MBS in Years Before Taking Office*, CNN Politics, Mar. 3, 2021.

[10] Ex. C, ¶ 6, Raffi Berg, *Jamal Khashoggi: Saudi Embassy Street in US Renamed After Murdered Journalist*, BBC, June 16, 2022.

[11] Ex. C, ¶ 5, Andrew Kaczynski and Em Steck, *Biden and his Top Officials Slammed Trump's Lack of Action Against Saudi Arabia, MBS in Years Before Taking Office*, CNN Politics, Mar. 3, 2021.

[12] *Id.*

[13] Ex. C, ¶ 7, Dan Whitcomb and Steve Holland, *Biden Administration says Saudi Prince has Immunity in Khashoggi Killing Lawsuit*, Reuters, Nov. 22, 2022.

Administration lodged its view that the Crown Prince was personally entitled to head-of-state immunity in a lawsuit pending in this District.[14] In that lawsuit, Khashoggi's ex-fiancée, Hatice Cengiz, leads a group of plaintiffs against the Crown Prince and other defendants for Khashoggi's murder. The Plaintiffs argue that Khashoggi was lured from Virginia to Istanbul and murdered "to stop his political activities in this country." [15]

Importantly, LIV does not and cannot show that the years-long outrage over Khashoggi's murder—including the national and international press articles cited above—are part of the "astro-turf" campaign that the Tour and Clout somehow generated to oppose LIV's golf tour. That is because the opposite is true: the Khashoggi controversy long predates and overshadows the world of golf. Indeed, it was Americans' persistent outrage over Khashoggi that convinced the Saudis and McKinsey to conceive of LIV, not the other way around.

### 2. Allegations Regarding the Kingdom's Relationship to the September 11, 2001 Terror Attacks

Yet the roots of LIV run even deeper, as the Khashoggi outrage did not suddenly appear against a background of pro-Saudi American sentiment. Almost immediately after the September 11, 2001, terror attacks killed nearly 3,000 people in New York, the Pentagon, and Pennsylvania, Congress and federal law enforcement and intelligence began to investigate the hijackers' network. On December 20, 2002, a Congressional Joint Inquiry issued a 838-page report with 28 redacted pages that reportedly discussed Saudi government links.[16] Those pages, finally made public in

---

[14] *Hatice Cengiz v. Mohammed bin Salman*, No. 1:20-cv-03009-JDB (D.D.C. 2020)

[15] *Id.*, Plaintiffs' Response to the Government's Statement of Interest, Doc. 55, p. 8, filed November 29, 2022. *See also* Ex. C, ¶ 7, Dan Whitcomb and Steve Holland, *Biden Administration says Saudi Prince has Immunity in Khashoggi Killing Lawsuit*, Reuters, Nov. 22, 2022 (reporting on controversy over the Administration's legal position).

[16] Ex. C, ¶ 26, Report of the U.S. Senate Select Comm. on Intelligence and U.S. House Permanent Select Comm. on Intelligence, *Joint Inquiry into Intelligence Community Activities Before and After the Terrorist Attacks of September 11, 2001*, S. Rept. No. 107-351, H. Rept. No. 107-792.

2016, confirmed that some hijackers "were in contact with, and received support or assistance from, individuals who may be connected to the Saudi Government" while in the United States.[17]

These disclosures had sparked a wave of outrage against the Saudis long before they had even begun to dream up Project Wedge/LIV. During the 2016 presidential race, former president Donald Trump, one of LIV's biggest supporters whose own properties hosted at least two LIV golf events, pointedly opined on live national TV: "Who blew up the World Trade Center? It wasn't the Iraqis, it was Saudi — take a look at Saudi Arabia, open the documents." [18] *See also* Ex. C, ¶ 9, YouTube (continuing, "We ought to get Bush or somebody to have the documents opened. Because, frankly, if you open the documents, I think you're gonna see that it was Saudi Arabia.").[19]

The impact of these partial government disclosures did not stop with the 2016 election campaign. First, the disclosures assisted groups of affected families, who organized for legislative action and filed litigation. Their efforts yielded bipartisan support. Later in 2016, Congress overrode a presidential veto to pass the Justice Against Sponsors of Terrorism Act (JASTA), which allowed individuals to hold foreign governments liable in federal courts for supporting terrorist attacks on American soil.[20] That same year, relying on the new law, families who lost loved ones, and others who were injured, sued the Kingdom and other defendants in the United States District Court for the Southern District of New York. That lawsuit, a Multi-District Litigation, remains

---

[17] Ex. C, ¶ 27, Jim Sciutto, Ryan Browne, and Deirdre Walsh, *Congress Releases Secret '28 pages' on Alleged Saudi 9/11 Ties*, CNN Politics, July 15, 2016.

[18] Ex. C, ¶ 8, Eric Levitz, *Donald Trump Suggested Saudi Arabia Was Behind 9/11 Multiple Times Wednesday*, New York Magazine, Feb. 17, 2016.

[19] Ex. C, ¶ 9, *Donald Trump Interview on Fox and Friends 2/17/16*, YouTube, posted Feb. 17, 2016, available at https://www.youtube.com/watch?v=j_DhzJL0I34 (last visited Jan. 3, 2023).

[20] Ex. C, ¶ 28, Congressional History of S.2040, *Justice Against Sponsors of Terrism Act*, 114th Congress, available at https://www.congress.gov/bill/114th-congress/senate-bill/2040/actions.

pending.[21] The 9/11 Plaintiffs' lawsuit continues to be well-publicized, and it had nothing to do with LIV, the PGA Tour, or Clout, having long predated the current controversy.

Further, the 9/11 families began an effort—which continues over two decades later—to enlist Congressional support for the declassification of more intelligence records relating to alleged Saudi involvement in the September 11 attacks. The 9/11 Families United group, for example, supported the September 11 Transparency Act in the last Congress (S. 2654/H.R. 4958), which had bipartisan lead sponsorship.[22] That bill was introduced on August 4, 2021, before LIV was even launched. Another families group, 9/11 Justice, also supports this legislation.[23]

The families have previously expressed concern that their advocacy and litigation efforts surrounding the September 11 attacks have made them targets of the Saudis. Approximately one year before his assassination, Khashoggi had been identified as a potential witness and interviewed by investigators for the Plaintiffs' committee in the MDL. Within their litigation, the plaintiffs cited the Khashoggi murder as an objective basis for U.S.-based opponents of the Saudi regime—including potential witnesses in their case—to fear for their safety.[24]

Finally, outside of their litigation and specific legislative initiatives, the 9/11 families and surviving victims joined with Khashoggi allies in pressuring President Biden to hold the Saudis accountable in advance of his July 2022 trip to visit the Kingdom.[25] As part of that effort, 9/11 Families United—not a Clout client—issued a press release outlining the results of a "recently-

---

[21] *In re: Terrorist Attacks on September 11, 2001*, No. 1:03-md-01570-GBD-SN (S.D.N.Y. 2003).
[22] Ex. C, ¶ 10, *Legislative Action*, 9/11 Families United, https://911familiesunited.org/legislative-action/ (last visited Jan. 3, 2023).
[23] Ex. C, ¶ 30, *Political Support*, 9/11 Justice, https://www.911justice.org/political_support (last visited Jan. 3, 2023).
[24] Ex. C, ¶ 37, *In re: Terrorist Attacks*, No. 1:03-md-01570-GBD-SN, Doc. 6003-2.
[25] Ex. C, ¶ 11, Ben Gittleson and Armando Garcia, *9/11 Families Respond to Biden Saudi Arabia Trip: 'Empathy is Not Enough'*, ABC News, June 14, 2022.

declassified FBI investigation," which noted that a Saudi militant network "was created, funded, directed, and supported by [the Kingdom]", and that "Saudi government officials and intelligence officers were directly operating and supporting the entities involved with this network." [26]

In short, the devastating September 11 terror attacks, and their ongoing reverberation throughout American politics and culture through the above-referenced litigation, legislative, and public relations efforts of 9/11 families, long predate LIV and have nothing to do with the Tour or Clout. Instead, this controversy is what catalyzed the Saudis to launch Project Wedge (LIV).

### 3. The Kingdom's Human Rights Record

In addition to "revulsion" of the Khashoggi murder and September 11, Saudi Arabia also faces bi-partisan scrutiny due to its deplorable record on human rights. In its 2021 Country Reports on Human Rights Practices,[27] the U.S. State Department lays out a selection of these abuses:

> Significant human rights issues included credible reports of: executions for nonviolent offenses; forced disappearances; torture and cases of cruel, inhuman, or degrading treatment of prisoners and detainees by government agents; harsh and life-threatening prison conditions; arbitrary arrest and detention; political prisoners or detainees; harassment and intimidation against Saudi dissidents living abroad; arbitrary or unlawful interference with privacy; collective punishment of family members for offenses allegedly committed by an individual; serious abuses in a conflict, including civilian casualties and damage to civilian infrastructure as a result of airstrikes in Yemen; serious restrictions on free expression and media, including unjustified arrests or prosecutions against journalists and others, and censorship; serious restrictions on internet freedom; substantial interference with the freedom of peaceful assembly and freedom of association, including overly restrictive laws on the organization, funding, or operation of nongovernmental organizations and civil society organizations; severe restrictions of religious freedom; restrictions on freedom of movement; inability of citizens to choose their

---

[26] Ex. C, ¶ 12, *ICYMI: President Biden Must Hold Kingdom of Saudi Arabia Accountable for 9/11 Attacks*, 9/11 Families United, https://911familiesunited.org/icymi-president-biden-must-hold-kingdom-of-saudi-arabia-accountable-for-9-11-attacks/ (last visited Jan. 3, 2023).

[27] Ex. C, ¶ 13, *Saudi Arabia 2021 Human Rights Report*, Country Reports on Human Rights Practices for 2021, U.S. Dept. of State, available at https://www.state.gov/wp-content/uploads/2022/03/313615_SAUDI-ARABIA-2021-HUMAN-RIGHTS-REPORT.pdf.

government peacefully through free and fair elections; serious and unreasonable restrictions on political participation; serious government restrictions on domestic and international human rights organizations; lack of investigation of and accountability for gender-based violence, including but not limited to domestic and intimate partner violence; criminalization of consensual same-sex sexual activity; and restrictions on workers' freedom of association, the role of trade unions, and labor committees.

Again, LIV does not and cannot show that the Tour or Clout created public sentiment against them on the Kingdom's dismal human rights record. As the State Department's 2021 report shows, those concerns were longstanding and were very much current.

### 4.  Oil production and gas prices

Finally, as was recently publicly reported, when domestic gas prices spiked partly due to a supply shock arising from Russia's invasion of Ukraine, it was Saudi Arabia that refused to help increase oil production. As was widely reported, when President Biden traveled to Saudi Arabia, he allegedly reached an agreement with the Crown Prince to have the Kingdom boost production.[28] However, shortly thereafter, Saudi Arabia reneged and worked with Russia and others to implement a 2 million barrel per day reduction in output.[29] The result in the United States was a continued increase in oil prices.[30]

In fact, according to Morning Consult, the American public's views of Saudi Arabia reached a low for 2022 after the OPEC+ oil cartel announced in early October that it would cut its production quota targets.[31] At that time, a substantial 53% majority of Americans said that they held an unfavorable opinion of the Kingdom.[32] *Id.*  Again, it is the actions of the Kingdom itself

---

[28] Ex. C, ¶ 14, Mark Mazzetti, Edward Wong, and Adam Entous, *U.S. Officials Had a Secret Oil Deal with the Saudis. Or so they Thought*, New York Times, Oct. 25, 2022.
[29] *Id.*
[30] *Id.*
[31] Ex. C, ¶ 15, Matthew Kendrick, *Saudi Arabia's Image in America Continues to Sink as Formal Relations Hit Nadir*, Morning Consult, Oct. 27, 2022.
[32] *Id.*

that have molded American's negative views and deteriorated the Kingdom's brand over the past two decades, not the recent efforts of the Tour or the advice of Clout.[33]

### C. LIV Voluntarily Jumped into the American Political Debate Surrounding the Kingdom Without Any Effort by the Tour or Clout.

Completely independent of any publicity efforts by Clout, the PGA Tour, or 9/11 Justice, LIV's own agents and supporters have openly acknowledged LIV's troubling connection to the Saudi regime. As golfer Phil Mickelson (previously a Plaintiff in the underlying case, who has been described as "arguably the face of" LIV) stated in an on-the-record discussion with sports journalist Alan Shipnuck in February of 2022, "they're (the Saudis) scary mother****ers to get involved with." [34] He added, "We know they killed Khashoggi and have a horrible record on human rights." [35] Mickelson's concerns with LIV's controllers are serious enough that he even admitted, "… I'm not even sure I even want (the Saudi Tour) to succeed, but just the idea of it is allowing us to get things done with the (PGA) Tour."[36]

Media gaffes were not limited to Mickelson. In May 2022, Greg Norman, chief executive for LIV, caused international outrage in response to a media question about the Khashoggi murder, stating, "Look, we've all made mistakes and you just want to learn from those mistakes and how you can correct them going forward." [37] The following month, LIV's Ari Fleischer-run press conferences at its initial events were also controversial. In one June 2022 event, Associated Press reporter Rob Harris "was reportedly cut off and escorted out of the press conference after trying

---

[33] *Id.*

[34] Ex. C, ¶ 16, Alena Botros, *Phil Mickelson Called the Saudis 'Scary,' but Said their LIV Golf Tour was a Major Stand Against the PGA*, Yahoo Finance, Aug. 3, 2022.

[35] Ex. C, ¶ 17, Joseph Wilkinson, *Phil Mickelson Calls Saudi Leaders 'Scary' but still Champions Upstart Golf Tour*, New York Daily News, Feb. 18, 2022.

[36] *Id.*

[37] Ex. C, ¶ 18, *Greg Norman says 'We all make Mistakes' when asked about Khashoggi Killing*, The Guardian, May 12, 2022.

to ask a follow-up question about reconciling the Saudi sportswashing attempts to buy favorable impressions via buying golfers. He was later allowed back in."[38]

A few months later, LIV's commissioner, Greg Norman, came to Capitol Hill himself to lobby legislators of both parties, including the Congressional Republican Study Committee. At least one Member of Congress reportedly walked out of the meeting in response to Norman's discussion of the Kingdom's control of LIV.[39]

These are examples of LIV's own failed efforts to influence the American public and political class, not events or stories that were somehow created by Clout or the Tour. They demonstrate that LIV's golfer-representatives have still not devised palatable, non-controversial answers for why they are willing to lend their own reputations to LIV. LIV's difficulties with the media and public are a natural reaction to the creation of a golf league that was intended to serve as a public relations and political vehicle for a foreign sovereign whose conduct on U.S. soil has made it deeply controversial with the American people. None of LIV's public miscues required the work of Clout or the PGA Tour. Instead, they highlight the argument the Tour has made in the underlying litigation: that professional golfers cannot lend their reputations to a regime like the Kingdom of Saudi Arabia without tainting themselves and the game of golf itself.

## II.    Clout Was Hired to Advise and Consult the Tour

Clout is a boutique public relations firm based in Washington, D.C. and Texas. Its primary hub is in Washington, D.C., and its president, David Polyansky, resides in Texas.[40] It has no office

---

[38] Ex. C, ¶ 34, Pat Forde, *CFP Media Consultant Ari Fleischer's Bad Publicity Tour Continues*, Sports Illustrated, June 7, 2022.
[39] Ex. C, ¶ 35, Olivier Knox, *Greg Norman, Pitching LIV Golf, Gets Rough Congress Welcome*, Washington Post, Sept. 22, 2022.
[40] Ex. A (Polyansky Dec.), ¶ 2.

in San Francisco.[41] Clout was hired by the PGA Tour to provide strategic support and advance its overall brand, covering topics well beyond the Saudis' LIV project.[42]

Plaintiffs have already received substantial discovery from the Defendant/Counterclaim Plaintiff PGA Tour regarding its work with Clout, as evidenced by the 36 public relations-related exhibits they attached to their Motion; the earliest communications between Clout and the Tour ███████████████████████,[43] but most communications date to the first half of 2022. Plaintiffs' exhibits show that through discovery from the Tour, they have full access to █████████ ████████████████████████████████████.[44] Further, Plaintiffs have received directly from the Tour something that Clout does not have, and that is far more relevant than Clout's unshared, internal thoughts and impressions: namely, ████████████████ ████████████████████████████.[45] Even over the holidays while Clout was preparing this brief, LIV received more Tour discovery and filed it in a supplemental brief in support of its Motion to Compel. (Doc. 10). LIV does not argue or suggest that the Tour's ongoing production has been incomplete in any way.

Further, the Plaintiffs' exhibits show that Clout's primary role was in providing feedback and advice to the Tour on proposed public messaging, not in serving as the Tour's press agent. Indeed, several of the exhibits—████████████████████████—do not copy Clout, show Clout work, or even reference Clout.[46] Even memos that are from Clout are of limited value because they do not show what the Tour actually did (or did not do) with Clout's advice. For

---

[41] Ex. A (Polyansky Dec.), ¶ 3.
[42] Ex. A (Polyansky Dec.), ¶ 4; *see, e.g.,* Doc. 1-2, Ex. 31 (7-page memorandum covering numerous topics, with only a passing reference to LIV).
[43] Doc. 1-2, Ex. 17.
[44] Doc. 1-2, Exs. 5, 6, 10, 11, 12.
[45] Doc. 1-2, Exs. 3, 4
[46] *See, e.g.,* Doc. 1-2, Exs. 7, 14.

example, Exhibit 16 ███████████████████████████████████████████████████████

███████████. But as shown in the rest of the Tour's production, none of these are the contacts

the Tour decided to focus on. Further, the media entities listed had either already decided to cover

Mickelson's and Norman's newsworthy comments, or are not cited by LIV as having actually

written damaging stories about LIV, its Saudi backers, or LIV golfers.

Indeed, there was no shortage of independent interest in LIV's Saudi controllers. Exhibit

17 ████████████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████. Exhibits

18-20 ██████████████████████████████████████████████████████████████████

█████████████████████████████████████████████████████████████████

█████████████████████████████████████████████████" A final trio of exhibits merely show

█████████████████████████████████████████████████████████████████

███████████████████████; Exhibit 27 shows ████████████████████; and Exhibit 35 shows

████████████████████████████. Finally, although a Clout message to the Tour

discusses the possibility of helping local mayors protest a LIV event in the Portland, Oregon, area,

Clout was not actually involved in the mayors' letter and does not know who was.[47]

None of these exhibits show Clout acting as the Tour's press agent or as an entity with

authority to directly approach media with its own pro-Tour statements; instead, they show Clout

merely strategically advising the Tour—the very sorts of communications the Tour itself should

already have and should be able to produce without burdening third parties.

---

[47] Ex. A (Polyansky Dec.), ¶ 8.

### III.   Clout's Was Hired to Work for 9/11 Justice, its Client

In June 2022, Clout was honored to be hired to work for 9/11 Justice, "a grassroots movement made up of the 9/11 community, which consists of 9/11 survivors, first responders, family members of those lost, and all volunteers and lower Manhattan residents, students and workers who are now suffering fatal illnesses due to their exposure to Ground Zero." [48] The families behind 9/11 Justice pressed to pass JASTA in 2016, and successfully pressured President Biden in September 2021—before LIV was formed—to issue an Executive Order declassifying documents from Operation Encore, an FBI investigation into Saudi complicity in the attacks. [49]

Contrary to LIV's insinuation, 9/11 Justice and other groups did not abruptly decide to criticize Saudi involvement in September 11 at the Tour's urging. First, as noted above, these families had long been involved in litigation and petitioning the government for full disclosure regarding the Saudis, and had been heavily involved in briefing the media and driving public narratives around these issues. [50] In those efforts, they had other public relations professionals. [51]

Second, as LIV knows from the Tour's production, it was the 9/11 families who approached the Tour as part of a plan to publicize their own cause—not the other way around. [52] Further, 9/11 Families United, a separate group from 9/11 Justice that is not a Clout client, issued its own press releases and public statements without any help or urging from Clout. [53] Indeed, 9/11 Families made the same easy and intuitive observation as 9/11 Justice: that LIV presented the

---

[48] Ex. C, ¶ 19, *Who Are We?*, 9/11 Justice, https://www.911justice.org/our_stories (last visited Jan. 3, 2023).

[49] *Id.*; *see also* Ex. B (Eagleson Dec.), ¶¶ 6, 8.

[50] Ex. B (Eagleson Dec.), ¶¶ 5, 8, 12.

[51] Ex. B (Eagleson Dec.), ¶ 9.

[52] Ex. B (Eagleson Dec.), ¶ 10.

[53] Doc. 1-2, Ex. 9 (████████████████████████████████████████████████████████████ ; Ex. B (Eagleson Dec.), ¶ 13 (showing that 9/11 Families United is a separate group).

perfect opportunity to highlight for policymakers, the national press, and the American public its decades-long struggle to hold the Saudis accountable for 9/11.[54] Rather than LIV serving as a useful vehicle for sports-washing the Saudis' bad conduct, as the Kingdom's McKinsey consultants had suggested, the 9/11 families saw LIV as the opposite: a reason to refocus the national debate after two decades since the attacks, on a flawed regime that had not yet provided "answers" or "accountability" on September 11.[55]

Finally, Clout has performed substantial work for 9/11 Justice that does not relate to LIV, its golfers, or golf.[56] Most of the 9/11 Justice website has nothing to do with golf or LIV.[57] The same is true of 9/11 Families United, which is not a Clout client.[58] Yet LIV, backed by the Saudi government, seeks all Clout communications with either group, so long as it is about the Saudis or September 11th. Specifically, Request 7 in the Subpoena demands "[a]ll Communications with 9/11 Families United, 9/11 Justice, or anyone associated with either (e.g., agents, members, officers, directors, employees, or associates) **related to Saudi Arabia**, the PGA Tour, LIV Golf, **the September 11, 2001 terrorist attacks**, Phil Mickelson, **protests**, or this lawsuit." (emphasis added). (Doc. 1-2, Ex. 1). Further, LIV chose to define "Saudi Arabia" in such a way as to include the Kingdom's PIF (its sovereign wealth fund) as well as any agents acting against the 9/11 families within the United States. *Id.*

---

[54] Ex. B (Eagleson Dec.), ¶ 11.
[55] Ex. C, ¶ 20, *9/11 Family Members Appeal to President Biden on News Nation*, 9/11 Justice, https://www.911justice.org/9_11_family_members_appeal_to_president_biden_on_news_nation (last visited Jan. 3, 2023).
[56] Ex. A(Polyansky Dec.), ¶ 6; Ex. B (Eagleson Dec.), ¶¶ 9, 14.
[57] Ex. C, ¶ 21, 9/11 Justice webpage, https://www.911justice.org/ (last visited Jan. 3, 2023).
[58] Ex. C, ¶ 22, 9/11 Families United webpage, https://911familiesunited.org/ (last visited Jan. 3, 2023).

Both Clout and its client and political associate, 9/11 Justice, have a reasonable fear that disclosure of their internal communications about the Saudis and September 11 will provoke retaliation.[59] First, as explained above, the Saudis are already believed to have murdered Jamal Khashoggi, a Washington Post journalist and witness in the 9/11 families' litigation against the Kingdom, in order to stop his activities in the United States. Additionally, the Saudis have already hired an agency in the United States specifically to track and monitor the advocacy activities of the 9/11 victims and families.[60] Finally, there have been numerous reported instances of Saudi critics, dissidents, and even U.S.-based reporters who cover Saudi Arabia being subjected to hacking of private devices and email accounts. *See* Ex. C, ¶ 24, Reuters (Saudi human rights dissident); Ex. C, ¶ 25, The New York Times (Ben Hubbard, the New York Times Beirut Bureau Chief, who has written about the Kingdom for years and in 2020 published a book about Crown Prince Mohammed bin Salman).[61] Disclosure of Clout's internal communications with its client 9/11 Justice, and of any contacts with 9/11 Families United, would reveal phone numbers, individual names and email addresses, and information about plans to continue sharp criticism of the Kingdom—all information that could well lead to hacking or other retaliation.[62] In the case of Clout, disclosure not only places its employees at risk, but it could place Clout at risk of having other clients' political information revealed, not because it has anything at all to do with the Saudis or golf, but because it will injure Clout and cause it to lose clients.[63]

---

[59] Ex. A (Polyansky Dec.), ¶ 14; Ex. B (Eagleson Dec.), ¶ 16.

[60] Ex. C, ¶ 23, Hailey Fuchs, *LIV Golf Enlists NRA-tied Firm as Consultants*, Politico, Oct. 11, 2022.

[61] Joel Schectman and Christopher Bing, *How a Saudi Woman's iPhone Revealed Hacking Around the World*, Reuters, Feb. 17, 2022; Ben Hubbard, *I was Hacked. The Spyware Used Against me Makes us All Volunerable*, The New York Times, Oct. 24, 2021.

[62] Ex. A (Polyansky Dec.), ¶¶ 10-14; Ex. B (Eagleson Dec.), ¶¶ 15-17.

[63] Ex. A (Polyansky Dec.), ¶¶ 11-12.

## ARGUMENT

### I.     Legal Standard for Motions to Compel Under Rule 45

A court "**must** quash or modify a subpoena that … (iii) requires disclosure of privileged or other protected matter, if no exception nor waiver applies;" or (iv) subjects a person to undue burden." Fed. R. Civ. P. 45(d)(3) (emphasis added). "A party or attorney responsible for issuing and serving a subpoena must take reasonable steps to avoid imposing undue burden or expense on a person subject to the subpoena. The court for the district where compliance is required must enforce this duty and impose an appropriate sanction … on a party or attorney who fails to comply." Rule 45(d)(1).

In this district, a motion to compel non-party discovery is evaluated under a two-prong test. First, the court must consider "whether the discovery sought is relevant to a party's claim or defense in the underlying litigation." *Diamond Servs. Manag. Co., LLC v. Knobbe, Martens, Olson & Bear, LLP*, 339 F.R.D. 334, 338 (D.D.C. 2021). This relevance standard is identical to that stated in Rule 26. Second, "the court must assess any objections to the subpoena under the standards supplied by Rule 45, which requires that district courts quash subpoenas that call for privileged matter or would cause an undue burden." *Id.* (internal quotes omitted). LIV surprisingly fails to mention the second step in this two-prong test.

The imposition of an undue burden, however, "is a factor entitled to special weight." *Diamond*, 339 F.R.D. at 339. Therefore, even when a subpoena calls for relevant information that may prove beneficial to the movant's case, the court must quash the subpoena if it would impose an undue burden upon the non-party. *In re Micron Tech., Inc. v. Sec.'s Litigation*, 264 F.R.D. 7, 9 (D.D.C. 2010). Here, LIV's non-party subpoena calls for the production of irrelevant documentation while simultaneously imposing an undue burden upon Clout.

## II.    The Subpoena Imposes an Undue Burden on Clout

### A.    LIV Refused to Explain Why the Trove of Documents Being Produced by the PGA Tour Is Insufficient, Which Was Essential to Rebutting Clout's "Undue Burden" Objection.

If the Court finds that LIV's non-party subpoena imposes an undue burden upon Clout, a non-party to the underlying litigation, the Court "must quash or modify [the] subpoena." Rule 45(d)(3). Here, LIV's non-party subpoena unduly burdens Clout because it calls for the production of a large quantity of documents that can be—and likely already have been—obtained  from the PGA Tour. This option is a categorically more convenient, less burdensome, and less expensive route for obtaining this documentation, which is why courts in this district unequivocally hold that discovery must be obtained from parties to the litigation *before* imposing the burden of production upon a non-party. *Diamond*, 339 F.R.D. at 339; *In re Motion to Compel Compliance with Subpoena to Dep't of Veterans Affs.*, 257 F.R.D. 12, 19 (D.D.C. 2009).

Indeed, all documents responsive to LIV's first request—and a large proportion of the documents responsive to five of the six remaining requests—can and should simply be produced by the Tour. LIV's Request 1 calls for "[a]ll communications with the PGA Tour," which are clearly within the possession, control, and custody of the PGA Tour. (Doc. 1-2, Ex. 1, Request 1).

Clout anticipates that a significant portion of the documents responsive to Requests 2, 3, 4, 5, and 6 are also available to LIV through the PGA Tour. Clout was hired by the PGA Tour to assist and consult regarding public relations issues.[64] LIV's Request 2 covers the entire field of Clout's work for the Tour as it pertains to LIV and its golfers in that it demands all "Documents, Communications, bills, and invoices" that are "related to" this consulting work. Request 2 therefore not only completely covers Request 1 (which only covers communications with the Tour

---

[64] Ex. A (Polyansky Dec.), ¶ 4.

on these topics), it also completely covers Requests 3 through 6 with respect to Clout's work for the Tour. Requests 3 through 6 mirror Request 2 in asking for "[a]ll Documents and Communications," but are crafted so that each request covers a specific sub-area of consulting work one by one: "public affairs campaigns" (Request 3), "coalition development" (Request 4), "strategic & crisis communications" (Request 5), and "competitive research" (Request 6).

In each case, Clout necessarily communicated its work, research, and advice to the Tour; if it was not doing so, Clout was not doing the job it was paid to do, as Clout was not a press agent for the Tour and did not send out Tour public communications under its own name.[65] Further, Clout necessarily sent its bills and invoices to the Tour. As discussed in more detail in Section III below, Clout's work is relevant to the underlying action (if at all) only to the extent that the Tour was actually aware of what Clout was doing or directed it. The way to establish this condition of relevance—that is, the Tour's knowledge and direction—is precisely through discovery into the Tour's own documents. LIV appears to have gotten, or to be getting, that discovery. Its Motion attaches a few dozen exhibits that either reflect the very same communications it is now asking Clout to re-produce, or that reflect oral discussions between the Tour's press department and Clout.

Importantly, this same reasoning applies to Request 7. By way of background, Request 7 may be the true motivating purpose behind the entire Subpoena, but when compared to the first six requests, it is clearly an outlier. Request 7 explicitly seeks Clout communications not with the PGA Tour or even with the media, but instead, with two groups of 9/11 families (9/11 Families United and 9/11 Justice). Each group has longstanding grievances with the Saudi state arising from the September 11, 2001 terror attacks and the Kingdom's subsequent conduct and influence operations in the United States. *See*, supra, Background, Section I. This includes a long-running

---

[65] *Id.*

MDL litigation and an ongoing political and PR struggle. *Id*. Against this background, it is telling that Request 7 relates not only to LIV, golfers, or the PGA Tour (the points at issue in the underlying lawsuit), but also to communications *on other political topics*, even if they have nothing at all to do with LIV, golfers, or golf. (Doc. 1-2, Ex. 1). These additional topics include the Kingdom of Saudi Arabia, its sovereign wealth fund, PIF, any of the Saudis' un-registered lobbyists who have acted on its behalf in the United States, the September 11 terrorist attacks, or protests. 9/11 Justice, but not 9/11 Families, is a Clout client.[66]

Setting aside a full treatment of "relevance" until Section III, it should be apparent that even if LIV's theory is correct, and some of Clout's communications with these 9/11 families were at the PGA Tour's direction, then once again, the documents establishing this condition of relevance will be in the possession of the Tour. Again, LIV appears to be receiving the discovery from the Tour that would either establish or undermine its theory. It makes no showing that it asked for these documents and has been denied them, or that the Tour has been unable to produce responsive documents. If LIV's theory is that the 9/11 families had no bone to pick with the Kingdom until the Tour came knocking (to be sure, a theory unsupported by facts), and that the Tour then manipulated the families through Clout, its first stop should be the Tour—it should not engage in a vastly overbroad fishing expedition against Clout and the 9/11 families that transparently seeks information on their political activities having nothing to do with LIV or golf.

In conclusion, it was LIV's burden in its Motion to show why its massive trove of documents from party discovery is insufficient, or that discovery has failed.[67] Until this preferred

---

[66] Ex. A (Polyansky Dec.), ¶ 9.

[67] If LIV files a reply brief, it should not be able to "sandbag" Clout by addressing for the first time this core element of a motion to compel. *See Bd. of Regents of Univ. of Wash. v. EPA*, 86 F.3d 1214, 1221 (D.D.C. 1996) ("To prevent this sort of sandbagging . . . we have generally held that

avenue for obtaining the requested documentation has been exhausted, placing the responsibility for finding, reviewing, and producing documents upon the shoulders of Clout constitutes an undue burden. *See In re Motion to Compel*, 257 F.R.D. at 19 ("Until the [requesting party] at least makes the effort and fails for some reason not attributable to its own fault, this Court cannot possibly determine whether any subpoena … no matter how limited, is still unduly burdensome because the information sought 'can be obtained from some other source that is more convenient, less burdensome, or less expensive.' Fed. R. Civ. P. 26(b)(2)(C)(I).").

**B. LIV Cannot Trivialize Clout's Burden by Citing Itself as the Measuring Stick**

Finally, LIV argues that the burden imposed upon Clout pales in comparison to the burden it has borne in this lawsuit. Even more puzzling is its argument that Clout, a PR boutique, must have sufficient resources to shoulder this lawsuit because the PGA Tour has annual revenues in excess of $1.5 billion. (Doc. 1-1, pp. 20-21). Arguments about the parties' resources can have no bearing on the Court's undue burden analysis. The proper analysis considers the entity "subject to the subpoena," not the entities involved in the underlying litigation. F.R.C.P. 45(d)(1).

In particular, LIV is in a poor position to argue that non-parties should have to ante up to match its own irrationally-assumed burden. This is a high-stakes, highly speculative antitrust lawsuit that LIV chose to file on an emergency basis. LIV can make that gamble because it is a political project of the Kingdom of Saudi Arabia, backed by $620-billion plus sovereign wealth fund, PIF.[68] LIV cannot deny this; its own Subpoena includes PIF within the very definition of "Saudi Arabia," expressly naming PIF as an example of "individuals and entities who act, have

---

issues not raised until the reply brief are waived."). Clout raised precisely this objection—a core element of Rule 45(d)—on page 1 of its original objection letter. *See* Motion, Exhibit 26, p. 1.

[68] Ex. C, ¶ 29, Alan Blinder and Sarah Hurtes, *Confidential Records Show a Saudi Golf Tour Built on Far-Fetched Assumptions*, New York Times, Dec. 11, 2022.

acted, purport to act, or have purported to act on behalf of the Kingdom …" (Doc. 1-2, Ex. 1). PIF funded LIV with billions of dollars to aid its sports-washing, political lobbying, and litigation efforts in the United States, and not with any real expectation of an economic return.[69] Non-parties, particularly a PR boutique like Clout, should not be forced to sit at LIV's billion-dollar table.

Additionally, as the Subpoena is currently written, Clout estimates that it has thousands of responsive documents, which will likely take hundreds of hours, and therefore well over $100,000, to produce and review.[70] That is an undue burden as a matter of law given that: (1) a substantial portion of these documents are available through the parties to the lawsuit; and (2) another significant portion of these documents will have no bearing on the underlying litigation, as further discussed in Section III, *infra*. Clout requests the Court quash LIV's subpoena for imposing an undue burden upon a non-party to the underlying litigation.

### III.     The Requests Seek Political Intelligence Against Saudi Opponents That Is Largely Irrelevant to the Antitrust Litigation

LIV's Subpoena will result in the production of thousands of irrelevant documents. Its seven overlapping requests are significantly overbroad because most of the requested documents would yield intelligence to the Kingdom about its political opposition in the United States— including scores of 9/11 families and victims—rather than relevant evidence in an antitrust lawsuit.

To distinguish between conditionally relevant and completely irrelevant portions of these requests, it is easier to reframe LIV's seven overlapping requests (most of which fold into Request 2, as discussed above) into six different Categories:

1) Clout's communications with the PGA Tour (Subpoena Requests 1-6);

2) Clout's internal communications regarding its work for the PGA Tour (Requests 2-6);

---

[69] *Id.*
[70] Ex. C (Greim Dec.), ¶ 38.

3)  Clout's communications to third parties on behalf of the PGA Tour (Requests 2-6);

4)  Clout's communications with 9/11 Justice (Request 7, and potentially 3-6);[71]

5)  Clout's internal communications regarding 9/11 Justice (potentially Requests 3-6); and

6)  Clout's communications to third parties on behalf of 9/11 Justice (potentially Requests 3-6).

Of these six Categories, only two, Categories 1 and 3, are arguably relevant (and then, only conditionally relevant, as discussed below) to the underlying dispute. Clout's communications to, about, or on behalf of other clients (Categories 4, 5, and 6) have no bearing on the PGA Tour's allegedly anticompetitive activities. And, similarly, Clout's internal thoughts and communications that were never relayed to the PGA Tour (Category 2) have no bearing on the Tour's allegedly anticompetitive activities. (By extension, Category 5, Clout's internal, in-house communications about 9/11 Justice that were never shared with 9/11 Justice, are the least relevant of all.) Because the majority of LIV's requests demand documents that fall outside the bounds of Categories 1 and 3,[72] the Subpoena is entirely overbroad and should either be quashed or heavily modified.

---

[71] Requests 3-6 seek "All Documents and Communications" pertaining to certain types of PR work "related to LIV Golf, any golfer who has participated in a LIV Golf tournament, or this lawsuit," even if that work was not performed on behalf of or at the request of the PGA Tour and was instead, for example, performed for 9/11 Justice. Request 7, in contrast, seeks Clout's communications with 9/11 Justice and 9/11 Families that have nothing to do with LIV or golf, and that merely relate to the Kingdom itself, PIF, the 9/11 terror attacks, the Kingdom's unregistered agents who are working to influence U.S. policy or monitor and track the Kingdom's opponents within the United States, or protests.

[72] LIV claims without citation that "Clout concedes that most of LIV's requests seek relevant documents." (Doc. 1-1, p. 12). This claim is categorically untrue. In fact, Clout firmly believes that the majority of LIV's requests for production fall within the bounds of categories 2, 4, 5, and 6 and are entirely irrelevant to the underlying litigation.

A. **Categories 1 and 3: Clout Communications with the PGA Tour, or to Outsiders on the PGA Tour's Behalf**

1. **These materials are only conditionally relevant, and LIV cannot show that anti-Saudi sentiment traces to the Tour, rather than the Saudis' widely reported and unpopular conduct**

Requests that fall within Categories 1 and 3 are at best conditionally relevant. *See* Fed. R. Evid. 104(b) ("When the relevance of evidence depends on whether a fact exists, proof must be introduced sufficient to support a finding that the fact does exist. The court may admit the proposed evidence on the condition that the proof be introduced later."). Here, Clout's communications advising the Tour on a publicity campaign, and any communications it may have had with third parties on behalf of the Tour pursuant to that campaign, are only relevant to the extent that another fact is true. Specifically, it must *first* be true that anti-Saudi sentiment was insubstantial in the United States before LIV was launched, and that as a result, no one cared that LIV was a Saudi PR project, so that it was the PGA Tour that generated anti-Saudi sentiment and caused the American public to be concerned with LIV's status as a sports-washing vehicle for the Kingdom of Saudi Arabia. Only if these things are true—so that the PGA Tour can actually have been responsible for 9/11 families' and the American public's outrage about the Kingdom's use of LIV—do the facts about Clout and the Tour's confidential deliberations (Category 1), or any messaging made by Clout on behalf of the Tour (Category 3), matter.

As shown above, the facts all fall on the other side. Leaked internal documents show what was obvious to all: the Kingdom launched LIV (Project Wedge) in an operation to manipulate American public opinion, which even their McKinsey consultants viewed as very unfavorable, by buying the reputations of great golfers and using it to bolster Saudi credibility.[73] LIV was not

---

[73] Ex. C, ¶ 29, Alan Blinder and Sarah Hurtes, *Confidential Records Show a Saudi Golf Tour Built on Far-Fetched Assumptions*, New York Times, Dec. 11, 2022.

launched because the Kingdom enjoyed popularity with the American public, it was launched because the Khashoggi murder, new revelations about the September 11 terror attacks, and the Kingdom's human rights violations and energy policies were tanking its domestic standing.[74] Further, it was LIV's own spokesmen who made the most colorful and damning comments about the organization's true purpose, including Phil Mickelson's worry that he was working with "scary mother***ers" and ambivalence about whether LIV succeeded, and Greg Norman's cold dismissal of the brutal murder of Washington Post journalist Jamal Khashoggi to silence his U.S. political activities as a mere "mistake." [75]

LIV is perfectly capable of citing the Tour's own statements and records—all of which could be produced by the Tour, if they exist—and comparing it to evidence of changes in the Kingdom's reputation in America to try and establish its claim that it was the Tour that caused the groundswell of opposition to LIV, rather than general public knowledge of the Kingdom's atrocities, and longstanding U.S. critics of the Kingdom who hold a powerful place in the hearts of the American public and who have long been influential with legislators. But LIV cannot do so. Instead, it merely cites internal planning documents between the PGA Tour and Clout—freely produced by the Tour—about efforts they were undertaking. But those documents only prove what the Tour planned to do (and in some cases, did). They do not establish that, in fact, anti-Saudi sentiment is some recent creation that was borne not of 9/11, the Khashoggi murder, or human rights violations, but instead, PGA Tour staff.

---

[74] Ex. C, ¶ 15, Matthew Kendrick, *Saudi Arabia's Image in America Continues to Sink as Formal Relations Hit Nadir*, Morning Consult, Oct. 27, 2022.

[75] Ex. C, ¶ 16, Alena Botros, *Phil Mickelson Called the Saudis 'Scary,' but Said their LIV Golf Tour was a Major Stand Against the PGA*, Yahoo Finance, Aug. 3, 2022; Ex. C, ¶ 18, *Greg Norman says 'We all make Mistakes' when asked about Khashoggi Killing*, The Guardian, May 12, 2022.

### 2.  LIV's Relevance Claims Fail on Their Own Terms

LIV claims Clout's advice regarding the Tour's publicity is relevant because "supposedly" anti-Saudi sentiment was a mere "pretext" for the Tour's anticompetitive conduct. (Doc. 1-1, p. 14). But as LIV's own cases show, proving "pretext" means proving that the defendant's claimed reasons for its action "played no part in the decision to act." *See, e.g., Image Tech. Serices, Inc. v. Eastman Kodak*, 125 F.3d 1195, 1219 (9th Cir. 1997). Here, the PGA Tour's concern was LIV's control (through PIF) by a deeply unpopular and disturbing Saudi regime—a connection that, as Phil Mickelson's own voluntary remarks showed, would taint top golfers who were also associated with the Tour. A publicity campaign raising those very concerns, and trying to make golfers aware of the impending danger, was fully consistent with, not contrary to, the Tour's actual position and concern. "Pretext" in this context would have meant something different: say, the Tour telling golfers and the Court that it was concerned with the taint, while at the same time courting and praising LIV and the Saudi regime. That is not what the Tour did.

LIV next claims that Clout's documents are necessary because "Clout and the Tour attempted to conceal the Tour's participation in the scheme." (Doc. 1-1, p. 14). But LIV never explains why this common operational tactic in public relations somehow converts the PGA Tour's legitimate concerns into anticompetitive conduct. First, the Tour was already on record as criticizing LIV for precisely the same problems that others in the media independently identified.[76] The purpose of avoiding Tour "fingerprints" was to avoid retaliatory attacks by LIV, an extremely well-funded, state-backed entity with its own PR consultants,[77] claiming (wrongly) that criticism of LIV and the Saudis was wholly driven by the Tour. For at least some LIV-friendly outlets, the

---

[76] *See*, supra, Section I(B).
[77] Ex. C, ¶ 29, Alan Blinder and Sarah Hurtes, *Confidential Records Show a Saudi Golf Tour Built on Far-Fetched Assumptions*, New York Times, Dec. 11, 2022.

Tour's efforts, rather than the underlying fact of the Saudis' strategy to use LIV as an influence operation in American politics, would become the story. That very misdirection, in fact, is precisely the tactic LIV has attempted in its Motion to Compel.

In short, LIV already has full access to the materials it needs to mount its "pretext" defense if that defense has any validity. For all of Clout's materials to be relevant, it would first need to be established that the Tour's publicity effort did indeed "manufacture" anti-Saudi and anti-LIV sentiment where none existed before. As shown above, common sense and the public record foreclose any such conclusion, and at any rate, LIV failed to present facts carrying its burden. Accordingly, Categories 1 and 3 should not be produced.

### B.  Category 2: Clout's Exclusively Internal Communications about the Tour

LIV spends significant time arguing that Clout's internal communications regarding the PGA Tour, items that did not originate with and were never shared with the Tour or any person outside of Clout, are relevant and should be produced. Clout's own internal and unshared work product, however, cannot logically be relevant under LIV's asserted theories.

First, even if the Court agrees that LIV has established both (a) conditional relevance, and (b) a coherent theory under which the publicity campaign constitutes "pretext", what is relevant is: (1) the PGA Tour's own intentions, knowledge, and instructions; and (2) any actual communications with third parties by the Tour or on its behalf. These documents will necessarily reside in Categories 1 and 3, discussed above. It is that set of documents that should be produced. And even then, of course, Category 1 and the PGA Tour's own communications should be sought from the Tour (which presumably has and is producing them all), and not from Clout. *See* Section II, *supra*. This would leave only Category 3 for Clout to produce.

Put another way, Clout's internal thoughts and views are utterly irrelevant unless they were disclosed to, adopted by, or acted upon by the PGA, or disclosed to media entities. This is true even if one accepts LIV's claim, unsupported by fact, that Clout somehow acted as a press agent for the Tour, rather than as a consultant that provided recommendations to the Tour for the Tour's own outgoing communications.[78] Category 2 documents are not "necessary" to show the "execution and performance" of any Tour actions on behalf of the PGA (Doc. 1-1, p. 13), as it is Category 1 and 3 documents that will actually reflect that work. Even if Clout acted "clandestinely" to assist the PGA Tour, (Doc. 1-1, pp. 14-15), that activity would be reflected in Category 3, Clout's external messages to third parties.[79]

Finally, LIV argues that it is entitled to Clout's internal communications because Clout was an agent of the Tour and, therefore, its own internal thoughts and views are attributable to the Tour. (Doc. 1-1, p. 15). This claim is erroneous for several reasons. First, Clout's scope of authority was limited, to guide strategic and rapid response communications, supportive competitive research and overall public affairs strategic support in advancement of PGA Tour's overall brand.[80] In other words, Clout was hired to: (1) guide the PGA Tour's communications with third parties, and (2) offer the PGA Tour strategic support to advance its overall brand. As evidence, many of LIV's exhibits show Clout making recommendations to the Tour concerning the Tour's own

---

[78] Ex. A (Polyansky Dec.), ¶ 4.

[79] LIV cites Exhibits 3 and 4 to its Motion as purported examples of "clandestine" activity, but even a cursory review of the documents show ███████████████████████████. Exhibit 3 references a recommendation to mount a digital campaign, and Exhibit 4 discusses the "narrative" the Tour would want to push. The documents are an important reminder that LIV apparently is receiving complete discovery from the Tour, and it is to the Tour that LIV should look for any evidence that the Tour actually undertook either of these recommendations.

[80] Ex. A (Polyansky Dec.), ¶ 4. Again, Clout was not the Tour's press agent and had no authority to issue statements, either under the Tour's name or under Clout's name, on the Tour's behalf. *Id.*

actions. (Doc. 1-1, p. 15). Clout's thoughts and views that it did *not* communicate to the Tour are not attributable to the Tour and are therefore completely useless to LIV in its purported efforts to show pretext.

The same result would obtain under the law of agency. Only knowledge that the agent gathers, or actions that it undertakes, when acting with actual or apparent authority from the principal, is imputed to the principal. *Salyers v. Metro. Life Ins. Co.*, 871 F.3d 934, 939-40 (9th Cir. 2017) (citing Rest. (Third) of Agency (2006)). The internal thoughts or beliefs of the agent are not imputed to the principal outside of the *respondeat superior* relationship. *McFarlane v. Esquire Magazine*, 74 F.3d 1296, 1303 (D.C. Cir. 1996); *Cantrell v. Forest City Pub. Co.*, 419 U.S. 245, 286 (1974).

For all of these reasons, even if LIV had met its burden with respect to Categories 1 and 3, it cannot push further to discover Clout's internal, unshared thoughts and communications that cast no light on anything said to, or communicated by, the PGA Tour. Category 2 documents are irrelevant and should not be produced.

**C.  Categories 4, 5, and 6: another Clout Client, 9/11 Justice**

Clout's communications to, about, or on behalf of 9/11 Justice (Categories 4, 5, and 6) for 9/11 Justice's own messaging cannot support LIV's purported effort to show pretext. Instead, LIV's requests—which are not even limited to communications about LIV, golf, or golfers—are a naked effort to build an intelligence file on opponents of the Kingdom within the United States.

LIV argues that Clout's communications with outside entities such as 9/11 Families United and 9/11 Justice are relevant because the PGA Tour "organized and likely funded" these groups. (Doc. 1-1, p. 3). The PGA Tour, however, did not create either group.[81] Both groups are composed

---

[81] Ex. A (Polyansky Dec.), ¶ 6; Ex. B (Eagleson Dec.), ¶¶ 6, 8-9.

of families that were involuntarily drawn together by the terrorist attacks of September 11, 2001. These families have worked together for well over a decade to demand justice for their loved ones and expose Saudi Arabia for its involvement with the 9/11 terrorist attacks, both through litigation and through lobbying and public relations efforts.[82] When 9/11 Families United discovered that the PGA Tour was to face competition from LIV—a Saudi funded golf organization designed to "sports-wash" the Saudi's reputation in America—9/11 Families United drafted a press release without any involvement by the Tour or Clout.[83] The Saudis, not the PGA Tour, are responsible for the messages espoused by 9/11 Families United.

9/11 Justice, unlike 9/11 Families, is a client of Clout. Many of its members are engaged in litigation against the Kingdom, and it has also lobbied for legislation and executive action intended to uncover the truth about the September 11 terror attacks.[84]

Importantly, as LIV knew when it drafted its Motion accusing the Tour of instigating the 9/11 groups' criticism of LIV, it was the founder of 9/11 Justice who reached out to the PGA Tour, not the other way around.[85] 9/11 Justice then became a client of Clout.

If the PGA Tour helped amplify the message of 9/11 Justice or others (a point Clout by no means admits here), it cannot support LIV's claim of pretext. The ensuing political alliance would have been consistent with the Tour's own pre-existing concern that professional golfers were coming under the sway of a publicity vehicle launched by a state with a reputation that was terrible and getting worse during the energy crisis of 2022. Precisely to avoid retaliatory attacks from

---

[82] Ex. B (Eagleson Dec.), ¶¶ 5-10.
[83] Ex. C, ¶ 36, *9/11 Families Outraged at American Golfers' 'Sports Washing' of Saudi Arabia*, 9/11 Families United, https://911familiesunited.org/9-11-families-outraged-at-american-golfers-sports-washing-of-saudi-arabia/ (last visited Jan. 3, 2023).
[84] Ex. B (Eagleson Dec.), ¶ 5.
[85] Ex. B (Eagleson Dec.), ¶ 10.

LIV's well-funded publicity machine, it would have made perfect sense for the Tour and the 9/11 groups not to disclose any such alliance.

Still, LIV may argue that under its "pretext" theory, any communications showing that the Tour made recommendations on 9/11 messaging are relevant. That theory lacks merit for the reasons outlined above in Section III, but even if this Court were inclined to agree, the relevant discovery would be produced under Category 1, Clout's communications with the Tour. Those documents would necessarily show any coordination regarding 9/11 messaging. The answer is not, as LIV urges, to open up all of Clout's communications with its 9/11 Justice client in order to fish for evidence of coordination from the other direction.

That is particularly true where LIV blatantly seeks communications that have nothing to do with LIV or golf, and instead seeks communications regarding LIV's Saudi controllers, the 9/11 attacks in general, the PIF, and any other agents the Saudis are using to manipulate public opinion, lobby, or monitor and track the 9/11 families themselves. Discovery in this antitrust case cannot be used by the Saudis to build an intelligence file regarding families who have been their political adversaries long before LIV was conceived by the Saudis' consultants, and who will be political adversaries long after LIV fades away.

## IV.    The First Amendment Protects Clout's Communications and Work With 9/11 Justice

LIV continues to press its Subpoena not because party discovery has failed to yield everything LIV has requested about the Tour's speech and actions, but instead, because the true purpose of the Subpoena is to build intelligence against a longtime political, litigation, public relations, and legislative opponent of the Kingdom: 9/11 victims, families, and their supporters. Even if the Court disagrees with Clout's arguments relating to undue burden and relevance, the

First Amendment Privilege protects from disclosure Clout's work with 9/11 Justice, including Clout's own internal communications and its communications with 9/11 Justice representatives.

### A.  The First Amendment Privilege Applies to Civil Discovery Subpoenas

The First Amendment Privilege is a constitutionally-derived privilege from discovery that, just like other privileges, applies to motions to compel and quash under Rule 45. Subpoenas issued to a third party will be quashed if they call for privileged matter or would cause an undue burden. Fed. R. Civ. P. 45(d)(3); *see also Cusumano v. Microsoft Corp.*, 162 F.3d 708, 717 (1st Cir. 1998) ("concern for the unwanted burden thrust upon non-parties is a factor entitled to special weight in evaluating the balance of competing needs" in Rule 45 inquiry); *see also* Fed. R. Civ. P. 45(c)(2)(B) (any court order to compel compliance with document subpoena "shall protect any person who is not a party or an officer of a party from significant expense" of compliance). In addition, Federal Rule of Civil Procedure 26(b)(1)-(2) requires district courts in "[a]ll discovery" to consider a number of factors potentially relevant to the question of undue burden, including: whether the discovery is "unreasonably cumulative or duplicative"; whether the discovery sought is "obtainable from some other source that is more convenient, less burdensome, or less expensive."

The United States Constitution guarantees a right to association to engage in activities protected by the First Amendment, such as speech, assembly, and petition for the redress of grievances. *See Roberts v. U.S. Jaycees*, 468 U.S. 609, 618 (1984); *NAACP v. Alabama*, 357 U.S. 449, 462-63 (1958). The Supreme Court has long "acknowledged the importance of freedom of association in guaranteeing the right of people to make their voices heard on public issues." *Citizens Against Rent Control v. City of Berkeley*, 454 U.S. 290, 295 (1981). Indeed, the right of association guaranteed by the First Amendment is premised in part on the notion that some ideas

will only be expressed through collective efforts. *See id*. at 294 ("[B]y collective effort individuals can make their views known, when, individually, their voices would be faint or lost."). Moreover, because some collective efforts to express ideas will only be undertaken if they can be undertaken in private, *see NAACP*, 357 U.S. at 462 ("Inviolability of privacy in group association may in many circumstances be indispensable to preservation of freedom of association, particularly where a group espouses dissident beliefs."), the Supreme Court has recognized a privilege, grounded in the First Amendment right of association, not to disclose certain associational information when disclosure may impede future collective expression. *Id.* ("It is hardly a novel perception that compelled disclosure of affiliation with groups engaged in advocacy may constitute a[n] effective [] restraint on freedom of association."). In other words, the First Amendment privilege generally guarantees the right to maintain private associations when, without that privacy, there is a chance that there may be no association and, consequently, no expression of the ideas that association helps to foster.

These First Amendment protections apply in the context of discovery. *See Grandbouche v. Clancy*, 825 F.2d 1463, 1466 (10th Cir. 1987). Specifically, there is a qualified privilege against the discovery of information where compelled disclosure may chill associational rights. *See NAACP*, 357 U.S. at 462-63. "There is a long history of precedent dealing with forced disclosure of activities and associations protected by the First Amendment. In all of those cases, the harm to first amendment values attendant upon disclosure was balanced against the governmental, or in the case of civil discovery, private, need for the information." *Australia/Eastern U.S.A. Shipping Conference v. United States*, 537 F. Supp. 807, 809 (D.D.C. 1982).[86]

---

[86] LIV's argument—citing no authority—that the First Amendment Privilege only applies to government demands for information, and not in civil discovery that is compelled by a court of law, is simply incorrect. (Doc. 1-1, p. 19). Indeed, the court in *Australia/Eastern U.S.A. Shipping*

When weighing a claim of First Amendment privilege in the discovery context, the court must balance the First Amendment claim against the need for the information sought, and "if the former outweighs the latter, then the claim of privilege should be upheld." *Black Panther Party v. Smith*, 661 F.2d 1243, 1266 (D.C. Cir. 1981), vacated as moot sub nom. *Moore v. Black Panther Party*, 458 U.S. 118, 102 S. Ct. 2505 (1982). The D.C. Circuit has set out principles to guide a trial court's decision in cases involving the implication of a First Amendment right in discovery. *Int'l Union v. Nat'l Right to Work Legal Defense and Ed. Found., Inc.*, 590 F.2d 1139, 1152 (D.C. Cir. 1978). Before compelling discovery, this court must assess (1) whether the information goes to the "heart of the lawsuit," (2) whether the party seeking the discovery sought the information through alternative sources, and (3) whether the party seeking disclosure made reasonable attempts to obtain the information elsewhere. *Id.*

### B.  The Privilege Applies to Protect Clout

#### 1.  Clout Has a Substantial First Amendment Privilege Claim

##### (a) LIV Seeks Communications Made in Preparation for Political Advocacy

Here, LIV seeks information from Clout relating to its own internal deliberations, and its communications with its client, 9/11 Justice, in preparation for and in furtherance of 9/11 Justice's ongoing political advocacy in the United States regarding the Kingdom of Saudi Arabia's conduct on American soil. LIV complains that Clout has engaged in "public protests . . . [and] advertising," that Clout was reaching out to "local press" and politicians, and finally that Clout communicated

---

*Conference* even observed that "in civil discovery the court has the benefit of a complaint alleging specific violations against which to measure the relevance of the request." 537 F. Supp. at 812. *See also Apple Inc. v. Match Grp., Inc.*, No. 21 MC80184YGRTSH, 2021 WL 3727067 (N.D. Cal. Aug. 19, 2021) (first amendment asserted in antitrust case between two private, non-government entities); *Klayman v. Judicial Watch, Inc.*, No. CV 06-670 (CKK)(AK), 2008 WL 11394177 (D.D.C. Jan. 8, 2008); aff'd, No. CV 06-670 (CKK), 2008 W.L 11394172 (D.D.C. Apr. 2, 2008) (first amendment asserted between two private, non-government entities).

with "the highest levels of government and the media." (Doc. 1-1, pp. 3, 6, 7-8). In order to obtain information about these protected activities, LIV is seeking "[a]ll Documents and Communications related to any public affairs campaigns," including internal communications, "[a]ll Communications with 9/11 Families United, 9/11 Justice, or anyone associated with either," including internal communications, and LIV defines "Communication" to mean "any contact between two or more persons," including within Clout. (Doc. 1-2, Ex. 1, Subpoena at 2, 9-10).

Therefore, LIV is transparently seeking to "compel[] disclosure of affiliation with groups engaged in advocacy" which the Supreme Court has held "constitute[s] a[n] effective [] restraint on freedom of association."). *NAACP*, 357 U.S. at 462. LIV seeks not only communications of those affiliating with Clout, but also "anyone associated" with Clout, 9/11 Families United, or 9/11 Justice. It bears emphasizing that none of these groups are parties to, or are even referenced within, LIV's lawsuit. However, Clout and 9/11 Justice, including their constituent employees and members, have associated for purposes of criticizing the Kingdom generally, and more specifically, for criticizing the Kingdom's decision to create and use LIV as a means for sports-washing the Kingdom's image.

### (b) Deliberations that Are Internal to a Political Association Receive Special Protection

Requests for internal communications and communications among groups, as LIV has done here in seeking communications exchanged among and between Clout and 9/11 Justice, has the potential "for chilling the free exercise of political speech and association guarded by the First Amendment." *Wyoming v. United States Dep't of Agric.*, 208 F.R.D. 449, 454-55 (D.D.C. 2002) (quoting *Fed. Election Comm'n v. Machinists Non-Partisan Political League*, 655 F.2d 380, 388 (D.C. Cir. 1981)). Internal communications receive elevated protection for the obvious reason that disclosing internal preparations for political speech will chill communication. S*ee Perry v.*

38

*Schwarzenegger*, 591 F.3d 1147 (9th Cir. 2010) (exempting from discovery internal communications because allowing such communications to be discovered would "interfere with the core of the associations' activities" and deter the free flow of information); *see also Whole Woman's Health v. Smith*, 896 F.3d 362, 372 (5th Cir. 2018) (exempting from discovery internal communications because such communications "must be permitted to be broad, uninhibited, and fearless, and that protecting such deliberations is a seminal aspect of the freedom to associate"); *In re Motor Fuel Temperature Sales Practices Litig.*, 641 F.3d 470, 481 (10th Cir. 2011) ("First Amendment privilege applies to the district court's discovery order, which requires . . . members to disclose to a private party their communications regarding strategy.").

LIV seeks not only Clout's communications with its clients (that is, with Clout's political associates), but shockingly, also internal communications, purely among Clout employees, *about* Clout's association with its political clients. Granting such a request would profoundly infringe upon Clout's and 9/11 Justice's free speech and associational rights. Clout worked with 9/11 Justice to engage in advocacy against not only the Kingdom of Saudi Arabia, but also against the Kingdom's public relations vehicle, LIV.[87] Clout and 9/11 Justice cannot freely communicate with each other and exchange plans for political advocacy and speech if those communications are subject to compelled and ongoing disclosure to their political opponents via third-party discovery in a wholly unrelated antitrust suit.

### (c) Clout Can Assert First Amendment Rights in it Political Association With 9/11 Justice

LIV objects that one member of the political association, Clout, is a commercial entity, and so therefore lacks standing to assert (or perhaps does not even enjoy) its own First Amendment

---

[87] Ex. A (Polyansky Dec.), ¶ 6.

rights. That is simply incorrect. To begin with, a for-profit entity has a First Amendment right to advocate and speak even on economic matters, let alone the political matters which Clout has joined with 9/11 Justice to advocate. "It is immaterial whether the beliefs sought to be advanced by association pertain to political, economic, religious or cultural matters." *Wyoming v. United States Dep't of Agric.*, 208 F.R.D. 449, 454 (D.D.C. 2002) (quoting *NAACP*, 357 U.S. at 460-61); *Int'l Union, United Auto., etc. v. Nat'l Right to Work Legal Def. & Educ. Found., Inc.*, 590 F.2d 1139, 1152 (1978) (same).

Plaintiff's reliance on *Bean LLC v. Bank*, 291 F.Supp.3d 34 (D.D.C. 2018), is wholly misplaced. In *Bean*, Congress subpoenaed a commercial bank only to identify who had paid Fusion GPS for work, and Fusion intervened. *Id.* at 39. The court recognized that the subpoenaed "financial records" were commercial in nature and "commercial transactions do not give rise to associational rights, even where the subjects of those transactions are protected by the First Amendment." *Id.* at 46. Thus, the fact that Fusion had been paid by specific entities (that is, commercial transactions) was not given associational privacy protection, but the court did *not* hold, as LIV urges here, that the underlying communications (including those made for the purposes of engaging in advocacy) would have been unprotected merely because Fusion was paid. *Bean* emphasized that in LIV's other cited case, *FEC v. Automated Bus. Servs.*, 888 F.Supp. 539, 541 (S.D.N.Y. 1995), the court had refused to quash subpoenas "on the ground that the subpoenas sought 'information regarding corporate and business transactions, *not* information regarding any political association the [vendor] may have had with [its customer].'" *Bean*, 291 F.Supp.3d at 46 (quoting *FEC*, 888 F.Supp. at 541-542).[88] Of course, that is not what LIV seeks from Clout. It

---

[88] If LIV means to suggests that *Bean* should be read more broadly to categorically deny First Amendment Privilege objections any time a litigant chooses to subpoena the for-profit partner in a nonprofit/for-profit political association, *Bean* has never been cited for that proposition, and

wants Clout's communications with its political associate and client, 9/11 Justice, even if they have nothing to do with LIV or golf. LIV's Saudi backers want to know what Clout and 9/11 Justice are communicating with each other about the September 11 attacks, the Kingdom's sovereign wealth fund, and any agents working on behalf of the Kingdom in the United States. That is building an intelligence file against a domestic political opponent, not antitrust discovery.

Finally, it bears repeating that Clout is asserting its own First Amendment Privilege, a privilege which it shares with 9/11 Justice over communications they share as part of their joint political association. For that reason, LIV is wrong to argue that Clout cannot raise the Privilege under the "prudential standing" doctrine, which "'require that parties assert their own rights rather than rely on the rights or interests of third parties.'" *Viceroy Gold Corp. v. Aubry*, 75 F.3d 482, 488 (9th Cir. 1996) (quoting *Hong Kong Supermarket v. Kizer*, 830 F.2d 1078, 1081 (9th Cir. 1987)). Yet even if prudential standing doctrine applied here and Clout had no First Amendment rights of its own, Clout should be able to assert the First Amendment rights of its political associate and client, 9/11 Justice. Courts consider two factors in determining whether to permit a party to bring suit on behalf of another: "(1) the relationship of the litigant to the person whose right he seeks to assert; and (2) the ability of the third party to assert his own right." *Viceroy Gold*, 75 F.3d at 488 (citing *Singleton v. Wulff*, 428 U.S. 106, 114-15 (1976)). Under the first prong, LIV Golf is seeking private planning communications that were shared and are held by both Clout and 9/11 Justice *precisely because* the two entities share a political association opposing the Kingdom and the agents the Kingdom has recruited to exert influence on its behalf in the United States. Thus, it

---

*Automated Bus.* has only been cited once on this topic—by *Bean.* At any rate, no court, including *Bean* and *Automated Bus.*, have ever actually applied such logic, and even those courts limited their reasoning to bank records and financial books.

is precisely the private, intimate communications LIV seeks that tie Clout and 9/11 Justice together. Under the second prong, it is only Clout that has been subpoenaed by LIV. Rather than an offensive claim or lawsuit (where prudential standing is traditionally invoked), this is the defense of a motion to compel in which LIV itself chose its target—Clout—and only Clout is here to defend the confidentiality of the communications. Accordingly, because Clout has its own First Amendment rights in its association 9/11 Justice, and because Clout can defend the interest of 9/11 Justice in those very same communications, this Court must take up and consider Clout's claims of First Amendment Privilege under Rule 45.

### (d) Disclosure Threatens to Chill Clout and 9/11 Justice's Association

Here, disclosure to LIV (and the Kingdom) of Clout's internal notes on its work with 9/11 Justice, and its private communications with 9/11 Justice, are reasonably likely to chill speech. *See, e.g., Australia/Eastern U.S.A. Shipping Conference*, 537 F. Supp. at 810 ("[T]here is no doubt that the overwhelming weight of authority is to the effect that forced disclosure of first amendment activities creates a chilling effect which must be balanced against the interests in obtaining the information."); *see also In re Motor Fuel Temperature Sales Practices Litig.*, 641 F.3d 470, 478 (10th Cir. 2011) (those asserting first amendment privileges must "demonstrate a reasonable probability that disclosure of any of the information would chill their associational rights.").

Clout "need only show that there is some probability that disclosure will lead to reprisal or harassment." *Black Panther Party*, 661 F.2d at 1267-68. It must show disclosure could lead to either (1) "harassment, membership withdrawal, or discouragement of new members," or (2) "other consequences which objectively suggest an impact on, or chilling of, the members' associational rights." *Perry*, 591 F.3d at 1162. Thus, in *Yohn v. California Tchrs. Ass'n*, the Central District of California refused to compel disclosure of a public relations firm's "public relations

strategies" because the firm made a prima facie showing that disclosure of "documents revealing [] internal deliberations and strategies would chill the [defendant's] ability to engage in strategic discussions and planning." 2017 WL 11635459, at *2 (C.D. Cal. Oct. 3, 2017).

Here, the affidavits of David Polansky and Brett Eagleson make out a prima facie case that disclosure is reasonably likely to chill their speech and association. First, in the public relations context, as in *Yohn*, Clout cannot continue to engage in fruitful strategic discussions and planning with 9/11 Justice if the 9/11 families' longtime opponent, the Kingdom, is able to peer into their internal communications and build its own political intelligence file.[89] Further, the Kingdom is not an ordinary domestic political opponent. It stands accused of murdering a Washington Post journalist, political dissident, and potential witness in the 9/11 families' MDL against the Kingdom Jamal Khashoggi, in order to stop political activities in the United States.[90] Other U.S. citizens, including journalists and writers who have covered the Kingdom and its leadership, report having had their phones hacked.[91] And LIV itself has even hired a U.S.-based firm to monitor and track the 9/11 victims and families who criticize it.[92] It is entirely reasonable and prudent for individuals associated with Clout and 9/11 Justice to fear retaliation if LIV is able to access all of their private communications about its Saudi backers and other Saudi agents working in the United States.

---

[89] Ex. A (Polyansky Dec.), ¶¶ 10-12.
[90] Ex. C, ¶ 4, Shane Harris, Greg Miller, and Josh Dawsey, *CIA Concludes Saudi Crown Prince Ordered Jamal Khashoggi*, Washington Post, Nov. 16, 2018.
[91] Ex. C, ¶ 25, Ben Hubbard, *I was Hacked. The Spyware Used Against me Makes us All Volunerable*, The New York Times, Oct. 24, 2021.
[92] Ex. C, ¶ 23, Hailey Fuchs, *LIV Golf Enlists NRA-tied Firm as Consultants*, Politico, Oct. 11, 2022.

**2. LIV Does Not Have a Legitimate Litigation Need for Clout's Communications with 9/11 Justice**

Courts test constitutional privilege claims by asking whether: (1) the information goes to the "heart of the lawsuit," (2) the party seeking discovery sought the information through alternative sources, and (3) the party seeking discovery made reasonable attempts to obtain it elsewhere. *International Union U.A.W.*, 590 F.2d at 1152. LIV's demands fail each of these tests.

**(a) Heart of the Lawsuit**

First, for the reasons set forth in Section III.C, Clout's work with 9/11 Justice is not at "the heart of the lawsuit." Work that supports 9/11 Justice's substantial focus on the Kingdom, the September 11 attacks, U.S. legislation and executive orders relating to both of these topics, and identifying and defending against other agents of the Saudi state in this country, has nothing to do with golf, golfers, or LIV's antitrust lawsuit against the PGA Tour. LIV cannot be used as a tool by the Kingdom to gain political intelligence against its longtime opposition in this country.

But even the Clout-9/11 Justice speech and association that pertains to LIV or golf is irrelevant to the lawsuit—and even if the PGA Tour encouraged or supported it in any way. As discussed in Section III(C), LIV's "pretext" argument against the Tour simply does not make sense. Rather than showing that the Tour took actions inconsistent with the concerns it raised with its golfers and in court, the Tour's own messaging expressing concerns about LIV's control by the Kingdom, and its association and support of other longstanding opponents of the Kingdom who shared the same concerns, are completely consistent. The purpose of this discovery, then, is not to show that a Tour defense is factually unsupportable, but rather, to chill Clout's association with 9/11 Justice and to weaken the effectiveness of their ongoing speech.

### (b) Alternative Sources and Reasonable Attempts to Locate the Information Elsewhere

Even if Clout's work for 9/11 Justice rested at the heart of LIV's lawsuit against the PGA (and it does not), LIV made no showing that it has tried unsuccessfully to find key information from sources that are not raising a First Amendment Privilege. This requirement has teeth: in *ETSI Pipeline Project v. Arkansas Power & Light Co.*, the court denied a motion to reconsider the quashing of a subpoena because "alternative sources had not been exhausted and that independent efforts to obtain the information had not been made." 674 F. Supp. 1491, 1492 (D.D.C. 1987).

LIV has admitted in a supplemental filing (Doc. 9) that its discovery from the PGA Tour has been sufficient to retrieve interactions in which the Tour viewed drafts of 9/11 family communications. If the PGA Tour is willing and able to make such disclosures, then the PGA Tour is the place to go for such targeted discovery. After all, even under LIV's theory of PGA Tour "pretext," it is PGA Tour's actual knowledge of and involvement in 9/11 family communications relating to golf—not the sum total of the 9/11 families' advocacy and planning with Clout—that is relevant. LIV has not claimed—and cannot now claim, in a reply to which Clout cannot respond— that something about the PGA Tour's production has been incomplete. Rather, the evidence of the PGA Tour's knowledge or involvement in 9/11 family advocacy will naturally reside there, and should be sought from there, not from Clout. The only reason to go to Clout is to seek irrelevant communications in which the PGA Tour was not involved, and to chill and muzzle 9/11 Justice's effective advocacy against the Kingdom on a variety of fronts. This Court should deny LIV's request to help it accomplish that unjust and unconstitutional goal.

### CONCLUSION

For the foregoing reasons, LIV's Motion to Compel should be denied.

Date: January 3, 2023                    Respectfully submitted,

                                         **GRAVES GARRETT, LLC**

                                         */s/ Edward D. Greim*
                                         Edward D. Greim (DDC Bar No. MO-008)
                                         Graves Garrett, LLC
                                         1100 Main Street, Suite 2700
                                         Kansas City, Missouri 64105
                                         Tel.: (816) 256-3181
                                         Fax: (816) 222-0534
                                         edgreim@gravesgarrett.com

                                         *Attorney for Respondent*


<u>**CERTIFICATE OF SERVICE**</u>

I hereby certify that on January 3, 2023, a true and correct copy of the foregoing was filed using the Court's CM/ECF system, which will send an electronic notification to all counsel of record.


                                         */s/ Edward D. Greim*
                                         Attorney for Respondent