# Exhibit C

## UNITED STATES DISTRICT COURT
## DISTRICT OF COLUMBIA

| | | |
|---|---|---|
| LIV GOLF, INC, | ) | |
| | ) | **Case No. 1:22-mc-00126-CJN** |
| **Movant,** | ) | |
| | ) | Underlying Case, LIV Golf, Inc., et |
| **v.** | ) | al. v. PGA Tour, Inc., pending in the |
| | ) | United States District Court for the |
| **CLOUT PUBLIC AFFAIRS, LLC,** | ) | Northern District of California: |
| | ) | |
| **Respondent.** | ) | Case No. 5:22-cv-04486-BLF |
| | ) | |

### DECLARATION OF EDWARD GREIM IN SUPPORT OF RESPONDENT'S RESPONSE IN OPPOSITION TO MOVANT'S MOTION TO COMPEL

I, Edward Greim, declare that:

1.      I am an attorney, duly licensed to practice law in the States of Missouri, Kansas, and New York, and a partner with the law firm of Graves Garrett LLC, counsel for Respondent Clout Public Affairs, LLC ("Clout") in the above-captioned action.

2.      I submit this declaration in support of Clout's Response in Opposition to Movant's Motion to Compel. I have personal knowledge of the facts stated herein and, if called as a witness, I could and would testify competently as to them under oath.

3.      To respond to LIV's subpoena as-written, Clout will be required to review upwards of 40,000 documents.

4.      The following is a true and correct link to a Washington Post article I last accessed on January 3, 2023: https://www.washingtonpost.com/world/national-security/cia-concludes-saudi-crown-prince-ordered-jamal-khashoggis-assassination/2018/11/16/98c89fe6-e9b2-11e8-a939-9469f1166f9d_story.html. A true and correct copy of this article is attached hereto as Exhibit C-1.

1

5.      The following is a true and correct link to a CNN article I last accessed on January 3, 2023: https://www.cnn.com/2021/03/02/politics/kfile-biden-officials-slammed-trump-action-on-khashoggi-death-saudi-arabia-mbs/index.html. A true and correct copy of this article is attached hereto as Exhibit C-2.

6.      The following is a true and correct link to a BBC News article I last accessed on January 3, 2023: https://www.bbc.com/news/world-middle-east-61831193. A true and correct copy of this article is attached hereto as Exhibit C-3.

7.      The following is a true and correct link to a Reuters article I last accessed on January 3, 2023: https://www.reuters.com/legal/biden-admin-says-saudi-prince-has-immunity-khashoggi-killing-lawsuit-court-2022-11-18/. A true and correct copy of this article is attached hereto as Exhibit C-4.

8.      The following is a true and correct link to a New York Magazine article I last accessed on January 3, 2023: https://nymag.com/intelligencer/2016/02/donald-trump-suggests-the-saudis-did-911.html. A true and correct copy of this article is attached hereto as Exhibit C-5.

9.      The following is a true and correct link to a YouTube video I last accessed on January 3, 2023: https://www.youtube.com/watch?v=j_DhzJL0I34

10.     The following is a true and correct link to the 9/11 Families United webpage I last accessed on January 3, 2023: https://911familiesunited.org/legislative-action/

11.     The following is a true and correct link to an ABC News article I last accessed on January 3, 2023: https://abcnews.go.com/Politics/911-families-respond-biden-saudi-arabia-trip-empathy/story?id=85390242. A true and correct copy of this article is attached hereto as Exhibit C-6.

12.     The following is a true and correct link to the 9/11 Families United webpage I last accessed on January 3, 2023: https://911familiesunited.org/icymi-president-biden-must-hold-kingdom-of-saudi-arabia-accountable-for-9-11-attacks/

13.     The following is a true and correct link to a Report from the United States Department of State I last accessed on January 3, 2023: https://www.state.gov/wp-content/uploads/2022/03/313615_SAUDI-ARABIA-2021-HUMAN-RIGHTS-REPORT.pdf.   A true and correct copy of this Report is attached hereto as Exhibit C-7.

14.     The following is a true and correct link to a New York Times article I last accessed on January 3, 2023: https://www.nytimes.com/2022/10/25/us/politics/us-saudi-oil-deal.html.  A true and correct copy of this article is attached hereto as Exhibit C-8.

15.     The following is a true and correct link to a Morning Consult article I last accessed on January 3, 2023: https://morningconsult.com/2022/10/27/views-of-saudi-arabia-in-america-opec-oil/. A true and correct copy of this article is attached hereto as Exhibit C-9.

16.     The following is a true and correct link to a Yahoo Finance article I last accessed on January 3, 2023: https://finance.yahoo.com/news/phil-mickelson-called-saudis-scary-234637151.html. A true and correct copy of this article is attached hereto as Exhibit C-10.

17.     The following is a true and correct link to a New York Daily News article I last accessed on January 3, 2023: https://www.nydailynews.com/sports/more-sports/ny-phil-mickelson-saudi-arabia-20220219-ixtqx2uytrb27lhx75xzanzyiu-story.html.  A true and correct copy of this article is attached hereto as Exhibit C-11.

18.     The following is a true and correct link to an article from The Guardian I last accessed on January 3, 2023: https://www.theguardian.com/world/2022/may/12/greg-norman-we-

all-make-mistakes-when-asked-about-jamal-khashoggi-killing. A true and correct copy of this article is attached hereto as Exhibit C-12.

19.     The following is a true and correct link to the 9/11 Justice webpage I last accessed on January 3, 2023: https://www.911justice.org/our_stories

20.     The following is a true and correct link to the 9/11 Justice webpage I last accessed on January 3, 2023:

https://www.911justice.org/9_11_family_members_appeal_to_president_biden_on_news_nation

21.     The following is a true and correct link to the 9/11 Justice webpage I last accessed on January 3, 2023: https://www.911justice.org/

22.     The following is a true and correct link to the 9/11 Families United webpage I last accessed on January 3, 2023: https://911familiesunited.org/

23.     The following is a true and correct link to a Politico article I last accessed on January 3, 2023: https://www.politico.com/news/2022/10/11/liv-golf-nra-mckenna-associates-00061215. A true and correct copy of this article is attached hereto as Exhibit C-13.

24.     The following is a true and correct link to a Reuters article I last accessed on January 3, 2023: https://www.reuters.com/technology/how-saudi-womans-iphone-revealed-hacking-around-world-2022-02-17/. A true and correct copy of this article is attached hereto as Exhibit C-14.

25.     The following is a true and correct link to a New York Times article I last accessed on January 3, 2023: https://www.nytimes.com/2021/10/24/insider/hacking-nso-surveillance.html. A true and correct copy of this article is attached hereto as Exhibit C-15.

26.     The following is a true and correct link to the December 20, 2002, Report of the Joint Inquiry into the Terrorist Attacks of September 11, 2001, which I last accessed on January

4

3,   2023:    https://www.intelligence.senate.gov/sites/default/files/documents/CRPT-107srpt351-5.pdf. A true and correct copy of this article is attached hereto as Exhibit C-16.

27.    The following is a true and correct link to a CNN article I last accessed on January

3,   2023:    https://www.cnn.com/2016/07/15/politics/congress-releases-28-pages-saudis-9-11/index.html. A true and correct copy of this article is attached hereto as Exhibit C-17.

28.    The following is a true and correct link to the Congressional history of the Justice Against  Sponsors  of  Terrorism  Act,  which  I  last  accessed  on  January  3,  2023: https://www.congress.gov/bill/114th-congress/senate-bill/2040/actions

29.    The following is a true and correct link to a New York Times article I last accessed on January 3, 2023: https://www.nytimes.com/2022/12/11/sports/golf/liv-saudi-pga.html.  A true and correct copy of this article is attached hereto as Exhibit C-18.

30.    The following is a true and correct link to the 9/11 Justice webpage I last accessed on January 3, 2023: https://www.911justice.org/political_support

31.    The following is a true and correct link to an article from The Nation, which I last accessed  on  January  3,  2023:  https://www.thenation.com/article/society/ari-fleischer-liv-golf-saudi-arabia/. A true and correct copy of this article is attached hereto as Exhibit C-19.

32.    The following is a true and correct link to a PR Week article I last accessed on January   3,   2023:   https://www.prweek.com/article/1789327/liv-golf-hires-fleischer-communications. A true and correct copy of this article is attached hereto as Exhibit C-20.

33.    The following is a true and correct link to a Washington Post article I last accessed on   January   3,   2023:   https://www.washingtonpost.com/sports/2022/09/19/greg-norman-liv-congress/. A true and correct copy of this article is attached hereto as Exhibit C-21.

34.     The following is a true and correct link to a Sports Illustrated article I last accessed on January 3, 2023: https://www.si.com/college/2022/06/08/ari-fleischer-liv-golf-press-conference-cfp. A true and correct copy of this article is attached hereto as Exhibit C-22.

35.     The following is a true and correct link to a Washington Post article I last accessed on January 3, 2023: https://www.washingtonpost.com/politics/2022/09/22/greg-norman-pitching-liv-golf-gets-rough-congress-welcome/. A true and correct copy of this article is attached hereto as Exhibit C-23.

36.     The following is a true and correct link to the 9/11 Families United webpage I last accessed on January 3, 2023: https://911familiesunited.org/9-11-families-outraged-at-american-golfers-sports-washing-of-saudi-arabia/

37.     Attached as Exhibit C-24 is a true and accurate copy of Doc. 6003-2 from *In re: Terrorist Attacks*, No. 1:03-md-01570-GBD-SN.

38.     If Clout is required to respond to the subpoena as-written, Clout will be required to review tens of thousands of potentially-responsive documents, which will likely take hundreds of hours, and therefore well over $100,000 to review and produce.


I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed in Kansas City, Missouri on January 3, 2023.


*/s/ Edward Greim*
Edward Greim

# Exhibit C-1

The Washington Post

*Democracy Dies in Darkness*

NATIONAL SECURITY

# CIA concludes Saudi crown prince ordered Jamal Khashoggi's assassination

By Shane Harris, Greg Miller and Josh Dawsey
November 16, 2018 at 6:11 p.m. EST

The CIA has concluded that Saudi Crown Prince Mohammed bin Salman ordered the assassination of journalist Jamal Khashoggi in Istanbul last month, contradicting the Saudi government's claims that he was not involved in the killing, according to people familiar with the matter.

The CIA's assessment, in which officials have said they have high confidence, is the most definitive to date linking Mohammed to the operation and complicates the Trump administration's efforts to preserve its relationship with a close ally. A team of 15 Saudi agents flew to Istanbul on government aircraft in October and killed Khashoggi inside the Saudi Consulate, where he had gone to pick up documents that he needed for his planned marriage to a Turkish woman.

In reaching its conclusions, the CIA examined multiple sources of intelligence, including a phone call that the prince's brother Khalid bin Salman, the Saudi ambassador to the United States, had with Khashoggi, according to the people familiar with the matter, who spoke on the condition of anonymity to discuss the intelligence. Khalid told Khashoggi, a contributing columnist to The Washington Post, that he should go to the Saudi Consulate in Istanbul to retrieve the documents and gave him assurances that it would be safe to do so.

It is not clear if Khalid knew that Khashoggi would be killed, but he made the call at his brother's direction, according to the people familiar with the call, which was intercepted by U.S. intelligence.

Fatimah Baeshen, a spokeswoman for the Saudi Embassy in Washington, said the ambassador and Khashoggi never discussed "anything related to going to Turkey." She added that the claims in the CIA's "purported assessment are false. We have and continue to hear various theories without seeing the primary basis for these speculations."

The CIA's conclusion about Mohammed's role was also based on the agency's assessment of the prince as the country's de facto ruler who oversees even minor affairs in the kingdom. "The accepted position is that there is no way this happened without him being aware or involved," said a U.S. official familiar with the CIA's conclusions.

The CIA sees Mohammed as a "good technocrat," the U.S. official said, but also as volatile and arrogant, someone who "goes from zero to 60, doesn't seem to understand that there are some things you can't do."

CIA analysts believe he has a firm grip on power and is not in danger of losing his status as heir to the throne despite the Khashoggi scandal. "The general agreement is that he is likely to survive," the official said, adding that Mohammed's role as the future Saudi king is "taken for granted."

A spokesman for the CIA declined to comment.

Over the past several weeks, the Saudis have offered multiple, contradictory explanations for what happened at the consulate. This week, the Saudi public prosecutor blamed the operation on a rogue band of operatives who were sent to Istanbul to return Khashoggi to Saudi Arabia, in an operation that veered off course when the journalist "was forcibly restrained and injected with a large amount of a drug resulting in an overdose that led to his death," according to a report by the prosecutor.

The prosecutor announced charges against 11 alleged participants and said he would seek the death penalty against five of them.

The assassination of Khashoggi, a prominent critic of Mohammed's policies, has sparked a foreign policy crisis for the White House and raised questions about the administration's reliance on Saudi Arabia as a key ally in the Middle East and bulwark against Iran.

President Trump has resisted pinning the blame for the killing on Mohammed, who enjoys a close relationship with Jared Kushner, the president's son-in-law and senior adviser. Privately, aides said, Trump has been shown evidence of the prince's involvement but remains skeptical that Mohammed ordered the killing.

The president has also asked CIA and State Department officials where Khashoggi's body is and has grown frustrated that they have not been able to provide an answer. The CIA does not know the location of Khashoggi's remains, according to the people familiar with the agency's assessment.

Among the intelligence assembled by the CIA is an audio recording from a listening device that the Turks placed inside the Saudi Consulate, according to the people familiar with the matter. The Turks gave the CIA a copy of that audio, and the agency's director, Gina Haspel, has listened to it.

The audio shows that Khashoggi was killed within moments of entering the consulate, according to officials in multiple countries who have listened to it or been briefed on its contents. Khashoggi died in the office of the Saudi consul general, who can be heard expressing his displeasure that Khashoggi's body now needed to be disposed of and the facility cleaned of any evidence, according to people familiar with the audio recording.

The CIA also examined a call placed from inside the consulate after the killing by an alleged member of the Saudi hit team, Maher Mutreb, a security official who has often been seen at the crown prince's side and who was photographed entering and leaving the consulate on the day of the killing.

Mutreb called Saud al-Qahtani, then one of the top aides to Mohammed, and informed him that the operation had been completed, according to people familiar with the call.

This week, the Treasury Department sanctioned 17 individuals it said were involved in Khashoggi's death, including Qahtani, Mutreb and the Saudi consul general in Turkey, Mohammad al-Otaibi.

The CIA's assessment of Mohammed's role in the assassination also tracks with information developed by foreign governments, according to officials in several European capitals who have concluded that the operation was too brazen to have taken place without Mohammed's direction.

Turkish President Recep Tayyip Erdogan has said his government has shared the audio with Germany, France, Britain and Saudi Arabia.

In addition to calls and audio recordings, CIA analysts also linked some members of the Saudi hit team directly to Mohammed himself. Some of the 15 members have served on his security team and traveled in the United States during visits by senior Saudi officials, including the crown prince, according to passport records reviewed by The Post.

The United States had also obtained intelligence before Khashoggi's death that indicated he might be in danger. But it wasn't until after he disappeared on Oct. 2 that U.S. intelligence agencies began searching archives of intercepted communications and discovered material indicating that the Saudi royal family had been seeking to lure Khashoggi back to Riyadh.

Two U.S. officials said there has been no indication that officials were aware of this intelligence in advance of Khashoggi's disappearance or had missed any chance to warn him.

Khashoggi "was not a person of interest" before his disappearance, and the fact that he was residing in Virginia meant that he was regarded as a U.S. person and therefore shielded from U.S. intelligence gathering, one of the officials said.

Trump has told senior White House officials that he wants Mohammed to remain in power because Saudi Arabia helps to check Iran, which the administration considers its top security challenge in the Middle East. He has said that he does not want the controversy over Khashoggi's death to impede oil production by the kingdom.

One lingering question is why Mohammed might have decided to kill Khashoggi, who was not agitating for the crown prince's removal.

A theory the CIA has developed is that Mohammed believed Khashoggi was a dangerous Islamist who was too sympathetic to the Muslim Brotherhood, according to people familiar with the assessment. Days after Khashoggi disappeared, Mohammed relayed that view in a phone call with Kushner and John Bolton, the national security adviser, who has long opposed the Brotherhood and seen it as a regional security threat.

Mohammed's private condemnation of the slain journalist stood in contrast to his government's public comments, which mourned Khashoggi's killing as a "terrible mistake" and a "tragedy."

U.S. officials are unclear on when or whether the Saudi government will follow through with its threatened executions of the individuals blamed for Khashoggi's killing. "It could happen overnight or take 20 years," the U.S. official said, adding that the treatment of subordinates could erode Mohammed's standing going forward.

In killing those who followed his orders, "it's hard to get the next set [of subordinates] to help," the official said.

John Hudson and Missy Ryan in Washington, Souad Mekhennet in Frankfurt, and Loveday Morris and Kareem Fahim in Istanbul contributed to this report.

# Exhibit C-2



☰  politics                                                                                      AudioLive TV

**KFILE**

# Biden and his top officials slammed Trump's lack of action against Saudi Arabia, MBS in years before taking office

By Andrew Kaczynski and Em Steck, CNN

Updated 8:43 AM EST, Wed March 3, 2021



▯ Video Ad Feedback

Bash to Psaki: Why hasn't Saudi Arabia been held accountable for murder of Khashoggi?

03:42 - Source: CNN

**(CNN)** — In the years prior to taking office, President Joe Biden, Vice President Kamala Harris, and many of their administration's top officials harshly criticized President Donald Trump's lack of action against Saudi Arabia and Crown

Prince Mohammed bin Salman for the 2018 murder of Saudi journalist and Washington Post columnist Jamal Khashoggi.

Biden is now facing criticism for not following through on campaign promises to hold Saudi Arabia accountable for the killing. The administration last Friday released a declassified intelligence report on Khashoggi's murder that said the crown prince, commonly known as MBS, directly approved the operation that ended with the murder of Khashoggi. He was killed and allegedly dismembered after entering the Saudi consulate in Istanbul on October 2, 2018, having gone into the building to collect documents for his upcoming wedding.



**RELATED ARTICLE**
Fact-checking Psaki's claim that there 'have not been sanctions put in place' on foreign leaders even in recent past

---

US Secretary of State Antony Blinken on Friday announced visa restrictions that affected 76 Saudis believed to be involved in harassing activists and journalists, but he did not announce any measures against the crown prince. And while the Biden administration has taken more steps than the Trump administration to punish Saudi actors for their role in Khashoggi's death, the actions of key members of the Biden administration differ from the sharp criticism they offered before they took office.

A CNN KFile review of past comments from Biden, Harris and some of their administration's top officials shows the extent to which they criticized the Trump administration for not punishing MBS or senior Saudi officials directly or seeking accountability from the Saudi government.

The White House referred CNN to remarks made by White House press secretary Jen Psaki at Tuesday's briefing. Psaki outlined the Biden administration's actions, including sanctioning the former deputy head of general intelligence and imposing visa restrictions on 76 Saudis believed to be involved with the Khashoggi operation, and said the White House "made clear that we expect additional reforms to be put in place" in their conversations with Saudi Arabia.



**RELATED ARTICLE**
Biden administration never considered MBS sanctions a viable option in response to Khashoggi report

---

"These decisions were made on the basis of decades of experience and consideration by our national security team on what would be most effective in not only deterring actions like this in the future, preventing this from ever happening again – which is, of course, our objective – but also being able to maintain a relationship moving forward," Psaki said.

"And, of course, we have important work we do with the kingdom of Saudi Arabia from intelligence sharing to deterring the actions of militants in the region. Those are in the national interest of those in the United States."

The State Department did not respond to multiple requests for comment.

## President Joe Biden and Vice President Kamala Harris

Speaking on the campaign trail at a CNN town hall in 2019, Biden referred to Khashoggi's death as "flat-out murder," saying the Saudi journalist was "butchered," and called for "consequences."

Two years after Khashoggi was murdered on October 2, 2018, Biden released a statement through his campaign calling for "accountability," and saying his administration would "reassess our relationship with the Kingdom." He also vowed he would punish senior Saudi leaders in a way the Trump administration did not.

"There's very little social redeeming value in the present government in Saudi Arabia," Biden said in a 2019 Democratic debate. "They have to be held accountable."

**RELATED ARTICLE**


**RELATED ARTICLE**
Three names mysteriously removed from Khashoggi intelligence report after initial publication
Case 1:22-mc-00126-CJN-MAU   Document 11-3   Filed 01/03/23   Page 14 of 1028

In tweets from June and October of 2019, as a Democratic presidential candidate, Harris also called for holding Saudi officials responsible.

"It's been 1 year since the horrific, premeditated murder of Washington Post journalist Jamal Khashoggi by Saudi Arabia. And Trump has yet to hold Saudi officials accountable," she wrote on Twitter in October 2019. "Unacceptable—America must make it clear that violence toward critics and the press won't be tolerated."

## Secretary of State Antony Blinken

Blinken, who is now Biden's secretary of state, in 2019 blasted the Trump administration's handling of Khashoggi's death and murder, calling it a missed opportunity to influence the Saudi government.

"I think the administration has missed a tremendous opportunity to use a horrific, terrible event, the murder of this journalist Khashoggi to use that as a way to influence Saudi behavior and Saudi policies in a way that better reflect our interests and our values," Blinken said on CBS News' Intelligence Matters podcast. "There was a moment to go to Saudi Arabia and say... your new leader or de facto leader, the crown prince acts in impulsive, and sometimes reckless ways. We're not telling you who should lead your country, but we are telling you he needs to be reigned in in some fashion."

"There was a moment to do all of that," he added. "That moment seems to have been squandered. Saudi Arabia seems to have a blank check. This is not about ending the alliance or the partnership with Saudi Arabia. It is making sure that the alliance actually reflects our interests and our values, not just Saudi Arabia's."

Speaking on CNN in November 2018, Blinken, who was a CNN global affairs analyst at the time, criticized "the [Trump] administration's blank check to the Saudis and its refusal apparently to seek any accountability from Mohammad bin Salman for his apparent involvement in the murder."

## National security adviser Jake Sullivan and White House domestic policy director Susan Rice

Jake Sullivan, who is now Biden's national security adviser, harshly criticized the Trump administration's response to Khashoggi's assassination, saying in June 2020 the administration gave Saudi leadership a "blank check" to wrongly continue "jailing dissidents, curbing speech, punishing women, and murdering a US resident and prominent journalist in a grotesque and almost sort of ostentatious way."

Sullivan insisted that a Biden administration would put "values, human rights and human dignity on the agenda" in a way "that has been completely taken off the table by Trump."

"Trump has looked the other way when it comes to the Saudis, taking a US-based journalist and literally hacking him to pieces. Trump gave them a complete free pass. Joe Biden would not, he would hold those responsible to account," he said in a September 2020 podcast.

Sullivan suggested in interviews from June 2020 that the US needed a "more aggressive public condemnation of what happened there than we saw from the Trump administration."

Sullivan's colleague Susan Rice, the former national security adviser to President Barack Obama and Biden's current White House domestic policy adviser, wrote a few weeks after Khashoggi's death that the US should launch an "impartial international investigation" into the matter. She also asserted Khashoggi's death could not have occurred without direction from MBS and that the crown prince must be held personally responsible.

"We should start by leading the push for an impartial international investigation into Mr. Khashoggi's killing. We must be

consistent and public in our judgment that the United States believes the killing could not have occurred without Prince Mohammed's blessing or, more likely, his order, Rice wrote in an October 2018 op-ed.

"Prince Mohammed is not and can no longer be viewed as a reliable or rational partner of the United States and our allies," she wrote, adding that "if we fail to punish him directly and target only those around him, the crown prince will be further emboldened to take extreme actions."

## White House press secretary Jen Psaki and State Department spokesperson Ned Price

Psaki and Ned Price, who are now the White House press secretary and State Department spokesperson, respectively, were both critical of the Trump administration's handling of Khashoggi's death.

Speaking on CNN's "Anderson Cooper 360" in October 2018, Psaki said there needed to "international action," in response to his death. Psaki was a CNN contributor at the time.

"They're really giving them a free pass at this point," she said.

Speaking on CNN's "The Lead" a month later, Psaki criticized the Trump administration's actions, saying MBS wouldn't necessarily survive without US support.

"Look, I think the question – the real issue at hand here is President Trump in and the administration going to stand by MBS... when the increasing evidence seems very clear what happened here," she said. "Obviously, we're going to continue to have a relationship with Saudi Arabia. They're an important relationship for the United States but his survival is interesting here, and I'm not sure survival would be as certain without the US support which he has at this point."

In a pair of tweets from 2018, Price said the Trump administration was "giving MBS a pass" and called Trump's actions "cowardly."

"Trump today cowardly signaled that, as a matter of administration policy, it doesn't matter whether MbS ordered the murder," wrote Price. "Now he'll have to certify, as a matter of law and intelligence, what the experts think. Either way, he'll disregard them to protect the Crown Prince."

## Top State Department nominees Wendy Sherman and Victoria Nuland and Deputy UN Ambassador Jeffrey Prescott

Some of Biden's top state department nominees and deputies were also fiercely critical of the Trump administration's handling of Khashoggi's death.

Wendy R. Sherman, Biden's nominee to become the deputy secretary of state, said that despite America's close allyship with Saudi Arabia, action must be taken.

"We don't have to destroy our relationship with Saudi Arabia. We've all done business with Saudi Arabia. We've all been impressed with some ways in which they've helped us in intelligence and strategic thinking about the Middle East, but this is a crime of untold proportion to take a resident, US citizen and murder them in the Saudi consulate. And there have to be consequences," Sherman said on MSNBC in October 2018.

In a separate interview with the Harvard Gazette two months later, Sherman said the US "cannot stand for what has occurred" and accused world leaders in November 2018 of giving the Saudis a "pass" for their role in Khashoggi's murder.

"I think that the Trump administration, quite frankly a lot of leaders around the world, have decided to give the crown prince of Saudi Arabia a pass," she said on MSNBC in November 2018. "But if you're going to give him a pass, which in this case I would not do, but if you are, end the Yemen war. Stop offensive weapons being sold to Saudi Arabia."

The Biden administration ended offensive military aid for the Saudi-led war in Yemen last month.

Victoria Nuland, Biden's nominee to become the third highest ranking official at the State Department, said there will have to be "consequences for this kind of extraterritorial illegal act."

"[The Khashoggi murder] has really captured the concern of the American people – not just members of Congress, but all across the country, people are watching this case, and Americans don't want to be on the side of grisly killers. They want their country to stand for rule of law, and the president's having to grapple with that now," said Nuland on NPR in October 2018.

Deputy UN Ambassador Jeffrey Prescott in 2019 said Trump refused to hold Saudi leadership to account for Khashoggi's murder.

Prescott tweeted, "[Trump] refused to hold the Saudi leadership to account for the murder of Jamal Khashoggi, an American resident and journalist: 'He's the leader of Saudi Arabia. They've been a very good ally,' Trump said in an interview in the Oval Office."

**Paid Links**

Search CNN...



**Log In**

Live TV

Audio

World

US Politics

Business

Health

Entertainment

Tech

Style

Travel

Sports

Videos

Features

Weather

More



**FOLLOW CNN POLITICS**

   

Terms of Use    Privacy Policy    Cookie Settings    Ad Choices    Accessibility & CC    About    Newsletters    Transcripts

© 2022 Cable News Network. A Warner Bros. Discovery Company. All Rights Reserved.
CNN Sans ™ & © 2016 Cable News Network.

# Exhibit C-3

B B C

Home | War in Ukraine | Coronavirus | Climate | Video | World | US & Canada | UK | Business | Tech    More

World | Africa | Asia | Australia | Europe | Latin America | Middle East

ADVERTISEMENT

# Jamal Khashoggi: Saudi embassy street in US renamed after murdered journalist

🕐 16 June 2022

Killing of Jamal Khashoggi



REUTERS

**By Raffi Berg**

BBC News

**A street in front of the Saudi embassy in Washington DC has been renamed after Jamal Khashoggi, whose murder by Saudi agents caused shock around the world.**

The local government in the US capital said it had changed the name to Jamal Khashoggi Way to ensure the dissident's memory "cannot be covered up".

US intelligence concluded that Saudi Crown Prince Mohammed bin Salman approved the killing. He denied this.

Next month, he will hold his first talks with US President Joe Biden.

Human rights activists, members of the US Congress and local councillors gathered outside the embassy on New Hampshire Avenue for the street sign unveiling.

"We intend to remind the people who are hiding behind those doors, we intend to remind them every day, every hour, every minute, that this is Jamal Khashoggi Way," said Sarah Leah Whitson, executive director of Democracy for the Arab World Now (Dawn).



**Reuters** ✔
@Reuters · **Follow**

A street sign in honor of slain journalist Jamal Khashoggi was unveiled outside the Saudi Arabian embassy in Washington, D.C.

**Watch on Twitter**

5:25 PM · Jun 15, 2022

❤️ 3.7K   💬 **Reply**   ↱ **Share**

**Read 191 replies**

The BBC is not responsible for the content of external sites.

**View original tweet on Twitter**

Dawn is a human rights group that was founded by Khashoggi, a dissident Saudi journalist who lived in the US and was a columnist for the Washington Post.

He was murdered by Saudi agents inside the kingdom's consulate in Istanbul, Turkey, in 2018 after being lured there.

A report by US intelligence agencies incriminated the Crown Prince Mohammed, Saudi Arabia's de facto ruler. The prince denied playing any role and Saudi prosecutors blamed "rogue" agents.

The incident caused widespread revulsion, causing the crown prince to be given the cold shoulder by the international community.

- **Khashoggi murder: US softens towards Saudi leader**

- **How did Khashoggi die?**

When he was contesting the Democratic nomination for the presidential election in 2019, Joe Biden pledged to "make [Saudi Arabia] pay the price, and make them in fact the pariah that they are" for Khashoggi's murder.

But on Tuesday the White House announced that Mr Biden would hold face-to-face talks with Crown Prince Mohammed when he visited Saudi Arabia during a Middle East tour in July.

A senior Biden administration official said human rights would be on the agenda, though activists warned that the meeting could rehabilitate the crown prince without guaranteeing improvements in the conservative Gulf kingdom.

Jamal Khashoggi Way is not the first street in front of an embassy in Washington DC to be renamed after a dissident.

**In 2018, the city council renamed the street outside Russia's embassy complex after Boris Nemtsov,** who was shot outside the Kremlin in 2015.

## More on this story



### Biden to visit Middle East allies amid strains

14 June 2022



### US softens towards Saudis after murder snub

14 July 2021



### Major reset under way in US-Saudi alliance

19 February 2021



### Saudi human rights under new spotlight in Biden era

## Related Topics

| Washington DC | Mohammed bin Salman | Saudi Arabia |

| United States | Killing of Jamal Khashoggi |

# Exhibit C-4



My View    Following    Saved

‹    Criminal    Government    Litigation    ›

4 minute read · November 22, 2022 9:27 AM CST · Last Updated a month ago

## Biden administration says Saudi prince has immunity in Khashoggi killing lawsuit

By Dan Whitcomb and Steve Holland



[Captions auto-generated & unedited.]
Saudi Crown Prince Mohammed bin



WASHINGTON, Nov 18 (Reuters) - The Biden administration ruled on Thursday that Saudi Arabian Crown Prince Mohammed bin Salman has immunity from a lawsuit over the murder of Jamal Khashoggi, drawing immediate condemnation from the slain journalist's former fiancee.

Advertisement · Scroll to continue

"Jamal died again today," Khashoggi's ex-fiancée, Hatice Cengiz, said on Twitter minutes after the news became public. She added later: "We thought maybe there would be a light to justice from #USA But again, money came first."

 **Register for free to Reuters and know the full story**

Register now

The Saudi government communications office did not immediately respond to a request for comment on Friday.

A spokesperson for the Saudi consulate in Washington could not be reached for comment on Thursday evening, after business hours.

## Latest Updates

Employment
**Union-friendly changes in the works at U.S. labor board**

Supreme Court of the United States
**Environmental cases to watch in 2023**

View 2 more stories ⌄

Feedback

"This is a legal determination made by the State Department under longstanding and well-established principles of customary international law," a spokesperson for the White House National Security Council said in a written statement. "It has nothing to do with the merits of the case."

The spokesperson referred further questions to the State and Justice Departments.

Advertisement · Scroll to continue

Justice Department lawyers said that the executive branch of U.S. government, referring to the Biden Administration, had "determined that defendant bin Salman, as the sitting head of a foreign government, enjoys head of state immunity from the jurisdiction of U.S. courts as a result of that office."

In late September, Saudi King Salman named Prince Mohammed prime minister in a royal decree which a Saudi official said was in line with responsibilities that the crown prince was already exercising.



"The Royal Order leaves no doubt that the Crown Prince is entitled to status-based immunity," lawyers for the prince said in an Oct. 3 petition requesting a federal district court in Washington dismiss the case, citing other cases where the United States has recognised immunity for a foreign head of state.

## FIST-BUMP

Biden was criticized for fist-bumping the crown prince on a visit to Saudi Arabia in July to discuss energy and security issues. The White House said Biden had told Prince Mohammed that he considered him responsible for Khashoggi's killing.

The prince, known by his initials MbS, has denied ordering Khashoggi's killing but acknowledged later that it took place "under my watch."

The longstanding alliance between the two countries was strained in October when a decision by the OPEC+ oil producer group led by Saudi Arabia to cut oil production unleashed a war of words between the White house and Riyadh.

The decision had raised concerns in Washington about the possibility of higher gasoline prices ahead of the November midterm elections. This latest move shows the administration's weakness vis-a-vis the kingdom, some analysts said.

"Deciding to grant sovereign immunity to MbS will send a very clear signal to him: that he should continue asserting Saudi Arabia's nationalist interests without compromise, even when these go directly against core interests of the United States," Cinzia Bianco, visiting fellow at the European Council on Foreign Relations, said.

Khashoggi had criticized the crown prince's policies in Washington Post columns. He had traveled to the Saudi consulate in Istanbul to obtain papers he needed to marry Cengiz, a Turkish citizen.

"It's beyond ironic that President Biden has single-handedly assured MBS can escape accountability when it was President Biden who promised the American people he would do everything to hold him accountable. Not even the Trump administration did this," Sarah Lee Whitson, a spokeswoman for Democracy for the Arab World Now, said in a written statement.

In a highly charged global atmosphere, the United States is keen to prevent its long-time ally from further distancing itself.

"Amid great power competition with Russia and China, the United States recognizes that Saudi has other options. And a further pivot of Saudi to the East must be prevented at all costs," Andreas Krieg, professor at King's College in London, said.



**Register for free to Reuters
and know the full story**

Cameron-Moore, William Maclean

    

Our Standards: **The Thomson Reuters Trust Principles.**

### Read Next / Editor's Picks

World
**The Republican wave that wasn't could dim Trump's White House hopes**
6:12 AM CST

World
**JPMorgan, Deutsche Bank seek dismissal of lawsuits by Jeffrey Epstein accusers**
4:51 AM CST

World
**Over 40% of U.S. COVID cases caused by Omicron subvariant XBB.1.5 - CDC**
December 30, 2022

Future of Money
**U.S. review could delay or block Binance deal for Voyager Digital**
December 30, 2022

**Newsletter** | Sent every weekday.

**Daily Docket**

An in-depth look at the day's most important headlines concerning the courts, law firms and the practice of law.

Sign up

## More from Reuters

Former Pope Benedict dies aged 95
(1:18) - December 31, 2022
Watch more videos



**Former Pope Benedict dies aged 95**
01:18


**Capitol riot panel report makes case to try Trump**
02:21


**Reuters pictures of the year 2022**
02:20


**England's trans teens face mounting barriers to care**
06:06


**A drag queen story hour goes ahead despite threats**


# Exhibit C-5

# Intelligencer



FEB. 17, 2016

## Donald Trump Suggested Saudi Arabia Was Behind 9/11 Multiple Times Wednesday

 *By Eric Levitz, senior writer for Intelligencer who covers politics and economics*



"Look at Saudi Arabia." Photo: Alex Wong/Getty Images

It's the oldest rule in politics: If you ever find yourself with a double-digit lead over all of your rivals, start accusing U.S. allies of knocking down the Twin Towers.

Did I type *oldest*? I meant the newest. On Wednesday, a series of polls showed Donald Trump head and shoulders above the rest of the GOP field both nationally and in this Saturday's primary in the Palmetto

State. To protect his lead, the former reality star decided to take his heresies against the Republican mainstream even one step further.



"Who blew up the World Trade Center? It wasn't the Iraqis, it was Saudi — take a look at Saudi Arabia, open the documents," Trump told the gang at *Fox & Friends* Wednesday morning, after defending his bizarre theory that George W. Bush was president on September 11.

Trump appeared to be referencing the 28 pages that were redacted from the 2002 Joint Inquiry into the 9/11 attacks. Those pages are widely said to implicate Saudi elites of financing the attacks. Last year, Massachusetts congressman Stephen Lynch told *The New Yorker* that the document offers direct evidence of "complicity on the part of certain Saudi individuals and entities in Al Qaeda's attack on America."

The Donald reiterated his suspicion of Saudi involvement at a campaign event later in the day, Mediaite reports.

"It wasn't the Iraqis that knocked down the World Trade Center," Trump told a crowd in Bluffton, South Carolina. "It wasn't the Iraqis. You will find out who really knocked down the World Trade Center, 'cuz they have papers in there that are very secret. You may find it's the Saudis, okay? But you will find out."

Fifteen of the 19 hijackers were Saudi nationals. And in 2012, former senator Bob Graham of Florida, who headed the 9/11 inquiry, wrote in an affidavit, "I am convinced that there was a direct line between at least some of the terrorists who carried out the September 11th attacks and the government of Saudi Arabia."

Graham's statement doesn't constitute a claim that the Saudi royal family had foreknowledge of the attacks. But it is a strong suggestion that some Saudi elites were sympathetic enough to Osama bin Laden's cause to help fund it. If Trump intended to claim that Saudi Arabia was more complicit in 9/11 than Saddam Hussein was, his point would be inarguable. But no matter what he meant, it's not every day that someone with a solid chance of becoming our next president repeatedly accuses an American ally of complicity in the worst terrorist attack in U.S. history.

TAGS: DONALD TRUMP   SAUDI ARABIA   GOP PRIMARY   SEPTEMBER 11

■ LEAVE A COMMENT

THE **Intelligencer** FEED

**9:59 A.M.** NFL

### Bills Say Damar Hamlin Went Into Cardiac Arrest on Field

*By Benjamin Hart*

The 24-year-old remained in the hospital in critical condition after collapsing on Monday night.



**8:00 A.M.** SOCIAL STUDIES

### America's Population Could Use a Boom

*By Jeff Wise*

Failing to reverse the country's population decline may exact a heavy toll.



**8:00 A.M.** POWER

### Life After Parkland

*By X González*

A shooting at their high school turned X González into an activist, a celebrity, a "survivor" — and the pressure almost killed them.



**MOST POPULAR**

**1.** **Remote Work Is Poised to Devastate America's Cities**
*By* ERIC LEVITZ

**2.** **Donald Trump's Final Campaign**
*By* OLIVIA NUZZI

**3.** **When Supply, Not Demand, Is the Problem**
*By* ERIC LEVITZ

**4.** **Bills Say Damar Hamlin Went Into Cardiac Arrest on Field**
*By* BENJAMIN HART

**5.** **America's Population Could Use a Boom**
*By* JEFF WISE

---

**1/2/2023** THE ENVIRONMENT
**New Yorkers Can Now Compost Themselves**
*By Chas Danner*
New York is now the sixth state to legalize human composting, which is one of several emerging green burial methods.

**1/2/2023** THE SYSTEM
**When Supply, Not Demand, Is the Problem**
*By Eric Levitz*
The economy is changing. Liberalism must change with it.

**12/31/2022** EARLY AND OFTEN
**Now You Can Read Trump's Tax Returns**
*By Chas Danner*
Here are some of the new revelations in the thousands of pages of documents released Friday by the House Ways and Means Committee.

**12/31/2022** FOREIGN INTERESTS
**Israel's Illiberal Rightward Turn Is a Warning**
*By Ross Barkan*
Netanyahu is back, leading an extreme-right government that leaves both Israel and America's left in an impossible bind.

**12/30/2022** BIG TECH
**Do You Have the Right to Repair Your Phone?**
*By Chris Stanton*
A movement taking on the likes of Apple is winning a major battle for consumers.

**12/30/2022** GAMES
**The 10 Biggest Sports Stories of 2022**
*By Will Leitch*
It was a normal-feeling year at last — but the real world kept intruding.

**12/29/2022** ELON MUSK

## Tesla's Terrible Year Has Gotten Even Worse

As Elon Musk devotes his time to boosting conspiracy theories on Twitter, the electric-car company's stock continues to plummet.

**12/29/2022  POLITICS**

## George Santos's Mother Did Not Die on 9/11

*By Nia Prater*

As the Congressman-elect's lies pile up, Attorney General Letitia James and the Nassau County DA's office have opened investigations.

**12/29/2022  NATURAL DISASTERS**

## The Bodies and the Blame Pile Up in Buffalo

*By Matt Stieb And Nia Prater*

The death toll from the Christmas storm is now at 37, and some residents are blaming the city for not issuing a travel ban earlier.

**12/29/2022  THE CITY POLITIC**

## What Hakeem Jeffries and Chuck Schumer Could Do for New York

*By Ross Barkan*

Bail out the subway, for starters.

**12/29/2022  THE WORLD IN 2023**

## Remote Work Is Poised to Devastate America's Cities

*By Eric Levitz*

To survive the work-from-home revolution, cities must let developers convert office buildings into deeply weird apartments.

**12/28/2022  CANCEL CULTURE**

## How Did Southwest Airlines Screw Up This Bad?

*By Matt Stieb*

The storm is over, but the canceled flights keep coming.

**12/28/2022  GEORGE SANTOS**

## George Santos Admits He Lied a Lot. But Maybe Not About Everything!

*By Ed Kilgore*

The Long Island fabulist got away with inventing an identity thanks to his prior obscurity. But he's not obscure anymore.

**12/27/2022  EARLY AND OFTEN**

## Politicians Whose Careers Didn't Survive 2022

*By Ed Kilgore*

From Sarah Palin to Liz Cheney to Beto O'Rourke, some big names in politics will likely fade from sight in the New Year.

**12/27/2022** TREMENDOUS CONTENT

### The History of Donald Trump Pretending to Be Superman

*By Margaret Hartmann*

The modern version of Lex Luthor is based on Trump, but that hasn't kept the man of "stop the steal" from repeatedly posing as the Man of Steel.

**12/27/2022** POLITICS

### Over 100 Migrants Were Sent to Kamala Harris's House on Christmas

*By Claire Lampen*

Local volunteers say they came from Texas, apparently at Governor Greg Abbott's direction.

**12/27/2022** THE INSIDE GAME

### Joe Biden Is Quietly Rolling Into 2024

*By Gabriel Debenedetti*

He has silenced a year's worth of chatter about potential replacements.

**12/26/2022** GAMES

### The Seven Most Important Athletes of 2022

*By Will Leitch*

Records broken, swan songs sung, and a superstar freed.

**12/23/2022** EXTREME WEATHER

### Oh, the Weather Outside Is Frightful

*By Chas Danner*

Vast stretches of the country have been struck by the bomb cyclone, making a treacherous mess.

**12/23/2022** YEAR IN REVIEW

### Intelligencer's 20 Most-Read Stories in 2022

*By Intelligencer Staff*

The articles our readers were most deeply engaged with this year.

**12/23/2022** THE POWER TRIP

### Donald Trump's Final Campaign

*By Olivia Nuzzi*

Inside his sad, lonely, thirsty, broken, basically pretend run for reelection. (Which isn't to say he can't win.)

**12/22/2022** EARLY AND OFTEN

### Senate Passes Massive Spending Bill That Closes January 6 Loophole

*By Ed Kilgore*

A dispute over immigration policy nearly blew up the whole thing, but the deal got done — with Electoral Count Act reforms intact.



SIGN IN TO COMMENT

 

**ABOUT INTELLIGENCER**     **ABOUT NEW YORK MAGAZINE**

**NEWSLETTERS**     **HELP**

**CONTACT**     **PRESS**

**MEDIA KIT**     **WE'RE HIRING**

**PRIVACY**     **TERMS**

**AD CHOICES**     **DO NOT SELL MY INFO**

**ACCESSIBILITY**

INTELLIGENCER IS A VOX MEDIA NETWORK.

© 2023 VOX MEDIA, LLC. ALL RIGHTS RESERVED.

# Exhibit C-6



-17%        -20%      -25%      -22%      -13%      -30%      -15%

              $26.95     $41.95    $27.95    $59.95    $27.95    $63.95
            -38%       -44%                -45%      -36%      -39%

$69.95       $57.95    $53.95    $81.95    $54.95    $69.95

# 9/11 families respond to Biden Saudi Arabia trip: 'Empathy is not enough'

The president plans to travel to Saudi Arabia in July.

By **Ben Gittleson** and **Armando Garcia**
June 14, 2022, 6:52 PM

↗ Share



On Location: January 3, 2023
Catch up on the developing stories making headlines.

---

A coalition of families and survivors of the Sept. 11 attacks on Tuesday urged President Joe Biden, during his visit to Saudi Arabia next month, to hold the kingdom accountable for its role in the terrorist strike that killed almost 3,000 people.

"We appreciate the president's commitment to do everything he can to support the 9/11 family community, but empathy is not enough," Terry Strada, the national chair of "9/11 Families United," said in a statement. "President Biden must do what past presidents have not, which is to demand transparency from Saudi Arabia and accountability for those who supported al Qaeda and the hijackers who murdered our loved ones."

## Top Stories



**Idaho murders: Suspect was identified through DNA using genealogy...**
Jan 2, 5:01 PM



**Family spokesperson gives update on Damar Hamlin's condition: 'He'...**
3 hours ago



**Buffalo Bills' Damar Hamlin in critical condition after cardiac...**
Jan 3, 1:18 AM



**Idaho suspect due in court, his family attending in support**
2 hours ago



**National park closes after hundreds of migrants land on islands**
Jan 2, 2:30 PM

○ ABC News Live



*24/7 coverage of breaking news and live events*

include a meeting with Saudi Arabia's King Salman, as well as with the effective leader of the country, Crown Prince Mohammed bin Salman, according to White House officials.



President Joe Biden walks down the steps of Air Force One at Andrews Air Force Base, Md., June 14, 2022.

Susan Walsh/AP



Strada was responding to a comment by White House spokesman John Kirby during an interview with CNN earlier in the day.

"What I can tell you is that the president will never shy away of representing the interests of the American people on a national security level wherever he goes," Kirby said, when asked if he could assure the victims' families that Biden would address some of their concerns with Mohammed.

"He continues to do everything he can to support the families of the victims of 9/11," Kirby added. "He knows what a devastating grief they still endure, and he will not shy away from representing them and their concerns."

and noted the president has taken steps toward accountability.

"President Biden made a commitment to ensuring the maximum degree of transparency under the law and to assist these families in their work to seek full accountability regarding the declassification of 9/11 documents," the spokesperson said, pointing to an executive order Biden signed that required certain federal agencies to review classified documents related to Sept. 11; that action has resulted in the declassification and release of thousands of pages of documents since he took office.

---

MORE: Fired-up Biden blames Republicans for blocking his plan to fight inflation    →

---

Biden has come under intense criticism for agreeing to meet with Mohammed, whom the U.S. has assessed ordered the operation that murdered Washington Post columnist Jamal Khashoggi.

As a candidate, Biden pledged to make Saudi Arabia a "pariah" over its human rights abuses.

But the president has also struggled to rein in sky-high inflation. While many ways out of his control, the rapidly rising cost of goods is weighing on Americans' wallets and proving to be a major political liability for Biden and Democrats heading into this fall's midterm elections.

Biden is seeking ways to relieve high gas prices, which have in large part been pushed higher by Russia's invasion of Ukraine and the subsequent sanctions on Moscow's oil and gas sector.

The White House has welcomed increased oil production with the hope it would drive down gas prices in the U.S. Biden authorized a historic release of oil from the nation's strategic reserve of petroleum, and his White House welcomed a decision by the OPEC+ oil cartel to boost its production levels.

While Saudi Arabia and the Biden administration have both said energy security will be part of Biden's discussions during his visit, the White House has sought to avoid the negative optics of an American president flying to Saudi Arabia in a bid for more oil.

"Of course, he will be -- they will discuss energy with the Saudi government," White House press secretary Karine Jean-Pierre told reporters Monday. "I think what I'm trying to say is to look at this trip as it being only about oil is not -- it would be simply wrong to do that."

The president had even danced around whether he was even going to go to Saudi Arabia at all; "I have no direct plans at the moment," he said on June 3, after multiple reports said he planned to travel there.

But while Biden once pledged to isolate Saudi Arabia, Jean-Pierre said Tuesday he was "not looking to rupture relationships."

at White House as Trump family, aides watch
lead fade away

_____

Asked if Biden would bring up Khashoggi during his meeting
with the crown prince, Jean-Pierre would not directly answer.

"Human rights is always part of the conversation in our foreign
engagements," she told reporters on Air Force One, en route to
Philadelphia. "So, that will always be the case."

Biden will also travel to Israel and the West Bank during the trip,
which will take place July 13 to 16, according to the White House.

## Related Topics

President Biden



Now Legal in Missouri, Cheech & Chong Say "You Gotta Try This!"
Tommy Chong's CBD                                    Learn More

Prime Is Now $139, But Few Know This Saving Hack
Online Shopping Tools

Amazon Has Millions Of Prime Subscribers - But Few Know About
This Savings Trick
Premium VIP Offers

New Congress live updates: House GOP drama ahead of speaker vote

New York OKs human composting law; 6th state in US to do so

2 Cards Charging 0% Interest Until 2024
CompareCredit.com

[Learn More]

This "Botox Alternative" Sold Out At Target (in Just 2 Days)
Vibriance

1/2 Cup Of This (Before Bed) Can Melt Your Belly Fat Like Never Before
Healthy Guru

Promoted Links by Taboola

ABC News Network | Privacy Policy | Your CA Privacy Rights | Children's Online Privacy Policy | Interest-Based Ads | About Nielsen Measurement | Terms of Use | Do Not Sell My Personal Information | Contact Us

Copyright © 2023 ABC News Internet Ventures. All rights reserved.

# Exhibit C-7

# SAUDI ARABIA 2021 HUMAN RIGHTS REPORT

## EXECUTIVE SUMMARY

The Kingdom of Saudi Arabia is a monarchy ruled by King Salman bin Abdulaziz Al Saud, who is both head of state and head of government. The 1992 Basic Law sets out the system of governance, rights of citizens, and powers and duties of the government, and it provides that the Quran and Sunna (the traditions of the Prophet Muhammad) serve as the country's constitution. It specifies that the rulers of the country shall be male descendants of the founder, King Abdulaziz (Ibn Saud).

The State Security Presidency, National Guard, and Ministries of Defense and Interior, all of which report to the king, are responsible for law enforcement and maintenance of order. The State Security Presidency includes the General Directorate of Investigation (mabahith), Special Security Forces, and Special Emergency Forces; police are under the Ministry of Interior. Civilian authorities generally maintained effective control over the security forces. There were credible reports that members of the security forces committed some abuses.

Significant human rights issues included credible reports of: executions for nonviolent offenses; forced disappearances; torture and cases of cruel, inhuman, or degrading treatment of prisoners and detainees by government agents; harsh and life-threatening prison conditions; arbitrary arrest and detention; political prisoners or detainees; harassment and intimidation against Saudi dissidents living abroad; arbitrary or unlawful interference with privacy; collective punishment of family members for offenses allegedly committed by an individual; serious abuses in a conflict, including civilian casualties and damage to civilian infrastructure as a result of airstrikes in Yemen; serious restrictions on free expression and media, including unjustified arrests or prosecutions against journalists and others, and censorship; serious restrictions on internet freedom; substantial interference with the freedom of peaceful assembly and freedom of association, including overly restrictive laws on the organization, funding, or operation of nongovernmental organizations and civil society organizations; severe restrictions of religious freedom; restrictions on freedom of movement; inability of citizens to choose their government peacefully through free and fair elections; serious and unreasonable

restrictions on political participation; serious government restrictions on domestic and international human rights organizations; lack of investigation of and accountability for gender-based violence, including but not limited to domestic and intimate partner violence; criminalization of consensual same-sex sexual activity; and restrictions on workers' freedom of association, the role of trade unions, and labor committees.

In several cases the government did not investigate, prosecute, or punish officials accused of committing human rights abuses, contributing to an environment of impunity.  The government prosecuted some officials for corruption, although there were allegations of significant due process violations and other human rights abuses, including allegations of torture, in these cases.

Houthi militant attacks from Yemen caused civilian casualties and damage to infrastructure.

# Section 1. Respect for the Integrity of the Person

## a. Arbitrary Deprivation of Life and Other Unlawful or Politically Motivated Killings

There were no reports that the government or its agents committed arbitrary or unlawful killings.  The Public Prosecutor's Office, which reports to the king, is responsible for investigating whether security force actions were justifiable and pursuing prosecutions.  Capital punishment may be imposed for a range of nonviolent offenses, including apostasy, sorcery, and adultery, although in practice death sentences for such offenses were rare and usually reduced on appeal.

On December 30, media reported that at least three of the individuals convicted in connection with the killing of Jamal Khashoggi, including Salah al-Tubaigy, Mustafa al-Madani, and Mansour Abahussein, were seen living in luxury villas in a government compound near Riyadh.  There was no further action on the case during the year.

In September 2020 the Public Prosecutor's Office announced a final verdict in the murder trial of journalist Jamal Khashoggi, killed at the Saudi consulate in Istanbul, Turkey, in 2018.

In January the Saudi Human Rights Commission (HRC) announced a moratorium on the death penalty for drug-related offenses, but as of November the government had not published the relevant changes.

Discretionary (*ta'zir*) death penalty sentences for those who committed crimes as minors are forbidden, and minors' prison sentences are capped at 10 years under an April 2020 royal decree.  (The 2018 Juvenile Law sets the legal age of adulthood at 18 based on the Hijri calendar.)  Minor offenders, however, who are convicted in *qisas*, a category of crimes that includes various types of murder, or *hudud*, crimes that carry specific penalties under the country's interpretation of Islamic law, still face the death penalty.

On February 8, Human Rights Watch (HRW) reported prosecutors were seeking 10-year prison sentences, rather than the death penalty originally sought, for four men convicted of crimes committed as minors:  Ahmad al-Faraj, Ali al-Batti, Ali al-Faraj, and Mohammed al-Faraj.  They were arrested in 2017 and 2018 on protest-related charges.

On June 15, the government executed Mustafa Hashem al-Darwish, a 26-year-old Shia citizen convicted of terrorism charges.  According to human rights organizations, he was detained in 2015 for alleged participation in riots between 2011 and 2012.  The official charge sheet did not specify the dates his alleged crimes took place, making it unclear whether he had turned 18 by that time. Government officials claimed he was executed for other crimes committed as an adult but provided no further information.

On November 10, the Supreme Court overturned the death sentence conviction against Abdullah al-Huwaiti, arrested at age 14 and sentenced to death three years later on murder and armed robbery charges.  Although no longer at risk of imminent execution, al-Huwaiti could still be sentenced to death at a later stage, since the case remained open, according to the European-Saudi Organization for Human Rights (ESOHR).

On October 27 and November 16, authorities released Shia prisoners Ali al-Nimr and Abdullah al-Zaher following completion of their 10-year prison sentences.  Al-Nimr and al-Zaher, along with Dawood al-Marhoun who remained imprisoned,

were arrested in 2012 as minors when they participated in political protests in 2011.  In February all three had their death sentences commuted to 10 years in prison with credit for time served.

On November 10, the Supreme Court overturned the death sentence conviction against Abdullah al-Huwaiti, arrested at age 14 and sentenced to death three years later on murder and armed robbery charges.

On November 11, the ESOHR said at least four individuals accused of crimes committed as minors continued to face the possibility of capital punishment, including Sajjad al-Yassin, Jalal al-Labbad, Yusuf al-Manasif, and Hasan Zaki al-Faraj.

## b. Disappearance

There were reports of disappearances carried out by or on behalf of government authorities.

According to the human rights organization al-Qst (ALQST) and Prisoners of Conscience, the whereabouts of physician and internet activist Lina al-Sharif were unknown since her arrest in May.  The groups claimed al-Sharif was arrested for comments on social media regarding national politics and human rights issues.

There were no updates during the year regarding the whereabouts of several members of the royal family detained in March 2020, including the former crown prince Mohammed bin Nayef Al Saud, Prince Ahmed bin Abdulaziz Al Saud, and Prince Nayef bin Ahmed Al Saud, a former head of army intelligence.  The government did not announce their detentions, but Reuters reported that the princes were accused of "contact with foreign powers to carry out a coup d'etat."  In June *NBC News* reported the former crown prince was being held at a government compound in Riyadh, but there was no subsequent confirmation.  According to the report, he had lost significant weight, could no longer walk unaided due to serious injuries from beatings, and was deprived of pain medication needed for previous injuries.

There was also no information during the year regarding the whereabouts of Prince Faisal bin Abdullah Al Saud, former head of the Saudi Red Crescent Society, also

detained by security forces in March 2020.

On April 5, the Specialized Criminal Court sentenced Abdulrahman al-Sadhan to 20 years' imprisonment, followed by a 20-year travel ban, on terrorism financing and facilitation charges.  After his arrest in 2018, al-Sadhan was detained incommunicado for two years before being allowed to speak with his family.  Legal proceedings against him began on March 3 in a process that Amnesty International said was marred by rights violations.  Al-Sadhan reportedly tweeted comments critical of the government and sympathetic to ISIS, which family members claimed were satirical in nature.  Family members alleged that al-Sadhan was physically abused during his detention and that he was unable to present a proper legal defense during his trial.

In July representatives of the family of Princess Basmah bint Saud reportedly filed an appeal to the Special Procedures experts at the UN Human Rights Council requesting their intervention to demand that authorities provide proof that she was alive.  Detained since 2019, media and rights groups reported the princess had health problems, including heart issues and osteoporosis.  On May 29, *Forbes* reported she had a brief telephone call with a relative.

## c. Torture and Other Cruel, Inhuman, or Degrading Treatment or Punishment

The law prohibits torture and makes officers who are responsible for criminal investigations liable for any abuse of authority.  Sharia, as interpreted in the country, prohibits judges from accepting confessions obtained under duress.  Statutory law states that public investigators shall not subject accused persons to coercive measures to influence their testimony.  There were, however, reports by human rights organizations, the United Nations, and independent third parties of torture and other cruel, inhuman, or degrading treatment or punishment.

Officials from the Ministry of Interior, Public Prosecutor's Office, and HRC, which is responsible for coordinating with other government entities to investigate and respond to alleged human rights violations (see section 5), claimed that rules prohibiting torture prevented such practices from occurring in the penal system, but human rights organizations, the United Nations, and independent third parties

said there were reports of torture and mistreatment of detainees by law enforcement officers.  Amnesty International assessed in August that the Specialized Criminal Court "routinely condemns defendants to lengthy prison terms and even death sentences following convictions based on 'confessions' extracted through torture."  It alleged that Mustafa al-Darwish's June execution resulted from confessions obtained by torture (see section 1.a.).  Amnesty International reported that former detainees in Mabahith-run facilities alleged abuse, including beatings, sleep deprivation, and long periods of solitary confinement for nonviolent detainees.

On January 15, three UN special rapporteurs sent a letter to the government regarding Ali Hassan al-Rabea, expressing concern at the alleged use of torture and mistreatment to extract confessions and other evidence.  In December 2020 the Supreme Court sentenced al-Rabea to death in a final ruling, not subject to appeal.  As of year's end, the sentence was pending King Salman's approval.  Al-Rabea was arrested in 2013, charged with participating in demonstrations, chanting antigovernment slogans, and possessing weapons.  The primary evidence reportedly presented against him was the confession allegedly made after being subjected to torture and mistreatment.

In July HRW reported anonymous accounts from prison guards alleging torture of political detainees, including of prominent activists Loujain al-Hathloul and Mohammed al-Rabea.  They alleged women's rights activists and others were subjected to electric shocks, beatings, whippings, and sexual abuse.  In February, following her sentencing and conditional release, al-Hathloul's family reported that an appeals court rejected a lawsuit regarding her claims of torture.  In December 2020 the Riyadh Criminal Court had previously dismissed her claim, citing a lack of evidence.

On July 28, the *Washington Post* reported that former interior ministry official Salem al-Muzaini was whipped, starved, beaten with iron bars, and subjected to electric shocks while held at two Saudi prisons and the Ritz-Carlton hotel from September 2017 until January 2018.  He was originally detained in Dubai in 2017 and transferred to Saudi Arabia.  Following his release in 2018, al-Muzaini allegedly disappeared in August 2020 after visiting a senior Saudi security official.  Al-Muzaini was married to Hissah al-Muzaini, the daughter of Saad al-Jabri, a

former high-ranking intelligence official who fled the country in 2016 (see sections 1.e. and 1.f.).

Courts continued to sentence individuals to corporal punishment. In March the Supreme Court clarified that the April 2020 royal decree that effectively eliminated flogging in most cases could be applied retroactively to sentences predating the decree. While flogging may no longer be used as a discretionary ta'zir sentence, it can still be used for three hudud crimes: drunkenness, sexual conduct between unmarried persons, and false accusations of adultery.

In March local media reported that the appeals court in Jeddah issued a final decision to overturn a sentence of 5,000 lashes for an individual convicted on drug trafficking charges. Reportedly the man instead received five years in prison, a five-year travel ban, and a large fine.

No additional information was available whether the remainder of the discretionary flogging element of activist Raif Badawi's sentence had been dropped. Badawi was sentenced to 1,000 lashes, 10 years in prison, and a 10-year travel ban in 2014 for insulting Islam, among other charges. He received 50 lashes in 2015, but further floggings were delayed due to health concerns.

Impunity was a problem in the security forces. Activists questioned the impartiality of procedures to investigate detainees' complaints of torture and maltreatment. The Ministry of Interior stated it installed surveillance cameras to record interrogations of suspects in some criminal investigation offices, police stations, and prisons where such interrogations occur. The government provided human rights training to security forces, but HRW continued to highlight concerns regarding abuse and deplorable conditions in detention centers.

**Prison and Detention Center Conditions**

Prison and detention center conditions varied, and some did not meet international standards; reported problems included overcrowding and inadequate conditions.

**Physical Conditions:** A July 7 ALQST report alleged that detention and deportation facilities suffered from overcrowding, poor hygiene and sanitation, and medical and administrative neglect. On August 14, the ESOHR estimated that at

least 20 persons had died due to prison conditions since 2010, adding that some of them appeared to have been tortured.  The years of individual deaths were not provided.

Juveniles constituted less than 1 percent of detainees and were held in separate facilities from adults, according to available information.

Authorities held pretrial detainees together with convicted prisoners.  They separated persons suspected or convicted of terrorism offenses from the general population.  Activists alleged that authorities sometimes detained individuals in the same cells as individuals with mental disabilities as a form of punishment and said authorities mistreated persons with disabilities.

Authorities differentiated between violent and nonviolent prisoners, sometimes pardoning nonviolent prisoners to reduce the prison population.  Shia inmates were in some cases held in separate wings of prisons and reportedly faced worse conditions than Sunnis.

Prisoners convicted on terrorism-related charges were often required to participate in government-sponsored rehabilitation programs before consideration of their release.

In February Attorney General Saud bin al-Mu'jab issued directives to prevent the spread of COVID-19 among prisoners and detainees.  On April 22, local media reported that approximately 68 percent of detainees in state security prisons were vaccinated against COVID-19.  Rights organizations said Zaheer Ali contracted COVID-19 during a prison outbreak in April and died, which they attributed to medical negligence by prison authorities.  Allegedly arrested for his writings in 2017, Ali died on May 8 in al-Ha'ir Prison, the United Kingdom-based rights groups Sanad and ALQST reported.

On October 12, ALQST reported academic and activist Musa al-Qarni, who was arrested in 2007 along with several other activists and charged with forming a secret organization and spreading anarchy, was beaten to death by fellow inmates. No information was available whether any inmates were charged in connection with his killing.

Online activists reported that at least five members of an outlawed human rights organization, the Saudi Civil and Political Rights Association (ACPRA), along with 25 other detainees in al-Ha'ir Prison, participated in a hunger strike between March 7 and March 14, reportedly to protest denied family contact, poor food quality, and attacks by prisoners suffering from mental illness.  ACPRA members Mohammed al-Qahtani, Fawza al-Harbi, Issa al-Nukhaifi, Fahad al-Arani, and Mohammed al-Hudaif participated, with Abdulaziz al-Sunaidi joining from Onayza Prison in al-Qassim.  On March 14, Prisoners of Conscience announced that the strike was suspended after prison administrators agreed to meet their demands.  On August 15, al-Qahtani restarted his hunger strike to protest prison administrators' alleged reneging on the March agreement.

**Administration:**  There was no information available on whether prisoners were able to submit allegations of mistreatment to prison or prosecutorial authorities without censorship or whether authorities responded or acted upon complaints.  There were multiple legal authorities for prisons and detention centers.  The General Directorate of Prisons administered approximately 91 detention centers, prisons, and jails, while the Mabahith administered approximately 20 regional prisons and detention centers for security prisoners.  The law gives the Public Prosecutor's Office the authority to conduct official visits of prisons and detention facilities "within their jurisdictional areas to ensure that no person is unlawfully imprisoned or detained."

The law provides that "any prisoner or detainee shall have the right to submit, at any time, a written or verbal complaint to the prison or detention center officer and request that he communicate it to a member of the [former] Bureau of Investigations and Public Prosecution [now the Public Prosecutor's Office]."  Prisoners submitted complaints to the HRC, which had offices in a number of prisons, and to the quasi-governmental National Society for Human Rights (NSHR) for follow-up.  Inmates, however, required approval from prison authorities to submit complaints to an HRC office.

The Public Prosecutor's Office announced in July the launch of the Ma'akom system, which allows citizens and residents to submit complaints directly regarding illegal detention or violations of detainee rights, using the online platform Absher, a hotline telephone number, or in person.  The Ministry of Interior-run website

(Nafetha) provided detainees and their relatives access to a database containing information regarding the legal status of the detainee, including any scheduled trial dates.

Authorities generally permitted relatives and friends to visit prisoners twice a week, although certain prisons limited visitation to once or twice a month. Prisoners were typically granted at least one telephone call per week.  There were reports that prison, security, or law enforcement officials denied this privilege in some instances, often during pretrial investigations.  The families of detainees could access the Nafetha website for applications for prison visits, temporary leave from prison (generally approved around post-Ramadan Eid holidays), and release on bail (for pretrial detainees).  Starting on October 31, families of detainees who received two doses of an approved coronavirus vaccine could apply for prison visits.  Family members of detained persons under investigation or in pretrial detention said family visits were typically not allowed, while others said visits or calls were extremely brief (less than five minutes).  Authorities at times reportedly denied some detainees their weekly call for several months or years.  Some family members of prisoners complained authorities canceled scheduled visits with relatives without reason.

**Independent Monitoring:**  Independent institutions were not permitted to conduct regular, unannounced visits to places of detention, according to the UN Committee against Torture.  Foreign diplomats regularly requested to attend non-consular trials of high-profile detainees but were not admitted into courtrooms.  In a limited number of cases, foreign diplomats were granted consular visits to individuals in detention, but the visits took place in a separate visitors' center where conditions may differ from those in the detention facilities holding the prisoners.

The government permitted the HRC and quasi-governmental NSHR to monitor prison conditions.  The organizations stated they visited prisons throughout the country and reported on prison conditions.  On July 7, local media reported the HRC conducted 1,538 prison visits during the fiscal year 2020-21, including visits to public prisons, security prisons, and various detention centers as well as "social observation centers" and girls' welfare institutions.

## d. Arbitrary Arrest or Detention

The law provides that no entity may restrict a person's actions or imprison a person, except under the provisions of the law.  The law of criminal procedure provides that authorities may not detain a person for more than 24 hours, but the Ministry of Interior and the State Security Presidency, to which the majority of forces with arrest powers reported, maintained and exercised broad authority to arrest and detain persons indefinitely without judicial oversight, notification of charges, or effective access to legal counsel or family, according to human rights groups.

**Arrest Procedures and Treatment of Detainees**

The law gives the Public Prosecutor's Office "complete and independent powers" to identify major crimes that require detention, according to local media.  In August 2020 the public prosecutor issued a list of 25 major crimes that mandate arrest and pretrial detention, including certain border crimes, corruption, homicide, and offenses against national security, among others.

According to the law, "No person shall be arrested, searched, detained, or imprisoned except in cases provided by law, and any accused person shall have the right to seek the assistance of a lawyer or a representative to defend him during the investigation and trial stages."  By law authorities may summon any person for investigation and may issue an arrest warrant based on evidence.  In practice authorities frequently did not use warrants, which were not required under the law in all cases.

The law requires authorities to file charges within 72 hours of arrest and hold a trial within six months, subject to exceptions specified by amendments to the law of criminal procedure and the counterterrorism law (see section 2.a.).  Authorities may not legally detain a person under arrest for more than 24 hours except pursuant to a written order from a public investigator.  Authorities reportedly often failed to observe these legal protections, and there was no requirement to advise suspects of their rights.

The law specifies procedures required for extending the detention period of an accused person beyond the initial five days.  There is a functioning bail system for

less serious criminal charges.  Authorities may approve detentions in excess of six months in "exceptional circumstances," effectively allowing individuals to be held in pretrial detention indefinitely in cases involving terrorism or "violations of state security."  The Public Prosecutor's Office may order the detention of any person accused of a crime under the counterterrorism law for up to 30 days, renewable up to 12 months, and in state security cases up to 24 months with a judge's approval.

By law defendants accused of any crime cited in the law are entitled to hire a lawyer to defend themselves before the court "within an adequate period of time to be decided by the investigatory body."  The government provided lawyers to defendants who made a formal application to the Ministry of Justice to receive a court-appointed lawyer and proved their inability to pay for their legal representation.  In cases involving terrorism or state security charges, detainees generally did not have the right to obtain a lawyer of their choice.

There were reports authorities did not always allow legal counsel access to detainees who were under investigation in pretrial detention.  Authorities indicated a suspect could be held up to 12 months in investigative detention without access to legal counsel if authorized by prosecutors.  Judicial proceedings begin after authorities complete a full investigation.

The king continued the tradition of commuting some judicial punishments.  Royal pardons could set aside a conviction or reduce or eliminate corporal punishment.  The remaining sentence could be added to a new sentence if the pardoned prisoner committed a crime subsequent to release.

Authorities commuted the sentences of some who had received prison terms.  The counterterrorism law allows the Public Prosecutor's Office to stop proceedings against an individual who cooperates with investigations or cooperates in thwarting a planned terrorist attack.  The law authorizes the State Security Presidency to release individuals already convicted in such cases.

**Arbitrary Arrest:**  Rights groups received reports from families claiming authorities held their relatives arbitrarily or without notification of charges.  During the year authorities detained without charge security suspects, persons who publicly criticized the government, Shia religious leaders, individuals with links to

rights activists, and persons accused of violating religious standards.

On May 6, Prisoners of Conscience reported that dozens of journalists and bloggers remained under arbitrary arrest.  In November Prisoners of Conscience reported that authorities had detained blogger Zainab al-Hashemi and university student Asmaa al-Subaie since May without charge.  The two were reportedly arrested with other online activists.  As of year's end, their whereabouts were unknown.

**Pretrial Detention:**  In August 2020 ALQST and the Geneva-based MENA Rights Group lodged a complaint with the UN Working Group on Arbitrary Detention and the Special Procedures of the UN Human Rights Council in Geneva regarding the "arbitrary" detention of Prince Salman bin Abdulaziz bin Salman Al Saud and his father.  In February international media reported that the two were moved from a house in Riyadh to "an undisclosed location" at the end of November 2020.  In 2018 Prince Salman was detained with 11 other princes after they staged what the prosecutor called a "sit-in" at a royal palace in Riyadh to demand the state continue to pay their electricity and water bills.  Sources told *Agence France Presse* that the prince and his father had never been formally interrogated or charged.

Incommunicado detention occurred (see section 1.b.).  Authorities reportedly did not always respect a detainees' right to contact family members following detention, and the counterterrorism law allows the investigatory body to hold a defendant for up to 90 days in detention (or longer) without access to family members or legal counsel.  Security and other types of prisoners sometimes remained in prolonged solitary detention before family members or associates received information of their whereabouts, particularly for detainees in Mabahith-run facilities.

During July and August, family members of Muslim scholar Salman al-Odah and Mohammed al-Qahtani (see section 1.c.) claimed authorities had denied them contact with their family members and lawyers for months.  According to his wife, al-Qahtani was able to call her on August 19 following a four-day hunger strike and after almost four months of incommunicado detention.  In September al-Odah's family reportedly said his eyesight had deteriorated during his solitary confinement.

**Detainee's Ability to Challenge Lawfulness of Detention before a Court:**  By law detainees are not entitled to challenge the lawfulness of their detention before a court.  In the case of wrongful detention, the law of criminal procedure, as well as provisions of the counterterrorism law, provide for the right to compensation if detainees are found to have been held unlawfully.

## e. Denial of Fair Public Trial

The law provides that judges are independent and not subject to any authority other than the provisions of sharia and the laws in force.  Although public allegations of interference with judicial independence were rare, the judiciary reportedly was subject to influence, particularly in the case of legal decisions rendered by specialized judicial bodies, such as the Specialized Criminal Court, which rarely acquitted suspects.  The Specialized Criminal Court and the Public Prosecutor's Office were not independent entities, as they reportedly were required to coordinate their decisions with executive authorities, including the king and crown prince.  Human rights activists claimed that the court's judges received implicit instructions to issue harsh sentences against human rights activists, reformers, journalists, and dissidents not engaged in violent activities.  Activists also reported that judicial and prosecutorial authorities ignored due process-related complaints, including lack of access by lawyers to their clients at critical stages of the judicial process, particularly during the pretrial investigation phase.

On March 8, local media reported that the Supreme Court eliminated the use of oaths (*al-qisama*) as evidence in murder or manslaughter cases.  Under Islamic law, the victim's family is allowed to take up to 50 oaths to officially confirm that the suspect was guilty if there was no direct evidence or if eyewitness testimony was invalid under Islamic law, as in the case of child witnesses.

Defendants are able to appeal their sentences.  The law requires a five-judge appellate court to affirm a death sentence, which a five-judge panel of the Supreme Court must then unanimously affirm.  Appellate courts may recommend changes to a sentence, including increasing the severity of a lesser sentence (up to the death penalty), if the trial court convicted the defendant of a crime for which capital punishment is permitted.

Defendants possess the right to seek commutation of a death sentence for some crimes and may receive a royal pardon under specific circumstances (see section 1.d.).  In some prescribed cases (qisas), the families of the deceased may accept compensation from the family of the person convicted in an unlawful death, sparing the convicted from execution.

On August 3, Amnesty International assessed that trials before the Specialized Criminal Court were "intrinsically unfair, with defendants subjected to flawed procedures that violate both Saudi and international laws."  Amnesty accused authorities of using the court to crack down on freedom of expression through the prosecution, sentencing, and resentencing processes, as well as bans on public speaking, human rights work, use of social media, and travel.  Among others, Amnesty cited the trial and conviction of activist Israa al-Ghomgham, who was sentenced to eight years in prison and an eight-year travel ban in February for charges related to her peaceful activism and participation in antigovernment protests.

On August 16, the court of appeals increased the sentence of activist Khalid al-Omair from seven to nine years without explanation, according to ALQST.

**Trial Procedures**

In the judicial system, there traditionally was no published case law on criminal matters, no uniform criminal code, no presumption of innocence, and no doctrine of stare decisis that binds judges to follow legal precedent.  In February the crown prince announced forthcoming legal reforms that would impact the personal status law, civil transactions law, evidence law, and discretionary sentencing, aiming to increase predictability and transparency in the legal system and expand protections for women (see section 6, Women).  On December 28, the Council of Ministers enacted the evidence law.

In the absence of a formalized penal code that details all criminal offenses and punishments, judges in the courts determine many of these penalties through their interpretations of sharia, which varied according to the judge and the circumstances of the case.  Because judges have considerable discretion in decision making, rulings and sentences diverged widely from case to case.

Several laws provide sentencing requirements for crimes, including terrorism, cybercrimes, trafficking in persons, and domestic abuse.

The Justice Ministry continued to expand a project started in 2007 to distribute model judicial decisions to ensure more uniformity of legal application, and the ministry published judicial decisions on its website.  The law states that defendants should be treated equally in accordance with sharia.  The Council of Senior Scholars, or the *ulema*, an autonomous advisory body, issues religious opinions (fatwas) that guide how judges interpret sharia.  In 2016 the Ministry of Justice issued a compilation of previous decisions that judges could refer to as a point of reference in making rulings and assigning sentences.

Appeals courts cannot independently reverse lower-court judgments of innocence or guilt; they are limited to affirming judgments, modifying sentences, or returning them to a lower court for modification.  Even when judges did not affirm judgments, appeals judges in some cases remanded the judgment to the judge who originally authored the opinion.  This procedure sometimes made it difficult for parties to receive a ruling that differed from the original judgment in cases where judges hesitated to admit error.  While judges may base their decisions on any of the four Sunni schools of jurisprudence, all of which were represented in the Council of Senior Scholars, the Hanbali School predominated and formed the basis for the country's law and legal interpretations of sharia.  Shia citizens used their legal traditions to adjudicate family law cases between Shia parties, although either party can decide to adjudicate a case in state courts, which apply Sunni legal traditions.

While the law states that court hearings shall be public, courts may be closed at the judge's discretion.  As a result, many trials during the year were closed.  The Ministry of Foreign Affairs continued to not approve foreign diplomatic missions to attend court proceedings at the Specialized Criminal Court as well as trials related to security and human rights issues.  Diplomatic personnel were generally allowed to attend consular proceedings of their own citizens.  Some family members of prisoners complained that neither they nor the legal representatives of the accused were permitted access to trials or notified of the status of trial proceedings.  In a number of cases, family members were given only 24 hours' notice before a trial hearing.

According to the Ministry of Justice, authorities may close a trial depending on the sensitivity of the case to national security, the reputation of the defendant, or the safety of witnesses.  HRC representatives sometimes attended trials at the Specialized Criminal Court.

By law authorities must offer defendants a lawyer at government expense.  In 2017 the Ministry of Justice stated that defendants "enjoy all judicial guarantees they are entitled to, including the right to seek the assistance of lawyers of their choosing to defend them, while the ministry pays the lawyer's fees when the accused is not able to settle them."  Activists alleged that many political prisoners were not able or allowed to retain an attorney or consult with their attorneys during critical stages of the investigatory and trial proceedings.  Detained human rights activists often did not trust the courts to appoint lawyers for them due to concerns of lawyer bias. The law provides defendants the right to be present at trial and to consult with an attorney during the trial.  The counterterrorism law, however, authorizes the attorney general to limit the right of defendants accused of terrorism to access legal representation while under investigation "whenever the interests of the investigation so require."  There is no right to discovery, nor can defendants view their own file or the minutes from their interrogation.  Defendants have the right to call and cross-examine witnesses.  Activists reported, however, that Specialized Criminal Court judges could decide to restrict this right in "the interests of the case."  The law provides that a prosecutor-appointed investigator may question the witnesses called by the defendant during the investigation phase before the initiation of a trial.  The investigator may also hear testimony of additional witnesses he deems necessary to determine the facts.  Authorities may not subject a defendant to any coercive measures or compel the taking of an oath.  The court must inform convicted persons of their right to appeal rulings.

The law does not provide for a right against self-incrimination.

The law does not provide for free interpretation services, although services were often provided in practice.  The law provides that "the court should seek the assistance of interpreters," but it does not obligate the court to do so from the moment the defendant is charged, nor does the law specify that the state will bear the costs of such services.

While sharia as interpreted by the government applies to all citizens and noncitizens, the law in practice discriminates against women, noncitizens, nonpracticing Sunni Muslims, Shia Muslims, and persons of other religions. In certain circumstances, the testimony of a woman equals one-half that of a man. Judges have discretion to discount the testimony of nonpracticing Sunni Muslims, Shia Muslims, or persons of other religions; sources reported judges sometimes completely disregarded or refused to hear testimony by Shia Muslims.

**Political Prisoners and Detainees**

The government maintained there were no political prisoners, including detainees who reportedly remained in prolonged detention without charge, while local activists and human rights organizations claimed there were "hundreds" or "thousands." Reporting by advocacy groups and press suggested authorities detained persons for peaceful activism or political opposition, including nonviolent religious figures, women's rights defenders, and human rights activists, and those who the government claimed posted offensive or antigovernment comments on social media sites.

In many cases it was impossible to determine the legal basis for incarceration and whether the detention complied with international norms and standards. During the year the Specialized Criminal Court tried political and human rights activists for nonviolent actions unrelated to terrorism, violence, or espionage against the state, and authorities restricted attorneys' access to detainees on trial.

International nongovernmental organizations (NGOs), the United Nations, and others criticized the government for abusing its antiterrorism legal authorities to detain or arrest on security-related grounds some dissidents or critics of the government or royal family who had not espoused or committed violence. According to the NGOs Prisoner of Conscience and EOHSR, more than 100 persons remained in detention for activism, criticism of government leaders or policies, impugning Islam or religious leaders, or "offensive" internet postings, including prominent activists such as Raif Badawi, Mohammed al-Qahtani, Naimah Abdullah al-Matrod, Maha al-Rafidi, Eman al-Nafjan, and Waleed Abu al-Khair; clerics including former grand mosque imam Salih al-Talib; and Sahwa movement figures Safar al-Hawali, Nasser al-Omar, and others.

Between February and June, several women's rights activists, who had been arrested in 2018 and convicted on charges related to their human rights work and their contact with international organizations, foreign media, and other activists, were released after having their sentences suspended or reduced to time served, although they reportedly continued to be subject to travel bans.  Sentenced by the Specialized Criminal Court in December 2020 to five years and eight months in prison, with credit for time served, Loujain al-Hathloul and Mayaa al-Zahrani were released in February and March, respectively.  Prisoners of Conscience also reported the release of Nouf Abdelaziz al-Jerawi in February.  Rights organizations reported that Nassima al-Sadah and Samar Badawi, who were sentenced to five years in prison with half suspended in 2018, were released on June 27 at the conclusion of their remaining sentences.  Al-Hathloul appealed her sentence, but on May 9, she was informed by state security officials that the Supreme Court upheld her conviction on terrorism charges.  While rights organizations welcomed the releases, they criticized the imposition of travel bans, as well as reports that the released rights activists were instructed not to make public statements regarding their sentences.

In October the Specialized Criminal Court of Appeals upheld the six-year prison sentence of women's rights activist Mohammed al-Rabea.  In April the court had sentenced al-Rabea under the country's counterterrorism law to six years' imprisonment, with credit for time served, and a travel ban.  Detained in 2018 along with al-Hathloul and Aziza al-Yousef, al-Rabea's arrest was also tied to his activism for women's right to drive and against the guardianship system.

On September 23, authorities released human rights defender Abdulrahman al-Shumiri following completion of his 15-year prison sentence, according to ALQST and Prisoners of Conscience.  He remained subject to a travel ban for 15 years following his release.  Al-Shumiri, a retired academic, was arrested in 2007 and sentenced on charges including disobeying the ruler.

In April the Specialized Criminal Court sentenced activist Yasser al-Ayyaf to two years in prison, according to Prisoners of Conscience.  Al-Ayyaf was arrested in 2018, reportedly for his activism and participation in peaceful sit-ins, marches, and protests between 2011 and 2013.  He spoke out in support of detainees held without trial and those who were detained after completing their sentences,

including his father, whom he claimed was incarcerated beyond the end of his 10-year sentence.  Al-Ayyaf was released in September.

**Politically Motivated Reprisal against Individuals Located Outside the Country**

**Extraterritorial Killing, Kidnapping, Forced Returns, or Other Violence or Threats of Violence:**  There were reports that authorities attempted to intimidate critics living abroad, pressured their relatives in the country, and in certain instances abducted or pressured dissidents and repatriated them to the country.  A Freedom House report on transnational repression released in February reported 10 cases of Saudi transnational repression carried out in recent years against former government officials and activists living abroad.

**Threats, Harassment, Surveillance, and Coercion:**  In July the *New York Times* reported that since 2018, Saudi Arabia had used Israeli cybersurveillance firms' spyware to monitor dissidents and political opponents at home and abroad.  A July 18 Amnesty International report alleged that an investigation into the Israeli cybersurveillance firm NSO Group revealed evidence that the Saudi government used its Pegasus software against Saudi journalist Jamal Khashoggi and his family members, including his fiancee, former wife, and son.  Other media reported that Khashoggi's associates Yahya Assiri, Omar Abdulaziz, and Ghanem al-Masari were also targeted by the software.

On February 27, the *Washington Post* reported that Saudi dissident Ahmed Abdullah al-Harbi disappeared while visiting the Saudi embassy in Ottawa in January and later reappeared in Saudi Arabia.  Activists alleged his return was coerced.  After his visit to the embassy in Ottawa, al-Harbi reportedly called two friends and stated he had been pressured during interrogation to reveal the names of activists and believed his family in Saudi Arabia was being threatened.  Al-Harbi had received asylum in Canada in 2019 after making statements critical of the Saudi government during his studies in the United States and was cooperating with activists critical of the government.  Al-Harbi's whereabouts following his return to Saudi Arabia remained unknown as of December.

In February media reported that Saad al-Jabri, a former high-ranking Saudi

intelligence official who fled the country in 2016, filed a second lawsuit in the United States alleging that Saudi officials tried to lure his daughter, Hissah al-Muzaini, to the Saudi consulate in Istanbul in 2019 (see section 1.c.). The *Wall Street Journal* reported on January 27 that 10 Saudi state-owned companies filed a civil suit in Canada against Saad al-Jabri, alleging embezzlement. Activists and al-Jabri's family claimed that the Canadian lawsuit against him was politically motivated. In an October 23 interview on *60 Minutes*, al-Jabri reiterated claims that a hit squad had been sent to kill him in 2018 and asserted that his son Omar and daughter Sarah had been imprisoned in Saudi Arabia to force his return to the country (see section 2.b.). The two were arrested in March 2020 and held in incommunicado detention, according to HRW. In November 2020 a court sentenced Omar and Sarah al-Jabri to, respectively, nine and six and one-half years in prison for money laundering and attempting escape. HRW reported an appeals court upheld their sentences in December 2020.

**Misuse of International Law-enforcement Tools:** There were reports that the government attempted to misuse international law enforcement tools for politically motivated purposes as reprisal against specific individuals located outside the country.

Activists claimed that Saudi Arabia misused an INTERPOL notice to secure the February arrest in Morocco of a government critic, Osama al-Hasani, a citizen of Saudi Arabia and Australia. He was deported to Saudi Arabia in March. HRW claimed that court documents showed Saudi authorities had previously cleared him of the charge of auto theft that was the basis for the Saudi INTERPOL notice. On March 12, the UN Office of the High Commissioner for Human Rights sent Moroccan authorities a letter urging them not to deport al-Hasani due to fears that he could face torture in Saudi Arabia. A Moroccan court approved al-Hasani's extradition to Saudi Arabia on March 13, according to press reports. On September 3, Prisoners of Conscience reported that the Specialized Criminal Court sentenced al-Hasani to four years' imprisonment.

**Civil Judicial Procedures and Remedies**

Complainants claiming human rights violations generally sought assistance from the HRC or the NSHR, which sometimes advocated on their behalf or provided

courts with opinions on their cases.  The HRC generally responded to complaints and can refer cases to the Public Prosecutor's Office; domestic violence cases were the most common.  Individuals or organizations may petition directly for damages or government action to end human rights violations before the Board of Grievances, except in compensation cases related to state security, where the Specialized Criminal Court handles remediation.  The counterterrorism law contains a provision allowing detainees in Mabahith-run prisons to request financial compensation from the Ministry of Interior, State Security Presidency, or both for wrongful detention beyond their prison terms.  In some cases the government did not carry out judicially ordered compensation for unlawful detentions in a timely manner.

## f. Arbitrary or Unlawful Interference with Privacy, Family, Home, or Correspondence

The law prohibits unlawful intrusions into the privacy of persons, their homes, places of work, and vehicles.  Criminal investigation officers are required to maintain records of all searches conducted; these records should contain the name of the officer conducting the search, the text of the search warrant (or an explanation of the urgency that necessitated the search without a warrant), and the names and signatures of the persons who were present at the time of search.  While the law also provides for the privacy of all mail, telegrams, telephone conversations, and other means of communication, the government did not respect the privacy of correspondence or communications and used the considerable latitude provided by the law to monitor activities legally and intervene where it deemed necessary.  Authorities targeted family members of activists and critics of the government.

In June dissident Abdullah al-Odah, son of prominent detained cleric Salman al-Odah (see section 1.d., Pretrial Detention), alleged that 17 of his family members were banned from travel and that his uncle, Khalid al-Odah, was arrested for tweeting about the cleric's arrest.

There were reports from human rights activists of governmental monitoring or blocking of mobile phone or internet usage.  (See section 1.e., Threats, Harassment, Surveillance, and Coercion, for reporting regarding the government's

purported use of Pegasus software to monitor activists and their families and friends.)  The government strictly monitored politically related activities and took punitive actions, including arrest and detention, against persons engaged in certain political activities, such as calling for a constitutional monarchy or publicly criticizing senior members of the royal family by name (see section 2.a.).  Customs officials reportedly routinely opened mail and shipments to search for contraband. Informants allegedly reported "seditious ideas," "antigovernment activity," or "behavior contrary to Islam" in their neighborhoods.

Use of encrypted communications by private citizens was banned, and authorities frequently attempted to identify and detain anonymous or pseudonymous users and writers who made critical or controversial remarks.  Government authorities regularly surveilled websites, blogs, chat rooms, social media sites, emails, and text messages.  Media outlets reported that authorities gained access to critics' and activists' Twitter and other social media accounts and in some cases questioned, detained, or prosecuted individuals for comments made online.  The counterterrorism law allows the government to access a terrorism suspect's private communications and banking information in a manner inconsistent with the legal protections provided by the law of criminal procedure.

The Committee for the Promotion of Virtue and the Prevention of Vice (CPVPV) is charged with monitoring and regulating public interaction between members of the opposite sex, although in practice CPVPV authorities were greatly curtailed compared with past years.

## g. Conflict-related Abuses

Saudi Arabia continued to conduct military operations in support of the UN-recognized government of Yemen against the Houthi militants.

The United Nations, NGOs, media outlets, as well as humanitarian and international organizations, reported what they characterized as disproportionate and indiscriminate use of force by all parties to the continuing conflict, causing civilian casualties and damage to infrastructure from shelling and airstrikes.  The UN Group of Eminent International and Regional Experts (GEE) concluded in September that the government of Yemen, Houthis, the Saudi-led coalition, and the

Southern Transitional Council were "responsible for human rights violations including arbitrary deprivation of life, enforced disappearances, arbitrary detention, gender-based violence, including sexual violence, torture and other forms of cruel, inhuman, or degrading treatment, the recruitment and use in hostilities of children, the denial of fair trial rights, violations of fundamental freedoms, and economic, social and cultural rights."  Additionally, the GEE specifically noted, "individuals in the [Saudi-led] coalition, in particular from Saudi Arabia, may have conducted airstrikes in violation of the principles of distinction, proportionality, and precaution, acts that may amount to war crimes."

In 2016 the government of Saudi Arabia and other governments participating in the Saudi-led coalition established the Joint Incident Assessment Team (JIAT), which consisted of military and civilian personnel from coalition countries, to investigate claims of civilian casualties linked to coalition air strikes or other coalition operations inside Yemen and coalition adherence to international humanitarian law.  The JIAT held press conferences to explain the results of its investigations to the public.  The GEE's September report expressed concerns regarding the Saudi-led coalition's investigation and prosecution efforts.  The GEE also stated the JIAT did not provide detailed case summary information or supporting evidence.

On numerous occasions, Saudi civilians were injured and killed and civilian objects and critical infrastructure were damaged or destroyed by missile, rocket, drone, artillery, and maritime cross-border attacks by Houthi militants in Yemen aimed at Saudi territory.

Saudi-led coalition airstrikes in Yemen reportedly resulted in civilian casualties and damage to civilian infrastructure on multiple occasions.  A report by the NGO Mwatana for Human Rights alleged that all parties to the conflict, including the Saudi-led coalition, "likely violated prohibitions under international humanitarian law and international humanitarian law " by depriving civilians of objects essential to their survival by targeting farms, water facilities, and artisanal fishing boats and equipment that destroyed, damaged or rendered useless objects essential to survival, namely agricultural areas, irrigation works, livestock, foodstuff, water infrastructure, fishing boats, and fishing equipment.  According to the UN's Civilian Impact Monitoring Project, Saudi-led coalition airstrikes accounted for 55 civilian casualty allegations in the first nine months of the year.  Casualties linked

to airstrikes were down 75 percent compared with the same period in 2020.  The nonprofit organization Yemen Data Project, affiliated with the Armed Conflict Location and Event Data Project, assessed civilian casualties linked to airstrikes in the first half of the year were the lowest of any six-month period since the start of the conflict.  In June the UN secretary-general noted a "sustained, significant decrease in killing and maiming due to air strikes" and delisted the Saudi-led coalition from the list of parties responsible for grave violations against children in armed conflict.  During the last three months of the year, the Saudi-led coalition increased airstrikes in and around more-populated areas in response to increased Houthi cross-border attacks and Houthi ground offensive operations in Ma'rib and Shabwah, which resulted in an increase in civilian casualties.

Mwatana for Human Rights alleged that groups aligned with the Saudi-led coalition were responsible for the disappearance of seven civilians in Yemen from September 2020 to September 2021.

# Section 2. Respect for Civil Liberties

## a. Freedom of Expression, Including for Members of the Press and Other Media

The law does not provide for or protect freedom of expression, including for members of the press and other media.  The law specifies, "Mass media and all other vehicles of expression shall employ civil and polite language, contribute towards the education of the nation, and strengthen unity.  Media are prohibited from committing acts that lead to disorder and division, affect the security of the state or its public relations, or undermine human dignity and rights."  Authorities are responsible for regulating and determining what speech or expression undermines internal security.  The government can ban or suspend media outlets if it concludes they violated the press and publications law, and it monitored and blocked hundreds of thousands of internet sites.  There were frequent reports of restrictions on free speech.

The counterterrorism law's definition of terrorism includes "any conduct…intended to disturb public order…or destabilize the state or endanger its national unity."  The law also penalizes "anyone who challenges, either directly or

indirectly, the religion or justice of the king or crown prince…or anyone who establishes or uses a website or computer program…to commit any of the offenses set out in the law."  Local human rights activists, international human rights organizations, and the UN special rapporteur on human rights and counterterrorism criticized the law for its overly broad and vague definitions of terrorism and criticized the government for using it to prosecute peaceful expression and dissent.

**Freedom of Expression:**  The government monitored public expressions of opinion and used legal controls to impede the free expression of opinion and restrict individuals from engaging in public criticism of the government.  The law forbids apostasy and blasphemy, which can carry the death penalty, although there were no recent instances of death sentences being carried out for these crimes (see section 1.a.).  Statements that authorities construed as constituting defamation of the king, monarchy, governing system, or Al Saud family resulted in criminal charges for citizens advocating government reform.  The government prohibits public employees from directly or indirectly engaging in dialogue with local or foreign media or participating in any meetings intended to oppose state policies.

The government detained a number of individuals for crimes related to their exercise of free speech during the year.

Prisoners of Conscience reported that authorities arrested journalist Fahid al-Shammari on March 3 for publishing videos with "false information" regarding food products.  Prisoners of Conscience claimed that the true reason for al-Shammari's arrest was a video mocking General Entertainment Authority chairman Turki Al al-Sheikh.  Al-Samara first published the video in 2019, but it recirculated on social media early in the year.

On October 27 and again on October 30, police in Mecca detained and released with a warning a foreign national for wearing a T-shirt reading, "Pray for the end of China's genocide & occupation in East Turkistan."  He was released three days later and departed the country.

Between May and June, multiple rights groups reported blogger Abdullah Jilan and two Twitter pseudonymous users, Ladon and Lioness, were arrested for tweets regarding social justice, equitable distribution of wealth, and job creation in the

country.  The groups stated the three were affiliated with Canada-based dissident Omar Abdulaziz and murdered journalist Jamal Khashoggi.

On November 17, Reporters Without Borders called for the immediate release of Yemeni journalist Ali Aboluhom, who received a 15-year prison sentence for tweets that, according to the Saudi authorities, promoted apostasy, atheism, and blasphemy.  According to the Gulf Center for Human Rights, on October 26, the criminal court in Najran sentenced Aboluhom to 10 years in prison after convicting him of apostasy and atheism and another five years in prison for publishing his writings on social media networks that "would prejudice public order, religious values, and morals."

**Freedom of Expression for Members of the Press and Other Media, Including Online Media:**  The law governs printed materials; printing presses; bookstores; the import, rental, and sale of films; television and radio; foreign media offices and their correspondents; and online newspapers and journals.  Media fall under the jurisdiction of the Ministry of Media.  The ministry may permanently close "whenever necessary" any means of communication – defined as any means of expressing a viewpoint that is meant for circulation – that it deems is engaged in a prohibited activity, as set forth in the law.

Government policy guidance instructs journalists in the country to uphold Islam, oppose atheism, promote Arab interests, and preserve cultural heritage.  The press law requires all online newspapers and bloggers to obtain a license from the ministry.  The law bans publishing anything "contradicting sharia, inciting disruption, serving foreign interests that contradict national interests, and damaging the reputation of the grand mufti, members of the Council of Senior Religious Scholars, or senior government officials."

The law states that violators can face substantial fines for each violation of the law, which doubles if the violation is repeated.  Other penalties include banning individuals from writing banned material.  While the Violations Considerations Committee in the Ministry of Media has formal responsibility for implementing the law, the Ministry of Interior, the CPVPV, and judges considered these issues regularly and exercised wide discretion in interpreting the law.  It was unclear which of these institutional processes accords with the law.

Although unlicensed satellite dishes were illegal, the government did not enforce restrictions on them, and their use was widespread.  Many foreign satellite stations broadcast a wide range of programs into the country in Arabic and other languages, including foreign news channels.  Access to foreign sources of information, including via satellite dishes and the internet, was common.  Foreign media and some privately owned satellite networks headquartered outside the country maintained local offices; they were subject to licensing requirements from the Ministry of Media and could not operate freely.

**Violence and Harassment:**  Authorities subjected journalists, writers, and bloggers to arrest, imprisonment, and harassment during the year (see section 1.c., Prison and Detention Center Conditions).  NGOs, academics, and the press claimed the government targeted dissidents using automated social media accounts to ensure that progovernment messages dominated social media trend lists and effectively silenced dissenting voices.  Automated account activity was reportedly accompanied by online harassment by progovernment accounts in some instances.

The Jeddah Criminal Court sentenced Ahmad Ali Abdelkader, a Sudanese media personality and journalist, to four years' imprisonment on June 8 for criticizing in tweets and media interviews Saudi actions in Sudan and Yemen.

On March 1, Reporters Without Borders filed a criminal complaint in Germany against the Saudi crown prince for his alleged role in the 2018 killing of journalist Jamal Khashoggi in Turkey and the arbitrary detention of 34 journalists in Saudi Arabia.  According to the complaint, 33 journalists, including blogger Raif Badawi, continued in detention.

In July Prisoners of Conscience reported the release of journalist Aql al-Bahili and writer Abdulaziz al-Dukhail without charges.  The two were arrested in April 2020, along with activist Sultan al-Ajmi, reportedly for tweeting condolences on the death of imprisoned reformer and rights activist Abdullah al-Hamid.  As of November, there were no updates on the status of al-Ajmi.

**Censorship or Content Restrictions:**  The government reportedly penalized those who published items counter to government guidelines and directly or indirectly censored media by licensing domestic media and by controlling importation of

foreign printed material.

All newspapers, blogs, and websites in the country must be government licensed. The Ministry of Media must approve the appointment of all senior editors and has authority to remove them.  The government provided guidelines to newspapers regarding controversial issues.  The Saudi Press Agency reported official government news.  The government owned most print and broadcast media and book publication facilities in the country, and members of the royal family owned or influenced privately owned and nominally independent operations, including various media outlets and widely circulated pan-Arab newspapers published outside the country.  Authorities prevented or delayed the distribution of foreign print media covering issues considered sensitive, effectively censoring these publications.

The government censored published online and print material it considered blasphemous, extremist, racist, offensive, or inciting chaos, violence, sectarianism, or harm to the public order, as well as criticism of the royal family or its allies among the Gulf Arab states.

In May the Public Prosecutor's Office warned against producing, sending, or storing materials in information networks and computers that might "affect public order and go against religious values and morals."  Local media reported in July the office issued an arrest warrant against an individual who shared on social media parts of a television program that allegedly spread tribal intolerance and hatred.  Following the arrest, the office stressed that hatred and intolerance disturb public order and that related actions are punishable by five-year sentences and substantial fines.

Online self-censorship was reportedly pervasive, as social media users were extremely cautious regarding what they posted, shared, or "liked" due to the threat of harassment or prosecution under broadly worded antiterrorism and other laws. The government closely monitored and often targeted users who expressed support for minority rights or political reform, in addition to those who exposed human rights violations.  Social media users were reportedly reluctant to express support for outspoken activists who were detained or received prison sentences. Questioning religious doctrine was strictly taboo, particularly content related to the

Prophet Muhammad.

In some cases, however, individuals criticized specific government bodies or actions publicly without repercussions.

**Libel/Slander Laws:**  The cybercrimes law provides for a maximum penalty of one year's imprisonment for "defamation and infliction of damage upon others through the use of various information technology devices," including social media and social networks.

**National Security:**  Authorities used the cybercrimes law and the counterterrorism law to restrict freedom of expression, including by prosecuting numerous individuals under these laws on charges related to statements made on social media.  On April 25, ALQST reported that activist Khaled al-Omair was sentenced to seven years' imprisonment for charges that included launching a hashtag on Twitter titled "the people want a new constitution."

On October 18, local media reported that authorities arrested a Palestinian national in Riyadh after he appeared in a video clip insulting Saudi Arabia and its leaders. Authorities deemed these comments as aimed to harm the country's national security and public order.

**Internet Freedom**

The Ministry of Media or its agencies must authorize all websites registered and hosted in the country.  The General Commission for Audiovisual Media has responsibility for regulating all audio and video content in the country, including satellite channels, film, music, internet, and mobile applications, independent from the Ministry of Commerce and Industry.  Internet access was widely available.

The press and publications law implicitly covers electronic media, since it extends to any means of expression of a viewpoint meant for circulation, ranging from words to cartoons, photographs, and sounds.  Laws, including the cybercrimes law, criminalize a number of internet-related activities, including defamation, hacking, unauthorized access to government websites, and stealing information related to national security as well as the creation or dissemination of a website for a terrorist organization.  Security authorities actively monitored internet activity, both to

enforce laws, regulations, and societal norms and to monitor recruitment efforts by extremist organizations such as ISIS.  The government prosecuted individuals who used the internet to criticize government officials or religious authorities, or express support for terrorism, blasphemy, and apostasy.

The government reportedly collected information concerning the identity of persons peacefully expressing political, religious, or ideological opinions or beliefs online.  According to Freedom House, authorities regularly monitored nonviolent political, social, and religious activists and journalists in the name of national security and maintaining social order.

In April and May, rights organizations reported that authorities arrested a number of prominent social media personalities, including Loujain Daghistani, Abdulaziz al-Tuwaijri, and Abdulrahman al-Sheikhi, regarding tweets calling for social and economic reform.  Daghistani and al-Tuwaijri were released in June and November, respectively.  No information was available on the charges against them.

Access to the internet is legally available only through government-authorized internet service providers (ISPs).  The government required ISPs to monitor customers and required internet cafes to install hidden cameras and provide identity records of customers.  Although authorities blocked websites offering proxies, persistent internet users accessed the unfiltered internet via other means.

On a number of occasions, government officials and senior clerics publicly warned against inaccurate reports on the internet and reminded the public that criticism of the government and its officials should be done through private channels, including official complaint processes.

The law criminalizes the publication or downloading of offensive sites, and authorities routinely blocked sites containing material perceived as harmful, illegal, offensive, or anti-Islamic.  The governmental Communications and Information Technology Commission filtered and blocked access to websites it deemed offensive, including sexual content, as well as pages calling for domestic political, social, or economic reforms or supporting human rights, including websites of expatriate Saudi dissidents.

Several voice-over-internet-protocol call services, such as WhatsApp, remained blocked and only accessible using a virtual private network.  On May 5, local media reported the government blocked the Clubhouse mobile phone application due to its potential use to spread offensive content.  Progovernment trolls reportedly took to "hashtag poisoning," a method of spamming a popular hashtag to disrupt criticism or other unwanted conversations through a flood of unrelated or opposing tweets.  Bots frequently shared identical messages.

The government continued to block some Qatari websites, such as the news site *al-Jazeera*.  The government also blocked access to the websites of the Turkish official news agency, Anadolu Agency, and the Turkish public broadcaster TRT's Arabic edition.  Writing for blocked websites, providing them with materials to publish, or promoting alternative addresses to access them are crimes under the cybercrimes law.

**Academic Freedom and Cultural Events**

The government restricted some public artistic expression but increasingly relaxed restrictions on cultural events dedicated to film, comics, music, and dance.

Academics reportedly practiced self-censorship, and authorities prohibited professors and administrators at public universities from hosting meetings at their universities with foreign academics or diplomats without prior government permission (see section 2.b., Freedom of Association).

The *Middle East Monitor* reported in February that Aisha Muhajir, a well-known religious scholar, was arrested for preaching and teaching the Quran at her home in Mecca.  After her arrest, Prisoners of Conscience claimed authorities threatened her sons with detention by authorities for questioning her arrest.

On July 14, ALQST and Prisoners of Conscience reported that authorities carried out a series of raids on July 7-8 in Abha, arresting a number of academics including Mohammed al-Hazemi, Qassem al-Alma'i, Ali al-Alma'i, Rasheed al-Alma'i, and Mohammed Kadwan al-Alma'i.  According to activists, they were arrested for attending a gathering hosted by an Arab Awakening-associated cleric.  As of November, the group reportedly remained in detention.

## b. Freedoms of Peaceful Assembly and Association

The law provides for limited freedom of assembly and association, but the government restricted these rights.

### Freedom of Peaceful Assembly

The law requires a government permit for an organized public assembly of any type.  The government categorically forbids participation in political protests or unauthorized public assemblies, and security forces reportedly arrested demonstrators and detained them for brief periods.  Security forces at times allowed a small number of unauthorized demonstrations throughout the country.

On November 9, Amnesty International called upon authorities to immediately release and drop all charges against 10 Egyptian men detained without charge for 16 months after attempting to organize a remembrance event marking the 1973 Arab-Israeli war.  On November 10, the Specialized Criminal Court postponed their first hearing until January 2022.

### Freedom of Association

The law provided for limited freedom of association, but the government strictly restricted this right.  The law provides a comprehensive legal framework to govern the establishment, operation, and supervision of associations and foundations.  The government prohibited the establishment of political parties.  All associations must be licensed by the Ministry of Human Resources and Social Development and comply with its regulations.  Groups that advocated changing elements of the social or political order reported their licensing requests went unanswered for years, despite repeated inquiries.  The ministry reportedly used arbitrary means such as requiring unreasonable types and quantities of information to delay and effectively deny licenses to associations.  The government also harassed and detained Saudi-based family members and associates of Saudi citizens living abroad who were outspoken critics of the government (see sections 1.b., Disappearances; 1.e., Threats, Harassment, Surveillance, and Coercion; and 1.f., Arbitrary or Unlawful Interference with Privacy, Family, Home, or Correspondence).

On April 7, ALQST reported that authorities increased the prison sentence of activist Mohammed al-Otaibi, founder of the NGO Union for Human Rights, from 14 to 17 years for unknown reasons.  From 2013 to 2017, the NGO worked to abolish the death penalty and strengthen women's role in society, until al-Otaibi's arrest in 2017.

Government-chartered associations limited membership only to citizens.

## c. Freedom of Religion

See the Department of State's *International Religious Freedom Report* at https://www.state.gov/international-religious-freedom-reports/.

## d. Freedom of Movement and the Right to Leave the Country

The law does not prohibit internal movement, emigration, or repatriation.  The government imposed some restrictions on foreign travel.

**In-country Movement:**  The government generally did not restrict the free movement of male citizens within the country.  The guardianship system no longer requires a woman to have the permission of her male guardian (normally a father, husband, son, brother, grandfather, uncle, or other male relative) to move freely within the country (see section 6, Women).  Following a July 2020 court ruling in favor of women's right to live independently, judicial authorities amended the absenteeism law, or *taghayyub*, to allow all unmarried, divorced, or widowed women to live alone without the consent of a male guardian.  Previously, the law granted guardians the right to report the "unapproved absence" of anyone under their guardianship (see section 6, Women).

Authorities respected the right of citizens to change residence or workplace, provided they held a national identification card.

**Foreign Travel:**  There are restrictions on foreign travel.  In March the government implemented reforms allowing most private-sector expatriate workers to obtain exit or reentry visas at the end of their work contract without their employer's permission.  Expatriate domestic workers, however, still require employer approval to travel or depart the country.  Saudi citizens of both genders

younger than 21 and foreign citizen workers under sponsorship require a guardian's consent to travel abroad.  The government reportedly confiscated passports for political reasons and revoked the rights of some citizens to travel, often without providing them notification or opportunity to contest the restriction. Courts regularly applied travel bans as part of sentencing, restricting the ability to leave the country after release from prison.  Travel bans reportedly involved individuals in court cases relating to state security, corruption, labor, financial, or real estate disputes, in addition to other crimes.

On April 9, the Specialized Criminal Court sentenced media worker Khalid al-Muhawish to 10 years' imprisonment and a 10-year travel ban for expressing support for the Muslim Brotherhood, the Syrian uprising, and the Palestinian cause, according to local media and rights organizations.

Activists, media, and rights groups alleged the government used travel bans as part of a broader effort to suppress dissent.  Activists estimated thousands of citizens were under travel restrictions, including released activists, relatives of citizens detained in the government's anticorruption campaign, and relatives of detained clerics and human rights activists.

## e. Status and Treatment of Internally Displaced Persons

Not applicable.

## f. Protection of Refugees

**Access to Asylum:**  The government cooperated with the Office of the UN High Commissioner for Refugees (UNHCR) and other humanitarian organizations in providing protection and assistance to refugees, returning refugees, or asylum seekers, as well as other persons of concern.  The law provides that the "state will grant political asylum if public interest so dictates."  Generally, there is not a codified asylum system for those fleeing persecution, and the country is not a party to the 1951 Refugee Convention.  The government permitted refugees recognized by UNHCR to stay in the country temporarily, pending identification of a durable solution, including third-country resettlement or voluntary repatriation.  The government generally did not grant asylum or accept refugees for resettlement

from third countries, however.  Government policy is to refuse refugee status to persons in the country illegally, including those who overstayed a pilgrimage visa. The government strongly encouraged persons without residency to leave, and it threatened or imposed deportation.  Access to naturalization was difficult for refugees.

In January and April, the government reiterated that Yemeni and Syrian visitors could extend their visit visas beyond the 180-day maximum validity.  On November 28, the government announced an automatic extension until January 31, 2022, of expiring residency permits and visitor visas of expatriates from countries where travel was restricted due to COVID-19 prevention measures.

Multiple media sources claimed the government had increased activities to arrest and deport undocumented migrants since June.  *The Khaleej Times* reported that authorities had arrested nearly 16,000 migrants, primarily from Ethiopia and Yemen, on August 8-12 for residency violations.  Some were deported, but others remained in detention due to Ethiopia's lack of capacity to absorb those that return.

On June 8, CNN reported that the government between 2018 and 2020 detained and deported to the People's Republic of China (PRC) at least one Uyghur Muslim after he performed the *Umrah* pilgrimage.  Another was arrested and reportedly still faced deportation as of December.  It was unclear whether the report referred to Hemdullah Abduweli (or Aimidoula Waili on his PRC passport) or Nurmemet Rozi (or Nuermaimaiti on his PRC passport), whom HRW reported in November 2020 were arrested and potentially faced deportation to China.  Both were residents in Turkey.  Abduweli had been in hiding since February 2020.  In a November 2020 interview with *Middle East Eye*, Abduweli was quoted saying the PRC government wanted him deported back to the PRC.

The government did not recognize the right of Saudi citizens to petition for access to asylum or refugee status in foreign countries.  The law penalizes Saudi citizens who seek asylum in foreign countries, and on at least one occasion Saudi officials allegedly coerced the return to Saudi Arabia of a Saudi citizen who had sought asylum in Canada.

**Abuse of Migrants or Refugees:**  On January 28, four UN special rapporteurs and

the UN Working Group on Arbitrary Detention sent a letter to the government addressing reports that hundreds of migrants were stranded in overcrowded detention centers for prolonged and indefinite periods, in unsanitary conditions, and without adequate access to health care and protections.  The letter expressed concern regarding potential deportation of hundreds of migrants without individual assessment.  In January media outlets reported the government agreed to repatriate 1,000 Ethiopian migrants per week to address overcrowding; a first group of 296 detainees were flown to Addis Ababa on January 27.  On June 21, the *Middle East Eye* alleged a police crackdown that reportedly began on June 11 targeted majority-migrant neighborhoods and led to the arrest of thousands of documented and undocumented Ethiopians.

**Employment:**  Refugees and asylum seekers were generally unable to work legally, although Syrian and Yemeni citizens who possessed a temporary visa could obtain a visitor card from the Ministry of Interior, which reportedly allows them to work.  The renewable permits are valid for up to six months and tied to the validity period of their temporary visas; men between the ages of 18 and 60 were eligible to apply.

On August 31, HRW reported that starting in July authorities began to terminate or refused to renew contracts of Yemenis employed in the country, potentially forcing their return to Yemen.  Local media reported in July that the Ministry of Human Resources and Social Development issued a statement on new regulations requiring businesses to limit the percentage of their workers from certain nationalities, including an upper limit of 25 percent for Yemeni nationals.

**Access to Basic Services:**  The government provides preferential access to education, health care, public housing, and other social services to citizens and certain legal residents.  The UNHCR office in Riyadh provided a subsistence allowance covering basic services to a limited number of vulnerable families, based on a needs assessment.  Authorities worked with the local UNHCR office to provide medical treatment, also following a needs assessment.  The government provided COVID-19 vaccines at no cost to all citizens and residents, regardless of legal status.

## g. Stateless Persons

The country has a number of habitual residents who were legally stateless, but data on the stateless population were incomplete and scarce.

Citizenship is generally derived only from the father.  The law approves acquisition of the original nationality by way of descent through the mother, as an exception, when the mother is a Saudi at the time of birth of the baby, as well as when a baby is born to a father of unknown nationality or no nationality.  Children born to an unmarried citizen mother who is not legally affiliated with the citizen father may be considered stateless, even if the father recognized the child as his.  If the government did not authorize the marriage of a citizen father and a noncitizen mother prior to birth of the children, they may also be considered stateless.

The nationality laws do not allow Saudi women married to foreign citizens to pass their nationality to their children, except in certain circumstances as noted above. Children of Saudi women married to foreign spouses receive permanent residency, but their residency status is revocable in the event of the death of the Saudi mother. Sons of citizen mothers and noncitizen fathers may apply for citizenship once they turn 18 (if not already granted citizenship at birth under certain circumstances); daughters in such cases can obtain citizenship only through marriage to a Saudi man.  A child may lose legal identification and accompanying rights if authorities withdraw identification documents from a parent (possible when a naturalized parent denaturalizes voluntarily or loses citizenship through other acts).  Since there is no codified personal status law, judges make decisions regarding family matters based on their own interpretations of Islamic law.

Foreign male spouses of female citizens can obtain permanent residency in the country without needing a sponsor, and they can receive free government education and medical benefits, although in general they cannot apply for citizenship on the basis of their marriage and residence.  These spouses are also included in the quota of Saudis employed in private companies under the labor quota system, which improves their employment prospects.

Female citizens must be between the ages of 30 and 50 to marry a non-Saudi man. Male citizens must be between the ages of 40 and 65 to marry a non-Saudi woman.

The extent to which those laws were enforced was unclear.

In past years the United Nations unofficially estimated there were 70,000 stateless persons in the country, almost all of whom were native-born residents known locally as Bidoon (an Arabic word that means "without" [citizenship]). Updated information on stateless persons was not available. Bidoon are persons whose ancestors failed to obtain nationality during the reign of the country's founder, King Abdulaziz, such as descendants of nomadic tribes not counted among the native tribes, descendants of foreign-born fathers who arrived before there were laws regulating citizenship, and rural migrants whose parents failed to register their births. As noncitizens, Bidoon are unable to obtain passports. The government sometimes denied them employment and educational opportunities, and their marginalized status made them among the poorest residents of the country. In recent years the Ministry of Education encouraged Bidoon children to attend school. The government issues Bidoon five-year residency permits to facilitate their social integration in government-provided health care and other services, putting them on similar footing with sponsored foreign workers. The General Directorate of Passports issued special identification cards to Bidoon similar to residency permits issued to foreigners in the country, but with features entitling their holders to additional government services similar to those available to citizens.

Some Baloch, West African, and Rohingya Muslims resident in Saudi Arabia were stateless. Some Rohingya had expired passports that Burma refused to renew; others had entered the country with fraudulent travel documents. Many of them had been held in detention for years following their entry into the country under fake passports. UNHCR estimated there were 280,000 Rohingya in the country. Some of these individuals benefited from a prior program to correct their residency status; in 2014 the government issued nearly 200,000 four-year residency permits to Rohingya who entered the country prior to 2008. Rohingya who arrived in the country after 2008 were not eligible for residency permits, although NGOs reported that Rohingya, including those without legal residency, were generally not subject to deportation. In March Bangladeshi State Minister for Foreign Affairs Shahriar Alam stated the government would not send Rohingya back to Bangladesh, and that Bangladesh would provide or renew Bangladeshi passports to

some Rohingya living in Saudi Arabia, enabling them to continue residing legally in Saudi Arabia.

There were also between 300,000 and 400,000 Palestinians living in Saudi Arabia who were not registered as refugees.

# Section 3. Freedom to Participate in the Political Process

The law does not provide citizens the ability to choose their national government in free and fair periodic elections held by secret ballot and based on universal and equal suffrage; it establishes an absolute monarchy led by the Al Saud family as the political system. The Allegiance Council, composed of up to 34 senior princes appointed by the king, is formally responsible for selecting a king and crown prince upon the death or incapacitation of either. Only select members of the ruling family have a voice in the choice of leaders, the composition of the government, or changes to the political system.

The law provides citizens the right to communicate with public authorities on any matter and establishes the government on the principle of consultation (*shura*). The king and senior officials, including ministers and regional governors, are required to be available through *majlis*, open-door meetings where any male citizen or noncitizen may express an opinion or a grievance without an appointment. Senior leaders were typically unavailable to the public, but their representatives or lower-level officials continued this traditional practice. Officials may also be reached through written petitions, such as an appeal of decisions from the legal system.

## Elections and Political Participation

**Recent Elections:** In 2015 elections were held for two-thirds of the 3,159 seats on 284 municipal councils; the government appointed the remaining third. Council members serve until the next election – nominally for four-year terms – but there was no public announcement of conducting municipal elections during the year. Women were allowed to vote and run as candidates for the first time in 2015. The voting age was also lowered to 18. The Ministry of Municipal and Rural Affairs actively encouraged women's participation in the municipal elections. Election

regulations prohibited candidates from contesting under party affiliation. Twenty-one women won seats, and 17 were appointed to seats, totaling approximately 1 percent of all available seats.

The NSHR observed the elections, and select international journalists were also permitted to observe. Independent polling station observers identified no irregularities with the election. Prior to the election, several candidates reported they were disqualified for "violating the rules and regulations" without further explanation. They had the right to appeal, and some were reinstated in time for the elections. Uniformed members of the security forces, including the military and police, were ineligible to vote.

**Political Parties and Political Participation:** There were no political parties or similar associations. The law does not protect the right of individuals to organize politically and specifically bans a number of organizations with political wings, including the Muslim Brotherhood, as terrorist groups. The government continued to regard human rights organizations, such as the Saudi Civil and Political Rights Association (ACPRA), as illegal political movements and treated them accordingly.

**Participation of Women and Members of Minority Groups:** The law permits women and men to engage in political activities on an equally limited basis. Women may vote and run for office in municipal elections and serve on the Shura council. Women served in a small number of senior positions within government ministries. On April 18, Inas al-Shahwan became the country's third female ambassador. In August local media reported the appointment of two women, Al-Anoud al-Aboud and Fatima al-Rashoud, to top senior leadership positions at the General Presidency for the Affairs of the Two Holy Mosques. Women expanded participation in the military, security forces, and other major institutions. On July 13, soldier Abeer al-Rashed became the first woman to conduct the security forces briefing for Hajj, in September the first class of female soldiers graduated from the Armed Forces Women's Training Center, and in October the first 30 Saudi female pilots received their licenses from OxfordSaudia Flight Academy.

There were no women on the High Court or Supreme Judicial Council and no female judges or public prosecutors. In January the undersecretary for women's

empowerment at the Ministry of Human Resources and Social Development claimed in an interview that the appointment of female judges was forthcoming, but by year's end no women had been appointed and no specific plans to do so had been released.

No laws prevent male citizens from minority groups from participating in political life on the same basis as other male citizens.  Societal discrimination, however, marginalized the Shia Saudi population, and tribal factors and long-standing traditions continued to dictate many individual appointments to positions. Government authorities were unlikely to appoint a Bedouin tribesman to a high-ranking ministerial-level position or the senior-most positions in the armed forces. All Council of Ministers members from tribal communities were members of urbanized "Hamael" tribes, rather than Bedouin tribes.  While the religious affiliation of Shura Council members was not known publicly, the council included an estimated seven or eight Shia members.  The Council of Ministers contained one religious minority member, Mohammad bin Faisal Abu Saq, a Shia Ismaili, who had held the position of minister of state for Shura affairs since 2014. Multiple municipal councils in the Eastern Province, where most Shia Saudis resided, had large proportions of Shia Saudis as members to reflect the local population, including a majority in Qatif and 50 percent in al-Hassa.  Eastern Province Shia judges dealing with intra-Shia personal status and family laws operated specialized courts.

# Section 4. Corruption and Lack of Transparency in Government

The law provides criminal penalties for official corruption, and the government generally implemented the law effectively.  The National Control and Anticorruption Commission (Nazaha) has sole authority to investigate and prosecute reports of corruption involving government employees.  Nazaha's ministerial-level director reports directly to the king.  During the year the government joined two multilateral efforts to counter corruption.  In February it joined the Organization for Economic Co-operation and Development Working Group on Bribery.  In June it founded the Global Operational Network of Anti-Corruption Law Enforcement Authorities (GlobE) for UN member states to share

anticorruption information under the UN Office on Drugs and Crime.  Human rights organizations criticized the government for using anticorruption campaigns as a pretext to target perceived political opponents and for arbitrarily detaining and abusing individuals targeted in the crackdown (see sections 1.c.; 1.d., Pretrial Detention; and 1.e., Threats, Harassment, Surveillance, and Coercion).

**Corruption:**  Nazaha conducted countercorruption campaigns throughout the year. It published monthly (based on the lunar Hijri calendar) reports of its activities, providing the overall number of investigations and arrests during the prior month and a list of the government ministries or agencies involved.  It periodically published limited details concerning convictions in cases that involved either senior-level officials or large sums of money; however, the press releases did not identify the officials by name or provide enough details to allow identification.

On May 27, Nazaha announced that an unnamed "senior member" of the royal family was convicted of using falsified academic credentials to obtain a government position.  The prince received a two-year prison sentence and a moderate fine.

On June 28, the *Middle East Monitor* alleged that Fahd bin Turki bin Abdulaziz Al Saud, the former joint force commander initially arrested on corruption charges in September 2020, was sentenced to death for treason for allegedly attempting a coup.  He remained in prison.

On August 11 Nazaha stated that an unnamed provincial governor was convicted of bribery and embezzlement and received a sentence of three years in prison and a small fine.

# Section 5. Governmental Posture Towards International and Nongovernmental Investigation of Alleged Abuses of Human Rights

The law provides that "the State shall protect human rights in accordance with Islamic sharia."  The government restricted the activities of domestic and international human rights organizations.

The government often cooperated with and sometimes accepted the recommendations of the NSHR, the sole government-licensed domestic human rights civil society organization.  The NSHR accepted requests for assistance and complaints regarding government actions affecting human rights.  The government blocked websites of unlicensed local human rights groups and charged their founders with founding and operating unlicensed organizations (see 2.b., Freedom of Association).

The government did not allow international human rights NGOs to be based in the country and restricted their access to the country for visits; there were no transparent standards governing visits by international NGO representatives. International human rights and humanitarian NGOs reported the government was at times unresponsive to requests for information and did not establish a clear mechanism for communication with NGOs on both domestic human rights issues and issues relating to the conflict in Yemen.

**The United Nations or Other International Bodies:**  In March the *Guardian* reported that a senior Saudi official in Geneva was accused of threatening to "take care of" UN special rapporteur on extrajudicial, summary, and arbitrary executions Agnes Callamard during her investigation into the 2018 murder of Jamal Khashoggi.  The *Washington Post* later reported the unnamed official was Saudi Human Rights Commission president Awad al-Awad.  He stated publicly that he had been present at the meeting but denied making any threatening remarks.

**Government Human Rights Bodies:**  The government had mechanisms to investigate and punish abuse, but their effectiveness was limited.  The HRC is part of the government and requires the permission of the Ministry of Foreign Affairs before meeting with diplomats, academics, or researchers with international human rights organizations.  The HRC president has ministerial status and reports to the king.  The HRC worked directly with the Royal Court and the Council of Ministers, with a committee composed of representatives of the Shura Council and the Ministries of Labor and Social Development and Interior, and with the Shura Council committees for the judiciary, Islamic affairs, and human rights.

During the year the HRC and NSHR were more outspoken in areas deemed less politically sensitive, including child abuse, child marriage, and trafficking in

persons.  While they avoided topics such as protests or cases of political activists that would require directly confronting government authorities, they inquired into complaints of mistreatment by some high-profile political prisoners.  The 18 full-time members of the HRC board included nine women and at least three Shia members; they received and responded to individual complaints, including those related to persons with disabilities, religious freedom, and women's rights.

The Shura Council's Human Rights Committee also actively followed cases and included women and Shia among its members.

The HRC and NSHR maintained records of complaints and outcomes, but privacy laws protect information concerning individual cases, and information was not publicly available.  On June 29, the HRC stated it handled 4,593 complaints in 2020, a 9 percent increase over 2019.

The Board of Grievances, a high-level administrative judicial body that hears cases against government entities and reports directly to the king, is the primary mechanism to seek redress for claims of abuse.  During the year the Board of Grievances held hearings and adjudicated claims of wrongdoing, but there were no reported prosecutions of security force members for human rights violations.  Military and security courts investigated an unknown number of abuses of authority and security force killings.  The HRC, in cooperation with the Ministry of Education, provided materials and training to police, other security forces, the Ministry of Defense, and the CPVPV on protecting human rights.

Citizens may report abuses by security forces at any police station or to the HRC or NSHR.  The Public Prosecutor's Office announced in July the launch of the Ma'akom system, which allows citizens and residents to submit complaints directly regarding illegal detention or violations of detainee rights, using the online platform Absher, a hotline telephone number, or in person (see Administration in section 1.c., Prison and Detention Center Conditions).

# Section 6. Discrimination and Societal Abuses

## Women

**Rape and Domestic Violence:**  Rape is a criminal offense under sharia with a

wide range of penalties, from flogging to execution.  The law does not recognize spousal rape as a crime.  The government enforced the law based on its interpretation of sharia, and in some cases courts punished victims as well as perpetrators for illegal "mixing of genders," even when there was no conviction for rape.  Survivors must prove that a rape was committed, and a woman's testimony in court was not always accepted.

Due to these legal and social obstacles, authorities brought few cases to trial. Statistics on incidents of, and prosecutions, convictions, or punishments for rape were not available.  Most rape cases were likely unreported because survivors faced societal and familial reprisal, including diminished marriage opportunities, criminal sanctions up to imprisonment, or accusations of adultery or sexual relations outside of marriage, which are punishable under sharia.  There were reports that domestic abuse in the form of incest occurred but was seldom reported to authorities due to fears of societal repercussions, according to local sources.

The law against domestic violence defines domestic abuse broadly and criminalizes domestic abuse with penalties of one month to one year of imprisonment or a fine unless a court provides a harsher sentence.

Researchers stated it was difficult to gauge the magnitude of domestic abuse, which they believed to be widespread.  Recent studies varied widely, finding the rate of domestic abuse among women to be anywhere between 15 to 60 percent.  In July, referencing a Ministry of Health report, local media reported authorities were investigating more than 2,700 domestic violence cases, in which 75 percent of the alleged survivors were female.  The National Family Safety Program, a quasi-governmental organization under the Ministry of National Guard, is charged with spreading awareness of and combatting domestic violence, including child abuse, and continued to report abuse cases.

Officials stated the government did not clearly define domestic violence and procedures concerning cases, including thresholds for investigation or prosecution, and thus enforcement varied from one government body to another.  Some women's rights advocates were critical of investigations of domestic violence, claiming investigators were hesitant to enter a home without permission from the male head of household, who may also be the perpetrator of violence.  Activists

reported the situation had improved in recent years, with greater awareness of resources for domestic violence survivors, such as the domestic violence hotline managed by the Ministry of Human Resources and Social Development.  They also noted a continued increase in authorities' willingness to investigate and prosecute domestic violence perpetrators, but they expressed concern that some police departments continued to neglect domestic violence cases.

On January 27, Prisoners of Conscience reported that a woman known only as Manal was arrested after publishing details on the disappearance and death of her 26-year-old sister, Qamar, allegedly at the hands of their two brothers.  Manal stated on Twitter that her two brothers killed Qamar for setting up a public Snapchat account.  Authorities in al-Kharj stated they arrested two individuals in connection with the murder on January 21.  As of November, Manal's whereabouts were unknown.

The government made some efforts to reduce domestic violence.  The Ministry of Human Resources and Social Development administered government-supported family-protection shelters, although women reported that remaining in the shelters was not always voluntary.  On March 29, the HRC and the Mawaddah Charitable Association signed a memorandum of understanding to increase coordination and antidomestic violence awareness efforts.  It would establish an independent body to research domestic violence, propose changes to the legal framework, and develop specialized centers for survivors, local media reported.  No additional information on implementation of the memorandum was available as of December.

**Female Genital Mutilation/Cutting (FGM/C):**  The official government interpretation of sharia prohibits the practice; however, some studies indicated up to 18 percent of women reported having undergone some type of FGM/C.

**Sexual Harassment:**  The extent of sexual harassment was difficult to measure, with little media reporting and no official government data.  No statistics were available on the incidence of sexual harassment due to reluctance to report violations.

On January 12, the Council of Ministers approved an amendment to the antiharassment law that allows for the public release of names of those convicted

for harassment, as a deterrent and to prevent offenders' employment in certain jobs. The law criminalizing sexual harassment carries a maximum penalty of five years in prison and a substantial fine. The HRC stated that a legal punishment against sexual harassment is irreversible, even if the victim renounced his or her own rights or did not file a legal complaint.

Local media reported a number of incidents of harassment during the year. In March the Public Prosecutor's Office ordered the arrest of a man seen in a video insulting and assaulting two young women in the streets of Riyadh and filed a criminal suit against him. On February 22, local media reported that former shura council member Iqbal Dandari won a case against a man for cyberharassment. Details regarding the case were unknown. On September 26, local media reported a number of sexual harassment incidents during National Day celebrations. Security authorities arrested and referred to the Public Prosecutor's Office three Saudi citizens in Medina, a Saudi and an Egyptian resident in Riyadh, and a Saudi citizen in Taif for harassing women.

In April the HRC launched a specialized group for confidential support of victims of sexual harassment and their families with psychological counseling and educational, social, and legal guidance.

**Reproductive Rights:** There were no reports of coerced abortion or involuntary sterilization on the part of government authorities.

Premarital sex is illegal under sharia law, and hospitals and health centers may report extramarital pregnancies to police. Access to most contraceptives required a prescription, but condoms were available at pharmacies and supermarkets for over-the-counter purchase. According to 2020 estimates by the UN Population Fund, 15 percent of all women and 23 percent of married women between the ages of 15 and 49 used a modern method of contraception.

In some cases women may be discouraged from making certain reproductive health decisions due to cultural and religious beliefs, social pressure, and lack of awareness of their rights.

Almost all women had access to skilled health attendants during pregnancy and childbirth. The most recent UN Population Fund estimates reported that skilled

health personnel attended 99 percent of births between 2010 and 2019.  While some women in rural areas had to travel to the closest medical facility to receive treatment, others received health services from Ministry of Health-sponsored mobile health clinics.  According to the government, women are entitled to medical assistance during pregnancy and delivery; the right to decide the details of their deliveries; and obtain maternity care in a language she understands and is appropriate to her cultural and religious beliefs.  Adult women also have the right to consent to any medical procedures.

Governmental and quasi-governmental agencies provided medical care to sexual violence survivors as well as psychological and social support.  The Ministry of Human Resources and Social Development's Center for Protection Against Abuse runs a 24-hour hotline and shelters across the country with access to medical care for victims of sexual violence, while the quasi-governmental National Family Safety Program agency provided medical support to sexual abuse victims.  (See sections 2.g. and 6, Children, for issues related to legal status for children born outside of marriage.)

**Discrimination:**  Women continued to face discrimination under law and custom.  A series of regulations issued from 2019 through year's end, however, granted women many of the same rights enjoyed by men pertaining to travel abroad, civil status, and employment.

Most restrictions under the guardianship system, which had required women to have permission from close male relatives to conduct certain actions, were eliminated.  There were reports, however, that government and nongovernment entities, primarily in rural areas, continued to require women to obtain guardian permission prior to providing services.

Women older than 18 have the right to perform several actions pertaining to civil status that were previously limited to men.  These included registering the birth of a child; registering the death of a spouse or close relative; registering a marriage or divorce (whether initiated by the husband or wife); and being designated "head of household," thereby allowing women to serve as the guardian of their minor children.  Women can also obtain from the Civil Status Administration a "family registry," which is official documentation of a family's vital records that verifies

the relationship between parents and children. This reform allows mothers to perform administrative transactions for their children, such as registering them for school or obtaining services at a hospital.

In June judicial authorities amended the absenteeism law, or *taghayyub*, to allow all unmarried, divorced, or widowed women to live alone without the consent of a male guardian. The amendment followed a July 2020 court decision in which a court ruled in favor of Maryam al-Otaibi, a Saudi woman who lived independently in Riyadh, despite prosecutors' attempt to convict her for absenteeism. Under the previous absenteeism law, guardians could report the unauthorized absence of anyone under their guardianship, which could lead to the arrest, detention, or forcible return of the individual.

In advance of Hajj in July, authorities ended the male guardian requirement for women to participate in the annual pilgrimage.

Adult women may legally own property and are entitled to financial support from their husbands or ex-husbands. They can make their own determinations concerning hospital care and no longer need a male guardian's permission to start a business.

By law women have equal rights to employment. On January 14, the Ministry of Human Resources and Social Development banned employee discrimination on the basis of race, color, gender, age, or disability, citing reforms to human resources laws. Commenting on a job advertisement that contained gender discriminatory language, the ministry stated it violated the labor law, stressing that citizens have equal employment rights without any form of discrimination, including gender.

On February 21, the Ministry of Defense began allowing women to serve in the army, air defense, navy, strategic missile force, and armed forces medical services as enlisted personnel, but not as officers. In November data from the Ministry of Human Resources and Social Development's National Labor Observatory showed women constituted 60 percent of Saudi youth who joined the local employment market during the first nine months of the year.

Women no longer require a guardian's permission to exit prisons after completing their terms.

The law permits women to transmit citizenship to their children under certain circumstances (see section 2.g. and section 6, Children).  The country's interpretation of sharia prohibits Muslim women from marrying non-Muslims, but Muslim men may marry non-Muslim women.  Women require government permission to marry noncitizens; men must obtain government permission if they intend to marry citizens from countries other than Gulf Cooperation Council-member states (Saudi Arabia, Bahrain, Kuwait, Oman, Qatar, and the United Arab Emirates).  Regulations prohibit men from marrying women from Bangladesh, Burma, Chad, and Pakistan.  The government additionally requires Saudi men wishing to marry a second wife who is a foreigner to submit documentation attesting to the fact that his first wife was disabled, had a chronic disease, or was sterile.

Few businesses still required or pressured women to sit in separate, specially designated family sections in public places.

Cultural norms selectively enforced by state institutions require women to wear an abaya (a loose-fitting, full-length cloak) in public.  Female foreigners, like males, were only required to dress "modestly."

Women faced discrimination in courts, where in some cases the testimony of a woman equals one-half that of a man.  Women have begun practicing law, but all judges are male.  In divorce proceedings, women must demonstrate legally specified grounds for divorce, but men may divorce without giving cause, citing "irreconcilable differences."  In doing so, men must pay immediately an amount of money agreed at the time of the marriage that serves as a one-time alimony payment.  Men may be forced, however, to make subsequent alimony payments by court order.  The government began implementing an identification system based on fingerprints, designed to provide women more access to courts, even if they chose to cover their faces with the *niqab* covering.

In February 2020 the Justice Ministry ended the so-called secret divorce, whereby men could divorce their wives without the woman's consent or knowledge.  The ministry also canceled an article in the marriage law that gave a husband the right to force his wife to return to her home against her will.

A woman needs a guardian's permission to marry or must seek a court order in the case of *adhl* (male guardians refusing to approve the marriage of women under their charge). In such cases the judge assumes the role of the guardian and may approve the marriage. During the year courts executed marriage contracts for women whose male guardians refused to approve their marriage, according to informed judicial sources quoted by local media. According to local media in 2020, courts considered an average of 750 marriage contract cases annually.

In February the crown prince announced forthcoming legal reforms that would impact the personal status law and expand protections for women. On October 24, Minister of Justice Walid al-Samaani stated the personal status draft law would address a woman's agreement to marriage, preserving her and her children's financial and alimony rights, as well as other issues related to divorce requests. Additional details regarding these reforms were not made public by year's end.

Courts routinely awarded custody of children when they attain a specified age (seven years for boys and nine years for girls) to the divorced husband or the deceased husband's family. In some cases former husbands reportedly prevented divorced noncitizen women from visiting their children.

Sharia-based inheritance laws discriminate against women, giving daughters one-half the inheritance awarded to their brothers.

According to recent surveys, women constituted 52 percent of public education and higher education students. Segregated education through the university level was standard. Some private universities, such as -Faisal University, offered partially segregated classes with students receiving instruction from the same teacher and able to participate together in class discussion, but with the women and men physically separated by dividers. A few other government universities offered coeducation in selected programs, largely in the sciences. Private international and national schools may offer coeducation at any grade; most private international schools are coeducational, while most private national schools are segregated. Primary public schools offered mixed-gender education up to the third grade.

## Systemic Racial or Ethnic Violence and Discrimination

Although racial discrimination is illegal, societal discrimination against members

of national, racial, and ethnic minorities was a problem.  Descendants of former slaves in the country, who have African lineage, faced discrimination in both employment and society.  There was formal and informal discrimination, especially racial discrimination, against foreign workers from Africa and Asia.  There was also discrimination based on tribal or nontribal lineage.  A tolerance campaign by the King Abdulaziz Center for National Dialogue sought to address discrimination, and it provided training during the year to combat discrimination against national, racial, or ethnic groups.

## Children

**Birth Registration:**  Citizenship generally derives from the father, and both the father and mother may register a birth.  There were cases of authorities denying public services to children of citizen parents, including education and health care, because the government failed to register the birth entirely or had not registered it immediately, sometimes because the father failed to report the birth or did not receive authorization to marry a foreigner.  Children of women who were married to foreign spouses receive permanent residency, but their residency status is revocable in the event of the death of the Saudi mother (see section 2.g., Stateless Persons).  On June 25, the social security administration announced children from foreign fathers and Saudi mothers will be allowed to benefit from their mother's pension, as long as she is widowed or divorced.  In January the HRC stated that a child born in the country to unknown parents would be considered a Saudi citizen.

**Child Abuse:**  Abuse of children occurred.  The National Family Safety Program operated a helpline dedicated to assisting children in matters ranging from bullying to abuse, providing counseling, tracking, and referrals to social services.  The Ministry of Human Resources and Social Development had 17 social protection units across the country providing social protection to children younger than 18 as well as other vulnerable populations suffering domestic violence and abuse.  Child abuse is a crime punishable by one year's imprisonment, a maximum fine of 50,000 riyals ($13,300), or both.

On January 30, local media reported that the family protection unit in Jizan investigated the case of a 15-year-old girl abused by her father, stating that legal actions would be taken against him.  There were no updates as of November.

**Child, Early, and Forced Marriage:**  The minimum age for marriage is 18; those younger than that age may marry only with court approval.  According to local media, the court ensures several conditions are met before approving a marriage contract for a bride or groom younger than 18, including assessing their psychosocial development and hearing statements from the potential bride, groom, and guardians to determine consent.  The HRC and NSHR monitored cases of child marriages, which they reported were rare or at least rarely reported, and took steps to prevent consummation of such marriages.  The application for a marriage license must record the bride's age, and registration of the marriage is a legal prerequisite for consummation.

**Sexual Exploitation of Children:**  The cybercrimes law stipulates that punishment for such crimes, including the preparation, publication, and promotion of material for pornographic sites, may be no less than two and one-half years' imprisonment or a substantial fine if the crime includes the exploitation of minors.  The law does not define a minimum age for consensual sex.  In February a woman was arrested for sexually abusing a girl in Riyadh.  The woman allegedly filmed herself and the girl and posted the footage on social media.  In the same month, Mecca police arrested a man for sexually harassing a child.  He reportedly posted a video of the harassment on social media.

**International Child Abductions:**  The country is not a party to the 1980 Hague Convention on the Civil Aspects of International Child Abduction.  See the Department of State's *Annual Report on International Parental Child Abduction* at https://travel.state.gov/content/travel/en/International-Parental-Child-Abduction/for-providers/legal-reports-and-data/reported-cases.html.

## Anti-Semitism

There were no known data on Jewish citizens and no statistics available concerning the religious denominations of foreigners.

Cases of government-employed imams using anti-Semitic language in their sermons were generally rare but occurred more frequently during the May conflict in Gaza.  The law requires government-employed imams to deliver all sermons in mosques in the country.  The Ministry of Islamic Affairs vets all sermons.  During

the year the ministry issued periodic circulars to clerics and imams in mosques directing them to include messages on the principles of justice, equality, and tolerance and to encourage rejection of bigotry and all forms of racial discrimination in their sermons.

On January 30, a *Washington Post* article cited expert assessments that anti-Semitic references and language in Saudi textbooks had been removed or tempered, including calls to "fight the Jews."  Nonetheless, some concerns remained regarding anti-Semitic themes in textbooks; for example, a textbook's passage refers to a Quranic text that suggests God changed a group of Israelites into "monkeys."

A report by the Anti-Defamation League (ADL) stated that the October Riyadh International Book Fair included exhibitors selling more than two dozen notoriously anti-Semitic books.  The ADL noted that the presence of these anti-Semitic books at the largest book fair in the country "seem[s] at odds with some positive Saudi trends."

In January a group of Israeli drivers traveled to Saudi Arabia to compete in the Dakar Rally, despite a ban on Israeli travelers to the country.  On February 2, the English-language newspaper *Arab News* ran an op-ed by two Israeli writers, Hay Eyta Cohen Yanarocak and Jonathan Spyer, believed to be the first time a Saudi newspaper knowingly published Israeli writers.

## Trafficking in Persons

See the Department of State's *Trafficking in Persons Report* at https://www.state.gov/trafficking-in-persons-report/.

## Persons with Disabilities

The law mandates the state to "protect human rights in accordance with Islamic law," which the Authority for Persons with Disabilities notes includes justice, equity, and antidiscrimination on any grounds, including disability.  On January 14, the Ministry of Human Resources and Social Development banned workplace discrimination, including on the basis of disability (see section 6, Women).  On April 21, the ministry announced that all private and government institutions were

obliged to meet certain accessibility requirements within six months; accommodations were implemented at some government buildings, retail establishments, and sidewalks. Local media reported that the ministry had formed expert committees to oversee the implementation of accessibility requirements that would follow the building code and accessibility standards developed by the King Salman Center for Disability Research. Newer commercial buildings often included such access, as did some newer government buildings.

The Ministry of Human Resources and Social Development is responsible for protecting the rights of persons with disabilities. Vocational rehabilitation projects and social care programs increasingly brought persons with disabilities into the mainstream. Children with disabilities could attend government-supported schools. The Ministry of Education took measures to integrate students with disabilities, including special education programs in regular schools, training faculty members who work with students with disabilities and providing technological instruments for students with disabilities free of charge. On September 29, the education minister stated students with disabilities would have equal educational opportunities to help them integrate into the labor market, adding that the ministry had prepared a teaching and training strategy to ensure students with disabilities students received proper education and training.

Persons with disabilities were elected and appointed to municipal councils in 2015, and two individuals with disabilities served on the consultative Shura Council, which was reconstituted in 2016.

## HIV and AIDS Social Stigma

There were no reports of societal violence or discrimination against persons with HIV or AIDS. By law the government deported foreign workers who tested positive for HIV or AIDS upon arrival or who tested positive when hospitalized for other reasons. There was no indication that HIV-positive foreigners failed to receive antiretroviral treatment or that authorities isolated them during the year. The Ministry of Health's HIV/AIDS program worked to counter stigma and discrimination against persons with HIV or AIDS.

## Acts of Violence, Criminalization, and Other Abuses Based on

## Sexual Orientation and Gender Identity

Under sharia, as interpreted in the country, consensual same-sex sexual conduct is punishable by death or flogging, depending on the perceived seriousness of the case.  It is illegal for men "to behave like women" or to wear women's clothes, and vice versa.  Due to social conventions and potential persecution, lesbian, gay, bisexual, transgender, queer, and intersex (LGBTQI+) organizations did not operate openly, nor were there LGBTQI+ rights advocacy events of any kind.  There were reports of official and societal discrimination, physical violence, and harassment based on sexual orientation or gender identity in employment, housing, access to education, and health care.  Clerics condemned homosexuality during government-approved Friday sermons at some mosques.

During the year local newspapers featured opinion pieces condemning homosexuality and calling on authorities to punish harshly individuals engaging in same-sex relations.

On October 24, local media reported that Northern Borders Province police arrested and referred for prosecution five men who appeared in public in women's clothing.  The men filmed themselves and posted the video on social media in an apparent attempt to attract more social media followers.  A police spokesman described their conduct as "inconsistent with the public morals of society."

Observers at the December MDLBeast Soundstorm music festival reported that it included the public display of LGBTQI+ culture.

## Other Societal Violence or Discrimination

Social, legal, economic, and political discrimination against the country's Shia minority continued.  HRW claimed that some state clerics and institutions "incited hatred and discrimination against religious minorities, including the country's Shia Muslim minority."

To address the problem, the Ministries of Defense and Interior and the National Guard included antidiscrimination training in courses offered by the King Abdulaziz Center for National Dialogue for police and other law enforcement officers.

# Section 7. Worker Rights

## a. Freedom of Association and the Right to Collective Bargaining

The law does not provide for the right of workers to form and join independent unions; however, trade unions and labor committees existed.  The law does not provide for the right to collective bargaining or the right to conduct legal strikes.  Workers faced potential dismissal, imprisonment, or, in the case of migrant workers, deportation for unsanctioned union activities.

The government allowed citizen-only labor committees in workplaces with more than 100 employees, but it placed undue limitations on freedom of association and was heavily involved in the formation and activities of these committees.  For example, the Ministry of Human Resources and Social Development approves the committee members and authorizes ministry and employer representatives to attend committee meetings.  Committee members must submit the minutes of meetings to management and then transmit them to the minister; the ministry can dissolve committees if they violate regulations or are deemed to threaten public security.  Regulations limit committees to making recommendations to company management that are limited to improvements to working conditions, health and safety, productivity, and training programs.

The law does not prohibit antiunion discrimination or require reinstatement of workers fired for union activity.  There was little information on government efforts to enforce applicable laws and whether penalties were commensurate with those for other laws involving denials of civil rights, such as discrimination.

## b. Prohibition of Forced or Compulsory Labor

The law does not prohibit or criminalize all forms of forced or compulsory labor, and forced labor occurred, especially among migrant workers, notably domestic workers.  Conditions indicative of forced labor experienced by foreign workers reportedly included withholding of passports, nonpayment of wages, restrictions on movement, and verbal, physical, and sexual abuse.  The law prohibits the confiscation of passports and nonpayment of wages.  Penalties for violations of labor laws were not commensurate with those for other analogous serious crimes,

such as kidnapping.  The government improved enforcement of the law, including electronic systems to monitor and ensure compliance.  On March 14, the government announced the Labor Reform Initiative, which eliminated the need for many private-sector workers to obtain their employer's permission to obtain an exit and re-entry visa, obtain a final exit visa, or change employers at the conclusion of their contract or after one year.  This provided increased freedom of movement and lessened the risks of forced labor for seven million private-sector workers.  According to the Human Resources Ministry, as of November, 65,000 workers had successfully changed employers.  The Labor Reform Initiative does not apply to domestic workers (see section 2.d.).

Many migrant workers, particularly female domestic workers, who are not covered under the labor law, were unable to exercise the right to terminate their employment contract, change employers, or leave the country without undue restrictions.  Employers may require a trainee to work for them upon completion of training for a period not to exceed twice the duration of the training or one year, whichever is longer.

The government expanded to all private-sector companies the implementation of the Wage Protection System, which requires employers to pay foreign workers by electronic transfer through a Saudi bank.  The government also implemented a mandatory e-contract system that includes type of work, salary, duration of contract, working hours, and annual leave.  Contracts were verified by both the employer and employee.  The government reported it used the Mudad platform to track Wage Protection System and e-contract compliance in real-time and imposed penalties for any firm that failed to maintain at least 80 percent compliance on a monthly basis.

Also see the Department of State's *Trafficking in Persons Report* at https://www.state.gov/trafficking-in-persons-report/.

## c. Prohibition of Child Labor and Minimum Age for Employment

The law prohibits and criminalizes all the worst forms of child labor and provides for a minimum age of employment.  The law provides that no person younger than 15 may legally work unless that person is the sole source of support for the family.

Children between the ages of 13 and 15 may work if the job is not harmful to health or growth and does not interfere with schooling.  A ministerial decree provides that hazardous operations, such as use of power-operated machinery, or harmful industries, such as mines and quarries, may not employ legal minors. Children younger than 18 may not be employed for shifts exceeding six hours a day.  There is no minimum age for workers employed in family-owned businesses or other areas considered extensions of the household, such as farming, herding, and domestic service.

The HRC and NSHR are responsible for monitoring enforcement of child labor laws.  There was little information on government efforts to enforce applicable laws and whether penalties were commensurate with those for other analogous serious crimes, such as kidnapping.  Authorities mostly enforced the law in response to complaints regarding children begging on the streets.

Most child labor involved children from other countries, including Yemen and Ethiopia, forced into begging rings, street vending, and working in family businesses.

Also see the Department of Labor's *Findings on the Worst Forms of Child Labor* at https://www.dol.gov/agencies/ilab/resources/reports/child-labor/findings.

## d. Discrimination with Respect to Employment and Occupation

The labor law in general prohibits discrimination in the terms of recruitment as well as during employment.  The law mandates that employers treat all workers equally and barred discrimination on the basis of gender, disability, age, or any other forms of discrimination, whether in work, employment, or advertising a vacancy.  No regulations prohibit discrimination on the basis of religion, political opinion, national origin or citizenship, sexual orientation or gender identity, language, or HIV-positive status.  Gender-based violence and harassment occurred in the workplace (see section 6, Women).  Discrimination with respect to employment and occupation occurred in all these categories.  There are no effective complaint resolution mechanisms to determine whether any existing penalties were commensurate with other laws on civil rights, such as election interference.

Women may work without their guardian's permission, but some employers required applicants to submit proof of it, even though the law prohibits the practice.  A 2019 decree expanded previous regulations barring employers from firing female workers on maternity leave and includes protection from dismissal for pregnancy-related illness if the absence is less than 180 days per year. Employers who violate the antidiscrimination law can be fined.  The antidiscrimination law only applies to citizens and does not protect the rights of expatriates.  There was widespread societal discrimination against African and Asian expatriate workers.

In recent years women's labor participation increased significantly, including in sectors traditionally dominated by men (see section 6, Women).  Prohibitions on employment of women in some hazardous jobs and night shifts were lifted.  The Ministry of Human Resources and Social Development explicitly approved and encouraged employment of women in specific sectors, particularly in government and retail, but women continued to face societal discrimination, and gender segregation continued in the workplace.  In medical settings and the energy industry, women and men worked together, and in some instances, women supervised male employees.  There were no women working as judges or as members of the Council of Senior Religious Scholars.

The first-quarter *Labor Market Report* by the General Authority for Statistics found the labor force participation rate of the total female working-age population was 33.6 percent.  Most non-Saudi women were employed as domestic workers.

No regulation requires equal pay for equal work.  In the private sector, the average monthly wage of Saudi women workers was 64 percent of the average monthly wage of Saudi men.  Labor dispute settlement bodies did not register any cases of discrimination against women.

The law grants women the right to obtain business licenses without the approval of their guardians, and women frequently obtained licenses in fields that might require them to supervise foreign workers, interact with male clients, or deal with government officials.  Women who work in establishments with 50 or more female employees have the right to maternity leave and childcare.  Bureaucratic procedures largely restricted women working in the security services to

employment in women's prisons, at women's universities, and in clerical positions in police stations, where they were responsible for visually identifying other women, for example those wearing niqabs, for law enforcement purposes.  In 2020 the military chief of general staff inaugurated the first women's wing in the armed forces, and on April 25, the Ministry of Defense created a joint admissions portal for upcoming military positions open to both women and men.  In September the first class of women graduated from the Saudi Armed Forces Training Academy.

Discrimination with respect to religious beliefs occurred in the workplace. Members of the Shia community complained of discrimination based on their religion and had difficulty securing or being promoted in government positions. They were significantly underrepresented in national security-related positions, including the Ministries of Defense and Interior and the National Guard.  In predominantly Shia areas, Shia representation was higher in the ranks of traffic police and employees of municipalities and public schools.  A small number of Shia occupied high-level positions in government-owned companies and government agencies.  Shia were also underrepresented in employment in primary, secondary, and higher education.

## e. Acceptable Conditions of Work

**Wage and Hour Laws:**  The monthly minimum wage for public-sector employees was above the estimated poverty-income level.  There was no private-sector minimum wage for foreign workers.

By law a standard workday is eight hours.  A standard workweek is 48 hours but can extend to 60 hours, subject to payment of overtime, which is 50 percent more than the basic wage.  The law requires employers to provide paid holidays on Eid al-Fitr, Eid al-Adha, and Saudi National Day but does not apply to domestic workers sponsored by individuals rather than companies.

An estimated 10.2 million foreign workers, including approximately 1.4 million women, made up approximately 75 percent of the labor force, according to the General Authority for Statistics' labor market survey for the first quarter.  Legal workers generally negotiated and agreed to work conditions prior to their arrival in the country, in accordance with the contract requirements contained in the law.

The law provides penalties for bringing foreigners into the country to work in any service, including domestic service, without following the required procedures and obtaining a permit.  Penalties, however, were not commensurate with those for similar crimes, such as fraud.

**Occupational Safety and Health:**  The government issued occupational safety and health standards that were up-to-date and appropriate for the main industries. The law provides for regular safety inspections and enables ministry-appointed inspectors to make unannounced inspections, initiate sanctions, examine materials used or handled in industrial and other operations, and submit samples of suspected hazardous materials or substances to government laboratories.  The government effectively enforced the law.

The Ministry of Health's Occupational Health Service Directorate worked with the Ministry of Human Resources and Social Development on health and safety matters.  Responsibility for identifying unsafe situations remains with occupational safety and health experts and not the worker.  By law employers are obligated to safeguard safety and health requirements in the workplace to protect employees from harm and disease.  Regulations require employers to protect some workers from job-related hazards and disease, although some violations occurred.  Penalties for violations of occupational safety and health laws were not commensurate with those for crimes such as negligence.  Punishment for labor violations involved a range of fines and the possible temporary or permanent closure of a business.  The law does not provide workers the right to remove themselves from a hazardous workplace without jeopardizing their employment.

**Informal Sector:**  The law requires that a citizen or business must sponsor foreign workers for them to obtain legal work and residency status, although the requirement exempts Syrian and Yemeni citizens who overstayed their visas.  The Ministry of Human Resources and Social Development implemented measures allowing noncitizen workers to switch their employer to a new employer or company that employed a sufficient quota of Saudi citizens.  Some workers were unaware of the new regulations and were forced to remain with their sponsor until completion of their contract or seek the assistance of their embassy to return home. There were also instances in which sponsors bringing foreign workers into the country failed to provide them with a residency permit, which undermined the

workers' ability to access government services or navigate the court system in the event of grievances.  Sponsors with commercial or labor disputes with foreign employees also could ask authorities to prohibit employees from departing the country until the dispute was resolved.  Authorities, however, would not jail or forcibly return fleeing workers who sought to exit the country within a 72-hour period or coordinate with their embassy for repatriation, provided the employees did not have criminal charges or outstanding fines pending against them.

Bilateral labor agreements set conditions on foreign workers' minimum wage, housing, benefits including leave and medical care, and other topics.  Those provisions were not drafted in line with international standards and varied depending on the bargaining power of the foreign workers' country.  There were reports that some migrant workers were employed on terms to which they had not agreed and experienced problems, such as delays in the payment of wages, changes in employer, or changed working hours and conditions.  Migrant workers, especially domestic workers, were vulnerable to abuse, exploitation, and conditions contravening labor laws, including nonpayment of wages, working for periods in excess of the 48-hour workweek, working for periods longer than the prescribed eight-hour workday without due compensation, and restrictions on movement due to passport confiscation.  There were also reports of physical, psychological, sexual, and verbal abuse.

There were reports that some migrant workers, particularly domestic employees, were unable to remove themselves from dangerous situations.  Some employers physically prevented workers from leaving or threatened them with nonpayment of wages if they left.  Sponsoring employers, who controlled foreign workers' ability to remain employed in the country, usually held foreign workers' passports, a practice prohibited by law.  In some contract disputes, in order to prevent the employee from leaving the country until resolution of the dispute, sponsors asked authorities to coerce the employee into accepting a disadvantageous settlement or risking deportation without any settlement.

While some foreign workers were able to contact the labor offices of their embassies for assistance, domestic workers faced challenges when attempting to gain access to their embassies, including restrictions on their freedom of movement and telephone access, confiscation of their passports, and being subjected to threats

and verbal and physical abuse.  During the year several dozen (primarily) female domestic workers sought shelter at their embassies' safehouses to escape physical and sexual abuse by their employers.  Those workers usually sought legal assistance from their embassies and government agencies to obtain end-of-service benefits and exit visas.  In addition to their embassies, some domestic servants could contact the NSHR, HRC, Interministerial General Secretariat to Combat Human Trafficking, and Migrant Workers' Welfare Department, which provided services to safeguard migrant workers' rights and protect them from abuse.  Some were able to apply to the offices of regional governors and lodge an appeal with the Board of Grievances against decisions by those authorities.

Occupational safety and health regulations do not cover farmers, herdsmen, domestic servants, or workers in family-operated businesses.  Although the Ministry of Human Resources and Social Development employed nearly 1,000 labor inspectors, foreign workers privately reported frequent failures to enforce health and safety standards.  Although statistics were unavailable, examples of major industrial accidents during the year that caused the death or serious injury to workers included local media reports from February 15 that at least six Bangladeshi migrant workers were killed in a fire at a furniture factory in Medina.

# Exhibit C-8

U.S. Officials Had a Secret Oil Deal With the Saudis. Or So They Thought. - The New York Times

**The New York Times** | https://www.nytimes.com/2022/10/25/us/politics/us-saudi-oil-deal.html

# U.S. Officials Had a Secret Oil Deal With the Saudis. Or So They Thought.

After Saudi leaders pushed to slash oil production despite a visit by President Biden, American officials have been left fuming that they were duped.

By Mark Mazzetti, Edward Wong and Adam Entous

Oct. 25, 2022

9 MIN READ

> **Sign up for the Russia-Ukraine War Briefing.** Every evening, we'll send you a summary of the day's biggest news. Get it sent to your inbox.

WASHINGTON — As President Biden was planning a politically risky trip to Saudi Arabia this summer, his top aides thought they had struck a secret deal to boost oil production through the end of the year — an arrangement that could have helped justify breaking a campaign pledge to shun the kingdom and its crown prince.

It didn't work out that way.

Mr. Biden went through with the trip. But earlier this month, Saudi Arabia and Russia steered a group of oil-producing countries in voting to slash oil production by two million barrels per day, the opposite of the outcome the administration thought it had secured as the Democratic Party struggles to deal with inflation and high gas prices heading into the November elections.

The move led angry Biden administration officials to reassess America's relationship with the kingdom and produced a flurry of accusatory statements between the two governments — including a charge by the White House that Saudi Arabia was helping Russia in its war in Ukraine.

Lawmakers who had been told about the trip's benefits in classified briefings and other conversations that included details of the oil deal — which has not been previously disclosed and was supposed to lead to a surge in production between September and December — have been left fuming that Crown Prince Mohammed bin Salman duped the administration.

This account is based on interviews with American officials and officials from Gulf Arab nations, as well as Middle East experts with knowledge of discussions between the two nations.

What happened over the last half-year is a story of handshake agreements, wishful thinking, missed signals and finger-pointing over broken promises. Far from rebuilding a relationship with a leader Mr. Biden had once pledged to treat as a "pariah" after the murder of journalist Jamal Khashoggi, the outcome has been another low point in America's tumultuous ties with Saudi Arabia.

The episode is also a revealing example of how Saudi Arabia, under the leadership of its ambitious and often ruthless crown prince, appears eager to shed some of its longtime reliance on the United States, with Prince Mohammed trying to position Saudi Arabia as a powerhouse of its own.

American officials said that, even days before the OPEC Plus decision, they had received assurances from the crown prince there would be no production cuts — and when they learned of the Saudi reversal they made a futile last-ditch push to change minds in the royal court.

The Saudi Energy Ministry said in a statement that "the kingdom rejects these allegations and stresses that such mischaracterizations made by anonymous sources are entirely false."

The ministry added, "The decisions of OPEC Plus are reached by the consensus of all members and determined solely by market fundamentals, not politics."

White House officials admit they were angered and surprised by what they said was a Saudi about-face, but insist their overall strategy to lower energy costs is working.

"We have a disagreement with Saudi Arabia over the most recent production cut, but our energy policy has always focused on prices, not number of barrels — and that policy is succeeding with crude oil prices down over 30 percent this year alone," Adrienne Watson, a National Security Council spokeswoman, said in a statement on Tuesday night.

At the same time, U.S. officials are bracing for another potential price surge in December, if a European embargo on Russian oil goes into effect and the Saudis refuse to increase oil production to make up for the anticipated reduction in supply. The officials say that would be a sure sign that the Saudis were helping the Russians by undermining the American and European-led plan.

Take survey

"While we clearly disagreed with the OPEC Plus decision in early October, we recognize the importance of continuing to work and communicate with Saudi Arabia and other producers to ensure a stable and fair global energy market," said Amos Hochstein, Mr. Biden's energy envoy.

Some analysts say that senior American and Saudi officials have misread each other on both the dynamics of the oil market and the geopolitics around Russia, and that the Biden administration will have a hard time figuring out how things went awry.

"Deconstructing Saudi decision-making right now is like Kremlinology on steroids," said Hussein Ibish, a scholar at the Arab Gulf States Institute in Washington. "It's become a matter of a relative handful of people around the king and the crown prince."

"Even the most well-informed people in the United States often don't know," he added.

The White House has indicated it might seek retribution for the Saudi decision, and some Democrats in Congress are making a push to scale back some military and economic ties to the kingdom. Even some of the president's staunchest supporters have called the episode an example of the administration sacrificing principles for political expediency — and having little to show for it.

"There's now a level of embarrassment as the Saudis merrily go on their way," said Representative Gerald E. Connolly, Democrat of Virginia and a member of the House Foreign Affairs Committee.



Mr. Biden met in Saudi Arabia with Crown Prince Mohammed bin Salman.  Doug Mills/The New York Times

## Fist Bump in Jeddah

Biden administration officials began planning in the spring for the president to make a summit stop in Saudi Arabia while also visiting Israel over the summer. They knew such a trip would bring criticism: Mr. Biden had denounced Prince Mohammed during the presidential campaign, had ordered the declassification of an intelligence assessment that the prince likely ordered the killing of Mr. Khashoggi and had thus far in his presidency refused to have a one-on-one meeting with the crown prince.

But some of the president's aides saw both short- and long-term benefits for the trip and had quietly tried to repair the relationship. They said it was important to work with the kingdom on the Yemen war and Iran, and to expand Israel's acceptance in the region. More immediately, they believed, the trip could shore up a Saudi commitment to convince OPEC to increase oil production as Russia's war in Ukraine had led to surging global fuel prices.

Leading proponents of the visit, including Mr. Hochstein and Brett McGurk, the top National Security Council official for Middle East policy, met during the spring with Prince Mohammed and his advisers. American officials said that in May, they reached a private oil deal with the Saudis that had two parts.

First, the Saudis would accelerate an OPEC Plus production increase of 400,000 barrels per day already planned for September, moving it to July and August. Then the Saudis would get the cartel to announce a further production increase of 200,000 barrels per day for each month from September to December of this year.

American officials said they hoped the announcements of gradual increases would signal to the markets that the Saudis were willing to address supply issues.

On June 2, OPEC Plus announced they would move up the production increase scheduled for September — fulfilling the first part of the secret deal.

That same day, the White House announced Mr. Biden would soon make a trip to Saudi Arabia.

Democratic lawmakers remained skeptical of the efforts at rapprochement. Representative Adam Schiff, Democrat of California and chairman of the House intelligence committee, said publicly that Mr. Biden should not travel to the kingdom. He and five other senior Democratic House members sent a letter on June 7 to Mr. Biden urging him to take a more guarded approach to Saudi Arabia — the most immediate issue, they said, was that "Saudi Arabia's refusal to stabilize global energy markets is helping bankroll Vladimir Putin's war crimes in Ukraine."

The White House agreed to give the lawmakers classified briefings about their diplomatic efforts on a range of issues, including the Yemen war, Iran and Saudi Arabia's relations with Israel. In briefings and talks with members of the congressional intelligence and foreign affairs committees, Mr. McGurk and Mr. Hochstein laid out the elements of a variety of agreements they had brokered with the Saudis, including the oil production boost intended to bring down prices.

Mr. McGurk said in a statement on Tuesday that diplomacy with the Saudis was mainly aimed at building stability and prosperity in the Middle East, "from establishing a truce in Yemen to countering Iran to fostering regional interconnectedness, including with Israel."

For Democratic lawmakers who attended the briefings, the apparent oil pledge from the Saudis promised relief both for American consumers being pummeled by inflation, and for Mr. Biden and his embattled party as they headed into the November elections.

The price of oil was slowly dropping by the time Mr. Biden arrived in Jeddah, Saudi Arabia, on July 15 for his meeting with Prince Mohammed and other Arab leaders. The image of the American president bumping fists with the Saudi crown prince he once vilified endures from the trip, but behind the scenes, White House officials believed they had at least shored up Saudi commitments on a number of fronts.

Saudis officials seemed eager to demonstrate to the Americans that they had delivered on their commitments — during the summit, they gave members of Mr. Biden's delegation a chart showing oil prices had fallen to $101 per barrel, down from more than $120 per barrel after the war in Ukraine began. The kingdom would soon pump more than 11 million barrels per day, a level it had reached for only a few months in total over the past several years.

We'd like to hear what you think about our reporting.



Saudi Arabia's energy minister, Prince Abdulaziz bin Salman. American officials believe he was instrumental in convincing the crown prince to cut production to keep oil prices from falling so low that they would impair the kingdom's economic development plans.  Tamir Kalifa for The New York Times

## October Surprise

The Americans came away from the summit with the belief that the agreement was on track and that Prince Mohammed was satisfied. But in Riyadh, top Saudi officials were privately telling others that they had no plans for further meaningful oil production increases.

Indeed, the first public warning of this came on Aug. 3, when OPEC Plus announced a paltry bump in production for September of 100,000 barrels a day — half of what U.S. officials believed the Saudis had promised them.

American officials said they did not understand why that decision was made. Then OPEC Plus announced on Sept. 5 it would cut production by 100,000 barrels per day — retracting the increase it had announced a month earlier. After that, U.S. officials were increasingly confused and concerned about the kingdom's direction.

In late September, American officials began hearing that Saudi Arabia could get OPEC Plus to announce a deep cut to oil production at a meeting scheduled for Oct. 5. U.S. officials scrambled to get Prince Mohammed to back away from any such move.

On Sept. 24, American officials met in person in the kingdom with Prince Mohammed and his brother Prince Abdulaziz bin Salman, the Saudi energy minister. During the meeting, Prince Mohammed assured the Americans that there would be no production cuts, according to U.S. officials with direct knowledge of what transpired.

But four days after that, the White House learned the crown prince had done the opposite: Saudi officials notified the Americans that Saudi Arabia would back production cuts at the OPEC Plus meeting, which took place in Vienna.

The White House dispatched Treasury Secretary Janet Yellen to speak by phone to Mohammed al-Jadaan, the Saudi finance minister, to argue against the production cut, but that failed to sway the Saudis.

American officials say they believe that Prince Mohammed was particularly influenced by a high-level Sept. 27 meeting in which Prince Abdulaziz, the energy minister, argued that oil production cuts were needed to keep prices from plummeting to as low as $50 per barrel. The U.S. officials said they learned Prince Abdulaziz asserted that, under such a scenario, the Saudi government would lack the resources to fund economic diversification projects at the heart of Prince Mohammed's domestic agenda.

Some U.S. officials believe that the Russians influenced the Saudi about-face, pointing to Prince Abdulaziz's strong working ties with top Russian officials close to Mr. Putin, particularly Alexander Novak, the deputy prime minister who oversees energy policy.



President Vladimir Putin of Russia meeting in 2019 with Crown Prince Mohammed bin Salman. Some U.S. officials say that Saudi Arabia is effectively backing Moscow over Ukraine by keeping oil prices high, an assertion that the Saudis reject.  Pool photo by Alexey Nikolsky/EPA, via Shutterstock

Saudi officials vehemently denied marching in lock step with Russia and said they have viewed themselves as a neutral mediator in Russia's war with Ukraine. Some American officials said that an answer to whether Riyadh has truly cast its lot with Moscow will come on Dec. 4, when OPEC Plus is scheduled to meet again.

The White House is working with European allies to implement a partial embargo and price cap on Russian oil sales beginning in December. Their goal is to deprive Moscow of resources and to increase pressure on Mr. Putin to end the war in Ukraine, while keeping global oil supplies stable.

But much hinges on what the Saudis choose to do. If they refuse to announce a production increase at that December meeting — around the time when Russian oil could come off the market — oil prices might surge, undermining Mr. Biden's efforts against Russia and stoking global inflation.

On Tuesday, speaking at an annual investment forum in Riyadh, Prince Abdulaziz suggested that was unlikely, arguing that Saudi Arabia was preserving its spare capacity to be ready for such shocks and saying the country felt great responsibility to be a "dependable supplier of oil."

Prince Abdulaziz said that the kingdom would do what was in its best interests.

We'd like to hear what you think about our

"I keep listening to, 'Are you with us or against us?' Is there any room for, 'We are for Saudi Arabia and the people of Saudi Arabia'?" he said. "We will have to deliver our ambitions."

Vivian Nereim contributed reporting from Riyadh.

# Exhibit C-9

Download Fastest Growing Brands 2022* Report



GEOPOLITICS

# Saudi Arabia's Image in America Continues to Sink as Formal Relations Hit Nadir

After OPEC+ output cut, 53% of U.S. adults viewed the kingdom negatively, the biggest share so far this year



US President Joe Biden (3rd-L) and Saudi Crown Prince Mohammed bin Salman (R) attend the Jeddah Security and Development Summit (GCC+3) at a hotel in Saudi Arabia's Red Sea coastal city of Jeddah on July 16, 2022. (Photo by MANDEL NGAN / AFP) (Photo by MANDEL NGAN/AFP via Getty Images)

Download Fastest Growing Brands 2022 Report



The decision by OPEC+ to cut oil production just ahead of the U.S. midterm elections prompted a backlash from the Biden administration and its allies in Congress, and Morning Consult survey tracking data suggests that criticism is resonating with Americans.

**POLITICAL INTELLIGENCE**

## Saudi Arabia's Popularity in U.S. Reached 2022 Low After OPEC+ Cut

But after initial dip, views are stabilizing

**Share of U.S. adults with favorable and unfavorable views of Saudi Arabia**



*Bpd stands for "barrels per day", the standard metric of petroleum production.

**MORNING CONSULT**

Data points represent a seven-day moving average of daily surveys conducted Dec. 26, 2021-Oct. 23, 2022, among a representative sample of at least 3,434 U.S. adults, with unweighted margins of error of +/- 1 to 2 percentage points. "Don't know/No opinion" responses are not shown.

## Americans' dismal opinions of Saudi Arabia have worsened

- Views of Saudi Arabia reached a low for 2022 after the OPEC+ oil cartel that dominates global petroleum production announced on Oct. 5 that it will cut its production quota targets by some 2

Download Fastest Growing Brands 2022 Report



- Even when Riyadh agreed to greater-than-expected boosts in June, the small decline in unfavorable views that followed evaporated before the month was out — and actually increased despite a 100,000 barrel-per-day hike announced in August as heavy media coverage of the trip President Joe Biden made to secure the small increase took a negative tone.

## Americans Increasingly See Saudi Arabia as Unfriendly or an Enemy to the U.S.

Negative views have ticked up across the political spectrum since summer



Surveys conducted in 2022 among a representative sample of roughly 2,200 U.S. adults, with unweighted margins of error of +/-2 percentage points. "Don't know/No opinion" responses are not shown.

## Americans are increasingly wary of the U.S.-Saudi relationship

- According to a recent Morning Consult/Politico survey, 49% of U.S. adults now say Saudi Arabia is either unfriendly to or an outright enemy of the United States, up from 42% in June. That adversarial

Download Fastest Growing Brands 2022 Report

saying they feel antipathy toward the Kingdom, and views among all groups worsened by roughly the same amount since the June survey.



**YOUR MORNING CONSULT**

**All the news you need on global business, politics and economies.** Delivered every morning.

SUBSCRIBE TODAY ▸

## Despite poor relations, rupture with Riyadh would gain little

The OPEC+ decision was met by unusually harsh rhetoric from the Biden administration and Democrats in Congress that baffled some foreign policy experts, and a New York Times report published Tuesday offered some explanation for the seemingly disproportionate response: U.S. officials viewed the move as a betrayal of a secret agreement struck earlier this summer to ensure increased production through 2022.

Nonetheless, discretion may have been the better part of valor for the White House. Regardless of the state of relations and Saudi Arabia's unpopularity among Americans, its vital role in U.S. interests makes it hard to impose boundaries on the relationship.

"The tools the United States might deploy to spank the Saudis are quite limited," said Thomas W. Lippman, former chief of The Washington Post's Middle East bureau who has spent three decades covering Saudi Arabia. "We could cut off student visas, but who thinks that would increase our influence in the country? The Saudis are steadfast partners in trying to contain Iran; if we cut off arms sales and military training, what will we gain by that? The French will be only too ready to step in anyway. What are we going to do, embargo Saudi ports that export oil we consume? The Saudis just aren't particularly vulnerable to American pressure."



Download Fastest Growing Brands 2022 Report

SUBSCRIBE TODAY

The White House, which announced a formal review of its relationship with the Saudis, has not provided any details of the "consequences" it promised to impose on the House of Saud, and did not respond to multiple requests for comment for this story.

What's more, the wisdom of any secret deal with the Saudis may have been suspect all along, particularly considering the political risk the Biden administration ran by cozying up to a perpetually unpopular regime that it had previously vowed to shun. Saudi Arabia is the de facto leader of OPEC+, but it cannot unilaterally dictate production quotas that would hurt the bottom line of most other members without risking its standing, its finances and the cohesion of the cartel, said Lippman.

And airing out dirty laundry publicly can only damage the scope of cooperation in the U.S.-Saudi relationship that may be sorely needed as the war in Ukraine unfolds, according to Karen E. Young, a political economist at Columbia University's Center on Global Energy Policy.

"The broader concern that the Saudi government has is about market manipulation and other governments politicizing what Saudi Arabia can or can't do in the oil markets, as we have seen here," said Young. "Whatever happens with Russia after the rollout of a European oil price cap and oil embargo is out of Saudi Arabia's control, and they fear they're going to take the blame for high energy prices regardless."

RELATED: After OPEC+ Cuts Oil Supplies, Nearly Half of U.S. Voters Support 'NOPEC' Bill

Matthew Kendrick   Matthew Kendrick is a data reporter at Morning Consult covering geopolitics and foreign affairs. @matt__kendrick

2022 ELECTIONS   COUNTRY FAVORABILITY   JOE BIDEN   MIDDLE EAST





**GEOPOLITICS BRIEFING**

SIGN UP ▶



LOGIN

.

**ABOUT**

About

Careers

Contact

**SOLUTIONS BY ROLE**

Insights

Communications

Marketing

Corporate Finance

**SOLUTIONS BY PRODUCT**

Brand Intelligence

Economic Intelligence

Political Intelligence

GET THE LATEST DATA AND INSIGHTS FROM OUR DAILY EMAIL NEWSLETTERS

SUBSCRIBE ▶

Download Fastest Growing Brands 2022® Report

Download Fastest Growing Brands 2022® Report



© 2023 Morning Consult, All Rights Reserved. The M Logo and MORNING CONSULT are registered trademarks of Morning Consult Holdings, Inc.

Privacy Policy   Security   Terms and Conditions   Do Not Sell or Share My Personal Information   California Privacy Notice

# Exhibit C-10

HOME    MAIL    NEWS    FINANCE    SPORTS    ENTERTAINMENT    LIFE    SEARCH    SHOPPING    YAHOO PLUS    MORE...



Search for news, symbols or companies

Sign in

Finance    Watchlists    My Portfolio    Crypto    Yahoo Finance Plus    News    Screeners    Markets    Videos    Personal Finance

A Leading Online Marketplace for Extraordinary Design

1stDIBS

SHOP NOW

((•)) U.S. markets close in 4 hours 52 minutes

| S&P 500 | Dow 30 | Nasdaq | Russell 2000 | Crude Oil |
|---|---|---|---|---|
| 3,828.78 | 33,102.39 | 10,404.50 | 1,761.52 | 78.92 |
| -10.72 (-0.28%) | -44.86 (-0.14%) | -61.98 (-0.59%) | +0.27 (+0.02%) | -1.34 (-1.67%) |

Ameritrade
Grow as a trader

Open an account
E*TRADE
from Morgan Stanley

💬 448



FORTUNE

# Phil Mickelson called the Saudis 'scary,' but said their LIV golf tour was a major stand against the PGA. His new lawsuit just backed up his talk

**Alena Botros**

August 3, 2022 · 2 min read

Golf champion Phil Mickelson and 10 fellow players in the Saudi-backed LIV Golf series have filed an antitrust lawsuit against the rival PGA Tour.

The lawsuit was filed Wednesday in federal court in San Francisco by Mickelson along with Bryson DeChambeau,



**Finance starts with the Morning Brief newsletter**

Sign up

Quote Lookup

TRENDING

1. Ukraine Latest: NATO Allies Seek Deal to Boost Defense Spending

2. Does Big Tech have a corporate governance problem?

3. US STOCKS-Wall Street drops as Apple, energy stocks weigh

4. Disney stock: 5 things Bob Iger needs to address in 2023

5. Internet providers warn against EU plans to make Big Tech cover telcos costs



yahoo!finance

Sign in

Finance    Watchlists    My Portfolio    Crypto    ⓎⒻ Yahoo Finance Plus    News    Screeners    Markets    Videos    Personal Finance

players in June in retaliation for participating in the new Saudi-backed tour. The allure of the LIV Series? Each tournament offers $25 million in prize money, with $20 million going directly to individual players.

Last week's LIV Series tournament was held at former President Donald Trump's golf club in Bedminster, N.J. Previously, the PGA announced that it would no longer hold its 2022 PGA Championship there, in response to the Jan. 6 riots.

The plaintiffs, in the suit, argue the PGA is using its enormous power against the players out of fear of competition, citing "the ability to force players into restrictive terms that foreclose them from playing in competing events and the ability to suppress player compensation below competitive levels."

The golfers go as far as to allege the PGA's actions have harmed their careers.

"The unlawful strategy has been both harmful to players and successful in threatening LIV Golf's otherwise-promising launch," the players said in the lawsuit.

The lawsuit specifically cites the PGA's two-year suspension of Mickelson, who has 45 PGA Tour victories.

"Mickelson's unlawful two year suspension from the PGA Tour has caused him irreparable professional harm, as well as financial, and commercial harm," plaintiffs wrote.

The *Washington Post* obtained a memo sent by the PGA to its remaining players on Wednesday after the lawsuit was filed.

"Fundamentally, these suspended players — who are now Saudi Golf League employees — have walked away from the TOUR and now want back in," it says. "With the Saudi Golf League on hiatus, they're trying to use lawyers to force their

YAHOO HOME | MAIL | NEWS | FINANCE | SPORTS | ENTERTAINMENT | LIFE | SEARCH | SHOPPING | YAHOO PLUS | MORE...

**Yahoo! finance**

Sign in

Finance | Watchlists | My Portfolio | Crypto | Yahoo Finance Plus | News | Screeners | Markets | Videos | Personal Finance


Hotels.com   BOOK NOW

## RECOMMENDED STORIES



**MarketWatch**

**My wife and I live 'an average life' in the Bay Area making $320K. Last year, we bought a house for**

Question: I was a victim of FOMO during the housing market craziness and bought a house for $200,000 over the asking price. Since it's a rental property, if you sell at a loss, you...

5h ago



**Zacks**

**Here's What to Expect From Petrobras' (PBR) Incoming CEO**

The new CEO of Petrobras (PBR) stresses the need to invest in the energy transition.

3h ago



Ad • Capital One Shopping    •••

**Amazon Left In Chaos After Shoppers Find This Out**

Think you're getting the best deal when you shop online? Don't buy a single thing until you try this — you won't regret it.

**Motley Fool**

**Where Will Rivian Stock Go in 2023?**

Rivian (NASDAQ: RIVN) has had an eventful first year as a public company, to say the least. It delivered vehicles to customers for the first time and grew production rapidly, but also ran into delays in ramping up production that have left investors unhappy.

# Exhibit C-11

ADVERTISEMENT
-39%
-38%
Men's Outdoor Ethnic Pattern Flee...
$88.95
$53.95
View now
-45%
Men's Vintage American Flag Print...
$93.95
$57.95
Men's Retro Li Fl
$

MORE SPORTS

# Phil Mickelson calls Saudi leaders 'scary' but still champions upstart golf tour

By Joseph Wilkinson
New York Daily News • Feb 18, 2022 at 7:01 pm

TOP SPORTS VIDEOS

Top Videos: - Game Recap: Heat 110, Clippers 100

NYPD gives Proud Boys free subway rides after neo-fascist group disrupts Drag...

George Santos funneled $25K to Lee Zeldin's campaign for governor —...

Bills safety Damar Hamlin in critical condition after suffering cardiac arrest on...

As George Santos readies for Tuesday swearing-in here's what he's said vs. the truth

Listen to this article

He's putting his mouth where the money is.

Phil Mickelson says he knows Saudi Arabia has a bad human rights record, but he's so set on changing the PGA Tour that he's still joining the country's breakaway golf league.

AD



"They're scary motherf-----s to get involved with," he told golf writer Alan Shipnuck in an interview published Thursday. "We know they killed (Washington Post reporter Jamal) Khashoggi and have a horrible record on human rights."



Phil Mickelson reacts after making a putt in August 2021. (Julio Cortez/AP)

Mickelson also mentioned that homosexuality is punishable by death in Saudi Arabia.



Men's Outdoor Ethnic Pattern Fleece Zipper Tactical Shirt Jacket ⧉

Jackets, Men's Outdoor Ethnic Pattern Fleece Zipper Tactical Shirt Jacket

By Blaroken

"Knowing all of this, why would I even consider it? Because this is a once-in-a-lifetime opportunity to reshape how the PGA Tour operates."

Mickelson, 51, has made his displeasure with the PGA Tour clear over the past few years. He believes that golfers should get a larger share of the Tour's revenue and control their own media rights, among other complaints.

Long a fan favorite, Mickelson has become arguably the face of the breakaway Saudi tour, which has been rumored for the past few years but not yet launched. Mickelson described it as an enemy-of-my-enemy situation.

"Unless you have leverage, (the PGA Tour) won't do what's right," he told Shipnuck. "And the Saudi money has finally given us that leverage. I'm not sure I even want (the Saudi tour) to succeed, but just the idea of it is allowing us to get things done with the (PGA) Tour."

Mickelson, a six-time major winner, said the Saudi organizers essentially let players write the startup tour's contract. Shipnuck reported that 20 current players, many of them big names, have agreed to join the Saudi tour.

PGA Commissioner Jay Monahan has said that any player who joins the Saudi tour will be banned from the PGA Tour for life. While some insiders view it as an empty threat, most of the Tour's young stars have recently committed to sticking around.

  

**Prime Is Now $139, But Few Know This Saving Trick**
Amazon Prime has millions of subscribers, but only few know about this amazing savings trick!

ExpertsInMoney.co

Learn more

# Exhibit C-12



**Jamal Khashoggi**

🕐 This article is more than **7 months old**

# Greg Norman says 'we all make mistakes' when asked about Khashoggi killing

**Australian golf champion makes remarks about journalist's murder at Saudi-backed league event**

*Guardian staff with agencies*

Thu 12 May 2022 04.23 EDT

The golf champion Greg Norman has attempted to dismiss questions over the murder of the journalist Jamal Khashoggi at a Saudi consulate as a "mistake," adding the Saudi government "wants to move forward".

Norman was speaking at a promotional event in the UK for a Saudi-backed golf tournament, the LIV Golf Invitational Series. The 67-year-old is chief executive of LIV Golf Investments, funded primarily by the Saudi sovereign wealth fund.

The $225m (£184m) competition, designed to rival other big golf series, has attracted controversy over Saudi Arabia's human rights record, including the murder and dismemberment of Khashoggi at the Saudi consulate in Istanbul in 2018.



We operate Google reCAPTCHA to protect our website and

Last year US intelligence agencies concluded that the Saudi crown prince, Mohammed bin Salman, had approved his murder.

"This whole thing about Saudi Arabia and Khashoggi and human rights; talk about it, but also talk about the good that the country is doing in changing its culture," Norman said. "Look, we've all made mistakes and you just want to learn by those mistakes and how you can correct them going forward."

The Australian golfer said he had not met Mohammed Bin Salman "but, at the same time, I do read that the Saudi government has made their statements and comments about it and they want to move forward".

When asked how he felt when he heard about the execution of 81 men in Saudi Arabia in March, Norman said: "I got a lot of messages but quite honestly I look forward. I don't look back. I don't look into the politics of things. I'm not going to get into the quagmire of whatever else happens in someone else's world. I heard about it and just kept moving on," he said.

Khashoggi had gone to the Saudi consulate in Istanbul on 2 October 2018 to collect documents required for him to marry his Turkish fiancee, Hatice Cengiz.

The killing was caught on listening devices planted by Turkish intelligence. The dissident was strangled by security aides and then dismembered by a forensic scientist who worked for Saudi intelligence. His body was then transferred in pieces to the nearby Saudi consul general's residence, where it is thought to have been burned in an outdoor oven. No remains have ever been found.

This article was amended on 12 May 2022 to correctly refer to Jamal Khashoggi's body being taken to the Saudi consul general's residence, not the Turkish consul general's residence as an earlier version said.

*PA and Reuters contributed to this report*

The year is 2033. Elon Musk is no longer one of the richest people in the world, having haemorrhaged away his fortune trying to make Twitter profitable. Which, alas, hasn't worked out too well: only 420 people are left on the platform. Everyone else was banned for not laughing at Musk's increasingly desperate jokes.

In other news, Pete Davidson is now dating Martha Stewart. An 86-year-old Donald Trump is still threatening to run for president. And British tabloids are still churning out 100 articles a day about whether Meghan Markle eating lunch is an outrageous snub to the royal family.

Obviously I have no idea what the world is going to look like in a decade. But here's one prediction I feel very confident making: without a free and fearless press the future will be bleak. Without independent journalism, democracy is doomed. Without journalists who hold power to account, the future will be entirely shaped by the whims and wants of the 1%.

A lot of the 1% are not big fans of the Guardian, by the way. Donald Trump once praised a Montana congressman who body-slammed a Guardian reporter. Musk, meanwhile, has described the Guardian, as "the most insufferable newspaper on planet Earth." I'm not sure there is any greater compliment.

I am proud to write for the Guardian. But ethics can be expensive. Not having a paywall means that the Guardian has to regularly ask our readers to chip in. **If you are able, please do consider supporting us.** Only with your help can we continue to get on Elon Musk's nerves.



**Arwa Mahdawi**
*Columnist, Guardian US*

| Single | Monthly | Annual |
|---|---|---|
| $7 per month | $13 per month | Other |

Continue →    Remind me in February    VISA  MasterCard  AMERICAN EXPRESS  P PayPal

# Exhibit C-13

POLITICO

POLITICS

# LIV Golf enlists NRA-tied firm as consultants

The Saudi-bankrolled tour is further extending its reach in the D.C. area.



LIV Golf CEO Greg Norman (left) stands with (from left) LIV golfers Talor Gooch, Dustin Johnson, Patrick Reed and Pat Perez on Sept. 18, 2022, in Sugar Hill, Ill. | AP Photo/Charles Rex Arbogast

By **HAILEY FUCHS**
10/11/2022 01:14 PM EDT

   

LIV Golf's tentacles are penetrating deeper into the nation's capital.

The Saudi-bankrolled enterprise, which has been making the rounds on Capitol Hill in recent months, has hired a prominent firm based in Arlington, Va., to

help advance its efforts to upend the golf industry.

Advertisement



McKenna & Associates, a non-partisan firm headed by Bush administration alum Andrew McKenna, is providing LIV with management consulting services, according to copies of correspondences viewed by POLITICO and people familiar with the arrangement. The firm helped LIV with monitoring and tracking the advocacy of families of 9/11 victims who were protesting the tour because of its ties to the Saudi government, according to the correspondence.

LIV Golf confirmed its relationship with the firm in a statement to POLITICO.

"McKenna has supported the management team as we continue to reinvent the global game of golf," it said.

It's not the first time in recent years that McKenna & Associates has done work for a controversial, high-profile client. The firm was at the heart of accusations that the National Rifle Association engaged in insider dealing when it hired the wife of a top NRA official. The NRA's own accountants reportedly raised concerns about the conflicts posed by that arrangement and its work in general, for which McKenna & Associates earned millions. And in 2020, New York Attorney General Tish James sued the NRA, alleging in part that top NRA officials hired McKenna's firm without going through the NRA's contract process and paid it $5 million over five years. That case is ongoing.

It's unclear when the firm picked up LIV as a client. But in a statement to POLITICO, McKenna & Associates defended its work on behalf of the golf tour.

"LIV's goal is to grow and to reinvent the global game of golf and our entire team is proud to be part of that effort," the statement said.

McKenna & Associates is not registered to represent LIV Golf under the Foreign Agents Registration Act, and the firm did not respond to a request for comment about why it has not. FARA generally mandates that entities lobbying or providing public relations consulting for a foreign principal, such as a foreign government, in the U.S. must register that work with the Department of Justice. However, there are exemptions to the law, including for activities "in furtherance of the bona fide trade or commerce," sometimes even if the foreign principal is state-owned.

Earlier this year, POLITICO reported that a subsidiary of the public relations giant Edelman had also done work for LIV Golf. That work was also never reported under FARA. Edelman maintained that it had been contracted through a golf-focused marketing firm.

AD

In August, former Rep. Ben Quayle (R-Ariz.) registered to lobby on behalf of the company, and last month LIV Golf CEO Greg Norman visited Capitol Hill as part of a Washington blitz.

The strongest political ties LIV has seemingly forged are with former President Donald Trump. The tour held an event in late July at Trump's country club in Bedminster, N.J. And in late October, LIV Golf will host a tournament at Trump National Doral in Miami.

The efforts illustrate the degree to which LIV Golf has sought to ingratiate itself in D.C. circles. The rollout of the tour has roiled professional golf and captivated Washington lawmakers, largely because of the organization's Saudi funding.

This month marked the four-year anniversary of the death of Washington Post journalist Jamal Khashoggi, which U.S. intelligence believes was approved by Saudi Crown Prince Mohammed bin Salman.

The website for McKenna & Associates describes Andrew McKenna as an alum of the George W. Bush administration and the 2000 Bush campaign. McKenna was also a former employee of the consulting and lobbying firm DCI Group, according to records with the Federal Election Commission. A source familiar with the arrangement said that firm also has done work for LIV Golf.

DCI Group is not registered to work with LIV under FARA, and the firm did not return requests for comment.

**FILED UNDER:** SAUDI ARABIA, POLITICS, BEN QUAYLE, GOLF, ARLINGTON, JAMAL KHASHOGGI,

## Huddle

A play-by-play preview of the day's congressional news

**EMAIL**

Your Email

**INDUSTRY**

Select Industry ▾

**EMPLOYER**

Employer

By signing up you agree to allow POLITICO to collect your user information and use it to better recommend content to you, send you email newsletters or updates from POLITICO, and share insights based on aggregated user information. You further agree to our privacy policy and terms of service. You can unsubscribe at any time and can contact us here. This site is protected by reCAPTCHA and the Google Privacy Policy and Terms of Service apply.

SIGN UP

**SPONSORED CONTENT**









Banned For 84 Years, Powerful Pain Reliever Legalized In Missouri

behealth.space



Doctor Says Slimming Down After 60 Comes Down To This

youstayfitwith.me



You Can Do Anything You Want In The Gym If You Breathe This

RAID: Shadow Legends



Flat Out Weight: Your Body Is Constantly Burning Energy

SN-Solution

Weight Loss After 60 Comes Down To This Daily Habit

drkellyannwellness.com

[Gallery] The Most Inappropriate Dress on The Met Gala Red Carpet

HeraldWeekly

Hands Down! The World's Healthiest Breakfast

Ka'Chava

Diabetes Is Not From Sweets! Meet The Main Enemy Of Diabetes

bloodysugar.online

Kia - Brand New and Affordable

Car deals | Search ads

Plastic Surgeon: "Use This Household Item To Fill In Wrinkles" (Here's How)

Beverly Hills MD

About Us

Advertising

Breaking News Alerts

Careers

Credit Card Payments

Digital Edition

FAQ

Feedback

Headlines

Photos

POWERJobs

Press

Print Subscriptions

Request A Correction

Write For Us

RSS

Site Map

Terms of Service

Privacy Policy

Do not sell my info

Notice to California Residents

© 2023 POLITICO LLC

# Exhibit C-14



My View   Following   Saved

Technology

8 minute read · February 17, 2022 5:00 PM CST · Last Updated a year ago

# How a Saudi woman's iPhone revealed hacking around the world

By Joel Schectman and Christopher Bing



[1/4] Saudi activist Loujain al-Hathloul makes her way to appear at a special criminal court for an appeals hearing, in Riyadh, Saudi Arabia March 10, 2021. REUTERS/Ahmed Yosri



WASHINGTON, Feb 17 (Reuters) - A single activist helped turn the tide against NSO Group, one of the world's most sophisticated spyware companies now facing a cascade of legal action and scrutiny in Washington over damaging new allegations that its software was used to hack government officials and dissidents around the world.

It all started with a software glitch on her iPhone.

An unusual error in NSO's spyware allowed Saudi women's rights activist Loujain al-Hathloul and privacy researchers to discover a trove of evidence suggesting the Israeli spyware maker had helped hack her iPhone, according to six people involved in the incident. A mysterious fake image file within her phone, mistakenly left behind by the spyware, tipped off security researchers.



**Register for free to Reuters and know the full story**

*Register now*

Advertisement · Scroll to continue

The discovery on al-Hathloul's phone last year ignited a storm of legal and government action that has put NSO on the defensive. How the hack was initially uncovered is reported here for the first time.

Al-Hathloul, one of Saudi Arabia's most prominent activists, is known for helping lead a campaign to end the ban on women drivers in Saudi Arabia. She was released from jail in February 2021 on charges of harming national security. read more

## Latest Updates

World
**Google alleges India antitrust body copied parts of EU order on Android abuse**

World at Work
**Startups spring from ashes of Big Tech purge**

Soon after her release from jail, the activist received an email from Google warning her that state-backed hackers had tried to penetrate her Gmail account. Fearful that her iPhone had been hacked as well, al-Hathloul contacted the Canadian privacy rights group Citizen Lab and asked them to probe her device for evidence, three people close to al-Hathloul told Reuters.

After six months of digging through her iPhone records, Citizen Lab researcher Bill Marczak made what he described as an unprecedented discovery: a malfunction in the surveillance software implanted on her phone had left a copy of the malicious image file, rather than deleting itself, after stealing the messages of its target.

Advertisement · Scroll to continue

He said the finding, computer code left by the attack, provided direct evidence NSO built the espionage tool.

"It was a game changer," said Marczak "We caught something that the company thought was uncatchable."





around the world, according to four people with direct knowledge of the incident.

Citizen Lab and al-Hathloul's find provided the basis for Apple's November 2021 lawsuit against NSO and it also reverberated in Washington, where U.S. officials learned that NSO's cyberweapon was used to spy on American diplomats.

In recent years, the spyware industry has enjoyed explosive growth as governments around the world buy phone hacking software that allows the kind of digital surveillance once the purview of just a few elite intelligence agencies.

Over the past year, a series of revelations from journalists and activists, including the international journalism collaboration Pegasus Project, has tied the spyware industry to human rights violations, fueling greater scrutiny of NSO and its peers.

But security researchers say the al-Hathloul discovery was the first to provide a blueprint of a powerful new form of cyberespionage, a hacking tool that penetrates devices without any interaction from the user, providing the most concrete evidence to date of the scope of the weapon.

In a statement, an NSO spokesperson said the company does not operate the hacking tools it sells – "government, law enforcement and intelligence agencies do." The spokesperson did not answer questions on whether its software was used to target al-Hathloul or other activists.

But the spokesperson said the organizations making those claims were "political opponents of cyber intelligence," and suggested some of the allegations were "contractually and technologically impossible." The spokesperson declined to provide specifics, citing client confidentiality agreements.

Without elaborating on specifics, the company said it had an established procedure to investigate alleged misuse of its products and had cut off clients over human rights issues.



Feedback



She was arrested and jailed in Saudi Arabia for almost three years, where her family says she was tortured and interrogated utilizing information stolen from her device. Al-Hathloul was released in February 2021 and is currently banned from leaving the country.

Reuters has no evidence NSO was involved in that earlier hack.

Al-Hathloul's experience of surveillance and imprisonment made her determined to gather evidence that could be used against those who wield these tools, said her sister Lina al-Hathloul. "She feels she has a responsibility to continue this fight because she knows she can change things."

The type of spyware Citizen Lab discovered on al-Hathloul's iPhone is known as a "zero click," meaning the user can be infected without ever clicking on a malicious link.

Zero-click malware usually deletes itself upon infecting a user, leaving researchers and tech companies without a sample of the weapon to study. That can make gathering hard evidence of iPhone hacks almost impossible, security researchers say.

But this time was different.

The software glitch left a copy of the spyware hidden on al-Hathloul's iPhone, allowing Marczak and his team to obtain a virtual blueprint of the attack and evidence of who had built it.

"Here we had the shell casing from the crime scene," he said.

Marczak and his team found that the spyware worked in part by sending picture files to al-Hathloul through an invisible text message.

The image files tricked the iPhone into giving access to its entire memory, bypassing security and allowing the installation of spyware that would steal a user's messages.

The Citizen Lab discovery provided solid evidence the cyberweapon was built by NSO, said Marczak, whose analysis was confirmed by researchers from Amnesty International and Apple, according to three people with direct knowledge of the situation.

sample to Apple last September.

Having a blueprint of the attack in hand allowed Apple to fix the critical vulnerability and led them to notify thousands of other iPhone users who were targeted by NSO software, warning them they had been targeted by "state-sponsored attackers."

It was the first time Apple had taken this step.


Saudi women's rights activist Loujain al-Hathloul is seen in this undated handout picture. Marieke Wijntjes/Handout via REUTERS

While Apple determined the vast majority were targeted through NSO's tool, security researchers also discovered spy software from a second Israeli vendor QuaDream leveraged the same iPhone vulnerability, Reuters reported earlier this month. QuaDream has not responded to repeated requests for comment. read more

The victims ranged from dissidents critical of Thailand's government to human rights activists in El Salvador.

Citing the findings obtained from al-Hathloul's phone, Apple sued NSO in November in federal court alleging the spyware maker had violated U.S. laws by building products designed "to target, attack, and harm Apple users, Apple products, and Apple." Apple credited Citizen Lab with providing "technical information" used as evidence for the lawsuit, but did not reveal that it was originally obtained from al-Hathloul's iPhone.

Feedback

Among those Apple warned were at least nine U.S. State Department employees in Uganda who were targeted with NSO software, according to people familiar with the matter, igniting a fresh wave of criticism against the company in Washington.

In November, the U.S. Commerce Department placed NSO on a trade blacklist, restricting American companies from selling the Israeli firm software products, threatening its supply chain. **read more**

The Commerce Department said the action was based on evidence that NSO's spyware was used to target "journalists, businesspeople, activists, academics, and embassy workers."

In December, Democratic Senator Ron Wyden and 17 other lawmakers called for the Treasury Department to sanction NSO Group and three other foreign surveillance companies they say helped authoritarian governments commit human rights abuses.

"When the public saw you had U.S. government figures getting hacked, that quite clearly moved the needle," Wyden told Reuters in an interview, referring to the targeting of U.S. officials in Uganda.

Lina al-Hathloul, Loujain's sister, said the financial blows to NSO might be the only thing that can deter the spyware industry. "It hit them where it hurts," she said.

 **Register for free to Reuters and know the full story**

Register now

Reporting by Joel Schectman and Christopher Bing; editing by Kieran Murray and Edward Tobin

    

Our Standards: **The Thomson Reuters Trust Principles.**

**Christopher Bing**
Thomson Reuters

Award-winning reporter covering the intersection between technology and national security with a focus on how the evolving cybersecurity landscape affects government and business.

  

**Read Next / Editor's Picks**

World at Work
**Startups spring from ashes of Big Tech purge**
5:42 AM CST

Charged
**Exclusive: Tesla makes China boss highest-profile executive after Musk**
1:48 AM CST

Future of Money
**Winklevoss says crypto broker Genesis negotiating in bad faith**
January 2, 2023

Technology
**TikTok-owner ByteDance cuts hundreds of jobs in China - SCMP**
6:13 AM CST

Newsletter | Daily.

**Technology Roundup**

From startups to the FAANGs, get the latest news and trends in the global technology industry.

Sign up

Feedback

## More from Reuters

How did the metaverse grow in 2022?
(2:28) - December 29, 2022
Watch more videos



How did the metaverse grow in 2022?
02:28


How a new smart ball accesses rugby data
00:56


Life-changing medical innovations





Israeli startup makes inroads with flying vehicle
01:20



Israeli startup makes inroads with flying vehicle

## Sponsored Content



Dianomi

### Why 2023 Could Kick Off a "Cash Frenzy" in Stocks

Sponsored by Stansberry Research



### 5 Companies That Send People Money When They're Asked Nicely

Sponsored by The Penny Hoarder



### Missouri: The List Of The Top Financial Advisor Firms Is Out

Sponsored by smartasset

### 6 Odd Things Millionaires Do With Money, But Most of Us Haven't Tried

Sponsored by The Penny Hoarder



### New year, new perspectives. BofA Global Research.

Sponsored by BofA Securities



### Start the Holidays With a Better Checking Account

Sponsored by NerdWallet

**Technology**

Feedback

Technology · December 29, 2022

Italy's Prime Minister Giorgia Meloni said on Thursday she would request a meeting with representatives of Intel to discuss a possible multibillion-euro investment by the U.S. chipmaker

Disrupted

**Baidu, Pony.ai start driverless robotaxi tests in Beijing**

December 30, 2022

Technology

**Russia's Yandex co-founder Volozh pens farewell message to staff**

December 30, 2022

Technology

**FTX Japan to return assets to clients from February**

December 30, 2022

Technology

**Bahamas regulator holds FTX assets pending delivery to customers, creditors**

December 30, 2022

## Sponsored Content

Dianomi ▷

**We think these stocks will soar in 2023**
Sponsored by The Motley Fool


**Hands Down One of the Best Cards for Good Credit**
Sponsored by The Ascent


**New year, new perspectives. BofA Global Research.**
Sponsored by BofA Securities


**This $300 Bonus Won't Last**
Sponsored by CardCritics


**6 Odd Things Millionaires Do With Money, But Most of Us Haven't Tried**
Sponsored by The Penny Hoarder


**Missouri: The List Of The Top Financial Advisor Firms Is Out**
Sponsored by smartasset


## Sponsored Content

Dianomi ▷

**American With Less Than $9,000 in Savings Should Do These 5 Things**
Sponsored by The Penny Hoarder

**Why 2023 Could Kick Off a "Cash Frenzy" in Stocks**
Sponsored by Stansberry Research

**This May Be the Best $5 You've Ever Spent (5 Expert Trade Recs)**
Sponsored by Trade of the Day Plus

**5 Companies That Send People Money When They're Asked Nicely**
Sponsored by The Penny Hoarder

**If You Have More Than $1,000 in Your Bank Account, Make These 5 Moves**
Sponsored by The Penny Hoarder

**Start the Holidays With a Better Checking Account**
Sponsored by NerdWallet

Feedback

Latest

**Home**

Media

Browse

**World**

**Business**

**Legal**

Graphics ⬈

Technology

Investigations ⬈

Lifestyle

About Reuters

**About Reuters** ⬈

**Careers** ⬈

**Reuters News Agency** ⬈

**Brand Attribution Guidelines** ⬈

**Reuters Leadership** ⬈

**Reuters Fact Check** ⬈

**Reuters Diversity Report** ⬈

Stay Informed

**Download the App** ⬈

**Newsletters** ⬈

Information you can trust

Reuters, the news and media division of Thomson Reuters, is the world's largest multimedia news provider, reaching billions of people worldwide every day. Reuters provides business, financial, national and international news to professionals via desktop terminals, the world's media organizations, industry events and directly to consumers.

Follow Us

    

Thomson Reuters Products

**Westlaw** ⬈

Build the strongest argument relying on authoritative content, attorney-editor expertise, and industry defining technology.

**Onesource** ⬈

The most comprehensive solution to manage all your complex and ever-expanding tax and compliance needs.

**Checkpoint** ⬈

The industry leader for online information for tax, accounting and finance professionals.

Refinitiv Products

**Refinitiv Workspace** ⬈

Access unmatched financial data, news and content in a highly-customised workflow experience on desktop, web and mobile.

**Refinitiv Data Catalogue** ⬈

Browse an unrivalled portfolio of real-time and historical market data and insights from worldwide sources and experts.

**Refinitiv World-Check** ⬈

Screen for heightened risk individual and entities globally to help uncover hidden risks in business relationships and human networks.

**Advertise With Us** ⬈   **Advertising Guidelines** ⬈

All quotes delayed a minimum of 15 minutes. See here for a complete list of exchanges and delays.

**Cookies** ⬈   **Terms of Use** ⬈   **Privacy** ⬈   **Digital Accessibility** ⬈   **Corrections** ⬈   **Site Feedback** ⬈

© 2022 Reuters. All rights reserved

Feedback

# Exhibit C-15



**The New York Times** | https://www.nytimes.com/2021/10/24/insider/hacking-nso-surveillance.html

**TIMES INSIDER**

## *I Was Hacked. The Spyware Used Against Me Makes Us All Vulnerable.*

Invasive hacking software sold to countries to fight terrorism is easily abused. Researchers say my phone was hacked twice, probably by Saudi Arabia.

**By Ben Hubbard**

Published Oct. 24, 2021    Updated Nov. 8, 2021                                                                    5 MIN READ

Times Insider explains who we are and what we do, and delivers behind-the-scenes insights into how our journalism comes together.

BEIRUT, Lebanon — In Mexico, the government hacked the cellphones of journalists and activists. Saudi Arabia has broken into the phones of dissidents at home and abroad, sending some to prison. The ruler of Dubai hacked the phones of his ex-wife and her lawyers.

So perhaps I should not have been surprised when I learned recently that I, too, had been hacked.

Still, the news was unnerving.

As a New York Times correspondent who covers the Middle East, I often speak to people who take great risks to share information that their authoritarian rulers want to keep secret. I take many precautions to protect these sources because if they were caught they could end up in jail, or dead.

But in a world where we store so much of our personal and professional lives in the devices we carry in our pockets, and where surveillance software continues to become ever more sophisticated, we are all increasingly vulnerable.

As it turned out, I didn't even have to click on a link for my phone to be infected.

To try to determine what had happened, I worked with Citizen Lab, a research institute at the Munk School of Global Affairs at the University of Toronto that studies spyware.

I hoped to find out when I had been hacked, by whom and what information had been stolen. But even with the help of professional internet sleuths, the answers were elusive.

What the investigation did find was that I had a run-in with the growing global spyware industry, which sells surveillance tools to governments to help them fight crime and track terrorists.

But the companies that sell these tools operate in the shadows, in a market that is largely unregulated, allowing states to deploy the technology as they wish, including against activists and journalists.

In 2018, I had been targeted with a suspicious text message that Citizen Lab determined had likely been sent by Saudi Arabia using software called Pegasus. The software's developer, the Israel-based NSO Group, denied its software had been used.



A screen shot from Ben Hubbard's phone of a WhatsApp message from June 2018 inviting him to a protest at the Saudi Embassy in Washington. Technology researchers later identified it as an attempt to hack his phone, likely by Saudi Arabia.

Case 1:22-mc-00126-CJN-MAU    Document 1-6    Filed 01/03/23    Page 155 of 1028

This year, a member of The Times's tech security team found another hacking attempt from 2018 on my phone. The attack came via an Arabic-language WhatsApp message that invited me by name to a protest at the Saudi Embassy in Washington.

Bill Marczak, a senior fellow at Citizen Lab, said there was no sign that either attempt had succeeded since I had not clicked on the links in those messages.

But he also found that I had been hacked twice, in 2020 and 2021, with so-called "zero-click" exploits, which allowed the hacker to get inside my phone without my clicking on any links. It's like being robbed by a ghost.

In the second case, Mr. Marczak said, once inside my phone, the attacker apparently deleted traces of the first hack. Picture a thief breaking back into a jewelry store he had robbed to erase fingerprints.

Tech security experts told me it was nearly impossible to definitively identify the culprits.

But based on code found in my phone that resembled what he had seen in other cases, Mr. Marczak said he had "high confidence" that Pegasus had been used all four times.

In the two attempts in 2018, he said, it appeared that Saudi Arabia had launched the attacks because they came from servers run by an operator who had previously targeted a number of Saudi activists.

It was not clear which country was responsible for the 2020 and 2021 hacks, but he noted that the second one came from an account that had been used to hack a Saudi activist.

I have been writing about Saudi Arabia for years and published a book last year about Crown Prince Mohammed bin Salman, the kingdom's de facto ruler, so Saudi Arabia might have reasons for wanting to peek inside my phone.

NSO denied its products had been involved in the hacks, writing in an email that I "was not a target of Pegasus by any of NSO's customers" and dismissing Mr. Marczak's findings as "speculation."

The company said it had not had the technology described in the 2018 attempts, and that I could not have been a target in 2020 or 2021 because of "technical and contractual reasons and restrictions" that it did not explain.



A protest outside the offices of NSO Group in July.  Nir Elias/Reuters

The Saudi Embassy in Washington did not respond to a request for comment.

NSO declined to say more on the record, but The Times reported that the company had canceled its contracts with Saudi Arabia in 2018 after Saudi agents killed the dissident writer Jamal Khashoggi, only to resume doing business with the kingdom the following year, adding contractual restrictions on the use of the software.

NSO shut down the Saudi system again this year after Citizen Lab found that the government had used Pegasus to hack the phones of 36 employees of the Arabic satellite network Al Jazeera.

Assigning responsibility for a particular hack is difficult, said Winnona DeSombre, a fellow at the Atlantic Council who studies commercial spyware, because many companies sell products similar to Pegasus, many countries use them and the software is designed to be covert.

She compared the process of analyzing the limited data left on compromised devices to "blind men touching the elephant."

"You can't say without the shadow of a doubt," she said.

I Was Hacked. The Spyware Used Against Me Makes Us All Vulnerable. - The New York Times

The traces left on my phone did not indicate how long the hackers had been inside or what they took, although they could have stolen anything: photos, contacts, passwords and text messages. They would have also been able to remotely turn on my microphone and camera to eavesdrop or spy on me.

Did they steal my contacts so they could arrest my sources? Comb through my messages to see who I'd talked to? Troll through photos of my family at the beach? Only the hackers knew.

As far as I know, no harm has come to any of my sources because of information that may have been stolen from my phone. But the uncertainty was enough to make me lose sleep.

Last month, Apple fixed the vulnerability that the hackers had used to get into my phone this year, after being informed of it by Citizen Lab. But other vulnerabilities may remain.

As long as we store our lives on devices that have vulnerabilities, and surveillance companies can earn millions of dollars selling ways to exploit them, our defenses are limited, especially if a government decides it wants our data.

Now, I limit the information I keep on my phone. I store sensitive contacts offline. I encourage people to use Signal, an encrypted messaging app, so that if a hacker makes it in, there won't be much to find.

Many spyware companies, including NSO, prevent the targeting of United States phone numbers, presumably to avoid picking a fight with Washington that could lead to increased regulation, so I use an American phone number.

I reboot my phone often, which can kick out (but not keep off) some spy programs. And, when possible, I resort to one of the few non-hackable options we still have: I leave my phone behind and meet people face to face.

# Exhibit C-16

**REPORT OF THE JOINT INQUIRY INTO THE TERRORIST ATTACKS OF SEPTEMBER 11, 2001 – BY THE HOUSE PERMANENT SELECT COMMITTEE ON INTELLIGENCE AND THE SENATE SELECT COMMITTEE ON INTELLIGENCE**



S. Rept. No. 107- 351          107ᵀᴴ Congress, 2ᴅ Session          H. Rept. No. 107-792

---

**JOINT INQUIRY INTO**
**INTELLIGENCE COMMUNITY ACTIVITIES**
**BEFORE AND AFTER THE TERRORIST ATTACKS OF**
**SEPTEMBER 11, 2001**

_____

# REPORT

**OF THE**

**U.S. SENATE SELECT COMMITTEE ON INTELLIGENCE**

**AND**

**U.S. HOUSE PERMANENT SELECT COMMITTEE ON**
**INTELLIGENCE**

TOGETHER WITH  ADDITIONAL VIEWS

DECEMBER 2002

S. REPT. NO. 107- 351        107TH CONGRESS, 2D SESSION        H. REPT. NO. 107-792

---

# JOINT INQUIRY INTO
# INTELLIGENCE COMMUNITY ACTIVITIES
# BEFORE AND AFTER THE TERRORIST ATTACKS OF
# SEPTEMBER 11, 2001

_____

# REPORT

## OF THE

## U.S. SENATE SELECT COMMITTEE ON INTELLIGENCE

## AND

## U.S. HOUSE PERMANENT SELECT COMMITTEE ON
## INTELLIGENCE

TOGETHER WITH  ADDITIONAL VIEWS

DECEMBER 2002

SHERWOOD L. BOEHLERT, NEW YORK
JIM GIBBONS, NEVADA
RAY LaHOOD, ILLINOIS
RANDY "DUKE" CUNNINGHAM, CALIFORNIA
PETER HOEKSTRA, MICHIGAN
RICHARD BURR, NORTH CAROLINA
SAXBY CHAMBLISS, GEORGIA
TERRY EVERETT, ALABAMA

NANCY PELOSI, CALIFORNIA, RANKING DEMOCRAT
SANFORD D. BISHOP, GEORGIA
JANE HARMAN, CALIFORNIA
GARY A. CONDIT, CALIFORNIA
TIM ROEMER, INDIANA
ALCEE L. HASTINGS, FLORIDA
SILVESTRE REYES, TEXAS
LEONARD L. BOSWELL, IOWA
COLLIN C. PETERSON, MINNESOTA

J. DENNIS HASTERT, ILLINOIS, EX OFFICIO
RICHARD A. GEPHARDT, MISSOURI, EX OFFICIO

TIMOTHY R. SAMPLE, STAFF DIRECTOR
CHRISTOPHER BARTON, CHIEF COUNSEL
MICHAEL W. SHEEHY, DEMOCRATIC COUNSEL

# U.S. HOUSE OF REPRESENTATIVES

## PERMANENT SELECT COMMITTEE
## ON INTELLIGENCE
### WASHINGTON, DC 20515–6415

December 20, 2002

The Honorable J. Dennis Hastert
Speaker of the House
U.S. Capitol
Washington, D.C.

Dear Mr. Speaker:

We are pleased to file today, as a House report, the Report of the Joint Inquiry of the House Permanent Select Committee on Intelligence and the Senate Select Committee on Intelligence into Intelligence Community Activities Before and After the Terrorist Attacks of September 11, 2001. Each committee, by separate vote on December 10, 2002, agreed to the identical text for the report and ordered it to be reported to that committee's House of Congress. Accordingly, it is also being filed today as a Senate report by the Senate Select Committee on Intelligence.

The report of the Joint Inquiry includes findings and conclusions, accompanying narrative, and recommendations. It also includes additional views, of both House and Senate members of their respective committees, which are collected in an Appendix.

We are delivering with this letter four nonclassified portions of the report: (1) the cover page; (2) a table of general contents; (3) a list of findings and conclusions (without accompanying narrative); and (4) the recommendations. The remainder of the House report contains highly classified and sensitive information that must be retained in a Sensitive Compartmented Information Facility (SCIF), and will therefore be stored in the secure facilities of the House Permanent Select Committee on Intelligence. The classified portions of the report will be submitted for declassification and a nonclassified text produced as a result of that process. The entire nonclassified report will be published as early as possible in the 108th Congress. The committees anticipate that the report of the Joint Inquiry will be published as a single document, bearing both a House and a Senate report number, as was done with the report of the Iran-Contra committees.

Sincerely yours,

Porter Goss
Chairman

Nancy Pelosi
Ranking Democrat

BOB GRAHAM, FLORIDA, CHAIRMAN
RICHARD C. SHELBY, ALABAMA, VICE CHAIRMAN

CARL LEVIN, MICHIGAN
JOHN D. ROCKEFELLER IV, WEST VIRGINIA
DIANNE FEINSTEIN, CALIFORNIA
RON WYDEN, OREGON
RICHARD J. DURBIN, ILLINOIS
EVAN BAYH, INDIANA
JOHN EDWARDS, NORTH CAROLINA
BARBARA A. MIKULSKI, MARYLAND

JON KYL, ARIZONA
JAMES M. INHOFE, OKLAHOMA
ORRIN G. HATCH, UTAH
PAT ROBERTS, KANSAS
MIKE DEWINE, OHIO
FRED THOMPSON, TENNESSEE
RICHARD G. LUGAR, INDIANA

THOMAS A. DASCHLE, SOUTH DAKOTA, EX OFFICIO
TRENT LOTT, MISSISSIPPI, EX OFFICIO

ALFRED CUMMING, STAFF DIRECTOR
BILL DUHNKE, MINORITY STAFF DIRECTOR
KATHLEEN P. McGHEE, CHIEF CLERK

# United States Senate

SELECT COMMITTEE ON INTELLIGENCE
WASHINGTON, DC 20510-6475

December 20, 2002

The Honorable Robert C. Byrd
President pro tempore
United States Senate
Washington, D.C.

Dear Mr. President:

We are pleased to file today, as a Senate report, the Report of the Joint Inquiry of the Senate Select Committee on Intelligence and the House Permanent Select Committee on Intelligence into Intelligence Community Activities Before and After the Terrorist Attacks of September 11, 2001. Each committee, by separate vote on December 10, 2002, agreed to identical text for the report and ordered it to be reported to that committee's House of Congress. Accordingly, it is also being filed today as a House report by the House Permanent Select Committee on Intelligence.

The report of the Joint Inquiry includes findings and conclusions, accompanying narrative, and recommendations. It also includes additional views, of both House and Senate members of their respective committees, which are collected in an Appendix. The Senate's unanimous consent agreement of November 15, 2002, 148 Cong. Rec. S11228, authorized the Secretary of the Senate to receive the Senate Select Committee on Intelligence's report after the adjournment sine die.

We are delivering to the Legislative Clerk, with this letter, four unclassified portions of the report: (1) the cover page; (2) a table of general contents; (3) a list of findings and conclusions (without accompanying narrative); and (4) the recommendations. The remainder of the report contains highly classified and sensitive information and must be retained in a sensitive compartmented information facility. For that reason it is being held in the secure facilities of the Senate Select Committee on Intelligence, in accordance with past practices regarding the retention by the committee of classified annexes. All Members of the Senate will be advised that the classified report is available for reading by them at the committee.

The classified portions of the report will be submitted for declassification and an unclassified text produced as a result of that process. The entire unclassified report will be published as early as possible in the 108th Congress. The committees anticipate that the report of the Joint Inquiry will be published as a single document, bearing both a House and a Senate report number, as was done with the report of the Iran-Contra Committees.

The Honorable Robert C. Byrd
December 20, 2002
Page Two

Sincerely,

Bob Graham                          Richard Shelby
Chairman                            Vice Chairman

Enclosures – As stated

# Foreword

This is the declassified version of the Final Report of the Joint Inquiry that was approved and filed with the House of Representatives and the Senate on December 20, 2002.  With the exception of portions that were released to the public previously (e.g., the additional views of Members, the GAO Anthrax Report, etc.), this version has been declassified by the Intelligence Community prior to its public release.  That review was for classification purposes only, and does not indicate Intelligence Community agreement with the accuracy of this report, or concurrence with its factual findings or conclusions.

At appropriate points in the report, relevant information that developed after the report was filed, or that has appeared in other public sources, has been inserted and is denoted with an asterisk (*) and an accompanying footnote.  Where necessary, information that the Intelligence Community has identified as classified for national security purposes has been deleted.  Such deletions are indicated with brackets and a strikethrough [————————].  In other portions of the report, alternative language that the Intelligence Community has agreed is unclassified has been substituted for the original report language which remains classified.  Paragraphs that contain alternative language, whether one word or several sentences, have been identified by brackets at the beginning and end of the paragraph.

As a result of these changes to the text, the page numbers at the bottom of each page do not match those of the original report.  In order to preserve a record of the original pagination, page numbers have been inserted in gray font [page xx] in the text to mark where the corresponding pages begin and end in the original report.

TOP SECRET

## SUMMARY TABLE OF CONTENTS

**Table of Contents**

**Members of the Joint inquiry**

**Joint Inquiry Staff**

**Abridged Findings and Conclusions**

**Recommendations**

**Final Report**

> **Part One – The Joint Inquiry**
>
> > **- The Context**
> > **- Findings and Conclusions**
> > > **- Factual Findings**
> > > **- Conclusions - Factual Findings**
> > > **- Systemic Findings**
> > > **- Related Findings**
>
> **Part Two – Narrative – The Attacks of September 11, 2001**
>
> **Part Three – Topics – The Attacks of September 11, 2001**
>
> **Part Four – Finding, Discussion and Narrative Regarding Certain Sensitive National Security Matters**
>
> **Glossary of Terms and Key Names**
>
> **Additional Views of Members of the Joint Inquiry**
>
> **Appendices**

TOP SECRET

# PART ONE—FINDINGS AND CONCLUSIONS

**Section**   **Page**

I.  The Joint Inquiry……………………………………………………………….. 1

II. The Context………………………………………………………………….. 3

III. Findings and Conclusions……………………………………………….. 6

    A. Factual Findings……………………………………………………….. 6
    B. Conclusion - Factual Findings……………………………………… 33
    C. Systemic Findings……………………………………………………… 33
    D. Related Findings……………………………………………………… 117

# PART TWO—NARRATIVE—THE ATTACKS OF SEPTEMBER 11, 2001……128

I.  The Plot Unfolds for the Attacks of September 11, 2001………………………… 128

    A. The al-Qa'ida Roots of the September 11 Attacks…………………………… 128
    B. The Springboards for the Attack—Germany and Malaysia…………………… 131
    C. The Principals Arrive in the United States -- January 2000 through April 2001.135
    D. The Supporting Hijackers Arrive--April to June 2001………………………… 137
    E. Final Organization of the Attacks……………………………………………… 139
    F. Financing of the Attacks………………………………………………………… 140
    G. Execution of the Attacks……………………………………………………… 141

II. Pentagon Flight Hijackers Khalid al-Mihdhar, Nawaf al-Hazmi and Salim al-Hazmi.. 143

    A. The Malaysia Meeting and Identification of Khalid al-Mihdhar and Salim and Nawaf al-Hazmi — First Watchlist Opportunity ………………………….. 143
    B. Khalid al-Mihdhar and Nawaf al-Hazmi Travel to the United States — Second Watchlist Opportunity ……………………………………………...…… 147
    C. Khalid al-Mihdhar Leaves the United States and Nawaf al-Hazmi Applies for a Visa Extension ……………………………………………………… 148
    D. The Attack on *USS Cole* and the Identification of Khallad—Third Watchlist Opportunity……………………………………………………… 148
    E. The June 11, 2001 FBI/CIA Meeting and Khalid al-Mihdhar's Return to the United States…………………………………………………………….. 150
    F. The Watchlisting of Khalid al-Mihdhar and Nawaf al-Hazmi………………… 151
    G. The Search for Khalid al-Mihdhar……………………………………………. 152

    H.  The Case Against Bin Ladin……………………………………………………… 154

III.  NSA Communications Intercepts Related to Khalid al-Mihdhar, Nawaf and
Salim al-Hazmi ………………………………………………………….…………… 155

IV.  Nawaf al-Hazmi and Khalid al-Mihdhar Had Numerous Contacts With an Active
FBI Informant………………..………………………………………………………… 157

    A.  Background…………………………………………………………………………. 158
    B.  Informant's Relationship with Two Hijackers……………………………… 159
    C.  Questions About the Informant's Credibility……………………………… 162

V.  Associates of the September 11 Terrorists in the United States……………………… 168

    A.  U.S. Intelligence Community Knowledge of Support Networks Prior to
        September 11………………………………………………………………………… 171
    B.  Persons Known to the FBI With Whom September 11 Hijackers May Have
        Associated in the United States …..……………………………………………… 172
        a.  Omar al-Bayoumi ……………………………………………………… 172
        b.  Osama Bassnan…………………………………………………………… 175
        c.  [Imam]*……..…………………………………………………………… 178
        d.  [Business Manager] …………………………………………………… 179
        e.  [Business Owner] ……………………………………………………… 180
        f.  [An Individual] …………………………..…………………………… 181
        e.  [An Individual]..……………………………………………………… 182

VI.  Germany—Investigation of the Hamburg Cell………………………………………… 183

VII.  The Hijackers' Visas………………………………………………………………………… 187

VIII.  The Rising Threat and the Context of the September 11 Attacks…………………… 190

    A.  A New Breed of Terrorists……………………………………………………… 191
    B.  Emergence of Usama Bin Ladin and al-Qa'ida………………………………… 194
    C.  Attributes of Bin Ladin's Terrorist Operations…………………………….... 196
    D.  Intelligence about Bin Ladin's Intentions to Strike Inside the United States…. 198
    E.  Indications of a Possible Terrorist Attack in Spring and Summer 2001………. 203
    F.  Intelligence Information on Possible Terrorist Use of Airplanes as Weapons…209

IX.  The Development of U.S. Counterterrorism Policy Before September 11…………… 215

---

* The identities of several individuals whose activities are discussed in this report have been deleted by the Joint Inquiry.  While the FBI has provided the Joint Inquiry with these names and those names are contained in the classified version of this final report, the Joint Inquiry has decided to delete them from this unclassified version due to the as yet unresolved nature of much of the information regarding their activities.

A. Counterterrorism as an Intelligence Priority……………………………………216
B. Growing Importance in the Clinton Administration……………………………216
C. Uncertainty During the Transition……………………………………………...217
D. The George W. Bush Administration……………………………………………218
E. Competing Priorities………………………………………………………………219
F. Policy Measures to Fight Terrorism……………………………………………… 220
G. The Law Enforcement Approach………………………………………………… 222
H. Disruptions and Renditions……………………………………………………… 225
I. Afghanistan as a Terrorist Sanctuary…………………………………………… 226
J. The Intelligence Community……………………………………………………… 229
K. The Declaration of War…………………………………………………………… 230
L. The Intelligence Community's Response………………………………………… 231
M. Shortcomings in the Intelligence Community's Response…………………… 232
N. The President and Senior Policy Advisor Responsibility……………………… 234
O. Lack of an Integrated Response………………………………………………… 236
P. The Intelligence Community's Failure to Establish a Coordinated Domestic
   Focus before September 11……………………………………………………… 241
Q. Steps Taken to Fight International Terrorism at Home………………………… 243
R. Lack of Focus on the Domestic Threat………………………………………… 243
S. Limited Counterterrorism Contributions by Other Intelligence Community
   Members…………………………………………………………………………… 247

**PART  THREE – TOPICS – THE ATTACKS OF SEPTEMBER 11, 2001……  250**

I. Counterterrorism Resources………………………………………………………… 250

A. Joint Inquiry Resource Review Methodology and Limitations………………… 251
B. Overall Intelligence Community Funding……………………………………… 254
C. Resources Dedicated to Counterterrorism……………………………………… 256
D. Personnel Shortages……………………………………………………………… 260
      a. Personnel Concerns at CIA…………………………………………………261
      b. Personnel Concerns at NSA…………………………………………………262
      c. Personnel Concerns at FBI…………………………………………………263
E. Counterterrorism and the Competition for Scarce Resources………………… 264
F. Policymaker Criticism of Intelligence Community Budget Allocations……… 266
G. Reliance on Supplemental Funding for Counterterrorism…………………… 267
H. How Easily Can Money Be Moved?…………………………………………… 269

II.  Foreign Liaison………………………………………………………………………... 270

A. Efforts to Improve Foreign Liaison…………………………………………… 271
B. Benefits of Foreign Liaison……………………………………………………… 272
C. Disadvantages of Relying on Foreign Liaison Services……………………… 274

   D.  Liaison Service Problems with the United States…………………………….. 275
   E.  Coordination of Foreign Liaison……………………………………………. 276
   F.  Additional Challenges for the FBI Overseas…………………………………. 278
   G.  Progress after September 11, 2001……………………………………………. 278

III.  Covert Action and Military Operations Against Bin Ladin……..………………….. 279

   A.  Background…………………………………………………………………. 279
   B.  Authorities to Conduct Covert Action Against Bin Ladin……………………. 281
   C.  Additional Operational Challenges and Constraints…………………………. 291
   D.  CIA Covert Action Against Bin Ladin [Prior to September 11, 2001]……….. 294
   E.  Use of [————————] Against Bin Ladin…………………………… 300
   F.  Use of U.S. Military Force Against Bin Ladin……………………………… 303

IV.  Strategy to Disrupt Terrorist Funding……………………………………………. 308

   A.  Financial Tracking before September 11……………………………………. 308
   B.  Financial Tracking after September 11……………………………………… 309

V.  Khalid Shaykh Mohammed (KSM):  The Mastermind of September 11……………. 309

   A.  KSM's Links to Terrorist Attacks before September 11……………………… 310
   B.  The Hunt for KSM………………………………………………………… 311
   C.  Finding KSM and Building the Case……………………………………….. 311
   D.  [————————————]……………………………………… 312
   E.  Link to al-Qa'ida Discovered……………………………………………… 313
   F.  The Emphasis on Renditions……………………………………………….. 313
   G.  KSM's U.S. Connection…………………………………………………… 314
   H.  The Hunt for KSM Continues………………………………………………. 315

VI.  The FBI's Investigation of Zacarias Moussaoui Before September 11………………. 315

VII.  The Phoenix Electronic Communication (EC)…………………………………….. 325

   A.  The Phoenix EC……………………………………………………………. 325
   B.  Headquarters' Response to the Phoenix EC………………………………….. 327
   C.  New York FBI Office Action in Connection with the Phoenix EC…………… 329
   D.  Handling of Phoenix EC Indicates FBI Headquarters Weaknesses…………… 329
   E.  Links from the Phoenix EC to September 11………………………………… 332
   F.  Previous FBI Focus on Suspected Terrorists at U.S. Flight Schools………….. 333

VIII.  Strategic Analysis…………………………………………………………………. 336

   A.  The Intelligence Community's Lack of Strategic Analysis…………………… 336
   B.  Analyst Qualifications and Training…………………………………………. 339
   C.  Analysts' Access to Information……………………………………………. 341

    D.  Language Skills……………………………………………………………... 343

IX.  Views of Outside Experts on the Intelligence Community……………………… 345

    A.  Setting Priorities………………………………………………………….... 346
    B.  Strategy and Organization………………………………………………….. 346
    C.  Should a Strong Director of National Intelligence Be Established?………….. 347
    D.  Should the Same Person be both DNI and Director of the CIA?……………. 348
    E.  Counterterrorism Within the United States and Creation of a Domestic
        Intelligence Agency………………………………………………………… 349
    F.  A Legislative Charter for the Intelligence Community……………………….. 353
    G.  Respect for the Rule of Law…………………………………………………... 353

X.  Information Sharing……………………………………………………………… 354

    A.  Information Sharing Between Intelligence Agencies and within the Federal
        Government………………………………………………………………… 355
        a. National Security Agency…………………………………………… 355
        b. The Central Intelligence Agency……………………………………… 357
        c. The Federal Bureau of Investigation…………………………………… 357
        d. The Department of State……………………………………………... 359
        e. The Federal Aviation Administration (FAA) and the Transportation
          Security Administration (TSA)……………………………………… 360
    B.  Information Sharing Between Intelligence Agencies and State and Local
        Officials…………………………………………………………………… 361
    C.  Additional Information Sharing Problems……………………………………. 362
    D.  The Wall - Barriers Between Law Enforcement and Intelligence…………….. 363

XI.  Technology Gaps………………………………………………………………… 368

    A. Technology Gaps at NSA…………………………………………………… 368
    B.  [————————————]……...………………………………388
    C.  [————————————]…….…………………………………388
    D.  [————————————]………………………………………389
    E.  [————————————] …...……………………………………… 389
    F.  Selection and Filtering for [————————] Communications…………… 371
    G.  Analyst Tools……………………………………………………………… 371
    H.  Collection Platforms………………………………………………………… 372

XII.  Technical Collection of Terrorist Communications………………………………… 373

    A. NSA's Organizational Structure for Collecting Terrorist Communications…… 374
    B. Signals Intelligence (SIGINT) and the September 11 Attacks………………… 374
    C.  A Chronological Review of NSA Collection Efforts Against al-Qa'ida……… 376
    D.  Technical Collection Problems and Limits at NSA…………………………… 379
        a. Difficulties of Gaining Actionable Intelligence on al-Qa'ida………….... 380

    b. Difficulties in Adjusting to Terrorist Targets……………………………… 381
    c. Problems Keeping Pace with [————————] Advances
        before September 11…………………………………………… 381
  E.  Insufficient Resources for Counterterrorism at NSA………………………… 382
  F.  Technical Collection at CIA……………………………………………………… 384
  G.  NSA/CIA Disputes over [—————] Collection…………………………… 384
  H.  Technical Collection at FBI……………………………………………………385

XIII.  Human Intelligence (HUMINT) Collection………………………………………… 385

  A. CIA Human Intelligence Collection……………………………………………… 386
  B. DIA Human Intelligence Collection……………………………………………… 390
  C. FBI Human Intelligence Collection……………………………………………… 391

XIV. Summary of Joint Inquiry Review of Anthrax Attacks……………………………… 393

**PART FOUR—FINDING, DISCUSSION AND NARRATIVE REGARDING
CERTAIN SENSITIVE NATIONAL SECURITY MATTERS…………………..……….395**

GLOSSARY………………………………………………………………………………… 423

Additional Views of Members……………………………………………………….. 436

Appendices

TOP SECRET

# Senate Select Committee on Intelligence (SSCI)

## 107th Congress

## Membership

Bob Graham, D - Florida, Chairman

Richard C. Shelby, R - Alabama, Vice Chairman

| DEMOCRATS | REPUBLICANS |
|---|---|
| Carl Levin, Michigan | Jon Kyl, Arizona |
| John D. Rockefeller, West Virginia | James M. Inhofe, Oklahoma |
| Dianne Feinstein, California | Orrin Hatch, Utah |
| Ron Wyden, Oregon | Pat Roberts, Kansas |
| Richard J. Durbin, Illinois | Mike DeWine, Ohio |
| Evan Bayh, Indiana | Fred Thompson, Tennessee |
| John Edwards, North Carolina | Richard Lugar, Indiana |
| Barbara Mikulski, Maryland | |

| | |
|---|---|
| Al Cumming, Staff Director | William Duhnke, Minority Staff Director |

TOP SECRET

TOP SECRET

## House Permanent Select Committee on Intelligence (HPSCI)

## 107th Congress

## Membership

Porter J. Goss, R - Florida, Chairman

Nancy Pelosi, D - California, Ranking Democrat

**REPUBLICANS**

Doug Bereuter, Nebraska

Michael N. Castle, Delaware

Sherwood L. Boehlert, New York

Jim Gibbons, Nevada

Ray LaHood, Illinois

Randy "Duke" Cunningham, California

Peter Hoekstra, Michigan

Richard Burr, North Carolina

Saxby Chambliss, Georgia

Terry Everett, Alabama

Timothy R. Sample, Staff Director

**DEMOCRATS**

Sanford D. Bishop, Georgia

Jane Harman, California

Gary A. Condit, California

Tim Roemer, Indiana

Silvestre Reyes, Texas

Leonard L. Boswell, Iowa

Collin C. Peterson, Minnesota

Bud Cramer, Alabama

Michael W. Sheehy,
Democratic Counsel

ix

TOP SECRET

~~TOP SECRET~~

## JOINT HOUSE/SENATE INQUIRY STAFF[*]

Eleanor Hill                    Director
Rick Cinquegrana               Deputy Director

David Barton
Ann Bennett
Daniel Byman
Michael Davidson
George Ellard
Rahul Gupta
Kay Holt
John Ivicic
Michael Jacobson
Everette Jordan
Miles Kara
John Keefe
Thomas Kelley
Dana Lesemann
Patti Litman
Arthur Menna
Lewis Moon
Patricia Ravalgi
Alonzo Robertson
Robert Rosenwald
Michael Smith
Catherine Williams

---

[*] As of December 1, 2002.  In addition, a substantial contribution to the development and direction of the Joint Inquiry was made by the Staff's first Staff Director, Britt Snider.  Other original members of the staff included Catherine Lotrionte, who left the staff in the summer of 2002.

x

~~TOP SECRET~~

TOP SECRET

## ABRIDGED FINDINGS AND CONCLUSIONS

## FACTUAL FINDINGS

**1. Finding:**  While the Intelligence Community had amassed a great deal of valuable intelligence regarding Usama Bin Ladin and his terrorist activities, none of it identified the time, place, and specific nature of the attacks that were planned for September 11, 2001. Nonetheless, the Community did have information that was clearly relevant to the September 11 attacks, particularly when considered for its collective significance.

**2. Finding:**  During the spring and summer of 2001, the Intelligence Community experienced a significant increase in information indicating that Bin Ladin and al-Qa'ida intended to strike against U.S. interests in the very near future.

**3. Finding:**  Beginning in 1998 and continuing into the summer of 2001, the Intelligence Community received a modest, but relatively steady, stream of intelligence reporting that indicated the possibility of terrorist attacks within the United States.  Nonetheless, testimony and interviews confirm that it was the general view of the Intelligence Community, in the spring and summer of 2001, that the threatened Bin Ladin attacks would most likely occur against U.S. interests overseas, despite indications of plans and intentions to attack in the domestic United States.

**4. Finding:**  From at least 1994, and continuing into the summer of 2001, the Intelligence Community received information indicating that terrorists were contemplating, among other means of attack, the use of aircraft as weapons.  This information did not stimulate any specific Intelligence Community assessment of, or collective U.S. Government reaction to, this form of threat.

**5. Finding:**  Although relevant information that is significant in retrospect regarding the attacks was available to the Intelligence Community prior to September 11, 2001, the Community too often failed to focus on that information and consider and appreciate its collective significance in terms of a probable terrorist attack.  Neither did the Intelligence Community demonstrate sufficient initiative in coming to grips with the new transnational threats.  Some significant pieces of information in the vast stream of data being collected were overlooked, some were not recognized as potentially significant at the time and therefore not disseminated, and some required additional action on the part of foreign governments before a direct connection to the hijackers could have been established.  For all those reasons, the Intelligence Community failed to fully capitalize on available, and potentially important, information.  The sub-findings below identify each category of this information.

### [Terrorist Communications in 1999]

**5.a.  [During 1999, the National Security Agency obtained a number of communications – none of which included specific detail regarding the time, place or nature of the September 11 attacks -- connecting individuals to terrorism who were identified, after September 11, 2001, as participants in the attacks that occurred on that day.]**

### Malaysia Meeting and Travel of al-Qa'ida Operatives to the United States

**5.b.  The Intelligence Community acquired additional, and highly significant, information regarding Khalid al-Mihdhar and Nawaf al-Hazmi in early 2000. Critical parts of the information concerning al-Mihdhar and al-Hazmi lay dormant within the Intelligence Community for as long as eighteen months, at the very time when plans for the September 11 attacks were proceeding.  The CIA missed repeated opportunities to act based on information in its possession that these two Bin Ladin-associated terrorists were traveling to the United States, and to add their names to watchlists.**

### [Terrorist Communications in Spring 2000]

**5.c.  [In January 2000, after the meeting of al-Qa'ida operatives in Malaysia, Khalid al-Mihdhar and Nawaf al-Hazmi entered the United States [————————————].  Thereafter, the Intelligence Community obtained information indicating that an individual named  "Khaled" at an unknown location had contacted a suspected terrorist facility in the Middle East.  The Intelligence Community reported some of this information, but did not report all of it.  Some of it was not reported because it was deemed not terrorist-related.  It was not until after September 11, 2001 that the Intelligence Community determined that these contacts had been made from future hijacker Khalid al-Mihdhar while he was living within the domestic United States.]**

### [Two Hijackers Had Numerous Contacts With an Active FBI Informant]

**5.d.  [This Joint Inquiry confirmed that these same two future hijackers, Khalid al-Mihdhar and Nawaf al-Hazmi, had numerous contacts with a long time FBI counterterrorism informant in California and that a third future hijacker, Hani Hanjour, apparently had more limited contact with the informant.  In mid- to late-2000, the CIA already had information indicating that al-Mihdhar had a multiple entry U.S. visa and that al-Hazmi had in fact traveled to Los Angeles, but the two had not been watchlisted and information suggesting that two suspected terrorists could well be in the United States had not yet [page xiii] been given to the FBI.  The San Diego FBI field office that handled the informant in question, did not receive that**

TOP SECRET

information or any of the other intelligence information pertaining to al-Mihdhar and al-Hazmi, prior to September 11, 2001.  As a result, the FBI missed the opportunity to task a uniquely well-positioned informant -- who denies having any advance knowledge of the plot --- to collect information about the hijackers and their plans within the United States].

## The Phoenix Electronic Communication

5.e.  On July 10, 2001, an FBI Phoenix field office agent sent an "Electronic Communication" to 4 individuals in the Radical Fundamentalist Unit (RFU) and two people in the Usama Bin Ladin Unit (UBLU) at FBI headquarters, and to two agents on International Terrorism squads in the New York Field Office.  In the communication, the agent expressed his concerns, based on his first-hand knowledge, that there was a coordinated effort underway by Bin Ladin to send students to the United States for civil aviation-related training.  He noted that there was an "inordinate number of individuals of investigative interest" in this type of training in Arizona and expressed his suspicion that this was an effort to establish a cadre of individuals in civil aviation who would conduct future terrorist activity.  The Phoenix EC requested that FBI Headquarters consider implementing four recommendations:

- accumulate a list of civil aviation university/colleges around the country;
- establish liaison with these schools;
- discuss the theories contained in the Phoenix EC with the Intelligence Community; and
- consider seeking authority to obtain visa information concerning individuals seeking to attend flight schools.

However, the FBI headquarters personnel did not take the action requested by the Phoenix agent prior to September 11, 2001.  The communication generated little or no interest at either FBI Headquarters or the FBI's New York field office.

## The FBI Investigation of Zacarias Moussaoui

5.f.  In August 2001, the FBI's Minneapolis field office, in conjunction with the INS, detained Zacarias Moussaoui, a French national who had enrolled in flight training in Minnesota.  FBI agents there also suspected that Moussaoui was involved in a hijacking plot.  FBI Headquarters attorneys determined that there was not probable cause to obtain a court order to [page xiv] search Moussaoui's belongings under the Foreign Intelligence Surveillance Act (FISA).  However, personnel at FBI Headquarters, including the Radical Fundamentalism Unit and the National Security Law Unit, as well as agents in the Minneapolis field office, misunderstood the legal standard for obtaining an order under FISA.  As a result, FBI Minneapolis Field Office personnel wasted valuable investigative resources trying to connect the Chechen rebels to al-Qa'ida.  Finally, no one at the FBI apparently connected the Moussaoui investigation with the heightened threat environment in the summer of

2001, the Phoenix communication, or the entry of al-Mihdhar and al-Hazmi into the United States.

### Hijackers In Contact With Persons of FBI Investigative Interest in the United States

**5.g.  The Joint Inquiry confirmed that at least some of the hijackers were not as isolated during their time in the United States as has been previously suggested. Rather, they maintained a number of contacts both in the United States and abroad during this time period.  Some of those contacts were with individuals who were known to the FBI, through either past or, at the time, ongoing FBI inquiries and investigations. Although it is not known to what extent any of these contacts in the United States were aware of the plot, it is now clear that they did provide at least some of the hijackers with substantial assistance while they were living in this country.**

### Hijackers' Associates in Germany

**5.h.  [Since 1995, the CIA had been aware of a radical Islamic presence in Germany, including individuals with connections to Usama Bin Ladin.  Prior to September 11, 2001, the CIA had unsuccessfully sought additional information on individuals who have now been identified as associates of some of the hijackers.]**

### Khalid Shaykh Mohammad

**5.i.  Prior to September 11, the Intelligence Community had information linking Khalid Shaykh Mohammed (KSM), now recognized by the Intelligence Community as the mastermind of the attacks, to Bin Ladin, to terrorist plans to use aircraft as weapons, and to terrorist activity in the United States.   The Intelligence Community, however, relegated Khalid Shaykh Mohammed (KSM) to rendition target status following his 1996 indictment in connection with the Bojinka Plot and, as a [page xv] result, focused primarily on his location, rather than his activities and place in the al-Qa'ida hierarchy.  The Community also did not recognize the significance of reporting in June 2001 concerning KSM's active role in sending terrorists to the United States, or the facilitation of their activities upon arriving in the United States. Collection efforts were not targeted on information about KSM that might have helped better understand al-Qa'ida's plans and intentions, and KSM's role in the September 11 attacks was a surprise to the Intelligence Community.**

TOP SECRET

**[Terrorist Communications in September 2001]**

**5.j.  [In the period from September 8 to September 10, 2001 NSA intercepted, but did not translate or disseminate until after September 11, some communications that indicated possible impending terrorist activity.]**

## CONCLUSION – FACTUAL FINDINGS

In short, for a variety of reasons, the Intelligence Community failed to capitalize on both the individual and collective significance of available information that appears relevant to the events of September 11.  As a result, the Community missed opportunities to disrupt the September 11th plot by denying entry to or detaining would-be hijackers; to at least try to unravel the plot through surveillance and other investigative work within the United States; and, finally, to generate a heightened state of alert and thus harden the homeland against attack.

No one will ever know what might have happened had more connections been drawn between these disparate pieces of information. We will never definitively know to what extent the Community would have been able and willing to exploit fully all the opportunities that may have emerged. The important point is that the Intelligence Community, for a variety of reasons, did not bring together and fully appreciate a range of information that could have greatly enhanced its chances of uncovering and preventing Usama Bin Ladin's plan to attack these United States on September 11, 2001.

## SYSTEMIC FINDINGS

Our review of the events surrounding September 11 has revealed a number of systemic weaknesses that hindered the Intelligence Community's counterterrorism efforts before September 11.  If not addressed, these weaknesses will continue to undercut U.S. counterterrorist efforts.  In order to minimize the possibility of attacks like September 11 in the future, effective solutions to those problems need to be developed and fully implemented as soon as possible.

[page xvi]

**1. Finding:  Prior to September 11, the Intelligence Community was neither well organized nor equipped, and did not adequately adapt, to meet the challenge posed by global terrorists focused on targets within the domestic United States.  Serious gaps existed between the collection coverage provided by U.S. foreign and U.S. domestic intelligence capabilities.  The U.S. foreign intelligence agencies paid inadequate attention to the potential for a domestic attack.  The CIA's failure to watchlist suspected terrorists aggressively reflected a lack of emphasis on a process designed to protect the homeland from the terrorist threat.  As a result, CIA employees failed to watchlist al-Mihdhar and al-Hazmi.  At home, the counterterrorism effort suffered from the lack of an effective domestic intelligence capability.  The FBI was unable to identify and monitor effectively the extent of activity by al-Qa'ida and other international terrorist groups operating in the United States.  Taken together, these problems greatly exacerbated the nation's vulnerability to an increasingly dangerous and immediate international terrorist threat inside the United States.**

TOP SECRET

**2. Finding: Prior to September 11, 2001, neither the U.S. Government as a whole nor the Intelligence Community had a comprehensive counterterrorist strategy for combating the threat posed by Usama Bin Ladin.  Furthermore, the Director of Central Intelligence (DCI) was either unwilling or unable to marshal the full range of Intelligence Community resources necessary to combat the growing threat to the United States.**

**3. Finding:  Between the end of the Cold War and September 11, 2001, overall Intelligence Community funding fell or remained even in constant dollars, while funding for the Community's counterterrorism efforts increased considerably.  Despite those increases, the accumulation of intelligence priorities, a burdensome requirements process, the overall decline in Intelligence Community funding, and reliance on supplemental appropriations made it difficult to allocate Community resources effectively against an evolving terrorist threat.  Inefficiencies in the resource and requirements process were compounded by problems in Intelligence Community budgeting practices and procedures.**

**4. Finding:  While technology remains one of this nation's greatest advantages, it has not been fully and most effectively applied in support of U.S. counterterrorism efforts.  Persistent problems in this area included a lack of collaboration between Intelligence Community agencies, a reluctance to develop and implement new technical capabilities aggressively, the FBI's reliance on outdated and insufficient technical systems, and the absence of a central counterterrorism database.**

**5. Finding:  Prior to September 11, the Intelligence Community's understanding of al-Qa'ida was hampered by insufficient analytic focus and quality, particularly in terms of strategic analysis.  Analysis and analysts were not always used effectively because of the perception in some quarters of the Intelligence Community that they were less important to agency counterterrorism missions than were operations personnel.  The quality of counterterrorism analysis was inconsistent, and many analysts were inexperienced, unqualified, under-trained, and without access to critical information.  As a result, there was a dearth of creative, aggressive analysis targeting Bin Ladin and a persistent inability to comprehend the collective significance of individual pieces of intelligence.  These analytic [page xvii] deficiencies seriously undercut the ability of U.S. policymakers to understand the full nature of the threat, and to make fully informed decisions.**

**6. Finding:  Prior to September 11, the Intelligence Community was not prepared to handle the challenge it faced in translating the volumes of foreign language counterterrorism intelligence it collected.  Agencies within the Intelligence Community experienced backlogs in material awaiting translation, a shortage of language specialists and language-qualified field officers, and a readiness level of only 30% in the most critical terrorism-related languages used by terrorists.**

**7. Finding:  [Prior to September 11, the Intelligence Community's ability to produce significant and timely signals intelligence on counterterrorism was limited by NSA's failure to address modern communications technology aggressively, continuing conflict between Intelligence Community agencies, NSA's cautious approach to any collection of intelligence**

relating to activities in the United States, and insufficient collaboration between NSA and the FBI regarding the potential for terrorist attacks within the United States].

**8. Finding:** The continuing erosion of NSA's program management expertise and experience has hindered its contribution to the fight against terrorism. NSA continues to have mixed results in providing timely technical solutions to modern intelligence collection, analysis, and information sharing problems.

**9. Finding:** The U.S. Government does not presently bring together in one place all terrorism-related information from all sources. While the CIA's Counterterrorist Center does manage overseas operations and has access to most Intelligence Community information, it does not collect terrorism-related information from all sources, domestic and foreign. Within the Intelligence Community, agencies did not adequately share relevant counterterrorism information, prior to September 11. This breakdown in communications was the result of a number of factors, including differences in the agencies' missions, legal authorities and cultures. Information was not sufficiently shared, not only between different Intelligence Community agencies, but also within individual agencies, and between the intelligence and the law enforcement agencies.

**10. Finding:** Serious problems in information sharing also persisted, prior to September 11, between the Intelligence Community and relevant non-Intelligence Community agencies. This included other federal agencies as well as state and local authorities. This lack of communication and collaboration deprived those other entities, as well as the Intelligence Community, of access to potentially valuable information in the "war" against Bin Ladin. The Inquiry's focus on the Intelligence Community limited the extent to which it explored these issues, and this is an area that should be reviewed further.

**11. Finding:** Prior to September 11, 2001, the Intelligence Community did not effectively develop and use human sources to penetrate the al-Qa'ida inner circle. This lack of reliable and knowledgeable human sources significantly limited the Community's ability to [page xviii] acquire intelligence that could be acted upon before the September 11 attacks. In part, at least, the lack of unilateral (i.e., U.S.-recruited) counterterrorism sources was a product of an excessive reliance on foreign liaison services.

**12. Finding:** During the summer of 2001, when the Intelligence Community was bracing for an imminent al-Qa'ida attack, difficulties with FBI applications for Foreign Intelligence Surveillance Act (FISA) surveillance and the FISA process led to a diminished level of coverage of suspected al-Qa'ida operatives in the United States. The effect of these difficulties was compounded by the perception that spread among FBI personnel at Headquarters and the field offices that the FISA process was lengthy and fraught with peril.

**13. Finding:** [————————————————————————————

_____
_____
_____
_____
_____
_____—].

**14. Finding:**  [Senior U.S. military officials were reluctant to use U.S. military assets to conduct offensive counterterrorism efforts in Afghanistan, or to support or participate in CIA operations directed against al-Qa'ida prior to September 11.  At least part of this reluctance was driven by the military's view that the Intelligence Community was unable to provide the intelligence needed to support military operations.  Although the U.S. military did participate in [——] counterterrorism efforts to counter Usama Bin Ladin's terrorist network prior to September 11, 2001, most of the military's focus was on force protection].


**15. Finding:**  The Intelligence Community depended heavily on foreign intelligence and law enforcement services for the collection of counterterrorism intelligence and the conduct of other counterterrorism activities.  The results were mixed in terms of productive intelligence, reflecting vast differences in the ability and willingness of the various foreign services to target the Bin Ladin and al-Qa'ida network.  Intelligence Community agencies sometimes failed to coordinate their relationships with foreign services adequately, either within the Intelligence Community or with broader U.S. Government liaison and foreign policy efforts.  This reliance on foreign liaison services also resulted in a lack of focus on the development of unilateral human sources.


**16. Finding:**  [The activities of the September 11 hijackers in the United States appear to have been financed, in large part, from monies sent to them from abroad and also brought in on their persons.  Prior to [page xix] September 11, there was no coordinated U.S. Government-wide strategy to track terrorist funding and close down their financial support networks.  There was also a reluctance in some parts of the U.S. Government to track terrorist funding and close down their financial support networks.  As a result, the U.S. Government was unable to disrupt financial support for Usama Bin Ladin's terrorist activities effectively. ]


## RELATED FINDINGS


**17. Finding:**  Despite intelligence reporting from 1998 through the summer of 2001 indicating that Usama Bin Ladin's terrorist network intended to strike inside the United States, the United States Government did not undertake a comprehensive effort to implement defensive measures in the United States.


**18. Finding:**  Between 1996 and September 2001, the counterterrorism strategy adopted by the U. S. Government did not succeed in eliminating Afghanistan as a sanctuary and training ground for Usama Bin Ladin's terrorist network.  A range of instruments was used to counter al-Qa'ida, with law enforcement often emerging as a leading tool because other

TOP SECRET

means were deemed not to be feasible or failed to produce results.  While generating numerous successful prosecutions, law enforcement efforts were not adequate by themselves to target or eliminate Bin Ladin's sanctuary.  The United States persisted in observing the rule of law and accepted norms of international behavior, but Bin Ladin and al-Qa'ida recognized no rules and thrived in the safe haven provided by Afghanistan.

19. Finding:  Prior to September 11, the Intelligence Community and the U.S. Government labored to prevent attacks by Usama Bin Ladin and his terrorist network against the United States, but largely without the benefit of an alert, mobilized and committed American public.  Despite intelligence information on the immediacy of the threat level in the spring and summer of 2001, the assumption prevailed in the U.S. Government that attacks of the magnitude of September 11 could not happen here.  As a result, there was insufficient effort to alert the American public to the reality and gravity of the threat.

20. Finding:  Located in Part Four Entitled "Finding, Discussion and Narrative Regarding Certain Sensitive National Security Matters."

TOP SECRET

## PART ONE—FINDINGS AND CONCLUSIONS

## I.  THE JOINT INQUIRY

In February 2002, the Senate Select Committee on Intelligence and the House Permanent Select Committee on Intelligence agreed to conduct a Joint Inquiry into the activities of the U.S. Intelligence Community in connection with the terrorist attacks perpetrated against our nation on September 11, 2001.  Reflecting the magnitude of the events of that day, the Committees' decision was unprecedented in Congressional history: for the first time, two permanent committees, one from the House and one from the Senate, would join together to conduct a single, unified inquiry.

The three principal goals of this Joint Inquiry were to:
- £ conduct a factual review of what the Intelligence Community knew or should have known prior to September 11, 2001, regarding the international terrorist threat to the United States, to include the scope and nature of any possible international terrorist attacks against the United States and its interests;
- £ identify and examine any systemic problems that may have impeded the Intelligence Community in learning of or preventing these attacks in advance; and
- £ make recommendations to improve the Intelligence Community's ability to identify and prevent future international terrorist attacks.

It should be noted that this Joint Inquiry had the specific charter to review the activities of the Intelligence Community and was limited to approximately one year's duration.  It is recognized that there are many other issues relating to the events of September 11, 2001 that are outside the limits of the Intelligence Community, and that additional new [page 2] information may be developed within the Intelligence Community that was not reviewed by the Inquiry within the allotted time.  With that in

mind, we look forward to cooperating with the new National Commission on Terrorist Attacks Upon the United States and the continuing oversight efforts of the House and Senate Intelligence Committees.

During the course of this Inquiry, these Committees have held nine public hearings as well as thirteen closed sessions in which classified information has been considered.  In addition, the Joint Inquiry Staff has reviewed almost 500,000 pages of relevant documents from the Intelligence Community agencies and other sources, of which about 100,000 pages have been selected for incorporation into the Joint Inquiry's records.  The Staff also has conducted approximately 300 interviews, and has participated in numerous briefings and panel discussions, that have involved almost 600 individuals from the Intelligence Community agencies, other U.S. Government organizations, state and local entities, and representatives of the private sector and foreign governments.

Thus, the Inquiry has sought and considered information from agencies throughout the Intelligence Community and other parts of the federal government; from relevant state and local authorities; and from private sector and foreign government individuals and organizations.  This report is based on information gathered by the Committees throughout this Inquiry as well as testimony and exhibits received during the course of both the closed and open hearings.  Consistent with the need to protect the national security, [page 2] the Committees will also subsequently issue an unclassified version of this report for public release.[*]

The statement of the Committees' findings and recommendations in Part I of this report includes only a brief summary of the nature of the terrorist threat that faced the United States, and the Intelligence Community, in the years that preceded the vicious attacks of September 11, 2001.  Given the scope of the information and issues considered during the course of this Inquiry, these findings and recommendations can only be completely understood against the background of the full hearing and investigative record. To provide that context, a detailed description of the hearings and investigative work of the Joint Inquiry is contained in Part II of this report.[1]

---

[*] This is the unclassified version of the original classified report that was approved by the Joint Inquiry.

## II.  THE CONTEXT

September 11, 2001, while indelible in our collective memory, was by no means America's first confrontation with international terrorism.  Although the nature of the threat had evolved considerably over time, the United States and its interests have long been prime terrorist targets.  For example, the bombings of the Marine barracks and the U.S. Embassy in Beirut, Lebanon in 1983 should have served as a clear warning that terrorist groups were not reluctant to attack U.S. interests when they believed such attacks would further their ends.

The Intelligence Community also had considerable evidence before September 11 that international terrorists were capable of, and had planned, major terrorist strikes within the United States.  The 1993 attack on the World Trade Center confirmed this point, as did the 1993 plots to bomb New York City landmarks and the 1999 arrest at the U.S.-Canadian border of Ahmad Ressam, who intended to bomb the Los Angeles International Airport.  [Page 4]

Usama Bin Ladin's role in international terrorism had also been well known for some time before September 11.  He initially came to the attention of the Intelligence Community in the early 1990s as a financier of terrorism.  However, Bin Ladin's own words soon provided evidence of the steadily escalating threat to the United States he and his organization posed.  In August 1996, he issued a *fatwa* -- or religious decree -- authorizing attacks on Western military targets in the Arabian Peninsula.  In February 1998, Bin Ladin issued a second *fatwa* authorizing attacks on U.S. civilians and military personnel anywhere in the world.  Bin Ladin's fatwas cited the U.S. military presence in

---

[1] Anthrax attacks in October 2001 eventually killed five Americans, contaminated the Senate Hart Office building in Washington, D.C. as well as U.S. Postal Service facilities in Maryland, and significantly affected the U.S. economy. The statement of Initial Scope of this Joint Inquiry made specific reference to the anthrax attacks.  In pursuing that matter, the Inquiry received briefings from the FBI and the U.S. General Accounting Office (GAO) regarding their investigations of the anthrax attacks.  It also requested that GAO's Center for Technology and Engineering review the attacks; current knowledge regarding the use of anthrax as a weapon; technologies available to detect anthrax; and the law enforcement community's ability to combat chemical and biological terrorist attacks, including the FBI's resources and analytical capabilities to investigate such attacks.  The GAO report has been completed.  It is summarized in Part Three of this report and is included in its entirety as an appendix.  To date, no connection has been established between the anthrax attacks and the terrorist attacks of September 11, 2001.

Saudi Arabia and the Persian Gulf, the Palestinian issue, and U.S. support for Israel as justification for ordering these attacks.

The gradual emergence of Bin Ladin and others like him marked a change from the type of terrorist threat that had traditionally confronted the Intelligence Community. Throughout the Cold War, radical left and ethno-nationalist groups had carried out most terrorist acts. Many of these groups were state-sponsored. The first bombing of the World Trade Center in February 1993, however, led to a growing recognition in the Intelligence Community of a new type of terrorism that did not conform to the Cold War model: violent radical Islamic cells, not linked to any specific country, but united in anti-American zeal. A July 1995 National Intelligence Estimate noted the danger of this "new breed". By 1996, agencies within the Intelligence Community were aware that Bin Ladin was organizing these kinds of cells, and they began to collect intelligence on him actively.

In January 1996, the Counterterrorist Center (CTC) – which had been established at CIA in 1986 -- created a special unit that was dedicated to focusing on Bin Ladin and his associates. The unit quickly determined that he was more than a terrorist financier, and it soon became a hub for expertise on Bin Ladin and for operations directed against his terrorist network, al Qa'ida. Officials from the unit, which started with about 16 CIA officers and grew to about 40 officers from throughout the Intelligence Community prior to September 11, 2001, had unprecedented access to senior agency officials and White House policymakers.

[Page 5]

[At the FBI, the Radical Fundamentalist Unit was created in March 1994 to handle responsibilities related to international radical fundamentalist terrorists, including Usama Bin Ladin. This Unit also handled other counterintelligence matters, and was

TOP SECRET

responsible for the coordination of extraterritorial intelligence operations and criminal investigations targeted at radical fundamentalist terrorists.  In 1999, the FBI recognized the increased threat to the United States posed by Bin Ladin and created the Usama Bin Ladin Unit to handle al-Qa'ida-related counterterrorism matters].

[As al-Qa'ida grew, both CIA and FBI officials recognized that the foreign intelligence, security, and law enforcement agencies of foreign governments, collectively referred to as "foreign liaison," could be of great value in penetrating and countering the organization. They understood that foreign liaison could act as a tremendous force multiplier against terrorism and, with that in mind, tried to coordinate and streamline what had been ad hoc relationships.  As a result, as former National Security Advisor Sandy Berger testified, al-Qa'ida cells were disrupted in a number of  countries after 1997.  CTC also stepped up its efforts to enhance the capabilities of some foreign liaison services to work against joint terrorist targets.  These efforts had mixed results].

The FBI also increased its focus on counterterrorism, establishing its own Counterterrorism Center at FBI Headquarters in 1996.  Recognizing the importance of good relationships with foreign liaison services, the FBI expanded the permanent stationing of agents, known as Legal Attaches, or "Legats," in principal cities across the globe.  In addition to improving relations with foreign services, the FBI engaged in an aggressive program with the CIA to arrest terrorists outside the United States.  Finally, the FBI established Joint Terrorism Task Forces (JTTFs) in thirty-five field offices before September 11.  These task forces were designed to bring together a range of federal, state and local agencies that could provide valuable assistance in counterterrorism investigations.

[Page 6]

The August 1998 bombing of two American embassies in East Africa definitively put the U.S. Intelligence Community on notice of the danger that Bin Ladin and his network, al-Qa'ida, posed.  The attacks showed that Bin Ladin's network was capable of carrying out very bloody, simultaneous attacks and inflicting mass casualties.  In December 1998, George Tenet, the Director of Central Intelligence, gave a chilling direction to his deputies at the CIA:

> We must now enter a new phase in our effort against Bin Ladin. . .
> .  We are at war. . . .  I want no resources or people spared in this
> effort, either inside the CIA or the Community.

Discovering and disrupting al-Qa'ida's plans proved exceptionally difficult, however.  Details of major terrorist plots were not widely shared within the al-Qa'ida organization, making it hard to develop the intelligence necessary to preempt or disrupt attacks.  Senior al-Qa'ida officials were sensitive to operational security, and many al-Qa'ida members enjoyed sanctuary in Afghanistan, where they could safely plan and train for their missions.  Finally, senior members of al-Qa'ida were skilled and purposeful: they learned from their mistakes and were flexible in organization and planning.

Nonetheless, particularly after the bombings in East Africa, the Intelligence Community amassed a body of information detailing Bin Ladin's ties to terrorist activities against U.S. interests around the world.  Armed with that information, prior to September 11, 2001, U.S. Government counterterrorist efforts to identify and disrupt terrorist operations focused to a substantial degree on Bin Ladin and his network.  The Intelligence Community achieved some successes – in some cases, major successes – in these operations.  In other cases, little came of the Intelligence Community's efforts.

[Page 7]

By late 2000 and 2001, the Intelligence Community was engaged in an extensive, shadowy struggle against al-Qa'ida.  Despite such efforts, Bin Ladin carried out successful and devastating attacks against Americans and citizens of other nations, including the bombing of  USS Cole in Yemen in October 2000 and the attacks on the World Trade Center and the Pentagon on September 11, 2001.

## III.  FINDINGS AND CONCLUSIONS

### A.  Factual Findings

In reviewing the documents, interview reports, and witness testimony gathered during this Inquiry, the Joint Inquiry has sought to determine what information was available to the Intelligence Community prior to September 11, 2001 that was relevant to

the attacks that occurred on that day.  The record that has been established through this Inquiry leads to the following factual findings and conclusions.

**1. Finding: While the Intelligence Community had amassed a great deal of valuable intelligence regarding Usama Bin Ladin and his terrorist activities, none of it identified the time, place, and specific nature of the attacks that were planned for September 11, 2001.  Nonetheless, the Community did have information that was clearly relevant to the September 11 attacks, particularly when considered for its collective significance.**

Discussion: This Inquiry has uncovered no intelligence information in the possession of the Intelligence Community prior to the attacks of September 11 that, if fully considered, would have provided specific, advance warning of the details of those attacks.  The task of the Inquiry was not, however, limited to a search for the legendary, and often absent, "smoking gun."  The facts surrounding the September 11 attacks demonstrate the importance of strengthening the Intelligence Community's ability to detect and prevent terrorist attacks in what appears to be the more common, but also far more difficult, scenario.  Within the huge volume of intelligence reporting that was available prior to September 11, there were various threads and pieces of information that, at least in retrospect, are both relevant and significant.  The degree to which the Community was or was not able to build on that information to discern the bigger picture [page 8] successfully is a critical part of the context for the September 11 attacks and is addressed in the findings that follow.

**2. Finding: During the spring and summer of 2001, the Intelligence Community experienced a significant increase in information indicating that Bin Ladin and al-Qa'ida intended to strike against U.S. interests in the very near future.**

Discussion: The National Security Agency (NSA), for example, reported at least 33 communications indicating a possible, imminent terrorist attack in 2001.  Senior U.S. Government officials were advised by the Intelligence Community on June 28 and July 10, 2001, that the attacks were expected, among other things, to "have dramatic consequences on governments or cause major casualties" and that "[a]ttack preparations have been made.  Attack will occur with little or no warning."

TOP SECRET

Some Community personnel described the increase in threat reporting as unprecedented, at least in their own experience.  The Intelligence Community advised senior policymakers of the likelihood of an attack but, given the non-specific nature of the reporting, could not identify when, where, and how an attack would take place.  Deputy Secretary of State Richard Armitage, in his testimony, described his recollection of the threat and the U.S. Government's response:

> We issued between January and September nine warnings, five of them global, because of the threat information we were receiving from the intelligence agencies in the summer, when [DCI] George Tenet was around town literally pounding on desks saying, something is happening, this is an unprecedented level of threat information. He didn't know where it was going to happen, but he knew that it was coming.

**3. Finding:  Beginning in 1998 and continuing into the summer of 2001, the Intelligence Community received a modest, but relatively steady, stream of intelligence reporting that indicated the possibility of terrorist attacks within the United States.  Nonetheless, testimony and interviews confirm that it was the general view of the Intelligence Community, in the spring and summer of 2001, that the threatened Bin Ladin attacks would most likely occur against U.S. interests overseas, despite indications of plans and intentions to attack in the domestic United States.**

[Page 9]

Discussion:  Communications intercepts, the arrests of suspected terrorists in the Middle East and Europe, and a credible report of a plan to attack a U.S. Embassy in the Middle East shaped the Community's thinking about where an attack was likely to occur.  While former FBI Director Louis Freeh testified that the FBI was "intensely focused" on terrorist targets within the United States, the FBI's Executive Assistant Director for Counterterrorism testified that in 2001 he thought there was a high probability – "98 percent" – that the attack would be overseas.  The latter was the clear majority view, despite the fact that the Intelligence Community had information suggesting that Bin Ladin had planned, and was capable of, conducting attacks within the domestic United States.

This stream of reporting began as early as 1998 and continued during the time of heightened threat levels in 2001.  For example, the Community received reporting in May 2001 that Bin Ladin supporters were planning to infiltrate the United States to conduct terrorist operations and, in late summer 2001, that an al-Qa'ida associate was considering mounting terrorist attacks within the United States.

[Of particular interest to the Joint Inquiry was whether and to what extent the President received threat-specific warnings during this period.  The Joint Inquiry was advised by a representative of the Intelligence Community that, in August 2001, a closely held intelligence report for senior government officials included information that Bin Ladin had wanted to conduct attacks in the United States since 1997.  The information included discussion of the arrest of Ahmed Ressam in December 1999 at the U.S.-Canadian border and the 1998 bombings of U.S. embassies in Kenya and Tanzania.  It mentioned that members of al-Qa'ida, including some U.S. citizens, had resided in or traveled to the United States for years and that the group apparently maintained a support structure here.  The report cited uncorroborated information obtained and disseminated in 1998 that Bin Ladin wanted to hijack airplanes to gain the release of U.S.-held extremists; FBI judgments about patterns of activity consistent with preparations for hijackings or other types of attacks; as well as information acquired in May 2001 that indicated a group of Bin Ladin supporters was planning attacks in the United States with explosives].[*]
[Page 10]

**4. Finding:  From at least 1994, and continuing into the summer of 2001, the Intelligence Community received information indicating that terrorists were contemplating, among other means of attack, the use of aircraft as weapons.  This information did not stimulate any specific Intelligence Community assessment of, or collective U.S. Government reaction to, this form of threat.**

Discussion:  [While the credibility of the sources was sometimes questionable and the information often sketchy, the Inquiry confirmed that the Intelligence Community did receive intelligence reporting concerning the potential use of aircraft as weapons.  For example, the Community received information in 1998 about a Bin Ladin operation that would involve flying an explosive- laden aircraft into a U.S. airport and, in summer 2001, about a plot to bomb a U.S. embassy from an airplane or crash an airplane into it.  The FBI and CIA were also aware that convicted terrorist Abdul Hakim Murad and several others had discussed the possibility of crashing an airplane into CIA Headquarters as part of "the Bojinka Plot" in the Philippines, discussed later in this report.  Some, but

---

[*] National Security Advisor Condoleeza Rice stated in a May 16, 2002 press briefing that, on August 6, 2001, the President's Daily Brief (PDB) included information about Bin Ladin's methods of operation from a historical perspective dating back to 1997.  One of the methods was that Bin Ladin might choose to highjack an airliner in order to hold passengers hostage to gain release of one of their operatives.  She stated, however, that the report did not contain specific warning information, but only a generalized warning, and did not contain information that al-Qa'ida was discussing a particular planned attack against a specific target at any specific time, place, or by any specific method.

apparently not all, of these reports were disseminated within the Intelligence Community and to other agencies].

The Transportation Security Administration, for example, advised the Committees that the Federal Aviation Administration (FAA) had not received three of these reports, that two others were received by the FAA but through State Department cables, and that one report was received by the FAA, but only after September 11, 2001. Many policymakers and U.S. Government officials apparently remained unaware of this kind of potential threat and the Intelligence Community did not produce any specific assessments of the likelihood that terrorists would in fact use airplanes as weapons. For example, former National Security Advisor Sandy Berger testified before these Committees that:

> I don't recall being presented with any specific threat information about an attack of this nature [the use of aircraft as weapons] or any alert highlighting this threat or indicating it was any more likely than any other.

That testimony is consistent with the views publicly expressed by the current National Security Advisor, Condoleeza Rice, shortly after the September 11 attacks. [Page 11] Similarly, Deputy Under Secretary of Defense Paul Wolfowitz testified that he had not been made aware of this type of potential threat:

> I don't recall any warning of the possibility of a mass casualty attack using civilian airliners or any information that would have led us to contemplate the possibility of our shooting down a civilian airliner.

Even within the Intelligence Community, the possibility of using aircraft as weapons was apparently not widely known. At the FBI, for instance, the FBI Phoenix field office agent who wrote the so-called "Phoenix memo" testified that he was aware of the plot to crash a plane into CIA Headquarters, but not the other reports of terrorist groups considering the use of aircraft as weapons.  The Chief of the Radical Fundamentalist Unit in the FBI's Counterterrorism Division also confirmed, in an Joint Inquiry interview, that he was not aware of such reports.

**5. Finding:  Although relevant information that is significant in retrospect regarding the attacks was available to the Intelligence Community prior to September 11, 2001, the Community too often failed to focus on that information and consider and appreciate its collective significance in terms of a probable terrorist attack.  Neither did the Intelligence Community demonstrate sufficient initiative in coming to grips**

**with the new transnational threats.  Some significant pieces of information in the vast stream of data being collected were overlooked, some were not recognized as potentially significant at the time and therefore not disseminated, and some required additional action on the part of foreign governments before a direct connection to the hijackers could have been established.  For all those reasons, the Intelligence Community failed to capitalize fully on available, and potentially important, information.  The sub-findings below identify each category of this information.**

### [Terrorist Communications in 1999}

**5.a.  [During 1999, the National Security Agency obtained a number of communications – none of which included specific detail regarding the time, place or nature of the September 11 attacks -- connecting individuals to terrorism who were identified, after September 11, 2001, as participants in the attacks that occurred on that day].**

[Page 12]

Discussion:  [In early 1999, the National Security Agency (NSA) analyzed communications involving a suspected terrorist facility in the Middle East that had previously been linked to al-Qa'ida activities directed against U.S. interests.  Information obtained [——] included, among other things, the full name of future hijacker Nawaf al-Hazmi. Beyond the fact that the communications involved a suspected terrorist facility in the Middle East*,* the communications did not, in NSA's view at the time, feature any other terrorist-related information.  The information was not published because the individuals mentioned in the communications were unknown to NSA, and, according to NSA, the information did not meet NSA's reporting thresholds.   NSA has explained that these thresholds are flexible, sometimes changing daily, and consist of several factors, including: the priority of the intelligence requirement; the apparent intelligence value of the information; the level of customer interest in the topic; the current situation; and the volume of intercept to be analyzed and reported].

[During the summer of 1999, NSA analyzed additional communications involving a suspected terrorist facility in the Middle East that included the name of Khaled.  At about the same time, the name Khallad also came to NSA's attention. This information did not meet NSA's reporting thresholds and thus was not disseminated].

TOP SECRET

[In late 1999, NSA analyzed communications involving a suspected terrorist facility in the Middle East that included the names of Khaled and Nawaf.  At this time, NSA did not associate the latter individual with the Nawaf al-Hazmi it had learned about in early 1999.  Later, the two individuals [−] were determined to be Khalid al-Mihdhar and Nawaf al-Hazmi, now known to be two of the September 11 hijackers.  [——————————————].  This information was passed to the CIA as well as the FBI in late 1999.  In early 2000, NSA also [————————————————————————] passed additional information about Khalid to the CIA, FBI, FAA, the Departments of State, Treasury, Transportation, and Justice, and others in the U.S. Government].

[Page 13]

## Malaysia Meeting and Travel of al-Qa'ida Operatives
## to the United States

 **5.b. The Intelligence Community acquired additional, and highly significant, information regarding Khalid al-Mihdhar and Nawaf al-Hazmi in early 2000.  Critical parts of the information concerning al-Mihdhar and al-Hazmi lay dormant within the Intelligence Community for as long as eighteen months, at the very time when plans for the September 11 attacks were proceeding.  The CIA missed repeated opportunities to act based on the information in its possession that these two Bin Ladin-associated terrorists were traveling to the United States, and to add their names to  watchlists.**

Discussion:  [By early January 2000, CIA knew al-Mihdhar's full name and that it was likely Nawaf's last name was al-Hazmi, knew that they had attended what was believed to be a gathering of al-Qa'ida associates in Malaysia, was aware that they had been traveling together, and had documents indicating that al-Mihdhar held a U.S. B-1B-2 multiple entry visa that would allow him to travel to and from the United States until April 6, 2000.  CIA arranged surveillance of the meeting and the DCI was kept informed as the operation progressed].

Despite having all this information, and despite the republication of CTC guidance regarding watchlisting procedures in December 1999 (see Appendix, "CTC Watchlisting Guidance – December 1999"), CIA did not add the names of these two individuals to the State Department, INS, and U.S. Customs Service watchlists that are used to deny individuals entry into the United States.  The weight of the record also

suggests that, despite providing the FBI with other, less critical, information about the Malaysia meeting, the CIA did not advise the FBI about al-Mihdhar's U.S. visa and the very real possibility that he would travel to the United States. The CIA stated its belief that the visa information was sent to the FBI and produced a cable indicating that this had been done.[*]

The FBI, for its part, had no record the visa information was received. Although the facts of the Malaysia meeting were included in several briefings for senior FBI officials, including FBI Director Louis Freeh, no record could be found that the visa information was part of these briefings.

[Page 14]

 [On March 5, 2000, CIA Headquarters received a cable from an overseas CIA station indicating that Nawaf al-Hazmi had traveled to Los Angeles, California on January 15, 2000. The following day, March 6, CIA Headquarters received a message from another CIA station noting its "interest" in the first cable's "information that a member of this group had traveled to the U.S." The CIA did not act on either message, again did not watchlist al-Hazmi or al-Mihdhar, and, again, did not advise the FBI of their possible presence in the United States. In 2000, these same two individuals had numerous contacts with an active FBI counterterrorism informant while they were living in San Diego, California].

On January 4, 2001, CIA acquired information that Khallad, a principal planner in the bombing of *USS Cole*, had, along with al-Mihdhar and al-Hazmi, attended the January 2000 meeting in Malaysia. Again, the CIA did not watchlist these two individuals. At the time, al-Mihdhar was abroad, but al-Hazmi was still in the United States. FBI Director Robert Mueller testified to the Joint Inquiry that: "al-Mihdhar's role in the September 11 plot . . . before his re-entry into the United States may well have been that of the coordinator and organizer of . . . the non-pilot hijackers."

In May 2001, the CIA provided FBI Headquarters with photographs taken in Malaysia, including one of al-Mihdhar, for purposes of identifying another *Cole* bombing

---

[*] In interviews, CIA personnel could not confirm that the visa information had in fact been provided to the FBI.

suspect. Although the CIA told FBI Headquarters about the Malaysia meeting and about al-Mihdhar's travel in Southeast Asia at that time, the CIA did not advise the FBI about al-Mihdhar's or al-Hazmi's possible travel to the United States. Again, the CIA did not watchlist the two individuals. While CIA personnel were working closely with the FBI in support of the *USS Cole* bombing investigation, the importance and urgency of information tying suspected terrorists to the domestic United States apparently never registered with them. CIA Director Tenet testified that CIA personnel:

> . . . in their focus on the [*USS Cole*] investigation, did not recognize the implications of the information about al-Hazmi and al-Mihdhar that [page 15] they had in their files.

On June 11, 2001, FBI Headquarters and CIA personnel met with the New York FBI field office agents who were handling the *USS Cole* investigation. The New York agents were shown the Malaysia photographs, but were not given copies. Although al-Mihdhar's name was mentioned, the New York agents' requests for more information about al-Mihdhar and the circumstances surrounding the photographs were refused, according to one of the field office agents. The FBI Headquarters analyst recalls that she said at the meeting that she would try to get the information the agents had requested.

In Joint Inquiry hearing testimony, one of the New York FBI agents who was present described his recollection of the meeting:

> When these photos were shown to us, we had information at the time that one of the suspects had actually traveled to the same region of the world that this might have taken place, so we pressed the individuals there for more information regarding the meeting. So we pressed them for information. [A]t the end of the meeting – some of them say it was because I was able to get the name out of the analyst, but at the end of that day we knew the name Khalid al-Mihdhar but nothing else. The context of the meeting was that we continued to press them two or three times on information regarding, "Why were you looking at this guy? You couldn't have been following everybody around the Millennium. What was the reason behind this?
>
> And we were told that that information – as I recall, we were told that that information could not be passed and that they would try to do it in the days and weeks to come. That meeting – I wouldn't say it was very contentious, but we were not very happy, the New York agents at the time were not very happy that certain information couldn't be shared with us.

Again, in that meeting, the CIA had missed yet another opportunity to advise the FBI about al-Mihdhar's visa and possible travel to the United States and, again, the CIA took no action to watchlist these individuals.  Just two days later, al-Mihdhar obtained a new U.S. visa and, on July 4, 2001, he re-entered the United States.

It was not until mid July 2001, that a concerned CIA officer assigned to the FBI triggered a CIA review of its cables regarding the Malaysia meeting, a task that, [page 16] ironically, fell to an FBI analyst assigned to the CTC.  Working with the Immigration and Naturalization Service (INS), the FBI analyst determined that both al-Mihdhar and al-Hazmi had entered the United States.  As a result of that effort, on August 23, 2001, the CIA finally notified the FBI and requested of the State Department that the two individuals should be watchlisted.

Even then, there was less than an all-out effort to locate what amounted to two Bin Ladin-associated terrorists in the United States during a period when the terrorist threat level had escalated to a peak level.  For example, neither CIA, FBI, nor State Department informed the FAA.  On August 21, 2001, coincidentally, FAA had issued a Security Directive, entitled "Threat to U.S. Aircraft Operators."  That Directive alerted commercial airlines that nine named terrorism-associated individuals – none of whom were connected to the 19 hijackers -- were planning commercial air travel and should receive additional security scrutiny if they attempted to board an aircraft.  The Directive was updated on August 24 and August 28, 2001.  Had FAA been advised of the presence of al-Hazmi and al-Mihdhar in the United States, a similar directive could have been issued, subjecting the two, their luggage and any carry-on items to detailed, FAA-directed searches.

Further, only the FBI's New York field office received a request from FBI Headquarters to conduct a search for the two prior to September 11, 2001.  The Headquarters written instruction to the New York field office only identified al-Mihdhar in its subject line.  Nawaf al-Hazmi was mentioned in the text, and it is not clear whether it was intended that he be a subject of the search as well.  It was not until September 11, 2001 that the Los Angeles FBI field office was asked to conduct a search.  Other FBI

offices with potentially useful informants, such as San Diego, were not notified prior to September 11.

A New York FBI field office agent testified that he urged FBI Headquarters on August 28, 2001 to allow New York field office criminal agents to participate in the search with FBI intelligence agents, given the limited resources that are often applied to [page 17] intelligence investigations.  The request was refused by FBI Headquarters because of concerns about the perceived "wall" between criminal and intelligence matters.  Looking back, the New York FBI agent testified about his hope that the Intelligence Community would overcome this kind of restriction in the future:

> …after everything happened and we had ramped up where thousands of FBI agents all over the world were trying to find somebody, I thought to myself – and I don't necessarily know how to do it, but we've got to be able to get there – when we find out a Khalid al-Mihdhar is in the country, intelligence, criminal, or whatever, we've got to be able to get to the level we were at September 12, the afternoon of September 11. We've got to be able to get there before September 11, not September 12.

Joint Inquiry witnesses testified that other federal agencies with potentially valuable information databases were never asked to assist in FBI's search.

### [Terrorist Communications in Spring 2000]

**5.c.  [In January 2000, after the meeting of al-Qa'ida operatives in Malaysia, Khalid al-Mihdhar and Nawaf al-Hazmi entered the United States [————————————————].  Thereafter, the Intelligence Community obtained information indicating that an individual named "Khaled" at an unknown location had contacted a suspected terrorist facility in the Middle East.  The Intelligence Community reported some of this information, but did not report all of it.  Some of it was not reported because it was deemed not terrorist-related.  It was not until after September 11, 2001 that the Intelligence Community determined that these contacts had been made from future hijacker Khalid al-Mihdhar while he was living within the domestic United States].**

Discussion:  [While the Intelligence Community had information regarding these communications, it did not determine the location from which they had been made [——]

TOP SECRET

[————————————————————————————]. After September 11, the FBI determined from domestic toll records that it was in fact the hijacker Khalid al-Mihdhar who had made these communications and that he had done so from within the United States. The Intelligence Community did not identify what was critically important [page 18] information in terms of the domestic threat to the United States: the fact that the communications were between individuals within the United States and suspected terrorist facilities overseas. That kind of information could have provided crucial investigative leads to law enforcement agencies engaged in domestic counterterrorist efforts].

**[Two Hijackers Had Numerous Contacts with an Active FBI Informant]**

**5.d. [This Joint Inquiry confirmed that these same two future hijackers, Khalid al-Mihdhar and Nawaf al-Hazmi, had numerous contacts with a long time FBI counterterrorism informant in California and that a third future hijacker, Hani Hanjour, apparently had more limited contact with the same informant. In mid- to late-2000, the CIA already had information indicating that al-Mihdhar had a multiple entry U.S. visa and that al-Hazmi had in fact traveled to Los Angeles, but the two had not been watchlisted and information suggesting that two suspected terrorists could well be in the United States had not yet been given to the FBI. The San Diego FBI field office, which handled the informant in question, did not receive that information or any of the other intelligence information pertaining to al-Mihdhar and al-Hazmi, prior to September 11, 2001. As a result, the FBI missed the opportunity to task a uniquely well-positioned informant -- who denies having any advance knowledge of the plot --- to collect information about the hijackers and their plans within the United States.]**

Discussion**:** [Nawaf al-Hazmi and Khalid al-Mihdhar had numerous contacts with a long-time FBI counterterrorism informant while they were living in San Diego, California. There are several indications that hijacker Hani Hanjour may have had more limited contact with the same informant in December 2000.]

[During the summer of 2000, the informant advised the FBI handling agent that the informant had contacts with two individuals named "Nawaf" and "Khalid". The informant described meeting these individuals. The informant described the two to the FBI agent as Saudi Muslim youths who were legally in the United States to visit and attend school. The FBI agent did not, at the time, consider these individuals to be of

interest to the [page 19] FBI.  While the agent says he asked the informant for the individuals' last names, the informant never provided that information and the FBI agent did not press for the names because he had no reason to think they were significant until after September 11, 2001.]

[————————————————————————————————————]

[During one of their last contacts, al-Hazmi advised the informant that he was moving to Arizona to attend flight training, but the informant did not advise the FBI of this information until after the September 11 attacks].

[When the FBI's San Diego field office determined after the attacks that a long-time FBI counterterrorism informant had had numerous contacts in 2000 with two of the September 11 hijackers, personnel there were immediately suspicious about whether the informant was involved in the plot. Subsequently, however, all of the field office personnel, including senior managers and various case agents, concluded that the informant was unwitting of, and had no role in, the September 11 plot].

[Several questions remain, however, with regard to the informant's credibility. First, while there are several indications suggesting that future hijacker Hani Hanjour had contact with the informant in December 2000, the informant has repeatedly advised the FBI that the informant does not recognize photos of Hanjour.  Second, the informant told the FBI that the hijackers did nothing to arouse the informant's suspicion, but the informant also acknowledged that al-Hazmi had contacts with at least four individuals the informant knew were of interest to the FBI and about whom the informant had previously reported to the FBI. Third, the informant has made numerous inconsistent statements to the FBI during the course of interviews after September 11, 2001. Fourth, the informant's responses during an FBI polygraph examination to very specific questions about the informant's advance knowledge of the September 11 plot were judged by the FBI to be "inconclusive," although the FBI asserts that this type of result is not unusual for such individuals in such circumstances].

[Page 20]

TOP SECRET

[Finally, there is also information which conflicts with the information provided by the informant concerning the dates of contacts with the hijackers. The Joint Inquiry, for example, brought to the FBI's attention information that is inconsistent with the date of initial contact as provided by the informant.  In its November 18, 2002 written response to the Joint Inquiry, the FBI has acknowledged that there are "significant inconsistencies" in the informant's statements about these contacts. The FBI investigation regarding this issue is continuing].

[The Administration has to date objected to the Inquiry's efforts to interview the informant in order to attempt to resolve those inconsistencies. The Administration also would not agree to allow the FBI to serve a Committee subpoena and deposition notice on the informant. Instead, written interrogatories from the Joint Inquiry were, at the suggestion of the FBI, provided to the informant. Through an attorney, the informant has declined to respond to those interrogatories and has indicated that, if subpoenaed, the informant would request a grant of immunity prior to testifying].

[The FBI agent who was responsible for the informant testified before the Joint Inquiry that, had he had access to the intelligence information on al-Mihdhar's and al-Hazmi's significance at the time they were in San Diego:

> It would have made a huge difference. We would have immediately opened [——————] investigations. We had the predicate for a [——————] investigation if we had that information.…[W]e would immediately go out and canvas the sources and try to find out where these people were. If we locate them, which we probably would have since they were very close – they were nearby – we would have initiated investigations immediately.…We would have done everything. We would have used all available investigative techniques.  We would have given them the full court press.  [Page 21]  We would…have done everything – physical surveillance, technical surveillance and other assets.

[Whether, as the agent testified he believes, that kind of investigative work would have occurred and would have then uncovered the hijackers' future plans will necessarily remain speculation. What is clear, however, is that the informant's contacts with the hijackers, had they been capitalized on, would have given the San Diego FBI field office perhaps the Intelligence Community's best chance to unravel the September 11 plot. Given the CIA's failure to disseminate, in a timely manner, intelligence information on

the significance and location of al-Mihdhar and al-Hazmi, that chance, unfortunately, never materialized].

### The Phoenix Electronic Communication

**5.e. On July 10, 2001, an FBI Phoenix field office agent sent an "Electronic Communication" to four individuals in the Radical Fundamentalist Unit (RFU) and two individuals in the Usama Bin Ladin Unit (UBLU) at FBI Headquarters, and to two agents on International Terrorism squads in the FBI New York field office.  In the communication, the agent expressed his concerns, based on his first-hand knowledge, that there was a coordinated effort underway by Bin Ladin to send students to the United States for civil aviation-related training.  He noted that there was an "inordinate number of individuals of investigative interest" in this type of training in Arizona and expressed his suspicion that this was an effort to establish a cadre of individuals in civil aviation who would conduct future terrorist activity.  The Phoenix agent's communication requested that FBI Headquarters consider implementing four recommendations:**

- **accumulate a list of civil aviation universities/colleges around the country;**
- **establish liaison with these schools;**
- **discuss the theories contained in the Phoenix EC with the Intelligence Community; and**
- **consider seeking authority to obtain visa information concerning individuals seeking to attend flight schools.**

**However, the FBI Headquarters personnel did not take the action requested by the Phoenix field office agent prior to September 11, 2001.  The Phoenix communication generated little or no interest at either FBI Headquarters or the FBI's New York field office.**

[Page 22]

<u>Discussion</u>:  Before the Joint Inquiry, the Phoenix agent who authored the Phoenix communication testified that:

> What I wanted was an analytical product. I wanted this discussed with the Intelligence Community.  I wanted to see if my hunches were correct.

He noted, however, that he also knew that this type of analytical product took a back seat to operational matters at the FBI:

> But, I am also a realist. I understand that the people at FBI Headquarters are terribly overworked and understaffed, and they have been for years. And at the time that I am a sending this in, having worked this stuff for 13 years, and watched the unit in action over the years, I knew that this was going to be at the bottom of the pile, so to speak, because they were

> dealing with real-time threats, real-timer issues trying to render fugitives
> back to the United States from overseas for justice.  And again, it is a
> resource issue.

The Phoenix agent was correct, and his communication did fall to the bottom of the pile.

He sent the communication to four individuals in the Radical Fundamentalist Unit, two individuals in the Usama Bin Ladin Unit, and two agents on International terrorism squads in the New York field office.  Only three of the eight addressees recall reading the communication prior to September 11, 2001.  Neither of the two Intelligence Operations Specialists who reviewed it at FBI Headquarters undertook a comprehensive national analysis of the theories it set forth.  Nor did they send the communication to the FBI's analytic unit or the Intelligence Community, as requested by the Phoenix agent. Instead, it was forwarded to the Portland FBI field office, not primarily because of concerns about flight school theories, but rather because that field office had a possible investigative interest in one of the individuals who were named in the communication.

Similarly, the New York field office personnel who reviewed the communication said they found it to be speculative and not particularly significant.  That office had been one of the recipients of a 1999 FBI Headquarters request to track Islamic flight students in its area of jurisdiction.

[Page 23]

The Chief of the Radical Fundamentalist Unit testified that he did not see the communication prior to September 11, 2001.  In his testimony before the Joint Inquiry, FBI Director Mueller acknowledged that: "the Phoenix [communication] should have been disseminated to all field offices and to our sister agencies, and it should have triggered a broader analytical approach."

After September 11, the FBI discovered that [——————],[*] one of the individuals who was identified in the Phoenix communication, was an associate of hijacker Hani

---

[*] The identities of several individuals whose activities are discussed in this report have been deleted by the Joint Inquiry.  While the FBI has provided the Joint Inquiry with these names and those names are contained in the classified version of this final report, the Joint Inquiry has decided to delete them from this unclassified version due to the as yet unresolved nature of much of the information regarding their activities.

Hanjour.  [This individual] left the United States in April 2000 and returned in June 2001, remaining in the United States for approximately one month.  The FBI now speculates that [the individual] may have returned to the United States either to evaluate Hanjour's flying skills, or to provide Hanjour with his final training on the flight simulator before the September 11 attacks.  [The individual] was an experienced flight instructor who was certified to fly Boeing 737s.

The FBI also has determined since September 11, 2001 that another individual mentioned in the Phoenix communication – [————————————] -- is also connected to the al-Qa'ida network.  [————————————] was arrested at an al-Qa'ida safehouse in Pakistan in 2002 along with [————————————], one of the most prominent al-Qa'ida facilitators.

### The FBI Investigation of Zacarias Moussaoui

**5.f. In August 2001, the FBI's Minneapolis field office, in conjunction with the INS, detained Zacarias Moussaoui, a French national who had enrolled in flight training in Minnesota.  FBI agents there also suspected that Moussaoui was involved in a hijacking plot.  FBI Headquarters attorneys determined that there was not probable cause to obtain a court order to search Moussaoui's belongings under the Foreign Intelligence Surveillance Act (FISA).  However, personnel at FBI Headquarters, including the Radical Fundamentalist Unit and the National Security Law Unit, as well as agents in the Minneapolis field office, misunderstood the legal standard for obtaining an order under FISA.  As a result, FBI Minneapolis field office personnel wasted valuable investigative resources trying to connect the Chechen rebels to al-Qa'ida.  Finally, no one at the FBI apparently connected the Moussaoui investigation with the heightened threat environment** [page 24] **in the summer of 2001, the Phoenix communication, or the entry of al-Mihdhar and al-Hazmi into the United States.**

Discussion:  On February 23, 2001, Moussaoui entered the United States at Chicago's O'Hare Airport, traveling on a French passport that allowed him to stay in the country without a visa for 90 days, until May 22, 2001.  On August 11, 2001, Moussaoui and his roommate arrived in Eagan, Minnesota to begin classes at Pan Am, a flight school that offered training on a Boeing 747 flight simulator used by professional pilots.

According to FBI documents, on August 15, an employee at Pan Am called the FBI's Minneapolis field office because he and other employees were suspicious of Moussaoui, who met none of the usual qualifications for Pan Am students.  The FBI's Minneapolis field office opened an international terrorism investigation and determined that, since Moussaoui had been authorized to stay in the United States only until May 22, 2001, he was no longer in proper legal status.

On the same day the Minneapolis field office learned about Moussaoui, it asked both the CIA and the FBI's legal attaché in Paris for any information about Moussaoui and informed FBI Headquarters of the investigation.  The FBI Headquarters agent who was responsible for the contact suggested that the Minneapolis field office put Moussaoui under surveillance.  However, a Minneapolis field office supervisory agent testified to the Joint Inquiry that:

> . . . .[m]y background in the criminal arena suggests that when a violation occurs and you can stop further or potential criminal activity, you act on that.  So that is exactly what I instructed the agents to do. . . . Because I didn't want him to get any additional time on a flight simulator that would allow him to have the knowledge that we could no longer take back from him to operate an aircraft.

INS agents took Moussaoui into custody on August 16 because his authority to stay in the United States had expired.  Moussaoui declined to consent to a search of his belongings.  On Saturday, August 18, the Minneapolis field office sent a detailed memorandum to an agent in the Radical Fundamentalist Unit (RFU) at FBI Headquarters describing the investigation.

[Page 25]

The memorandum stated that Moussaoui had two knives, padded gloves and shin guards in his possession when he was arrested; had told his roommate that "true Muslims must prepare themselves to fight;" and had begun exercise and martial arts training.  In addition, the memorandum stated that the Minneapolis field office believed that Moussaoui and his roommate were part of a larger international radical fundamentalist group.  Based on Moussaoui's "possession of weapons and his preparation through physical training for violent confrontation," the Minneapolis filed office stated it had reason to believe that Moussaoui, his roommate, "and others yet unknown,"  were conspiring to seize control of an airplane.

The Minneapolis field office agent testified to the Inquiry that Minneapolis agents decided not to try to obtain a criminal search warrant to search Moussaoui's belongings as that might prejudice any subsequent efforts to get a court order for a physical search under FISA.  The FBI field office agent contacted the CTC, which then advised CIA stations abroad about Moussaoui and asked them in an August 25 cable to provide any relevant information they might have.  Based on information provided by the FBI's Minneapolis field office, that cable described Moussaoui and his roommate as "suspect 747 airline attackers" and a "suspect airline suicide attacker," who might be "involved in a larger plot to target airlines traveling from Europe to the U.S….."

On August 21, 2001, the Minneapolis field office agent sent an e-mail to the RFU supervisory agent at FBI Headquarters stating: "[It is] imperative that the [U.S. Secret Service] be apprised of this threat potential indicated by the evidence.…If [Moussaoui] seizes an aircraft flying from Heathrow to NYC, it will have the fuel on board to reach DC."  In an interview, the FBI Headquarters agent to whom the message was addressed said that he told the Minneapolis field office agent that he was working on a notification to the entire Intelligence Community and the Secret Service about the threat presented by Moussaoui.  The RFU supervisory agent did send a teletype message to the Intelligence Community and other U.S. Government agencies, including the FAA, on September 4, 2001.  That message reported the FBI's interviews of Moussaoui and his roommate, as well as other information the FBI had obtained.  The teletype, however, merely described [page 26] the steps in the investigation and did not place Moussaoui's actions in the context of the
increased level of terrorist threats during the summer of 2001.  Nor did it provide its recipients with any analysis of Moussaoui's actions or plans, or information about what type of threat he may have presented.

[On August 22, the FBI legal attache's office in Paris provided a report to the RFU and the Minneapolis field office that contained information [————————
————————].  The FBI's receipt of this information began a series of discussions between the Minneapolis field office and FBI Headquarters focusing on whether the Chechen rebels were a "recognized" foreign power for purposes of obtaining approval to

search Moussaoui's belongings under FISA.  The Minneapolis field office agent testified to the Joint Inquiry that he had had no training in FISA, but that he believed, based on advice from FBI Headquarters, that "we needed to identify a – and the term that was thrown around was 'recognized foreign power' and so that was our operational theory." As the FBI's Deputy General Counsel has testified, however, this was incorrect.  The FBI may obtain a search warrant under FISA for an agent of any international terrorist group, including the Chechen rebels.  Because of this misunderstanding, the Minneapolis field office expended valuable time and effort trying to establish a connection between the Chechen rebels and al-Qa'ida, which it believed was a "recognized" foreign power].

The FBI Headquarters supervisory agent briefed the FBI's Deputy General Counsel, who testified that he agreed with the Headquarters agent that there was insufficient information to show that Moussaoui was an agent of a foreign power.  The FBI's focus shifted to arranging for Moussaoui's deportation to France on September 17, 2001, at which point French officials would search his belongings and provide the results to the FBI.  Although the FBI was no longer considering a search warrant under FISA, no one revisited the idea of attempting to obtain a criminal search warrant.

[Page 27]

Thus, during the summer of 2001 -- a time when the Intelligence Community was on the highest state of alert, disparate parts of the FBI had information about Zacarias Moussaoui – a suspected suicide hijacker, a Phoenix field office agent's suspicions about radical fundamentalists engaging in flight training, and the entry into the United States of Nawaf al-Hazmi and Khalid al-Mihdhar, who would become two of the September 11 hijackers.  The FBI field office agents in Minneapolis who were investigating Moussaoui knew nothing about the Phoenix communication or al-Hazmi and al-Mihdhar.  The Phoenix field office agent had never heard about Moussaoui or the two future hijackers.  The FBI agents in New York who were informed on August 23, 2001 that al-Hazmi and al-Mihdhar had entered the United States knew nothing about the other events of that summer.  And, finally, the Chief of the RFU at FBI Headquarters, which had handled both the Moussaoui investigation and the Phoenix communication, acknowledged in testimony to the Joint Inquiry on September 24, 2001, that no one at FBI Headquarters connected those events.

TOP SECRET

[The indictment against Moussaoui, which was filed on December 11, 2001, alleges that Moussaoui possessed a number of items on August 16, 2001.  On that day, which is when FBI and INS agents first interviewed him, the INS took Moussaoui's possessions for safekeeping. Absent search authority, however, the possessions were not examined at that time.  As it turned out, according to the indictment, Moussaoui's possessions included letters indicating that Moussaoui was a marketing consultant in the United States for Infocus Tech.  The letters had been signed by Yazid Sufaat, whom the Intelligence Community was aware was the owner of the Malaysian condominium in which the January 2000 al-Qa'ida meeting attended by hijackers al-Mihdhar and al-Hazmi had been held.  The indictment also alleges that Moussaoui possessed a notebook listing two German telephone numbers and the name "Ahad Sabet," which, the indictment states, was used by Ramzi Bin al-Shibh to send funds to Moussaoui.  Bin al-Shibh, who was apprehended in Pakistan in September 2002, is named in the indictment as a supporting conspirator].

### Hijackers In Contact With Persons of FBI Investigative Interest
### in the United States

**5.g. The Joint Inquiry confirmed that at least some of the hijackers were not as isolated during their time in the United States as has been previously suggested. Rather, they maintained a number of contacts both in the United** [page 28] **States and abroad during this time period.  Some of those contacts were with individuals who were known to the FBI, through either past or, at the time, ongoing FBI inquiries and investigations. Although it is not known to what extent any of these contacts in the United States were aware of the plot, it is now clear that they did provide at least some of the hijackers with substantial assistance while they were living in this country.**

Discussion: The Intelligence Community had information indicating the potential existence of an al-Qa'ida support network in the United States prior to the attacks, and this was consistent with al-Qai'da's modus operandi in previous attacks.  The FBI had, to some degree, focused sources and investigative work on radical Islamic extremists within the United States prior to September 11.  Former National Security Advisor Sandy Berger testified that, during his time in office, the FBI view had been that "al-Qa'ida had limited capacity to operate in the United States and any presence here was under surveillance."

[Ironically, this Inquiry has confirmed that at least some of the hijackers operated, without detection, within the scope of the FBI's coverage of radical Islamic extremists. Hani Hanjour, Mohamed Atta, Marwan al-Shehhi, Nawaf al-Hazmi, and Khalid al-Mihdhar may have had contact with a total of 14 people who had come to the FBI's attention during counterterrorism or counterintelligence investigations prior to September 11, 2001. Four of those 14 were the focus of active FBI investigations during the time that the hijackers were in the United States. In fact, as noted earlier, two future hijackers had numerous contacts with an active FBI counterterrorism informant while in the United States. Despite their proximity to FBI targets and at least one FBI source, the future hijackers successfully eluded FBI attention].

Several examples illustrate not only the reliance of the hijackers on the potential support networks, but also the ease with which they operated despite the FBI's pre-September 11 domestic coverage. Shortly after their arrival in the United States, future hijackers Khalid Al-Mihdhar and Nawaf Al-Hazmi moved to San Diego at the suggestion of Omar al-Bayoumi, who had previously been the focus of an FBI counterterrorism [———] inquiry. In San Diego, they stayed at al-Bayoumi's apartment for several days until he was able to find them an apartment. He then co-signed their lease, paid [page 29] their security deposit and first month's rent, arranged a party to welcome them to the San Diego community, and tasked another individual to help them become acclimated to the United States. [————————————————————————————————————————————————————————————————]. The second individual served as their translator, helped them obtain bank accounts and drivers' licenses, and assisted them in locating flight schools.

[Other individuals in San Diego also provided the two hijackers with similar types of assistance. A manager of a local gas station, who was at the time being investigated by the FBI, hired al-Hazmi to work for him briefly, after receiving a call from a mutual friend at the mosque. In addition, a local imam, who was the subject of an FBI counterterrorism inquiry for part of the time that the future hijackers were in San Diego, served as their spiritual advisor when they were living in San Diego. Finally, al-Hazmi and al-Mihdhar also maintained a number of other contacts in the local Islamic

community during their time in San Diego, some of whom were also known to the FBI through counterterrorist inquiries and investigations].

Future hijacker Hani Hanjour also may have received flight-related assistance from [an individual], who, was also known to the FBI and was, in fact, included among the individuals discussed in the Phoenix communication.  As noted earlier, [this individual] left the United States in April 2000, and returned in June 2001, remaining in the United States for approximately one month.  [The individual] was an associate of Hanjour's and the FBI now speculates that [the individual] may have returned to the United States either to evaluate Hanjour's flying skills, or to provide Hanjour his final training on the Cessna simulator before the attacks.  This individual was an experienced flight instructor and was certified to fly Boeing 737s.

When some of the future hijackers relocated to the East Coast, it appears that they received assistance similar to that provided to them on the West Coast.  Al-Hazmi and al-Mihdhar's spiritual advisor relocated to the East Coast, and, when Hanjour and al-Hazmi arrived at his mosque, one of the mosque's members helped them find an apartment in the area.  After approximately a month, this same individual drove Hanjour and al- [page 30] Hazmi, along with two other hijackers, to Connecticut, and then to Paterson, New Jersey.  From the hotel in Connecticut where they stayed for two nights, a total of 75 calls were made in attempts to locate apartments, flight schools, and car rental agencies for the future hijackers.  The hijackers were also in contact with a number of other people during their time on the East Coast.

[The fact that these future hijackers could rely on this type of support within the United States is consistent with other information that was available to the Intelligence Community prior to September 11, 2001.  That information also points to the existence of an al-Qa'ida support network within the United States.  An August 2001 Intelligence Community publication for senior U.S. government policy officials (called a "SEIB"), for example, indicated that al-Qa'ida members, including some U.S. citizens, have resided in or traveled to the U.S. for years, and the group apparently maintains a support structure in the United States.  The FBI Phoenix field office agent who authored the Phoenix communication also testified that, based on his experience, he had developed an

"investigative theory" that indicated that this kind of support network had been in place in Arizona for some time].

[Finally, an early summer 2001 Intelligence Community report stated that Khalid Shaykh Mohammed – the senior al-Qa'ida official who has been identified as the mastermind of the September 11 attacks -- was recruiting individuals to travel to the United States and engage in planning terrorist-related activity there.  According to the [——————] report, these individuals would be "expected to establish contact with colleagues already living there."  This information was disseminated [————————] to all Intelligence Community agencies and the [————], military commanders, and components within the Departments of Treasury and Justice].

[A September 12, 2001 FBI interview [————————————————— —————————————————] also suggests the existence of an al-Qa'ida support network within the United States. In that interview, an individual with al-Qa'ida connections recalled that a senior al-Qa'ida operative had discussed [page 31] "using multiple cells operating independently in the United States that could execute ten operations simultaneously or in sequence that would produce a big impact on the United States."  When queried by the FBI, the individual indicated that the senior operative had the necessary people positioned in the United States to carry out such a plan, noting that the senior operative has many contacts in the United States].

### Hijackers' Associates in Germany

**5.h. [Since 1995, the CIA had been aware of a radical Islamic presence in Germany, including individuals with connections to Usama Bin Ladin.  Prior to September 11, 2001, the CIA had unsuccessfully sought additional information on individuals who have now been identified as associates of some of the hijackers].**

Discussion:  [CIA and FBI counterterrorism operations and investigations prior to September 11, 2001 repeatedly produced intelligence relating to two individuals in Hamburg, Germany – Mamoun Darkazanli, a suspected logistician in Bin Ladin's network, and Mohammed Zammar, a suspected recruiter for al- Qa'ida.  The CIA had

been seeking more information about Darkazanli.  [⸺⸺⸺⸺⸺⸺⸺

⸺⸺⸺⸺⸺⸺⸺⸺⸺⸺⸺⸺⸺⸺⸺⸺

⸺⸺⸺⸺⸺⸺⸺⸺⸺⸺⸺⸺⸺⸺⸺⸺

⸺⸺⸺⸺⸺⸺⸺⸺⸺⸺⸺⸺⸺⸺⸺⸺

⸺⸺⸺⸺⸺⸺⸺⸺⸺⸺⸺⸺⸺⸺].

After September 11, 2001, it was determined that these same two individuals had been associates in Hamburg of hijackers Mohamed Atta, Marwan al-Shehhi, and Ziad Jarrah, as well as other individuals, such as Ramzi bin al-Shibh, who are now believed to have been involved in the September 11 plot.  In fact, the FBI now believes that Zammar recruited Atta, al-Shehhi, and Jarrah into Al Qaeda, and encouraged their participation in the September 11 attacks.

[Page 32]

### Khalid Shaykh Mohammad

**5.i. Prior to September 11, the Intelligence Community had information linking Khalid Shaykh Mohammed (KSM), now recognized by the Intelligence Community as the mastermind of the attacks, to Bin Ladin, to terrorist plans to use aircraft as weapons, and to terrorist activity in the United States.   The Intelligence Community, however, relegated KSM to rendition target status following his 1996 indictment in connection with the Bojinka Plot and, as a result, focused primarily on his location, rather than his activities and place in the al-Qa'ida hierarchy.  The Community also did not recognize the significance of reporting in June 2001 concerning KSM's active role in sending terrorists to the United States, or the facilitation of their activities upon arriving in the United States.   Collection efforts were not targeted on information about KSM that might have helped better understand al-Qa'ida's plans and intentions, and KSM's role in the September 11 attacks was a surprise to the Intelligence Community.**

Discussion:  [According to information obtained by the Intelligence Community from several sources after September 11, 2001, Khalid Shaykh Mohammed (KSM) -- also known as "Mukhtar" (Arabic for "The Brain") -- masterminded the September 11 attacks.  The information indicates that KSM presented a plan to Usama Bin Ladin to mount an attack using small rental aircraft filled with explosives.  Usama Bin Ladin reportedly suggested using even larger planes.  Thus, the idea of hijacking commercial airliners took hold.

TOP SECRET

Thereafter, KSM reportedly instructed and trained the hijackers for their mission, including directing them to undergo pilot training].

KSM came to the attention of the Intelligence Community as a terrorist in early 1995 when he was linked to Ramzi Yousef's "Bojinka Plot" in the Philippines.  One portion of that plot involved the idea of crashing an airplane into CIA Headquarters.  Through additional intelligence and investigative efforts in 1995, KSM was also connected to the first World Trade Center bombing.  He was indicted by a U.S. grand jury in January 1996.  The indictment was kept under seal until 1998 while the FBI and CIA attempted to locate him and arrange to take him into custody.  Subsequently, indications were received that he might have been involved in the East Africa U.S. Embassy bombings.

[In June 2001, [⸺⸺⸺⸺] disseminated a report to all Intelligence Community agencies, [⸺⸺⸺], military commanders, and components in the Treasury and Justice [page 33] Departments emphasizing KSM's ties to Bin Ladin as well as his continuing travel to the United States.  The report explained that KSM appears to be one of Bin Ladin's most trusted lieutenants and was active in recruiting people to travel outside Afghanistan, including to the United States, on behalf of Bin Ladin.  According to the report, he traveled frequently to the United States, including as recently as May 2001, and routinely told others that he could arrange their entry into the United States as well.  Reportedly, these individuals were expected to establish contact with colleagues already there.  The clear implication of his comments, according to the report, was that they would be engaged in planning terrorist-related activities].

Although this particular report was sent from the CIA to the FBI, neither agency apparently recognized the significance of a Bin Ladin lieutenant sending terrorists to the United States and asking them to establish contacts with colleagues already there.  CTC questioned this report at the time and commented:  "We doubt the real [KSM] would do this…because if it is [KSM], we have both a significant threat and an opportunity to pick him up."  Neither the CIA nor the FBI has been able to confirm whether KSM had in fact been traveling to the United States or sending recruits here prior to September 11.

**[Terrorist Communications in September 2001]**

**5.j.  [In the period from September 8 to September 10, 2001 NSA intercepted, but did not translate or disseminate until after September 11, some communications that indicated possible impending terrorist activity].**

<u>Discussion</u>: [In early September 2001, NSA intercepted [——————————] communications involving [————————————————————————]. The communications discussed events that were to occur in the near term and appeared to be related to terrorism.  In the first communication, [————————————————] [—————] asked whether [——————].  [—] responded that [————————————] [——————————].

[Page 34]

[Another communication, between [———] and an unknown person [———], was a discussion of whether [————————————————————].

[————————————————————————————————————

————————————————————————————————————

——————————].  NSA did not disseminate reports regarding the communications until September 12 and 13, 2001].


Two additional communications that indicated imminent terrorist activity were intercepted by NSA on September 10, 2001.  The communications contained conversations between unknown individuals located abroad. NSA Director Hayden described the content of those communications in his testimony before the Joint Inquiry:

> In the hours just prior to the attacks, NSA did obtain two pieces of information suggesting that individuals with terrorist connections believed something significant would happen on September 11.

These communications were, however, not translated into English and disseminated by NSA until September 12, 2001.


It remains uncertain whether any of the September [————————] conversations referred directly to the attacks of September 11. Like the intelligence reporting described earlier, these intercepts did not provide any indication of where or what terrorist activities might occur.

## B.  CONCLUSION – FACTUAL FINDINGS

In short, for a variety of reasons, the Intelligence Community failed to capitalize on both the individual and collective significance of available information that appears relevant to the events of September 11.  As a result, the Community missed opportunities to disrupt the September 11 plot by denying entry to or detaining would-be hijackers; to at least try to unravel the plot through surveillance and other investigative work within the United States; [page 35] and, finally, to generate a heightened state of alert and thus harden the homeland against attack.

No one will ever know what might have happened had more connections been drawn between these disparate pieces of information. We will never definitively know to what extent the Community would have been able and willing to exploit fully all the opportunities that may have emerged. The important point is that the Intelligence Community, for a variety of reasons, did not bring together and fully appreciate a range of information that could have greatly enhanced its chances of uncovering and preventing Usama Bin Ladin's plan to attack the United States on September 11, 2001.

## C.  SYSTEMIC FINDINGS

Our review of the events surrounding September 11 has revealed a number of systemic weaknesses that hindered the Intelligence Community's counterterrorism efforts before September 11.  If not addressed, these weaknesses will continue to undercut U.S. counterterrorist efforts.  In order to minimize the possibility of attacks like September 11 in the future, effective solutions to those problems need to be developed and fully implemented as soon as possible.

**1. Finding:  Prior to September 11, the Intelligence Community was neither well organized nor equipped, and did not adequately adapt, to meet the challenge posed by global terrorists focused on targets within the domestic United States.  Serious gaps existed between the collection coverage provided by U.S. foreign and U.S. domestic intelligence capabilities.  The U.S. foreign intelligence agencies paid inadequate attention to the potential for a domestic attack. The CIA's failure to watchlist suspected terrorists aggressively reflected a lack of emphasis on a process designed to protect the homeland from the terrorist threat.  As a result, CIA**

**employees failed to watchlist al-Mihdhar and al-Hazmi.  At home, the counterterrorism effort suffered from the lack of an effective domestic intelligence capability.  The FBI was unable to identify and monitor effectively the extent of activity by al-Qa'ida and other international terrorist groups operating in the United States.  Taken together, these problems greatly exacerbated the nation's vulnerability to an increasingly dangerous and immediate international terrorist threat inside the United States.**

[Page 36]

Discussion:  The United States has a long history of defining internal threats as either foreign or domestic and assigning responsibility to the intelligence and law enforcement agencies accordingly.  This division reflects a fundamental policy choice and is codified in law.  For example, the National Security Act of 1947 precludes CIA from exercising any internal security or law enforcement powers.   The Congressional investigations of the 1970's into the activities of the intelligence agencies, including their efforts to collect information regarding anti-Vietnam War activists and other "radicals," reinforced the importance of this division in the minds of the Congress, the American public, and the agencies.

The emergence, in the 1990s, of a threat posed by international terrorists who operate across national borders demanded huge changes in focus and approach from intelligence agencies traditionally organized and trained to operate primarily in either the United States or abroad.  The legal authorities, operational policies and cultures that had molded agencies like CIA, NSA and the FBI for years had not responded to the "globalization" of terrorism that culminated in the September 11 attacks in the United States.  While some efforts, such as the creation of the CTC at CIA in 1986, were made to increase collaboration between these agencies, the agencies focused primarily on what remained essentially separate spheres of operations.  In the absence of any collective national strategy, they retained significant autonomy in deciding how to attack and array their resources against Usama Bin Ladin and al-Qa'ida.  Efforts to develop such a strategy might have exposed the significant counterterrorism gaps that existed between the agencies as well as the increasingly urgent need to compensate for those gaps in the absence of more fundamental changes in organization and legal authority.

Prior to September 11, CIA and NSA continued to focus the bulk of their efforts on the foreign operations of terrorists.  While intelligence reporting indicated that al-

Qa'ida intended to strike in the United States, these agencies believed that defending against this threat was primarily the responsibility of the FBI.  This Joint Inquiry found that both agencies routinely passed a large volume of intelligence to the FBI, but that neither agency followed up to determine what the FBI learned from or did with that [page 37] information.  Neither did the FBI keep NSA and CIA adequately informed of developments within its areas of responsibility.

As noted earlier, the record confirms instances where, despite numerous opportunities, information that was directly relevant to the domestic threat was simply overlooked and not disseminated in a timely manner to the FBI.  For example, the CIA analyst who neglected to raise the information concerning al-Mihdhar and al-Hazmi's U.S. travel in a June 2001 meeting with the FBI in New York said in a Joint Inquiry interview that the information he had learned concerning the pair's travel to Los Angeles "did not mean anything to him."  He also explained to the Joint Inquiry that the information was operational in nature and he would have needed permission before disclosing it.

The CIA's inconsistent performance regarding the watchlisting of suspected terrorists prior to September 11 also suggests a lack of attention to the domestic threat. Watchlists are a vital link in denying entry to the United States by terrorists and others who threaten the national security, and CTC had reminded personnel of the importance of watchlisting in December 1999 (see Appendix, "CTC Watchlisting Guidance – December 1999").  Yet, some CIA officers in CTC indicated they did not put much emphasis on watchlists.  The Joint Inquiry confirmed that there was no formal process in place at the CTC prior to September 11 for watchlisting suspected terrorists, even where, as was the case with al-Hazmi and al-Mihdhar, there were indications of travel to the United States.

Other CIA personnel reported that they received no training on watchlisting and that names were added on an ad hoc basis.  In the days and weeks following the September 11 attacks, more focused CIA review of over 1,500 Classified Intelligence Reports that had not previously been provided to the State Department for watchlist purposes resulted in the identification of 150 suspected terrorists and the addition of 58

suspected terrorist names to the watchlist.  DCI Tenet acknowledged in his testimony before the Joint Inquiry that CIA's watchlisting training had been deficient and that a [page 38] mistake had been made in the failure to watchlist both al-Mihdhar and al-Hazmi promptly.

[There were also gaps between NSA's coverage of foreign communications and the FBI's coverage of domestic communications that suggest a lack of sufficient attention to the domestic threat.  Prior to September 11, neither agency focused on the importance of identifying and then ensuring coverage of communications between the United States and suspected terrorist-associated facilities abroad [——————————————————————].  Consistent with its focus on communications abroad, NSA adopted a policy that avoided intercepting the communications between individuals in the United States and foreign countries].

NSA adopted this policy even though the collection of such communications is within its mission and it would have been possible for NSA to obtain FISA Court authorization for such collection.  NSA Director Hayden testified to the Joint Inquiry that NSA did not want to be perceived as targeting individuals in the United States and believed that the FBI was instead responsible for conducting such surveillance.  NSA did not, however, develop a plan with the FBI to collect and to ensure the dissemination of any relevant foreign intelligence to appropriate domestic agencies.  This further evidences the slow response of the Intelligence Community to the developing transnational threat.

[The Joint Inquiry has learned that one of the future hijackers communicated with a known terrorist facility in the Middle East while he was living in the United States.  The Intelligence Community did not identify the domestic origin of those communications prior to September 11, 2001 so that additional FBI investigative efforts could be coordinated.  Despite this country's substantial advantages, there was insufficient focus on what many would have thought was among the most critically important kinds of terrorist-related communications, at least in terms of protecting the Homeland].

[Page 39]

While most of the Intelligence Community focused on the collection of foreign intelligence, the Joint Inquiry was told repeatedly that the nation lacked an effective domestic intelligence capability prior to September 11.  Former National Coordinator for Counterterrorism Richard Clarke saw this as a longstanding problem that became painfully obvious in the aftermath of September 11:

> Well, I hear all of these comments about the Phoenix memo, the Minnesota case, whatever.  I think they miss the point that the failures were years earlier.  It was a failure on the part of the United States to not have a domestic intelligence collection capability.  I understand the reasons for the lack of the ability.  I know the abuses the FBI engaged in [during] the 1950s and 1960s.  I know the reason we have the Attorney General-levied guidelines.  But I think the pendulum swung too far, and when we became aware of the fact that there were forces in the world such as al-Qa'ida, and others, Iran, Hezbollah, that meant us ill, certainly by the 1980s or 1990s we should have recognized the need for a domestic intelligence collection capability.  Other democracies with civil rights and civil liberties have that.  It doesn't mean you become a totalitarian state if you do a good job of oversight and control.  We needed to have a domestic intelligence collection and analysis capability, and we did not have it, and only now are we beginning to get it.
> . . . .
> But my point about the FBI was not just a few hints were missed or dots weren't connected; it is – my point was, they didn't have the mission.  It was not their job to be a domestic collection service.  Their job was to do law enforcement. And they didn't have the rules that permitted them to do domestic intelligence collection.

While the FBI's counterterrorist program had produced successful investigations and major prosecutions of both domestic and international terrorists, numerous witnesses told the Joint Inquiry that the program was, at least prior to September 11, incapable of producing significant intelligence products.  The FBI's traditional reliance on an aggressive, case-oriented, law enforcement approach did not encourage the broader collection and analysis efforts that are critical to the intelligence mission.  Lacking appropriate personnel, training, and information systems, the FBI primarily gathered intelligence to support specific investigations, not to conduct all-source analysis for dissemination to other intelligence agencies.  Former National Security Advisor Sandy Berger testified about the FBI's failure, prior to September 11, to assess the extent of the foreign terrorist threat to the United States adequately: [page 40]

> Until the very end of our term in office, the view we received from the Bureau was that al-Qa'ida had limited capacity to operate in the United

States and that any presence here was under surveillance.  That was not implausible at the time.  With the exception of the World Trade Center bombings in 1993, not attributed before 9/11 to Bin Ladin, plots by foreign terrorists within the United States have been detected and stopped. But revelations since September 11 have made it clear that the Bureau underestimated the domestic threat.  The stream of threat information we received continuously from the FBI and CIA pointed overwhelmingly to attacks on U.S. interests abroad.  Certainly, the potential for attacks in the United States was there.

Former National Security Advisor Brent Scowcroft told the Joint Inquiry hearing on September 19, 2002, that:

> . . . .I was thinking back [on] intelligence information from the FBI, and I was trying to think of cases where we actually got it.  Not very much, because we are or I was focused on foreign intelligence primarily.  There was some counterintelligence issues where the FBI intelligence was particularly involved, and the one case I mentioned. Pan Am 103, but that was investigative intelligence and the FBI and the CIA did an absolutely brilliant job on that. But I can't think of many--can't recall of any instances of pure intelligence product from the FBI. And I don't say that pejoratively at all.

Former National Coordinator for Counterterrorism Richard Clarke voiced similar concerns about the extent of the FBI's understanding of the domestic threat:

> Let me give you the FBI case, because I think it is the most clear. Following the Millennium alert . . . and . . . review, it became very clear to . . . the [FBI] Assistant Director for Counterterrorism, there was the potential for sleeper cells in the United States, people . . . the United States that had been involved in the planned attacks.
> . . . .
> This was in 2000.  The Assistant Director . . . then began a program to try to get more control of the 56 FBI field offices, and I visited five or six of the field offices and asked them what they were doing about al-Qa'ida.  I got sort of blank looks of "what is al-Qa'ida?"

He compared the effort to add priority to al-Qa'ida investigations in the FBI field offices to "trying to . . . sort of turn this big Queen Mary luxury liner, trying to turn it."

[Page 41]

Numerous individuals told this Inquiry that the FBI's 56 field offices enjoy a great deal of latitude in managing their work, consistent with the dynamic and reactive nature of its traditional law enforcement mission.  In counterterrorism efforts, however, that flexibility apparently served to dilute the FBI's national focus on Bin Ladin and al-

Qa'ida.  Although the FBI made counterterrorism a "Tier One" priority, not all of its field offices responded consistently to this FBI Headquarters decision.  The New York Field Office did make terrorism a high priority and was given substantial responsibility for the al-Qa'ida target following the first attack on the World Trade Center in 1993.  However, many other FBI offices were not focused on al-Qa'ida and had little understanding of the extent of the threat it posed within this country prior to September 11.

The combination of these factors seriously handicapped efforts to identify and defend against the foreign terrorist threat to the domestic United States.  It is not surprising, in the absence of more focused intelligence, that senior policymakers told this Inquiry that, prior to September 11, they believed the terrorist threat was focused on U.S. interests overseas.  Deputy Secretary of State Armitage, for example, testified that ". . . I don't think we really had made the leap in our mind that we are no longer safe behind these two great oceans. . . ."  Former Deputy Secretary of Defense John Hamre said in a Joint Inquiry interview that he could not remember ever seeing an intelligence report on the existence of terrorist sleeper cells in the United States.  In retrospect, he recalled: ". . . we thought we were dealing in important things, but we missed the domestic threat from international terrorism."

**2. Finding: Prior to September 11, 2001, neither the U.S. Government as a whole nor the Intelligence Community had a comprehensive counterterrorist strategy for combating the threat posed by Usama Bin Ladin.  Furthermore, the Director of Central Intelligence (DCI) was either unwilling or unable to marshal the full range of Intelligence Community resources necessary to combat the growing threat to the United States.**

Discussion:  The Intelligence Community is a large distributed organism.  It encompasses 14 agencies and tens of thousands of employees.  The number of people [page 42] employed exclusively in the effort against Usama Bin Ladin and al-Qa'ida was relatively small.  In addition, these people were operating in geographically dispersed locations, often not connected by secure information technologies, and within established bureaucracies that were not culturally or organizationally attuned to one another's requirements.  Many of them had limited experience against the target, and did not know one another.  To achieve success in such an environment, leadership is a critical factor.  The Joint Inquiry found that the Intelligence Community's structure made leadership difficult.

Usama Bin Ladin first came to the attention of the Intelligence Community in the early 1990s, initially as a financier of terrorist activities. In 1996, as Bin Ladin's direct involvement in planning and directing terrorist acts became more evident, the DCI's Counterterrorist Center (CTC) created a special unit to focus specifically on him and the threat he posed to the interests of the United States. Personnel within CTC recognized as early as 1996 and 1997 that Usama Bin Ladin posed a grave danger to the United States.

Following the August 1998 bombings of two U.S. embassies in East Africa, the DCI made combating the threat posed by Usama Bin Ladin one of the Intelligence Community's highest priorities, establishing it as a "Tier 0 priority." The DCI raised the status of the Bin Ladin threat still further when he announced in writing in December 1998 regarding Bin Ladin: "We are at war…I want no resources or people spared in this effort, either inside the CIA or the [Intelligence] Community." This declaration appeared in a memorandum from the DCI to CIA senior managers, the Deputy DCI for Community Management and the Assistant DCI for Military Support.

The Intelligence Community as a whole, however, had only a limited awareness of this declaration. For example, some senior managers in the National Security Agency and the Defense Intelligence Agency say they were aware of the declaration. However, it was apparently not well known within the Federal Bureau of Investigation. In fact, the Assistant Director of the FBI's Counterterrorism Division testified to the Joint Inquiry that he "was not specifically aware of that declaration of war."

[Page 43]

Furthermore, and even more disturbing, Joint Inquiry interviews of FBI field office personnel indicated that they were not aware of the DCI's declaration, and some had only a passing familiarity with the very existence of Usama Bin Ladin and al-Qa'ida prior to September 11. Neither were the Deputy Secretary of Defense or the Chairman of the Joint Chiefs of Staff aware of the DCI's declaration. This suggests a fragmented Intelligence Community that was operating without a comprehensive strategy for combating the threat posed by Bin Ladin, and a DCI without the ability to enforce consistent priorities at all levels throughout the Community.

The Director of NSA at the time of the DCI's 1998 declaration was Lieutenant General Kenneth Minihan.  He acknowledged in a Joint Inquiry interview that he was aware of that declaration, but believed that the DCI was speaking for CIA only.  In his experience, he said, the DCI generally left Intelligence Community matters to the head of the Community Management Staff.

The record of this Joint Inquiry indicates that the DCI *did not* marshal resources effectively even within CIA against the threat posed by al-Qa'ida.  Despite the DCI's declaration to CIA officials that the Agency was at war with Bin Ladin, there is substantial evidence that the DCI's Counterterrorist Center needed additional personnel prior to September 11, and that the lack of resources had a substantial impact on its ability to detect and monitor al-Qa'ida's activities.  For example:

- In a September 12, 2002 Joint Inquiry hearing, the former Chief of CTC testified that he did not have enough people to counter the threat posed by Bin Ladin's network:  "The three concepts I would like to leave you with are people, the finances, and operational approvals or political authorities.  We didn't have enough of any of these before 9/11."

- In the same hearing, a senior CTC manager said, "Did we have enough personnel resources?  No.  We always needed more."

[Page 44]

- In the same hearing, a former Chief of the CTC unit dedicated to focusing on Bin Ladin explained: "We never had enough officers from the Directorate of Operations.  The officers we had were greatly overworked….We also received marginal analytic support from the Directorate of Intelligence…."

- In a September 20, 2002 Joint Inquiry hearing, a CIA officer commented on the reasons for the CIA's failure to follow-up regarding the two September 11 hijackers who came to the attention of the Intelligence Community in January 2000:

  How could these misses have occurred?…  The CIA operators focused on the Malaysia meeting while it occurred; when it was over, they focused on

other, more urgent operations against threats real or assessed.  Of the many people involved, no one detected that the data generated by this operation crossed a reporting threshold, or, if they did, they assumed that the reporting requirement had been met elsewhere…. They are the kinds of misses that happen when people – even very competent, dedicated people such as the CIA officers and FBI agents and analysts involved in all aspects of this story – are simply overwhelmed.

- When asked why there was no marshaling of personnel to CTC to fight Bin Ladin's network, the former Chief of CTC recalled that the CIA's Deputy Director of Operations said there were not enough personnel to go around and CTC was already well-endowed with people as compared to other divisions in CIA.

Almost immediately after September 11, 2001, there was a substantial infusion of personnel into the CTC.  No comparable shift of resources occurred in December 1998 after the DCI's declaration of war, in December 1999 during the Millennium crisis, or after the attack on *USS Cole* in October 2000.

In his testimony before the Joint Inquiry on October 17, 2002, the DCI said, "In hindsight, I wish I had said, 'Let's take the whole enterprise down,' and put 500 more people there sooner."  It is noteworthy that the DCI's comments were limited to the CIA [page 45] and did not encompass marshaling the resources of other agencies within the Intelligence Community.

Despite the DCI's December 1998 declaration of war, other priorities continued to detract from the Intelligence Community's effort against Bin Ladin.  The Joint Inquiry heard repeatedly about intelligence priorities that competed contemporaneously with Bin Ladin for personnel and funds.  These included a range of regional and global issues. The NSA Director described the pre-September 11 situation at NSA:

We, like everyone else at the table, were stretched thin in September.  The war against terrorism was our number one priority.  We had about five number one priorities.  And we had to balance what we were doing against all of them. . . . .

[Further, the NSA Director testified that he knew what NSA had to do to improve its capabilities against the modern means of communications used by Bin Ladin and other

targets prior to September 11, but was unable to obtain Intelligence Community support and resources for that effort:

> Given all the other intelligence priorities, it would have been difficult at that time within the [Intelligence Community] or the Department of Defense to accept the kind of resource decisions that would have been necessary to make our effort against the target more robust.  NSA was focused heavily on [a range of regional and global issues].  Our resources, both human and financial, were in decline.  Our efforts in 2000 to churn money internally were not accepted by the Community; its reliance on [signals intelligence] had made it reluctant to give it up].

The inability to realign Intelligence Community resources to combat the threat posed by Usama Bin Ladin is a relatively direct consequence of the limited authority of the DCI over major portions of the Intelligence Community.  As former Senator Warren Rudman noted on October 8, 2002 in his testimony before the Joint Inquiry: "You have a Director of Central Intelligence who is also the Director of CIA; eighty-five percent of [the Intelligence Community's budget] is controlled by the Department of Defense."
[Page 46]

While the DCI has statutory responsibility that spans the Intelligence Community, his actual authorities are limited to the budgets and personnel over which he exercises direct control, i.e., the CIA, the Office of the DCI, and the Community Management Staff.  As former Congressman and House Intelligence Committee Chairman Lee Hamilton stated in his testimony to the Joint Inquiry on October 3, 2002:

> Currently, the Director of Central Intelligence, the leading intelligence figure, as we all know, does not control but a small portion of his budget.  The DCI has, as I understand it, enhanced authority after 1997, and that permits him to consolidate the national intelligence budget, to make some trade-offs, but given the overwhelming weight of the Defense Department in the process, that is of limited value.
> . . . .
> The very phrase "Intelligence Community" is intriguing.  It demonstrates how decentralized and fragmented our intelligence capabilities are. . . .  The Intelligence Community is a very loose confederation. . . .
> . . . .
> [T]he thing that puzzles me here is why we reject for the Intelligence Community the model of organization that we follow in every other enterprise in this country.  We have someone at the head who has responsibility and accountability.  We accept that.  But for some reason we reject it when it comes to the Intelligence Community.

Further evidence of the absence of authoritative leadership and a comprehensive counterterrorist strategy can be found in what the DCI referred to in his Joint Inquiry testimony on October 17, 2002 as "The Plan." In his testimony, the DCI said:

> In spring of 1999, we produced a new comprehensive operational plan of attack against [Usama Bin Ladin] and al Qaeda inside and outside of Afghanistan. The strategy was previewed to senior CIA management by the end of July of 1999. By mid-September it had been briefed to the CIA operational level personnel, to NSA, to the FBI and other partners. The CIA began to put in place the elements of this operational strategy which structured the agency's counterterrorism activity until September 11 of 2001.

[According to documents reviewed by the Joint Inquiry, "The Plan" of 1999 consisted primarily of a variety of CIA covert action efforts directed against Usama Bin Ladin. Later, "The Plan" also included [———————————————————————— ————————————————————————————————]. Thus, "The Plan" was focused principally on CIA, Afghanistan, covert action, and technical collection aimed at Usama Bin Ladin].

From a broader perspective, "The Plan" was significant for what it did not include:

- An Intelligence Community-wide estimate of the threat posed by Usama Bin Ladin's network to the United States and to U.S. interests overseas;
- Significant participation by other elements of the Intelligence Community;
- A delineation of the resources required to execute "The Plan;"
- Any decisions to downgrade other Intelligence Community priorities to accommodate the priority of "The Plan;"
- Any attention to the threat to and vulnerabilities of the U.S. homeland; and
- Any FBI involvement.

The absence of involvement by agencies other than CIA in "The Plan" is particularly troubling, given gaps that existed in the efforts by other agencies to address Bin Ladin. While the CIA was putting significant effort and attention into Usama Bin Ladin, covert action, and Afghanistan, the FBI, for example, was focused on other issues. Although FBI leadership recognized after the Embassy bombings in August 1998 that al-

Qa'ida posed an increasing threat to United States interests, investigations in the United States of those who raised funds for other terrorist groups continued to consume considerable field resources and attention prior to September 11.

While the FBI devoted considerable resources to the criminal investigations of the terrorist attacks overseas, substantial efforts to prevent similar attacks at home were lacking.  Former National Security Advisor Sandy Berger told the Joint Inquiry: ". . . if there was a flood of intelligence information [on terrorism] from the CIA, there was hardly a trickle from the FBI."  In some FBI field offices, there was little focus on, or awareness of, Usama Bin Ladin and al-Qa'ida.  This included the San Diego field office where FBI agents would discover, after September 11, that there had been numerous local connections to at least two of the hijackers.

[Page 48]

The Executive Assistant Director of the FBI's Counterterrorism Division testified to the Joint Inquiry that the FBI had no war plan against Bin Ladin: "Did we have a war plan, a five-paragraph ops order issued on Usama Bin Ladin and al-Qa'ida?  Absolutely, we did not at that time."   When asked how the FBI's counterterrorism program fit into the overall Intelligence Community counterterrorism program, the same Assistant Director replied:  "I am not sure if I know the answer to that. I talked to [the DCI] briefly about this. I have talked to [the CTC Chief] prior to -- the answer to your question is, I don't know the answer."  Without a comprehensive strategy in place for the whole Intelligence Community, there was no assurance that agencies like the FBI were focused on the DCI's "war" effort.

Consistent with the absence of any comprehensive strategy, a recent Department of Justice Inspector General (IG) report found that: "The FBI has never performed a comprehensive written assessment of the risk of the terrorist threat facing the United States." As the IG report explained: "Such an assessment would be useful not only to define the nature, likelihood, and severity of the threat but also to identify intelligence gaps that need to be addressed.  Moreover, we believe that comprehensive threat and risk assessments would be useful in determining where to allocate attention and resources...on programs and initiatives to combat terrorism."  This kind of assessment still had not been completed as recently as Director Mueller's testimony on October 17, 2002.  Nor did the DCI's National Intelligence

Council ever produce a National Intelligence Estimate (NIE) regarding the threat to the United States posed by al-Qa'ida or Usama Bin Ladin.

Without the support of a comprehensive strategy or credible domestic threat assessment, DCI resource requests were often unsuccessful.  In response to questions about his own efforts to obtain additional counterterrorism resources, the DCI described to the Joint Inquiry hearing on June 18, 2002 his inability, prior to September 11, to generate necessary support within the Executive Branch:

> [I would ask e]very year in [the] budget submission. [Page 49]
> . . . .
> I'm not talking about the Committee.  I'm talking about the front end at OMB and the hurdle you have to get through to fully fund what we thought we needed to do the job. Senator Kyl once asked me a question in Senator Shelby's Committee and said, how much money are you short. I'm short $900 million to $1 billion every year for the next five years, is what I answered. And we told that to everybody downtown for as long as anybody would listen and never got to first base.  So you get what you pay for in terms of our ability to be as big and robust as people - and when I became Director, we had [————] case officers around the world. Now we're up to about [————] and the President's given us the ability to grow that by another [————]. And everybody wonders why you can't do all the things people say you need to do. Well, if you don't pay at the front end, it ain't going to be there at the back end.  Having said that, I think we made an enormous amount of progress against this target. That would be my view].

**3. Finding:  Between the end of the Cold War and September 11, 2001, overall Intelligence Community funding fell or remained even in constant dollars, while funding for the Community's counterterrorism efforts increased considerably. Despite those increases, the accumulation of intelligence priorities, a burdensome requirements process, the overall decline in Intelligence Community funding, and reliance on supplemental appropriations made it difficult to allocate Community resources effectively against an evolving terrorist threat.  Inefficiencies in the resource and requirements process were compounded by problems in Intelligence Community budgeting practices and procedures.**

Discussion:  [Throughout the Joint Inquiry, numerous officials at CIA, NSA and the FBI testified that the greatest constraint in their effort against al-Qa'ida  was the availability of too few resources, compounded by too many requirements and priorities. Regional and global issues were identified as some of the other important issues that competed with counterterrorism and made heavy resource demands].

These other policy priorities demanded the support of the Intelligence Community and made it difficult to transfer people or funds to counterterrorism.  DCI Tenet testified that:

> As I 'declared war' against al-Qa'ida in 1998 – in the aftermath of the East Africa embassy bombings – we were in our fifth year of round-the-clock support to Operation Southern Watch in Iraq.  Just three months earlier, we were embroiled in answering questions on the India and Pakistan nuclear tests and trying to determine how we could surge more people to understanding and countering [page 50] weapons of mass destruction proliferation.  In early 1999, we surged more than 800 analysts and redirected collection assets from across the Intelligence Community to support the NATO bombing campaign against the Federal Republic of Yugoslavia.

[Similarly, NSA Director Hayden testified that NSA was focused heavily on several other high priority intelligence targets.  An FBI budget official told the Joint Inquiry that counterterrorism was not a priority for Attorney General Ashcroft before September 11, and the FBI faced pressure to make cuts in counterterrorism to satisfy his other priorities].

The Joint Inquiry's review of available budget and resource data confirmed that, overall, the Intelligence Community budget peaked in fiscal year 1992 and thereafter fell or remained even in constant dollars.  The FBI is an exception to the overall resource picture.  Its overall funding increased for much of the 1990s, though most of this went to the Bureau's non-intelligence programs.

[In all, however, Intelligence Community capabilities declined over time.  At the CIA, for example, the Directorate of Operations cut the number of its personnel deployed overseas by almost [————] and closed down a portion of facilities in one part of the world – where much information relating to terrorism could likely have been available.  In addition, the necessary support "tail" for counterterrorism, such as communications and training, suffered from the decline in resources].

Specific funding for counterterrorism was, however, at least one exception to the overall budget decline.  Within existing budgets, counterterrorism spending generally

increased while funding for other issues generally fell or remained steady.  The counterterrorism component of the overall Intelligence Community budget, for example, at least doubled at most agencies.  Former National Security Advisor Sandy Berger emphasized the added funding that was provided for counterterrorism: [page 51]

> . . . the Clinton Administration more than doubled the federal government's counterterrorism spending from $5 billion in FY [Fiscal Year] 1996 to over $11 billion in FY 2000) at a time of strong bipartisan effort to achieve balanced budgets that resulted in highly constrained spending for most programs. . . [T]he FBI's counterterrorism staff budget increased by 250% and their counterterrorism budget increased by nearly 350%.  Similar increases were made in the CIA counterterrorism budget.

In general, personnel allocated to counterterrorism also increased.  Although specifics are imprecise, this Inquiry's review and estimates provided by various agencies indicate that the number of personnel working on terrorism steadily increased despite overall decreases in Intelligence Community staffing.  Nevertheless, the number of counterterrorism personnel prior to September 11 generally remained small and paled by comparison with post-September 11 levels.

During the course of the Joint Inquiry, Intelligence Community officials identified a number of factors that limited their ability to allocate greater resources for counterterrorism, despite the funding increases that occurred in that area.  These included, in addition to the overall general decline in funding for intelligence, outdated and unrealistic intelligence priorities, and an overburdened requirements process.

The Intelligence Community's current strategic-level guidance for national security priorities was established by Presidential Decision Directive (PDD)-35 in 1995.  Former National Security Advisor Anthony Lake described PDD-35 as follows:  "It formally established our top intelligence priorities and placed terrorism among them, led only by intelligence support for our troops in the field and a small number of states that posed an immediate or potential serious threat to the United States."  In an effort to rank the myriad post-Cold War threats facing the United States, PDD-35 established a tier system of priorities.  The tiers were broad and concentrated at the upper levels of the scale.  For example, there were both Tier 1A and Tier 1B priorities, but the highest priority was assigned to Tier Zero.

[Page 52]

However, as several Intelligence Community officers told the Joint Inquiry, in practice, the lack of adequate separation between the tiers made it very difficult to choose between priorities, and the intelligence prioritization process was often confusing. Former National Counterterrorism Coordinator Richard Clarke noted that the White House "…never really gave good systematic, timely guidance to the Intelligence Community about what priorities were at the national level."  Deputy National Security Advisor Steven Hadley responded to Joint Inquiry questions by stating that Bush Administration officials were told by Clinton Administration officials during the transition that "this priority-setting process [PDD-35] … was not effective for communicating changing priorities over time."   Joint Inquiry interviews with Intelligence Community officials indicate that many felt that the prioritization process was so broad as to be meaningless.

Moreover, PDD-35 was never effectively adapted before September 11 to meet the changing nature of the threat, despite specific language in the document that required an annual review.  As certain threats, including terrorism, increased in the late 1990s, none of the "lower level" Tier 1 priorities were downgraded so that resources --money and people-- could be reallocated.  For much of the Intelligence Community, everything became a priority since its customers in the U.S. Government wanted to know everything about everything all the time.

The growing inadequacy of the PDD-35 structure fueled an overburdened and increasingly ineffective requirements system within the Intelligence Community.  At NSA, for example, an official described the PDD-35 requirements system as "cumbersome."   NSA analysts acknowledged that they had far too many broad requirements -- some 1500 formal requirements by September 11 -- that covered virtually every situation and target.  Working from these 1500 formal requirements, NSA had developed almost 200,000 "Essential Elements of Information" that were desired by its customers.  While they understood the gross priorities and worked on the requirements that were practicable on any given day, several NSA analysts acknowledged that the [page 53] priority demands sometimes precluded them from delving as deeply into certain areas as they would have liked.

As counterterrorism became an increasingly important concern for senior Intelligence Community officials, collection and analytic efforts did not always keep pace because other requirements competed with terrorism for attention, and real priorities often were not clear.  In Joint Inquiry interviews, CIA officials said that, because overall resources were finite, any increased focus on counterterrorism meant that other issues would have to receive less attention.  At the FBI, where overall funding had increased, officials said that substantial efforts focused on investigating terrorist cases overseas, critical infrastructure protection programs, and other priorities not directly related to strategic intelligence or al-Qa'ida activity within the United States.

[The Director of NSA testified that prior to September 11, other priorities frustrated his attempts to acquire capabilities to process modern communications used by terrorists and other intelligence targets:

> It required a significant redirection of investment for us to acquire the capabilities to exploit modern communications.  I mentioned . . .trying to churn . . .within what was then a fixed top line about $200 million . . . .  And we could only get about a third of it to stick because the people who were using the products we created out of traditional means were unable to give up those product lines to allow us to reinvest those dollars for the new age signals environment . . . . I was unable to move some money because we were going to erode our coverage of [another intelligence target] as part of this effort.]

Even within the CTC, the staff and resources dedicated to counterterrorism could not keep pace with the amount and scope of incoming intelligence reporting.  The DCI attributed CIA inaction on a cable pointing to al-Hazmi's travel to the United States to the fact that overworked CTC personnel did not have time to read "information only" cables from the field:

> The cable that came in from the field at the time, sir, was labeled "information only," and I know that nobody read that cable. . . . Sir, we weren't aware of it [page 54] when it came into headquarters.  We couldn't have notified the [FBI].  Nobody read that cable in the March time frame. . . . It was an information-only cable from the field and nobody read that information-only cable.  [In hindsight, of] course it should have been.

Another CIA official indicated, post-September 11: "The second thing that was clear, as I showed [CTC personnel] the cable from March 5, [2000] -- just the look on their face told me everything I needed to know. They just hadn't seen it. It passed them by." The former CTC Chief added:

> We have asked everyone have you seen this and what action was taken. It did not attract appropriate attention so that they could have been watchlisted. I think that the Director has already mentioned that that was not done at the time. I think that it was reasonable by certainly March 5 that we would have been in the position, we should have been in a position to firmly watchlist this. I just have to underscore that we do this hundreds of times a month. It should have been done. It was not. We have very good people working this issue. It was not done, and it was not done because of the press of lots of other work. We probably should have picked up on this in early March, but we'd gone by for two months. The delay in that, sir, was the [     ], took about six weeks to get that information to us, and in March we should have picked up on it. All things being equal, they should have been watchlisted; I think that month we watchlisted about 150 people. It should have been done. It wasn't. It was a fact of life. And I think what contributed to that was these same officers watching this operation were also doing a lot of other things. So it's like balls in the air. There gets to be a point where you don't treat each one with the attention that it deserves.

There was also a March 6, 2001 cable from the field that called attention to the portion of the March 5 cable regarding al-Hazmi's travel to the United States, but CTC personnel also did not read that cable at the time.

Senior NSA and CIA officials have acknowledged that, in hindsight, they would have devoted many more personnel resources to the al-Qa'ida target and expedited the development of certain collection capabilities. However, they testified that the operating environment prior to September 11 – a combination of escalating requirements and limited resources – limited their ability to respond to the growing terrorist threat.

[Page 55]

Those problems were aggravated by shortcomings that existed in the Intelligence Community's budgeting practices. The President annually submits to Congress an Intelligence Community budget for the coming fiscal year. Included in that request are both ongoing and new programs that are subject to long established, well understood oversight and accountability procedures. Supplemental appropriations usually are granted in reaction to unforeseen events that are not part of the President's budget

request.  Since it is temporary by nature, supplemental funding is not meant to pay for additional personnel or for structural upgrades in future years.

The Intelligence Community received large supplemental appropriations from 1998 to 2001 to fight terrorism.  These additional funds were provided by Congress following several major al-Qa'ida attacks and to support the effort during the Millennium celebrations.  In particular, most of CIA's and some of NSA's efforts against al-Qa'ida in the late 1990's were funded from supplemental appropriations.

In Joint Inquiry interviews, Intelligence Community officials were critical of this reliance on supplementals for counterterrorism programs.  A former CTC Chief, for example, told the Joint Inquiry that reliance on supplementals made it hard to create a stable counterterrorism program.  He noted that it is far more difficult to develop plans for hiring and training personnel and to pursue long-term technical programs that require years to develop without a stable year-to-year funding basis.

Despite such limitations, the Intelligence Community agencies sought additional supplemental appropriations to sustain its counterterrorism effort rather than alter the President's budget request to provide annual counterterrorism funding.  This is because altering the annual budget request would have required the Intelligence Community agencies to make substantial reductions in other programs, a course they were reluctant to follow because of the many other intelligence priorities for which they were responsible.

Certain other Intelligence Community budgeting practices and procedures further impeded efforts to ensure an effective allocation of resources to counterterrorism.  A lack [page 56] of transparency in agency budgets made it very difficult to determine whether the counterterrorism mission was properly funded because counterterrorism is not an explicit Intelligence Community budget category.  Instead, each Intelligence Community agency budget consists of a compilation of funding levels desired for specific capabilities, such as the cost of a particular number of intelligence officers or satellites. Many of these capabilities are useful for more than one mission.  For example, a CIA operations officer may collect intelligence on the internal politics of a country, a weapons shipment, and terrorism.  The CIA considered having its personnel record the time they

expend on various missions, as do FBI field officers, but this was rejected due to the perceived administrative burden it would impose.

This makes it very difficult to measure the amount of resources that the Intelligence Community allocates to a particular mission such as counterterrorism.  As a result of this ambiguity, the Intelligence Community often does not know how much it spends on different issues and, therefore, is unable to compare the funding levels it is devoting to one mission versus another.  For example, the CIA had great difficulty determining for this Inquiry precisely how many of its personnel worked on al-Qa'ida in recent years.

Moreover, different components of the Intelligence Community use different measures when they do try to determine how much they spend on missions such as counterterrorism.  To further complicate matters, there is no agreed-upon way to measure the level of indirect costs, such as communications, that is devoted to counterterrorism versus other mission areas.  Congressional overseers as well as senior Intelligence Community managers thus find it difficult to judge whether agency resource allocations reflect overall intelligence priorities.

In Fiscal Year 1999, the Office of Management and Budget began to require that the Intelligence Community identify counterterrorism spending in each agency. However, this information is gathered after money is spent, rather than as a planning and accountability tool for Intelligence Community managers.  In addition, the information is [page 57] collected manually, is not subject to systematic controls and does not constitute much more than an educated estimate.

Finally, the Joint Inquiry confirmed through interviews that several other budget-related problems hindered Intelligence Community efforts to satisfy counterterrorism priorities and requirements:

- The DCI's Community Management Staff has little authority to ensure compliance with the DCI's priorities.  It cannot withhold funding from the Intelligence Community agencies if they do not comply with those priorities;

- Managers within the CIA often found the budget planning and execution process confusing, making it harder for them to articulate their needs; and

- Intelligence Community officials complained that reprogramming money is difficult due to a slow Congressional approval process for even small changes.

**4. Finding:  While technology remains one of this nation's greatest advantages, it has not been fully and most effectively applied in support of U.S. counterterrorism efforts.  Persistent problems in this area included a lack of collaboration between Intelligence Community agencies, a reluctance to develop and implement new technical capabilities aggressively, the FBI's reliance on outdated and insufficient technical systems, and the absence of a central counterterrorism database.**

<u>Discussion:</u>  The Joint Inquiry confirmed that the Intelligence Community had not yet fully incorporated the benefits of technology in the war against terrorism.  Lack of agency collaboration in the areas of technical collection and systems development was one contributing factor.   While CIA and NSA have had many successful joint counterterrorism technical operations, the Inquiry was told that overlapping targets and greater use of similar technologies caused friction between the two agencies in some instances.  Disputes emerged regarding which agency should be in charge of developing and using such technologies against which targets.  The Director of NSA explained to the Joint Inquiry that "the old divisions of labor are impractical – the new electronic universe [page 58] requires more and more cooperation."  He added that he "would not be surprised if someday the closeness of this relationship would require organizational changes."

In Joint Inquiry interviews, agency personnel stated that, while individual relationships and cooperation between CIA and NSA at the working level had often been very good, relationships at the mid- and upper-management levels of those agencies were often strained.  CIA perceived NSA as wanting to control technology use and development, while NSA was concerned that CIA was engaged in operations that were NSA's responsibility.

As a result, significant agency resources were devoted to documenting authorities and responsibilities.  For example, no less than seven executive-level memoranda (including one from the President) have been necessary to reach agreement and define the responsibilities and authorities of CIA and NSA in one counterterrorism effort.  The agencies also established a Senior Partnership Advisory Group to continue to deal with these issues and CIA assigned several officers to NSA to enhance technology development.

Prior to September 11, the Director of NSA publicly acknowledged the challenge posed by Usama Bin Ladin's access to the modern communications technology developed by a three trillion dollar industry.  Despite this recognition, NSA failed to focus its efforts against al-Qa'ida's use of certain forms of this technology, [————————————]. NSA also had not adapted technology fully to the challenge of transnational threats such as terrorism.  These present much different challenges than those posed by state actors, such as the former Soviet Union, that were NSA's primary targets in the 1980's.  As a result, prior to September 11, NSA provided little counterterrorism intelligence from certain important technical sources.  More critically, NSA has not been able to describe to the Joint Inquiry its plans to address this technical problem on a larger scale.

[Page 59]

Similarly, NSA could not demonstrate its current analytic tools to the Joint Inquiry and could not identify upgrades that will assist NSA analysts in identifying critical intelligence amidst the large volumes of information it collects.  In the absence of such tools, NSA language analysts must still conduct the bulk of their work with pencil and paper.  Many develop their own personal "databases" on index cards that cannot be made readily available to counterterrorism analysts at other agencies.  NSA's highly publicized TRAILBLAZER program was often cited by NSA officials as the solution to many of these problems, but the implementation of those solutions is three to five years away and confusion still exists at NSA as to what will actually be provided by that program.

The FBI's Deputy Assistant Director for Counterterrorism Analysis testified to the Joint Inquiry that "one of the FBI's major deficiencies was that the FBI confronted a

variety of problems in sharing information, not only with other agencies but within the Bureau itself. This was and is largely attributable to inadequate information technology." Likewise, Director Mueller acknowledged to the Joint Inquiry that "[o]ver the years, [the FBI] failed to develop a sufficient capacity to collect, store, search, retrieve, analyze, and share information."

In their testimony, FBI field agents from Phoenix, Minneapolis and New York all cited the FBI's technology problems as among the top three things they would like to see addressed in terms of the counterterrorism effort. As a New York agent explained:

> The technology, number one. The FBI is a member of the Intelligence Community. We have to be able to communicate with them. We have to be able to have databases that can be integrated with them, and right now we do not. It is a major problem. It is a major problem for our analysis.

The FBI deployed its Automated Case System (ACS) in 1995 to replace a system of written reports and indices. The ACS was supposed to enable agents to send leads to other FBI offices and units and to have access to a vast array of data electronically. [Page 60] However, study after study has concluded that ACS is limited in its search capacity, difficult to use, and unreliable.

The Chief of the FBI's Radical Fundamentalist Unit (RFU) testified that ACS remains unfriendly, unreliable and unworkable, and that, instead of using ACS to manage cases, many agents rely on e-mail and paper copies to transmit important data. In interviews, some FBI personnel conceded that "routine" leads, on which there were no automated communications, might have "fallen through the cracks." Despite the priority given to the war against terrorism since September 11, the Joint Inquiry heard testimony that, at least as of the end of September 26, 2002, there were still 68,000 outstanding, unassigned leads directed to the Counterterrorism Division, dating back to 1995. Because many FBI personnel did not use ACS to track outstanding leads, the FBI has been unable to determine how many of these leads have been completed. As the RFU Chief explained:

> I think we need to make it very clear, though, because there is [sic] 68,000 leads outstanding on that point, that does not mean that those leads were not handled.... [E]ven though the lead is shown in the computer as not covered by the Counterterrorism Division, it is covered by the operational

> unit.  So there is a lot of duplication. . . .[T]he system is very cumbersome, and people unfortunately have just become very frustrated with it, to the point where . . . [w]hat will frequently happen, for example, is even though a field division sends a lead to headquarters and ACS, they are also e-mailing that communication to the particular FBI headquarters [supervisory special agent].  So they are getting it and working on it via the e-mail but not necessarily within the ACS system. . . . Even though a couple of years ago . . . there was a directive that went out to the field telling them to stop sending hard copies to headquarters because they should be retrieved electronically, it was well known, both in the field and at headquarters, that you wouldn't get the communication or there was a good chance that you weren't going to get it.  As such, the field would routinely still send hard copy.

ACS requires that FBI analysts search for information relevant to their analytical responsibilities.  This is in stark contrast to the CIA's automated system, which automatically routes communications to analysts that are relevant to their interests.  Before September 11, 2001, many FBI field agents did not include sensitive information in ACS because they believed the system was not secure.  In addition, many agents who did include information in ACS blocked access to it in order to limit the number of FBI [page 61] personnel who could obtain the information.  Given these limitations, ACS does not provide assured retrieval of complete, authoritative information on any subject.  The fact that many FBI personnel do not understand how to make maximum use of the limited capabilities of ACS and the FBI's other databases compounds the problem.

Because of its limitations, many agents simply did not use ACS as a research or case management tool.  When the Phoenix FBI field office agent was drafting his July 2001 Electronic Communication, he had no easy or reliable way of querying a central FBI system to determine whether there were other reports on radical fundamentalists taking flight training or whether other FBI field offices were investigating similar cases.  As a result, the agent did not know that another FBI field office had voiced concern about Middle Eastern men taking flight lessons in 1998 or that an operational unit in the Counterterrorism Section at FBI Headquarters had directed twenty-four field offices (including Phoenix) to pay close attention to certain Islamic students engaged in aviation training in 1999.

TOP SECRET

In addition, because of the limitations of ACS, a number of addressees on the Phoenix communication, including the Chief of the FBI Headquarters Radical Fundamentalist Unit, were not aware of the communication before September 11. Further, even though that Unit handled both the Phoenix communication and the exchanges with the Minneapolis FBI field office in connection with the Moussaoui investigation, no one connected the two matters. Likewise, the Minneapolis FBI field office agents investigating Moussaoui had no reliable way of determining whether there was information in FBI files about threats to aviation or terrorist plots to hijack planes and, therefore, did not know about the Phoenix communication and other concerns about Middle Eastern men taking flight lessons.

While ACS and most other FBI databases are classified at the Secret level, a large percentage of the information disseminated throughout the Intelligence Community is classified Top Secret and, therefore, cannot be maintained on ACS. The information is instead maintained on a separate database to which FBI counterterrorism personnel do [page 62] not have access at their desks. Further, the CIA places human intelligence information in a special compartment at the Secret level and that information also cannot be shared within the FBI's databases.

The Chief of the FBI's Radical Fundamentalist Unit described the FBI's situation in September 24, 2002 testimony to the Joint Inquiry:

> . . . [C]ommunications coming into our building from NSA, from CIA cannot be integrated into our existing databases. So if an analyst is working, say, on a subject in Phoenix division and they run that person's name through our databases, they will not retrieve information on that person that other agencies may also have. It is required of them to get up, walk over to a different set of--or a different computer that has access to a different database and search that name in that database; and the two databases will never come together and be integrated. So it is a setup for failure in terms of keeping a strategic picture of what we are up against.

Although some FBI personnel have access to separate Top Secret Intelligence Community networks, the FBI's computer systems are not linked to Intelligence Community systems or even to the Department of Justice.

**5. Finding:  Prior to September 11, the Intelligence Community's understanding of al-Qa'ida was hampered by insufficient analytic focus and quality, particularly in terms of strategic analysis.  Analysis and analysts were not always used effectively because of the perception in some quarters of the Intelligence Community that they were less important to agency counterterrorism missions than were operations personnel.  The quality of counterterrorism analysis was inconsistent, and many analysts were inexperienced, unqualified, under-trained, and without access to critical information.  As a result, there was a dearth of creative, aggressive analysis targeting Bin Ladin and a persistent inability to comprehend the collective significance of individual pieces of intelligence.  These analytic deficiencies seriously undercut the ability of U.S. policymakers to understand the full nature of the threat, and to make fully informed decisions.**

Discussion:  Despite the recognition of the increased threat posed to the United States by al-Qa'ida, the U.S. Intelligence Community's analytic focus on al-Qa'ida was woefully inadequate prior to the September 11 attacks.  At the CTC, for example, there were only three analysts assigned to work on al-Qa'ida full time between 1998 and 2000, [page 63] and five between 2000 and September 11, 2001.  Including analysts from elsewhere in CIA who were in some part attentive to al-Qa'ida, the total was fewer than forty.

[In terms of "work years," the equivalent of nine analyst work years was expended on al-Qa'ida within CTC's Assessments and Information Group in September 1998.  According to CIA, nine CTC analysts and eight analysts in the Directorate of Intelligence were assigned to UBL in 1999.  This was only a fraction of the analytic effort that was to be devoted to al-Qa'ida in July 2002].

DCI Tenet acknowledged at the June 19, 2002 Joint Inquiry hearing that:

> I think that is correct.  I think [the number of analysts in the CTC analytic unit working on Usama Bin Ladin and al-Qa'ida] was too small. . . . I think one of the things I would say is from a strategic analytical perspective we should have had more analysts than we did. . . .

[At the FBI, there were fewer than ten tactical analysts and only one strategic analyst assigned to al-Qa'ida prior to September 11, 2001. The NSA had only a limited number of Arabic linguists, on whom analysis depends, and, prior to September 11, few were dedicated full-time to targeting al-Qa'ida.  At the time, NSA's Arabic linguists were

also being used to support other high priority targets in the region and to translate intelligence originating in the region and elsewhere].

Elsewhere in the Intelligence Community, other agencies dedicated varying numbers of analysts to the al-Qa'ida issue prior to September 11, 2001.  The other two primary all-source analysis centers, DIA's Joint Intelligence Task Force, Combating Terrorism, and State Department's Bureau of Intelligence Research (INR) focused on anti-terrorism and force protection analysis to protect overseas equities.  INR dedicated one analyst solely to al Qa'ida, and, at Secretary of State direction, provided a daily summary of intelligence relating to Usama bin Ladin and his activities.  DIA devoted 30 analysts to Sunni Extremism and, on any given day, several of them – augmented by Reservists – would be involved with Usama bin Ladin-related issues.

[Page 64]

Other agencies and organizations maintained at least an awareness of al-Qa'ida and performed roles such as financial tracking and training camp observation consistent with their charters.  One non-Intelligence Community organization, the FAA, dedicated as many as five analysts at any one time to al Qa'ida.  In late 2000, according to FAA officials, FAA offered CTC Chief Cofer Black the support of its nearly two-dozen analysts regarding transportation security issues in exchange for broader information sharing, but this offer was not accepted because of CTC concerns about protecting its sources and methods.  The Joint Inquiry was told that a similar offer of analytic support was made to CTC Chief Black by DIA in 2000, but with similar results.  FAA and DIA are both represented at CTC.

The Intelligence Community's focus was also far more oriented toward tactical analysis of al-Qa'ida in support of operations than on the strategic analysis needed to develop a broader understanding of the threat and the organization.  For example, as mentioned earlier, the DCI's National Intelligence Council never produced a National Intelligence Estimate (NIE) on the threat to the United States posed by al-Qa'ida and Usama Bin Ladin.  Active analytic efforts to identify the scope and nature of the threat, particularly in the domestic United States, were clearly inadequate.

TOP SECRET

As noted in an August 2001 CIA Inspector General report, analysts assigned to CTC only had time to focus on crises or short-term demands, and "did not have the time to spot trends or to knit together the threads from the flood of information."  These shortcomings, unfortunately, had an impact on areas that were directly relevant to the September 11 attacks.  The Joint Inquiry record confirms, for example, that the Intelligence Community had devoted little or no analytic focus prior to September 11 to the terrorist use of aircraft as weapons or to the significant role in al-Qa'ida that was played by Khalid Shaykh Mohammed.

This review also confirms that the FBI was performing little, if any, strategic analysis against al-Qa'ida prior to the September 11 attacks.  The Chief of the FBI's National Security Intelligence Section testified that the FBI had "no analysts" dedicated [page 65] to strategic analysis prior to September 11.  In fact, as of that date, the FBI had only one strategic analyst working on al-Qa'ida matters.  FBI Assistant Director for Counterterrorism Dale Watson testified that he could not recall any instance where the FBI Headquarters terrorism analytical unit produced "an actual product that helped out."

When the FBI did complete analytic products, the quality was inadequate.  During the summer of 2001, the U.S. Intelligence Community was in a state of heightened alert, due to concern about an imminent al-Qa'ida attack.  However, this concern was not reflected in the FBI's National Law Enforcement Threat System (NLETS) reports, which are the means through which the FBI communicated terrorist threat information with state and local law enforcement entities.  In a May 2001 NLETS report, for example, the FBI assessed the risk of terrorism as "low," and, in a July 2, 2001 NLETS report, stated that the FBI had no information indicating a credible threat of terrorist attack in the United States, although the possibility of such an attack could not be discounted.  Additional FBI notices that were issued later in July 2001 indicated that there was a potential for attacks against U.S. interests abroad, but again that the possibility of an attack in the United States could not be discounted.

More focus on strategic analysis by the FBI and the CIA would have helped crystallize the threat, particularly within the United States, and perhaps spurred more immediate defensive action by U.S. Government policymakers.  The Intelligence

Community was not, however, poised or equipped to deliver the kind of analytic products needed. The FBI, for example, was not even aware of the collective significance of information pertaining to al-Qa'ida that was contained within its own files. This fact is underscored by its failure to connect available information on al-Mihdhar and al-Hazmi, Zacarias Moussaoui, and the FBI Phoenix field office agent's Electronic Communication in the summer of 2001. The FBI's Deputy Assistant Director for Counterterrorism Analysis, recently detailed from CIA to improve the FBI's analytic capability, testified that the Bureau "didn't have analysts dedicated to sort of looking at the big picture and trying to connect the dots, say between the Phoenix memo and Moussaoui and some [page 66] other information that might have come in that might have suggested that there were individuals there who might be preparing to hijack aircraft."

One of the primary reasons that there was so little focus on strategic analysis in the Intelligence Community may have been the perception that operational personnel and matters were more important to agency counterterrorism missions and operations than analysis and analytic personnel. Consistent with its traditional law enforcement mission, the FBI was, prior to September 11, a reactive, operationally driven organization that did not value strategic analysis. While FBI personnel appreciated case specific analysis, for example, most viewed strategic analytic products as academic and of little use in on-going operations. The FBI's Assistant Director for Counterterrorism acknowledged in Joint Inquiry testimony that the reactive nature of the FBI was not conducive to success in counterterrorism:

> No one was thinking about the counterterrorism program what the threat was and what we were trying to do about it. And when that light came on, I realized that, hey, we are a reactive bunch of people, and reactive will never get us to a prevention and what we do. . . .Is there anybody thinking and where's al-Qa'ida's next target? And no one was really looking at that.

He also testified about the difficulty of going beyond the FBI's traditional case-oriented approach:

> We will never move away from being reactive. We understand that. And that's what people want to talk about most of the time is how's that case going in East Africa, or how's the *USS Cole* investigation going? But if you step back and look at it strategically you need to have people thinking

> beyond the horizon and that's very difficult for all of us.  It's particularly
> difficult for law enforcement people.

Other FBI executives acknowledged the FBI's pre-September 11 analytic failings. Director Mueller testified that:

> I would be the first to concede that we have not done a good job in analysis. We have not had either the technology nor the analytical cadre of individuals that we have needed to perform strategic analysis.

In Joint Inquiry testimony, the FBI's Deputy Assistant Director for Counterterrorism Analysis referred to strategic analysis as the FBI's "poor stepchild" prior to September 11, 2001.  As a result, our review confirmed that strategic analysts were often marginalized by the operational units and rarely, if ever, received requests from operational sections for analytical assessments of pending al-Qa'ida's cases.

In 2000, FBI management aggravated this situation by transferring five strategic analysts who had been working on al-Qa'ida matters to FBI operational units to assist with ongoing cases.  According to a former Chief of the International Terrorism Analytic Unit, this "gutted" the analytic unit's al-Qa'ida-related expertise and left the unit with little ability to perform strategic analysis.

Concerns about protecting criminal prosecutions also limited the FBI's ability to utilize strategic analytic products.  In interviews, some analysts said they frequently told not to produce written analyses, lest the analyses be included in discovery during criminal prosecutions.  FBI analysts were further hindered because of the limitations of the FBI's information technology.

Due in large part to these cultural and practical issues, the Bureau has had little success in building a strategic analytic capability, despite numerous attempts before September 11 to do so.  For example, in 1996, the FBI hired approximately fifty strategic analysts for counterterrorism purposes, many with advanced degrees.  According to both current and former FBI analytic personnel and supervisors, most of those analysts left the Bureau within two years because they were dissatisfied with the role of strategic analysis at the FBI.

The lack of emphasis on strategic counterterrorism analysis was also an issue at the CIA.  The former Chief of CTC testified that, at the CTC:

> We have under-invested in the strategic only because we've had such near-term threats.  The trend is always toward the tactical. . . . The tactical is where lives are saved.  [Page 68]  And it is not necessarily commonly accepted, but strategic analysis does not . . . get you to saving lives.

Analysts in the CTC also expressed concern to the Joint Inquiry that their opinions were not given sufficient weight.  A manager in the CTC confirmed to the Staff that CIA operations officers in the field resented being tasked by analysts because they did not like "to take direction from the ladies from the Directorate of Intelligence." Despite the need for increased analytic capability, CTC reportedly refused to accept analytic support offered by at least two other agencies prior to September 11, 2001.  As mentioned earlier, representatives of both FAA and DIA informed the Inquiry that CTC management rebuffed their offers of analytic assistance in 2000 because those agencies wanted greater access to CTC information in return, and this raised CTC concerns regarding protection of its intelligence sources and methods.

Analysts at NSA commented to the Joint Inquiry that CTC viewed them as subordinate – "like an ATM for signals intelligence."  NSA analysts say they attempted to accommodate CTC preferences by focusing on short-term operational requirements – sometimes at the expense of more thorough analysis -- and even altered NSA reporting formats because CTC did not like including NSA analyst comments in the text of signals intelligence reports.  Several NSA analysts also described a definite perception that the DCI would always side with CIA and CTC operational personnel in any disagreements between NSA and CTC.

Some of the shortcomings in analytical capability can be traced to the fact that analysts were often inexperienced, under-trained, and, in some cases, unqualified for the responsibilities they were given.  At the CTC, the analysts were a relatively junior group prior to September 11 since CTC had traditionally relied on rotational assignments.  An analytic career service was not created in CTC until about 1997.  The average CTC

analyst had three years of analytic experience, versus the eight years for analysts in the CIA's Directorate of Intelligence.

[Page 69]

A former counterterrorism analyst at DIA explained to the Joint Inquiry the consequences for analytic perspective of this shortfall in experience and knowledge:

> Coupled with this issue of experience comes the ability to place current intelligence reporting in the context of historical perspectives. In the period leading up to the 1998 East Africa bombings and the 2000 attack against the *USS Cole* in Yemen, terrorism analysts nearly across the board incorrectly assessed that a group would not conduct an attack in an area where it was able to operate with relative ease. Additionally, there appears to be a continued reluctance to correctly assess and evaluate the nature of cooperation between many [——————] and [—————] Islamic extremist groups. Both of these examples, and there are certainly others, occurred despite over a decade of credible reporting to the contrary.

At the FBI, a January 2002 internal study found that 66% of the FBI's 1200 "Intelligence Research Specialists" (strategic analysts) were unqualified. This problem was compounded by the fact that newly-assigned strategic and operational analysts received little counterterrorism training upon assuming their positions. As the Chief of the FBI's National Security Intelligence Section testified:

> While there was no standardized training regimen, other than a two-week basic analytical course, training was available on an ad hoc basis and guidance was provided by both the unit chiefs of the analytical units and the FBI's Administrative Services Division. The development of a standardized curriculum, linked to job skills, and career advancement was being planned . . . , but it was never implemented.

The quality of Intelligence Community counterterrorism analysis also suffered as a result of the fact that agency analysts often did not have access to important information residing at other agencies. DIA's Associate Director for Intelligence at the Joint Chiefs of Staff testified about the extent of these problems:

> In my opinion, one of the most prolonged and troubling trends in the Intelligence Community is the degree to which analysts, while being expected to incorporate all sources of information into their assessments,

have been systematically separated from the raw material of their trade…. At least for a few highly complex high stakes issues, such as terrorism, where information by its nature is fragmentary, ambiguous and episodic, we need to find ways to emphatically put the "all" back in the discipline of all-source analysis.

[Page 70]

Intelligence Community analysts had particularly limited access to "raw material" contained in the FBI's counterterrorism investigations, including Foreign Intelligence Surveillance Act (FISA)-derived information, and to unpublished NSA information. The former acting head of the FBI's Usama Bin Ladin Unit informed the Joint Inquiry that, prior to September 11, the FBI would generally only provide the CIA with FISA-derived information when the FBI wanted it passed to a foreign government.  Primarily due to the FBI's technological problems, the FBI's analysts did not even have access to all relevant FBI information.  The FBI's Deputy Assistant Director for Counterterrorism Analysis testified that "the FBI lacked effective data mining capabilities and analytical tools, it has often been unable to retrieve key information and analyze it in a timely manner—and a lot has probably slipped through the cracks as a result."

There also was, and apparently continues to be, a reluctance at CIA to provide raw data to analysts outside the Agency.  DCI Tenet testified that even analysts at the Department of Homeland Security will not be allowed access to CIA raw data:

> There was a headline today that said raw data provided. Well, actually that's not what's envisioned. They will get all of the finished product, the finished analytical product, the finished intelligence that NSA, CIA and FBI issues, and on a case-by-case basis, depending on what kind of an environment we're in, we actually may give them a piece of raw data.

Discussions of access to "raw data" or "raw traffic" raise objections from CIA, since it immediately equates the term to internal operational traffic, and from NSA.  Both agencies are concerned with protecting the sources and methods they use to collect intelligence, a responsibility that has been specifically placed upon the DCI by the National Security Act, and NSA is also concerned about its legal responsibilities to "minimize" U.S. person data in the information it collects.

A significant portion of the communications collected by NSA involves U.S. persons as parties or contains information about U.S. persons.  NSA is responsible under law and Attorney General procedures for ensuring that information of this type that does [page 71] not have intelligence value is eliminated before intelligence is disseminated to persons outside the NSA production chain.  NSA does allow analysts from other agencies to have access to raw intercepts on a case-by-case basis, typically at NSA and after the analysts have been trained in the minimization rules.

Analysts, for their part, maintain that there is intelligence information of potential significance embedded in the raw CIA and NSA data.  Much of this, they believe, is filtered out during the CIA and NSA processes that determine what information analysts receive in disseminated form.   The CIA has implicitly recognized this by integrating its counterterrorism analysts into CTC where they have full access to raw traffic, an access that most CIA analysts do not routinely enjoy.

[As an example, the Joint Inquiry found numerous operational cables relating to the meeting in Malaysia that was attended by al-Hazmi and al-Mihdhar in January 2000 containing information that could have enabled all-source analysts to assess that meeting more completely.  DIA identified four specific leads its terrorism analysts could have pursued had this information been shared with it in early 2000, and three leads in the critical August 2001 timeframe that DIA believes would have allowed additional action to be taken concerning the arrest of Moussaoui and the watchlisting of Al-Mihdhar and al-Hazmi.  However, DIA did not learn of this operational traffic until informed of it in the course of the Joint Inquiry in April 2002].

Intelligence analytical personnel told the Joint Inquiry that they are not seeking access to operational details or the identification of sources and methods.  The DIA Director, for example, observed that he has tried to convince CTC that DIA does not want operational details, but only important intelligence buried in the operational traffic.

The inadequate quality of the Intelligence Community counterterrorism analysis impacted not only the Intelligence Community's strategy and operations, but also the

ability of the U.S. Government's policymakers to understand the threat and to make informed decisions. Several current and former U.S. government policymakers provided [page 72] testimony to this effect before these Committees.   For example, Richard Clarke, the former National Coordinator for Security, Infrastructure and Counterterrorism at the National Security Council ("National Counterterrorism Coordinator") explained to the Joint Inquiry that:

> FBI did not provide analysis. FBI, as far as I could tell, didn't have an analytical shop. They never provided analysis to us, even when we asked for it, and I don't think that throughout that 10-year period we really had an analytical capability of what was going on in this country.

Richard Armitage, the Deputy Secretary of State complained that Intelligence Community analysis tends to provide policymakers with only one view, and that dissenting opinions are rarely expressed:

> I am the consumer.  It's very rare that we get the one off voice or the dissident voice . . . .  For a policy maker, the dissident voice is very helpful to either confirm what you think or really open up a new area, and this is not generally done.  If I had to say the one biggest weakness in the analysis area, I would say that's it.  Second, it's the way analysis in the Intelligence Community is generally put forth, and it's related, and that is consensus…I really would just enforce this observation about the need to get alternative views up, because almost everything that's important here is shrouded in ambiguity and uncertainty.  There is a tendency to want to get things scrubbed out to get the differences eliminated.

Former National Security Advisor Sandy Berger implied in his testimony that the U.S. Government has often relied too heavily on analytic expertise within the U.S. Government, and that he believes that the best analytic expertise is often found elsewhere:

> I think we live in a world . . .in which expertise increasingly does not exist in the government.  It's a very complicated world.  And the five people who know Afghanistan the best or Sierra Leone the best are probably located either in academia, think tanks or in companies, not to devalue the people of the government.  So we have to find a way in my judgment to integrate the expertise that exists on the outside with the information that exists on the inside.

A former DIA counterterrorism analyst told the Joint Inquiry hearing on October 8, 2002: [page 73]

> The single most important issue that will affect future performance is the experience level of the analyst. While this certainly applies to all intelligence analysts regardless of subject area, it is even more critical for those trying to prevent the next terrorist attack. In the case of an analyst responsible for tracking a Middle Eastern terrorist group, this person will need to have an expertise or at least a good working knowledge of terrorism itself, the group that they have for an account, regional and country issues present in the group's operating area, which can be quite extensive, and Islamic history, culture and the sects thereof. This . . . required level of expertise is rarely going to be found outside the Intelligence Community and is instead going to be recruited from academia and then developed in-house through training programs and mentors.

Former Chairman of the House Intelligence Committee Lee Hamilton noted in his testimony to the Joint Inquiry on October 3, 2002 that the Hart-Rudman Commission had concluded that the U.S. Government's personnel system has become a national security issue. As he stated:

> There is too much rigidity in the system. There is not enough allowance for incentive. And it is an exceedingly serious problem in our government. And it has national security consequences. We've got to work through this matter so that managers can manage more effectively. . . . . I would absolutely assure you . . . that you would not tolerate in your office the kind of management restrictions that operate today in the federal government. . . .  Now I know the importance of this to employees, so it's a tough problem, but the only thing I want to say here, Senator, when you talk about personnel we are now approaching this national security review and we have to look at the civil service system and we have to find ways and means of getting more flexibility into it. If we don't, we're going to choke ourselves to death.

During the same hearing, former CIA Inspector General Frederick Hitz discussed a number of actions that might be taken to enhance the quality of the personnel employed by the Intelligence Community agencies. These included the idea of establishing an intelligence reserve corps that could be activated at a time of particular need, an intelligence reserve officer training corps, and more internships to introduce young people into the agencies.  While he recognized that some of these ideas are not new, he did not believe they had been vigorously pursued.

In sum, prior to September 11, the Intelligence Community's analytic components failed to understand the collective significance of the information in their possession.

This failure is attributable not only to the factors discussed above, but also to a basic lack of creativity and imagination in evaluating the intelligence that was at hand.  Ironically, the best example of the creative, imaginative and aggressive analysis of relevant [page 74] intelligence that this review has found was not a product of Intelligence Community analysts, but, instead, of an FBI field agent in Phoenix.  The Phoenix agent, in reviewing his office's case files, went beyond the facts of those individual cases to focus on a larger, and far more serious, picture of the potential, long-term threat.  By putting together various pieces of information, he became convinced that Usama Bin Ladin was sending individuals to aviation-related training in order to put al-Qa'ida in a position to target civil aviation.  His July 2001 Electronic Communication to FBI Headquarters was a strategic analytic product that correctly identified at least one critical element that was to be used in the plot that unfolded on September 11, an element that apparently eluded far more seasoned analysts elsewhere in the Intelligence Community.

**6. Finding:  Prior to September 11, The Intelligence Community was not prepared to handle the challenge it faced in translating the volumes of foreign language counterterrorism intelligence it collected.  Agencies within the Intelligence Community experienced backlogs in material awaiting translation, a shortage of language specialists and language-qualified field officers, and a readiness level of only 30% in the most critical terrorism-related languages.**

Discussion:  The language problem has been one of the Intelligence Community's perennial shortfalls.  Prior to September 11, the shortage of language specialists who would be qualified to process large amounts of foreign language data in general, and Arabic in particular, was one of the most serious issues limiting the Intelligence Community's ability to analyze, discern, and report on terrorist activities in a timely fashion.  According to a senior NSA official, [———————————————— ————————————————————]. These are promptly scanned for intelligence value, and only the most important – [———————————] -- are then translated into English.  Yet, prior to September 11, NSA had [———] personnel assigned to this task.

[Analyzing, processing, translating, and reporting al-Qa'ida-related [——————— ——————] communications requires the highest levels of language and target knowledge expertise that exist at the National Security Agency.  The large number of

communicants whose native origins cover all of the major Arabic dialects makes this [page 75] analysis linguistically and analytically difficult. The target lives in and understands life in a thoroughly Islamic milieu, a milieu that is often reflected in the target's communications].

Evaluating these communications requires considerable subject matter expertise in Islam in general and Islamic extremism in particular in order to ensure the best possible interpretations. Very few Arabic language analysts at NSA have done any graduate work in Islamic Studies and the vast majority of these linguists [————

————————————————————————

————————————————————————

——————————————————————].

The NSA Senior Language Authority explained to the Joint Inquiry that the Language Readiness Index for NSA language personnel working in the counterterrorism "campaign languages" is currently around 30%. This Index is based on the percentage of the mission that is being performed by qualified language analysts. The current low level of the Index is due in part to the fact that NSA has moved roughly [——] language personnel since September 11 from areas in which they were performing quite well to counterterrorism, where they must gain experience and expertise before their performance can improve.

[According to the Chief of the FBI's Language Services Division, prior to September 11, the Bureau employed [——] Arabic speakers and was experiencing a translation backlog. As a result, 35% of Arabic language materials derived from Foreign Intelligence Surveillance Act (FISA) collection were not reviewed or translated. If the number of Arabic speakers were to remain at [——], the projected backlog would rise to 41% in 2003.]

The Director of the CIA Language School testified that, given the CIA's language requirements, the CIA Directorate of Operations is not fully prepared to fight a world- [page 76] wide war on terrorism and at the same time carry out its traditional agent recruitment and intelligence collection mission. She also added that there is no strategic

plan in place with regard to linguistic skills at the Agency.  When asked about the language ability of CIA field officers, the Language School Director stated:

> [Traditionally we have had an adequate number of Arabic speakers to conduct their business in [———————————— ————————————].  Level of language required to use with a volunteer or for a thorough debriefing is very different than the level of language you need to socially chit-chat with somebody or to even recruit someone. And that is where the bar has been raised much higher, and that's why we must now have a cadre of language speakers, [—————] who indeed can debrief and write up reports with these volunteers].

The Director of the CIA Language School explained that CIA should have a pool of interpreters to meet language support needs at home and abroad, but that this is not easy to achieve.  She stated that: "With the progress of technology, we keep on getting more material – [————————————————————————]. These things need translation, we don't have that capability."   In her view, CIA field officers are typically generalists, and this has been important to their career progression culture since the mid-1970s.  Now, however, it is an absolute must that these officers possess expertise rather than mastery of "one little dab here and one little dab there."  Her recommendation was that either a culture change within CIA is called for or that a cadre of specialists be developed and not penalized.

**7. Finding:  [Prior to September 11, the Intelligence Community's ability to produce significant and timely signals intelligence on counterterrorism was limited by NSA's failure to address modern communications technology aggressively, continuing conflict between Intelligence Community agencies, NSA's cautious approach to any collection of intelligence relating to activities in the United States, and insufficient collaboration between NSA and the FBI regarding the potential for terrorist attacks within the United States].**

Discussion:  While one of the Intelligence Community's greatest strengths is its ability to rely on its advanced technical collection capabilities, the Joint Inquiry confirmed that the Community did not, prior to September 11, fully exploit those [page 77] capabilities in the effort against Bin Ladin and al-Qa'ida.  Pre-September 11, [— ———————————————————————————————— ———————————————————————]. Post-September 11, this increased  to [——— —————].

It became very clear after September 11 [————————————

————————————————————————————————

————————————————————————————————

————————————————————————————————

————————————————————————————————

————————————————————————].  In testimony before the Joint Inquiry, the NSA

Director acknowledged that "little was known prior to 11 September of how al-Qa'ida

used [————————————] communications. . . .We continue to attack key gaps that

remain in our . . . [ ————————————] exploitation capabilities."

Similarly, NSA has long had a program to use [————————————

————————————————————————], but again little was known about al-

Qa'ida targets and few such operations were mounted before September 11.  After

September 11, this changed and the NSA Director was able to testify that: "[————————

————————————————————————————————

————————————————————————]."

The inability to bring technical collection capabilities to bear in the
counterterrorism area was particularly apparent in regard to signals intelligence that could
have shed greater light on the potential for terrorist activity within the domestic United
States.  Both the NSA and the FBI have the authority, in certain circumstances, to
intercept international communications, to include communications that have one
communicant in the United States and one in a foreign country, for foreign intelligence
purposes.  While those authorities were intended to insure a seamless transition between
U.S. foreign and domestic intelligence capabilities, significant gaps between those two
spheres of intelligence coverage persisted and impeded domestic counterterrorist efforts.
[Page 78]

Before September 11, it was NSA policy not to target terrorists in the United
States, even though it could have obtained a Foreign Intelligence Surveillance Court
order authorizing such collection.  NSA Director Hayden testified that it was more
appropriate for the FBI to conduct such surveillance because NSA does not want to be

perceived as targeting individuals in this country and because the intelligence produced about communicants in the United States is likely to be about their domestic activities.

[As a result, NSA regularly provided information about these targets to the FBI – both in its regular reporting and in response to specific requests from the FBI – [—————————————————————————————————————] that NSA acquired in the course of its collection operations.  The FBI used this information in its investigations and obtained FISA Court authorization for electronic surveillance [—————————————————————————] when FBI officials determined that such surveillance was necessary to assist one of its intelligence or law enforcement investigations].

[One collection capability that was used by both NSA and FBI under approval of the FISA Court (the "FISA Court technique") had a [————] probability of collecting [————] communications between individuals in the United States and foreign countries.  NSA did not use the FISA Court technique against [—————————], however, precisely because of this [——————————] probability].

As NSA Director Hayden has testified to the Joint Inquiry, NSA believed it was the FBI's responsibility to collect communications of individuals in the United States. General Hayden stated two reasons for this position.  One is that, since the individual is in the United States, the information obtained is most likely to relate to domestic activity that is of primary interest to the FBI.  The second reason is that NSA does not want to be viewed as targeting persons in the United States.  Joint Inquiry interviews of a wide range of NSA personnel, from the Director down to analysts, revealed the consistent theme that NSA did not target individuals in the United States.  This is so ingrained at NSA that one counterterrorism supervisor at NSA admitted that she had never even thought about using this technique against [——————————].

[Page 79]

Despite the NSA view that this category of intelligence collection was the FBI's responsibility, NSA and the FBI did not develop any plan to ensure that the Bureau made an informed decision about whether to use the FISA Court technique to collect communications between the United States and foreign countries that NSA was not covering.   Thus, a gap developed between the level of coverage of communications

between the United States and foreign countries that was technically and legally available to the Intelligence Community and the actual use of that surveillance capability].

[This gap was potentially very damaging in the case of Khalid al-Mihdhar during the period in early 2000 when he was in the United States.  [————————

————————————————————————————————————

————————————————————————————————————

————————————————————————————————————

————————————————].  His presence in the United States was not determined by the Intelligence Community at the time.  [——————————————————

——————————————————————————————————————].

[NSA and CIA officers often worked closely together in [————] collection efforts against al-Qa'ida.  The two agencies conducted [——————] operations, And these operations often met with some success.  However, one type of these operations – [——————————————————————————

——————————] – caused much friction between NSA and CIA.  This was especially true at the mid- and upper-management levels where struggles developed regarding which agency was in charge of developing and using such technology when human intelligence and signals intelligence targets overlapped.  CIA perceived NSA as wanting to control technology deployment and development, while [page 80] NSA was concerned that CIA was conducting NSA-type operations.  The NSA Chief of Data Acquisition noted to the Inquiry that this has been an issue during his entire tour of almost three years. These frictions persisted even after the September 11 attacks.  In the first six months of 2002, for example, no less than seven executive-level memoranda (including one from the President) were issued in attempts to delineate CIA and NSA responsibilities and authorities in this collection area].

The Chief of NSA's Signals Intelligence Directorate acknowledged these frictions in a Joint Inquiry interview, but cited the executive memoranda as evidence that the situation is improving.  NSA Director Hayden, told the Joint Inquiry that "the old divisions of labor are impractical; the new electronic universe requires more and more

cooperation. "  He also added that he "would not be surprised if someday the closeness of this relationship would require organizational changes."

**8. Finding:  The continuing erosion of NSA's program management expertise and experience has hindered its contribution to the fight against terrorism.  NSA continues to have mixed results in providing timely technical solutions to modern intelligence collection, analysis, and information sharing problems.**

Discussion:  One of the side effects of NSA's downsizing, outsourcing, and transformation has been the loss of critical program management expertise, systems engineering, and requirements definition skills.  These skills were devalued by NSA during the 1990s when most technical development was done within the agency, and the impact of their loss was evident in NSA's response to the Joint Inquiry's attempts to gather information concerning NSA's plans for developing solutions to its current technology gaps in areas of particular importance to counterterrorism.  [——————

————————————————————————————————

————————————————————]. NSA was able to provide little more than very high-level and general vision statements.


The impact of this lack of program management was evident during interviews with analysts who expressed frustration regarding their current working environment. [page 81]  For example, they must now write three versions of reports in order to accommodate the demands of various customers and uses.  The TRAILBLAZER program, which the NSA Director has described as NSA's "effort to revolutionize how we produce SIGINT in a digital age," is now not expected to produce such results until 2004 at the earliest and confusion still exists as to what those results will actually be.  In the meantime, none of the analysts were aware of any near term efforts to alleviate their current system's technical limitations.

NSA personnel also stated that NSA's efforts to collect [——————————————

————————————————————————], reveals a critical deficiency in its capabilities.  The solution to this deficiency is well understood and estimated to cost less than $1 million to implement.   However, the project manager is still struggling for funds to pay for an upgrade that would not be completed until 2004.

The Joint Inquiry also found a high level of frustration among contractors who do business with the NSA.  Common themes repeated to the Joint Inquiry concern the extremely poor quality of solicitation packages and acquisition expertise on the part of NSA employees and the inability of program managers to speak with consistency and authority on future contract opportunities.  NSA also lacks a formal Contracting Officer Technical Representative certification program.   This is of special concern as NSA continues to increase its reliance on contractors.  In testimony to the Joint Inquiry in October 2002, the NSA Director stated that NSA "spent about a third of our SIGINT development money this year making things ourselves.  Next year the number will be [dropping to] 17%."

The Chief of Staff for NSA's Signals Intelligence Directorate (SID) told the Joint Inquiry he fears that "SID has lost its business acumen…and [he] worries greatly about the lack of acquisition experience and program planning, especially in light of NSA's huge budget increase."  He also told the Joint Inquiry that he has worked actively on this issue, especially in providing program management training to frontline workers.

[Page 82]

**9. Finding**:  **The U.S. Government does not presently bring together in one place all terrorism-related information from all sources. While CTC does manage overseas operations and has access to most Intelligence Community information, it does not collect terrorism-related information from all sources, domestic and foreign. Within the Intelligence Community, agencies did not adequately share relevant counterterrorism information, prior to September 11.  This breakdown in communications was the result of a number of factors, including differences in the agencies' missions, legal authorities and cultures.  Information was not sufficiently shared, not only between different Intelligence Community agencies, but also within individual agencies, and between the intelligence and the law enforcement agencies.**

Discussion:  Counterterrorism, like other transnational threats such as drug trafficking, requires close coordination and information sharing among and within the Intelligence Community agencies.  Despite some improvement, significant problems remained in the sharing of information within the Intelligence Community, prior to September 11.  As a result, the Community was unable to exploit the full range of capabilities and expertise in the counterterrorist effort.

Each of the principal collectors and analyzers of counterterrorism intelligence -- the FBI, CIA, NSA, and DIA -- has its own distinct missions, sets of legal authorities and restraints, and cultures.  Unfortunately, these factors, while serving many other legitimate purposes, often hinder collaboration and willingness to share information.  In his testimony, former Congressman and House Intelligence Committee Chairman Lee Hamilton described the problem:

> The very phrase "Intelligence Community" is intriguing.  It demonstrates how decentralized and fragmented our intelligence capabilities are. . . . The Intelligence Community is a very loose confederation.  There is a redundancy of effort, an imbalance between collection and analysis, and problems, as we have repeatedly heard in recent weeks, of coordination and sharing.

While DCI George Tenet and former FBI Director Louis Freeh testified that collaboration and information sharing in the Intelligence Community have markedly improved in recent years, this Inquiry found that the agencies still act too often and at too many levels as a loose collection of entities.  The Joint Inquiry heard testimony that confirmed problems in sharing information between different Intelligence Community agencies, within individual Intelligence Community agencies, and between law [page 83] enforcement and intelligence agencies.

For example, the former FBI agent who had handled the San Diego informant testified about his personal experience with information sharing between the FBI and the CIA:

> <u>Ms. Hill</u>: You also [said] that, in your opinion, information sharing between the FBI and the CIA prior to 9/ll was almost nonexistent.
>
> <u>Former FBI Agent</u>: It was bad. Well, it's not nonexistent, but . . . if you have a case that has a common mission and everybody can benefit from it, you're going to get their assistance. But if you don't have that, asking them for something, it's very, very difficult.
> . . . .
> <u>Former FBI Agent</u>: If I had to rate it on a ten-point scale, I'd give them about a 2 or a 1.5 in terms of sharing information.
>
> <u>Ms. Hill</u>: Well, could you tell us what your experience was?  Why do you say that?
>
> <u>Former FBI Agent</u>: [P]art of the problem here, I think, is being able to communicate with them. . . .

TOP SECRET

Ms. Hill: By "them," you mean the CIA?

Former FBI Agent: With the CIA. Everything's got to go through headquarters, usually.

Ms. Hill: Through your headquarters, or through CIA?

Former FBI Agent: Through [FBI] headquarters. Normally, . . . you have some information you want the Agency to check on. You end up writing it up, sending it back through electronic communication or teletype, . . . or memo. . . . And then the Bureau, FBI headquarters, runs it across the street to the Agency.  And then, maybe six months, eight months, a year later, you might get some sort of response.

Even after the first World Trade Center attack in 1993, the Millennium plot, and attacks against U.S. embassies in East Africa in 1998 revealed that global Islamic extremists were capable of reaching into the United States, there was little sustained effort by the FBI, NSA, and CIA to work together to collect and share information about contacts between foreign persons in the United States and those abroad.  For example, while a great amount of information that NSA collects is routinely transmitted electronically into CTC databases at CIA, this is not true of terrorist information collected domestically by the FBI.

The Acting Chief of the FBI's Radical Fundamentalist Unit, told the Joint Inquiry in an interview that, prior to September 11, the FBI would primarily think to provide the [Page 84] CIA with information obtained through FISA surveillance only when it was also being passed to a foreign government.  The FBI did not share such information with CTC on a routine basis, partly due to the FBI's inadequate information technology, but also because they believed that sharing information with intelligence agencies raised legal concerns relating to the traditional separation between law enforcement and intelligence operations.  As a consequence, gaps occurred in the collection and analysis of information about individuals and groups operating in the United States and abroad.

The FBI has traditionally viewed intelligence primarily as a tool for developing evidence to be used in FBI cases, rather than as the basis for valuable strategic analysis for the FBI or other intelligence agencies.  As Director Mueller noted to the Joint Inquiry:

. . . one of the things that we have to do, and I think is changing since September 11, is for agents who are very good in the criminal sphere to look at a piece of information and not run it through the sifting that you do to determine whether it would be admissible in court. In other words, is it hearsay? Well, I am going to thrust it aside. Do I have lack of foundation? Therefore, I am going to disregard that.

Prior to September 11, FBI personnel were not trained or equipped to share intelligence developed during FBI counterterrorism investigations with the Intelligence Community or even with other units within the FBI on a regular basis.  For example, after receiving the Electronic Communication from the Phoenix field office in July 2001 indicating that al-Qa'ida might be sending operatives to the United States for flight training, a Headquarters Intelligence Operations Specialist (IOS) did not send it to the FBI's analytic unit or to the CIA.  Instead, the IOS forwarded it to the FBI field office in Portland, Oregon, primarily because of possible connections to an individual case there.

The Joint Inquiry's review of a July 2002 CIA cable that it found within a local FBI field office's investigative files provides another example of information sharing problems within the FBI.  A CIA officer assigned to a Joint Terrorism Task Force in California sent a cable to CIA Headquarters after analyzing information gleaned primarily from a review of the local FBI field office's investigative files.  He also [Page 85] provided a copy to the local FBI agent who was responsible for those files. The cable sets forth the CIA officer's concerns regarding indications that persons associated with a foreign government may have provided financial support to some of the September 11 hijackers while they were living in the United States.  Those indications, addressed in greater detail elsewhere in this report, obviously raise issues with serious national implications.  Nevertheless, the FBI agent to whom he provided a copy viewed it only in relation to ongoing investigations and did not consider its possible value for other cases or the FBI's national counterterrorism strategy.  Thus, the FBI agent placed the cable in only one case file and did not forward a copy to FBI Headquarters.

Similarly, the FBI typically used information obtained through the Foreign Intelligence Surveillance Act (FISA) only in connection with the cases in which it was

obtained and would not routinely disseminate it within the FBI or to other members of the Intelligence Community. FBI personnel advised the Joint Inquiry that FISA information was not included in the FBI's Automated Case System (ACS) because both criminal and intelligence agents had access to that system.

Culture and policy issues also limited the extent to which CIA shared counterterrorism information within the Intelligence Community. As noted earlier, a lack of focus on the domestic terrorist threat, which was viewed as an FBI, rather than CIA, mission, accounted for some information sharing problems. For example, the DCI acknowledged in his testimony that CIA was not sufficiently focused on advising the State Department to watchlist all terrorist operatives who might be traveling to the United States, even though this would provide valuable information to domestic agencies in targeting these persons at ports of entry. On at least three occasions between January 2000 and August 2001, there were opportunities to watchlist future hijackers Nawaf al-Hazmi and Khalid al-Mihdhar, but the CIA failed to do so. In his testimony on October 17, 2002, the DCI admitted this failure, attributing it to:

> . . .uneven practices, bad training and a lack of redundancy. The fact that [CTC personnel] were swamped does not mitigate the fact that we didn't overcome that [with] a separate unit or better training for those people.

[Page 86]

Aside from the formal watchlist procedure, the record strongly suggests that, despite numerous related contacts with the FBI during the period, no one at CIA advised the FBI about al-Mihdhar's U.S. visa and the fact that al-Hazmi had traveled to the United States. Ironically, this occurred despite the fact that both CIA and FBI personnel were at the time working in CTC where the information was received. The CIA employee who briefed FBI personnel about al-Mihdhar on January 6, 2000, but did not mention any information about al-Mihdhar's visa and potential travel to the United States, indicated in an e-mail to a colleague at CIA that same day: "In case FBI starts to complain later . . . below is exactly what I briefed them on." This CIA employee told the Joint Inquiry that he had, at the time, been assigned to work at the FBI Strategic Information Operations Center specifically to fix problems "in communicating between the CIA and the FBI." Obviously, such problems remained.

TOP SECRET

The Joint Inquiry also heard from many different agencies within the Intelligence Community, most notably the Defense Intelligence Agency (DIA), that the perception that collecting agencies have "ownership" of the intelligence they acquire impedes the free flow of information.  In a Joint Inquiry interview, one DIA official complained that analysts were often denied access to critical intelligence held in other Intelligence Community agencies:

> We have to get raw data to the analysts.  The analysts have been separated from source-generated data that is important.  There is excessive, filtering, packaging and selective product reporting that is not helpful.  Some problems are so important that the U.S. Government cannot afford any longer to filter.

In his testimony, the DCI confirmed that this filtering will continue when he noted that even all-source analysts within the new Department of Homeland Security will not have access to all raw intelligence on anything like a routine basis.  This tendency to ownership, in its simplest form, means that the originating agency is free to edit and otherwise truncate the information it collects before it disseminates it to other agencies.  On the other hand, analysts frequently argued that, in the world of counterterrorism, there is information in this filtered data that the collecting agency may not recognize as having significance in the aggregate to analysts elsewhere.  In interviews, DIA officials [page 87] emphasized that they always received threat information from other Intelligence Community agencies, but did not always have access to the background information necessary to understand the nature of the threat reporting fully.  A senior DIA analytical official testified that:

> Senior [Defense Department] officials received information that his analysts did not receive.  However, to extract meaning from that data, to perform the true analytic function, we need to get that information into the hands and the brains of analysts who are paid to fill in the gaps of missing information to compensate for absent evidence and to turn information into knowledge.  That's what we pay them to do.  They don't have the information, they can't do that.

In a written statement to the Joint Inquiry, the new Director of the DIA noted: " In my opinion, one of the most prolonged and troubling trends in the Intelligence Community is the degree to which analysts – while being expected to incorporate the full

range of source information into their assessments – have been systematically separated from the raw material of their trade. "

Information sharing is also limited by the longstanding Intelligence Community practices of narrowly limiting disclosures of intelligence information outside normal channels in order to protect sources and methods.  Disclosures to criminal investigators and prosecutors were intentionally limited to avoid having intelligence become entangled in criminal prosecutions.  In deference to those kinds of restrictions, CIA did not provide the FBI New York field office criminal agents who were investigating the *USS Cole* bombing information regarding the al-Qa'ida meeting in Malaysia that was attended by hijackers-to-be al-Hazmi and al-Mihdhar.

A 1995 Department of Justice policy that established procedures -- often referred to as the "wall" -- governing FBI sharing of Foreign Intelligence Surveillance Act (FISA)-derived intelligence information with investigators handling parallel criminal investigations also prevented sharing of important intelligence.  Under this policy, the FBI could share information from FISA surveillances with criminal investigators if the information was relevant to a crime under investigation and an attorney in an FBI field office or in the Office of Intelligence Policy and Review (OIPR) at the Department of [page 88] Justice authorized its release.  In al-Qa'ida FISA cases, the FISA Court directed that the Court itself act as the "wall" and determine whether the information in question was relevant to a criminal investigation and, thus, could be shared.

Unfortunately, the Inquiry confirmed that the Intelligence Community agencies, perhaps overly "risk averse" in dealing with FISA-related matters, restricted the use of information far beyond what was required.  The majority of FBI personnel interviewed in the course of the Inquiry incorrectly believed that the FBI could not share FISA-derived information with criminal investigators at all or that an impossibly high standard had to be met before the information could be shared.  Most did not know that FISA-derived information  could be shared with criminal investigators if it was simply relevant to the criminal investigation.  Because of these misunderstandings, FBI intelligence investigators rarely sought approval to pass FISA-derived information to FBI criminal investigators.

Further, as a result of the FISA Court decision, NSA placed a caveat on all its [————] terrorism intelligence products requiring OIPR approval before information could be shared with criminal investigators. This stemmed from NSA's concern that it could not determine which of its intelligence reports were the result of information obtained through FBI-conducted FISA surveillances (and therefore subject to the "wall" requirements) and which were not. The effect of this NSA effort to comply with the FISA Court's decision was an unnecessary restriction on the sharing of NSA-acquired intelligence information with criminal investigators.

In August 2001, when the FBI was attempting to locate al-Hazmi and al-Mihdhar in the United States, an FBI Headquarters e-mail prohibited New York field office criminal agents from participating in the search because the information had originated in intelligence channels. However, because this information was not derived from a FISA surveillance, there was no reason it could not be shared with FBI criminal agents. Expressing his utter frustration with the system, a New York FBI agent responded by e-mail: [page 89]

> Whatever has happened to this - someday someone will die – and wall or not – the public will not understand why we were not more effective and throwing every resource we had at certain "problems." Let's hope the [FBI's] National Security Law Unit will stand behind their decisions then, especially since the biggest threat to us now, UBL, is getting the most "protection."

**10.** **Finding**: **Serious problems in information sharing also persisted, prior to September 11, between the Intelligence Community and relevant non-Intelligence Community agencies. This included other federal agencies as well as state and local authorities. This lack of communication and collaboration deprived those other entities, as well as the Intelligence Community, of access to potentially valuable information in the "war" against Bin Ladin. The Inquiry's focus on the Intelligence Community limited the extent to which it explored these issues, and this is an area that should be reviewed further.**

Discussion: This Inquiry confirmed that, prior to September 11, problems in information sharing reached beyond the boundaries of the Intelligence Community to encumber the flow of information to and from various other entities. At each level, communications with potentially valuable partners in the war against terrorism – other

federal agencies, state and local authorities -- were restricted.  Witnesses testified that these restrictions on information flow occurred at great cost to the counterterrorism effort.

Officials in the Departments of Treasury, Transportation, and State told the Joint Inquiry that, although they receive threat information from the Intelligence Community, they do not always receive the information that adds context to the threat warnings.  In many instances, officials told the Joint Inquiry, this lack of context prevents them from properly estimating the value of the threat information and taking preventive actions. The Joint Inquiry was also told that not all threat information in the possession of the Intelligence Community is shared with non-Intelligence Community entities that need it the most in order to counter the threats.

For example, DCI Tenet testified that:  "The documents we've provided show some 12 reports spread over seven years which pertain to possible use of aircraft as terrorist weapons. We disseminated those reports to the appropriate agencies, such as the [page 90] FAA, the Department of Transportation and the FBI as they came in." Subsequently, the Transportation Security Intelligence Service (TSIS) -- which formerly was the Intelligence Office at FAA -- researched the 12 reports mentioned by DCI Tenet to determine what actions had been taken as a result.  TSIS reported to the Joint Inquiry that it had no record of having received three of those reports, two others had been derived from State Department cables, and one report was not received at all by FAA until after September 11, 2001.  A TSIS official also testified that, despite its clear relevance to civil aviation, the FAA was not provided a copy of the FBI's July 1, 2001 Phoenix communication until its existence was made known to officials there by the Joint Inquiry in early 2002.

In a similar vein, the FAA had certain intelligence information in its possession prior to September 11 regarding the terrorist who was apprehended on his way from Canada to the Los Angeles Airport at the time of the Millennium.  It also had conducted a detailed analysis of the bomb materials that were seized with him, and connected them to the Bojinka Plot to blow up commercial airliners over the Pacific that had been discovered in the Philippines in 1995.  In testimony to the Joint Inquiry, a TSIS official

indicated uncertainty regarding whether or not these findings had been formally communicated to the CIA.

The CIA and NSA had sufficient information available concerning future hijackers al-Mihdhar and al-Hazmi to connect them to Usama Bin Ladin, the East Africa embassy bombings, and the *USS Cole* attack by late 2000, and there were at least three different occasions when these individuals should have been placed on the State Department's TIPOFF watchlist and the INS and Customs watchlists.  Nonetheless, this was not done, nor was the FBI notified of their potential presence in the United States until late August 2001.

The CIA also did not provide the Department of State with almost 1500 terrorism-related intelligence reports until shortly after September 11, 2001.  These reports led to the addition of almost 60 names of terrorist suspects to the State watchlist.  Also, due to a [page 91] lack of awareness of watchlisting policies and procedures among CIA personnel before September 11, this information was not provided to the watchlists at INS, and Customs.  Intelligence officers at the Departments of Energy and Transportation also did not have access to FBI data, CIA reports, and names on the watchlists.

The FBI did not advise the Department of State's Diplomatic Security Service of the reasons for its inquiries regarding al-Mihdhar and al-Hazmi's visa information in August 2001 when it was engaged in efforts to find the two individuals in the United States.  Neither was INS asked by the FBI to use means available to it, including a search of the Law Enforcement Support Center's database, to locate al-Mihdhar and al-Hazmi when the FBI was looking for them in the United States in August 2001.  INS and FAA officials who testified at the Joint Inquiry's October 1, 2002 hearing asserted that their agencies might have been able to assist the FBI in locating the two if the FBI had told them of the purpose and importance of the search.

Officials from the Departments of Transportation, State, Energy, Defense, and Treasury stated to the Joint Inquiry that, unless information is shared by the Intelligence Community on a timely basis, they are unable to include dangerous individuals on various watchlists to either deny them entry into the United States or apprehend them in

the United States.  The Transportation Security Administration Assistant Under Secretary of Intelligence testified that, had he received the July 2001 FBI Phoenix field office agent's Electronic Communication, for example, he would have "…started to ask a lot more probing questions of the FBI as to what this was all about…what connections these people may have had to flight schools, by going back to the Airmen Registry in Oklahoma City that is maintained by the FAA to try to identify additional people."

The INS also was not privy to the presence of two known terrorists inside the United States.  The INS Deputy Executive Associate Commissioner testified to the Joint Inquiry hearing on October 1, 2002 that "there is a likelihood" that INS agents would have been able to stop al-Mihdhar and al-Hazmi in August 2001.  The INS Law Enforcement Support Center (LESC) has been in operation for more than ten years.  It is [page 92] capable of querying every INS database and is available on a 24 hour per day, seven-day per week basis.  The LESC reportedly can provide information in about seven minutes on the legal status of individuals in the United States.

In their testimony before the Joint Inquiry hearing, state and local government witnesses were adamant about the necessity of the intelligence and law enforcement agencies sharing terrorist information with state and local authorities.  Former Virginia Governor James Gilmore stated that, in his entire four-year term, he never received any intelligence or law enforcement information regarding terrorists.  Governor Gilmore also testified that:

> . . . to the extent that there has been intelligence sharing, it has been ad hoc. It has been without a real systematic approach. And what would you expect. With the Intelligence Community, it is not within the culture if not within the statute that you don't share information. If you do, you are even subject to criminal penalties not to mention the danger of sharing information and to the danger of people who provide it. And the capacities of the United States in order to gather it.

In addition, he explained that he was not even given a security clearance while he was Governor that would have allowed him to be briefed on possible terrorist plots.

The Police Commissioner of Baltimore stated at the same hearing that he does not receive intelligence information about suspected terrorists living in his jurisdiction even

though some may have been associated with the September 11 hijackers.  He also cited the fact that there are 650,000 law enforcement officers nationwide and they should be viewed by the federal intelligence and law enforcement agencies as force-multipliers. However, this can only happen if information flows in both directions.  The Police Commissioner also testified that, domestically, the local police force is the "biggest collector" of information, not the federal government.  To illustrate his point that information must flow in both directions, he added, "we can tell when people move from one cave to another in Afghanistan, but we can't tell when they move from one row house to another in Baltimore."

By contrast, former FBI Director Louis Freeh testified that information sharing with federal, state and local authorities was a priority for the FBI.  In his Joint Inquiry testimony on October 8, 2002, he said: [page 93]

> We doubled and tripled the number of Joint Terrorism Task Forces [JTTFs] around the United States so we could multiply our forces and coordinate intelligence and counterterrorism operations with the FBI's federal, state, and local law enforcement partners.  Thirty-four of these JTTFs were in operation by 2001. . . . We were also tasked to set up the National Domestic Preparedness Office to counter terrorist threats and to enhance homeland security.

Mr. Freeh added that counterterrorism was such a high priority that the FBI instituted a national threat warning system in order to disseminate terrorism related information to state and local authorities around the country and organized national, regional and local practice exercises to help the country prepare for terrorist attacks.

Further, FBI Director Mueller explained in his October 17, 2002 testimony before the Joint Inquiry the changes that had been made in this regard by the FBI since September 11, and added that:

> As a result of these initiatives and despite some of the testimony that this [Inquiry] has heard, we have received numerous letters of support and gratitude from state and local officials and most particularly from the International Association of Chiefs of Police [IACP]. . . . Our agents must work closely with our local and state law enforcement partners. . . . I don't believe that [the testimony of the Baltimore Police Commissioner] is representative of the feeling in the field. Does his testimony surprise me? I would say probably not.  But I will tell you every time that I have . . .

.seen, either publicly or in testimony before this committee or another committee, that there is a police chief who is not getting what he or she wants, I have called, picked up the phone and called them to try to address those concerns.

. . . .

[A] letter from William Berger, the President of the IACP. . . . praises us for the changes we have made to address this particular problem. I will just read one paragraph:

> It is my belief that the steps you have taken have been very responsive to these concerns and clearly demonstrate the FBI's commitment to enhancing its relationship with State and local law enforcement in improving our ability to combat not only terrorism, but all crime.

> I was at the IACP two weeks ago. I talked to the hierarchy, and I believe that they are supportive. There are isolated individuals throughout the United States who do not believe we are doing enough, and there are areas where we still have a ways to go, getting clearances for chiefs of police, exchange of information all the [page 94] way down and getting it back up. We have a number of [JTTFs] that are working exceptionally well around the country. I think if you went to 9 or 10, or 99 out of 100, or 55 out of 56 you will find that State and local police are very supportive of the relationship. There will always be one, there will always be two, and we try to address them as we come along.

Following the events of September 11, 2001, the IACP President did indeed write to FBI Director Mueller to express his appreciation for the steps the FBI has taken, including the creation of the State and Local Law Enforcement Advisory Panel and the Office of Law Enforcement Coordination. Subsequently, however, the IACP President was quoted on September 19, 2002 that:

> [Federal communications with state and local police] didn't work again…Most local police in New England were informed by the FBI office in that area…about an hour before the public, but police in other regions didn't know about the change until Attorney General John Ashcroft and Homeland Security Director Tom Ridge announced it at a press conference.

The Inquiry found that the FBI's establishment of JTTFs in many FBI field offices had begun to correct some information sharing problems by encouraging coordination between federal, state, and local agencies prior to September 11. These efforts did result in some successes. For example, in the Moussaoui investigation, the INS representative on the Minneapolis JTTF was able to use the INS database to

determine Moussaoui's immigration status quickly. The INS and FBI representatives then approached Moussaoui together and he was taken into INS custody at an INS facility and questioned by the FBI.

However, a variety of shortcomings in the JTTF program limited its effectiveness prior to September 11. First, not all of the FBI field office had JTTFs. Further, some of the JTTFs were hampered by a lack of analytic personnel, limited participation by local law enforcement organizations, incomplete access to information by some of the participants, and the absence of CIA detailees.

Prior to September 11, only 35 FBI field offices had JTTFs and only six JTTFs had CIA representatives. This might help explain why [page 95] the CIA did not receive a copy of the July 2001 Phoenix communication until well after September 11. The Gilmore Advisory Panel reported anecdotal evidence suggesting that the JTTF and other similar efforts, while well intentioned, continue to be confusing, duplicative, non-routine, and bifurcated in both structure and implementation.

**11. Finding:  Prior to September 11, 2001, the Intelligence Community did not effectively develop and use human sources to penetrate the al-Qa'ida inner circle. This lack of reliable and knowledgeable human sources significantly limited the Community's ability to acquire intelligence that could be acted upon before the September 11 attacks.  In part, at least, the lack of unilateral (i.e., U.S. –recruited) counterterrorism sources was a product of an excessive reliance on foreign liaison services.**

Discussion:  The U.S. Intelligence Community was not able to penetrate al-Qa'ida's inner circle successfully before September 11, despite the fact that human penetration of that organization was considered a priority. Richard Clarke, the former National Counterterrorism Coordinator, described the problem as well as the impact that it had on policymakers:

> [It was not until 1999 that the Counterterrorism Center began to have some success in developing penetrations of al-Qa'ida. A new Director. . .took over the Counterterrorism Center and was instructed by George Tenet to get human penetrations of al-Qa'ida, and they did have some success in the succeeding years, although none of them very high level.

. . . .
. . . . [——————————————————————————————
————————————————————————————] never had anyone in
position to tell us what was going to happen in advance, or even where
Bin Ladin was going to be in advance [————————————————
————————————] we never knew where
he was going to be in advance, And usually we were only informed about
his – where he was after the fact. . . . And [——————————————]
where they were able to tell us where they thought he was at the moment,
[——————————————] the CIA itself recommended against
action, because they said their sources were not very good, or not good
enough to recommend military action].

[Page 96]

      Former Director Louis Freeh emphasized the critical difference that human

sources and adequate "infiltration" of terrorist organizations could have made in the

context of the September 11 attacks:

> If one of those 19 hijackers had spoken – maybe they did, maybe we don't
> know about it yet – incautiously or imprudently to someone in some place
> where that information could have been captured, we could have had a day
> of terror prevented instead of September 11th. There's all kinds of
> possibilities there.  So, infiltration. We need to have our agents sitting
> around wherever they were sitting around in Hamburg and the U.A.E. and
> other places, as well as in the caves over in Afghanistan so we can know
> what is going on.

[Lacking access to senior, high level al-Qa'ida leadership, the Community relied on

secondhand, fragmented and often questionable human intelligence information, a great

deal of which was obtained from volunteers or sources obtained through the efforts of

foreign liaison].

      [According to senior CTC officials, CIA had no penetrations of al-Qa'ida's

leadership and never obtained intelligence that was sufficient for action against Usama

Bin Ladin from anyone.  A large number of current and former CTC officers indicated

that CTC had numerous unilateral sources outside the leadership who were reporting on

al-Qa'ida, and a larger number who were being developed for recruitment, prior to

September 11.  The best source was handled jointly by CIA and the FBI.  In addition,

CIA managed a network of [——————] in Afghanistan that often reported

information regarding Bin Ladin issues and relations with the Taliban.  They occasionally

provided threat information as well, but had no access to al-Qa'ida's leadership].

[Especially after the East Africa U.S. embassy bombings in 1998, CIA also tried many avenues in an effort to obtain access to Bin Ladin and his inner circle. [————————

————————————————————————————————————————————

————————————————————————————————————————————————]

[page 97] [————————————————————————————————————————

————————————————————————————————————————————————

————————————————————————————————————————————————

————————————————————————————————————————————————

——————————————————————————————————————]. Despite these creative attempts, according to former senior officials of CTC, CIA had no penetrations of al-Qa'ida's leadership, and the Agency never acquired intelligence from anyone that could be acted upon, prior to September 11].

[Numerous sources were being handled by foreign intelligence services. Most disruptions of al-Qa'ida activities abroad before September 11 were the result of joint initiatives with foreign governments. However, relying on foreign services [————————

————————————] meant that very little counterterrorism intelligence was obtained by CIA in some parts of the world [————————————].

[There was a surge in volunteer sources after the 1998 East African embassy bombings, another surge on the anniversary of those bombings in 1999, and a third after the December 1999 disruption of the Jordanian Millennium plot. [————————————

————————————————————————————————————————————

————————————]. One of these was very good and provided information that was used to thwart attacks on U.S. interests in Europe. Several of these volunteers continue to act as CIA sources. [————————————————————————————————————————

——————————————————————————————————————————]. The negative considerations were that most volunteer information was considered bogus by CTC, some volunteers were suspected of being al-Qa'ida provocations, and some were believed to have cooperated with terrorist groups].

The inability to develop reliable human sources effectively stemmed, in part, from the difficult nature of the target. Members of Usama Bin Ladin's inner circle have close bonds established by kinship, wartime experience, and long-term association. [Page 99] Information about major terrorist plots was not widely shared within al-Qa'ida, and many of Bin Ladin's closest associates lived in war-torn Afghanistan. The United States had no official presence in that country and did not formally recognize the Taliban regime, which viewed foreigners with suspicion.  Pakistan is the principal access point to southern Afghanistan, where al-Qa'ida was particularly active, but U.S.-Pakistani relations were strained by Pakistani nuclear tests in 1998 and a military coup in 1999.

While attempts to penetrate al-Qa'ida cells outside Afghanistan may have presented fewer obstacles, other factors limited CIA efforts to do so.  [——————————

—————————————————————————————————————————————

—————————————————————————————————————————————

—————————————————————————————————————————————

—————————————————————————————————————————————

—————————————————————————————————————————————

—————————————————————————————————————————————

———————————————]. This meant as a practical matter that CIA did not focus as heavily as would otherwise have been the case on recruiting human sources of counterterrorism intelligence in other locations such as [————————————————].

CTC personnel said they did not view guidelines issued by former DCI John Deutch in 1996 concerning CIA recruitment of human sources with poor human rights records as an impediment to the pursuit of terrorist recruitments in al-Qa'ida, and none of the CTC officers interviewed by the Joint Inquiry attributed the lack of penetration of the al-Qa'ida inner circle to the Deutch guidelines.  In fact, the effort to recruit such penetrations became increasingly aggressive with respect to Bin Ladin's network beginning in 1999.  These responses should be balanced against the examination of the effect of the Deutch guidelines that was conducted by the House Permanent Select Committee on Intelligence (HPSCI) Subcommittee on Terrorism and Homeland Security. Its July 2002 report stated in this regard: [page 99]

> . . . Many CIA managers at headquarters posited that the guidelines did not present a problem and that no extra labor [was] required on the part of field officers as a result of the guidelines.  Many others, including CIA officers in the field who brought their concerns to the attention of HPSCI members and staff, had a different view . . . . Their concerns were not that waivers were denied, but that they were not career enhancing and that the process by which requests were brought forward was cumbersome and resulted in disincentive to work to recruit anyone who might have been involved in proscribed acts. . . .

Prior to September 11, the FBI also attempted, but with only limited success, to develop human sources regarding the activities of al-Qa'ida and other terrorist groups within the United States.  Again, the difficult nature of the target, as well as FBI and Department of Justice policies and practices, may have hampered the FBI's coverage of the radical fundamentalist community in this country.

Recruiting sources in fundamentalist communities within the United States may have been more difficult than such recruitments abroad.  The FBI advised the Joint Inquiry that, for example, only 21 FBI agents possess the Arabic language skills that would be expected to be important in pursuing such recruitments.

However, even those FBI agents who were skilled at developing such sources faced a number of difficulties that may have hampered the FBI's ability to gather intelligence on terrorist activities in the United States.  According to several FBI agents, for example, FBI Headquarters and field managers were often unwilling to approve potentially controversial activity involving human sources who were in a position to provide counterterrorism intelligence.  The 1996 Antiterrorism and Effective Death Penalty Act specifically outlawed providing material support to terrorism.  If an FBI source was involved in illegal funding or in terrorist training, the agent responsible for the source had to obtain approval from FBI Headquarters and the Department of Justice to allow the source to engage in the illegal activity.  According to FBI personnel, this was a difficult process that sometimes took as long as six months.  Because terrorist sources frequently engaged in activity that violated the 1996 Act, the cumbersome approval process often discouraged aggressive recruitment of these sources in the field.

[page 100]

FBI agents also cited to the Joint Inquiry the requirement for prior DCI approval of FBI source travel abroad as a roadblock to sending sources overseas for operational purposes.  Several FBI agents expressed the opinion to the Joint Inquiry that the CIA took advantage of this requirement to prevent FBI sources from operating overseas.  Another FBI agent complained that FBI Headquarters management did not readily approve overseas travel for sources because of its belief that the FBI should focus on activity within the United States.  When FBI management did approve overseas travel for assets, it often declined to allow the responsible agents to accompany the sources during such travel.  These decisions, according to FBI agents in Joint Inquiry interviews, significantly diminished the quality of the operations

The FBI also apparently did not use those counterterrorism sources that had been identified in the most effective and coordinated manner.  The FBI generally focused source reporting on cases and subjects within the jurisdiction of specific field offices and did not adequately use sources to support a national counterterrorism intelligence program.  For example, the FBI received intelligence in 1999 that a terrorist organization was planning to send students to the United States for aviation training.  While an operational unit at FBI Headquarters instructed twenty-four field offices to "task sources" for information, it appears that no FBI sources were in fact asked about the matter.

In addition, when the Phoenix FBI agent reported to FBI Headquarters in July 2001  his concern that Middle Eastern students were coming to the United States for civil aviation-related training, there was no effort by either FBI Headquarters or the field office that was advised of his concern by FBI Headquarters to task counterterrorism sources for any relevant information.   Similarly, when Minneapolis FBI field office agents detained Zacarias Moussaoui in August 2001, they were concerned that he might be part of a larger conspiracy.  Nonetheless, neither the Minneapolis field office nor FBI Headquarters asked any FBI sources whether they knew anything about Moussaoui or the existence of any larger plot.

[Page 101]

[Finally, in August 2001, the FBI learned from the CIA that terrorist suspects Nawaf al-Hazmi and Khalid al-Mihdhar were in the United States.  Neither the FBI field offices that were involved in the search nor FBI Headquarters thought to ask FBI field

offices to ask their sources whether they were aware of the whereabouts of the two individuals, who later took part in the September 11 attacks.  As one result, the San Diego counterterrorism informant who had numerous contacts with those two individuals during 2000 was never asked to help the FBI locate them in the last weeks before September 11].

**12.** **Finding:**  **During the summer of 2001, when the Intelligence Community was bracing for an imminent al-Qa'ida attack, difficulties with FBI applications for Foreign Intelligence Surveillance Act (FISA) surveillance and the FISA process led to a diminished level of coverage of suspected al-Qa'ida operatives in the United States.  The effect of these difficulties was compounded by the perception that spread among FBI personnel at Headquarters and the field offices that the FISA process was lengthy and fraught with peril.**

Discussion:  In the summer of 2000, during preparation for the trial in New York of those involved in the bombing of the U.S. embassies in East Africa, prosecutors discovered factual errors in applications for FISA orders sanctioning electronic surveillance.  The FISA Court found that these errors included an erroneous statement that a FISA target was not under criminal investigation, erroneous statements concerning overlapping intelligence and criminal investigations, and unauthorized sharing of FISA information with criminal investigators and prosecutors.

The FISA Court also determined that these errors called into question the certifications that had been made by senior officials that the FISA surveillances requested by the applications had as their purpose the gathering of foreign intelligence, rather than criminal-related information, as required by FISA.  After being informed of additional errors in subsequent months, the FISA Court barred an FBI agent who had prepared one of the erroneous applications from appearing before the Court again.

The FBI and the Department of Justice's Office of Intelligence Policy and Review (OIPR) began a systematic review of the FISA application process in September 2000 to [page 102] ensure the accuracy of FISA Court filings.  Some FISA surveillances targeting al-Qa'ida agents were allowed to expire while OIPR and the FBI investigated how the errors had occurred.  These orders were not renewed until after the attack on *USS Cole* in October 2000.  In April 2001, the Bureau promulgated procedures for the review of draft

FISA declarations and the submission of FISA applications to the Court.  OIPR also revised the standard al-Qa'ida FISA application to reduce the amount of extraneous information that was required and that increased the likelihood of factual errors.

During this process, many FISA surveillances of suspected al-Qa'ida agents expired because the FBI and OIPR were not willing to apply for application renewals when they were not completely confident of their accuracy.  Most of the FISA orders targeting al-Qa'ida that expired after March 2001 were not renewed before September 11. The Joint Inquiry received inconsistent figures regarding the specific number of FISA orders that were allowed to expire during the summer of 2001.  One FBI manager stated that no FISA orders targeted against al-Qa'ida existed in 2001, others interviewed said there were up to [——] al-Qa'ida orders at that time, and an OIPR official explained that approximately two-thirds of  the number of FISA orders targeted against al-Qa'ida had expired in 2001.

Several organizations played a role in the breakdown of the FISA process in the year before the September 11 attacks.  According to FBI personnel, OIPR and the FISA Court erred by requiring much extraneous information in FISA applications, thus increasing the likelihood of mistakes.  Bureau agents frequently could not or did not verify the accuracy of information in the FISA applications.  The FISA Court's order prohibiting an FBI agent from appearing before the Court also apparently had a chilling effect on FBI agents, and they became increasingly unwilling to confirm the veracity of FISA applications.

**13. Finding**:  [——————————————————
————————————————————————
———————————————————— [page 103] ——
————————————————————————
————————————————————————
————————————————————————
————————————————————————
————————————————————————
————————————————————————
————————————————————————
————————————————————————
——————————].

Discussion:  [During his tenure, President Clinton signed  documents authorizing CIA covert action against Usama Bin Ladin and his principal lieutenants.  [———————

————————————————————————————————————

————————————————————————————————————

————————————————————————————————————

————————————————————————————————————

——————————————————————].

[————————————————————————————————

————————————————————————]:

- [————————————————————————————————

————————————————————————————————

————————————————————————————————

——————————————————————].

- [————————————————————————————————

————————————————————————————————

————————————————————————————————

————————————————————————————————

————————————————————————————————————].

[————————————————————————————————

————————————————————————————————————] [page

104] [————————————————————].  [Former National Security Advisor Sandy Berger testified to the Joint Inquiry on September 19, 2002 that, from the time of the East Africa U. S. Embassy bombings in 1998, the U. S. Government was:

> . . . embarked [on] an very intense effort to get Bin Ladin, to get his lieutenants, through both overt and covert means. . . . We were involved – at that point, our intense focus was to get Bin Ladin, to get his key lieutenants.  The President conferred a number of authorities on the Intelligence Community for that purpose.

<u>Senator Shelby</u>:  By "get him," that meant kill him if you had to, capture him or kill him?

<u>Mr. Berger</u>:  I don't know what I can say in this hearing, but capture and kill. . . . There was no question that the cruise missiles were not trying to capture him.  They were not law enforcement techniques. . . ."]

[————————————————————————————
————————————————————————————
————————————————————————————
————————————————————————————
————————————————————————————
————————————————————————————
————————————————————————————————].

[————————————————————————————
————————————————————————————
————————————————————————————
————————————————————————————
——————————————————————]."  As former National Security Advisor Berger noted in his Joint Inquiry interview, "We do not have a rogue CIA."

[————————————————————————————
————————————————————————————
————————————————————————————
————————————————————————————
————————————————————————————
————————————————————————————
————————————————————————].”

In his June 11, 2002 briefing to the Joint Inquiry, Mr. Clarke reiterated this point when he said: [page 105]

I think if you look at the 1980s and 1970s, the individuals who held the job of [DDO], one after another of them was either fired or indicted or

condemned by a Senate committee.  I think under those circumstances, if you become Director of Operations, you would want to be a little careful not to launch off on covert operations that will get you personally in trouble and will also hurt the institution.  The history of covert operations in the 1950s and 1960s and 1970s was not a happy one, and I think that lesson got over-learned by people who at the time were probably in their twenties and thirties, but by the time they became in their fifties, and they were managers in the [Directorate of Operations], I think that they institutionalized a sense of covert action is risky and is likely to blow up in your face.  And the wise guys at the White House who are pushing you to do covert action will be nowhere to be found when the Senate Select Committee on Intelligence calls you up to explain the mess that the covert action became.

Mr. Clarke went on to say: "I think it is changed because of 9/11.  I think it is changed because George Tenet has been pushing them to change it."

In a July 26, 2002 Joint Inquiry interview, a former Chief of CTC made a similar point when he implicitly acknowledged that he pushed whenever possible for clarity in the covert action authorities [————————————————————————————

————————————————————————————————————————————

————————————————————————————————————————————

————————————————————————————————————————————

————————————————————————————————————————————

————————————————————————————————————————————

————————————————————————————————————————————

————————————————————————————————————————————

————————————————————————————————————————————

————————————————————————————————————————————

————————————————————————————————————————]."

The policy makers' reluctance [————————————————] limited the scope of CIA operations against Bin Ladin.  [————————————————————————] [Page 106] [————————————————————————————————————————

————————————————————————————————————————————

———————————————————————————
———————————————————————————
——————————————————————].”

[—————————————————————————
———————————————————————————
————————————————————————]:

[—————————————————————————
———————————————————————————
———————————————————————————
———————————————————————————
———————————————————————————
———————————————————————————
———————————————————————————
———————————————————].

     In any event, the differing perceptions about the scope of the authorizations shaped the types of covert action the CIA was willing to direct against Bin Ladin prior to September 11, 2001 and, therefore, its ultimate effectiveness.  [———————————————
———————————————————————————
———————————————————————————
———————————————————————————
———————————————————————————
———————————————————————————
————————————].

[—————————————————————————
———————————————————————————
————————————————————————] [Page 107] [——————————————————————
———————————————————————————
———————————————————————————
——————].

The CIA's actual efforts to carry out covert action against Bin Ladin in Afghanistan  prior to September 11, 2001 were limited and do not appear to have significantly hindered al-Qa'ida's ability to operate.  [——————————]:

- [————————————————————————————
————————————————————————————
————————————————————————————
————————————————];

- [————————————————————————————
————————————————————————————
————————————];"

- [————————————————————————————
————————————————————————————
————————————————————————————
————————];

- [————————————————————————————
————————————————————————————
————————————————————————————
————————————————————————————
————————————————];"

[Page 108]

- [————————————————————————————
————————————————————————————
————————————————————————————
————————————————————————————
————————————————————————————

_____

_____];

- [_____

_____]; and,

- [_____

_____].

Many of these efforts were key elements in "the Plan" – initially developed in 1999 and subsequently modified -- that the DCI described in his testimony before the Joint Inquiry on October 17, 2002.  "The Plan" did not, however, feature elements commonly associated with war plans or contingency plans, such as a mission statement, strategic goals or objectives, a statement of commander's intent, a delineation of the resources that would be required or are available for the operation, or the measures by which operational success might be measured.  Although a covert action plan might not be expected to contain all of the elements of a war plan, the absence of all these elements suggests an absence of rigor in the planning process.

[_____

_____

_____

_____

_____

_____]

[Page 109] [_____

_____

_____

_____].

The Joint Inquiry heard testimony on September 12 and September 19, 2002 that, between March 2001 and September 2001, the Bush Administration was engaged in a

review of counterterrorism policy. ——————————————————
——————————————————].

[——————————————————————————————

—————————————————
—————————————————
—————————————————
—————————————————

———————————].  [Deputy Secretary of State Armitage testified that the Bush Administration was considering, among other things, "increased authorities for the Central Intelligence Agency" in the summer of 2001 and was close to final agreement on a more aggressive strategy against Bin Ladin and his followers by September 11, 2001:

> The National Security Council . . . called for new proposals [in March 2001] on a strategy that would be more aggressive against al-Qa'ida.  The first deputies meeting, which is the first decision making body in the administration, met on the 30th of April and set off on a trail of initiatives to include financing, getting at financing, to get at increased authorities for the Central Intelligence Agency, sharp end things that the military was asked to do. . . . So, from March through about August, we were preparing a national security Presidential directive, and it was distributed on August 13 to the principals for their final comments.  And then, of course, we had the events of September 11. . . .]

**14. Finding:  [Senior U.S. military officials were reluctant to use U.S. military assets to conduct offensive counterterrorism efforts in Afghanistan, or to support or participate in CIA operations directed against al-Qa'ida prior to September 11.  At least part of this reluctance was driven by the military's view that the Intelligence Community was unable to provide the intelligence needed to support military operations.  Although the U.S. military did participate in [——] counterterrorism efforts to counter Usama Bin Ladin's terrorist network prior to September 11, 2001, most of the military's focus was on force protection].**

Discussion:  National Security Council officials, CIA officers in the CTC, and senior U.S. military officers differ regarding the U.S. military's willingness to conduct operations against Usama Bin Ladin prior to September 11, 2001.  In general, however, [page 110] these officials indicate that senior military leaders were reluctant to have the military play a major role in offensive counterterrorism operations in Afghanistan prior to September 11:

TOP SECRET

- In his June 11, 2002 remarks, former National Coordinator for Counterterrorism Richard Clarke said, "the overwhelming message to the White House from the uniformed military leadership was 'we don't want to do this,' [————————

————————————————————]. Later in that same briefing, he said: "The military repeatedly came back with recommendations that their capability not be utilized [————————————————] in Afghanistan."

- In a written response to the Joint Inquiry, former National Security Advisor Sandy Berger said:

  > President Clinton's top military advisers examined [military options]. They advised us that there would be a low probability of success for such operations in Afghanistan (before 9/11 when we did not have the cooperation of Pakistan and other bordering nations) in the absence of substantial lead-time actionable intelligence (i.e., specific advanced knowledge of where bin Ladin would be at a specific time and place). There were many obstacles to deploying ground troops into Afghanistan from staging areas at some distance, including a serious possibility of detection, difficulty of basing back-up forces nearby and logistical difficulties.

- Interviews of officials at the CTC and a review of CTC documents support the finding that the military did not seek an active role in offensive counterterrorism operations.  For example, ————————————————————————

————————————————————————————]."  In the CTC's view, although there was "lots of desire at the working level," there was "reluctance at the political level," and it was "unlikely that JSOC will ever deploy under current circumstances."

[Page 111]

- On September 12, 2002, a former Chief of CTC said: "You know, [the U.S. military] – they have their own views on their willingness to take casualties and take risky operations… For them to go, they are more exacting in their requirements, in terms of intelligence certainly, before they engage."

- Another former Chief of CTC testified:

    > Actually it was discussed… turning the ball over to [the military], but having them do it themselves.  They declined, as I recall, as best I recall, because they lacked the covert action authorities to work in that environment.  Since there wasn't an official declaration of war, there wasn't fighting, they didn't think they had the authorities to go in and do it themselves.  They were willing to help… but they couldn't put boots on the ground themselves.

- The former Chairman of the Joint Chiefs of Staff stated that the U.S. military primarily thought about the threat posed by Usama Bin Ladin's network in terms of protecting U.S. forces deployed overseas from terrorist attack.  He also stated his belief that the CIA and FBI should have the lead roles in countering terrorism, and that military tools should be viewed as an extension and supplement to the leading roles played by the CIA and FBI.  In discussing offensive counterterrorism operations in Afghanistan, the former Chairman cited the lack of actionable intelligence, noting "Look at the risk associated with swooping in."  With regard to using U.S. military forces in clandestine operations, the former Chairman said: "you don't put U.S. armed forces in another country if the President doesn't declare war, unless you declare war on the Taliban." He said he never received a tasker to put boots on the ground to obtain actionable intelligence, noting "the military does what it is told to do."

- The Joint Chief of Staff's Director of Operations indicated that options developed by the military for the White House in 2000 were in part aimed at "educating" the National Security Advisor on the complexities of operations in Afghanistan involving "U.S. boots on the ground."

[Page 112]

In Joint Inquiry interviews, senior and retired U.S. military officers cited the lack of precise, actionable intelligence as a primary obstacle to the military conducting its own operations against Bin Ladin.  The former Chairman of the Joint Chiefs of Staff stated, for example: ". . . you can develop military operations until hell freezes over, but they are worthless without intelligence."

However, according to CIA officers in the CTC who testified before the Joint Inquiry on September 12, 2002, the U.S. military often levied so many requirements for highly detailed, actionable intelligence prior to conducting an operation – far beyond what the Intelligence Community was ever likely to obtain – that U.S. military units were effectively precluded from conducting operations against Bin Ladin's organization on the ground in Afghanistan or elsewhere prior to September 11.  A former Chief of CTC's special Bin Ladin unit said:

> [the military's] requirements, before they operate, are absolutely impossible for us to collect in most instances.  [————————
>
> ————————————
>
> ——————————]. And the requirements they sent us included items like, which side of the door are the hinges on, do the windows open out or go up and down.  And it is just not the kind of intelligence we can provide on anything resembling a regular basis.

The Department of Defense did ask the Defense HUMINT [Human Intelligence] Service to determine whether it could obtain information regarding Bin Ladin's whereabouts.  However, the former Chairman of the Joint Chiefs of Staff indicated that the U.S. military did not undertake any independent efforts, utilizing U.S. military forces, to determine Bin Ladin's location.

Lower-level military officers appeared to be more enthusiastic than senior military officials about active military participation in counterterrorism efforts.  Senior CIA officers, CIA documents, and at least one former special operations forces [page 113] commander indicated, in interviews and testimony, that military operators were both capable and interested in conducting a special operations mission against Bin Ladin in Afghanistan prior to September 11.  A former JSOC commander told the Joint Inquiry that his units did have the ability to put small teams into Afghanistan.   A CIA document commenting on the prospects of Joint Special Operations Command units participating in an operation to capture Bin Ladin said: "lots of desire at the [military] working level," but there was "reluctance at the political level."

Despite senior officers' reluctance to play a major role, military personnel and assets did contribute to several counterterrorism efforts in addition to force protection.

The Joint Inquiry has identified [——————] major types of military participation in, or support for, operations to counter Usama Bin Ladin's terrorist network prior to September 11:

- On August 20, 1998, following the bombings of two U.S. embassies in East Africa, the U.S. military, acting on President Clinton's orders, launched cruise missiles at Usama Bin Ladin-related targets in Sudan and Afghanistan.  One of the objectives of those strikes was to kill Usama Bin Ladin.  As former National Security Advisor Sandy Berger testified: "we [were] trying to kill Bin Ladin, we dropped cruise missiles on him;"

- Between 1999 and 2001, the U.S. military positioned a number of Navy ships and submarines armed with cruise missiles in the North Arabian Sea to launch additional cruise missile strikes at Bin Ladin in the event the Intelligence Community was able to obtain precise information on his whereabouts in Afghanistan; and

- [In 2000 and 2001, the Joint Staff and U.S. Air Force provided technical assistance in the development of the Predator unmanned aerial vehicle as a [Page 114] second source of intelligence on Usama Bin Ladin's precise whereabouts in Afghanistan.  Former National Security Advisor Sandy Berger told the Joint Inquiry that:

    > The Clinton Administration was engaged in an active strategy against Bin Ladin and was continuously examining new initiatives for defeating Bin Ladin and al-Qa'ida, given what was known and the allies available at the time.  For example, in 2000, we developed the Predator program, which was successfully tested in late 2000 and was available to be operationalized as a critical intelligence platform to confirm intelligence on his whereabouts when the weather cleared in the Spring of 2001].

In general, however, the CIA and U.S. military did not engage in joint operations, pool their assets, or develop joint plans against Usama Bin Ladin in Afghanistan prior to September 11, 2001 – despite interest in such joint operations at the CIA.  Commenting on the idea of the CIA and U.S. military engaging in joint operations, a former Chief of CTC testified:

I think it is absolutely great [idea]. This is something we have been advocating for a long time. If you want to go to war, you take the CIA, its clandestinity, its authorities, and you match it up with special operations forces of the U.S. military, you can really – you can really do some damage.… This is something that we have tried to advocate at the working level, and we haven't made much progress. But, if this is something that [the Congress] would like to look into, it would be great for the United States.

Similarly, a former Chief of CTC's special Bin Ladin unit said: "As someone who served  [————] and worked with special forces, they want to work with us and we want to work with them. History was made between the CIA and special forces. We need to do that." However, the former Chairman of the Joint Chiefs of Staff told the Joint Inquiry that he did not believe in joint operations with the CIA. He said, "I want to make sure the military piece of the plan is under military control, and not predicated on the CIA's piece being successful."

**15. Finding:  The Intelligence Community depended heavily on foreign intelligence and law enforcement services for the collection of counterterrorism intelligence and the conduct of other counterterrorism activities.  The results were mixed in terms of productive intelligence, reflecting vast differences in the ability and willingness of the various foreign services to target the Bin Ladin and al-Qa'ida network. Intelligence Community agencies sometimes failed to coordinate their relationships with foreign services adequately, either within the Intelligence Community or with broader U.S. Government liaison and foreign policy efforts.  This reliance on foreign liaison services also resulted in a lack of focus on the development of unilateral human sources.**

[Page 115]

Discussion:  [In the mid-1990s, CIA counterterrorism officials decided that unilateral operations alone were of limited value in penetrating al-Qa'ida and that foreign liaison services could serve as a force multiplier.  Foreign intelligence and security services often had excellent local knowledge and capabilities; [————————————

————————————————————————————————————————

————————————————————————————————————————

————————————————————————————————————————

————————————————]. Therefore, CIA, FBI, NSA, and other Intelligence Community agencies strengthened their liaison relationships with existing foreign partners and forged new relationships to fight al-Qa'ida and other radical groups. For example, the CIA [————

──────────────────────────────────────────────]. The FBI expanded its Legal
Attache (Legat) program].

[Despite those efforts, many weaknesses in foreign liaison relationships were
apparent before the September 11 attacks. These weaknesses limited the amount and
quality of the counterterrorism intelligence received as a result of those relationships. For
example, individuals in some liaison services organization are believed to have
cooperated with terrorist groups].

[Regarding Saudi Arabia, former FBI Director Louis Freeh testified that,
following the 1996 Khobar Towers bombing, the FBI "was able to forge an effective
working relationship with the Saudi police and Interior Ministry." A considerable
amount of personal effort by Director Freeh helped to secure what he described as
"unprecedented and invaluable" assistance in the Khobar Towers bombing investigation
from the Saudi Ambassador to the United States and the Saudi Interior Minister. By
contrast, the Committees heard testimony from U.S. Government personnel that Saudi
officials had been uncooperative and often did not act on information implicating Saudi
nationals].

[Page 116]

[According to a U. S. Government official, it was clear from about 1996 that the
Saudi Government would not cooperate with the United States on matters relating to
Usama Bin Ladin. [───────────────────────────────────────────────
────────────────────────────────────────────────────────────────
────────────────────────────────────────────────────────────────
────────────────────────────────────────────────────────────────
──────────────────────], reemphasized the lack of Saudi cooperation and stated that there was
little prospect of future cooperation regarding Bin Ladin. [───────────────────
───────] told the Joint Inquiry that he believed the U.S. Government's hope of eventually
obtaining Saudi cooperation was unrealistic because Saudi assistance to the U.S.
Government on this matter is contrary to Saudi national interests].

[A U. S. Government official testified to the Joint Inquiry on this issue [─────────
────────────────────────] as follows:

[————————————————————————————————

————————————————————————————

————]….[F]or the most part it was a very troubled relationship where the Saudis were not providing us quickly or very vigorously with response to it.  Sometimes they did, many times they didn't.  It was just very slow in coming.

The Treasury Department General Counsel testified at the July 23, 2002 hearing about the lack of Saudi cooperation:

There is an almost intuitive sense, however, that things are not being volunteered. So I want to fully inform you about it, that we have to ask and we have to seek and we have to strive.  I will give you one-and-a-half examples.  The first is, after some period, the Saudis have agreed to the designation of a man named Julaydin, who is notoriously involved in all of this; and his designation will be public within the next 10 days.  They came forward to us two weeks ago and said, okay, we think we should go forward with the designation and a freeze order against Mr. Julaydin.  We asked, what do you have on him?  Because they certainly know what we have on him, because we shared it as we tried to convince them that they ought to join us.  The answer back was, nothing new.
. . . .
. . . I think that taxes credulity, or there is another motive we are not being told.

[Page 117]

[A number of U. S. Government officials complained to the Joint Inquiry about a lack of Saudi cooperation in terrorism investigations both before and after the September 11 attacks. ——————————————————————————

————————————————————————————————————

————————————————].  A high-level U. S. Government officer cited greater Saudi cooperation when asked how the September 11 attacks might have been prevented.  In May 2001, the U.S. Government became aware that an individual in Saudi Arabia was in contact with a senior al-Qa'ida operative and was most likely aware of an upcoming al-Qa'ida operation.  [——————————————————————————

————————————————————————————————————

——————————————————————————].


[————————————————————————————————

————————————————————————————————————

————————————————————————————————————

_____

_____

_____

_____

_____].

Several other Arab governments hesitated to share information gleaned from arrests of suspects in the *USS Cole* bombing and other attacks.  Even several European governments were described to the Joint Inquiry as indifferent to the threat al-Qa'ida posed prior to September 11, while others faced legal restrictions that impeded their ability to share intelligence with the United States or to disrupt terrorist cells.  Prior to September 11, for example, [_____], despite repeated requests from CIA, [Page 118] provided little helpful information [_____]. A CIA representative described the situation in his testimony before the Joint Inquiry:

> We had passed [_____] a great number of leads about al-Qa'ida members. We passed [them] a great deal of leads on al-Qa'ida members, including some of the people you see in the press now, like [_____ _____], and we had really given them a lot of names to track after September 11. The arrests they made [after September 11, 2001] showed that they had in fact been following them and monitoring them to some extent. But the CIA did not get information back [ ] on it to any measurable extent that would help us with our efforts.

[CIA's liaison partners vary in competence and commitment.  [_____ _____ _____].  However, the Agency still had to rely heavily on liaison partners in several countries in order to acquire counterterrorism intelligence for the conduct of other counterterrorism activities].

There were also missteps in the efforts of various Intelligence Community agencies to develop foreign liaison relationships. [_____ _____ _____ _____].  However, significant problems arose because liaison on counterterrorism was not always well integrated into overall U.S. regional goals and

liaison relations.  As a result, other issues, albeit important, sometimes diverted attention from counterterrorism.

The many channels for contact between U.S. and foreign intelligence services also led to a lack of coordination at times.  Former National Security Advisor Sandy Berger noted that many U.S. agencies, ranging from the CIA and FBI to the Agriculture Department, develop liaison service relations and that, in some countries, there are now a dozen or more of these kinds of relationships.  Often, U.S. ambassadors were not able to control these interactions, and, as a result, the U.S. Government did not always place [page 119] proper priorities on what it asked of foreign governments.  In his testimony, Mr. Berger recommended giving "the DCI authority to coordinate all intelligence cooperation with other countries."

Finally, the capabilities of FBI Legats were not always incorporated within the overall intelligence relationship with a foreign country.  Thus, other members of the U.S. Intelligence Community did not always utilize relationships developed by the Legats to their full advantage.

**16. Finding**:  [**The activities of the September 11 hijackers in the United States appear to have been financed, in large part, from monies sent to them from abroad and also brought in on their persons.  Prior to September 11, there was no coordinated U.S. Government-wide strategy to track terrorist funding and close down their financial support networks.  There was also a reluctance in some parts of the U.S. Government to track terrorist funding and close down their financial support networks.  As a result, the U.S. Government was unable to disrupt financial support for Usama Bin Ladin's terrorist activities effectively**].

Discussion:  [Tracking terrorist funds can be an especially effective means of identifying terrorists and terrorist organizations, unraveling and disrupting terrorist plots, and targeting terrorist financial assets for sanctions, seizures, and account closures.  As with organized criminal activity, financial support is critically important to terrorist networks like al-Qa'ida.  Prior to September 11, 2001, however, no single U.S. Government agency was responsible for tracking terrorist funds, prioritizing and coordinating government-wide efforts, and seeking international collaboration in that effort.  Some tracking of terrorist funds was undertaken before September 11.  For the

most part, however, these efforts were unorganized and ad-hoc, and there was a reluctance to take actions such as seizures of assets and bank accounts and arrests of those involved in the funding.  A U.S. Government official testified before the Joint Inquiry, for example, that this reluctance hindered counterterrorist efforts against Bin Ladin: "Treasury was concerned about any activity that could adversely affect the international financial system . . . ]."

Treasury Department General Counsel David Aufhauser testified to the Joint inquiry on July 23, 2002 that, prior to September 11, the financial war on terrorism was "ad-hoc-ism", episodic, and informal without any orthodox mechanism for the exchange [page 120] of information or setting of priorities.  He stated that, prior to September 11, the DCI never asked Treasury to perform an analysis of Bin Ladin, al-Qa'ida, or associated terrorist financing.

At the same hearing, the Chief of the FBI's Financial Review Group also testified to the lack of an overall financial strategy against terrorist funding.  He stated that the FBI's financial investigations prior to September 11 were inconsistent, done on a case-by-case basis, and not supervised by a specialized unit at FBI Headquarters.

Given this lack of focus on terrorist financing, the Intelligence Community was unable, prior to September 11, to identify and attack the full range of Bin Ladin's financial support network.  Former National Counterterrorism Coordinator Richard Clarke described for the Joint Inquiry his pre-September 11 frustration with the Intelligence Community's lack of focus in this regard:

[——————————————————————————
————————————————————————————
————————————————————————————
————————————————————————————
————————————————————————————
————————————————————————————
————————————————————————].
. . . .
Whenever we pressed the various agencies to do more on finding Bin Ladin's money, we would hear that they didn't consider it as important as the White House did for the reason you specified, that you were able to

stage an operation for a small amount of money.  My view was that it may have been true that you could stage an operation for a small amount of money, but you couldn't run al-Qa'ida for a small amount of money.  Al-Qa'ida was a vast worldwide organization that was creating terrorist groups in various countries that would not be called a-Qa'ida, but would be called names associated with that particular country.  But they were creating terrorist groups, they were funding them from the start.  They were taking preexisting terrorist groups and buying their allegiance and buying them additional capability.  It seemed to me it must have cost a great deal of money to be al-Qa'ida, but I was never able to get the Intelligence Community to tell me within any range of magnitude how much money the annual operating budget of al-Qa'ida may have been.

[Page 121]

Prior to September 11, there was also some reluctance to use available financial databases to track suspected terrorists.  The Chief of the FBI's Financial Review Group – which had been only a section in the FBI's White Collar Crime Unit before September 11 -- and the Director of the Treasury Department's Financial Crimes Enforcement Network (FinCEN) both testified before the Joint Inquiry that, prior to September 11, they had capabilities to develop leads on terrorist suspects and link them to other terrorists and to terrorist funding sources.  They both agreed that they would have been able to locate Nawaf al-Hazmi and Khalid al-Mihdhar in the United States in August 2001, if asked, through credit card and bank information. The use of these capabilities in the first weeks after September 11 enabled the FBI, with assistance from the Secret Service, to connect almost all of the 19 hijackers to each other very quickly by linking bank accounts, credit cards, debit cards, address checks, and telephones.  Despite the existence of those capabilities, the FBI did not seek their assistance in the search for al-Hazmi and al-Mihdhar in late August 2001.

FinCEN was involved in tracking terrorist funds prior to September 11 and experienced some success.  FinCEN began doing linkage analysis of terrorist financing in October 1999 and first identified a specific account with a direct link to al-Qa'ida in February 2001.  It has the advantage of being able to work with both law enforcement and intelligence information, and to combine that information with Bank Secrecy Act and commercial data to assist the Treasury Department's Office of Foreign Assets Control (OFAC) and others in the seizure, blocking, and freezing of terrorist assets.  FinCEN's capabilities have been made available to federal, state, and local law enforcement agencies for lead purposes since before September 11.

The FBI did some tracking of terrorist funds prior to September 11, but this was mostly done on an episodic basis, primarily directed at money laundering activity, in the context of field office investigations with no national or international coordination, and with very limited cooperation with the Treasury Department.  The Joint Inquiry was informed that the FBI's newly-formed Financial Review Group is developing what did not exist pre-September 11, a national strategy for a coordinated U.S. Government-wide [page 122] effort to track terrorist funds, mine financial data from a common database, investigate, disrupt, arrest, and prosecute.

International cooperation in tracking terrorist funds was also not easy to achieve prior to September 11.  For example, the Director of OFAC at the Treasury Department testified that he made two trips to Saudi Arabia, Bahrain, the United Arab Emirates, and Kuwait in 1999 and 2000 to request their cooperation in tracking and restricting Bin Ladin and al-Qa'ida funds, but only achieved limited results.  Pre-September 11, OFAC did take some actions, such as trade sanctions and an asset freeze against the Taliban for harboring Bin Ladin, that achieved a modicum of success.

On September 24, 2001, President Bush gave a new priority to the tracking of terrorist funds when he stated:  "We will direct every resource at our command to win the war against terrorists, every means of diplomacy, every tool of intelligence, every instrument of law enforcement, *every financial influence.  We will starve the terrorists of funding*." (Emphasis added.)  The President made this statement four days after signing an executive order to block the funds of terrorists and their associates.  Substantial actions have been taken by the U.S. Government in this area since September 11, including blocking terrorist-related assets; seizing assets and smuggled bulk cash; arresting terrorist financiers and indicting them;  and, shutting down front companies, charities, banks, and hawala conglomerates that served as financial support networks for al-Qa'ida and Bin Ladin.

New authorities that have been granted since September 11 have also been instrumental in making these seizure and arrest actions successful.  For example, OFAC at Treasury requested and received in the October 2001 USA PATRIOT Act explicit

authorities to block assets while an investigation is in progress and to use classified information as evidence in order to place additional names on the list for freezing and blocking assets.  The challenge facing the Intelligence Community is to maintain, expand and adapt the use of these capabilities to combat future terrorist threats effectively. Despite improvements since September 11, former National Counterterrorism [page 123] Coordinator Richard Clarke told the Joint Inquiry that, as of June 2002, there were still many unanswered questions about Bin Ladin's finances:



> We asked [CIA] in particular [————————————], because initially – because he was said to be a financier.  They were unable to do that, [————————————————————————].CIA was [————————————] unable to tell us what it cost to be Bin Ladin, what it cost to be al-Qa'ida, how much was their annual operating budget within some parameters, where did the money come from, where did it stay when it wasn't being used, how it was transmitted.  They were unable to find answers to those questions.

Part of the challenge for the Intelligence Community, and particularly the FBI, is the difference between terrorist financing and other forms of organized criminal money laundering.  Strategies and tactics that were effective in countering money laundering must be reexamined in order to assure their effectiveness in regard to terrorist financing. The Treasury Department's General Counsel was in England at a money laundering conference on September 11, 2001 and explained to the Joint Inquiry how his perception of the problem shifted as he watched the two World Trade Center towers disintegrate:

> It was as if we had been looking at the world through the wrong end of a telescope. . . . Money had been spirited around the globe by means and measures and in denominations that mocked all of our detection. . . . The most serious threat to our well being was now clean money intended to kill, not dirty money seeking to be rinsed in a place of hiding.

## D.  RELATED FINDINGS

During the course of this Joint Inquiry, testimony and information were received that pertained to several issues involving broader, policy questions that reach beyond the boundaries of the Intelligence Community. In the three areas described below, the Inquiry finds that policy issues were relevant to our examination of the events of September 11.

[Page 124]

**17. Finding**:  Despite intelligence reporting from 1998 through the summer of 2001 indicating that Usama Bin Ladin's terrorist network intended to strike inside the United States, the United States Government did not undertake a comprehensive effort to implement defensive measures in the United States.

Discussion:  As noted earlier, the Joint Inquiry has established that the Intelligence Community acquired and disseminated from 1998 through the summer of 2001 intelligence reports indicating in broad terms that Usama Bin Ladin's network intended to carry out terrorist attacks inside the United States.  This information encompassed, for example, indications of plots for attacks within the United States that would include:

- attacks on civil aviation;
- assassinations of U.S. public officials;
- use of high explosives;
- attacks on Washington, D.C., New York City, and cities on the West Coast;
- crashing aircraft into buildings as weapons; and
- using weapons of mass destruction.

The intelligence that was acquired and shared by the Intelligence Community was not specific as to time and place, but should have been sufficient to prompt action to insure a heightened sense of alert and implementation of additional defensive measures.  Such actions could have included: strengthened civil aviation security measures; increased attention to watchlisting suspected terrorists so as to keep them out of the United States; greater collaboration with state and local law enforcement authorities concerning the scope and nature of the potential threat; a sustained national effort to inform and alert the American public to the growing danger; and improved capabilities to deal with the consequences of attacks involving mass destruction and casualties.  The U.S. Government did take some steps in regard to detecting and preventing the use of weapons of mass destruction, but did not pursue a broad program of additional domestic defensive measures or public awareness.

[Page 125]

Both the DCI and the FBI Director discussed the important role that defensive measures could have played.  According to the DCI's 's testimony, looking back at the September 11 attacks:

> . . . since now we understand and possibly have understood the basis of the history of specific reporting with regard to specific targets, and the context was we raced from threat period to threat period, from target to target, and once we resolved them we never thought about the fact that the security that was protecting, whether it's a plane or an infrastructure or a bridge, is poor to begin and somebody will come back to the same target that they've planned against.  Unless they see a security profile and a deterrent posture that's different, there's nothing to stop them from doing that, because essentially we all believed that it would never happen here. That's the point.
>  . . . .
> . . . I posit a theory that we were so busy overseas in terms of what we were doing at the time that, you know, they were looking here the whole time and steadily planning in terms of what they were doing.  So they were operating on two fronts.

FBI Director Mueller added:

> I think you can look at what happened September 11 and I think both of us would say there are things we did right and things we missed and did wrong. But you look at it from the perspective of could we have prevented these individuals, identified these individuals and prevented them from undertaking this multi-plane undertaking, and I guess I would say I think it's speculation, but in looking at each of the areas that we could have done better, I'm not certain you get to the point where we stop these individuals.
>
> On the other hand, looking at the concept of hijacking planes and taking them over, as a country one could look back and say with reports of hijackings over a period of time, perhaps we as a country should have looked at changing the way we protect our planes, which means doing what we are doing now in terms of hardening the cockpit, understanding that the threat of a hijacking is not for a person to hijack a plane and get it to the ground, utilizing the passengers as hostages, but the concept of using a plane as a weapon.  Had we, as a country, reached the position where the attacks were such and the possibilities such that we would change what we did in our airline industry to harden cockpits and train pilots to resist being taken over, that's another avenue that I think might have made a difference. But that's speculation.

**18. Finding:  Between 1996 and September 2001, the counterterrorism strategy adopted by the U. S. Government did not succeed in eliminating Afghanistan as a sanctuary and training ground for Usama Bin Ladin's terrorist network.  A range of instruments was used to counter al-Qa'ida, with law enforcement often emerging** [pge 126] **as a leading tool because other means were deemed not to be feasible or failed to produce results.  Although numerous successful prosecutions were generated, law enforcement efforts were not adequate by themselves to target or eliminate Bin Ladin's sanctuary.  While the United States persisted in observing the rule of law and accepted norms of international behavior, Bin Ladin and al-Qa'ida recognized no rules and thrived in the safehaven provided by Afghanistan.**

Discussion:  Between 1996 and September 2001, the United States worked with dozens of cooperating foreign governments to disrupt al-Qa'ida activities, arrest and interrogate operatives, and otherwise prevent terrorist attacks.  Throughout that period of time, however, Afghanistan was largely a terrorist "safe haven."  In its Afghan sanctuary, al-Qa'ida built a network for planning attacks, training and vetting recruits, indoctrinating potential radicals, and creating a terrorist army with little interference from the United States.

Some CIA analysts and operators have told the Joint Inquiry that they recognized as early as 1997 or 1998 that, as long as the Taliban continued to grant Bin Ladin's terrorist organization sanctuary in Afghanistan, it would continue to train a large cadre of Islamic extremists and generate numerous terrorist operations.  In 1999, senior officials at the CIA and the State Department began to focus on the Taliban as an integral part of the terrorist problem.  In 1999 and 2000, the State Department worked with the United Nations Security Council to obtain resolutions rebuking the Taliban for harboring Bin Ladin and allowing terrorist training.  The Defense Department began to focus on this issue in late 2000, after the *USS Cole* bombing.  A State Department demarche to Taliban representatives in Pakistan, on June 26, 2001, specifically noted the threats to Americans emanating from Afghanistan and stated that the United States would hold the Taliban regime directly responsible for any actions taken by terrorists harbored by the Taliban.

Former National Security Advisor Berger noted in a statement to the Joint Inquiry that "In fact, there was a concerted military, economic, and diplomatic pressure on the Afghanistan and the Taliban…."  Mr. Berger also explained that Saudi Arabia and

TOP SECRET

Pakistan were pressed to cut support for the Taliban and that covert and military measures were taken to disrupt al-Qa'ida activities in Afghanistan.  Unfortunately, the [page 127] Joint Inquiry found that none of these actions were effective in hindering terrorist training or al-Qa'ida's ability to operate from Afghanistan.

[Despite the Intelligence Community's growing recognition that Afghanistan was churning out thousands of radicals, the U.S. government did not integrate all the instruments of national power and policy – diplomatic, intelligence, economic, and military – to address this problem.  [————————————————————

————————————————————————————————

————————————————————————]. Prior to September 11, military force was used only in the August 20, 1998 cruise missile strikes on targets in Afghanistan and the Sudan.  Former National Security Advisor Sandy Berger testified to the Joint Inquiry that massive military strikes on Afghanistan would have had  little public or Congressional support before September 11, 2001.  Moreover, as Mr. Berger noted to the Joint Inquiry, a lack of intelligence on which to base action hindered efforts to use military force in Afghanistan].

Permitting the sanctuary in Afghanistan to exist for as long as it did allowed Bin Ladin's key operatives to meet, plan operations, train recruits, identify particularly capable recruits or those with specialized skills, and ensure that al-Qa'ida's masterminds remained beyond the reach of international justice.  In his testimony before the Joint Committee on October 17, 2002, the DCI responded to a question about what he would do differently prior to September 11, 2001, saying:

> [H]indsight is perfect, we should have taken down that sanctuary a lot sooner.  The circumstances at the time may have not warranted, the regional situation may have been different, and after [September] 11 all I can tell you is we let a sanctuary fester, we let him build capability.  And there may have been lots of good reasons why in hindsight it couldn't have been done earlier or sooner.  I am not challenging it, because hindsight is always perfect, but we let him operate with impunity for a long time without putting the full force and muscle of the United States against it.

As an adjunct to covert and military efforts to eliminate Bin Ladin's sanctuary in Afghanistan, the United States Government relied heavily on law enforcement to counter

TOP SECRET

[page 128] terrorism.  The origins of this emphasis on prosecutions can be traced back to the 1980s, when Congress and President Reagan gave the FBI an important role in countering international terrorism, including events overseas.  More recently, the successful prosecutions of individuals involved in the 1993 World Trade Center bombing, the plot to attack New York City landmarks, and the 1998 bombings of two U.S. Embassies in East Africa added to the emphasis on law enforcement as a counterterrorism measure.

Senior Department of Justice officials, including former U.S. Attorney for the Southern District of New York Mary Jo White, who prosecuted many of the most important cases against al-Qa'ida, point out that they saw their efforts as an adjunct to other means of fighting terrorism.  Prosecutions do have several advantages in the fight against terrorism.  As Ms. White noted to the Joint Inquiry, prosecutions take terrorists off the street.  She acknowledged that this does not shut down an entire group, but some bombs do not go off as a result of the arrests.  In addition, critical intelligence often comes from the investigative process, as individual terrorists confess or reveal associates through their personal effects and communications.  Former FBI Director Louis Freeh pointed out to the Joint Inquiry, "you can't divorce arrest from prevention."  Ms. White also contends that the prosecutions may deter some, though admittedly not all, individuals from using violence.  Finally, the threat of a jail sentence often induces terrorists to cooperate with investigators and provide information.

Heavy reliance on law enforcement had limits, however.  As Paul Pillar, National Intelligence Officer for the Near East and Asia, explained to the Joint Inquiry, it is easier to arrest underlings than masterminds.  Those who organize and plan attacks, particularly the ultimate decision makers who authorize them, are often thousands of miles away when an attack is carried out.  In addition, the deterrent effect of imprisonment is often minimal, particularly for highly motivated terrorists such as those in al-Qa'ida.

Moreover, law enforcement is time-consuming.  The CIA and the FBI expended considerable resources supporting investigations in Africa and in Yemen regarding the Embassies and *USS Cole* attacks, a drain on scarce manpower and resources that could

TOP SECRET

[page 129] have been used to gather information and disrupt future attacks.  Further, there were no established mechanisms for law enforcement officials to share foreign intelligence developed in these investigations with the Intelligence Community, and they did not always recognize it, prior to September 11.  Finally, law enforcement standards of evidence are high, and meeting these standards often requires unattainable intelligence or the compromise of sensitive intelligence sources or methods.

At times, law enforcement and intelligence have competing interests.  The former head of the FBI's International Terrorism Division noted to the Joint Inquiry that Attorney General Janet Reno leaned toward closing down Foreign Intelligence Surveillance Act-based collection activities if they seemed to hinder criminal cases.  Ms. White, however, said that the need for intelligence was balanced with the effort to arrest and prosecute terrorists.

The reliance on law enforcement when individuals can operate from a hostile country such as the Taliban's Afghanistan appears particularly ineffective, as the masterminds are often beyond the reach of justice.  One FBI agent, in a Joint inquiry interview, scorned the idea of using the Bureau to take the lead in countering al-Qa'ida. He noted that the FBI can only arrest and support prosecution and cannot shut down training camps in hostile countries.  He added that, "[it] is like telling the FBI after Pearl Harbor, 'go to Tokyo and arrest the Emperor.'"  In his opinion, a military solution was necessary because, "[t]he Southern District [of New York] doesn't have any cruise missiles."  As the DCI testified to the Joint Inquiry on June 19, 2002:

> The fact that you went into the sanctuary and took it down is the single most important thing that occurred [after September 11], because they no longer operated with impunity in terms of their training and financing and all the things they were doing. And that opportunistically has changed the game. So the policy question I would answer first is, the longer you wait when you see this kind of thing, the longer you wait to intervene, the longer you wait to allow evidence to manifest behavior, I guarantee you will be surprised and hurt.

**19. Finding**:  Prior to September 11, the Intelligence Community and the U.S. Government labored to prevent attacks by Usama Bin Ladin and his terrorist

TOP SECRET

**[page 130] network against the United States, but largely without the benefit of an alert, mobilized and committed American public.  Despite intelligence information on the immediacy of the threat level in the spring and summer of 2001, the assumption prevailed in the U.S. Government that attacks of the magnitude of September 11 could not happen here.  As a result, there was insufficient effort to alert the American public to the reality and gravity of the threat.**

Discussion:  The record of this Joint Inquiry indicates that, prior to September 11, 2001, the U.S. Intelligence Community was involved in fighting a "war" against Bin Ladin largely without the benefit of what some would call its most potent weapon in that effort: an alert and committed American public. Senior levels of the Intelligence Community, as well as senior U.S. Government policymakers, were aware of the danger posed by Bin Ladin.  Information that was shared with senior U.S. Government officials, but was not made available to the American public because of its national security classification, was explicit about the gravity and immediacy of the threat posed by Bin Ladin.  For example:

- In December 1998, as noted earlier, the DCI wrote:  "We must now enter a new phase in our effort against Bin Ladin…We are at war…I want no resources or people spared in this effort, either inside CIA or the [Intelligence] Community."

- A classified document signed by the President in December 1998 read in part: "The Intelligence Community has strong indications that Bin Ladin intends to conduct or sponsor attacks inside the United States"; and

- A classified document signed by the President in July 1999 characterized a February 1998 statement by Bin Ladin statement as a "de facto declaration of war" on the United States.

In addition, numerous classified intelligence reports were produced and disseminated by the Intelligence Community prior to September 11, based upon information obtained from a variety of sources, about possible terrorist attacks being planned by Usama Bin Ladin's terrorist network.  Some of this information was summarized and released, in declassified form, in the Joint Inquiry's September 18, 2002 hearing, including: [page 131]

- In June 1998, the Intelligence Community obtained information from several sources that Usama Bin Ladin was considering attacks in the United States, including against Washington, D. C. and New York;

TOP SECRET

TOP SECRET

- In August 1998, the Intelligence Community obtained information that a group of unidentified Arabs planned to crash an explosive-laden plane from a foreign country into the World Trade Center;

- In September 1998, the Intelligence Community obtained information that Usama Bin Ladin's next operation could possibly involve flying an aircraft loaded with explosives into a U.S. airport;

- In October 1998, the Intelligence Community obtained information that al-Qa'ida was trying to establish an operative cell within the United States, and that there might be an effort underway to recruit U.S. citizen- Islamists and U.S.-based expatriates from the Middle East and North Africa;

- In September 1999, the Intelligence Community obtained information that Usama Bin Ladin and others were planning a terrorist act in the United States, possibly against specific landmarks in California and New York City; and

- In late 1999, the Intelligence Community obtained information regarding the Bin Ladin network's possible plans to attack targets in Washington, D. C. and New York City during the New Year's Millennium celebrations.

There is little indication of any sustained and successful national effort to mobilize public awareness about the gravity and immediacy of the threat prior to September 11, however.  Specifically citing speeches by President Clinton at the United Nations in 1995 and at George Washington University in1996 regarding the fight against terrorism, former national Security Advisor Sandy Berger told the Inquiry that the President: "continuously attempted to raise public awareness of the terrorist threat, as a central challenge to our country and our future, [and] including in every State of the Union address for eight years."

Clearly, there were Presidential remarks regarding terrorism in the years before September 11, 2001, including references to the threat that Bin Ladin's network posed to the interests of the United States.  There were also periodic statements and references to [page 132] the threat from terrorism and Bin Ladin in Congressional testimony and elsewhere by both the DCI and the FBI Director.

In an interview, Richard Clarke, the former National Counterterrorism Coordinator under President Clinton, pointed to background briefings to the press by his office immediately after the Millennium crisis in January-February 2000 and the

Administration's cooperation with the *New York Times* in December 2000 and with CBS's *60 Minutes* on stories about terrorism as efforts to inform the American people of the growing terrorist threat.

These efforts were, however, largely sporadic and, given the classified nature of intelligence, limited in terms of the specifics that could be shared with the public about the immediacy and gravity of the threat. They were not sufficient to mobilize and sustain heightened public awareness about the danger of a domestic attack.

By comparison to what has occurred since September 11, the American public was not focused on and was not on heightened alert regarding Bin Ladin, his *fatwa* against the United States, and the immediate likelihood of a terrorist attack on American soil. In the aftermath of September 11, two incidents illustrate the difference that an alerted American public can, and does, make:

- On September 11, 2001, passengers aboard Flight 93, aware that two aircraft had been flown into the World Trade Center towers in New York City, attempted to retake control of their hijacked aircraft and, it is widely believed, saved further loss of life and destruction; and

- On December 22, 2001, an alert flight attendant on board an American Airlines flight from Paris to Miami noticed passenger Richard Reid attempting to light a fuse in his shoe. Reid was subsequently subdued by a number of passengers and has pleaded guilty to charges of attempting to blow up the aircraft.

[Page 133]

Kristen Breitweiser, speaking on behalf of the families of the victims of the September 11 attacks, reminded the Joint Inquiry of the importance of an alert and involved American public in the war against terrorism. In her testimony, she emphasized the potential importance of information that was not shared with the public before September 11, 2001:

> One thing remains clear from history. Our intelligence agencies were acutely aware of an impending domestic risk posed by Al Qaeda. A

question that remains unclear is how many lives could have been saved had this information been made more public.

. . . .

How many victims may have taken notice of these Middle Eastern men while they were boarding their plane? Could these men have been stopped? Going further, how many vigilant employees would have chosen to immediately flee Tower 2 after they witnessed the blazing inferno in Tower 1, if only they had known that an Al Qaeda terrorist attack was imminent?

Could the devastation of September 11 been diminished in any degree had the government's information been made public in the summer of 2001?

**20. Finding**:  **Located in Part Four Entitled "Finding, Discussion and Narrative Regarding Certain Sensitive National Security Matters."**

TOP SECRET

## PART TWO – NARRATIVE – THE ATTACKS OF SEPTEMBER 11, 2001

### I.  The Plot Unfolds for the Attacks of September 11, 2001

The Joint Inquiry received testimony from the Director of Central Intelligence and the Directors of the Federal Bureau of Investigation and the National Security Agency, and also examined the records of these agencies, to determine what the Intelligence Community knows now about the September 11 attacks.  FBI Director Mueller described efforts by the U.S. intelligence and law enforcement communities "to find out everything we could about the hijackers and how they succeeded."

### A.  The al-Qa'ida Roots of the September 11 Attacks

Usama Bin Ladin came to the FBI's attention after the first attack on the World Trade Center in February 1993.  While the FBI has not linked that attack directly to Bin Ladin, the investigation developed information that Muslim men, including participants in the attack, had been recruited at the al-Kifah refugee office in Brooklyn, New York and sent to training camps in Afghanistan – first to fight the Soviet army and later to engage in a *jihad* against the United States.  In 1993, the FBI also learned of a plot to blow up bridges, tunnels, and landmarks in New York.  That investigation led to the conviction of Omar Abdul al-Rahman, the "Blind Sheikh," for soliciting others to commit all of those acts of terrorism in 1993.  Bin Ladin's *fatwas* and press statements later called for avenging the Blind Sheikh's imprisonment.

The FBI has identified at least two Bin Ladin connections in Ramzi Yousef's 1995 conspiracy, centered in the Philippines, to blow up twelve U.S. airplanes flying East Asian routes to the United States.  Mohamed Jamal Khalifah, the alleged financier of the plot, is Bin Ladin's brother-in-law.  Ramzi Yousef was arrested at a Bin Ladin guesthouse in Pakistan to which Yousef had fled after the plot had been uncovered.  Yousef was a principal in the first World Trade Center attacks, for which he was tried and convicted upon being returned to the United States. [Page 135]

TOP SECRET

TOP SECRET

George Tenet, the Director of Central Intelligence (DCI), testified that "a common thread runs between the first attack on the World Trade Center in February 1993 and the 11 September attacks." The thread is Khalid Shaykh Muhammad, also known as Mukhtar or "the Brain." According to the DCI, Muhammad, "a high-ranking al-Qa'ida member," was "the mastermind or one of the key planners of the 11 September operation." The DCI noted that Mukhtar is Ramzi Yousef's uncle, and, after the World Trade Center attack, Muhammad joined Yousef in the 1995 airplane plot, for which Muhammad has been indicted by a federal grand jury.

In August 1996, Bin Ladin issued the first *fatwa* declaring *jihad* against the United States. A second *fatwa* in February 1998 proclaimed: "to kill the Americans and their allies – civilian and military is an individual duty for every Muslim who can do it in any country in which it is possible to do it." Bin Ladin repeated these threats in a May 1998 press interview. The bombings of the U.S. embassies in Kenya and Tanzania followed in August.

In June 1998, the Department of Justice obtained a sealed indictment in the Southern District of New York against Bin Ladin as the sole named defendant in a "conspiracy to attack defense utilities of the United States." Among other overt acts, the indictment charged that in October 1993 "members of al-Qa'ida participated with Somali tribesmen in an attack on United States military personnel serving in Somalia [which] killed a total of 18 United States soldiers and wounded 73 others." The indictment was unsealed after the East African embassy bombings and was followed by a series of superseding indictments that charged Bin Ladin and others with a conspiracy to "murder United States nationals anywhere in the world, including in the United States."

The U.S. Government produced proof in the embassy bombing trials of Bin Ladin's direct connections to the attacks. Mohamed al-Owhali, who was to have been a suicide passenger in the Kenya bombing, ran from the bomb truck moments before it exploded. After his arrest in Kenya, al-Owhali confessed and admitted that he had been given a telephone number in Sana'a, Yemen, which he called before and after the bombing. Telephone records for calls to that number led to the bomb factory for the Nairobi attack in a house occupied by a ranking al-Qa'ida [page 136] member and training camp veteran. Calls from Bin Ladin's satellite phone to the Yemen number were made the day of the attack and the day after when al-Owhali called that number for help. Al-Owhali also confessed that he had asked Bin Ladin for a

TOP SECRET

mission, a request that led to his being in the bomb truck.  According to al-Owhali, the suicide driver had been present with him at Bin Ladin's May 1998 press conference.

U.S. investigators have also described Bin Ladin's connection to the October 2000 attack on the United States Navy's ship, *USS Cole*. The [————————————————], which figured in the East Africa embassy bombings, was also used in planning the attack on *USS Cole*. In addition, Tawfiq bin Attash, known as Khallad, who had been a trainer at an al-Qa'ida camp in Afghanistan, prepared an introduction in the summer of 1999 for Abdel Rahim al-Nashiri addressed to Jamal al-Badawi, who had trained under Khallad.  Al-Nashiri is believed to be a long-time Bin Ladin operative and a first cousin of the suicide driver who attacked the U.S. Embassy in Kenya.  Khallad appears to have directed the *Cole* operation from Afghanistan or Pakistan, while al-Nashiri was its local manager.

Investigators believe that Khallad's letter set in motion plans to attack another U.S. Navy ship.  Following al-Nashiri's introduction, Badawi obtained the boat that would be used in the failed attack on *USS The Sullivans* in January 2000.  The same boat was used later that year in the attack against *USS Cole*.

[In testimony to the Joint Inquiry, the DCI explained that, after September 11, 2001, CIA learned [————] that "in 1996, Bin Ladin's second-in-command, Muhammad Atif, drew up a study on the feasibility of hijacking U.S. planes and destroying them in flight."  Khalid Shaykh Muhammad proposed to Bin Ladin that the World Trade Center "be targeted by small aircraft packed with explosives."  Bin Ladin reportedly suggested using even larger planes].

According to the DCI, Muhammad Atif "chose the hijackers from young Arab men who had no previous terrorist activities."   After Bin Ladin had approved the selection, Khalid Shaykh [page 137] Muhammad "trained them and instructed them on acquiring pilot training" and "supervised the 'final touches' of the 11 September operation."

## B.  The Springboards for the Attack - Germany and Malaysia

In addition to Afghani-based al-Qa'ida roots of the September 11 attacks, the FBI reports that "[t]he operational planning for the September 11th attacks took place in overseas locations, most notably Germany, Malaysia and the United Arab Emirates."

### Malaysia

Two principal hijackers in the September 11 attacks, Khalid al-Mihdhar and Nawaf al-Hazmi, entered the United States on a flight from Bangkok on January 15, 2000, a week after leaving a meeting in Kuala Lumpur, Malaysia.  Three other principals, Mohammed Atta, Marwan al-Shehhi, and Ziad Jarrah, entered the United States in May and June 2000 from or through Europe.  Atta, al-Shehhi, and Jarrah had lived in Hamburg, Germany where they associated with each other in various ways.  A sixth principal, Hani Hanjour, had been in the United States off and on since October 1991.

In June 18 testimony at a Joint Inquiry hearing, the DCI described al-Hazmi and al-Mihdhar as "al-Qa'ida veterans."  They had been involved with al-Qa'ida for six years before September 11, 2001, "having trained and fought under al-Qa'ida auspices in three different countries."

Al-Hazmi first traveled to Afghanistan in 1993 as a teenager and came into contact with a key al-Qa'ida facilitator in Saudi Arabia in 1994.  In 1995, al-Hazmi and al-Mihdhar traveled to Bosnia to fight with other Muslims against the Serbs.  Al-Hazmi probably came into contact with al-Qa'ida leader Abu Zubaydah when Zubaydah visited Saudi Arabia in 1996 to convince young Saudis to attend al-Qa'ida camps in Afghanistan.  Sometime before 1998, al-Hazmi returned to Afghanistan and swore loyalty to Bin Ladin.  He fought against the Northern Alliance, possibly with his brother Salem, another of the hijackers, and returned to Saudi Arabia in early 1999, [page 138] where, [————————————————————], he disclosed information about the East Africa embassy bombings.

Al-Mihdhar's first trip to the Afghanistan training camps was in early 1996.  [————————

—————————————————]. In 1998, al-Mihdhar traveled to Afghanistan and swore allegiance to Bin Ladin.

In April 1999, Nawaf al-Hazmi, Salem al-Hazmi, and Khalid al-Mihdhar obtained visas through the U.S. Consulate in Jeddah, Saudi Arabia. Al-Mihdhar and Nawaf al-Hazmi then traveled to Afghanistan and "participated in special training," which, according to the DCI, may have been "facilitated by Khallad" (Tawfiq bin Attash who also directed the *USS Cole* operation). A *USS Cole* suicide bomber also participated in that training.

From Yemen, al-Mihdhar traveled to Kuala Lumpur, arriving on January 5, 2000. There he met al-Hazmi, who had traveled to Malaysia from Pakistan. In Malaysia, the two met Khallad at a condominium owned by Yazid Sufaat, who later signed letters of introduction on behalf of Zacarias Moussaoui that were found in Moussaoui's possessions after the September 11 attacks. Malaysian police arrested Sufaat in December 2001 after they developed information that he had procured four tons of bomb material, ammonium nitrate, for an Indonesian *jihad* cell.

**Germany**

In testimony before the Joint Inquiry, DCI Tenet described the significant characteristics that were shared by Muhammad Atta, Marwan al-Shehhi, and Ziad Jarrah – the September 11 hijackers who most likely piloted the airplanes that the groups they were part of commandeered. The three were intelligent, spoke English and were proficient in several other languages, and were familiar with Western society. They were also educated in technical subjects and had [page 139] mastered skills necessary to pilot planes. Of particular note, the three were part of a group of young Muslim men in Hamburg, Germany, who came from different countries and backgrounds, but attended the same mosques, shared acquaintances, and were drawn together by Islamist views and disenchantment with the West.

Atta was born in Egypt in 1968. He graduated from Cairo University with a degree in Architectural Engineering in 1990 and began attending the Technical University in Hamburg in 1992. Between 1996 and 1998, Atta traveled in the Middle East and then returned to Germany.

Al-Shehhi was born in the United Arab Emirates in 1978.  A sergeant in the UAE Army, he was sent to Germany for technical studies in 1996.  In 1997 and 1998, he studied English at the University at Bonn and electrical engineering at the Technical University in Hamburg.

Jarrah was born in Lebanon in 1975.  He attended the Fachhochschule, a technical University in Hamburg from 1996 to 2000, studying aircraft construction and maintenance.

While in Germany, Atta, al-Shehhi, and Jarrah, according to FBI documents, Akept company with a loosely organized group of associates comprised of roommates, co-workers and mosque colleagues.@  Three associates, Ramzi Bin al-Shibh, Said Bahaji, and Zakariya Essabar, became subjects of post-September 11 German arrest warrants for alleged membership in a terrorist organization and for murder and aircraft piracy.  A fourth, Mounir el Motassadeq, is on trial in Hamburg on those charges.*

Bin al-Shibh, who was born in Yemen in 1972 and entered Germany in 1995, is described as a Asupporting conspirator" in the Moussaoui indictment.  In August 2000, Jarrah attempted to enroll Bin al-Shibh in the Florida Flight Training Center, where Jarrah was taking lessons.  On August 15, Bin al-Shibh sent a $2200 wire transfer to the school for tuition, and in July and September, he transferred funds to al-Shehhi in Florida.  Between May and October 2000, Bin al-Shibh unsuccessfully attempted four times -- three in Germany and once in Yemen [page 140] - to obtain a visa to travel to the United States.  Between December 2 and 9, 2000, Bin al-Shibh was in London.  Moussaoui flew from London to Pakistan on December 9.

FBI Director Mueller testified that Bin al-Shibh was a "significant money person."  The Moussaoui indictment charges that Bin al-Shibh received $15,000 in wire transfers from the UAE on or about July 30 and 31, 2001 and that he wired $14,000 to Moussaoui in Oklahoma on or about August 1 and 3 from train stations in Dusseldorf and Hamburg.

[DCI Tenet testified that, after September 11, 2001, CIA received reports identifying Bin al-Shibh "as an important al-Qa'ida operative."  The agency suspects that, "unlike the three

---

* Motassadeq was convicted in Germany on February 19, 2003 of being a member of a terrorist organization and accessory to over 3,000 murders in New York and Washington.

Hamburg pilots, he may have been associated with al-Qa'ida even before moving to Germany in 1995." Bin al-Shibh flew to Spain in early September 2001. He disappeared until an interview with al-Jazeera was aired in September 2002, and he was captured in Pakistan on September 11, 2002. Bin al-Shibh is now being held [———————————————] at an undisclosed location].

Atta lived at Marienstrasse 54 in Hamburg with Bin al-Shibh, Essabar, and Bahaji. Director Tenet testified that, after Bin al-Shibh failed to obtain a U.S. visa, "another cell member," Essabar, "tried [on two occasions in December 2000] and failed to obtain a visa in January 2001" to travel to Florida while Atta and al-Shehhi were there. Uncorroborated sources report that Essabar was in Afghanistan in late September 2001. Bahaji left Germany on September 3, 2001 for Pakistan. Uncorroborated sources also placed him in Afghanistan in late September 2001.

DCI Tenet testified that Muhammad Heydar Zammar was an acquaintance of members of Atta's circle in Hamburg, where Zammar lived. Zammar, a German citizen born in Syria in 1961, was described by DCI Tenet as "a known al-Qa'ida associate," active in Islamic extremist circles since the 1980s, who trained and fought in Afghanistan in 1991 and in Bosnia in 1995 and returned to Afghanistan a number of times between 1995 and 2000.

It has been reported that U.S. and German officials believe that Zammar is a pivotal figure in understanding the genesis of the September 11 attacks. DCI Tenet told the Joint [page 141] Inquiry that Zammar "was taken into custody by the Moroccans [———————————]" when he traveled to Morocco to divorce his wife and that he was "moved from Morocco into Syrian custody, where he has remained." It has also been reported that Zammar has provided details about the September 11 attacks to U.S. investigators. According to the DCI, Zammar has said that he met Atta, al-Shehhi, and Jarrah in the late 1990s in Hamburg's al-Qods mosque and he "persuaded them to travel to Afghanistan to join the jihad."

DCI Tenet testified that Atta may have traveled to Afghanistan for the first time in early 1998. In June 1998, he applied for a new passport in Egypt, although his old one had not expired. This suggested, according to the DCI, "that he might have been trying to hide evidence of his travel to Afghanistan." On November 29, 1999, Atta flew from Hamburg to Istanbul and then to Karachi. He left Pakistan to return to Hamburg on February 25, 2000.

In the fall of 1999, al-Shehhi stayed at Bin Ladin's Qandahar guesthouse while awaiting transportation to Pakistan for medical treatment.  He returned to Germany in January 2000.  According to FBI information, Atta and al-Shehhi "were both present at Bin Ladin facilities in Kandahar in December 1999."   The DCI noted that "Jarrah's travel at this time mirrored Atta's," as Jarrah flew from Hamburg to Karachi on November 25, 1999 and stayed in Pakistan for two months.

There are indications that Bin al-Shibh was in Afghanistan in 1998 and had been seen at the Khalden Camp or guesthouse in late 1998.   The Moussaoui indictment alleges that Moussaoui had been present at the Khalden Camp in or about April 1998.

## C.  The Principals Arrive in the United States – January 2000 through April 2001

On January 15, 2000, one week after leaving Malaysia, Khalid al-Mihdhar and Nawaf al-Hazmi flew to Los Angeles from Bangkok and settled in the San Diego area.  In April 2000, al-Hazmi took an introductory flying lesson at the National Air College in San Diego.  A week [page 142] later, al-Hazmi received a $5000 wire transfer through a third party sent from the United Arab Emirates.  In May, al-Mihdhar and al-Hazmi took flight training in San Diego, and in June, al-Mihdhar left the U.S. on a Lufthansa flight from Los Angeles to Frankfurt, connecting to Oman.  Al-Mihdhar did not return to the United States until thirteen months later in July 2001.

Al-Hazmi remained in the United States, staying in the San Diego area until December 2000 when he moved to Arizona with Hani Hanjour who had just returned to the United States.  The DCI testified that Hanjour went to Afghanistan for six weeks in 1989 when he was 17 to participate in a *jihad*.  He first entered the United States in October 1991 from Saudi Arabia to attend an English language program at the University of Arizona in Tucson.  When he left the U.S. in early 1992 for Saudi Arabia, he was a "different person," according to a brother who spoke to the media.  According to the DCI, Hanjour then "wore a full beard, cut his past social ties, and spent most of his time reading books on religion and airplanes."  Hanjour returned to the United States in April 1996.  After residing in Florida for a month, he moved to Oakland, California, where he took an English language course.  In the summer, he began flight training, and in September, he moved to Arizona where he took flight lessons for a month in Scottsdale.

Hanjour left the U.S. for Saudi Arabia in November 1996, returning to the United States in November 1997.

Hanjour left the United States again in April 1999, after receiving an FAA commercial pilot certificate.  In September, after an initial denial, he obtained a student visa in Jeddah and returned to the United States.  Then in November 2000, having stayed in Florida for a month, he met al-Hazmi in California and traveled with him to Arizona in early December.  On December 12, he took up residence in Mesa, Arizona with al-Hazmi and resumed aviation training.  He took Boeing groundwork and simulator training in February and March 2001, when he and al-Hazmi left Arizona for northern Virginia.

Atta returned to Germany from Afghanistan through Pakistan in February 2000.   On March 1, he sent the first of a series of e-mails to pilot training schools in Lakeland, Florida and Norman, Oklahoma.  Claiming that his passport had been lost, Atta obtained a new Egyptian passport in Hamburg in May 2000 and a visa for travel to the United States.  He crossed over to the Czech Republic by bus [page 143] and flew to Newark in June 2000.  Al-Shehhi had arrived several days earlier on a flight from the United Arab Emirates through Brussels to Newark.  He obtained a new passport, apparently in Pakistan before leaving for Germany at the beginning of January 2000.  Later that month, he obtained a ten-year multiple entry visa at the U.S. consulate in Dubai.  Atta and al-Shehhi stayed in the New York area, renting apartments together until the beginning of July when they flew to Oklahoma City for a short visit to the Airman Flight School in Norman.  They proceeded to Florida, opened a joint account at Sun Trust Bank (depositing $7000), and began training at Huffman Aviation in Venice.

In the meantime, Jarrah arrived in the U.S. on June 27 at Atlanta, Georgia.  Earlier in the year, he reported losing his Lebanese passport, and in May he obtained a five-year B1/B2 multiple entry visa.  On arriving in the United States, Jarrah proceeded to Venice, Florida, where he began training at the Florida Flight Training Center.

In Fall 2000, Atta and al-Shehhi obtained instrument certifications and commercial pilot licenses while at Huffman Aviation.  They also spent a brief period at Jones Aviation in Sarasota, Florida.  From December 29 through 31, Atta and al-Shehhi received Boeing flight simulator training at Sim Center and Pan Am International in Opalocka, Florida.  The FBI reports that that

both men "requested training on >executing turns and approaches" but not other training normally associated with the course.@  In the meantime, Jarrah continued flight training until December 2000 where he had begun it, the Florida Flight Training Center.  In mid-December and in early January 2001, he took Boeing flight simulator lessons at the Aeroservice Aviation Center in Virginia Gardens, Florida.

In December 2000, al-Shehhi flew to Hamburg and then on to the United Arab Emirates, returning for the December flight simulator training with Atta.  On January 4, 2001, Atta flew from Tampa through Miami to Madrid, returning to Miami on January 10.   The DCI testified that the purpose of Atta's trip to Spain "may have been to meet with another al-Qa'ida operative to pass along an update on the pilots' training progress and receive information on the supporting hijackers who would begin arriving in the U.S. in the spring."  DCI Tenet testified that "Atta may also have traveled outside of the U.S. in early April 2001 to meet an Iraqi intelligence officer, although we are still working to [page 144] corroborate this."  Atta may have traveled under an unknown alias: the CIA has been unable to establish that he left the United States or entered Europe in April under his true name or any known alias.

On April 18, al-Shehhi, who traveled outside the United States three times, flew to Egypt by way of Amsterdam and returned to Miami from Egypt through Amsterdam on May 2.  In Egypt, al-Shehhi visited Atta's father and returned to the U.S. with Atta's international driver's license.  Apart from that, the DCI testified, "nothing else is known of al-Shehhi's activities while traveling outside the U.S."  Jarrah traveled even more frequently, taking at least five trips outside the United States to visit his family in Lebanon, and to visit his girl friend in Germany.

After al-Shehhi returned from Morocco in January 2001, he and Atta moved to Georgia for flight training.  In February, they traveled to Virginia Beach, Virginia, where they opened a mailbox account.  A crop duster pilot in Belle Glade, Florida identified Atta as inquiring about the purchase and operation of crop dusters while Atta was living in the Atlanta area.

**D.  The Supporting Hijackers Arrive – April to June 2001**

TOP SECRET

The thirteen remaining hijackers, the "muscle," whose role was to overcome pilots and control passengers, began arriving in the United States in April 2001.  Except for one threesome, they arrived in pairs, the last in June.  Twelve of the thirteen were from Saudi Arabia, and one was from the United Arab Emirates.  Salem al-Hazmi, Nawaf's brother,  obtained his visa as early as April 1999; seven obtained visas from September to November 2000; three, as late as June 2001.  As FBI Director Mueller noted, these hijackers arrived in the United States "within a fairly short window," each transiting through the United Arab Emirates.

Many in the group knew each other.  There were two pairs of brothers, the al-Hazmis and al-Shehris, in addition to networks of friends.  Many came from southwest Saudi Arabia, and they represented a range of socioeconomic levels.  A few had higher education.  Others had little education.  Some had struggled with depression or alcohol abuse.  Some, according to DCI Tenet, "never exhibited much religious fervor, before apparent exposure to extremist ideas – through family members, friends, [page 145] or clerics – led to an abrupt radicalization and separation from their families;" some spoke of "their desire to participate in *jihad* conflicts such as the war in Chechnya, and some appear to have used this as a cover for traveling to Afghanistan."  The DCI also testified that "[a]s part of their commitment to militant Islam, these young Saudis traveled to Afghanistan to train in the camps of their exiled countryman Usama Bin Ladin."  Most supporting hijackers went to Afghanistan for the first time in 1999 or 2000.  Notwithstanding the experience in Afghanistan, the CIA does not believe that the supporting hijackers became involved in the plot until late 2000.  Their early travel may have "added these young men to the ranks of operatives that al-Qa'ida could call upon to carry out future missions," but DCI Tenet said he does not believe that al-Qa'ida leadership wanted the supporting hijackers to know about the plot any sooner than necessary: "they probably were told little more than that they were headed for a suicide mission inside the United States."

Al-Mihdhar, who left the United States a year before, obtained a visa in Jeddah in June 2001, using a new Saudi passport.  According to DCI Tenet, he "spent the past year traveling between Yemen and Afghanistan, with occasional trips to Saudi Arabia."  Al-Mihdhar traveled to New York in July 2001 from Saudi Arabia, six days after the last of the supporting hijackers had flown to the United States.  FBI Director Mueller testified that "al-Mihdhar's role in the September 11 plot between June 2000 and July 2001 – before his re-entry into the United States – may well have been that of the coordinator and organizer of the movements of the non-pilot

hijackers.  This is supported by his apparent lengthy stay in Saudi Arabia and his arriving back in the United States only after the arrival of all the hijackers."

## E.  Final Organization of the Attacks

Beginning in May 2001, each of the four pilot hijackers flew across the United States. FBI Director Mueller described these trips:  "With their training complete, it appears that the pilots began conducting possible surveillance flights as passengers aboard cross-country flights transiting between the Northeast United States and California."   On May 24, al-Shehhi flew from New York to San Francisco on a Boeing 767 (seated in first class), leaving immediately on a Boeing 757 (seated in first class) to Las Vegas.  On May 27, al-Shehhi left Las Vegas to San Francisco, continuing to New York on a Boeing 767 (seated in first class).  On June 7, Jarrah flew from Baltimore via Los Angeles to Las [page 146] Vegas, returning to Baltimore on June 10.  On June 28, Atta flew from Boston to San Francisco, continuing to Las Vegas, departing there on July 1 through Denver to Boston.  On August 13, Atta flew a second time across country from Washington to Las Vegas on a Boeing 757 (seated in first class), returning on August 14 to Ft. Lauderdale.  On August 13, Hanjour and al-Hazmi (seated in first class) flew from Dulles to Las Vegas via Los Angeles.  They left Las Vegas on August 14 on a flight to Minneapolis (close to Eagan, Minnesots, where Moussaoui had started flight lessons the day before), connecting an hour and a half later to a flight to Baltimore.

Director Mueller noted the Las Vegas layovers:

Each of the return flights for these hijackers had layovers in Las Vegas.  To date, the purpose of these one-to-two day layovers is not known.  However, with respect to travel to Las Vegas, we know that at least one hijacker on each of the four hijacked airplanes traveled to Las Vegas, Nevada sometime between May and August of 2001.  This travel consisted of an initial transcontinental trip from an east-coast city to a west-coast city, and a connection in that west-coast city to a Las Vegas-bound flight.

Atta flew to Zurich from Miami in July 2001, continuing on to Madrid.  He checked out of a Madrid hotel on July 9 and rented a car that he returned on July 19, after having driven 1,908 kilometers.  For the days immediately following July 9, Atta's whereabouts are unknown until he checked into a hotel in Tarragona on Spain's east coast on July 16.  On July 9, Bin al-Shibh flew from Hamburg to Tarragona, where he checked out of a hotel on July 10.  His

whereabouts from July 10 to 16 are unaccounted for, "roughly the same period during which Atta's movements are unknown," suggesting, according to DCI Tenet, that "the two engaged in clandestine meetings on the progress of the plot." Atta returned to the United States on July 19, arriving in Atlanta. Jarrah traveled to Germany from Newark on July 25, returning on August 5, a trip that may have permitted further contact with Bin al-Shibh. Director Mueller also testified that "[d]uring the summer of 2001, some of the hijackers, specifically Mohamed Atta and Nawaf al-Hazmi appear to have met face-to-face on a monthly basis to discuss the status of the operation, and ultimately the final preparation for the attack." In an interview with al-Jazeera shortly before his capture, Bin al-Shibh described al-Hazmi as Atta's "right hand."

[Page 147]

As the supporting hijackers arrived, they divided between Florida and New York before moving to three staging areas. The two who arrived in Virginia and the two who arrived in New York joined Nawaf al-Hazmi and Hanjour in Paterson, New Jersey. The four who arrived in Orlando and the five who arrived in Miami joined Atta, al-Shehhi, and Jarrah in the Fort Lauderdale, Florida area.

The nineteen hijackers began to book September 11 flights on August 26. Al-Mihdhar and Majed Moqed, hijackers on the Pentagon flight, were unable to buy tickets on August 24 because their address could not be verified. They finally purchased them with cash on September 5 at the American Airlines counter in the Baltimore/Washington International Airport. The hijackers in the Fort Lauderdale area also booked flights to locations in the Boston, Newark, New Jersey, and Washington, D.C. areas where the teams for each September 11 flight assembled.

## F. Financing of the Attacks

The FBI estimates that the September 11 attacks cost $175,000 to $250,000. According to Director Mueller and Bureau documents, "the funding mechanism behind the conspiracy appears to center around Marwan al-Shehhi and individuals providing financial support primarily" through the "banking and wire service infrastructure" of the United Arab Emirates.

In Hamburg, al-Shehhi received substantial transfers from the UAE by wire from Mohamed Yousef Mohamed Alqusaidi, whom the FBI believes to be al-Shehhi's brother. In July 1999, al-Shehhi opened a checking account in the UAE and soon after granted a power of

attorney over the account to Alqusaidi.   From July 1999 to November 2000, about $100,000 moved through the account.  While they were in Germany, al-Shehhi transferred funds to Atta.

In July 2000, al-Shehhi and Atta opened a joint account at Suntrust Bank in Venice, Florida, which received, according to the FBI, Awhat appears to be the primary funding for the conspiracy,@ four transfers from the UAE totaling approximately $110,000 from Ali Abdul Aziz Ali using a variety of aliases. In June 2000, al-Shehhi also received $5,000 by Western Union wire from Isam Mansour.  In [page 148] April, Ali wired $5,000 to al-Hazmi in San Diego. Several hijackers, including Hanjour and al-Mihdhar, supplemented their financing with credit cards drawn on Saudi and UAE banks.

Transfers to Bin al-Shibh on July 30 and 31, 2001, which preceded his transfers to Moussaoui, were from Hashem Abdulraham, whom FBI Director Mueller identified as Khalid Sheikh Mohammed, "the Brain."

There was also an important flow of money back to the UAE immediately before September 11.  FBI documents state that funds "were returned to the source because the hijackers would not have wanted to die as thieves, therefore they returned the money that was provided to them.@  Three hijackers, including Atta and al-Shehhi, sent funds to Mustafa Ahmed Alhawsawi in the UAE.  Al-Hazmi sent an Express Mail package to a UAE post office box rented in Alhawsawi's name that contained al-Mihdhar's debit card for an account in which $10,000 remained.  Alhawsawi also had power of attorney over accounts of several hijackers in the UAE.

## G.  Execution of the Attacks

At approximately 7:59 a.m., on September 11, American Airlines Flight 11, bound for Los Angeles, was cleared for takeoff from Logan International Airport in Boston.  On board were 81 passengers and 11 crew members.  Two hijackers were in the first two seats in First Class, from which the cockpit doors were easily accessible.  According to Director Mueller, the hijackers "apparently using commonly available box cutters" seized the aircraft and diverted its

course at about 8:13 a.m.  At 8:45 a.m. Flight 11 crashed into the World Trade Center's North Tower, which collapsed at 10:25 a.m.

Atta is believed to have been the pilot because he was the only Flight 11 hijacker known to have had flight training.  He spent the night before the attacks in Portland, Maine, flying to Boston on the morning of September 11.  Atta's luggage did not make the connection to Flight 11. The FBI Director testified that a search "revealed a three page letter handwritten in Arabic which, upon translation, was found to contain instructions on how to prepare for a mission applicable, but not specific, to the September 11 operation."

[Page 149]

At approximately 7:58 a.m., United Airlines Flight 175, also bound for Los Angeles, left Logan with 65 passengers and crew members.  At 9:05 a.m., Flight 175 crashed into the World Trade Center's South Tower, which collapsed at 9:55 a.m.  Marwan al-Shehhi is believed to have been the pilot.

As of December 2002, the Office of the Chief Medical Examiner of the City of New York reported that 2792 persons are reported as missing as a result of the attacks on the World Trade Center, including persons on the ground and passengers and crew of the two planes.  Of this number, 2743 death certificates have been issued.  The Chief Medical Examiner has periodically revised the death toll based on continuing forensic and other determinations.

At approximately, 8:20 a.m., American Airlines Flight 77 left Dulles International Airport for Los Angeles with 58 passengers and six crew members.  The last routine radio contact with the plane was at 8:50 a.m.  A few minutes later the plane made an unauthorized turn.  At 9:39 a.m., Flight 77 crashed into the Pentagon's southwest side.   In addition to the passengers and crew, 125 military and civilian Pentagon employees died.  The pilot is believed to have been Hani Hanjour.  A copy of the letter in Atta's luggage was found in a car registered to al-Hazmi that had been parked at Dulles.

At approximately 8:42 a.m., United Airlines Flight 93 left Newark International Airport for San Francisco with 37 passengers and seven crew members.  Ziad Jarrah was the only one of four hijackers aboard known to have a pilot's license; therefore, he is believed to have been the

pilot.  At approximately 10:03 a.m., Flight 93 crashed into the ground at Stoney Creek Township in southwestern Pennsylvania.

Telephone calls from passengers and crew to family and friends described attempts by passengers and crew to retake the plane prior to the crash.  One call described three hijackers wearing bandanas and armed with knives, with one hijacker claiming to have a bomb strapped to his waist.  Two hijackers entered the cockpit and closed the door behind them.  The passengers were herded to the back of the plane.  The captain and co-pilot were seen lying on the floor of the First Class section, possibly [page 150] dead.  At the words, "Let's roll," passengers rushed forward.  As described by the FBI Director, the cockpit tape-recorder indicates that a hijacker, minutes before Flight 93 hit the ground, "advised Jarrah to crash the plane and end the passengers attempt to retake the airplane."

A copy of the letter found in Atta's baggage and al-Hazmi's car was also found at the Flight 93 crash site.  The FBI notes that some of the Arabic on the cockpit tape, "such as supplications to Allah, conforms to the suicide preparation instructions" in that letter.

In the UAE, Alhawsawi, the plot financier, consolidated in his bank account funds the hijackers had returned, to which he added funds he withdrew from one of their accounts just hours before the September 11 attacks.  He then flew to Karachi, Pakistan.  His whereabouts are unknown.

## II.  Pentagon Flight Hijackers Khalid al-Mihdhar, Nawaf al-Hazmi, and Salem al-Hazmi

### A.  The Malaysia Meeting and Identification of Khalid al-Mihdhar and Salem and Nawaf al-Hazmi – Watchlist Opportunity Lost

[In late 1999, the Intelligence Community launched a worldwide effort to disrupt terrorist operations that were planned to occur during the Millennium celebrations.  A CIA officer told the Joint Inquiry that, as the Intelligence Community reviewed information from the 1998 East Africa embassy bombings, "a kind of tuning fork . . . buzzed when two individuals reportedly planning a trip to Kuala Lumpur were linked indirectly to what appeared to be a support element . . . involved with the Africa bombers."  One traveler, Khalid al-Mihdhar, started his journey to Malaysia from the Middle East, where, according to Joint Inquiry testimony from DCI Tenet, he

had been at a "suspected al-Qa'ida logistics facility."  The other, Nawaf al-Hazmi, began his trip to Malaysia from Pakistan.  Initially, only the travelers' first names were known.  From the outset, information circulated throughout the Intelligence Community that identified them as "terrorist operatives."  For example, a CIA cable stated, "Nawaf's travel may be in support of a terrorist mission]."

[Page 151]

The intelligence preceding the Malaysian meeting also showed that a person whose first name was Salem would attend.  An intelligence analyst observed at the time that "Salem may be Nawaf's younger brother," and that observation was reported to other Intelligence Community agencies.

The Kuala Lumpur meeting took place between January 5 and 8, 2000.  There has been no intelligence about what was discussed at the meeting, but, according to DCI Tenet, surveillance [————————————————] that began with al-Mihdhar's arrival on January 5 "indicated that the behavior of the individuals was consistent with clandestine activity."

It was later determined that Khallad bin-Atash, a leading operative in Bin Ladin's network, also attended the meeting.  According to DCI Tenet, Khallad was "the most important figure at the Kuala Lumpur meeting" and he would later become "a key planner in the October 2000 *USS Cole* bombing."

The principal location of the meeting was a condominium owned by Yazid Sufaat, who DCI Tenet identified to the Joint Inquiry as "a Malaysian chemist . . .  directed by a terrorist leader to make his apartment available."  Later in 2000, Sufaat signed letters of introduction for Zacarias Moussaoui as a representative of his company, letters Moussaoui took with him to the United States.

DCI Tenet testified that, "[i]n early January 2000, we managed to obtain a photocopy of al-Mihdhar's passport as he traveled to Kuala Lumpur."  This gave the CIA al-Mihdhar's full name, his passport number, and birth information.  It also showed that al-Mihdhar held a U.S. visa, issued in Jeddah, Saudi Arabia in April 1999, that would not expire until April 2000.  These

facts were verified at the U.S. consulate in Jeddah before the meeting started.  The DCI told the Joint Inquiry:

> We had at that point the level of detail needed to watchlist [al-Mihdhar] – that is, to nominate him to State Department for refusal of entry into the US or to deny him another visa.  Our officers remained focused on the surveillance operation and did not do so.

Surveillance photographs of the meeting were taken by the [————————————] and transmitted to CIA Headquarters.  When the meeting ended, al-Mihdhar, al-Hazmi, and Khallad (under a different name) flew to Thailand seated side by side.

[Page 152]

Soon after the travelers left Malaysia on January 8, the CIA received evidence that Nawaf's last name might be al-Hazmi when it learned that someone with that last name had been seated next to al-Mihdhar on the flight from Malaysia.  That information could have led to Nawaf al-Hazmi's watchlisting.

Unknown to the CIA, since early 1999 the National Security Agency had information associating al-Hazmi by his full name with the Bin Ladin network, information it did not disseminate.  NSA Director Hayden, told the Joint Inquiry:

> We did not disseminate information we received in early 1999 that was unexceptional in its content except that it associated the name of Nawaf al-Hazmi with al-Qa'ida. . . .  At the time of the meeting in Kuala Lumpur, we had the al-Hazmi brothers, Nawaf and Salem, as well as Khalid al-Mihdhar, in our sights.  We knew of their association with al-Qa'ida, and we shared this information with the Community.  I've looked at this closely.  If we had handled all of the above perfectly, the only new fact that we could have contributed at the time of Kuala Lumpur was that Nawaf's surname (and perhaps that of Salem, who appeared to be Nawaf's brother) was al-Hazmi.

Although NSA did not disseminate this information to the Intelligence Community before September 11, it was available in NSA databases.  However, no one at CIA or elsewhere asked NSA before September 11 to review its database for information about Nawaf al-Hazmi.

Knowledge of Nawaf's last name also pointed to his brother Salem's last name, which meant that the Intelligence Community had in its grasp the full names of three of the future hijackers.  In addition, the State Department had in the records of its Jeddah consulate the fact

that Nawaf and Salem al-Hazmi had obtained U.S. visas in April 1999, several days before al-Mihdhar obtained his U.S. visa at that consulate.

Thus, at the time of the Malaysia meeting, the CIA had passport information regarding al-Mihdhar, including his U.S. visa. A CIA officer, who was working as a CTC Supervisor, testified before the Joint Inquiry that a CTC cable in early 2000 noted that al-Mihdhar's passport information had been "passed to the FBI," but the CIA was unable to "confirm either passage or receipt of the [page 153] information" and, thus, could not identify "the exact details . . . that were passed." The Joint Inquiry found no record of the visa information at FBI Headquarters.

While the Malaysia meeting was in progress, a CIA employee sent an e-mail to a CIA colleague describing "exactly" the briefings he had given two FBI agents on al-Mihdhar's activities. The CIA employee had been assigned to the FBI's Strategic Information Operations Center to deal with problems "in communicating between the CIA and the FBI." The e-mail did not mention that al-Mihdhar held a U.S. visa, but did report that the CIA employee told the second FBI agent the following:

> This continues to be an [intelligence] operation. Thus far, a lot of suspicious activity has been observed but nothing that would indicate evidence of an impending attack or criminal enterprise. Told [the first FBI agent] that as soon as something concrete is developed leading us to the criminal arena or to known FBI cases, we will immediately bring FBI into the loop. Like [the first FBI agent] yesterday, [the second FBI agent] stated that this was a fine approach and thanked me for keeping him in the loop.

An e-mail from the second FBI agent to FBI Headquarters discussed the conversation with the CIA employee. This e-mail also did not mention al-Mihdhar's visa information. None of the participants in these communications now recalls discussing the visa information.

## B. Khalid al-Mihdhar and Nawaf al-Hazmi Travel to the United States – Watchlist Opportunity Lost

[For six weeks, CIA sought to locate al-Mihdhar in Thailand.  It was unsuccessful, however, because, according to a CIA officer's testimony, "[w]hen they arrived [in Thailand] we were unable to mobilize what we needed to mobilize."  Nonetheless, in February 2000, CIA rejected a request from foreign authorities to become involved because CIA was in the middle of an investigation "to determine what the subject is up to]."

[In early March 2000, CIA Headquarters, including CTC and its Bin Ladin unit, received a cable from a CIA station in [—] noting that Nawaf al-Hazmi had traveled to Los Angeles on January 15, 2000.  The cable was marked "Action Required: None, FYI [For Your Information]."  The following day, another station, which had been copied on the cable by the originating station, cabled [page 154] CTC's Bin Ladin unit that it had read the cable "with interest," particularly "the information that a member of this group traveled to the U.S. following his visit to Kuala Lumpur."  No action resulted at CIA].*

Once again, the CIA did not add Nawaf al-Hazmi's name to the State Department's watchlist for denying admission to the United States.  It also did not notify the FBI that a "terrorist operative," as al-Hazmi was described in January, had entered the United States.  The CIA did not consider the possibility that al-Mihdhar and al-Hazmi, who had flown together to Thailand, continued on together to the United States.  In fact, al-Mihdhar had flown with al-Hazmi to the United States on January 15, 2000.

The CIA Headquarters employee who had direct responsibility for tracking the movement of the attendees at the Malaysia meeting does not recall either the March 5 or March 6, 2000 messages concerning al-Hazmi's travel to the United States.  The CTC Supervisor, referred to earlier, testified before the Joint Inquiry:

> It's very difficult to understand what happened with [the March 5] cable when it came in.  I don't know exactly why it was missed.  It would appear that it was missed.

---

* This occurred even though CTC had republished guidance reminding personnel of the importance of watchlisting in December 1999. (see Appendix, "CTC Watchlisting Guidance – December 1999").

DCI Tenet also testified about this omission: "Our receipt of the information in March should have triggered the thought to watchlist al-Hazmi, but no CTC officer recalls even having seen the cable on his travel to LA when it arrived."  In fact, the DCI explained: "[n]obody read that cable in the March time frame."  Summing up these early watchlisting failures, the DCI told the Joint Inquiry:

> During the intense operations to thwart the Millennium and Ramadan threats, the watchlist task in the case of these two al-Qa'ida operatives slipped through.  The error exposed a weakness in our internal training and an inconsistent understanding of watchlist thresholds.

## C.  Khalid al-Mihdhar Leaves the U.S. and Nawaf al-Hazmi Applies for a Visa Extension
[Page 155]

By February 2000, al-Mihdhar and al-Hazmi had settled in San Diego, California where they used their true names on a rental agreement.  They did the same in obtaining California driver's licenses.

[In May 2000, they took flight lessons in San Diego.  While in San Diego, the two had numerous contacts with a long-time FBI counterterrorism informant].

On June 10, al-Mihdhar flew from Los Angeles to Frankfurt, and then on to Oman.  Al-Hazmi remained in the United States.  On July 12, two days before the expiration of the six-month visa he had been granted on arriving in January, al-Hazmi applied to the INS for an extension, using the address of the San Diego apartment he had shared with al-Mihdhar.

The INS does not have a record of any additional extension request by al-Hazmi, who remained in the United States illegally after his extension expired in January 2001.  In December 2000, al-Hazmi moved to Mesa, Arizona, with Hani Hanjour, another hijacker.

## D.  The Attack on *USS Cole* and the Identification Of Khallad – Watchlist Opportunity Lost

On October 12, 2000, two Al Qa'ida terrorists attacked *USS Cole* as the destroyer refueled in Yemen.  In investigating the attack, the FBI developed information that Khallad bin

Attash had been a principal planner of the bombing and that two other participants in the *Cole* conspiracy had delivered money to Khallad in Malaysia at the time of the Malaysia meeting. The FBI shared this information with the CIA, whose analysts decided to conduct a review of what was known about the meeting.

In January 2001, CIA concluded, based on statements by a joint CIA/FBI human source, that Khallad appeared in one of the surveillance photos taken during the Malaysia meeting. The CIA recognized that Khallad's presence at the meeting was significant because it meant that the other attendees, including al-Mihdhar and al-Hazmi, had been in direct contact with the key planner of the *Cole* attack for Bin Ladin's network. DCI Tenet described the import of this development to the Joint Inquiry: [page 156]

> The Malaysian meeting took on greater significance in December 2000 when the investigation of the October 2000 USS Cole bombing linked some of Khalid al-Mihdhar's Malaysia connections with Cole bombing suspects. We further confirmed the suspected link between al-Mihdhar and al-Hazmi and a person thought to be one of the chief planners of the Cole attack, via a joint FBI-CIA [human] asset. This was the first time that CIA could definitively place al-Hazmi and al-Mihdhar with a known al-Qa'ida operative.

Although al-Mihdhar and al-Hazmi had now been "definitively" placed "with a known al-Qai'ida operative," the CIA once again did not act to add them to the State Department's watchlist. In January 2001, Khalid al-Mihdhar was abroad, his visa had expired, and he would have to clear a watchlist check before obtaining a new visa to re-enter the United States.

The DCI testified that the information about Khallad resulted from a "joint case" the FBI and the CIA were conducting. The CTC Chief at the time also testified that the CIA ran "a joint operation with the FBI to determine if a Cole suspect was in a Kuala Lumpur surveillance photo":

> Both agencies wanted to find out who killed our sailors. Both agencies were working to bring those terrorists to justice. We were in the business of providing information to the FBI, not withholding it.

The day after the photo identification by the joint CIA/FBI human source in January 2001, the asset's identification of Khallad in the photo was reported to CIA Headquarters. However, the Joint Inquiry found no information showing that the FBI representative on the scene, who also worked with that source, was told about the identification or that the information

was provided to FBI Headquarters.  To the contrary, contemporary documents over the next month strongly suggest that the FBI did not know of this development.  It was not until August 30, 2001, that CIA Headquarters transmitted to the FBI a memorandum stating, "We wish to advise you that, during a previously scheduled meeting with our joint source," Khallad was identified in a surveillance photo.

## E.  The June 11, 2001 FBI/CIA Meeting and Khalid al-Mihdhar's Return to the United States

[Page 157]

On May 15, 2001, the CTC Supervisor, who had just been detailed to the FBI, sent a request to CIA Headquarters for the surveillance photographs of the Malaysian meeting.  In a May 18 e-mail to a CIA analyst, the CIA officer described the basis for his interest:

> . . . the reason (aside from trying to find a photo of the second *Cole* bomber) I'm interested is because Khalid Mihdar's two companions also were couriers of a sort, who traveled between [the Far East] and Los Angeles at the same time (hazmi and salah).

"Salah" was the name under which Khallad traveled during the Malaysian meeting.  Thus, information about al-Hazmi's travel to the United States began to attract attention at CIA at least as early as May 18, 2001.

Toward the end of May 2001, a CIA analyst contacted an Intelligence Operations Specialist (IOS) at FBI Headquarters about the surveillance photographs.  The CIA wanted the FBI to review the photographs to determine whether a person in the custody of [——] officials in connection with the FBI's *Cole* investigation, who had carried money to Southeast Asia for Khallad in January 2000, could be identified.  When interviewed, the FBI IOS explained to the Joint Inquiry that the CIA had told her that the photographs had been taken during the Malaysia meeting, but had said nothing about al-Mihdhar's potential travel to the United States.  The CIA also did not tell the FBI IOS that the photographs were of a meeting Khallad had attended.

[On June 11, 2001, the CIA analyst and FBI IOS traveled to New York to meet with FBI criminal case agents handling the *Cole* investigation.  The New York agents were shown, but not given copies of [——] of the [——] surveillance photographs taken in Malaysia and were asked if they could identify anyone in them.  A New York FBI agent testified to the Joint Inquiry that the agents pressed for information about the photographs and asked: "Why were you

looking at this guy?  You couldn't have been following everybody around the Millennium.  What was the reason behind this?"  Nonetheless, the agent said, "at the end of the day we knew the name Khalid al-Mihdhar but nothing else."  The agent testified that he was told that "the information could not be passed" at that time, but might be "in the days and weeks to come."  However, no additional information was transmitted for use in a criminal case until after September 11].

[Page 158]

In addition to not being told why al-Mihdhar was being surveilled, the New York agents were not told about his U.S. visa, Nawaf al-Hazmi's travel to the United States, the January 2001 photo identification of Khallad, or the fact that the analyst had come upon material in a CIA database that led him to conclude that "Al-Hazmi was an experienced [Mujahadeen]."  The FBI IOS had none of that information, but the CIA analyst who attended the New York meeting acknowledged to the Joint Inquiry that he had seen all of it.  In fact, he had received an e-mail just three weeks earlier that referred to al-Hazmi's travel to the United States.  That information, he related in a Joint Inquiry interview, "did not mean anything to him," since he was interested in terrorist connections to Yemen.  The CIA analyst explained to the Joint Inquiry that the information was operational in nature and he would not disclose it outside CIA unless he had prior authority to do so.

Summing up the New York meeting and all that preceded it, the same CTC Supervisor on detail to the FBI, who did not attend the meeting but knew of it testified:

> [E]very place that something could have gone wrong in this over a year and a half, it went wrong.  All the processes that had been put in place, all the safeguards, everything else, they failed at every possible opportunity.  Nothing went right.

On June 13, 2001, al-Mihdhar obtained a new U.S. visa in Jeddah, using a different passport than the one he had used to enter the United States in January 2000.  On his visa application, he checked "no" in response to the question whether he had ever been in the United States.  On July 4, al-Mihdhar re-entered the United States.

**F.  The Watchlisting of Khalid al-Mihdhar and Nawaf al-Hazmi**

In early July 2001, the same CTC Supervisor located in a CIA database the cable for which he had been searching that contained information the CIA had acquired in January 2001 about Khallad's attending the Malaysia meeting.  He told the Joint Inquiry that Khallad's presence at the meeting deeply troubled him and he immediately sent an e-mail from FBI Headquarters to CTC stating, "[Khallad] is a major league killer, who orchestrated the *Cole* attack and possibly the Africa bombings."

[Page 159]

A review was launched at CIA of all cables regarding the Malaysia meeting.  The task fell largely to an FBI analyst assigned to CTC.  On August 21, 2001, the analyst put together two key pieces of information: the intelligence the CIA received in January 2000 that al-Mihdhar had a multiple entry visa to the United States, and the information it received in March 2000 that al-Hazmi had traveled to the United States.  Working with an INS representative assigned to CTC, the analyst learned that al-Mihdhar had entered the United States on January 15, 2000, had departed on June 10, and had re-entered the United States on July 4, 2001.  Suspicions were further aroused by the fact that al-Mihdhar and al-Hazmi had arrived in Los Angeles in January 2000, when Ahmed Ressam would have been in Los Angeles to conduct terrorist operations at Los Angeles Airport, but for his apprehension at the U.S./Canada border in December 1999.

On August 23, 2001, the CIA sent a cable to the State Department, INS, Customs, and FBI requesting that "Bin Ladin-related individuals," al-Mihdhar, al-Hazmi, Khallad, and one other person at the Malaysia meeting, be watchlisted immediately and denied entry into the United States "due to their confirmed links to Egyptian Islamic Jihad operatives and suspicious activities while traveling in East Asia."  Although the CIA believed that al-Mihdhar was already in the United States, placing him on the watchlist would enable authorities to detain him if he attempted to leave.  The CIA cable stated that al-Hazmi had arrived in Los Angeles on January 15, 2000 on the same flight as al-Mihdhar and that there was no record of al-Hazmi's departure.  On August 24, the State Department watchlisted al-Mihdhar, al-Hazmi, and the others listed in the CIA cable.  On August 27, it revoked the visa that al-Mihdhar had obtained in June.

## G.  The Search for Khalid al-Mihdhar

FBI Headquarters promptly sent to the FBI New York field office a draft communication recommending the opening of "an intelligence investigation to determine if al-Mihdhar is still in

TOP SECRET

the United States."  It stated that al-Mihdhar's "confirmed association" with various elements of Bin Ladin's terrorist network, including potential association with two individuals involved in the attack on *USS Cole*, "make him a risk to the national security of the United States."  The goal of the intelligence [page 160] investigation was to "locate al-Mihdhar and determine his contacts and reasons for being in the United States."

That communication precipitated a debate between FBI Headquarters and New York field office personnel as to whether to open an intelligence or criminal investigation on al-Mihdhar.  A New York FBI agent tried to convince Headquarters to open a criminal investigation, given the importance of the search and the limited resources available in intelligence investigations, but Headquarters declined to do so.  An e-mail exchange between Headquarters and the New York agent described the debate:

- From FBI Headquarters:

    "If al-Midhar is located, the interview must be conducted by an intel [intelligence] agent.  A criminal agent CAN NOT be present at the interview.  This case, in its entirety, is based on intel.  If at such time as information is developed indicating the existence of a substantial federal crime, that information will be passed over the wall according to the proper procedures and turned over for follow-up criminal investigation.  (Emphasis in original.)

- From the New York agent:

    Whatever has happened to this - someday someone will die – and wall or not – the public will not understand why we were not more effective and throwing every resource we had at certain 'problems.'  Let's hope the [FBI's] National Security Law Unit (NSLU) will stand behind their decisions [about the "wall"] then, especially since the biggest threat to us now, UBL, is getting the most 'protection.'"

The agent was told in response:  "we (at Headquarters) are all frustrated with this issue," but "[t]hese are the rules.  NSLU does not make them up."

The former head of the FBI's International Terrorism Operations Section explained to the Joint Inquiry why the search for al-Mihdhar was conducted as an intelligence, rather than a criminal matter:  "Although we certainly suspect, and rightfully so, that they were probably

engaged in . . . criminal acts, the information brought to us came essentially in total in the intelligence channel, so an intelligence investigation was opened."

[Page 161]

The FBI contacted the Bureau of Diplomatic Security at the State Department on August 27, 2001 to obtain al-Mihdhar and al-Hazmi's visa information. This was provided to the FBI on August 29 and revealed that, on entering the United States in July 2001, al-Mihdhar claimed that he would be staying at a Marriott hotel in New York City. An FBI agent determined on September 5 that al-Mihdhar had not registered at a New York Marriott. The agent checked computerized national and New York criminal and motor vehicle indices on al-Mihdhar and al-Hazmi, but those checks were negative. On September 11, the agent sent an electronic communication to the FBI's Los Angeles Field Office, asking it to look for al-Mihdhar and to check airline records.

## H. The Case Against Bin Ladin

In the days following the September 11 attacks, the FBI received additional photographs from the surveillance of the Malaysia meeting. One of these, the FBI quickly learned, was a photograph of Khallad. The Bureau also learned that the January 2001 photo identification of Khallad by the joint FBI/CIA asset had been mistaken. The person thought to be Khallad was actually Nawaf al-Hazmi. The conclusion that Khallad had attended the Malaysian meeting was nonetheless correct.

Later in September, the FBI prepared an analysis of Bin Ladin's responsibility for the September 11 attacks to help the State Department develop a "White Paper" that could be shared with foreign governments:

> Even at this early stage of the investigation, the FBI has developed compelling evidence [the analysis concluded] which points to Bin Ladin and al-Qa'ida as the perpetrators of this attack. By way of illustration, at least two of the hijackers met with a known senior al-Qa'ida terrorist, the same al-Qa'ida terrorist which reliable information demonstrates orchestrated the attack on *USS Cole* and who was involved in the planning of the East Africa Embassy Bombings.

The two hijackers were al-Mihdhar and al-Hazmi. The senior al-Qa'ida terrorist was Khallad. The place they met was Malaysia. The facts linking al-Mihdhar and al-Hazmi to Khallad and therefore to [page 162] Bin Ladin became the crux of the case the State Department made to

governments around the world that Bin Ladin should be held accountable for the September 11 attacks.

### III.  NSA Communications Intercepts Related to Khalid al-Mihdhar, Nawaf and Salem al-Hazmi

[In the fall of 1998, NSA began to focus its analysis on a suspected terrorist facility in the Middle East.  That facility had been associated with al-Qa'ida activities against U.S. interests.  [———

————————————————————————————————————————————————————

————————————————————————————————————————————————————

————————————————————————————————].

[In early 1999, NSA analyzed communications involving a suspected terrorist facility in the Middle East, some of which were associated with Nawaf al-Hazmi and Khaled [———], who NSA now believes to have been Khalid al-Mihdhar. [————————————————————————

————————————————————————————————————————————————————

———————————————————————————————————————— ].  These communications were the first indication NSA had of a link between al-Mihdhar and al-Hazmi. They were not disseminated in NSA SIGINT reporting because the persons were unknown and the subject matter did not meet NSA reporting thresholds.   Those thresholds vary, depending on the judgment of the NSA analyst who is reviewing the intercept and the subject, location, and content of the intercept].

[In early 1999, another organization obtained the same or similar communications and published the information in a report it gave to NSA.  NSA's practice was to review such reports and disseminate those responsive to U.S. intelligence requirements.  For an undetermined reason, NSA did not disseminate the [———] report.  It was not until early 2002 during the Joint Inquiry that NSA realized that it had the [———] report in its databases and subsequently disseminated it to CIA and other customers].

[No additional activity of counterterrorism interest was associated with the suspected terrorist facility in the Middle East until summer 1999 when NSA analyzed additional communications involving Khaled, that is, al-Mihdhar, [page 163] and [————————————————

_____

_____

_____

_____].  At about the same time, the name Khallad came to the attention of NSA for the first time].

[NSA analyzed communications associated with a suspected terrorist facility in the Middle East from later in the summer of 1999.  These communications also involved the names of Khaled and others.  None of this information was disseminated because the subject matter did not meet NSA reporting thresholds].

[In late 1999, NSA analyzed communications associated with a suspected terrorist facility in the Middle East involving Nawaf al-Hazmi, Khaled, and, for the first time, Salem.  It was thought at the time that Salem might be al-Hazmi's younger brother, and this was later confirmed].

[In early [—————] 2000, NSA analyzed what appeared to be related communications concerning a Khaled [———].  NSA reported this information in early January to CIA, FBI, and other counterterrorism customers].

[After this NSA report [———], CIA submitted a formal request to NSA in early 2000 for approval to share information in the report with [—————] foreign intelligence liaison services, along with the fact that Khaled may have been connected to a suspected terrorist facility in the Middle East that had previously been linked to al-Qa'ida's activities against U.S. interests. CIA wanted to cite these connections to enlist liaison assistance [—————————————————————]. NSA allowed the information to be released].

[Page 164]

[On January 10, the Counterterrorist Center (CTC) at CIA gave NSA information regarding the [————————————————] Kuala Lumpur meeting, including information about al-Mihdhar [————————————]; the name of the person who assisted him in Kuala Lumpur; the fact that al-Mihdhar's primary purpose in coming to Malaysia appeared to have been to meet with others [————————————]; and other information

156

[————————————————].

On January 13, NSA received CIA operational reporting from CTC. [————————
————————————————————————————————
————————————————————————————————
————————————————————————————————
————————————————————————————————
————————————————————————————].

[In mid-January 2000, NSA queried its databases for information concerning Khaled [———
————————————————————————————————
————————————————————————]. These queries remained active until May 2000, but did not uncover any information].

[In early 2000, NSA analyzed communications involving Khaled and a suspected terrorist facility in the Middle East linked to al-Qa'ida activities directed against U.S. interests. The FBI determined, based on toll records it obtained after September 11, that Khaled had been in the United States at the time. [————————————————————————————
————————————————————————]. Some of these communications met NSA reporting thresholds and were reported to FBI, CIA, and other customers, but some did not. [————————————————————————————————
————————————].

[NSA analyzed additional communications in the summer of 2000 that were associated with a suspected terrorist facility in the Middle East, Salem and Khaled. [————————————
[page 165] ————————————————————————————
————]. NSA did not believe this provided any new information, and there was no dissemination].

## IV. [Nawaf al-Hazmi and Khalid al-Mihdhar Had Numerous Contacts with an FBI Informant]

[Two September 11 hijackers, Khalid al-Mihdhar and Nawaf al-Hazmi, lived in San Diego, California, beginning in February 2000. Al Mihdhar left San Diego in June 2000, while al-Hazmi remained until December 2000, when he moved to Arizona. During the time they were in San Diego, these two hijackers had numerous contacts with a long-time FBI counterterrorism informant. A third hijacker, Hani Hanjour, may have had more limited contact with this individual in December 2000].

CIA and FBI Headquarters had information tying al-Mihdhar and al-Hazmi to al-Qa'ida as early as January 2000 and later received information that they were in the United States. The San Diego FBI field office received none of this information before September 11. As a result, the informant was not asked to collect information about the hijackers.

[An FBI written response to the Joint Inquiry acknowledges questions about the informant's credibility, but the Administration and the FBI have objected to the Joint Inquiry's request to interview the informant and have refused to serve a Committee subpoena and notice of deposition on the informant. As suggested by the FBI, the Joint Inquiry submitted written interrogatories for response by the informant. Through an attorney, the informant declined to respond and indicated that, if subpoenaed, the informant would require a grant of immunity prior to testifying. Thus, this section has been prepared without access to the informant and in reliance on FBI documents, interviews of FBI personnel, and FBI representations about the informant].

## A. Background

[In the aftermath of the September 11 attacks, the San Diego FBI field office determined that a long-time FBI counterterrorism informant had numerous contacts with Nawaf al-Hazmi and Khalid al-Mihdhar].

[Page 166]

[——————————————————————————

———————————————————————————

———————————————————————————

———————————————————————————

—————————————————————————————].

[——————————————————————————————

————————————————————————————————

————————————————————————————————

————————————————————————————————

—————————————————————————].


## B.  [Informant's Contacts with Two Hijackers]


[After the September 11 attacks, the informant's FBI handling agent interviewed the informant about contacts with al-Hazmi and al-Mihdhar. Due to suspicions that the informant might have been involved in the attacks, the informant was interviewed multiple times by a number of FBI agents about the informant's contacts with the hijackers. According to the FBI handling agent, the informant admitted having numerous contacts with al-Hazmi and al-Mihdhar, but denied knowledge of the plot and initially expressed disbelief that the two were involved].


[The informant provided the FBI with information concerning the informant's contacts with al-Hazmi and al-Mihdhar. The informant subsequently told the FBI slightly different stories concerning the initial contact and provided different dates for the contacts with them].


[The informant told the FBI that during the contacts with al-Hazmi and al-Mihdhar, the informant observed no signs that they were involved in terrorist activity. The informant said that at the time the informant thought that [page 167] the two were good, religious Muslims. They did not act in a peculiar manner and did nothing to arouse the informant's suspicions.  [——————

————————————————————————————————

————————————————————————————————

—————————————————].


[The informant told the FBI that based on the informant's contacts with al-Hazmi and al-Mihdhar, they did not work, yet they always seemed to have money. Although they did not fit the profile of rich Saudis, the informant never questioned them about finances].

[————————————————————————————————————————

————————————————————————————————————————

————————————————————————————————————————

————————————————————————————————————————

————————————————————————————————————————

———————————————————————————————————— ].


[————————————————————————————————————————

————————————————————————————————————————

————————————————————————————————————————

————————].


[During one of the informant's final contacts with al-Hazmi in San Diego, al-Hazmi was [page 168] with someone the informant had not previously met. The informant described the person as 27 years old, 5'8", 130 to 140 pounds, fair complexion, and of either Saudi or Yemeni ancestry. The FBI has determined that Hani Hanjour, who fits this general description, arrived in San Diego from Dubai on December 8, 2000, and left San Diego with al-Hazmi for Arizona several days later. The two future hijackers lived together in Arizona. The informant was shown a picture of Hanjour and stated this was not the person that the informant had met].


[After September 11, the informant gave the FBI a list of individuals the informant understood had contacts with al-Hazmi and al-Midhar while they were in San Diego.

- [————————————————————————————————————————

  ————————————————————].

- [————————————————————————————————————————

  ————————————————————————————————————————

  ————————————————————————————————————————].

- [——————————————————————————————
  ——————————————————————————————
  ————————————————————].

- [——————————————————————————————
  ————————————].

[Four of the persons had been the subject of FBI investigations; three of them had been under active FBI investigation during the time that the future hijackers were in San Diego. The FBI opened counterterrorism investigations on other individuals on the list after September 11].

[The informant's handling agent described his relationship with the informant in a Joint Inquiry hearing:

> At some points, I would speak to the informant several times a day for hours at a times, while there were also periods that I did not speak with the informant for several months. Our discussions were not only about substantive matters of interest to the FBI, but also about personal matters such as the informant's health, family, and general well being…[D]uring…a debriefing in the summer of 2000 the informant told me that the informant met two individuals the informant described as] good Muslim Saudi youths who were legally in the [page 169]United States to visit and attend school. According to the informant, they were religious and not involved in criminal or political activities…At some later point, but before September 11, the informant told me their names were Nawaf and Khalid.  The informant did not tell me their last names prior to September 11, 2001].

[According to the handling agent, the informant did not mention that al-Hazmi was pursuing flight training until after September 11. The handling agent told the Joint Inquiry that he did not consider the informant's information about these individuals unusual:

[——————————————————————————————
——————————————————————————————
——————————————————————————————
————————————————————————————].

[The FBI handling agent said he "did not document the information provided by the informant on these two persons in FBI files before September 11". This was because the

informant "provided this information during a discussion of personal matters and not because the informant believed it had any investigative significance:"

> As required by the Attorney General Guidelines, I only recorded information about persons with some nexus to international terrorism, foreign counterintelligence or criminal activity. I was unaware prior to September 11 of 2001 that these persons had any such ties].

[The handling agent said in Joint Inquiry interviews that none of the information provided by the informant about the hijackers before September 11 raised concerns. The fact that the two individuals were Saudi was not a concern before September 11 because Saudi Arabia was considered an ally.  The FBI confirmed this in its written response].

[The agent noted that [————————————————————————————————————————————————————————————————————]. He also explained that, if the informant had told him about [page 170] contacts between the two and persons under investigation or if he had received derogatory information about them from Headquarters, he could have taken some action. However, the informant did not tell the FBI about al-Hazmi's and al-Mihdhar's contacts with persons under investigation until after September 11. In addition, the FBI's San Diego field office did not learn until after September 11 that the CIA had information that al-Hazmi and al-Mihdhar were affiliated with al-Qa'ida and had been linked to persons connected to the *Cole* bombing].

[FBI interviews of the informant after September 11 confirm the FBI handling agent's account and add some context.  [————————————————————————————————————————————————————————————————————————————————————————————————————————————————]. The informant confirmed that the two individuals were only mentioned in passing during a conversation with the handling agent. The informant recalls identifying the two only by their first names because the informant did not consider them suspicious. The informant told the FBI that other details were not provided prior to September 11 because the informant did not consider the information important or significant].

## C. Questions about the Informant's Credibility

[When the San Diego office realized that the informant had numerous contacts with the two hijackers, FBI personnel became suspicious that the informant may have been involved in the plot. San Diego personnel interviewed by the Joint Inquiry, including senior managers and case agents, now believe that the informant was an unwitting observer with no role in the attacks because:

- The informant made no effort to hide the hijackers or their identities from the FBI handling agent.

- [————————————————————————————————————————————————————————————————————————————————————————————————————————].

[Page 171]

- The informant has cooperated fully since September 11, agreeing to FBI interviews and to being polygraphed by the FBI. Although the informant's responses during the polygraph examination to very specific questions about the informant's advance knowledge of the September 11 plot were judged to be "inconclusive," the FBI asserts this type of result is not unusual for such individuals in such circumstances.

- The informant provided the FBI with extensive details after September 11 on the informant's contacts with the hijackers and their associates in the San Diego area].

[In a written response to a Joint Inquiry staff statement, the FBI provided additional reasons for concluding that the informant was not a conspirator. [————————————————————————————————————————————————————————————————————————————————————————————————————————————————————————————————————————————————————————————————————————

———————————————————————————————————

——————————————————————————————————].

[The FBI handling agent attributed inconsistencies in the informant's reporting to the informant's personality.

[————————————————————————————————
——————————————————————————————————]

Despite these characteristics, the FBI handling agent testified that the informant was "very credible, highly reliable, very, very credible, very useful." In the FBI handling agent's opinion, the informant was "duped" by the hijackers and was not suspicious of them at all].

[The FBI's written response notes that the informant did not report on the hijackers' association with others the informant knew were of interest to the FBI because the associations known to [page 172] the informant appeared innocuous. For example, al-Hazmi and al-Mihdhar associated with a local imam ostensibly because the "two hijackers attended religious services at the mosque where the imam preached." In addition, the informant "has advised that…neither al-Hazmi nor al-Mihdhar conducted themselves in a manner which [the informant] subjectively viewed as suspicious nor has FBI investigation to date developed any evidence that [the informant's] lack of suspicion was not objectively reasonable]."

[————————————————————————————————

———————————————————————————————————

——————————————————————————————————].

[Based on Joint Inquiry interviews of San Diego FBI personnel involved with the informant before September 11 or in assessing the informant's credibility after the attacks and reviews of thousands of Bureau documents, several unresolved questions about the informant's credibility remain. Although the informant did not recognize hijacker Hani Hanjour in photographs shown to the informant by the FBI after September 11, there are indications that Hanjour was in the San Diego area with al-Hazmi in December 2000 and probably met the informant:

- [——————————————————————————————
  ————————————————————————————————
  ———————————————— ].

- [——————————————————————————————
  ————————————————————————————————
  ————————————————————].

- [——————————————————————————————
  ————————————————————————————————
  ——————————————————].

- [——————————————————————————————
  [page 173] ——————————————————].

[FBI personnel believe it likely that the informant met Hanjour in December 2000 and are unable to explain why the informant failed to identify Hanjour].

[The informant's credibility is called into question in other important ways:

- The informant made a variety of inconsistent statements to the FBI during the course of multiple interviews. The informant has provided the FBI with many different dates as to the informant's numerous contacts with al-Hazmi and al-Mihdhar and their initial contact. The FBI acknowledged that "San Diego agrees with [the] Joint Inquiry…that there are significant inconsistencies" in the informant's reports.

- Some of the informant's statements are not consistent with information developed through investigation concerning the dates of the contacts. The FBI concedes that the hijackers may have known the informant months earlier than the informant admitted. [——————————————————————————————
  ————————————————————————————————
  ————————————————————————————————

—————].

- [——————————————————————————

  [page 174] ——————————————————————

  ——————————————————————————

  ——————————————————————————].

- The informant told the FBI after September 11, 2001 that al-Hazmi had told the informant that he was moving to Arizona for flight training and never mentioned flight training he received while living in San Diego.

- [——————————————————————————

  ——————————————————————————

  ——————————————————————————].

- [——————————————————————————

  ——————————————————————————

  ——————————————————————————

  ——————————————————————————

  ——————————————————————————

  ——————————————————————————].

In its written response, the FBI acknowledges "unexplained inconsistencies" in the informant's reporting which continue to warrant ongoing FBI investigation].

[The CIA was aware in January 2000 that al-Mihdhar had a U.S. visa and in March 2000 that al-Hazmi had traveled to California. The FBI handling agent testified that, if he had access to the CIA intelligence concerning al-Mihdhar and al-Hazmi when they were in San Diego]:

> It would have made a huge difference. We would have immediately opened [———] investigations. We had the predicate for a [——] investigation if we had that information.… [page 175] We would immediately go out and canvas the sources and try to find out where these people were. If we locate them, which we probably would have since they were very close – they were nearby – we would have initiated investigations immediately….We would have done everything. We would have used all available investigative techniques. [We] would have given them the full court press. We would…have done everything – physical surveillance, technical surveillance and other assets.

[FBI Headquarters became aware in late August 2001 that al-Hazmi and al-Mihdhar were in the United States. The San Diego field office did not receive this information until after September 11. The FBI handling agent stated that he believes that San Diego could have located the two hijackers, and he was critical of Headquarters' failure to share information]:

> We'd have immediately gone out to various assets who already work in the streets for us. We'd basically run the names by them and find out – we'd locate them…I'm sure. I'm sure we could have located them and we could have done it within a few days.

[The San Diego office was also generally unaware of the al-Qa'ida threat. As the FBI handling agent testified]:

> We knew  [al-Qa'ida] was an important person or organization. But we didn't have any presence. We didn't have any cases and we didn't have any source information that indicated that these guys were here in San Diego at that time.

[The FBI handling agent said that he did not discuss Bin Ladin or al-Qa'ida with the informant before September 11 because that was:

> . . . not an issue in terms of my assignments. [————————————————————————————

> ——————————].

[In a written response, the FBI took issue with the contention that the FBI was not treating al-Qa'ida as a serious threat in San Diego, citing an internal document dated March 15, 1999 which identified:

> [Usama Bin Ladin as the number one priority of the U.S. Intelligence [page 176] Community. [———————————————————————
> ————————————————————————————].

The Assistant Special Agent in Charge in San Diego told the Joint Inquiry that, upon assuming his duties in June 2000, he met with the counterterrorism squad to review this communication and emphasize the stated priorities].

The FBI response also noted that "there was no known al-Qaeda presence in San Diego before 9/11/2001." However, the record confirms that future hijackers al-Mihdhar, al Hazmi, and perhaps Hanjour, were in the San Diego area and unknown to the FBI during the time they were there.

## V.  Associates of the September 11, 2001 Terrorists in the United States

In June 2002 testimony before the Joint Inquiry, DCI Tenet and FBI Director Mueller asserted, in explaining how the September 11 hijackers had avoided the notice of the Intelligence Community, that the conspirators intentionally avoided actions or associations that would have attracted law enforcement attention during their time in the United States.  The DCI said:

> Once in the U.S., the hijackers were careful, with the exception of minor traffic violations, to avoid drawing law enforcement attention and even general notice that might identify them as extremists.  They dressed in Western clothes, most shaved their beards before entering the U.S., and they largely avoided mosques.

FBI Director Mueller appeared to concur:

> While here, the hijackers effectively operated without suspicion, triggering nothing that would have alerted law enforcement and doing nothing that exposed them to domestic coverage.  As far as we know, they contacted no known terrorist sympathizers in the United States.

The former Assistant Director for the FBI's Counterterrorism Division also emphasized this point in his testimony: [page 177]

168

TOP SECRET

> [T]here were no contacts with anybody we were looking at inside the United
> States . . . quite honestly, with zero contact in the United States of any of our
> known people with the 19 persons coming here that we had no information about,
> intelligence-wise, before, through no one's fault, that's how they did it.

However, the Joint Inquiry review of documents and interviews of FBI personnel indicate that the six hijackers who served as the leaders and facilitators of the September 11 attacks were not isolated in the United States, but instead maintained a number of contacts in the United States before September 11.  Although the extent to which the persons with whom they were in contact in the United States were aware of the September 11 plot is unknown, it is clear that those persons provided some of the hijackers with substantial assistance while they prepared for the attacks.  These contacts in the United States helped hijackers find housing, open bank accounts, obtain drivers licenses, locate flight schools, and facilitate transactions.

The record of the Joint Inquiry demonstrates that some persons known to the FBI through prior or then-current FBI counterterrorism inquiries and investigations may have had contact with the hijackers, for example;

- [Nawaf al-Hazmi and Khalid al-Mihdhar had numerous contacts with a long-term FBI counterterrorism informant while they were living in San Diego, California. There are several indications that hijacker Hani Hanjour may have had more limited contact with this individual in December 2000].

- Before September 11, hijackers al-Mihdhar, Nawaf al-Hazmi, Hanjour, Muhammed Atta, Marwan al-Shehhi, and possibly others had contact with people who had come to the FBI's attention during counterterrorism or counterintelligence inquiries or investigations. In all, some of the hijackers were in various degrees of contact with at least fourteen such persons; four of whom were the focus of active FBI investigations, while the hijackers were in the United States.

- Before September 11, al-Mihdhar, al-Hazmi, Hanjour, Atta, al-Shehhi, and possibly other hijackers attended at least seven mosques in California, Florida, Virginia, Arizona, and [page 178] Maryland, some of which were also attended by persons of interest to the FBI.

TOP SECRET

TOP SECRET

The fact that so many persons known to the FBI may have been in contact with the hijackers raises questions as to how much the FBI knew about the activities of Islamic extremist groups in the United States before September 11 and whether the FBI was well-positioned to thwart the attack.  Moreover, the extent to which the hijackers interacted with and relied on other persons in the United States is vitally important in understanding the *modus operandi* of the hijackers and al-Qa'ida and in preventing future attacks.

At a Joint Inquiry hearing in October 2002, FBI Director Mueller commented on his earlier testimony about the hijackers' conduct in the United States:

> [When] I say that the hijackers did "nothing that exposed them to domestic coverage" . . . [and when I say that] the hijackers "contacted no known terrorist sympathizers in the United States," [I] meant in the context of the hijackers not contacting — before 9/11 — terrorist sympathizers on whom we had technical or other form of coverage.  The point being that had they done so, we might have been able to identify them as a result of that coverage.  When making that statement, I did not have in mind what may have been known to the Bureau about persons such as al-Bayoumi [a Saudi living in California, who may have assisted hijackers, al-Hazmi and al-Midhar].  I can see, however, how the statement could be subject to an alternate interpretation that even as of June 18 we had uncovered no persons who had had contact with the hijackers and were "terrorist sympathizers."  I can assure the Committee that I had no intent to mislead.

In a written response to the Joint Inquiry, the FBI explained that, "while [the hijackers] lived their day-to-day lives in an open manner, [they] pursued their inimical objectives in a cloistered, secretive and highly covert manner that kept them on the periphery of the FBI's counterterrorism coverage."  The FBI acknowledged that:

> . . . the hijackers 'may have had contact' with subjects of prior or current [counterterrorism] investigations in San Diego.  Such contact occurred principally through the hijackers' attendance of religious services at various mosques in San Diego, some frequented by subjects of FBI [counterterrorism] investigations.

[Page 179] However, the FBI argued that there is "a significant difference between 'having contact' and 'making contact'" and contends that "[t]he record does not suggest that the hijackers unilaterally or affirmatively sought out or initiated contact with the 14 persons named."

Nonetheless, at least one FBI document prepared shortly after the September 11 attacks concluded that the hijackers, rather than operating in isolation, were assisted by "a web of

TOP SECRET

contacts " in the United States.  In an undated draft analysis based on information available as of November 2001, the FBI's Investigative Services Division concluded:

> Initial reporting from observers cast the hijackers as loners who stayed aloof from those around them.  While these characterizations remain an accurate appraisal of the hijackers' general orientations toward most persons they came into contact with in the United States, more intensive scrutiny reveals that the hijackers – in particular, the six leaders/facilitators – were involved with a much greater number of associates than was originally suspected.  In addition to frequent and sustained interaction between and among the hijackers of the various flights before September 11, the group maintained a web of contacts both in the United States and abroad.  These associates, ranging in degrees of closeness, include friends and associates from universities and flight schools, former roommates, people they knew through mosques and religious activities, and employment contacts.  Other contacts provided legal, logistical, or financial assistance, facilitated U.S. entry and flight school enrollment, or were known from UBL-related activities or training.

## A.  U.S. Intelligence Community Knowledge of Support Networks prior to September 11

The Intelligence Community had information before September 11 suggesting the existence of a radical Islamic network in the United States that could support al-Qa'ida and other terrorist operatives.  The FBI had focused sources and investigative work to some degree on radical Islamic extremists within the United States before September 11. However, according to former National Security Advisor Sandy Berger, the Bureau believed that "al-Qa'ida had limited capacity to operate in the United States and [that] any presence here was under [FBI] surveillance."

An August 2001 Senior Executive Intelligence Brief, provided to senior U.S. Government officials at the time, noted that al-Qa'ida members, including some U.S. citizens, resided in or traveled [page 180] to the United States for years and apparently maintained a support structure here.  According to CIA documents, [————————————] in June 2001 [———] al-Qa'ida operative Khalid Shaikh Mohammed was recruiting persons to travel to the United States and engage in planning terrorist-related activity here.  [————————————], these persons would be "expected to establish contact with colleagues already living there."  In short, before September 11, the Intelligence Community recognized that a radical Islamic network that could provide support to al-Qa'ida operatives probably existed in the United States.

171

The FBI Phoenix field office agent who wrote the "Phoenix communication" testified that he believed this type of support network existed in Arizona before September 11:

> I cannot sit here and testify today that [Wadi] al-Haj established a network there. However, looking at things historically in Arizona we have seen persons go to school at the University of Arizona in Tucson who subsequently went on to become rather important figures in the al-Qa'ida organization . . . prior to al-Qa'ida even coming into existence these people were living and going to school in Arizona. As al-Qa'ida formed and took off and became operational, we've seen these people travel back into the State of Arizona. We've seen Usama bin Ladin send people to Tucson to purchase an airplane for him [and] it's my opinion that's not a coincidence. These people don't continue to come back to Arizona because they like the sunshine or they like the state. I believe that something was established there and I think it's been there for a long time. We're working very hard to try to identify that structure. So I cannot say with a degree of certainty that one is in place there. But . . . that's my investigative theory. . . .

## B.  Persons Known to the FBI with whom September 11 Hijackers may have Associated in the United States

The Joint Inquiry identified a number of individuals known to the FBI through prior or then-current inquiries or investigations who had some degree of contact with some of the hijackers and are described below.

### a. Omar al-Bayoumi

[Page 181]

On January 15, 2000, following an important meeting of al-Qa'ida operatives in Malaysia, hijackers al-Hazmi and al-Midhar arrived in Los Angeles, where they remained for approximately two-and-a-half weeks. At one point, they met Omar al-Bayoumi. A person the FBI interviewed after September 11 says that he was with al-Bayoumi when the latter met al-Hazmi and al-Mihdhar. This person says that al-Bayoumi invited him to travel to Los Angeles, explaining that he had business at the Saudi Consulate. When they arrived at the consulate, al-Bayoumi met with someone behind closed doors. Al-Bayoumi and the person with whom he had traveled to Los Angeles went to a restaurant, where they met al-Hazmi and al-Mihdhar. Al-Bayoumi struck up a conversation with al-Hazmi and al-Mihdhar after he heard them speaking Arabic, and he invited them to move to San Diego. Al-Bayoumi returned to San Diego after leaving the restaurant, and al-Hazmi and al-Mihdhar arrived in San Diego shortly thereafter.

According to several FBI agents, the meeting at the restaurant may not have been accidental.  In fact, the FBI's written response to the Joint Inquiry refers to the restaurant encounter as a "somewhat suspicious meeting with the hijackers."  According to another person the FBI interviewed after September 11, al-Bayoumi said before his trip that he was going to Los Angeles to pick up visitors.

When al-Hazmi and al-Mihdhar moved to San Diego, al-Bayoumi gave them considerable assistance.  They stayed at al-Bayoumi's apartment for several days, until he was able to find them an apartment.  Al-Bayoumi co-signed their lease and paid their first month's rent and security deposit.  The FBI noted in a written response to the Joint Inquiry that "financial records indicate a cash deposit of the same amount as the cashier's check into al-Bayoumi's bank account on the same day, which suggests that the hijackers reimbursed him."  However, another FBI document appears to reach a different conclusion: "a review of Khalid al-Mihdhar and Nawaf al-Hazmi's bank records indicate [*sic*] there is no bank documentation that supports the reimbursement of [the rent money], or any monies to Omar al-Bayoumi from al-Hazmi or al-Midhar."

 After the hijackers moved into their own apartment, al-Bayoumi organized and hosted a party to welcome them to the San Diego community.  He also tasked [——————],* another member of the Islamic Center of San Diego, to help them become acclimated to the United States.  [————], whose [page 182] brother is the subject of an [——————] counterterrorism investigation, served as their translator, answered their questions about obtaining driver's licenses, and called a flight school in Florida for them.

[Since September 11, the FBI has learned that al-Bayoumi has connections to terrorist elements.  He has been tied to an imam abroad who has connections to al-Qa'ida.  Further, the FBI's Executive Assistant Director for Counterterrorism and Counterintelligence described in testimony before the Joint Inquiry FBI contacts "with the [————————] government about collection on a person named [——————], who has ties to al-Qa'ida, who has ties to al-

---

* The identities of several individuals whose activities are discussed in this report have been deleted by the Joint Inquiry.  While the FBI has provided the Joint Inquiry with these names and those names are contained in the classified version of this Final Report, the Joint Inquiry has decided to delete them from this unclassified version due to the as yet unresolved nature of much of the information regarding their activities.

TOP SECRET

Bayoumi." According to FBI documents, [————————] was also in the Phoenix and San Diego areas in 2000 and 2001].

[An FBI report after a search of Bayoumi's residence asserted that an "exhaustive translation of his documents made it clear that . . . he is providing guidance to young Muslims and some of his writings can be interpreted as jihadist." According to an individual interviewed by the FBI, al-Bayoumi's salary from his employer, the Saudi Civil Aviation authority, was approved by Hamid al-Rashid. Hamid is the father of Saud al-Rashid, whose photo was found in a raid of an al-Qa'ida safehouse in Karachi and who has admitted to being in Afghanistan between May 2000 and May 2001. The FBI noted, however, that there is no direct evidence that the money al-Rashid authorized for al-Bayoumi was used for terrorist purposes].

[In September 1998, the FBI opened a counterterrorism inquiry on al-Bayoumi based on a report [————————————————————————————————————— ————————].

[During the counterterrorism inquiry, the FBI discovered that al-Bayoumi had been in contact with several persons who were under FBI investigation [————————————————————————————————————————————————————————————————— —————————————————————————————].

[Page 183]

Despite the fact that he was a student, al-Bayoumi had access to seemingly unlimited funding from Saudi Arabia. For example, an FBI source identified al-Bayoumi as the person who delivered $400,000 from Saudi Arabia for the Kurdish mosque in San Diego. One of the FBI's best sources in San Diego informed the FBI that he thought that al-Bayoumi must be an intelligence officer for Saudi Arabia or another foreign power.

[The Bureau closed its inquiry on al-Bayoumi in July 1999 for reasons that remain unclear. The responsible FBI agent said that she closed the inquiry because the original complaint [————————————————————— ] turned out to be false and she had developed no other information of such significance as to justify continuing the investigation. [————————— ————————————————————————————————————————————————————————————————— —————————————————————————————————————————————————————————————————

TOP SECRET

TOP SECRET

_____

_____

_____

_____

_____

_____

_____

_____]:

     [_____

_____

_____

_____

_____

_____

_____].

**b.  Osama Bassnan**

[Page 184]

     [Although the FBI has not developed definitive evidence that Osama Bassnan, another Saudi national living in San Diego, had ties to al-Hazmi and al-Mihdhar, the following information obtained by the Joint Inquiry suggests such a connection:

- Bassnan was a close associate of al-Bayoumi, [_____ _____].  Bassnan also had close ties to a number of other persons connected to the hijackers, including [_____ _____].

- [_____ _____ _____ _____].

TOP SECRET

- Bassnan lived in the apartment complex in San Diego across the street from al-Hazmi and al-Mihdhar.

- [⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯].

- [⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯].

[Page 185]

- [⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯].

- [⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯⎯].

[The FBI did not investigate Bassnan before September 11, but had been made aware of him on several occasions.  In May 1992, the State Department provided the FBI with a box of documents recovered from an abandoned car.  The documents were in Arabic, and one, a newsletter to supporters of the Eritrean Islamic Jihad (EIJ) Movement, provided updates on the EIJ's council and was marked "confidential."  The box contained letters addressed to Bassnan that discussed plans to import used cars to the United States.  The FBI opened a counterterrorism inquiry on the EIJ, but, having failed to develop information that would predicate further investigation, closed the investigation in December 1992.  In 1993, the FBI received reports that

Bassnan had hosted a party for the "Blind Sheikh" in Washington, D.C. in 1992.  However, the FBI did not open an investigation].

The Intelligence Community had information connecting Bin Ladin to the EIJ as of 1996.  [————————————————————————————————————].  In addition, FBI documents note that a high-level member of the EIJ was on Bin Ladin's Shura Council.  A May 2000 FBI document indicates that FBI Headquarters personnel were not handling EIJ matters due to resource constraints.

After September 11, the FBI developed information clearly indicating that Bassnan is an extremist and a Bin Ladin supporter. [————————————————————————————————

————————————————————————————————————————————————————————————————————————

———————[page 186]————————————————————————————————————————————————

——————————————————].

[————————————————————————————————————————————————————————————

——————————————————————————————————————————————————————————————

——————————————————————————————————————————————————————————————

——————————————————————————————————————————————————————————————

——————————————————————————————————————————————————————————————

——————————————————————————————————————————————————————————————

——————————————————].

In early December 2002, the FBI orally advised the Joint Inquiry that it would be amending its written response to reflect the comments [————————————————————————————————

——————————————].  According to the FBI, the amended response will note that there is some evidence that Bassnan had contact with the hijackers, but the FBI does not believe this evidence to be credible and has not been able to corroborate this reporting through subsequent investigation.

c.  [Imam]*

[After the September 11 attacks, the FBI developed information that al-Hazmi and al-Mihdhar were closely affiliated with an Imam in San Diego who reportedly served as their spiritual advisor during their time in San Diego.  [——————————————————————————

——————————————————————————————————————————————

——————————————————————————————————————————————

——————————————————————————————————————————————

——————————————].  Several persons informed the FBI after September 11 that this imam had closed-door meetings in San Diego with al-Mihdhar, al-Hazmi, and another individual, whom al-Bayoumi had asked to help the hijackers].

[Page 187]

[This imam moved to Falls Church, Virginia in 2001 [—————————————————

——————].  In 2001, hijackers al-Hazmi and Hanjour also moved to Falls Church and began to attend the mosque with which the imam was associated.  One of members of the mosque helped them find an apartment in the area and, after approximately a month, this person drove Hanjour and al-Hazmi, along with two other hijackers, to Connecticut and then to Paterson, New Jersey. From the hotel in Connecticut where they stayed for two nights, a total of 75 calls were made to locate apartment, flight schools, and car rental agencies for the hijackers.  The hijackers then returned to Paterson on their own.  During a search of Ramzi Binalshibh's residence in Germany, police found the phone number for the imam's mosque.  The FBI agent responsible for the September 11 investigation informed Joint Inquiry staff that "there's a lot of smoke there" with regard to the imam's connection to the hijackers].

[The FBI originally opened a counterterrorism inquiry into the imam's activities in June 1999 [———————————————].  During the counterterrorism inquiry, the FBI discovered that the imam was in contact with a number of other persons of investigative interest, including [—————

——————————————].

_____

*  The identities of several individuals whose activities are discussed in this report have been deleted by the Joint Inquiry.  While the FBI has provided the Joint Inquiry with these names and those names are contained in the classified version of this Final Report, the Joint Inquiry has decided to delete them from this unclassified version due to the as yet unresolved nature of much of the information regarding their activities.

178

[In early 2000, the imam was visited by a subject of a Los Angeles investigation closely associated with Blind Sheikh al-Rahman.  [————————————————————————

————————————————————————————————————————————————

————————————————————————————————————————————————

————————————————————————————————————].

[The FBI closed its inquiry into the activities of the imam in March 2000, approximately two months after al-Hazmi and al-Midhar arrived in San Diego.  [————————————————

——————————————————————————————].  In the case closing memorandum, the agent asserted that the imam had been "fully identified and does not meet the criterion for [further] investigation."  The investigation was closed despite the imam's contacts with other subjects of counterterrorism investigations and reports concerning the imam's connection to suspect [page 188] organizations.  The Bureau's written response to the Joint Inquiry asserts that "the imam was a 'spiritual leader' to many in the community" and that hundreds of Muslims associated with him].

d.  **[Business Manager]**

[In 2000, al-Hazmi briefly worked at a San Diego business.  The manager of the business, told the FBI that he hired al-Hazmi after receiving a call from "mutual friends" at the Saranac Street Mosque.  The FBI does not know how much al-Hazmi was paid or whether he received financial support from the business manager or the business owner because the business manager often paid employees in cash].

[In January 2000, before al-Hazmi's employment at the business, the FBI Los Angeles field office initiated a counterterrorism investigation of the business manager after a person whom the FBI was surveilling entered the business manager's car in a mosque parking lot.  That person was [————————————], the brother of a known Bin Ladin operative [——————].  The business manager was under FBI investigation when he hired al-Hazmi].

[The FBI agent handling the business manager's investigation interviewed him by phone.  The business manager told the agent that he did not want to meet in person because it would be a

strain to travel to Los Angeles.  The business manager informed the agent that he had lived in San Diego for two and a half years and did not want to give his home address.  The business manager said that he worked at the local business.  The agent concluded that the business manager did not pose a threat to national security, and the investigation was closed in December 2000].

**e.  [Business Owner]**

[The business owner, a Palestinian by birth and a U.S. citizen, owns a number of businesses in the San Diego area, including the business where al-Hazmi worked for several weeks.  A number of the hijackers' associates, including [————] and [————], also worked at this business.  FBI records show that both al-Mihdhar and al-Hazmi spent time socializing at the business].

[Page 189]

[Before September 11, the business owner was in contact with an individual who told the FBI after September 11 that he was al-Hazmi's best friend and that the individual had contact with an FBI informant who also had contacts with the hijackers.  The FBI also learned that the business owner had been associating with other persons with possible ties to the hijackers, including Osama Bassnan, and it received reports that the business owner cheered upon learning of the September 11 attacks].

[The FBI conducted several investigations of the business owner prior to September 11.  The first was opened in August 1991 upon receipt of reports from the San Diego Police Department that, during a traffic stop, he had stated that the United States needed another Pan Am 103 attack and that he could be the one to carry it out.  The business owner also said that all Americans should be killed for what they did to Iraqis].

[During the investigation, the FBI developed information that the business owner was associated with members of the Palestinian Front for the Liberation of Palestine (PFLP), a known terrorist organization, in San Diego and Chicago.  In 1994, San Diego police also received an anonymous call stating that the business owner was a PFLP member.  The FBI received information in 1994 that he had threatened to kill a former Israeli intelligence officer

who resided in San Diego.  The business owner informed the Israeli that he was a member of the Palestine Liberation Organization and that the orders to kill him had come from the PLO].

[The FBI closed its investigation of the business owner, but reopened it in 1997 when it received information tying him to a possible terrorist plot based in North Carolina.  In February 2001, a stockbroker called the FBI to say that the business owner had closed his account, explaining that he was sending the money to freedom fighters in Afghanistan.  During its post-September 11 investigation, the FBI discovered that the business owner was associating with Osama Bassnan and [————————], two other possible hijacker associates in San Diego].

[Page 190]

**f.  [An Individual]**

[According to information obtained by the FBI after September 11, hijacker Marwan al-Shehhi was in contact with an individual (referred to as "the first individual" below) on the East Coast.  [————————————————————————————————————————

————————————————————————————————————————————————————

————————————————————————————————————————————————————

——————————————————————————————————————————————].

[————————————————————————————————————————————————

————————————————————————————————————————————————————

————————————————————————————————————————————————————

————————————————————————————————————————————————————

————————————————————————————————————————————————————

————————————————————————————————————————————————————

——————————————————————————————].  Intelligence reporting has confirmed that a second individual, reportedly connected to the first individual, was an associate of Atta's in college and that information in the first individual's possession connected the first individual to Mohammed Atta's sister].

[The first individual has been the subject of an FBI investigation since July 1999 and has ties to important al-Qa'ida figures and several organizations linked to al-Qa'ida.  The FBI is concerned that this individual is in contact with several persons with expertise in nuclear

sciences.  [————————————————————————————————————
————————————————————————————————————————————
————————————————————————————————————————————
————————————————————————————————————————————
————————————————————————————————————————————
————————————————————————————————————————————
————————————————————————————————————————————
————————————————————————————————————————————
————————————————————————————————————————————
————————].

[Page 191]

In a written response to the Joint Inquiry, the FBI stated [————————————————
————————————————————————————————————————————
————————————————————————————————————————————
————————————————————————————————————————————
————————————————————————————————————————————
————————————————].

## g.  [An Individual]

[An individual may have assisted hijacker pilot Hani Hanjour.  This individual was known to the FBI and is discussed in the Phoenix Communication.  The FBI believes that, beginning in 1997, Hanjour and this individual trained together at a flight school in Arizona. Several instructors at the school told the FBI that the two were associates and one instructor thought they might have carpooled together].

[The FBI has confirmed five occasions when this individual and Hanjour were at the school on the same day.  On one occasion in 1999, logs show that Hanjour and this individual used the same plane.  According to a flight instructor, the individual was an observer and school rules require that Hanjour approve the individual's presence in the aircraft.  Another person informed the FBI after September 11 that the individual and Hanjour knew each other from flight training and through a religious center in Arizona].

[Some evidence links Hanjour and the individual in the summer of 2001.  The FBI has located records from a Phoenix flight school showing that one day in June Hanjour and several other persons signed up to use a Cessna simulator.  The next day, two persons who signed up with Hanjour the previous day came to the facility with the individual.  An employee of the flight school told the FBI that he recalls a fourth person had been with Hanjour the day before.  Another employee placed Hanjour and this person together during that time frame, although she was not completely confident in her identification].

[The FBI attempted to investigate the individual in May 2001, but decided not to open a formal investigation after determining that the individual was out of the country.  Because the FBI did not place the individual's name on a watchlist, it was unaware that the individual returned to the United States soon after and may have associated with Hanjour and several other Islamic extremists.  In a Joint Inquiry hearing, a Phoenix [page 192] FBI agent conceded that the individual might have returned to the United States to screen pilots for the September 11 attacks].

## VI.  Germany – Investigation of the Hamburg Cell

According to the FBI, "much of what took place on September 11, 2001 originated during the mid-1990s when [presumed hijacker pilots] Mohammed Atta, Marwan al-Shehhi, and Ziad Jarrah moved to Germany, eventually settling in Hamburg, and began to associate with Islamic extremists."

An FBI agent asserted in a Joint Inquiry interview that the three future hijackers were not radicals when they came to Germany, but became so during their time there.  While in Hamburg, Atta, al-Shehhi, and Jarrah attended the al Quds mosque where they met a group of radical Islamists, including Mohammed Haydar Zammar, Mamoun Darkazanli, Zakariya Essabar, Ramzi Bin al-Shibh, Said Bahaji, and Munir Mottasadeq.  The hijackers prayed, worked, lived, socialized, and attended university classes with this group, which has become known as the "Hamburg Cell."

Zammar and Darkazanli were known to U.S. [————————————] before September 11.  Zammar was born in Syria in 1961, moved to Germany, and obtained German citizenship.  According to an FBI summary of its September 11 investigation, Zammar is believed to have recruited Atta, al-Shehhi, and Jarrah into al-Qa'ida and encouraged their participation in the September 11 attacks.

Darkazanli is a Syrian national, born in 1958.  He entered Germany in 1983 and became a naturalized German citizen in 1990, though he retained his Syrian citizenship.  While Darkazanli's relationship to the future hijackers is less clear, he is a close associate of Zammar.

According to the FBI, Bin al-Shibh and Essabar were to have participated in the conspiracies that carried out the September 11 attacks.  A martyr video was discovered in Bin al-Shibh's possessions in Afghanistan, and [————] reportedly discovered information about flight training on Essabar's computer.  [Page 193]  However, neither was able to obtain a U.S. entry visa.  Before the attacks, Bin al-Shibh and Bahaji left for Pakistan where Bin al-Shibh was eventually captured [————————————].

Mottasadeq lived with Atta and signed his will, and also had power of attorney for al-Shehhi.  He is now being held in Germany on charges related to September 11.*

[————————————————————————————————————————————————————————————————————————————————————————————————————] Darkazanli was in contact with a number of Islamic extremists, including [————————————————————————————————————————————————————————————].

After September 11, the FBI discovered that Darkazanli traveled to Spain in the summer of 2001 at approximately the same time that Atta was there.  It is possible that Darkazanli and Atta met with Yarkas, who may have had advance knowledge of the September 11 attacks.

---

* Motassadeq was convicted on February 19, 2003 in Germany of membership in a terrorist organization and accessory to over 3,000 murders in New York and Washington.

Spanish authorities intercepted a call to Yarkas on August 27, in which he was told, "we have entered the field of aviation and we have even slit the throat of the bird."  The FBI speculates that the "bird" represented the bald eagle, symbol of the United States.  Yarkas, who was arrested by the Spanish on November 13, 2001, has met at least twice with Bin Ladin.  A Spanish indictment alleges that he had contacts with Mohammed Atta and Ramzi Bin al-Shibh.

[————————————————————————————————————————

————————————————————————————————————————————].


According to CIA documents, the U.S. Intelligence Community first became aware of Darkazanli in 1993 when a person arrested in Africa carrying false passports and counterfeit money was found with Darkazanli's telephone number.  A CIA report notes that, despite careful scrutiny of Darkazanli and his business dealings, authorities were not able to make a case against him.

[Page 194]

The FBI became interested in Darkazanli in 1998 after the arrests of Wadi El-Hage and Abu Hajer, operatives in Bin Ladin's network.  According to FBI documents, Darkazanli's fax and telephone numbers were listed in El-Hage's address book.  El-Hage has been convicted for his role in the 1998 Embassy bombings and is in U.S. custody.  The FBI also discovered that Darkazanli had power of attorney over a bank account belonging to Hajer, a high-ranking al-Qa'ida member who has served on its Shura Council.  Hajer is currently in U.S. custody.


[————————————————————————————————————————

————————————————————————————————————————————

————————————————————————————————————————————

————————————————————————————————————————].


[Zammar had come to the CIA and FBI's attention on numerous occasions before the September 11 attacks.  CIA documents refers to Zammar as an Islamic extremist and note that his name has turned up in the possession of several extremists questioned or detained.  Of particular importance, [————————————————————————] in mid-1999 that Zammar was in direct contact with one of Bin Ladin's senior operational coordinators].

[In March 1999, CIA received intelligence about a person named "Marwan" who had been in contact with Zammar and Darkazanli. Marwan was described as a student who had spent time in Germany [————————————————]. The CIA speculated at the time that this was a Bin Ladin associate who lived in the United Arab Emirates, but now believes that Marwan was Marwan al-Shehhi, one of the presumed hijacker pilots. After September 11, the FBI received information about additional connections before the attacks between Zammar and persons who participated in the attacks].

[Considerable pressure was placed on foreign authorities in the years leading up to the September 11 attacks to target Darkazanli, Zammar, and other radicals [————]. A senior U.S. Government officer told [page 195] the Joint Inquiry that significant information concerning al-Qa'ida members had been shared with foreign authorities, but that it became apparent only after September 11, 2001 that the foreign authorities had been watching some of those persons before that date].

[The Joint Inquiry reviewed numerous documents describing efforts to pressure [————] authorities to act. [————————————————————————————————
————————————————————————————————————————
————————————————————————]. In the end, these efforts were largely unsuccessful. In most cases, the [————————————] did not take actions that were suggested].

Significant legal barriers restricted Germany's ability to target Islamic fundamentalism. Before September 11, it was not illegal in Germany to be a member of a foreign terrorist organization, to raise funds for terrorists, or plan a terrorist act outside German territory. This law has since been changed. A legal privilege also dramatically restricted the government's ability to investigate religious groups. In fact, due to the difficulty in investigating terrorist cases, the German government would often attempt to investigate terrorist subjects for money laundering. Unfortunately, laundering laws were difficult to enforce. For example, over the past several years, out of three to four hundred money laundering investigations, only one person has been convicted. [————————————————————————————————
————————————]. The German government apparently did not consider Islamic groups a threat and were unwilling to devote significant investigative resources to this target.

TOP SECRET

[——————————————————————————————————

——————————————————————————————————

——————————————————————————————————

————————————————————].

U.S. efforts [————] also provide a window into CIA and FBI coordination and information sharing.  Both agencies were interested in radical Islamists [————].  However, on several occasions the FBI and CIA unknowingly operated against the same targets.  The FBI legal attaché in Germany did [page 196] not recall getting information about Darkazanli and Zammar from the German government or the CIA before September 11.  He was unaware that Darkazanli and Zammar had been the subject of government investigations before the attacks.

## VII.  The Hijackers' Visas

The Joint Inquiry reviewed passport and visa histories of the nineteen hijackers involved in the September 11 attacks to determine whether they entered the United States legally.  It also sought to determine whether there were anomalies in the visa process that might have alerted U.S. Government officials to the hijackers in some way.

Over ten million applications for visas to enter the United States are received each year at approximately two hundred fifty consular locations.  Consular officers at posts abroad review all applications and interview selected applicants to determine whether they are likely to return to countries of origin in accordance with the visa or are suspected of criminal or terrorist activities.  Consular officers must certify in writing that they have checked applicant names against the State Department's watchlist.

Although there were anomalies and mistakes on some of the hijackers' visa applications, consular-affairs experts at the State Department contended in Joint Inquiry interviews that these errors were "routine."  By contrast, an October 2002 review by the General Accounting Office (GAO) concluded that the omissions and inconsistencies in the hijacker's applications should have raised concerns about why they wanted visas to come to the United States.

187

Fifteen of the 19 hijackers were Saudi nationals who received visas in Saudi Arabia. Before September 11, the United States had not established heightened screening for illegal immigration or terrorism by visitors from Saudi Arabia.  In a Joint Inquiry hearing, DCI Tenet described a less than rigorous review of visa applicants in Saudi Arabia before September 11:

> Most of the young Saudis [hijackers] obtained their U.S. visas in the fall of 2000. The State Department did not have a policy to stringently examine Saudis seeking visas [page 197] before 11 September because there was virtually no risk that Saudis would attempt to reside or work illegally in the U.S. after their visas expired.  U.S. Embassy and consular officials do cursory searches on Saudis who apply for visas, but if they do not appear on criminal or terrorist watchlists they are granted a visa.  Thousands of Saudis every year are granted visas, as a routine; the majority are not even interviewed.  The vast majority of Saudis study, vacation, or do business in the U.S. and return to the kingdom.

Consistent with this description of the situation, the Joint Inquiry's review confirmed that, prior to September 11, 2001, only a small percentage of visa applicants in Saudi Arabia were interviewed by consular affairs officers; travel agencies were used to deliver visa applications to consular offices in Saudi Arabia; and a relatively low standard was applied in scrutinizing visa applications for accuracy and completeness in Saudi Arabia.

The 19 hijackers received visas at consular offices abroad in accordance with routine procedures.  The majority of the hijackers sought new passports shortly before applying for visas.  Requests for new passports can stem from theft, loss, or accidental destruction.  However, terrorists also often try to hide travel to countries that provide terrorist training by acquiring new passports.

Multiple-entry visas were issued to the hijackers for periods ranging from two to ten years. Eighteen of the nineteen received B-1/B-2 visas for tourist and business purposes.  The nineteenth hijacker, Hani Hanjour, was issued a B-1/B-2 visa in error.  He should have been issued an F-1 visa for study in the United States because he had expressed a desire to study English here.  Recognizing the error, the INS issued Hanjour an F-1 visa when he arrived in the United States.

At their ports-of-entry, the hijackers were issued "stay visas" valid for six months.  Some hijackers, Atta, Hanjour, al-Shehhi, al-Mihdhar, and Jarrah, entered and re-entered the United States for several six-month periods before September 11.  They stayed for five or six months,

went abroad for weeks or months, re-entered the United States, and received additional six-month stays.

Since the majority of the hijackers were Saudi nationals who received their visas in Saudi Arabia, questions have been raised about the "Visa Express" program, a process in many countries that encourages visa applicants to submit non-immigrant applications to designated travel agencies or other collection points for forwarding to U.S. embassies.  In Joint Inquiry interviews, State Department [page 198] officials described Visa Express as simply an application collection process and not a visa adjudication, issuance, or determination system.  Visa Express is merely a way of "dropping the application off."  Travel agencies assist by giving applicants correct forms, helping non-English speakers fill out the forms, and collecting fees.  Approximately sixty embassies and consulates throughout the world use travel agencies or other businesses in this manner.

The Visa Express program in Saudi Arabia began in May 2001.  Five of the 19 hijackers applied for visas in Saudi Arabia in June, so it is likely that they used travel agencies to acquire application forms and deliver them to the embassy.  None of the five, including al-Mihdhar, was on a watchlist at the time.  Thus, when name checks were performed, the system showed no derogatory information.  If derogatory information did exist in the system, as was the case with a suspected terrorist who applied for a visa in Saudi Arabia in August 2001 under the Visa Express program, the watchlist system should block issuance of a visa.

State Department officials informed the Joint Inquiry that the Visa Express program was terminated in Saudi Arabia in July 2002 because news reports suggested that the program allowed Saudi applicants to skirt the normal process.  According to State Department officials, the program did not affect the number of Saudis interviewed because applicants are selected for interviews when their applications present signs of an intention to immigrate.  These officials said that all applications, including those delivered to consular officers under the Visa Express program in Saudi Arabia, were checked against the watchlist.

The Joint Inquiry also received information from the Immigration and Naturalization Service about the 19 hijackers, two of whom, including Nawaf al-Hazmi, had overstayed their visas.  In addition, Hani Hanjour had been issued an F-1 visa to study English, but did not

register for classes and, therefore, became "a non-immigrant status violator." The INS was not aware of these violations until after September 11.

### VIII.  The Rising Threat and the Context of the September 11 Attacks

[Page 199]

A basic question before the Joint Inquiry was whether the Intelligence Community adequately recognized the threat international terrorist groups posed to the United States. The Inquiry therefore examined the evolution of the terrorist threat to this country, the Community's response since the creation of the Counterterrorist Center (CTC) in 1986, and what the Community has or should have learned from all sources, including previous terrorist attacks, about the threat to the United States.

[Understanding the September 11 attacks requires an historical perspective broader than the details of those attacks. Consequently, the Joint Inquiry took note of major acts of terrorism directed against the United States in the 1980s and early 1990s, including:

- The 1983 bombings of the U.S. Embassy and Marine Barracks in Beirut by Islamic Jihad

- The March 1984 kidnapping and murder of William Buckley, a CIA official in Beirut, and subsequent kidnapping of other U.S. citizens in Lebanon

- The April 1984 bombing of a restaurant frequented by members of the U.S. armed forces near Torrejon Airbase in Spain by the Iranian-backed terrorist group Hizbollah

- The September 1984 bombing of the U.S. Embassy annex in Beirut

- The June 1985 hijacking of TransWorld Airways Flight 847

- The October 1985 hijacking of the cruise ship Achille Lauro

- The November 1985 hijacking of an EgyptAir flight from Athens and

[Page 200]

- The December 1985 attack on the Rome and Vienna airports by the Abu Nidal organization.

Before the emergence of al-Qa'ida in the early 1990s, attacks like these shaped the U.S. Government's conception of how terrorist groups behaved.  In general, those groups were viewed as instruments of the nation states that sponsored them and they were not interested in mass casualties.  The lessons learned at that time were reflected in Joint Inquiry testimony by former National Security Advisor Brent Scowcroft:

> [In the late 1980s], terrorism was primarily a phenomenon which was state-sponsored or state-assisted or tolerated.  And therefore, it was natural for us to think of deterring or dealing with terrorism primarily through the sponsor than through the terrorist organizations directly where things like deterrence and so on would have some impact.…A further point, none of the terrorist organizations at that time so far as we knew had global reach.  This meant that while U.S. persons, U.S. interests, and U.S. assets were not immune from terrorist attack, the United States homeland, in effect, was.  And that certainly colored how terrorism was viewed.  Terrorist organizations appeared to be either regionally or issue related.  And even though Hizbollah was thought to be behind many of the terrorist acts that occurred during the Reagan Administration, the acts themselves seemed to be relatively independent and uncoordinated events rather than part of an overall strategy.

Terrorism aimed at the United States began to take on a different set of characteristics in the 1990s as Bin Ladin and al-Qa'ida emerged as a threat to the United States.  Bin Ladin was intent on striking inside the United States, and the Intelligence Community detected numerous signs of a pending terrorist attack by al-Qa'ida in the spring and summer of 2001.

## A.  A New Breed of Terrorists

International terrorism struck directly in the United States in February 1993, when a truck bomb exploded in the parking garage of the World Trade Center in New York City.  A second alarm sounded in June 1993 when the FBI arrested eight persons for plotting to bomb New York City landmarks, including the United Nations and the Lincoln and Holland tunnels.  The central figures in these plots were Ramzi Yousef and Sheikh Omar Abd al-Rahman, who was the

TOP SECRET

spiritual leader of both Gama'at al- [page 201] Islamiya and Egyptian Islamic Jihad.  Although the Intelligence Community has not established that Bin Ladin had a role in either plot, both Yousef and Rahman were later determined to have ties to Bin Ladin.  Both 1993 plots featured the deliberate intent to kill thousands of innocents by a group composed of different nationalities without a state sponsor, characteristics previously absent from terrorist schemes.

The new trend in terrorism became more apparent in January 1995 when Philippine National Police discovered Ramzi Yousef's bomb-making laboratory in Manila and arrested his accomplice, Abdul Hakim Murad.  Captured material and interrogations of Murad revealed Yousef's plot to kill the Pope, bomb the U.S. and Israeli embassies in Manila, blow up twelve U.S. airliners over the Pacific Ocean, and crash a plane into CIA Headquarters.  These plans were known collectively as the "Bojinka Plot." Murad was eventually convicted for his role in the plot and is currently incarcerated in the United States.

It is worth noting that Murad was charged only for his involvement in the scheme to blow up the airliners over the Pacific and not for the other aspects of the Bojinka Plot.  Because the plans to crash a plane into CIA Headquarters and to assassinate the Pope were only at the "discussion" stage, prosecutors decided not to include those plots in the indictment.  FBI agents who were interviewed by the Joint Inquiry about the Bojinka Plot confirmed this tight focus on the elements of the crime investigated and charged, explaining that the case was about a plan to blow up twelve airliners and, therefore, other aspects of the plot were not relevant to the prosecution.  As a result, the Joint Inquiry was able to locate almost no references to the plan to crash a plane into CIA Headquarters in the FBI's investigatory files on the case.

The first World Trade Center bombing, the New York City landmarks plot, and the Bojinka Plot pointed to a new form of terrorism.  The plots revealed a growing threat from persons who ascribed to a radical interpretation of Sunni Islam; they involved infliction of mass casualties; and they confirmed that international terrorists were interested in attacking symbolic targets within the United States, such as the World Trade Center.

[page 202]

The increasing development of religious-based terrorist organizations in the 1990s contributed directly to the emergence of this new form.  As Bruce Hoffman, a terrorism expert

TOP SECRET

with the RAND Corporation noted in a statement for the Joint Inquiry record: "[f]or the religious terrorist, violence first and foremost is a sacramental act or a divine duty."

The new breed also focused on America.  In testimony before the Joint Inquiry, former National Security Advisor Sandy Berger noted that the new terrorists were "hardened by battle against the Soviets in Afghanistan in the '80s and energized against the United States by the military presence we left in Saudi Arabia after the Gulf War."

The first attack on the World Trade Center in 1993, five years before Bin Ladin openly called on his followers to bring *jihad* to America, was a clear signal that Sunni extremists sought to kill Americans on American soil.  Seven years later, the arrest of Ahmed Ressam and the seizure of bomb-making materials in his car at the U.S./Canada border should have dispelled all doubt that al-Qa'ida and its sympathizers sought to operate on U.S. soil, even though most of the terrorist masterminds remained overseas.

Emphasis on mass casualties was another important change from the terrorism the United States witnessed in the 1980s.  Although attacks in the 1980s sometimes were intended to kill hundreds of official or military personnel, for example, the bombings of the Marine barracks and the U.S. Embassy in Lebanon, no major terrorist group attempted to kill thousands of civilians. Brian Jenkins, an expert on terrorism, wrote in 1975: "[T]errorists want a lot of people watching and a lot of people listening and not a lot of people dead."  Twenty years later, Director of Central Intelligence James Woolsey contended that: "[T]oday's terrorists don't want a seat at the table; they want to destroy the table and everyone sitting at it."  The 1999 edition of the FBI's *Terrorism in the United States* pointed out that the number of terrorist attacks had decreased in the 1990s, but the number of casualties had increased.  Terrorism had evolved from a frightening episodic danger that could kill hundreds to an ominous menace that directly threatened the lives of tens of thousands of Americans.

[Page 203]

It took some time for the Intelligence Community to recognize the emergence of this new form of terrorism.  In Joint Inquiry interviews, FBI personnel who were involved in the investigation of the 1993 World Trade Center bombing suggest that the Intelligence Community was initially confused about the new adversary.  This form of terrorism featured Arabs from countries hostile to one another working together without a state sponsor.  Counterterrorism

experts eventually recognized the shift and incorporated it into their analyses.  A July 1995 National Intelligence Estimate, for example, identified a "new breed" of terrorist, who did not have a state sponsor, was loosely organized, favored an Islamic agenda, and had an extreme penchant for violence.

## B.  Emergence of Usama Bin Ladin and al-Qa'ida

Usama Bin Ladin's connection to international terrorism first came to the attention of the Intelligence Community in the early 1990s.  According to a former CTC Chief in testimony before the Joint Inquiry, Bin Ladin was first seen as "a rich Saudi supporting Islamic extremist causes."  He founded the al-Qa'ida organization in 1989 and moved to Sudan in 1991 or 1992.  During his time in Sudan, Bin Ladin built a network of international Islamic extremists and allied himself with other Sunni terrorist groups.

Bin Ladin drew on a broad network of Islamic radicals fighting in the Balkans, Chechnya, and Kashmir in an attempt – in their eyes – to defend Islam against its persecutors.  Fighters from Saudi Arabia, Egypt, Pakistan, and many other countries took up arms to aid their co-religionists, while Muslims from around the world contributed money.  Although the specific actions of al-Qa'ida often did not enjoy widespread support, the causes it championed were viewed as legitimate, indeed laudable, in much of the Muslim world.

[In December 1992, as U.S. military forces were deploying to Somalia as part of a United Nations operation to provide humanitarian assistance to a starving population, Islamic extremists attacked a hotel in Aden, Yemen housing U.S. service members supporting that operation.  An Intelligence Community paper from April 1993 concluded that "[Bin Ladin's] group almost certainly played a role" in that attack.  An article from an April 1993 National Intelligence Daily also took note that three to four hundred Islamic militants had [page 204] received training the previous year at military camps in Afghanistan funded by Persian Gulf Arabs.  One camp was run by an Egyptian and funded by Bin Ladin].

In Joint Inquiry testimony, former CTC Chief Cofer Black reported that the CIA learned in 1993 that "Bin Ladin was channeling funds to Egyptian extremists" and in 1994 that "al-Qa'ida was financing at least three terrorist training camps in northern Sudan."  He also noted

Bin Ladin's connection to the 1995 assassination attempt against Egyptian President Mubarak and explained that "an al-Qa'ida defector [had] laid out for us Bin Ladin's role as a head of a global terrorist network."

[In November 1995, five Americans were killed when the Office of Program Management at a Saudi National Guard facility in Riyadh was bombed. According to the Intelligence Community, the cumulative body of evidence eventually suggested that Bin Ladin and a group he supported were responsible. [————————————————————————————————————————————————————————————————————————————].

In May or June 1996, Bin Ladin moved from Sudan to Afghanistan, where he was treated as an honored guest of the Taliban, then the dominant political and military group. According to DCI Tenet's testimony before the Joint Inquiry, "[o]nce Bin Ladin found his safehaven in Afghanistan, he defined himself publicly as a threat to the United States. In a series of declarations, he made clear his hatred for Americans and all we represent."

In August 1996, Bin Ladin issued a public *fatwa* or religious decree, authorizing attacks by his followers against Western military targets on the Arabian Peninsula. In February 1998, Bin Ladin and four other extremists issued another public *fatwa* expanding the 1996 *fatwa* to include U.S. military and civilian targets anywhere in the world. In a May 1998 press conference, Bin Ladin publicly discussed "bringing the war home to America."

On August 7, 1998, two truck bombs destroyed U.S. embassies in Nairobi, Kenya and Dar Es Salaam, Tanzania. Two hundred twenty four people, including twelve Americans, were killed in the attacks and 5,000 were injured. The Intelligence Community confirmed very quickly that these attacks [page 205] had been carried out by Bin Ladin's terrorist network. The attacks showed that the group was capable of carrying out simultaneous attacks and inflicting mass casualties.

In early December 1999, the Jordanian government arrested members of a terrorist cell that planned to attack religious sites and tourist hotels in connection with the Millennium celebrations. About a week later, in mid-December 1999, Algerian extremist Ahmed Ressam tried to enter the United States from Canada with bomb making chemicals and detonator

equipment.  He was arrested after an alert Customs agent asked to search his car and he attempted to flee.  Investigation revealed that his target was Los Angeles International Airport and that he was an operative with ties to Bin Ladin's network.

In describing what the U.S. Government might have done differently before September 11, DCI Tenet testified:

> [T]he one thing that strikes me that we all just let pass from the scene after the Millennium threat was this fellow who tried to cross the border from Canada into the United States.  There were no attacks.  There were no Americans killed.  We didn't have any hearings.  We didn't talk about failures.  We didn't talk about accountability.  We just assumed the system would keep working because it prevented the last attack.  He tried to cross the border; and I think one of the things that everybody should have done is say, "what does this mean?," more carefully, rather than just moving from this threat to the next.  Assuming that it had been disrupted, what does it mean for the homeland?  Should we have taken more proactive measure sooner?  Hindsight is perfect, but it is the one event that sticks in my mind.

In October 2000, Bin Ladin operatives carried out an attack by boat on *USS Cole*, as it was refueling in Aden, Yemen.  Seventeen U.S. sailors were killed.  An investigation revealed that *USS The Sullivans* had been the original target of the *Cole* attack in January 2000, but the terrorists' boat had sunk from the weight of the explosives loaded on it.

## C.  Attributes of Bin Ladin's Terrorist Operations

As the 1990s progressed, it became clear that Bin Ladin's terrorist network was unusual, although not unique, in its skill, dedication, and ability to evolve.  The 1998 embassy attacks, the [page 206] planned attack in Jordan around the Millennium, and the attack on *USS Cole* suggested a highly capable adversary.  Operations carried out by Bin Ladin's network before September 11 suggested several worrisome traits:

- Long-range planning.  The 1998 attack on two U.S. embassies in East Africa took five years from its inception.  The planning for the attack on *USS Cole* took several years.

- Simultaneous operations.  The 1998 attack on the two embassies and the Millennium plots demonstrated that al-Qa'ida was able to conduct simultaneous attacks, suggesting sophisticated overall planning.  In a statement for the Joint Inquiry record, RAND's Bruce Hoffman noted that simultaneous terrorist attacks are rare, as few groups have enough skilled operators, logisticians, and planners to conduct such operations.

- Operational security.  Terrorist manuals and training emphasize that operations should be kept secret and details compartmented. Communications security is also stressed.  Thus, disrupting these operations is difficult, even if low-level foot soldiers make mistakes and are arrested.  Several attacks carried out by Bin Ladin's operatives occurred with little warning. Even the successful disruption of part of a plot, as occurred during the Millennium, does not necessarily reveal other planned attacks, such as an attack on a U.S. warship planned for around the same time.

- Flexible command structure.  Bin Ladin's network uses at least four different operational styles: a top-down approach employing highly-skilled radicals; training amateurs like Richard Reid, the so-called "shoebomber," to conduct simple, but lethal attacks; helping local groups with their own plans, as with Jordanian plotters during the Millennium; and fostering like-minded insurgencies.  Tactics that can stop one type of attack do not necessarily work against others.

- Imagination.  Most terrorists are conservative in their methods, relying on small arms or simple explosives.  The attack on *USS Cole,* however, was a clear indication of the Bin [page 207] Ladin network's tactical flexibility and willingness to go beyond traditional delivery means and targets.

Size also distinguishes Bin Ladin's network from many terrorist groups.  The recently disrupted Greek radical group, November 17, for example, contained fewer than fifty people. According to Hoffman, the Japanese Red Army and the Red Brigades both had fewer than one hundred dedicated members.  Even the Irish Republican Army, one of the most formidable terrorist organizations in the 1970s and 1980s, had no more than four hundred activists.

Arresting and prosecuting members of these groups was an effective way to end or lessen the threat they posed.

Although the number of highly skilled and dedicated persons who have sworn fealty to Bin Ladin was probably in the low hundreds before September 11, the organization as a whole is much larger, with tens of thousands having gone through the training camps in Afghanistan.  Its organizational and command structures, which employ many activists who are not formal members of the organization, make it difficult to determine where al-Qa'ida ends and other radical groups begin.  Media reports indicate that al-Qa'ida has trained thousands of activists in Sudan and Afghanistan, and interviews of intelligence officials indicate that al-Qa'ida can draw on thousands of supporters when raising funds, planning, and executing attacks.

**D.  Intelligence about Bin Ladin's Intentions to Strike Inside the United States**

Central to the September 11 plot was Bin Ladin's determination to carry out a terrorist operation inside the United States.  The Joint Inquiry therefore reviewed information the Intelligence Community held before September 11 that suggested that an attack within the United States was a possibility.  Our review confirmed that, shortly after Bin Ladin's May 1998 press conference, the Community began to acquire intelligence that Bin Ladin's network intended to strike within the United States.  Many of these reports were disseminated throughout the Community and to senior U.S. policy-makers.

These intelligence reports should be understood in their proper context.  First, they generally did not contain specific information as to where, when, and how a terrorist attack might occur, and, [page 208] generally, they were not corroborated.  Second, these reports represented a small percentage of the threat information that the Intelligence Community obtained during this period, most of which pointed to the possibility of attacks against U.S. interests overseas.  Nonetheless, there was a modest, but relatively steady stream of intelligence indicating the possibility of terrorist attacks inside the United States.  Third, the credibility of the sources providing this information was sometimes questionable.  While one could not, as a result, give too much credence to some of the individual reports, the totality of the information in this body of reporting clearly reiterated a consistent and critically important theme: Bin Ladin's intent to launch terrorist attacks within the United States.

198

The Joint Inquiry reviewed many intelligence reports, including:

- In June 1998, the Intelligence Community obtained information from several sources that Bin Ladin was considering attacks in the United States, including Washington, D.C., and New York.  This information was provided to [——————] senior government officials in July 1998.

- In August 1998, the Intelligence Community obtained information that a group of unidentified Arabs planned to fly an explosive-laden plane from a foreign country into the World Trade Center.  The information was passed to the FBI and the FAA. The latter found the plot to be highly unlikely, given the state of the foreign country's aviation program.  Moreover, the agencies believed that a flight originating outside the United States would be detected before it reached its intended target inside the United States.  The FBI's New York office took no action on the information, filing the communication in the office's bombing file.  The Intelligence Community acquired additional information since then suggesting links between this group and other terrorist groups, including al-Qa'ida

- In September 1998, the Community prepared a memorandum detailing al-Qa'ida infrastructure in the United States, including the use of fronts for terrorist activities. [page 209]  This information was provided to [————] senior government officials in September 1998.

- In September 1998, the Community obtained information that Bin Ladin's next operation might involve flying an explosives-laden aircraft into a U.S. airport and detonating it.  This information was provided to [——————] senior government officials in late 1998.

- In October 1998, the Community obtained information that al-Qa'ida was trying to establish an operative cell within the United States.  This information suggested an

effort to recruit U.S. citizen Islamists and U.S.-based expatriates from the Middle East and North Africa.

- In the fall of 1998, the Community received information concerning a Bin Ladin plot involving aircraft in the New York and Washington, D.C. areas.

- In November 1998, the Community obtained information that a Bin Ladin terrorist cell was attempting to recruit a group of five to seven men from the United States to travel to the Middle East for training, in conjunction with a plan to strike U.S. domestic targets.

- In November 1998, the Community received information that Bin Ladin and senior associates had agreed to allocate rewards for the assassination of four "top" intelligence agency officers.  The bounty for each assassination was $9 million.  The bounty was in response to the U.S. announcement of an increase in the reward for information leading to Bin Ladin's arrest.

- In the spring of 1999, the Community obtained information about a planned Bin Ladin attack on a government facility in Washington, D.C.

[Page 210]

- In August 1999, the Community obtained information that Bin Ladin's organization had decided to target the U.S. Secretary of State, Secretary of Defense, and DCI. "Target" was interpreted by Community analysts to mean "assassinate."

- In September 1999, the Community obtained information that Bin Ladin and others were planning a terrorist act in the United States, possibly against specific landmarks in California and New York City.

- In late 1999, the Community obtained information regarding possible Bin Ladin network plans to attack targets in Washington, D.C. and New York City during the Millennium celebrations.

- On December 14, 1999, Ahmed Ressam was arrested as he attempted to enter the United States from Canada, and chemicals and detonator materials were found in his car. Ressam's intended target was Los Angeles International Airport.  Ressam was later determined to have links to Bin Ladin's terrorist network.

- In February 2000, the Community obtained information that Bin Ladin was making plans to assassinate U.S. intelligence officials, including the Director of the FBI.

- In March 2000, the Community obtained information regarding the types of targets that operatives in Bin Ladin's network might strike.  The Statue of Liberty was specifically mentioned, as were skyscrapers, ports, airports, and nuclear power plants.

- In March 2000, the Intelligence Community obtained information suggesting that Bin Ladin was planning attacks in specific West Coast areas, possibly involving the assassination of several public officials.

- In April 2001, the Community obtained information from a source with terrorist connections who speculated that Bin Ladin was interested in commercial pilots as [page 211] potential terrorists.  The source warned that the United States should not focus only on embassy bombings, that terrorists sought "spectacular and traumatic" attacks and that the first World Trade Center bombing would be the type of attack that would be appealing.  The source did not mention a timeframe for an attack. Because the source was offering personal speculation and not hard information, the information was not disseminated within the Intelligence Community.

The Joint Inquiry did not find any comprehensive Intelligence Community list of Bin Ladin-related threats to the United States that was prepared and presented to policymakers before September 11.  Such a compilation might have highlighted the volume of information the Community had acquired about Bin Ladin's intention to strike inside the United States.

[Nonetheless, the Intelligence Community did not leave unnoticed Bin Ladin's February 1998 declaration of war and intelligence reports indicating possible terrorist attacks inside the

United States.  The Community advised senior officials, including [————————————] the Congress, of the serious nature of the threat.  The Joint Inquiry also reviewed documents, other than intelligence reports, that demonstrate that the Intelligence Community, at least at senior levels, understood the threat Bin Ladin posed to the domestic United States, for example:

- A December 1998 Intelligence Community assessment that Bin Ladin "is actively planning against U.S. targets. . . .  Multiple reports indicate UBL is keenly interested in striking the U.S. on its own soil . . . .  [A]l-Qa'ida is recruiting operatives for attacks in the U.S. but has not yet identified potential targets."

- The December 1998 declaration of war memorandum from the DCI to his deputies at the CIA:

  We must now enter a new phase in our effort against Bin Ladin . . . we all acknowledge that retaliation is inevitable and that its scope may be far larger than we have previously experienced. . . .  We are at war. . . .  I want no resources or people spared in this effort, either inside CIA or the [Intelligence] Community.

[Page 212]

- A document prepared by the CIA and signed by the President in December 1998: "The Intelligence Community has strong indications that Bin Ladin intends to conduct or sponsor attacks inside the United States."

- June 1999 testimony to the Senate Select Committee on Intelligence by the CTC Chief and a July 1999 briefing to House Permanent Select Committee on Intelligence staff members describing reports that Bin Ladin and his associates were planning attacks inside the United States.

- A document prepared by the CIA and signed by the President in July 1999 characterizing Bin Ladin's February 1998 statement as a "de facto declaration of war" on the United States.

In testimony before the Joint Inquiry, however, former National Security Advisor Sandy Berger put this information in context:

The stream of threat information we received continuously from the FBI and CIA pointed overwhelmingly to attacks on U.S. interests abroad. Certainly the potential for attacks in the United States was there.

## E.  Indications of a Possible Terrorist Attack in Spring and Summer 2001

The Joint Inquiry record confirms that, in the eyes of the Intelligence Community, the world appeared increasingly dangerous for Americans in the spring and summer of 2001. During that period, the Intelligence Community detected a significant increase in information that Bin Ladin and al-Qa'ida intended to strike against U.S. interests in the very near future. Some Community officials have suggested that the increase in threat reporting was unprecedented, at least in their own experience.  While the reporting repeatedly predicted dire consequences for Americans, it did not provide specific detail that could be acted on.

Between late March and September 2001, the Intelligence Community identified numerous signs of an impending terrorist attack, some of which pointed specifically to the United States as a target: [page 213]

- In March, an intelligence source claimed that a group of Bin Ladin operatives was planning to conduct an unspecified attack in the United States in April 2001.  One of the operatives allegedly resided in the United States.

- In April, the Intelligence Community obtained information that unspecified terrorist operatives in California and New York State were planning a terrorist attack in those states for April.

- [Between May and July, the National Security Agency reported at least thirty-three communications suggesting a possibly imminent terrorist attack.  The Intelligence Community thought at the time that one of them might have constituted a signal to proceed with terrorist operations.  While none of these reports provided specific information on the attack, and it was not clear that any persons involved in the intercepted communications had first-hand knowledge of where, when, or how an

attack might occur, they were widely disseminated within the Intelligence
Community].

- In May, the Intelligence Community obtained a report that Bin Ladin supporters were
planning to infiltrate the United States by way of Canada to carry out a terrorist
operation using high explosives. This report mentioned without specifics an attack
within the United States. In July, this information was shared with the FBI, the
Immigration and Naturalization Service, the Customs Service, and the State
Department and was included in an intelligence report for senior government officials
in August.

[Page 214]

- In May, the Department of Defense acquired and shared with other elements of the
Intelligence Community information suggesting that seven persons associated with
Bin Ladin had departed various locations for Canada, the United Kingdom, and the
United States.

- In June, CTC obtained information that key operatives in Bin Ladin's organization
were disappearing, while others were preparing for martyrdom.

- In July, the CTC became aware of a person who had recently been in Afghanistan
who reported, "Everyone is talking about an impending attack." The Intelligence
Community was also aware that Bin Ladin had stepped up his propaganda efforts in
the preceding months.

- On August 16, the INS detained Zacarias Moussaoui in Minneapolis, Minnesota. His
conduct had aroused suspicions about why he was learning to fly large commercial
aircraft and had prompted the flight school he was attending to contact the local FBI
field office. FBI agents believed that Moussaoui might have intended to carry out a
terrorist act.

- On August 23, CIA requested that al-Mihdhar and al-Hazmi, who had first come to
the attention of the CIA and NSA in 1999 as possible associates of Bin Ladin's

network, be added to the Department of State watchlist for denying entry to the United States.

- In late summer, the Intelligence Community obtained information that a person associated with al-Qa'ida was considering terrorist operations in the United States. There was no information as to the timing or possible targets.

- On September 10, NSA intercepted two communications [————————] suggesting imminent terrorist activity.  These communications were not translated [page 215] into English and disseminated until September 12.  They were not specific, and it is unclear whether they referred to the September 11 attacks.

During the summer of 2001, the Intelligence Community also disseminated information to a wide range of senior government officials at  all federal agencies and military commands about the potential for imminent terrorist attacks.  For example:

- On June 25, the Intelligence Community issued a terrorist threat advisory warning government agencies that there was a high probability of an imminent "spectacular" terrorist attack resulting in numerous casualties against U.S. interests abroad by Sunni extremists associated with al-Qa'ida.

- Subsequently, intelligence information provided to [—————] senior government leaders on June 30 indicated that Bin Ladin's organization expected near-term attacks to have dramatic consequences on governments or cause major casualties.

- [A briefing prepared for senior government officials at the beginning of July asserted: "Based on a review of all-source reporting over the last five months, we believe that UBL will launch a significant terrorist attack against U.S. and/or Israeli interests in the coming weeks.  The attack will be spectacular and designed to inflict mass casualties against U.S. facilities or interests.  Attack preparations have been made. Attack will occur with little or no warning]."

- Later, on July 9, intelligence information provided to [——————] senior government leaders indicated that members of Bin Ladin's organization continued to expect imminent attacks on U.S. interests.

[Of particular interest to the Joint Inquiry was whether and to what extent the President received threat-specific warnings during this period.  Access to this information was denied the Joint Inquiry by [page 216] the White House.  However, the Joint Inquiry was told by a representative of the Intelligence Community that, in August 2001, a closely held intelligence report for [——————] senior government officials included information that Bin Ladin had wanted to conduct attacks in the United States since 1997.  The information included discussion of the arrest of Ahmed Ressam in December 1999 at the U.S.-Canadian border and the 1998 bombings of U.S. embassies in Kenya and Tanzania.  It mentioned that members of al-Qa'ida, including some U.S. citizens, had resided in or traveled to the United States for years and that the group apparently maintained a support structure here.  The report cited uncorroborated information obtained and disseminated in 1998 that Bin Ladin wanted to hijack airplanes to gain the release of U.S.-held extremists; FBI judgments about patterns of activity consistent with preparations for hijackings or other types of attacks; as well as information acquired in May 2001 that indicated a group of Bin Ladin supporters was planning attacks in the United States with explosives].*

The Joint Inquiry was also interested in the nature and scope of the intelligence that was being provided to senior policymakers regarding the terrorist threat.  In addition to the President's Daily Brief, the Intelligence Community produces a Senior Executive Intelligence Brief (SEIB) each day, a series of short articles that summarize political, military, economic, and diplomatic developments around the world of particular interest to senior government executives.  The Joint Inquiry reviewed SEIBs distributed by the Intelligence Community in the spring and summer of 2001 and confirmed a rise in reporting on Bin Ladin between March and June.  This increase was still only a relatively small portion of the array of intelligence subjects that the SEIBs brought to the attention of policymakers.  For example, the peak in Bin Ladin–related

---

* National Security Advisor Condoleeza Rice stated in a May 16, 2002 press briefing that, on August 6, 2001, the President's Daily Brief (PDB) included information about Bin Ladin's methods of operation from a historical perspective dating back to 1997.  One of the methods was that Bin Ladin might choose to highjack an airliner in order to hold passengers hostage to gain release of one of their operatives.  She stated, however, that the report did not contain specific warning information, but only a generalized warning, and did not contain information that al-Qa'ida was discussing a particular planned attack against a specific target at any specific time, place, or by any specific method.

reporting came in June 2001 when Islamic extremists, including Bin Ladin and al-Qa'ida, were referred to in eighteen of the 298 articles that appeared in the SEIBs that month.

The rise in threat reporting concerning Bin Ladin in 2001, though lacking in detail, did generate government terrorist advisories and warnings, including:

- An FAA Circular on June 22, 2001, referring to a possible hijacking plot by Islamic terrorists to secure the release of fourteen persons incarcerated in the United States in connection with the 1996 bombing of Khobar Towers.

[Page 217]

- A public, worldwide caution issued by the State Department on June 22, warning Americans traveling abroad of the increased risk of a terrorist action.

- Four terrorism warning reports or warning report extensions issued by the Department of Defense on June 22 and 26, and July 6 and 20, primarily to alert U.S. military forces and the Department of Defense to signs that Bin Ladin's network was planning a near-term, anti-U.S. terrorist operation.

- A State Department démarche to Taliban representatives in Pakistan on June 26, 2001, declaring that the Taliban would be held responsible for terrorist attacks carried out by Bin Ladin or al-Qa'ida.

- An FBI communication on July 2, advising federal, state, and local law enforcement agencies of increased threat reporting about groups aligned with or sympathetic to Bin Ladin. The communication noted that the majority of the reports suggested a potential for attacks against U.S. targets abroad and that the FBI had no information suggesting a credible threat of terrorist attack in the United States, although the possibility could not be discounted.

Deputy Secretary of State Richard Armitage described the situation to the Joint Inquiry:

> In fact, [the intelligence] was good enough for us to take several steps. We issued between January and September nine warnings, five of them global, because of the threat information we were receiving from the intelligence agencies in the

> summer, when George Tenet was around town literally pounding on desks saying, something is happening, this is an unprecedented level of threat information. He didn't know where it was going to happen, but he knew that it was coming.

Interviews conducted during the Joint Inquiry show that the general view within the Intelligence Community in the spring and summer of 2001 was that an attack on U.S. interests was more likely to occur overseas, possibly in Saudi Arabia and Israel.  Intelligence information, the arrest of suspected terrorists in the Middle East and Europe, and a credible report of a plan to attack a U.S. embassy in the [page 218] Middle East shaped the Community's thinking about where an attack was likely to occur.  In fact, FBI agents working in Yemen on the *Cole* investigation were told to leave the country because of concern about a possible attack.

The belief that an attack was likely to occur overseas was also reflected in numerous statements and data the Joint Inquiry reviewed, for example:

- In a May 16, 2002 press briefing, National Security Advisor Condoleezza Rice said: "I want to reiterate that during this time, the overwhelming bulk of the evidence was that this was an attack that was likely to take place overseas"

- The FBI's Assistant Director for Counterterrorism at the time said that the intelligence he was seeing led him to believe with a high probability – "98 percent" – that an attack would occur overseas.

- At a Joint Inquiry hearing, Deputy Secretary of State Richard Armitage testified: "I, in general, perceived the threat to be at our interests overseas, primarily in the Gulf, some in Southeast Asia, and most definitely in Israel. That is from my point of view and the Department of State."

- At the same hearing, Deputy Secretary of Defense Paul Wolfowitz testified:  "I would say near-term we perceived the threat to be overseas, as Secretary Armitage says.  In the mid- to longer-term, we perceived the threat to be mass casualties in the United States as a result of chemical or biological or conceivably nuclear attack. . . ."

- Deputy National Security Advisor Steve Hadley asserted in a written response to Joint Inquiry questions:

> The specific warning the Administration did have pointed to operations against U.S. interests abroad. . . .  The threat warnings, in the spring and summer of 2001, did not, to my knowledge, include any specific warning information to indicate plans for terrorist [page 219] attacks inside the United States. . . .  During this period of increased threat reporting, information from [Intelligence Community] agencies focused specifically on potential attacks in Europe, the Middle East, and the Arabian Peninsula. . . .   [Intelligence Community] officials, however, did not discount the possibility of domestic attacks by al-Qa'ida and other groups.

Bin Ladin-related threat reporting began to decline in July 2001.  The Intelligence Community did, however, continue to follow up on some of the information in its possession.

## F.  Intelligence Information on Possible Terrorist Use of Airplanes as Weapons

Central to the September 11 attacks was the terrorists' use of airplanes as weapons, which National Security Advisor Condoleezza Rice addressed in a May 2002 press briefing:

> I don't think anybody could have predicted that these same people would take an airplane and slam it into the World Trade Center, taken another one and slam it into the Pentagon; that they would try to use an airplane as a missile, a hijacked airplane as a missile.  All of this reporting about hijacking was about traditional hijacking.  You take a plane – people were worried they might blow one up, but they were most worried that they might try to take a plane and use it for release of the blind Sheikh or some of their own people.

The Joint Inquiry confirmed that, before September 11, the Intelligence Community produced at least twelve reports over a seven-year period suggesting that terrorists might use airplanes as weapons.  As with the intelligence reports indicating Bin Ladin's intentions to strike inside the United States, the credibility of sources was sometimes questionable and information often sketchy.  The reports reviewed by the Joint Inquiry included:

- In December 1994, Algerian Armed Islamic Group terrorists hijacked an Air France flight in Algiers and threatened to crash it into the Eiffel Tower.  French authorities deceived the terrorists into thinking the plane did not have enough fuel to reach Paris and diverted it to Marseilles.  A French anti-terrorist force stormed the plane and killed all four terrorists.

[Page 220]

- In January 1995, a Philippine National Police raid turned up material in a Manila apartment suggesting that Ramzi Yousef, Abdul Murad, and Khalid Shaykh Mohammad planned, among other things, to crash an airplane into CIA Headquarters. The police said that the same group was responsible for the bombing of a Philippine airliner on December 12, 1994. Information on the threat was passed to the FAA, which briefed U.S. and major foreign carriers.

- In January 1996, the Intelligence Community obtained information concerning a planned suicide attack by persons associated with Shaykh al-Rahman and a key al-Qa'ida operative to fly to the United States from Afghanistan and attack the White House.

- In October 1996, the Intelligence Community obtained information regarding an Iranian plot to hijack a Japanese plane over Israel and crash it into Tel Aviv. A passenger would board the plane in the Far East, commandeer the aircraft, order it to fly over Tel Aviv, and crash the plane into the city.

- In 1997, an FBI Headquarters unit became concerned about the possibility that an unmanned aerial vehicle (UAV) would be used in terrorist attacks. The FBI and CIA became aware of reports that a group had purchased a UAV and concluded that the group might use the plane for reconnaissance or attack. The possibility of an attack outside the United States was thought to be more likely, for example, by flying a UAV into a U.S. embassy or a U.S. delegation.

- In August 1998, the Intelligence Community obtained information that a group, since linked to al-Qa'ida, planned to fly an explosive-laden plane from a foreign country into the World Trade Center. As explained earlier, the FAA found the plot to be highly unlikely given the state of the foreign country's aviation program. Moreover, the agencies concluded that a flight originating outside the United States would be detected before it reached its target. The FBI's New York office took no action on the information.

[Page 221]

- In September 1998, the Intelligence Community obtained information that Bin Ladin's next operation might involve flying an explosives-laden aircraft into a U.S. airport and detonating it.  This information was provided to senior government officials in late 1998.

- In November 1998, the Intelligence Community obtained information that the Turkish Kaplancilar, an Islamic extremist group, had planned a suicide attack to coincide with celebrations marking the death of Ataturk, the founder of modern Turkey.  The conspirators, who were arrested, planned to crash an airplane packed with explosives into Ataturk's tomb during a ceremony.  The Turkish press said the group had cooperated with Bin Ladin, and the FBI's New York office included this incident in a Bin Ladin database.

- In February 1999, the Intelligence Community obtained information that Iraq had formed a suicide pilot unit that it planned to use against British and U.S. forces in the Persian Gulf.  The CIA commented that this was highly unlikely and probably disinformation.

- In March 1999, the Intelligence Community obtained information regarding plans by an al-Qa'ida member, who was a U.S. citizen, to fly a hang glider into the Egyptian Presidential Palace and detonate explosives.  The person, who received hang glider training in the United States, brought a hang glider to Afghanistan.  However, various problems arose during the testing of the glider.  He was subsequently arrested and is in custody abroad.

- In April 2000, the Intelligence Community obtained information regarding an alleged Bin Ladin plot to hijack a Boeing 747.  The source, a "walk-in" to the FBI's Newark office, claimed that he had learned hijacking techniques and received arms training in a Pakistani camp.  He also claimed that he was to meet five or six persons in the United States.  Some of these persons would be pilots who had been instructed to take over a plane, fly to Afghanistan, or, if they could not make it there, blow the plane up.  Although [page 222] the source passed a polygraph, the Bureau was unable to verify any aspect of his story or identify his contacts in the United States.

- In August 2001, the Intelligence Community obtained information about a plot to bomb the U.S. embassy in Nairobi from an airplane or crash the airplane into it.  The Intelligence Community learned that two people who were reportedly acting on instructions from Bin Ladin met in October 2000 to discuss this plot.

The CIA disseminated several of these reports to the FBI and to agencies responsible for preventive actions.  These included the FAA, which is responsible for issuing security directives, alerting domestic and international airports and airlines of threats the Intelligence Community has identified.*

In testimony before the Joint Inquiry, DCI Tenet mentioned additional evidence developed since September 11 concerning al-Qa'ida's intention of to use airplanes as weapons:

> [After 11 September, we learned from a foreign government service that in 1996, Bin Ladin's second-in-command, Muhammad Atif, drew up a study on the feasibility of hijacking US planes and destroying them in flight, possibly influenced by Yousef's and Mukhtar's unrealized plans [the Bojinka Plot]. . . . Bin Ladin's determination to strike America at home increased with the issuance of the February 1998 *fatwa* targeting all Americans, both military and civilian. The ideas about destroying commercial airliners that had been circulating in al-Qa'ida leadership circles for several years appear to have been revived after that *fatwa*, in the early planning stages of the 9/11 plot.  We believe that outside events also shaped al-Qa'ida leaders' thinking about an airliner attack.  [——————————————————————] the October 1999 crash of Egypt Air Flight 990, attributed in the media to a suicidal pilot, may have encouraged al-Qa'ida's growing impression that air travel was a vulnerability for the United States].

Despite these reports, the Intelligence Community did not produce any specific assessments of the likelihood that terrorists would use airplanes as weapons, and U.S. policymakers apparently remained unaware of this kind of potential threat.  Former National Security Advisor Sandy Berger testified before the Joint Inquiry:  "We heard of the idea of airplanes as weapons, but I don't recall being presented with any specific threat information about an attack of this nature or any alert highlighting this [page 223] threat or indicating it was any more likely than any other."  In response to written Joint Inquiry questions, Deputy National Security Advisor Steve Hadley asserted:

---

* As noted earlier, however, the former intelligence office at FAA, the Transportation Security Intelligence Service, researched 12 reports concerning the possible use of airplanes as weapons that the DCI testified had been disseminated to appropriate agencies and found that there was no record of FAA receipt of three of them, two others had been derived from State Department reports, and one was not received by FAA until after September 11, 2001.

> Before September 11, I do not recall receiving any information concerning al-Qa'ida using aircraft as weapons for attacks within the United States. One CIA analysis stated that al-Qa'ida was interested in possible hijackings in order to win the release of imprisoned al-Qa'ida members, but did not mention the possibility of using aircraft themselves as weapons.

The failure to consider seriously the use of aircraft as weapons may be the result of insufficient resources directed to intelligence analysis. Before September 11, CTC had forty analysts to analyze terrorism issues worldwide, with only one of its five analytic branches focused on terrorist tactics. As a result, the only terrorist tactic on which CTC had performed strategic analysis was the use of chemical, biological, radiological and nuclear weapons because of the obvious potential for mass casualties.

Aviation-related terrorism was included in some broader terrorist threat assessments, such as the National Intelligence Estimate (NIE) on terrorism. For example, a 1995 NIE mentioned the plot to blow up twelve U.S. airliners and cited the consideration the Bojinka conspirators gave to attacking CIA Headquarters with an aircraft laden with explosives. The FAA worked with the Intelligence Community on this analysis and drafted the section addressing the threat to civil aviation, which said:

> Our review of the evidence… suggests the conspirators were guided in their selection of the method and venue of attack by carefully studying security procedures in place in the region. If terrorists operating in [the United States] are similarly methodical, they will identify serious vulnerabilities in the security system for domestic flights.

A 1997 update to the 1995 NIE concluded:

> Civil aviation remains a particularly attractive target in light of the fear and publicity the downing of an airliner would evoke and the revelations last summer of the U.S. air transport sectors' vulnerabilities.

As a result of the increasing threats to aviation, Congress required the FAA and FBI to conduct joint threat and vulnerability assessments of security at select "high risk" U.S. airports and to provide [page 224] annual reports to Congress. A classified portion of the December 2000 report downplayed the threat to domestic aviation:

> FBI investigations confirm domestic and international terrorist groups operating within the U.S. but do not suggest evidence of plans to target domestic civil aviation. Terrorist activity within the U.S. has focused primarily on fundraising,

recruiting new members, and disseminating propaganda.  While international terrorists have conducted attacks on U.S. soil, these acts represent anomalies in their traditional targeting which focuses on U.S. interests overseas.

Thus, less than a year before the September 11 attacks, and notwithstanding intelligence information to the contrary, the FBI and FAA assessed the prospects of a terrorist incident targeting domestic civil aviation in the United States as relatively low.

After September 11, the CIA acknowledged some of the information that was available regarding the use of airplanes as weapons.  A draft analysis dated November 19, 2001, "The 11 September Attacks:  A Preliminary Assessment," explains:

> We do not know the process by which Bin Ladin and his lieutenants decided to hijack planes with the idea of flying them into buildings in the United States, but the idea of hijacking planes for suicide attacks had long been current in jihadist circles.  For example, GIA terrorists from Algeria had planned to crash a Air France jet into the Eiffel Tower in December 1994, and Ramzi Yousef – a participant in the 1993 World Trade Center bombing – planned to explode 12 US jetliners in mid-air over the Pacific in the mid-1990s.  Likewise the World Trade Center had long been a target of terrorist bombers.

Despite that intelligence, the Joint Inquiry found no evidence that, before September 11, analysts in the Intelligence Community were:

- cataloguing information regarding the use of airplanes as weapons as a terrorist tactic;

- sending requirements to collectors to look for additional information on this threat; or

- considering the likelihood that Bin Ladin, al-Qa'ida, or any other terrorist group, would attack the United States or U.S. interests in this way.

[Page 225]

The CTC's Deputy Director acknowledged that the CIA had not performed strategic analysis on airplanes as weapons before September 11.  He also explained ways in which CTC has sought to improve its analytic capabilities since then:

> We have a couple of approaches to strategic analysis in CTC now…We have spent a fair amount of analytic time looking at intelligence reporting that [al-Qa'ida is] going to use a particular type of tactic or go after a particular type of target, other intelligence reporting…that shows that they have actually trained at that tactic or trained for that type of target. . . .  When you get all three of those ingredients, that's pretty sobering.  What is most alarming to us is the number of tactics that we've gotten that kind of a case on, that three-legged case . . . on

> surface-to-air missiles…use of truck bombs and car bombs . . . the use of aircraft, both aircraft hijackings and aircraft as weapons . . . the use of improvised explosive devices like Mr. Reid put in his shoes several months ago . . . the use of poisons and toxins.  Put it all together and you can say that al-Qa'ida has built a handful of cards, any of which it could be playing, all of which it intends at some point and with some opportunity to play.  Its choices are very broad and very frightening.

Even if enough analysis is done to provide better analysis to policymakers regarding strategic threats, there remains the issue of how much influence that information will have in warning other federal entities and the private sector.  In discussing what could have been done better before September 11, the DCI told the Joint Inquiry that the failure to focus on the the use of airplanes as weapons was just one area that should have been part of a "systematic thought process to think about how you play defense:"

> You can disseminate all of the threat reportings you want. You can do the strategic analysis about airplanes. You can do the strategic analysis about car bombs, truck bombs, assassination attempts, fast boats and everything else. You can put all of that out there to people. Unless somebody is thinking about the homeland from the perspective of buttoning it down to basically create a deterrence that may work, your assumption will be that the FBI and the CIA are going to be one-hundred percent flawless all of the time.  And it will never happen.

## IX.  The Development of U.S. Counterterrorism Policy before September 11

When the Cold War ended, counterterrorism was not a top U.S. policy priority. However, as the threat from al-Qa'ida increased in the 1990s, concern grew about the danger to America.  The Clinton [page 226] Administration steadily increased its attention to terrorism, which became a top priority after the August 1998 attacks on U.S. embassies in Kenya and Tanzania.  The Bush Administration also devoted considerable attention to the al-Qa'ida threat as it conducted a policy review in the months before September 11.

Despite sharpened focus in the years before September 11, terrorism remained only one concern of many and counterterrorism efforts had to compete with other priorities.  The process for setting intelligence priorities was also vague and confusing, and neither the Clinton nor the Bush Administration developed an integrated counterterrorism strategy that drew on all elements of national power before September 11.

## A.  Counterterrorism as an Intelligence Priority

Counterterrorism was not a top intelligence priority in the immediate aftermath of the Cold War.  Former National Security Advisor Brent Scowcroft testified that the first Bush Administration focused primarily on the former Soviet Union.  Moreover, the sense of immediacy diminished because the incidence and severity of terrorism had declined since the Reagan Administration.  Mr. Scowcroft noted that the focus of discussions on terrorism was state-sponsored attacks, from which the U.S. homeland was thought to be immune.

As a result, neither the first Bush administration nor the Intelligence Community devoted considerable attention to terrorism at the time.  Former National Coordinator for Counterterrorism Richard Clarke noted that the first Bush Administration approved only one "narrow document" related to terrorism, suggesting that the subject was not a high priority.  Thus, as former National Security Advisor Sandy Berger testified:

> When President Clinton began his first term in 1993, the Intelligence Community was primarily focused on the agenda created by the Soviet Union's collapse, the Cold War's end, and our Gulf War victory. . . .  The CIA maintained no significant assets in Afghanistan after our withdrawal from the region in 1989.  Little was known about Osama Bin Ladin except that he was one of many financiers of terrorist groups.

[Page 227]

## B.  Growing Importance in the Clinton Administration

Mr. Clarke has testified that, when the Clinton Administration came into office, "the furthest thing from [its] mind in terms of the policy agenda was terrorism."  This quickly ended with Mir Amal Kansi's murder of two CIA employees outside agency Headquarters shortly after President Clinton's inauguration.  That event, plus the Iraqi attempt to assassinate former President Bush in 1993 and the February 1993 bombing of the World Trade Center, "catapulted" terrorism onto the Administration's agenda, according to Mr. Berger.  He also noted that these events led to the President becoming personally focused on terrorism.

The Clinton Administration issued several documents that many witnesses saw as reflecting the growing importance of terrorism:

- In 1995, the Clinton Administration issued Presidential Decision Directive (PDD) 35, which former National Security Advisor Anthony Lake described as "formally establish[ing] our top intelligence priorities and plac[ing] terrorism among them, led only by intelligence support for our troops in the field and a small number of states that posed an immediate or potential serious threat to the United States."

- Several months later in 1995, the President issued PDD 39, the first PDD issued explicitly on terrorism since the Reagan administration.  Mr. Lake noted that PDD 39 "mandated increased efforts to capture terrorists abroad; high priority for detecting and preventing attacks with weapons of mass destruction; and the exchange between the FBI and CIA of high-level anti-terrorism officials."

- In 1998, Presidential Decision Directives 62 and 63 were issued to raise the importance of counterterrorism within the interagency process and to clarify responsibilities for reacting to an attack.  According to Mr. Clarke, these directives established an interagency coordination process, to include regular meetings to evaluate threats, discuss resources, and treat counterterrorism as a continuous, rather than *ad hoc* concern.

Al-Qa'ida emerged as a leading adversary during the second term of the Clinton Administration.  Mr. Berger told the Joint Inquiry that Bin Ladin was portrayed as a financier as late as 1996, but that U.S. knowledge of his activities and concern about the threat his organization posed began to grow rapidly.  After the August 1998 attack on U.S. embassies in Kenya and Tanzania, Bin Ladin dominated [page 228] U.S. counterterrorism concerns.  As Mr. Berger testified, "In 1996 he was on the radar screen; in 1998 he was the radar screen."

Senior level officials met frequently on terrorism.  In the months before the Millennium celebrations, according to Mr. Berger, there were constant Principals Meetings and much senior level attention to the risk of an al-Qa'ida attack.  According to Deputy National Security Advisor Steve Hadley, Mr. Berger and Mr. Clarke both emphasized the importance of terrorism during the transition from the Clinton to the Bush Administration.

## C.  Uncertainty During the Transition

Transitions between administrations always take considerable time. For some high level positions, such as National Coordinator for Counterterrorism, it is difficult if not impossible to maintain continuity or an intense daily focus on an issue, if the status of the person holding the position is unclear.  Mr. Berger explained that the Clinton Administration did not respond to the

October 2000 attack on *USS Cole*, in part, because it believed that the incoming Bush Administration should handle the matter.  However, Bush Administration officials testified that they did not begin their major counterterrorism policy review until April 2001.  Thus, it appears that significant slippage in counterterrorism policy may have taken place in late 2000 and early 2001.  At least part of this was due to the unresolved status of Mr. Clarke as National Coordinator for Counterterrorism and his uncertain mandate to coordinate Bush Administration policy on terrorism and specifically on Bin Ladin.

## D.  The George W. Bush Administration

Al-Qa'ida remained an intelligence priority under the Bush administration.  Mr. Hadley told the Joint Inquiry that "countering terrorist threats to the United States was a top intelligence priority from the first days of this Administration."  He noted that Clinton Administration counterterrorism programs and covert action authorities remained in place in early 2001, while the Bush Administration considered a far more aggressive policy against al-Qa'ida and its Taliban supporters: [page 229]

> From the first days of the Bush Administration through September 2001, it conducted a comprehensive, senior-level review of policy for dealing with al-Qa'ida.  The goal was to move beyond the policy of containment, criminal prosecution, and limited retaliation for specific attacks, toward attempting to 'roll back' al Qa'ida.

[As Deputy Secretary of State Richard Armitage testified to the Joint Inquiry on September 19, 2002:

> The National Security Council . . . called for new proposals [in March 2001] on a strategy that would be more aggressive against al-Qa'ida.  The first deputies meeting, which is the first decision making body in the administration, met on the 30th of April and set off on a trail of initiatives to include financing, getting at financing, to get at increased authorities for the Central Intelligence Agency, sharp end things that the military was asked to do. . . . So, from March through about August, we were preparing a national security Presidential directive, and it was distributed on August 13 to the principals for their final comments.  And then, of course, we had the events of September 11. . . .]

That policy review reportedly involved drafting new covert action authorities, several senior level meetings to discuss policy alternatives, and exploration of other initiatives.   The review was nearing completion in the days before September 11.

### E.  Competing Priorities

[Counterterrorism was only one of many priorities for both the Clinton and Bush Administrations.  Although a complete review of their policy priorities is beyond the scope of this inquiry, several senior officials have suggested the wide range of concerns that faced both administrations:

- Intelligence Community officials with responsibility for resource management noted that a range of regional and global issues were important concerns that policymakers emphasized in allocating resources.

- Mr. Clarke explained that he faced resistance to using military force in Afghanistan, in part because the United States was already bombing Iraq and Serbia.

- Former Clinton Assistant Secretary of State for South Asia Karl Inderfurth noted in an interview that the East Africa embassy bombings made counterterrorism the top U.S. priority in its dealings with the Taliban regime in Afghanistan.  Before then, ending the civil war, advancing women's rights, and establishing a broad-based government were U.S. priorities for that country.

- Mr. Inderfurth also noted that concerns about an Indian-Pakistani conflict, or even nuclear confrontation, competed with efforts to press Pakistan on terrorism.

[Page 230]
- Mr. Hadley noted that Bush Administration concerns before September 11 included the P-3 aircraft incident with China and the June 2001 G-8 Summit].

Even those involved directly in counterterrorism efforts focused much of their attention on groups other than al-Qa'ida and its affiliates.  Mr. Clarke told the Joint Inquiry that Iran and the Lebanese Hizbollah were the most important terrorist concerns during the first Clinton Administration.  This was corroborated by Mr. Lake, who noted that the Administration's "primary preoccupation was on state sponsors of terrorism and such organizations as Hizbollah."

TOP SECRET

The Iranian supported attack on the U.S. military at Khobar Towers in 1996 reinforced this concern, according to Mr. Clarke.

Several agencies also focused their counterterrorism efforts on force protection.  After the embassy bombings, the State Department tried to augment security in its facilities worldwide.  Similarly, the attacks on Khobar Towers and *USS Cole* led to increased Defense Department and military efforts to protect U.S. military facilities and assets abroad.

Moreover, the process of setting intelligence priorities was often confusing.  Mr. Clarke noted that the White House "never really gave good systematic, timely guidance to the Intelligence Community about what the priorities were at the national level."  Mr. Hadley stated that Bush Administration officials were told during the transition that "this priority-setting process [PDD-35] . . . was not effective for communicating changing priorities over time."  Joint Inquiry interviews with Intelligence Community officials suggest that many felt that the prioritization process was so broad as to be meaningless.

There was also bureaucratic confusion about responsibility for counterterrorism.  Despite efforts by the NSC's Counterterrorism Security Group to streamline the process, agencies often did not coordinate their counterterrorism efforts.  Mr. Inderfurth noted that the State Department had different elements working on counterterrorism in regard to Afghanistan, Saudi Arabia, embassy security, and other matters.  Former Deputy Secretary of Defense John Hamre noted in an interview that several different components of the Defense Department were involved in counterterrorism, often with little coordination.

[Page 231]

**F.  Policy Measures to Fight Terrorism**

In accordance with the growing importance of terrorism, Clinton Administration officials took several steps to strengthen U.S. counterterrorism efforts.  During the late 1990s, the CIA initiated a campaign, working with foreign liaison services to disrupt and "take down" al-Qa'ida and other terrorist cells around the world.  Mr. Clarke told the Joint Inquiry that "'disrupt' means 'arrest,' if possible, have the host country arrest, or if there is any reason to bring them back to the United States, to arrest them and bring them back here."  The Clinton Administration

TOP SECRET

TOP SECRET

strongly backed this campaign, according to Mr. Berger, who pointed out that terrorist cells were dismantled and disrupted in more than twenty countries as a result.

The Clinton Administration used military force, albeit in a limited manner as is discussed in detail in a separate chapter.  Mr. Clarke noted that the retaliatory strike on Iraq in 1993 for its attempted assassination of former President Bush was the first time the U.S. had used military force to punish a state for terrorism since 1986.  According to Mr. Berger, the 1998 cruise missile strikes on terrorism-linked facilities in Afghanistan and Sudan were meant to demonstrate the Clinton Administration's seriousness, as well as to disrupt al-Qa'ida's infrastructure.  The Clinton Administration also initiated an increasingly aggressive covert action policy, also discussed in a separate section.

Mr. Berger, Mr. Clarke, and Mr. Lake noted several other measures the Clinton Administration initiated:

- Increasing intelligence funding after 1995

- More than doubling the number of FBI agents devoted to, and more than tripling the FBI budget for, counterterrorism

- Expanding the size of the CTC and otherwise increasing CIA efforts against terrorism

[Page 232]

- Passing the Anti-Terrorism and Effective Death Penalty Act in 1996 and legislation to track foreign student visas

- Pressing CIA to establish an operational unit focused on tracking Bin Ladin and terrorist financing (Intelligence Community and Clinton Administration officials differ as to who deserves credit for this effort)

- Encouraging CIA and the FBI to improve cooperation on terrorism, including exchanging senior officials.  (Officials in the FBI, CIA, and Clinton Administration also differ as to who deserves credit for this effort)

- Increasing diplomatic pressure on the Taliban through bilateral discussions, U.N. sanctions, and freezing of assets.

Policymakers report to the Joint Inquiry that they had limited flexibility with regard to Afghanistan.  Mr. Berger testified that neither Congress, the media, nor the international community supported invading Afghanistan before September 11.  During the Bush Administration, the United States issued a démarche to the Taliban in June 2001, noting that it would be held accountable for al-Qa'ida attacks on the United States.

Neither the Clinton nor Bush Administration aggressively tried to disrupt al-Qa'ida financing.  A former Intelligence Community official testified that in 1996 or 1997 the Intelligence Community had plans [——————————————————————— ———————————————————], plans the Treasury Department blocked due to concerns about [————————————] and worries that [————————————]. Because of Treasury's concerns, the Intelligence Community, according to the former official, was limited before September 11 to "[——————————————————————— ———————————————————]."  Mr. Clarke noted that counterterrorism officials hoped to appeal Treasury's initial position by presenting concrete information on terrorism fundraising. The Intelligence Community, however, was not able to provide the information.

[Page 233]

## G.  The Law Enforcement Approach

Some policy makers recognized that countering al-Qa'ida required the application of all aspects of U.S. power.  According to testimony from Deputy Secretary of Defense Paul Wolfowitz, the effort against al-Qa'ida:

> . . . is not just something for the Intelligence Community alone; . . . you can't go to war against al-Qa'ida without recognizing the role that the Government of Afghanistan is playing.  You can't go after the Government of Afghanistan without recognizing the problems in your relationship particularly with Pakistan, but with other neighboring countries, and you can't get serious about this without looking at military options.

Before September 11, however, neither the Clinton nor Bush Administration developed a plan to disrupt al-Qa'ida that integrated U.S. diplomatic, economic, intelligence, and military

assets.  Deputy Secretary of State Richard Armitage testified that the Bush Administration received briefings on the urgency of the al-Qa'ida threat, but "we were never given a plan," a contention Mr. Berger echoed.  Mr. Wolfowitz testified that even contingency planning for using the military for counterterrorism "was in the very most primitive stages."  General Hugh Shelton, former Chairman of the Joint Chiefs of Staff, told the Joint Inquiry that he did not believe that policy makers had any serious plans to use the military in a significant way against the Taliban before September 11.

In the absence of a more comprehensive strategy, the United States defaulted to relying on law enforcement, at home and abroad, as the leading instrument in the fight against al-Qa'ida. The perpetrators of the 1993 World Trade Center bombing and the plot against New York City landmarks, several conspirators in the 1998 embassy bombings, and several members of a group that planned Millennium attacks were all prosecuted.   This emphasis on prosecution continued a trend begun in the 1980s when Congress and President Reagan gave the FBI an important role in countering international terrorism, including attacks overseas.

Government officials apparently never intended to rely exclusively on law enforcement to fight terrorism.  Senior Department of Justice officials testified that they saw their efforts as an adjunct to other means of fighting terrorism.   Mary Jo White, who as U.S. Attorney for the Southern District of [page 234] New York prosecuted many of the most important cases against al-Qa'ida, testified before the Joint Inquiry that "no one considered prosecutions to be the country's counterterrorism strategy or even a particularly major part of it."  Mr. Wolfowitz testified that terrorism "is not a law enforcement problem, and it can't be dealt with simply by retaliating against individual acts of terrorism."  However, covert action and military force had little impact before September 11.

Prosecutions do have several advantages in the fight against terrorism.  As Ms. White noted in her testimony and in an interview, prosecutions take terrorists off the street.  She acknowledged that this does not shut down an entire group, but some bombs, she said, do not go off as a result of arrests.  In addition, she pointed out that critical intelligence often comes from the investigative process, as individual terrorists confess or reveal associates through their personal effects and communications.  As former FBI Director Louis Freeh asserted in an interview, "You can't divorce arrest from prevention."  Ms. White contended that the

prosecutions might deter some, though not all individuals from violence.  Finally, the threat of a jail sentence often induces terrorists to cooperate with investigators and provide information.

Heavy reliance on law enforcement, however, has costs.  National Intelligence Officer for the Near East and South Asia Paul Pillar noted in Joint Inquiry testimony that it is easier to arrest terrorist underlings than masterminds.  Those who organize and plan attacks, particularly the ultimate decision makers who authorize them, are often thousands of miles away when an attack is carried out.  In addition, the deterrent effect of imprisonment is often minimal for highly motivated terrorists such as those in al-Qa'ida.

Moreover, law enforcement is time-consuming.  The CIA and the FBI expended considerable resources supporting investigations in Africa and in Yemen into the embassy and *U.S.S. Cole* attacks, a drain on scarce resources that could have been used to gather information and disrupt future attacks.  Finally, law enforcement standards of evidence are high, and establishing a legal case that meets these standards often requires unattainable intelligence and threatens to compromise sensitive sources or methods.

[Page 235]

At times, law enforcement and intelligence have competing interests.  The former head of the FBI's International Terrorism Section noted that Attorney General Reno leaned toward closing down surveillances under the Foreign Intelligence Surveillance Act if they hindered criminal cases.  In addition, convictions that help disrupt terrorists are often based on lesser charges (such as immigration violations), and this may not always convince FBI field personnel that the effort is worthwhile compared with other cases that put criminals in jail for many years.  As former FBI Assistant Director for Counterterrorism Dale Watson explained, Special Agents in Charge of FBI field offices focused more on convicting than on disrupting.

Reliance on law enforcement when individuals have fled to a hostile country, such as Iran or the Taliban's Afghanistan, appears particularly ineffective, as the masterminds are often beyond the reach of justice.  One FBI agent scorned the idea of using the Bureau to take the lead in countering al-Qa'ida, noting that all the FBI can do is arrest and prosecute.  They cannot shut down training camps in hostile countries.  He noted that the strategy is "like telling the FBI after Pearl Harbor, 'go to Tokyo and arrest the Emperor.'"  In his opinion, a military solution was necessary because "[t]he Southern District doesn't have any cruise missiles."

## H.  Disruptions and Renditions

Disruptions and renditions are important tools in the fight against terrorism, and terrorist activity can be disrupted in many ways.  Examples include watchlists to deny entry into the United States, liaison relationships with foreign intelligence and law-enforcement services willing to arrest and detain radicals, raids on terrorist facilities, and criminal investigations and prosecutions.

In testimony to the Joint Inquiry, the DCI summed up the ultimate disruption of al-Qa'ida operations -- destruction of the Afghani sanctuary:

> In this struggle, we must play offense as well as defense. The move into the Afghanistan sanctuary was essential. We have disrupted the terrorists' plans, denied them the comfort of their bases and training facilities and the confidence that they can mount and remount attacks without fear of serious retribution.

[Page 236]

Disruption became increasingly important in the years before September 11.  Following the arrest of Ahmed Ressam with explosives at the U.S./Canada border and the discovery of plots in Jordan during the Millennium celebrations, a worldwide effort was launched to thwart other attacks.  The effort involved dozens of foreign intelligence services, which detained suspected radicals, minimally to keep them off the streets, but also in the hope of gaining confessions or intimidating them into aborting planned attacks.  Former National Security Advisor Sandy Berger gave some idea of the scope of these disruption efforts when he testified that the Intelligence Community had worked around the world since 1997 to dismantle al-Qa'ida cells in about twenty countries.

A rendition is the arrest and detention of terrorist operatives for return to the United States or another country for prosecution.  Renditions often lead to confessions, and they disrupt terrorist plots by shattering cells and removing key individuals.  In practice, almost all renditions entail disruptions.

[Working with a wide array of foreign governments, CIA and FBI have helped deliver dozens of suspected terrorists to justice.  CTC officers responsible for the renditions program told the Joint Inquiry that, from 1987 to September 11, 2001, CTC was involved in the rendition

of several dozen terrorists, a number that increased substantially after September 11.  Former

National Counterterrorism Coordinator Richard Clarke described for the Joint Inquiry a

particularly successful program, through which "we were able to identify al-Qa'ida members

throughout the world [————————————————————————

————]."

The emphasis on renditions and disruptions increased as the Intelligence Community

received more frequent reports of impending al-Qa'ida attacks in the spring and summer of 2001.

As DCI Tenet testified:

> Starting in the spring and continuing through the summer of 2001 we saw a
> significant increase in the level of threat reporting.  Again, working with the FBI
> and foreign liaison services, we thwarted attacks on the U.S. Embassy in Paris,
> our Embassy in Yemen, U.S. facilities in Saudi Arabia and operations to kidnap
> U.S. citizens. We approached twenty countries with specific targets for disruption,
> prompting arrests in [————————————————————————
> ————], and elsewhere.

[Page 237]

[U.S. Government officials told the Joint Inquiry that [————————————

—————————————————————] , and that there are a number of factors that make

the rendition process difficult.  [————————————————————————

————————————————————————————————————————

————————————————————————————————————————

————————————————————————————————————————

————————————————————————————————————————

————————————————————————————————————————

————].

## I. Afghanistan as a Terrorist Sanctuary

[Between 1996 and September 2001, the United States worked with dozens of foreign

governments to disrupt al-Qa'ida, arrest and interrogate its operatives, and prevent terrorist

attacks.  Throughout that period, Afghanistan was a terrorist safehaven, in which al-Qa'ida built

a network for planning attacks, training and vetting recruits, and indoctrinating potential radicals.

In essence, al-Qa'ida created a terrorist army in Afghanistan with little interference.  As DCI

George Tenet explained in testimony before the Joint Inquiry:

The terrorist plotting, planning, recruiting, and training  in the late 1990s were aided immeasurably by the sanctuary the Taliban provided.

> -- Afghanistan had served as a place of refuge for international terrorists since the 1980s.  The Taliban actively aided Bin Ladin by assigning him guards for security, permitting him to build and maintain terrorist camps, and refusing to cooperate with efforts by the international community to extradite him.

> -- In return, Bin Ladin invested vast amounts of money in Taliban projects and provided hundreds of well-trained fighters to help the Taliban consolidate and expand their control of the country.

> --While we often talk of two trends in terrorism – state supported and independent -- in Bin Ladin's case with the Taliban what we had was something completely new: a *terrorist* sponsoring a *state*]. (Emphasis in original.)

Some CIA analysts and operators told Joint Inquiry staff that they recognized as early as 1997 that Bin Ladin's terrorist organization would continue to train cadres of Islamic extremists and generate numerous terrorist operations, as long as the Taliban granted al-Qa'ida sanctuary in Afghanistan.

[Page 238]

Failure to eliminate Afghanistan as a terrorist sanctuary had practical operational consequences.  In describing to the Joint Inquiry the CIA's 1999 plan to capture and bring Bin Ladin and his principal lieutenants to justice, DCI Tenet explained that, because "U.S. policy stopped short of replacing the Taliban regime, . . . the ability of the U.S. Government to exert pressure on Bin Ladin" was seriously limited.  Because our government had "no official presence in Afghanistan, and relations with the Taliban were seriously strained," the DCI asserted, it became much "more difficult to gain access to Bin Ladin and al-Qa'ida personnel."

Between 1999 and 2001, the government did undertake some efforts to address the problem of Afghanistan as a terrorist sanctuary.  In 1999, senior CIA and State Department officials began to focus on the Taliban as an integral part of the terrorist problem.  In 1999 and 2000, the State Department worked with the United Nations Security Council to obtain resolutions rebuking the Taliban for harboring Bin Ladin and allowing terrorist training.  The Defense Department began to focus on this issue in late 2000 after the *Cole* bombing and formulated military options for dealing with the Taliban.

According to Steve Hadley, President Bush's Deputy National Security Advisor, the Bush Administration initiated shortly after taking office a senior-level review of al-Qa'ida policy.  In Summer 2001, the State Department sent a démarche to Taliban representatives in Pakistan, which noted threats to Americans emanating from Afghanistan and declared that the United States would hold the regime responsible for actions by terrorists the Taliban harbored. None of these actions appears to have restrained terrorist training or al-Qa'ida's ability to operate in Afghanistan.

Despite the Intelligence Community's growing recognition that Afghanistan was churning out thousands of radicals, the Joint Inquiry found little effort to integrate the instruments of national power - diplomatic, intelligence, economic, and military - to address the problem effectively.  [————————————————————————————————— ————————————————————————————————].  Little effort was made to use the full force of the U.S. military before September 11, with the exception of August 1998 cruise missile strikes.  Former National Security Advisor Sandy [page 239] Berger testified that there was little public or Congressional support for an invasion of Afghanistan before September 11.

Permitting the sanctuary in Afghanistan to exist allowed Bin Ladin's key operatives to meet, plan, train recruits, and ensure that al-Qa'ida's masterminds remained beyond the reach of international justice.  In testimony before the Joint Inquiry, the DCI explained:

> Nothing did more for our ability to combat terrorism than the President's decision to send us into the terrorists' sanctuary.  By going in massively, we were able to change the rules for the terrorists.  Now they are the hunted.  Now they have to spend most of their time worrying about their survival.  Al-Qa'ida must never again acquire a sanctuary.

In response to a question about what he would have done differently in hindsight before September 11, the DCI reiterated this point about sanctuary:

> [W]e should have taken down that sanctuary a lot sooner.  The circumstances at the time may have not warranted, the regional situation may have been different, and after 9/11 all I can tell you is we let a sanctuary fester, we let Bin Ladin build capability.  And there may have been lots of good reasons why in hindsight it couldn't have been done earlier or sooner.  I am not challenging it, because hindsight is always perfect, but we let him operate with impunity for a long time without putting the full force and muscle of the United States against it.

## J.  The Intelligence Community

[The nation's experience with international terrorism in the 1980s began with the bombings of the U.S. Embassy in Beirut in April 1983 and a U.S. Marine barracks in Beirut in October.  The Islamic Jihad claimed responsibility for both attacks, which were followed by the March 1984 kidnapping and murder of William Buckley, a CIA official in Beirut.  Over the next two years, terrorist groups kidnapped other American citizens in Lebanon who were not connected to the U.S. Government].

In April 1984, the Iranian backed terrorist group Hizbollah claimed responsibility for the bombing of a restaurant frequented by U.S. service members near Torrejon Airbase in Spain.  In September 1984, the U.S. Embassy annex in Beirut was bombed. 1985 brought a flurry of terrorist [page 240] activity against U.S. citizens and interests, including the June 1985 hijacking of TransWorld Airways Flight 847, the October 1985 hijacking of the cruise ship *Achille Lauro*, and the November 1985 hijacking of an EgyptAir flight from Athens to Malta.  In December 1985, terrorists from the Abu Nidal organization attacked the Rome and Vienna airports.

Certain responses by the U.S. Government to the emerging threat were of particular interest to the Joint Inquiry because they became the foundation of our policy toward international terrorism before the September 11 attacks.  A task force led by Vice President George H. W. Bush made a series of recommendations in a December 1985 report on combating terrorism, some of which were quickly implemented:

- President Reagan signed National Security Decision Directive 207 in January 1986, outlining our nation's policy with respect to international terrorism and assigning counterterrorist functions to government components.

- The Director of Central Intelligence's Counterterrorist Center was established in February 1986 as the focal point for counterterrorism.

- A directive signed in the spring of 1986 authorized the CIA to conduct certain counterterrorist activities.

As is explained in more detail in other sections of this report, America first faced major international terrorist attacks within the United States in February 1993 when a bomb was detonated in the World Trade Center and in June 1993 when the FBI arrested eight persons for plotting to bomb New York City landmarks.  In 1996, as Bin Ladin's involvement in directing terrorist acts became more evident, the Counterterrorist Center created a special unit with ten to fifteen members to focus on him.  Since 1996, the Community has been actively engaged in operations with mixed success to collect intelligence on Bin Ladin and disrupt his network.  On September 10, 2001, thirty-five to forty people were assigned to the CTC's Bin Ladin unit.  In 1999, the FBI also created a Bin Ladin unit at Headquarters. Approximately nineteen persons were working in that unit on September 10.

[Page 241]

In August 1998 after the two embassy bombings in Africa, the Intelligence Community quickly confirmed that the attacks had been carried out by Bin Ladin's network.  The DCI made combating the threat Bin Ladin posed one of the Intelligence Community's highest priorities, establishing it as a "Tier [Zero] priority," and he raised the status of the threat still further when he announced in December 1998 that "[w]e are at war" with Bin Ladin.


**K.  The Declaration of War**


Whether and when the Intelligence Community as a whole recognized that Bin Ladin was waging war on the United States and that it was necessary to respond in kind is an important factor in assessing the Community's response to the threat Bin Ladin's network posed.  In interviews, many persons on the National Security Council staff and at CTC pointed to the August 1998 bombings of two U.S. embassies in East Africa as the moment when they recognized that Bin Ladin was waging war against the United States.  That judgment was reflected in two statements by President Clinton in the immediate aftermath of the bombings:

- On August 20, 1998, in an address to the nation on military action against terrorist sites in Afghanistan and Sudan, President Clinton declared:  "A few months ago, and again this week, Bin Ladin publicly vowed to wage a terrorist war against America."

- On August 22, 1998, in a radio address to the nation, President Clinton declared: "Our efforts against terrorism cannot and will not end with this strike.  We should have realistic expectations about what a single action can achieve, and we must be prepared for a long battle."

In December 1998, Director of Central Intelligence George Tenet elaborated on the President's statements in a memorandum to senior CIA managers, the Deputy DCI for Community Management, and the Assistant DCI for Military Support, declaring war on Bin Ladin: [page 242]

> We must now enter a new phase in our effort against Bin Ladin. . . .  We are at war. . . .  I want no resources or people spared in this effort, either inside [the] CIA or the Community.

## L.  The Intelligence Community's Response

The DCI stated to the Joint Inquiry that in early 1999, following his declaration, he ordered a baseline review of CIA's operational strategy against Bin Ladin.  According to the DCI's testimony before the Joint Inquiry, the CIA "produced a new comprehensive operational plan of attack against the Bin Ladin/al-Qa'ida target inside and outside Afghanistan," a plan of attack that in subsequent testimony the DCI simply called "The Plan":

> The Plan included a strong and focused intelligence collection program to track – and then act against – Bin Ladin and his associates in terrorist sanctuaries.  It was a blend of aggressive human source collection – both unilateral and with foreign partners – and enhanced technical collection. . . .To execute the Plan, CTC developed a program to select and train the right officers and put them in the right places.  We moved talented and experienced operations officers into the [CTC].  We also initiated a nation-wide program to identify, vet and hire qualified personnel for counterterrorist assignments in hostile environments.  We sought native fluency in the languages of the Middle East and South Asia, combined with policy, military, business, technical, or academic experience.  In addition, we established an eight-week Counterterrorist Operations Course to share the tradecraft we had developed and refined over the years.

[According to documents reviewed by the Joint Inquiry, "The Plan" included covert action and technical collection aimed at capturing Bin Ladin and his principal lieutenants.  CIA activities within The Plan included working with [————————————————————

————————————————————————————————————————

———————————————]. The Plan was the Intelligence Community's strongest response before September 11, 2001 to the Bin Ladin threat and the DCI's declaration. The Plan is examined in greater depth in the chapter on covert action].

[Page 243]

## M. Shortcomings in the Intelligence Community's Response

The Joint Inquiry has determined that the Intelligence Community as a whole was not on a war footing before September 11. For example, knowledge of the DCI's declaration appears to have been limited. Some senior managers at NSA and DIA were aware of the statement, but many in the FBI had not heard of it. For example, the Assistant Director of the FBI's Counterterrorism Division testified to the Joint Inquiry that he "was not specifically aware of that declaration of war." Senior officers in other components of the government, including the Defense Department and the U.S. military, apparently were also unaware of the declaration. When asked whether he knew that the United States had been at war with Bin Ladin, Deputy Secretary of State Richard Armitage responded:

> I was briefed in January and February [2001], leading to my hearings in March before the U.S. Senate. The term "at war" was, to my knowledge, not used. There was no question, though, that we were in a struggle with al-Qa'ida, and al-Qa'ida was the very first thing that the administration took on at the deputies level.

[The Joint Inquiry also reviewed whether the DCI's declaration of war had any real effect in the covert action area prior to September 11, 2001. Cofer Black, former CTC Chief, explained in a statement to the Joint Inquiry: "[A]fter 9/11, the gloves came off]."

[Resources dedicated to counterterrorism generally increased during the 1990s. Notwithstanding the DCI's December 1998 exhortation to spare no resources, however, counterterrorism had to compete with other intelligence priorities. Senior CIA officers pointed to, for example, a variety of regional and global issues as intelligence priorities that required resource allocations. In testimony before the Joint Inquiry, the DCI took note of those competing intelligence requirements]:

> As I "declared war" against al-Qa'ida in 1998 – in the aftermath of the East Africa embassy bombings – we were in our fifth year of round-the-clock support to Operation Southern Watch in Iraq. Just three months earlier, we were embroiled in answering questions on the India and [page 244] Pakistan nuclear tests and trying to determine how we could surge more people to understanding

and countering weapons of mass destruction proliferation. In early 1999, we surged more than 800 analysts and redirected collection assets from across the Intelligence Community to support the NATO bombing campaign against the Federal Republic of Yugoslavia.

The only substantial infusion of personnel to counterterrorism occurred after September 11, 2001, when the number of CIA personnel assigned to CTC nearly doubled -- from approximately 400 to approximately 800 -- and additional contractors were hired in support of CTC. No comparable shift of resources occurred in December 1998 after the DCI's declaration of war, in December 1999 during the Millennium crisis, or in October 2000 after the attack on *USS Cole*.

NSA Director Hayden described a similar situation before September 11:

> We, like everyone else at the table, were stretched thin in September. The war against terrorism was our number one priority. We had about five number one priorities. And we had to balance what we were doing against all of them.

General Hayden asserted that he knew what NSA had to do to target Bin Ladin effectively before September 11, but was unable to obtain Intelligence Community support and resources for that purpose:

> Given all the other intelligence priorities, it would have been difficult at that time within the [Intelligence Community] or the Department of Defense to accept the kind of resource decisions that would have been necessary to make our effort against the target more robust. NSA was focused heavily on [a range of regional and global issues]. Our resources, both human and financial, were in decline. Our efforts in 2000 to churn money internally were not accepted by the Community; its reliance on [signals intelligence] had made it reluctant to give it up.

The Joint Inquiry also learned that, even after the DCI's declaration of war, there was considerable variation in the degree to which FBI-organized Joint Terrorism Task Forces prioritized and coordinated efforts targeting Bin Ladin and al-Qa'ida in the United States. While the Bureau's New York office took the lead in the vast majority of counterterrorism investigations concerning Bin Ladin, many other FBI offices around the country were unaware of the magnitude of the threat. In an interview, former National Coordinator for Counterterrorism Richard Clarke contended that FBI field [page 245] offices, except New York, were "clueless" about counterterrorism and al-Qa'ida and did not make them priorities. Former National Security Advisor Berger testified before the Joint Inquiry: "What we have learned since

9/11 makes clear that the FBI, as an organization, was not as focused [on the counterterrorism mission]."

## N.  The President and Senior Policy Advisor Responsibility

The DCI's December 1998 declaration was remarkable for its foresight and aggressiveness.  But it could only have effect within a limited sphere because coordinating the U.S. Government's response to the Bin Ladin threat was not the responsibility of the DCI or the Intelligence Community, but of the President and the National Security Council.

In a Joint Inquiry briefing, Mr. Clarke touched on this issue when he discussed Presidential Decision Directive 62, "Protection Against Unconventional Threat to the Homeland and Americans Overseas."   That PDD was signed by President Clinton in May 1998, before the bombings of the two U.S. Embassies in Africa and before the DCI's declaration of war.  According to Mr. Clarke, the PDD created a ten-program counterterrorism initiative and assigned counterterrorist responsibilities to specific agencies:

- Apprehension, extradition, rendition, and prosecution (Department of Justice);

- Disruption (CIA);

- International cooperation (State);

- Preventing terrorist acquisition of weapons of mass destruction (National Security Council);

- Consequence management (Department of Justice/Federal Emergency Management Agency);

- Transportation security (Department of Transportation);

- Protection of critical infrastructure and cybersystems (National Security Council);

- Continuity of operations (National Security Council);

- Countering the foreign terrorist threat in the United States (Department of Justice); and [page 246]

- Protection of Americans overseas (Departments of State and Defense).

Within that effort were the seeds of an integrated, comprehensive government-wide strategy for countering the Bin Ladin threat that could have put the nation on a war footing before September 11.  The initiative is perhaps the closest that President Clinton and the National Security Council came between 1998 and the Administration's departure from office in January 2001 to a coordinated response to the threat.  However, the PDD does not appear to have had much impact.  It is clearly not as straightforward as the DCI's declaration and, beyond Mr. Clarke's reference to it in his testimony, no other Joint Inquiry witness pointed to PDD-62 as the policy guiding the government's response to the growing al-Qa'ida threat.

Shortly after the Bush Administration took office in January 2001, the National Security Council undertook a review of existing policy for dealing with al-Qa'ida.  In response to written Joint Inquiry questions, Deputy National Security Advisor Steve Hadley explained:

> The Administration took the al-Qa'ida threat seriously and, from the outset, began considering a major shift in United States counterterrorism policy.  From the first days of the Bush Administration through September 2001, it conducted a senior-level review of policy for dealing with al-Qa'ida.  The goal was to move beyond the policy of containment, criminal prosecution, and limited retaliation for specific attacks, toward attempting to "roll back" al-Qa'ida.  The new goal was to eliminate completely the ability of al-Qa'ida and other terrorist groups of global reach to conduct terrorist attacks against the United States. . . .  Between May and the end of July 2001, four Deputies Committee meetings were held directly related to the regional issues which had to be resolved in order to adopt a more aggressive strategy for dealing with al-Qa'ida.  These meetings focused on [———

————————————————————————————————————————

————————————————————————————————————————

————————————————————————————————————————

————————————————————————————————————].

This new policy might have produced a coordinated government response to the Bin Ladin threat or put the nation on more of a war footing with al-Qa'ida before September 11.  However, as Mr. Hadley noted, "[t]he Administration finalized its review of policy on al-Qa'ida at an NSC Principals [page 247] Committee meeting on September 4, 2001."  President Bush had not reviewed the draft policy before September 11.

In short, the DCI and other Intelligence Community officials recognized the Bin Ladin threat.  Notwithstanding the DCI's declaration, President Clinton's August 1998 statements, and intelligence reports to policymakers over many years indicating that Bin Ladin was waging war

TOP SECRET

on the United States, neither President Clinton nor President Bush nor their National Security Councils put the government or the Intelligence Community on a war footing before September 11.

## O.  Lack of an Integrated Response

Usama Bin Ladin's involvement in international terrorism first came to the attention of the Intelligence Community in the early 1990s.  As his direct involvement in planning and directing terrorism became more evident, CTC created a unit to focus specifically on Bin Ladin and the threat he posed to U.S. interests.  CTC personnel recognized as early as 1996 that Bin Ladin posed a grave danger to the United States.

Following the August 1998 bombings of two U.S. embassies, the DCI placed Bin Ladin's terrorist network among the Intelligence Community's highest priorities.  The DCI raised the status of the threat further still when he announced to CIA senior managers in December 1998:

> We are at war [with Bin Ladin] . . . .  I want no resources or people spared in this effort, either inside the CIA or the [Intelligence] Community.

These were strong words.  Rather than having a galvanizing effect, however, the Joint Inquiry record reveals that the Intelligence Community continued to be fragmented without a comprehensive strategy for combating Bin Ladin.  The record also shows that the DCI was either unable or unwilling to enforce consistent priorities and marshal resources across the Community.

Evidence of a fragmented Intelligence Community can be found in the limited distribution of the DCI's declaration.  The Community as a whole had only a limited awareness of the statement.  For [page 248] example, although some senior NSA and DIA managers were aware of it, few FBI personnel were.  The Assistant Director of the FBI's Counterterrorism Division told the Joint Inquiry that he "was not specifically aware of that declaration of war." Equally disturbing, Joint Inquiry interviews of FBI field personnel showed that they did not know of the DCI's declaration, and some had only passing familiarity with Bin Ladin and al-Qa'ida before September 11.  Senior U.S. military officers were also unaware of the DCI's declaration.

TOP SECRET

[A former chief of the unit in the DCI's Counterterrorist Center formed to focus on Bin Ladin, put it succinctly:

> In my experience between 1996 and 1999, CIA's Directorate of Operations was the only component of the Intelligence Community that could be said to have been waging the war that Bin Ladin declared against the United States in August of 1996.  The rest of the CIA and the Intelligence Community looked on our efforts as eccentric and, at times, fanatic].

Additional evidence of the absence of a comprehensive counterterrorist strategy and authoritative leadership can be found in "The Plan" the DCI described in testimony before the Joint Inquiry:

> In spring of 1999, we produced a new comprehensive operational plan of attack against [Bin Ladin] and al Qaeda inside and outside of Afghanistan.  The strategy was previewed to senior CIA management by the end of July of 1999.  By mid-September, it had been briefed to the CIA operational level personnel, to NSA, to the FBI, and other partners. The CIA began to put in place the elements of this operational strategy which structured the agency's counterterrorism activity until September 11 of 2001.

[According to documents reviewed by the Joint Inquiry, in 1999 "The Plan" consisted of a variety of CIA covert actions against Bin Ladin.  Later, in 2000, "The Plan" came to include [—————————————].  "The Plan" focused principally on CIA covert action and technical collection aimed at capturing Bin Ladin.  "The Plan" was also significant for what it did not include:

- A Community estimate of the threat Bin Ladin's network posed to the United States and to U.S. interests overseas; [page 249]

- Significant participation by elements of the Intelligence Community other than the CIA;

- Delineation of the resources required to execute the plan;

- Decisions to downgrade other Community priorities to accommodate the priorities of the plan;

- Attention to the threat to and vulnerabilities of the U.S. homeland; and

- Discussion of FBI involvement in the plan.

The Assistant Director of the FBI's Counterterrorism Division testified to the Joint Inquiry that the FBI had no war plan against Bin Ladin: "Absolutely, we did not [have a plan] at that time."   When asked how the FBI's counterterrorism program fit into the overall Community program, the Assistant Director replied:

> I am not sure if I know the answer to that.  I talked to [the DCI] briefly about this. I have talked to [the CTC Chief] before -- the answer to your question is, I don't know the answer.

The lack of involvement by agencies other than the CIA is particularly troubling, given gaps in efforts by those agencies to address the threat.  For example, while the CIA devoted resources to Bin Ladin, covert action, and Afghanistan, the FBI focused on investigating funding for terrorist groups other than al-Qa'ida, even though FBI leadership recognized after the embassy bombings in August 1998 that al-Qa'ida posed an increasing threat.  In some FBI field offices, there was little appreciation for Bin Ladin and al-Qa'ida, including the San Diego office where FBI agents would discover after September 11 connections between terrorist sympathizers and at least two hijackers.

Consistent with this evidence of the absence of a comprehensive strategy is a recent finding by the Inspector General for the Department of Justice that "[t]he FBI has never performed a comprehensive written assessment of the risk of the terrorist threat facing the United States": [page 250]

> Such an assessment would be useful not only to define the nature, likelihood, and severity of the threat but also [to] identify intelligence gaps that need to be addressed.  Moreover, . . .  comprehensive threat and risk assessments would be useful in determining where to allocate attention and resources . . . on programs and initiatives to combat terrorism.

This assessment still had not been completed as recently as FBI Director Mueller's Joint Inquiry testimony on October 17, 2002.  Likewise, the DCI's National Intelligence Council never produced a National Intelligence Estimate on the threat al-Qa'ida and Bin Ladin posed to the United States.

[Absent a comprehensive strategy for combating the threat Bin Ladin posed, the DCI could not be assured that the entire Intelligence Community would focus on the "war."  The record of the Joint Inquiry also establishes that the DCI was unable or unwilling to enforce priorities and marshal resources in accordance with his declaration that the Intelligence Community was "at war."  Despite the DCI's declaration, the Joint Inquiry heard repeatedly about CIA intelligence priorities that competed with Bin Ladin for personnel and funds, including other high priority intelligence targets worldwide].

NSA Director Hayden described to the Joint Inquiry the situation at his agency before September 11:

> We, like everyone else at the table, were stretched thin in September [2001].  The war against terrorism was our number one priority.  We had about five number one priorities.  And we had to balance what we were doing against all of them.

General Hayden also explained that he knew what NSA had to do to target Bin Ladin, but he had been unable to obtain sufficient Community support and resources:

> Given all the other intelligence priorities, it would have been difficult at that time within the [Intelligence Community] or the Department of Defense to accept the kind of resource decisions that would have been necessary to make our effort against the target more robust.  NSA was focused heavily on [a range of regional and global issues].  Our resources, both human and financial, were in decline.  Our [page 251] efforts in 2000 to churn money internally were not accepted by the Community; its reliance on [signals intelligence] had made it reluctant to give it up.

The Joint Inquiry record establishes that, even within the CIA, the DCI did not enforce priorities or marshal resources effectively against the al-Qa'ida threat.  Despite the DCI's declaration of war against Bin Ladin, there is substantial evidence that the CIA's Counterterrorist Center had insufficient personnel before September 11, which had a substantial impact on its ability to detect and monitor al-Qa'ida.  For example, a former CTC Chief testified before the Joint Inquiry that he did not have the resources to counter the threat Bin Ladin posed:

> The three concepts I would like to leave you with are people, the finances, and operational approvals or political authorities.  We didn't have enough of any of these before 9/11.

When asked why personnel were not marshaled to CTC to fight Bin Ladin's network, the former Chief recalled the CIA's Deputy Director of Operations explaining that there were not enough

personnel to go around and that CTC was already well supplied with staff compared to other CIA divisions.

A former Chief of the CTC unit dedicated to Bin Ladin also told us, in a judgment confirmed by his successor:

> We never had enough officers from the Directorate of Operations.  The officers we had were greatly overworked. . . .  We also received marginal analytic support from the Directorate of Intelligence. . . .

In particular, a CIA officer commented on the reasons for the CIA's failure to follow through on information about two September 11 hijackers who came to the attention of the Intelligence Community in January 2000:

> How could these misses have occurred?…  The CIA operators focused on the Malaysia meeting [the hijackers attended]; when it was over, they focused on other, more urgent operations against threats real or assessed.  Of the many people involved, no one detected that the data generated by this operation crossed a reporting threshold, or, if they did, they assumed that the reporting requirement had been met elsewhere. . . .  They are the kinds of misses that happen when people – even very competent, dedicated people such as the [page 252] CIA officers and FBI agents and analysts involved in all aspects of this story – are simply overwhelmed.

On September 12, 2002, there was a substantial infusion of personnel into the CTC.  No comparable shift of resources occurred in December 1998 after the DCI's declaration of war, in December 1999 during the Millennium crisis, or in October 2000 after the attack on *USS Cole*.  In testimony before the Joint Inquiry, DCI George Tenet asserted, "In hindsight, I wish I had said, 'Let's take the whole enterprise down,' and put 500 more people there sooner."  It is noteworthy that the DCI's comments were limited to the CIA and did not encompass the resources of other agencies within the Intelligence Community.

In response to questions about efforts to obtain additional counterterrorism resources, DCI Tenet described to the Joint Inquiry his inability, before September 11, to generate necessary support within the Executive Branch:

> [I would ask every] year in [the] budget submission . . . I'm not talking about the Committee.  I'm talking about the front end at OMB and the hurdle you have to get through to fully fund what we thought we needed to do the job.  Senator Kyl once asked me "How much money are you short?"  "I'm short $900 million to $1 billion every year for the next five years" is what I answered.  And we told that to

> everybody downtown for as long as anybody would listen and never got to first base.  So you get what you pay for in terms of our ability to be as big and robust as people - and when I became Director, we had [——] case officers around the world. Now we're up to about [——] and the President's given us the ability to grow that by another [——].  And everybody wonders why you can't do all the things people say you need to do.  Well, if you don't pay at the front end, it ain't going to be there at the back end.

The inability to realign Intelligence Community resources to combat the threat Bin Ladin posed is in part a direct consequence of the limited authority the DCI enjoys over major portions of the Intelligence Community.  As former Senator Warren Rudman noted in testimony before the Joint Inquiry: "[E]ighty-five percent of [the Intelligence Community's budget] is controlled by the Department of Defense."

[Page 253]

While the DCI has statutory responsibility spanning the Intelligence Community, his actual authority is limited to budgets and personnel over which he exercises direct control: the CIA, the Office of the DCI, and the Community Management Staff.  As former House Intelligence Committee Chairman Lee Hamilton told the Joint Inquiry:

> Currently, the Director of Central Intelligence, the leading intelligence figure . . . control[s] but a small portion of his budget. The DCI has, as I understand it, enhanced authority after 1997, and that permits him to consolidate the national intelligence budget, to make some trade-offs, but given the overwhelming weight of the Defense Department in the process, that is of limited value. . . .  [T]he thing that puzzles me here is why we reject for the Intelligence Community the model of organization that we follow in every other enterprise in this country.  We have someone at the head who has responsibility and accountability.  We accept that.  But for some reason, we reject it when it comes to the Intelligence Community.

In sum, the Joint Inquiry found leadership and structural failings in the Intelligence Community's response to the Bin Ladin threat.  Proposals to restructure the Community are examined in another section of this report**.**

## P.  The Intelligence Community's Failure to Establish a Coordinated Domestic Focus Before September 11, 2001

Throughout the 1990s, the desire and capacity of international terrorist groups, particularly Islamic radicals, to strike the United States at home increased dramatically.  Several terrorist attacks and disrupted plots in the 1990s underscored the reality of this danger.

Recognizing the threat, the Intelligence Community warned regularly and repeatedly that al-Qa'ida and affiliated radicals sought to kill Americans on U.S. soil.

The FBI increased its focus on terrorism in the 1990s, but critics charge that it neither focused sufficiently on radical Islamist activities in the United States nor properly aligned itself to counter the growing danger of terrorism domestically.  As a result, the critics say, radical Islamists were able to exploit our freedoms and operate undetected within the United States. Several senior FBI officials, [page 254] however, contend that countering terrorism at home was a top priority and that Islamic radicals simply did not present opportunities for the FBI to disrupt their activities.

[Other Intelligence Community members made only limited contributions to preventing attacks at home and refrained from activities that could be construed as monitoring American citizens.  The CIA provided general assessments, noting the risk to the United States. NSA offered some leads related to possible radical activity in the United States, but chose not to intercept communications between individuals in the United States and foreign countries.  In general, the Community as a whole did not come together to close gaps in coverage of international terrorist activity in the United States].

As is explained in other sections of this report, in the 1990s, it became clear that al-Qa'ida was a deadly adversary operating in America and able to levy attacks on U.S. soil.  The relative immunity from international terrorism that America had enjoyed for many years was gone.  Al-Qa'ida was also unusual in its dedication, size, organizational structure, and mission. As former CTC Chief Cofer Black testified, al-Qa'ida became more skilled and attracted more adherents throughout the 1990s, becoming in essence a small army by the end of the decade.

The Intelligence Community repeatedly warned that al-Qa'ida had both the capability and the intention to threaten the lives of thousands of Americans and that it wanted to strike within the United States.  This information was conveyed in intelligence reports, broader intelligence assessments, counterterrorism policy documents, and classified Congressional testimony.  Policymakers from the Clinton and Bush administrations have testified that the Intelligence Community repeatedly warned them of the danger al-Qa'ida posed and the urgency of the threat.

**Q.  Steps Taken to Fight International Terrorism at Home**

The FBI increased its focus on terrorism throughout the 1990s and helped prevent several major attacks that would have killed many innocent people.  According to Director Mueller, these schemes included a 1993 plot to attack New York City landmarks; a 1995 plot to bomb U.S. commercial aircraft; [page 255] a 1997 plot to place pipe bombs in New York City subways; and a plot to bomb the Los Angeles airport in December 1999.

The FBI took several important measures to improve its ability to fight international terrorism in the United States.  Former Director Freeh testified that, during the 1990s, the FBI more than doubled the number of personnel working counterterrorism, and its counterterrorism budget more than tripled.  In 1998, former Assistant Director for Counterterrorism Dale Watson and other FBI leaders recognized that the Bureau was reacting to terrorist attacks rather than preventing them.  They initiated the "MAXCAP05" program to improve the FBI's ability to counter terrorism.  In 1999, the FBI made counterterrorism a separate Headquarters division, elevating its importance within the Bureau, and created a separate operational unit focused on Bin Ladin.

Several current and past senior FBI officials have also testified about Bureau initiated personnel exchanges with the CIA and the expansion of its Legal Attaché program (stationing FBI representatives in U.S. Embassies), both of which deepened the FBI's ability to link domestic and international threats.  Finally, former Director Freeh has testified that Joint Terrorism Task Forces (JTTFs) were given increasing prominence throughout the 1990s.  The JTTF model, originally created to improve coordination between the FBI and the New York City Police Department, was expanded to other cities after the first World Trade Center attack.  Over time, the number of JTTFs increased, improving coordination with state and local officials and even other elements of the Intelligence Community, as CIA officers joined several task forces.

**R.  Lack of Focus on the Domestic Threat**

In spite of these steps, several critics contend that the Intelligence Community did not pay sufficient attention to the risk of an attack at home, and that, as a result, the United States became a sanctuary for radical terrorists:

- Former National Security Advisor Brent Scowcroft testified that as a result of American freedoms and civil liberties, "the safest place in the world for a terrorist [page 256] to be is inside the United States. . . .  As long as [terrorists] don't do something that trips them up against our laws, they can do pretty much all they want."

- Richard Clarke, former NSC Special Coordinator for Counterterrorism, contends that, with the exception of the New York office, FBI field offices around the country were "clueless" about counterterrorism and al-Qa'ida and did not make these targets priorities.  Former National Security Advisor Berger testified that the FBI was not sufficiently focused on counterterrorism before September 11.

- As the Joint Inquiry record confirms, FBI officials working on terrorism faced competing priorities and the ranks of those focusing on al-Qa'ida were not sufficiently augmented.  Only one FBI strategic analyst focused exclusively on al-Qa'ida before September 11.  The former Chief of the FBI's International Terrorism Section stated that he had more than one hundred fewer Special Agents working on international terrorism on September 11 than he did in August 1998.

- Interviews of FBI New York field office and FBI Headquarters personnel suggest that the New York Field Office, the office of origin for all major Bin Ladin-related investigations, focused primarily on investigating overseas attacks.

- The terrorist threat was viewed through a narrow lens because of the FBI's case-based approach.  Interviews of FBI personnel show that analysts were sent to operational units to assist in case work rather than assess data gathered by the various field offices.

- According to FBI agents, FBI counterterrorism training was extremely limited before September 11.

- Former U.S. Attorney Mary Jo White testified that the FBI often lacked linguists competent in the languages and dialects spoken by radicals linked to al-Qa'ida.

[Page 257]

- An FBI agent with considerable counterterrorism experience noted that foreign governments often knew more about radical Islamist activity in the United States than did the U.S. Government because they saw this activity as a threat to their own existence.

As is discussed in other sections of this report, the Joint Inquiry record confirms that the FBI's decentralized structure and inadequate information technology made the Bureau unable to correlate the knowledge possessed by its components. The FBI did not gather intelligence from all its many cases nation-wide to produce an overall assessment of al-Qa'ida's presence in the United States. The Joint Inquiry has also found that many FBI field offices had not made counterterrorism a top priority and they knew little about al-Qa'ida before September 11.

The FBI also did not inform policymakers of the extent of terrorist activity in the United States, although former Director Freeh stated that he met regularly with senior U.S. Government officials to discuss counterterrorism. Former National Security Advisor Berger has testified that the FBI assured him that there was little radical activity in the United States and that this activity was "covered." Although the FBI conducted many investigations, these pieces were not fitted into a larger picture.

FBI officials argue that al-Qa'ida and its sympathizers proved a difficult target in the United States. Director Mueller contends that the hijackers did little to arouse suspicion in the United States, staying away from known terrorist sympathizers:

> They gave no hint to those around what they were about. They came lawfully. They lived lawfully. They trained lawfully.

This judgment is corroborated by several senior FBI investigators who point out that, although "international radical fundamentalists" operate in the United States, "real al-Qa'ida members," those involved in planning or carrying out attacks, avoid other radicals and radical mosques as part of their tradecraft. As is discussed elsewhere in this report, that judgement is open to some question, based on what is now known about the activities of the hijackers in the United States.

[Page 258]

Former FBI Director Freeh also noted in an interview that al-Qa'ida operations were small and were not connected to real "cells," and the former Assistant Director for the FBI's Counterterrorism Division contended that many of the "red flags" now apparent are visible only in hindsight.  Other FBI officials noted in testimony that U.S. protection of civil liberties precluded the use of intrusive investigative techniques, and Mr. Freeh criticized the idea of using the FBI preventively by being much more aggressive as a potential risk to a democratic and open society.

Finally, FBI officials contend that resources were limited, while requirements kept increasing.  Former Director Freeh and the Assistant Director for the Counterterrorism Division testified that the FBI provided security against terrorism at trials, at special events such as the Olympics, and for meetings of world leaders, all of which demanded considerable resources.  In addition, cyber threats and weapons of mass destruction demanded FBI attention.  Mr. Freeh testified that, by the end of the decade, "the allocations were insufficient to maintain the critical growth and priority of the FBI's counterterrorism program."

The Joint Inquiry received mixed reports regarding the FBI's aggressiveness in penetrating radical Islamic groups in the United States.  Former U.S. Attorney Mary Jo White testified that FBI sources proved invaluable in the successful prevention of the 1993 attack on New York landmarks and the prosecution of the first World Trade Center attack that same year.  In addition, the FBI had numerous wiretaps and several human informants in its effort to target various radical Islamist organizations.

However, an FBI official involved in the investigations of the first World Trade Center attack and other terrorist plots argued that the FBI made it exceptionally difficult to handle sources and that this difficulty increased in the 1990s.  The agent contended that the FBI did not want to be associated with persons engaged in questionable activities, even though they can provide useful information.  In addition, he asserted that agent performance ratings downgraded the importance of developing informants.  Director Mueller, however, testified that many constraints and restrictions had decreased since the 1970s, enabling FBI agents to recruit sources with few impediments.

[Page 259]

**S.  Limited Counterterrorism Contributions by other Intelligence Community Members**

The criticisms regarding the FBI's limited attention to the danger at home reflects a large gap in the nation's counterterrorism structure, a failure to focus on how an international terrorist group might target the United States itself. No agency appears to have been responsible for regularly assessing the threat to the homeland.  In his testimony before the Joint Inquiry, Deputy Secretary of Defense Wolfowitz asserted that an attack on the United States fell between the cracks in the U.S. Intelligence Community's division of labor.  He noted that there is "a problem of where responsibility is assigned."

The CIA and NSA followed events overseas, and their employees saw their job as passing relevant threat information to the FBI.  Both the CIA and NSA are leery of activity that suggests they are monitoring U.S. citizens or conducting assessments linked to the activities of persons in the United States, a task that officials interviewed at these agencies believed belongs exclusively to the FBI.  The FBI, on the other hand, does not have the analytic capacity to prepare assessments of U.S. vulnerability and relies heavily on the CIA for much of its analysis.

At times, the CIA ignored threat activity linked to the United States, focusing instead on radical activity overseas.  For instance, one CIA officer told the Joint Inquiry in an interview that the travel of two hijackers to Los Angeles was not important and that he was interested only in their connection to Yemen.

[A particular failure by NSA and the FBI to coordinate the interception of communications by al-Qa'ida operatives before September 11 illustrates the gaps between programs implemented by the members of the Intelligence Community.  Both the FBI and NSA had programs in place to collect al-Qa'ida communications.  [————————————————— —————————].  The FBI had not identified a significant number of al-Qa'ida cells in the United States and, thus, had fewer opportunities to use electronic surveillance against these targets].

[While each agency pursued its own collection strategy, neither exerted any effort to develop a coordinated plan to intercept international communications, particularly those between the United [page 260] States and foreign countries.  We now know that several hijackers communicated extensively abroad after arriving in the United States and that at least two entered,

247

left, and returned to this country.  Effective coordination among the Intelligence Community agencies could have provided potentially important information about hijacker activities and associations before September 11].

[NSA analyzed several communications from early 2000 involving hijacker Khalid al-Mihdhar, and a suspected terrorist facility in the Middle East that was associated with al-Qa'ida's activities directed against United States' interests. [—————————————————————————————————————————————].  The Intelligence Community did not determine until after September 11, 2001 that these contacts occurred while al-Mihdhar was in the United States. [————————————————————————————————————————————————————————————————————————————————————————————————————————————————].  Knowledge of al-Mihdhar's presence in the United States could have proven crucial to launching an investigation that might have revealed information about him and his roommate, hijacker Nawaf al-Hazmi, who came into contact with Hani Hanjour and other hijackers at various times in 2001].

[Better coordination between NSA and the FBI might have: improved prospects for determining that al-Mihdhar was in this country in early 2000; led to the collection of information concerning international communications by other hijackers; identified radical suspects; and created leads for the FBI.  Both NSA and FBI are authorized to access international communications between the United States and foreign countries.  [————————————————————————————————————————————————————————————————————————————————————————————————————————————————————].

[Both agencies had independently learned of the suspected terrorist facility in the Middle East and knew that it was linked to al-Qa'ida activities directed against United States' interests.  The FBI informed NSA when it learned of the suspected terrorist facility in August 1998.  [Page 261]  NSA disseminated several reports of communications involving the suspected terrorist facility in the Middle East to the FBI, including reports relating to [——————————————————————].  However, NSA and the FBI did not fully coordinate their efforts, and, as a result, the opportunity to determine al-Mihdhar's presence in the United States was lost].

[————————————————————————————————————————

————————————————————————————————————————————

————]. [NSA Director Hayden testified before the Joint Inquiry that the collection of
communications between the United States and foreign countries will most likely contain
information about [——] domestic activities and, thus,  [——————] is the responsibility of the FBI,
not NSA.  General Hayden contrasted the foreign intelligence value of such intercepts and their
domestic security value.  If the former is at stake, he asserted, NSA should intercept the
communications; if the latter, the FBI].

General Hayden, senior NSA managers, NSA legal staff, and NSA analysts made clear in
Joint Inquiry testimony and interviews that they do not want to be perceived as focusing NSA
capabilities against "U.S. persons" in the United States.  The Director and his staff were
unanimous that lessons NSA learned as a result of Congressional investigations during the 1970s
should not be forgotten.

[Whatever the merits of this position, it was incumbent on NSA and the FBI to coordinate
so that the full range of intelligence collection weapons in the arsenal of the Intelligence
Community could have been deployed against the terrorist threat.  NSA routinely gave the FBI
intelligence reporting, and that reporting contained leads about foreign terrorist-related
communications.   In addition, NSA responded to requests from the FBI for such information
[————————————].  The FBI used NSA-supplied information to advance its investigative
interests.  However, there was no inter-agency procedure in effect to ensure that the FBI made an
informed decision to cover communications that NSA was not covering [——————————————

————————————————————————————————————————————].

[Page 262]

[Page 262]

## PART THREE-TOPICS-THE ATTACKS OF SEPTEMBER 11, 2001

## I. Counterterrorism Resources

Throughout the Joint Inquiry, Intelligence Community witnesses cited a lack of money and people to explain why agencies failed to produce more intelligence on al-Qa'ida, did not arrest or disrupt more terrorists, and were otherwise limited in their response to the growing terrorist threat.

In general, between the end of the Cold War and September 11, 2001, Intelligence Community resources fell or remained even in constant dollars. As a result, overall capabilities declined. The CIA, for example, reduced the number of its operations officers in the field. In addition, the necessary support "tail" for counterterrorism, such as communications and training, eroded. More generally, depth of coverage and expertise declined as personnel moved from crisis to crisis or focused only on the highest priorities.

Within the overall intelligence budget, however, spending on counterterrorism increased considerably during the 1990s. The counterterrorism component of the overall National Foreign Intelligence Program (NFIP) at least doubled at most agencies in the decade before the September 11 attacks, while funding for other intelligence missions declined or stayed even.

In spite of this increase in counterterrorism resources, the overall decline in Intelligence Community resources made it difficult to expand the counterterrorism effort significantly to meet the growing threat. In addition, the overall decline in capabilities hindered the robustness of the counterterrorism effort. Spending on counterterrorism, and spending on al-Qa'ida in particular, relied heavily on supplemental appropriations, which carried with it additional disadvantages.

Although details are imprecise, the Joint Inquiry's research and Intelligence Community agency estimates show that the number of people working on terrorism rose steadily, despite overall decreases in Intelligence Community staffing. Nonetheless, the number of people in

counterterrorism remained small, particularly when compared with post-September 11 levels.

[Page 263]

## A.  Joint Inquiry Resource Review Methodology and Limitations

To explore resource allocations, the Joint Inquiry reviewed documents, requested additional information on specific issues, and interviewed knowledgeable personnel.  Documents included formal NFIP submissions and responses; staffing descriptions for major counterterrorism offices, such as the Counterterrorist Center (CTC) at CIA and the FBI's Counterterrorism Division; CIA and FBI submissions requesting additional resources; supplemental appropriations and justifications; National Security Council (NSC)-mandated reviews of counterterrorism spending throughout the Intelligence Community; Inspector General reports; internal assessments of the effort against al-Qa'ida; and many other documents.

Because existing documentary information was insufficient, the Joint Inquiry asked the Intelligence Community for additional information.  This included identifying the number of personnel who worked directly on al-Qa'ida and terrorism; determining and reviewing budget methodology; calculating full-time-equivalent staffing levels; and ascertaining resources that other groups received.  Interviews related to resources spanned a range of policy officials, Intelligence Community leaders, and budget officers from the agencies and former OMB officials.  Policy officials at the NSC and Department of Defense (DoD) were asked about the level of resources provided for intelligence and for counterterrorism.

Based on this review, it appears that the Intelligence Community has only a limited sense of what is budgeted for missions such as counterterrorism.  Agencies submit budget requests for field agents or spy satellites, for instance, but do not systematically track the missions for which these capabilities are used.  As a result, methodologies vary for estimating how much is spent on terrorism.  Moreover, because Intelligence Community managers do not use this data for day-to-day operations, little information was readily available in response to our data requests.  The Intelligence Community cannot quickly determine how or where money is spent, or which missions its personnel are carrying out.

TOP SECRET

Intelligence Community budgeting procedures thus make it difficult to determine whether counterterrorism as a mission is properly funded.  Community components budget by [page 264] capabilities, such as the number of intelligence officers or satellites, rather than by missions, such as counterterrorism.  Many of these capabilities, however, serve more than one function or mission, making it difficult to measure resource allocation.  For example, a CIA field officer may collect on the internal politics of a country, a weapons shipment, and terrorism.

According to the CIA's Associate Deputy Director for Operations (DDO) for Resources, Plans and Policies, it is difficult to measure how much is spent on counterterrorism and the least precise area of accounting is human resources.  For instance, in the field, personnel might work on several targets.  Requiring them to keep track of the time they spend on particular tasks was considered, but rejected due to the administrative burden this would impose.

Also, counterterrorism often entails infrastructure costs that cannot be readily allocated to a particular effort.   Before Fiscal Year (FY) 1999, there was little effort to track counterterrorism spending because counterterrorism was not an office or an expenditure center.  Counterterrorism is not limited to CTC, and other CIA components support the effort.  Finally, the CIA's accounting system focused on capabilities and resources, not on missions.

In FY 1999, the Office of Management and Budget (OMB) required that spending on counterterrorism be tracked.  According to the CIA Budget Office's Director and Deputy Director, counterterrorism spending was calculated by determining the cost of CTC and specific counterterrorism operations for other offices.  Indirect costs for those offices, like infrastructure and computers, were not included.  To make these calculations, budget officers had to examine each organization and each program.  While efforts are underway to restructure budget procedures to make data more easily retrievable, it remains difficult to determine what the Intelligence Community is spending on specific issues and missions.  Data must be manually retrieved since budget systems do not "talk" to human resources systems.  The effort is time and labor intensive and not "repeatable" because different measures are used in different years.

TOP SECRET

Even the CIA report on the counterterrorism effort that was provided in response to a specific Joint Inquiry request required a manual reconstruction of hours worked, which is imprecise at best.  Thus, the Agency could provide only limited information on how its officers [page 265] divided their time in 1998.  A senior NSA official in testimony criticized personnel accounting procedures that focus only on one product line, such as counterterrorism, noting that cryptographers, target developers, and other personnel contribute to products even if they are not formally part of the product lines.  However, NSA was unable to provide a procedure to account for the contributions of these personnel.

As a result of these ambiguities, the Community often does not know how much it spends on particular efforts, making it difficult to compare funding across missions.  Moreover, different components of the Community use different measures to determine how much they spend on missions, and there is no universally accepted method to measure indirect costs such as infrastructure.

In light of these difficulties, the estimates of spending on counterterrorism that follow should be viewed as rough outlines, not detailed pictures of overall expenditures.  Since counterterrorism is not an explicit budget category for the Intelligence Community, it is difficult to estimate the percentage of Community capabilities (e.g., field officers or spy satellites) dedicated to counterterrorism.  Community budget officers advised that components of the Community use different measures to estimate total sums spent on counterterrorism and these measures are not consistently used within agencies.  Finally, indirect costs (such as infrastructure or communications) are often excluded from these figures.

In addition to this data problem, the White House refused to allow the Intelligence Community to respond to Joint Inquiry requests for information regarding budgets and budgetary decision making.  Many important resource issues revolved around the question of "Who said no?" to requests for additional funds for counterterrorism.  However, the White House invoked Executive privilege and refused to permit the Intelligence Community to provide "pre-decisional" data on budget requests that were made by agencies before they were sent to Congress.  The Joint Inquiry received some of this information indirectly, but large gaps remain.  The White House also invoked Executive privilege in response to requests for information on spending for covert action.

253

TOP SECRET

[Page 266]

## B. Overall Intelligence Community Funding

Overall funding of intelligence agencies and associated personnel levels fell or remained roughly even in constant dollars from the end of the Cold War until September 11, 2001, hindering the Community's response to the growing terrorist threat. As Chart 1.0 shows, the Intelligence Community budget fell or remained even in constant dollars throughout the 1990s.

*Chart 1.0:  Total NFIP Funding And Positions, FY 1990 To FY 2000 [Redacted]*



Source:  CMS

[Page 267]

Many of the overall capabilities, such as communications and training, that are needed to support counterterrorism and other intelligence operations were cut as part of money-saving efforts. Some critics claim these cuts went too far. For example, Deputy Secretary of Defense

TOP SECRET

Wolfowitz testified that his work with the "Rumsfeld Commission" in 1998 concerning the ballistic missile threat to the United States made clear to him that "resources for intelligence had been cut too deeply."  DCI Tenet testified that the CIA regularly asked OMB for more money, but had little success.  This led to a shortage of trained agents and other resources.

Former FBI Director Freeh testified that the FBI did not have sufficient resources to "maintain the critical growth and priority of the FBI's counterterrorism program."  From 1996 to 1999, Congress increased appropriations substantially, but from 2000 to 2002, requests for additional funds were denied.  As a result, FBI Headquarters units that dealt with Islamic extremism had insufficient resources.  According to Mr. Freeh:

> For FY 2000, 2001, and 2002 FBI counterterrorism budgets, I asked for a total of 1,895 Special Agents, analysts, linguists, and others.  The final, enacted allocation I received was 76 people over those three years. . . .  Thus, at the most critical time, the available resources for counterterrorism did not address the known critical needs.

The House and Senate Intelligence Committees typically authorized more for the Intelligence Community in the years before September 11 than the Congressional appropriators eventually approved.  As Chart 1.1 indicates, only in one fiscal year (FY1996) did the appropriation exceed the authorization.

[Page 268]

TOP SECRET

*Chart 1.1: NFIP Appropriations and Authorizations, FY1993-FY2001 [Redacted]*



FY1993   FY1994   FY1995   FY1996   FY1997   FY1998   FY1999   FY2000   FY2001

Source:  HPSCI

## C. Resources Dedicated To Counterterrorism

[Spending dedicated to counterterrorism grew, however, even as overall resources on intelligence declined.  Former National Security Advisor Samuel Berger noted for the record that "working with Congress, [the Clinton administration] more than doubled the counterterrorism budget from 1995 to 2000, during a time of budget stringency – with a 350 % increase in the FBI's counterterrorism funds, and (although classified) substantial increases in CIA's counterterrorism resources."  Information from the CIA's Chief Financial Officer shows that funds appropriated to CTC increased from [        ] in FY 1992 to [        ] in FY 2000, excluding supplemental appropriations.  Former FBI Director Freeh testified that the number of [page 269] Special Agent and support positions dedicated to terrorism more than doubled from 1993 to 1999.  To achieve these increases, the Intelligence Community shielded counterterrorism programs from

budget cuts and, as the terrorist threat grew, increased the number of personnel and the amount of resources dedicated to counterterrorism. However, despite this relative increase in resources, there was no massive increase before September 11, 2001].

Chart 1.2 describes overall trends in the Intelligence Community budget dedicated to counterterrorism before September 11, 2001. As Chart 1.2 shows, in the decade before September 11, direct spending on counterterrorism throughout the Community roughly quintupled in a time of tight budgets.

[Page 270]

*Chart 1.2: Intelligence Community Counterterrorism Spending Before September 11 [Redacted]*



Source: CMS

TOP SECRET

Charts 1.3, 1.4, and 1.5 compare the amounts the President requested of Congress for CIA, NSA and the FBI with the amounts, including supplemental appropriations, that were eventually appropriated. Agency leaders testified that their requests for resources were sometimes not satisfied, even though Congress appropriated as much or more than the President requested. This is because OMB often reduces agency requests before transmitting them to Congress. As mentioned earlier, the White House denied the Joint Inquiry access to pre-decisional budget data about what was asked of the White House and what was transmitted to Congress. Thus, the Joint Inquiry was not able to obtain that information for the Intelligence Community agencies, apart from FBI data available to the Senate Intelligence Committee.

[Page 271]

*Chart 1.3. CIA Spending on Counterterrorism Before September 11 [Redacted]*



Source: CMS

TOP SECRET

TOP SECRET

As Chart 1.3 illustrates, CIA appropriations for counterterrorism increased throughout the 1990s.  In general, appropriations for CIA met or exceeded the requests that were submitted by the President to Congress.

[Page 272]

***Chart 1.4.  FBI Spending On Counterterrorism Before September 11 [Redacted]***



Source:  FBI (information provided to SSCI)

The FBI usually received more – at times far more – than the amounts the President initially requested from Congress.  FBI appropriations for counterterrorism increased dramatically in the mid-1990s and then fell or remained roughly constant in the years before September 11, 2001.

[Page 273]

TOP SECRET

*Chart 1.5. NSA Spending On Counterterrorism Before September 11 [Redacted]*



Source:  CMS

NSA received increases in counterterrorism funding, consistent with the rest of the Intelligence Community, with dramatic increases throughout the 1990s.  Appropriations consistently met or exceeded Presidential requests to Congress.

Intelligence Community officials contend that the increasing resources they received were not sufficient to meet the growing threat.  For example, Cofer Black, former CTC Chief, testified that a lack of resources was a major impediment for CTC.  Officials at NSA and CIA also stated in Joint Inquiry interviews that resources had been a problem.

**D.  Personnel Shortages** [Page 274]

The number of analysts, operations officers, field agents, and other intelligence professionals working on al-Qa'ida was limited, creating personnel shortages that led to important information being overlooked.

**a.  Personnel Concerns At CIA**

At the request of the Joint Inquiry, the CIA reviewed its counterterrorism effort from 1998 to 2002.  This included analysts and operators outside CTC, many of whom made important contributions but worked only part time on al-Qa'ida.  The review resulted in estimates of total "work-years" (i.e., 2087 labor hours per annum) combining the time expended by analysts focusing exclusively on al-Qa'ida and those working on related issues, such as terrorist financing.  The results are summarized in Table 2.0.

*Table 2.0.  Full-Time Equivalent Personnel Dedicated To Counterterrorism At CIA  (Excludes CIA Contractors And Detailees From Other Agencies)*

| Full-Time Equivalent (Work-years) for Staff Employees | September 1998 | August 2001 | July 2002 |
|---|---|---|---|
| Total Headquarters and Staff Work-years Devoted to al-Qa'ida | [     ] | [     ] | [     ] |
| Total Headquarters and Staff Work-years Devoted to Terrorism, Excluding al-Qa'ida | [     ] | [     ] | [     ] |
| Total CTC Effort against terrorism (both al-Qa'ida and other groups) | [     ] | [     ] | [     ] |

As Table 2.0 indicates, the number of CIA personnel working on al-Qa'ida almost doubled from the August 1998 East Africa U.S. embassy attacks to September 11, 2001.  Before [page 275] September 11, the numbers of CTC personnel involved in the effort against terrorism grew, though much of the increase occurred in the field.

Despite these increases, the former Chief of the CTC's Sunni Extremist Group testified that "[w]e always needed more," though he also noted that every other part of the CIA's Directorate of Operations (DO) also believed they needed more resources.  DCI Tenet testified

TOP SECRET

that "we never had enough" personnel working on al-Qa'ida."  Many CTC personnel asserted in interviews that the number of employees was well below the levels that were necessary, given the volume of information and the growing nature of the threat.  One officer claimed she was told when appeals for more resources were rejected: "People [will] have to die for them to get resources."

The lack of adequate resources meant that CTC personnel responsible for al-Qa'ida were required to work extremely long hours without relief.  This created morale problems, made retention difficult, and fostered the perception that the DO did not truly support the counterterrorism mission.  As the former Chief of the CTC unit focused on Bin Ladin testified:

> We never had enough officers from the [DO].  The officers we had were greatly overworked.  And there was always more senior-level concern for [———————————————————————] than for providing more officers to protect the health and welfare of the unit's officers.

[Despite recognition of the menace al-Qai'da posed and the relatively limited understanding of its network, the CIA had relatively few analysts working on the problem.  At CTC, the total work-years for terrorism analysis relating to al-Qa'ida inside its analytic group was only nine in September 1998.  According to CIA, nine CTC analysts and eight analysts in the Directorate of Intelligence were assigned to UBL and al-Qa'ida in 1999.  This was only a fraction of the analytic effort that was to be devoted to al-Qa'ida in July 2002].

## b.  Personnel Concerns At NSA

[NSA had only a limited number of Arabic linguists.  Before September 11, 2001, few were dedicated full-time to al-Qa'ida, which was only one of many priority counterterrorism [page 276] targets at NSA for which Arabic linguists were needed.  For example, those linguists were also used to support other important regional topics and to translate intelligence originating in other parts of the world].

TOP SECRET

TOP SECRET

### c. Personnel Concerns At The FBI

The FBI labored under a hiring freeze in the last years of the Clinton Administration.  As a result, it did not train new agents, according to an interview of former Director Freeh.   Although FBI full-time-equivalent work-years on international terrorism doubled from 1993 to 1998, they fell or remained constant from 1999 to September 2001, according to FBI information.  That information also shows that actual work-years of agents and support personnel in the field grew from 482 in 1993 to 1,034 in 2000.  Despite this dramatic increase, FBI officials claim they did not receive enough resources to manage the emerging threat.  A summary of FBI requests for additional personnel for counterterrorism and the responses from the Department of Justice, Office of Management and Budget, and Congress is presented in Chart 1.6.
[Page 277]

*Chart 1.6  FBI Resource Requests*



Source:  FBI

Chart 1.6 demonstrates that FBI requests for additional personnel were cut or rejected at times by the Department of Justice, the Office of Management and Budget, and the Congress. Sometimes the Bureau received most of its initial request, and its request was exceeded in one instance.  Former OMB officials noted in Joint Inquiry interviews that it was rare for any agency to receive more than its initial request during a time of budget stringency.  They also pointed out that, while the FBI often did not receive additional personnel for counterterrorism, many other agencies faced significant cuts.

### E.  Counterterrorism and the Competition for Scarce Resources

[Page 278]

Because intelligence budgets were shrinking while counterterrorism resources were steadily growing, senior policy and intelligence officials were reluctant to make the additional cuts in other programs that would have been necessary to augment counterterrorism programs further. This would have jeopardized their ability to satisfy other collection priorities within the Intelligence Community.  As Director of Central Intelligence George Tenet testified:

> As I "declared war" against al-Qa'ida in 1998 – in the aftermath of the East Africa embassy bombings – we were in our fifth year of round-the-clock support to Operation Southern Watch in Iraq.  Just three months earlier, we were embroiled in answering questions on the India and Pakistan nuclear tests and trying to determine how we could surge more people to understanding and countering weapons of mass destruction proliferation.  In early 1999, we surged more than 800 analysts and redirected collection assets from across the Intelligence Community to support the NATO bombing campaign against the Federal Republic of Yugoslavia.

[Similarly, NSA Director Hayden testified that his energy was focused heavily on a range of regional and global issues.  An FBI budget official told the Joint Inquiry that counterterrorism was not a priority for Attorney General Ashcroft before September 11, 2001 and that the FBI faced pressure to make cuts in counterterrorism to satisfy the Attorney General's other priorities].

The CIA's Associate Deputy Director for Operations (DDO) for Resources recalled some attempt to protect counterterrorism in response to the DCI's declaration of war.  However, this did not lead to any change in training, any dramatic increase in the size of CIA's Middle East stations,

or significantly greater numbers of personnel assigned to CTC.  A particular problem was that counterterrorism was a worldwide target, and the DO was closing stations in less strategic areas [——] even though al-Qa'ida was active there.  This hindered acquisition of information on terrorism in these areas.  In interviews, CIA officials explained that they were reluctant to cut entire areas of collection, particularly in the field, because senior U.S. Government policymakers had many requirements for intelligence across a wide variety of issue areas.

[Page 279]

By the late 1990s, Intelligence Community coverage of many issues was exceptionally slim, and staffing was skeletal.  The CIA's DO cut by almost one-third the number of personnel deployed overseas, according to the DDO.  The Associate DDO for Resources noted that the DO often was not able to meet its collection goals, in part because an increased focus on counterterrorism meant that other issues received less attention.  At best, the DO could sustain what it had, but could not invest in the future.  Communications and training suffered tremendously, DO officials reported.

[The Intelligence Community was unable to reduce requests for collection on other priorities.  As NSA Director Hayden testified, "Our efforts in 2000 to churn money internally were not accepted by the Community; its reliance on [signals intelligence] had made it reluctant to give it up."  Former CTC Chief Black noted that shifting resources was difficult because the policy community had other demands for intelligence.  He stated in an interview that "[w]e could see it coming in Afghanistan, but, for example, couldn't get more Agency slots [within the theater]."  In an interview, the CIA official responsible for the Near East noted that, even after September 11, no major issues were deleted, despite the imperatives of the war on terrorism].

As a result, Intelligence Community officials contend they had too many priorities for the resource levels that were available.  The NSA Director testified that, "[g]iven all the other intelligence priorities, it would have been difficult at that time within the [Intelligence Community] or the Department of Defense to accept the kind of resource decisions that would have been necessary to make our effort against the target more robust."

Requests for additional assistance by counterterrorism officials often fell on unsympathetic ears because of declining resources.  Mr. Black noted in an interview that the DDO told him that

the CTC had more than its share of people when compared with other divisions. According to the Associate DDO for Resources, every office in the DO asked for more people and the demand for Arabists was particularly high. In general, requests for additional personnel were small because managers knew that resources were limited.

[Page 280]

When additional resources did become available, intelligence officials sought to build up overall capabilities, not just those tied to terrorism. According to the Director of the CIA's Office of the Budget, proposals for putting more DO officers in the field, which was a priority for several years, were not specifically tied to counterterrorism. Any additional field officers would be tasked according to current requirements.

## F. Policymaker Criticism of Intelligence Community Budget Allocations

Several former OMB and NSC officials asserted in interviews that the FBI and CIA focused too much on protecting overall funding, and not enough on shifting priorities to increase spending on terrorism. Budget requests specifically tied to counterterrorism were generally approved, according to former OMB officials. However, most requests were for overall capabilities, which met with less support.

For example, former National Coordinator for Security, Infrastructure and Counterterrorism Richard Clarke criticized the Intelligence Community and the FBI for not putting aside other priorities to ensure that al-Qa'ida received sufficient coverage. Mr. Clarke explained in a briefing that only a small part of CIA's counterterrorism expenditures was devoted to al-Qa'ida, even though "[w]e in the NSC and we in the OMB asked CIA repeatedly to find programs of lesser priority, either in the CIA budget or the Intelligence Community budget, to increase the size of these activities, and they claimed there was no program anywhere in the intelligence budget where they could get any funding to reprogram." Former OMB officials corroborate Clarke's argument that the Intelligence Community was reluctant to reprogram money to pay for efforts against al-Qa'ida or otherwise re-align overall spending.

The FBI's use of counterterrorism resources received particular criticism. The Bureau assigned fewer than ten tactical analysts and only one strategic analyst to al-Qa'ida before

September 11.  Analysts instead focused on critical infrastructure, case support, and domestic terrorism.  FBI officials told the Joint Inquiry that they focused on investigating overseas terrorism, rather than on strategic analysis or on radical activity in the United States.

[Page 281]

## G.  Reliance on Supplemental Funding For Counterterrorism

The President submits to the Congress an annual budget for the Intelligence Community for the coming fiscal year.  The budget request includes funding for ongoing and new programs. Programs that are part of the President's request are considered programs of record (also called base programs) and have established and well understood oversight and accountability procedures. Whereas the President's budget request anticipates funding for current priorities, supplemental appropriations are a reaction to unforeseen events and are granted in addition to base funding.

The Intelligence Community relied heavily on supplemental appropriations to finance the effort against terrorism.  The Community received large supplementals to fight terrorism following several major al-Qa'ida attacks and as part of the effort during the Millennium celebrations.  In particular, most of the CIA's program against al-Qa'ida in later years was funded from supplemental appropriations.  This hindered efforts to sustain and plan counterterrorism programs.

Chart 1.7 illustrates the critical importance of supplemental funding in the effort against al-Qa'ida.

[Page 282]

*Chart 1.7  Supplemental Appropriations In The Effort Against al-Qa'ida*
*[Redacted]*



Source: CIA

In interviews, Intelligence Community officials criticized the reliance on supplementals for vital programs such as counterterrorism.  Former CTC Chief Black, for example, told the Joint Inquiry that reliance on supplementals made it hard to create a stable program.  The Associate DDO for Resources explained several of the challenges supplementals posed:

- Supplemental funding must be used in the fiscal year in which it is appropriated and is not meant to establish long-term programs, making it difficult to plan for the future;

- Supplementals were tactically focused and did not pay for additional personnel or infrastructure upgrades (the September 11 supplemental appropriation was an exception to this rule); and [page 283]

- Programs within the DO take years to develop and cannot be "surged" or cut from year to year.

Despite these problems, the Intelligence Community sought additional supplementals to sustain its counterterrorism effort, rather than alter program funds in the President's budget request.  DO officials reportedly did not change overall funding patterns because they did not want to lose expertise or capabilities in other areas; they were confident that supplemental funding would be appropriated to sustain their effort; and the overall funding was largely for "target neutral" infrastructure, such as communications, that would also hinder the effort against al-Qa'ida if cut.

The Director of CIA's Office of the Budget noted that, if a supplemental is expected, program managers can plan without changing their base.  In his judgment, from late 1998 through 2001, managers reasonably expected supplementals (though the amount was never fixed) and thus could do some planning.  If supplemental funding was not appropriated, base funding could have been adjusted to spend more on al-Qa'ida.

**H.  How Easily Can Money Be Moved?**

[The Intelligence Community has limited flexibility in redistributing resources in response to crises.  Reallocation can occur within budget categories.  For example, operational activities relating to both a foreign country and counterterrorism may fall into "agent operations" or "analysis" and tradeoffs between them are easier to make.  According to a senior Community Management Staff (CMS) budget official, there is considerable latitude in re-allocating small sums, though what counts as "small" varies across agencies.  To re-allocate larger amounts, approval must be obtained from the Congressional Intelligence Committees].

According to the CMS budget official, CMS tries to influence the budget and agency spending, but has limited authority.  CMS tries to use a "bully pulpit" and takes matters up with the DCI when intelligence components do not comply with CMS directives.  CMS also has some leverage in these matters because of its influence over future budget proposals.  [Page 284]

269

However, CMS exerts only limited control over the expenditure process.  Unlike agency comptrollers, CMS cannot withhold money from agencies that do not comply with its directives.  Agencies may also appeal to the DCI to overturn CMS guidance or inform Congressional staff about their dissatisfaction.  The interests of the Secretary of Defense also matter tremendously in the appropriations process, as the Secretary controls the vast majority of the Intelligence Community budget.  As a result, CMS is often able to influence only the margins of the process.

Within agencies, resource realignment is also restricted, according to the CIA's Budget Director.  Resources cannot be taken out of programs that OMB and Congress have "fenced," i.e., dedicated for only specified activities.  National Security Council-mandated [———————] program money is always fenced.   To move fenced money, budget office must negotiate with the Congress, CMS, OMB, and others.  In addition, personnel services funds cannot be reallocated to pay for non-personnel services costs.

In light of these limits, there has been a call for increasing the budget authority of Intelligence Community managers.  For instance, former National Security Advisor Berger testified: "I believe in strengthening the DCI's program to plan, program, and budget for intelligence collection, analysis, and dissemination will permit much more effective integration of our intelligence priorities and efforts, including better concentration on counterterrorism."  And former FBI Director Freeh criticized the budget process as taking away discretion from the FBI Director and making it difficult to transfer money to priorities such as terrorism.

## II.  Foreign Liaison

Al-Qa'ida is engaged in a worldwide struggle against the United States and its allies.  Those responsible for the September 11 plot, for example, became radicalized in Germany, held meetings in Malaysia, and received funds channeled through the United Arab Emirates.  The September 11 attack is only one example of the global scope of al-Qa'ida's activities.  The group has conducted or supported attacks not only in America, but also in the Balkans, the Caucasus, [page 285] France, Ethiopia, Indonesia, Kenya, Saudi Arabia, Somalia, Spain, Tanzania, Tunisia, Uzbekistan, Yemen, and dozens of other countries.

The Intelligence Community recognized early on that an effective U.S. response to al-Qa'ida must be global and that foreign intelligence and security services ("liaison services") would be important allies in fighting terrorism.  Improving ties to liaison services became increasingly important for the CIA, FBI, NSA, and other agencies, and their efforts helped make foreign countries more effective partners and more willing to assist U.S. counterterrorism efforts.

[Several problems remained, however, some of which are inherent to bilateral relationships.  CIA's liaison partners vary in competence and commitment.  Others are unwilling to share information and some include individuals believed to have cooperated with terrorist groups. At times, U.S. policies and procedures also hinder successful liaison].

## A.  Efforts to Improve Foreign Liaison

[In the mid-1990s, CIA counterterrorism officials recognized that unilateral CIA operations alone were not sufficient in penetrating and countering terrorist organizations.  For instance, difficulties in unilaterally penetrating [———————] extremist groups necessitated increased cooperation with liaison services, according to a former CTC Chief.  To this end, CIA, NSA, and other Intelligence Community agencies strengthened their liaison relationships with existing partners and forged new relationships to fight al-Qa'ida and other terrorist groups.

Throughout the 1990s, the FBI also greatly expanded its efforts to work with foreign governments against terrorism.  Former FBI Director Louis Freeh testified that he met with dozens of foreign leaders to build a global counterterrorism network and greatly expanded the Bureau's presence overseas through its Legal Attache ("Legat") program. As of September 11, 2001, the FBI had agents assigned to 44 U.S. embassies.  As Mr. Freeh explained, the FBI began to position itself around the globe "in places that matter in the fight against terrorism," particularly in the Middle East, as Legats were assigned to Cairo, Islamabad, Tel Aviv, Ankara, [page 286] Riyadh, and other sites.  As a result, he added, the FBI was often able to expedite access to witnesses and create additional channels for information about terrorism.

[Liaison relationships within a country often vary by agency.  For instance, interviews the Joint Inquiry conducted in [————————————————————————————

————————————————————————————————————————————————

————————————————————————————————————————————————

————].  Arrangements also vary by location.  For example, FBI Legats often have established relationships with liaison services in Europe, but they often coordinate efforts through CIA in certain countries of counterterrorism interest].

[The struggle against al-Qa'ida led U.S. intelligence agencies to work closely with liaison services that were not major partners during the Cold War.  The Joint Inquiry received testimony and responses from U.S. Government officials that several foreign liaison services deserved praise for their assistance to the United States.  [————————————————————————

————————————————————————————————————————————————

————————————————————————————————————————————————

————————————————————————————————————].

[In the developing world, many liaison services are limited in resources, training and [————————————————], according to CIA officers, and the U.S. may be able to augment their capabilities greatly.  According to Joint Inquiry interviews in [——], for example, the U.S. has helped pay for and train the [————————], to the point that the [——] require personnel to take several CIA- taught courses in order to rise above the rank of Major.  The CIA support has improved [————————] capabilities and has led to several joint efforts against terrorism, according to the Chief of CIA's Near East Division].

[The CIA has also developed a program that CIA personnel told the Joint Inquiry makes liaison services [page 287] better able and more willing to pursue terrorist groups].

## B.  Benefits Of Foreign Liaison

[The United States relies heavily on liaison services in the fight against terrorism because they offer many critical advantages.  A former CTC Chief described liaison services as a "force multiplier."  Their [————————————————], language skills and cultural backgrounds enable

them to work more effectively against local terrorism than can most American intelligence officers [————].  Some liaison services are highly skilled and have operated against these targets for decades].

Liaison services can also provide considerable assistance in human intelligence operations that goes beyond mere information sharing.  [————————————————————————————————————————————————————————————————————————————————————————————————————————————————————————————————————————————————————————————————].

In addition, liaison services have legal jurisdiction in their own countries, which they used before September 11 to support a number of U.S. Government operations against terrorist suspects and otherwise disrupt terrorist activities.  Liaison services, particularly those outside the West, can operate more freely in accordance with laws and procedures often less restrictive than those of liberal democracies. [————————————————————————————————————————————————————————————————————————————————————————————————————————————————————————————————————].

[Page 288]

Liaison operations are often necessary because of the paucity of unilateral Intelligence Community sources, according to CIA's National Intelligence Officer for the Near East and South Asia.  This is especially so in remote or hostile parts of the world where U.S. access is limited. [————————————————————————————————————————————————————————————————————————————————————————].

Liaison services are also important for [————————————————————————————————————————————————————————————————————————].

273

## C.  Disadvantages of Relying on Foreign Liaison Services

[Despite the many advantages of working with foreign liaison services, this approach has several limitations that were manifest before September 11.  These limitations can hinder cooperation and possibly be exploited by terrorists].

[On some occasions, individuals in some liaison services are believed to have cooperated with terrorist groups, [——————————————————————————————————————————— ——————————————————————————————————————————————————————— ——————————————————————————————————————————————————————— ———————————————————————————————————————————————]. In addition, the former Chief of CTC's Bin Ladin unit testified that [——————————————————— ——————————————————————————————————————————————————————— ———————————————————————————————————————].

Governments can also be highly sensitive about information that embarrasses them or implicates their citizens in terrorism.  The former Chief of CTC's Bin Ladin unit testified that [— ——————————————————————————————————————————————————————— ———————————————————————————————————————————————————————

[page 289] ———————————————————————————————————————— ——————————————————————————————————————————————————————— ———————————————————————————————————————].

Problems are common even with governments that have long been close partners of the United States.  Many intelligence services are reluctant to share information.  Even the most cooperative services withhold information to protect sources and methods and for other reasons. Several European governments were described as indifferent to the threat al-Qa'ida posed before September 11, while others faced legal restrictions that impeded their ability to disrupt terrorist cells.

Former National Security Advisor Sandy Berger told the Joint Inquiry that European governments (except Britain) did not share the U.S. assessment of the al-Qa'ida threat.  Joint

274

Inquiry interviews in Germany showed that the Germans did not see Islamist groups as a significant threat to their interests before September 11.  Deputy National Security Advisor Steve Hadley also noted that European support varied according to the perceived threat.

[The former Chief of CTC's Bin Ladin unit testified that some European services had minimal interest in the Bin Ladin target and offered little assistance.  [——————————

————————————————————————————————————

——————————]."  Bin Ladin also was not a priority target for the [————————————

————] until after September 11, according to Joint Inquiry interviews abroad].

Several services are apparently excessively bureaucratic.  Interviews in Germany revealed that the intelligence apparatus was deliberately fragmented to make abuses of power more difficult.  This fragmentation also made coordination and information sharing more difficult. Furthermore, before September 11, it was not illegal to be a member of foreign terrorist organizations in Germany or to raise funds for them.  The Assistant Director for the FBI's [page 290] Counterterrorism Division noted that "the Germans were so restrictive prior to 9/11 with their Constitution about what they can and cannot do, that they could do very little."

[Finally, [————————] liaison partners have their own equities to consider, and this must be taken into account when working with them and in evaluating information received from them. Some services will try to take advantage of joint operations to seek more information [————————

————————————————————————————————————

——————————].

## D.  Liaison Service Problems with the United States

An array of factors can often hinder the degree of liaison services cooperation.  Many of these are outside the control of the Intelligence Community.

275

TOP SECRET

Leaks of information revealing a liaison service's role in assisting the United States are a source of frustration cited by almost every expert the Joint Inquiry interviewed.  At times, leaks are the result of procedures regarding warnings.  For example, the U.S. has issued warnings based on information from liaison services – warnings required by U.S. policies – even though this angered the liaison service by potentially revealing its sources.  More commonly, leaks are unauthorized, serve no policy purpose and simply anger liaison services whose sources and methods may be compromised.

[Leaks also hinder cooperation with governments that prefer to minimize public ties to the U.S., and particularly to U.S. intelligence.  For example, one foreign government is sensitive to excessive public connections with the United States because they damage its reputation in the area and provide fuel for criticism to [———] rivals, according to a U.S. Government official].

Interviews with Intelligence Community officials suggest a range of additional problems.  The U.S. can easily overwhelm a small liaison service with many demands.  For instance, CIA Station personnel in [———] maintain that one of their principal responsibilities is to decide on the priorities for requests for information so that the [————] do not receive too many.  U.S. laws, [page 291] particularly those that attach the death penalty to crimes, make it difficult for several governments to extradite terrorist suspects to, or provide information in support of prosecutions by, the U.S.  This has hindered cooperation in the investigations of Zacarias Moussaoui and other suspects.  Finally, although intelligence cooperation is often isolated from shifts in bilateral diplomacy, poor bilateral relations can affect intelligence liaison relations in negative ways.

**E.  Coordination of Foreign Liaison**

[Most Intelligence Community officials operating overseas coordinate liaison relations well with DCI representatives who are responsible for intelligence relations with foreign governments.   U.S. Ambassadors are always briefed, according to the Chief of the CIA's [———————].  He emphasized that the primary instruction given to the DCI representatives by CIA is: "Recruit the U.S. Ambassador first," that is, gain the good will of the Ambassador.  Interviews with several Ambassadors indicate that, in general, the Intelligence Community coordinates well with U.S. embassies].

TOP SECRET

Nonetheless, there are challenges to coordinating relations with liaison services.  For instance, liaison on counterterrorism has not always been integrated into overall U.S. regional goals.  Senior policy makers told the Joint Inquiry that, before September 11, they had not always succeeded in incorporating the struggle against al-Qa'ida into U.S. policy toward key states [——————————————————————].  As a result, other issues often diverted attention from terrorism.

There are also many channels through different agencies for U.S. Government liaison with foreign governments.  These range from CIA and FBI to the Agriculture and Commerce Departments.  As former National Security Advisor Sandy Berger noted, U.S. ambassadors often lack control over these relationships and, consequently, the U.S. Government does not always properly consider the priorities of all the requests it makes of foreign governments.

Mr. Clarke also noted that there exists a "gentleman's agreement" with friendly liaison services: "you don't spy in the United States and we don't spy in your country."  In his view, [page 292] however, this arrangement can put the U.S. at "some disadvantage when [foreign liaison services] are not terribly aggressive on our behalf."

[This disadvantage was compounded by the decision at the end of the Cold War to cut CIA presence in some Western countries dramatically.  [————————————————————— ——————————————————————————————————————— ——————————————————————————————————————— ———————————].

[The CIA is responsible for coordinating the overall intelligence liaison relationship, but FBI Legats and Defense Department attachés do not need CIA permission to interact with their local partners when, for example, a U.S. citizen overseas is involved in terrorism.  Weaknesses in inter-agency coordination overseas can also reflect lack of coordination within the United States.  For example, during Joint Inquiry interviews abroad, it was determined that a joint planning meeting to target al-Qa'ida leader [———————————————], which was to include CIA officers and their foreign liaison service counterparts, did not include the local FBI Legat.  In fact, he was not aware of the meeting, although the Bureau plays a major role in tracking [————————].  In

277

general, however, CIA and FBI have come to learn more about each other's procedures and requirements and, as a result, have improved cooperation overseas].

## F.  Additional Challenges for the FBI Overseas

The FBI's Legat program, which grew rapidly in the 1990s and remains relatively new, faces several additional problems.  FBI agents reported to the Joint Inquiry that some offices were responsible for too large an area or for too many countries.  As a result, they have little opportunity for the face-to-face meetings with foreign counterparts that are integral to establishing liaison relationships.  In addition, Legats have limited funding for interaction with foreign counterparts.  One Legat also noted that most FBI agents in the United States have little understanding of how the program works and, therefore, do not use it effectively.

[Page 293]

In addition, the Joint Inquiry was told in interviews that FBI Headquarters has often been slow in responding to Legat requests for support or information.  The FBI Headquarters unit that supports the Legat program appears to be understaffed, since it has the same number of staff to support 45 Legat offices as it did when there were only 20 such offices.

## G.  Progress After September 11

[The Joint Inquiry did not delve deeply into how liaison relationships changed after the September 11 attacks.  However, almost all interviews and testimony that dealt with this subject indicated that cooperation had improved dramatically, particularly in regard to al-Qa'ida.  The immediacy and magnitude of the threat impressed governments worldwide.  In addition, increased U.S. attention to terrorism increased pressure on other governments to cooperate, and the amount of shared intelligence reporting has greatly increased, as have other types of cooperation, even with some previously recalcitrant or hostile countries [————————————].

### III.  Covert Action and Military Operations Against Bin Ladin

[The Joint Inquiry examined whether the Intelligence Community might have missed opportunities to disrupt the September 11 attacks through covert action or military operations directed against Usama Bin Ladin.  To answer that question, the Joint Inquiry reviewed covert action documents and interviewed twenty-six persons with first-hand knowledge of U.S. efforts to capture Bin Ladin before September 11.  The review included documents authorizing covert action [————————————————————————————————————————————

————————————————], and information related to 13 military options formulated by the Chairman of the Joint Chiefs of Staff in late 2000.  Interviews included CIA personnel involved in covert action to capture Bin Ladin and his principal lieutenants; senior military officers responsible for planning contingency operations; [————————————————————————————————————————

————————————————]; senior CIA and NSC officials and senior military officers involved in [page 294] authorizing and implementing covert action and the use of military force; and State Department counterterrorism officials.

### A.  Background

The National Security Act of 1947, as amended, defines "covert action" as "activities of the United States Government to influence political, economic, or military conditions abroad, where it is intended that the role of the United States Government will not be apparent or acknowledged publicly."  Covert action does not include activities whose primary purpose is to acquire intelligence; traditional diplomatic or military activities; traditional law enforcement activities; or routine support to these activities or the activities of other government agencies abroad.

[In spring 1986, President Reagan signed a directive authorizing CIA to conduct certain counterterrorism operations abroad].  [————————————————————————————

————————————————————————————————————————————————————

————————————————————————————————————————————————————

————————————————————————————————————————————————————

————————————————————————————————————————————————————

—————————————————————————————
—————————————————————————————
—————————————————————————————
—————————————————————————————
—————————————————————————————
—————————————————————————————
—————————————————————————————
—————————————————————————————
—————————————————————————————
————————————————————————————].

[————————————————————————————
————————————————, [page 295] ——————————
——————————————————]. All actions authorized [———————] must be
important to U.S. national security as established in the relevant Presidential Finding.  [————
—————————————————————————————
—————————————————————————————
—————————————————————————————
—————————————————————————————
————————————————]:

        [————————————————————————
        —————————————————————————
        —————————————————————————
        ——————————————————].

    [————————————————————————————
—————————————————————————————
—————————————————————————————
—————————————————————————————
—————————————————————————————
—————————————————————————————
—————————————————————————————
—————————————————————————————
——————————————].

The U.S. military does not require [————————————————————
——————————].  Thus, a traditional military operation, such as a strike by cruise missile or special operations forces, to kill or capture Bin Ladin would require only an order from the President.

## B.  Authorities to Conduct Covert Action Against Bin Ladin

[Page 296]

[Former National Security Advisor Sandy Berger testified that "from August 1998 on, . . . [President Clinton] authorized a series of overt and covert actions to try to get Bin Ladin and his principal lieutenants."  [————————————————————
————————————————————————————————————
————————————————————————————————————
——————————————————]:

    [————————————————————————————
————————————————————————————————————
————————————————————————————————————
————————————————————————————————————
————————————————————————————————————
————————————————————————————————————
————————————————————————————————————
——————————————————————].

  [————————————————————————————————
————————————————————————————————————
——————————————————————————]:

•  [————————————————————————————————
——————————————————————————————];

•  [————————————————————————————————
————————————————————————————————————
——————————————————];

- [————————————————————————————————————————

————————————————————————————————————

——]; and

[Page 297]

- [————————————————————————————————————————

————————————————————————————————————————

————————————————————————————————————————

————————————————].

According to CIA personnel and NSC officials interviewed by the Joint Inquiry, Bin Ladin and his associates were expected to resist capture attempts.  [————————————————————

————————————————————————————————————————————————].
The President also ordered the U.S. Navy to fire cruise missiles at targets in Sudan and Afghanistan. Some of the missiles were aimed at a location where Bin Ladin was thought to be, and the Joint Inquiry was told that one of the objectives of the strike was to kill Bin Ladin.

[————————————————————————————————————————

————————————————————————————————————————————

————————————————————————————————————————————

————————————————————————————————————————————

————————————————————————————————————————————

————————————————————————————————————————————

————————————————————————————————————————————

————————————————————————————————————————————

————————————————————————————————————————————

————————].  The NSC was considering [————————] operations: to capture Bin Ladin and a U.S. Navy cruise missile strike to kill him.  According to a former Chief of CTC's Bin Ladin unit, the NSC decided against a cruise missile strike because of concerns about collateral damage to a nearby mosque.

NSC and CIA personnel alike have said that [————————————————————

————————————————————].  They differ in their interpretation [————————],

however.  [————————————————————————————

————————————————————————————————

[page 298] —————————————————————————

————————————————————————————————].


[Former National Security Advisor Sandy Berger testified to the Joint Inquiry on September 19, 2002 that, from the time of the East Africa U.S. Embassy bombings in 1998, the U.S. Government was:

> . . . embarked [on] an very intense effort to get Bin Ladin, to get his lieutenants, through both overt and covert means. . . . We were involved – at that point, our intense focus was to get Bin Ladin, to get his key lieutenants.  The President conferred a number of authorities on the Intelligence Community for that purpose.
>
> <u>Senator Shelby</u>:  By "get him," that meant kill him if you had to, capture him or kill him?
>
> <u>Mr. Berger</u>:  I don't know what I can say in this hearing, but capture and kill. . . . There was no question that the cruise missiles were not trying to capture him.  They were not law enforcement techniques. . . ."]

[————————————————].  Mr. Berger noted that the Administration was openly and simultaneously trying to kill Bin Ladin with cruise missiles.  Mr. Clarke also told the Joint Inquiry in June 2002 that "we wanted to make clear to the people in the field that we preferred arrest, but we recognized that that probably wasn't going to be possible."  [————————————————

————————————————————————————————].


[Later in the September 19, 2002 hearing, Mr. Berger and former National Security Advisor Brent Scowcroft were asked whether the Executive Order 12333 prohibition on assassinations should be reconsidered.  They responded:

> <u>Mr. Scowcroft</u>:  . . . it gets us into all kinds of complications and drawing legalistic lines.  One of the things that we found [in connection with a 1989 coup attempt in Panama] is that CIA personnel who were – I wouldn't say involved, but who knew about it and were meeting with the coup plotters and so on, were concerned about being accessories; because if you mount a coup, . . . it is very likely there are going to be some people killed.
>
> <u>Mr. Berger</u>:  . . . we received rulings from the Department of Justice that the Executive Order did not prohibit our ability . . . to try to kill Bin Ladin, because it

TOP SECRET

did not apply to situations in which you are acting in self-defense or you are acting against command and control targets against an enemy, which he certainly was. . . . [A]s a practical matter, it didn't stop us from doing anything].

. . . .

<u>Senator Bayh</u>:  . . . we have heard from some of [those] who deal in these kinds of areas.  They are pretty reluctant, absent an express authorization, to wander too far down that path for fear of having the wrong legal interpretation and someday being faced with a lawyer who has a different analysis of some kind. . . .

<u>Mr. Berger</u>:  They certainly would have to have clarity from the President of the United States or something like that.]

[——————————————————————————————

————————————————————————————————

————————————————————————————————

————————————————————————————————

————————————————————————————————

————————————————————]:

- "[————————————————————————————

————————————————————————————————

—————————————————————————————]."

- "[————————————————————————————

————————————————————————————————

————————————————————————————————

————————————————————————————————

————————————————————————————————

————————————————————————————————].

[page 299] [————————————————————————

————————————————————————————————

————————————————————————————————

————————————————————————————————

——————————————].

TOP SECRET

TOP SECRET

- "[—————————————————————————————————
————————————————————————————————————
————————————————————————————————————
————————————————————————————————————
————————————————————————————————————
————————————————————————————————————
————————————————————————————————————
————————————————————————].""

- "[—————————————————————————————————
————————————————————————————————————
————————————————————————————————————
————————————————————————————————————
———]."

- "[—————————————————————————————————
————————————————————————].""

As former National Security Advisor Berger noted in his interview, "We do not have a rogue CIA."

While NSC officials maintained that [————————————————————————————
————————————————————————————————————————————].  CIA personnel interviewed by the Joint Inquiry explained that [——————————————————
————————————————————————————————————————————

[page 300] ——————————————————————————————————————————
————————————————————————————————————————————
————————————————————————————————————————————
——————————————————————].

[——————————————————————————————————————————
————————————————————————————————————————————

285

_____

_____]:

- [_____

  _____]:

- [_____

  _____

  _____

  _____]; and

- [_____

  _____

  _____

  _____]."

[_____

_____

_____

_____

_____

_____

_____

[page 301] _____

_____

_____].

[_____

_____

_____

_____

_____

286

TOP SECRET

—————————————————————————————————————————
—————————————————————————————————————————
—————————————————————————————————————————
—————————————————————————————————————————
———————————————————————————————————————].

[——————————————————————————————————————
—————————————————————————————————————————
—————————————————————————————————————————
—————————————————————————————————————————
—————————————————————————————————————————
—————————————————————————————————————————
—————————————————————————————————————————
—————————————————————————————————————————
—————————————————————————————————————————
—————————————————————————————————————————
—————————————————————————————————————————
———————————————].

[——————————————————————————————————————
—————————————————————————————————————————
—————————————————————————————————————————
—————————————————————————————————————————

[Page 302] ——————————————————————————————
————————————————]:

[——————————————————————————————————————
—————————————————————————————————————————
—————————————————————————————————————————
—————————————————————————————————————————
———————————————].
. . . .
[——————————————————————————————————————
—————————————————————————————————————————
———————————————————————————————————————].

287

[———————————————————————————————————
————————————————————————————————————————
————————————————————————————————————————
————————————————————————————].

[———————————————————————————————————
————————————————————————————————————————
————————————————————————————————————————
————————————————————————————————————————
————————————————————————————————————————
————————————————————————————————————————
————————————————————————————————————————
—————————————].

[———————————————————————————————————
————————————————————————————————————————
————————————————————————————————————————
————————————————————————————].

[Page 303]

[———————————————————————————————————
————————————————————————————————————————
————————————————————————————————————————
————————————————————————————————————————
————————————————————————————————————————
————————————————————————].

According to individuals interviewed by the Joint Inquiry, [———————————
————————————————————————————————————————
————————————————————————————————————————
————————————————————]. This idea reflects a tension between two views of counterterrorist efforts. One view is that the problem is primarily a law enforcement matter, with prosecutions and

convictions as the ultimate goal, while the other is that we are at war and terrorists are combatants in a foreign army who may be detained until the end of the conflict.

[————————————————————————————————————————
————————————————————————————].  The White House refused to allow the Joint Inquiry to review the relevant documents, but [————————————————————————————————
————————————————————————————————————]:

[————————————————————————————————————————
————————————————————————————————————————
————————————————————————————————————————
————————————————————————————————————————
————————————————————————————————————————
————————————————————————————————————————
————————————————————————————————————————
————————————————————————————————————————
————————————————————————————————————————
————————————————————————————————————————
————————————————————————————————————————
————————————————————————————————————————].

[————————————————————————————————————————
————————————————————————————————————————
[Page 304] ——————————————————————————————
————————————————————————————————————————
————————————————————————————————————————
————————————————————————————————————————
————————————————————————————————————————
——————————————————————————].

[Deputy Secretary of State Richard Armitage testified to the Joint Inquiry on September 19, 2002 that:

> The National Security Council . . . called for new proposals [in March 2001] on a strategy that would be more aggressive against al-Qa'ida.  The first deputies meeting, which is the first decision making body in the administration, met on the 30th of April and set off on a trail of initiatives to include financing, getting at financing, to get at increased authorities for the Central Intelligence Agency, sharp end things that the military was asked to do. . . . So, from March through about August, we were preparing a national security Presidential directive, and it was

distributed on August 13 to the principals for their final comments.  And then, of course, we had the events of September 11. . .].

[————————————————————————————————————————————————————————
————————————]:

- [————————————————————————————————————————————————————
————————————————————————————————————————————————————————
————————————————————————————————————————————————————————
————————————].

- [————————————————————————————————————————————————————
————————————————————————————————————————————————————————
————————————————————————————————————————————————————————
————————————————————————————————————————————————————————
————————————————————————————————————————————————————————
————————————————————————————————————————————————————————
————————————————————————————————————————————————————————
————————————————————————————————————————————].

The Joint Inquiry was told [————————————————————————————————————————
————————————————————————————————————].  The Joint Inquiry was not able to determine whether senior U.S. Government policymakers or the President reviewed them before that date.

Within the Congress, distribution of [————————————————————] was limited to the Speaker of the House, the Senate Majority Leader, the Minority Leaders of the [page 305] House and Senate, and the Chairs and Ranking Minority members of the House and Senate Intelligence Committees.  Congress did nor receive [————————————————————————].

Senior U.S. military officers involved in planning military operations against Bin Ladin have told Joint Inquiry staff that there were no documents [————————————] authorizing the U.S. military to carry out clandestine operations against Bin Ladin.  Nor were there efforts to draft

such documents, because they were not deemed necessary.  However, Presidential approval would have been required for military operations.

## C.  Additional Operational Challenges and Constraints

In interviews, CTC personnel pointed out numerous operational challenges and constraints they faced in attempting to capture [————] Bin Ladin and his lieutenants:

- Bin Ladin resided in a country suspicious of foreigners and embroiled in a civil war. Thus, determining his whereabouts was exceptionally difficult and dangerous, especially for Western intelligence officers.

- Bin Ladin had a number of enemies, any one of whom might attempt to kill him.  As a result, when he traveled inside Afghanistan, he was always in the company of a large security detail.  Some of his bodyguards were "hardened killers" who had fought with Bin Ladin against the Soviet invasion of Afghanistan.

- [————————————————————————————————————].  Moreover, Bin Ladin  and his associates were careful not to reveal operational information [————————————————————————].

[Page 306]

- [————————————————————————————————]; and

- The U.S. had limited access to Afghanistan and the countries near it, [————————————————————————————————————————].

In interviews with the Joint Inquiry, a former CTC Chief and a former Chief of the [—————————] Extremist Group also described constraints on CIA actions:

- The CIA could not violate the Constitution, U.S. law, or human rights, including Bin Ladin's, during these operations;

- The operations could not violate the prohibition on assassinations in Executive Order 12333;

- [————————————————————————————————————————————————————————————];

- [————————————————————————————————————————————————————————————];

- The CIA was not authorized to upset the political balance in Afghanistan; and

- The U.S. military did not support putting U.S. "boots on the ground" in Afghanistan.

[Page 306]

[In the September 12, 2002  hearing, a CIA official also spoke of the constraints he faced in staging covert action against Bin Ladin:

[————————————————————————————————————————————
————————————————————————————————————————————
————————————————————————————————————————————
————————————————————————————————————————————
————————————————————————————————————————————
————————————————————————————————————————————
————————————————————————————————————————————
————].

In a Joint Inquiry interview, a former CTC Chief also offered his opinion that firing cruise missiles based on a single strand of human intelligence was not advisable since the risk of missing Bin Ladin or inflicting excessive collateral damage outweighed the chances of success.

In a statement to the Joint Inquiry, a former CTC Chief cited the "international political context of this period" as presenting "an operational environment with major impediments that CIA constantly fought to overcome":

- "The U.S. Government had no official presence in Afghanistan, and relations with the Taliban were seriously strained.  Both of these factors made it difficult to get access to Bin Ladin and al-Qa'ida personnel."

- "U.S. policy stopped short of replacing the Taliban regime or providing direct support to others for the specific purpose of overthrowing the Taliban.  These realities limited our ability to exert pressure on Bin Ladin."

- "During this period, the Taliban gradually gained control over most of Afghanistan, increasingly limiting the opposition's capabilities and room to maneuver."

[Page 308]

- "U.S. relations with Pakistan, the principal access point to Afghanistan, were strained due to the nuclear tests of 1998 and the military coup in Islamabad in 1999."

He also noted other factors that complicated CIA operations against Bin Ladin:

[————————————————————————————————————————————————————————————————————————————————————————————————————————————————————————————————————————————————————————].

The former CTC Chief explained that these challenges and operational constraints, [——————————————————————————————————————], left virtually no room to craft an executable operation.  In an interview with the Joint Inquiry, CIA's Deputy Director for Operations also noted that CIA [——————————————————————————————] capabilities had "atrophied" in the years preceding the September 11 attacks.

293

General Hugh Shelton, former Chairman of the Joint Chiefs of Staff, and the Joint Staff's current Director of Operations pointed to two additional constraints on military operations against Bin Ladin. The first was the absence of "actionable" intelligence on Bin Ladin's whereabouts: the Intelligence Community never provided a location and time at which a missile strike could be launched.  The second was the absence of a declaration of war or some similar declaration indicating that the Taliban was a formal enemy.  In General Shelton's view, the absence of such a declaration precluded the United States from sending U.S. soldiers into Afghanistan to capture or kill Bin Ladin.  He believes that solving the Afghanistan problem before September 11 required the full range of diplomatic, economic, and military tools available to the U.S. Government.

[Page 309]

In contrast, the Chief of CTC's Bin Ladin unit through June 1999, told the Joint Inquiry:

[———————————————————————————————————
————————————————————————————————————————
————————————————————————————————————————
————————————————————————————————————————
————————————————————————————————————————
———————————————————————————————————————].

A former CTC Chief had a somewhat different view of intelligence support to the military during his tenure [———————————————————]:

[The military has] exacting criteria that intelligence needs, that needs to be met before they can launch an operation.  [—————————————————————
————————————————————————————————————————
———————————————————————————————————————].

Another Chief of CTC's Bin Ladin unit had yet another view on actionable intelligence:

I think our swift victory . . . after September 11th – underscores the fact that we had an enormous body of actionable intelligence on Bin Ladin's terrorist infrastructure. [———————————————————————————————
————————————————————————————————————————
————————————————————————————————————————
————————————————————————————————————————
———————————————————].

**D.  CIA Covert Action Against Bin Ladin [                          ]**

[The Joint Inquiry also became aware of the existence of [———————————————————
————————————————].  The White House declined to provide access, but the Joint Inquiry was able to develop some information about their content.

[Page 310]

Notwithstanding the extensive efforts [————————] to guide CIA covert action against Bin Ladin, actual efforts to implement covert action and military operations against him in Afghanistan before September 11 were very limited.  A central element in these efforts was the CTC unit established in 1996 to focus exclusively on Bin Ladin and his terrorist network. Initially, the unit was created to examine terrorist financing and to determine whether Bin Ladin posed a significant threat.  [————————————————————————————
————————————————————————————————————————————
————————————————————————————————————————————
————————————].

[————————————————————————————————————————
————————————————————————————————————————————
————————————————————————————————————————————].  In February 1998, Bin Ladin issued his public *fatwa* authorizing attacks on American civilians and military personnel anywhere in the world.  His statement and subsequent indictment in the United States added urgency to the effort to formulate a covert action plan against him.  [————————————————
————————————————————————————————————————].

[————————————————————————————————————————————
————————————————————————————————————————————
————————————————————————————————————————————
————————————————————————————————————————————
————————————————————————————————————————————
————————————————————————————————————————————
————————————————————————————————————————————
————————————————————————————————————————————
————————————————————————————].

[————————————————————————————————————

———————————————————————————————————————

———————————————————————————————————————

——————————————————————————————————— [page

311] ————————————————————————————————————

———————————————————————————————————————

———————————————————————————————————————

———————————————————————————————————————

———————————————————————————————————————

———————————————————————————————————————

———————————————————————————————————————

———————————————————————————————————————

————————————————————].

[————————————————————————————————————

———————————————————————————————————————

———————————————————————————————————————

———————————————————————————————————————

———————————————————————————————————————

———————————————————————————————————————

———————————————————————————————————————

———————————————————————————————————————

———————————————————————————————————————

——————————————————————————————].

[————————————————————————————————————

———————————————————————————————————————

———————————————————————————————————————

——————————————————————————].

[————————————————————————————————————

———————————————————————————————————————

———————————————————————————————————————

[Page 312]

—————————————————————]  [The President ordered the U.S. Navy on August 20, 1998 to launch cruise missiles against targets in Afghanistan and Sudan.  This is the only instance the Joint Inquiry has been able to identify in which the CIA or U.S. military carried out an operation directly against Bin Ladin before September 11].

According to the President's public statements at the time, the cruise missile strikes were launched in self-defense against groups that had played key roles in the embassy bombings, had executed earlier attacks against Americans, were planning to launch additional attacks, and were attempting to obtain chemical weapons.  All personnel interviewed on this matter by the Joint Inquiry concur that one objective of the strikes in Afghanistan was to kill Bin Ladin.

• [———————————————————————————————

—————————————]. [Page 313]

- [————————————————————————————————
————————————————————————————————
————————————————].

- [————————————————————————————————
————————————————————————————————
————————————————————————————————].

[————————————————————————————————
————————————————————————————————
————————————————————————————————
————————————————————————————————
————————————————].

    In the summer and fall of 1999, following the arrival of a new Chief of CTC and a new Chief of the Bin Ladin unit, CTC reviewed its covert action program against Bin Ladin and developed "The Plan."  This review was propelled by the DCI's December 1998 memorandum declaring "war" against Bin Ladin.  The Plan that resulted in September 1999 contained five main elements, with an estimate of each element's prospects of success:

- [————————————————————————————————
————————————————————————————————
————————————————————————————————
————————————].

- [————————————————————————————————
————————————————————————————————
————————————————————————————————
————————————————].

[Page 314]

298

- [————————————————————————————
————————————————————————————
————————————————————————————
————————————————————————————
————————————————————————————
————————————————————————————
————————————————————————————
————————————————————————————
————————————————————————————
————————————————————————————
————].

- [————————————————————————————
————————————————————————————
————————————————————————————
————————————————————————————
————————————————————————————
————————————————————————————
————————————————].

A CIA September 1999 briefing presentation outlining these elements concluded:

[The Bin Ladin unit] cannot implement "The Plan" without additional resources. . . . Without additional resources, we will continue to be defense [sic]. . .not offensive. . . .  [The Chief of the CTC is] working on resource issue.

[————————————————————————————
————————————————]." In CTC's view, although there was "lots of desire at the working level," there was "reluctance at the political level," and it was "unlikely that JSOC will ever deploy under current circumstances."

A [————————————] CIA document mentions another option to capture Bin Ladin [————
————————————————————————————[Page 315][————————————————————————————
————————————————————————————].

TOP SECRET

In testimony before the Joint Inquiry, the DCI acknowledged impediments to "The Plan":

> U.S. policy stopped short of replacing the Taliban regime, limiting the ability of the U.S. Government to exert pressure on Bin Ladin. U.S. relations with Pakistan, the principal access point to Afghanistan were strained by the Pakistani nuclear tests in 1998 and the military coup in 1999. The U.S. Government had no official presence in Afghanistan, and relations with the Taliban were seriously strained. Both factors made it more difficult to gain access to Bin Ladin and al-Qa'ida personnel.

Over time, CTC officers engaged in these covert action efforts concluded that "getting Bin Ladin" required dealing with the Taliban regime first. They believed that the different means of capturing Bin Ladin were unlikely to succeed as long as the Taliban continued to provide Bin Ladin a safehaven. In addition, CIA officers recognized that the entire al-Qa'ida apparatus in Afghanistan, not just Bin Ladin, was a problem. Thus, placing pressure on the Taliban to expel Bin Ladin and end its support for terrorism was necessary.

[————————————————————————————————————————
—————————————————————————————————————————
—————————————————————————————————————————
————————————————————]. [The Joint Inquiry was denied access to that document].

While it appears that CIA was not able to mount a single operation against Bin Ladin directly before September 11, CIA [————————————————————————————
————————————————————————————————] were key factors in U.S. military execution of Operation Enduring Freedom in Afghanistan beginning in October 2001. The DCI alluded to this in his testimony before the Joint Inquiry on June 18-19, 2002.

[Page 316]

**E. [Use of [————————————————————————] against Bin Ladin**

[In June 2002, then-Presidential Advisor for Cybersecurity Richard Clarke told a Congressional forum examining technology that can be used to combat terrorism:

> Because of that development, which was telescoped and done very quickly in six months instead of three years, we were able to launch [——————————] into Afghanistan last September].

300

TOP SECRET

[Former National Security Advisor Berger testified that the President demanded more information on Bin Ladin's location in 2000:

> We were continually looking at what we were doing, looking at new techniques, looking at new steps we could take.  In the fall – in February of 2000, for example, I sent a memo to President Clinton outlining what we were doing.  And he wrote back, this is not satisfactory.  It was particularly related to how you find this guy. We have got to do more.  And that prompted us to work with the Intelligence Community and the military on a new technique for detecting Bin Ladin. . . . Actually it was very promising as a way of determining where he would be if we had one strand of human intelligence].

[———————————————————————————————————————

——————————————————————————————————————————

——————————————————————————————————————————

——————————————————————————————————————————

——————————————————————————————————————————

——————————————————————————————————————————

——————————————————————————————————————————

——————————————————————————————————————————

———————————————————————————].

[———————————————————————————————————————

——————————————————————————————————————————

——————————————————————————————————————————

——————————————————————————————————————————

——————————]:

    [———————————————————————————————

    ———————————————————].

[Page 317]

[———————————————————————————————————————

——————————————————————————————————————————

————].

[———————————————————————————————————————

——————————————————————————————————————————

TOP SECRET

——————————————————————————————————
——————————————————————————————————
————————————————————].

   [—————————————————————————————
——————————————————————————————————
——————————————————————————————————
————————————————————————].

   [—————————————————————————————
——————————————————————————————————
————————————————————————————————].

   [—————————————————————————————
——————————————————————————————————
——————————————————————————————————
——————————————————————————————————
——————————————————————————————————
——————————————————————————————————
——————————————————————————————————
——————————————————————————————————
——————————————————————————————————
————————————————————].

[Page 318]

   [—————————————————————————————
——————————————————————————————————
——————————————————————————————————
——————————————————————————————————
——————————————————————————————————
——————————————————————————————————
——————————————————————————————————
——————————————————————————————————

_____

_____]:

    [_____

_____

_____].

    [Beginning in 2001, the U.S. Government embarked on an effort to develop [_____

_____

_____

_____].

    [_____

_____

_____].

    [_____

_____

_____

_____

_____

_____]

[Page 319]

**F.  Use of U.S. Military Force Against Bin Ladin**

    According to interviews of current and retired senior military officers and DoD civilians about U.S. military options for capturing or killing Bin Ladin, cruise missile strikes in August 1998, following the embassy bombings in East Africa, were the only use of U.S. military force against Bin Ladin or his terrorist network in Afghanistan prior to September 11, 2001.  On [____] occasions in [_____], President Clinton and his advisors contemplated additional missile strikes against Bin Ladin.

        • [_____

_____

_____

_____

_____

_____

_____

_____

_____].

- [_____

_____

_____

_____

_____].

- [_____

_____

[page 320]_____

_____

_____

_____

_____].

In each situation, the Intelligence Community lacked "actionable intelligence" for a capture or kill operation by military means.  Mr. Clarke described the problem:

The Clinton Administration considered additional military strikes against Afghanistan on [ ] occasions [_____ _____ _____].  We now know that on only one of those [——] occasions was the intelligence correct.

[Actionable intelligence was particularly difficult to obtain since killing or capturing Bin Ladin required knowing where he would be when cruise missiles arrived at the target area, not

TOP SECRET

where he had been when they were launched.  Several senior CIA officers who were interviewed, including the Deputy Director for Operations, two former CTC Chiefs, a former Chief of CTC's Bin Ladin unit, and a [——————————————————————————————————

—————————————————————————————————————————————————

————].  Thus, CIA's general reluctance to rely on a single source of information or recommend missile launches based on human intelligence alone was compounded by concerns about the reliability of this information.  In addition, policymakers sought information on the presence of non-combatants and property that might be damaged in a strike].

[The interviewees also mentioned contingency plans to launch additional cruise missile strikes at Bin Ladin had the Intelligence Community been able to obtain precise information on his location.  [Page 321] As former National Security Advisor Sandy Berger explained to the Joint Inquiry:

> Unfortunately, after August 1998, we never again had actionable intelligence information reliable enough to warrant another attack against Bin Ladin or his key lieutenants.  If we had, President Clinton would have given the order.  The President ordered two submarines loaded with cruise missiles on perpetual deployment off the coast of Pakistan for that very purpose.  We also were engaged in a number of covert efforts I cannot discuss in this unclassified format].

According to a CIA document, in December 1999, the U.S. Special Operations Command had been tasked to begin planning and was "working closely" with CIA.  The Joint Inquiry did not identify any operations that came about as a result of this planning.

In an interview with the Joint Inquiry, General Shelton, former Chairman of the Joint Chiefs of Staff explained the military options beyond cruise missile strikes.  In the fall of 2000, he prepared a paper containing 12 or 13 options for using military force against Bin Ladin.  Several options reportedly involved "U.S. boots on the ground" in Afghanistan and were aimed at capturing Bin Ladin, [————————————————————].  General Shelton, along with Secretary of Defense William Cohen, discussed these options with National Security Advisor Berger in late 2000, after Mr. Berger had expressed impatience with U.S. efforts to get Bin Ladin.  The military Joint Staff's Director of Operations described the military options paper as an effort to "educate" the National Security Advisor about the "extraordinary complexity of the 'boots-on-the-ground' options."  According to this officer, the military did not receive any tasking to develop

TOP SECRET

these options further.  The Joint Inquiry requested a copy of both the paper detailing the military options as well as the military Joint Staff's pre-September 11 strategic plan for Afghanistan that is discussed below.  The NSC denied that request, although a senior officer in the military Joint Staff was allowed to brief the Joint Inquiry on those options.

Former Chairman Shelton said the options could have been executed "very quickly," but depended on the Intelligence Community obtaining actionable intelligence.  He said CIA never provided such intelligence and the military had never been tasked to obtain it.

Mr. Clarke explained that "the overwhelming message to the White House from the uniformed military leadership was 'we don't want to do this,' [——————————————————]
[Page 322] ————————————————————————————————————————
————————————————————]."  Mr. Clarke also said that '[t]he military repeatedly came back with recommendations that their capability not be utilized for commando operations in Afghanistan."

According to CTC officers, the military levied so many requirements for highly detailed, actionable intelligence before conducting an operation – far beyond what the Intelligence Community was ever likely to obtain – that U.S. military units were effectively precluded from conducting operations against Bin Ladin's organization on the ground in Afghanistan before September 11.  As noted above, the Joint Inquiry heard conflicting testimony from CIA officers about the Intelligence Community obtaining actionable intelligence.  For instance, one former CTC officer told the Joint Inquiry:

> [————————————————————————————————————————
> ————————————————————————————————————————
> ————————————————————————————————————————
> ————————————————————————————————————————
> ————————————————————————————————————————
> ————————————————————————————————————————
> ——————————————————————].

A former CTC Chief [————————————————————] explained:

> [The military has] exacting criteria that intelligence needs . . . that needs to be met before they can launch an operation.  [————————————————————————
> ————————————————————————————————————————————].

TOP SECRET

The military Joint Staff's Director of Operations also mentioned a strategic plan developed by the Joint Staff in late 2000 for dealing with the Taliban regime. The U.S. military was coming to the same conclusion as the Intelligence Community: getting Bin Ladin meant dealing with the Taliban regime first and shutting down the sanctuary in Afghanistan.

The Joint Inquiry also asked General Shelton whether the military and CIA ever pooled assets or developed plans to conduct a joint operation against Bin Ladin. The former Chairman said that no plans existed, and that, as a general principle, he was opposed to joint CIA-military [page 323] operations. He explained that he did not want U.S. military units to be dependent on the actions of CIA paramilitary units outside the military chain of command. He noted an instance in which CIA and the U.S. military conducted a coordinated operation [————————————]. In that case, a "firewall" between CIA and military units allowed the military to proceed even if CIA units did not accomplish their mission. General Shelton said that he would have insisted on similar arrangements for joint operations in Afghanistan against Bin Ladin. In contrast, a former CTC Chief said about joint operations involving CIA and military units:

> I think it is an absolutely great [idea]. This is something we have been advocating for a long time. If you want to go to war, you take the CIA, its clandestinity, its authorities, and you match it up with special operations forces of the U.S. military, you can really – you can really do some damage... This is something that we have tried to advocate at the working level, and we haven't made much progress. But, if this is something that you [the Congress] would like to look into, it would be great for the United States.

Similarly, a former Chief of CTC's Bin Ladin unit commented:

> As someone who [————————————] worked with special forces, they want to work with us and we want to work with them. History was made between the CIA and special forces. We need to do that.

TOP SECRET

## IV.  Strategy to Disrupt Terrorist Funding

Bin Ladin and al-Qa'ida financial assets and networks are substantial, diverse, and elusive. In addition to Bin Ladin's personal wealth, the al-Qa'ida financial network relies on funds reportedly raised through legitimate and illegitimate businesses and on donations from wealthy Muslims and charitable organizations supporting Muslim causes.  Bin Ladin has claimed that he has access to four ways of transferring money: smuggling cash, the global banking system, the Islamic banking system, and hawalas or informal money transfer networks.  Bin Ladin once boasted to a Pakistani newspaper that the cracks in the Western financial system were as familiar to him and his al-Qa'ida colleagues as the lines on their own hands.

[Page 324]

## A.  Financial Tracking before September 11

Before September 11, no single federal agency was responsible for tracking terrorist funds or coordinating U.S. Government efforts and securing international collaboration to interdict these funds.  Some agencies did track terrorist financing, but, for the most part, the effort was disorganized and related to specific cases, and the U.S. Government was generally reluctant to seize assets or make arrests relating to that financing.

The General Counsel of the Department of Treasury explained to the Joint Inquiry that, before September 11, 2001, the financial war on terrorism was "ad-hoc-ism," episodic, and informal, with no mechanism for exchanging information among agencies or for setting priorities. He described errors in perception, focus, and targeting of the Bin Ladin threat and his realization as he watched the World Trade Center Towers disintegrate:

> It was as if we had been looking at the world through the wrong end of a telescope. . . .  Money had been spirited around the globe by means and measures and in denominations that mocked all of our detection. . . .  The most serious threat to our well-being was now clean money intended to kill, not dirty money seeking to be rinsed in a place of hiding.

The fact that, before September 11, no single agency was responsible for coordinating government efforts to attack terrorist funding does not mean that individual agencies were not tracking funds effectively, identifying terrorists and their organizations, and unraveling their plots by targeting assets.  The Chief of the FBI's Financial Crimes Section and the Director of

TOP SECRET

Treasury's Financial Crimes Enforcement Network (FinCEN) told the Joint Inquiry that, before September 11, they had the capacity to develop leads on terrorist suspects and link them to other terrorists by examining funding sources.  The FBI Financial Crimes Section Chief also explained his belief that he would have been able to locate hijackers Nawaf al-Hazmi and Khalid al-Mihdhar, if asked, through credit card and banking transactions.

FinCEN started doing linkage analysis of terrorist financing in April 1999 and first identified an account with a direct link to Bin Ladin in February 2001.  FinCEN has the advantage of being able to work with law enforcement and intelligence information, which it [page 325] combines with Bank Secrecy Act information and commercial data to produce a product useful to the Department of Treasury and others in seizing, blocking, and freezing terrorist assets.  These capabilities and databases at FinCEN, the Drug Information Center, and across the Intelligence Community enabled the FBI and FinCEN to connect almost all 19 hijackers within days after September 11 by linking their bank accounts, credit cards, debit cards, addresses, and telephone numbers.

## B.  Financial Tracking after September 11

Since September 11, 2001, the federal government has taken actions to block and seize terrorist assets such as smuggled cash, to arrest and indict terrorist financiers, and to shut down front companies, charities, banks, and hawala conglomerates that offer financial support to al-Qa'ida.  On September 24, 2001, four days after signing an Executive Order blocking terrorist funds, President Bush gave a new priority to the effort: "We will starve the terrorists of funding." The Treasury General Counsel described to the Joint Inquiry the change in the government's strategy: "the difference between the activity before 9/11 and after 9/11 is the difference between a mule and an 8-cylinder Chevy."

## V.  Khalid Shaykh Mohammed:  The Mastermind Of September 11

[Khalid Shaykh Mohammed (KSM) is one of al-Qa'ida's most senior leaders and is believed to be the mastermind behind the September 11 attacks.  Although the Intelligence

TOP SECRET

Community knew of KSM's support for terrorism since 1995 and later learned of his links to al-Qa'ida, he was not recognized as a senior al-Qa'ida lieutenant.  In April 2002, the Intelligence Community learned that KSM and his group conceived the September 11 plot.  KSM is also known as Mukhtar or "the Brain]."

The efforts the Intelligence Community took against KSM illustrate the difficulties it had in understanding al-Qa'ida's activities and structure and formulating a coherent response.  The Community devoted few analytic or operational resources to tracking KSM or understanding his [page 326] activities.  Coordination within the Community was irregular at best, and the little information that was shared was usually forgotten or dismissed.

## A.  KSM's Links to Terrorist Attacks before September 11

KSM and his followers played a major role in several Islamist extremist plots before September 11.  These plots are notable for the large number of casualties they sought to create, the use of airplanes, and focus on symbolic targets such as the World Trade Center and U.S. government facilities, all characteristics of the September 11 attacks.

Investigators determined in 1995 that KSM was linked to the February 1993 bombing of the World Trade Center.  Federal prosecutors gave CIA a copy of a financial wire transaction for $660 between Qatar and the U.S., dated several days before the blast, from "Khaled Shaykh" in Doha to Muhammad Salameh, one of four defendants convicted in the World Trade Center bombing.  With additional information that emerged from the Philippines investigation described below, CIA was able to determine that Khaled was KSM, that KSM was an uncle of Ramzi Yousef, the mastermind of the first World Trade Center bombing plot, and that KSM had married the sister of Yousef's wife.

[In 1995, Yousef's plots to bomb twelve U.S. airplanes flying Asian routes, kill the Pope, and crash a plane into CIA Headquarters were thwarted by Philippine police when a fire erupted in an apartment where Yousef was preparing explosives.  The police seized a list of names and telephone numbers and found a notation for "Khalid Doha" with telephone and facsimile numbers in Qatar.  [————————————————————————————————

310

——————————————————————————————————]. Yet another link to KSM was made when Yousef, who was apprehended shortly after fleeing the Philippines, made a call from detention to Qatar and asked to speak with "Khalid." This number was similar to the one found by the Philippine police. [————————————————————————————— ——————————————————————].

[Page 327]

## B. The Hunt for KSM

The Intelligence Community agencies worked together to apprehend KSM during his time in Qatar and in the Balkans. However, KSM's frequent travels, and the slow pace of efforts to learn his whereabouts, [————————————————————————].

## C. Finding KSM and Building the Case

[—————————————————————————————————— ————————————————————————————————————— ————————————————————————————————————— ————————————————————————————————————— —————————————————————————————]. [Prosecutors asked that CIA continue to assist the FBI by using its assets to help establish the case. [————————————— ————————————————————————————————————— ————————————————————————————————————— ————————————].

[—————————————————————————————————— ————————————————————————————————————— ————————————————————————————————————— ————————————————————————————————————— —————————————————————————————————————].

[It was determined that KSM was a top priority. The FBI was poised to take a photograph abroad for identification purposes. If KSM were identified from the photograph, an indictment

311

would be sought.  [—————————————————————————————————

————————————————————————————————————————————————

—————————————————————————————————].  On December 30, 1995 KSM was

identified [page 328] from the photograph, and he was indicted by a New York City  grand jury in

January 1996.  The indictment was sealed and would be opened once KSM was in custody].


**D.**  [————————————————————]


　　　[———————————————————————————————————

————————————————————————————————————————————————

————————————————————————————————————————————————

————————————————————————————————————————————————

————————————————————————————————————————————————

——————————————————].


　　　[———————————————————————————————————

————————————————————————————————————————————————

————————————————————————————————————————————————————].


　　　[———————————————————————————————————

————————————————————————————————————————————————

————————————————————————————————].


　　　[———————————————————————————————————

————————————————————————————————————————————————

————————————————————————————————————————————————

————————————————————————————————————].

**E.  Link to al-Qa'ida Discovered**

The Intelligence Community was not sure of KSM's alliances until after [————].  For example, a December 1995 CIA cable stated, "As far as we know, Yousef and his [page 329] confederates – such as [KSM] – are not allied with an organized terrorist group and cannot readily call upon such an organized unit to execute retaliatory strikes against the U.S. or countries that have cooperated with the U.S. in the extradition of Yousef and his associates."

[This assessment changed in 1996 when a foreign government shared information that Bin Ladin and KSM had traveled together to a foreign country the previous year.  In August 1998, after the bombing of the U.S. Embassy in Nairobi, another foreign government sent CIA a list of the names of individuals who flew into Nairobi before the attack.  Based on information delivered by another liaison service, CIA recognized that one of the passengers' names was an alias for KSM.  The liaison report also described KSM as close to Bin Ladin.  In an interview, the FBI agent responsible for the KSM case could not remember this information, even though it had been disseminated by CIA.  This information and subsequent reporting led the CIA to see KSM as part of Bin Ladin's organization.  Several CIA cables indicated that following up on information relevant to KSM was essential, given his past activities and his links to al-Qa'ida].

**F.  The Emphasis on Renditions**

[———————————————————————————————
————————————————————————————————
————————————————————————————————
————————————————————————————————
————————————————————————————————
————————————————————————]. 

[———————————————————————————————
————————————————————————————————
————————————————————————————————
————————————]: [Page 330]

TOP SECRET

[————————————————————————————
————————————————————————————
————————————————————————————
————————————————————————————
————————————————————————————
————————————————————————————
————————————————————————————
————————————————————————————
————————————————————].

Only once before September 11 did an analyst write requirements that were intended to determine KSM's role in al-Qa'ida, his future plans, or other traditional intelligence concerns.

## G.  KSM's U.S. Connection

[Though KSM had numerous links to the United States, it appears that information concerning such links was difficult to discover and did not generate an aggressive response.  The Intelligence Community knew that KSM had attended college in the United States in the 1980s.  Both the CIA and FBI tried to track this down, but they were unsuccessful until the Kuwaitis published information in the media.  CIA disseminated a report that KSM had traveled to the United States as recently as May 2001 and was sending recruits to the United States to meet colleagues already in the country did not cause the Intelligence Community to mobilize, even though it contained apparently significant [——————] information.  The report explained that KSM was a relative of convicted World Trade center bomber Ramzi Yousef, appeared to be one of Bin Ladin's most trusted lieutenants and was active in recruiting people to travel outside Afghanistan, including to the United States, to carry out unspecified activities on behalf of Bin Ladin.  According to the report, he continued to travel frequently to the United States, including as recently as May 2001, and routinely told others that he could arrange their entry into the United States as well.  Reportedly, these individuals were expected to establish contact with colleagues already there.  The clear implication of his comments, according to the report, was that they would be engaged in planning terrorist-related activities].

[Page 331]

The CIA did not find the report credible, but noted that it was worth pursuing in case it was accurate: "if it is KSM, we have both a significant threat and an opportunity to pick him up."  The Joint Inquiry requested that CIA review this particular source report and provide information

314

TOP SECRET

concerning how CTC, CIA field personnel, and other agencies reacted to this information.  That information has not been received.

## H.  The Hunt for KSM Continues

[Since September 11, the CIA has come to believe that KSM may have been responsible for all Bin Ladin operations outside Afghanistan.  In Spring 2002, intelligence indicated that he played a leading role in the *USS Cole* bombing.  In the Summer 2002, CIA created a new High Value Target Team to track and target terrorist masterminds such as KSM.  In the summer of 2002, KSM appeared along with Ramzi Bin al-Shibh in a taped al-Jazeera interview.  Despite Bin al-Shibh's capture in Pakistan shortly thereafter, KSM has not yet been found].[*]

## VI.  The FBI's Investigation of Zacarias Moussaoui Before September 11

Zacarias Moussaoui came to the attention of the FBI as the Intelligence Community was detecting numerous signs of an impending terrorist attack against U.S. interests somewhere in the world.  He was in the custody of the Immigration and Naturalization Service (INS) on September 11, 2001. The Joint Inquiry examined whether information resulting from the FBI's investigation of Moussaoui could have alerted the government to the scope and nature of the attacks on September 11.

From interviews with flight school personnel and with Moussaoui himself in August 2001, the FBI pieced together the details of his arrival in the United States.  Moussaoui contacted the Airman Flight School in Oklahoma by e-mail on September 29, 2000 and expressed interest in taking lessons to fly a small Cessna aircraft.  On February 23, 2001, he entered the United States at Chicago's O'Hare Airport, traveling on a French passport that allowed him to stay in [page 331] the country without a visa for 90 days until May 22, 2001.  On February 26, he began flight lessons at Airman Flight School.

---

[*] On March 1, 2003, Khalid Shaykh Mohammed was captured in Rawalpindi, Pakistan as a result of a joint operation by Pakistani and U.S. authorities.

TOP SECRET

TOP SECRET

Moussaoui was unhappy with the training and, at the end of May, contacted Pan American International Flight School in Minneapolis.  While Airman provided flight lessons in piloting Cessnas and similar small aircraft, Pan Am provided ground training and access to a Boeing 747 flight simulator used by professional pilots.

Most of Pan Am's students were newly hired airline pilots, who used the flight simulator for initial training, or active airline pilots, who used the equipment for refresher training.  Although anyone can sign up for lessons at Pan Am, the typical student has a pilot's license, is employed by an airline, and has several thousand flight hours.  Moussaoui had none of these qualifications.

On August 11, Moussaoui and his roommate, Hussein al-Attas, arrived in Egan, Minnesota and checked into a hotel.  Moussaoui began classes at Pan Am on August 13.  On Wednesday, August 15, a Pan Am employee called the FBI's Minneapolis Field Office because he and other Pan Am employees had become suspicious of Moussaoui.

Before September 11, the FBI determined that Moussaoui had paid approximately $6,800 in cash for training on the Boeing 747 simulator, but met none of the usual criteria for students at the flight school.  Moussaoui had no aviation background and, apparently, no pilot's license.  It was also considered odd that Moussaoui simply wanted to learn the most challenging elements of flying, taking off and landing a 747, which he referred to as an "ego boosting thing."

Based on information from the flight school, the FBI field office opened an international terrorism investigation of Moussaoui.  Agents within that office saw him as a threat to national security.   Because the FBI field office in Minneapolis hosts and is part of a Joint Terrorism Task Force, INS agents, who share space and work closely with the FBI in Minneapolis, were able to determine immediately that Moussaoui had been authorized to stay in the United States until May 22, 2001 and, thus, was "out of status" when the FBI began to investigate him in August.  [Page 333]  On the day the Minneapolis field office learned about Moussaoui, it asked both the CIA and the FBI's legal attaché in Paris for information about him.  The FBI field office also informed FBI Headquarters about the investigation.

TOP SECRET

TOP SECRET

FBI documents indicate Moussaoui's instructors thought that he had what they characterized as a "legitimate" interest in aircraft. Nonetheless, he was unlike any other student with whom his flight instructor had worked. Moussaoui began the ground school portion of the training with a Power Point presentation on aircraft systems. The instruction was reportedly useless for Moussaoui, who had no background in sophisticated aircraft systems and, apparently, had only approximately 50 hours of flight training in light civil aircraft. In addition, Moussaoui was extremely interested in the operation of the plane's doors and control panel. Pan Am found that suspicious. Further, Moussaoui reportedly said that he would "love" to fly a simulated flight from Heathrow Airport in England to John F. Kennedy Airport in New York. Thus, the Minneapolis FBI office decided to arrest Moussaoui.

In a Joint Inquiry interview, a Minneapolis FBI field office agent said that a Supervisory Agent at Headquarters had suggested that Moussaoui be put under surveillance, but Minneapolis did not have enough agents to do that. In testimony before the Joint Inquiry, however, the Minneapolis agent said that he had relied on his criminal experience in deciding to arrest Moussaoui, rather than surveilling him:

> The decision on whether or not we were going to put Mr. Moussaoui under surveillance rested with me. And I made the decision that he was going to be arrested because we had a violation. The INS was participating as a member, a full member of our joint terrorism task force. My background in the criminal arena suggests that when a violation occurs and you can stop further or potential criminal activity, you act on that. So that is exactly what I instructed the agents to do. If we had the possibility of arresting him, we were going to arrest him. If we needed to surveil him, we certainly could have instituted a surveillance plan. . . . It was not appropriate to do [so] in this case.

In response to questions, the agent explained in more detail why he decided to arrest Moussaoui, rather than put him under surveillance: [Page 334]

> Because I didn't want him to get any additional time on a flight simulator that would allow him to have the knowledge that we could no longer take back from him to operate an aircraft. This provided us the opportunity to freeze the situation as it was going on right there, prevent him from gaining the knowledge that he could use at some point in the future. And, if ultimately we determined all we could do, after interviewing him and doing some other investigative steps, if all we could do was deport him, then we would be sensitized to the fact that he was interested in doing something else and he could be put in the Tip-off System. He would be put in--the appropriate notifications could have been made if he attempted to reenter the United States. But our focus was on preventing him getting the knowledge that he would have needed. . . .

TOP SECRET

TOP SECRET

[I]t is important to remember the circumstances that were present before September llth.  We had no real incidents of airplane hijacking that had happened domestically within the preceding decade. We now have a different perspective, that it is very, very difficult to go back and forget and not acknowledge. But, again, I speak to my criminal background in saying if a violation has occurred, and we can take further steps to stop what could speak to a continued violation, we will act.  And those were the circumstances under which I made that decision.

Thus, on August 16, 2001, FBI agents, along with two INS agents, went to Moussaoui's hotel.  The INS agents temporarily detained Moussaoui and his roommate, Hussein al-Attas, while checking to determine if they were legally in the United States.  Al-Attas showed the INS agents a valid student visa and agreed to allow the agents to search his property in the hotel room.

Moussaoui showed the agents his passport case, which included his passport, a British driver's license, a bank statement showing a deposit of $32,000 in cash to an Oklahoma account, and a notification from INS acknowledging his request to extend his stay in the United States. The INS agents determined that Moussaoui had not received an extension beyond May 22, 2001, and they therefore took him into custody.

Moussaoui declined to allow the agents to search his belongings.  When the agents told him that he would be deported, Moussaoui agreed to let the agents take his belongings to the INS office for safekeeping.  In packing those items, the agents noticed that Moussaoui had a laptop computer.

[Page 335]

The agents interviewed Moussaoui at the INS office in Minneapolis.  He told them that he had traveled to Morocco, Malaysia, and Pakistan for business, although he could not provide details of his employment or convincingly explain the $32,000 bank balance.

After Moussaoui's detention, the Minneapolis case agent called the field office's legal counsel and asked if there was any way to search Moussaoui's possessions without his consent. He was told that he had to obtain a search warrant.  Over the ensuing days, Minneapolis agents considered several alternatives, including a criminal search warrant and a Foreign Intelligence Surveillance Act (FISA) Court search order.  They also considered deporting Moussaoui to France, after arranging for French authorities to search his possessions and share their findings

with the FBI.  Adding to the sense of urgency, a supervisor in the INS Minneapolis office told the FBI that INS typically does not hold visa-waiver violators like Moussaoui for more than 24 hours before returning them to their home countries.  Under the circumstances, however, the supervisor said that INS would hold Moussaoui for seven to ten days.

After August 17, the FBI did not conduct additional interviews of Moussaoui.  On Saturday, August 18, Minneapolis sent a detailed memorandum to FBI Headquarters describing the Moussaoui investigation and concluding that Minneapolis had reason to believe that Moussaoui, al-Attas "and others yet unknown" were conspiring to seize control of an airplane, based on Moussaoui's "possession of weapons and his preparation through physical training for violent confrontation."

In Joint Inquiry interviews, FBI Minneapolis field office agents said that FBI Headquarters advised against trying to obtain a criminal search warrant as that might prejudice subsequent efforts to obtain a FISA Court order.  Under FISA, an order warrant could be obtained if the agents could establish probable cause to believe that Moussaoui was an agent of a foreign power and that he had engaged in international terrorism or was preparing to do so.  FBI Headquarters was concerned that if a criminal warrant were denied and the agents then tried to obtain a FISA Court order, the FISA Court would think the agents were trying to use authority for an intelligence investigation to pursue a criminal case.

[Page 336]

Around this time, an attorney in the National Security Law Unit at FBI Headquarters asked the Chief Division Counsel in the Minneapolis field office whether she had considered trying to obtain a criminal warrant.  The Chief Division Counsel replied that a FISA order would be the safer course.  Minneapolis also wanted to notify, through the local U.S. Attorney's Office, the Criminal Division within the Department of Justice about Moussaoui, believing it was obligated to do so under Attorney General guidelines that require notification when there is a "reasonable indication" of a felony.  FBI Headquarters advised the Minneapolis field office that there was not enough evidence to justify notifying the Criminal Division.

The Minneapolis field office agent became increasingly frustrated with what he perceived as a lack of assistance from the Radical Fundamentalist Unit (RFU) at Headquarters.  He had had

conflicts with the RFU agent over FISA issues earlier and believed that Headquarters was not being responsive to the threat Minneapolis had identified.  At the suggestion of a Minneapolis supervisor, the agent contacted an FBI officer who had been detailed to the CTC.  The agent shared the details of the Moussaoui investigation with the CTC detailee and provided the names of Moussaoui's associates.  The agent explained in a Joint Inquiry interview that he was looking for any information CTC could provide to strengthen the case linking Moussaoui to international terrorism.

On August 21, the Minneapolis field office agent sent an e-mail to the RFU Supervisory Special Agent handling this matter:

> [It's] imperative that the [U.S. Secret Service] be apprised of this threat potential indicated by the evidence. . . .  If [Moussaoui] seizes an aircraft flying from Heathrow to NYC, it will have the fuel on board to reach D.C.

The RFU supervisory special agent sent a teletype to several U.S. Government agencies on September 4, 2001, recounting the interviews of Moussaoui and al-Attas and other information the FBI had obtained in the meantime.  The teletype, however, merely described the investigation.  It did not place Moussaoui's actions in the context of the increased level of terrorist threats during the summer of 2001, and it did not analyze Moussaoui's actions or plans or present information about the type of threat he might have presented.

[Page 337]

A CIA officer detailed to FBI Headquarters learned of the Moussaoui investigation from CTC personnel in the third week of August.  The officer was alarmed about Moussaoui for several reasons.  First, Moussaoui had denied being a Muslim to the flight instructor, while al-Attas, Moussaoui's companion at the flight school, informed the FBI that Moussaoui was a fundamentalist.  Further, the fact that Moussaoui was interested in using the Minneapolis flight school simulator to learn to fly from Heathrow to Kennedy Airport made the CIA officer suspect that Moussaoui was a potential hijacker.  As a result of these concerns, CIA Stations were advised by cable of the facts known about Moussaoui and al-Attas and were asked to provide information they had.  Based on information received from the FBI, CIA described the two in the cable as "suspect 747 airline attackers" and "suspect airline suicide attacker[s]," who might be "involved in a larger plot to target airlines traveling from Europe to the U.S."

TOP SECRET

On Wednesday, August 22, the FBI Legat in Paris provided a report that [————————
————————————————————————————] started a series of discussions between Minneapolis and Headquarters RFU as to whether a specific group of Chechen rebels was a "recognized" foreign power, that is, was on the State Department's list of terrorist groups and for which the FISA Court had previously granted orders.

The RFU agent told Joint Inquiry staff that, based on advice he received from the NSLU, he believed that the Chechen rebels were not a "recognized" foreign power and that, even if Moussaoui were to be linked to them, the FBI could not obtain a search order under FISA. The RFU agent told the Minneapolis agents that they had to connect Moussaoui to al-Qa'ida, which he believed was a "recognized" foreign power. The Minneapolis case agent later testified before the Joint Inquiry that he had had no training in FISA, but that he believed that "we needed to identify a – and the term that was thrown around was 'recognized foreign power' and so that was our operational theory."

As the FBI's Deputy General Counsel would later testify, the agents were incorrect. The FBI can obtain a search warrant under FISA for an agent of any international terrorist group, including Chechen rebels. Because of this misunderstanding, the Minneapolis field office spent [page 338] valuable time and resources trying to connect the Chechen group to al-Qa'ida. The Minneapolis field office agent contacted CTC, asking for additional information regarding connections between the group and al-Qa'ida. The Minneapolis supervisor also suggested that the RFU agent contact CTC for assistance on the issue. The RFU agent responded that he had all the information he needed and requested that Minneapolis work through FBI Headquarters when contacting CTC in the future. Ultimately, the RFU agent agreed to submit Minneapolis' FISA request to attorneys in the FBI's NSLU for review.

In interviews, several FBI attorneys with whom the RFU agent consulted confirmed that they advised the RFU agent that the evidence was insufficient to link Moussaoui to a foreign power. One of the attorneys noted that Chechen rebels were not an international foreign terrorism group under FISA. The Deputy General Counsel, however, testified before the Joint Committee that "no one in the national security law arena said that Chechens were not a power that . . . could qualify as a foreign power under the FISA statute." The FBI attorneys also said that, had they had

321

been aware of the July 2001 communication from the Phoenix field office raising concerns about al-Qa'ida flight training in the U.S., they would have forwarded the FISA request to the Justice Department's Office of Intelligence Policy and Review.

Two FBI agents assigned to the Oklahoma City field office's international terrorism squad visited Airman Flight School on August 23 as part of the Moussaoui investigation.  In September 1999, one of the agents had been assigned a lead from the Orlando field office to inquire at the flight school about another individual, who had been identified as Usama Bin Ladin's personal pilot and who had received flight training at Airman Flight School.  The agent had not been given any background information about this individual, and he did not know that the person had cooperated with the Bureau during the East Africa U.S. embassy bombings trial.  Although the agent told the Joint Inquiry that this lead had been the most significant terrorism information he had seen in Oklahoma City, he did not remember it when he returned to the flight school two years later to ask questions about Moussaoui.  The agent acknowledged that he should have connected the two visits but he did not have time to do so.

[Page 339]

[The Joint Inquiry also confirmed that an individual, who attempted to post bond for Moussaoui's roommate, had been the subject of a full-field FBI international terrorism investigation in the Oklahoma City Field Office.  According to FBI reports, this individual was a Vice President of Overseas Operations and Recruiting for al-Fatah, the Palestinian group, and a member of the Muslim Brotherhood.   He was also a close associate of [——————————————],  the imam at the Islamic Center [——————], which hijackers al-Hazmi and al-Midhar attended when they lived there.  That imam was also a close associate of the imam in San Diego who served as the hijackers' spiritual leader.  The Minneapolis field office agent and the head of the RFU both testified that neither of them knew that the individual who had attempted to post bond for Moussaoui's roommate was the subject of a terrorism investigation before September 11].

On August 27, the RFU agent told the Minneapolis supervisor that the supervisor was getting people "spun up" over Moussaoui.  According to his notes and his statement to the Joint Inquiry, the supervisor replied that he was trying to get people at FBI Headquarters "spun up" because he was trying to make sure that Moussaoui "did not take control of a plane and fly it into the World Trade Center."  The Minneapolis agent said that the Headquarters agent told him:

[T]hat's not going to happen. We don't know he's a terrorist. You don't have enough to show he is a terrorist.  You have a guy interested in this type of aircraft – that is it.

[On August 28, the RFU agent edited, and returned to Minneapolis for comment, the request for a FISA Court order that Minneapolis had prepared.  The RFU agent told the Joint Inquiry that it was not unusual for FBI Headquarters agents to make changes to field submissions.  The major substantive change was removal of information that tried to make connections between the Chechen rebels and al-Qa'ida.  After the edit was complete, the RFU agent briefed the FBI Deputy General Counsel, who told the Joint Inquiry that he agreed with the agent that there was insufficient information to show that Moussaoui was an agent of a foreign power].

The Bureau's focus shifted to arranging for Moussaoui's planned deportation to France, planned for September 17.  French officials had agreed to search his belongings and provide the results to the FBI.   Although the FBI was no longer considering a FISA Court order, no one [page 340] revisited the idea of attempting to obtain a criminal search warrant, even though the only reason for not attempting to obtain a criminal search warrant earlier – concern that it would prejudice a request under FISA – no longer existed.

On Thursday, September 4, Headquarters sent a teletype to the Intelligence Community and other government agencies, including the Federal Aviation Administration (FAA), providing information about the Moussaoui investigation. The teletype noted that Moussaoui was being held in custody, but did not describe any particular threat that the FBI thought he posed -- for example, that he might be connected to a larger plot.  The teletype also did not recommend that the addressees take action or look for additional indicators of a terrorist attack.  It also did not provide any analysis of a possible hijacking threat or specific warnings.  The following day, the Minneapolis field office agent hand-carried the teletype to two employees of the FAA's Bloomington, Minnesota office and briefed them on the investigation.  The two FAA employees told the Joint Inquiry that the agent did not convey any urgency about the teletype and did not ask them to take specific action.  The final preparations for Moussaoui's deportation were underway on September 11.

TOP SECRET

The Joint Inquiry record demonstrates that the FBI's focus when Moussaoui was taken into custody appears to have been almost entirely on investigating specific crimes and not on identifying links between investigations or on sharing information with other agencies with counterterrorist responsibilities.  The RFU chief testified that no one at Headquarters saw a connection between the Moussaoui case and the Phoenix communication, the possible presence of al-Mihdhar and al-Hazmi in the United States, and the flood of warnings about possible terrorists attacks in the United States, some using airplanes as weapons, all of which developed in the spring and summer of 2001.  Moreover, as the RFU Chief testified, before September 11, the FBI did not canvass persons in custody and cooperating with the government in terrorist investigations to see whether they knew Moussaoui.  After September 11, FBI agents showed one of those persons a photograph of Moussaoui and asked him what he knew of Moussaoui.  He asserted that he had met Moussaoui in an al-Qa'ida terrorist camp in Afghanistan.  When asked about this during [page 341] testimony before the Joint Inquiry, the RFU Chief admitted that "[t]he photograph was not shown before 9/11 and it should have been."

[The indictment against Moussaoui, which was filed on December 11, 2001, alleges that Moussaoui possessed a number of items on August 16, 2001.  On that day, which is when FBI and INS agents first interviewed him, the INS took Moussaoui's possessions for safekeeping.  Absent search authority, however, the possessions were not examined at that time.  As it turned out, according to the indictment, Moussaoui's possessions included letters indicating that Moussaoui was a marketing consultant in the United States for Infocus Tech.  The letters had been signed in October 2000 by Yazid Sufaat, whom the Intelligence Community was aware was the owner of the Malaysian condominium used for the January 2000 al-Qa'ida meeting attended by hijackers al-Mihdhar and al-Hazmi.  The indictment also alleges that Moussaoui possessed a notebook listing two German telephone numbers and the name "Ahad Sabet," which the indictment states was used by Ramzi Bin al-Shibh to send funds to Moussaoui.  Bin al-Shibh, who was apprehended in Pakistan in September 2002, is named in the indictment as a supporting conspirator.]

324

TOP SECRET

TOP SECRET

## VII.  The Phoenix Electronic Communication

In July 2001, an FBI agent in the Phoenix field office sent an "Electronic Communication" (EC) to the Usama Bin Ladin and the Radical Fundamentalist Units at Headquarters and to several agents on an International Terrorism squad in the New York field office.  The agent outlined his concerns about a coordinated effort by Bin Ladin to send students to the United States for aviation training.  He noted an "inordinate number of individuals of investigative interest" taking such training in Arizona and speculated that this was part of an effort to establish a cadre of persons, trained in aviation, who could conduct terrorist activity.  The EC contained a number of recommendations the agent asked FBI Headquarters to consider.

The FBI's handling of the Phoenix EC is symptomatic of its focus on short-term operational priorities, often at the expense of long-term strategic analysis. The Bureau's ability to handle strategic analytic products, such as the EC, was limited before September 11, 2001.  The EC also highlights inadequate information sharing within the FBI, particularly between operational and analytic units.  Several addressees on the EC, especially at the supervisory level, did not receive it before September 11 because of limitations in the electronic dissemination [page 342] system.  The Joint Inquiry repeatedly heard such complaints about the FBI's information technology.  Finally, the FBI's case-driven approach, while extremely productive in the Bureau's traditional law-enforcement mission, does not generally encourage FBI personnel to pay attention to preventive analysis and strategy, particularly when the matter appears to have no direct, immediate impact on ongoing counterterrorism investigations.

### A.  The Phoenix EC

The Special Agent in Phoenix who wrote the EC told the Joint inquiry he first became concerned about aviation-related terrorism in the early 1990s, while he was investigating Libyans with suspected terrorist ties who were working for U.S. aviation companies.  Possible terrorists with easy access to aircraft conjured up for the agent visions of Pan Am Flight 103, which terrorists had blown up years before.  His primary concern was that Islamic extremists, studying aviation subjects ranging from security to piloting, could learn how to hijack or destroy aircraft

TOP SECRET

and evade airport security.  However, the agent told the Joint Inquiry that, in writing the EC, he never imagined terrorists using airplanes as was done on September 11.

The Phoenix EC focused on ten individuals who were subjects of FBI investigations, Sunni Muslims from Kenya, Pakistan, Algeria, the United Arab Emirates, India, and Saudi Arabia.  Not all were in flight training; several were aeronautical engineering students, and one was studying international aviation security.

The Phoenix agent testified that in April 2000 he interviewed the primary subject of the EC.  In the agent's experience, young foreign nationals who are subjects of interviews tend to be somewhat intimidated in their first contact with the FBI.  By contrast, this subject told the agent that he considered the U.S. Government and military to be legitimate targets of Islam.  The agent noticed a poster of Bin Ladin and another poster of wounded Chechen mujahideen fighters in the subject's apartment.  He was also concerned that the subject, who was taking expensive aviation training, was from a poor Middle Eastern country and had not studied aviation before his arrival in the United States.

[Page 343]

The agent described to the Joint Inquiry another incident that increased his suspicion about Middle Eastern flight students in the Phoenix area.  During a physical surveillance, the agent determined that the primary subject of the Phoenix EC was using a vehicle registered to another person, who in 1999 had been detained with a third person after trying to gain access to the cockpit of a commercial airliner on a domestic flight.  The two told FBI agents who questioned them that they thought the cockpit was the bathroom, and they accused the Bureau of racism.  After an investigation, they were released and the case was closed.  In November 2000, the subject's name was added to the State Department's watchlist after intelligence information was received that he may have received explosive and car bomb training in Afghanistan.  In August 2001, the same person applied for a visa to re-enter the United States and, as a result of the watchlisting, was denied entry.

Finally, the Phoenix agent's concern about Middle Eastern flight students in Arizona was fueled by suspicion that al-Qa'ida had an active presence in Arizona.  Several Bin Ladin operatives had lived and traveled to the Phoenix area, and one of them -- Wadih El-Hage, a Bin

Ladin lieutenant -- had been convicted for his role in the 1998 East Africa U.S. embassy bombings. The agent believes that El-Hage established a Bin Ladin support network in Arizona that is still in place.

The Phoenix EC requested that FBI Headquarters consider four recommendations:

- Headquarters should accumulate a list of civil aviation university and colleges around the country;

- FBI offices should establish liaison with these schools;

- Headquarters should discuss the theories in the EC with the Intelligence Community; and

- Headquarters should consider seeking authority to obtain visa information on persons seeking to attend flight schools.

[Page 344]

## B.  Headquarters' Response to the Phoenix EC

When the Phoenix agent sent the EC to FBI Headquarters, he requested that the Radical Fundamentalist Unit (RFU) and the Usama Bin Ladin Unit (UBLU) consider implementing the suggested actions.  The Phoenix agent explained in testimony to the Joint Inquiry that:

> Basically what I wanted was an analytic product.  I wanted this discussed with the Intelligence Community.  I wanted to see if my hunches were correct.

The EC was initially assigned to an Intelligence Operations Specialist (IOS) in the RFU, who worked on it with a Intelligence Operations Specialist in the UBLU.  The latter consulted two IOSs in her unit, mentioning specifically the paragraph in the EC about obtaining visa information.  Their discussion centered on the legality of the proposal and whether it raised profiling issues.  The IOS also decided to forward the EC to the Portland FBI field office because a person named in the EC, with ties to suspected terrorists arrested in the Middle East in early 2001, was an employee of an airline and had previously lived and studied in the northwestern United States.  Portland did not take action on the communication or disseminate it because it was sent to the field for "informational purposes" only.

On August 7, 2001, the Specialists in the two units decided that the matter should be closed.  The Specialist in the UBLU told the Joint inquiry that she intended to return to the project once she had time to do additional research, but on September 11, she had not yet had an opportunity to do so.  Both Specialists also said that they had considered assigning the Phoenix communication to a Headquarters analytic unit, but had decided against it.

The Chiefs of both the RFU and UBLU informed the Joint Inquiry that they did not see the Phoenix EC before September 11.   They do not remember even hearing about the flight school issue until after September 11.  An FBI audit of the central records system requested by the Joint Inquiry supports their statements.

[Page 345]

The Phoenix EC was also not shared with other agencies before September 11, although the former Chief of the FBI's International Terrorism Operations Section explained in testimony to the Joint Inquiry:

> One of the great frustrations is that [the Phoenix Communication] talks about airlines—we have FAA people in the [International Terrorism Operations Section]; it talks about intelligence—we have CIA people; it talks about visas—there are State Department people and immigration people in that unit.  That information should have been shared, if only for [informational] purposes, with all those people at our Headquarters.  And it wasn't done, and it should have been done.

In fact, Transportation Security Administration Assistant Undersecretary for Intelligence Claudio Manno testified at a Joint Inquiry hearing that "the first time that we saw [the Phoenix EC] was when it was brought to our attention by [the Joint Inquiry Staff].   Had the FAA received the memo before September 11, Mr. Manno believes that:

> [W]e would have started to ask a lot more probing questions of FBI as to what this was all about, to start with.  There were a number of things that were done later to try to determine what connections these people may have had to flight schools by going back [to information] maintained by the FAA to try to identify additional people. . . .  [I]n fact our process is whenever we get a threat, we open . . .  an intelligence case file, and that is so we segregate that issue from the hundreds and hundreds and hundreds of other intelligence reports that we get and that we focus on it.  And the work that may entail in trying to determine whether this is a credible threat, something that needs to be acted upon, maybe going back and working with FBI to try and get additional information.  In some cases it can be working with the State Department or the CIA if it requires overseas work.  So we make all efforts to try to get to the bottom of what this is all about.

**C.  New York FBI Office Action in Connection with the Phoenix EC**

The Phoenix EC was sent to two FBI New York field agents who specialize in Bin Ladin cases. They were asked to "read and clear" the memorandum, but were not asked to take follow-up action.  A Joint Inquiry audit of electronic records shows that at least three people in New York saw the EC before September 11.  Two of the three do not recall seeing the communication [page 346] before September 11; the third remembers reading it, but said that it did not resonate with him because he found it speculative.

The New York agents stated in Joint Inquiry interviews that they had been aware that Middle Eastern men frequently came to the United States for flight training because the United States was considered the best and most reasonably priced venue for such training.  In the agents' view, information about Middle Eastern men with ties to Usama Bin Ladin receiving flight training in the United States would not necessarily be alarming because the agents knew that persons connected to al-Qa'ida had already received training in the United States.  Before September 11, many agents believed that Bin Ladin needed pilots to operate aircraft he had purchased in the United States to move men and material.  Two pilots with al-Qa'ida ties testified for the government during the East African embassy bombing trial.

Nonetheless, the FBI had also received reports not entirely consistent with this view of Bin Ladin pilots.  One of those who testified and one other pilot had been trained in al-Qa'ida camps in Afghanistan to conduct terrorist operations.  One who had received training in surveillance and intelligence apparently was selected for the course because of his aviation skills.  In addition, the FBI's New York field office was one of the recipients of the 1997 communication from FBI Headquarters, asking that the field office identify Islamic students from certain countries who were studying aviation within its area of responsibility.

**D.  Handling of Phoenix EC Indicates FBI Headquarters Weaknesses**

The manner in which FBI Headquarters handled the Phoenix EC provides valuable insight into the Bureau's operational environment before September 11, 2001.  A number of FBI

TOP SECRET

executives have acknowledged that the handling of the EC illustrates important weaknesses before September 11.  For example, Director Mueller told the Joint Inquiry:

> . . . the Phoenix memo should have been disseminated to all field offices and to our sister agencies, and it should have triggered a broader analytical approach. . . . These incidents . . . have informed us on needed changes, particularly the need to improve accountability, analytic capacity and resources, information sharing and technology, to name but a few.

[Page 347]

The Joint Inquiry found that the FBI's strategic, analytic, and technological problems were the primary weaknesses demonstrated by the handling of the Phoenix EC.  As a supervisory Headquarters agent testified: "when you want to look at systemic problems, . . . clearly you are going to be focused in on strategic analysis and you are going to be focused in on technology; and to run a national program you have to do both."

The Phoenix EC demonstrates how strategic analysis took a back seat to operational priorities at the Bureau before September 11.  Many people throughout the government and the FBI believed that an attack was imminent in Summer 2001, but this led only to further de-emphasis of strategic analysis.  For example, the Specialist in the  UBL unit who handled the Phoenix EC was primarily concerned with a person in the EC connected to persons arrested overseas and paid less attention to the flight school theories.

The RFU Chief told the Joint Inquiry that because he could not keep up with the approximately one hundred pieces of mail he saw daily, he assigned responsibility for reviewing intelligence reports to an Intelligence Operations Specialist in the unit.  Even the FBI analytic unit responsible for strategic analysis was largely producing tactical products to satisfy the operational section.  There was no system for handling projects with nationwide impact, such as the Phoenix EC, differently than other matters.  In fact, the Phoenix agent testified that he recognized the possibility that his EC might not receive a great deal of attention.

> I am also a realist.  I understand that the people at FBI Headquarters are terribly overworked and understaffed, and they have been for years.  And at the time that I am sending this in, having worked this stuff for thirteen years, and watched the unit in action over the years, I knew that this was going to be at the bottom of the pile, so to speak, because they were dealing with real-time threats, real-time issues trying to render fugitives back to the United States from overseas for justice.

330

TOP SECRET

TOP SECRET

The handling of the Phoenix EC also exposed information sharing problems among FBI Headquarters elements.  A number of analysts commented in Joint Inquiry interviews that the UBLU and RFU frequently do not share information with the International Terrorism analytic unit.  A UBLU supervisor explained that the Investigative Services Division, of which the [page 348] analytic unit is a part, was not a "major player" and that information was often not shared with it.  In testimony before the Joint Inquiry, the FBI's Deputy Assistant Director for Counterterrorism Analysis referred to strategic analysis as the Bureau's "poor stepchild" before September 11.  As a result, strategic analysts were often marginalized by the operational units and rarely if ever received requests from those units for assessments of pending al-Qa'ida cases.

Even if the Phoenix EC had been transmitted to the International Terrorism Analytic Unit, its capacity to conduct strategic analysis on al-Qa'ida was limited because five of the unit's analysts had been transferred to operational units.  According to the Chief of the National Security Intelligence Section, the Bureau had no personnel dedicated solely to strategic analysis before September 11.  The Joint Inquiry has also been told that, as competent new analysts arrived, UBLU and RFU would recruit them as operational support analysts or refuse to share information with them if they remain in the analytic unit.

Due to the FBI's technological limitations, operational units, such as UBLU and RFU, controlled information flow.  Strategic analysts often had to rely on operational units for incoming intelligence, a problem the FBI's Deputy Assistant Director for Counterterrorism Analysis acknowledged before the Joint Inquiry: "[because] the FBI lacked effective data mining capabilities and analytical tools, it has often been unable to retrieve key information and analyze it in a timely manner—and a lot has probably slipped through the cracks as a result."  Thus, even if the project had been assigned to an al-Qa'ida analyst in the analytic unit, there can be no guarantee that the several reports the FBI had received about airplanes as weapons and terrorist networks sending students to flight schools in the United States would have been drawn together.

The handling of the Phoenix EC also illustrates the extent to which technological limitations affected information flow because most EC addressees have told the Joint Inquiry that they had not seen the EC before September 11.  The FBI's electronic system is not designed to ensure that all addressees receive communications, a point a Headquarters supervisory agent

TOP SECRET

addressed in testimony before the Joint Inquiry: "I can tell you that, based on my position, that my name is on hundreds, if not thousands of documents in that building that will probably not be brought to my attention."  In fact, the electronic system was considered so unreliable that many [page 349] personnel in the field and at Headquarters used e-mail and followed up personally on important communications to ensure that they were not neglected.  The same supervisory agent described the FBI's information systems as "a setup for failure in terms of keeping a strategic picture of what we are up against."  He went on to conclude that, "the technology problems . . . are still there."

RFU and UBLU policies at the time of the Phoenix EC gave the person to whom the matter was assigned discretion to determine which people in the unit would see the report.  One FBI employee said that he was not certain why the Phoenix agent put all the addressees on the EC but believes the Intelligence Operations Specialist probably decided that the EC was more relevant to UBLU and therefore did not route the communication to all addressees within the RFU.

**E.  Links from the Phoenix EC to September 11**

FBI officials have noted in public statements and Joint Inquiry testimony that the September 11 hijackers did not associate with anyone of "investigative interest."  However, there are indications that hijacker Hani Hanjour, who was unknown to the Intelligence Community and law enforcement agencies before September 11, associated with [————], an individual who was mentioned in the Phoenix EC, had taken flight training in the United States, and was possibly a radical fundamentalist.  There are several reasons why [————] 's association with Hanjour did not bring Hanjour to the FBI's attention before September 11.

FBI personnel believe that, beginning in 1997, Hanjour and the person named in the Phoenix EC trained together at a flight school in Arizona and may also have known each other through a religious center.  The Bureau attempted to investigate this person in May 2001, but discovered that he was out of the country.  The Phoenix office generally did not open investigations on persons they believed had permanently left the United States.  Although there were no legal bars to opening an investigation, Headquarters discouraged this practice.  The Phoenix office did not notify INS, the State Department, or CIA of its interest in this person. The

TOP SECRET

[page 350] FBI was apparently unaware that the person returned to the United States soon thereafter and may have associated with Hanjour and several other Islamic extremists.

For the FBI to be aware that persons of investigative interest have returned to the United States, close contact must be maintained with INS and CIA. Unfortunately, before September 11, no system was in place to ensure coordination. In this case, the FBI did not notify the INS, State Department, or CIA of its interest in the Phoenix subject. Therefore, this person was able to get back into the United States without any notification to the FBI.

The FBI has confirmed since September 11, 2001, that another individual mentioned in the Phoenix EC is also connected to the al-Qa'ida network. This individual was arrested [——————————————] in Pakistan in 2002 with [————], one of the most prominent al-Qa'ida figures and one of the primary al-Qa'ida facilitators.

**F. Previous FBI Focus on Suspected Terrorists at U.S. Flight Schools**

The Phoenix EC must be understood in a broader context: it was not the first occasion that the FBI was concerned about terrorist groups sending persons to the United States for aviation study. The agents involved in drafting the Phoenix EC and the Headquarters personnel who worked on it were unaware of this context.

In 1981, as the U.S. military was involved in hostilities with Libya, President Reagan decided to revoke visas held by Libyan students in the United States involved in aviation or nuclear studies. In March 1983, the INS published a rule in the Federal Register, terminating the non-immigrant status of Libyan nationals or persons acting on behalf of Libyan entities engaged in aviation or nuclear studies. The INS turned to the FBI for assistance in locating such persons. In May 1983, FBI Headquarters sent a "priority" communication to all field offices, asking for assistance in complying with the INS request.

In 1998, the Chief Pilot in the FBI's Oklahoma City Field Office informed an agent on the office's counterterrorism squad that he had observed many Middle Eastern men at Oklahoma [page 351] flight schools. An intra-office communication to the counterterrorism squad supervisor

TOP SECRET

was drafted noting the Chief Pilot's concern that the aviation education might be related to terrorist activity and his speculation that light planes would be an ideal means to spread chemical or biological agents. The communication was sent to the office's "Weapons of Mass Destruction" control file, apparently for informational purposes only with no follow-up requested or conducted.

The FBI also received reports in 1998 that a terrorist organization might be planning to bring students to the United States for flight training. The FBI was aware that persons connected to the organization had performed surveillance and security tests at airports in the United States and had made comments suggesting an intention to target civil aviation.

In 1999, the FBI received reports that another terrorist organization was planning to send students to the United States for aviation training. The purpose of this training was unknown, but organization leaders viewed the plan as "particularly important" and reportedly approved open-ended funding for it. An operational unit in the Counterterrorism Section at Headquarters instructed 24 field offices to pay close attention to Islamic students from the target country engaged in aviation training. This communication was sent to the Phoenix Office's International Terrorism squad, but the agent who wrote the Phoenix EC does not recall it. The communication requested that field offices "task sources, coordinate with the INS, and conduct other logical inquiries, in an effort to develop an intelligence baseline" regarding the terrorist group's involvement with students. There is no indication that field offices conducted any investigation after receiving the communication. The analyst who drafted it explained that he received several calls from the field for guidance since it raised concerns about the Buckley Amendment, which bars post-secondary educational institutions that receive federal funding from releasing personal information without written student consent.

The project was subsequently assigned to the International Terrorism Analytic Unit at Headquarters, where an analyst determined that 75 academic and more than 1000 non-academic institutions offered flight education in the United States. In November 2000, the analyst informed field offices that no information had been uncovered about the terrorist group [page 352] recruiting students and stated that "further investigation by FBI field offices is deemed imprudent" by FBI Headquarters.

TOP SECRET

The former chief of the operational unit involved in this project told the Joint Inquiry that he was not surprised by the apparent lack of vigorous investigative action by the field offices.  The FBI's structure often prevented Headquarters from forcing field offices to take investigative action they were unwilling to take.  The FBI was so decentralized, he said, and Special Agents in Charge of field offices wielded such power that when field agents complained to a supervisor about a request from Headquarters, the latter would generally back down.

Personnel working on the Phoenix EC at Headquarters were not aware of these earlier reports on terrorist groups sending aviation students to the United States and did not know that Headquarters had undertaken a systematic effort in 1999 to identify Middle Eastern flight students in the United States.  This example demonstrates the lack of information sharing in the FBI. According to interviewees, this is a problem not only at Headquarters, but also in the field. Agents often will be familiar only with cases in their own squad.  The FBI's Deputy Assistant Director for Counterterrorism Analysis, recently detailed from CIA to improve the FBI's analytic capability, testified before the Joint Inquiry that the Bureau "didn't have analysts dedicated to sort of looking at the big picture and trying to connect the dots, say between the Phoenix memo . . . and some other information that might have come in that might have suggested that there were persons there who might be preparing to hijack aircraft."

The Phoenix agent also testified that he was unaware of most of the earlier reports on the potential use of airplanes as weapons.  He explained that after a downsizing at Headquarters "we in the field . . . saw a decreased amount of analytical material that came out of Headquarters that could assist someone like myself in Arizona."  In an interview, the agent noted that he often felt "out on an island" investigating counterterrorism in Phoenix.  In his words, before September 11 counterterrorism and counterintelligence were the "bastard stepchild" of the FBI because these programs do not generate career-enhancing statistics like other programs, such as Violent Crimes/Major Offenders or drugs.

[Page 353]

TOP SECRET

## VIII.  Strategic Analysis

A recurrent theme throughout this Joint Inquiry has been the need for stronger, more focused analytic capability throughout the Intelligence Community.  The FBI had fewer than ten tactical analysts and only one strategic analyst assigned to al-Qa'ida before September 11.  At CTC, only three analysts were assigned to al-Qa'ida full time between 1998 and 2000, and five analysts between 2000 and September 11, 2001.  Including analysts from other CIA components in CIA who focused on al-Qa'ida to some degree, the total was fewer than 40 analysts.  DCI Tenet acknowledged at a Joint Inquiry hearing that the number of analysts in the CTC analytic unit working on Bin Ladin and al-Qa'ida was "too small" and "we should have had more analysts than we did."

NSA had, in all, approximately [——] analysts in its Counterterrorism "Product Line," supported by analysts in other lines.  Throughout 2001, the Counterterrorism Product Line had a standing request for an additional [———] SIGINT analysts, but there was little expectation that such a large request would be satisfied.  Moreover, requirements for NSA's Arabic linguists were substantial.  Before September 11, only [————] language analysts were working "campaign languages," such as Arabic, Pashto, and Dari.  Today that number is almost [——], but requirements continue to increase.

When CTC was created in 1986, DIA's analytic capability remained as a parallel analytic organization.  In 1993 or 1994, DIA began a concerted effort against Bin Ladin, with a total authorized strength of 80 terrorism analysts.

## A.  The Intelligence Community's Lack of Strategic Analysis

The Intelligence Community's analytic focus on al-Qai'da was far more oriented toward tactical analysis in support of operations than on strategic analysis intended to develop a broader understanding of the threat and the organization.  For example, the DCI's National Intelligence Council never produced a National Intelligence Estimate on the threat al-Qa'ida posed to the United States.  According to an August 2001 CIA Inspector General report, CTC analysts only had time to focus on crises or short-term demands and "did not have the time to spot trends or to [page

TOP SECRET

354] knit together the threads from the flood of information."  Commenting on the CTC's analytic record, the Director of Terrorism Analysis explained during a Joint Inquiry hearing:

> [W]hile the unit's production had gone up dramatically—particularly in the area of current intelligence where the increase had been more than double—production of strategic research had, in fact, remained flat. Earlier correction of these shortcomings would not have enabled us to produce explicit tactical warning of the September 11 plot—the available data was only sufficient to support the strategic warning we indeed provided – but we did recognize our shortcomings and took several steps to address them.

In a Joint Inquiry hearing, DCI Tenet explained the importance of strategic analysis:

> [T]he single lesson learned from all of this is the strategic analytical piece of this has to be big and vibrant to give you the chance to be predictive, even when you don't have much information to go on.  I think it's a very important point.  We've made a lot of progress.

FBI witnesses identified little, if any, strategic analysis against domestic al-Qa'ida activities before September 11, 2001.  The Chief of the FBI's National Security Intelligence Section testified to the Joint Inquiry that the FBI had "no analysts" dedicated to strategic analysis before September 11.  In fact, as of that date, the FBI had only one analyst working on al-Qa'ida.  FBI Assistant Director for Counterterrorism Dale Watson testified that he could not recall any instance where the FBI Headquarters analytical unit produced "an actual product that helped out."

In regard to the September 11 attacks, witnesses confirmed the Bureau's failure to connect information on al-Mihdhar, al-Hazmi, Moussaoui, and the FBI Phoenix memorandum in the summer of 2001.  The FBI's Deputy Assistant Director for Counterterrorism Analysis, recently detailed from the CIA to improve the FBI's analytic capability, testified before the Joint Inquiry that the Bureau "didn't have analysts dedicated to sort of looking at the big picture and trying to connect the dots, say between the Phoenix memo and Moussaoui and some other information that might have . . . suggested that there were individuals there who might be preparing to hijack aircraft."

One of the primary reasons there was so little focus on strategic analysis in the Intelligence Community may have been the perception that operational matters were more [page 355] important to counterterrorism missions than analysis.  Consistent with its traditional law enforcement mission, the FBI was, before September 11, a reactive, operationally-driven

TOP SECRET

organization that did not value strategic analysis.  While FBI personnel appreciated case-specific analysis, most viewed strategic analytic products as academic and of little use in on-going operations.  The FBI's Assistant Director for Counterterrorism acknowledged in Joint Inquiry testimony that the reactive nature of the FBI was not conducive to success in counterterrorism:

> No one was thinking about the counterterrorism program what the threat was and what we were trying to do about it.  And when that light came on, I realized that, hey, we are a reactive bunch of people, and reactive will never get us to a prevention and what we do. . . .  Is there anybody thinking and where's al-Qa'ida's next target?  And no one was really looking at that.

The Assistant Director also acknowledged the difficulty of going beyond the FBI's traditional case-oriented approach:

> We will never move away from being reactive.  We understand that.  And that's what people want to talk about most of the time is how's that case going in East Africa, or how's the *USS Cole* investigation going?  But if you step back and look at it strategically you need to have people thinking beyond the horizon and that's very difficult for all of us.  It's particularly difficult for law enforcement people.

A former CTC Chief also told the Joint Inquiry that in CTC:

> We have underinvested in the strategic only because we've had such near-term threats.  The trend is always toward the tactical. . . . The tactical is where lives are saved.  And it is not necessarily commonly accepted, but strategic analysis does not … get you to saving lives.

In Joint Inquiry testimony, the FBI's Deputy Assistant Director for Counterterrorism Analysis explained that, before September 11, strategic analysis was the FBI's "poor stepchild." As a result, strategic analysts were often marginalized by operational units and rarely, if ever, received requests from operational sections for assessments of pending al-Qa'ida cases.

In 2000, FBI management aggravated this situation by transferring five strategic analysts, who had been working on al-Qa'ida matters, to operational units to assist with ongoing cases. [Page 356]  According to a former Chief of the International Terrorism Analytic Unit, this "gutted" the analytic unit's al-Qa'ida expertise and left it with little capacity to perform strategic analysis.

TOP SECRET

Concerns about protecting criminal prosecutions also limited the FBI's ability to utilize strategic analytic products.  In interviews, some analysts said they frequently were told not to produce written analyses, lest they be included in discovery during criminal prosecutions.  FBI analysts were further hindered because of the limitations of the FBI's information technology.

The Bureau has had little success in building a strategic analytic capability, despite numerous attempts before September 11 to do so.  For example, in 1996, the FBI hired approximately 50 strategic analysts, many with advanced degrees.  Most of those analysts left the Bureau within two years because they were dissatisfied with the role of strategic analysis at the FBI.

CTC analysts also expressed concern that their opinions were not given sufficient weight.  A CTC manager confirmed that CIA operations officers in the field resented tasks from analysts because they did not like to take direction from the Directorate of Intelligence.  Despite the need for increased analytic capability, CTC reportedly refused to accept analytic support from other agencies in at least two instances before September 11.  Both FAA and DIA informed the Joint Inquiry that CTC management rebuffed offers of analytic assistance because the agencies wanted in return greater access to CTC intelligence, particularly intelligence about CIA operations.

NSA analysts told Joint Inquiry staff that the CTC viewed them as subordinate, like an "ATM" for signals intelligence.  The analysts attempted to accommodate CTC requests for information by focusing on short-term operational requirements, sometimes at the expense of more thorough analysis, even changing reporting formats because CTC did not like NSA analyst comments to be embedded in the text of the reports.   Several NSA analysts also stated their belief that the DCI will always side with the CIA's CTC operational personnel over NSA analysts in the event of agency disagreements.

[Page 357]

**B.  Analyst Qualifications and Training**

The Joint Inquiry explored the extent to which analysts were inexperienced, undertrained, and, in some cases, unqualified for the responsibilities they were given.  At the CTC, analysts were a relatively junior group before September 11 with three years experience on the average, in

contrast to eight years for analysts in the CIA's Directorate of Intelligence.  The Director of Terrorism Analysis explained during a closed hearing:

> We had some analysts who had been on the terrorism target for some time, but . . . our biggest concentration was people at about the three to four years of experience, so we had a few senior analysts, a large cadre of very good, very experienced when we hired them, but nevertheless they hadn't had the ten years, fifteen years on the account that you would want. There's a historical reason for that. In the Counterterrorist Center, when it was founded, people were brought in on a rotational basis and worked there for two years, and then they went back to their home office. So you hadn't built up that skill back in the late eighties and nineties. Starting in about '97 the Counterterrorist Center had a career service, a nurturing expertise-building service. So by 2000, when I arrived in the Center, what you had is the new people who had been hired into that career service who were reaching their own, but still in the beginning part of their careers.

A January 2002 FBI internal study found that 66% of the FBI's 1200 "Intelligence Research Specialists," or analysts, were unqualified.  This problem was compounded by the fact that newly assigned analysts received little counterterrorism training.   As the Chief of the FBI's National Security Intelligence Section told the Joint Inquiry:

> While there was no standardized training regimen, other than a two-week basic analytical course, training was available on an ad hoc basis and guidance was provided by both the unit chiefs of the analytical units and the FBI's Administrative Services Division.  The development of a standardized curriculum, linked to job skills, and career advancement was being planned . . . , but it was never implemented.

A senior CTC supervisor testified at a Joint Inquiry hearing that CTC did not have enough analysts with sufficient experience to produce sophisticated, in-depth analysis in the quantities needed.  In the same hearing, the FBI's Deputy Assistant Director for Counterterrorism Analysis testified that FBI analysts "had great expertise on investigations, [but] were not in a position to see the big picture [or] connect the dots."  As a result, the FBI's [page 358] Counterterrorism Division had great difficulty in producing integrated intelligence assessments that provided early warning of emerging threats.  Finally, the Chief of DIA's Joint Intelligence Task Force for Combating Terrorism concluded, "We are probably still in the business of describing potentials more than we are able to really render predictive analysis."  That testimony reinforces an observation by a DIA senior official with broad experience in counterterrorism that Intelligence Community analysts largely perform descriptive analysis, and interpretive analysis skills have not been encouraged or built into the workforce.

Former NSA Director William Odom also focused on training in materials he submitted to the Joint Inquiry:

> [Although] the Intelligence Community's system of education and training is extensive, diverse, specialized — and fragmented . . . it lacks three key elements. First, nowhere is a common doctrinal understanding of intelligence functions and processes documented and taught to all Intelligence Community management and executive leadership personnel.  Second, the teaching of Community-wide resource management has been generally neglected.  Third, there is no educational emphasis on senior executive leadership and staff training.

## C.  Analysts' Access to Information

The Joint Inquiry was also told that all-source counterterrorism analysis suffered because analysts not located at CTC had limited access to "raw material" in FBI counterterrorism investigations, including Foreign Intelligence Surveillance Act information, unpublished NSA information and CIA operations cables.  The Special Assistant for Intelligence at DIA testified about the extent of these problems:

> In my opinion, one of the most prolonged and troubling trends in the Intelligence Community is the degree to which analysts, while being expected to incorporate all sources of information into their assessments, have been systematically separated from the raw material of their trade. . . .  At least for a few highly complex high stakes issues, such as terrorism, where information by its nature is fragmentary, ambiguous and episodic, we need to find ways to emphatically put the "all" back in the discipline of all-source analysis.

At the FBI, information access continues to be frustrated by serious technology shortfalls. The Bureau's Deputy Assistant Director for Counterterrorism Analysis told the Joint Inquiry:

[page 359]

> There were a variety of problems in sharing information, not only with other agencies, but within the Bureau itself. This was and is largely attributable to inadequate information technology. In a nutshell, because the Bureau lacks effective data mining capabilities and analytical tools, it has often been unable to retrieve key information and analyze it in a timely manner - and a lot probably has slipped through the cracks as a result.

Following the attack on the *USS Cole*, DIA recognized the need for better information sharing and initiated the Joint Terrorism Analysis Center.  The DIA Special Assistant for Intelligence testified:

TOP SECRET

. . . a specific aspect of the concept of operations was its provisions for a highly-protected merged data base containing all U.S. intelligence on terrorism, regardless of sensitivity, sourcing or collection methods.  This was a Director of DIA initiative to overcome the evident vulnerabilities posed by insufficient intelligence sharing within the U.S. Intelligence Community. Although Intelligence Community principals endorsed the idea at the time and since, it has so far not been implemented. . . .  Legacy rules, policies, interpretation of regulations, and agency cultures continue to impede information and data sharing.  As a result, we cannot bring our full analytical power to bear on the terrorist threat, nor can we provide the best possible support to military planners, operators, decision makers or to other consumers of intelligence. . . .  [P]rogress is being made and there are positive developments under way.  But so far remedies remain insufficient to the magnitude of the problem.

Witnesses also described a lack of collaboration among analysts within the Intelligence Community.  Terrorist-related intelligence often consists of small fragments of seemingly disparate information.  Information that may seem unimportant to one agency may be critical to another.  Capitalizing on the analytical strengths of each intelligence agency to understand the terrorist target from different angles should be paramount.  Unfortunately, there was no mechanism in place to enable inter-agency collaboration.  A former CTC Director of Terrorism Analysis described the problem:

> I think the only way to overcome the various cultures of the various agencies is to force the interaction . . . where you're putting people together and getting the understanding. You do find out there are real concerns.  People aren't trying to be jerks on purpose.  They have problems and you start finding out about those and learning how to work with those.

[Page 360]

Although it was established with the intention that it would be the Intelligence Community's hub for counterterrorism activities, some suggested that CTC's operational focus significantly overshadowed collaborative strategic analysis.  In interviews, NSA analysts, for example, said that CTC viewed them as subordinate, despite the value of their products.  Constructive CTC feedback on their reports was rare.  A positive step was taken in early 2001 when NSA and CTC analysts began holding bi-weekly video teleconferences, but these were suspended following September 11 due to workload demands.

DIA analysts reported that their efforts are not fully appreciated by CIA.  According to a senior DIA official, a lack of trust on the part of collectors and all-source analysts underlay the failure of the CIA to share information with the rest of the Intelligence Community concerning the January 2000 Malaysia meeting that involved at least two of the September 11 hijackers.

TOP SECRET

Another component of collaboration is understanding the culture and information requirements of other intelligence agencies.  NSA regularly sends liaison personnel to other intelligence agencies to help NSA customers better understand its products.  Currently there are [——] NSA analysts assigned to CTC; before September 11, there were [——].  There also are [——] NSA analysts at the FBI; before September 11, there were [——].  These analysts often do double duty as NSA liaison and by working on projects for the offices to which they are assigned.

Conversely, no CIA analyst and only one FBI analyst works in NSA's Counterterrorism Product Line.  The lack of Intelligence Community representation at NSA reportedly prevents collaboration and insight into how customers use NSA products.  Over a year ago, for example, a CIA analyst agreed to an assignment at NSA.  While there, she was able to scour unpublished NSA transcripts for lead information, such as [————————], of utility to CTC operations.  She left after four months without a replacement, despite CTC's increasing need for leads.  While the CIA analyst was at NSA, she had access to the CIA computer network, which is not otherwise available to NSA analysts.  The CIA detailee conducted searches of CIA operational cables to determine how NSA products were being used by CTC and to check lead information relevant to NSA.  These NSA analysts found the information very useful.  When the detailee left, the CIA computer access left as well.  A senior NSA analyst said that, if her office had daily [page 361] access to CIA [————————] cable traffic, its productivity could increase dramatically with immediate insight into [——————] requirements and lead information.  Currently, the responsibility for reviewing CTC [————————] cables for lead information falls to overworked NSA analysts assigned to CTC who usually conduct these searches "when they have the time."

## D.  Language Skills

[Witnesses emphasized for the Joint Inquiry the critical importance of language skills in counterterrorism analysis.  The linguistic expertise needed to identify, analyze, and disseminate intelligence relating to the al-Qa'ida threat includes an understanding of colloquial expression in [——] "terrorist languages" and dialects.  [————————————————————
————————————————————————————————————————

————————————————]. The majority of Intelligence Community language employees, however, do not have the skills necessary to understand terrorist communications.

[According to NSA's Deputy Director for Analysis and Reporting, "[a]nalyzing, processing, translating, and reporting al-Qa'ida related [————————] communications requires the highest levels of language and target knowledge expertise that exists." Communicants speak all major Arabic dialects, making analysis linguistically and conceptually challenging. Evaluating these communications requires considerable subject-matter expertise in Islam in general and Islamic extremist thought in particular to ensure accurate interpretation. Very few NSA Arabic language analysts have done any graduate work in Islamic Studies, [————————————————————————————————————————————————————————————]. The targeted person lives in and understands life in a thoroughly Islamic milieu that is reflected in that person's communications].

[The level of language expertise needed to work on the counterterrorist threat is very high. Subject-matter knowledge is necessary in explosives, chemistry, technical communications, [——————————————], paramilitary operations, weaponry and tactics. Moreover, speakers of Arabic [page 362] and other languages used by al-Qa'ida are in demand: Arabic linguists are also sought for such important issues [———] as other regional and terrorist intelligence targets].

The pool of qualified persons from which the Intelligence Community can draw to meet this challenge is very small and includes persons with military experience, university students, and those with native background or extensive experience in particular countries. Very few U.S. college graduates have more than a limited capability in Arabic. According to the 2002 Integrated Postsecondary Education Data System statistics, American colleges granted only six degrees in Arabic in the survey year, 183 in Chinese, and 339 in Russian. U.S. colleges or universities offer degrees in languages that are critical in countering the terrorist threat, such as Dari, Pashto, Punjabi, Persian-Farsi, Hindi, Urdu, Turkmen, Tadjik, Tagalog, Somali, Kurdish, Chechen, or Uzbek.

344

In sum, the Joint Inquiry was told that the quality of Intelligence Community counterterrorism analysis affected not only its strategy and operations, but also the ability of U.S. Government policymakers to understand threats and make informed decisions.  Several current and former policymakers provided testimony underlining the importance of intelligence analysis. For example, Mr. Clarke, former National Coordinator for Counterterrorism, explained:

> The FBI did not provide analysis.  The FBI, as far as I could tell, didn't have an analytical shop. They never provided analysis to us, even when we asked for it, and I don't think that throughout that ten-year period we really had an analytical capability of what was going on in this country.

Former National Security Advisor Sandy Berger implied in his testimony that the U.S. Government has often relied too heavily on analytic expertise within its own ranks:

> I think we live in a world, Congressman, in which expertise increasingly does not exist in the government.  It's a very complicated world.  And the five people who know Afghanistan the best or Sierra Leone the best are probably located either in academia, think tanks or in companies, not to devalue the people of the government.  So we have to find a way in my judgment to integrate the expertise that exists on the outside with the information that exists on the inside.

[Page 363]

## IX.  Views of Outside Experts on the Intelligence Community

The Joint Inquiry interviewed and took testimony from many leading experts on the Intelligence Community.  The experts touched on a wide array of topics, but much of the discussion revolved around four issues: setting priorities, strategy against international terrorism, reform of the Intelligence Community, and counterterrorism within the United States.  Included in the record are, for example, the testimony and statements of several seasoned observers: Lee Hamilton, former chairman of the House Permanent Select Committee on Intelligence, Judge William Webster, former Director of the Federal Bureau of Investigation and the Central Intelligence Agency, General William Odom, former Director of the National Security Agency; Frederick Hitz, former CIA Inspector General; former Senator Warren Rudman, co-chairman of the U.S. Commission on National Security/21[st] Century; and former Governor James Gilmore, chairman of the Advisory Panel to Assess Domestic Response Capabilities for Terrorism Involving Weapons of Mass Destruction.

TOP SECRET

## A.  Setting Priorities

Former Congressman Hamilton placed "first" on his list of reforms setting "clear priorities for the Intelligence Community."  Because demand for intelligence by policymakers has become "insatiable," the Congressman argued, the Intelligence Community has become "demand driven" and "there are simply too many intelligence targets, products, and consumers."  Since the end of the Cold War, there has not been a "clear set of priorities" within the Intelligence Community and, consequently, there has not been an ordered allocation of resources.

In addition, Former Congressman Hamilton noted that generally "responsibility [has been] on the consumer of the intelligence in both the Legislative and the Executive branches to set forward in some orderly manner the priorities," and he called on the National Security Council to provide guidelines for "long-term strategic planning."   The two most important [page 364] priorities, he urged, should be "combating and preventing terrorism" and "preventing the proliferation of weapons of mass destruction."

## B.  Strategy And Organization

Senator Rudman brought to the Joint Inquiry's attention a 1996 recommendation of the Aspin/Brown Commission on Roles and Capabilities of the United States Intelligence Community, "a distinguished group of Americans who spent a lot of time looking in advance of 9/11 at precisely the things that [the Joint Inquiry is] looking at post-9/11."  Under the heading, "The Need for a Coordinated Response to Global Crime," the Aspin/Brown Commission recommended that, in responding to terrorism and other transnational criminal dangers to the American people, the U.S. Government may have to develop "strategies which employ diplomatic, economic, military, or intelligence measures . . . instead of, or in collaboration with, law enforcement response."   This made it essential "that there be overall direction and coordination of U.S. response to global crime."  Senator Rudman reflected, "I will tell you that nobody evidently read it."

TOP SECRET

TOP SECRET

Congressman Hamilton stated the broad case for reorganizing the Intelligence Community, which he described as now a "loose confederation" with redundant efforts, imbalances between collection and analysis, and coordination problems:

> The very phrase 'Intelligence Community' is intriguing.  It demonstrates how decentralized and fragmented our intelligence capabilities are. . . .  New intelligence priorities demand a reorganization of the Intelligence Community. . . . [W]e really are in a new era, and we must think anew.

Joint Inquiry witnesses expressed a range of views on two interrelated questions about the organization of the Intelligence Community:

-- whether Community leadership should be vested in a new, cabinet-level Director of National Intelligence (DNI) with Community-wide responsibilities beyond those now vested in the Director of Central Intelligence (DCI), particularly with regard to budget planning and execution; and [page 365]

-- whether the "double-hatting," by which the DCI is also the Director of the Central Intelligence Agency, should be ended so that the DNI becomes the President's principal intelligence advisor with authority to lead the Community, while a separate Director oversees the CIA.

## C.  Should a Strong Director of National Intelligence be Established?

Congressman Hamilton testified that:

> [w]e need a single cabinet-level official who is fully in charge of the Intelligence Community, a Director of National Intelligence or DNI."  To fulfill that role, the DNI "must be in frequent and candid contact with the President[,] have his full confidence  . . . have control over much, if not most of, the Intelligence Community budget, and the power to manage key appointments.  [Presently, the DCI] does not have this control, and thus [the DCI] lacks authority.

Former National Security Advisor Sandy Berger also stated:

> . . . [S]trengthening the DCI's authority to plan, program and budget for intelligence collection, analysis and dissemination will permit much more effective integration of our intelligence priorities and efforts, including better concentration on counterterrorism.

TOP SECRET

A DNI with authority over management and particularly budget, Congressman Hamilton concluded, is important for "responsibility and accountability":

> The person who controls the budget controls the operation.  And if you don't have budget authority, you are dramatically undercut in your ability to manage the operation.  That's why the bureaucrats fight so hard over budget.  Budget is power.

General Odom expressed a limited difference on the extent of the proposed Director of National Intelligence's budget authority:  "I think Congressman Hamilton wants more executive budget authority than I do, but otherwise I think we overlap enormously."  The General would give the DNI the planning power necessary to take "an overall comprehensive look" at the intelligence budget and assess whether intelligence agencies are adequately funded.  He would not give the DNI budget "execution" or "spending" power, which would require that Congress [page 366] rewrite regulations governing Department of Defense spending because NSA, a principal member of the Intelligence Community, is a component of the Department of Defense.

## D.  Should the Same Person be both DNI and Director of the CIA?

Several experts called for separate heads of the Intelligence Community and the CIA.  Former National Security Advisor Sandy Berger "encourage[d] the Committees to consider proposals to separate the DCI and CIA Director positions, so the DCI can focus primarily on Community issues and not just CIA concerns."  Congressman Hamilton was even more definite: to avoid a "natural bias" toward the CIA, the head of the CIA should not also be the DNI:  "You cannot be head of the Intelligence Community and head of the CIA at the same time.  There's a conflict there.  And I want someone over all that. . . ."  General William Odom, former Director of the National Security Agency;  added: "The DCI becomes trapped if he's also directing an agency, and therefore he doesn't look at the Community as a whole as much as he could."

Judge Webster disagreed with separate appointments and roles for the head of the Community and the CIA and argued instead for keeping the DCI "double-hatted," but strengthening the DCI role.

> [M]ore emphasis [should be put] on finally addressing the lack of real authority that the DCI has over the Intelligence Community.  He does not write the report cards on the agency heads.  He does not even pick the agency heads.  He has nominal authority over the budget….

Reflecting on his time as DCI, Judge Webster explained that "[o]ccasionally I would issue something that looked nominally like an instruction, it was mostly hoping with a lot of groundwork behind it . . . something would come of it."  If the head of national intelligence were placed at the White House "without troops," Judge Webster argued, "it's difficult for me to see how it would be truly effective."

Former CIA Inspector General Fred Hitz agreed with Judge Webster, describing the Secretary of Defense as an "800-pound gorilla" that the DCI has never been able to wrestle to the ground because of the Secretary's responsibility and command authority for defense intelligence [page 367] agencies.  Mr. Hitz recommended "realistic" proposals giving the DCI "a kibitzing power over selection of Director of NSA and more collaborative powers with the Secretary of Defense."

Former Congressman Hamilton responded that the Director of National Intelligence should have "real authority and real personnel authority": "I wouldn't put him in the White House, as Judge Webster is suggesting [I would]."  General Odom argued that the DNI "has to take some organizational capability with him – he can't just stand out there in an office and be a czar over in the White House."  He should have an expanded National Intelligence Council as a reinforcement which together with the DCI's Community management staff give him "a pretty good organizational base."  As for limiting change to strengthening the existing DCI position, Congressman Hamilton asserted:

> We're in a new world, and we have to begin to think of ways to structure this.  I have heard the argument about strengthening the DCI for 35 years. . . .  It's a move in the right direction.  But I don't think it gets us into the new era we're in.

## E.  Counterterrorism within the U.S and Creation of a Domestic Intelligence Agency

The witnesses addressed the organizational and other challenges to the effective conduct of counterterrorism operations in the United States.  To Congressman Hamilton, the CIA and FBI must "fundamentally alter" policies and practices: "The FBI, with its new emphasis on prevention, will have to focus more on counter-terrorism, and the CIA will have to trace international leads to the homeland."  Indeed, "the threat of terrorism is going to require an unprecedented overlap between intelligence and law enforcement."  Although Congressman Hamilton favored

TOP SECRET

restructuring the Intelligence Community so that "resources can be coordinated and agencies aid, not obstruct one another," he did not recommend a new organization to conduct counterterrorism domestically:

> I don't think it's a statutory solution, a legislative solution. . . .  Most important, the two agencies will have to share information and work together to infiltrate, disrupt and destroy terrorist cells … If the shortcomings leading up to 9/11 were systemic in nature, the solution lies in better system management, the handling and analysis of vast amounts of information, and the distribution in a timely manner of the key conclusions to the right people.

[Page 368]

Congressman Hamilton urged recognition of the fact that CIA and FBI have "for a very long period" done their jobs "quite well" and they are now "suddenly confronted with a new world."  The decision to transform FBI priorities from law enforcement to prevention is a "huge change," and we cannot expect the Bureau "to turn around on a dime."  Rather than new legislation, change "takes leadership, it takes oversight."

In contrast, General Odom argued for a major change in the organization of U.S. counterintelligence and counterterrorism.  Counterintelligence, he urged, "is in the worst shape of all."  Five agencies have counterintelligence operations – FBI, CIA, and three military services – "with no overall manager." As a consequence, "[t]he parochialism, fragmentation, and incompetence are difficult to exaggerate in the U.S. counterintelligence world."  Fragmentation and lack of skills ensures "dismal performance" because "terrorists, like spies, come through openings."

General Odom recommended that the "first step" is "to take [counterintelligence] responsibility out of the FBI, leaving the Bureau with its law enforcement responsibilities, and create a National Counterintelligence Service under the DCI with operational oversight over the [counterintelligence] operations of the CIA and the three military departments in the Pentagon." The new organization would not be given arrest authority, which would remain with the FBI and other law enforcement organizations: "The FBI might be the agency to use [intelligence] to go make arrests and provide the evidence for prosecutions, but the business of locating spies, finding out what they're doing, understanding patentable collection, terrorist infiltrations, et cetera, can be primarily an intelligence operation."

TOP SECRET

Judge Webster did not "warm to the idea of separating counterterrorism from the FBI." He responded to proposals for a separate domestic intelligence service modeled after England's MI-5 service:

> We're not England. We're not 500 miles across our territory. We have thousands of miles to cover. Would you propose to create an organization that had people all over the United States, as the FBI does?

[Page 369]

The Congress, Judge Webster argued, would "never vote the resources to have a second FBI throughout the country." It is better, then, "to use what we have and train them to be more responsive." Rather than spending time "moving the boxes around," Judge Webster recommended that Congress look to those areas in the system which need to be shored up with appropriate resources and training." The "crucial" example, he testified, was the FBI's twelve year-old information system, that "the FBI has been trying to get help with for years, and has not succeeded." Judge Webster also called for "new sets of relationships between CIA, which has been functioning largely abroad, until more recently, with the FBI's participation and expanded legal attaché relationships, and the law enforcement responsibilities of dealing with the threat here":

> More than any other kind of threat, there is an interrelationship between law enforcement and intelligence in dealing with the problem of terrorism … We need both investigative capability and intelligence collection capability, as well as those who go through the bits and pieces and fill in the dots.

Senator Rudman maintained that creation of a British-styled MI-5 domestic intelligence service would not solve the problems we face: "You have got enormous domestic collection capability in the FBI, assuming it is focused in the right direction." He concluded that the Intelligence Community could enhance its campaign against terrorism by adopting measures designed to share and cooperate amongst its members:

> [T]he more jointness that you have between these agencies, the more they work in joint counterterrorism centers, the more their information databases become common, the more there is constant daily, hourly cooperation between them, the more the NSA is brought in by statute, if necessary, to supplying the FBI with domestic counterterrorism information, then you will do the improvement you need.

Senator Rudman spoke forcefully against proposals for a new counterterrorism organization:

> I do not believe we need new structures or new systems. We may need different kinds of people, we may need different kinds of technology, but I don't think

[page 370] there is anything wrong with the systems.  I think there is a lot wrong with how they have been used over the last ten years.

Senator Rudman did not believe that a law-enforcement culture makes it impossible for the Bureau to be an effective intelligence-gathering agency, an issue he has also addressed as chairman of the President's Foreign Intelligence Advisory Board.  "The best domestic intelligence-gathering organization . . . on the ground today is the FBI," although the Senator agreed that "[t]he problem is that they have had a law enforcement mind-set."  In spite of that problem, the Bureau has 56 field offices and 44 offices overseas, and, therefore, "it is not a question of trying to get a new agency to do the domestic intelligence, counterintelligence; it is a question of [getting] the resources" necessary for the task.

Following the Joint Inquiry hearings, the Commission that Governor Gilmore chairs on assessing domestic response capabilities against terrorism, released recommendations in advance of its fourth annual report in December 2002.  The Commission recommended establishment of a National Counter Terrorism Center (NCTC), a "stand-alone organization" headed by a Senate confirmed, presidential appointee, "responsible for the fusion of intelligence, from all sources, foreign and domestic, on potential terrorist attacks inside the United States."  The Commission also recommended that "collection of intelligence . . . on international terrorist activities inside the United States, including the authorities, responsibilities and safeguards under the Foreign Intelligence Surveillance Act, which are currently in the FBI, be transferred to the NCTC" for two reasons:  First, "while the FBI remains the world's preeminent law enforcement agency, there is a big difference between dealing with a terrorist act as a crime to be punished and dealing with it as an attack to be prevented."  Second, "it is important to separate the intelligence function from the law enforcement function to avoid the impression that the U.S. is establishing a kind of 'secret police.'"  The proposed NCTC would not have arrest authority.

Governor Gilmore's preference is "to maintain these [domestic intelligence] functions within the FBI and to build upon [its] considerable structures, sources and resources to upgrade and improve these functions."  Nevertheless, he said he would support the Commission's recommendation, given the oversight provisions and legal restrictions described in the Commission's preliminary report to ensure that our civil liberties are not diminished.  Another Commission member disagreed with the [Page 371] recommendation, however, asserting in

TOP SECRET

dissent that "[t]he FBI culture as a law enforcement agency provides a backdrop and check and balance against any abuse of civil liberties."

## F.  A Legislative Charter for the Intelligence Community

Beyond streamlining the Intelligence Community by, for example, enacting legislation to create a new Director of National Intelligence, Congressman Hamilton urged the enactment of a "legislative charter" for the Community, a task he knew from personal experience would be difficult to accomplish:

> U.S. intelligence is governed by a set of disparate laws and executive orders produced over the last fifty-five years.  No single one of these laws provides a comprehensive legal foundation for our massive intelligence establishment.  This is a remarkable state of affairs in a country that takes the rule of law so seriously.

In short, the Congressman testified, "[w]e need a statutory foundation for U.S. intelligence."

## G.  Respect for the Rule of Law

Notwithstanding differences on particular proposals, many witnesses joined in the conviction Congressman Hamilton voiced that "[r]eforms in the Intelligence Community must not come at expense of the rule of law and respect for civil liberties."  As Judge Webster put it:  "I hope that in the rush to judgment, we will remember who we are and [that] the methods we choose, both for intelligence and for law enforcement, will be consistent with who we are in this country."  Congressman Hamilton described the challenges ahead:  "Intelligence work requires that our government obtain information, and obtaining that information requires surveillance of people who have committed no crime -- the challenge is to facilitate information-gathering about suspicious people, while insulating legitimate personal and political activity from intrusive scrutiny."

Congressman Hamilton also stressed that responsibility for protecting basic rights lies in several places:

> It's very easy to overlook these matters of privacy and civil rights -- it has to come from the top of the agency.  It has to be protected by the courts.  The United

TOP SECRET

[page 372] States Congress, the intelligence committees, have to be sensitive to the manner in which intelligence activities are carried out, and they have to zero in on civil rights and liberties.

Judge Webster added that ensuring that investigatory tools are used in accordance with the law is "an important role for the Department of Justice," and, therefore, he is opposed to law enforcement "go[ing] outside the Department of Justice at the federal level by giving it to people who are not trained and do not understand the requirements that the Constitution and our laws impose on them."

General Odom asserted that "[t]he [Congressional] committees that did the investigation [of the Intelligence Community] in the 1970s did a great service in implementing the system that they have at NSA now, ensuring that rights are not violated":

> Congress should get credit for that.  And as the director of the agency I felt better for having this.  I felt that I could be certain that my bureaucracy was not going to run away and violate these kind of rights.  And it was a thoughtfully done process that created that system in the 1970s.

Finally, General Odom emphasized the importance of accountability:

> In the military, we have a tradition.  When you screw things up, we relieve the commander, which leaves me puzzled about the behavior of the Administration in the intelligence area.  I consider intelligence . . . a military engagement, and I would hold the commanders as responsible as I would ship commanders who run their ships aground.  They don't stay around after they've run them aground, even if they are not very guilty.

## X.  Information Sharing

Before September 11, 2001, the Intelligence Community had not melded into an effective team to prevent terrorist attacks within the United States.  Efforts had been taken to improve cooperation between the CIA and FBI.  After the DCI created the CTC in 1986, for instance, CIA and FBI cross-detailed personnel to each other's counterterrorism units, but this did not lead to a plan between those two agencies or across the Community to integrate intelligence collection and analysis.  In the absence of a plan, agencies tended to operate independently.

[Page 373]

TOP SECRET

Prior to September 11, information was inadequately shared not only within the Intelligence Community, but also between the Community, other federal agencies, and state and local authorities.  In sum, the Joint Inquiry discovered significant problems in how intelligence agencies shared information among themselves and with entities that need information to protect the nation against terrorist attack.

## A.  Information Sharing between Intelligence Agencies and within the Federal Government

In closed and open hearings witnesses from both the intelligence and law enforcement communities spoke of the need to share information.  As the Comptroller General put it in a statement submitted for the Joint Inquiry record, "The success of a homeland security strategy relies on the ability of all levels of government and the private sector to communicate and cooperate effectively with one another."

### a.  National Security Agency

NSA intercepts well over [——————] communications each day, which it uses to create reports for dissemination to components of the Executive Branch that have expressed requirements for certain information.  The growth of global communications and computer networks has significantly increased the volume of communications NSA can intercept.  One of the major challenges the agency faces is to find information buried in the avalanche of electronic data it receives every day.  In deciding which communications [———] to target, which [——] to monitor [————], and which communications to select [——————], NSA tries to maximize its exploitation capability, including its linguistic and analytic workforce.

[The effort to find and report the most useful information results in decisions at every step in the exploitation process that leave information behind, unanalyzed and unreported.  Thus, potentially vital information is rejected before analysts see it, or, if it reaches an analyst, it is not reported to customers.  For example, NSA informed the Joint Inquiry that it reported some but not all communications analyzed in 1999 and the first half of 2000 involving a [page 374] suspected terrorist facility in the Middle East linked to al-Qa'ida activities directed against U.S. interests.  NSA did not publish other communications involving this facility and associated with a participant

355

in a January 2000 meeting in Malaysia, hijacker Khalid al-Mihdhar.  As was explained in the section of this report devoted to that meeting, these communications fell below NSA's reporting threshold].

NSA officials described the threshold as a subjective standard that can change every day. It is a product of several factors including the priority of the intelligence topic (for example, threat warnings have the highest priority), the level of customer interest in a particular subject, the perceived value of the information, and the amount of intercept available for analysis and reporting.  In short, analysts have considerable discretion in reporting information, especially when it is fragmentary or obscure.

A major concern of NSA customers is that this winnowing process is not sufficiently well informed to avoid leaving potentially vital but seemingly irrelevant information on the "cutting room floor," particularly with regard to targets like al-Qa'ida where the smallest piece of information may fill in the mosaic of the organization and its plans.  To make well-informed decisions about what to report, NSA needs detailed knowledge about how raw intercept data might respond to customer needs.  NSA deploys many analysts to customer agencies to understand their needs and help them shape NSA reports.  This is an important, but not complete solution to the problem.

NSA officials complained to the Joint Inquiry that its customers rarely reciprocate by assigning analysts to NSA to access its information, including raw intercepts.  An NSA counterterrorism supervisor noted that the productivity of NSA analysts was substantially increased when a CIA analyst with access to Directorate of Operations cables was detailed to NSA.

NSA officials are concerned about sharing raw intercepts in large part because some intercepts contain information about "U.S. persons" that NSA must protect under "minimization procedures" established by the Attorney General and the Foreign Intelligence Surveillance Court. It is not practical to review all raw traffic to strip off this information, and minimized [page 375]

information might not have the same value as original text.  NSA officials also cited concerns about protecting sources and methods that produced the data and the difficulties in separating content from information about them.

### b.  The Central Intelligence Agency

CIA personnel also make decisions about sharing information, particularly with regard to [————————————] cables that contain vital information about CIA activities.

[NSA has told the Joint Inquiry that regular access to [————————] cables would enhance its understanding of material it intercepts and increase the productivity of its analytic workforce.  The Director of the Defense Intelligence Agency expressed particular concern about cables relating to the Malaysia meeting.  Joint Inquiry staff identified numerous CIA [——] cables concerning that meeting that contained information of value to all-source analysts.  In response to a Joint Inquiry request, DIA identified four leads its terrorism analysts could have pursued in early 2000 and one in December 2000, had information been shared.  DIA also identified three leads in [CIA] cables in August 2001 that would have allowed it to take action concerning the Malaysian meeting, Zacarias Moussaoui, Khalid al-Mihdhar, and Nawaf al-Hazmi].

[CIA is concerned that access to cables would place its sources and methods at risk because cables contain information about activities, including meetings with human assets.  Most analytic personnel recognize this concern and profess not to want operational details or information about sources and methods.  These analysts see information of potential significance, embedded in the raw data.  The CIA, they believe, filters out many intelligence "nuggets" before analysts receive the information.  The agency has itself recognized the value of this data by integrating its counterterrorism analysts into the CTC where they are supposed to have full access to raw traffic].

[Page 376]

### c.  The Federal Bureau Of Investigation

The FBI collects vast amounts of information from both criminal and intelligence investigations, including interviews, wiretaps, physical searches, grand jury material, and

intelligence disseminated by other members of the Intelligence Community.  The FBI's problem is twofold: 1) dissemination of information within the Bureau and, 2) sharing of information with other members of the Intelligence Community.  In some cases, the FBI was limited by legal or policy constraints on, for example, the use of grand jury information and information obtained through criminal wiretaps.  The USA Patriot Act eliminated some of those constraints.  However, the FBI has also been hampered by its own limitations, for example, a failure to develop a strategy for sharing information.  As its Deputy Assistant Director for Counterterrorism and Counterintelligence testified:

> We did not leverage what we had information-wise, and we did not leverage what other agencies had as information. We lacked analysts, we lacked linguists, we lacked electronic architecture that allows to us interact with other organizations. . . . We lacked size.  And we lacked attacking the target from 360 degrees.  For example, we did not develop a program that leveraged what we have as expertise, what the Treasury had as expertise, and what the [CIA] had as to expertise for a concentrated, focused, aggressive investigation in finances.  Terrorist organizations . . . like al-Qa'ida . . . have several points of strength, but several points of weakness. . . .  We did not leverage State and local police.  The culture says you don't share that information.

In addition, as a result of technological problems, FBI analysts did not have access to all information within the Bureau.  The FBI's Deputy Assistant Director for Counterterrorism Analysis testified that "the FBI lacked effective data mining capabilities and analytical tools, it has often been unable to retrieve key information and analyze it in a timely manner, and a lot has probably slipped through the cracks as a result."

Before September 11, FBI personnel were not trained or equipped to share foreign intelligence developed in counterterrorism investigations with the Intelligence Community or even with other units within the Bureau, which deprived analysts throughout the Community of information.  The FBI's Chief of the Counterintelligence Analysis Section in the Counterintelligence Division explained: [page 377]

> Technology alone, however, is not the silver bullet; gaining access to all relevant FBI information associated with an individual terrorist suspect, terrorist group or State Sponsor was also an issue the analysts faced periodically. Information was sometimes not made available because field offices, concerned about security or media leaks, did not upload their investigative results or restricted access to specific cases. This, of course, risks leaving the analysts not knowing what they did not know.

Finally, the FBI typically used information obtained through the Foreign Intelligence Surveillance Act only in the cases in which it was obtained and would not routinely disseminate the information within the Bureau or to other members of the Intelligence Community.

## d.  The Department Of State

One of the principal State Department contributions to the fight against terrorism is the TIPOFF watchlist program, which, according to its director, was established in 1987 after the Department issued a visa to someone the Intelligence Community knew was a terrorist.

According to TIPOFF's Director, from inception to Summer 2002, the program prevented 763 individuals from receiving visas to enter the United States.  However, the Joint Inquiry was told that information flow into TIPOFF before September 11 was less than complete.  It was not until 1995, eight years after a terrorist was mistakenly allowed into the United States, that the CIA approved State Department declassification of data for inclusion in TIPOFF.  Before the change in policy, State would submit a list of names monthly for CIA declassification, and that process delayed the watchlist updates.

Growing concern about the terrorist threat did not noticeably increase the amount of information shared between the Intelligence Community and the State Department before September 11, which, in contrast, advised the Joint Inquiry that it received at least 1,500 CIA Central Intelligence Reports containing terrorist names shortly after September 11.  State Department officials also spoke about the difficulty in obtaining data for watchlisting purposes from the FBI National Crime Information Center, in spite of ten years of negotiations with the Bureau for access.

[Page 378]

September 11 hijackers Khalid al-Mihdhar and Nawaf al-Hazmi provide perhaps the most glaring examples of incomplete information sharing with the State Department.  As is demonstrated in other sections of this report, the CIA had reportable information about these men long before it asked that they be "watchlisted" in August 2001.  As DCI Tenet testified, this failure is not the result of a limited problem in the systems in place:

> The fact that we did not recommend al-Hazmi and al-Mihdhar for watchlisting is not attributable to a single point of failure.  There were opportunities, both in the

field and at Headquarters, to act on developing information. The fact that this did not happen – aside from questions of CTC workload, particularly around the period of the disrupted Millennium plots – pointed out that a whole new system, rather than a fix at a single point in the system, was needed.

In particular, the DCI pointed to CIA personnel not understanding their obligation to place people on watchlists or the criteria by which watchlist decisions should be made.  The Director of the TIPOFF program also described poor attendance at meetings he would arrange to brief CIA personnel on the program and the frequent turnover of CIA personnel assigned to it.

Some improvements have been made since September 11.  For example, Ambassador Francis Taylor told the Joint Inquiry that, "in August, 2002, the entire TIPOFF database, including full biographic records on nearly 85,000 terrorist names, photographs, fingerprints, and on-line documentation, was made available to the authorized users from five Intelligence Community and law enforcement agencies."  In August 2002 the State Department added over seven million names from FBI indices to a State watchlist, augmenting the 5.8 million names already uploaded.

### e.  The Federal Aviation Administration (FAA) and the Transportation Security Administration (TSA)

The FAA and its successor TSA are responsible for making threat information available to airlines and airports, domestic and foreign.  Without specific information from intelligence [page 379] and law enforcement agencies, TSA is unable to provide the context of threat to carriers and airports.  FAA officials told the Joint Inquiry that they have to make convincing cases about threats to the aviation industry because the industry is not willing to absorb additional security costs, absent strong evidence of need.

An example of the importance of providing context is the memorandum an agent in the FBI's Phoenix office prepared expressing concern about Middle Eastern students taking aviation training.  Claudio Manno, TSA's Assistant Undersecretary for Intelligence, told the Joint Inquiry that the FAA saw the Phoenix memorandum for the "first time" when Joint Inquiry staff brought the matter up.  Mr. Manno testified that, had he been made aware of the document, he would have done "a number of things that were done later" to advance the post-September 11 investigation.

TOP SECRET

**B.  Information Sharing between Intelligence Agencies and State and Local Officials**

Although federal officials emphasized the importance of state and local perspectives, the Joint Inquiry heard witnesses complain that the federal government does not systematically involve state and local agencies in counterterrorism programs.  Governor Gilmore, Chairman of the Advisory Panel to Assess Domestic Response Capabilities for Terrorism Involving Weapons of Mass Destruction, testified:

> [T]o the extent that there has been intelligence sharing, it has been ad hoc. It has been without a real systematic approach.  And what would you expect?  With the Intelligence Community, it is within the culture if not within the statute that you don't share information.  If you do [share information], you are even subject to criminal penalties. . . .

Some progress was made on information sharing with state and local officials after the FBI organized Joint Terrorism Task Forces in its field offices.  Starting with the first JTTF New York City in 1980, the FBI made a concerted effort to expand the program.  As Director Freeh noted, "We doubled and tripled the number of Joint Terrorism Task Forces around the United States so we could multiply our forces and coordinate intelligence and counterterrorism [page 380] operations with FBI's federal, state, and local law enforcement partners."  As of September 11, thirty-five FBI field offices had JTTFs; now all fifty-six offices do.

JTTFs are designed to combine federal and local law enforcement and intelligence capabilities into a cohesive unit to address complex international and domestic terrorism investigations.  JTTFs might include federal participants from CIA, INS, the Marshals Service, the Secret Service, TSA, Customs, the Bureau of Alcohol, Tobacco, and Firearms, the State Department, U.S. Postal Inspection Service, the IRS, Park Police, and other agencies.

According to FBI representatives, JTTFs have improved communication among these agencies and enabled the FBI to leverage their capabilities in counterterrorism investigations.  For example, INS personnel assigned to the Minneapolis JTTF were able to determine quickly that Zacarias Moussaoui's authority to stay in the United States had expired, leading to his arrest and detention.

361

JTTFs have not solved the information concerns of all state and local officials.  Baltimore Police Commissioner Edward Norris told the Joint Inquiry that serious gaps remain:

> I would like to know exactly what everyone else knows in my city. Whatever Federal agencies are working on in my city . . ., I should know exactly what's happening. . . .  [W]e know for a fact [that] terrorists are living in our cities.  We all know they're here; we just don't know who they are, we being the urban police departments in this country.  I would like to know and I would like to have a briefing . . . at least every month.  I would like to know what's happening, because I get briefings from my intelligence division every day, so I know who we're working on and I know what we're looking at. . . .  If I had access in a full briefing from whatever agency investigating within my city, it would make my life a whole lot more efficient and comfortable.  I would like to know what is happening, but currently do not.

## C.  Additional Information Sharing Problems

Detailing employees from one agency to another is often praised as a form of information sharing, but the Joint Inquiry heard that there are several limits to the practice.  The Departments of State, Transportation, Treasury, and Energy and the INS, Customs, and other organizations detail personnel to the CIA's Counterterrorist Center, the FBI, and, to a much lesser extent, NSA.
[Page 381]

Intelligence Community agencies also send detailees to non-intelligence and law-enforcement agencies.  Numerous task forces and cooperative agreements exist between the FBI and border-security and intelligence agencies.  Task forces are also primary vehicles for involving state and local agencies in counterterrorism efforts.

The Joint Inquiry was told repeatedly that host agencies restrict access to information and limit databases detailees can query on security and policy grounds.  Detailees often learn about intelligence only after host agency employees make ad hoc judgments to share information.

Representatives of detailing agencies also told the Joint Inquiry that host agency employees often do not understand issues of interest to other agencies and consequently provide detailees with information without context.

Access to databases is also impaired.  This is  because there is no single architecture in the Intelligence Community that bridges all federal, state, and local government databases.

TOP SECRET

Cultural concerns are another problem.  Former DIA Director Admiral Thomas Wilson explained to the Joint Inquiry that "information sharing" implies that one "owns the information." According to Admiral Wilson, agencies must shed the belief that they own information, which, in fact, belongs to the government.

## D.  The Wall: Barriers between Law Enforcement and Intelligence

Legal and other considerations have substantially influenced the degree to which intelligence agencies share information with law enforcement agencies.  These concerns also affected how information was shared between FBI intelligence components and FBI criminal investigators and Department of Justice prosecutors.  In interviews and at hearings, the Joint Inquiry has been told repeatedly that a phenomenon known as the "Wall" significantly hampered the free flow of information between the intelligence and law-enforcement entities.  Michael Rolince, former Chief of the FBI's International Terrorism Operations Section, testified:

> [Page 382] In terrorism cases this became so complex and convoluted that in some FBI field offices FBI agents perceived walls where none actually existed. In fact, one New York supervisor commented that "so many walls had created a maze" which made it very difficult for the criminal investigators.

The "Wall" is not a single barrier, but a series of restrictions between and within agencies constructed over sixty years as a result of legal, policy, institutional, and personal factors.  These walls separate foreign from domestic activities, foreign intelligence from law-enforcement operations, the FBI from the CIA, communications intelligence from other types of intelligence, the Intelligence Community from other federal agencies, and national-security information from other forms of evidence.

Following World War II, the National Security Act of 1947 created the Central Intelligence Agency, our first peacetime civilian intelligence organization.  Two fundamental considerations shaped that Act: the United States would not establish an organization that coupled foreign and domestic intelligence functions, and the FBI's domestic jurisdiction would be preserved.  To satisfy these aims, the Act provided that the CIA would not have police, subpoena, or law enforcement powers and would not perform internal security functions.

TOP SECRET

Generations of intelligence professionals have been trained in the belief that the CIA should not play an internal security role.  They also learned that sensitive information should be disclosed only to those with a demonstrable "need to know" the information within the rigidities of a national security classification system.  In addition, law enforcement personnel have long recognized that confidentiality, protection of witnesses, and secrecy of grand jury information are essential to the successful investigation and prosecution of crimes.  Thus, in the law-enforcement and foreign intelligence professions, security practices and strict limits on sharing information have become second nature.

The division between foreign intelligence and law enforcement is illustrated in the different procedures developed for law-enforcement and foreign-intelligence electronic surveillance and searches.

[Page 383]

The Fourth Amendment to the Constitution requires a judicial warrant for most physical searches for law enforcement purposes.  In 1967, the Supreme Court held in *Katz v. United States*, 389 U.S. 347, that the Constitution requires that law enforcement officers engaged in electronic surveillance in criminal investigations also obtain a warrant.

The 1967 decision stated that it was not addressing the question of whether electronic surveillance for foreign intelligence required a warrant.  However, in 1972, the Court held that a domestic group could not be subjected to warrantless electronic surveillance, even if authorized by the President or Attorney General, unless a connection was established between the group and a foreign power.  The government's argument that surveillance was necessary to collect intelligence about the group as part of an "internal security" or "domestic security" investigation was not sufficient to override the Constitutional warrant requirement.  The Court explicitly did not address the President's surveillance power with respect to foreign powers.

A few years later, Congress conducted extensive investigations into the activities of U.S. intelligence agencies, including warrantless electronic surveillance of citizens who were not agents of a foreign power and warrantless physical searches purportedly to identify subversives and protect intelligence sources and methods.  These investigations led to the enactment of the Foreign Intelligence Surveillance Act of 1978 (FISA).

FISA established a special court in response to the argument that the judiciary was not equipped to review requests for foreign intelligence surveillances.  Recognizing that intelligence and law enforcement interests would coincide in many cases where foreign intelligence surveillance is appropriate, such as espionage and terrorism investigations, the Act permits information produced by surveillance to be shared with law enforcement.  However, to ensure that the division between foreign-intelligence and law-enforcement surveillance was maintained, the Act required a certification that "the purpose" of a proposed FISA surveillance was collection of foreign-intelligence information.

[Page 384]

In the early 1980s, the law enforcement and intelligence communities often worked together often in counterintelligence and counternarcotics investigations.  Law enforcement agencies became more acutely aware in the course of this collaboration of the evidentiary complications that could arise as a result of using intelligence information in law enforcement efforts.  For example, defense attorneys seeking discovery of investigative information relating to the guilt or innocence of their clients could move to have charges dismissed, if the government withheld information on the basis of national security.  Thus, increased interaction between law enforcement and intelligence agencies required that procedures be devised to disseminate intelligence for law enforcement use while protecting intelligence sources and methods.  For example, intelligence agencies provided information to law enforcement organizations "for lead purposes only," so as to allow those organizations to act on the information without its becoming entwined in criminal prosecutions.

Personnel within the Justice Department and United States Attorneys' Offices were given responsibility for insulating law enforcement personnel from intelligence information while finding ways for them to benefit from it.  These arrangements came to be known as "walls."

To avoid court rulings that FISA surveillances were illegal because foreign intelligence was not their "primary purpose," Department of Justice lawyers began to limit contacts between FBI personnel involved in these activities and DOJ personnel involved in criminal investigations.  One result of this approach was that the then Counsel for Intelligence Policy at DOJ, the official

most responsible for dealing with the FISA Court, was recused from handling FISA applications on al-Qa'ida because she had worked with prosecutors on the embassy bombing prosecution.

The Attorney General issued procedures in 1995 regulating FBI foreign intelligence investigations in which FISA was used and potential criminal activity was discovered. These procedures required notice and coordination among the FBI, DOJ's Criminal Division, and its Office of Intelligence Policy and Review (OIPR). In November 2001, the FISA Court adopted these procedures.

[Page 385]

The wall in FISA matters became thicker and higher over time, as the FISA Court explained in a May 2002 opinion rejecting procedural changes proposed by the Attorney General:

> [T]o preserve . . . the appearance and the fact that FISA [was] not being used *sub rosa* for criminal investigations, the Court routinely approved the use of information screening "walls" proposed by the government in its applications. Under the normal "wall" procedures, where there were separate intelligence and criminal investigations, or a single counter-espionage investigation with overlapping intelligence and criminal interests, FBI criminal investigators and [DOJ] prosecutors were not allowed to review all of the raw FISA [information] lest they become *de facto* partners in the FISA [operations]. Instead, a screening mechanism, or person, usually the chief legal counsel in an FBI field office, or an assistant U.S. attorney not involved in the overlapping criminal investigation, would review all of the raw [information] and pass on only that information which might be relevant evidence. In unusual cases . . . , [DOJ] lawyers in OIPR acted as the "wall." In significant cases, . . . such as the bombings of the U.S. embassies in Africa, . . . where criminal investigations of FISA targets were being conducted concurrently, and prosecution was likely, this Court became the "wall" so that FISA information could not be disseminated to criminal prosecutors without the Court's approval.

The thicket of procedures, reviews, and certifications regarding FISA information and contact between foreign-intelligence and criminal investigators led to confusion and error. An FBI attorney noted in an interview that, as detail was added to certain FISA applications, the Court began to expect that level of detail in all applications. Thus, an application to renew a surveillance of an intelligence officer of a foreign government that might have originally required two paragraphs in support grew to many pages, increasing the possibility of error in details.

In March 2000, the Department of Justice discovered substantive errors in factual applications presented to the FISA Court. By September 2000, the Department identified errors in

about seventy-five FISA matters, and in March 2001 notified the FISA Court of additional errors. In response, the Court required that all DOJ personnel involved in FISA matters certify that they understood that FISA information could not be shared with criminal prosecutors without the Court's approval and an FBI agent involved with the erroneous filings was barred from the Court. While the Department attempted to correct the process that had led to erroneous [page 386] filings, a large number of FISA surveillances, including many related to international terrorism, expired in the spring and summer of 2001.

[The consequences of the FISA Court's approach to the Wall between intelligence gathering and law enforcement before September 11 were extensive. FBI personnel involved in FISA matters feared the fate of the agent who had been barred and began to avoid even the most pedestrian contact with personnel in criminal components of the Bureau or DOJ because it could result in intensive scrutiny by OIPR and the FISA Court. In addition, because NSA was not certain that it could identify reporting that came from FISA derived information, it began to indicate on all reports of terrorism-related information that the content could not be shared with law enforcement personnel without FISA Court approval].

The various walls have had other consequences of direct relevance to the Joint Inquiry. For example, a CIA employee spoke to two FBI employees in January 2000 about the activities of future hijacker Khalid al-Mihdhar in Malaysia, but did not tell them that he had a U.S. visa. The CIA officer stated in an e-mail at the time that the FBI would be brought "into the loop," only after "something concrete" was developed "leading us to the criminal arena or to known FBI cases." Perhaps reflecting the deadening effect of the long standing wall between CIA and FBI, the FBI agents reportedly thanked the CIA employee and "stated that this was a fine approach," although the FISA wall did not apply in this case.

Even in late August 2001, when the CIA told the FBI, State, INS, and Customs that Khalid al-Mihdhar, Nawaf al-Hazmi, and two other "Bin Laden-related individuals" were in the United States, FBI Headquarters refused to accede to the New York field office recommendation that a criminal investigation be opened, which might allow greater resources to be dedicated to the search for the future hijackers than would be available in an intelligence investigation. This was based on Headquarters' reluctance to utilize intelligence information to draw the connections

367

between al-Mihdhar and the *USS Cole* bombing necessary to open a criminal investigation.  FBI attorneys took the position that criminal investigators "CAN NOT" (emphasis original) be involved and that criminal information discovered in the intelligence case would be "passed over the wall" according to proper procedures.  An agent in the FBI's New York field office responded by e-mail, [page 387]  "Whatever has happened to this, someday someone will die and, wall or not, the public will not understand why we were not more effective in throwing every resource we had at certain problems."  Again, FBI Headquarters applied FISA "walls" to a non-FISA case.

The USA PATRIOT Act, enacted in response to September 11, provided unambiguous authority for the Attorney General and other law enforcement officials to disclose to the Director of Central Intelligence foreign intelligence collected in the course of a criminal investigation.  The Act also requires that intelligence be "a significant purpose" of a FISA search rather than "the purpose."  These provisions were intended to reduce, if not remove restrictions that had grown up around FISA operations.  The Foreign Intelligence Surveillance Review Court, in its first opinion since being established in 1979, has affirmed that the Act permits the free flow of intelligence to prosecutors, who may direct and control FISA surveillances.

## XI.  Technology Gaps

Technology is critical to the Intelligence Community's efforts to collect, analyze, and disseminate information on terrorist identities, locations, capabilities, plans, and intentions.  The Joint Inquiry examined a number of issues in order to assess how well-postured the Community was in regard to its use of technology as well as its understanding of the use of technology by terrorists.  The NSA, which, of all the intelligence agencies, relies the most on technical collection, received most of the attention.

## A.  Technology Gaps at NSA

Al-Qa'ida members employed a variety of communications technologies, including modern ones such as [————————————————————————————————], in the conduct of their activities.  In his testimony, NSA Director Lt. Gen. Hayden lamented the fact that terrorists have access to the three-trillion-dollar-a-year communications industry.  The Joint

368

Inquiry attempted to examine NSA's current and planned capabilities to exploit these types of modern communications as well as the tools being used and developed to help linguists and analysts process and share the volumes of information collected.  In addition, the Joint Inquiry [page 388] examined the health of the technical collection platforms from which the majority of counterterrorism intelligence information is derived.

The assessment presented below draws on testimony, interviews, and some NSA documentation.

[————————————————————]

[————————————————————————————————————————————————————————————————————————————————————————————————————————————————————————————].

[————————————————————————————————————————————————————————————————————————————————————————————————————————————————————————————————].

[——————————————————————————]

[————————————————————————————————————————————————————————————————————————————————————————

——————————————————————————————————————————

——————————————————————————————————————————].

[Page 389]

[————————————————————————————————————————

——————————————————————————————————————————

——————————————————————————————————————————

——————————————————————————————————————————

———————————————————————].

[————————————————————————]

[————————————————————————————————————————

——————————————————————————————————————————

——————————————————————————————————————————

——————————————————————————————————————————

——————————————————————————————————————————

——————————————————————————————————————————

———————————].

[————————————————————————]

[————————————————————————————————————————

——————————————————————————————————————————

——————————————————————————————————————————

——————————————————————————————————————————

——————————————————————————————————————————

———————————————————————].

[————————————————————————————————————————

——————————————————————————————————————————

——————————————————————————————————————————

——————————————————————————————————————————]

[Page 390] [————————————————————————————
——————————————————].

## F.  Selection and Filtering for [——————————————————]Communications

Much of NSA's pre-September 11 success against terrorist targets was due to the ability to [————————————————————] based on [———————————] interest rather than randomly choosing among millions of communications.  With the proliferation of multimedia communications, even better selection and filtering techniques will be required.

One area of increased attention is [————————————————————————————
——————————————————] an area in which NSA has made only limited progress.  [—————
——————————————].  Unfortunately, NSA's selection capabilities suffer from a critical deficiency, [————————————————————————————] .  The solution to this deficiency is well understood and estimated to cost less than $1 million to implement. However, the Joint Inquiry learned in interviews that even though [———————————] have been available for many years, and even though NSA has had recent significant funding increases, the program manager is still "scrounging" for funds to pay for this upgrade that would not be completed until 2004.

## G.  Analyst Tools

NSA often did not provide analysts with sufficient tools to exploit the data collected.  For example, NSA in 1998 did not have the capability to [————————————————————————————
—————————————————], NSA's Analysis and Production Chief, noted, "At that time the systems that were in place were high tailored, not integratable.  The plug and play was only beginning to come into play at that point in time.  So a tailored solution that you might be able to architect at home wasn't necessarily one that you could deploy across [———————————] or within a CT shop."  [————] noted, however, that this capability now existed.

[Page 391]

However, field operators still do not have such tools, even though they were available at NSA Headquarters after September 11.  During a visit to the [————————————————————],

371

Joint Inquiry personnel found [————] linguists frustrated with Headquarters support for language tools.  In fact, one of their primary concerns was the inability to display [——————————————————].  They noted that they could purchase software on the local economy that can display [——————————————] but are prohibited from doing so because the software is not an "approved application" for their computer platform.  "When they officially requested such a capability through official channels, they were told that something could be available in 18 months."  They noted that some computers they still use are 1993 vintage UNIX machines that cannot even display ordinary graphical user interfaces correctly due to color graphics limitations.


**H.  Collection Platforms**


    NSA collects signals intelligence using a variety of methods or platforms.  Often these platforms, which have a sizable infrastructure investment, serve a myriad of intelligence missions.  In identifying these critical platforms, the Joint Inquiry examined statistics on counterterrorism-related reporting.  The following chart shows the source of counterterrorism reports per technical collection platform both pre- and post-September 11:

| Collection Platform | All Counterterrorism Reports 10 May 01 - 10 Sep 01 | All Counterterrorism Reports 11 Sep 01 - 11 Jan 02 | Percent Increase |
|---|---|---|---|
| [——————————————————] | [——————————] | [——————————] | [———————] |

    NSA spending increases after September 11, however, are not focused on several of the most productive sources of counterterrorism information.  [——————————————] [Page 392]

372

[————————————————————————————————
————————————————————————————————
————————————————————————————————
————————————————————————————————
————————————————————————————————
————————————————————————————————
————————————————————————————————
————————————————————————————————
————————————————————————————————
————————————————————————————].

       The evidence suggests that an effective counterterrorism effort requires [————————
————————————————]. In testimony, Lt. Gen. Hayden acknowledged, [————————
————————————————————————————————
————————————————————————————————]. Lt.
Gen. Hayden also stated that in his effort to develop capabilities against new communications
technologies by the end of the 1990s, "This meant taking money away from current, still active,
still producing activities. . . ." Since the attacks, NSA has focused on its transformation strategy.

       Lt. Gen. Hayden testified:

> "Shortly after September 11th, I had a meeting of my senior leaders. I asked them
> the following question: Is there any part of our transformation roadmap that we
> should change as a result of the attacks? Unanimously, they responded, 'No, but
> we need to accelerate these changes.' With the money the President has requested
> and Congress has provided, we have done just that."

NSA's commitment to the future viability of the [————————] collection platforms remains
unclear, despite their value.

## XII. Technical Collection of Terrorist Communications

       [Responsibility for most of the technical collection of terrorist communications falls under
the purview of the National Security Agency, although the CIA and the FBI also conduct technical
collection against terrorism. NSA and other agencies learned valuable information from
intercepting terrorist communications and prevented several planned attacks. Indeed, numerous

officials throughout the policy and Intelligence Community told the Joint Inquiry that [page 393] Signals Intelligence (SIGINT) was a valuable source of information on al-Qa'ida.  Exploitation of terrorist communications, however, was uneven at best and suffered from insufficient investment. Al-Qa'ida was only one of several high priority targets and a difficult one].

## A.  NSA's Organizational Structure for Collecting Terrorist Communications

Within the NSA, the Signals Directorate, which was created in February 2001 by combining the Operations and Technology Directorates, has the primary SIGINT mission.  Within the Signals Directorate, the Counterterrorism Product Line has the lead for counterterrorism reporting.  [————————————————————————————————————————————————————————————————————————————————————————————————————————————————]:

- [————————————————————————————————————————————];

- [————————————————————————————————];

- [——————————————————————————];

- [————————————————————————————————————————————————————];

- [————————————————————————————————];

- [——————————————————————————].

## B.  SIGINT and the September 11 Attacks

Prior to 11 September 2001, NSA had no specific information indicating the date, time, place, or participants in an attack on the United States. Numerous NSA personnel, including

Lt. [page 394] General Hayden, the Director of the NSA (DIRNSA), repeatedly related this conclusion to the Joint Inquiry.

[NSA had intercepts on September 10, 2001 that, in retrospect, appear to relate to the September 11 attacks.  These intercepts were processed on September 11 (after the terrorist attacks) and reported early on September 12, 2001.  Although each of the products referred to something occurring the following day, neither intercept had specifics on the attack, location, or targets.  This wording was similar to other non-specific threats occasionally reported by NSA over the past several years].

In an effort to place the September 10 messages in perspective, General Hayden testified, "I should also note that [over a period of time] earlier that summer we had intercepted and reported over 30 such imminent attack messages and that since September 11 [NSA continues to report similar activities]."

In fact, following September 11, there was a flurry of similar [————] intercepts that were not associated with any terrorist attacks:

- [———————————————————————————————————————————
   ————];

- [———————————————————————————————————————];

- [———————————————————————————————————————————
   ————]; and

- [———————————————————————————————————————————
   ————].

[Page 395]

**C.  A Chronological Review of NSA Collection Efforts Against al-Qa'ida**

[In the years before the September 11 attacks, NSA steadily increased its collection on al-Qa'ida.  Initial Intelligence Community efforts focused on Bin Ladin himself as a terrorist financier.  As the 1990s wore on, this effort expanded to collection on Bin Ladin's associates and the al-Qa'ida organization.  [——————————————————————————————

————————————————————————————————————————————————

————————————————————————————————————————————————

————————————————————].

The following review is largely drawn from Joint Inquiry interviews.  It highlights important milestones in NSA's collection against al-Qa'ida.

[————————————————————————————————————————————

————————————————————————————————————————————————

————————————————————————————————].  Bin Ladin was viewed almost exclusively by the Intelligence Community as a terrorist financier until 1996].

[In 1996, CTC established its Bin Ladin unit as the Intelligence Community focal point for tracking Bin Ladin.  [————————————————————————————————

————————————————————].  The first phase of the unit's Bin Ladin project was strategic information gathering, [————————————————————————————————————————].  It was at this point that the Intelligence Community began focusing on the Bin Ladin target as a terrorist support network in addition to being a terrorist financier].

[————————————————————————————————————————————

————————————————————————————————————————————————

————————————————————————————————————————————————

————————————————————————————————————————————————

————————————————————————————————————————————————

————————————————————————————————————————].

[Page 396]

TOP SECRET

[Before Bin Ladin issued his February 1998 anti-American *fatwa*, [———————————————————————————————————]. Following the *fatwa*, the Director of NSA appealed to [                ] partners, few of which were focused on counterterrorism at the time, for counterterrorism assistance. [————————————————————————————————————————————————————————————————————————].

[Following the August 1998 East Africa Embassy bombings, NSA instituted a much higher operations tempo, which never really subsided. After the bombings, at the request of FBI's New York Field Office, NSA provided all reports that appeared related to the attacks. This information was useful to the FBI].

[In the fall of 1998, NSA lost the ability to listen to Bin Ladin on his satellite phone. This loss was probably the result of, among other things, a media leak. [————————————————————————————————————————————————————————————————————————————].

[————————————————————————————————————————————————————————————————————————————].

In February 1999, the Department of State demarched the Taliban, [————————————————————————————————————————————————————————————————————————————].

[Page 397]

TOP SECRET

[——————————————————————————————
———————————————————————————————
———————————————————————————————
———————————————————————————————
———————————————————————————————
——————————————————————].

The Millennium threat surge began in November 1999.  The Millennium threat was a top priority for the entire Intelligence Community, and NSA personnel worked around the clock supporting CIA's disruption campaign.   During this time, Jordanian officials arrested terrorists linked to al-Qa'ida.  [——————————————————————————
———————————————].

[——————————————————————————————
———————————————————————————————
———————————————————————————————
———————————————————————————————
——————————————————].

Several other advances occurred throughout 2000.  [——————————————
———————————————————————————————
———————————————————————————————
———————————————————————————————
———————————————————————————————
———————————————————————————————
———————————————————————————————
———————————————————————————————
———————————————————————————].

[Page 398]

Following the *USS Cole* bombing in October 2000, NSA consolidated some of its counterterrorism efforts [——————————————————————————
———————————————————————————————

_____

_____

_____].

[By the winter of 2000, NSA noted a general rise in threat activity.  The Intelligence Community assessed the threat to be mostly oriented abroad.  In spring 2001, NSA noted another significant rise in threat activity.  Again, the Intelligence Community assessed the threat to be directed abroad].

[Throughout June and July 2001, another rise in threat activity was identified.  NSA analysts noted vague communications traffic indicating that something was afoot.  Intelligence Community speculation centered on whether the likely target was abroad.  The U.S. military was sufficiently concerned that an attack would occur on the Arabian Peninsula that "ThreatCon Delta" was declared and all ships in the area were sent to sea].

[Military customers asked NSA/CT analysts if the threat were real.  NSA counterterrorism analysts reviewed the evidence and were confident that it was.  [_____ _____ _____ _____ _____ _____].

[In the spring, the Intelligence Community reported indications that an attack may have been postponed.  The Joint Inquiry was told that this led the Intelligence Community to believe that a real terrorist attack had been averted].

[Page 399]

## D.  Technical Collection Problems and Limits at NSA

Technical collection was limited.  This was due to both the nature of the target and missteps by the NSA and other U.S. government elements.

## a. Difficulties of Gaining Actionable Intelligence on al-Qa'ida

[Several senior NSA officials, including the Deputy Director of NSA and Chief of the counterterrorism organization contended in interviews and testimony that information on terrorist plans and intentions was often not available [————————————————————————————

————————————————————————————————————————————————————————

————————————————————————————————————————————————————————

————————————————]. Even when information was intercepted, the analyst often must interpret arcane, circumspect discussions, put them into context, and identify linkages to other known targets or activities. NSA's Director stated: "…. we do not anticipate being able to provide detailed threat information from SIGINT in most cases." Indeed, SIGINT did not provide significant intelligence to prevent other major terrorist attacks against U.S. interests such as Khobar Towers, the East Africa U.S. Embassies, and *USS Cole*].

[However, these arguments are somewhat belied by evidence uncovered during the Joint Inquiry that identified several instances of communications providing some specifics in terms of a timeframe and general location for terrorist activity. In addition, the FBI acquired toll records that five or six hijackers communicated extensively abroad after they arrived in the United States. The Intelligence Community had no information prior to September 11, 2001 regarding these communications, and, as a result, does not know what clues they may have contained].

[————————————————————————————————————————————————

————————————————————————————————————————————————————————

————————————————————————————————————————————————————————

————————————————————————————————————————————————————————

————————————————————————————————————————————————]

[Page 400] [————————————————————]. The Director of NSA, testifying about the targeting challenges facing NSA, said "cracking into these targets is hard – very hard – and SIGINT operations require considerable patience – sometimes over years – before they mature."

380

**b.  Difficulties in Adjusting to Terrorist Targets**

The communications sophistication of stateless terrorists in general and al-Qa'ida in particular clearly surprised NSA officials.  The rise of al-Qa'ida seemingly paralleled in some respects what NSA's Director referred to as "the telecommunications and information revolution" of the past ten years.  He noted that al-Qaida operatives are skilled users of the global telecommunications infrastructure, "al-Qa'ida is in many respects different from NSA's typical SIGINT targets of the past 50 years."

In spring 2001, NSA began to change direction: rather than analyzing *what was collected*, NSA would dissect its targets' communications practices to determine *what to collect*.  This is commonly referred to at NSA as *hunting* rather than *gathering*.  This procedure was in its infancy when the September 11 terrorist attacks occurred.

**c.  Problems Keeping Pace with [———————————] Advances before September 11**

[——————————————————————————————
————————————————————————————————
————————————————————————————————
————————————————————————————————
————————————————————————————————
————————————————————————————————
————————————————————————————————
————————————————————————————————
——————————————————————————].  The Director of NSA did acknowledge NSA's deficiencies in dealing with some forms of modern communications, but was also quick to credit his organization for working on the building blocks before September 11, so that [Page 401] fielding additional capabilities after September 11 was expedited].

NSA's Director apparently felt handcuffed in his effort to move forward in this area, citing his inability to "churn" (redirect) some $200 million into "new age signals ... because we were going to erode our coverage of [other intelligence issues] as part of this effort."  Indeed, General

381

TOP SECRET

Hayden told the Joint Inquiry that he was severely criticized on several occasions for abandoning so-called legacy communication paths in favor of developing robust new capabilities.

[There is some apparent inconsistency concerning NSA's concentration.  On at least one occasion, the Director of NSA asserted that it was not so much NSA's inability to collect some modern communications, but other factors.  The bulk of the information available to the Joint Inquiry, however, suggests NSA was behind the curve in this area and only began to catch up after September 11, 2001].

**E.  Insufficient Resources for Counterterrorism at NSA**

Although NSA has had difficulty in generating consistent, accurate personnel numbers for the Joint Inquiry, it appears from interviews and the limited information provided that personnel employed in the counterterrorism organization were largely static over several years, despite repeated efforts by local managers to increase the numbers of linguists and analysts.  General Hayden testified that in hindsight he would have liked to have doubled his resources against al-Qa'ida.

NSA acknowledged it had insufficient numbers of linguists and analysts on the counterterrorism target.  This acknowledgment seems to have come from leadership in retrospect, while those closer to the counterterrorism problem stated to the Joint Inquiry they had been requesting personnel increases for years, mostly to little or no avail.

[Page 402]

Declining overall resources made it difficult to dramatically expand counterterrorism coverage.  As discussed in more detail in a separate chapter, for much of the 1990s NSA's budget and manpower were steadily reduced to a point that all collection efforts were impeded.  Cuts were "salami-sliced" across the agency rather than specifically targeted, a tactic employed by NSA for many years to cope with declines while still trying to satisfy an increasing number of intelligence requirements, and competing priorities (especially force protection requirements) that drained scarce resources, such as Arabic linguists.  Funds for [————————] collection, historically two of NSA's most lucrative reporting sources, were essentially put in a maintenance

TOP SECRET

mode, with investment focused on other collection sources that NSA felt needed to be developed to have a more balanced SIGINT collection system.

There was little significant, sustained reaction to the DCI's declaration of war on al-Qa'ida in 1998.  Indeed, LTG Hayden (who became Director of NSA in 1999) noted that by 1998, NSA was already at a heightened counterterrorism posture and thus no additional wholesale shifts in resources were made at that time.  LTG Minihan, the Director of NSA at the time of the DCI's declaration, told the Joint Inquiry that he felt the DCI was speaking for the CIA only.  In his view, the DCI generally left Intelligence Community matters to the head of the Community Management Staff.

[Numerous individuals noted that counterterrorism was but one of several seemingly equally high priority targets levied on NSA prior to September 11.  Although the Director of the Signals Directorate stated that in addition to al-Qa'ida, [—————] was the only other Tier 0 (highest priority) target in the 1998-2001 timeframe, there did not seem to be an objective method for resource assignment within NSA, nor guidance from the DCI.  The Director of NSA in his testimony referred to the PDD-35 requirements system as "cumbersome."  The requirements system in place on the eve of September 11 consisted of some 1,500 standing requirements calling for some 200,000 detailed pieces of information – ad hoc requirements that were received telephonically or via e-mail, and requests for additional information.  In response, NSA juggled resources to cope with competing requirements but did not make dramatic cuts in other priorities to dramatically expand counterterrorism coverage].

[Page 403]

The NSA Director also cautioned in his testimony, "If these hearings were about the war that had broken out in Korea or the crisis in the Taiwan Straits that had taken us by surprise or if we had been surprised by a conflict in South Asia or if we had lost an aircraft over Iraq or if American forces had suffered casualties in Bosnia or Kosovo, in any of these cases I would be here telling you that I had not put enough analysts or linguists against the problem. We needed more analysts and linguists across the agency, period."

**F.  Technical Collection at CIA**

Most of the technical collection operations at the CIA have a human access element, and the primary offices with responsibility are in the Directorate of Operations.  The Counterterrorism Center has a Technical Operations Branch that is responsible for orchestrating special technical collection operations for terrorist targets.  Some of these operations are conducted in concert with NSA, [——————————————————————————————————————— ———————————————————————————].

[——————————————————————————————————————— ——————————————————————————————————————————— ——————————————————————————————————————————— ——————————————————————————————————————————— ——————————————————————————————————————————— ————].  [Despite this [———————————————] effort, a senior CIA official testified that in hindsight he would have liked to have had more [——————————————————————— ——————————————].

**G.  NSA/CIA Disputes Over [———————————————————] Collection**

[NSA and CIA failed to agree on an approach to collect [———————————————————], and both agencies independently developed a capability [——————————————————————— ————————].  After considerable discussion with NSA and CIA personnel, the Joint Inquiry [page 404] determined that CIA wished to have [———————————————————] as soon as possible [—— ———————————————————————————], and NSA said it could not deliver in the requested timeframe.  Accordingly, CIA developed its own capability while NSA continued with its program, which ultimately was delivered some 15 months early.  In the end, peace was made and over time, NSA and CIA began to benefit from each other's capabilities].

Especially during periods of budgetary shortfalls, the competitive example just cited appears particularly wasteful.  To avoid similar disputes, NSA and CIA have created the Senior Partnership Advisory Group (SPAG).

**H.  Technical Collection at FBI**

The FBI performs considerable technical collection within the United States to support its own intelligence and criminal investigations.  It also supports the collection efforts of Intelligence Community agencies, [————————————————————————————————————————————————————————].  These activities are conducted pursuant to the authority of the Foreign Intelligence Surveillance Act of 1978.  [————————————————————————————————————————————————————————————————————————————————————————————————————————————————————————————————————————————————————————].

FBI was conducting relatively few technical collection operations against al-Qa'ida before September 11.  The intelligence produced was of relatively limited value because the targets did not appear to be involved in significant activity.

FBI officials indicated that after September 11 a joint program had begun with NSA [————————————————————————————————————].  FBI is responsible for collecting the information.  NSA receives the information and is responsible for reporting to the Intelligence Community and [page 405] intelligence customers.  [—————————].  FBI personnel maintain that collaboration [————————————————————————————] can still be improved.


**XIII.  HUMINT Collection**

Three agencies in the Intelligence Community have primary responsibility for HUMINT (intelligence from human sources) collection:  the CIA, the FBI, and the DIA.  Before September 11, none of these agencies had collected any information through HUMINT sources warning of the September 11 attacks on the Pentagon and the World Trade Center.

[The agencies' attempts to use human penetrations to gather intelligence on al-Qa'ida steadily grew throughout the 1990s, until by the end of the decade it was a top priority. The CIA met with the most success through its foreign liaison relationships and with volunteers. It made only limited progress with unilateral attempts to place human assets in al-Qa'ida's leadership. The DIA's Defense Humint Services (DHS) had some success against the Taliban, but little against al-Qa'ida. The FBI collected valuable information on Islamic radical activity in the United States, but the Bureau's focus was often overseas. In addition, the FBI often failed to coordinate its human collection].

The Joint Inquiry collected information about the agencies' pursuit of HUMINT through interviews and reviews of documents. The Joint Inquiry was frequently unable to catalog or audit the HUMINT sources from the information delivered by CIA because the documents were heavily redacted for source protection. This did decrease the Joint Inquiry's ability to judge the breadth and depth of the HUMINT program at CIA.

## A.  CIA Human Intelligence Collection

[The  CIA has tried to collect on Bin Ladin and al-Qa'ida since the mid-1990s. Collecting human intelligence on al-Qa'ida became an increasingly important priority at the CIA, and in 1996, the Counterterrorist Center (CTC) set up a special Bin Ladin unit to increase its focus on [page 406] Bin Ladin. The CIA used the three traditional mechanisms for developing HUMINT or field intelligence:  unilateral sources, volunteers, and liaison relationships].

The CIA made the penetration of al-Qa'ida a top priority. The DCI characterized the counterterrorism effort against Bin Ladin and his organization to the Committees on June 18, 2002 in this way:

> We understood that our first priority was to try and stop the next attack that was going to occur and operate against these people around the world, and then penetrate a sanctuary through whatever means we could, to build the [capabilities] that would allow us to mount these kinds of operations. . . . As we race through [a] period of threat when we're disrupting specific attacks against embassies and overseas facilities and thousands of people would be dead, except for what we did, I don't remember anybody saying you guys are too timid, you're not working it hard enough or you haven't expended a level of effort.

386

TOP SECRET

[To improve collection on, and efforts to disrupt, al-Qa'ida, a special unit focused on Bin Ladin was created in early 1996.  The Bin Ladin unit initially had fewer than 20 people, and included operations officers, analysts who acted as targeteers, and desk officers who directed field operations.  At the start, it did not have any case officers of its own deployed to the field.  To conduct operations overseas for intelligence collection or disruption, the unit had to work through the Directorate of Operations (DO) area divisions and request the use of their operations officers to pursue al-Qa'ida related leads.  With the passage of time and the increased priority of al-Qa'ida, more people were added to the Bin Ladin unit and more case officers were assigned to the field either permanently or temporarily.  The area divisions also increased their case officers' efforts against the target].

However, Joint Inquiry interviews indicate that even into 2001, the Bin Ladin unit knew it needed more people – particularly experienced Headquarters desk officers and targeters – to effectively meet the HUMINT challenge.  In early Spring 2001 briefing to the DCI, CTC [page 407] requested hiring a small group of contractors not involved in day-to-day crises to digest vast quantities of information and develop targeting strategies.   The briefing emphasized that the unit needed people, not money.

The penetration of al-Qa'ida by an Intelligence Community human asset is an exceptionally difficult task.  Intelligence Community officials in several agencies told the Joint Inquiry that members of Usama Bin Ladin's inner circle have close bonds established by kinship, wartime experience, and long-term association.  Information about major terrorist plots was not widely shared within al-Qa'ida, and many of Bin Ladin's closest associates lived in war-torn Afghanistan.  The United States had no official presence in that country and did not formally recognize the Taliban regime, which viewed foreigners with suspicion.  Pakistan is the principal access point to southern Afghanistan, where al-Qa'ida was particularly active, but U.S.-Pakistani relations were strained by Pakistani nuclear tests in 1998 and a military coup in 1999.  This was an exceedingly difficult operational environment in which to conduct clandestine operations.

[Nevertheless, CIA officials recognized the imperative of penetrating al-Qa'ida, particularly at the leadership level.  A CTC presentation made to the CIA senior leadership on December 2, 1999 noted:

- Without penetrations of [the] UBL organization… [————————————
————————————].

- While we need to disrupt operations…we need to also recruit sources inside UBL's organization.

- Realize that recruiting terrorist sources is difficult…but we must make an attempt].

[On the next day, the CTC briefed the National Security Council Small Group about the CIA's lack of sources and the importance of recruitment:

We will continue with disruptions of operations and renditions…but with an increased emphasis on recruiting sources; at this time, we have no penetrations inside UBL's leadership].

[Page 408]

[Because this target was such a high priority, the CIA tried many unilateral avenues to obtain access to Bin Ladin and his inner circle.  Interviews of CIA officials and documents provided to the Joint Inquiry indicate the CIA tried to  [————————————

————————————————————————————————

—————————————————————————————————]

According to documents reviewed by the Joint Inquiry Staff, [————————————
————————————]: "[————————————
————————————]." Despite these creative attempts, former CTC officers told the Joint Inquiry that before September 11 the CIA had no penetrations of al-Qa'ida's leadership, and the Agency never got actionable intelligence [————————————].

In interviews with current and former CTC officers, the Joint Inquiry learned that [———
——————————————————————————————

——————————————————————————————

——————————————————————————————

——————————————————————————————

——————————————————————————————

——————————————————————————————]

_____

_____].

The CIA frequently draws on an active set of volunteer sources, [———], to gain intelligence. [_____

_____

_____

_____

_____].

[Page 409]

[Volunteers needed particular scrutiny, as some of these individuals were suspected of being sent in from foreign intelligence services as counterintelligence assets, or they might have been al-Qa'ida provocations.  [_____

_____

_____

_____

_____].

[_____

_____

_____

_____

_____

_____

_____

_____].

Critical to the successful collection of intelligence and to the disruption of terrorist activities were the relationships forged with foreign liaison services.  (See Section II).  Because of the scarce personnel resources initially assigned to this target, and because of the intense pressure to capture Bin Ladin himself, CTC chose to have liaison services develop sources wherever possible to support the U.S. mission.  In addition, as noted in section II, liaison services had

additional capabilities that made them particularly effective against the al-Qa'ida target.  The DCI, the senior leadership of the CTC, and the leadership of the Directorate of Operations were actively engaged in building and maintaining these liaison relationships.

Developing relationships with liaison services paid off handsomely when there was some actionable intelligence about a terrorist or a cell.  For example, in July 2001, a Bin Ladin operative was arrested in the [————————————————————————————————————————————— ———————————].  Because of this arrest, a plot to bomb an American Embassy in Europe was thwarted.

[Page 410]

[The liaison relationship worked extremely well with the [———], as well as with other services in the [——————].  Liaison sources often provided valuable information about the al-Qa'ida network, but the CIA could not rely on them to provide access to Bin Ladin's leadership.  Moreover, in other parts of the world, abdicating collection to foreign partners meant the CIA obtained precious little information.  According to one U.S. Government official, if liaison services did not want to help, for example in certain Western countries, there was little that could be done, by CIA].

## B.  DIA Human Intelligence Collection

[DIA's Defense HUMINT Service also plays a role in clandestine collection, though on a much smaller scale than CIA.  According to General Dayton, the Director of DHS, after the Embassy bombings DHS "got excited" about Bin Ladin and al Qa'ida.  They searched their old agent files and reestablished contact with [———] sources that could help them with terrorist targets. [——————] former highly placed agents were reactivated.  Prior to September 11, at any one time, DHS had [———————] active.  Based on those sources they produced several hundred intelligence reports from fall 1998 to September 2001.

Most of the DHS sources were focused on [———————] and had little direct reporting capability against [————————].  DHS characterized its [———————] sources as well placed and extremely useful in the post-September 11 air campaign targeting effort.  [——————— —————————————————————————————————————————————

_____

_____].

## C.  FBI Human Intelligence Collection

The FBI attempted to develop specific intelligence that could be acted upon before September 11 by penetrating terrorist organizations operating in the United States.  Before September 11, the FBI had 70 full field investigations of individuals with al-Qa'ida ties. [Page 411] However, Bureau and Department of Justice policy and practice may have hampered the FBI's coverage of the radical fundamentalist community in this country.   Much of the FBI's effort against al-Qa'ida was actually expended overseas, with the investigations of the terrorist attacks against the US Embassies in Africa in 1998 and the *USS Cole* in 2000.

Recruiting sources in fundamentalist communities within the United States is difficult for many of the reasons noted above with regard to the penetration of al-Qa'ida in general.  However, even those FBI agents who were skilled at developing such sources faced a number of difficulties that may have hampered the Bureau's ability to gather intelligence on terrorist activities in the United States.  According to several agents, for example, FBI Headquarters and field managers were often unwilling to approve potentially controversial activity involving human sources that could provide counterterrorism intelligence.

The 1996 Antiterrorism and Effective Death Penalty Act, which specifically outlawed providing material support to terrorism, posed a particular problem.  If an FBI source was involved in illegal funding or in terrorist training, the agent responsible for the source had to obtain approval from Headquarters and the Department of Justice to allow the source to engage in the illegal activity.  This reportedly was a difficult process that sometimes took as long as six months.  Because terrorist sources frequently engaged in activity that violated the 1996 Act, the cumbersome approval process negatively affected the Bureau's ability to operate more sources successfully.

Sending sources recruited in the United States overseas proved particularly difficult.  Some FBI agents also saw the requirement that the Director of Central Intelligence approve such

391

operations as a problem, claiming that the CIA took advantage of this requirement to prevent FBI sources from operating overseas.  Another FBI agent stated that FBI Headquarters management did not readily approve overseas travel for sources because of its belief that the Bureau should focus on activity within the United States.  When management did approve such operations, it often declined to allow the responsible agents to accompany the sources while traveling overseas, a decision some agents believe significantly diminished the quality of the operations.

[Page 412]

The Joint Inquiry was told by several officials that the FBI was not using its network of counterterrorism sources in the most effective and coordinated manner.  The Bureau focused source reporting on cases and subjects within specific field offices and did not adequately use sources to support a national counterterrorism intelligence program.  In 1999, the FBI received reporting that a terrorist organization was planning to send students to the United States for aviation training.  In response, an operational unit at FBI Headquarters instructed twenty-four field offices to "task sources" for information.  However, it appears that no FBI sources were asked about the matter.  The problems experienced in Phoenix and Minneapolis – both of which are discussed in separate sections – further suggest that the FBI did not effectively task its sources in the United States to follow up on suspicious activity.

[This problem was painfully manifest in August 2001, when the FBI was made aware by CIA that terrorist suspects Nawaf al-Hazmi and Khalid al-Mihdhar were in the United States.  Neither the FBI field offices that were involved in the search nor FBI Headquarters thought to ask FBI field offices to ask their sources whether they were aware of the whereabouts of the two individuals, who later took part in the September 11 attacks.  A San Diego FBI field office agent who handled such sources, including the source who had numerous contacts with Nawaf al-Hazmi and Khalid al-Mihdhar, insisted to the Joint Inquiry that he would have been able to find them through his sources].

Finally, that same agent testified that he had "never" discussed any FBI interest in Bin Ladin or al-Qa'ida with that source prior to September 11, "because that was not an issue in terms of my assignments.  I was interested in Hamas, Hizbollah, Popular Front for the Liberation of Palestine, the Democratic Front for the Liberation of Palestine, the whole different range."   He stated that "we knew [al-Qa'ida] was an important person or important organization.  But we

didn't have any presence.  We didn't have any cases and we didn't have any source information that indicated that these guys were here in San Diego at that time."

[Page 413]

## XIV.  Summary of Joint Inquiry Review of Anthrax Attacks

In October 2001, the Congress, the United States Postal Service (USPS), and elements of the domestic infrastructure were the targets of anthrax attacks that eventually killed five Americans.  The Joint Inquiry requested that the General Accounting Office review those attacks, focusing on the difficulty of producing and spreading anthrax, mail as a delivery system, the status of USPS efforts to detect anthrax, the federal investigation into the attacks, and how the government is preparing for other incidents.

When the Joint Inquiry report was filed, the GAO investigation had been substantially completed, with an initial finding that no consensus exists among experts regarding the ease with which terrorists or a disgruntled scientist could effectively produce and disseminate anthrax on U.S. soil.  According to the GAO, technical experts believe that it would be very difficult to overcome technical and operational challenges to produce and deliver biological warfare agents sufficient to cause mass casualties.

According to the experts the GAO interviewed, delivery of anthrax by mail is not as efficient a method of producing mass casualties as military technologies.  However, in the public's mind and in terms of economic damage, anthrax powder in the mail represents a potentially significant problem.  The USPS effort to defend against biological agents illustrates a key aspect of homeland defense: the distinction between reactive and proactive operational environments.  Whereas the nation's posture had been to prevent attacks against military facilities, the anthrax attacks targeted civilian facilities that are unprepared to react.

According to the GAO, the FBI is aware of numerous anthrax incidents throughout the United States, which were random in nature and determined to be hoaxes.  Because this was the first time the FBI responded to an actual attack, however, there was some initial confusion about the investigative roles and responsibilities of various agencies.  The Bureau has recognized the

TOP SECRET

need to involve subject-matter experts and, as a result, its investigative teams include scientists, criminal investigators, hazardous-material experts, investigators from other federal agencies, and federal laboratories.

[Page 414]

As a result of the anthrax attacks, the FBI and other investigative agencies have increased attention on chemical and biological threats.  These agencies have reached agreements delineating roles and responsibilities, increased liaison with public health officials, developed a Center for Disease Control and FBI handbook for conducting investigations, and identified state and local officials who need security clearances for access to classified information.

To date, no connection has been established between the anthrax attacks and the terrorist attacks of September 11.

A copy of the GAO report can be found in the Appendix to this volume.

TOP SECRET

[Page 415]

## PART FOUR—FINDING, DISCUSSION AND NARRATIVE REGARDING
## CERTAIN SENSITIVE NATIONAL SECURITY MATTERS

**20. Finding**:  [Through its investigation, the Joint Inquiry developed information suggesting specific sources of foreign support for some of the September 11 hijackers while they were in the United States.  The Joint Inquiry's review confirmed that the Intelligence Community also has information, much of which has yet to be independently verified, concerning these potential sources of support.  In their testimony, neither CIA nor FBI officials were able to address definitively the extent of such support for the hijackers globally or within the United States or the extent to which such support, if it exists, is knowing or inadvertent in nature.  Only recently, and at least in part due to the Joint Inquiry's focus on this issue, did the FBI and CIA strengthen their efforts to address these issues.  In the view of the Joint Inquiry, this gap in U.S. intelligence coverage is unacceptable, given the magnitude and immediacy of the potential risk to U.S. national security. The Intelligence Community needs to address this area of concern as aggressively and as quickly as possible].**

Discussion:  [The Joint Inquiry reviewed information in FBI and CIA documents suggesting specific potential sources of foreign support for the September 11 hijackers.  While the Joint Inquiry uncovered this material during the course of its review of FBI and CIA documents, it did not attempt to investigate and assess the accuracy and significance of this information independently, recognizing that such a task would be beyond the scope of the Joint [page 416] Inquiry.  Instead, the Joint Inquiry referred a detailed compilation of information it had uncovered in documents and interviews to the FBI and CIA for further investigation by the Intelligence Community and, if appropriate, law enforcement agencies.  A detailed summary of the available information pertaining to this issue is included in the classified version of the Joint Inquiry final report].

[It should be clear that this Joint Inquiry has made no final determinations as to the reliability or sufficiency of the information regarding these issues that was found contained in FBI and CIA documents.  It was not the task of this Joint Inquiry to conduct the kind of extensive investigation that would be required to determine the true significance of such alleged support to the hijackers.  On the one hand, it is possible that these kinds of connections could suggest, as indicated in a CIA memorandum, "incontrovertible evidence that there is support for these terrorists [——————————]."  On the other hand, it is also possible that further

investigation of these allegations could reveal legitimate, and innocent, explanations for these associations].

[Given the serious national security implications of this information, however, the leadership of the Joint Inquiry is referring the Joint Inquiry Staff's compilation of relevant information to both the FBI and the CIA for investigative review and appropriate investigative and intelligence action].

[Page 416]

[————————————————————————————————————————————————————
————————————————————————————————————].

[————————————————————————————————————————

—————————————————————————————————————————————

—————————————————————————————————————————————

—————————————————————————————————————————————

—————————————————————————————————————————————

—————————————————————————————————————————————

—————————————————————————————————————————————

—————————————————————————————————————————————

————————————————————————————————————]:

- [—————————————————————————————————————————

—————————————————————————————————————————————

—————————————————————————————————————————————

—————————————————————————————————————————————

—————————————————————————————————————————————

—————————————————————————————————————————————

—————————————————————————————————————————————

—————————————————————————————————————————————

_____

_____

_____

_____ _____

_____

_____

_____—];

[Page 417]

- [—————————————————————————————————————————

——————————————————————————————————————————————

——————————————————————————————————————————————

——————————————————————————————————————————————

——————————————————————————————————————————————

——————————————————————————————————————————————

——————————————————————————————————————————————

——————————————————————————————————————————————

——————————————————————————————————————————————

——————————————————————————————————————————————

——————————————————————————————————————————————

——————————————————————————————————————————————

——————————————————————————————————————————————

——————————————————————————————————————————————

——————————————————————————————————————————————

——————————————————————————————————————————————

—————————————————————————];

- [————————————————————————————————————————

——————————————————————————————————————————————

————————————————————————————————————————————————]

————————————————————————————————
——————————————————————————————————————];

[Page 418]

- [————————————————————————————————
————————————————————————————————————
————————————————————————————————————
————————————————————————————————————
—————————————————————————]; and

- [————————————————————————————————
————————————————————————————————————
——————].

[————————————————————————————————
———————————————————————————], including:

- [————————————————————————————————
————————————————————————————————————
————————]
————————————————————————————————
———————————————————————————————];

- [—————————————————————————————————
————————————————————————————————————
————————————————————————————————————
————————————————————————];

- [————————————————————————————————
————————————————————————————————————
————————————————————————————————————
————————————————————————————————————

[page 419]

——————];

- [——————————————————————————————

——————];

- [——————————————————————————————

——————]

[——————————————————————————————

——————].

[——————————————————————————————

[page 420]

TOP SECRET

_____

————————————————————————————————————].

## NARRATIVE

[—————————————————————————————————]

    [———————————————————————————————
_____
_____
_____
_____
————————————————————————————].

    [———————————————————————————————
_____
_____
_____
——————————————————————————].

    [———————————————————————————————
_____
_____
——————————————————————————].

    [———————————————————————————————
_____
_____

~~TOP SECRET~~

[page 421] ————————————————————————————— ——

————].

    [———————————————————————————————

————————————————————————————————————]

[————————————————————————————————————

———————————————].

    [———————————————————————————————

————————————————].

   [————————————————————————————————

————————————]

    [———————————————————————————————

———————————————]:

     •  [———————————————————————————

————————————————];

[Page 422]

- [————————————————————————————————————————————————
————————————————————————————]; and

- [————————————————————————————————————————————————
————————].

[————————————————————]

[————————————————————————————————————————————————
————————————————————————————————————————————————
————————————————————————————————————————————————
————————————————————————————————————————————————
————————————————————————————————].

[————————————————————————————————————————————————
————————————————————————————————————————————————
————————————————————————————————————————————————
————————————————————————————————————————————————
——————————.¹————————————————————————————————————]
————————————————————————————————————————————————
————————————————————————————————————————————————
————————————————————————————————————————————————
————————————————————————————————————————————————
————————————].

[Page 423]

[————————————————————————————————————————————————
————————————————————————————————————————————————

————————————————————

¹ [————————————————————————————————————————————————
————————————————————————————————————————————————————]
————————————————————————————————————————————————————
————————].”

_____

_____]:

- [_____
  _____];

- [_____
  _____];

- [_____
  _____];

- [_____
  _____
  ____]:;

- [_____
  _____
  _____
  _____
  _____
  _____
  _____].

[_____
_____
_____
_____

[page 424] _____
_____

TOP SECRET

—————————————————————————————

——————————————————————————].


    [————————————————————————————————————————————

—————————————————————————————

————————————————]:

       [——————————————————————————

       —————————————————————————————

       ————————————————————————————————————]


[—————————————————————————————

—————————————————————————————

—————————————————————————————

—————————————————————————————

—————————————————————————————

——————————————————————————————

———————————————————].


    [——————————————————————————

————————————————————————————

—————————————————————————————

—————————————————————————————

—————————————————————————————

—————————————————————————————

——————————————].

[Page 425]

    [—————————————————————————————

———————————————————————]:

       [——————————————————————————

       ————————————————————————].

TOP SECRET

[_____]

[_____].

[_____].

[Page 426]

[_____].

TOP SECRET

The Joint Inquiry also found, [——————————————————————————————————————————————————————————————————]:

- [——————————————————————————————————————————————————————————————————————————————————————————————————————————————————————————————————————————————————————————————————————————————————————————————];

- [——————————————————————————————————————————————————————————————————————————————————————————————————————————————————————————————————————————————————————————————————————————————————————————];"

- [——————————————————————————————————————————————————————————————————————];

- [——————————————————————————————————————————————————————————————————];

[Page 427]

- [——————————————————————————————————————————————————————————————————————————————————————————————————————————————————————————————————————].

[——————————————————————————————————————————————————————————————————————————————————————————————————————————————————————————————————————————————————————————————————————————————————————————————————

—————————————————————————
—————————————————————————
———————————————————————].

    [————————————————————————
—————————————————————————
—————————————————————————
—————————————————————————
—————————————————————————
—————————————————————————
—————————————————————————
—————
—————————————————————————
————————————————————————].

    [————————————————————————
—————
—————————————————————————
—————
—————————————].

[Page 428]

    [————————————————————————
————————————————]:

      [————————————————————————
————————————————————].

[————————————————————————]:

      [————————————————————————
—————————————————————————
—————————————————————————
————————————————————————].

[——————————————————————————————————————
————————————————————————————————————————
————————————————————————————————————————
————————————————————————————————————————
———————————————————————————————————————]
[————————————————————————————————————————
————————————————————————————————————————
————————————————————————————————————————
————————————————————————————————————————
————————————————————————————————————————
————————————————————————————————————————
————————————————————————————————————
———————————————————————————————————————].

[————————————————————————————————————————
————————————————————].

    [————————————————————————————————————————
————————————————————————————————————————
————————————————————————————————————————
————————————————————————————————————————
——————————————————————————————————— [page
429] ————————————————————————————————————
————————————————————————————————————————
———————————————————————————————].

    [————————————————————————————————————————
————————————————————————————————————————
————————————————————————————————————————
————————————————————————————————————————
————————————————————————————————————————
————————————————————————————————————————
————————————————————————————————————————
————————————————————————————————————————

TOP SECRET

——————————————————————————————————————
——————————————————————————————————————].

    [——————————————————————————————————————
——————————————————————————————————————
——————————————————————————————————————
——————————————————————————————————————
——————————————————————————————————————
——————————————————————————————————————
——————————————————————————————————————
——————————————————————————————————————
——————————————————————————————————————
——————————————————————————————————————
——————————————————————————————————————

————————].

    [——————————————————————————————————————
——————————————————————————————————————
——————————].

[Page 430]

    [——————————————————————————————————————
——————————————————————————————————————
——————————————————————————————————————
——————————————————————————————————————
——————————————————————————————————————
——————————————————————————————————————
——————————————————————————————————————
——————————————————————————————————————
——————————————————————————————————————].

[——————————————————————————————————————
——————————————————————————]

[——————————————————————————————————————————
——————————————————————————————————————————
——————————————————————————————————————————
——————————————————————————————————————————
——————————————————————————————————————————
——————————————————————————————————————————
------------------------------------------------------------------------
————————————————————].

[——————————————————————————————————————————
——————————————————————————————————————————
——————————————————————————————————————————
——————————————————————————————————————————
————————————————————————————].

[——————————————————————————————————————————
——————————————————————————————————————————
——————————————————————————————————————————
——————————————————————————————————————————
———————————————————————————————————— [Page
431] ——————————————————————————————————————
——————————————————————————————————————————
——————————————————————————————————].

[——————————————————————————————————————————
——————————————————————————————————————————
——————————————————————————————————————————
——————————————————————————————————————————
——————————————————————————————————————————
——————————————————————————————————————————

[page 432]

~~TOP SECRET~~

[————————————————————————————————————————
————————————————————]

    [————————————————————————————————————————
————————————————————————————————].

    [————————————————————————————————————————
————————————————————————————————————————
————————————————————————————————————————
————————————————————————————————————————
————————————————————————————————————————
————————————————————————————————————————
————————————————————————————————————————
————————————————————————————————————————
————————].

[Page 433]

    [————————————————————————————————————————
————————————————————————————————————————
————————————————————————————————————————
————————————————————————————————————————
————————————————————————————————————————
————————————————————————————————————————
————————————————————————————————————————
————————————————————————————————————————
————————
————————————————————————————————————————
————————].[2]

————————————————————

[—————————————————————————————————

———————————————————————————————————

———————————————————————————————————

———————————————————————————————————

———————————————————————————————————

———————————————————————————————————

———————————————————————————————————

———————————————————————————————————

——————————————————————————————

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

————].

[—————————————————————————————————

———————————————————————————————————

———————————————————————————————————

———————————————————————————————————

———————————————————————————————————

———————————————————————————————————

—————————————————————————————— [page

434] ———————————————————————————————

——————————————————————————————]."

In testimony before the Joint Inquiry, [————————————————————]:

[—————————————————————————————————

————————————————————————].

[—————————————————————————————————

- - - - - - - - - - - - - - - - - - - - - - - - - -

—————————————————————————————————

————————————————————].

[—————————————————————————————————

- - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - - -

TOP SECRET

_____
_____
_____
_____

_____
_____
_____ _____
_____—].

　　[—————————————————————————————————————————————————————
_____
_____
_____
_____
_____
_____—].

[Page 435]

　　[—————————————————————————————————————————————————
_____
_____
_____
_____
_____
_____—].

　　[—————————————————————————————————————————————————
_____
_____
_____—]:

　　　　[———————————————————————————————————————————————
—————————————————————————————————————————
———————————————].

[.——————————————————————————————————————
—————————————————————————————————————————
—————————————————————————————————————————
—————————————————————————————————————————
—————————————————————————————————————————
—————————————————————————————————————————
—————————————————————————————————————————
—————————————————————————————————————————
—————————————————————————————————————————
—————————————————————————————————————————
—————————————————————————————————————————
—————————————————————————————————————————
——————————————————————————————————————]. 

[————————————————————————————————————————
——————————————————————————————————————— [page
436] ———————————————————————————————————————
—————————————————————————————————————————
—————————————————————————————————————————
—————————————————————————————————————————
—————————————————————————————————————————
—————————————————————————————————————————
—————————————————————————————————————————
——————————————————————]. 

[A U. S. Government official testified about [————————————————————]:

[————————————————————————————————————————
—————————————————————————————————————————
—————————————————————————————————————————
—————————————————————————————————————————
——————————————
—————————————————————————————————————————
—————————————————————————————————————————
—————————————————————————————————————————

—————————————————————————————————————
—————————————————————————————————————
—————————————————————————————————————
—————————————————————————————————————
—————————————————————————————————————
————————————————————————————————————————].

[———————————————————————————————————————
————————]:

[———————————————————————————————————
——————————————————————————————————————
——————————————————————————————————————
——————————————————————————————————————
——————————————————————————————————————
——————————————————
——————————————————————————].

Finally, [————————————————————————————————
—————————————————————————————————————————
——————————————————————————————————————{page 437] ——————————————————————————————————————
——————————————————————————————————————————
————————
——————————————————————————————————————————
——————————————————————————————————————————
——————————————————————————————————————————
——————————————————————————————————————————
——————————————————————————————————————————
——————————————————————————————————].

[———————————————————————————————————————
——————————————————————————————————————————
——————————————————————————————————————————
——————————————————————————————————————————
——————————————————————————————————————————
——————————————————————————————————————————
——————————————————————————————————————————
——————————————————————————————————————————

————————————————————————————————————————
————————————————————————————————————————
————————————————————————————————————————
————————————————————————————————————

——————————————————————————————————————————

——————————————————————————————————————————

——————————————————————————————————————————

——————————————————————————————————————————

———————————]. 

[————————————————————————————————]

    [——————————————————————————————————————

——————————————————————————————————————[page

438]————————————————————————————————

————————————————————————].

    [——————————————————————————————————

——————————————————————————————————————————

——————————————————————————————————————————

——————————————————————————————————————————

——————————————————————————————————————————

————————————————————————————————————————
————————————————————————————————————————

——————————————————————————————————————————

——————————————————————————————————————————

——————————————————————————————————].

    [——————————————————————————————————

——————————————————————————————————————————

——————————————————————————————————————————

————————————————————————————].

[——————————————————————————————————————

————————————————————————————————————— ———

—————————————————————————————————————

————————————————————————————————— ———

—————————————————————————————————————

—————————————————————————————————————

————————————————————————————————————

—————————————————————————————————————

—————————————————————————————————————

—————————————————————————————————————

—————————————————————————————————————

——————————].

[Page 439]

[——————————————————————————] A U.S. Government official testified to
the Joint Inquiry on this issue]:

[——————————————————————————————————————

——————————————————————————————————————

——————————————————————————————————————

——————————————————————————————————————

———————————————————————————].

[——————————————————————————————————————

——————————————————————————————————————

——————————————————————————————————————

——————————————————————————————————————

——————————————————————————————————————

——————————————————————————————————————

——————————————————————————————————————

—————————————————————————————————————]

——————————————————————————————————————————————————————
————————————————————————————————————————————————————].

[————————————————————————————————————————————————————
——————————————————————————————————————————————————————
——————————————————————————————————————————————————————
——————————————————————————————————————————————————————
——————————————————————————————————————————————————————
——————————————————————————————————————————————————————
——————————————————————————————————————————————————————
——————————————————————————————————————————————————————
——————————————————————————————————————————————————
——————————————————————————————————].

[A U. S. Government official testified at the [———————————] hearing about [—————
————————————————————————————]: [page 440]

[————————————————————————————————————————————————————
——————————————————————————————————————————————————————
——————————————————————————————————————————————————————
——————————————————————————————————————————————————————
——————————————————————————————————————————————————————
——————————————————————————————————————————————————————
——————————————————————————————————————————————————————
——————————————————————————————————————————————————————
——————————————————————————————————].

Mr. Bereuter:  [———————————————————]?

U. S. Government official:  [————————————————————————————
————————————————————————————].

[————————————————————————————————————————————————————
——————————————————————————]

[————————————————————————————————————————————————————
——————————————————————————————————————————————————————
——————————————————————————————————————————————————————

—————————————————————————————————————————
—————————————————————————————————————————
—————————————————————————————————————————
———
—————————————————————————————————————————
—————————————————————————————————————————
—————————————————————————————————————————
——————————————————————————].

[———————————————————————————————————————
———————————————————————]:

[———————————————————————————————————————
————————————————————————————————————————].

[Page 441]

[———————————————————————————————————————
————————————————————————————————————————————]:

[———————————————————————————————————————
————————————————————————————————————————
————————————].

[———————————————————————————————————————
—————————————————————————————————————————
—————————————————————————————————————————
—————————————————————————————————————————
—————————————————————————————————————————
—————————————————————————————————————— ———
———————————————————————————] .

[———————————————————————————————————————
————————————————————————————————————]:

[———————————————————————————————————————
————————————————————————————————]

[page 442]

[————————————————————————————————————
————————————————————————————————————————
———————————————————————————————————— 

————————————————].

[Page 443]

[————————————————————————————————————

——————————]:

[————————————————————————————————————————
————————————————

————————————————————————————————————
————————————————————————————————————
————————————————————————————————————
————————————————————————————————————

————————————————————————————————————].

[————————————————————————————————————

——————————]:

[————————————————————————————————————————
————————————————————————————————
————————————————————————————————————
————————————————————————————————————
————————————————————————————————

————————————————————————————————].

In the October 10, 2002 closed hearing, FBI Director Mueller acknowledged that he became aware of some of the facts regarding this issue only as a result of the investigative work of the Joint Inquiry Staff:

> I'm saying the sequence of events here, I think the staff probed and, as a result of the probing, some facts came to light here and to me, frankly, that had not come to light before, and perhaps would not have come to light had the staff not probed. That's what I'm telling you. So I'm agreeing with you that the staff probing brought out facts that may not have come to this Committee.

> Senator DeWine: But what you're also saying, though, is that that probing then brought facts to your attention.

> Director Mueller: Yes.

**GLOSSARY**
**OF**
**TERMS AND KEY NAMES**

[Page 444]

# GLOSSARY
# OF
# TERMS AND ACRONYMS

| | |
|---|---|
| ACS | FBI Automated Case System |
| Actionable Intelligence | Intelligence information that is directly useful to customers for immediate exploitation without having to go through the full intelligence production process; it may address strategic or tactical needs, close support of US negotiating teams, or action elements dealing with such matters as international terrorism or narcotics. |
| AIG | Assessments and Information Group – Counterterrorist Center's analytic arm pre-September 11.  After September 11th this office became the Office of Terrorism Analysis. |
| Agent | (1) A person who engages in clandestine intelligence activity under the direction of an intelligence organization but who is not an office, employee, or co-opted worker of that organization. (2) An individual who acts under the direction of an intelligence agency or security service to obtain, or assist in obtaining, information for intelligence or counterintelligence purposes.  (3) One who is authorized or instructed to obtain or to assist in obtaining information for intelligence or counterintelligence purposes. |
| Analysis | A process in the production step of the intelligence cycle in which intelligence information is subjected to systematic examination in order to identify significant facts and derive conclusions therefrom. |
| Asset | (1) Any resource – a person, group, relationship, instrument installation, supply – at the disposition of an intelligence agency for use in an operational or support role.  (2) A person who contributes to a clandestine mission but is not a fully controlled agent. |

[———————————————————]

| | |
|---|---|
| BW | Biological Warfare |
| CBRN | Chemical, Biological, Radiological, Nuclear |
| CDC | FBI Chief Division Counsel (Chief Field Office Counsel) |

| | |
|---|---|
| CIA | Central Intelligence Agency.  An Intelligence Community agency established under the National Security Council for the purpose of coordinating the intelligence activities of several US departments and agencies in the interest of national security.  The CIA collects, [page 445] produces, and disseminates foreign intelligence and counterintelligence; conducts counterintelligence activities abroad; collects, produces, and disseminates intelligence on foreign aspects of narcotics production and trafficking; conducts special activities approved by the President; and conducts research, development, and procurement of technical systems and devices. |
| CIR | Central Intelligence Report– A specific form of communicating intelligence from the CIA to other agencies. |
| Clandestine Operation | A preplanned secret intelligence collection activity or covert political, economic, propaganda, or paramilitary action conducted so as to assure the secrecy of the operation; encompasses both clandestine collection and covert action. |
| Classification | The determination that official information requires, in the interest of national security, a specific degree of protection against unauthorized disclosure, coupled with a designation signifying that such a determination has been made; the designation is normally termed a security classification and includes Confidential, Secret, and Top Secret. |
| Compartmentation | (1) Formal system of restricted access to intelligence activities, such systems established by and/or managed under the cognizance of the DCI to protect the sensitive aspects of sources, methods, and analytical procedures of foreign intelligence information, limited to individuals with a specific need for such information and who are therefore given special security clearances and indoctrination in order to have access to it.  (2) Establishment and management of an intelligence organization so that information about the personnel, organization, or activities of one component is made available to any other component or individual only to the extent required for the performance of assigned duties. |
| Counterintelligence | Information gathered and activities conducted to protect against espionage, other intelligence activities, sabotage, or assassinations conducted for or on behalf of foreign powers, organizations, persons, or terrorist activities, but not including personnel, physical, document, or communications security programs. |
| Counterterrorism | Offensive measures taken to prevent, deter, and respond to a |

terrorist act or the documented threat of such an act.

| | |
|---|---|
| Covert Action | (1) An operation designed to influence governments, events, organizations, or persons in support of foreign policy in a manner that is not necessarily attributable to the sponsoring power; it may [page 446] include political, economic, propaganda, or paramilitary activities. (2) Operations that are so planned and executed as to conceal the identity of, or permit plausible deniability by, the sponsor. |
| Covert Operation | (Preferred term - Clandestine operation).  A covert operation encompassing covert action and clandestine collection. |

[————————————————————————]

| | |
|---|---|
| CSG | Counterterrorism Security Group (also known as the Coordinating Subgroup) |
| CTAU | Counterterrorist Action Unit |
| CTC | DCI's Counterterrorist Center at the CIA |

[————————————————————————]

| | |
|---|---|
| CTD | FBI Counterterrorism Division |
| DCI | Director of Central Intelligence- (1) Primary advisor to the President and National Security Council on national foreign intelligence, appointed by the President with the consent of the Senate.  (2) Head of the Intelligence Community and responsible for the development and execution of the National Foreign Intelligence Program.  (3) Director of the Central Intelligence Agency. |
| DHS | DIA's Defense Human Intelligence (HUMINT) Service |
| DHS | Department of Homeland Security |
| DIA | The Defense Intelligence Agency is an agency of the Intelligence Community responsible for satisfying the foreign military and military-related intelligence requirements of the Secretary of Defense, the Joint Chiefs of Staff, the Unified and Specified Commands, other Defense components, and, as appropriate, non-defense agencies.  It is a provider of military intelligence for national foreign intelligence and counterintelligence products and |

|  | is responsible for coordinating the intelligence activities of the military services and managing the Defense Attaché System. |
|---|---|
| Dissemination | The timely distribution of intelligence products (in oral, written, or [page 447] graphic form) to departmental and agency intelligence consumers in a suitable form. |
| DNI | Director of National Intelligence |
| Domestic Collection | The acquisition of foreign intelligence information within the United States from governmental or nongovernmental organizations or individuals who are witting sources and choose to cooperate by sharing such information. |

[—————————————————]

|  |  |
|---|---|
| EC | FBI Electronic Communication |
| Estimate | (1) An analysis of a foreign situation, development, or trend that identifies its major elements, interprets the significance, and appraises the future possibilities and the prospective results of the various actions that might be taken.  (2) An appraisal of the capabilities, vulnerabilities, and potential courses of action of a foreign nation or combination of nations in consequence of a specific national plan, policy, decision, or contemplated course of action.  (3) An analysis of an actual or contemplated clandestine operation in relation to the situation in which it is or would be conducted in order to identify and appraise such factors as available and needed assets, and potential obstacles, accomplishments, and consequences. |
| FAA | Federal Aviation Administration |
| Fatwa | Religious decree |
| FBI | Federal Bureau of Investigation-The FBI is within the Department of Justice.  It is the principal law enforcement investigative arm of the US government and the lead agency responsible for counterterrorism in the United States. |
| FinCEN | Financial Crimes Enforcement Network of the Treasury Department |
| Finding | A determination made by the President stating that a particular intelligence operation is important to the national security of the |

|  | United States, in compliance with Section 503 (50 U.S.C. 413b) of the National Security Act, as amended. |
|---|---|

[Page 448]

| Finished Intelligence | (1) The product resulting from the collection, processing, integration, analysis, evaluation, and interpretation of available information concerning foreign countries or areas.  (2) The final result of the production step of the intelligence cycle; the intelligence product. |
|---|---|
| FISA Court | Court that reviews, for sufficiency, applications for orders issued under the Foreign Intelligence Surveillance Act. |
| FISA Order | Order authorized under the Foreign Intelligence Surveillance Act to conduct electronic or physical searches within the US for foreign intelligence purposes. |
| Foreign intelligence service | An organization of a foreign government that engages in intelligence activities. |
| Foreign Liaison | Efforts to work with foreign government intelligence services, including law enforcement agencies that gather or carry out intelligence-related activities.  Examples of foreign liaison include sharing information, joint collection efforts, and the arrest of suspected terrorists by foreign governments using US-supplied information.  Every major US intelligence agency has some form of liaison relationship with foreign governments. |

[————————————————————————————————]
[ ————————————].

| HPSCI | House Permanent Select Committee on Intelligence- A permanent select committee of the House of Representatives established by House Rule XLVIII, whose function is to monitor and provide oversight for the Intelligence Community and intelligence-related activities of all other government organizations.  The committee is also responsible for legislation pertaining to intelligence agencies and activities, including authorizing appropriations for such activities. |
|---|---|
| IC | Intelligence Community-The aggregate of the following executive branch organizations and agencies involved in intelligence activities:  the Central Intelligence Agency; the National Security Agency; the Defense Intelligence agency; offices within the Department of Defense for the collection of specialized national foreign intelligence through reconnaissance programs; the Bureau of Intelligence and Research of the Department of State; |

intelligence elements of the military services, the Federal Bureau of Investigation, the Department of Treasury, and the Department [page 449] of Energy; and staff elements of the Office of the Director of Central Intelligence.[1]

IICT

Interagency Intelligence Committee on Terrorism

[————————————————————————]

Intelligence

(1) A body of evidence and the conclusions drawn therefrom acquired and furnished in response to the known or perceived requirements of customers; it is often derived from information that is concealed or not intended to be available for use by the acquirer.  (2)  A term used to refer collectively to the functions, activities, or organizations that are involved in the process of planning, gathering, and analyzing information of potential value to decision-makers and to the production of intelligence as defined above.  (3)  The product resulting from the collection, collation, evaluation, analysis, integration, and interpretation of all collected information.

Intelligence assessment

A category of intelligence production that encompasses most analytical studies dealing with subjects of policy significance, thorough in its treatment of subject matter – as distinct from building-block papers, research projects, and reference aids, but unlike estimative intelligence need not attempt to project future developments and their implications; usually coordinated within the producing organization, but may not be coordinated with other intelligence agencies.

Intelligence report

(1) A product of the production step of the intelligence cycle; (2) Military Usage-A specific report of information, usually on a single item, made at any level of command in tactical operations and disseminated as rapidly as possible in keeping with the timeliness of the information.

Intelligence requirement

Any subject, general or specific, upon which there is a need for the collection of intelligence information or the production of intelligence.

International terrorism

Terrorist acts that transcend national boundaries in their conduct or purpose, the nationalities of the victims, or the resolution of the incident.  Such an act is usually designed to attract wide publicity

---

[1] Pursuant to Title I, Section 105, of the Intelligence Authorization Act for Fiscal Year 2002, the United States Coast Guard has been included as an element of the Intelligence Community.

[page 450] to focus attention on the existence, cause, or demands of the perpetrators.

| | |
|---|---|
| IOS | FBI's Intelligence Operations Specialists- Specialists conduct case specific (tactical) research. |
| IRS | FBI's Intelligence Research Specialist- Specialists conduct long term (strategic) research. |

[————————————————————————————].

| | |
|---|---|
| JITF-CT | DIA's Joint Intelligence Task Force – Combating Terrorism |
| JSOC | Military's Joint Special Operations Command |
| JTTF | FBI's Joint Terrorism Task Force |
| LEGAT | FBI's Legal Attaché in foreign countries |
| Manila (Bojinka) Plot | A Ramzi Yousef plot to blow up 12 airliners over the Pacific Ocean and to crash a plane into the CIA Headquarters (1995) |
| MI-5 | Britain's internal security service (BSS). |

[————————————————————————————————]
[————————————————————————]

| | |
|---|---|
| NGO | Non-Governmental Organization |
| NIC | National Intelligence Council, comprised of the National Intelligence Officers (NIOs), their staff, and an analytic group. The NIOs support the DCI by producing national intelligence estimates and other interagency assessments and by advising him on the intelligence needs of policymakers. |
| NID | National Intelligence Daily – An Intelligence Community produced digest of current intelligence drafted six times a week for senior government officials.  (Replaced by the SEIB) |
| NIE | National Intelligence Estimate: (1) A thorough assessment of a situation in a foreign environment relevant to the formulation of foreign, economic, and national security policy, that projects probable future courses of action and developments, and is structured to illuminate differences of view within the Intelligence Community; it is issued by the DCI with the advice of the National Foreign Intelligence Board; (2) a strategic estimate of capabilities, |

[page 451] vulnerabilities, produced at the national level as a composite of the views of the Intelligence Community.

| | |
|---|---|
| NIMA | National Imagery and Mapping Agency, an Intelligence Community agency. |
| NIO | The senior staff officer of the DCI for an assigned area of functional or geographic responsibility. The NIO manages estimative and interagency intelligence production on behalf of the DCI; he is the principal point of contact between the DCI and intelligence consumers below the cabinet level and is a primary source of national-level substantive guidance to intelligence Community planners, collectors, and resource managers. |
| NFIP | National Foreign Intelligence Program |
| NRO | National Reconnaissance Office, an Intelligence Community agency. |
| NSA | National Security Agency, the Intelligence Community agency responsible for centralized coordination, direction, and performance of highly specialized technical functions in support of US Government activities to protect US communications and produce foreign intelligence information. It coordinates, directs, and performs all cryptologic functions for the US Government; collects, processes, and disseminates SIGINT information for DoD, national foreign intelligence, and counterintelligence purposes; and is the national executive agent for classified communications and computer security. |
| NSD | National Security Directive |
| NSC | National Security Council |
| NSLU | FBI National Security Law Unit |
| OIPR | Office of Intelligence Policy Review, Department of Justice |
| OMB | Office of Management and Budget |
| PDB | President's Daily Brief (Prepared by CIA for President and very small number of other senior officials) |
| PDD | Presidential Decision Directive |

[Page 452]

TOP SECRET

| | |
|---|---|
| PENTTBOMB | FBI investigation of September 11 WTC & Pentagon attacks |
| PFIAB | President's Foreign Intelligence Advisory Board-A body consisting of senior non-government members appointed by, and reporting directly to, the President, empowered to assess the quality, quantity, and adequacy of intelligence collection, of analysis and estimates, or counterintelligence, and other intelligence activities with a view toward increasing the effectiveness of the national intelligence effort; specific duties and responsibilities are outlined in Executive Order 12331. |
| Phoenix EC | Electronic communication of July 2001 from the FBI's Phoenix field office to FBI Headquarters expressing concern about an increase in the number of Middle Eastern men enrolled in civil aviation training (also referred to as the Phoenix Memo). |
| Raw Intelligence | A colloquial term meaning collected intelligence information that has not yet been converted into finished intelligence. |
| RFU | FBI's Radical Fundamentalist Unit |
| SA | Special Agent |
| SAC | Special Agent in Charge |
| SEIB | Senior Executive Intelligence Brief  (CIA intelligence summary for senior USG officials; replaced the NID, see above.) |
| SIGINT | Signals intelligence-Intelligence information derived from signals intercept comprising, either individually or in combination, all communications intelligence, electronic intelligence, and foreign instrument signals intelligence, however, transmitted. |
| SIOC | FBI's Strategic Information Operations Center |
| SOIC | Senior Officials of the Intelligence Community-The heads of the organizations comprising the Intelligence Community or their designated representatives. |
| SRTD | Signals Research and Target Development, a NSA function |
| SSA | Supervisory Special Agent |
| SSCI | Senate Select Committee on Intelligence- A select committee of the Senate established by Senate Resolution 400, 94th Congress, 2nd Session (1976), whose function is to monitor and provide oversight |

TOP SECRET

[page 453] over the Intelligence Community and intelligence-related activities of all other government organizations; the Committee is also responsible for legislation pertaining to intelligence agencies and activities, including authorizing appropriations for such activities.

| | |
|---|---|
| Strategic intelligence | Intelligence required for the formulation of policy and military plans at national and international levels; it differs primarily from tactical intelligence in level of use, but may also vary in scope and detail. |
| Tactical intelligence | Intelligence produced in support of military, intelligence, or other operations, or that relates to the specific time, date, nature, and other details of events. |
| Title III Order | Order issued by a court pursuant to the provisions of Title III of the Omnibus Crime Control and Safe Streets Act of 1968, Public Law 90-351 (June 19, 1968), as amended, authorizing the interception of oral, wire, and/or electronic communication. |
| UAV | Unmanned Aerial Vehicle |
| UBLU | FBI's Usama bin Ladin Unit |
| USSID | United States Signals Intelligence Directive |
| Volunteer | Persons who, on their own initiative, make contact with a government representative and volunteer information and/or request political asylum. |
| WTC | World Trade Center |

TOP SECRET

[Page 454]

# KEY NAMES

| | |
|---|---|
| Mohamed Yousef Mohamed Alqusaidi | Marwan al-Shehhi's brother |
| Muhammed Atif | Bin Ladin's lieutenant |

[————————————————————————]
         [————————————]

[————————————————————]

| | |
|---|---|
| Usama Bin Ladin | Leader of al-Qa'ida and promoter of terrorist attacks against US |
| Imad Mugniyah | Hizbollah Leader |
| Khalid Shaykh Mohammad | Bin Ladin Lieutenant; believed to be the mastermind of the September 11th attacks (AKA Mukhtar or "the Brain") |
| Mohamed al-Owhali | Passenger in truck bomb that jumped out of the bomb laden vehicle before it crashed into the American embassy in Kenya |
| Al-Qa'ida | Terrorist organization led by Usama bin Ladin.  Translates as "the Base" |
| Omar Abd al-Rahman | Blind Sheikh |
| Ahmed Ressam | Convicted terrorist who tried to cross into the United States from Canada with explosives intending to target Los Angeles International Airport in December 1999 |
| Ramzi Yousef | Organizer of the 1993 bombing of the World Trade Center |
| Ayman Zawarhari | Bin Ladin lieutenant |
| Abu Zubaydah | Bin Ladin Lieutenant captured in March 2002 |

TOP SECRET

[Page 455]

# SEPTEMBER 11, 2001 HIJACKERS

American Airlines Flight 11 hit the North Tower of the World Trade Center at 8:45 a.m.

| | | |
|---|---|---|
| Mohamed Atta | [Mo-Ha-mahd  A-tta] | Pilot |
| Abd Al-Aziz Al-Omari | [Abd al-A-ziz Al-OMA-ree] | |
| Satam Al-Suqami | [Sa-TOM Ah-Suq-AMI] | |
| Wail Al-Shehri | [Wa-EEL Ah-SHEH-ree] | |
| Walid Al-Shehri | [Wa-LEED  SHEH-ree] | |

United Airlines Flight 175 hit the South Tower of the World Trade Center at 9:05 a.m.

| | | |
|---|---|---|
| Marwan Al-Shehhi | [Mar-WAHN Ah-SHEH-hee] | Pilot |
| Ahmed Al-Ghamdi | [Ah-MED al-GAM-dee] | |
| Hamza Al-Ghamdi | [HAM-za al-GAM-dee] | |
| Fayez Ahmed | [FA-yez AH-med] | |
| Mohand Al-Shehri | [MO-hahnd ah-SHEH-ree] | |

American Airlines Flight 77 hit the Pentagon at 9:39 a.m.

| | | |
|---|---|---|
| Hani Hanjour | [Ha-NEE HAN-joor] | Pilot |
| Khalid Al-Mihdhar | [Kah-LEED al-MID-har] | |
| Majid Moqed | [MAH-jid MOE-Ked] | |
| Nawaf Al-Hazmi | [Now-Woff al-HAS-me] | |
| Salim Al-Hazmi | [Sa-LEEM al-HAS-me] | |

United Airlines Flight 93 crashed in Pennsylvania at 10:10 a.m.

| | | |
|---|---|---|
| Ziad Jarrah | [Zee-YAHD Jara] | Pilot |
| Ahmad Al-Nami | [AH-med Ah-Nah-mee] | |
| Ahmad Al-Haznawi | [AH-med al-Has-NOW-wee] | |
| Saled Al-Ghamdi | [Sah-EED al-GAM-dee] | |

**ADDITIONAL VIEWS**

**AND**

**APPENDICES**

**TABLE OF CONTENTS**

Additional Views Of Members

Sen. Richard C. Shelby

Rep. Michael N. Castle

Sen. Mike DeWine

Rep. Jane Harman

Sen. John Kyl & Sen. Pat Roberts

Sen. Carl Levin

Sen. Barbara A. Mikulski

Rep. Tim Roemer

Appendices

Initial Scope Of Joint Inquiry

Supplemental Joint Inquiry Rules

Joint Inquiry Hearings

List of Hearing Witnesses

List of Persons Interviewed

Counterterrorism Organizations Within The Intelligence Community

Evolution Of The Terrorist Threat And The U.S. Response, 1983-2001

Selected Events In The Chronology Of Terrorism, 1982 – 2001

CIA/FBI Failures In Regard To Two September 11 Hijackers, The Phoenix Electronic Communication, And The Moussaoui Investigation (Adapted From A Chart Presented By Senator Carl Levin At The October 17, 2002 Joint Inquiry Hearing)

The Phoenix Electronic Communication

Moussaoui Related FBI Field Agent Notes & Field Office/Headquarters E-Mails

General Accounting Office: Analysis Of U.S. Anthrax Attacks

CTC Watchlisting Guidance – December 1999

The Joint Inquiry In Court

Access Limitations Encountered By The Joint Inquiry

**ADDITIONAL VIEWS**


**OF**


**MEMBERS OF**
**THE JOINT INQUIRY**

On December 10, 2002, the Report of the Joint Inquiry was voted on and approved by the House Permanent Select Committee on Intelligence and the Senate Select Committee on Intelligence.  The following additional views were submitted by individual members of those committees.

# September 11 and the Imperative of Reform in the U.S. Intelligence Community

## Additional Views of Senator Richard C. Shelby
## Vice Chairman, Senate Select Committee on Intelligence

### December 10, 2002

> "In actual practice, the successful end to the Cold War and the lack of any national intelligence disasters since then seem to militate in favor of keeping the existing structure until some crisis proves it to be in dire need of repair. . . . Thus we are likely to live with a decentralized intelligence system – and the impulse toward centralization – until a crisis re-aligns the political and bureaucratic players or compels them to cooperate in new ways."

> — Deputy Chief, CIA History Staff
> publication dated 2001[1]

Our country's Intelligence Community was born because of the devastating surprise attack the United States suffered at Japanese hands at Pearl Harbor on December 7, 1941. In the wake of that disaster, America's political leaders concluded "that the surprise attack could have been blunted if the various commanders and departments had coordinated their actions and shared their intelligence." This was the inspiration behind the National Security Act of 1947,

---

[1] *Central Intelligence: Origin and Evolution* (Langley, Virginia: CIA History Staff, CIA Center for the Study of Intelligence, 2001), from the Historical Perspective by Dr. Michael Warner [hereinafter "Warner"], at 2 & 18.

1

which "attempted to implement the principles of unity of command and unity of intelligence."[2]

Sixty years later, on September 11, 2001, we suffered another devastating surprise attack, this time by international terrorists bent upon slaughtering Americans in the name of their God. This second attack is the subject of the findings and recommendations of the unprecedented Joint Inquiry conducted by the Senate Select Committee on Intelligence (SSCI) and the House Permanent Select Committee on Intelligence (HPSCI).  In this document, I offer my own assessments and suggestions, based upon my four and a half years as Chairman of the SSCI and one and a half years as its Vice Chairman. These additional views are intended to complement and expand upon the findings and recommendations of the Joint Inquiry.

Long before the September 11 attacks, I made no secret of my feelings of disappointment in the U.S. Intelligence Community for its performance in a string of smaller-scale intelligence failures during the last decade.  Since September 11 I have similarly hid from no one my belief that the Intelligence Community does not have the decisive and innovative leadership it needs to reform itself and to adapt to the formidable challenges of the 21st Century.

In the following pages, I offer my suggestions about where our Intelligence Community should go from here.  These views represent the distilled wisdom of my eight years on the SSCI, of innumerable hearings, briefings, and visits to sensitive sites and facilities, and of thousands of man-hours of diligent work by intelligence oversight professionals on the SSCI staff over several years.  Most of all, these Additional Views represent the conclusions I have reached as a result of the work of our Joint Inquiry Staff and the many private and public committee hearings we have had into the intelligence failures that led up to September 11.

---

[2]       Warner, *supra*, at 1.

I hope that the American public servants who inherit responsibility for these matters during the 108th Congress and the second half of President Bush's first term will carefully consider my arguments herein.  Thousands of Americans have already been killed by the enemy in the war declared against us by international terrorists, and though we have enjoyed some signal successes since our counteroffensive began in late September 2001, our Intelligence Community remains poorly prepared for the range of challenges it will confront in the years ahead.

Too much has happened for us to be able to conclude that the American people and our national security interests can be protected simply by throwing more resources at agencies still fundamentally wedded to the pre-September 11 *status quo*.  I salute the brave and resourceful Americans – both in and out of uniform – who are even at this moment taking the fight to the enemy in locations around the world.  These patriots, however, deserve better than our government's recommitment to the bureaucratic recipes that helped leave us less prepared for this crisis than we should have been.

I hope that the Joint Inquiry's report – and these Additional Views thereto – will help spur the kind of broad-ranging debate in Congress, within the Administration, and among the American public that our present circumstances deserve.   The road to real intelligence reform is littered with the carcasses of forgotten studies and ignored reports.  We cannot afford to let the results of this unprecedented Joint Inquiry be forgotten as well.  The American people will not forgive us if we fail to make the changes necessary to ensure that they are better protected in the future.

## Executive Summary

**Community Structure and Organization.**  With respect to the structure and organization of the U.S. Intelligence Community (IC), the story of counterterrorism (CT) intelligence work before September 11 illustrates not only the unwillingness of the Director of Central Intelligence (DCI) fully to exercise the powers he had to direct resources and attention to CT, but also the institutional weakness of the DCI's office within the Community.  Caught ambiguously between its responsibilities for providing national-level intelligence and providing support to the Department of Defense to which most IC agencies owe their primary allegiance, the Community proved relatively unresponsive to the DCI's at least partly rhetorical 1998 declaration of "war" against Al-Qa'ida.  The fragmented nature of the DCI's authority has exacerbated the centrifugal tendencies of bureaucratic politics and has helped ensure that the IC responds too slowly and too disjointedly to shifting threats.  Ten years after the end of the Cold War, the Community still faces inordinate difficulty responding to evolving national security threats.

To help alleviate these problems, the office of the DCI should be given more management and budgetary authority over IC organs and be separated from the job of the CIA Director, as the Joint Inquiry suggests in urging that we consider reinventing the DCI as the "Director of National Intelligence."  Moreover, the DCI (or DNI, as the case may be) should be compelled actually to use these powers in order to effect real IC coordination and management.  An Intelligence Community finally

4

capable of being coherently managed as a Community would be able to reform and improve itself in numerous ways that prove frustratingly elusive today – ultimately providing both its national-level civilian and its military customers with better support.  Congress should give serious consideration, in its intelligence reform efforts, to developing an approach loosely analogous to that adopted by the Goldwater-Nichols Act in reforming the military command structure in order to overcome entrenched bureaucratic interests and forge a much more effective "joint" whole out of a motley and disputatious collection of parts.

Most importantly, Congress and the Administration should focus upon ensuring an organizational structure that will not only help the IC respond to current threats but will enable our intelligence bureaucracies to change themselves as threats evolve in the future.  We must not only learn the lessons of the past but learn how to keep learning lessons as we change and adapt in the future.  To this end, the IC should adopt uniform personnel and administrative standards in order to help ensure that its personnel and organizational units remain unique and valuable individual resources but also become administratively fungible assets, capable of being reorganized and redirected efficiently as circumstances demand.   It will also be necessary to break the mindset within the IC that holds that only intelligence professionals actually employed by the traditional collection agencies can engage in collection or analysis of those agencies' signature types of intelligence.  The traditional collection agencies' expertise in "their" areas should be used to enrich the Community's pool

of intelligence know-how rather than as barriers to entry wielded in defense of bureaucratic and financial "turf."  Instead, the collection agencies should be charged with certifying – but not running or controlling – training curricula within other IC agencies that will produce competent specialists in the relevant fields.

Ultimately, Congress and the Administration re-examine the basic structure of the intelligence provisions of the National Security Act of 1947 in light of the circumstances and challenges our country faces today.  Returning to these roots might suggest the need to separate our country's "central" intelligence analytical functions from the resource-hungry collection responsibilities that make agencies into self-interested bureaucratic "players."

**Information-Sharing.**  Our Joint Inquiry has highlighted fundamental problems with information-sharing within the IC, depriving analysts of the information access they need in order to draw the inferences and develop the conclusions necessary to inform decision-making.  The IC's abject failure to "connect the dots" before September 11, 2001 illustrates the need to wholly re-think the Community's approach to these issues.

The CIA's chronic failure, before September 11, to share with other agencies the names of known Al-Qa'ida terrorists who it knew to be in the country allowed at least two such terrorists the opportunity to live,

move, and prepare for the attacks without hindrance from the very federal officials whose job it is to find them. Sadly, the CIA seems to have concluded that the maintenance of its information monopoly was more important that stopping terrorists from entering or operating within the United States. Nor did the FBI fare much better, for even when notified in the so-called "Phoenix Memo" of the danger of Al-Qa'ida flight school training, its agents failed to understand or act upon this information in the broader context of information the FBI already possessed about terrorist efforts to target or use U.S. civil aviation. The CIA watchlisting and FBI Phoenix stories illustrate both the potential of sophisticated information-sharing and good information-empowered analysis and the perils of failing to share information promptly and efficiently between (and within) organizations. They demonstrate the need to ensure that intelligence analysis is conducted on a truly "all-source" basis by experts permitted to access all relevant information – no matter where in the IC it happens to reside.

The IC's methods of information-sharing before September 11 suffered from profound flaws, and in most respects still do. In order to overcome bureaucratic information-hoarding and empower analysts to do the work our national security requires them to do, we need to take decisive steps to reexamine the fundamental intellectual assumptions that have guided the IC's approach to managing national security information. As one witness told the Joint Inquiry, we may need "to create a new paradigm wherein 'ownership' of information belonged with the analysts

and not the collectors." In addition, the imbalance between analysis and collection makes clear that in addition to being empowered to conduct true "all-source" analysis, our analysts will also need to be supplied with powerful new tools if they are to provide analytical value-added to the huge volumes of information the IC brings in every day. Recent development and initiatives in comprehensive databasing and data-mining suggest that solutions to these challenges may be within our reach. The information-analysis organization within the new Department of Homeland Security als has great potential to contribute to effective CT information-sharing and analyst-empowerment within the U.S. Government – and Congress has given it the legal tools it needs to play this crucial catalytic role. Meanwhile, Congress should take decisive steps to help stem our contemporary culture of endemic "leaking" of national security information to the media, so as better to ensure that our analysts remain better informed about terrorists than the terrorists do about them.

**Intelligence-Law Enforcement Coordination**. The September 11 story also illustrates the tremendous problems of coordination between U.S. law enforcement and intelligence entities that developed out of a long series of misunderstandings, timorous lawyering, and mistaken assumptions. Congress and the Administration have made progress since September 11 in breaking down some of the mythologies that impeded coordination. Thanks to Congress' passage of the USA PATRIOT Act of 2001 and the Justice Department's success in appellate litigation to compel the Foreign Intelligence Surveillance Court to implement these

changes, for instance, the legally fallacious "Wall" previously assumed to exist between intelligence and law enforcement work has been breached and years of coordination-impeding Justice Department legal reticence has been overcome.

With luck, we will never again see the kind of decision-making exhibited when the CIA refused to share information with FBI criminal investigators about two known Al-Qa'ida terrorists (and soon-to-be suicide hijackers) in the United States, and when the FBI – only days before the September 11 attacks – deliberately restricted many of its agents from participating in the effort to track down these terrorists on the theory that this was work in which criminal investigators should play no role.  Hopefully we will also no longer see the kind of fundamental legal misunderstanding displayed by FBI lawyers in the Moussaoui case, in which investigators in Minneapolis were led on a three-week wild goose chase by a faulty analysis of the Foreign Intelligence Surveillance Act (FISA).  It will take sustained Congressional oversight in order to ensure compliance with the information-sharing authorities and mandates of the USA PATRIOT Act, but it is imperative that we ensure that such problems do not recur.  To help achieve this, Congress should modify the Act's "sunset" provisions and should approve legislation proposed by Senators Kyl and Schumer to modify FISA's "foreign power" standard.

**Domestic Intelligence**.  The story of September 11 is also replete with the FBI's problems of internal counterterrorism and

9

counterintelligence (CI) coordination, information-sharing, and basic institutional competence.  The FBI was unaware of what information it possessed relevant to internal terrorist threats, unwilling to devote serious time, attention, or resources to basic intelligence analytical work, and too organizationally fragmented and technologically impoverished to fix these shortfalls even had it understood them and really wished to do so.  These problems persisted, moreover, through a major FBI reorganization ostensibly designed to address these problems, which had been well known for years.

The FBI's problems in these respects suggests that the Bureau's organizational and institutional culture is terribly flawed, and indeed that the Bureau – as a law enforcement organization – is fundamentally incapable, in its present form, of providing Americans with the security they require against foreign terrorist and intelligence threats.  Modern intelligence work increasingly focuses upon shadowy transnational targets, such as international terrorist organizations, that lack easily-identifiable geographic loci, organizational structures, behavioral patterns, or other information "signatures." Against such targets, intelligence collection and analysis requires an approach to acquiring, managing, and understanding information quite different from that which prevails in the law enforcement community.  The United States already has a domestic intelligence agency in the form of the FBI, but this agency is presently unequal to the challenge, and provides neither first-rate CT and CI competence nor the degree of civil liberty protections that would obtain

10

were domestic intelligence collectors deprived of their badges, guns, and arrest powers and devoted wholly to CI and CT tasks.

This pattern of dysfunction compels us to consider radical reform at the FBI. A very strong argument can be made for removing the CI and CT portfolios from the Bureau, placing them in a stand-alone member of the Intelligence Community that would be responsible for domestic intelligence collection and analysis but would have no law enforcement powers or responsibilities. Alternatively, it might be sufficient to separate the CI and CT functions of the FBI into a semi-autonomous organization that reports to the FBI director for purposes of overall coordination and accountability, but which would in every other respect be wholly separate from the "criminal" components of the FBI. A third approach might be to move the FBI's CI and CT functions to the new Department of Homeland Security, thereby adding a domestic collection element to that organization's soon-to-be-created Undersecretariat for Information Analysis and Infrastructure Protection. Some kind of radical reform of the FBI is long overdue, and should be a major item on the "intelligence reform" agenda for the 108th Congress. The Bush Administration and the 108th Congress should make it a high priority to resolve these issues, and to put the domestic components of our Intelligence Community on a footing that will enable them to meet the challenges of the 21st century.

**Human Intelligence.** The status quo of IC approaches to human intelligence (HUMINT) was tested against the Al-Qa'ida threat and found

wanting.  The CIA's Directorate of Operations (DO) has been too reluctant to develop non-traditional HUMINT platforms, and has stuck too much and for too long with the comparatively easy work of operating under diplomatic cover from U.S. embassies.  This approach is patently unsuited to HUMINT collection against nontraditional threats such as terrorism or proliferation targets, and the CIA must move emphatically to develop an entirely new collection paradigm involving greater use of non-official cover (NOC) officers.  Among other things, this will necessitate greater efforts to hire HUMINT collectors from ethnically and culturally diverse backgrounds, though without a fundamental shift in the CIA's HUMINT paradigm diversity for diversity's sake will be of little help.  The CIA should also spend more time developing its own sources, and less time relying upon the political munificence of foreign liaison services.

**Covert Action.**  The CIA's decidedly mixed record of success in offensive operations against Al-Qa'ida before September 11 illustrates the need for the President to convey legal authorities with absolute clarity.  If we are not to continue to encourage the kind of risk-averse decision-making that inevitably follows from command-level indecision, our intelligence operators risking their lives in the field need to know that their own government will make clear to them what their job is and protect them when they do it.  Congress should bear this in mind when conducting its legitimate oversight of covert action programs in the future, even as it

struggles to cope with the oversight challenges posed by the potential for the Defense Department to take a greater role in such activities.

**Accountability.**  The story of September 11 is one replete with failures: to share information, to coordinate with other agencies; to understand the law, follow existing rules and procedures, and use available legal authorities in order to accomplish vital goals; to devote or redirect sufficient resources and personnel to counterterrorism work; to communicate priorities clearly and effectively to IC components; to take seriously the crucial work of strategic counterterrorism analysis; and most importantly, to rise above parochial bureaucratic interests in the name of protecting the American people from terrorist attack.

The DCI has declared us to be at "war" against Al-Qa'ida since 1998, and as the President has declared, we have really been so since at least September 11.  Some have suggested that this means that we should postpone holding anyone accountable within the Intelligence Community until this war is over and the threat recedes.  I respectfully disagree.

The threat we face today is in no danger of subsiding any time soon, and the problems our Intelligence Community faces are not ones wisely left unaddressed any longer.  Precisely *because* we face a grave and ongoing threat, we must begin reforming the Community immediately. Otherwise we will be unable to meet this threat.  The metaphor of "war" is instructive, for wise generals do not hesitate to hold their subordinates

13

accountable while the battle still rages, disciplining or cashiering those who fail to do their duty.  So also do wise Presidents dispose of their faltering generals under fire.  Indeed, failures in wartime are traditionally considered less excusable, and are punished more severely, than failures in times of peace.

Nor should we forget that accountability has two sides.  It is also a core responsibility of all good leaders to reward those who perform well, and promote them to positions of ever greater responsibility.  In urging the Intelligence Community to hold its employees accountable, the IC must therefore both discipline those who fall down on the job and reward those who have excelled.

For these reasons, it is disappointing to me that despite the Joint Inquiry's explicit mandate to "lay a basis for assessing the accountability of institutions and officials of government" and despite its extensive findings documenting recurring and widespread Community shortcomings in the months and years leading up to September 11, the Joint Inquiry has not seen fit to identify *any* of the individuals whose decisions left us so unprepared.  I urge President Bush to examine the Joint Inquiry's findings in order to determine the extent to which he has been well served by his "generals" in the Intelligence Community.

Some have argued that we should avoid this issue of accountability lest we encourage the development of yet more risk-aversion within the

14

Community.  I do not believe this is the case.  The failings leading up to September 11 were not ones of impetuousness, the punishment for which might indeed discourage the risk-taking inherent in and necessary to good intelligence work.  The failures of September 11 were generally ones not of reckless *commission* but rather of nervous *omission*.  They were failures to take the necessary steps to rise above petty parochial interests and concerns in the service of the common good.  These are not failings that will be exacerbated by accountability.  Quite the contrary.  And, more importantly, it is clear that without real accountability, these many problems will simply remain unaddressed – leaving us needlessly vulnerable in the future.

I advocate no crusade to hold low-level employees accountable for the failures of September 11.  There clearly were some individual failings, but for the most part our hard-working and dedicated intelligence professionals did very well, given the limited tools and resources they received and the constricting institutional culture and policy guidance they faced.  The IC's rank-and-file deserve no discredit for resource decisions and for creating these policies.

Ultimately, as the findings of the Joint Inquiry make clear – though they stop short of actually saying so – accountability must begin with those whose job it was to steer the IC and its constituent agencies through these shoals, and to ensure that all of them cooperated to the best of their abilities in protecting our national security.  Responsibility must lie with

the leaders who took so little action for so long, to address problems so well known.  In this context, we must not be afraid publicly to name names.  The U.S. Intelligence Community would have been far better prepared for September 11 but for the failure of successive agency leaders to work wholeheartedly to overcome the institutional and cultural obstacles to inter-agency cooperation and coordination that bedeviled counterterrorism efforts before the attacks: DCIs George Tenet and John Deutch, FBI Director Louis Freeh, and NSA Directors Michael Hayden and Kenneth Minnihan, and NSA Deputy Director Barbara McNamara.  These individuals are not responsible for the disaster of September 11, of course, for that infamy belongs to Al-Qa'ida's 19 suicide hijackers and the terrorist infrastructure that supported them.  As the leaders of the United States Intelligence Community, however, these officials failed in significant ways to ensure that this country was as prepared as it could have been.

I.      *Intelligence Community Structure*

        A.      *The DCI's Problematic "War" of 1998*

The Director of Central Intelligence (DCI) testified before Congress in February 2001 that he considered Usama bin Laden and Al-Qa'ida to be *the most important national security*

*threat* faced by the United States.[3]   In December 1998, in fact – in the wake of the terrorist bombings of the U.S. embassies in Dar es Salaam, Tanzania, and Nairobi, Kenya – he had proclaimed that "[w]e are at war" with Al-Qa'ida.[4]   The story of this "war," however, underlines the problematic nature of the U.S. Intelligence Community's management structure.

As the Joint Inquiry Staff (JIS) has noted in its presentations to the Committees, "[d]espite the DCI's declaration of war in 1998, there was no massive shift in budget or reassignment of personnel to counterterrorism until after September 11, 2001."[5]   Indeed, the amount of money and other resources devoted to counterterrorism (CT) work after the DCI's "declaration of war" in 1998 barely changed at all.  The budget requests sent to Congress relating to the CIA's Counterterrorism Center (CTC), for instance, rose only marginally – in the low single-digit percentages each year into Fiscal Year 2001 – and at rates of increase essentially unchanged from their slow growth before the "war." (These requests, incidentally, were met or exceeded by Congress, even to the point that the CIA ended Fiscal Year 2001 with millions of dollars in counterterrorism money left *unspent*.[6])

In his 1998 "declaration of war," the DCI had declared to his deputies at the CIA that "I

---

[3]   Senate Select Committee on Intelligence, hearing into "Worldwide Threats to National Security" (February 7, 2001) (remarks of George Tenet, declaring that "Osama bin Laden and his global network of lieutenants and associates remain the most immediate and serious threat.")

[4]   JIS, written statement submitted to joint SSCI/HPSCI hearing (September 18, 2001), at 9.

[5]   JIS, written statement submitted to joint SSCI/HPSCI hearing (September 18, 2001), at 10.

[6]   The detailed figures remain classified.

want no resources or people spared in this effort, either inside the CIA or the Community."[7]  CIA
officials also told the HPSCI on March 4, 1999 – in a written response to questions about the
CIA's proposed budget for Fiscal Year 2000 – that "the Agency as a whole is well positioned" to
work against Al-Qa'ida targets, and that they were "confident that funding could be redirected
internally, if needed, in a crisis."[8]

---

[7]     JIS, written statement submitted to joint SSCI/HPSCI hearing (September 18, 2001), at 9.

[8]     Central Intelligence Agency, response to "HPSCI Questions for the Record" (March 4, 1999)
         (declassified portion).

Shortly thereafter, however, a study conducted within the CTC found that it was unable to carry out more ambitious plans against Al-Qa'da for lack of money and personnel,[9] and CIA officials reported being "seriously overwhelmed by the volume of information and workload" before September 11, 2001.[10]  According to former CTC chief Cofer Black, "before September 11, we did not have enough people, money, or sufficiently flexible rules of engagement."[11]  The troops fighting the DCI's "war," in short, didn't have the support they needed.  (Even when the DCI requested additional counterterrorism money from Congress, it almost invariably did so in the form of supplemental appropriations requests – thus denying Community managers the ability to prepare long-term plans and programs because these increases were not made a part of the Community's *recurring* budgeting process.)

Under the National Security Act of 1947, the DCI has considerable budgetary power over the U.S. Intelligence Community.  His consent is needed before agency budget requests can be folded into the National Foreign Intelligence Program (NFIP) budget proposal, and he has authority over reprogramming both money and personnel between agencies.[12]  Simultaneously serving as Director of the CIA, the DCI also has essentially complete authority over *that*

---

[9]     This was the conclusion presented to an internal CIA conference on September 16, 1999.  Further information about this internal study, however, has not been declassified.

[10]    JIS, written statement submitted to joint SSCI/HPSCI hearing (September 18, 2001), at 13.

[11]    Cofer Black, written statement submitted to joint SSCI/HPSCI hearing (September 26, 2001), at 10.

[12]    *See* 50 U.S.C. § 403-4(b), (c), and (d).

organization, both with respect to budget requests and day-to-day management.  If a DCI were willing actually to *use* the full range of powers available to him, these statutory levers would give him considerable influence over the Community.  One of the great unanswered questions of our September 11 inquiry, therefore, is how the DCI could have considered himself to be "at war" against this country's most important foreign threat without bothering to use the full range of authorities at his disposal in this fight.

Unfortunately, part of the reason for this failure is the current DCI's longstanding determination – which he expressed quite frankly to some of us at a SSCI off-site meeting – that he does not really *consider* himself to be DCI.  His principal interest and focus in office, he has told us, revolves around his role as head of the CIA, rather than his role as head of the Community as a whole.  (The DCI has also publicly supported the creation of an Undersecretary of Defense for Intelligence [USDI], which seems likely only to reduce his influence over the Defense components of the U.S. Intelligence Community.)  Part of the reason may also lie in the merely rhetorical nature of the DCI's 1998 proclamation: since September 11 the DCI has pointed to his "declaration of war" as a token of his pre-September 11 seriousness of purpose against Al-Qa'ida, but it does not appear to have been circulated or known outside a small circle of intimates before that date.  And part of the reason that more was not done may also lie at higher levels of political authority.  The nature of the "war" contemplated in 1998 certainly pales in comparison to the use of that term after September 11, and officials have suggested in the press that they undertook, as much as was politically possible at the time.[13]

---

[13]     *See, e.g.*, Barton Gellman, "Broad Effort Launched After '98 Attacks," *Washington Post* (December 19, 2001), at A1 (quoting former Assistant Secretary of State for South Asian Affairs Karl Inderfurth that "Until September 11th, there was certainly not any groundswell of support to mount a major attack on the Taliban."); Bob Drogin, "U.S. Had Plan for Covert Afghan Options Before 9/11," *Los Angeles Times* (May 18, 2002), at A14 (quoting former Clinton Administration State Department official that invasion of Afghanistan was "really not an option" before

That said, there can be no gainsaying that even if the DCI *had* really meant to "declare war" against Al-Qa'ida in 1998, the fragmented structure of the Intelligence Community and his tenuous authority over its component agencies would have greatly handicapped any effort to conduct an effective counterterrorist campaign from the DCI's office.  His existing budget and reprogramming authorities under Section 104 of the National Security Act, for instance, extends by its terms only to the NFIP budget – and not to the Joint Military Intelligence Program (JMIP) and the Tactical Intelligence and Related Accounts (TIARA) budgets.[14]  For this reason, no serious plan to reform the U.S. Intelligence Community can ignore the problem of Community management and the weaknesses of the *office* of the DCI as the Community's nominal head.

2.      *Reinvigorating the Office of the DCI?*

The most obvious problem with respect to the IC's ability to act as a coherent and effective whole is the fact that more than 80 percent of its budgets and personnel resources are controlled by the Department of Defense (DOD).  The DCI may be the titular head of the Intelligence Community, but the National Security Agency (NSA), National Imagery and Mapping Agency (NIMA), National Reconnaissance Office (NRO), Defense Intelligence

---

September 11).

[14]     Section 104 only discusses the NFIP.  *See* 50 U.S.C. §§ 403-4(b) (budget approval); 403-4(c) (reprogramming); & 403-4(d) (transfer of funds and/or personnel).

Agency (DIA), and military service intelligence arms are all DOD organizations and report first and foremost to the Secretary of Defense.  (The heads of NSA and DIA, and the service intelligence agencies are active duty military officers, and the NRO Director is an Undersecretary of the Air Force.)  Only the CIA itself – and a comparatively tiny "Community Management Staff" (CMS) – is unambiguously under the authority of the DCI.

The domination of the IC by the Department of Defense is perhaps the most fundamental bureaucratic fact of life for anyone who aspires to manage the Community as a whole.  As one organizational history of the CIA has noted, "[t]he DCI never became the manager of the Intelligence Community," and decisions over the years to "us[e] declining resources first and foremost to support military operations effectively blunted the Congressional emphasis upon centralization by limiting the wherewithal that DCIs and agency heads could devote to national and strategic objectives."[15]

Nor is this arrangement entirely accidental.  This awkward balance of authority between DCI and the Secretary of Defense reflects an inability finally to decide whether agencies such as NSA and NIMA are "really" national intelligence agencies that should report to the DCI or "combat support agencies" that should report to DOD.  The U.S. military, of course, is an enormous – and, in wartime, perhaps the most important – consumer of certain sorts of intelligence product, particularly signals intelligence (SIGINT), photographic and other imagery (IMINT), and mapping products.  Without immediate access to such support, our armed forces would have difficulty knowing where they are, where the enemy is, and what the enemy is doing.  The reason that the military possesses integral service intelligence arms and cryptologic support

---

[15]   Warner, *supra*, at 8 & 17.

components, in fact, is precisely because the imperatives of war planning and operational decision-making do not permit these functions to be entirely separated from the military chain of command.  This attitude, however, also exists at the national level: DOD officials insist that organizations such as NSA and NIMA are, above all else, "combat support agencies." Implicitly, this means that in any unresolvable resource-allocation conflict between the Secretary of Defense and the DCI, the Secretary must prevail.

The difficulty lies in the fact that the DOD components of the Intelligence Community are also vital parts of the *national* intelligence system, and provide crucial intelligence products to national-level consumers, including the President. To the extent that DOD's domination of IC resources impedes the Community's ability to provide adequate national-level support – and to the extent that such high-level bureaucratic stand-offs hamper the IC's ability to reorient itself against dangerous emerging threats, or to *reform* itself in response to intelligence failures – we face grave challenges.

These problems have led many to suggest the need finally to empower the DCI to act as the *true* head of the U.S. Intelligence Community.  At one pole, such suggestions have included proposals to give the DCI full budgetary and management authority over all IC components – effectively taking them out of DOD and establishing the DCI as something akin to a cabinet-level "Secretary of Intelligence."  (Former National Security Advisor Brent Scowcroft has allegedly recommended something to this effect, but his report has never been released – supposedly due to Defense Department opposition.)  At the other pole, some in Congress have suggested merely ending the "dual-hatted" nature of the DCI's office by separating the roles of DCI and CIA Director.

In my view, these two poles leave us with a Hobson's choice between the virtually unworkable and the clearly undesirable. Creating a *true* DCI would entail removing dozens of billions of dollars of annual budgets from the Defense Department, and depriving it of "ownership" over "its" "combat support organizations."  In contemporary Washington bureaucratic politics, this would be a daunting challenge; DOD and its Congressional allies would make such centralization an uphill battle, to say the least.

Indeed, if anything, the trend in the post-September 11 world is *against* DCI centralization.  DOD has asked for, and Congress has now established, a new Undersecretary of Defense for Intelligence (USDI) to oversee and coordinate DOD's intelligence components, creating what may well be, in effect, a Pentagon DCI – and one, moreover, likely to have at least as much influence over the agencies in question than the DCI himself.  DOD's Joint Intelligence Task Force for Counterterrorism (JITF-CT) already reproduces at least some of the analytical functions of the CIA's CTC, DIA analysts already supply all-source analysis across a wide range of functional and regional specialties, and press accounts suggest that the Pentagon is increasingly interested in establishing its own parallel covert action capability using Special Operations Forces (SOF) troops.[16]  DOD is, in short, creating a parallel universe of intelligence organs increasingly independent of the DCI.  Particularly under a DCI who prizes his role as CIA Director above his Community responsibilities, the prospects for DCI centralization are grim indeed.

On the other hand, without more, proposals merely to separate the DCI's office from that of the CIA Director will likely only make the situation worse.  At the moment, one of the few

---

[16]     Susan Schmidt & Thomas E. Ricks, "Pentagon Plans Shift in War on Terror; Special Operations Command's Role to Grow With Covert Approach," *Washington Post* (September 18, 2002), at A1.

sources of bureaucratic power the DCI enjoys is his "ownership" of what is, in theory at least, the nation's premier intelligence analysis organization – and its only specialist HUMINT collection agency – the CIA.  Heading the CIA gives the DCI at least "a seat at the table" in national-level debates: a DCI *without* the limited but non-trivial bureaucratic clout of the CIA behind him would find himself even more marginalized and ineffective than the office is today.

My experience with the fragmented and disjointed Community management process have led me to conclude that the best answer is probably to give more management and budgetary authority over IC organs to an effective DCI focused upon issues of IC coordination and management – as the Joint Inquiry has suggested by urging that we consider the creation of a "Director of National Intelligence" with powerful new Community-management authority. Because he will need to use these new powers to arbitrate between and set policies for self-interested bureaucratic "players" within the Intelligence Community rather than *be* one of them, this augmented DCI (or DNI, as the case may be) should not simultaneously hold the position of CIA Director.

The "combat support" argument is, in my view, overblown.  There is nothing to suggest that organizations like NSA and NIMA would *deny* crucial support to the Defense Department the moment that they were taken out of the DOD chain of command.  Any lingering doubts about the effectiveness of the Pentagon's "combat support" from intelligence agencies could be allayed by improving the effectiveness and resources devoted to the services' organic intelligence and cryptologic components.  (Civilian directors of NSA and NIMA – appointed with DCI and Secretary of Defense concurrance – could serve as Assistant DCIs for SIGINT and IMINT, respectively, serving alongside an Assistant DCI for Military Intelligence, a high-ranking military officer charged with ensuring that the IC is at all times aware of and responsive to

25

military needs.)  Best of all, an Intelligence Community finally capable of being coherently managed *as a Community* would be able to reform and improve itself in numerous ways that prove frustratingly elusive today – ultimately providing both its national-level civilian *and* its warfighter customers with better support.

Congress took a remarkable step in reforming the basic structure of the military command system in 1986 with the passage of the Goldwater-Nichols legislation.[17]  This landmark legislation – which reformed the roles of the Chiefs of Staff and created an entirely new system of regional unified commanders – tilted at what were thought to be bureaucratic windmills and ran into fearsome bureaucratic opposition, but it succeeded brilliantly and helped our armed forces find new strength and coherence in war-winning "joint" operations.  The success of the Goldwater-Nichols reforms should be a lesson to Intelligence Community reformers today, for it teaches that it *is* possible sometimes to overcome entrenched bureaucratic interests and forge a much more effective whole out of a motley and disputatious collection of parts.

Unfortunately, Congress, the Administration, and the American public have yet to engage in much of a debate about these issues.  Perhaps nothing can shock us into serious debates about the fundamental structure of our Intelligence Community if the horror of September 11 cannot, but I am hopeful that the SSCI and HPSCI will make these issues a centerpiece of their agenda for the 108th Congress.  I urge them strongly to do so.

C.    *An Agile and Responsive IC*

---

[17]        Public Law 99-433 (October 1, 1986).

As the 108th Congress takes up these reform challenges, I would like to offer some additional suggestions that I believe would help the IC both meet the challenges it faces today and be prepared for those it may face tomorrow.  One of the roots of our problems in coping with threats such as that posed by Al-Qa'ida beginning in the 1990s is that the tools with which we have had to fight transnational terrorism were designed for another era.  The U.S. Intelligence Community is hard-wired to fight the Cold War, engineered in order to do a superlative job of attacking the intelligence "targets" presented by a totalitarian superpower rival but nowhere near as agile and responsive to vague, shifting transnational threats as we have needed it to be.

The lesson of September 11, therefore, should be not simply that we need to reform ourselves so as to be able to address the terrorist threat but also that *we need an Intelligence Community agile enough to evolve as threats evolve, on a continuing basis.*  Hard-wiring the IC in order to fight terrorists, I should emphasize, is precisely the *wrong* answer, because such an approach would surely leave us unprepared for the next major threat, whatever it turns out to be.  Our task must be to ensure that whatever we do to "fix" the problems that helped leave us unprepared in the autumn of 2001, we make sure that the Intelligence Community can change, adapt, and move in unanticipated directions in the future.  Otherwise the IC will face little but a future punctuated by more intelligence failures, more Congressional inquiries, and more Commissions.

This is perhaps the most powerful argument for strengthening the DCI's ability to lead the Intelligence Community *as a community*, insofar as it is notoriously difficult to reorient large bureaucracies under the best of circumstances, and virtually impossible to do so simply by *persuasion.*  But there are additional steps that Congress and the Administration should consider in order to make the IC "quicker on its feet" in anticipating and preparing for – and, where that

fails, responding to – future threats.

Well short of putting the entire Community under a "Secretary for Intelligence," one way to greatly augment the ability of the Intelligence Community to adapt flexibly and effectively to future threats would be to increase the degree of uniformity in its personnel management system. A homogenized payment and benefits structure for the Community would not necessarily require putting the agencies themselves under the DCI's operational command. It would, however, enable the IC to move personnel and reorganize organizational structures on an *ad hoc* basis much more effectively in response to future developments.

Achieving such organizational flexibility – and the conceptual flexibility that must accompany it – will be essential if the Community is not simply to replace its dangerous and inflexible Cold War hard-wiring with an equally rigid and unadaptable CT paradigm. This is what might be called the "meta-lesson" of our current round of "lessons learned" studies of intelligence failures: we must not only learn the lessons of the past but learn *how* to *keep* learning lessons as we change and adapt in the future. Adopting uniform personnel standards would help the Community ensure that its personnel and organizational units remain unique and valuable individual resources but they would also become *administratively* fungible assets, capable of being reorganized and redirected efficiently as circumstances demand.

The CIA, to its credit, has experimented in recent years with approaches to organizing "virtual stations" – *ad hoc* issue-focused organizations mimicking the structure of an overseas Directorate of Operations outpost, but simply existing within CIA Headquarters. In the future, the IC as a whole will need to learn from (and improve upon) this concept, by developing ways to "swarm" personnel and resources from various portions of the Community upon issues of

particular importance as circumstances demand.  At the same time, the IC will have to be willing to move personnel resources *out* of programs and organizations that no longer fulfil their missions, or whose targets have been superseded in priority lists by more important threats.  We must, in short, be willing to build new structures and raze old ones in a continual process of "creative destruction" not unlike competitive corporate approaches used in the private sector.

Concomitant with this, it will also be necessary to break the artificial definitional monopoly within the IC that holds that only intelligence professionals actually employed by the traditional collection agencies can engage in collection or analysis of those agencies' signature types of intelligence.  We should be open to unconventional HUMINT collection opportunities, for instance, and should not deny non-CIA analysts a chance to provide the analytical "value-added" that can be obtained by making them more aware than they are today of the origins of their information.  And we should reject the self-satisfied assumptions of NSA managers that only NSA personnel can be trusted with analyzing "raw" SIGINT data.  (Unfortunately, the Administration seems to be heading in precisely the wrong direction in this respect.  If recent reports are to be believed, the President intends to ratify the information-monopolistic *status quo* by issuing an Executive Order to make Homeland Security intelligence analysts dependent upon the traditional IC collection bureaucracies to tell these analysts what information is relevant.[18])

The traditional collection agencies *do* have valuable expertise in "their" areas, but this expertise should be used to enrich the Community's pool of intelligence expertise rather than simply as barriers to entry wielded in defense of bureaucratic and financial "turf."  Instead, the collection agencies should be charged with certifying – but not running or controlling – training

---

[18]     *See, e.g.*, Dan Eggen & John Mintz, "Homeland Security Won't Have Diet of Raw Intelligence," *Washington Post* (December 6, 2002) at 43.

curricula within other IC agencies that will produce competent specialists in the relevant fields. A SIGINT analyst, for instance, should be properly trained to meet the relevant professional standards (*e.g.*, compliance with USSID 18), but there is no reason why he must receive his paycheck from NSA in order to make important contributions to the Community. Agencies such as CIA and NSA with special expertise in a particular "INT" should become jealous advocates and guardians of high professional standards within the Community as a whole, but they should no longer be permitted to use their expertise to maintain parochial information monopolies.

Fundamentally, Congress and the Administration should be willing, over the coming months, carefully to examine the basic structure of the intelligence provisions of the National Security Act of 1947 in light of the circumstances and challenges our country faces today. At a time in which the State Department and the military services provided the only thing resembling national-level information collection and analytical expertise in the entire U.S. Government, the Act set up a "central" intelligence agency to be an objective source of information and to stand above the bureaucratic political infighting of the day. It was to be what Colonel William ("Wild Bill") Donovan had called for in October 1946: "a centralized, impartial, independent agency that is qualified to meet the atomic age."[19] In 2002, however, the CIA no longer quite fulfils that function, now existing as one of many bureaucratic fiefdoms within a sprawling – and Defense-dominated – Intelligence Community.

---

[19]    Thomas F. Troy, *Donovan and the CIA: A History of the Establishment of the Central Intelligence Agency* (Langley, Virginia: CIA Center for the Study of Intelligence, 1981), *supra*, at 382 (quoting Donovan); *see also id.* at 408 (noting that "Congress wanted CIA . . . [to be] free from undue military influence as well as Department control."); *id.* at 410 (noting that Donovan "recognized that the appropriate status for intelligence was independence and that such independence required the establishment of an 'agency' free of any other department of government").

One possibility to which Congress and the Administration should give very careful consideration is whether we should return to the conceptual inspiration behind the intelligence-related provisions of the National Security Act of 1947: the need for a "central" national level knowledge-compiling entity standing above and independent from the disputatious bureaucracies.  Returning to these roots might suggest the need to separate our country's "central" intelligence analytical functions from the resource-hungry collection responsibilities that make agencies into self-interested bureaucratic "players" – that is, to separate human intelligence (HUMINT) collection into a specialized service that would, along with other collection agencies, feed information into a national-level purely analytical organization built around the core of the CIA's Directorate of Intelligence.  (The resulting pure-analysis organization would arguably be the sole institution that could appropriately be run *directly* by a new Director of National Intelligence, who would serve as the overall head of the IC and as the President's principal intelligence advisor.)  Whether or not we determine that this is the right answer, however – and howsoever we determine that any such agency would interact with a more empowered DCI – our opportunity seriously to consider such changes is *now*.

## II.     *Information-Sharing*

Perhaps the most fundamental problem illustrated by the findings of the Joint Inquiry Staff (JIS) in connection with the intelligence failures leading up to September 11 relates to the problem of persuading U.S. Intelligence Community agencies to share information efficiently and effectively.  This problem is inextricably tied up with the longstanding problem of ensuring quality intelligence analysis within the Community, for without *access* to a broad range of information upon which to draw inferences and base conclusions, even the best individual

analysts necessarily find themselves gravely handicapped.

There exists a fundamental tension in intelligence work between the need for security and the need for sharing information.  Increasing the number of persons having access to a particular item of information inevitably leads to at least *some* increase in the likelihood of its compromise, either accidentally or deliberately (*e.g.*, in a "leak" to the press or to a foreign power through espionage).  Agencies which possess sensitive information, therefore, tend to prefer to restrict others' access to "their" information.  (This is particularly true in an Intelligence Community institutional culture in which knowledge literally *is* power – in which the bureaucratic importance of an agency depends upon the supposedly "unique" contributions to national security it can make by monopolizing control of "its" data-stream.)

On the other hand, *perfectly* secure information is perfectly *useless* information.  Since the purpose of intelligence-gathering is to inform decision-making, restricting access inevitably degrades the value of having intelligence collectors in the first place.  For good analysis to be possible, expert analysts must be able to perform what is called "all-source intelligence fusion" – drawing upon the available breadth of information in order to tease patterns of "signal" out of the mass of irrelevant and distracting "noise" that comprehensive collection invariably brings in.  If good analysis is to form the basis for intelligent policy, moreover, information must be passed along to the policy community in order to inform their actions.

This tension between security and sharing has been part of the fabric of intelligence policy for years, perhaps manifesting itself most clearly in U.S.-British debates during the Second World War over when (or whether) to share high-grade communications intelligence with operational commanders who needed such information in order to win the war against Nazi

Germany.[20]  Today, similar debates continue as it becomes clear that the sort of sophisticated pattern-analysis and semi- or fully-automated "data-mining" capabilities that will be necessary for intelligence analysis to keep up with complex transnational threats such as those presented by Usama bin Laden's Al-Qa'ida organization are not compatible with traditional notions of inter-Intelligence Community secrecy and restrictions upon access based upon an outsider's "need to know" as determined by the agency information-holders themselves.

A.     *The Intelligence Community's Failure to "Connect the Dots" Prior to 9/11*

The most fundamental problem identified by the JIS is our Intelligence Community's inability to "connect the dots" available to it before September 11, 2001 about terrorists' interest in attacking symbolic American targets.  Despite a climax of concern during the summer of 2001 about imminent attacks by Al-Qa'ida upon U.S. targets, the Intelligence Community (IC) failed to understand the various bits and pieces of information it possessed – about terrorists' interest in using aircraft as weapons,[21] about their efforts to train pilots at U.S. flight schools,[22] about the

---

[20]     *See, e.g.,* F.W. Winterbotham, *The Ultra Secret* (New York: Harper & Row, 1974), at 86; John Winton, *ULTRA At Sea* (New York: Morrow & Co., 1988), at 148; Patrick Beesly, *Very Special Intelligence: The Story of the Admiralty's Operational Intelligence Centre, 1939-1945* (London: Greenhill, 2000), 89, 98-100, 189-90, & 279; David Kohnen, "F-21 and F-211: A Fresh Look into the 'Secret Room,'" in *New Interpretations in Naval History: Selected Papers from the Fourteenth Naval History Symposium* ed. Randy Carol Balano and Craig L. Symonds, (Annapolis, Md.,: Naval Institute Press, 2001), at 304 & 327-29.

[21]     For an account of information available to the Intelligence Community about terrorists' interest in using aircraft as weapons, *see* JIS, written statement presented to SSCI/HPSCI joint hearing (September 18, 2002), at 26-28.

[22]     For an account of information available about terrorists' interest in acquiring aviation training at U.S. flight schools, *see* JIS, written statement presented to SSCI/HPSCI joint hearing (September 24, 2002), at 3.

presence in the U.S. of Al-Qa'ida terrorists Khalid al-Mihdhar and Nawaf al-Hazmi, and about Zacarias' Moussaoui's training at a U.S. flight school – as being in some fashion related to each other.

As the JIS concluded, the IC failed to "connect[] these individual warning flags to each other, to the 'drumbeat' of threat reporting that had just occurred, or to the urgency of the 'war' efforts against Usama bin Laden."[23]  Having failed to make that connection, the IC was caught flat-footed when the attack finally came.  Accordingly, no effort to "fix" the problems highlighted by September 11 should be taken seriously unless it attempts to address the pervasive problems of information-sharing that afflict our Intelligence Community.

(1)     *Terrorist Names*

One of the serious problems identified by our Joint Inquiry is the pervasive refusal of the CIA, in the months and years before September 11, to share information about suspected terrorists with the very U.S. Government officials whose responsibility it is to keep them out of the United States: the State Department consular officials who issue visas and the INS officials who man immigration posts at every American port of entry.

As the JIS outlined in its testimony before one of our joint SSCI/HPSCI hearings, the so-called TIPOFF system provides the basic "watchlist" function by which consular and INS

---

[23]     JIS, written statement presented to SSCI/HPSCI joint hearing (September 18, 2002), at 10.

officials check visa applicants or U.S. arrivals against lists of suspected terrorists and other undesirables.  With respect to suspected terrorists, the TIPOFF database is populated principally through the submission of names from the CIA.  Crucially, however, without CIA input, these officials cannot do their job – and even terrorists *known* to the CIA will be able freely to acquire visas and be granted entry if the CIA has neglected to share their names with TIPOFF.

Alarmingly, this is apparently precisely what happened for years, because CIA was unwilling to share more than a small fraction of its information about suspected terrorists with State and INS.  Based upon clear internal guidance issued on December 11, 1999, the CIA was *required* to pass to the TIPOFF program the names of *all* persons it suspected of being terrorists.[24]  Before September 11, however, the Agency did not consistently do this.  Instead, it often provided the names of suspected terrorists to TIPOFF if the CIA already had information indicating that the terrorist planned to travel to the United States.[25]  Because of the practical impossibility of knowing the personal travel plans, in advance, of every suspected terrorist in the world, this inevitably meant that the CIA withheld hundreds or perhaps thousands of names from the TIPOFF database – names of persons who were thus free to obtain U.S. visas and walk through INS booths without notice.  Indeed, even though it signed an explicit Memorandum of

---

[24]   CIA Office of Congressional Affairs Liaison Officer Gary Dionne, unclassified telephonic communication to SSCI Minority Counsel Christopher Ford (December 9, 2002).  The text of the December 11, 1999 guidance, however, is still classified.

[25]   CIA officials have informed SSCI staff that this occurred because State Department officials felt overly burdened with having to process all the names.  Their account, however, is not consistent with the State Department complaints about CIA practice recorded by the JIS.  *See, e.g.*, JIS, written statement presented to SSCI/HPSCI joint hearing (September 20, 2002), at 15.  In any event, it is clear that the "rules of the road" involved the CIA passing comparatively few names in violation of its own rules: by no one's account were the 1999 guidelines actually consistently followed as written.

Understanding (MOU) in January 2001 with the FBI, NSA, and State Department on watchlist procedures, State Department officials have complained to the JIS that the CIA still did not share many of its terrorism-related Critical Intelligence Report (CIRs) with the TIPOFF program in the months leading up to the September 11 attacks.[26]

What's more, the CIA apparently did not take its watchlisting responsibilities very seriously even when it *did* see fit to pass some names to TIPOFF.  According to the JIS, the CIA provided its employees no training in this regard.[27]   Indeed, one CIA official from the Counterterrorism Center's special cell devoted to tracking Al-Qa'ida told the JIS that he didn't feel that his organization needed to worry about whether anyone watchlisted Al-Qa'ida terrorists.[28]  The CIA, therefore, apparently neither trained nor encouraged its employees to follow its own rules on watchlisting – embodied in the December 1999 guidance – and they clearly did not do so.[29]

---

[26]   JIS, written statement presented to SSCI/HPSCI joint hearing (September 20, 2002), at 15.

[27]   JIS, written statement presented to SSCI/HPSCI joint hearing (September 20, 2002), at 7-8.

[28]   JIS, written statement presented to SSCI/HPSCI joint hearing (September 20, 2002), at 8.

[29]   Strangely, to judge from the testimony given in Joint Inquiry hearings by JIS representatives, the JIS does not seem ever to have discovered that the CIA had "hard" guidance in place requiring such watchlisting.  The CIA, however, has now provided me with a copy of its classified December 1999 guidance.

36

Nor, despite repeated inquiries about watchlisting standards, did the CIA apparently ever disclose the existence of this guidance to the JIS.  As the JIS has recounted, "[w]e were told that there was, at the time, no formal system in place at the CTC for watchlisting suspected terrorists."[30]  This, however, was not true.  As noted above, the CIA's December 1999 guidance specifically provided watchlisting standards – which were often ignored.  By failing to provide this information to the JIS, the CIA thus managed to keep the fact that it violated its own rules out of the formal report of the Joint Inquiry.

---

[30]      JIS, written statement presented to SSCI/HPSCI joint hearing (September 20, 2002), at 7.

The magnitude of the CIA's watchlisting failures and the potential impact of this information-hoarding upon our country's preparedness for terrorist attack may be seen in the contrast between the CIA's pre-September 11 performance in this respect and its performance after the attacks. Within a month after September 11, the CIA provided more than 1,500 CIRs to TIPOFF that had it had previously withheld. The State Department reported a 455 percent increase in the number of names CIA provided during the months after the attacks – with the total provided rising from 1,761 during the three months before September 11 to 4,251 in the three months afterwards.[31] But for the shock of September 11, these *thousands* of potential terrorists would presumably still be free to obtain visas and enter the United States without anyone asking any questions, thanks to the CIA's apparent belief that only *it* can be trusted with its information. As it turns out, two of the September 11 hijackers did precisely this.

    (2)    *The al-Mihdhar and al-Hazmi Story*

What such watchlisting problems can mean in practice is illustrated by the failures of the CIA and FBI in dealing with Al-Qa'ida-affiliated terrorists Khalid al-Mihdhar and Nawaf al-Hazmi. Their story is ably recounted by in the body of the JIS report, but its highlights are worth repeating here. Al-Mihdhar and al-Hazmi attended a terrorist meeting in Kuala Lumpur, Malaysia, in early January 2000.[32] This meeting was known to – and surveiled by – the CIA, which already knew that al-Mihdhar possessed a multiple-entry visa permitting him to travel to the United States. The National Security Agency (NSA) also independently possessed information linking al-Hazmi to Al-Qa'ida. Neither the CIA nor NSA, however, saw fit to

---

[31]    JIS, written statement presented to SSCI/HPSCI joint hearing (September 20, 2002), at 15.

[32]    JIS, written statement presented to SSCI/HPSCI joint hearing (September 20, 2002), at 5.

provide their names to the TIPOFF database.[33]   There is apparently some confusion over whether the CIA told the FBI anything about al-Mihdhar and al-Hazmi.   CIA e-mail traffic reviewed by the JIS, however, suggests that the CIA did brief the FBI in general terms .   The CIA, however, still did not bother to tell the FBI that al-Mihdhar had a multiple-entry visa that would allow him to enter the United States.[34]

---

[33]   JIS, written statement presented to SSCI/HPSCI joint hearing (September 20, 2002), at 6.

[34]   JIS, written statement presented to SSCI/HPSCI joint hearing (September 20, 2002), at 6-7.

In early March 2000, the CIA learned that al-Hazmi had arrived in Los Angeles on January 15.  Despite having just learned of the presence in this country of an Al-Qa'ida terrorist, the CIA told no one about this.  The internal cable transmitting this information, in fact, contained the notation: "Action Required: None, FYI."[35]  This information came at the height of the U.S. Intelligence Community's alarm over Al-Qa'ida's "Millennium Plot," and al-Hazmi's arrival had occurred at about the same time the CIA knew that Al-Qa'ida terrorist Ahmed Ressam was also supposed to have arrived in Los Angeles to conduct terrorism operations.[36]  Still, however, the CIA refused to notify anyone of al-Hazmi's presence in the country.

By this point, both al-Mihdhar and al-Hazmi – both terrorists known to the CIA – were living in San Diego under their true names.  They signed these names on their rental agreement, both used their real names in taking flight school training in May 2000, and al-Mihdhar even used his real name in obtaining a motor vehicle identification card from the State of California.[37]  In July 2000, al-Hazmi even applied to the INS for an extension of his visa, sending in this application using both his real name and his current address in San Diego (where he would remain until that December).[38]  INS, of course, had no reason to be concerned, since the CIA had

---

[35]   JIS, written statement presented to SSCI/HPSCI joint hearing (September 20, 2002), at 7; *see also generally* CIA officer, written statement presented to SSCI/HPSCI joint hearing (September 20, 2002), at 3.

[36]   JIS, written statement presented to SSCI/HPSCI joint hearing (September 20, 2002), at 8 & 10.

[37]   JIS, written statement presented to SSCI/HPSCI joint hearing (September 20, 2002), at 8.

[38]   JIS, written statement presented to SSCI/HPSCI joint hearing (September 20, 2002), at 8-9.

withheld the two terrorists' names from TIPOFF.  Nor did the FBI have any reason to look for them – *e.g.*, by conducting a basic Internet search for their names or by querying its informants in Southern California  – since the last it had heard from CIA was that these two terrorists were overseas.

The CIA's failure to watchlist al-Mihdhar and al-Hazmi became even more alarming and inexplicable in January 2001, when the CIA discovered that the Malaysia meeting had also been attended by a suspect in the *USS Cole* bombing.  This presumably made the two terrorists even more interesting to the CIA – and their known presence in the U.S. even more dangerous, by confirming their linkages to Al-Qa'ida operational cells – but the CIA still did not bother to inform TIPOFF.  This failure was particularly damaging because al-Mihdhar was overseas at the time: putting his name on the watchlist would have enabled INS agents to stop him at the border.[39]

Even when given the opportunity to tell the FBI – in face to face meetings – about the presence of these two terrorists in the United States, the CIA refused.  At a meeting in June 2001 with FBI officials from the New York Field Office who were working on the *USS Cole* case, a CIA official refused to tell them that al-Mihdhar and al-Hazmi had come to the United States.[40]

Meanwhile, Khalid al-Mihdhar was in Jeddah, Saudi Arabia, and applied for a new U.S.

---

[39]    JIS, written statement presented to SSCI/HPSCI joint hearing (September 20, 2002), at 9; *see also* CIA official, written statement presented to SSCI/HPSCI joint hearing (September 20, 2002), at 4; Michael Rolince, written statement presented to SSCI/HPSCI joint hearing (September 20, 2002), at 2.

[40]    JIS, written statement presented to SSCI/HPSCI joint hearing (September 20, 2002), at 21; *see also id.* at 10.

visa in June 2001.   The State Department officials who took this application appear to have followed procedures and checked his name against their CLASS database, which incorporates TIPOFF watchlist information.   Because CIA continued to refuse to put the name of this Al-Qa'ida terrorist into TIPOFF, however, no CLASS "hits" occurred, and al-Mihdhar was given a visa and returned to the United States unmolested in July.[41]

---

[41]      JIS, written statement presented to SSCI/HPSCI joint hearing (September 20, 2002), at 10.

The CIA only decided to watchlist al-Hazmi and al-Mihdhar in late August 2001, by which point they were already in the United States and in the final stages of preparing for the September 11 attacks.[42]  By this point, tragically, it was too late for the FBI – hamstrung by its own investigative regulations – to stop them.  Although the FBI scrambled in late August and early September to locate the two terrorists in the United States,[43] it denied itself the services of any of its own agents assigned to criminal work and refused even to conduct a basic Internet search that would have revealed al-Hazmi and al-Mihdhar living under their true names in San Diego.  (According to testimony from an FBI agent in New York who conducted just such an Internet search *after* the September 11 attacks, finding al-Mihdhar's address "within hours."[44]) It also denied itself any assistance that could have been obtained from Treasury officials in tracking down al-Mihdhar and al-Hazmi through their credit card or banking transactions.  As it turned out, however, on September 11, 2001, the two men boarded American Airlines Flight 77, and helped fly it into the Pentagon.

<div style="text-align:center">(3)   <em>The "Phoenix Memo"</em></div>

The affair of the FBI Electronic Communication (EC) sent by the Phoenix field office to FBI Headquarters in order to warn officials about potential dangers from Al-Qa'ida-affiliated individuals training at U.S. flight schools, also illustrates the tremendous difficulty our

---

[42]   JIS, written statement presented to SSCI/HPSCI joint hearing (September 20, 2002), at 10; *see also* Rolince, *supra*, at 3.

[43]   JIS, written statement presented to SSCI/HPSCI joint hearing (September 20, 2002), at 11.

[44]   FBI Agent from New York Field Office, testimony before joint SSCI/HPCSI hearing (September 20, 2002), *available from* Federal News Service (response to question from Senator Shelby).

Intelligence Community has had with sharing information and "connecting the dots" – particularly where the FBI is concerned.

The FBI special agent in Phoenix who sent the EC to headquarters on July 10, 2001, addressed his memorandum to the Usama bin Laden Unit (UBLU) and the Radical Fundamentalist Unit (RFU) within the Bureau's counterterrorist organization.  Headquarters personnel, however, decided that no follow-up was needed, and no managers actually took part in this decision or even *saw* the memorandum before the September 11 attacks.[45]  The CIA was made aware of the Phoenix special agent's concerns about flight schools, but it offered no feedback[46] despite the information the CIA possessed about terrorists' interest in using aircraft as weapons.  Nor did the new FBI officials who saw the Phoenix EC at headquarters ever connect these concerns with the body of information already in the FBI's possession about terrorists' interest in obtaining training at U.S. flight schools.[47]  The full contents of the "Phoenix Memo" have yet to be made public, but it is astonishing that so little was made of it, especially since it drew readers' attention to certain information *already in the FBI's possession* suggesting a very specific reason to be alarmed about one particular foreign student at an aviation university in the United States.[48]

---

[45]   JIS, written statement presented to SSCI/HPSCI joint hearing (September 24, 2002), at 2.

[46]   JIS, written statement presented to SSCI/HPSCI joint hearing (September 24, 2002), at 6.

[47]   JIS, written statement presented to SSCI/HPSCI joint hearing (September 24, 2002), at 11-13.

[48]   FBI Special Agent in Phoenix, Arizona, electronic communication addressed to Radical Fundamentalist Unit *et al.* (July 10, 2001), at 5.  The FBI declined to declassify any more specific an account of this information.

44

(4)     *Missed Opportunities*

Altogether, the al-Mihdhar/al-Hazmi and "Phoenix EC" stories suggest both the potential of sophisticated information-sharing and good information-empowered analysis and the dangers of *failing* properly to "connect the dots."  It is impossible to know, of course, whether the September 11 plot could have been disrupted – or at least significantly delayed – had the FBI and CIA acted properly in sharing and understanding information available to them.  The evidence, however, suggests a number of pregnant "what ifs":

- If the CIA had been willing to share its information about al-Mihdhar and al-Hazmi with consular and INS officials through the TIPOFF program, one or both of them might have been apprehended upon entering or reentering the United States after their Malaysia meeting.

- If the CIA had informed the FBI when it first knew that al-Mihdhar and al-Hazmi were in the United States – and the FBI had permitted itself to do common-sense things like use the Internet – these two terrorists might have been located at their home in San Diego (or in flight school in the area) long before the September 11 attacks.  Surveillance of them might have led the FBI to other hijackers, or to operational cell leaders, or their deportation might have disrupted the plot.

- If the FBI had been able to "connect the dots" between the Phoenix EC and the body of information already in the FBI's possession about terrorist interest in U.S. flight schools – and information held by the Intelligence

Community about terrorists' interest in using aircraft as weapons – it might have been better able to investigate Zacarias Moussaoui and obtain information on some of the other September 11 hijackers from information in Mouassaoui's computer and in his personal effects.

- If the FBI had understood the full significance of the Phoenix EC in light of this other information, they might have begun to conduct the follow-up work recommended by the Phoenix special agent.  In May 2001, the FBI had already briefly considered opening an investigation upon one of the individuals named in the EC, but this was dropped when it was discovered he was out of the country at the time.  Had the Phoenix EC spurred serious follow-up by FBI Headquarters, however, this individual's name might have been added to the TIPOFF watchlist – leading investigators right to him upon his subsequent return to the United States.  Restarting the aborted investigation of this individual would likely also have led the FBI to his radical fundamentalist flight school classmate in Arizona, September 11 hijacker Hani Hanjour.[49]

The September 11 story, therefore, should be an object lesson in the perils of failing to share information promptly and efficiently between (and within) organizations, and in the need to ensure that intelligence analysis is conducted on a *truly* "all-source" basis by experts permitted to access *all* relevant information – no matter where in the Intelligence Community it happens to reside.

---

[49]     JIS, written statement presented to SSCI/HPSCI joint hearing (September 24, 2002), at 10.

B.      *Pervasive Problems of Information-Sharing*

That effective information-sharing and truly all-source analysis should have been such a scarce commodity in counterterrorism work during the months and years leading up to September 11 – years during which the Director of Central Intelligence supposedly believed the U.S. Intelligence Community to be "at war" with Al-Qa'ida and made fighting it his highest priority – is a testament to the recurring problems of agency parochialism and information-hoarding.  Even Community-wide attempts to "fix" the problem of information-sharing, such as the DCI's ongoing development of the computerized Intelligence Community-Wide System for Information Sharing (ICSIS), simply replicate the problem.  ICSIS will be built around a series of agency-specific electronic "shared spaces" accessible to users of the system, but populated only with such information as each agency sees fit to permit others to see.[50]  ICSIS will, in other words, presumably speed access to what agencies *are* willing to share, but it will do nothing to address broader issues of their unwillingness to permit experts from *other* intelligence agencies any window upon the data-streams the monopolization of which is the source of each host agency's bureaucratic power.[51]

---

[50]     It is not even clear that ICSIS will meet the Community's needs even on its own terms.  In January 2001, the NIMA Commission report recommended that NIMA begin building a new information-management system essentially from scratch, notwithstanding ICSIS planned deployment over the next ten years.  *See* Dr. Robert C. Norris, written statement presented to joint SSCI/HPSCI hearing (October 1, 2002), at 4.

[51]     The culture of information-holder control is formally enshrined most obviously in the "originator control" (ORCON) classification caveat, which requires that anyone given access to a certain piece of information *not* reveal it to anyone else without explicit permission from its originating agency.  According to FBI official Michael Rolince, the ORCON caveat made it very difficult for the FBI to pass intelligence information to criminal investigators in terrorism cases, "even for lead purposes," because the originating agency (frequently the CIA) would refuse to allow it.  *See* Michael Rolince, written statement presented to joint SSCI/HPSCI hearing (September 20, 2002),

at 4.  According to the JIS, ORCON rules present a major problem to efficient information-sharing, because they impose upon sharing arrangements a cumbersome and lengthy case-by-case adjudication process.  *See* JIS, written statement presented to joint SSCI/HPSCI hearing (October 1, 2002), at 6.  Our Joint Inquiry also discovered this to be the case, encountering frequent delays allegedly because of the necessity of clearing ORCON transmittals to Congress.

   In travels and discussions with U.S. Allies currently engaged in helping us fight the war against terrorism, SSCI Members and staff have heard many complaints that the U.S. classification caveat "no foreign" (NOFORN) has also unnecessarily impeded information-sharing.  Even our closest military allies have privately complained about what they describe as the unnecessary and reflexive use of the NOFORN caveat by U.S. officials.  This has frequently resulted in U.S. intelligence officers stamping "NOFORN" on information provided to them by those same allies, denying these contributors to our war and intelligence efforts the ability to see the intelligence products we make out of their information.  The Intelligence Committees attempted to draw attention to this "NOFORN problem" in § 831 of the Fiscal Year 2003 Intelligence Authorization Bill (Public Law 107-306), which requires that the DCI and the Secretary of Defense report to Congress on the impact of NOFORN practices upon allied intelligence-sharing relationships.

Such information-hoarding thus goes deeper than simply being "policy," often reaching the level of simple reflex.  For instance, the FBI for years monopolized the processing of information obtained from surveillance under the Foreign Intelligence Surveillance Act (FISA) – even though it fell hopelessly behind in processing FISA "raw data" and accumulated vast backlogs of untranslated tapes that were of no use to anyone.  Thus also does the NSA insist that only *its* employees can be trusted with handling "raw" signals intelligence (SIGINT) data under the standards prescribed by U.S. Signals Intelligence Directive (USSID) 18.  And the CIA's Directorate of Operations usually refuses even to let *CIA analysts* see its own operational cable traffic.

Reading the DCI's authority to protect intelligence "sources and methods" as barring the disclosure of source information not simply to the public or to U.S. adversaries but also to *anyone else in the U.S. Intelligence Community*, the CIA has proven unwilling to permit others a window upon the context that source information can occasionally provide.  CIA information-hoarding is hardly a problem unique to the al-Mihdhar and al-Hazmi story.  The CIA also refused requests by U.S. Navy intelligence officers to turn over highly relevant information about the source of an intelligence warning that might have prompted the Navy to direct the *USS Cole* away from Yemen in October 2000.

As the Senate and House Intelligence Committees have seen repeatedly, the Intelligence Community shares information poorly and reluctantly, at best.  Especially since September 11, Community representatives have assured us on innumerable occasions that their coordination and information-sharing problems have been fixed: it has become their mantra that such cooperation is now "seamless" and "unprecedented."  Even today, however, these sharing

arrangements consist principally of the assignment of agency personnel for reciprocal details at counterpart agencies (*e.g.*, FBI personnel at the CIA, and CIA personnel at the FBI).  (Nor is the CIA's CTC much of a "joint" center in the military sense, since the overwhelming majority of its personnel are CIA employees.  It was, and remains, a CIA organization.)

Such cross-detailing, as we have long known and as testimony before our Joint Inquiry hearings has made doubly clear, is at best "an imperfect response" to the information-sharing problem.

> "The almost unanimous opinion among the detailing agencies is that host agencies still restrict access to information and limit the databases that can be queried by detailees from other agencies on grounds of personnel or information security, and intelligence policies."[52]

---

[52]     JIS, written statement presented to SSCI/HPSCI joint hearing (October 1, 2002), at 7.

Such detailees commonly bring special experience and contextual knowledge to their assignments that host-agency personnel may lack, but they are seldom fully trusted by their host agencies and are seldom, if ever, permitted to know as much as "real" agency employees. Moreover, even when detailees are given comparatively good access to host-agency information, they are almost invariably prohibited from passing it back to their home organizations. This, for instance, is the fate of non-FBI officials assigned to the FBI-run Joint Terrorism Tracking Task Forces (JTTFs).[53] It is also that of DIA analysts cross-assigned to other IC agencies.[54] As Rear Admiral Lowell Jacoby recounted in testimony submitted to the Joint Inquiry, cross-assigned personnel are routinely denied "unfettered and unconditional access to all relevant . . . information" and are often not permitted to transmit to their home agencies what they *are* permitted to see.[55]

Today, the "seamless" and "unprecedented" information-sharing within our Intelligence Community remains built around personal contacts and such cross-details. According to FBI Counterterrorism chief Dale Watson, the FBI's arrangements with the CIA and with other U.S. Government agencies revolve principally around the "exchange of working level personnel and senior managers at the headquarters level."[56] This may represent considerable progress compared with what prevailed before September 11, but it is woefully inadequate to our intelligence needs in the 21st century.

---

[53]   JIS, written statement presented to SSCI/HPSCI joint hearing (October 1, 2002), at 7-8.

[54]   JIS, written statement presented to SSCI/HPSCI joint hearing (October 1, 2002), at 13.

[55]   RADM Lowell E. Jacoby, written statement presented to SSCI/HPSCI joint hearing (October 1, 2002), at 5.

[56]   Dale Watson, written statement presented to SSCI/HPSCI joint hearing (September 26, 2002), at 4 & 6.

C.    *The Future of Information-Sharing*

(1)    *The Imperative of "Deep" Analyst Data-Access*

The greatest contributions that intelligence analysis can make against vague, shifting, and inherently ambiguous transnational threats such as international terrorism lie in analysts' capacity to conduct "all-source fusion" of information – performing the classic task of assembling fragmentary information into actual or inferential "mosaics" and teasing useful "signals" out of the "noise" brought in by our wide-ranging means of intelligence collection. Problems of information-hoarding and dysfunctional sharing methodologies, however, restrict analysts' ability to apply their talent, training, and experience against intelligence targets in a truly *all-source* fashion.  If they are to be expected to have success against such modern targets in the future, we will need to do a great deal to improve their ability to survey and draw patterns out of the masses of data that exist in discrete and carefully-guarded bundles throughout the Intelligence Community.

Intelligence collectors – whose status and bureaucratic influence depends to no small extent upon the monopolization of "their" information-stream – often fail to recognize the importance of providing analysts with "deep" access to data.  The whole *point* of intelligence analysis against transnational targets is to draw patterns out of a mass of seemingly unrelated information, and it is crucial that the analysis of such patterns not be restricted only to personnel from a single agency.  As Acting DIA Director Lowell Jacoby observed in his written testimony before the Joint Inquiry, "information considered irrelevant noise by one set of analysts may

52

provide critical clues or reveal significant relationships when subjected to analytic scrutiny by another."[57]

This suggests that the fundamental intellectual assumptions that have guided our Intelligence Community's approach to managing national security information for half a century may be in some respects crucially flawed, in that it may *not* be true that information-*holders* – the traditional arbiters of who can see "their" data – are the entities best placed to determine whether outsiders have any "need to know" data in their possession. Analysts who *seek* access to information, it turns out, may well be the participants best equipped to determine what *their* particular expertise and contextual understanding can bring to the analysis of certain types of data.

In this vein, the Military Intelligence Board has explicitly suggested that deep information-sharing will require a re-examination of traditional concepts of "need to know" – although, not surprisingly, traditional collection agencies such as the CIA still contest this conclusion.[58]   Rear Admiral Jacoby made the point firmly to our Joint Inquiry, writing that it should be the task of intelligence reformers

---

[57]   RADM Lowell E. Jacoby, written statement presented to SSCI/HPSCI joint hearing (October 1, 2002), at 4.

[58]   JIS, written statement presented to SSCI/HPSCI joint hearing (October 1, 2002), at 12.

"to create a new paradigm wherein 'ownership' of information belonged with the analysts and not the collectors.  In my opinion, one of the most prolonged and troubling trends in the Intelligence Community is the degree to which analysts – while being expected to incorporate the full range of source information into their assessments – have been systematically separated from the raw material of their trade."[59]

Sadly – and dangerously – the result of this systematic separation is that "groundbreaking, innovative, true all-source analysis" has become "the exception, not the rule" in today's Intelligence Community.[60]

The imperative of "deep" analyst data-access is intertwined with another dynamic.  For some time, our ability to analyze information has been falling increasingly behind the enormous volumes of information collected by our intelligence agencies.   This imbalance between analysis and collection has been the subject of numerous SSCI hearings.  It has important implications for the future of information-sharing within the Intelligence Community because it suggests that in addition to being empowered to conduct *true* "all-source" analysis, our analysts will also need to be supplied with powerful new tools if they are to work their analytical magic upon such large information volumes.

As Rear Admiral Jacoby has suggested, the challenge for intelligence reform is thus

---

[59]    Jacoby, *supra*, at 6.

[60]    *Id.*

54

twofold: we must persuade information-holders to give analysts "deeper" and less conditional access to data than they have ever before enjoyed, and we must equip analysts with the tools needed to "mine" these data-streams for useful information.

> "[W]e need to find a way to immediately and emphatically put the 'all' back into all-source analysis. . . . If we expect analysts to perform at the level and speed expected in a counterterrorism mission environment characterized by pop-up threats, fleeting targets, and heavily veiled communication, they require immediate, on-demand access to data from *all* sources and the ability to mine, manipulate, integrate, and display all relevant information."[61]

As noted previously, making information accessible necessarily exists in some tension with keeping it secure – and some balance must always be sought between *usability* and *security*. I have come to the conclusion that our Intelligence Community, dominated by traditional collection agencies such as CIA and NSA that enjoy special status precisely because of the monopolization of "their" data-streams (*e.g.*, HUMINT and SIGINT), has drawn this line in ways incompatible with our intelligence needs in the 21st century. I thus believe, with RADM Jacoby, that we must bring about a radical change in the access collection agencies give to all-source analysts, including all-source analysts from outside their own ranks.

Such analyst empowerment must be accomplished in ways that do not leave our secrets

---

[61] RADM Lowell E. Jacoby, written statement presented to SSCI/HPSCI joint hearing (October 1, 2002), at 7.

unduly vulnerable to compromise.  It is thus the challenge of reform not only to persuade

recalcitrant information-hoarders into making their databases available to sophisticated

analytical exploitation but also to ensure that the resulting information architectures are secure.

There is no reason why appropriately cleared analysts should not be trusted with such

information: they are no less patriotic, no less committed to protecting national security, and no

less professional in their fields than the collection bureaucrats who would presume to deny them

access.  That said, of course, there is every reason to develop comprehensive security protocols

and accountability systems to reduce the risk of espionage or accidental compromise that is to

some degree inherent in any expansion of the universe of persons given access.

Fortunately, recent efforts to move forward in empowering analysts to conduct *true* all-

source analysis provide reasons for confidence that a workable solution is possible.  As the

SSCI's Technical Advisory Group (TAG) – a nonpartisan group principally composed of expert

private sector technologists and managers with the highest possible security clearances – has

forcefully recommended, we must move forward into the realm of comprehensive databasing

and data-mining *now*, and the technology we need is either in existence already or well on its

way to development.  As this technology advances, the TAG has suggested, agency resistance to

such developments in the name of "security" is looking increasingly like a mere excuse:

> "The technology of multi-level-security databases and computer
> systems is highly developed, and all that stands between the
> present moment and the operation of such a database in the
> National interest is political will."[62]

---

[62]   SSCI Technical Advisory Group, "TAG Findings-&-Recommendatinos Post-9/11," memorandum
      to Senators Bob Graham and Richard Shelby (April 3, 2002), at 3.

(2)    *Faltering Steps Forward*

In efforts to meet the analytical challenge of transnational terrorism, both the Department of Defense (DOD) and the Department of Justice (DOJ) have undertaken new experiments in all-source fusion aimed at the targets.  At DOD, the Defense Intelligence Agency set up an organization it calls Joint Intelligence Task Force-Counterterrorism (JITF-CT).  Established in the wake of the bombing of the *USS Cole* by Al-Qa'ida members in October 2000, and augmented by new assignments of personnel and resources after the September 11 attacks, JITF-CT aspires to provide its analysts with deep data access sufficient to permit real all-source fusion.  According to RADM Jacoby, DIA's aim in establishing JITF-CT was to create a "stand-alone limited access data repository accredited to host the entire range of terrorism related information, regardless of source"  – including not just "highly compartmented intelligence," but also "law enforcement information related to ongoing investigations or prosecutions, and security incident reporting sometimes catalogues as criminal, rather than terrorism activity."  JITF-CT seeks to "apply state-of-the-practice technological tools and expertise that enhance opportunities for 'analytic discovery.'"[63]

The Attorney General established his own Foreign Terrorist Tracking Task Force (FTTTF) after September 11 in order to help develop "deep"-access data-mining techniques and apply these new methodologies to the formidable challenge of catching terrorists operating within the United States.  FTTTF is co-located with the Pentagon's Joint Counterintelligence Assessment Group (JCAG, a.k.a. the Counterintelligence Field Activity, or CIFA), which

---

[63]    RADM Lowell E. Jacoby, written statement presented to SSCI/HPSCI joint hearing (October 1, 2002), at 2.

provides technical support.[64] As with JITF-CT, FTTTF/JCAG aspires to bring about great innovations in analyst access to and data-mining of disparate "all-source" data-streams.

The experience of these innovative analytical cells, however, is simultaneously encouraging and dispiriting.  It is encouraging in that it shows a commendable interest in inter-agency information-sharing on something approaching – or at least aspiring to – a truly all-source basis, and enabled by state-of-the-art analytical tools.  Nonetheless, it is also dispiriting in that the available evidence suggests that these organizations are experiencing some notable "pushback" by the traditional information-holders within the Intelligence Community.  According to RADM Jacoby, for instance, JITF-CT and DIA are still being denied information by "those intelligence and law enforcement organizations that are the 'owners' or 'arbiters' of unshared information."  "This is no small problem" as Jacoby emphasizes, for although the

---

[64]     JIS, written statement presented to SSCI/HPSCI joint hearing (October 1, 2002), at 15-16.

"un-shared information falls largely into the categories of background and contextual data, sourcing, seemingly benign activities, and the like . . . it is within these categories that the critical 'connecting dot' may well be found."[65]

The CIA has its own "all-source" fusion cell devoted to terrorist targets, in the form of the DCI's Counterterrorism Center (CTC).  The CTC has performed this function for some years, and not without some success.  Even CTC has had difficulty penetrating the veil of agency information-hoarding.  Although as an operational arm of the CIA staffed principally by Directorate of Operations personnel, the CTC is denied far less information in CIA operational cables than organizations such as JITF-CT, it still encounters information-sharing problems in dealing with *other* organizations.  In particular, timely and effective access to law enforcement information has been a traditional weakness at CTC, and the NSA has refused to permit the Center access to "raw" SIGINT data.  Moreover, another weakness of CTC as an *analytical* fusion cell is precisely its *operational* focus: CTC plays a vital role in spearheading our country's campaign to disrupt and dismember terrorist cells overseas, but this necessarily means that it devotes less time to purely *analytical* work on terrorism than would otherwise be the case.  Indeed, not unlike FBI analysts diverted to "operational" support to ongoing investigations (see below), CTC analysts apparently spend a great proportion of their time providing analytical support to CTC's ongoing *operations*.

---

[65]    RADM Lowell E. Jacoby, written statement presented to SSCI/HPSCI joint hearing (October 1, 2002), at 5.

More than a year after September 11, there is still "no single agency or database or computer network that integrates all counter terrorism information nationwide."[66]  And there is no center devoted entirely to counterterrorist analysis on a truly all-source basis.  As former Representative Lee Hamilton emphasized in testimony before our Joint Inquiry, this is a significant unmet need within the Intelligence Community.

> "We need a center in the government for all intelligence – foreign and domestic – to come together.  There is currently no place in the government where we put together data from all of our domestic and foreign sources – the CIA, FBI, Department of Defense, Department of State, NSA, and other agencies."[67]

(3)    *Technological and Bureaucratic Empowerment*

(a)    *"Total Information Awareness"*

To help address the need for technological change to support the kind of analyst empowerment that our Intelligence Community needs, Dr. Robert Norris of the National Defense University and RADM Jacoby of DIA argued that the IC should take its cue from the private sector and move toward a common data format standard.  Such a standard, they suggested, would allow data-interoperability – as opposed to *system* interoperability, which is much more

---

[66]    JIS, written statement presented to SSCI/HPSCI joint hearing (October 1, 2002), at 5.

[67]    Lee Hamilton, written statement presented to SSCI/HPSCI joint hearing (October 3, 2002), at 4.

challenging and is perhaps unattainable [68] – across the Community, or even across the federal government as a whole.

> "Interoperability at the data level is an absolutely necessary attribute of a transformed intelligence environment because it enables horizontal integration of information from all sources – not just intelligence – and at all levels of classification."[69]

---

[68] Dr. Robert C. Norris, written statement presented to SSCI/HPSCI joint hearing (October 1, 2002), at 10 (*quoting* LTG Peter Cuviello); *see also id.* at 7 (*quoting* Brig. Gen. Michael Ennis).

[69] RADM Lowell E. Jacoby, written statement presented to SSCI/HPSCI joint hearing (October 1, 2002), at 8.

In this regard, RADM Jacoby suggested that the Community follow the commercial world in embracing eXtensible Markup Language (XML) was a way to ensure such data-interoperability.[70]

Interestingly, an ongoing project by the Information Awareness Office (IAO) of the Defense Advanced Research Projects Agency (DARPA) suggests that while such data-interoperability would be enormously useful, it may not be an absolute prerequisite for meaningful "deep access" data-mining within the Intelligence Community, the U.S. Government, or beyond.  The SSCI has been following with great interest IAO's work on what it calls its "Total Information Awareness" (TIA) project, for this project holds out the prospect of providing the technological tools  to achieve radical analyst empowerment vis-á-vis the IC's entrenched information-holders.

---

[70]     *Id.*

TIA aspires to create the tools that would permit analysts to data-mine an indefinitely-expandable universe of databases.  These tools would not be database-specific, but would rather be engineered in such a way as to allow databases to be added to the analytical mix as rapidly as interface software could be programmed to recognize the data formats used in each new database and to translate queries and apply specific "business rules" into a form usable therein.  Through this system, TIA hopes to enable an analyst to make search requests – either on a name-by-name basis or in order to apply sophisticated pattern-recognition software – to each among a "cloud" of remotely-distributed databases.  Each analyst user would possess a complex set of individual "credentials" which would be embedded in each query and "travel" with that query through the database universe.  These credentials would include information such as the user's access permissions and the specific legal and policy authorities under which each query has been conducted; they would tell the system what sorts of responses that user is permitted to get.[71]  Even when the user did not have authority to see certain types of information, the system would be able to tell the analyst whether any data responsive to his query existed in any particular database, allowing him to submit a request for access to higher authority.[72]  Information responsive to user queries would then be passed back through the system to an automated data repository, where it would be stored for analytical exploitation.[73]

---

[71]  The TIA project also contemplates a system of "selective revelation of information," whereby  initial responses to a query would indicate merely the presence of responsive entries or patterns. Subsequent queries – and perhaps additional levels of authority – would be needed for the analyst to "bore deeper" into the data.

[72]  This helps analysts get avoid the "you don't know what you don't know" dilemma, yet without compromising particularly sensitive information to unauthorized individuals.

[73]  IAO officials have told committee staff that DARPA envisions the possibility of supporting analysts with semi-automated functions that would "learn" from the behavior of large numbers of other users on the system, "pushing" data out to users working on specific topics in ways loosely analogous to

The TIA approach thus has much to recommend it as a potential solution to the imperative of deep data-access and analyst empowerment within a 21st-century Intelligence Community.  If pursued with care and determination, it has the potential to break down the parochial agency information "stovepipes" and permit nearly pure *all*-source analysis for the first time – yet without unmanageable security difficulties.  If done right, moreover, TIA would be infinitely scalable: expandable to as many databases as our lawyers and policymakers deem to be appropriate.[74]

---

the way in which the software at Amazon.com recommends books to browsers based upon what *other customers* who selected a particular title also picked.

[74]    What's more, the TIA architecture is being designed to create elaborate audit trails upon the initiation of each query.  These audit trails, which would be accessible to intelligence oversight organs, would be specially encrypted and secured against tampering, and would allow overseers to hold each accredited user accountable for activity undertaken within the system and information gleaned therefrom. Moreover, developing TIA will apparently not involve the use of any data from actual persons (*e.g.*, information about real Americans). IAO plans to construct a "virtual" economy filled with huge numbers of "synthetic" personal transactions by millions of hypothesized people.  A "red team" would develop and "carry out" attacks within this virtual environment, role-playing the parts of individual terrorists in order to create transactional trails.  The software developers would then try to develop programs to identify these patterns of "terrorist" transactions, picking them out of the "noise" of the "synthetic" civilian transactions in which they will be embedded.  This approach, DARPA hopes, will identify the best ways to identify real terrorists while minimizing the system's intrusion upon the transactional records of *non*-terrorists.

TIA promises to be an enormously useful tool that can be applied to whatever data we feel comfortable permitting it to access.  How broadly it will ultimately be used is a matter for policymakers to decide if and when the program bears fruit.  It is worth emphasizing, however, that TIA would provide unprecedented value-added even if applied exclusively *within* the current Intelligence Community – as a means of finally providing analysts deep but controlled and accountable access to the databases of collection and analytical agencies alike.  It would also be useful if applied to broader U.S. Government information holdings, subject to laws restricting the use of tax return information, census data, and other information.  Ultimately, we might choose to permit TIA to work against some of the civilian "transactional space" in commercially-available databases which are already publicly and legally available today to marketers, credit card companies, criminals, and terrorists alike.  The point for civil libertarians to remember is that policymakers can choose to restrict TIA's application however they see fit: it will be applied only against the data-streams that our policymakers and our laws permit.

I mention TIA here at some length because it represents, in my view, precisely the kind of innovative, "out of the box" thinking of which I have long been speaking – and which Americans have a right to *expect* from their Intelligence Community in the wake of a devastating surprise attack that left 3,000 of their countrymen dead.  It is unfortunate that thinking of this sort is most obvious in the Defense Department rather than among Intelligence Community leaders, and more unfortunate still that projects like TIA are likely to encounter significant *resistance* from the entrenched information-holders at the core of the traditional IC.  Nevertheless, projects like this represent a bright spot in the Community's baleful recent history of counterterrorist information-sharing.

(b)     *Homeland Security Intelligence Fusion*

Another bright spot is the potential for a fresh start that is presented by the new Department of Homeland Security.  The Homeland Security bill signed by President Bush on November 25, 2002 contains provisions which I wrote specifically in order to help address these information-sharing problems within the Intelligence Community and between other federal agencies.  Specifically, this new law makes it the responsibility of the Undersecretary for Information Analysis and Infrastructure Protection at the Department of Homeland Security to

> "establish and utilize . . . a secure communications and information technology infrastructure, including data-mining and other advanced analytical tools, in order to access, receive, and analyze data and information in furtherance of the responsibilities under this section . . . ."[75]

This language is complemented by the strong information-access provisions I also wrote into the bill.  These provisions provide appropriately-cleared Homeland Security analysts with authority affirmatively to *access* (*i.e.*, not simply to be *given*):

---

[75]     Public Law 107-296 (November 25, 2002), at § 201(d)(14).

> "*all* information, including reports, assessments, analyses, and
> unevaluated intelligence related to threats of terrorism against the
> United States . . . that may be collected, possessed, or prepared by
> any agency of the Federal Government."[76]

Read together, as they were intended to be, these provisions provide statutory authorization for a radical new approach to counterterrorist information-sharing in which analysts are for the first time given the ability to conduct *real* "all-source" analysis and to "connect the dots" in order to protect our nation from terrorists.

It was my hope with this legislation to begin to move our Intelligence Community, to paraphrase former DIA Director Thomas Wilson, beyond the realm of information "sharing" entirely, inasmuch as "sharing" connotes information *ownership* by the party that decides to share it, an idea that is antithetical to *truly* empowering analysts to connect all the right "dots."[77]

My views on this subject have been powerfully reinforced by the findings of the Joint Inquiry, which has recommended that Congress work diligently to ensure the success of the Homeland Security information analysis office – including ensuring that it gets "full and timely access to all counterterrorism-related intelligence information," including all the "'raw' supporting data" it needs.  While it certainly remains in President Bush's power to stop his new

---

[76]     *Id.* at § 202(a)(1) (emphasis added).

[77]     *See* JIS, written statement presented to SSCI/HPSCI joint hearing (October 1, 2002), at 13 (citing VADM Thomas Wilson).

Homeland Security organization short of leading the way toward this new paradigm, it is my hope – and it was the inspiration behind my contributions to Title II of the Homeland Security bill and the recommendations of the Joint Inquiry – that he will use this historic opportunity to bring the U.S. Intelligence Community into the 21st century.  I dearly hope that, recent press reports to the contrary,[78] the Administration will not squander the opportunity to make true all-source fusion finally work to protect Americans from terrorism.

    (4)    *The Other Side of the Coin: Protecting National Security Information*

---

[78]    *See, e.g.*, Eggen & Mintz, *supra*, at 43.

In the context of information sharing, a quick word should also be said about the need to protect national security information from unauthorized disclosure. Those of us with regular access to highly classified information cannot help but be appalled by the frequency with which the publication within the Intelligence Community of enormously sensitive reports is quickly followed by sensationalistic press accounts of that very same information. The President, the Secretary of Defense, and other officials have all stated emphatically the dangers posed by the endemic culture of media "leaks" in modern Washington. As Attorney General Ashcroft has noted, "there is no doubt and ample evidence that unauthorized disclosures of classified information cause enormous and irreparable harm to the nation's diplomatic, military, and intelligence capabilities."[79] As we have learned during the course of this Joint Inquiry, our Intelligence Community's ability *personally* to track Usama bin Laden himself was lost in 1998 on account of a senior official's boasting to the media about a certain type of collection capability. We simply *cannot* hope to fight the war on terrorism with sustained success if we continue to see our intelligence activities and capabilities featured in the press as part of what Senator Pat Roberts has described as "the leak of the week."

Unfortunately, however, our current laws against disclosing classified information are far too weak, and investigations of leaks usually far too difficult, for prosecutors to have had any success in pursuing them. Indeed, in the last half-century, I am aware of only *one* non-espionage case in which someone was prosecuted for an unauthorized disclosure. The SSCI and HPSCI tried to address this issue in 2000 by placing a section in our Fiscal Year 2001 intelligence authorization bill that would have made it a felony for someone with authorized access to

---

[79]     Attorney General John Ashcroft, letter to Vice President Dick Cheney (October 15, 2002).

classified information knowingly to disclose it to someone not authorized to receive it.[80] President Clinton, however, vetoed the bill.

Now that the war on terrorism has refocused us upon the potentially appalling consequences of our culture of leaks, the 108th Congress should take up and enact this legislation anew – and President Bush should sign it.  Such anti-leaks legislation will become more important than ever as we move into the 21st century world of true "all-source" fusion and automated data-mining within the Intelligence Community.  We should also bear continually in mind the admonition contained in the Joint Inquiry's recommendation to consider the degree to which "excessive classification" has impeded the IC's ability to handle the information-management responsibilities we ask of it.  We must both punish leaks of information *and* ensure that the only information subject to classification is that which truly needs to be.

## III.    *Intelligence-Law Enforcement Coordination*

Another of the discouraging lessons of September 11 is the extent to which the United States' law enforcement agencies (LEAs) and its Intelligence Community (IC) still have not managed to work effectively with each other.  Progress has been made in this regard since the terrorist attacks, thanks in large part to Congress' prompt passage of the USA PATRIOT Act of 2001 (Public Law 107-56).  This remains an area, however, in which much improvement is

---

[80]    *See* S.2507 (106th Congress, 2d Sess.), at § 303.

needed – as well as sustained Congressional oversight to ensure that these agencies really do make cooperation part of their institutional culture over the long run.

       A.     *FISA and Its Discontents*

Much of the blame for the dysfunctional nature of pre-September 11 LEA/IC coordination can be traced to a series of misconceptions and mythologies that grew up in connection with the implementation of domestic intelligence surveillance (and physical searches) under the Foreign Intelligence Surveillance Act (FISA).[81]  Rigid and restrictive readings of FISA in the early and mid-1990s acquired with time the apparent legitimacy of long-presumed acceptance, and created a sterile and ultimately fallacious conventional wisdom that effectively – but unnecessarily – *prevented* meaningful LEA/IC coordination.

       (1)     *Development of the "No Coordination" Myth*

Much of the pre-September 11 problems with FISA can be traced to confusions associated with participants' understandings of the so-called "purpose test" embodied in the statute.  Under FISA as it existed before 2001, a surveillance or search order could only be obtained if, among other things, the government was able to certify – and a federal judge on the FISA court agreed – that "the purpose" of the undertaking was to collect foreign intelligence information.

---

[81]     18 U.S.C. § 1801 *et seq.*

Taking their cue from *non-FISA* caselaw setting forth the constitutional rules for warrantless intelligence surveillance, most courts interpreting FISA – and essentially all intra-Executive Branch officials who dealt with these matters – read FISA's "the purpose" language as imposing the requirement that the "primary" purpose of the requested surveillance or search be the collection of foreign intelligence.  Warrantless surveillance cases such as *Truong*[82] arising out of activities undertaken before the passage of the FISA statute, had helped create what became known as the "primary purpose" test.  Technically, the seminal "primary purpose" cases did not apply to surveillance conducted under FISA, a statute enacted by Congress in order to establish a special, court-overseen system of domestic intelligence surveillance and thus to replace the pre-FISA constitutional standard with a specified statutory one.  Nevertheless, it did not take long for courts and commentators alike to interpret FISA as incorporating the pre-FISA "primary purpose" test.

As the FISA Court of Review ably explained in a recent landmark decision (and the first case ever heard by that appellate body established by the FISA statute in 1978), FISA itself imposes few, if any, restrictions upon intelligence/law enforcement coordination.  Indeed, according to the Court of Review, the very *idea* that there exists a "dichotomy" between "criminal" and "intelligence" purposes was merely an unwarranted assumption that subsequent participants in the FISA process imagined into the law.[83]  Nevertheless, in short order it had

---

[82]     *United States* v. *Truong Dinh Hung*, 629 F.2d 908 (4th Cir. 1980).

[83]     *See* Foreign Intelligence Surveillance Court of Review, *In re: Sealed Case No. 02-001* (November 18, 2002) [hereinafter "Court of Review Opinion"], at 18-19.

become the conventional wisdom of U.S. intelligence oversight law that FISA incorporated the "primary purpose" test – and thus that there must at some point be a limit to the permissible degree of "criminal investigative" involvement in electronic surveillance or physical searches[84] under FISA.

---

[84]   Physical searches were not covered by the original FISA statute, being added to the law in 1995. (Before that point, therefore, physical searches still fell under the pre-FISA constitutional standards for warrantless surveillance.)

More importantly – and, as it turns out, far more perniciously – this half-imagined "purpose test" itself came to be interpreted extremely rigidly, in ways that in time came to be seen effectively to preclude *any* meaningful coordination between criminal investigators and intelligence personnel even in terrorism and espionage cases.  As first discussed publicly in connection with a report on the Wen-Ho Lee affairs by the Chairman of the Senate Governmental Affairs Committee in 1999,[85] and as subsequently detailed both in a General Accounting Office (GAO) study[86] and the declassified findings of a special Justice Department review – the Attorney General's Review Team (AGRT) headed by Assistant U.S. Attorney Randy Bellows, which produced the so-called "Bellows Report"[87] – DOJ attorneys adopted a

---

[85]   Fred Thompson & Joseph Lieberman, "Special Statement on "Department of Energy, FBI, and Department of Justice Handling of the Espionage Investigation into the Compromise of Design Information on the W-88 Nuclear Warhead" (August 5, 1999), *available at* http://www.senate.gov/~gov_affairs/ 080599_china_espionage_statement.html (visited August 23, 2001).

[86]   General Accounting Office, *Coordination Within Justice on Counterintelligence Criminal Matters is Limited* (July 2001) [hereinafter "GAO Report"].

[87]   Attorney General's Review Team, *Final Report on the Handling of the Los Alamos National Laboratory Investigation* (May 2000), declassified version [hereinafter "Bellows Report"].

hyper-restrictive, and legally unnecessary, approach to FISA applications.  This approach, as was apparently intended, maximized the likelihood of FISA order requests being approved by the Foreign Intelligence Surveillance Court (FISC) and certainly minimized FISA "intrusions" upon American privacy.[88]  It came at the cost, however, of prohibiting a great deal of useful *and quite lawful* information-sharing and coordination between intelligence and criminal investigators.

---

[88]     These debates, of course, came up with most vehemence in connection with proposed FISA surveillance or physical searches of the property of "United States persons" – that is, U.S. citizens, lawful permanent residents, or U.S. corporations, *see* 50 U.S.C. §§ 1801(i) (providing definition) – because FISA imposes special rules for dealing with U.S. persons, *see id.* at § 1801(a), 1804(a), & 1825(a).  FISA surveillance and searches are much more easily available, under the statute, against non-U.S. persons such as foreign diplomats or facilities within the United States. *See, e.g., id.* at § 1802(a)(1) (permitting surveillance of premises exclusively controlled by a foreign power without need for court approval).

As best I have been able to piece these things together today – and in its recent decision on these matters, the FISA Court of Review (COR) disclaimed any real certainty about when these problems first arose[89] – the most damaging manifestations of this phenomenon came about after 1995, in the wake of the espionage prosecution of senior CIA officer (and Soviet mole) Aldrich Ames.  Criminal and intelligence investigators in that case allegedly cooperated closely, so closely that lawyers within Attorney General Janet Reno's Justice Department apparently became convinced that they might "lose" the Ames case if defense counsel asked the trial judge to suppress evidence obtained by intelligence surveillance on the grounds that this collection had "really" been for *criminal* purposes.

As it turned out, Ames' guilty plea brought the case to a conclusion before this issue could be joined.  Unsettled by the episode, Clinton Administration lawyers apparently concluded that they would in the future essentially *prohibit* coordination between criminal and intelligence investigators.  The Attorney General issued special guidelines in July 1995 setting forth standards for information-sharing and coordination between FBI agents working on FISA cases or other intelligence investigations and attorneys in DOJ's Criminal Division.  These guidelines *did* permit some cooperation, specifying standards for when the Criminal Division was to be

---

[89]     *See* Court of Review Opinion, *supra*, at 10 (suggesting that this dynamic may have begun "at some point during the 1980s").

notified of information.[90]

---

[90]     Attorney General Janet Reno, "Procedures for Contacts Between the FBI and the Criminal Division Concerning Foreign Intelligence and Foreign Counterintelligence Investigations," memorandum to Assistant Attorney General, Criminal Division, *et al.* (July 19, 1995).

As detailed by GAO, however, these guidelines were never really enforced within DOJ. With these guidelines standing, in effect, in abeyance, DOJ attorneys – especially those within the Office of Intelligence Policy and Review (OIPR), which serves as the Department's "gatekeeper" on FISA matters – were free to interpret FISA as banning essentially *any* contact between FISA investigators and the Criminal Division.  As GAO and a special internal DOJ report have recounted, coordination on intelligence cases dropped off significantly after the guidelines were issued, and what contact *was* undertaken commonly occurred so late in the process as to be substantively useless.[91]  According to some participants, meetings between FBI intelligence investigators and Criminal Division attorneys became "unproductive," and even "weird" and "surreal."  The new restrictions imposed by OIPR prevented the FBI from obtaining "meaningful advice from the Criminal Division during an FCI [foreign counterintelligence] investigation," and impeded "the FBI's ability to do its job."[92]  In short order, OIPR attorneys turned the "primary purpose test" into a *de facto* "'exclusive' purpose" test.[93]  No FISA request was permitted to go forward if there was *any* meaningful coordination between criminal and intelligence investigative organs, and similar "no-coordination" standards were applied to all FCI and counterintelligence investigations.  Denied any meaningful ability to coordinate actions between the LEA and IC spheres, the FBI developed a Byzantine system of parallel investigative tracks for working terrorism issues: "dirty" teams of intelligence investigators and "clean" teams of purely criminal-focused agents would work the same terrorist cases at the same time, "[y]et they rarely talk[ed] to each other."[94]  This organizational allergy even to the most common-sense

---

[91]     *See* GAO Report, *supra*, at 14.

[92]     Bellows Report, *supra*, at 732-33.

[93]     *See* GAO Report, *supra*, at 14.

[94]     *See, e.g.*, Roberto Suro, "FBI's 'Clean' Team Follows 'Dirty' Work of Intelligence," *Washington*

forms of counterterrorist cooperation become infamous after September 11: a "Wall" had been built between intelligence and law enforcement.

(2)     *Manifestations in the September 11 Intelligence Failure*

Spurred by Congressional attention given to OIPR's excessively restrictive approach to FISA during the Wen-Ho Lee affair – and by the scathing critique of that office offered in the Bellows Report – DOJ began to realize in the final months of the Clinton Administration that it had created a significant national security problem for itself.  On January 21, 2000, Attorney General Reno promulgated some new "interim measures," but she failed to adopt new guidelines before leaving office.   Revised formal guidance, however, was not forthcoming until set forth in August 2001 by Deputy Attorney General Larry Thompson.[95]  This clarified the rules for coordination between law enforcement and intelligence organs, emphasizing that notification of the Criminal Division is *mandatory* when information is developed that "reasonably indicate[s] that a significant federal crime has been, is being, or may be committed."[96]

---

*Post* (August 16, 1999), at A13.

[95]     Deputy Attorney General Larry Thompson, "Intelligence Sharing," memorandum to Assistant Attorney General Michael Chertoff *et al.* (August 6, 2001).

[96]     *Id.* at 2.

These new rules, however, did not make major changes in the 1995 guidelines, and were clearly insufficient to change the institutional culture that had developed within the FBI and the Justice Department around what was now the virtually unchallenged conventional wisdom of the "no coordination" myth.  Investigators working before September 11 to get to the bottom of alarming terrorist cases such as those of Khalid al-Mihdhar, Nawaf al-Hazmi, and Zacarias Moussaoui repeatedly ran into the "Wall" and its institutional side-effects: an investigative culture positively allergic to LEA/IC information-sharing and coordination, and remarkably ignorant about how much such cooperation was actually allowed.

FBI special agents in the New York Field office working on the Bureau's investigation of the bombing of the Navy destroyer *USS Cole* by Al-Qa'ida, for instance, met with CIA officials in June 2001 in an effort to obtain information.  At this point, the CIA knew both that al-Mihdhar and al-Hazmi were linked to a prime suspect in the *Cole* attack *and* that they were both in the United States, but it refused to give the FBI this information.  Former CIA CTC chief Cofer Black later testified before Congress that the CIA's refusal to tell the FBI about these two terrorists loose in the United States had been entirely consistent with "rules against contaminating criminal investigators with intelligence information."[97]  As one of the FBI agents involved in this episode put it,

> "'[t]he Wall', and implied, interpreted, created or assumed
> restrictions regarding it, prevented myself [sic] and other FBI
> agents working a criminal case out of the New York Field Office

---

[97]   Cofer Black, written statement presented to joint SSCI/HPSCI hearing (September 26, 2002), at 3.

to obtain information from [the] Intelligence Community,

regarding Khalid al-Mihdhar and Nawaf al-Hazmi in a meeting on

June 11, 2001."[98]

---

[98]      JIS, written statement presented to joint SSCI/HPSCI hearing (September 20, 2002), at 21.

Nor was this all.  After the FBI was belatedly notified by the CIA in August 2001 that known Al-Qa'ida terrorists al-Mihdhar and al-Hazmi were in the United States, the Bureau began trying to track them down.  Despite the urgency of this task, however, FBI Headquarters prohibited FBI criminal investigators in New York from participating in the search for these terrorists and refused even to tell them what little was known about the two men at the time.  As one of the New York agents was informed in an e-mail from Washington, D.C., "that information will be passed over the wall" only if "information is developed indicating the existence of a substantial federal crime."[99]  Perceiving there to be an unbridgeable gap between law enforcement and intelligence work, the FBI thus refused even to talk to *itself* in order to prevent mayhem by known Al-Qa'ida terrorists in the United States.  Meanwhile, al-Mihdhar and al-Hazmi were in the final stages of their preparations for the September 11 attacks.

As noted by the JIS, these information sharing problems clearly "reflect misunderstandings that have developed over the last several years about using information derived from intelligence gathering activities in criminal investigations."[100]  DOJ's "policies and practices regarding the use of intelligence information in FBI criminal investigations" helped make it enormously harder for the government to find al-Mihdhar and al-Hazmi in the last weeks before September 11[101] – even though they were both living and traveling under their true names at the time, and a simple Internet search requested by one of the New York FBI agents

---

[99]   JIS, written statement presented to joint SSCI/HPSCI hearing (September 20, 2002), at 21.

[100]   JIS, written statement presented to joint SSCI/HPSCI hearing (September 20, 2002), at 13 (*quoting* e-mail message sent on August 29, 2001, from FBI Headquarters to FBI Special Agent in New York City).

[101]   JIS, written statement presented to joint SSCI/HPSCI hearing (September 20, 2002), at 20.

*after* the World Trade Center attacks yielded their address in San Diego "within hours."[102]  The tragedy of this is that it was so needless: the law actually *did* not bar all cooperation across the "Wall" between law enforcement and intelligence.  It was simply *assumed* to do so because years of timorous lawyering in the Justice Department and Intelligence Community reticence had created an institutional culture hostile to coordination.  As FBI official Michael Rolince put it, procedures for information-sharing became so baroque and restrictive that sharing was essentially prohibited: "In terrorism cases, this became so complex and convoluted that in some FBI field offices agents perceived 'walls' where none actually existed."[103]

---

[102]   FBI Agent from New York Field Office, testimony before joint SSCI/HPCSI hearing (September 20, 2002), *available from* Federal News Service.

[103]   Michael Rolince, written statement presented to joint SSCI/HPSCI hearing (September 20, 2002), at 4.

Coordination problems also arose in the Moussaoui case, in which FBI agents in the Minneapolis Field Office were desperate to search Moussaoui's personal effects for clues about his activity. Even though Moussaoui was in government custody, however, FBI agents were prohibited from looking through his computer and papers without court permission. FBI Headquarters actually *prohibited* intelligence investigators in Minneapolis from notifying the Criminal Division at the Justice Department about the Moussaoui situation, and *prohibited* agents from pursuing a criminal search warrant against him.[104]

FBI Headquarters apparently barred the pursuit of a criminal warrant on the theory that any professed interest in criminal prosecution would jeopardize any chances of a FISA – a reasonable assumption given OIPR's longstanding approach to such matters.[105]   When the FBI agents actually contacted Headquarters about obtaining such a FISA order, however, they were given inexcusably confused and inaccurate information from attorneys at the FBI's National Security Law Unit (NSLU). FBI attorneys at Headquarters told Minneapolis that in order to get a FISA, they had to produce evidence showing that Moussaoui was affiliated with one or more groups on the State Department's official list of "terrorist" organizations. This legal advice was patently false and has no basis either in the FISA statute or in DOJ policy or guidelines.

---

[104]     JIS, written statement presented to joint SSCI/HPSCI hearing (September 24, 2002), at 17-18.

[105]     During the Wen-Ho Lee affair, for instance, OIPR chief counsel Francis Fragos Townsend had rebuffed FBI attempts to get a FISA order in early 1999 because the FBI was by that point *considering* pursuing a criminal search warrant against Lee.  According to contemporaneous notes taken by FBI officials, Townsend rejected the FBI's efforts to renew FISA discussions with the dismissal that the case had become "way too criminal."  *See* Thompson & Lieberman, *supra*, at 13.

Nevertheless, this bad advice led the Minneapolis agents on a legal wild goose chase for nearly three weeks, as they tried to find enough information connecting Chechen terrorist organizations – with whom Moussaoui had some ties, but who were not on the list – to Al-Qa'ida.[106]

      (3)    *Developments Since September 11*

---

[106]    JIS, written statement presented to joint SSCI/HPSCI hearing (September 24, 2002), at 19-20; *see also* Minneapolis FBI Agent, testimony before joint SSCI/HPSCI hearing (September 24, 2002), *available from* FDCH Political Transcripts (September 24, 2002)..

Since the September 11 attacks, both Congress and the Justice Department have taken important steps to revise the law and policies restricting law enforcement/intelligence coordination.  The myth that FISA prohibited essentially all coordination between intelligence and law enforcement agents, while untrue even under pre-September 11 law, was addressed by Congress' passage of the USA PATRIOT Act of 2001 (Public Law 107-56), which took aim directly at the "primary purpose" test long assumed to be part of FISA case law.  Whereas FISA for years had provided that "the purpose" of FISA surveillance had to be intelligence collection, after President Bush's signature of the USA PATRIOT Act, FISA said merely that orders are to be granted where this is "a significant purpose."[107]  Thereafter, no inference of a "primary" purpose test should have been permitted, much less an "exclusive purpose" standard.  After October 26, 2001, the FISA statute permitted surveillance and physical searches even for undertakings that were *primarily* criminal – provided only that intelligence collection was not an *insignificant* reason for the undertaking.

It took over a year, however, for the USA PATRIOT Act changes to penetrate the U.S. Government's entrenched "no coordination" bureaucratic culture.  In November 2001, immediately *after* Congress had enacted the "significant purpose" change to FISA, the Foreign Intelligence Surveillance Court broke with previous precedent and for the first time *required* DOJ and the FBI to follow the Attorney General's *July 1995 guidelines* on law enforcement-intelligence coordination.[108]  Although court approval was necessary under the FISA statute for the establishment of FISA "minimization rules" for handling information on U.S. citizens or lawful permanent residents, the FISC had never before seen fit to enforce specific general rules

---

[107]    Public Law 107-56 (October 26, 2001), at § 218.

[108]    *See* Court of Review Opinion, *supra*, at 21-22 (recounting history of case).

on coordination between intelligence and law enforcement organs.  The July 1995 guidelines had been the creation of the Attorney General's policy discretion, and the FISC had never required them to be followed during the long years of the late 1990s when they were being ignored by DOJ attorneys seemingly hostile to the very *idea* of such coordination.  Yet the moment that Congress changed the law in order to make clear that it intended there to be no "Wall," the FISC stepped in to *impose* the very legal standards repudiated by the USA PATRIOT Act.

With its November 2001 ruling imposing the July1995 guidelines upon the post-September 11 Justice Department, the FISC necessarily established the precedent that any *changes* to the coordination guidelines required court approval.  Things got still more strange after the Attorney General duly submitted draft guidelines in March 2002, seeking the FISC's approval to implement the changes written into law by the USA PATRIOT Act.  These new proposals embodied the "significant purpose" changes, and permitted extensive information-sharing and coordination between intelligence and law enforcement elements within the Department and the FBI – to the point that "*all* DOJ component are free to offer advice and make recommendations, both strategic and tactical, about the conduct and goals of the investigations."[109]

The FISC, however, rejected the Attorney General's proposed changes, declaring in a May 17, 2002 opinion that they went too far.  Wholly ignoring the USA PATRIOT Act's changes to the FISA "purpose test," this opinion explicitly *endorsed* what the FISC itself described as "the Wall" between law enforcement and intelligence – finding support for this not

---

[109]   "Intelligence Sharing Procedures for Foreign Intelligence and Foreign Counterintelligence Investigations Conducted by the FBI," memorandum from Attorney General John Ashcroft to FBI Director *et al.* (March 6, 2002), at 2.

in the crucial "purpose test" modified by Congress but in the statute's substantively unrelated provisions on "minimization rules" to govern the handling of information specifically about U.S. persons.[110]

---

[110]  *See* Foreign Intelligence Surveillance Court, *In re: All Matters Submitted to the Foreign Intelligence Surveillance Court*, Memorandum Opinion (as Corrected and Amended), multiple docket numbers (May 17, 2002) [hereinafter "FISC Opinion"], at 18 & 22-27.

It was not until November 2002 that the FISA Court of Review – the never-before-used appellate body created by the statute – issued an opinion overruling the FISC's decision.  Thanks to the Court of Review holding, the law thus stands today where Congress *intended* it to stand on October 26, 2001: there is no restriction upon coordination between law enforcement and intelligence organs in connection with FISA surveillance or physical searches, and such activity can lawfully be undertaken even if *primarily* done with prosecutorial intent, provided that a "significant" intelligence purpose remains.[111]  Given its erratic and reflexive behavior after September 11, how faithfully the FISC actually applies this standard to individual FISA requests remains to be seen.[112]  Provided that the FBI can persuade its NSLU attorneys to *learn* FISA law

---

[111]  Ironically, the law stands here today even though the Court of Review held that before the USA PATRIOT Act there really was never any "dichotomy" between a FISA order's "intelligence" and "criminal" purpose *in the first place*.  As the Court of Review explained the law, under FISA as originally written, even a *wholly* prosecutorial purpose *should* have been acceptable – insofar as putting spies and terrorist behind bars and/or using the threat of prosecution to "squeeze" them for information *was* an entirely legitimate "intelligence" purpose.  According to the Court of Review, the USA PATRIOT Act, by purporting to loosen a "purpose test" that Congress wrongly assumed to exist, actually *imposed* a balancing test between "criminal" and "law enforcement" purposes for the first time.  The bottom line, however, is that FISA law today *actually* says what Congress *intended* it to say after the passage of the USA PATRIOT Act.

[112]  There is some room for concern that the FISC's legal instincts have become too congruent with the "Wall" mentality.  As the Court of Review acidly suggested in a barbed footnote to its November 2002 opinion, some of the FISC's eagerness to defend mistaken concepts of the "Wall" may have stemmed from the fact that an OIPR attorney closely associated with "Wall" thinking recently took up a position as FISA clerk to the federal district judges serving on the FISC.  *See* Court of Review Opnion, *supra*, at 20 n.15.  The attorney in question is Allan Kornblum, who achieved a degree of notoriety in FISA circles as the DOJ lawyer perhaps most personally responsible for the Department's much-criticized interpretation of "probable cause" under the FISA statute during the Wen-Ho Lee affair.  *See* Fred Thompson & Joseph Lieberman, transcript of press conference (August 5, 1999) (*available from* Federal News Service), at 2-3 (remarks of Senator Thompson describing OIPR's "highly restrictive view of probable cause" as "a faulty interpretation") & 4 (remarks of Senator Lieberman, noting that he "disagreed" with OIPR's "judgment call"); Bellows Report, *supra*, at 482 (concluding that the Wen-Ho Lee FISA application indeed "established probable cause" and "should have resulted in the submission of a FISA application, and the issuance of a FISA order").

better – and provided that Attorney General Ashcroft succeeds in replacing the "Wall" culture with new attitudes devoted to effective coordination – there is reason for optimism that coordination-related problems of the sort seen in the al-Mihdhar, al-Hazmi, and Moussaoui cases will not recur.

<div align="center">(4)    <em>Intelligence-Law Enforcement Information-Sharing</em></div>

In addition to problems stemming from presumed legal obstacles to passing crucial information from the Intelligence Community to law enforcement, the events of September 11 highlighted the problems of passing information in the other direction: from law enforcement *to* the Intelligence Community.  Throughout the 1990s, for instance, the Justice Department, the FBI, and the offices of various U.S. Attorneys around the country accumulated a great deal of information about Al-Qa'ida and other terrorist networks operating within the United States. This information was derived from law enforcement investigations into such events as the 1990 assassination of Rabbi Meier Kahane, the 1993 World Trade Center bombing, the abortive plot to blow up various harbors and tunnels in New York City, the 1996 Khobar Towers attack, the 1998 U.S. embassy bombings, Al-Qa'ida's "Millennium Plot," and the attack on the *USS Cole* in October 2000.  Most of this information, however, remained locked away in law enforcement evidence rooms, unknown to and unstudied by counterterrorism (CT) analysts within the Intelligence Community.

That this information possessed potentially huge relevance to the Intelligence Community's CT work is beyond question.  Indeed, until the late1990s, at least, U.S. law enforcement offices probably had more information on Al-Qa'ida – its key members operating in the West, its organizational structure, and its methods of operation – than the CIA's CTC.  Two

CT specialists from the Clinton Administration's National Security Council later described court records from 1990s terrorism trials as being "a treasure trove" that contained "information so crucial that we were amazed that the relevant agencies did not inform us of it while we were at the NSC."[113]   A small office within the Office of Naval Intelligence, for instance, began a whole new field of inquiry into terrorist maritime logistics networks in the summer of 2001 on the basis of a single FBI interview form (a "Form 302") and the public court transcripts from the 1998 embassy bombings trials in New York, long before anyone had even *tried* systematically to "mine" law enforcement records for intelligence-related information.[114]   That most such law enforcement information remained off limits to intelligence analysts before September 11 is terribly, and perhaps tragically, unfortunate.[115]

---

[113]     Daniel Benjamin & Steven Simon, *The Age of Sacred Terror* (New York: Random House, 2002), at xii-xiii.

[114]     This office, known as the Maritime Target Development Division (MTDD), has since been elevated to the status of full-fledged Department office within the ONI organization.

[115]     The degree to which law enforcement information remained so firmly embedded within records unsearched by intelligence analysts can perhaps be seen in the failure of our own JIS to identify within Intelligence Community records what is perhaps the earliest known reference by an Islamic fundamentalist to a plot to attack buildings such as the World Trade Center towers.  After U.S. law

Even apart from coordination-related concerns about the "Wall" discussed previously, the sharing of law enforcement information with the IC was fiercely resisted by law enforcement officials.  Some of this was unavoidable, insofar as information protected by Rule 6(e) of the Federal Rules of Criminal Procedure – that is, grand jury information – really could *not* lawfully be passed to intelligence analysts.  Like the mythology of the coordination "Wall" in the years before September 11 the "Rule 6(e) excuse" acquired an unwarranted mythological dimension of its own.

---

enforcement authorities captured El-Sayyid Nosair after his assassination of Rabbi Meier Kahane in 1990, they found in one of his notebooks a lyrical description of the need to destroy "the enemies of Allah . . . by means of destroying exploding [sic], the structure of their civilized pillars such as the touristic infrastructure which they are proud of an their high world buildings which they are proud of . . . ."  *See* Benjamin & Simon, *supra*, at 6.  More than a decade after this evidence was seized, the JIS' searches of Intelligence Community databases for information that might have presaged the September 11 attacks has apparently produced *not a single reference* to this pregnant early warning signal by an Islamic fundamentalist now long known to have been linked to Sheikh Omar Ahmad Abdel Rahman and the terrorist cell responsible for the 1993 World Trade Center attacks and involved in plotting to blow up multiple tunnels and monuments in New York City thereafter.

Rule 6(e) restricts the disclosure of information *actually revealed* in the confidence of the grand jury chamber.  This prohibition, however, does not actually reach *other* information in the possession of law enforcement entities, such as FBI "Form 302" witness interview records, documents obtained in response to search warrants, "lead" information acquired from sources, and so forth.  Even during the most secretive grand jury investigation, in other words, there is a huge amount of information that can be shared with intelligence officials without running afoul of Rule 6(e).  (Such information may be highly sensitive, of course, but protecting sensitive sources and methods is hardly something with which the Intelligence Community lacks experience.)

Sadly, however, Rule 6(e) increasingly came to be used simply as an excuse for *not* sharing information – leaving vital collections of *shareable* information about international terrorist groups off-limits to IC intelligence analysts.  For years, it was routine FBI and DOJ practice to respond to virtually *any* Intelligence Community requests for information with the answer that "Rule 6(e)" prevented any response.  As two frustrated NSC veterans describe it,

> "Rule 6E [sic] is much more than a procedural matter: it is the bulwark of an institutional culture, and as Justice Department lawyers readily admit, it is used by the Bureau far more often than it should be.  It is one of the Bureau's foremost tools for maintaining the independence that the FBI views as its birthright."[116]

---

[116]  Benjamin & Simon, *supra*, at 227.

Indeed, by this account, NSC officials met with Attorney General Reno in 1993 about the obstacles this dynamic presented for counterterrorism analysis.  "Although the issue was revisited many times over the next four years," nothing happened: "The FBI balked at the proposal, and [Attorney General] Reno, although she was [FBI Director] Louis Freeh's boss, could never bring him around."[117]

---

[117]     *Id.*

After the surprise attacks on September 11, the new Justice Department of Attorney General Ashcroft worked with Congress to put the Rule 6(e) issue to rest.  Apparently working from the assumption that it would be easier to change the law itself than to fix a parochial and dysfunctional institutional culture that used the Rule as an excuse to prevent *all* information-sharing, they determined simply to *change* Rule 6(e) to permit information-sharing with intelligence officials.  This change was incorporated into the USA PATRIOT Act.[118]

As the law stands today, even intelligence-related information that derives exclusively from revelations within the confines of the grand jury chamber may freely be shared with the Intelligence Community.   The USA PATRIOT Act, in fact, permits sharing criminal wiretapping information[119] and more generally authorizes information-sharing "[n]otwithstanding any other provision of law"[120] – thus sweeping within its ambit not only Rule 6(e) but also 18 U.S.C. § 2517 and any other rule that might providing an excuse to hoard information.  Indeed, Title IX of the Act included a provision that, subject to the Attorney General's establishment of procedures and standards for such sharing, *requires* law enforcement organs to pass information with intelligence significance to the Intelligence Community.[121]

(5)     *Recommendations*

---

[118]     P.L. 107-56, at § 203(a).

[119]     *Id.* at §  203(b).

[120]     *Id.* at § 203(d).

[121]     *Id.* at § 905.

Organizational cultures are notoriously hard to change, and it remains to be seen how well the legal and policy changes of the post-September 11 period will become part of the institutional fabric of the Justice Department and the FBI.  In the interest of ensuring that sustained progress is made in this regard, Congress probably made a mistake in subjecting the broad "notwithstanding any other provision of law" sharing provision and the "significant purpose" FISA amendment in the USA PATRIOT Act to that bill's "sunset" clause – which will cause these important provisions to expire in December 31, 2005.[122]   If it wishes to see these improvements in information-sharing and law enforcement-intelligence coordination succeed in the long term, the 108th Congress should consider exempting them from the "sunset" provision.[123]

The 108th Congress should also reintroduce and promptly approve the amendment to FISA proposed in June 2002 by Senators Kyl and Schumer.  This legislation – which was introduced during the 107th Congress as S.2586 – would modify the "foreign power" definition in the FISA statute to permit the issuance of surveillance or search orders against *non*-U.S.

---

[122]      *See id.* at § 224(a) (providing for expiration of certain provisions).

[123]      Congress should also closely monitor the Intelligence Community's *use* of grand jury and other protected law enforcement information.  Such information is quite properly subject to oversight by federal judges while it remains within law enforcement channels.  When passed to the Intelligence Community, however, it leaves the courts' control and oversight.  Since the Department of Justice has taken the position that the intelligence oversight committees of Congress should not be permitted to see any grand jury information, this means that there is *no* oversight of what use is made of grand jury material passed to the Intelligence Community.  The Senate Select Committee on Intelligence tried to provide for such oversight in its FY03 authorization bill, *see* S.2506 (107th Cong., 2d Sess.), at § 306, but this provision was removed in conference at the insistence of the Administration.  The 108th Congress would do well to consider the civil liberties implications of passing grand jury information to the Intelligence Community without effective oversight – as well as the implications for the oversight prerogatives of Congress more generally, as such information is incorporated over time into intelligence products denied to the committees because they contain such material.

persons suspected of international terrorist activity but whose ties to a specific foreign terrorist "group" cannot initially be shown.  Debates continue in FISA circles about whether Zacarias Moussaoui's ties to the Chechen rebels were sufficient to provide a "foreign power" nexus under the existing FISA statute.  Discussions of the Moussaoui case, however, have made clear that there is a potential loophole in the law that might be exploited by *future* terrorists.

Specifically, as discussed in a public hearing of the SSCI during the summer of 2002, the FISA statute is built around a 1970s-era conception of the "international terrorist group."  When FISA was enacted in 1978, the typical terrorist group was a Marxist-style organization with a fairly rigid, authoritarian organizational structure and chain of command (*e.g.*, Baader-Meinhoff gang, the Red Brigades, the PLO, the Red Army Faction, the PFLP, and so forth).  Terrorist organizations today, however, have increasingly "flat" or "networked" organizational structures, tending to be decentralized and comparatively resistant to institutional "decapitation." Moreover, as the FBI's Deputy General Counsel has noted, terrorism today is far more indiscriminate and more focused simply upon causing mass casualties than were terrorist groups at the time FISA was adopted.[124]  Whereas terrorist groups in the 1970s tended to focus upon achieving specific political goals or upon targeting specific individuals, often using the *threat* of violence as much as violence itself (*e.g.*, in hostage-taking situations), modern terrorist groups are increasingly interested simply in annihilating their perceived enemies on as grand as scale as technologically feasible.

Modern terrorists, therefore, are both more lethal *and* harder to tie to formal "group" structures than the terrorists Congress had in mind when enacting the FISA statute's current

---

[124]    Marion E. ("Spike") Bowman, written statement submitted to SSCI hearing (July 31, 2002), at 1.

definition of a terrorist "foreign power."  Senators Kyl and Schumer have proposed to permit

FISA orders to issue against even a single individual who appears to be involved in terrorism,

provided that such a person is not a U.S. person and that his terrorism has an international nexus.

 (The proposal, therefore, would have no impact upon American citizens or lawful permanent

residents, and would not affect investigations into *domestic* terrorist groups.)  The Kyl/Schumer

legislation is supported by the Administration, and was favorably received by the SSCI when

discussed at our July 2002 hearing.  It deserves the support of the 108th Congress.


**IV.**    ***Domestic Intelligence***


The findings of our Joint Inquiry Staff have also highlighted grave and continuing

problems with the Federal Bureau of Investigation in connection with its national security work.

 Though still renowned for its criminal investigative competence, the FBI has shown a disturbing

pattern of collapse and dysfunction in its counterintelligence and counterterrorism functions.

These recurring problems have, in turn, led many observers – and Members of Congress –

increasingly to lose faith in the Bureau's ability to meet the national security challenges it faces,

despite a series of internal reorganizations over the past several years that have failed to rectify

the situation.


In light of the FBI's dismal recent history of disorganization and institutional

incompetence in its national security work, many of us in Congress have begun to consider

whether it might better serve the interests of the American people to separate the

counterintelligence and counterterrorism functions of the Bureau into an entirely separate

organization – one that would be free of the structural, organizational, and cultural constraints

that have greatly handicapped the FBI's ability to conduct the domestic intelligence work our country depends upon it to perform.

A.      *Tyranny of the Casefile*

Fundamentally, the FBI is a law enforcement organization: its agents are trained and acculturated, rewarded and promoted within an institutional culture the primary purpose of which is the prosecution of criminals.  Within the Bureau, information is stored, retrieved, and simply *understood* principally through the conceptual prism of a "case" – a discrete bundle of information the fundamental purpose of which is to prove elements of crimes against specific potential defendants in a court of law.

The FBI's reification of "the case" pervades the entire organization, and is reflected at every level and in every area: in the autonomous, decentralized authority and traditions of the Field Offices; in the priorities and preference given in individual career paths, in resource allocation, and within the Bureau's status hierarchy to criminal investigative work and *post hoc* investigations as opposed to long-term analysis; in the lack of understanding of and concern with modern information management technologies and processes; and in deeply-entrenched individual mindsets that prize the production of evidence-supported narratives of defendant wrongdoing over the drawing of probabilistic inferences based upon incomplete and fragmentary information in order to support decision-making.

At its core, the FBI has always been – and remains – a "casefile" organization wedded inextricably to a "casefile" mentality.  This is not a bad thing: the Bureau is often, and generally accurately, described as the "world's premier law enforcement organization."  It does its

traditional job quite well.  But the tyranny of the case file presents a fundamental obstacle to national security work, for the simple reason that law enforcement organizations handle information, reach conclusions, and ultimately just *think* differently than intelligence organizations.  Intelligence analysts would doubtless make poor policemen, and it has become very clear that policemen make poor intelligence analysts.

Particularly against shadowy transnational targets such as international terrorist organizations that lack easily-identifiable geographic loci, organizational structures, behavioral patterns, or other information "signatures," intelligence collection and analysis requires an approach to acquiring, managing, and *understanding* information quite different from that which prevails in the law enforcement community.  Intelligence analysts tend to reach conclusions based upon disparate fragments of data derived from widely-distributed sources and assembled into a probabilistic "mosaic" of information.  They seek to distinguish useful "signals" from a bewildering universe of background "noise" and make determinations upon the basis of vague pattern recognition, inferences (including negative inferences), context, and history.  For them, information exists to be *cross-correlated* – evaluated, and continually subjected to re-evaluation, in light of the total context of what is available to the organization as a whole.  Intelligence analysts think in degrees of possibility and probability, as opposed to categories of admissibility and degrees of contribution to the ultimate criminal-investigative aim of proof "beyond a reasonable doubt."

The "analyst" mindset is thus radically different than that cultivated by training and acculturation within a law enforcement environment, which necessarily focuses upon building carefully-managed bundles of information about specific individuals or organizations for specific purposes.  Far from embracing probabilistic inference, "knowledge" in a law enforcement

100

context aspires – in its ideal form at least – not only to *certainty* but also to *admissibility*, the two essential conceptual elements of being able to prove someone guilty beyond a reasonable doubt in a court of law.  Within such a paradigm, information exists to be *segregated* and ultimately employed under carefully-managed circumstances for the single specific purpose for which it was gathered.

Naturally, these are only ideal types.  In reality, intelligence knowledge management is more Balkanized and disaggregated than the model suggests, and law enforcement information-holdings more interconnected.  Nevertheless, the basic mindsets *do* exist, and the FBI's conceptual and institutional baggage as a law enforcement "casefile" organization has made it very hard – some might conclude impossible – for the Bureau to mature as a competent player in the national security field.

(1)     *Resistance to Intelligence Analysis*

(a)     *Impact of "Casefile" Mentality on pre-9/11 Analysis*

The Joint Inquiry Staff (JIS) has outlined several examples of such problems within the FBI in the period leading up to the September 11 terrorist attacks.  The FBI, for instance, knew that convicted terrorist Abdul Hakim Murad had been involved in an extremist Islamic plot to blow up 12 U.S.-owned airliners over the Pacific Ocean and crash an aircraft in to CIA Headquarters.  Murad was not charged with a crime in connection with the CIA crash plot, apparently because it was merely at the "discussion" stage when he was apprehended.  Because the CIA crash plot did not appear in the indictment, however, the FBI effectively forgot all about it.

101

As the JIS has recounted, the FBI's case file for the Murad case essentially ignored the air crash plot, and FBI agents interviewed as part of our inquiry confirmed that Murad's only significance to them was in connection specifically with the crimes for which he was charged: "the other aspects of the plot were not part of the criminal case and therefore not considered relevant."[125]  Convinced that the only information that really matters was information directly related to the criminal investigation at hand, the FBI thus ignored this early warning sign that terrorists had begun planning to crash aircraft into symbols of U.S. power.  Thus, rather than being stored in a form that would permit this information to be assessed and re-assessed in light of a much broader universe of information about terrorist plans and intentions over time, the Murad data-point was simply forgotten.  Like all the other tidbits of information that might have alerted a sophisticated analyst to terrorists' interest in using airplanes to attack building targets in the United States,[126] the episode disappeared into the depths of an old case file and slipped out of the FBI's usable institutional memory.

The handling of information about the Murad air-crash plot and the flight-school information is, unfortunately, illustrative of the FBI's more general problems in "connecting the dots" in ways that good intelligence analysts are expected to do.  So pervasive was the FBI's

---

[125]    JIS, written statement presented to SSCI/HPSCI joint hearing (September 18, 2002), at 11-12.

[126]    For a summary of intelligence holdings – from all intelligence agencies – related to the potential use of aircraft as weapons, *see* JIS, written statement presented to SSCI/HPSCI joint hearing (September 18, 2002), at 26-28.

"casefile" mentality, in fact, that it bled over into the basic architecture of how the Bureau handled terrorist information even when it *tried* to do intelligence analysis.

As the JIS has recounted, the FBI for years has tracked terrorism information in ways that essentially *prohibit* broad, cross-cutting analytical assessment.  If it identified a suspected terrorist in connection with a Hamas investigation, for example, the FBI would label him as a Hamas terrorist and keep information on him in a separate "Hamas" file that would be easily accessible to and routinely used only by "Hamas"-focused FBI investigators and analysts.  The Usama bin Laden unit would be unlikely to know about the FBI's interest in that individual, and no one thought to establish a system for cross-referencing terrorist connections between the carefully-segregated institutional files. [127]  This approach is entirely unsuited to virtually *any* long-term strategic analytical work, and is patently inappropriate to counterterrorism analysis against the loose, interconnected and overlapping networks of Islamic extremists that make up the modern *jihadist* movement.

The FBI's decentralized organizational structure contributed to these problems, in that it left information-holdings fragmented into largely independent fiefdoms controlled by the various field offices.  The New York Field Office for years played the principal counterterrorism role within the FBI simply because it had the misfortune of hosting the 1993 World Trade Center attacks, thereby acquiring a degree of experience with Islamic fundamentalist terror groups.  Even so, this work focused upon terrorism *cases* – not strategic analysis – and the FBI's decentralized structure left other field offices in the dark.  As the JIS concluded, there was even great "variation in the degree to which FBI-led Joint Terrorism Task Forces (JTTFs) prioritized

---

[127]   JIS, written statement presented to SSCI/HPSCI joint hearing (September 24, 2002), at 14.

and coordinated field efforts targeting Bin Ladin and al-Qa'ida," and "many other FBI offices around the country were unaware of the magnitude of the threat."[128]

The culturally and organizationally fragmented nature of FBI information-holdings apparently even extended to the handling of knowledge *within* individual FBI offices themselves. In August 2001, for example, as FBI agents first sought to establish whether Zacarias Moussaoui was a terrorist, FBI agents from the local field office visited the flight school in Norman, Oklahoma, where Moussaoui had been taking flying lessons. The FBI agents were not aware that their *own* field office had become concerned about that *same* flight school two years before – because the personal pilot of Usama bin Laden (UBL) had been training there.[129]

The earlier episode in Norman, had it been remembered, may not have been much use in obtaining criminal probable cause to search Moussaoui's personal effects, but being aware of such disparate and *potentially* connected bits of information is at the core of all-source intelligence analysis "fusion." Such fusion, apparently, was quite beyond the capabilities of the FBI. Despite all the FBI knew about terrorist interest in U.S. flight schools and in the potential use of aircraft as weapons, for example, it had declared in December 2000 in a joint report with

---

[128]     JIS, written statement presented to SSCI/HPSCI joint hearing (September 18, 2002), at 18.

[129]     JIS, written statement presented to SSCI/HPSCI joint hearing (September 24, 2002), at 19.

the FAA that its "investigations" did not suggest any "evidence" of terrorist plans to target U.S. domestic civil aviation.[130]

---

[130]     JIS, written statement presented to SSCI/HPSCI joint hearing (September 18, 2002), at 29.

By the summer of 2001, the FBI knew from the Phoenix EC about UBL-associated individuals training at U.S. flight schools, that UBL's organization also used the Norman flight school Moussaoui attended, about past Libyan efforts to send terrorists through aviation training in the U.S., and that Murad had planned to attack the CIA with an aircraft.  As a result, the FBI was the U.S. Government agency probably best positioned in the late summer of 2001 to "connect the dots" with an analytical assessment warning of terrorist interest in using U.S.-trained pilots to crash aircraft into symbolic American buildings.  It was also the agency best positioned to connect such analyses with Moussaoui's activity at Norman, or the presence of known Al-Qa'ida terrorists al-Mihdhar and al-Hazmi at flight school in San Diego.  Follow-up investigation of the names suggested in the Phoenix EC, which might have occurred had the FBI assembled enough of the information in its possession to understand the potential threat posed by terrorists at U.S. flight schools, might also conceivably have led the Bureau to Hani Hanjour – one of the September 11 hijackers who trained at flight school in Arizona with one of the individuals identified in the EC as having links to Al-Qa'ida.[131]

The Bureau  was unable to connect these "dots," however, in large part because

> "[t]he FBI's focus at the time Moussaoui was taken into custody appears . . . to have been almost entirely on investigating specific crimes and not on identifying linkages between separate investigations or on sharing information with other U.S. Government agencies with counterterrorist responsibilities."[132]

---

[131]    JIS, written statement presented to SSCI/HPSCI joint hearing (September 24, 2002), at 10.

[132]    JIS, written statement presented to SSCI/HPSCI joint hearing (September 24, 2002), at 19.

Approaching issues of intelligence fusion with a law enforcement "casefile" mindset and organizational structure left the FBI unprepared for the national security challenges of modern terrorism.

Moreover, because the FBI is fundamentally a "casefile" organization, it has been very poor at *disseminating* any intelligence information it might happen to acquire or analytical products it might happen to produce. The Bureau disseminated extraordinarily few intelligence reports before September 11, 2001, even with respect to what is arguably its most unique and powerful domestic intelligence-collection tool: collection under the Foreign Intelligence Surveillance Act (FISA).[133] The FBI's problems in counterterrorist intelligence before September 11 were thus threefold: the Bureau did not know what information it possessed, it did not approach this information with an intelligence analysis mindset, and it too often neglected to inform other agencies of what it *did* know or believe.

Even when the FBI did see fit to *try* to notify the rest of the Intelligence Community about the potential threat represented by the Moussaoui situation not long before the September 11 attacks, it was unable to place the Moussaoui case in the analytical context that would have made this information useful to analysts and intelligence consumers. On September 4, the FBI's Radical Fundamentalist Unit (RFU) sent out a teletype that did no more than merely recount the investigative steps the FBI was undertaking in its Moussaoui investigation. The author

---

[133] At a joint SSCI/HPSCI hearing on July 18, 2002, Senator Feinstein read into the record the number of reports sent from the FBI to the CIA on terrorism issues. These figures have not been declassified, but there were essentially *no* FISA-derived "dissems" issued by the FBI in calendar year 2001. (The number of "disseminations" issued by the FBI to other members of the IC – mostly in connection with FISA surveillance or searches – *since* October 2001 is much higher.)

apparently did not find it worthy of comment that Al-Qa'ida threat warnings were at a fever pitch when Moussaoui had come to the Bureau's attention.[134]  (Given the FBI's poor record of internal information-sharing, it is conceivable that the author was not even *aware* of the broader analytical context, even though he worked in the office at FBI Headquarters nominally responsible for having such awareness.  At any rate, the RFU teletype certainly provided no such context.)  Despite Moussaoui's specific focus upon aviation training, the RFU's teletype to the FAA on that same day also contained no analytical context that would have helped a reader understand Moussaoui's potential significance.[135]

<div align="center">(b)    *Analysis versus Investigations*</div>

<div align="center">(i)    *Disinterest in Analysis*</div>

---

[134]    JIS, written statement presented to SSCI/HPSCI joint hearing (September 24, 2002), at 18.

[135]    JIS, written statement presented to SSCI/HPSCI joint hearing (September 24, 2002), at 21.

Fundamentally, the FBI consistently prized investigations and operations in its national security work and neglected long-term analysis of the sort that might have permitted agents to understand more about the pre-September 11 threat of terrorists using civil aviation.  According to FBI Counterterrorism Division chief Dale Watson, counterterrorism work was "a relatively low-priority program" at the Bureau for many years.  He has testified that it received more emphasis beginning in late 1998, but even this new emphasis grew out of the FBI's *investigations* into the 1996 Khobar Towers bombing and the 1998 East African embassy attacks.[136]  This emphasis does *not* seem to have changed the FBI's disinterest in long-term strategic analytical work in support of the Bureau's national security responsibilities.

As the Joint Inquiry Staff put it,

> "At the FBI, our review found that, prior to September 11, 2001, support for ongoing investigations and operations was favored, in terms of allocating resources, over long-term, strategic analysis. We were told, during the course of our FBI interviews, that prevention occurs in the operational units, not through strategic analysis, and that, prior to September 11, the FBI had insufficient resources to do both."[137]

These problems were, in large part, an outgrowth of the "casefile" mentality that prevailed at the Bureau.   According to the JIS,

---

[136]    Dale Watson, written statement presented to SSCI/HPSCI joint hearing (September 26, 2002), at 3.

[137]    JIS, written statement presented to SSCI/HPSCI joint hearing (September 18, 2002), at 28-29.

"the case-driven, law enforcement approach, while important and extremely productive in terms of the FBI's traditional mission, does not generally 'incentivize' attention to big-picture, preventive analysis and strategy.  This is particularly true when there is no direct and immediate impact on an ongoing criminal prosecution."[138]

Counterterrorism (CT) and counterintelligence (CI) work were for years considered less prestigious career fields for FBI agents.  CT and CI investigations could last for years and often produced no defendants at all, and analytic work almost *never* produced easily-quantifiable career trophies.  Particularly after the collapse of the Soviet Empire, managers de-emphasized the FBI's CI mission, assignments to national security billets became less and less attractive within an organization focused upon criminal cases.  The reluctance of agents to "homestead" in national security work – instead of working CT and CI issues merely on a rotational basis, which was much more common – helped preclude any possibility of breaking the hegemony of the "casefile" mindset within the organizaztion's national security components.

On top of a general lack of emphasis upon national security work within the organization as a whole, the FBI suffered in particular from a positive aversion to long-term strategic analysis of the sort routinely expected of intelligence agencies.  CT investigations, after all, were at least

---

[138]     JIS, written statement presented to SSCI/HPSCI joint hearing (September 24, 2002), at 2-3.

*investigations* – and bore at least some resemblance to ordinary law enforcement work. Analysis, however, was apparently anathema.  Even as the FBI received ever-greater amounts of CT money and personnel during the late 1990s, therefore, it showed little interest in devoting more effort to strategic intelligence or to analytical efforts aimed at Al-Qa'ida cells in the United States.

According to the JIS, the FBI's disinterest in analysis work led managers systematically to reassign good analysts from doing strategic analysis to supporting operational (*i.e.*, investigative) units.  JIS investigators were "told that the FBI's al-Qa'ida-related analytic expertise had been 'gutted' by transfers to operational units and that, as a result, the FBI's [international terrorism] analytic unit had only one individual working on al-Qa'ida at the time of the September 11 attacks."[139]  Indeed, the FBI seems to have regarded "intelligence analysts" as little more than a pool of disposable personnel assets to be redeployed as needed to other responsibilities – which perhaps explains the Bureau's longstanding failure to insist upon clear standards for adjudging intelligence "analyst" qualifications in the first place.[140]

---

[139]     JIS, written statement presented to SSCI/HPSCI joint hearing (September 18, 2002), at 28-29; *see also id.* at 18.

[140]     The SSCI became so concerned about the fuzziness of these standards that it enacted specific provisions in the Fiscal Year 2003 Intelligence Authorization Bill (Public Law 107-306) to encourage the Director of Central Intelligence to promulgate Community-wide standards for individuals performing intelligence functions.  As the Senate Report put it,

> "the Committee has become concerned that, particularly in the area of analysis, elements of the Intelligence Community are denominating

individuals as 'analysts' or 'intelligence analysts' without adherence to
a meaningful common definition of that word."
U.S. Senate Select Committee on Intelligence, S.Rep. 107-149, *Report to Accompany S. 2506*,
107th Cong., 2d Sess. (May 13, 2002), at 12.

Discouragingly, all of the problems found by the JIS with the FBI's chronic inability to perform serious intelligence analysis occurred despite a major reorganization of the FBI announced in late 1999 *in order to improve the Bureau's ability to do analysis.* In November 1999, FBI Director Louis Freeh announced that he was creating a new "Investigative Services Division" within the FBI to "coordinate the FBI's international activities, integrate and substantially strengthen its analytic capabilities, and oversee the Bureau's crisis management functions." This reorganization was the result of Director Freeh's 1998 "Strategic Plan," which allegedly "focuse[d] on the need to improve the FBI's capacity for information analysis."[141] According to Attorney General Reno, this new organizational scheme would "help enable the Bureau to face the challenges of the next millennium."[142] The Bureau's failures leading up to September 11 thus suggest the possibility that *no* internal FBI reorganizations will prove able to effect real reform.

(ii)     *Problems Illustrated by the Phoenix EC*

According to the JIS, the FBI's handling of the Phoenix EC was "symptomatic of a focus on short-term operational priorities, often at the expense of long-term, strategic analysis. . . . [W]e have found that the FBI's ability to handle strategic analytic products, such as the Phoenix EC, was, at best, limited prior to September 11, 2001." [143]

"The manner in which the Phoenix EC was handled demonstrated

---

[141]     Federal Bureau of Investigation, press release (November 19, 1999), at 1-2.

[142]     *Id.* at 1.

[143]     JIS, written statement presented to SSCI/HPSCI joint hearing (September 24, 2002), at 2.

how strategic analysis took a back seat to operational priorities prior to September 11. * * * Even the analytic unit responsible for strategic analysis was largely producing tactical products to satisfy the operational section.  In fact there was no requirement [at the time] to handle projects with nationwide impact, such as Phoenix, any different[ly] than any other project."[144]

---

[144]    JIS, written statement presented to SSCI/HPSCI joint hearing (September 24, 2002), at 8.

Due to "[i]nadequate information sharing within the FBI, particularly between the operational and analytic units,"[145] the recipients of the Phoenix EC lacked any knowledge of information – already within the FBI's possession, but lost or ignored in a myriad of disaggregated casefiles – that would have put the EC into a broader context of longstanding concern with terrorism threats related to Middle Eastern flight school students training in the United States.[146]

As it was, even those FBI "Intelligence Operations Specialists" (IOSs) – the name itself reveals the Bureau's preference for "operations" over "analysis" – who *did* see the Phoenix EC decided *against* sending it to the FBI's lone analytic unit concerned with terrorism.[147] Nor is it clear that it would have done much good to pass the EC to that unit, as it had been effectively crippled by personnel poaching and bureaucratic infighting.

> "[T]he capability to conduct strategic analysis on al-Qa'ida was limited because five of the unit's analysts had transferred into operational units.  The Joint Inquiry Staff has been told that every time a competent new analyst arrived, the UBLU or RFU would either try to recruit them as IOS or would refuse to share information.  This allowed the ULBU and RFU to control the information flow.  The end result, unfortunately, is that there is no

---

[145] JIS, written statement presented to SSCI/HPSCI joint hearing (September 24, 2002), at 2.

[146] For a summary of information relating to this context, *see* JIS, written statement presented to SSCI/HPSCI joint hearing (September 24, 2002), at 3.

[147] JIS, written statement presented to SSCI/HPSCI joint hearing (September 24, 2002), at 7.

one left whose role is to perform strategic analysis."[148]

Against this deep background of analytical and organizational dysfunction and mismanagement in the national security arena, it is hard to imagine that real CT and CI analytical reform within the FBI is really possible.

(2)      *The FBI's Inability to Know what it Knows*

(a)      *Technological Dysfunction*

In addition to these cultural and organizational problems – or perhaps in large part *because* of them – the FBI has never taken information technology (IT) very seriously, and has found itself left with an entirely obsolete IT infrastructure that is wholly inadequate to the FBI's current operational needs, much less to the task of supporting sophisticated all-source intelligence fusion and analysis.  Fundamentally, the FBI's IT system has changed surprisingly little since the late 1980s or early 1990s, a decade during which the rest of the computer world moved at extraordinary speed.

---

[148]      JIS, written statement presented to SSCI/HPSCI joint hearing (September 24, 2002), at 8.

116

The handling of the Phoenix EC demonstrates some of these technological deficiencies, highlighting the "limitations in the electronic dissemination system" that kept FBI supervisors from seeing the document *even when it was addressed to them.*[149]  According to the JIS, the problems with the Phoenix EC "are consistent with the complaints we have repeatedly heard throughout this inquiry about the FBI's technology problems."[150]  The Bureau's electronic system for disseminating messages such as the Phoenix EC was itself "considered so unreliable that many FBI personnel, both at the field offices and at FBI headquarters, use e-mail instead."[151]  Since most offices at the FBI *lack* a classified e-mail capability, this represents a fundamental obstacle to information-sharing of even the most rudimentary sort.  Moreover, as users have fled the dysfunctional case-tracking system, the Bureau appears to have lost any ability to track leads entered into it.  The JIS, for instance, was told that "there are 68,000 outstanding and unassigned leads assigned to the counterterrorism division dating back to 1995."  At the time of our Inquiry, the FBI had no idea whether any of these leads had been assigned and dealt with outside the electronic system.[152]

This disastrous information-management system compares unfavorably with the systems developed elsewhere in the Intelligence Community for sharing data and providing analysts with the information they need to conduct intelligence "fusion."  In this respect, it is useful to

---

[149]   JIS, written statement presented to SSCI/HPSCI joint hearing (September 24, 2002), at 9.

[150]   JIS, written statement presented to SSCI/HPSCI joint hearing (September 24, 2002), at 2.

[151]   JIS, written statement presented to SSCI/HPSCI joint hearing (September 24, 2002), at 9.

[152]   JIS, written statement presented to SSCI/HPSCI joint hearing (September 24, 2002), at 9.

compare the IT capabilities of the CIA with those at FBI.

> "At CIA, the DCI's CTC maintains a massive database of terrorist
> related information going back at least two decades.  Within this
> database are analytic papers, messages between CIA headquarters
> and CIA stations and bases around the world, signals intelligence
> reports from the National Security Agency (NSA), and various
> briefings, memoranda, and working notes."[153]

At the most generous, the FBI is years away from having such IT capabilities, even if the Bureau's organizational structure and institutional culture permitted such tools to be used appropriately.

The FBI's TRILOGY project seeks to improve the Bureau's IT infrastructure in order to bring it up to IC standards, but this project was only begun at the very end of the tenure of Director Louis Freeh – who himself apparently did not even use a personal computer – and remains a very long way from completion.  Moreover, as suggested above, even if TRILOGY *succeeds* in bringing the FBI up to "Community standards" in the IT realm, those standards are themselves inadequate to the challenges of 21st-century intelligence analysis.

(b)      *A Pattern of Failures*

---

[153]      JIS, written statement presented to SSCI/HPSCI joint hearing (September 20, 2002), at 3.

Unfortunately, this combination of organizational, cultural, and technological impediments has led the FBI into a recurring pattern of information dysfunction. Time after time during the past few years, the Bureau has distinguished itself by its inability to assess what is in its own files – much less to make productive analytical use of such information. This occurred, for instance, in 1997 when the FBI misplaced vital information in its own files linking the People's Republic of China to illicit political influence operations during the 1996 U.S. Presidential campaign.[154] It happened with the belated discovery of thousands of pages of documents related to convicted Oklahoma City bomber Timothy McVeigh – just days before his execution.[155] It happened on several occasions during the FBI's botched handling of the Wen-Ho Lee nuclear espionage investigation, when agents in the Albuquerque field office or at FBI Headquarters misplaced or failed to pass along crucial information that might have permitted agents to discover Lee's unlawful removal of nuclear secrets from the Los Alamos National Laboratory months or years before they finally did.[156]

As detailed by the JIS in the present inquiry, the same thing happened with the Phoenix EC and the many tidbits of information in the FBI's possession relating to terrorists' interest in U.S. flight schools. It also happened in the FBI's belated revelation to the Joint Inquiry in the late summer of 2002 of certain information relating to the activities of September 11 hijackers

---

[154] *See* U.S. Department of Justice, Office of the Inspector General, *The Handling of FBI Intelligence Information Related to the Justice Department's Campaign Finance Investigation* (July 1999) [unclassified Executive Summary], *available at* http://www.usdoj.gov:80/oig/fbicfi/fbicfi.1htm.

[155] *See, e.g.*, David Johnson, "Citing FBI Lapse, Ashcroft Delays McVeigh Execution," *New York Times* (May 12, 2001), at A1.

[156] *See* Thompson & Lieberman, *supra*, at 3-4 & 11.

Khalid al-Mihdhar and Nawaf al-Hazmi.

Being able to know what one knows is the fundamental prerequisite for any organization that seeks to undertake even the most rudimentary intelligence analysis.  The FBI, however, has repeatedly shown that it is unable to do this.  It does not know what it knows, it has enormous difficulty analyzing information when it *can* find it, and it refuses to disseminate whatever analytical products its analysts might, nonetheless, happen to produce.  The Bureau's repeated failures in this regard – despite successive efforts to reorganize its national security components – have led many observers to conclude that "mixing law enforcement with counterintelligence" simply cannot work.  As one former director of the National Security Agency has suggested, "cops" cannot do the work of "spies."[157]  This insight, in turn, has led to widespread public debate over the need for radical structural reform – including removing the CI and CT functions from the FBI entirely.

    B.     *The Need to Consider Radical Reform*

---

[157]    Gen. William Odom, USA (ret.), written statement presented to JIS hearing (October 3, 2002), at 4.

For all of these reasons, I believe that a very strong argument can be made for removing the CI and CT portfolios from the FBI.  Despite repeated reorganizations, the FBI has simply performed too poorly for the American people to have much faith in its ability to meet current and future challenges no matter *how* many aggressive "reform" plans are announced by FBI management.  Even a year after September 11, in fact, the FBI's deputy director sent angry e-mail messages to Bureau field offices declaring that he was "amazed and astounded" that the Special Agents in Charge (SACs) *still* refused to commit essential resources to the fight against terrorism and *still* refused to share information properly with Headquarters.  "You need to instil a sense of urgency," he told them, insisting that the SACs send their agents "out on the street and develop sources" and "demand that information is being sent" to headquarters.[158]  If September 11 cannot persuade the existing FBI to focus properly upon terrorism, perhaps nothing can.

Some observers have thus suggested placing the Bureau's CI and CT functions within their own separate agency, a stand-alone member of the Intelligence Community that would be responsible for domestic intelligence collection and analysis but would have no law enforcement powers or responsibilities.  This would be, in effect, an American analogue to the British Security Service (a.k.a. MI-5) or the Australian Security Intelligence Organization (ASIO).

There is much to recommend such an approach.  The FBI today performs the domestic intelligence role within the U.S. Intelligence Community.  Its problem, however, is that it performs this task poorly – and arguably *cannot* be made to perform it well given the cultural and organizational chasm that exists between a "casefile" organization and a true intelligence organization.  An MI-5 analogue would allow our domestic intelligence collection and analytical

---

[158]   Eric Lichtblau, "FBI Officials Say Some Agents Lack a Focus on Terror," *New York Times* (November 21, 2002), at 1 (quoting Deputy Director Bruce J. Gebhardt).

functions to be performed by a "pure-knowledge" organization freed from the tyranny of the casefile and thus able properly to perform these functions.

Paradoxically, such a freestanding "domestic spy agency" might offer advantages over our current structure even in terms of civil liberties.  Today, domestic intelligence collection is performed by FBI special agents who, in addition to their "pure-knowledge" functions, also have law enforcement powers: they have badges, can carry firearms, and can arrest and detain Americans.  I suspect that most Americans, however, would feel safer having such collection performed by intelligence officers who do *not* possess coercive powers – and who can only actually take *action* against someone through a process of formal coordination with law enforcement officials (*e.g.*, an office remaining within the FBI that would function as an analogue to the Special Branch, which performs law enforcement liaison functions with the British Security Service).

Should the creation of a wholly freestanding agency turn out to be, in bureaucratic terms, "a bridge too far," an alternative approach might be to separate the CI and CT functions of the FBI into a semi-autonomous organization.  This approach envisions an organization that would still report to the FBI director for purposes of overall coordination and accountability, but which would in all other respects (*e.g.*, training and promotion pipelines, IT systems, management structures, and chains of command) be entirely separate from the "criminal" components of the FBI.  (This approach might be called the "NNSA option," after Congress' effort in 1999 to create a semi-freestanding National Nuclear Security Administration within the Energy Department – though any effort to do this with the FBI would have to avoid the rampant "dual-hatting" that has eroded the effectiveness of our NNSA reforms.)

A third approach might be to move the FBI's CI and CT functions to the new Department of Homeland Security, thereby adding a domestic *collection* element to that organization's soon-to-be-created Undersecretariat for Information Analysis and Infrastructure Protection.  This might allow the collection components to take advantage of working within a "national security" culture rather than a "law enforcement" culture, and would give them a broader base of institutional support than they might enjoy as a freestanding "MI-5" within the Intelligence Community.  Many Americans, however, might be uncomfortable with combining these functions with the already sweeping security responsibilities of the new Department.

Whatever the best answer turns out to be, I believe some kind of radical reform of the FBI is in order – indeed, is long overdue – and should be a major item on the "intelligence reform" agenda for the 108th Congress.  The FBI has, unfortunately, shown that in its present form, it is not capable of successfully performing domestic intelligence collection and analysis against modern CI and CT challenges.  The Bush Administration and the 108th Congress should make it a high priority to resolve these issues, and to put the domestic components of our Intelligence Community on a footing that will enable them to meet the challenges of the 21st century.

## V.   *Human Intelligence*

In an unclassified report such as this one, it is hard to provide much supporting information for a critique of human intelligence (HUMINT) operations against terrorist groups prior to September 11.  Suffice it to say, however, that the *status quo* of Intelligence Community approaches in this regard was tested against the Al-Qa'ida threat and found wanting.

CIA officials have publicly boasted that they had operatives in Afghanistan before September 11,[159] but careful observers should not confuse the periodic infiltration of operatives for brief *liaison* meetings with friendly warlords for a real HUMINT or paramilitary *presence*. Such unfounded braggadocio aside, the distinguishing feature of anti-terrorist HUMINT three years after the embassy bombings and the DCI's "declaration of war" against Al-Qa'ida was our *lack* of HUMINT penetration of the organization, especially of its central operations.

It is well known in the intelligence world that "[c]landestine handling of agents or other covert activity is usually assigned to intelligence officers under diplomatic cover"[160] – that is, to officials operating out of embassies who, while they face greater risks than the average diplomat, are in the final analysis protected from arrest by diplomatic immunity. The CIA's HUMINT collection service, the Directorate of Operations (DO), admits to occasionally using non-official cover (NOC) officers,[161] but such assignments are the rare exception rather than the rule, and

---

[159]     *See, e.g.*, Drogin, *supra* (quoting CIA Deputy Director for Operations Jim Pavitt that "we were there before the 11th of September").

[160]     FBI Section Chief Timothy D. Bereznay, statement for the record submitted to the House International Relations Committee (May 11, 2000), at 2.

[161]     Both DCI Tenet, during his confirmation hearing, and his predecessor John Deutch have discussed CIA policy with respect to the employment of NOCs posing as members of certain professions. As Deutch explained it, the CIA has a policy of generally avoiding "having a U.S. intelligence asset use U.S. journalistic cover." John Deutch, testimony before SSCI hearing (February 22,

NOCs too often suffer career damage because their nonconventional assignments necessarily remove them from the usual network of DO contacts and advancement opportunities.

---

1996), *available from* Federal News Service transcripts (February 22, 1996); *see also* George Tenet, testimony before SSCI hearing (May 6, 1997), *available from* Federal News Service transcripts (May 6, 1997).

This balance between diplomatic cover officers and NOCs may have served the CIA tolerably well during the Cold War – though HUMINT was never regarded as our strong suit against the Soviets – but it is patently *unsuited* to HUMINT collection against nontraditional threats such as terrorism or proliferation targets.  As former DCI James Woolsey has observed, "[o]ne needs to use non-official cover officers to recruit spies inside terrorist organizations," because "not too many [Al-Qa'ida] supporters and friends attend embassy cocktail parties."[162] Especially against Al-Qa'ida – which is known actively to *seek out* Islamic converts such as José Padilla, John Walker Lindh, and Richard Reid, who have "legitimate" papers and can travel and live in the West without raising much suspicion – it is hard to understand why the CIA was not more interested in, and successful at, NOC-based HUMINT operations against Al-Qa'ida before September 11.

The CIA has relied too much, in my view, upon traditional embassy-based HUMINT, and not enough upon NOCs.  It has also focused too heavily upon HUMINT operations conducted in collaboration with foreign intelligence services.  There is nothing intrinsically wrong with liaison service work, and such collaboration has produced some of the greatest HUMINT successes we have had in the war against terrorism.  Liaison operations are also by far the *easiest* sort of HUMINT for CIA officers to conduct against terrorist groups when those officers are operating under diplomatic cover.  (Visiting one's liaison counterpart at his office is rather less hazardous than actually developing sources in the *souk*, and "State Department" employees are unlikely to be invited to many radical Islamist meetings anyway.)  Liaison work, however, is inherently conducted only on the basis of, and limited by the extent of, the cooperative service's *own* interests – rather than those of the CIA or the United States.  They are

---

[162]    James Woolsey, testimony before Senate Judiciary Committee Subcommittee (September 3, 1998), *available from* Federal News Service transcripts (September 3, 1998).

also of necessarily limited utility in countries in which the host government is, to some extent at least, part of the problem.  In the final equation, there is no substitute for mounting our *own* extra-embassy, non-official cover HUMINT operations.

It is far past time for the CIA to recognize the sharp limitations of its traditional Cold War approach to HUMINT, and to begin serious development – in a large-scale, programmatic way, rather than simply on an *ad hoc* or "volunteer" basis – of nontraditional HUMINT "platforms" and the use of NOCs.  A greater emphasis upon non-Caucasian NOC officers would also probably pay dividends out of proportion to the investments necessary to recruit and train such individuals.  Indeed, it is perhaps in getting undercover agents out (and at risk) amongst the "target" population that the HUMINT operators of the DO perhaps have the most to learn from their law enforcement counterparts.  If the Drug Enforcement Administration can put actual, salaried *American* officers undercover in clannish narcotrafficking organizations in foreign countries, surely the CIA can learn to penetrate aggressively proselytizing Islamic fundamentalist organizations.  We depend upon them to do just that.

As a final note, it is worth pointing out that I do not believe the language in the Joint Inquiry's "Recommendations" concerning the importance of enhancing "the recruitment of a more ethnically and culturally diverse workforce with the intelligence skills and expertise needed for success in counterterrorism efforts" is meant to represent our collective endorsement of workplace diversity *for its own sake.*  Rather, the Committees believe that the challenges of both understanding and penetrating international terrorist organizations and the milieu in which they move require that the Intelligence Community seek to develop larger numbers of native-speaking translators, culturally-attuned analysts, and HUMINT operators – especially NOC officers – ethnically and culturally indistinguishable from their collection targets.  In legal terms,

certain specific target-related types of ethnic and cultural diversity should be sought as a bona fide occupational qualification.  Without a fundamental shift in the CIA's operational paradigm, diversity for diversity's sake alone will do little to improve the CIA's ability to execute its mission.

## VI.   *Covert Action*

### A.   *Clarity and Support*

As with HUMINT operations, there is obviously little one can say here about the lessons that should be learned from the CIA's clearly mixed record of success in offensive operations against Al-Qa'ida before September 11, 2001.[163]  One important lesson, however, was suggested by former National Security Advisor Sandy Berger in his testimony before our Joint Inquiry.  In giving covert action instructions to the CIA, he said it is incumbent upon the President to convey

---

[163]   DCI Tenet confirmed the existence of CIA offensive operations against Al-Qa'ida in public testimony before the Joint Inquiry.  *See* George Tenet, testimony before joint SSCI/HPSCI hearing (October 17, 2002), *available from* FDCH Political Transcripts (October 17, 2002) (declining to discuss specific legal authorities received by CIA to conduct operations before September 11, 2001 but describing "offensive operations" and a "plan of attack" both "inside Afghanistan and globally" to "render" Al-Qa'ida terrorists [capture and deliver them to appropriate authorities], "disrupt" Usama bin Laden's terrorist infrastructure and finances, and otherwise "degrade his ability to engage in terrorism").

legal authorities – the limits spelled out in a covert action "finding" or Memorandum of Notification (MON) as to what agents are permitted to do in pursuit of the stated aim – with absolute clarity.[164]  Unfortunately, as the committees have heard repeatedly from knowledgeable participants, Berger's injunction was honored more in the breach than in the observance by the very Administration he served.

Particularly given the unpleasant history of covert action scandals that have affected the CIA, one should not be surprised to find that – ironically, perhaps – the covert action infrastructure is a relatively cautious one.  Intelligence officers will often, and with good reason, hesitate to take operational risks or to push aggressively to accomplish their missions if they are operating under ambiguous or convoluted legal authorities and always suspect that they may be prosecuted or hauled before a hostile inquiry for any actual or perceived missteps.  This admonition clearly applies to both Executive Branch and Congressional leaders: whatever the merits or demerits of the policies they are asked by the President to execute, our intelligence operators risking their lives in the field need to know that their own government will make clear to them what their job is and protect them when they do it.  Neither assurance, unfortunately, could be had by the DO's covert action staffs working against terrorism in the late 1990s.

As far as the anti-terrorism efforts of the Intelligence Community *since* September 11 are

---

[164]    Sandy Berger, testimony before joint SSCI/HPSCI hearing (September 18, 2002), *available from* FDCH Political Transcripts (September 19, 2002) (remarking with respect to covert action authorities that "We certainly would have to have clarity from the President of the United States ....").

concerned, I believe it is important that the record reflect that we on the oversight committees of Congress *have* been kept apprised of the new approaches and initiatives adopted by the President as part of our country's war on terrorism.  As any perusal of our closed hearing records at the SSCI will show, we have been uniformly supportive.  These are challenging times, and they have in some respects demanded unprecedented responses.  In the past, Congress has sometimes contributed to cultural and legal problems of risk-aversion within the Intelligence Community by conducting high-profile investigations into intelligence activities.  Congress can and must continue to assert its prerogatives in undertaking careful oversight of IC activities and conducting investigations wherever necessary.  Historians of the United States' war on terrorism, however – and, above all, our intelligence operatives currently in the field – should be aware that our committee Members have forcefully *supported* the IC's current counterterrorist campaign. Far too much is already publicly known about this campaign, but if and when the full story is actually told, it must be made clear that what has occurred has been undertaken with the knowledge and support of the oversight organs of our national legislature.

2.    *Oversight Challenges*

Perhaps in part because of frustrations with the existing covert action system, it has been widely reported that the Defense Department is interested in augmenting a quasi-covert action capability of its own, based upon its highly competent cadre of special operations forces (SOF).[165]  If this parallel system works, I wish it well: the covert action side of the war on terrorism could certainly use the manpower and expertise.  It is worth emphasizing, however, that a greater DOD involvement in the world of covert action could present oversight challenges

---

[165]    *See, e.g.*, Schmidt & Ricks, *supra.*

for Congress.

The oversight mechanism and reporting requirements for covert action contained in 50 U.S.C. §§ 413b, of course, operate in a *functional* basis rather than an agency-specific one. The law does not require that only the CIA conduct covert action: rather, the President can designate any government entity for this purpose if he sees fit. DOD forces conducting covert action-type operations against Al-Qa'ida, however, may be harder for Congress to oversee if the Defense Department decides to treat attacks on Al-Qa'ida and affiliated terrorist networks as part of its "wartime" *operational* responsibilities rather than as part of covert action policy.

Like the rules in Executive Order 12,333 regarding "assassination," some might argue that "covert action" is a conceptual category more appropriate to times of "peace" in which special restrictions and oversight rules are crafted to oversee the government's employment of certain somewhat sinister policy tools. By this argument, operational conduct in attacking "enemy" forces in time of "war" is something else entirely – and is not something into which Congress has traditionally enjoyed any meaningful visibility, let alone had "oversight"responsibilities. In truth, such questions are legal matters of first impression, because the federal laws governing covert action were not yet in place the last time we faced a bitter war of indefinite duration against a global enemy. How exactly the line is drawn between "covert action" oversight and "operational" opacity, therefore, remains to be determined. The 108th Congress should watch these issues carefully, for the oversight committees are the only real "check" our constitutional scheme provides in these areas. We should take care that any alleged covert action "exception" does not swallow its rule.

131

## VII.    *Accountability*

The story of September 11 is one replete with failures: to share information, to coordinate with other agencies; to understand the law, follow existing rules and procedures, and use available legal authorities in order to accomplish vital goals; to devote or redirect sufficient resources and personnel to counterterrorism work; to communicate priorities clearly and effectively to IC components; to take seriously the crucial work of strategic counterterrorism analysis; and most importantly, to rise above parochial bureaucratic interests in the name of protecting the American people from terrorist attack.

One of the mandates of this inquiry has been to "lay a basis for assessing the accountability of institutions and officials of government"[166] by identifying any problems and failings within the Intelligence Community that helped leave us unprepared for the terrorist attacks.  The Joint Inquiry's recommendations call for the agency Inspectors General to

> "review the factual findings and the record of this Inquiry and
> conduct investigations and reviews as necessary to determine
> whether and to what extent Intelligence Community personnel at
> all levels should be held accountable for any omission,
> commission, or failure to meet professional standards in regard to
> the identification, prevention, or disruption of terrorist attacks,
> including the events of September 11, 2001."

---

[166]    SSCI & HPSCI, "Initial Scope of Joint Inquiry" (June 5, 2002), from the preamble.

The DCI has declared us to be at "war" against Al-Qa'ida since 1998, and as the President has declared, we have really been so since at least September 11.  Some have suggested that this means that we should postpone holding anyone accountable within the Intelligence Community until this war is over and the threat recedes.  I respectfully disagree.

The threat we face today is, unfortunately, in no danger of subsiding any time soon, and the problems our Intelligence Community faces are not ones wisely left unaddressed any longer.  Indeed, it is precisely *because* we face a grave and ongoing threat that we must begin reforming the Community immediately.  Otherwise we will simply be unable to meet this threat.  The metaphor of "war" is instructive in this regard, inasmuch as wise generals should not – and historically do not – hesitate to hold their subordinates accountable while the battle still rages, disciplining or cashiering those who fail to do their duty.  So also do wise Presidents dispose of their faltering generals under fire.  As the fabric of military law makes clear, failures in wartime are traditionally considered less excusable, and are punished more severely, than failures in times of peace.  If we are indeed at war, accountability is more important now than ever, for it is through insisting upon accountability that life-threatening problems may best be fixed.

Nor should we forget that accountability has two sides.  It is also a core responsibility of all good leaders to reward those who perform well, and promote them to positions of ever greater responsibility.  In urging the Intelligence Community to hold its employees accountable, the IC must therefore both discipline those who fall down on the job and reward those who have excelled.  For officials charged with protecting our national security and keeping Americans safe from attack, professional advancement should proceed by Darwinian selection.

For these reasons, it is disappointing to me that despite the Joint Inquiry's explicit

133

mandate to "lay a basis for assessing the accountability of institutions and officials of government" and despite its extensive findings documenting recurring and widespread Community shortcomings in the months and years leading up to September 11, the Joint Inquiry has not seen fit to identify *any* of the persons whose decisions left us so unprepared. Careful readers of the Joint Inquiry's findings will be left with little doubt as to the identities of at least some of the officials responsible. It is unfortunate, however, that the Joint Inquiry has shied away from its oversight responsibilities in refusing to provide more of the accountability to which we ask the IC to subject itself. I thus urge President Bush carefully to examine the Joint Inquiry's findings in order to determine the extent to which he has been well served by his "generals" in the Intelligence Community.

Some have argued that we should avoid this issue of accountability lest we encourage the development of a worse climate of intra-Community risk-aversion and legal timorousness than the Committees have already seen during the 1990s. I do not believe this is the case. To begin with, the failings leading up to September 11 were not ones of impetuousness, the punishment for which might indeed discourage the risk-taking inherent in and necessary to good intelligence work. The failures of September 11 were generally ones not of reckless *commission* but rather of nervous *omission*. They were failures to take the necessary steps to rise above petty parochial interests and concerns in the service of the common good. These are not failings that will be exacerbated by accountability. Quite the contrary. And, more importantly, it is clear that without real accountability, these many problems will simply remain unaddressed – leaving us terribly and needlessly vulnerable in the future.

By no means do I advocate a crusade to hold low-level employees accountable for the failures of September 11. There clearly were some individual failings, but for the most part our

hard-working and dedicated intelligence professionals did very well, given the limited tools and resources they received and the constricting institutional culture and policy guidance they faced. The IC's rank-and-file deserve no discredit for resource decisions and for creating these policies.

Ultimately, as the findings of the Joint Inquiry make clear – though they carefully stop short of saying so explicitly – accountability must begin with those whose job it was to steer the IC and its constituent agencies through these shoals, and to ensure that all of them cooperated to the best of their abilities in protecting our national security. Responsibility must lie with the leaders who took so little action for so long, to address problems so well known. In this context, we must not be afraid publicly to name names, and I do so here. The U.S. Intelligence Community would have been far better prepared for September 11 but for the failure of successive agency leaders to work wholeheartedly to overcome the institutional and cultural obstacles to inter-agency cooperation and coordination that bedeviled counterterrorism efforts before the attacks: DCIs George Tenet and John Deutch, FBI Director Louis Freeh, and NSA Directors Michael Hayden and Kenneth Minnihan, and former NSA Deputy Director Barbara McNamara. These individuals are not responsible for the disaster of September 11, of course, for that infamy belongs to Al-Qa'ida's 19 suicide hijackers and the terrorist infrastructure that supported them. As the leaders of the United States Intelligence Community, however, these officials failed in significant ways to ensure that this country was as prepared as it could have been.

135

ADDITIONAL VIEWS OF REPRESENTATIVE MIKE CASTLE (R-DELAWARE)
TO BE APPENDED TO THE REPORT OF THE JOINT INQUIRY
ON THE SEPTEMBER 11, 2001 TERRORIST ATTACKS ON THE UNITED STATES

I fully support the findings and recommendations that were debated and approved by the Members and Senators serving on the Joint Inquiry on the September 11, 2001 terrorist attacks on the United States.  As the outgoing Chairman of HPSCI's Technical and Tactical Subcommittee, I want to communicate my strong support for Recommendation 10 concerning the National Security Agency's past performance and future role in the global war on terrorism. Specifically, the Joint Inquiry's Recommendation 10 mandates a report from the Director of the National Security Agency to the House and Senate Intelligence Committees no later than June 30, 2003 that will provide the following: (1) a description of solutions for the technological challenges confronting the NSA in the war on terrorism; (2) a quarterly review of the goals, products to be delivered, funding levels, and schedules for every NSA technology development program so as to ensure strict accountability for NSA program expenditures; (3) the implementation by NSA, CIA and FBI of a strategy to fully integrate these agencies' collection and analytic capabilities in the war on terrorism; and (4) the development of legislative proposals to improve NSA's coordination and collaboration with other elements of the U.S. Intelligence Community.

Although the issue of visa issuances and control was not within the scope and jurisdiction of the Joint Inquiry's review, we did review some information that gave us a glimpse into this issue.  As a result, I am very concerned that significant reforms need to be implemented immediately with respect to the management, coordination and oversight of our Nation's visa program.  The visa program has suffered from a lack of accountability, unclear lines of bureaucratic responsibility between the Departments of State and Justice, and contradictory legal authorities. The State Department's Bureau of Consular Affairs and the Justice Department's Immigration and Naturalization Service have joint responsibility for the management of our visa program, yet this program's administration has been characterized by poor management practices, uneven enforcement policies, and inadequate coordination between these agencies and other elements of the U.S. intelligence and law enforcement communities. The majority of the

September 11th hijackers were wrongly admitted to the United States -- in violation of U.S. immigration laws -- as a result of decisions made and errors committed by responsible State Department and Justice Department officers. The fact that many of them entered and operated in true name, further emphasizes the extent to which the current system is broken.

Entry of foreign nationals into the United States is a privilege that demands clear authorities to determine who may legally enter the United States with a visa, accurate information on all visa applicants that is fully shared between the relevant agency decisionmakers, and full accountability to ensure that the requirements of consular and immigration law are properly enforced.

Equally troubling is our government's inability to properly account for foreign nationals who overstay the authorized period of their visas.  These foreign nationals are in violation of our immigration laws and should be held legally accountable.  Although the recently enacted Department of Homeland Security bill addresses the need for visa reform, I strongly believe that significant legislative changes are urgently needed to redirect and reorganize our national visa policies.

ADDITIONAL COMMENTS
JOINT INQUIRY STAFF REPORT
U.S. SENATOR MIKE DEWINE
DECEMBER 18, 2002

My purpose in providing these additional comments is to express my support for certain recommendations, my reservations regarding others, and my concerns about key intelligence areas that simply are not addressed in the report's recommendations.  Accordingly I have identified several areas of this report that merit additional comment.

**INCREASE RESOURCES**

The tragic September 11th terrorist attacks represent a massive intelligence failure.  Congress and past Administrations, over a period of many years, failed to provide adequate resources to the Intelligence Community.   To avert future attacks and improve the security of this nation, in the weeks and months and years ahead, we will need to invest a considerable amount of time and resources in making up for decades of shortfalls in our commitment to intelligence.  That will necessitate an on-going, continuous, sustained effort ultimately aimed at reforming the Intelligence Community.

**FISA CHANGES**

FISA is one of the primary weapons we have in our war on terrorism, and it is crucial that the Intelligence Community be able to use it aggressively and effectively.  The recent Court of Review decision is an important clarification, which should allow the Intelligence Community to confer and coordinate more effectively with law enforcement officials.  Nonetheless, the report makes a major omission by failing to recommend any further enhancements to the FISA statute.

**<u>FISA -- Amend and Make Stronger</u>**

1

It is important that we continue to refine and improve the FISA statute, and consequently, I believe that Congress should adopt the proposed Kyl/Schumer amendment to FISA and the proposed DeWine amendment to FISA.

The Kyl/Schumer amendment would remove the requirement that the subject suspected of international terrorism be affiliated with a "group engaged in international terrorism or activities in preparation therefore."  This change would allow the surveillance of individuals who are not affiliated with any terrorist group and would give the government another weapon to terrorists, who act alone.

The DeWine amendment would lessen the burden on the government by changing the standard for showing that a proposed FISA target is "a foreign power or agent of a foreign power." Rather than the current "probable cause" standard, the amendment applies a "reasonable suspicion" standard.  Both standards require the court to apply a "totality of the circumstances" test and examine all the various factors to determine if the government has met its burden.  But the reasonable suspicion standard is slightly easier to satisfy, and that is appropriate, because these cases involve national security interests.  Under such dangerous circumstances, it is appropriate to balance the competing interests in a slightly different way than usual, and make it a little bit easier for the law enforcement interest to prevail.  Such a change would make it a little more likely that FISA surveillance is permitted and would make it more likely that FISA can effectively be used in the war on terrorism.  For example, in the case of the Moussaoui investigation, there was some uncertainty about whether the facts were sufficient to find probable cause, and so the Justice Department did not apply for a FISA warrant (However, under any legitimate reading of the facts in Moussaoui, the government could have met a reasonable suspicion standard and most likely would have asked for and received surveillance authority.).

## FISA -- Congressional Oversight

In addition to these and other enhancements to FISA, it is important that Congress improve the quality and quantity of oversight with regard to FISA.  There are two separate and distinct reasons for this.  First, as the recent Court of Review opinion made clear, in recent years, the

FISC has imposed on the Justice Department a set of <u>court-created</u> FISA rules that have unnecessarily limited the use of the FISA statute.[1]  More vigorous and informed Congressional oversight might have prevented those limitations from being imposed.

Furthermore, the Intelligence Committees should hold regularly scheduled hearings to examine the FISA process and receive testimony from senior officials at OIPR and the FBI.  These hearings should explore the FISA process and provide information as to how FISA is being implemented.  For example, in order to better determine how the Executive Branch is utilizing FISA, the Committee should examine the number of FISA warrants issued during a given period of time and the general subject matter or issues those warrants were meant to address.  Furthermore, these hearings should be used to explore a wide range of hypothetical situations -- situations based on actual cases that demonstrate to the Committee how the law would be applied in certain scenarios.  This would allow the Committee to develop a better understanding of how FISA is being implemented in a practical, day-to-day manner and also alert the Committee to any instances where the FISC or Justice Department is departing from Congressional intent.

---

[1] As originally drafted in 1978, FISA allowed surveillance when "the purpose" of that surveillance was to obtain "foreign intelligence information," which is defined, essentially, as information the government needs to protect against attack, sabotage, clandestine intelligence activities, or international terrorism. Over the years, the FISC interpreted "the purpose" to mean "the primary purpose," and interpreted "foreign intelligence information" to mean information that the government needs to protect itself against attack, sabotage, etc., <u>using methods other than law enforcement</u>.  So, the FISC took the view that using a FISA warrant to obtain foreign intelligence information that was primarily for use as part of an intelligence strategy, (e.g., to flip a spy) was legitimate; using a FISA warrant to obtain information that was primarily for use as part of a law enforcement strategy (e.g., prosecution) was not legitimate.

One of the indicia used by the FISC to determine whether the primary purpose was intelligence (legitimate) or law enforcement (not legitimate) was the degree of involvement by law enforcement agents in the investigation and FISA application process.  Accordingly, the Justice Department, with the approval of the FISC, adopted very restrictive guidelines to minimize law enforcement contact with intelligence officers.

After the passage of the Patriot Act, the Justice Department litigated the issue of how much contact is allowed between intelligence agents and law enforcement officials, and on appeal, the Foreign Intelligence Surveillance Court of Review overruled the FISC.  The Court of Review held that FISA, as originally drafted, did not contain any distinction between foreign intelligence information utilized as part of an intelligence strategy and foreign intelligence information used as part of a law enforcement strategy. Accordingly, the Justice Guidelines strictly limiting contact between law enforcement agents and intelligence officers have never been necessary. It is interesting to note that the Court of Review found that the Patriot Act actually <u>created</u> a distinction between law enforcement use and intelligence use of FISA information.  However, because of other modifications in the Patriot Act, the Justice Department is still free from earlier, FISC-created limitations on contact between intelligence officers and law enforcement.

**FISA -- Protecting Civil Liberties**

The second reason enhanced Congressional oversight is important is because it would provide increased protection of the civil liberties of potential FISA surveillance targets.  The FISA process, rightfully so, is highly secretive and not subject to the usual procedural protections built into most other courtroom proceedings.  Accordingly, it is particularly important that the Intelligence Committee provide oversight to assure that the FISA process is not being abused, especially now, as we look for ways to enhance and further utilize it in the war against terrorism.

In doing so, the Intelligence Committee should consider whether or not the current FISA process provides adequate legal representation for the legal position of potential subject of surveillance.  The inherently *ex parte* nature of the application process raises concerns about civil liberties and may have the counterintuitive effect of making the FISC and even the prosecutors reluctant to use FISA to the full extent allowed by law.  Congress should consider whether it could be useful to provide authority to the FISC and to the Court of Review to appoint, on a case-by-case basis, an advocate for the subject.  The advocate could be one of a number of pre-cleared attorneys with prior FISA experience, who could serve as a defense attorney on a limited number of cases, where the FISC or Court of Review felt it would be useful.[2]

**EMPOWERING THE HEAD OF THE INTELLIGENCE COMMUNITY**

I believe we need to create a cabinet-level intelligence position -- a director of intelligence, who is ultimately responsible for control of the budgets and operations of the overall Intelligence Community.  While most experts seem to agree that we need to strengthen the head of national intelligence -- whether that is the DCI or the DNI or some other cabinet-level position -- there is less agreement as to how we go about doing this.  My own view is that there are two critical things to keep in mind if we empower the head of national intelligence: First, we need to give the DCI complete budget authority, and second, we need to keep the DCI as the head of the CIA.

---

[2] These advocates would not contact nor inform the subject of the potential surveillance about the proceedings. Instead, they would act as officers of the court, representing the legal position in opposition to the Justice Department's application for a FISA warrant.

**Budget Authority**

The DCI already has authority to review and approve budgets, personnel, and resources for virtually every aspect of the national intelligence program.  Yet, despite this authority, the DCI still actually controls only about 15 to 20 percent of the actual intelligence budget.  It is not surprising that as a result, he has been unable to provide necessary leadership within the Intelligence Community, as exemplified by DCI's inability to fully mobilize the Intelligence Community in response to his "declaration of war" on al Qaeda.  The DCI has understood the terrorist danger as much as any human being could; yet he didn't have command of all the troops, so to speak, to get the job done.  That's why the DCI needs the authority both to manage and oversee the execution of the Intelligence Community budgets.

**The DCI as Head of the CIA**

The report's recommendation to separate the positions of DCI and head of the CIA is likely to be counterproductive.  A number of experts agree with this proposition.  During the open hearings just completed in the intelligence committee Judge Webster, the former head of the CIA and the former head of the FBI, said, in reaction to the suggestion to split the DCI from the CIA:  "I would strengthen the DCI. I would not have a head of the national intelligence unless that [head of] national intelligence was actually running something."

In his written testimony to the Committee, Anthony Lake, former National Security Advisor, also supported maintaining the CIA under DCI control.  Furthermore, the 2001 Hart-Rudman Commission report took this position, as did the 104th Congress House Intelligence Committee staff report, which stated: "Indeed, the testimony of former DCIs and other former senior IC officials all concur that the DCI needs an agency 'of his own' -- i.e., the CIA -- if he is to have any real power within the IC."

At this stage, the operational authority vested in the head of the CIA comprises a substantial amount of the power of the DCI.  Removal of that authority now would separate him from his

operational base and significantly dilute the power of the DCI, at a time when it is not clear that the requisite budgetary authority will, in fact, be conferred upon the office of DCI.

**OPEN-SOURCE INFORMATION**

In another important area, the Intelligence Community needs to pay more attention to the collection and analysis of open-source information.  This type of information needs to be examined and needs to be taken more seriously.  We must remember that open-source information was used to warn investigators in 1999 that al-Qaeda terrorists might fly a hijacked airliner into American buildings.  Library of Congress analyst, Rex Hudson, wrote a report for the National Security Council -- based entirely on unclassified material -- which noted the possibility of almost exactly the kind of attack that occurred on September 11th.  Hudson concluded: "Suicide bombers belonging to al-Qaeda's Martyrdom Battalion could crash an aircraft packed with high explosives into the Pentagon, the headquarters of the CIA, or the White House."

The Intelligence Community is simply not accustomed to assessing the value of open sources nor is it used to integrating them into their work.  In fact, the Intelligence Community is more inclined to use open-source material as a last resort, not as a primary source, no matter how compelling the information. This attitude needs to change, and the Community must re-evaluate how it prioritizes open-source material that ultimately can be of extraordinary value, either by itself or as a mechanism to refine or evaluate other intelligence.

**REPORTS**

I am also concerned that the Intelligence Community is not being informed about a number of important intelligence issues because of delays in the issuance of requested reports.  Part of the problem is that the Senate and House Intelligence Committees are asking for too many unnecessary reports.  Compounding that, the Intelligence Community has been slow in the production of the reports, themselves, though in the recent past, the Community has started producing many of these required reports in a more timely fashion.  Still a lag remains.  To help

remedy that, the Intelligence Committees should continue to discuss with the Intelligence Community the status of the currently requested reports and determine which ones are necessary, eliminating those report requests that are not absolutely essential and ensuring that the ones required do, in fact, get generated and issued to the Committees.

## MULTI-LEVEL SECURITY CAPABILITY

One of the most significant problems examined during the open hearings was the lack of information sharing between agencies.  In assessing that area of concern, the Intelligence Community needs to figure out how agencies and intelligence personnel can better share and disseminate important information, while still protecting that information from getting into the wrong hands.  A relatively simple way to address this would be through the use of a technology known as "multi-level security" capability.  Basically, the use of multi-level security allows computer users with different levels of security classification to get different levels of access to information contained and stored in a comprehensive intelligence database.  In other words, database users would be able to access only the information in the database that their security clearances allow them to view.

This would allow the myriad intelligence agencies to safely combine all of their databases, including those containing the most sensitive data and make the entire combined database accessible to a wide range of intelligence and law enforcement personnel, without sacrificing security for the most highly classified data.  For example, a detective in Cincinnati who notices unusual activity around city hall could do a search of the comprehensive Community-wide database for "city halls in Ohio" and come up with some non-classified FBI information about possible attacks on city halls around the state or in other states.  He then also would get a notification from the system that there was more information about that topic, but that it was classified at a level above his clearance.  At that point, he could go to his supervisor and begin the process of having that information sent to someone within the department who has the appropriate level of clearance.  This would help resolve one of the many information-sharing problems facing the Intelligence Community.

**REFORMING HUMAN INTELLIGENCE COLLECTION (HUMINT)**

U.S. Human Intelligence collection organizations are unable to penetrate organizations like Al Qaeda because they are not properly organized for the task and have become too risk averse to undertake the kind of dangerous operations required for success.  A new organization must be built from the ground up as a small, agile, and adaptive organization with a corporate culture of taking prudent risks.  It would have a limited list of targets: terrorists, proliferators, and "rogue states."  Creating a new organization has the advantage of creating a capability to directly target organizations like Al Qaeda better than is possible today, yet without undermining the strengths of the existing HUMINT organizations.

**<u>A Broken Corporate Culture</u>**

With a few exceptions, the current structure of the HUMINT community remains based on the official cover system used during the Cold War to fight the largely static Soviet threat.  Official cover is when a clandestine intelligence officer appears to work as an employee of another U.S. government agency.  Many of the Soviet officers and officials we were trying to recruit during the Cold War associated with U.S. government officials in the course of their normal duties, so it made sense to put our HUMINT collectors in roles where they were likely to encounter their targets in the course of their "ordinary" daily work.  The problem is that while the foreign threat has changed since the end of the Cold War, too many U.S. clandestine HUMINT collectors still work under official cover.  The work they do in this capacity is important, but it does not offer the full range of capabilities to go after targets such as proliferators or terrorist organizations like Al Qaeda that do not knowingly associate with U.S. government officials.  Nobody openly associated with any element of the U.S. government is going to be able to get close to an organization like Al Qaeda, so an official cover is of little use against these targets.  The best "platforms" for targeting groups like Al Qaeda are *non*-official cover operations, or NOC's.   A non-official cover is when a clandestine officer appears to be a private citizen without any U.S. government affiliation, typically operating under the cover of a legitimate commercial enterprise.

8

Clandestine human intelligence collection operations under non-official cover (NOC) are very difficult to detect and the U.S. Intelligence Community acknowledges that they are the best platform for working against targets like Al Qaeda.   U.S. intelligence entities like the CIA's Directorate of Operations (CIA/DO) have been unable, however, to transform their organizations to employ fully the range of possibilities offered by NOC operations.  The primary obstacle is a corporate culture problem – lighter covers (such as official cover) tend to "crowd out" deep covers (such as non-official cover).  What this means is that in a clandestine human intelligence collection agency that starts out with a good balance of official and non-official covers, the agency will eventually phase out most of its NOC's in lieu of official cover operations.[3]  The reason this happens is two fold: First, many clandestine officers prefer the lifestyle offered by the official cover assignments over NOC assignments, and second, supervisors prefer subordinates who are under official cover where they can be more easily managed.

Clandestine officers prefer official cover assignments because working as a NOC officer is a difficult life-style.  NOC's are paid the same government salary as their colleagues under official cover, but they get few of the comforts available to those under official cover and none of the legal protections.  NOC's have to spend most of their time abroad, and will not be able to meet and network with most of their colleagues in the Agency.  Meanwhile, their peers under official cover can interact and network with other agency colleagues, leading to steady promotions and better assignments.  Relative to official cover, non-official cover assignments also offer less prestige, safety and comfort, and involve a less family-friendly lifestyle.[4]

Not only do clandestine officers generally not want to serve as NOC's, but their managers do not want to use them because officers under official cover are much easier to manage than a NOC.  A NOC requires much more elaborate and difficult operational security measures (also known as tradecraft).  Another big reason managers do not like using officers under non-official cover is risk aversion: NOC officers are not protected by diplomatic immunity.  It is one thing to have an official cover employee declared *persona non grata* and expelled from the country; it's quite another to have him arrested and shot.  Official cover operations are too deeply entrenched in the

---

[3] Bruce Berkowitz, "Deep Cover," Hoover Digest, Fall, 2002.
[4] Bruce Berkowitz, "Deep Cover, " Hoover Digest, Fall, 2002

organizational structure, personnel system, and tradecraft of intelligence entities like CIA, and their organizations have developed incentives and procedures that make it hard to adopt NOC operations on a larger scale.

## A Broken Cover System

The Central Intelligence Agency's Directorate of Operations' (CIA/DO) official cover system has been well known, both in and out of the agency, as a significant operational vulnerability for many years.  Foreign intelligence services are all too familiar with the CIA's official cover system, which suffers from the fact that it is not difficult for sophisticated observers to distinguish CIA officers from actual officers of other U.S. government agencies.  The current system of official cover largely amounts to little more than a non-attribution system similar to that used by journalists in Washington, D.C.: it is clear who the intelligence officers are, but diplomatic manners usually preclude saying so.  This system works for the bulk of CIA operations, which involve liaison contacts with foreign intelligence services and working with "walk-in" sources (in which the source approaches the agency, not vice versa).  In both types of work, the CIA's sources know who they are dealing with and need to know where to go to find them, which makes official cover an excellent fit.  This does not work, however, when trying to recruit hard targets such as members of Al Qaeda's inner circle, who do not associate with U.S. government officials.

The state of our non-official cover (NOC) system is no better.  U.S. intelligence's NOC programs have been damaged by half-hearted execution of operational security measures and under-utilization by managers.  The U.S. Intelligence Community is well aware of these significant problems but takes little action to fix them because effective cover is not critical to the way our HUMINT agencies currently do business.  Too often content to work with foreign liaison intelligence services and accept walk-ins, HUMINT managers generally do not go after difficult targets, and thus feel they do not need the tools that an effective cover provides.

Even beyond the limitations imposed by a system made up of mostly official cover assignments, the existing HUMINT agencies are further limited by a corporate culture that has become

excessively risk-averse.  For example, despite all the  advantages of a career under official cover as compared to non-official cover, the average CIA/DO employee still doesn't spend a significant amount of time overseas.  Only about 35 percent of CIA/DO employees have spent more than 3 out of the last 10 years overseas.  This low ratio indicates that the wrong mindset now dominates what is supposed to be an overseas clandestine service.

### The Solution – A New OSS

The answer to the problems described above is to create an environment in which the aggressive non-official cover operations we need to be conducting are not "crowded out" by official cover operations.  A small agile and adaptive organization should be built, along the lines of the Office of Strategic Services (OSS) in World War II, chartered with a corporate culture of taking prudent risks, and operating exclusively from non-official cover (NOC) platforms.  This would be a small organization that would augment the existing HUMINT agencies and work against a limited list of targets: terrorists, proliferators and "rogue states."  This organization could be created within an existing HUMINT agency like the CIA or the Defense HUMINT Service (DHS), but creating it as an independent agency would help avoid the possibility that its aggressive non-official cover operations would be "crowded out" by the official cover operations being conducted in these agencies.  Creating an independent agency would also avoid the possibility that it would be held back by the culture of risk aversion that exists in agencies like the CIA and the DHS.   Another possibility is to create the organization as an independent agency of the Department of Defense.

- Creating a new organization has the advantage of creating a capability to directly target organizations like Al Qaeda without undermining the strengths of the existing HUMINT organizations.  For example, two of CIA/DO's strengths are their work with foreign liaison intelligence services and taking "walk in" sources.  These are important missions that would not be compatible with a new organization operating exclusively under non-official covers.  Thus, there is both room for, and a need for, both CIA/DO and a new organization that operates exclusively from non-official cover collection platforms.

- This new organization should use bolder, more innovative non-official covers than have been typically employed by entities like CIA/DO, which typically operates under the cover of a commercial enterprise.

- To be successful, during its initial build-up this organization may have to have full access to CIA, the Defense HUMINT Service (DHS) and FBI data about both their employees and sources to select candidates to work in and for the new agency, and the authority to "grab" sources and interview employees for this new high priority program.  In terms of the terrorism target, FBI's many low level sources and contacts in the U.S. and international Islamic community may be most productive.

- The new agency would also need to have a significant level of independence in order to avoid being strangled at birth.  The agency would have to keep selected personnel in the other HUMINT agencies informed of its activities but it would have primacy in matters concerning terrorism, proliferation or rogue states and would not need to seek CIA approval to recruit new sources.

- Operating under a corporate culture of taking prudent risks, particularly when working under non-official cover could subject employees to significant danger.   This is, however, a necessary risk in light of the clear and present threat posed by terrorism and proliferation.   Our elite military special-forces units, such as the U.S. Navy Seals, sustain injuries and deaths every year as a result of training alone, not to mention casualties sustained in combat.  These injuries and deaths aren't the result of reckless behavior – our special forces are the best in the world because they train like they fight.  These casualties are the result of prudent risks that were willingly accepted and clearly understood by everyone involved, in order to produce the best special-forces that will be well trained when we need them.  The work of this new HUMINT agency would be no less important and we should be willing to accept a similar level of risk.

- This new organization should be chartered and resourced to leverage advanced technologies to aid all aspects of their work.  Advanced equipment and software can

allow officers to covertly communicate no matter where their work takes them and support their non-official covers over decades.  Such technology can also be used to ensure more timely delivery of intelligence to consumers such as military commanders.  Finally, the new organization should work closely with the National Security Agency and other organizations to use advanced technology to conduct technical penetrations of targets like Al Qaeda.

• This new agency should endeavor to learn from both the successes and failures of Israeli HUMINT efforts.  Their aggressive tactics and inventive use of non-official covers may serve as a useful guide for this new agency.  The Israelis have had notable successes in penetrating terrorist organizations and we should learn from their efforts.  The new agency may also want to consider some level of partnership with the Israeli HUMINT services, in light of the amount of overlap in the terrorism and proliferation threats to both our national interests.

• It should be acknowledged at the outset that the kind of aggressive, non-official cover operations described above would take a toll on the officers who conduct them and that many of them could experience "burn out" in as few as five to ten years.  The agency should be structured from the outset to accommodate this high turnover rate and provide pension, disability and placement services for officers who leave the service before reaching civil service retirement age.  It may be appropriate in some cases to place some of these officers under "lighter" cover at agencies like CIA/DO.

## A Longer Term Approach

The current HUMINT system is handicapped by a need to conduct operations that can deliver results within the span of an officer's three year tour in order to benefit the careers of both the HUMINT collector and his or her chain of command.  We must create in our Intelligence Community a culture and capability that allows the longer-term, unorthodox approaches to human intelligence collection required to combat organizations like Al Qaeda.  Rather than the current HUMINT system's typical three-year assignment under official cover and focused on a

geographical location, officers would be allowed to spend much longer periods of time moving from country to country at their own discretion to build up and reinforce their bone fides to support a non-official cover.

- A new HUMINT organization, like the above-proposed organization, could give its officers the autonomy to invest the years required and take the necessary risks to infiltrate organizations like Al Qaeda.  For example, an officer operating under non-official cover would be allowed to attend a radical mosque in the United States and over a period of months and years develop the range of contacts that would allow him to travel abroad, receive training in a radical Islamic terrorist training camp and infiltrate organizations like Al Qaeda.  Such an assignment would be undertaken with the understanding that it would not yield results for months or even years.  The current HUMINT system is averse to such an assignment that would involve allowing an officer to be out of contact with his chain of command for weeks and months at a time, and leave him continually exposed to grave danger in the course of the assignment.

U.S. clandestine human intelligence entities like the Central Intelligence Agency's Directorate of Operations (CIA/DO) themselves admit that they are not able to penetrate organizations like Al Qaeda.  This failure results from their reliance on an official cover system, which does not allow them to get close to Al Qaeda operatives.   Even if entities like the CIA/DO were able to build a substantial non-official cover capability, it would soon be "crowded out" by lighter cover operations, like official cover operations, because the corporate culture of these agencies has grown comfortable with the advantages of life under official cover.  A new independent organization, like the one proposed above, must be built from scratch in order to create a culture in which aggressive, non-official cover operations can flourish and not be "crowded out."  With this new organization focusing on aggressive non-official cover operations, the work that can be done from official cover, like liaison with foreign intelligence services and handling "walk-ins", would be left to existing entities like the CIA/DO that have expertise in this kind of work.

Such a new NOC organization, if created independent of existing HUMINT collection agencies like the CIA and operating in the "black" world, may also benefit from being removed from the

14

media spotlight and the politics that consume agencies like the CIA on a daily basis.  A bold venture like the new organization proposed above will require the latitude to learn by trial and error as it proceeds into largely uncharted territory.   The message must be delivered loud and clear that it is acceptable to fail on the way to success.  Oversight of this new entity by Congress and the Executive Branch, while ensuring that the agency operates within the law, also will need to focus on making sure that the agency remains aggressive and does not shy from taking prudent risks in order to ensure that a culture of risk aversion does not develop.  A new independent clandestine HUMINT agency may be the fresh start we need to break the pattern of failure that has prevented us penetrating groups like Al Qaeda.

**CONCLUSION**

In conclusion, I thank the Chairs of the Joint Committee for their leadership and work over the past several months, as we have reviewed and studied vast amounts of information regarding the September 11th terrorist attacks and the state of the Intelligence Community.  I also want to thank my fellow Senate and House Intelligence Committee colleagues and staffs, and the Joint Investigative staff for the countless hours spent on this inquiry.

Our nation's security -- the safety and protection of our loved ones -- is directly linked to the quality of the intelligence gathered and analyzed by the Community.  Good intelligence is what allows us to find the terrorists before they find us.  That's what good intelligence can do -- and reforming our methods of collecting, analyzing, and disseminating good intelligence is our aim in these recommendations and this report.

We must realize, though, that as this joint inquiry ends, our real work, as members of the House and Senate Intelligence Committees, just begins. There are many unresolved issues and areas which time did not permit the Joint Committee to fully and thoroughly investigate.  Furthermore, it is incumbent upon us, as Intelligence Committee members, and it is incumbent upon the entire Congress and the President to act on the report's recommendations.   We must not let this report sit idle.  We need to continue this critical national debate, even as the next commission begins its work.  We need to continue to hold hearings.  We need to introduce legislation that can help

remedy the shortfalls we have identified throughout this investigative process.   We need to be committed to an on-going, continuous, sustained effort to reform and fully fund the Intelligence Community.  As such, the issuance of this report must be viewed as a beginning -- not an end.

**Joint Inquiry Report**
**ADDITIONAL VIEWS**
**The Honorable Jane Harman**

The Joint Inquiry report is a strong product from a strong staff and unprecedented Congressional collaboration.  I strongly support this report.  It provides the most complete and comprehensive assessment of the plot behind the 9/11 terrorist attacks.  It identifies systemic and structural problems within the U.S. Intelligence Community that hampered the prevention of these attacks.  And, most important, it looks forward: it applies lessons learned to make recommendations critical to prevent further attacks.  Using the information in this report, the 108th Congress has a base on which to oversee, fund, reshape, and reform the intelligence functions of the federal government.

The additional views below supplement the report's findings and recommendations.

**Director of National Intelligence**

To date, the term "Intelligence Community" (IC) has been an oxymoron.  The community is really a collection of stovepipes working separately – often in conflicting or self-interested ways.

Creating a real Community requires a coherent approach across agencies and overarching leadership.  The recommendation aims to empower a Director of National Intelligence (DNI) to lead the community by pairing authority with responsibility.  The Director of Central Intelligence currently lacks the statutory authority to do this.

The DNI would also have the responsibility and accountability for bringing unity to the different intelligence collection and analysis functions.  The Director would allocate budget resources to provide people and technology where they are needed most, regardless of which federal department houses the agency.

All agree that the Administration, Congress, and the IC leadership must act together to foster a more innovative and less risk-averse intelligence culture.  The employees in intelligence

agencies today are hard-working, capable, and dedicated, but often lack the resources and tools they need to gather, process, analyze, and use information in today's digital environment.  In my view, these workers deserve the trust and appreciation of Congress and the nation, and should be encouraged and empowered to be imaginative, innovative, and collaborative in order to protect us from future attacks.

**Information Sharing**

The investigation revealed that significant intelligence leads about some of the hijackers were available but did not get widely shared.  This was less a willful refusal to share information than it was a failure to grasp its significance.  For example, the CIA and NSA had collected information on hijackers al Hazmi and al Mihdhar that connected them to bin Laden, the East Africa Embassy bombings, and the attack on the USS Cole.  The agencies also had information indicating that both men were in the United States.  The al Hazmi and al Mihdhar story shows what many analysts had claimed for years—the raw databases of CIA and NSA contain extremely valuable information that does not get noticed, shared, integrated, or acted upon.

Entities within the agencies that collect signals and human intelligence guard their "raw" data; few outside analysts are allowed access.  The NSA and CIA's Directorate of Operations typically insist that they alone, not even all-source intelligence analysts or other sophisticated consumers, possess the special expertise required to evaluate human or signals intelligence data.  Before sharing information, these entities go through an internal analysis process that "filters" out everything that does not seem to the analyst sufficiently important or reliable to report.  But as the al Hazmi and al Mihdhar cases demonstrate, analysts can fail to appreciate what might be important to potential consumers, who bring different perspectives and other sources of information.

There are powerful reasons why the entities within the CIA, NSA, and FBI that collect the raw data are so unwilling to allow access to outside analysts – even those within their parent agency.  Compartmentation of classified information is sometimes needed to protect sensitive sources and methods.  There is also a need to protect constitutionally-protected privacy rights.  For example,

NSA personnel are trained in "minimization" procedures to cordon off and protect the communications the agency intercepts.  The FBI, historically, has been very concerned to protect the integrity of actual or potential legal proceedings, causing its field offices to restrict access to its unreported information.

These obstacles to full exploitation of intelligence information hinder our national security, and must be overcome.  It should be feasible to clear all-source counterterrorism analysts to the same standards demanded of the human and signals intelligence collectors and train them in "minimization" procedures to protect the privacy of U.S. persons.

As intelligence agencies increasingly focus on homeland security, they must share information with state and local governments, first responder groups, private companies, and the American public.  To the extent possible, the intelligence community should create unclassified products that provide guidance for the appropriate responder groups to prevent or prepare for terrorist threats.  The IC must work with the Department of Homeland Security to match threat information with vulnerability assessments, and provide the new Department with the intelligence it needs to communicate to first responders what they should look for.

**Domestic Intelligence Collection**

The findings reflect problems in gathering and processing actionable intelligence about foreign terrorists on American soil.  Problems also exist for gathering and handling intelligence on Americans who assist foreign terrorists or plan terrorist plots.  The nature of the terrorist threat does not allow us the luxury of focusing abroad to learn of terrorist activity; we must recognize the existence of terrorist organizations within the United States and develop the capacity to uncover, infiltrate, and disrupt them while respecting the privacy and Constitutional rights of law abiding Americans.

The FBI is currently responsible for gathering intelligence within the United States, but is not adequately organized nor resourced to successfully meet this mission.  Notwithstanding efforts by FBI Director Mueller, the FBI does not have a robust counterterrorism capability, and there

are serious policy and legal questions in co-locating within one agency responsibility for domestic intelligence with law enforcement.  Intelligence is fundamentally predictive, based on assumptions, hypotheses, analyses, and forecasts; law enforcement is responsive, based on credible evidence.  These functions use different approaches and operating procedures and there is great risk that marrying the two will sacrifice one or both.

The report recommends further study and debate of a separate domestic intelligence agency, without law enforcement responsibility or authorization.  Such an entity would be modeled on Britain's MI-5, but would be tailored to reflect the U.S. federal system and civil rights laws.  Establishing a new agency is not a panacea; Congress must vest any new entity with authorities and safeguards following a national debate over the appropriate scope of domestic intelligence collection.

**Privacy and Civil Liberties**

Collecting information on U.S. citizens and foreign visitors in the United States raises serious civil liberty and privacy implications, and it is critical that Congress defend the freedoms and rights of Americans and others.  The report recommends continuing Congressional oversight of domestic intelligence authorities, including a review of the implementation of the Foreign Intelligence Surveillance Act and USA Patriot Act.

Within the Executive Branch, it is important that the position of Civil Rights and Civil Liberties Officer in the Department of Homeland Security be filled promptly by a senior and well-respected official so that protection of civil liberties is an integral part of homeland security planning and strategy, and not as an afterthought.

**Leaks**

Throughout the Joint Inquiry, I have expressed concern with what appear to be frequent leaks of classified intelligence information.  The public disclosure of sensitive intelligence information can have devastating effects on intelligence sources and methods needed to fight terrorism.  The

report recommends the President and agency heads take specific steps to prevent and appropriately punish the unauthorized disclosure of properly classified intelligence. The 108th Congress should demand updates on the measures recommended by the Attorney General in a report to the Congress in fall 2002.

**Conclusion**

Intelligence remains the key to preventing terrorist attacks. The IC has had many successes in uncovering and preventing attacks that, by necessity, go unreported and publicly unappreciated. But terrorists need to be successful only once to kill Americans and demonstrate the inherent vulnerabilities we face.

We have learned that despite considerable attention and significant efforts across and throughout the intelligence agencies in the summer of 2001, crucial information was not exploited, and organizational barriers in the IC blocked preventive action. Solutions to these problems involve forging a true "digital" community of intelligence agencies with strong leadership, overcoming entrenched bureaucratic and risk-averse cultures, and empowering our intelligence employees.

This report and these additional views are a basis for action in the 108th Congress. It will be my priority to see these improvements made.

JOINT INQUIRY STAFF REPORT

ADDITIONAL VIEWS

SENATOR JON KYL, SENATOR PAT ROBERTS

## I. The Need for Additional Views

The Report is a product of the Joint Inquiry Staff (JIS), not the Senators and Representatives who sit, respectively, on the Senate Select Committee on Intelligence (SSCI) and the House Permanent Select Committee on Intelligence (HPSCI). The Chairman and Vice Chairman of the SSCI and the Chairman and Ranking Member of the HPSCI (the "Big Four") made most decisions and supervised the JIS. The JIS should be commended for putting together the first official account of the events leading up to the terrorist attacks of September 11, 2001.

It is difficult, however, for rank-and-file Members of the two committees to know how thorough or accurate the Report is because of the way the JIS and the "Big Four" conducted the inquiry, withholding information and decisions from the Members and SSCI and HPSCI staff throughout the process. While the Report should be a useful historical document on which to base further inquiries, we cannot vouch for its contents.

Beyond that, the investigation was deficient for what it did not include. While intelligence community failures were identified, they were presented frequently in a mode of "mistakes were made" rather than as the beginning of an inquiry as to why they were made.

After prodding by several Senators, some underlying causes of these failures were identified, but even then, they were not further probed to determine what might have been done differently. And the fact that the prodding was necessary illustrates our concern that the JIS either ran out of time or did not have the inclination or instruction to examine, for instance, why U.S. government agencies were risk-averse, who is responsible for the inadequate resources devoted to counter-terrorism efforts, why legal authorities were so confusing, and why leadership was so lacking. Without this examination, the Report will be of limited value in determining "lessons learned."

The record should also reflect some of the differences in opinion among Members on how the Report was (or should have been) prepared. The inquiry was conducted and overseen in

1

a way that left rank-and-file Members at a distinct disadvantage, and left insufficient time to examine many relevant issues. The final draft of the Report -- which is several hundred pages long and highly classified -- was delivered to Members four days before the one and only meeting scheduled for its consideration, when most Members were out of town. There was no debate about the Report, only about the Recommendations. But there was little basis for debate since the product was strictly the work of the JIS -- more like an Inspector General's report than a typical congressional committee report. Throughout the process, rank-and-file Members complained about irregularities. Specific examples include:

·     Upon instructions from the Chairmen -- and in violation of SSCI rules -- the JIS often failed to tell Members and staff of important non-compartment information it discovered in a timely manner.

·     Information relating to open hearings -- such as the JIS staff statement and witness statements -- were routinely provided only late on the night before the hearing.

·     Committee staff, and sometimes even the staff directors, were often excluded from meetings of the "Big Four," whose decisions were often made without consultation. Members' liaison staff, and, therefore, the Members themselves, were in the dark about these decisions.

·     Despite repeated requests, records of JIS interviews with key witnesses conducted in the spring were not made available to committee staff for review until fall, when the final draft report was already in the late drafting stages.

·     Over the strong objections of several Members, and key officials of the intelligence community, the "Big Four" scheduled a series of open hearings that sidetracked the ongoing investigation from mid-July to late October.

Here is a representative example of the lack of meaningful rank-and-file input into "Big

Four" decisions: During the JIS hearing of September 24, 2002 on "U.S. Government Counter-Terrorism Organizations and the Evolution of the Terrorist Threat," Chairman Goss asked unanimous consent to include in the record several documents relating to that day's hearing. However, among these documents were requests to the administration regarding its decision not to declassify certain information. These requests from the "Big Four" were made without consultation with the rank-and-file Members -- a fact that Senator Kyl noted for the record at that time. He stated: "Mr. Chairman, I have no objection, but I would like the record to note that the matter that the four of you spoke to is not a matter that has been discussed by the full membership of the committee. Therefore, at least I for one am in no position to judge whether the requests that you have made are warranted or not."

The holding of open hearings was particularly frustrating. The decision to hold them was apparently made by the "Big Four" despite the concerns of the JIS and the objections of other Senators. The JIS was forced to focus on them for three months, and from there had to go right into drafting the Report in order to meet the year-end deadline.

Several Members voiced their opposition to holding open hearings before the investigative work was completed and the Report written (and, we had supposed, agreed to). We objected, mostly in closed committee business meetings, that it was premature to convene open hearings before the investigation was complete. And indeed, at the point when the JIS began preparing for them (July, 2002), its investigations into the causes of 9/11 largely ground to a halt. Due to dramatic media leaks and the potential for further compromise, intelligence agencies "pushed back" against open hearings, causing further friction with the JIS investigation.

The hearings distracted these agencies, our "front line troops" on the war on terrorism, and they distracted Members and congressional staff from our traditional oversight responsibilities. They also, in our view and the view of Vice Chairman Shelby, publicly revealed a lot of sensitive information from which our enemies could profit. Most of the information presented had already been revealed in closed hearings, which were far more productive because those who participated could delve freely into classified information.

Key figures in our counter-terrorism efforts were unnecessarily compromised by these public hearings. A case in point is the Arizona resident whose identity came out in the media.

3

His name and face were even broadcast on Al-Jazeera. His family was harassed and was potentially in danger from extremists. Our hard-working people deserve better treatment than that. We should have been more circumspect about publicly releasing results before the investigation was complete and the two intelligence committees had had a chance to adequately review the final Report.

## II. Deficiencies in the Report

These inadequacies in the process resulted in a Report that falls well short of addressing the core problems that led to 9/11. Because the fundamental problems that led to 9/11 are almost certainly rooted in poor policy and inadequate leadership, the investigation should have delved more deeply into conflicting interpretations of legal authorities (including presidential directives), budget allocations, institutional attitudes, and other key areas. Only penetrating these areas will tell us how policymakers, including Congress, contributed to the failures the Report identifies. In other words, only such a thorough exercise will help us to make sure the failures are not repeated.

What best shows the tendency of the JIS investigation to go to the water's edge but no farther is that, in the Report, there is a pronounced tendency to identify problems as "facts," or "realities," rather than as matters to be plumbed for underlying causes. For instance, we have the following JIS testimony to the joint committees: "The 1996 Khobar Towers attack, the 1998 African embassies attacks, and the 2000 *USS Cole* attack led the Departments of State and Defense to focus heavily on force protection, but not on meeting the challenge of Afghanistan, even though they recognized the dangers emanating from terrorist camps there."[1] So, the problem of Afghanistan as a haven for terrorists was widely recognized. But the CIA and FBI lacked the means, and also lacked a plan, to go after training camps in Afghanistan in a comprehensive manner. It would be reasonable to wonder at this point: What efforts were made to penetrate various groups in Afghanistan (or if there were efforts, why were they not successful), and why

---

[1]Emphasis added. Written statement of Eleanor Hill, in testimony before a hearing of the House Permanent Select Committee on Intelligence and the Senate Select Committee on Intelligence (hereafter "the joint committees"), October 8, 2002.

was there no attempt to beef up the military for a comprehensive response? The record shows that little effort was made to effectively utilize the military even after President Clinton's post-embassy bombing declaration in 1998 that "there will be no sanctuary for terrorists." Again, it is reasonable to ask why actions did not match words. These are questions we believe have not been asked, or at best have been asked superficially, by the JIS.

Other areas were treated similarly:

**Risk Aversion**

The JIS did not examine risk aversion as a distinct and separate issue, despite the fact that several witnesses and interviewees told the staff that it was a big problem. Indeed, no intelligence or law-enforcement agency escaped being described by its own officials as hampered by an aversion to taking risks of one sort or another.

For instance, at the September 24, 2002 JIS open hearing, a cloaked "Minneapolis FBI Agent" testified about risk aversion in the FBI. He was asked if he thought previous disciplinary actions involving agents making erroneous applications to the Foreign Intelligence Court of Review (the court set up under the Foreign Intelligence Surveillance Act, or FISA) had made agents reluctant to file FISA applications. He responded that these did indeed have a chilling effect.[2]

FBI fears of being seen as committing racial or religious profiling were acknowledged by a Phoenix special agent who attempted to alert FBI headquarters about suspicious individuals seeking pilot training. The special agent's now-famous electronic communication to headquarters recommended that it consider seeking authority to obtain visa information from the State Department on individuals who got visas to attend flight school. The intelligence operations specialists at FBI headquarters who reviewed the "Phoenix Memorandum" told the JIS that they had decided among themselves that seeking that authority raised profiling concerns. FBI qualms in this regard were stimulated by public allegations of racial profiling that were made against FBI agents who questioned two Middle Eastern men who had acted suspiciously on an Air West flight

---

[2] Statements of a Minneapolis FBI Agent before the joint committees, September 24, 2002.

from Phoenix to Washington, D.C. in 1999.

JIS director Eleanor Hill described the latter incident at the September 24, 2002 hearing: "During a physical surveillance of the subject of the Phoenix [electronic communication], the agent determined that he was using a vehicle registered to another individual. In 1999, the owner of the car and an associate of his were detained for trying to gain access to the cockpit of a commercial airliner on a domestic flight. They told the FBI that they thought the cockpit was the bathroom and they accused the FBI of racism."[3]

During the same hearing, Senator Hatch pressed the FBI witnesses on problems brought on by perceived racial profiling. Michael Rolince of the FBI remarked on his colleagues' interactions as they pursued leads on possible terrorist attacks during Y2K celebrations around the world: "I think you only need to go back to the millennium . . . There was a proposal on the table to interview every subject of every full and every preliminary inquiry investigation [regarding Osama Bin Laden] . . . and we were concerned about follow-on events for the Y2K. That met with overwhelming resistance by the [Special Agents in Charge] in the field for a lot of different reasons, one of which is we would be hounded unmercifully over the profiling issue."[4]

---

[3]Written statement of Eleanor Hill, in testimony before the joint committees, September 24, 2002.

[4] Michael Rolince, testimony before the joint committees, September 24, 2002.

The head of the National Security Agency, Lieutenant General Michael Hayden, told the JIS that, in 2000, his agency found itself having to fend off -- in an unusual public hearing -- Representative Robert Barr's public criticisms. Representative Barr had criticized the National Security Agency for what he believed were inappropriate collection activities.[5]

Many comments on risk aversion alluded to congressional oversight and/or investigations dating back to the Church and Pike investigations of the 1970s. In the 1980s, congressional investigation and litigation involving the FBI's investigation of the Committees in Solidarity with the People of El Salvador led indirectly to newer agents being "warned to be careful that they do not violate religious groups' First Amendment rights."[6] It is quite possible -- though this theme was not fully explored by the JIS -- that a legacy of caution left by these historical episodes contributed to timidity in tackling the Al Qaeda problem before Al Qaeda struck on 9/11.

---

[5] Joint Inquiry Staff, Memorandum from the Joint Inquiry Staff to Eleanor Hill, dated November 6, 2002, Subject: "October 31, 2002, Questions from Senators Kyl and Roberts."

[6] Joint Inquiry Staff, Memorandum from the Joint Inquiry Staff to Eleanor Hill, dated November 6, 2002, Subject: "October 31, 2002, Questions from Senators Kyl and Roberts."

A good example of comments that gave prominence to this subject is that of Richard Clarke, the National Security Council counter-terrorism coordinator from 1993 to October, 2001, who discussed in a JIS briefing on June 11, 2002 the atmosphere he would like to see engendered within our intelligence agencies. Mr. Clarke said the ethos should be: "Don't be afraid to make mistakes. Encourage a climate in the military and in the law-enforcement communities and in the CIA that says, perfection is not the goal here; and if you have good intentions and you mess up along the way, you will not be punished as an organization or as an individual. Get away from this risk-averse culture, where one mistake and you are out." He added that "we need a thousand more Colleen Rowleys, and you are never going to get them until you provide them with some encouragement, both from the Director of the FBI, from the President of the United States and, most importantly, from the Congress. . . . [B]elieve it or not, a lot of people in the executive branch are scared stiff about being up in front of a congressional committee."[7]

Changing the culture of risk aversion in these agencies is a major undertaking. It should be a central focus of any corrective actions we may attempt following this investigation. Yet the Report seems only to document the "fact" of risk aversion, rather than get at why it existed. Without knowing the causes, how can we be certain the conditions that led to it in the 1990s have been corrected? The two congressional intelligence committees should be very careful when it comes to recommending that individuals who were "to blame" for 9/11-related failures be aggressively punished, lest we promote the scapegoating of junior government employees by those who actually bore more responsibility. (See Recommendation #16.)

**Insufficient Resources**

Throughout this investigation, top intelligence officials cited a lack of money and people, in the years before the 9/11 attacks. One CIA witness described intelligence resources fighting terrorism as "a platoon in a brigade-sized field and doing the best they can."[8] This was known, yet little was done to correct it.

---

[7] Richard Clarke, testimony before the joint committees, June 11, 2002.

[8] Statements of a CIA witness before the joint committees, September 20, 2002.

During the 1990s, intelligence community budgets stayed roughly even in constant dollars, or slightly declined. Overall capabilities declined. Primarily by taking from other budgets, counter-terrorism funds doubled. The Report states that, "in spite of increased counter-terrorism resources, the overall decreases in Intelligence Community resources made it difficult to expand the counter-terrorism effort significantly to meet the growing threat. . . .The number of people working on terrorism rose steadily, despite overall decreases in Intelligence Community staffing. Nonetheless, the number of people in counter-terrorism remained small."[9]

One notices a lack of clarity here. The Report spends many pages cataloging why it is difficult to pinpoint how much money was expended on counter-terrorism; yet the document does not really grapple with the contradiction between the high-ranking officials' complaints about inadequate resources and the fact that, according to the Office of Management and Budget, the intelligence agencies usually got what they asked for. Some excerpts describing this disconnect follow:

· "DCI  Tenet testified that the CIA regularly asked OMB for more money, but had little success."[10]

· "Agency leaders testified that their requests for resources were sometimes not satisfied, even though Congress appropriated as much or more than the President requested. This is because OMB often reduces agency requests before sending them to Congress."[11]

· "In general, CIA appropriations for counter-terrorism met or exceeded the requests that were submitted by the President to Congress."[12]

· "[National Security Agency] appropriations consistently met or exceeded Presidential

---

[9] Final JIS Report, Tab E, pp. 2-3.

[10] Final JIS Report, Tab E, p. 7.

[11] Final JIS Report, Tab E, p. 9.

[12] Final JIS Report, Tab E, p. 10.

requests to Congress."[13]

·       "The FBI usually received more -- at times far more -- than the amounts the President
initially requested from Congress."[14]

---

[13]Final JIS Report, Tab E, p. 12.

[14]Final JIS report, Tab E, p. 11.

·   "Budget requests specifically tied to counter-terrorism were generally approved, according to OMB officials."[15]

Yet officials from the intelligence agencies contended after the fact that the enhanced resources they received were not sufficient to meet the growing threat. One officer of the Counter-Terrorism Center claimed she was told when appeals for more resources were rejected: "People [will] have to die for them to get resources."[16]

Director of Central Intelligence George Tenet is in a rare and privileged position of having a personal audience with the President on a near-daily basis. When the Director of Central Intelligence declares war on Al Qaeda, as George Tenet did in 1998, we should see a dramatic effect. Did he press his case with President Clinton that he did not have enough people or resources? What he said in written testimony before the joint committees on October 17, 2002 is that the CIA prepared a policy-and-objectives statement in early 1997 that reflected a determination to go on the offensive against terrorism. Director Tenet:

"The submission outlined our Counter-Terrorism Center's offensive operations, listing as their goals to 'render the masterminds, disrupt terrorist infrastructure, infiltrate terrorist groups, and work with foreign partners.' . . . It highlighted efforts to work with the FBI in a bold bid to destroy the infrastructure of major terrorist groups worldwide.

---

[15]Final JIS Report, Tab E, p. 19.

[16]Final JIS Report, Tab E, p. 14.

". . . The FY99 submission -- prepared in early 1998 -- continued the trend in requesting a substantial funding increase for offensive operations against terrorism.  . . . The FY 2000 budget submission prepared in early 1999 described Bin Laden as 'the most significant individual sponsor of Sunni Islamic extremism and terrorism activity in the world today.' Our FY 2000 submission noted our use of a wide range of operational techniques, joint operations with foreign partners, and the recruitment of well-placed agents."[17]

Director Tenet continued: "Despite these clear intentions and the daring activities that went with them, I was not satisfied that we were doing all we could against this target. In 1998, I told key leaders at CIA and across the intelligence community that we should consider ourselves 'at war' with UBL. I ordered that no effort or resource be spared in prosecuting this war. In early 1999, I ordered a baseline review of CIA's operational strategy against Bin Laden."[18]

In spite of Director Tenet's claims of "daring activities" and not being satisfied that the CIA was doing all it could against terrorists, the JIS found that "There was a reluctance to take risks in which CIA officers might die."[19]

But, back to the question of resources: What did Tenet do to follow up? Did he request more? Were the requests rejected? By whom? Why? If requests for money had been granted, would that have made any difference? And finally, how much has changed since 9/11?

---

[17]George Tenet, testimony before the joint committees, October 17, 2002.

[18]Ibid.

[19]Joint Inquiry Staff, Memorandum from the Joint Inquiry Staff to Eleanor Hill, dated November 6, 2002, Subject, "October 31, 2002, Questions from Senators Kyl and Roberts."

The JIS was able to get the personnel and fiscal counter-terrorism requests of the FBI dating to the early 1990s. These contained the total number of additional positions or monies requested by the FBI of the Department of Justice, requested by the Department of Justice of the Office of Management and Budget, requested by the OMB of Congress, and enacted by Congress. Within these data are indications of irrational, ad hoc budgeting and funding decisions.[20]  The positions approved by each entity in turn, as the requests wended their way from the FBI to Congress, sometimes showed wild disparities and inconsistencies. Yet the root causes for this remain unexplored. Without this information, the JIS contended it could not determine the "failure mechanisms" in the budgeting process. What was the impact on counter-terrorism as a result of the administration's budget requests and congressional responses, and what changes would be required to rectify the problems? The JIS Report does not provide answers.

### A Flawed Legal/Institutional Framework

It is also evident that some of the pre-9/11 failings were caused by government officials operating under unclear authorities. The joint committees heard testimony from a number of senior officers from the intelligence agencies, the National Security Council, and the Pentagon. The committees were presented with divergent perspectives on exactly what authorities existed in our efforts to take the war to the terrorists.

---

[20]Final JIS Report, Chart 1.5 ("FBI  Resource Requests"); Joint Inquiry Staff briefing to the joint committees, "An Overview of Counter-Terrorism Resources," Slide #6 ("FBI  Requests for Additional Counter-Terrorism Resources and the DOJ, OMB, and Congressional Response").

National Security Council officials said they provided all the tools, both physical and legal, to do the job; intelligence agency officials said the National Security Council provided neither. Stated former National Security Advisor Anthony Lake: "In June, 1995, Presidential Decision Directive 39 mandated increased efforts to capture terrorists abroad."[21] His successor as National Security Advisor, Sandy Berger, said in response to our questions for the record: "President Clinton approved every strike or other action against bin Laden proposed by his intelligence, military, and national security advisors."[22]

On the other side of this divide, Members heard from intelligence officials, such as Cofer Black, former chief of the Counter-Terrorism Center, comments about being hampered by a lack of operational flexibility. Mr. Black: "I want to make this very clear. I do not feel that I had sufficient authorities to do the best job that we could."[23] He underlined this point at a later hearing: "All I want to say is that there was before 9/11 and after 9/11. After 9/11 the gloves came off."[24]

While the details of this debate remain classified, the JIS Report, as it does in so many other respects, documents the fact that there were discordant views without digging to find the point of failure that allowed this confusion to persist.

---

[21]Written statement of Anthony Lake, in testimony before the joint committees, September 19, 2002.

[22]Memorandum from Sandy Berger to Senator Graham dated November 4, 2002, Subject: "Reply to Additional Joint Inquiry Questions."

[23]Cofer Black, statements before the joint committees, September 12, 2002.

[24]Written statement of Cofer Black, in testimony before the joint committees, September 26, 2002.

14

Uncertainty about a particular legal authority is shown in the FBI's decision-making surrounding the search of Zaccarias Moussaoui's computer. Minneapolis agent Rowley thought a FISA warrant could be obtained. Headquarters personnel thought not, because it was not clear Moussaoui was acting on behalf of an international terrorist organization.[25]  More in-depth analysis of this issue might have resulted in a recommendation by our committees to revisit the legal definition, under FISA, of a "foreign power"-- a term that currently only includes foreign governments or international terrorist organizations. A warrant for surveillance of an individual is only granted under FISA if a court finds probable cause to believe the target of the warrant is linked either to a foreign government or an established organization. This may have made sense when the Foreign Intelligence Surveillance Act was enacted during the Cold War, but apparently, as noted, U.S. authorities did not try to obtain a FISA warrant to search Moussaoui in the summer of 2001 because the FBI could not prove he was linked to a specific terrorist group. Senator Kyl has offered a three-word change to the statute that would permit a FISA warrant to be obtained if the person suspected of terrorist activity is a foreign person. This change is supported by the Department of Justice.

Another change in the law that could improve the institutional framework would be further congressional legislation to enable the U.S. Government to deter and punish unauthorized disclosure of security-related information.

**Leadership Failures**

Al Qaeda's attack on Washington and New York occurred after a long period of poor leadership at the highest levels of the U.S. Government regarding terrorism. Despite repeated assaults on the United States and its interests -- the 1993 World Trade Center attack, the bombing of the American embassies in Kenya and Tanzania in 1998, the attack on the *USS Cole* in 2000, to name a few -- the U.S. Government was still unwilling to treat terrorism as a true national security issue until 9/11.  Indeed, the previous administration strove mightily to treat terrorism strictly as a law-enforcement issue, often thinking in terms of what evidence could be gathered on

---

[25] "F.B.I. Denial of Search Warrant for Suspect's Belongings Is at Center of Inquiries," Philip Shenon, New York Times, June 7, 2002.

terrorists that would hold up in a court of law. Even when we did respond with military force –
sending cruise missiles into Afghanistan and Sudan after the 1998 embassy attacks, for instance –
it  smacked of doing something for show, rather than a real attempt to treat the terrorist threat for
what it is -- a war.

But these leadership failures at the political level do not absolve the decision-makers at
the intelligence agencies of their own failures. The problem of inadequate allocation of resources,
for example, appears to be a result of confused leadership in the intelligence community. Just
about every person interviewed indicated that, before 9/11, he or she was overtasked and
undermanned. Yet the Counter-Terrorism "Center" evidently did not fully use the resources
already in the community. Analysts from agencies outside the CIA indicated to the JIS that they
were not being tapped to assist counter-terrorism work inside the Counter-Terrorism Center.  JIS
information indicates that the Defense Intelligence Agency and the Federal Aviation
Administration offered analytic support to the chief of the Counter-Terrorism Center, but both
offers were rebuffed.[26]  So, in spite of a 1998 DCI declaration of war on Al Qaeda, two key
organizations were not allowed to fully throw their support behind the anti-terror effort. In this
connection, Director Tenet stated before our committee –  apparently with pride -- that, by 2001,
the Counter-Terrorism Center "had 30 officers from more than a dozen agencies on board,
[constituting] ten percent of its staff complement at that time."[27]  This means the CIA accounted
for 90 percent of the personnel at the Counter-Terrorism Center, and the "more than a dozen"
other agencies were only allotted the remaining 10 percent of the billets. Clearly, the Counter-
Terrorism Center, created as an intelligence community entity to fuse information and analysis,
did not fully leverage the assets resident throughout the law-enforcement and intelligence
communities.

Instead we had fragmented counter-terrorism analytic centers at CIA headquarters, at the
Pentagon, and at various FBI locations. The failure to concert the community's activities had

[26] Joint Inquiry Staff, Memorandum from the Joint Inquiry Staff to Eleanor Hill, dated
November 6, 2002, Subject: "October 31, 2002, Questions from Senators Kyl and Roberts."

[27] Written statement of George Tenet, in testimony before the joint committees, October
17, 2002.

severe consequences. Did the intelligence community fail the Director of Central Intelligence by not offering more support to the Counter-Terrorism Center, or did the Director of Central Intelligence fail the Counter-Terrorism Center by not bringing in more government-wide talent and skills?

Only after 9/11 did the various intelligence and law-enforcement entities begin to put aside their parochialism and work together in a more productive manner. With better leadership of the intelligence community, this condition would not have been prevalent before 9/11. It would not have taken that monumental disaster for our nation to get the members of the community to cooperate with one another.

One of the purposes of the Joint Inquiry, as stated in the preamble to the House and Senate committees' "Initial Scope" document, was to "lay the basis for assessing the accountability of institutions and officials of government." The JIS Report, however, apparently fails to identify which officials within the intelligence community had responsibility, before 9/11, for strategic and tactical warning of terrorist activity. Instead, Recommendation #16 suggests that discovering who is accountable should be the job of the Inspectors General of the various agencies.

**Inadequate Scope**

The failures that led to 9/11 occurred not only in the intelligence community. The JIS was selective about what threads of inquiry it was willing to follow beyond the intelligence community. Failure to examine the State Department's visa-issuance process must rank as the most glaring of these omissions because the answer to the question  – could 9/11 have been prevented -- is yes, if State Department personnel had merely followed the law and not granted non-immigrant visas to 15 of the 19 hijackers in Saudi Arabia.

We repeat: If our own laws regarding the issuance of visas had been followed by the State Department, most of the hijackers would not have been able to obtain visas, and 9/11 would not have happened. Because the entire culture of the State Department is geared toward facilitating smooth relations with foreign governments, State Department personnel have tended to ignore the potential effect of their practices on national security.

An October, 2002 report of the General Accounting Office found that, before 9/11, there was among U.S. consular officers abroad a wide divergence of opinions and practices regarding

"the authority of consular officers to deny questionable applicants a visa; the role of the visa process in ensuring national security; and the types of changes . . . appropriate given the need for heightened border security."[28]

Section 214(b) of the Immigration and Nationality Act essentially creates a presumption against the issuance of visas to single young men without visible means of support. Consular officers are empowered with broad authority to deny visas in cases where the applicant fails to overcome this presumption. Section 214(b), which pertains to non-immigrant visas, specifically provides that applicants for such visas must demonstrate that they: 1) have a residence abroad and strong ties to a country that they have no intention of abandoning; 2) intend to leave the United States in a timely manner; and 3) intend to engage in legitimate activities related to the non-immigrant category.

---

[28] "Border Security: Visa Process Should Be Strengthened as an Antiterrorism Tool," General Accounting Office, October, 2002, p. 3.

The failure of several of the terrorist hijackers, including the ringleader, Mohammed Atta, to completely fill out their applications provided ample reason for denying the visas. Only one of the 15 terrorists who were from Saudi Arabia provided an actual address; the rest listed only general locations, such as "California," "New York," "Hotel D.C." and "Hotel."[29] Only three of the 15 provided the name and street address of present employer or school as required on the application. Only one of these applications had additional documentation or explanatory notes provided by a consular officer that addressed any discrepancy or problem with the original application.

It was the official position of the State Department's Bureau of Consular Affairs for over a year, that 13 of the 15 terrorists from Saudi Arabia had been personally interviewed and that there was nothing in their visa applications or in the interviews that should have prevented issuance of their visas. According to the GAO, however, only two of the Saudi applicants were actually interviewed, and all 19 hijackers had substantial omissions and inconsistencies on their visa applications that should have raised concerns about why they wanted visas.

---

[29] "Visas for Terrorists," Joel Mowbray, National Review, October 28, 2002.

The GAO reported that these applicants were presumed to be eligible based upon pre-9/11 internal State Department policies that stressed that all applicants from Saudi Arabia and the United Arab Emirates were to be considered "good cases" and, therefore, exempt from interviews. Moreover, the GAO noted that applicants from these two countries were not required to "complete their applications or [provide] supporting documentation."[30] Why was this so? The pervasiveness in Saudi Arabia of Wahhabism, a radical, anti-American variant of Islam, was well-known before 9/11. The JIS should have inquired why the country of Saudi Arabia was given such preferential treatment by the State Department and whether the intelligence agencies were complicit in the policy.

### III. Comments on Recommendations

When there is a crisis, there is a tendency to look for easy solutions. A case in point is the first and most publicized Recommendation to come out of this investigation: the creation of a new "Director of National Intelligence." Good policies, good leadership, adequate resources, and will can better protect the American people from terrorism than simply creating new offices and rearranging organizational charts. And, as we have attempted to show, policy, resources, and leadership were issues that were not treated in sufficient depth by the JIS.  It is not at all clear that a new intelligence "czar" could succeed where the Director of Central Intelligence has not. For that matter, the Report does not even conclude that DCI Tenet or any predecessor DCI did fail. The disconnect between the JIS' investigative efforts and the Recommendation supposedly based on them is remarkable.

On the merits of the "Director of National Intelligence" idea itself, we would concur with some of the points made by Vice Chairman Shelby in his Statement of Additional Views. Separating the job of the head of the intelligence community from the directorship of the CIA is an idea of some value. It has been endorsed by a number of post-Cold War studies of intelligence-community reform. However, we in the House and Senate intelligence committees have not yet deliberated enough on this question to draw any conclusions.

---

[30]GAO report, p. 17.

As indicated above, we are particularly troubled by the JIS Report's Recommendation #16, calling for lower-level personnel to be held accountable by the various agencies' Inspectors General. It is doubtful whether this would improve the functioning of the intelligence agencies. Accountability of this kind would, in our view, have a troubling result: exacerbating what so many people quoted herein cited as a pervasive problem, namely, aversion to risk. Accountability of those at the very top is what is needed; it alone produces accountability at the intervening levels, and among officers in the field who run down the leads to find terrorists.

It would be expecting too much to think that U.S. authorities should have predicted that the attack of 9/11 would come. But the level of dysfunction in the security and intelligence agencies comes as a shock to Americans, who had faith in the expertise of the intelligence community. To restore that faith it must improve its performance, and in this regard, the proposition "First things first" is only common sense. Our duty to understand precedes our ability to improve. The JIS Report, in not fully coming to terms with what produced the intelligence failures it identified, left that duty unfulfilled. These Additional Views are offered not to criticize those who worked very hard under difficult circumstances to file a Report by the end of the 107th Congress, but to provide a more complete perspective for those who are charged to further investigate the terrorist attacks of September 11, 2001.

**LAW ENFORCEMENT SENSITIVE**

**Additional Views of Senator Carl Levin**

A fair reading of the facts contained in the Joint Inquiry report has led me to a deeply troubling conclusion:

Prior to September 11th, United States intelligence officials possessed terrorist information that if properly handled could have disrupted, limited, or possibly prevented the terrorist attacks against the World Trade Center Towers, the Pentagon, and United Airlines Flight 93.  At crucial points in the twenty-one months leading up to September 11th, this intelligence information was either not shared or was not acted upon, and, as a result, opportunities to thwart the terrorist plot were squandered.

While the Joint Inquiry did not uncover a "smoking gun" leading up to September 11th, a number of "lit fuses" were known to counter-terrorism officials during a period of time when our Intelligence Community was at a heightened state of alert over imminent attacks from al-Qaeda.  The report details how in the months leading up to September 11th these fuses were allowed to burn and how attempts to extinguish them were shockingly frustrated.

Two of the terrorists hijackers – al-Mihdhar and al-Hazmi – were allowed to enter the United States in January 2000 because the CIA, who knew the two to be linked with al-Qaeda and the 1998 East African embassy bombings, failed repeatedly to place them on a entry watchlist. One of the two – al Mihdhar – was able to leave and re-enter the United States in 2001 and, according to the FBI, may have spent his time abroad organizing the travel of the twelve terrorists who constituted the hijacking "muscle" into the United States.

On June 11, 2001, at a meeting of FBI and CIA officials, FBI field agents from New York investigating al-Qaeda's responsibility for the deadly U.S.S. Cole bombing, pressed for information regarding the CIA's interest in al-Mihdhar and al-Hazmi and their attendance at the

**LAW ENFORCEMENT SENSITIVE**

**LAW ENFORCEMENT SENSITIVE**

January 2000 Malaysia meeting of al-Qaeda terrorists, which included the person responsible for planning the U.S.S. Cole attack.  The CIA official at the meeting denied the FBI agent's request and withheld basic and relevant information about the suspected terrorists because he did not believe he had the authority to share the information.

Two and half months after this June 11, 2001, meeting, and after the two terrorists had been determined to have entered the country and were watchlisted, a FBI New York agent pressed FBI headquarters to use full criminal resources to find these at-large members of al-Qaeda.  The agent's request was denied by the FBI's National Security Law Unit which cited a "wall" that prevented the sharing of intelligence information with criminal case agents.  Invoking this so-called "wall" was erroneous however, and, as a result, the FBI's search for the terrorists in the two weeks leading up to the attacks was unnecessarily hamstrung.

**(LES)** The FBI's Minneapolis field office opened an international terrorism investigation of Zacarias Moussaoui and soon after arrested him on August 16, 2001.  After the arrest, the CIA urgently solicited its stations around the world for additional information on Moussaoui, who it characterized as a "suspect airline suicide attacker" who might be "involved in a larger plot to target airlines traveling from Europe to the U.S."  And yet, over the next three weeks FBI Minneapolis officials were frustrated in their efforts to obtain a FISA search warrant of Moussaoui's belongings by legal officials at FBI headquarters based on an incorrect reading of the search warrant requirements, a mistake now acknowledged by the FBI.  After September 11th, Moussaoui's belongings revealed links to al-Qaeda officials which connected him to the planners of the terrorist plot.

Finally, while the Joint Inquiry report addresses at length the FBI's mishandling of the July 10, 2001, Phoenix Electronic Communication, it fails to note that many of the individuals identified by the FBI Phoenix agent as being part of a suspected al-Qaeda cell infiltrating the American civil aviation industry were the subject of "UBL-related investigations" by the FBI

**LAW ENFORCEMENT SENSITIVE**

**LAW ENFORCEMENT SENSITIVE**

after the terrorist attacks.  The warnings contained in the Phoenix Electronic Communication were largely ignored before September 11th.  But surprisingly, despite all the subsequent attention given to the Phoenix document, the FBI Director, in the year after the terrorists attacks, was unable to inform the Senate Select Committee on Intelligence and the Joint Inquiry how many of the suspects identified by the Phoenix agent were linked to al-Qaeda and of the status of the investigation.

**Senator Barbara A. Mikulski**

As a member of the Senate Intelligence Committee, I voted in support of the recommendations of the Joint Intelligence Inquiry.

Protecting the American people is the most important responsibility I have as a United States Senator.  We owe it to the victims of the September 11th and anthrax attacks, their families, and the nation to find answers.  Who knew what and when before the September 11th attacks?  And if they didn't know, why?  The purpose of the joint inquiry was to ask the tough questions and use the answers to detect, deter and disrupt future attacks.

We must put in place an intelligence framework to meet the threats of the twenty-first century.  We need a national debate and national consensus on the best way to prevent terrorism, protect the nation and preserve the Constitution and civil liberties.

A new framework demands reform.  Our intelligence agencies must change.  They must change their culture and how they operate.  Congress and the Administration must make sure these agencies have the right resources to do their jobs.  That means new technology, better training, and increased funding.  The time for status quo is over.  The threats to America are real and potentially devastating.   We must be rigorous and unflinching in pursuit of reform.

While we protect America, we must also protect our Constitution and civil liberties.

There must be a vigorous national debate about the need for a domestic intelligence agency.  The American people have a right to know, a right to be heard and a right to be included. The debate must be conducted in the sunshine.  Congress should review any proposals through the committee process. Public comment should be encouraged through hearings, town halls meetings and other forums.

The American people must be informed and involved.  Reform cannot be achieved in secret or

by executive fiat.  A decision on a new intelligence agency should be based on a national debate and national consensus, not partisan politics.

This debate must take place, and it must happen soon.  I have no doubt that if America goes to war against Iraq, terrorists will go to war against America – on American soil.  America will be part of the battlefield.   We must be prepared.

That is why I support the important concrete changes recommended by the Joint Inquiry Committee to revamp, reform and reinvigorate the Intelligence Community.

- **Creating a Cabinet-level Director of National Intelligence position.**  This gives one person responsibility and authority over every element of the Intelligence Community – to set priorities, assign personnel, and manage a unified budget.  Breaking down silos and ending turf battles must be top priority.  Putting a single person in charge is a solid first step to real reform.

- **Creation of a national watchlist center.**  Four of the terrorists involved in the September 11th attacks were stopped by local law enforcement for speeding or for not having a driver's license.  When the police officers did the checks, there were no flashing yellow lights about these men.  Today local law enforcement knows more about dead-beat dads than death threat terrorists.   Something is really wrong here.  We need to fix it.  Creating a national watchlist center will ensure that information about potential terrorists is available to those who need it – from Customs inspectors to local cops on the beat.

- **Creating better technologies for intelligence.**  Our intelligence community must stay ahead of the curve on developing and using new technologies.  We need to make sure our ears on the world don't go deaf because of commercial encryption or huge volumes of data.

- **Reforming the FBI.**  The FBI must be more effective and efficient in both law enforcement and preventing terrorism.  That means better analysis and training,

modernizing computer systems to share information, and cooperation with other intelligence agencies.

# ADDITIONAL VIEWS
## Congressman Tim Roemer

I want to begin by congratulating the leadership of the Joint Inquiry for their bipartisanship, productivity, and helpful recommendations.  In the history of Congress, very few joint inquiries have been created, let alone been successful.  Congress, as an institution, can look at this bicameral and bipartisan accomplishment with pride.

Although I generally embrace the findings and recommendations of the report, there are several areas where further emphasis is needed and additional improvements must be made.

One of my great frustrations during my service on the Permanent Select Committee on Intelligence has been the degree to which access to information is restricted, either from the committee or within the committee, often for reasons that have little or no correlation to national security.  Many times, these restrictions have the effect of impairing the ability of members of the committee to make fully informed decisions on important budgetary or policy matters.  For example, during the Joint Inquiry, it became clear that individual government officials had been briefed about certain terrorist related information before September 11.  The substance of these briefings was declassified and made public.  The dates that these briefings took place were declassified.  Thus, sensitive information that might reveal sources, methods, or expose national security concerns, is not part of the equation here.  But the identity of the participants in the briefings, even by reference to the title of the offices they held, was not declassified.  In other words, a judgment was made that national security would not be endangered if the American people knew the specifics about information their government possessed about terrorism, but would be threatened if they knew who in their government knew that information.  There are few things more destructive, in my judgment, to the bond of trust between the people and their government than refusing to declassify information which might be politically uncomfortable or embarrassing.  Classification should be for important national security reasons, and references to title and positions should not be classified or asserted as covered under the doctrine of executive privilege.

12-17-02, 11:45 am

The executive branch suffers from a tendency toward over classification which, especially in the area of intelligence, diminishes Congress' ability to effectively oversee budget and policy decisions.  I hope that the procedures through which information is classified will be streamlined.  Additionally, we must accelerate the pace of review for declassification of information already classified.  As part of these efforts, I strongly encourage the administration to reconsider its decision to maintain the classification of titles and positions in the matter of concern to the Joint Inquiry.

The Joint Inquiry focused almost totally, given the jurisdiction of the two committees, on the September 11-related activities of the intelligence agencies.  Although these agencies have significant responsibilities on security issues, and terrorism issues specifically, those responsibilities are not exclusive in either area.  To understand fully how the September 11 attacks were successfully conducted requires a look well beyond the borders of the intelligence community.  Issues like the Federal Aviation Administration (FAA) and airline security; the manner in which visa applications are reviewed; the procedures used to grant entry into the United States at points of entry, as well as those used to monitor our borders; and issues related to the security of our ports, particularly our ability to track the movement of cargo, all need to be scrutinized.  A more thorough and comprehensive look at the September 11 attacks, and ways to prevent attacks in the future, needs to be done.  I am hopeful that the recently established national commission will complete that job.

The Joint Inquiry would have benefited greatly, in my judgment, had it been able to hear directly from the most senior national security officials in the current administration.  For various reasons, the Secretaries of State and Defense, the Attorney General, and the National Security Advisor were not questioned directly about issues related to the September 11 attacks.  I do not believe that the record of the national commission will be complete unless this shortcoming is addressed.

I agree with those who urge a more exhaustive investigation of the means through which the September 11 hijackers were supported financially while they were planning and training for the attacks.  Money combines with ideology to form the lifeblood of terrorism.  Shutting off the

12-17-02, 11:45 am

flow of funds, whatever their source, is critical to winning the war against terrorism.  Of particular concern is whether other nations, either wittingly or as a result of less than aggressive efforts to monitor financial transactions within their own borders, may have provided support to the September 11 hijackers, or may be providing support to other terrorists who would do harm to the United States.  I believe it is imperative that every effort be made to fully investigate all financial relationships between terrorist groups and members of the international community.  Our Joint Inquiry has scratched the surface of this critical issue; other investigations, including the national commission, must complete this effort.

We also recommended that a Cabinet-level Director of National Intelligence (DNI) be appointed to lead the intelligence community.  This grows out of our concern that the current structure is not conducive to the management of the intelligence community as a coherent whole.  The intelligence community encompasses more than a dozen agencies and tens of thousands of employees.  These entities are diverse in their focus and composition.  We found that there were serious difficulties in setting budget and policy priorities across the intelligence community and ensuring their implementation.  Thus, the intelligence community is ill equipped to meet the new challenge of global terrorists focused on targets within the United States.

Leadership of the intelligence community should be strengthened through the creation of a new position with sufficient authority, resources, and staff to manage intelligence agencies as a cohesive entity.  We believe this Director of National Intelligence should be sufficiently empowered that he or she can exercise the full range of management, budgetary and personnel responsibilities.  Making this position a reality, however, will raise a host of practical issues that will require careful consideration by the Congress, not least of which is the question of what authority over the intelligence agencies should remain with the heads of the departments in which these entities reside.

The Joint Inquiry recommends that the new Director of National Intelligence not be permitted to serve as the head of the Central Intelligence Agency (CIA) or any other individual intelligence agency.  The intent of this provision is to ensure that leadership of the intelligence community remains focused and consistent across all agencies of the community.  However, an

argument can be made that a DNI would be more effective if he or she also served as the head of an agency.  I would strongly recommend that the Congress and commission study this issue more carefully, and I will remain open to the debate.

The Joint Inquiry recommendations recognized that the workforce of the intelligence community is its greatest resource.  All Americans should be thankful for the thousands of individuals employed by U.S. intelligence agencies who make countless sacrifices for our collective security.  Yet we have found that these individuals are not as well equipped and well trained as they should be.  The Joint Inquiry makes numerous recommendations on measures that should be implemented to enhance the development of the workforce with the skills and expertise, and intelligence tools, needed for success in counterterrorist efforts.  First among these is better expertise, especially in languages.  Language readiness is woefully inadequate across the intelligence community, and the Congress has repeatedly stressed the need for a strategic plan to remedy the problem with multi-faceted, sustained and creative approaches.

On another personnel matter, the importance of strategic analysis cannot be overstated. This topic is well developed in sections of the report, but I wish to further emphasize that already existing information technology can assist in the development of better analytic products, if fully utilized.  The collection agencies disseminate intelligence reports to large numbers of users through cables, whose formats were defined many years ago.  These cables tend to provide very little context, so if the recipient is not familiar with the details of the particular topic the importance of the intelligence could be likely missed.  This could have contributed to the failure of the CIA to watchlist Nawaf al-Hazmi and Khaled al-Mihdhar.  Intelligence reporting formats should be modernized and analytic tools more widely utilized to facilitate the discovery of links between new and previously acquired information.  These efforts can contribute to a greater depth and quality of analysis.

Finally, the importance of all collected information is not always well understood by the reports officers who act as collection filters when they create the cables that are disseminated to the all-source analysts.  The Joint Inquiry uncovered instances where information was not disseminated, because intelligence thresholds were not met, that in hindsight, would have

12-17-02, 11:45 am

revealed important information about some of the September 11th hijackers.  The Joint Inquiry recommendations and the conference report on the Intelligence Authorization Act for Fiscal Year 2003 both address this issue concerning access to "raw" intelligence.  Since seemingly insignificant information given to the right analyst, or appropriately data-mined and correlated by an analytic tool, could help uncover the next plot, such information must be made available to a limited number of analysts for domestic security and force protection purposes.

12-17-02, 11:45 am

**APPENDICES**

# APPENDIX

# THE SENATE SELECT COMMITTEE
# ON
# INTELLIGENCE

# AND

# HOUSE PERMANENT SELECT COMMITTEE
# ON
# INTELLIGENCE

# INITIAL SCOPE OF JOINT INQUIRY

(148 Cong. Rec. H3493 (daily ed. Jun 5, 2002))

# Congress of the United States
### Washington, DC 20515

## PREAMBLE

To reduce the risk of future terrorist attacks; to honor the memories of the victims of the September 11 terrorist attacks by conducting a thorough search for facts to answer the many questions that their families and many Americans have raised; and to lay a basis for assessing the accountability of institutions and officials of government:

## THE SENATE SELECT COMMITTEE ON INTELLIGENCE
## AND
## HOUSE PERMANENT SELECT COMMITTEE ON INTELLIGENCE

## ADOPT THIS

## INITIAL SCOPE OF JOINT INQUIRY

Pursuant to section 5(a)(1) of Senate Resolution 400, 94th Congress, Rule 6 of the Rules of Procedure of the Senate Select Committee on Intelligence, Rule XI(1)(b) of the Rules of the House of Representatives, and Rule 9 of the Rules of Procedure of the House Permanent Select Committee on Intelligence, the two Committees have authorized an investigation, to be conducted as a Joint Inquiry, into the Intelligence Community's activities before and after the September 11, 2001 terrorist attacks on the United States. The Committees have undertaken this Joint Inquiry pursuant to their responsibility to oversee and make continuing studies of the intelligence activities and programs of the United States Government and all other authority vested in the Committees.

The purpose of this Joint Inquiry is —

(a) to conduct an investigation into, and study of, all matters that may have any tendency to reveal the full facts about —

(1) the evolution of the international terrorist threat to the United States, the response of the United States Government including that of the Intelligence Community to international terrorism, from the creation of the Director of Central Intelligence's Counterterrorist Center in 1986 to the present, and what the Intelligence Community had, has, or should have learned from all sources of information, including any terrorist attacks or attempted ones, about the international terrorist threat to the United States;

(2) what the Intelligence Community knew prior to September 11 about the scope and nature of any possible attacks against the United States or United States interests by international terrorists, including by any of the hijackers or their associates, and what was done with that information;

(3) what the Intelligence Community has learned since the events of September 11 about the persons associated with those events, and whether any of that information suggests actions that could or should have been taken to learn of, or prevent, those events;

(4) whether any information developed before or after September 11 indicates systemic problems that may have impeded the Intelligence Community from learning of or preventing the attacks in advance, or that, if remedied, could help the Community identify and prevent such attacks in the future;

(5) how and to what degree the elements of the Intelligence Community have interacted with each other, as well as other parts of federal, state, and local governments with respect to identifying, tracking, assessing, and coping with international terrorist threats; as well as biological, chemical, radiological, or nuclear threats, whatever their source (such as the Anthrax attack of 2001).

(6) the ways in which the Intelligence Community's responses to past intelligence problems and challenges, whether or not related to international terrorism, have affected its counterterrorism efforts; and

(7) any other information that would enable the Joint Inquiry, and the Committees in the performance of their continuing responsibilities, to make such recommendations, including recommendations for new or amended legislation and any administrative or structural changes, or other actions, as they determine to be necessary or desirable to improve the ability of the Intelligence Community to learn of, and prevent, future international terrorist attacks; and

(b) to fulfill the Constitutional oversight and informing functions of the Congress with regard to the matters examined in the Joint Inquiry.

# APPENDIX

# THE SENATE SELECT COMMITTEE
## ON
## INTELLIGENCE

# AND

# HOUSE PERMANENT SELECT COMMITTEE
## ON
## INTELLIGENCE

# SUPPLEMENTAL JOINT INQUIRY RULES

148 Cong. Rec. S5032 (daily ed. Jun 5, 2002)

148 Cong. Rec. H3493 (daily ed. Jun 12, 2002)

## HOUSE PERMANENT SELECT COMMITTEE ON INTELLIGENCE
## SUPPLEMENTAL JOINT INQUIRY RULES

In connection with the Joint Inquiry with the Senate Select Committee on Intelligence into the events of September 11, 2001, authorized by the House Permanent Select Committee on Intelligence ("HPSCI") pursuant to Rule XI(1)(b) of the Rules of the House of Representatives and Rule 9 of HPSCI's Rules of Procedure, and pursuant to Rule XI(2)(a) of the Rules of the House of Representatives, HPSCI adopts the following Joint Inquiry Rules to supplement HPSCI's Rules for purposes of the Joint Inquiry only:

### JOINT INQUIRY RULE 1. JOINT PROCEEDINGS

1.1. HPSCI may conduct hearings jointly with the Senate Select Committee on Intelligence. All joint hearings shall be considered hearings of both Committees.

1.2. The Rules of Procedure of HPSCI and the Senate Select Committee on Intelligence shall apply in all hearings and other proceedings of this Joint Inquiry, except where superseded by these Joint Inquiry Rules, provided that, at any joint hearing, if any rules of the two Committees are inconsistent, the rules of that Committee whose Chairman or his designee is presiding shall apply.

1.3. For the purposes of the proceedings of this Joint Inquiry, all employees on the staff of either Committee working on the Joint Inquiry shall be considered to be acting on behalf of both Committees.

### JOINT INQUIRY RULE 2. HEARINGS

2.1. All testimony at hearings shall be taken under oath or affirmation.

### JOINT INQUIRY RULE 3. DEPOSITIONS

3.1. All testimony taken, and all documents, records, or other materials produced, at a deposition of the Senate Select Committee on Intelligence shall be considered part of the record of both Committees.

## SENATE SELECT COMMITTEE ON INTELLIGENCE
### SUPPLEMENTAL JOINT INQUIRY RULES

In connection with the Joint Inquiry with the House Permanent Select Committee on Intelligence into the events of September 11, 2001, authorized by the Senate Select Committee on Intelligence ("SSCI") pursuant to section 5(a)(1) of Senate Resolution 400, 94th Congress, and Rule 6 of the SSCI's Rules of Procedure, and pursuant to Rule XXVI.2 of the Standing Rules of the Senate, the SSCI adopts the following Joint Inquiry Rules to supplement the SSCI's Rules of Procedure for purposes of the Joint Inquiry only:

### JOINT INQUIRY RULE 1.  JOINT PROCEEDINGS

1.1.  The SSCI may conduct hearings jointly with the House Permanent Select Committee on Intelligence.  All joint hearings shall be considered hearings of both Committees.

1.2.  The Rules of Procedure of both the SSCI and the House Permanent Select Committee on Intelligence shall apply in all hearings and other proceedings of this Joint Inquiry, except where superseded by these Joint Inquiry Rules, provided that, at any joint hearing, if any rules of the two Committees are inconsistent, the rules of that Committee whose Chairman or his designee is presiding shall apply.

1.3.  For the purposes of the proceedings of this Joint Inquiry, all employees on the staff of either Committee working on the Joint Inquiry shall be considered to be acting on behalf of both Committees.

### JOINT INQUIRY RULE 2.  HEARINGS

2.1.  All testimony at hearings shall be taken under oath or affirmation.

2.2.  Subpoenas for the attendance of witnesses, or the production of documents, records, or other materials, at hearings may be authorized by vote of the SSCI pursuant to SSCI Rule 2, or by the SSCI's Chairman and Vice Chairman, acting jointly.

### JOINT INQUIRY RULE 3. DEPOSITIONS

3.1.  All testimony taken, and all documents, records, or other materials produced, at a deposition of the SSCI shall be considered part of the record of both Committees.

3.2.  Subpoenas for depositions and notices for the taking of depositions may be authorized by vote of the SSCI pursuant to SSCI Rule 2, or by the SSCI's Chairman and Vice Chairman, acting jointly, and shall be issued and served as provided in SSCI Rule 7.  Deposition notices shall specify a time and place of examination and the name or names of Committee members or staff who will take the deposition.  Depositions shall be in private and shall, for purposes of the rules of both Committees, be deemed to be testimony given before the Committees in executive session.

3.3.  Witnesses shall be examined upon oath administered by a member of the SSCI or by an individual authorized by local law to administer oaths.  Questions may be propounded by members or staff of either Committee.  If a witness objects to a question and refuses to testify, the Committee members or staff present may proceed with the deposition, or may, at that time or subsequently, seek a ruling on the objection from the Chairman of the SSCI or any member of the SSCI designated by the Chairman.  The SSCI shall not initiate procedures leading to civil or criminal enforcement unless the witness refuses to testify after having been ordered and directed to answer by the Chairman or a member designated by the Chairman.

3.4.  Procedures for the attendance of counsel for witnesses at, and for the inspection, correction, and filing of transcripts of, depositions shall be as provided in SSCI Rules 8.4 and 8.7.

**APPENDIX**

**JOINT INQUIRY HEARINGS**

# JOINT INQUIRY HEARINGS

| <u>Date</u> | <u>Subject/Substance</u> | <u>Status</u> |
|---|---|---|
| Jun 4, 2002 | Business Meeting | Closed |
| Jun 5 | Evolution Of The Threat | Closed |
| Jun 6 | Evolution of The Threat | Closed |
| Jun 11 | Richard Clarke<br>Former National Coordinator for<br>Security, Infrastructure, and Counterterrorism | Closed |
| Jun 12 | The Intelligence Community Before September 11<br><br>Airplanes As Weapons | Closed |
| Jun 18 | Lt. General Michael Hayden<br>Director, National Security Agency<br><br>Robert Mueller<br>Director of the Federal Bureau of Investigation<br><br>George Tenet<br>Director of Central Intelligence | Closed |
| Jun 19 | Lt. General Michael Hayden<br>Director, National Security Agency<br><br>George Tenet<br>Director of Central Intelligence<br><br>Robert Mueller<br>Director of the Federal Bureau of Investigation | Closed |
| Jul 16 | Technical Collection | Closed |
| Jul 18 | Technical Collection | Closed |
| Jul 23 | Financial Campaign | Closed |

| | | |
|---|---|---|
| Jul 25 | Analysis & Language | Closed |
| Sep 12 | Covert Action | Closed |
| Sep 18 | Representatives Of September 11 Victims' Families | Open |
| Sep 19 | Richard Armitage<br>Deputy Secretary Of State | Open |
| | Samuel Berger<br>Former National Security Advisor To<br>The President | |
| | Brent Scowcroft<br>Former National Security Advisor To<br>The President | |
| | Paul Wolfowitz<br>Deputy Secretary Of Defense | |
| Sep 20 | The Hijackers | Open |
| Sep 24 | Moussaoui & The Phoenix Electronic Communication | Open |
| Sep 26 | Moussaoui & The Phoenix Electronic Communication | Closed |
| Sep 26 | Response To The Terrorist Threat | Open |
| Oct 1 | Information Sharing | Open |
| Oct 3 | Proposed Reorganization Of The Intelligence Community | Open |
| Oct 8 | Lessons Learned | Open |
| Oct 9 | FBI/CIA Issues | Closed |
| Oct 10 | FBI/CIA Issues | Closed |
| | Robert Mueller<br>Director of the Federal Bureau of Investigation | |
| | George Tenet<br>Director of Central Intelligence | |

| Oct 17 | Lt. General Michael Hayden<br>Director, National Security Agency | Open |
| | | |
| | Robert Mueller<br>Director of the Federal Bureau of Investigation | |
| | | |
| | George Tenet<br>Director of Central Intelligence | |
| | | |
| Dec 10 | Business Meeting | Closed |

**APPENDIX**

**LIST OF HEARING WITNESSES**

## List of Hearing Witnesses

The following is a list of witnesses who appeared before Joint Inquiry hearings conducted by the House Permanent Select Committee on Intelligence and the Senate Select Committee on Intelligence in open or closed session.  Affiliations listed are as of the date of appearance.

*June 4, 2002*        **Business Meeting (No Witnesses)**

*June 5, 2002*        **Alonzo Robertson,** Joint Inquiry Staff
                      **John Keefe,** Joint Inquiry Staff

*June 6, 2002*        **Eleanor Hill,** Director, Joint Inquiry Staff
                      **Alonzo Robertson,** Joint Inquiry Staff
                      **John Keefe,** Joint Inquiry Staff

*June 11, 2002*       **Richard Clarke,** Special Advisor to the President for Cyberspace Security, Executive Office of the President, former Coordinator for Security, Infrastructure, and Counterterrorism,  National Security Council, 1993 - 2001.

*June 12, 2002*       **Miles Kara,** Joint Inquiry Staff
                      **Patti Litman,** Joint Inquiry Staff
                      **Michael Jacobson,** Joint Inquiry Staff

*June 18, 2002*       **George Tenet,** Director of Central Intelligence
                      **Robert Mueller,** Director, Federal Bureau of Investigation
                      **Lieutenant General Michael Hayden, USAF,** Director, National Security Agency

*June 19, 2002*       **George Tenet,** Director of Central Intelligence
                      **Robert Mueller,** Director, Federal Bureau of Investigation
                      **Lieutenant General Michael Hayden, USAF,** Director, National Security Agency

*July 16, 2002*       **Robert Rosenwald,** Joint Inquiry Staff

**Patti Litman,** Joint Inquiry Staff

*July 18, 2002*    **Lieutenant General Michael Hayden, USAF,** Director, National Security Agency
**Dr. Donald Kerr,** Deputy Director of Central Intelligence for Science and Technology
**James Caruso,** Deputy Assistant Director for Counterterrorism and Counterintelligence, Federal Bureau of Investigation

*July 23, 2002*    **David Aufhauser,** General Counsel, Department of Treasury
**James Sloan,** Director, Financial Crimes Enforcement Network
**Richard Newcomb,** Office of Foreign Assets Control
**Dennis Lormel,** Section Chief, Financial Review Group, Federal Bureau of Investigation

*July 25, 2002*    **Central Intelligence Agency Officer**
**Defense Intelligence Agency Officer**
**National Security Agency Officer**
**Federal Bureau of Investigation Supervisor**
**Central Intelligence Agency Officer**

*Sept. 12, 2002*    **Counterterrorist Center Officers**, Central Intelligence Agency
**Cofer Black,** Former Chief, Counterterrorist Center, Central Intelligence Agency

*Sept. 18, 2002*    **Eleanor Hill,** Director, Joint Inquiry Staff
**Kristin Breitweiser,** Co-Founder of September 11th Advocates
**Stephen Push,** Co-Founder and Treasurer of Families of September 11th

*Sept. 19, 2002*    **Richard Armitage,** Deputy Secretary of State
**Paul Wolfowitz,** Deputy Secretary of Defense
**General Brent Scowcroft, USAF (Ret.)** National Security Advisor, Ford Administration and George H.W. Bush Administration
**Samuel Berger,** National Security Advisor, Clinton Administration, Second Term

*Sept. 20, 2002*    **Eleanor Hill,** Director, Joint Inquiry Staff
**CIA Officer**
**FBI Special Agent**
**Michael Rolince,** Special Agent-in-Charge, Washington Field Office, Federal Bureau of Investigation

2

**Christopher Kojm,** Deputy for Intelligence Policy and Coordination, Bureau of intelligence and Research, Department of State

*Sept. 24, 2002*
**Eleanor Hill,** Director, Joint Inquiry Staff
**FBI Special Agent,** Minneapolis Field Office
**FBI Special Agent,** Phoenix Field Office
**FBI Supervisor,** FBI Headquarters

*Sept. 26, 2002*
**Cofer Black,** Former Chief, Counterterrorist Center, Central Intelligence Agency
**Dale Watson,** Former Executive Director, Counterintelligence and Counterterrorism Division, Federal Bureau of Investigation
**FBI Special Agent,** Minneapolis Field Office
**FBI Special Agent,** Phoenix Field Office
**FBI Supervisor,** FBI Headquarters
**Michael Rolince,** Special Agent-in-Charge, Washington Field Office, Federal Bureau of Investigation
**M. E. Bowman,** Deputy General Counsel, Federal Bureau of Investigation

*Oct 1, 2002*
**Eleanor Hill,** Director, Joint Inquiry Staff
**James S. Gilmore, III,** Former Governor of the Commonwealth of Virginia and Chairman, Advisory Panel to Assess Capabilities for Domestic Response to Terrorism
**Amb. Francis X. Taylor,** Counterterrorism Coordinator, Department of State
**Claudio Manno,** Acting Associate Under Secretary for Intelligence, Transportation Security Agency
**Joseph B. Greene,** Assistant Commissioner for Investigations, U.S. Immigration and Naturalization Service
**Louis E. Andre,** Special Assistant to the Director for Intelligence, J-2, Defense Intelligence Agency
**Edward T. Norris,** Police Commissioner, City of Baltimore, MD

*Oct 3, 2002*
**Eleanor Hill,** Director, Joint Inquiry Staff
**Lee Hamilton,** Former Chairman, House Permanent Select Committee on Intelligence**,** Director, Woodrow Wilson International Center for Scholars
**Judge William Webster,** Former Director of Central Intelligence and Former Director, Federal Bureau of Investigation
**Lieutenant General William Odom, USA (Ret.),** Former Director, National Security Agency
**Frederick Hitz,** Former Inspector General, Central Intelligence Agency

*Oct 8, 2002*
**Eleanor Hill,** Director, Joint Inquiry Staff
**Warren Rudman,** Former U.S. Senator

**Judge Louis Freeh,** Former Director, Federal Bureau of Investigation
**Mary Jo White,** Former U.S. Attorney, Southern District of New York
**Paul Pillar,** National Intelligence Officer for Near East/South Africa, Central Intelligence Agency

*Oct 9, 2002*        **Pasquale D'Amuro,** FBI Executive Assistant Director
**CIA Official**
**FBI Special Agent**

*Oct 10, 2002*      **George Tenet,** Director of Central Intelligence
**Robert Mueller,** Director, Federal Bureau of Investigation

*Oct 17, 2002*      **Eleanor Hill,** Director, Joint Inquiry Staff
**George Tenet,** Director of Central Intelligence
**Robert Mueller,** Director, Federal Bureau of Investigation
**Lieutenant General Michael Hayden, USAF,** Director, National Security Agency

4

# APPENDIX

# INTERVIEWS CONDUCTED
# IN THE COURSE
# OF
# THE JOINT INQUIRY

SECRET

# INTERVIEWS CONDUCTED
# IN THE
# COURSE OF
# THE JOINT INQUIRY [*]

[—————————], *Assistant Legal Attache, Paris, Federal Bureau of Investigation*

[—————————], *Program Manager, Counterterrorist Center, Central Intelligence Agency*

[—————————], *Inspection Division, Federal Bureau of Investigation*

[—————————], *Assistant General Counsel, Federal Bureau of Investigation*

[—————————], *Directorate of Science and Technology, Central Intelligence Agency*

**Maj. Gen. Keith Alexander**, *Intelligence and Security Command, Land Information Warfare Agency*

[—————————], *Counterterrorist Center, Central Intelligence Agency*

**Charles E. Allen**, *Associate Director of Central Intelligence for Collection*

[—————————], *Special Agent, Newark Field Office, Federal Bureau of Investigation*

[—————————], *Special Agent, Washington Field Office, Federal Bureau of Investigation*

[—————————], *Associate Director for Intelligence, Joint Chiefs of Staff*

[—————————], *New York Field Office, Federal Bureau of Investigation*

[—————————], *New York Field Office, Federal Bureau of Investigation*

[—————————], *Headquarters, Defense Intelligence Agency*

---

[*] Note: This is only a partial list of persons from whom the Joint Inquiry acquired information.  It includes persons who were present for group discussions, as well as those who were interviewed individually. Foreign government officials are not included.  Interviewee affiliations are as of the date of interview. Names have been redacted for both national security and privacy reasons.

1

SECRET

SECRET

**John Arriza**, *Director, TIPOFF Watchlist Program, Department of State*

**[——————]**, *National Security Agency Representative to Counterterrorist Center*

**Maureen Baginski**, *Director, Signals Intelligence Directorate, National Security Agency*

**James Baker**, *Counsel for Intelligence Policy, Department of Justice*

**[——————]**, *New York Field Office, Federal Bureau of Investigation*

**[——————]**, *Assistant Legal Attache, Singapore, Federal Bureau of Investigation*

**[——————]**, *New York Field Office, Federal Bureau of Investigation*

**[——————]**, *Defense Attaché, U.S. Army, Tel Aviv, Israel*

**[——————]**, *Counterterrorist Center, Central Intelligence Agency*

**Samuel "Sandy" Berger**, *Former Assistant to the President for National Security Affairs*

**Richard Betts**, *Professor, Columbia University*

**[——————]**, *Counterterrorist Center, Central Intelligence Agency*

**[——————]**, *Special Agent, Oklahoma City Field Office, Federal Bureau of Investigation*

**Joe Billy,** *Special Agent In-Charge, New York Field Office, Federal Bureau of Investigation*

**[——————]**, *Counterterrorist Center, Central Intelligence Agency*

**Cofer Black**, *Former Chief, Counterterrorist Center, Central Intelligence Agency*

**[——————]**, *Counterterrorist Center, Central Intelligence Agency*

**William Black**, *Deputy Director, National Security Agency*

**[——————]**, *Defense Intelligence Agency*

**[——————]**, *[——————]*, *[——————]*, *Central Intelligence Agency*

SECRET

[——————], *Counterterrorist Center, Central Intelligence Agency*

[——————], *Foreign Broadcast Information Service, Central Intelligence Agency*

[——————], *Section Chief, Counterintelligence Division, Federal Bureau of Investigation*

[——————], *Special Agent, New York Field Office, Federal Bureau of Investigation*

[——————], *Office of General Counsel, Counterterrorist Center, Central Intelligence Agency*

**Marion E. (Spike) Bowman**, *Deputy General Counsel for National Security Affairs, Federal Bureau of Investigation*

[——————], *Former NSA Detailee to Counterterrorist Center, Central Intelligence Agency*

[——————], *Directorate of Operations, Central Intelligence Agency*

[——————], *Chief of Language School, Central Intelligence Agency*

**John Brennan,** *Executive Director, Central Intelligence Agency*

[——————], *[——————], [——————], Central Intelligence Agency*

[——————], *Private Citizen*

[——————], *Counterterrorist Center, Central Intelligence Agency*

[——————], *Counterterrorist Center, Central Intelligence Agency*

[——————], *Radical Fundamentalist Unit, Federal Bureau of Investigation*

**Robert Bryant,** *Former Deputy Director, Federal Bureau of Investigation*

[——————], *Counterterrorist Center, Central Intelligence Agency*

**Jeffrey Builta**, *Defense Intelligence Agency*

[——————], *[——————], [——————], Central Intelligence Agency*

3

SECRET

[——————], *Joint Counterintelligence Assessment Group, Department of Defense*

[——————], *Former Special Agent, San Diego Field Office, Federal Bureau of Investigation*

[——————], *Special Agent, New York Field Office, Federal Bureau of Investigation*

[——————], *Counterterrorism Office, National Security Unit, Immigration and Naturalization Service*

[——————], *Senior Science Advisor, Joint Chiefs of Staff*

[——————], *Headquarters, Defense Intelligence Agency*

[——————], *Central Intelligence Agency*

**Lt. Gen. Michael Canavan, U.S. Army (Ret),** *Former Commander, Joint Special Operations Command*

[——————], *Federal Bureau of Investigation*

[——————], *Special Agent, New York Field Office, Federal Bureau of Investigation*

**Amb. Timothy Carney**, *Former US Ambassador to Sudan*

[——————], *Former Chief, CIA Counterterrorist Center, Central Intelligence Agency*

[——————], *Supervisory Special Agent, FBI Representative to Department of State*

[——————], *Counterterrorist Center, Central Intelligence Agency*

**James T. Caruso**, *FBI Deputy Executive Assistant Director for Counterintelligence and Counterterrorism*

[——————], *Counterterrorist Center, Central Intelligence Agency*

**Ed Chase,** *Office of Management and Budget*

[——————], *Supervisory Special Agent, New York Field Office, Federal Bureau of Investigation*

[——————], *Supervisory Special Agent, New York Field Office, Federal Bureau of Investigation*

[——————], *National Security Agency Representative to Deputy Director of Central Intelligence*

4

SECRET

SECRET

**Richard Clarke**, *Former National Coordinator for Counterterrorism, Clinton and Bush Administrations*

[————————]**,** *Boston Field Office, Federal Bureau of Investigation*

[————————]*, Special Agent, New York Field Office, Federal Bureau of Investigation*

[————————]*, Counterterrorist Center, Central Intelligence Agency*

[————————]*, Counterterrorist Center, Central Intelligence Agency (Retired)*

[————————]*, Special Agent, New York Field Office, Federal Bureau of Investigation*

[————————]*, Headquarters, Federal Bureau of Investigation*

[————————]*, Civil Aviation Security Field Office, Minneapolis Airport, Department of Transportation*

**Jay Corcoran,** *Director of Intelligence, U.S. Customs Service*

[————————]*, Information Operation Specialist, Federal Bureau of Investigation*

[————————]*, Counterterrorist Center, Central Intelligence Agency*

[————————]**,** *[————————], [————————], Central Intelligence Agency*

[————————]*, National Security Agency*

**Roger Cressey**, *National Security Counsel*

**William P. Crowell**, *Former Deputy Director, National Security Agency*

[————————]**,** *Special Agent, New York Field Office, Federal Bureau of Investigation*

[————————]**,** *National Security Agency*

[————————]**,** *Counterterrorist Center, Central Intelligence Agency*

**Pasquale D'Amuro**, *Assistant Director, Counterterrorist Division, Federal Bureau of Investigation*

**Maj. Gen. Keith Dayton**, *Director of Operations, Defense Intelligence Agency*

SECRET

SECRET

[———————], *National Security Agency*

[———————], *Special Agent, Phoenix Field Office, Federal Bureau of Investigation*

**John Deutch**, *Former Director of Central Intelligence*

[———————]**,** *Supervisory Special Agent, Federal Bureau of Investigation*

[———————]**,** *Assistant Legal Attache, Islamabad, Federal Bureau of Investigation*

[———————]**,** *Division Chief, Central Intelligence Agency*

[———————], *Inspection Division, Federal Bureau of Investigation*

**Patrick Duecy**, *Director, Joint Intelligence Task Force, Defense Intelligence Agency*

[———————]**,** *Director, Executive Secretary, Central Intelligence Agency*

[———————]**,** *Legal Attaché, London, England, Federal Bureau of Investigation*

[———————], *Special Agent, Boston Field Office, Federal Bureau of Investigation*

[———————], *National Security Agency*

[———————], *Special Agent, New York Field Office, Federal Bureau of Investigation*

[———————]**,** *Department of State Representative to Counterterrorist Center, Central Intelligence Agency*

[———————]**,** *Counterterrorist Center, Central Intelligence Agency*

[———————]**,** *Counterterrorist Center, Central Intelligence Agency*

[———————]**,** *Headquarters, Federal Bureau of Investigation*

[———————]**,** *Radical Fundamentalist Unit, Federal Bureau of Investigation*

[———————]**,** *[———————], [———————], [———————], [———————], Central Intelligence Agency*

SECRET

SECRET

[————————], *U.S. Customs Service*

[————————], *Legal Attaché, Brussels and The Hague, Federal Bureau of Investigation*

[————————], *Supervisory Special Agent, New York Field Office, Federal Bureau of Investigation*

[————————], *Supervisory Special Agent, Radical Fundamentalist Unit, Federal Bureau of Investigation*

[————————], *Office of General Counsel, Counterterrorist Center, Central intelligence Agency*

**Louis J. Freeh**, *Former Director, Federal Bureau of Investigation*

**Vice Adm. Scott Fry**, *Commander, 6th Fleet, Former Deputy Director of Operations, Joint Chiefs of Staff*

[————————], *Former Federal Bureau of Investigation Special Agent*

[————————], *Special Agent, New York Field Office, Federal Bureau of Investigation*

[————————], *National Security Agency*

[————————], *Portland Field Office, Federal Bureau of Investigation*

[————————], *Federal Bureau of Investigation*

[————————], *Supervisory Special Agent, New York Field Office, Federal Bureau of Investigation*

[————————], *Federal Bureau of Investigation Representative to Central Intelligence Agency*

[————————], *Counterterrorist Center, Central Intelligence Agency*

[————————], *Special Agent, San Diego Field Office, Federal Bureau of Investigation*

[————————], *Acting Legal Attaché, Tel Aviv, Israel, Federal Bureau of Investigation*

[————————], *Special Agent, Federal Bureau of Investigation*

[————————], *Language Specialist, Federal Bureau of Investigation*

[————————], *Special Agent, San Diego Field Office, Federal Bureau of Investigation*

7

SECRET

SECRET

[——————], *Counterterrorist Center, Federal Bureau of Investigation*

[——————], *Private Citizen*

[——————], *Legal Attaché, Berlin, Federal Bureau of Investigation*

[——————], *Central Intelligence Agency*

[——————], *Special Agent, Federal Bureau of Investigation*

[——————], *[——————], Central Intelligence Agency*

[——————], *[——————], [——————], Central Intelligence Agency*

**William Gore**, *Special Agent In-Charge, San Diego Field Office, Federal Bureau of Investigation*

**Brig. Gen. Scott Gration**, *Former Deputy Director Information Operations, Joint Chiefs of Staff*

[——————], *Counterterrorist Referent, [——————], Central Intelligence Agency*

[——————], *[——————], Central Intelligence Agency*

[——————], *Counterterrorist Center, Central Intelligence Agency*

[——————], *Chief, Language Services Division, Federal Bureau of Investigation*

[——————], *Former [——————] Division Chief of Operations, [——————], Central Intelligence Agency*

[——————], *National Security Agency*

**Carol Haave,** *Deputy Assistant Secretary of Defense for Security and Information Operations*

[——————], *Counterterrorist Center, Central Intelligence Agency*

[——————], *Special Agent, San Diego Field Office, Federal Bureau of Investigation*

[——————], *National Imagery and Mapping Agency*

8

SECRET

**Lee Hamilton**, *Former House Permanent Select Committee on Intelligence Chairman,*
*Director, Woodrow Wilson International Center for Scholars,*
*Director, Center on Congress at Indiana University*

[———————], *Supervisory Special Agent, Federal Bureau of Investigation*

**John Hamre**, *Former Deputy Secretary of Defense, Former Comptroller, Department of Defense*

[———————], *Associate Deputy Director of Central Intelligence for Operations for Resources,*
*Plans and Policy*

[———————], *Special Agent, San Diego Field Office, Federal Bureau of Investigation*

[———————], *Former Supervisory Special Agent, Phoenix Field Office, Federal Bureau of Investigation*

[———————], *Counterterrorist Center, Central Intelligence Agency*

[———————], *National Imagery and Mapping Agency*

[———————], *Headquarters, Federal Bureau of Investigation*

[———————], *Immigration and Naturalization Service*

[———————], *Special Agent, Phoenix Field Office, Federal Bureau of Investigation Retiree)*

**Richard Haver**, *Special Assistant for Intelligence, Office of the Secretary of Defense*

**Lt. Gen Michael Hayden**, *Director, National Security Agency*

**Christine Healey**, *Minority Counsel, House Permanent Select Committee on Intelligence*

[———————], *Booz Allen & Hamilton*

[———————], *General Accounting  Office*

**Frederick Hitz**, *Former Inspector General, Central Intelligence Agency*

[———————], *National Security Agency*

[———————], *[————], Division Chief, Central Intelligence Agency*

[——————], *Acting Legal Attaché, London, England, Federal Bureau of Investigation*

[——————], *Private Citizen*

**Karl Inderfurth**, *Former Assistant Secretary of State for South Asia*

[——————], *National Security Agency*

**Rear Adm. Lowell E. Jacoby**, *Director, Defense Intelligence Agency, Joint Chiefs of Staff*

[——————], *Central Intelligence Agency*

[——————], *Special Agent, Federal Bureau of Investigation*

**Robert Jervis**, *Professor, Columbia University*

[——————], *[——————], [——————], Central Intelligence Agency*

[——————], *Special Agent, Boston Field Office, Federal Bureau of Investigation*

[——————], *Defense Intelligence Agency*

[——————], *Special Agent, Minneapolis Field Office, Federal Bureau of Investigation*

[——————], *National Security Agency Representative to Federal Bureau of Investigation*

[——————], *Counterterrorist Center, Central Intelligence Agency*

[——————], *Counterterrorist Center, Central Intelligence Agency*

[——————], *Counterterrorist Center, Central Intelligence Agency*

[——————], *Special Agent, New York Field Office, Federal Bureau of Investigation*

[——————], *National Security Agency*

**Donald Kerr**, *Deputy Director of Central Intelligence for Science and Technology*

[——————], *Counterterrorist Center, Central Intelligence Agency*

SECRET

**[—————————],** *Defense Intelligence Agency*

**[—————————],** *Counterterrorist Center, Central Intelligence Agency*

**[—————————],** *Counterterrorist Center, Central Intelligence Agency*

**[—————————],** *Counterterrorist Center, Central Intelligence Agency*

**[—————————],** *National Security Agency Representative to Federal Bureau of Investigation*

**[—————————],** *Directorate for Science and Technology, Central Intelligence Agency*

**[—————————],** *Former Counterterrorist Center, Central Intelligence Agency*

**David Kris**, *Associate Deputy Attorney General, Department of Justice*

**Capt. Michael Kuhn**, *U.S. Navy*

**[—————————],** *Special Agent, Phoenix Field Office, Federal Bureau of Investigation*

**[—————————],** *Supervisory Special Agent, Phoenix Field Office, Federal Bureau of Investigation*

**Thomas Kuster**, *Director of Counterterrorism Policy, Department of Defense*

**[—————————],** *Assistant Special Agent In-Charge, San Diego Field Office, Federal Bureau of Investigation*

**[—————————],** *Supervisory Special Agent, Boston Field Office, Federal Bureau of Investigation*

**[—————————],** *Language Specialist, Federal Bureau of Investigation*

**[—————————],** *Supervisory Special Agent, Headquarters, Federal Bureau of Investigation*

**Matthew Levitt,** *Washington Institute for Near East Policy*

**[—————————],** *Supervisory Special Agent, New York Field Office, Federal Bureau of Investigation*

**[—————————],** *Supervisory Special Agent, Headquarters, Federal Bureau of Investigation*

11

SECRET

[——————————], *Deputy Assistant Director, Inspection Division, Federal Bureau of Investigation*

[——————————], *National Security Agency*

[——————————], *National Security Agency*

**John Louder**, *National Reconnaissance Agency*

**Mark Lowenthal,** *Associate Director of Central Intelligence for Analysis and Production*

[——————————], *Department of State*

[——————————], *Headquarters, Federal Bureau of Investigation*

[——————————], *Federal Bureau of Investigation*

[——————————], *Supervisory Special Agent, Cleveland Field Office, Federal Bureau of Investigation*

[——————————], *Supervisory Special Agent, Federal Bureau of Investigation*

[——————————], *Central Intelligence Agency*

**Claudio Manno**, *Federal Aviation Administration, Transportation Security Administration*

[——————————], *Headquarters, Federal Bureau of Investigation*

[——————————], *Headquarters, Federal Bureau of Investigation*

[——————————], *National Security Agency*

[——————————], *Department of State*

[——————————], *Counterterrorist Center, Central Intelligence Agency*

[——————————], *Special Agent, San Diego Field Office, Federal Bureau of Investigation*

[——————————], *Counterterrorist Center, Central Intelligence Agency*

[——————————], *U.S. Navy*

SECRET

[——————], *Assistant Special Agent In-Charge, New York Field Office, Federal Bureau of Investigation*

**Mary McCarthy**, *Former Senior Director for Intelligence Programs, National Security Council*

**Steven McCraw**, *Special Agent In-Charge, San Antonio Field Office, Federal Bureau of Investigation*

[——————], *Immigration and Naturalization Service Representative to Federal Bureau of Investigation*

[——————], *Special Agent, San Diego Field Office, Federal Bureau of Investigation*

**Barbara McNamara**, *Former Deputy Director, National Security Agency*

[——————], *Counterterrorist Center, Central Intelligence Agency*

[——————], *Counterterrorist Center, Central Intelligence Agency*

[——————], *Counterterrorist Center, Central Intelligence Agency*

[——————], *Special Agent, San Diego Field Office, Federal Bureau of Investigation*

[——————], *Supervisory Special Agent, Federal Bureau of Investigation*

**Mark Miller**, *Central Intelligence Agency Representative to Federal Bureau of Investigation*

[——————], *Chief Information Officer, Central Intelligence Agency*

[——————], *Immigration and Naturalization Service*

[——————], *National Security Agency*

**Lt. Gen. Kenneth Minihan**, *Former Director, National Security Agency*

[——————], *Supervisory Special Agent, Federal Bureau of Investigation*

[——————], *Special Agent, Dallas Field Office, Federal Bureau of Investigation*

[——————], *Special Agent, Dallas Field Office, Federal Bureau of Investigation*

[——————], *Office of Homeland Security*

13

SECRET

[—————————], *National Security Agency*

[—————————], *Defense Intelligence Agency*

[—————————], *Special Agent, San Diego Field Office, Federal Bureau of Investigation*

[—————————], *Division Chief, National Security Agency*

[—————————], *[—————————], [—————————], Central Intelligence Agency*

[—————————], *Former Analyst, Federal Bureau of Investigation*

[—————————], *Analyst, Central Intelligence Agency*

**Lt. Gen. Gregory Newbold,** *Former Director of Operations, Joint Chiefs of Staff*

[—————————], *Central Intelligence Agency*

**Glenn Nordin**, *Assistant Director of Intelligence Policy (Language), Department of Defense*

[—————————], *Immigration and Naturalization Service*

[—————————], *Defense Intelligence Agency*

[—————————], *Headquarters, Federal Bureau of Investigation*

[—————————], *Former Chief, Counterterrorist Center, Central Intelligence Agency*

[—————————], *Central Intelligence Agency Analyst, [—————————]*

[—————————], *Counterterrorist Center, Central Intelligence Agency*

[—————————], *Analyst, Central Intelligence Agency*

[—————————], *Customs Representative to CIA Counterterrorist Center*

[—————————], *Headquarters, Federal Bureau of Investigation*

SECRET

SECRET

**James Pavit**, *Deputy Director of Central Intelligence for Operations*

[————————], *Defense Intelligence Agency*

[————————], *Central Intelligence Agency Representative to FBI New York Field Office*

[————————], *Supervisory Special Agent, Dallas Field Office, Federal Bureau of Investigation*

[————————], *[————————], [————————], Central Intelligence Agency*

**Thomas Pickard**, *Former Deputy Director, Federal Bureau of Investigation*

[————————], *Supervisory Special Agent, Federal Bureau of Investigation*

[————————], *Assistant Special Agent In-Charge, Sacramento Field Office, Federal Bureau of Investigation*

**Paul Pillar**, *National Intelligence Officer for Near East, South Africa, Central Intelligence Agency*

[————————], *Special Agent, Phoenix Field Office, Federal Bureau of Investigation*

**John Pistole,** *Deputy Assistant Director, Counterterrorism Division, Federal Bureau of Investigation*

[————————], *Special Agent, New York Field Office, Federal Bureau of Investigation*

[————————], *Assistant General Counsel, Federal Bureau of Investigation*

[————————], *Unit Chief, Federal Bureau of Investigation*

[————————], *Deputy Director, Office of Budget, Central Intelligence Agency*

[————————], *Office of General Counsel, National Security Agency*

[————————], *Assistant Special Agent In-Charge, Boston Field Office, Federal Bureau of Investigation*

[————————], *National Security Agency*

[————————], *Analyst, Counterterrorist Center, Central Intelligence Agency*

[————————], *[————————], [————————], Central Intelligence Agency*

15

SECRET

SECRET

**COL Richard G. Reynolds,** *Defense Attaché, Amman, Jordan*

**Keith Rhodes,** *Chief Technologist, Center for Technology and Engineering, General Accounting Office*

**Susan Rice**, *Former Senior Director for African Affairs, National Security Council*

[——————], *Analyst, [ ——————], Central Intelligence Agency*

[——————], *Central Intelligence Agency*

[——————], *U. S. Customs Service*

[——————], *Language School, Central Intelligence Agency*

[——————], *Federal Aviation Administration*

**Michael Rolince,** *Headquarters, Federal Bureau of Investigation*

[——————], *Counterterrorist Center, Central Intelligence Agency*

[——————], *Federal Bureau of Investigation Special Agent attached to Joint Terrorist Task Force*

[——————], *Special Agent, Minneapolis Field Office, Federal Bureau of Investigation*

**Colleen Rowley**, *Principal Legal Advisor, Minneapolis Field Office, Federal Bureau of Investigation*

**Mary Ryan**, *Assistant Secretary of State for Consular Affairs*

[——————], *Office of General Counsel, Federal Bureau of Investigation*

[——————], *Federal Aviation Administration Representative to Federal Bureau of Investigation*

[——————], *Special Agent, Minneapolis Field Office, Federal Bureau of Investigation*

**Jerry Savage**, *Office of Inspector General, Department of Defense*

[——————], *Central Intelligence Agency*

[——————], *Counterterrorist Center, Central Intelligence Agency*

16

SECRET

[——————], *Counterterrorist Center, Central Intelligence Agency*

[——————], *Central Intelligence Agency, [——————]*

[——————], *Central Intelligence Agency*

[——————], *Central Intelligence Agency*

**John Schuhart**, *Director, Resource Management Office, Community Management Staff*

[——————], *Special Agent, San Diego Field Office, Federal Bureau of Investigation*

[——————], *National Security Agency Representative to Deputy Director of Central Intelligence*

[——————], *[——————], [——————], Central Intelligence Agency*

[——————], *Oklahoma City Field Office, Federal Bureau of Investigation*

[——————], *Directorate of Science and Technology, Central Intelligence Agency*

[——————], *National Security Agency*

[——————], *Counterterrorist Center, Central Intelligence Agency*

[——————], *National Security Agency*

[——————], *Special Agent, San Diego Field Office, Federal Bureau of Investigation*

**Michael Sheehan**, *Ambassador to the UN, former Coordinator for Counterterrorism, Department of State*

**Michael Sheehy**, *Minority Staff Director, House Permanent Select Committee on Intelligence*

**Gen. Hugh Shelton**, *Former Chairman, Joint Chiefs of Staff*

[——————], *Director, Office of the Budget, Central Intelligence Agency*

[——————], *Defense Intelligence Agency*

[——————], *Central Intelligence Agency, [——————], [——————]*

17

SECRET

SECRET

[——————————], *Deputy Counsel for Operations, Department of Justice*

[——————————], *Special Agent, San Diego Field Office, Federal Bureau of Investigation*

[——————————], *Special Agent, San Diego Field Office, Federal Bureau of Investigation*

**James Sloan**, *Director, Financial Crimes Enforcement Network, Department of Treasury*

[——————————], *National Security Agency*

[——————————], *Immigration and Naturalization Representative to CIA Counterterrorist Center*

[——————————], *Special Agent, Kansas City Field Office, Federal Bureau of Investigation*

[——————————], *Department of State*

[——————————], *Special Agent, New York City Field Office, Federal Bureau of Investigation*

[——————————], *National Security Agency*

[——————————], *Counterterrorist Center, Central Intelligence Agency*

[——————————], *Headquarters Analyst, Federal Bureau of Investigation*

[——————————], *Counterterrorist Center Analyst, Central Intelligence Agency*

[——————————], *National Security Agency*

**Roy Surrett**, *Director of Intelligence, U.S. Customs Service*

[——————————], *Supervisory Special Agent San Diego Field Office, Federal Bureau of Investigation*

[——————————], *Language Specialist, Federal Bureau of Investigation*

[——————————], *Special Agent, San Diego Field Office, Federal Bureau of Investigation*

**Francis X. Taylor**, *Ambassador at Large for Coordination and Implementation of Government-wide U.S. Counterterrorism Policy, Department of State*

**Richard Taylor**, *Former Deputy Director of Operations, National Security Agency*

SECRET

[—————————], *Joint Intelligence Task Force-Counterterrorism, Defense Intelligence Agency*

[—————————], *Headquarters Analyst, Federal Bureau of Investigation*

[—————————], *National Security Agency*

[—————————], *Inspection Division, Federal Bureau of Investigation*

[—————————], *Supervisory Special Agent, San Diego Field Office, Federal Bureau of Investigation*

[—————————], *Counterterrorist Center, Central Intelligence Agency*

**Frances Fragos Townsend,** *Former Counsel for Intelligence Policy, Department of Justice*

[—————————], *Central Intelligence Agency*

[—————————], *Directorate of Operations Senior Official, Central Intelligence Agency*

[—————————], *Boston Field Office, Federal Bureau of Investigation*

[—————————], *Counterterrorist Center, Central Intelligence Agency*

[—————————], *Counterterrorist Center, Central Intelligence Agency*

[—————————], *Headquarters Analyst, Federal Bureau of Investigation*

[—————————], *Analyst, National Security Agency*

[—————————], *Chicago Field Office, Federal Bureau of Investigation (Retired)*

[—————————], *[—————————], [————], [————], Central Intelligence Agency*

[—————————], *Defense Intelligence Agency*

19

[——————————], *Federal Bureau of Investigation*

[——————————], *Counterterrist Center, Central Intelligence Agency*

[——————————], *Chief of Operations, [————————————],, Central Intelligence Agency*

**Maj. Gen. Ward**, *U.S. Army, Vice Director of Operations, Joint Chiefs of Staff*

[——————————], *Defense Intelligence Agency, Department of Defense*

[——————————], *Directorate for Science and Technology, Central Intelligence Agency*

**Dale Watson**, *Executive Assistant Director for Counterterrorism and Counterintelligence, Federal Bureau of Investigation*

**William Webster**, *Former Director of Central Intelligence, Former Director, Federal Bureau of Investigation*

[——————————]**,** *[————————————], [————————], [—————————], National Security Agency*

[——————————]**,** *Financial Review Group, Federal Bureau of Investigation*

[——————————]**,** *Counterterrorist Center, Central Intelligence Agency*

[——————————]**,** *Counterterrorist Center Analyst, Central Intelligence Agency*

**Linton Wells**, *Principal Deputy Assistant Secretary of Defense  (Command, Control, Communications and Intelligence), Department of Defense*

[——————————], *Central Intelligence Agency*

[——————————]**,** *[————————————], [————————————], Central Intelligence Agency*

**Mary Jo White**, *Former U.S. Attorney for the Southern District of New York*

[——————————]**,** *Counterterrorist Center, Central Intelligence Agency*

[——————————]**,** *Former Special Agent, Milwaukee Field Office, Federal Bureau of Investigation*

[——————————]**,** *Special Agent, Phoenix Field Office, Federal Bureau of Investigation*

[——————], *Central Intelligence Agency*

[——————], *Central Intelligence Agency Representative to Federal Bureau of Investigation*

[——————], *[——————], [———], [———], National Security Agency*

**Vice Adm. Thomas Wilson (Ret)**, *Former Director, Defense Intelligence Agency*

[——————], *Boston Field Office, Federal Bureau of Investigation*

[——————], *National Security Law Unit, Federal Bureau of Investigation*

[——————], *Finance Division, Federal Bureau of Investigation*

**James Woolsey**, *Former Director of Central Intelligence*

[——————], *Former Special Agent, Chicago Field Office, Federal Bureau of Investigation*

**Austin Yamada**, *Deputy Assistant Secretary of Defense for Special Operations, Department of Defense*

[——————], *Special Agent, Oklahoma City Field Office, Federal Bureau of Investigation*

**Wayne Zaidemann**, *Legal Attaché, Amman, Jordan, Federal Bureau of Investigation*

21

**APPENDIX**

**COUNTERTERRORISM ORGANIZATIONS**
**WITHIN**
**THE INTELLIGENCE COMMUNITY**

SECRET

# COUNTERTERRORISM ORGANIZATIONS
# WITHIN
# THE
# INTELLIGENCE COMMUNITY
### (As of December 31, 2002)


The U.S. Intelligence Community currently consists of the Office of the Director of Central Intelligence, the Central Intelligence Agency, the National Security Agency, the Defense Intelligence Agency, the National Imagery and Mapping Agency, the National Reconnaissance Office, other specialized offices within the Department of Defense, the intelligence elements of the military services, the Federal Bureau of Investigation, the Department of the Treasury, the Department of Energy, the Bureau of Intelligence and Research of the Department of State, and the Coast Guard.


## PRIMARY COUNTERTERRORISM AGENCIES


<u>Central Intelligence Agency (CIA)</u>

The Counterterrorist Center (CTC) is the CIA's primary counterterrorism component. In 1993, a special unit was established within the CTC, the Bin Ladin Issue Station, with personnel from CIA, NSA, FBI and other agencies to develop intelligence on Bin Ladin and his organization. The CIA worked alone and with friendly foreign intelligence services to disrupt Bin Ladin, degrade his ability to engage in terrorism, and bring him to justice.

[Within CTC, several units focus on al-Qa'ida:

- The [———] Extremist CT Operations Group, the CTC operational arm, tracks al-Qa'ida and other [————] radical groups. In 1996, the CTC created [the Bin Ladin Issue] Station to target Bin Ladin and his network, [————————————————]. The CTC's [———] Extremist Branch also follows a range of radical [———] groups, which are not part of al-Qa'ida, but often share personnel, provide logistical support, or otherwise assist it.

- The Office of Terrorism Analysis, the CTC's analytic arm, is responsible for providing analytical products on terrorism. OTA now has approximately [———] analysts. Before September 11, its [———] analysts were part of the smaller Assessments and Information Group, which was organized into five branches, only one of which focused (partially) on Bin Ladin.

1

SECRET

- [The Renditions Group (formerly the Renditions Branch) [————————
  ————————————————]. From 1986 to September 2001, the Renditions Branch was involved in several dozen renditions].

- [The Financial Operations Group, which was established after September 11, grew out of the Bin Ladin Station's efforts to track Bin Ladin's financial activities.  [————————————————
  ————————————————————].

The CIA developed an operational strategy, referred to as "the Plan," so that CTC could react quickly to operational opportunities, renditions, and analysis to disrupt and capture Bin Ladin and his principal lieutenants.

To execute its plan against Bin Ladin, CTC developed a program to train and position personnel and move experienced operations officers into the Center to identify, vet, and hire qualified personnel for counterterrorism assignments.  They sought fluency in Mid-East and South-Asian languages, combined with police, military, business, technical, or academic expertise, and established an eight week advanced counterterrorism operations course.

From 1999 to September 11, human intelligence sources against terrorism grew by more than fifty percent.  Working across agencies, and in some cases with foreign services, the CIA designed and built [————————] for specific use against Al-Qa'ida inside Afghanistan.  By September 11, sufficient collection programs and human networks were in place to cover almost all of Afghanistan.

Federal Bureau of Investigation (FBI)

The FBI within the Department of Justice is the principal law-enforcement arm of the government and the lead agency responsible for counterterrorism in the United States.

In 1999, the Counterterrorism Division was established in FBI Headquarters, incorporating the International Terrorism Operations Division, the Domestic Terrorism Division, the National Domestic Preparedness Office, and the National Infrastructure Protection Center.  The Radical Fundamentalist Unit and the Bin Ladin Unit became operational units within the International Terrorism Operations Section.  These units advise field offices on Attorney General Guidelines and coordinate field terrorism investigations.

Since the 1980s, the FBI's New York Field Office has had the principal role in the FBI's counterterrorism effort.  It has been the lead field office for Bin Ladin investigations and was the first to establish a Joint Terrorism Task Force of state and federal law enforcement and intelligence personnel.

2

SECRET

A reorganization of the FBI's Counterterrorism Division was announced in May 2002, which includes:

- Headquarters centralization of counterterrorism programs
- Joint Terrorism Task Forces in all field offices and a National JTTF at Headquarters
- Flying Squads to support field operations
- Enhanced counterterrorism and analytical training
- Shifting 518 field agents from criminal investigations to counterterrorism

National Security Agency (NSA)

Within NSA, a Department of Defense entity, responsibility for collecting, processing, analyzing, and reporting signals intelligence (SIGINT) is centered principally within the Signals Intelligence Directorate created in February 2001.  Within SID, the Counterterrorism Product Line has the lead for SIGINT production on counterterrorism targets.  CT Product Line personnel increased from approximately [——] before September 11 to about [——] in April 2002.

A portion of NSA's counterterrorism SIGINT reports comes from other product lines within SID:

- [——————————————————————————————————————————].
- [——————————————————————————————————————].
- [——————————————————————————————————————————].
- [——————————————————————————————————————————].

Department of State

The Bureau of Intelligence and Research (INR), the intelligence arm of the Department of State, has three units involved in counterterrorism: the Office of Analysis for Terrorism, Narcotics and Crime, the Office of Intelligence Coordination, and the Office of Intelligence Operations.  Outside INR, a Coordinator for Counterterrorism is responsible for developing counterterrorism policy.

The State Department also works closely with the Justice Department's Immigration and Naturalization Service to prevent terrorist suspects from entering the United States.  To this end, the State Department maintains two key counter-terrorism databases:

3

SECRET

- TIPOFF, a classified database within INR containing the names of foreigners who are not allowed to enter the United States because of ties to terrorism and other illegal activities and

- The Consular Lookout and Support System (CLASS), an unclassified database designed to assist in visa processing.

Information in TIPOFF and CLASS is derived from the Intelligence Community and other sources, such as the Immigration and Naturalization Service, the Drug Enforcement Agency, the Customs Service, and the Federal Aviation Authority. All consular officers must use the CLASS system before issuing visas.

Defense Intelligence Agency (DIA)

DIA is the Department of Defense element that produces and manages intelligence for the Secretary of Defense. Within DIA, the offices principally responsible for counterterrorism include the Defense Human Intelligence Service and the Joint Intelligence Task Force-Combating Terrorism.

Since July 2001, the Joint Terrorism Task Force – Counterterrism (JITF-CT) has been the focal point for all DIA counterterrorism analysis and production. The JITF-CT provides warnings, threat assessments, and all-source analysis and production and serves as a counterterrorism knowledge base within the Department of Defense.

Department of Transportation (DoT)

Within DoT, the U.S. Coast Guard and the Transportation Security Administration play a role in the government's counterterrorism mission. Pursuant to the Intelligence Authorization Act of 2002, the Coast Guard has become an Intelligence Community member. After September 11, DoT established the Transportation Security Administration, within which the Transportation Security Intelligence Service coordinates intelligence support and provides current and strategic warnings on threats to U.S. transportation.

Department of Treasury

Within Treasury, the Financial Crimes Enforcement Network is responsible for assisting U.S. intelligence and law enforcement agencies in tracking the movement of terrorist funds.

4

**APPENDIX**


**EVOLUTION
OF THE TERRORIST THREAT
AND THE
U.S. RESPONSE**

**1983 – 2001**

TOP SECRET

# Evolution of the terrorist threat and U.S. response, 1983-2001

## The Building Threat: Pre-1993

| Year | "Big picture" view | Selected, major terrorist events | U.S. institutional responses to terrorism |
|------|--------------------|----------------------------------|--------------------------------------------|
| 1979 | Soviet invasion of Afghanistan. Lebanese civil war already underway. | | |
| 1980 | | | First FBI Joint Terrorism Task Force established in NY City. |
| 1981 | | | |
| 1982 | Jun. Israeli invasion of Lebanon.<br><br>Sep. U.S. Marine peacekeeping presence established in Lebanon following assassination of Lebanese President. | | |
| 1983 | | 18 Apr. Bombing of U.S. embassy in Beirut. 63 killed, including CIA's Middle East director. 120 injured. (Islamic Jihad.)<br><br>23 Oct. Marine barracks bombing in Beirut. 241 Marines killed. French base attacked. (Islamic Jihad.) | |
| 1984 | 26 Feb. U.S. Marines depart Lebanon. | 16 Mar. CIA officer William Buckley kidnapped in Beirut. Other U.S. citizens not connected to the U.S. government are kidnapped over the next two years.<br><br>12 Apr. Hezbollah bombed restaurant near U.S. airbase near Torrejon, Spain, killing 18 U.S. servicemen. 83 injured. | |

TOP SECRET

TOP SECRET

| | | |
|---|---|---|
| | 20 Sep. Hezbollah Bombing of U.S. embassy annex in Beirut. 14 Americans killed. | |
| **1985** | 14 Jun. TWA 847 hijacked by Hezbollah terrorists. | |
| | 7 Oct. *Achille Lauro* hijacking. Palestinian Liberation Front took 700 hostages. 1 U.S. citizen killed. | |
| | 23 Nov. Egypt Air flight from Athens to Malta carrying several U.S. citizens hijacked by Abu Nidal Group. | |
| | Dec. Rome/Vienna airport bombings by Abu Nidal Organization. | Dec. Vice President's Report on Combating Terrorism. 40 recommendations. Key recommendations: Presidential [directive] regarding terrorism, National Security Decision Directive 207, establish a CTC. |
| **1986** | | 20 Jan. President signs NSDD-207, which delineates broad outlines of U.S. government policy for dealing with terrorism and set in place government-wide mechanisms for responding to the emerging threat. |
| | | Feb/Mar. CIA establishes CTC. |
| | 30 Mar. Palestinian splinter group detonated a bomb as TWA 840 approached Athens, killing four U.S. citizens. | |
| | 5 Apr. Bombing of La Belle disco in Berlin, Germany, killing two U.S. servicemen and one Turkish civilian. 200 wounded. Traced to Libyan perpetrators. | 9 Apr. Operation El Dorado Canyon. U.S. bombing of Libya. |
| | | Spring. Directive signed that authorizes CIA to conduct certain counterterrorism activities. |

TOP SECRET

| Year | | | |
|------|------|------|------|
| **1987** | | Sep. Rendition of Fawaz Yunis, wanted for hijacking Royal Jordanian airliner in which 6 Americans killed. [_____]. | 27 Aug. Omnibus Diplomatic Security and Antiterrorism Act expands FBI jurisdiction to include violence against U.S. nationals abroad. |
| **1988** | | 17 Feb. U.S. Marine LtCol William Higgins kidnapped/murdered by Iranian-backed Hezbollah.<br><br>14 Apr. Organization of Jihad Brigades exploded a car bomb outside a USO club in Naples, Italy, killing one U.S. sailor.<br><br>21 Dec. Bombing of Pan Am 103 over Lockerbie, Scotland. | |
| **1989** | 15 Feb. Soviet withdrawal from Afghanistan completed. | | 13 Oct. Terrorist Threat Warning System established. |
| **1990** | Aug. Iraq invades Kuwait. U.S. launches Operation Desert Shield. | | |

TOP SECRET

| 1991 | Jan-Mar. Operation Desert Storm expels Iraqi forces from Kuwait.<br><br>Apr. Operation Provide Comfort. Safe havens for Kurdish refugees in northern Iraq. This operation eventually becomes enforcement of no-fly zones over northern/southern Iraq, operations which continue to this day and resulted in a large, semi-permanent U.S. military presence in the Persian Gulf region. | Jan/Feb. CTC thwarts Iraqi agents' plans worldwide.<br><br>18-19 Jan. Iraqi agents planted bombs at the U.S. Ambassador to Indonesia's residence and at the USIS library in Manila |
| --- | --- | --- |
| 1992 | Rise of jihadist movement.<br><br>Dec. U.S. Operation Restore Hope to provide humanitarian relief to Somalia. | Dec. Attack on Aden hotel housing U.S. service members for the operation in Somalia. Possibly the first attack by UBL's network. |

TOP SECRET

# The Hunt for bin Ladin, 1993-2001

| Year | "Big picture" developments | Terrorist attacks and "tactical" counterterrorist actions | U.S. "strategic" responses to the terrorist threat | Other intelligence actions and issues |
|------|----------------------------|-----------------------------------------------------------|----------------------------------------------------|----------------------------------------|
| 1993 | Bin Ladin in Sudan.<br><br>26 Apr. [Intelligence warns that [——] is increasingly convinced that U.S. is working for its overthrow, and may be preparing to sponsor terrorist attacks against U.S. | 26 Feb. World Trade Center bombing.<br><br>20 Mar.  Sarin gas attack in Tokyo subway kills 12, sickens 5000. Aum Shinrikyo responsible.<br><br>23 Mar. Rendition of Abu Halima, suspect in World Trade Center bombing [<br>———] to FBI custody.<br><br>14 Apr. Iraqi Intelligence Service attempt to assassinate former President Bush in Kuwait thwarted. | 2 Apr. [CIA paper characterizes UBL as "independent actor [who] sometimes works with other individuals or governments [——] [——] [to] promote militant Islamic causes throughout the region…" [His group almost certainly played a role in an earlier bombing directed against U.S. interests].<br><br>20 Apr.  NID: [Hundreds of Islamic militants received training during the past year at military camps in Afghanistan. [———<br>[———<br>[———<br>————————].]. |  |

TOP SECRET

5

TOP SECRET



interests in the country.

May. [ ].

24 Jun. Arrest of 8 subjects—including 5 Sudanese—plotting to bomb NY City landmarks—U.N. building, 26 Federal Plaza, and Lincoln/Holland tunnels.

2 Jul.  Shaykh Abdel Rahman is detained by FBI in connection with the World Trade Center bombing.

25 Aug. Shaykh Rahman is indicted. Rahman is the spiritual leader of both Gama'at al-Islamiya and Egyptian Islamic Jihad.

Sep. [ ].

Sep. [CIA file summary prepared on UBL reports that [ ].

Sep. CIA HQ sends requirements to overseas stations to assess vulnerability of UBL network [ ].

30 Nov.  [Identification of intelligence targets associated with UBL and terrorist-related activities].

TOP SECRET



**1994**

[ ] Feb. [                        ].

9 Mar.  UBL denies link with terrorism in interview with London-based Saudi opposition paper, Al Quds Al-Arabi.

14 Aug. Sudan hands over Carlos the Jackal to France.

Fall.  Taliban movement established in Kandahar, Afghanistan.

30 May. [                                    ].

11 Oct.  CIA Office of Inspector General inspection of CIA's Counterterrorist Center finds that threats posed by some state-sponsored and leftwing terrorist groups have declined while threats from radical religious, ethnic, and

| | | | |
|---|---|---|---|
| | 11 Dec. Philippines airliner bombed. 1 passenger killed.<br><br>24 Dec. Members of the Armed Islamic Group seized an Air France flight to Algeria; they apparently intended to crash it into the Eiffel Tower. The four terrorists were killed during a rescue effort. | non-government terrorist groups have increased... Biggest weakness was limited ability to warn of impending attack. Difficulty of penetrating terrorist groups caused this weakness. | |
| 1995 | 7 Jan. Philippine police discover Ramzi Yousef's bombmaking lab and arrest accomplice Abdul Hakim Murad. Captured materials revealed Yousef's plot to blow up the Pope, U.S., and Israeli embassies in Manila, United Airlines aircraft flying Asian routes, and to crash a plane into CIA HQ. Murad also tells Philippine authorities that Yousef was involved in the World Trade Center bombing and planted bomb on the Philippine airliner in Dec 94.<br><br>10 Feb. Ramzi Yousef extradition from Pakistan.<br><br>19 Apr. Bombing of Murrah Federal Bldg in Oklahoma City. | 25 Jan. CTC briefs NSC. [_____<br>_____<br>_____<br>_____<br>_____<br>_____<br>_____<br>_____<br>_____<br>_____<br>_____<br>_____<br>_____ ].<br><br>2 Mar. President signs Presidential Decision Directive 35 providing overarching intelligence guidance. Terrorism is a Tier 1B issue. Intelligence requirements: collection information on plans/intentions inside terrorist circles, increase Near East, South Asia, and Islamic cultural and language expertise, expansion of | Spring. [_____] provides most significant reporting on UBL to date. [_____<br>_____<br>_____<br>_____<br>_____]. |

8

TOP SECRET

TOP SECRET

9



analytic cadre.

21 Jun. Presidential Decision Directive 39 supersedes NSDD-207. Calls for reducing terrorist capabilities; aggressive IC program, including covert action; return of indicted terrorist to U.S., including by force if necessary, as a matter of highest priority. Also confirmed and clarified FBI's role in counter-terrorism.

Jul. National Intelligence Estimate on terrorism. Judges that foreign terrorists will attempt an attack in the U.S. in the next year or two. Bombing of World Trade Center crossed a threshold to more large-scale attacks. Most likely threat of attack in the U.S. would be from transient groupings of individuals similar to that drawn together by Ramzi Yousef. Threat also from established groups: Hezbollah, Gama'at al-Islamiya, Hamas, and Jamā'a al-Fuqra. (Neither UBL nor al-Qa'ida mentioned. UBL is mentioned as a terrorist financier in a Mar 95 finished intelligence report from CIA's [_____] office)

Jun. Assassination attempt on Mubarak in Addis Ababa. UBL-authorized operation. Linkages to Egyptian Islamic Jihad and Egyptian al-Gama'at Islamiya.

[-] Jun. [

].

[-] Jul. [

].

[-] Aug. [

].

Late 1995. [

].

TOP SECRET



[-] Sep. [                    ]

[-].

13 Nov. Office of Personnel Management/Saudi National Guard facility in Riyadh bombed. Five Americans killed in this incident. Information eventually suggests UBL and CDLR were responsible.

[-].

[-] Dec.  Ramzi Yousef associate and al-Qaida lieutenant Wali Khan Amin Shah is captured [     ]. He is deported to the United States and convicted. on terrorism charges.

[-] Nov. [

TOP SECRET

10

TOP SECRET



**1996**

8 Jan. [UBL] station established in CTC.

15 Feb. U.S. Embassy Khartoum closes.

24 Apr. Antiterrorism and Effective Death Penalty Act. Directs Secretary of State, in conjunction with Attorney General and Secretary of Treasury to designate any organization that meets certain criteria as a foreign terrorist organization (criteria: must engage in terrorist activity that threatens the security of U.S. nationals or the national security of the United States).

[-] Apr. [          ]..

[-] May. [

25 Jun. Khobar Towers bombing. 19 U.S. service members killed. [A June 2001 U.S. indictment charged that the Saudi Hezbollah, with support from Iran, carried out the attack. According to the indictment, Iran and its surrogate, the Lebanese Hezbollah, recruited and trained the bombers, helped direct their surveillance, and assisted in planning the attack].

[-] Aug. [

Spring 1996. [

Spring 1996. [          ].

10 Jul. London daily, *The Independent*, publishes an undated interview with UBL in Afghanistan. UBL declares that the killing of Americans in the Khobar Towers bombing marked

[Summer 1996. A volunteer claimed that [

TOP SECRET

11

TOP SECRET



the beginning of the war between Muslims and the U.S.

23 Aug. UBL issues a "fatwa" authorizing attacks against Western military targets in the Arabian Peninsula.

2 Aug. DCI briefs Democratic leaders: the terrorist threat is increasing, it is a national security issue and human intelligence is at the heart of the effort against terrorism.

Summer 1996. [

Summer 1996. [

TOP SECRET

TOP SECRET



3-4 Sep. Operation Desert Strike. Cruise missile strikes against Iraq.

11 Sep. Egyptian government issues an arrest warrant for UBL, based on UBL's longtime support of Egyptian terrorist groups like EGI and EIJ.

Sep. Taliban comes to power in Afghanistan; takes Kabul.

Dec. [                ].

[Winter. Information indicates UBL considers jihad worldwide.]

22 Oct. [                ].

[Late 1996. [——] reports [——] indicate that UBL is much more of a terrorist—rather than just a terrorist financier—than the CIA has previously thought. Reporting provides significant new details about UBL and his terrorist support infrastructure known as "Al Qaeda." [Note: first reference to Al Qaeda].

[Late 1996. Bin Ladin Unit develops most detailed information yet regarding UBL's intentions].

[                ].

TOP SECRET



**1997**

Jan. [

28 Jan. [

[-] Jan. [          ].

30 Jan. [

One number in Kenya is associated with significant UBL-related activities and individuals, including Wadi el-Hage, one of UBL's most important lieutenants. El-Hage is a dual U.S.-Lebanese citizen.

Early 1997. [          ].

Feb. CTC has identified Muhammed Atef as UBL's key lieutenant. Alias Abu Hafs al-Masri.

[-] Feb. [



TOP SECRET

TOP SECRET



Early 1997. [ ].

10 Apr. [DDO briefs SSCI on covert action. UBL unit is running operations. It is focusing these operations to collect data that can be used to build target packages, which, in turn, can be used in future contingencies to render UBL and/or dismantle the ability of his organization to wage terrorism. [ ].

Spring 1997. [ ].

Spring 1997. [ ].

TOP SECRET

TOP SECRET



Apr. Update to 1995 terrorism National Intelligence Estimate.

Spring 1997. Foreign liaison service says it is studying the early 1997 proposal for a joint operation [ ].

Nov. Secretary Albright trip to South Asia.

Spring 1997. [ ].

[Fall 1997. [ ]

26 May. Saudi government extends formal recognition of the Taliban government of Afghanistan. The decision immediately follows reports that the Taliban have extended their control into northern Afghanistan.

31 Oct. Kenyan authorities arrest and later deport [ ] reportedly connected to a terrorist plot against the U.S. embassy in Nairobi.

16

TOP SECRET

**1998**

Late 1997. [

Late 1997. [

Late 1997. [

Jan-Jun. [

28 Jan. DCI Worldwide Threat Brief. "... issues range from the proliferation of WMD to international terrorism, drug trafficking.

23 Feb. Bin Ladin fatwa calling for jihad against U.S. military and

TOP SECRET



civilian targets anywhere in the world. Fatwa represents a shift from criticizing the states in the region and attacks the U.S. instead.

16 Mar. Letter sent from UBL to Egyptian press complaining about U.S. occupation of the Arabian Peninsula. "Let them rest assured of the weakness and cowardice of American soldiers. They are fastest to fail and least persevering in the fire of war. We will never forget how they disappeared in the wake of Riyadh and Khobar incidents."

May 11-13. India conducts nuclear tests. Pakistan conducts nuclear tests May 28.

26 May. UBL press conference. UBL declared his supporters would strike U.S. targets in the Gulf. Indicated the results of his jihad would be

information warfare, and international financial turmoil…" "In addition to traditional terrorist groups, the U.S. faces an increasing threat from transnational groups, such as UBL's organization…"

6 Mar. C/CTC, et al, brief Congressional staff on the CTC strategic plan for FY98…." [         ].

Apr. U.S. Ambassador to U.N. Richardson visits Kabul and Sherbergan.

18 May. [         ].

10 Mar. C/CTC briefs SSCI staff. [         ].

TOP SECRET

18

TOP SECRET



"visible" within weeks. He also talked about "bringing the war home to America." [Note: this is possibly a call for attacks in the U.S.]

12 Jun. In an interview with a U.S. journalist, UBL indicates he may attack a U.S. military passenger aircraft using antiaircraft missiles. At a press conference in the previous month, he indicated the results of his jihad would be "visible" within weeks.

[-] Jul. [    ].

May. Police in Europe arrest 60 members of the Algerian Armed Islamic Group (GIA) to pre-empt threats to the coming World Cup in Paris.

Jun. Officers [    ] raid homes and NGO offices of Mustafa Majid and Mohammed Fouda, [    ] linked to UBL. [    ]
[    ].

Summer 1998. Liaison service captured [    ] a member of a UBL cell in Europe.
[    ].

22 May. President signs PDD-62 on counter-terrorism and PDD-63 on infrastructure protection.

[    ] PDD-63 establishes the National Infrastructure Protection Center.

10 Jun. UBL indicted by federal grand jury, Southern District of New York. Sealed indictment. Conspiracy to destroy national defense utilities.

[Summer [    ] suggest UBL is planning attacks in the U.S. [    ] says plans are to attack in NY and Washington. Information mentions an attack in Washington probably against public places. UBL probably places a high priority on conducting attacks in the U.S....CIA has little information about UBL's operatives in the U.S.]

Summer 1998. [    ].

Summer 1998. [    ].

TOP SECRET



Jul.  UBL remains in Afghanistan, changing his location frequently.

[——]. He remains on good terms with the Taliban, [Unconfirmed reporting] claimed UBL was considering attacks in the U.S.

21-23 Aug. [Media reports concerning UBL electronic communications].

7 Aug. UBL bombings of U.S. embassies in Nairobi and Dar Es Salaam. 224 killed, 5000 injured.

20 Aug. U.S. military strike against UBL terrorist training camps in Afghanistan and pharmaceutical plant in Sudan suspected of producing chemical weapons.

Fall 1998  [——

[-] Aug. [——].

[Information indicates that UBL is interested in publicity and attacks involving mass casualties].

29 Jul.   CTC warns of possible Chemical, Biological, Radiological, or Nuclear (CBRN) attack by UBL. [——].

21 Aug. [Recap: DCI eight committee briefing regarding why CIA concluded that UBL was responsible for the bombings in Africa. DCI noted large number of renditions of UBL supporters].

[–] Sep. [_____], Abu Hajer, who is head of UBL's computer operations and weapons procurement, was arrested *abroad*. Hajer is the most senior-level UBL operative arrested to date.

18 Sep. DCI briefs members of Congress on bombings. [_____]. DCI noted that the FBI is following 3 or 4 Bin Ladin operatives in the U.S.

2 Sep. DCI testimony to SSCI/HPSCI: "Key elements of CIA's offensive strategy against UBL include: hit UBL's infrastructure; work with liaison to break up cells and carry out arrests; disrupt and weaken bin Ladin's businesses and finances; [_____]; recruit or expose his operatives; … pressure on the Taliban; and enhancing unilateral capability to capture him.

Sep. [Information indicates UBL has considered conducting attacks in the U.S. The near-term threat to Americans is greater in Europe, where UBL's infrastructure is better established].

[Fall 1998. [_____] claimed that UBL's next target would possibly involve flying an explosives-laden aircraft into a U.S. airport and detonating it].

Fall 1998. [Information indicates al-Qa'ida is trying to establish an operative cell within CONUS to strike at the heart of U.S. interests and [_____].

TOP SECRET



trying to recruit U.S. citizen Islamists and U.S.-based foreign nationals. No targets were mentioned but NYC was cited as a center of recruitment efforts].

Fall 1998. [                  ].

Fall 1998. [Collection against UBL satellite phone ends, following media leaks].

Fall 1998. [UAE UBL cell is attempting to recruit a group of 5 to 7 young men from the United States to travel to the Middle East for training. This is in conjunction with planning to strike U.S. domestic targets.

4 Nov.  Bin Ladin and Mohammed Atef indicted in Southern District of New York. Also announcement made of reward for the two under State Department rewards program.

[-] Oct. [                  ].

1 Dec.

TOP SECRET

22



Intelligence Community assessment of UBL... "UBL is actively planning against U.S. targets and already may have positioned operatives for at least one operation...Multiple reports indicate UBL is keenly interested in striking the U.S. on its own soil. According to [____]. Al Qaeda is recruiting operatives for attacks in the U.S. but has not yet identified potential targets."

17 Dec. Operation Desert Fox. Strikes against Iraq.

Late Dec. "It is a religious duty to acquire weapons of mass destruction to defend Muslims," according to a UBL interview in Christmas 1998. UBL has been seeking CBRN materials, expertise and other resources since the early 1990s.

4 Dec. DCI memo. "We are at war.... I want no resources or people spared in this effort, either inside CIA or the Community."

[-] Dec. [____]

The report also mentions UBL affiliates in major U. S. cities].

Fall 1998. Several reports note that UBL is considering a new attack, using biological toxins in food, water, or ventilation systems of U.S. embassies. [____].

[-] Dec. [____] reports member of UBL was planning operations against U.S. targets. Plans to hijack U.S. aircraft proceeding well. Two individuals [____] had successfully evaded checkpoints in a dry run at a NY airport. [____].

TOP SECRET



**1999**

17 Feb. Operation Noble Anvil. U.S. combat operations against Serbia due to ethnic cleansing in Kosovo.

Spring. [___] the Taliban's fear of airstrikes had led the group to press UBL to act more discreetly.

Spring. [___], UBL supporters in Afghanistan are experimenting with enhancing conventional explosives with radioactive material. [___]

Jun. [___] began staging first operation to attack a

[-] Jan. [Arrests [___], including 2 senior operatives, have provided leads to potential targets. Information indicates U.S. naval facility was the principal target. Some terrorist planning continues, including one operation abroad and another in connection with associates in a foreign country. Another report states that [___] plans an attack soon].

24 Jun. Eight Iraqis tied to al-Qaida arrested in Amman based on tip

4 Jan. U.S. Attorney General approved establishment of the National Threat Warning System.

Feb. State Department demarches Taliban for supporting UBL. [___]

[-] Feb. [___]

7 Jun. Director FBI puts Bin Ladin on FBI's "10 Most Wanted List."

24 Jun. DCI at SSCI hearing: "... we have seen numerous

Jan. Counterterrorism supplemental enables NSA to initiate development [___]

[-] Jan. [___]

May. [___]

TOP SECRET

TOP SECRET



U.S. ship in Yemen.

reports that bin Ladin and his associates are planning terrorist attacks against U.S. officials and facilities in a variety of locations, including in the U.S."

Jul. Kargil crisis. Kashmir.

[-] Jul. [                              ].

[-] Jul. [                              ].

Jul. Tashkent diplomatic efforts on Afghanistan to influence Taliban, persuade it to expel UBL.

Jul.   CTC rethinking disruption operations.   [                ].

Jul. [                ] the Taliban leadership reaffirmed its commitment not to oust UBL.

25

TOP SECRET



Aug. [

Al Qaeda's capabilities have suffered from arrests of key operatives.

24 Aug. A truck bomb exploded at Mullah Omar's compound in Afghanistan. [

Aug. Bin Ladin's organization has decided to target high-ranking U.S. officials, including the Secretary of Defense, Secretary of State, and the Director of Central Intelligence, though no particular plans have been made or approved

[-] Aug. [

[-] Sep. CTC has engaged with SOCOM and JSOC in capture discussions. JSOC has been tasked to begin planning.

10 Sep. [CTC conference on UBL. "We are at war with UBL. We have been working against UBL for over four years... during this period, we

Aug. [

23 Aug. A cooperating witness in the Africa bombings case mentioned that a former U.S. Special Forces member from California, Ali Mohammed, provided training to UBL operatives in Africa and a bombing suspect in Haroun.

TOP SECRET



27 Sep. [

[-] Sep. [

have been able to:
- Stop at least two UBL attacks against U.S. interests abroad
- Render over 30 foreign nationals abroad
- Significantly damage UBL's infrastructure
- Put doubt in UBL's mind about security of his operations and operatives]

Oct 8. State Department designates Al Qaeda a foreign terrorist organization. Current state sponsors of terrorism: Iran, Iraq, Libya, Syria, Sudan, North Korea, Cuba.

15 Oct. UN deplores provision of safe haven to UBL and demands his rendering to some country. On 14 Nov 99, sanctions are to begin which ban most foreign flights of Ariana except for humanitarian need and the Hajj. Freezes funds for Taliban except on humanitarian groups.

[-] Oct. [

[-] Oct. [

12 Oct. Pakistani Chief of Army Staff Musharraf ousts Prime Minister Nawaz Sharif in a bloodless military coup.

TOP SECRET

27

TOP SECRET

Fall 1999. [                                        ].

Late 1999. Al-Mihdhar at UBL camp in Afghanistan.

Winter. Muhammad Atta reportedly sighted at UBL facility in Afghanistan. Marwan al-Shehhi at the UBL guesthouse in Kandahar [                        ].

[-] Nov. [                    ].

Dec. [Foreign authorities arrested a [    ] team of terrorists which planned New Year's Eve attack on pilgrims in Jordan. [        ]. Members of the team have direct links to al-Qa'ida, [        ].

Dec. Senior al-Qaida operatives [        ] detained based on CIA information.

21 Nov. FBI elevates counter-terrorism to a standing division within FBI HQ separate from the National Security Division. FBI has 26 JTTFs in operation.

26 Oct. CTC's priorities are disrupting UBL operations and recruiting penetrations;

Dec. [                        ].

8 Dec. According to CTC, accepting the theory that UBL wants to inflict maximum casualties, cause massive panic, and score a psychological victory, then UBL may be seeking to attack between 5 and 15 targets on the Millennium. "Because the U.S. is UBL's ultimate goal.... we must assume that several of these targets will be in the U.S...."



confirm [           ] involvement in facilitating explosives and poisons training for UBL operatives.

Dec. 14. Ahmed Ressam arrested at U.S.-Canadian border with bomb-making chemicals and detonator components. Intended target was Los Angeles International Airport.

[-] Dec. [

[-] Dec. Disruption operations:

[-] Dec. [

[-] Dec. [

20 Dec. [DCI sends report on Millennium threat to all liaison services. The item describes arrest of Algerian in Seattle and mounting evidence that UBL and other extremists intend to launch attacks against U.S. interests abroad and at home].

TOP SECRET



TOP SECRET



TOP SECRET

31

**2000**

5 Jan.  Khalid al-Mihdhar and Nawaf al-Hazmi hold meetings with a senior UBL field operative in Malaysia and Bangkok between 5 and 8 Jan 2000.

3 Jan. Bombing of *USS The Sullivans* aborted. An explosives-laden boat sank as it was launched in Aden harbor.

Jan. Al-Qaida operative [—] detained at CIA behest.  He is deported and admits he has received training at Al-Qaida camps in Afghanistan.

Jan. DCI announces Abu Zubaida the #1 terrorist target.

[-] Mar. [UBL planning operations to kidnap U.S. diplomats or civilians in [—] to hold as bargaining chips. [—].

Feb. [

3 Mar. [

[-] Feb. [

Mar. [

Mar. [

TOP SECRET

TOP SECRET



TOP SECRET

Mar. [

May. [

Jun. [

[-] Jun. [

[-] Apr. [

[-] Jun. [

[-] Jul.  [

[-] Mar. [

1 Jul. Atta and al-Shehhi begin flight training at Huffman Aviation and Jones Flying Service.

TOP SECRET



16 Jul. CTC briefing to House Committee on Government Operations and Reform. C/CTC lists accomplishments, i.e., [____] disruptions of terrorists' organizational planning over the past two years. Helped render more than 30 terrorists in other countries since [____], more than half of whom were associates of UBL's Al Qaeda.

[-] Jul. [

[-] Sep. [

30 Sep. Taliban issued press statement on unknown aircraft seen over Kandahar allegedly looking for UBL.

Sep. [

Sep. [

Sep. [

Sep. [

33

TOP SECRET

TOP SECRET

TOP SECRET



34

Sep. [

Fall 2000. [

Oct. [

Oct. [

Nov. [

[-] Oct.  [Four foreign extremists with links to UBL arrested abroad and then released due to insufficient evidence].

12 Oct.  *USS Cole* bombing. Aden, Yemen. 17 U.S. sailors killed.

13 Oct.  Explosion damages UK Embassy in Yemen.

Oct. [

[-] Oct. [UBL reportedly forced to postpone bombing of [——] U.S. embassies. Still planning attacks in several locations [——]. Targets include U.S. facility abroad].

TOP SECRET



TOP SECRET



21 Dec.  Hijackers Atta and Marwan al-Shehhi receive their pilots' licenses.

10 Nov.  [          ] FBI rendition of al-Qaida operative based in Africa.

Fall 2000.  [

]

[-] Dec. North Africans in Frankfurt, Germany Meliani Group arrested.  [

]

19 Dec.  Adoption of UN Security Council Resolution (UNSCR) 1333 strongly condemning use of Afghanistan under control of Taliban for sheltering and training terrorists and demands its cessation. Also demands, per UNSCR 1267 (1999) that Taliban turn over UBL to appropriate country where he is indicted, etc., and close all terrorist camps under Taliban control.  Issues list of sanctions including arms embargo, freezing of UBL and Al Qaeda assets, and other economic sanctions.

TOP SECRET



TOP SECRET

37

Early 2001. [

]

[-] Jan.  Photos taken [

] of al-Mihdhar and associates shown to shared CIA-FBI asset. Asset identifies associate as bin Atash, suspected planner of *Cole* bombing.

[-] Jan. [

]

[-] Jan. [

]

[-] Jan. [

]

[-] Jan. [

]

[-] Jan. [

]

2001

TOP SECRET

29 Jan. CTC briefing on al-Qa'ida to SSCI: [

                                           ]. Some 70,000 to 120,000 people trained in the camps in Afghanistan since 1979.

6 Feb. DCI classified worldwide threat brief: "…this year the thrust of terrorist attacks on U.S. facilities and interests come to the forefront…. UBL, his associates remain most immediate and serious threat. UBL's commitment to striking against the U.S. undiminished…. strong indications panning new operations… capable of mounting multiple attacks with little or no warning."

6 Feb. Senior Executive Intelligence Brief (SEIB): The discovery of multiple terrorist plots since October shows an energized international "jihad movement" is raising the threat to U.S. interests, particularly in the Middle East and Europe. Most significant spike in activity since the time of the Millennium. Stems in part from changes in bin Ladin's practices. To avoid implicating himself and his Taliban hosts, he has allowed cells in his network to plan attacks more independently.

9 Feb.  As a result of an evaluation

[–] Feb. [

TOP SECRET



[____], a liaison service identified, and invited CIA to participate in tasking, a sensitive asset with [____].

by the USS Cole task force, DCI has directed CTC to form a strategic analysis group to help put context into threat reporting and to think out of the box.

15 Feb.  Recap: Since May 98, more than [____] terrorists captured and delivered to U.S. or foreign law enforcement. Since summer 2000, these have included: [____].

19 Feb.  Four persons associated with UBL network arrested in Frankfurt, Germany.

[-]1 Feb. [____] confirms press accounts of two arrests in Yemen regarding USS Cole. [____].

[-] Feb. [____]

TOP SECRET



Early 2001. [

Apr. [

[-] Feb. [

extremist tied to Ahmed Ressam, had been arrested [

[-] Apr. [

[-] Apr. [

40

TOP SECRET



TOP SECRET

19 Apr. [Bin Ladin organization is assessed to be in the throes of advanced preparations for a major attack, most probably on an American or Israeli target. The information does not mention the target of the attacks, nor the venue or dates. At the hub of activity is an al-Qa'ida figure. Target and date uncertain. The information implies a bomb against a major target].

23 Apr. The second wave of 9-11 hijackers arrives throughout the eastern seaboard between late April and late Jun 2001.

May. [_____]extensive efforts [_____] to get a videotape of UBL the widest public airing. Just before East Africa bombings, UBL used media to predict news to [_____].

Spring 2001. [_____]

[—] Apr. [_____]

Spring 2001. [_____]

10 May. DCI tells Senate Appropriations Committee hearing terrorism is on the rise especially against the U.S. Eighty percent increase since 1998. Strategic initiative is to pre-empt terrorist plans, and it is paying off with disruptions that include [s] and bin Ladin plots. Despite successes, limits to what we can do. Generally not have specific time-and-place warning of attacks. Likely to be attack against U.S. interests over the next year.

Spring 2001. [_____]

May. [_____]

TOP SECRET

41

TOP SECRET



[–] May. [_____].

[–] May. [Foreign authorities seize terrorist suspect. Links to Ressam Millennium cell].

May. UK law enforcement officials released all of the Algerian extremists who were recently arrested in London. [_____]. One [_____]. [_____], was immediately re-arrested on a French warrant. The leader of the cell [_____] also was re-arrested on immigration charges pending possible deportation. Both individuals had prior knowledge of Ressam's abortive attack on LAX.

[–] May. [Spanish police arrested Frankfurt terrorist cell member].

[–] May. [_____]

TOP SECRET



[ ] Jun. [ ]

[ ] Jun. [ ]

Jun. Reporting [ ]

Jun. [ ]

[ ], a Middle East service arrested [ ] suspected terrorists for their involvement in planning of terrorist attacks against diplomatic personnel and/or interests [ ]

Jun. [Foreign officials arrested [ ] individuals

5 Jun. DC/CTC briefing for HPSCI: "What worries me is that we're on the verge of more attacks that are larger and more deadly—not necessarily CBRN, but could go that way also."

Jun. THREATCON Delta declared. U.S. naval ships in Persian Gulf ports head to sea.

24 Jun. Multiple current threats. Martyrdom threat possible in Jordan. USS Cole investigation threatens terrorists. Africa bombing sentences handed out. [ ] threats in Bahrain, Saudi Arabia, Israel. [ ] threat in Europe. Yemen threat. [ ] threat in Indonesia, India, Turkey, [ ] threat to U.S. embassies, [ ] in the Philippines.

28 Jun. "Based on a review of all-source reporting over the last five months, we believe that UBL will launch a significant terrorist attack against U.S. and/or Israeli interests in the coming weeks. The attack will

Jun. [ ]

Spring 2001. [ ]



| | | | |
|---|---|---|---|
| indicated operatives linked to UBL's organization expect their near-term attacks to have dramatic consequences such as destabilizing governments or causing major casualties. | who [_____] are members of Al Qaeda organization and were planning to bomb the U.S. embassy and other U.S. facilities [_____]. | be spectacular and designed to inflict mass casualties against U.S. facilities or interests. Attack preparations have been made. Attack will occur with little or no warning. They are waiting us out, looking for a vulnerability." | [_____]. |
| 4 Jul. Mihdhar enters U.S. at JFK Airport. | | | |
| Jul. Extremists associated with UBL [_____] continued to expect imminent attacks on U.S. interest but operational delays may persist, probably in response to enhanced U.S. security measures. | Jul. British re-arrest Algerian [_____] knew of Ressam's terrorist plans. Ressam said UBL was aware of his terrorist plans and intentions in the U.S. | | |
| Jul. [Reports indicate UBL planning unspecified attacks on U.S. facilities abroad]. | | | Jul. [_____]. |
| Jul. [Over the last [_____] weeks, there have been over 25 reports alluding to an impending attack. Never before has the Intelligence Community seen so many indicators]. | Jul. [_____] a cell of international Islamic extremists [_____] involved in anti-U.S. terrorist planning. Even with the arrests, attacks may still be planned [_____]. | | |
| | Jul. [_____] | | |

TOP SECRET



Summer 2001. [                    ].

30 Jul.  U.N. Security Council adopts Resolution 1363. Stresses obligation of U.N. member states to comply with UNSCRs 1267 and 1333, respectively, which calls on Taliban to cease its support of terrorists in the territory it controls and the turning over of UBL to appropriate authorities. Offers assistance to states including those bordering on Afghanistan to increase their capability to implement measures imposed by above resolutions, which include an arms embargo and freezing of UBL assets.

1 Aug.  CIA Inspector General report on CTC: "well-managed, fulfilling interagency responsibilities for DCI, made progress on problems previously identified,

Jul. [                    ]

Jul. [                    ]

Aug.  Clandestine [
          ] and media reports indicate UBL has wanted to conduct attacks in the U.S. since 1997.... Al-Qa'ida members—

TOP SECRET

TOP SECRET

including some who are U.S. citizens—have resided in or traveled to the U.S. for years, and the group apparently maintains a support structure that could aid attacks.

3 Aug. The IC continues to estimate that [____] extremists associated with Al Qaeda are now prepared to conduct one or more terrorist attacks at any time. The IC continues to believe that the most likely locales for such attacks are on the Arabian Peninsula, the Middle East and Europe.

particularly relationship with FBI. Customers did identify gaps—plans and intentions of key terrorist groups and timely, specific warning of attack.

[-] Aug. [_____ ].

Summer 2001. [_____

[_____ ].

46

TOP SECRET

TOP SECRET



25 Aug.  Between 25 and 31 Aug, 9/11 hijackers buy tickets for Sep 11, 2001.

Aug. [

16 Aug. Zacarias Moussaoui detained by INS.

Aug. [

16 Aug.  CTC Assessment: for every UBL operative that we stop, an estimated 50 operatives slip through our loose net undetected. Based on recent arrest, it is clear that UBL is building up a worldwide infrastructure which will allow him to launch multiple and simultaneous attacks with little or no warning.

Aug. [

Aug. [

].

].

23 Aug.  Nawaf al-Hazmi and al-Mihdhar added to TIPOFF watchlist. Al-Hazmi arrived in U.S. January 15, 2000, no record of his departure. Al-Mihdhar departed June 10, 2000, returned July 4, 2001.

TOP SECRET

TOP SECRET



9 Sep. Assassination of Afghan Northern Alliance leader Masood by Al Qaeda operatives posing as journalists.

11 Sep. World Trade Center/Pentagon/Stony Creek attacks.

10 Sep. In the hours just prior to the 9/11 attacks, NSA obtains two pieces of information suggesting that individuals with terrorist connections believed something significant would happen on September 11. No specific indication of time, place, or type of expected event. Because of the nature of the processes involved, NSA is unable to report the information until September 12.

Sep. [

10 Sep. [

10 Sep. [

TOP SECRET

48

TOP SECRET

17 Sep.

7 Oct. Operation Enduring Freedom commences.

TOP SECRET

**APPENDIX**

**SELECTED EVENTS
IN THE
CHRONOLOGY
OF TERRORISM**

**1982 – 2001**

Unclassified

# Selected events in the chronology of terrorism, 1982-2001



Terrorist incident

Information indicating terrorist activity or intentions to strike inside the United States

Information indicating terrorist activity or intentions to use airplanes as weapons

Information indicating terrorist activity or intentions to strike inside the United States using airplanes as weapons

Communications intercepts suggesting possible imminent terrorist activities

Unclassified



Jun. Israeli invasion of Lebanon.

Apr 18. Bombing of U.S. Embassy, Beirut.

Oct 23. Bombing of U.S. Marine barracks and French Embassy, Beirut.

Apr 12. Restaurant bombing near Torrejon Airbase, Spain.

Feb 26. U.S. Marines depart Lebanon.

Mar 16. Kidnapping of U.S. Embassy official William Buckley, Beirut.

Sep 20. Bombing of U.S. Embassy annex, Beirut.

Sep. U.S. Marine peacekeeping presence in Beirut.

1982   1983   1984   1985

Terrorist Incident

Unclassified



Terrorist Incident

1985

1986

1987

1988

Jun 14. Hijacking of TWA 847.

Oct 7. Hijacking of *Achille Lauro*.

Nov 23. Hijacking of EgyptAir flight.

Dec. Attack on Rome/Vienna airports.

Mar 30. TWA 840 bombing.

Apr 5. LaBelle Disco bombing, Germany.

Spring 1986. President authorizes counterterrorist activities.

Apr 9. U.S. bombs Libya.

Feb/Mar. DCI's Counterterrorist Center established.

Jan 20. President signs policy directive on terrorism.

Unclassified



Dec 21. Pan Am 103 bombing, Lockerbie, Scotland.

Feb 15. Soviet withdrawal from Afghanistan.

Circa 1989. Al Qa'ida founded.

Aug. Iraq invades Kuwait.
U.S. launches Operation Desert Shield.

1988

1989

1990

1991

Terrorist Incident

Unclassified



Jan. U.S. launches Operation Desert Storm to liberate Kuwait.

Feb 23. Bombing of World Trade Center, New York City.

Apr. CIA paper refers to bin Ladin as a supporter of militant Islamic causes.

Dec. U.S. launches Operation Restore Hope in Somalia.

Cicra 1991-1992. Bin Ladin moves to Sudan.

Dec. Attack on hotel in Yemen housing U.S. personnel supporting Somalia operations -- probably the bin Ladin network's first attack on U.S. personnel.

Jun 24. FBI arrests eight individuals. Attacks on New York City landmarks thwarted.

Jul 2. Sheik Omar Abd al-Rahman arrested.

✹ Terrorist Incident

● Information indicating terrorist activity or intentions to strike inside the United States

1991   1992   1993   1994

Unclassified



Dec 11. Bombing of Philippine airline, Manila, by Ramzi Yousef.

Dec 23. Algerian extremists hijack plane and threaten to crash it into the Eiffel Tower.

Feb 10. Ramzi Yousef arrested and extradited to U.S.

Jun. Attempted assassination of Egyptian President Mubarak, Ethiopia.

Summer 1995. President signs policy document on terrorism.

Jul. National Intelligence Estimate on terrorism published.

Jan 7. Philippine police raid Ramzi Yousef's apartment in Manila. Bojinka Plot uncovered.

Nov 13. Five Americans killed in bombing of Saudi Arabia National Guard facility, Riyadh, Saudi Arabia.

Circa Apr. Saudi Arabia revokes bin Ladin's citizenship.

**Terrorist Incident**

**Information indicating terrorist activity or intentions to strike inside the United States using airplanes as weapons**

1994

1995

1996

Unclassified



Jun 25. Bombing of Khobar Towers, Saudi Arabia.

Aug 23. Bin Ladin issues a *fatwa* authorizing attacks on Western military targets in the Arabian Peninsula.

Circa 1997. Bin Ladin residing in Afghanistan.

1997. African authorities arrest and later deport individuals plotting to attack U.S. Embassy Nairobi.

May/Jun. Bin Ladin moves to Afghanistan.

Jan. CIA creates special unit to focus on bin Ladin.

1998

1997

1996

**Terrorist incident**

Information indicating terrorist activity or intentions to use airplanes as weapons

Information indicating terrorist activity or intentions to strike inside the United States using airplanes as weapons

Unclassified



1998

1999

Aug 20. U.S. cruise missile strikes against Afghanistan and Sudan. Intelligence Community makes bin Ladin a top priority.

Summer/winter 1998. Two authorizations for counterterrorism activities.

Nov 4. Bin Ladin indicted by federal grand jury.

Aug 7. Bombing of U.S. embassies in Nairobi and Dar es Salaam.

1998. U.S. Government and foreign law enforcement thwart a terrorist attack against U.S. Embassy Tirana.

May 26. In a press conference, bin Ladin discusses "bringing the war home to America."

May 22. President signs policy documents on counterterrorism and national infrastructure protection.

Circa summer/fall 1998. Intelligence Community begins to acquire information that bin Ladin operatives may be planning attacks in the U.S.

Feb 23. Bin Ladin publicly calls for jihad against U.S. civilians and military personnel anywhere in the world.

Terrorist incident 

Information indicating terrorist activity or intentions to strike inside the United States 

Information indicating terrorist activity or intentions to use airplanes as weapons

Information indicating terrorist activity or intentions to strike inside the United States using airplanes as weapons

Unclassified



● Information indicating terrorist activity or intentions to strike inside the United States

● Information indicating terrorist activity or intentions to use airplanes as weapons

Circa late 1998 to Spring 2000. Hijackers Atta, al-Shehhi, and Jarrah are together in Hamburg, Germany.

Dec 1999. Atta, al-Shehhi, and Jarrah travel to Afghanistan.

On three separate occasions during the year, the President authorizes counterterrorism activities.

Jun 7. FBI puts bin Ladin on "Ten Most Wanted" list.

Jun 1999. Chief of the Counterterrorist Center testifies before intelligence committees that bin Ladin and associates are planning attacks in the U.S.

Oct 15. U.N. Security Council Resolution 1267 deplores provision of safehaven to bin Ladin and demands his rendering to justice.

Dec 14. Ahmed Ressam arrested attempting to enter Washington State. Numerous foreign intelligence and law enforcement services arrest, detain, or surveil suspected terrorists worldwide.

1999

2000

Unclassified

2000. Attack on a U.S. warship aborted.

Jan 5-8. Meeting of Al Qa'ida operatives in Malaysia.

Jan 15. Two individuals from the Malaysia meeting – al-Mihdhar and al-Hazmi – enter the U.S. Over the next several months, they take flight lessons in San Diego but abandon that effort.

Oct 12-13. Bombing of *USS Cole*, Aden, Yemen. Attack on British Embassy Yemen.

Mar. CIA receives information that al-Hazmi entered the U.S. on Jan 15.

Spring/summer/fall 2000. Hijackers Atta, al-Shehhi, Jarrah enter the U.S. and take flight lessons in Florida.

Dec 19. U.N. Security Council Resolution 1333 strongly condemns Taliban for sheltering and training terrorists.

Circa Dec 2000-Feb 2001. *Cole* investigation triggers renewed CIA interest in the Malaysia meeting.

2001

2000





Terrorist Incident

Information indicating terrorist activity or intentions to strike inside the United States

Information indicating terrorist activity or intentions to use airplanes as weapons

Unclassified



# APPENDIX

## CIA/FBI FAILURES
## IN REGARD TO
## TWO OF THE SEPTEMBER 11 HIJACKERS,
## THE PHOENIX ELECTRONIC COMMUNICATION,
## AND
## THE MOUSSAOUI INVESTIGATION

### (ADAPTED FROM A CHART PRESENTED
### BY SENATOR CARL LEVIN
### AT THE OCTOBER 17, 2002
### JOINT INQUIRY HEARING)

**CIA/FBI FAILURES IN REGARD TO TWO SEPTEMBER 11 HIJACKERS,**
**THE PHOENIX ELECTRONIC COMMUNICATION, AND THE MOUSSAOUI INVESTIGATION**
**(BASED ON CHART PRESENTED BY SENATOR CARL LEVIN AT OCTOBER 17, 2002 JOINT INQUIRY HEARING)**

## CIA Failures

| al-Mihdhar | Al-Hazmi |
|---|---|
| 1. 1/5/00 – CIA acquires Mihdhar's passport information with multiple entry U.S. visa but does not watchlist him. | 1. 1/9/00 – CIA has information to determine Hazmi's full name and learns that Hazmi left Malaysia with Mihdhar on 1/8/00 but does not watchlist Hazmi.  Nor does it notify the FBI about the Hazmi travel. |
| 2. 1/8/00 – CIA does not notify FBI when it learns Mihdhar has left Malaysia and, again, does not watchlist him. | 2. 1/9/00 – CIA does not check U.S. immigration records to determine whether Hazmi, like Mihdhar, has a U.S. multiple entry visa (which had been used on 4/3/99). |
| 3. 3/5/00 – CIA Headquarters does not read cable on Hazmi travel to U.S., so does not consider likelihood that Mihdhar traveled with him.  CIA does not check to determine whether Mihdhar is in the U.S. until 8/21/01 - 17 months later. | 3. 3/5/00 – CIA Headquarters does not read cable noting Hazmi travel to U.S., so does not watchlist Hazmi or notify the FBI that he is in the country. |
| 4. 1/2001 – CIA does not watchlist Mihdhar after learning he was in Malaysia with Khallad, aka Tawfiq bin Attash, planner of the bombing of USS Cole. | 4. 1/2001 – CIA does not watchlist Hazmi after learning he was in Malaysia with Khallad, aka Tawfiq bin Attash, planner of the bombing of USS Cole. |
| 5. 6/11/01 – CIA analyst at N.Y. meeting with FBI is aware of Mihdhar travel and visa information but does not pass it on to FBI because "it does not mean anything to [him]" and he does not have permission to reveal operational details. | |

## FBI Failures

| al-Mihdhar | al-Hazmi |
|---|---|
| 1. 1/5/00 – CIA notifies FBI about Malaysia meeting, but FBI does not watchlist Mihdhar. | 1. 8/28/01 – After Mihdhar and Hazmi are placed on watchlist, FBI opens investigation on Mihdhar, but not Hazmi.  FBI does not check whether Hazmi extended his original U.S. visa (an extension applied for on 7/12/00, and granted on 6/18/01). |
| 2. 8/28/01 – FBI NY agent request for full criminal investigation is denied by FBI Headquarters official.  Agent decries the "wall:" preventing the sharing of intelligence information with criminal investigators. | |

| Phoenix 7/10/01 Electronic Communication | Moussaoui Investigation, August – September 2001 |
|---|---|
| 1. FBI RFU does not direct that FBI field offices establish liaisons with aviation schools around the country, as requested by the Phoenix agent who wrote the Electronic Communication. | 1. FBI Headquarters and agents in Minneapolis misunderstand legal standard for obtaining a FISA order, believing they have to link Moussaoui to a "recognized foreign power."  Minneapolis wastes time and resources trying to connect Chechen rebels, which FBI did not consider a "recognized foreign power," to al-Qa'ida. |
| 2. FBI RFU fails to share the Phoenix Electronic Communication with other agencies prior to September 11, the FBI's analytical unit, or any of the FBI's field offices. | 2. On August 24, CTC alerts CIA stations worldwide about Moussaoui.  FBI waits until September 4 to send teletype to Intelligence Community and other government agencies, noting that Moussaoui was in custody, but not describing any particular threat, i.e., that he might be connected to a larger plot.  The teletype did not recommend that addressees take action or look for additional indicators of a terrorist attack. |
| 3. FBI's New York field office receives the Phoenix Electronic Communication, but does not take action, although personnel there knew that al-Qa'ida had previously received flight training in the U.S. | 3. FBI does not connect Moussaoui with heightened threat in Summer 2001, the Phoenix Electronic Communication, or Mihdhar and Hazmi's entry into U.S. |

**APPENDIX**

**THE
PHOENIX
ELECTRONIC COMMUNICATION**

SECRET

# FEDERAL BUREAU OF INVESTIGATION

Precedence:  ROUTINE                          Date:  07/10/2001

To:  Counterterrorism          Attn:  RFU
                                       SSA
                                       IRS

   New York

From:  Phoenix
        Contact:  SA

Approved By:

Drafted By:

Case ID #:  (S)                        (Pending)

Title:  (S)  ZAKARIA MUSTAPHA SOUBRA;
             IT-OTHER

Synopsis:  (S)  UBL                    supporters attending civil
aviation universities/colleges in the State of Arizona.

            (S)      Derived From  G-3
                     Declassify On:  X1

(U)  Full Field Investigation Instituted:  04/17/2000 (NONUSPER)

Details:  (S)  The purpose of this communication is to advise the
Bureau and New York of the possibility of a coordinated effort by
USAMA BIN LADEN (UBL) to send students to the United States to
attend civil aviation universities and colleges. Phoenix has
observed an inordinate number of individuals of investigative
interest who are attending or who have attended civil aviation
universities and colleges in the State of Arizona. The inordinate
number of these individuals attending these type of schools and
fatwas

SECRET

SECRET

To: Counterterrorism   From: Phoenix
Re: ████████████████ 07/10/2001

(S) ████████████████████████████ gives reason to
believe that a coordinated effort is underway to establish a
cadre of individuals who will one day be working in the civil
aviation community around the world. These individuals will be in
a position in the future to conduct terror activity against civil
aviation targets.

(S) Phoenix believes that the FBI should accumulate a
listing of civil aviation universities/colleges around the
country. FBI field offices with these types of schools in their
area should establish appropriate liaison. FBIHQ should discuss
this matter with other elements of the U.S. intelligence
community and task the community for any information that
supports Phoenix's suspicions. FBIHQ should consider seeking the
necessary authority to obtain visa information from the USDOS on
individuals obtaining visas to attend these types of schools and
notify the appropriate FBI field office when these individuals
are scheduled to arrive in their area of responsibility.

(S) Phoenix has drawn the above conclusion from
several Phoenix investigations to include captioned investigation
and the following investigations: ████████████████████
██████), a Saudi Arabian national and two Algerian Islamic
extremists ████████████████████████████████

(S) Investigation of ZAKARIA MUSTAPHA SOUBRA was
initiated as the result of information provided by ████████ a
source who has provided reliable information in the past. The
source reported during April 2000 that SOUBRA was a supporter of
UBL and ████████████████████████████████. SOUBRA arrived in
Arizona from London, England on 08/27/1999 on an F-1 student visa
to attend EMBRY RIDDLE UNIVERSITY (ERU), Prescott, Arizona. ERU
only teaches courses related to the field of aviation. SOUBRA is
an Aeronautical Engineering student at ERU and has been taking
courses in "international security" relating to aviation. SOUBRA,
within weeks of his arrival at Prescott, Arizona, ████████
████████████████████████ supporting UBL, at Mosques
located throughout Arizona. SOUBRA has also organized anti United
States and Israeli demonstrations in the area of ARIZONA STATE
UNIVERSITY (ASU), Tempe, Arizona. He has also established and
organized an Islamic student association on the ERU campus
organizing the Muslim student population on the ERU campus.

(S) Phoenix has identified several associates of SOUBRA
at ERU who arrived at the university around the same time that he

SECRET

2

SECRET

To: Counterterrorism  From: Phoenix
Re: S███████████ 07/10/2001

did. These individuals are Sunni Muslims who have the same
radical fundamentalists views as SOUBRA.  They come from Kenya,
Pakistan, United Arab Emirates, India, Saudi Arabia and Jordan.
SOUBRA's associates are(S)



(S) The above individuals are involved with SOUBRA and
regularly participate in meetings with him in Prescott, Arizona.

(S) FBIHQ, IRS ████████████ RFU, wrote an
analytical paper on the ████████████ dated 11/09/1999, in
support of FBINY investigation captioned: ████████████
████████████ research paper can be found in ████████
████████ The following information was gleaned from IRS
research paper.



SECRET

3

SECRET

To: Counterterrorism   From: Phoenix
Re:             07/10/2001



(S) " The Fatwa is jihad against the U.S. and British government, armies, interests, **airports** (emphasis added by FBI Phoenix), and instructions and it has been given because of the U.S. and British aggression against Muslims and the Muslim land of Iraq...we...confirm that the only Islamic Fatwa against this explicit aggression is Jihad. Therefore the message for the British governments or any other government of non-Muslim countries is to stay away from Iraq, Palestine, Pakistan, Arabia, etc...or face full scale war of Jihad which it is the responsibility and the duty of every Muslim around the world to participate in...We...call upon...Muslims around the world including Muslims in the USA and in Britian to confront by all means whether verbally, financially, politically or militarily the U.S. and British aggression and do their Islamic duty in relieving the Iraqi people from the unjust sanctions."

(S) SOUBRA was interviewed by FBI Phoenix on 04/07/2000 and 05/11/2000 at his residence. On 04/07/2000, interviewing Agents observed photocopied photographs of UBL, IBN KHATTAB and wounded Chechnyan Mujahadin tacked to his livingroom wall. SOUBRA admitted to ▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮▮ in the State of Arizona. SOUBRA stated that he considers the United States Government and U.S. Military forces in the Gulf as "legitimate military targets of Islam." He also stated that the targeting of the U.S. Embassies in Africa was "legitimate." SOUBRA denied having received any military training. However, Phoenix believes that SOUBRA was being less than truthful in this

SERET

4

SECRET

To: Counterterrorism   From: Phoenix
Re: ▇▇▇▇▇▇▇▇▇▇▇ 07/10/2001

regard. SOUBRA was defiant towards interviewing Agents and it was clear that he was not intimidated by the FBI presence. It is obvious that he is a hardcore Islamic extremist who views the U.S. as an enemy of Islam. Investigation of SOUBRA is continuing.



SECRET

TO: Counterterrorism   From: Phoenix
Re: (S) ▓▓▓▓▓▓▓▓  07/10/2001



(S) Phoenix believes that it is more than a coincidence
that subjects who are supporters of UBL are attending civil
aviation universities/colleges in the State of Arizona. As
receiving offices are aware, Phoenix has had significant UBL
associates/operatives living in the State of Arizona and
conducting activity in support of UBL. WADIH EL-HAGE, a UBL
lieutenant recently convicted for his role in the 1998 bombings
of U.S. Embassies in Africa, lived in Tucson, Arizona for several
years during the 1980s.

SECRET

SECRET

TO:  Counterterrorism  From:  Phoenix
Re:  07/10/2001



(S)  This information is being provided to receiving
offices for information , analysis and comments.

SECRET

7

SECRET

To: Counterterrorism  From: Phoenix
Re: ▓▓▓▓▓▓▓▓▓▓ 07/10/2001

LEAD(s):

Set Lead 1:

COUNTERTERRORISM

AT WASHINGTON, DC

(S)  The RFU/UBLU is requested to consider implementing the suggested actions put forth by Phoenix at the beginning of this communication.

Set Lead 2:

NEW YORK

AT NEW YORK, NEW YORK

(S)  Read and Clear

♦♦

SECRET

8

ENTIRE Connection - [EntireConnection - [1]

```
12/06/01                    Modify Leads
14:03:20
View Lead, then press Enter

                  : Covered
                  : COUNTERTERRORISM
                  : WASHINGTON, DC

                  : 07/27/2001        0150PM
                  : 09/25/2001        0500PM

                  : 08072001          0433PM
                  A COVERED - CONSULTED WITH UBLU, NO ACTION
                    RECONVENE ON THIS ISSUE
```

F1=Help F2=Exit F4=Prompt F6=Multv F7=Bkwd F8=Fwd F12=Cancel

MAY 2 9 2003

# APPENDIX

# MOUSSAOUI-RELATED
# FBI FIELD AGENT NOTES
# AND
# FIELD OFFICE/HEADQUARTERS E-MAILS[*]

---

[*] The contents of this Appendix have been withheld at the request of the Department of Justice so as to avoid any impact on the prosecution of Zacharias Moussaoui.

**APPENDIX**

**GENERAL ACCOUNTING OFFICE
ANALYSIS
OF
U.S. ANTHRAX ATTACKS**

LIMDIS FOUO

# SUMMARY

## OF

## JOINT INQUIRY REVIEW

## OF

## ANTHRAX ATTACKS

In October 2001, the Congress, the United States Postal Service (USPS), and elements of the domestic infrastructure were the targets of anthrax attacks that eventually killed five Americans.  The Joint Inquiry requested that the General Accounting Office review those attacks, focusing on the difficulty of producing and spreading anthrax, mail as a delivery system, the status of USPS efforts to detect anthrax, the federal investigation into the attacks, and how the government is preparing for other incidents.

When the Joint Inquiry report was filed, the GAO investigation had been substantially completed, with an initial finding that no consensus exists among experts regarding the ease with which terrorists or a disgruntled scientist could effectively produce and disseminate anthrax on U.S. soil.  According to the GAO, technical experts believe that it would be very difficult to overcome technical and operational challenges to produce and deliver biological warfare agents sufficient to cause mass casualties.

According to the experts the GAO interviewed, delivery of anthrax by mail is not as efficient a method of producing mass casualties as military technologies.  However, in the public's mind and in terms of economic damage, anthrax powder in the mail represents a potentially significant problem.   The USPS effort to defend against biological agents illustrates a key aspect of homeland defense: the distinction between reactive and proactive operational environments.  Whereas the nation's posture had been to prevent attacks against military facilities, the anthrax attacks targeted civilian facilities that unprepared to react.

LIMDIS FOUO

LIMDIS FOUO

According to the GAO, the FBI is aware of numerous anthrax incidents throughout the United States, which were random in nature and determined to be hoaxes. Because this was the first time the FBI responded to an actual attack, however, there was some initial confusion about the investigative roles and responsibilities of various agencies. The Bureau has recognized the need to involve subject-matter experts and, as a result, its investigative teams include scientists, criminal investigators, hazardous-material experts, investigators from other federal agencies, and federal laboratories.

As a result of the anthrax attacks, the FBI and other investigative agencies have increased attention on chemical and biological threats. These agencies have reached agreements delineating roles and responsibilities, increased liaison with public health officials, developed a Center for Disease Control and FBI handbook for conducting investigations, and identified state and local officials who need security clearances for access to classified information.

To date, no connection has been established between the anthrax attacks and the terrorist attacks of September 11.

A copy of the GAO report follows.



**G A O**
Accountability • Integrity • Reliability

**United States General Accounting Office**
**Washington, DC 20548**

December 6, 2002

The Honorable Bob Graham,
Chairman, Select Committee on Intelligence
United States Senate

The Honorable Richard Shelby
Vice Chairman, Select Committee on Intelligence
United States Senate

The Honorable Porter J. Goss
Chairman, Permanent Select Committee on Intelligence
House of Representatives

The Honorable Nancy Pelosi
Ranking Minority Member
Permanent Select Committee on Intelligence
House of Representatives

Subject:  Analysis of U.S. Anthrax Attacks

The purpose of this letter is to transmit a copy of our statement for inclusion in the
Committee record, regarding our response to your request to collect information on
the October 2001, anthrax in the United States using the United States Postal Service
(USPS) as a vehicle.  To address this objective, we specifically drew upon the
biodetection work we are conducting at the USPS and the chemical-biological
defense work we are performing at the Department of Defense.  We have also
collected the Federal Bureau of Investigation's response to last year's anthrax
attacks, and analyzed new information regarding the steps necessary to produce dry
anthrax spores.

This statement has been designated "Limited Official Use Only" because of the
sensitive nature of the information it contains.  Release to the public could be
detrimental to the government and/or public safety.  Recipients should not discuss or
release this report to anyone whose official duties do not require access to the
information it contains.  This report should be safeguarded when not being used and
destroyed when no longer needed.  It is my understanding that your procedures for
handling materials submitted to the Committee will fully address these concerns.

This assignment was conducted by staff from our Applied Research and Methods
team and Office of Special Investigations under assignment code 460539.  If you have
any questions, please contact Sushil Sharma, Assistant Director, Center for

Technology and Engineering, at (202) 512-3460, Don Fulwider, Assistant Director, Office of Special Investigations at (202) 512-7413, or me at (202) 512-6412.  We can also be reached at SharmaS@gao.gov, FulwiderD@gao.gov, or RhodesK@gao.gov, respectively.

Sincerely yours,

Keith A. Rhodes
Chief Technologist
Director, Center for Technology and Engineering
Applied Research and Methods

Page 2

United States General Accounting Office

# GAO

## Testimony

Before the Select Committee on Intelligence, U.S. Senate, and the Permanent Select Committee on Intelligence, House of Representatives

Tuesday, December 10, 2002

# DIFFUSE SECURITY THREATS

## Information on U.S. Domestic Anthrax Attacks

Statement for the Record by Keith Rhodes,
Chief Technologist,
Center for Technology and Engineering

## ~~LIMITED OFFICIAL USE ONLY~~

~~This statement has been designated "Limited Official Use Only" because of the sensitive nature of the information it contains. Release to the public could be detrimental to the government. Recipients should not discuss or release this statement to anyone whose official duties do not require access to the information it contains. This statement should be safeguarded when not being used and destroyed when no longer needed.~~

*Released by GAO 6/12/03*



**G A O**
Accountability * Integrity * Reliability

Limited Official Use Only

Mr. Chairman and Members of the Joint Committee:

As you requested in your letter of October 31, 2002, we are pleased to submit our statement for the record on the anthrax threat. We collected this information as part of several ongoing and completed projects dealing with the anthrax threat, the anthrax vaccine, and technologies to detect and identify anthrax spores,[1] that is, anthrax in a powder form. As you requested, my testimony will focus on the following questions: (1) How easy is it to produce and weaponize anthrax? (2) What studies were conducted to test mail as a weapon delivery system? And (3) what is the status of the United States Postal Service's (USPS) efforts to detect anthrax in the mail? You also requested that we provide an overview of federal law enforcement agencies' initial investigation in response to the October 2001 anthrax attack and how these agencies are preparing for similar incidents in the future.

In conducting our work on anthrax production processes, we identified and consulted with a wide range of current and retired experts in anthrax and biological weapons production processes from the U.S. Army's Dugway Proving Grounds, Utah, a principal site of biological weapons testing; the U.S. Army Medical Research Institute of Infectious Diseases, Ft. Detrick, Maryland; the Institute of Genomic Research, Bethesda, Maryland; the University of Arizona, Tucson, Arizona; and the United Kingdom.

In conducting our work on USPS's efforts to detect anthrax in the mail, we reviewed documents associated with USPS efforts to procure anthrax detection devices, met with USPS officials, and also met with industry experts and vendors representing the technologies USPS is considering. We also met with officials of the Canadian Defense Research Establishment Suffield (DRES) and observed the results of their tests of anthrax in mail in an office setting.

Finally, in conducting our work on how law enforcement agencies responded to the October 2001 anthrax attack, we contacted representatives from the Federal Emergency Management Agency; the Environmental Protection Agency's (EPA) Office of Criminal

---

[1] See U.S. General Accounting Office, *Diffuse Security Threats: Technologies for Mail Sanitization Exist, but Challenges Remain*, GAO-02-365 (Washington, D.C.: April 23, 2002) and *Diffuse Security Threats: USPS Air Filtration Systems Need More Testing and Cost Benefit Analysis before Implementation*, GAO-02-838 (Washington, D.C.: August 22, 2002).

Limited Official Use Only

GAO-03-323T

~~Limited Official Use Only~~

Enforcement, Forensics and Training (OCEFT); the Federal Bureau of Investigation's (FBI) Weapons of Mass Destruction Unit and Washington Field Office; USPS's Manager for Environmental Management, Incident Commander for the Brentwood facility, and Postal Inspector; and the Department of Health and Human Services' Office of Public Health Preparedness and Centers for Disease Control and Prevention (CDC).

The work on which this statement is based began in November 2001 and has continued through November 2002, and it was conducted in accordance with generally accepted government auditing standards.

## Background

As of October 2002, intelligence assessments have not changed since 1990 for chemical and biological warfare threats on the battlefield or by terrorists, This is especially true, intelligence analysts told us, in terms of the numbers of countries suspected of developing anthrax spores, the types of biological agents these countries are known to possess, and their ability to weaponize and deliver such agents.[2] Unfortunately, for assessing a similar nonbattlefield threat, there are no current data on which to base an estimate apart from data on the October 2001 attack.

As to the terrorist threat, according to officials at the State Department's Diplomatic Security and at the Central Intelligence Agency, no clear evidence exists at this time that U.S. missions or interests overseas are threatened by foreign states or terrorist attacks using chemical and biological agents. According to these officials, terrorist attacks involving the use of conventional bombs are considered the greatest threat to U.S. overseas missions.[3]

In 1998, at least 12 U.S. abortion clinics received letters that claimed to contain anthrax powder, followed by more than 35 such letters in 1999 and over 30 in 2000. All of these were found to be hoaxes. In addition, DOD committed to a program on December 15, 1997, to vaccinate the entire military because it considered anthrax powder to be a major battlefield

---

[2] See also U.S. General Accounting Office, *Medical Readiness: Safety and Efficacy of the Anthrax Vaccine*, GAO/T-NSIAD-99-148 (Washington, D.C.: April 29, 1999).

[3] See U.S. General Accounting Office, *State Department: Serious Problems in the Anthrax Vaccine Immunization Program*, GAO-01-21 (December 13, 2000).

~~Limited Official Use Only~~

~~Limited Official Use Only~~

threat.[4] Simultaneously, the American public was introduced to biological warfare threats in a series of evening prime-time television addresses, including one by then-Secretary of Defense William Cohen, showing the relative power of bio-weapons. There was much attendant publicity, both about the importance of the threat and concerns about the safety and efficacy of the vaccine. From 1998 to September 2001, more than 400 anthrax powder hoaxes occurred in the United States. While much attention has been paid to the anthrax letters sent in October 2001, more than 750 hoax letters involving anthrax threats were sent worldwide in October and November 2001. According to a non-profit center specializing in issues related to weapons of mass destruction, a single group, called the Army of God, sent more than 550 hoax letters to abortion clinics in the United States.

## Ease of Production of Anthrax Spores

As you know, many conflicting statements have been made in public testimony before Congress and in the press concerning the ease or difficulty with which terrorists or a lone scientist could effectively disseminate, on U.S. soil, a chemical or biological agent, specifically anthrax, and cause mass casualties. As to the biological agents, all of the experts we met with agreed that while a laboratory scientist may be able to grow cultures of some bio-agents, the production and use of most biological warfare agents would require a relatively high degree of sophistication in terms of both expertise and equipment.

According to technical experts in the many fields associated with biological agents, including those formerly with state-sponsored offensive biological weapons programs, it would be very difficult for a terrorist to overcome major technical and operational challenges to effectively and successfully weaponize and deliver a biological warfare agent to cause mass casualties.[5] If terrorists could overcome these obstacles, experts believe that those without a prior knowledge of these agents would have to conduct extensive experimentation to perfect their skills, which would

---

[4] In July 2000, DOD ordered a temporary slowdown of its program because the U.S. anthrax vaccine manufacturer could not win Food and Drug Administration (FDA) approval of its manufacturing process and facilities. In January 2002, FDA approved the U.S. manufacturer's facilities and vaccine manufacturing process and DOD announced the resumption of its anthrax vaccination program in June 2002.

[5] See U.S. General Accounting Office, *Combating Terrorism: Need for Comprehensive Threat and Risk Assessments of Chemical and Biological Attacks*, GAO/NSIAD-99-163 (Washington, D.C.: September 7, 1999).

~~Limited Official Use Only~~

GAO-03-323T

~~Limited Official Use Only~~

result in their increased risk of discovery. Specialized knowledge is needed to acquire the right biological warfare agent, process it, improvise a weapon or device, and effectively deliver it to cause mass casualties.

To make high-quality anthrax powder, a number of challenging steps and specialties are involved:

- Acquisition of a virulent strain of anthrax (such as the Ames strain), by (1) locally isolating a strain from a dead animal, (2) purchasing a small sample from an organization that already possessed it, or (3) stealing or by other means obtain it from a laboratory known to possess it.
- Culturing or growing the organism to yield a large quantity, which could be done in commercially available fermenters or on agar plates (if fermented, the result is a slurry or liquid concentrate; if on an agar plate, the result is a wet paste).
- Harvesting, washing, and concentrating the cultured sample, typically done in a centrifuge, which also removes most of the liquid and results in a wet paste.[6]
- Drying and grinding or milling the sample to sufficiently small size,[7] including milling the spores to achieve the required particle size, and, possibly, adding appropriate chemicals to prevent aggregation of spores and to reduce static charge.[8]
- Testing to confirm dispersion patterns and potency to cause mass casualties, unless the perpetrators are highly confident of their abilities.

## Studies Conducted to Test Mail as a Delivery System for Anthrax

Prior to 1998, the military did not envision mail as a delivery system for anthrax powder. In 1998, SAIC, a defense contractor, asked a scientist from the former U.S. offensive biological weapons program, to articulate in a paper several scenarios for delivery of biological warfare agents to support decontamination and containment. One of these scenarios included anthrax powder being sent through the mail. According to this

---

[6]Experts told us that anthrax production is not an exact science. The yield and quality of each batch is variable even when produced legitimately in a highly sophisticated facility.

[7]There are several drying and milling methods. Some will greatly increase the static charge, and some will reduce the efficiency of the production. Any anthrax powder of < 5 microns is essentially a vapor.

[8]While it has been suggested that static charge could be reduced without adding chemicals, we have not been provided data to support this assertion. At this point, containment becomes imperative if the perpetrator wants to leave no evidence and protect himself or herself.

~~Limited Official Use Only~~

GAO-03-323T

~~Limited Official Use Only~~

paper, if a letter contained more than 2 to 3 grams of powder, it would be relatively easy to detect by its visible shape. In addition, the author believed, by sending the anthrax in a letter, the area of contamination would be limited, so decontamination procedures could be implemented successfully. In this paper, however, the operational environment of automated mail processing was not considered.

In Canada, the first Canadian anthrax hoax letter incident occurred on January 30, 2001, at the Citizenship and Immigration Office. Since no experimental study on which to base a realistic assessment of the threat posed by these "anthrax letters" could be found, Defense Research Establishment Suffield (DRES), a Canadian defense research and development organization, undertook a series of experiments to determine the extent of the hazard. This study was an attempt to (1) mimic what might occur in an office or mailroom if an envelope containing anthrax powder was received and opened and (2) estimate the aerosol release of the anthrax powder from the letters. This study also did not consider the operational environment of automated mail processing. Although this study was not published until October 1, 2001, DRES officials provided a schedule of briefings that were conducted through the spring and summer of 2001, when the results of the study were discussed.

The results indicated that dispersion of spores in an office setting would be far more effective than had initially been suspected. Significant numbers of aerosolized particles (>99% in the 2.5 to 10 micron size range) were released when envelopes, containing 0.1 or 1.0 grams of anthrax powder, were opened. A lethal dose could be inhaled within seconds of opening such an envelope. In addition, the powder quickly spread throughout the room so that if other workers were present, depending on their location and the airflow within the office, they would also be likely to inhale a lethal dose. The results also indicated that envelopes with corners not totally sealed could pose a threat to individuals in the mail-handling system. However, it is important to note that the scientists were only evaluating the anthrax threat that could result from opening an anthrax-contaminated letter. They did not evaluate whether the mail going through the pinch rollers in a postal sorting machine could also result in secondary contamination. Although these results are significant with respect to local area contamination, overall, the mail as a means of producing mass casualties remains an inefficient method of dissemination as compared with the various military technologies. Nonetheless, in terms of public concerns and economic damage, anthrax powder in the mail represents a potentially significant problem.

~~Limited Official Use Only~~

~~Limited Official Use Only~~

## USPS Efforts to Detect Anthrax in the Mail

USPS has been pursuing several approaches, including procedural changes and a number of currently available technologies, to reduce risk through early detection of biohazards, primarily anthrax. USPS has identified several key areas of focus, including (1) redesign of mail collection boxes for both risk reduction and detection, (2) development of technology and procedures to reduce the volume of "anonymous" mail, (3) deployment of vacuum/filtration technology on automated sorting equipment, (4) use of mass spectrometry for detection, and (5) pursuit of a variety of technologies to aid investigators in finding whoever was responsible for earlier anthrax attacks through the mail and deterring future attempts at placing biohazards in the mail.

To date, USPS has focused on systemwide detection technology—centered mainly on Polymerase Chain Reaction (PCR) detection—placed on the initial operation in processing facilities for mail with the greatest risk, which is picked up at collection boxes, residences, and small businesses.[9] USPS continues to face challenges in developing this technology for its operational environment. USPS continues to work with the manufacturers of several different technologies and is conducting additional testing and prototyping to fully determine the viability of these technologies in a mail processing environment. We are continuing to monitor USPS efforts to procure and deploy these technologies.

The USPS efforts to defend against biological agents illustrate a key aspect of homeland defense—namely, the distinction between reactive and proactive operational environments. Prior to the October 2001 letters containing anthrax powder, the vast majority of technologies and techniques for defending against biological agent attacks were based on a post-release reaction approach. This post-release approach assumed that the delivery of the biological warfare agent would be via a known weapon system; that the target would be an active military site; that the soldiers at the site would be protected by adequate training, clothing, and prophylaxis; and that a high number of false positive detections would not hinder the site's operations in any significant way.

The USPS efforts illustrate a completely new proactive environment and concept of operations for these techniques and technologies. The USPS

---

[9]PCR technology is able to detect small quantities of DNA with a particular genetic sequence (e.g., anthrax) and is the nucleus of the biohazard detection system (BDS) specifically designed for USPS.

~~Limited Official Use Only~~

GAO-03-323T

Limited Official Use Only

environment is a civilian one, in which the assumptions are that affected people would not have the full protection and training that would be available in a battlefield setting; that the biological warfare agent would have to be intercepted prior to its release, to minimize the impact on both humans and operations; that the delivery mechanism may not be obvious; and that the rate of false positive detection must be minimal in order to avoid unnecessary interruption to normal mail processing activities. As we stated earlier, overcoming the lack of data on the threat in this domestic civilian environment will be critical to USPS success in establishing a biological agent defense.

## Overview of Law Enforcement's Initial Response to the Anthrax Attack

The FBI as lead investigative agency is currently investigating a series of bioterrorism incidents using anthrax spores that were sent through the mail and which resulted in 22 anthrax cases, including five deaths, since October 3, 2001. This is the first time the FBI has conducted this kind of investigation. The FBI's investigative team includes criminal investigators with scientific knowledge. In addition, the FBI has reached out to the scientific community to gain additional scientific knowledge about anthrax. Further, the FBI's HAZMAT Response Team was used to gather evidence at various crime scenes contaminated by anthrax utilizing Personal Protection Equipment. [16] The FBI also utilized the expertise of (1) EPA's Office of Criminal Enforcement, Forensics and Training (OCEFT) to assist in gathering evidence at one of the crime scenes, the Senate Hart Building; (2) USPS's Postal Inspector in collecting evidence involving the contamination of the mail system; (3) CDC and the Florida health unit that initially reported the first anthrax case; and (4) Department of Defense laboratories.

The FBI had previously been made aware of numerous anthrax incidents throughout the United States, which were random in nature and determined to be hoaxes. Because this was the first time the FBI responded to an actual anthrax attack, there was some confusion about the investigative roles and responsibilities of relevant agencies. As a result, the FBI recognized the need for increased coordination with public health officials, including CDC, and other investigative agencies. The CDC particularly is a key agency in any biological terrorist threat because it is

---

[16] The FBI has 17 Field Offices that have HAZMAT Response Teams that are fully trained and equipped to respond to a hazardous material incident. These teams work in conjunction with the state and local first responders, to assess and evaluate the incident and provide direction to obtain evidence that could be used in subsequent prosecutions.

Limited Official Use Only

GAO-03-323T

Limited Official Use Only

able to identify biological agents and has the tools to investigate and respond quickly.

## Current Efforts to Prepare for Future Bioterrorist Attacks

The anthrax investigation has prompted the FBI and other investigative agencies to focus additional attention on the chemical and biological threat. Some of these efforts include (1) agreements among the FBI, other federal agencies, and state and local governments delineating each organization's role; (2) increasing liaison efforts with public health officials; (3) preparation by the FBI and CDC of a handbook for conducting investigations involving biological agents; and (4) identification of key state and local officials needing security clearances to allow access to classified information.

Mr. Chairman, thank you for giving us the opportunity to submit this statement. If you have any questions on the statement or follow-up questions, we will be happy to respond.

Limited Official Use Only

**APPENDIX**


**CTC WATCHLISTING GUIDANCE**

**DECEMBER 1999**

# CTC WATCHLISTING GUIDANCE

## December 1999

Questions raised by Senator Shelby and his staff in December 2002 prompted the Joint Inquiry to inquire further regarding whether CIA's Counterterrorist Center (CTC) had any established guidance concerning the watchlisting program. The Joint Inquiry had asked CTC about such watchlisting guidance in April 2002, and had been told in a written CIA response that no such guidance existed.

As a result of this renewed request, the Joint Inquiry was able to determine that CTC had sent a cable in December 1999 to all Directorate of Operations (DO) stations and bases, the subject of which was "Terrorism Guidance." The cable was designated as "Read and Retain," and its purpose was to remind DO personnel of pre-existing, periodically republished guidance regarding several important subjects of relevance to their counterterrorism efforts. The Joint Inquiry also determined that the unit in CTC that was responsible for matters relating to Usama Bin ladin and al-Qa'ida received a copy of the cable.

One paragraph of the nine paragraph "Terrorism Guidance" cable (see attached copy) reminded recipients of the procedures for watchlisting "potential," "possible," "known," or "suspected" terrorists. The guidance stated, in part, that:

> . . . It is important to flag terrorist personality information in DO intelligence reporting for [the State Department watchlist program] so that potential terrorists may be watchlisted. Information for inclusion in [the State Department watchlist program] must raise a reasonable suspicion that the individual is a possible terrorist . . . . Information for [the State Department watchlist] program should be based on the following priorities:
>
>> -- known or suspected terrorists who pose or may pose a present threat to U.S. interests in the United States or abroad:
>
> . . . .

Thus, CTC personnel and CIA station and base personnel abroad were reminded in December 1999 of the existence, importance and thresholds of the watchlisting program shortly before CTC learned in January 2000 that a known al-Qa'ida associate – al-Mihdhar – possessed a multiple entry U.S. visa; one month before the Malaysia meeting; and three months before CTC received information from the field indicating that at least one known al-Qa'ida associate – Nawaf al-Hazmi – had traveled to the United States.

DEC. 13 2001 10:11AM HP LASERJET 3200                                    p.2
Case 1:22-mc-00126-CJN-MAU   Document 11-3   Filed 01/03/23   Page 950 of 1028

S E C R E T

DOSE

DIRECTOR 676309

11 DECEMBER 1999

5.  VISAVIPER PROGRAM:

THE VISAVIPER PROGRAM PROVIDES A CONSULAR CHANNEL FOR
WATCHLISTING POTENTIAL TERRORISTS BY CONTRIBUTING TERRORIST
PERSONALITY INFORMATION FOR THE STATE DEPARTMENT'S UNCLASSIFIED
CLASS AND CLASSIFIED TIPOFF DATABASES.  IT IS IMPORTANT TO FLAG
TERRORIST PERSONALITY INFORMATION IN DO INTELLIGENCE REPORTING
FOR VISAVIPER SO THAT POTENTIAL TERRORISTS MAY BE WATCHLISTED.
INFORMATION FOR INCLUSION IN VISAVIPER MUST RAISE A REASONABLE
SUSPICION THAT THE INDIVIDUAL IS A POSSIBLE TERRORIST,
ANDBIOGRAPHIC DATA MUST BE SUFFICIENT FOR IDENTIFICATION PURPOSES
OR STATE DEPARTMENT WILL NOT MAKE A VISAVIPER ENTRY.  INFORMATION
FOR THE VISAVIPER PROGRAM SHOULD BE BASED ON THE FOLLOWING
PRIORITIES:

    --KNOWN OR SUSPECTED TERRORISTS WHO POSE OR MAY POSE A
PRESENT THREAT TO U.S. INTERESTS IN THE UNITED STATES OR ABROAD;

    --KNOWN OR SUSPECTED TERRORISTS NOT NOW KNOWN TO BE ENGAGED
IN TERRORIST ACTIVITIES AGAINST U.S. INTERESTS BUT WHO WERE SO
ENGAGED WITHIN THE PAST 15 YEARS;

    --KNOWN OR SUSPECTED TERRORISTS WHO ARE CURRENTLY ENGAGING
IN TERRORIST ACTIVITY AGAINST NON-U.S. INTERESTS, OR WHO WERE SO
ENGAGED WITHIN THE PAST TEN YEARS.

S E C R E T

# APPENDIX

# THE JOINT INQUIRY IN COURT

# THE JOINT INQUIRY IN COURT

On August 20, 2002, the Department of Justice (DOJ) filed a motion in *United States v. Moussaoui*, Crim. No. 01-455-A, in the Eastern District of Virginia, concerning potential disclosure in the Joint Inquiry's public hearings and reports of information provided by the Federal Bureau of Investigation (FBI) and other Executive Branch agencies about the Government's investigation of Zacarias Moussaoui.  The relief sought by DOJ would have imposed significant limitations on the Joint Inquiry's ability to inform the public about the FBI's conduct of its Moussaoui investigation in the weeks leading up to September 11, 2001.  For that reason, the Joint Inquiry appeared before Judge Leonie Brinkema, the presiding judge in the Moussaoui prosecution, to oppose DOJ's motion.  The issue was finally resolved favorably for the Joint Inquiry in a court order on September 23, 2002 that effectively cleared the way for FBI testimony at the Joint Inquiry's public hearing the next day on the FBI's conduct of the Moussaoui investigation.

This portion of the Appendix briefly describes the issues that were presented and the orders that were issued in conjunction with the Moussaoui litigation.  Although begun as a nonpublic, or "sealed" proceeding, the pleadings in the case were unsealed by the court and the orders were also filed on the public record.

At the outset of the Joint Inquiry, representatives of the Joint Inquiry and DOJ discussed procedures for access to FBI and DOJ information that would recognize the need for a thorough Congressional inquiry and yet avoid interfering with the Moussaoui case and other pending criminal prosecutions and investigations.  On April 9, 2002, the Joint Inquiry Staff Director wrote to the Director of Central Intelligence -- with copies to the FBI and other Intelligence Community agencies -- to describe procedures for meeting this goal that were being adopted by the Joint Inquiry.  These procedures included a commitment by the Joint Inquiry to consult with the Justice Department "before any information that is obtained from Intelligence Community records and that may constitute evidence in a criminal proceeding is made public."

Over the following weeks, it became clear that DOJ believed there were legal bars to the Joint Inquiry's public disclosure of materials about the FBI's Moussaoui investigation.  As a result of these concerns, DOJ advised the Joint Inquiry in a May 31, 2002 letter that "the Department may have to oppose efforts to release publicly certain protected information prior to the trial, to the extent that it would impair the government's ability to present its case, infringe upon the defendant's right to a fair trial, or compromise the integrity of other investigations."

One bar, in DOJ's view, was a Protective Order in the Moussaoui case that had been prepared by DOJ and entered by the District Court on February 5, 2002.  That Order provided, among other things, "that none of the discovery materials produced by the government to the defense shall be disseminated to the media by the government."

The other bar, in DOJ's view, was Eastern District of Virginia Local Criminal Rule 57. That Rule bars several categories of out-of-court statements by the prosecution or defense "which a reasonable person would expect to be further disseminated by any means of public communication," but also contains a specific proviso that nothing in it is intended to preclude "hearings or the lawful issuance of reports by legislative, administrative, or investigative bodies."

In the next several months, as the date for the first public hearings approached, the Joint Inquiry sought to assure DOJ that its concerns could be accommodated by the Inquiry.  A June 27, 2002 letter to the Attorney General from the leaders of the Joint Inquiry stated that the objective of the Inquiry's planned public hearing on the Moussaoui matter was "not to consider the guilt or innocence of Mr. Moussaoui, which is a matter for the Judicial Branch, but to examine the counterterrorist efforts of U.S. Government personnel and the organizations and authorities under which they operate."  The letter also informed the Attorney General that the Offices of Senate Legal Counsel and House General Counsel had advised the Joint Inquiry that neither the Protective Order nor the Local Rule governed the public proceedings of Congress.

2

In July 2002, DOJ's Criminal Division asked for a further description of the subjects that would be addressed in the Joint Inquiry's public hearings, which were scheduled to begin in September.  On August 5, 2002, the Joint Inquiry Staff Director wrote to the Assistant Attorney General for the Criminal Division and explained that the scope of the Inquiry's planned public examination of the Moussaoui matter would include "FBI activity concerning Zacarias Moussaoui from August 15, 2001, when an intelligence investigation was opened, through September 11, 2001."

On August 20, 2002, DOJ filed an "Expedited Motion of the United States for Clarification Regarding the Applicability of the Protective Order for Unclassified but Sensitive Material and Local Criminal Rule 57 to Information that May be Made Public in Congressional Proceedings."  DOJ asked the District Court to order that "[t]he Protective Order and Local Rule would preclude the provision of information regarding 'The Moussaoui Investigation,' as described [in the Joint Inquiry letter of August 5], for public use . . . ."  The Department also submitted an order, which the District Court granted, "to authorize the service of its Expedited Motion with its attachments on the representatives of the House and Senate Intelligence Committees who are involved in the Joint 9/11 Inquiry, and to enable these committees to reply to the motion and attend any scheduled hearing."

With the assistance of the Offices of Senate Legal Counsel and House General Counsel, the General Counsel of the Joint Inquiry filed a reply on behalf of the Joint Inquiry on August 26 and participated in the argument on August 29, 2002.  The reply asked that the District Court deny DOJ's requested relief for three main reasons: "(1) the protective order does not govern testimony before Congress, nor does it govern the production of documents to Congress, the use of documents by it, or the issuance of its reports; (2) Local Criminal Rule 57 specifically does not preclude the holding of legislative hearings or the issuance of legislative reports, and (3) the proposed expansion of the order by the Department of Justice runs afoul of the separation of powers."

On August 29, the District Court entered an order that denied DOJ's motion. Stating that the Protective Order "is too complicated in its present form," the order directed the submission of a new Protective Order. The August 29 order also stated "that nothing in this Order is intended to affect the applicability of Local Rule 57 to the participants in this case."

The transcript of the August 29 hearing was released publicly on August 30. Representatives of DOJ and the Joint Inquiry discussed, but could not agree on, the import of the Court's ruling, particularly regarding the applicability of the Local Rule to the testimony of FBI witnesses at the public hearing. During the first week of September 2002, DOJ asked the Joint Inquiry to advise it regarding which of the documents that had been provided to the Joint Inquiry by the FBI were believed to be relevant to a public hearing concerning the Moussaoui investigation. On September 11, 2002, the Joint Inquiry's General Counsel provided DOJ with a list of documents that were substantially likely to be included in public questioning of FBI witnesses at public hearings.

On September 20, DOJ filed a "Renewed Expedited Motion of the United States for Clarification Regarding the Applicability of Local Criminal Rule 57 to Information to be Made Public in Congressional Proceedings." Focusing only on the Local Rule, the Department did not renew its earlier arguments about the applicability of the Protective Order to Congressional proceedings. The Department asked the District Court to enter an order that "Local Criminal Rule 57 applies to Department of Justice personnel who are testifying at public Congressional hearings, including but not limited to, all statements such personnel make in response to questions asked by Members and staff at such hearings."

Again assisted by the Offices of Senate Legal Counsel and House General Counsel, the Joint Inquiry General Counsel replied in writing that:

> . . . the order sought by the United States would substantially shut down the opportunity of the full Congress and the public to understand the important issues involved in the FBI's handling of the Moussaoui investigation prior to September 11. The relief sought by the United States would, in effect, amount to an injunction blocking a proceeding of the Congress that no Court has ever issued.

On September 23, 2002, the District Court denied the DOJ motion, as follows:

> The Joint Inquiry made clear in its August 5, 2002 letter to the Assistant Attorney General for the Criminal Division the limited parameters of the inquiry and has reiterated in its Reply that the Committees will not ask witnesses to comment about the merits of this case.  Indeed, the questions are expected to focus on "what government officials heard, observed, reasoned, recommended, and acted on (or did not act on) prior to September 11."  [Quoting Joint Inquiry Reply.]  The Committees are not interested in "expressions of current judgment from government witnesses about the defendant's guilt or innocence or the government's plans for presenting its case."  [Quoting Joint Inquiry Reply.]  Given the ground rules articulated by the Joint Inquiry, FBI personnel should have no difficulty responding to Congress' questions without violating Local Rule 57 or any other order of this Court.  Accordingly, the Renewed Expedited Motion for Clarification is DENIED.

In accordance with its commitment to consult with the Department of Justice, the Joint Inquiry continued to allow DOJ to review and comment regarding the contents of staff statements related to the Moussaoui case and other matters.  At the Joint Inquiry's September 24 public hearing and the closed hearing that followed concerning the Moussaoui matter, the Joint Inquiry permitted a DOJ representative to attend with FBI witnesses for the purpose of advising whether any question called for an answer that might impair the Moussaoui prosecution.  Thus, the Inquiry was able to proceed with a full public exposition of the issues raised in the Moussaoui investigation without impeding the due process and fair trial interests of Moussaoui and DOJ.

**APPENDIX**

**ACCESS LIMITATIONS
ENCOUNTERED
BY THE
JOINT INQUIRY**

TOP SECRET

# ACCESS LIMITATIONS
# ENCOUNTERED
# BY THE
# JOINT INQUIRY

The Joint Inquiry received assurances from the White House, the Director of Central Intelligence and the heads of the Intelligence Community agencies that its access would be complete and unprecedented and that the agencies would "bend over backwards" and "be forward leaning" in response to requests for information made in the course of the Inquiry.  While the major agencies in the Inquiry – CIA, FBI and NSA – provided substantial support and allowed access to large volumes of information, there were certain areas in which no access was allowed, and others where access was achieved only after extensive discussions and delays or under conditions that limited the scope of the Inquiry's work.

## Access Denied

-- The President's Daily Brief (PDB):  the White House determined, and the DCI and CIA agreed, that the Joint Inquiry could have no access to the contents of the PDB. Ultimately, this bar was extended to the point where CIA personnel were not allowed to be interviewed regarding the simple process by which the PDB is prepared.  Although the Inquiry was inadvertently given access to fragments of some PDB items early on, this decision limited the Inquiry's ability to determine systematically what Presidents Clinton and Bush, and their senior advisors, were being told by the Intelligence Community agencies, and when, regarding the nature of the threat to the United States from Usama Bin Ladin and al-Qa'ida.  Despite the White House decision, the Joint Inquiry was advised by Intelligence Community representatives of the content of an August 2001 PDB item that is discussed in the report.  This glimpse into that PDB indicated the importance of such access [————————————————]

[—————————————————————————————————————

—————————————————————]. *


-- <u>Foreign Liaison Relationships</u>:  The DCI refused to allow the Joint Inquiry to have access to a series of reports that had been prepared within CTC regarding the strengths and weaknesses of the CIA's liaison relationships with a variety of foreign governments.  This decision affected the Inquiry's ability to determine the extent to which some foreign governments had or had not cooperated and shared information with the United States in countering Bin Ladin and al-Qa'ida prior to September 11.


-- <u>Budget Information</u>:  Because a lack of resources was raised repeatedly by Intelligence Community representatives throughout the Inquiry, it became important to review the budget requests that had been made by the various agencies through the relevant years and to compare the treatment of those requests within the agencies from which they originated, within the Administration, and by Congress.  While certain information was made available regarding agency and Congressional action, the Office of Management and Budget (OMB) and the White House prevented the agencies from sharing information regarding budget requests that were submitted by the agencies to OMB and the actions OMB took to increase or decrease those requests before they were submitted to Congress.  This limited the Inquiry's ability to determine where in the budget process requests for additional counterterrorism resources were changed.


-- [<u>Covert Action Programs</u>:  Covert action was an important part of CIA's overall effort to counter the threat posed by Bin Ladin prior to September 11, 2001.  [———————————

—————————————————————————————————————

—————————————————————————————————————

——————————]. The NSC denied the Joint Inquiry access to documents, thereby limiting its ability to inquire into this area].

---

* National Security Advisor Condoleeza Rice stated in a May 16, 2002 press briefing that, on August 6, 2001, the President's Daily Brief (PDB) included information about Bin Ladin's methods of operation from a historical perspective dating back to 1997.  One of the methods was that Bin Ladin might choose to highjack an airliner in order to hold passengers hostage to gain release of one of their operatives.  She stated, however, that the report did not contain specific warning information, but only a generalized warning, and did not contain information that al-Qa'ida was discussing a particular planned attack against a specific target at any specific time, place, or by any specific method.

-- <u>NSC-Level Information</u>:  There were several areas of counterterrorism intelligence policy development where insight into discussions involving the DCI, CIA and other Intelligence Community officials, and personnel at the National Security Council and White House levels would have been helpful in determining why certain options and programs were or were not pursued in particular time frames.  Access to most information that involved NSC-level discussions was blocked, however, by the White House.  Even agency documents that were drafted in anticipation of NSC discussion were denied to the Inquiry as "pre-decisional."  The Inquiry also was denied access to, or a briefing concerning, the findings and conclusions of the report of the National Security Presidential Directive-5 Commission on Intelligence Reform chaired by Lt.Gen. Brent Scowcroft.

-- <u>Interview of the DCI</u>:  The Joint Inquiry attempted to schedule an interview of DCI George Tenet in order to solicit his recollections, understandings and opinions regarding a host of questions relating to policy, resource, organizational, authority, priorities, and other issues that had been developed during the Inquiry.  Such an interview was at first delayed and then made conditional on further discussions with DCI staff.  Ultimately, the DCI testified at length in closed and open sessions before the Joint Inquiry and the interview was denied on that basis.

-- [Interview of FBI Informant:  On August 8, 2002, the FBI informed the Joint Inquiry that two of the hijackers had numerous contacts with a long time FBI counterterrorism informant.  The Joint Inquiry made numerous requests to the FBI to interview the informant in an effort to resolve some of the inconsistencies in the informant's reporting and to better evaluate how effectively the FBI utilized the informant.  The FBI, supported by the Attorney General and the Administration, refused to make the informant available for an interview or to serve a Congressional deposition notice and subpoena on the informant, whose whereabouts were known to the FBI at the time.  The FBI also strongly objected to a Joint Inquiry interview of the informant, citing concerns about adverse impact on FBI efforts to recruit future informants.  The Joint Inquiry instead agreed with a suggestion by FBI officials that, as an initial step, written

TOP SECRET

interrogatories be served on the informant.  The FBI agreed to deliver those interrogatories to the informant for a written response.  Soon after, the informant retained an attorney, who advised the Joint Inquiry that the informant would not respond to the interrogatories.  The attorney also advised the Joint Inquiry that, if subpoenaed, the informant would be unwilling to testify without an immunity agreement.  As a result, while the Joint Inquiry interviewed and received testimony from FBI personnel familiar with the information provided by the informant, it was denied the opportunity to discuss that information directly with the informant].

-- <u>NSA Technical and Contractual Information</u>:  The Joint Inquiry sought to determine whether and how NSA is planning to cope with changing technology and requirements, and how it is equipped to manage the allocation of scarce resources for research and development in the counterrterrosim area.  Despite numerous requests for specific planning and other documents and briefings, NSA provided very limited responsive information in this area.

-- <u>CIA and NSA Documents</u>:  CIA took the position that so-called "operational cables" from the field and certain other documents it deemed to be sensitive could be subject to Joint Inquiry review at CIA Headquarters, but that no copies could be brought to the Joint Inquiry's office.  NSA adopted a similar position concerning its transcripts and disseminated intelligence reports and, ultimately, almost all other materials.  This prevented the incorporation of the original documents in the Inquiry's central records where they could be drawn upon effectively for research and reference purposes.  Both agencies did, however, allow verbatim notes to be made and removed to Inquiry offices.  This consumed many hours and slowed the Inquiry's progress.  Both agencies then agreed to allow copies to be removed from their premises if the Joint Inquiry agreed to allow them to be stored by the agencies at the end of the Inquiry, and even provided a draft of an agreement that would recognize this.  When the Inquiry later agreed in principle and responded

with a revised draft, however, the agencies decided that such an agreement was no longer desirable and returned to their original positions.

-- <u>Military Options</u>:  In order to evaluate allegations that the U.S. military was reluctant to become involved in the effort against Bin Ladin prior to September 11, and to assess the interplay between the CIA and the military in covert action and special operations relating to counterterrorism, the Joint Inquiry asked to review documents regarding 13 military options that had been reportedly prepared by the Joint Chiefs of Staff (JCS) in response to a White House request.  The JCS Legal Counsel, supported by the Defense Department (DOD) General Counsel and the NSC, took the position that this request exceeded the scope of the Joint Inquiry's authority, but provided a summary briefing concerning the options.

**Access Limited**

-- <u>Foreign Government Information at the FBI</u>:  The FBI allowed the Joint Inquiry to review information provided by foreign governments at the FBI, but would not allow the documents or verbatim notes to be carried to the Inquiry's offices.  This limited and delayed the Inquiry's efforts to understand the level of cooperation displayed by the [————] and other governments in counterterrorism efforts prior to September11.

-- <u>Interview Policies</u>:  The Intelligence Community agencies insisted that agency representatives – usually legal or congressional affairs – be present to monitor all interviews of their personnel – present or former.  The Inquiry took the position that agency monitors would be excluded where an agency employee, or Joint Inquiry personnel, decided that their presence would inhibit the full and frank discussion of any matter.  Some of the agencies "pre-briefed" personnel who were to be interviewed by the Joint Inquiry, explaining to them what the agency position was on certain matters and urging the employees not to range too broadly in their responses.  In one instance, after lengthy discussions with DOJ and FBI personnel, a former FBI agent was interviewed without monitors present at his request.  On occasion, agency legal

representatives instructed individuals not to respond to questions that the monitors deemed would reveal pre-decisional matters or legal advice.

**Access Delayed**

-- <u>Department of Justice (DOJ) Concerns</u>:  The Joint Inquiry agreed with DOJ's position that information sealed by court order or relating directly to Grand Jury proceedings, and evidence obtained by means of electronic surveillance conducted under 18 U.S.C. §2510, et seq., not be provided to the Inquiry.  Some previously sealed information was, with the assistance of DOJ and by court order, eventually provided to the Inquiry.  While this agreement was not inconsistent with the goals of the Inquiry, significant delays resulted in the first months of the Inquiry while Intelligence Community and other U.S. Government agencies waited for DOJ to develop an efficient process for review of all information requested by the Inquiry.  Subsequently, DOJ took the position that FBI personnel who had been involved in the Moussaoui investigation or the September 11 investigation and who might be trial witnesses could not be interviewed by the Joint Inquiry about those matters.  This issue was not resolved until the Congressional leaders of the Joint Inquiry met with the Attorney General and senior Department of Justice officials in early May and expressed their objections to the DOJ position.  Other DOJ objections and concerns relating specifically to Joint Inquiry access to and use of information relating to the Moussaoui investigation were dealt with in federal court and are discussed in a separate section of this Appendix, entitled "The Joint Inquiry In Court."

-- <u>The Third Agency Rule/Internal Reviews</u>:  The Intelligence Community initially took the position that any information from one agency that was found in the files of another agency could not be shared with the Joint Inquiry until the originating agency had been consulted and given its permission.  This slowed the disclosure process significantly. Based on Inquiry objections, the Community first reduced the application of this procedural obstacle to only intelligence that

TOP SECRET

had not been disseminated in finished form, and finally agreed to provide the Inquiry with access and simultaneous notice to the originating agency.  In addition, the agencies insisted on reviewing and redacting certain information from documents before they were provided to the Inquiry, further preventing timely responses to Inquiry requests. Finally, the agencies would not provide the Inquiry with electronic access to information, but insisted on providing paper copies of all information.  This not only slowed production of the material, but also hindered the efficient review and utilization of this information by the Inquiry.

-- <u>Interview of the Deputy National Security Advisor</u>:  The Joint Inquiry requested the opportunity to conduct an interview of the National Security Advisor to the President in May 2002 in order to obtain a better understanding of the development of counterterrorism policy in the Bush Administration before September 11, 2001.  The NSC resisted this and suggested in June that the Deputy National Security Advisor be the subject instead and that written questions be provided instead of conducting an interview.  The Joint Inquiry provided written questions in July but did not receive responses until November 2002.

# Congress of the United States
## Washington, DC 20515

**Committee Sensitive**

July 1, 2002

President George W. Bush
The White House
1600 Pennsylvania Avenue
Washington, DC 20500

Dear Mr. President:

As you know, the Joint Inquiry of the Senate Select Committee on Intelligence and the House Permanent Select Committee on Intelligence is reviewing the performance of the Intelligence Community in connection with the attacks of September 11. Key aspects of this Inquiry include the organization and functions of the Community and whether legislative action is necessary to improve its ability to produce and share critical intelligence for counter-terrorism purposes. We are requesting that the draft report of the 2001 NSPD-5 Presidential Commission on Intelligence Reform chaired by General Brent Scowcroft be made available to the Joint Inquiry as it considers those issues. As you know, reports of the Commission's tentative findings have appeared in the media. Based on those reports, the findings appear to be highly relevant to the work of the Joint Inquiry.

If your staff has any questions or would like to discuss this request further, they should contact Eleanor Hill, the Joint 9/11 Inquiry Staff Director, at (202) 226-0911.

We appreciate your support for our effort and look forward to receiving the Commission report.

Sincerely,

Bob Graham
Chairman
Senate Select Committee on
  Intelligence

Porter Goss
Chairman
House Permanent Select
  Committee on Intelligence

Richard Shelby
Vice Chairman
Senate Select Committee on
  Intelligence

Nancy Pelosi
Ranking Democrat
House Permanent Select
  Committee on Intelligence

**Committee Sensitive**

# Congress of the United States
## Washington, DC 20515

**Committee Sensitive**

July 1, 2002

Mitchell E. Daniels, Jr.
Director
Executive Office of the President
Office of Management and Budget
725 17th Street, NW
Washington, DC 20503

Dear Mr. Daniels:

The Joint Inquiry Staff of the House and Senate Intelligence Committees seeks access to several Office of Management and Budget documents that are relevant to our ongoing inquiry. These documents have either been referred to in briefings or hearings before the Committees or during staff interviews of Intelligence Community personnel.

As you know, the Committees announced the scope of their joint inquiry in June, which focuses on the performance of the Intelligence Community in connection with the terrorist attacks of September 11th [enclosure (1)]. As part of that inquiry, we are reviewing the resources granted to the Intelligence Community during the course of its counter-terrorism efforts. Enclosure (2) is an initial list of requests.

Your assistance will facilitate the Joint Inquiry in key areas of interest to the House and Senate Intelligence Committees. Please do not hesitate to call me if there is anything I can do to expedite this request. I can be reached at (202) 226-0911. Please have your staff contact Daniel Byman at the same number with any specific questions regarding this request.

We appreciate your cooperation in this most important effort.

Sincerely,

Eleanor Hill
Director, Joint Inquiry Staff

Enclosures:
(1) Initial Scope of the Joint Inquiry
(2) List of requested documents

**Committee Sensitive**

PRINTED ON RECYCLED PAPER

**Committee Sensitive**

## Joint 9/11 Inquiry

### OMB Document Request
### July 1, 2002

- OMB guidance levels ("passback") for the Intelligence Community agencies, including the FBI, since 1986;

- Any "overguidance" requests from the Director of Central Intelligence or the heads of other members of the Intelligence Community related to terrorism since FY98;

- OMB National Security Crosscut Report to Congress for FY99-present;

- Documents from the OMB "Director's Review" on intelligence programs for the Fall of 1998, the Fall of 1999, and the Fall of 2000; and

- National Security Crosscut Data on counterterrorism for FY00 and FY01 requested by OMB from the various Intelligence Community agencies.

# Congress of the United States
## Washington, DC 20515

## PREAMBLE

To reduce the risk of future terrorist attacks; to honor the memories of the victims of the September 11 terrorist attacks by conducting a thorough search for facts to answer the many questions that their families and many Americans have raised; and to lay a basis for assessing the accountability of institutions and officials of government:

### THE SENATE SELECT COMMITTEE ON INTELLIGENCE
### AND
### HOUSE PERMANENT SELECT COMMITTEE ON INTELLIGENCE

### ADOPT THIS

### INITIAL SCOPE OF JOINT INQUIRY

Pursuant to section 5(a)(1) of Senate Resolution 400, 94th Congress, Rule 6 of the Rules of Procedure of the Senate Select Committee on Intelligence, Rule XI(1)(b) of the Rules of the House of Representatives, and Rule 9 of the Rules of Procedure of the House Permanent Select Committee on Intelligence, the two Committees have authorized an investigation, to be conducted as a Joint Inquiry, into the Intelligence Community's activities before and after the September 11, 2001 terrorist attacks on the United States. The Committees have undertaken this Joint Inquiry pursuant to their responsibility to oversee and make continuing studies of the intelligence activities and programs of the United States Government and all other authority vested in the Committees.

The purpose of this Joint Inquiry is --

(a) to conduct an investigation into, and study of, all matters that may have any tendency to reveal the full facts about --

(1) the evolution of the international terrorist threat to the United States, the response of the United States Government including that of the Intelligence Community to international terrorism, from the creation of the Director of Central Intelligence's Counterterrorist Center in 1986 to the present, and what the Intelligence Community had, has, or should have learned from all sources of information, including any terrorist attacks or attempted ones, about the international terrorist threat to the United States;

(2) what the Intelligence Community knew prior to September 11 about the scope and nature of any possible attacks against the United States or United States interests by international terrorists, including by any of the hijackers or their associates, and what was done with that information;

(3) what the Intelligence Community has learned since the events of September 11 about the persons associated with those events, and whether any of that information suggests actions that could or should have been taken to learn of, or prevent, those events;

(4) whether any information developed before or after September 11 indicates systemic problems that may have impeded the Intelligence Community from learning of or preventing the attacks in advance, or that, if remedied, could help the Community identify and prevent such attacks in the future;

(5) how and to what degree the elements of the Intelligence Community have interacted with each other, as well as other parts of federal, state, and local governments with respect to identifying, tracking, assessing, and coping with international terrorist threats; as well as biological, chemical, radiological, or nuclear threats, whatever their source (such as the Anthrax attack of 2001).

(6) the ways in which the Intelligence Community's responses to past intelligence problems and challenges, whether or not related to international terrorism, have affected its counterterrorism efforts; and

(7) any other information that would enable the Joint Inquiry, and the Committees in the performance of their continuing responsibilities, to make such recommendations, including recommendations for new or amended legislation and any administrative or structural changes, or other actions, as they determine to be necessary or desirable to improve the ability of the Intelligence Community to learn of, and prevent, future international terrorist attacks; and

(b) to fulfill the Constitutional oversight and informing functions of the Congress with regard to the matters examined in the Joint Inquiry.

# Congress of the United States
## Washington, DC 20515

~~Top Secret~~   – Committee Sensitive

July 8, 2002

Dr. Condoleezza Rice
Assistant to the President for National Security Affairs
National Security Council
The White House
Washington, DC 20504

Dear Dr. Rice:

The Joint Inquiry Staff of the House and Senate Intelligence Committees seeks access to several National Security Council (NSC) documents that are relevant to our ongoing inquiry. These documents have either been referred to in briefings or hearings before the Committees or during staff interviews of Intelligence Community personnel.

As you know, the Committees announced the scope of their Joint Inquiry in June, which focuses on the performance of the U.S. Intelligence Community in connection with the terrorist attacks of September 11th [enclosure (1)]. In keeping with that guidance, the Joint Inquiry Staff is reviewing the U.S. Government response to international terrorism as part of its examination of the Intelligence Community's performance. As part of that effort, it is important that we review the policy guidance the Intelligence Community received from the National Security Council, including covert action instructions.

Enclosure (2) is forwarded as an initial list of requests. This list focuses primarily on covert action and the use of force against al-Qa'ida.

Your assistance will facilitate the Joint Inquiry in key areas of interest to the House and Senate Intelligence Committees. Please do not hesitate to contact me if there is anything I can do to expedite this request. I can be reached at (202) 226-0911. Please have your staff contact Daniel Byman with any specific questions regarding this request.

We appreciate your continued cooperation in this most important effort.

Sincerely,

Eleanor Hill
Director, Joint Inquiry Staff

Enclosures:
(1) Initial Scope of the Joint Inquiry
(2) List of requested documents

~~Top Secret~~   – Committee Sensitive

~~Top Secret~~/   – Committee Sensitive

### Joint 9/11 Inquiry

### NSC Document Request
### July 1, 2002

- Minutes, memoranda, or other documents prepared in connection with Principals' meetings concerning proposals for covert action against terrorism between 1998 and September 11, 2001, particularly with regard to al-Qa'ida or Usama bin Ladin;

- Memoranda or other documents related to any requests the NSC made to the CIA for covert action options from 1996 to September 11, 2001, [                    ]

- The NSC policy options paper, prepared by Richard Clarke's office during Spring 2001, which proposed a change in U.S. policy regarding [                ]

- Memoranda, documents, or other records related to requests the NSC made to the Department of Defense and/or the Joint Chiefs of Staff regarding possible military options against al-Qa'ida from 1994 to September 11, 2001, including military strikes and [                ]; and

- The after-action report on the Millennium prepared by the National Coordinator for Counterterrorism's office.

# Congress of the United States
## Washington, DC 20515

### PREAMBLE

To reduce the risk of future terrorist attacks; to honor the memories of the victims of the September 11 terrorist attacks by conducting a thorough search for facts to answer the many questions that their families and many Americans have raised; and to lay a basis for assessing the accountability of institutions and officials of government:

### THE SENATE SELECT COMMITTEE ON INTELLIGENCE
### AND
### HOUSE PERMANENT SELECT COMMITTEE ON INTELLIGENCE

### ADOPT THIS

### INITIAL SCOPE OF JOINT INQUIRY

Pursuant to section 5(a)(1) of Senate Resolution 400, 94th Congress, Rule 6 of the Rules of Procedure of the Senate Select Committee on Intelligence, Rule XI(1)(b) of the Rules of the House of Representatives, and Rule 9 of the Rules of Procedure of the House Permanent Select Committee on Intelligence, the two Committees have authorized an investigation, to be conducted as a Joint Inquiry, into the Intelligence Community's activities before and after the September 11, 2001 terrorist attacks on the United States. The Committees have undertaken this Joint Inquiry pursuant to their responsibility to oversee and make continuing studies of the intelligence activities and programs of the United States Government and all other authority vested in the Committees.

The purpose of this Joint Inquiry is --

(a) to conduct an investigation into, and study of, all matters that may have any tendency to reveal the full facts about --

(1) the evolution of the international terrorist threat to the United States, the response of the United States Government including that of the Intelligence Community to international terrorism, from the creation of the Director of Central Intelligence's Counterterrorist Center in 1986 to the present, and what the Intelligence Community had, has, or should have learned from all sources of information, including any terrorist attacks or attempted ones, about the international terrorist threat to the United States;

(2) what the Intelligence Community knew prior to September 11 about the scope and nature of any possible attacks against the United States or United States interests by international terrorists, including by any of the hijackers or their associates, and what was done with that information;

(3) what the Intelligence Community has learned since the events of September 11 about the persons associated with those events, and whether any of that information suggests actions that could or should have been taken to learn of, or prevent, those events;

(4) whether any information developed before or after September 11 indicates systemic problems that may have impeded the Intelligence Community from learning of or preventing the attacks in advance, or that, if remedied, could help the Community identify and prevent such attacks in the future;

(5) how and to what degree the elements of the Intelligence Community have interacted with each other, as well as other parts of federal, state, and local governments with respect to identifying, tracking, assessing, and coping with international terrorist threats; as well as biological, chemical, radiological, or nuclear threats, whatever their source (such as the Anthrax attack of 2001).

(6) the ways in which the Intelligence Community's responses to past intelligence problems and challenges, whether or not related to international terrorism, have affected its counterterrorism efforts; and

(7) any other information that would enable the Joint Inquiry, and the Committees in the performance of their continuing responsibilities, to make such recommendations, including recommendations for new or amended legislation and any administrative or structural changes, or other actions, as they determine to be necessary or desirable to improve the ability of the Intelligence Community to learn of, and prevent, future international terrorist attacks; and

(b) to fulfill the Constitutional oversight and informing functions of the Congress with regard to the matters examined in the Joint Inquiry.

# Congress of the United States
## Washington, D.C.

~~Top Secret~~   – Committee Sensitive

July 31, 2002

Dr. Stephen Hadley
Deputy Assistant to the President for National Security Affairs
National Security Council
The White House
Washington, DC 20504

Dear Mr. Hadley:

The Joint Inquiry is examining the performance of the U.S. Intelligence Community in connection with the terrorist attacks of September 11, 2001. Per our discussions with John Bellinger, I ask that you submit a written response for inclusion in the record of the ongoing Joint Inquiry of the House and Senate Intelligence Committees. Your assistance will make an important contribution to our effort.

Attached is an initial list of questions that cover your time at the National Security Council. After we receive your answers, our staff seeks to interview you to discuss any remaining issues.

Your assistance will facilitate the Joint Inquiry in key areas of interest to the House and Senate Intelligence Committees. Please do not hesitate to call me if there is anything I can do to expedite this request. I can be reached at (202) 226-0911. For any specific questions regarding this request, please have your staff contact Daniel Byman at the same number.

We appreciate your cooperation in this most important effort.

Sincerely,

Eleanor Hill
Director, Joint Inquiry Staff

Enclosure:
   List of questions

**Proposed Questions for Deputy National Security Advisor Hadley**

### Terrorism as a Policy Priority

1. During your time as Deputy National Security Advisor, what priorities did you establish for U.S. intelligence priorities and where did terrorism fit in? How did this change from the priorities of the Clinton administration?

2. How were these priorities conveyed to the Intelligence Community? Did the Intelligence Community propose any changes in priority with regard to counterterrorism or al-Qa'ida? What were they?

3. Prior to September 11, who at the National Security Council and the U.S. government played a leading role in setting counterterrorism policy? Who else was involved in this process? Please describe the process, the participants, and the fora.

4. Prior to September 11, did Congress support the NSC's counterterrorism efforts? Did Congress oppose NSC priorities related to terrorism in any way? Please provide details of both, as appropriate.

5. Was Richard Clarke, the National Coordinator for Counterterrorism, included all in Principals' meetings related to terrorism after January 2002? If not, why not? How was it determined who would be involved in such meetings? What was his role in counterterrorism policy and intelligence prioritization after January 2002?

6. During the transition from the Clinton administration, did former National Security Adviser Sandy Berger or other senior Clinton NSC officials provide any advice, information, warning, or guidance requiring policy, priorities, or threats from al-Qa'ida and Bin Ladin? If so, what was the advice, information, warning, or guidance?

7. Prior to September 11, was the Administration engaged in a review of counterterrorism policy? What issues were identified for change? What stage were plans in? What changes in the role of the Intelligence Community, if any, were planned? What happened to the review after the September 11 attacks?

8. When the new Administration came into office, was it aware that Usama bin Ladin had declared war on the United States in 1998? Who provided this information, and how was it provided? What was the impact of that fact on the

Administration's national security priorities?  How did it affect the Intelligence Community's posture?

9.  Prior to September 11, did the President or other senior officials in the administration make any public statements or give any speeches on the subject of the threat of terrorism, or Usama bin Ladin's terrorist network in particular?  If so, please make copies available to the Joint Inquiry Staff.

## Resources

1.  Prior to September 11, did the Intelligence Community come to the new Administration with any requests for additional counterterrorism resources, e.g., additional funding?  Who made the request, and what was the nature of the proposal?

2.  Did the Intelligence Community ask the Administration for more resources to fight Usama bin Ladin and al-Qa'ida?  Who made this request?

3.  Did the Intelligence Community ever cite a lack of resources as the basis for not acting?  If so, provide details and the NSC response.

4.  When the DCI, Director of NSA, and FBI Director requested more counterterrorism resources, what was the stated justification for their requests?

5.  What was the NSC's response to each specific Intelligence Community request for any increases in resources for counterterrorism?  For al-Qa'ida?

## Agency responsiveness and support for policy makers

1.  What specific strengths did you observe in intelligence collection, analysis, and reporting on Bin Ladin, al-Qaeda or terrorism in general prior to September 11?  What specific weaknesses?  Please provide specific examples of each.

2.  What was the quality of intelligence received by the NSC?  Did the NSC make any efforts to improve this quality?

3.  With respect to Intelligence Community counterterrorism efforts prior to September 11, how responsive were the CIA, the FBI, NSA, and DIA?

- Did they provide the President and the National Security Council with the information needed to make informed decisions?
- Did the agencies use their authority aggressively?  Did they cite limits or a lack of authority as a basis for no action?
- Did they shift resources appropriately in response to NSC direction?

- Did the NSC provide any specific tasking to Intelligence Community agencies to which they did not respond?  Please provide specific examples.

## Threat to the homeland

1.  Prior to September 11, including especially spring/summer 2001, what information did the Intelligence Community provide to the National Security Council, orally or in writing, indicating the possibility of terrorist attacks inside the United States?

2. Prior to September 11, what information did the Intelligence Community provide to the National Security Council on al-Qa'ida activities and infrastructure inside the United States?

3.  Prior to September 11, did the National Security Council ever consider alerting the American people to the internal threat from al-Qaeda? What happened?

4.  Did the National Security Council ever consider enhancing U.S. border controls, e.g., by strengthening watchlist programs, alerting the FAA or the airlines, or inspecting cargo containers on a larger scale?  If so, what happened?

5. Prior to September 11, what was the National Security Council's view regarding how well postured the FBI was with respect to combating terrorist groups inside the United States?   What steps were taken to improve the FBI, if any?

6.  Prior to September 11, did the Intelligence Community provide the NSC with any information regarding the possibility that al-Qa'ida members would use airplanes as weapons or hijack airplanes in the United States?  What did the NSC do in response to this information?

## Foreign governments

1.  Prior to September 11, which foreign governments were most and least helpful regarding counterterrorism?  How were they helpful or not helpful in each case?

2.  Prior to September 11, were the governments of Saudi Arabia and Pakistan supportive of U.S. counterterrorism efforts?  How responsive were European allies?  What priority was counterterrorism cooperation in Saudi Arabia relative to military operations against Iraq, the Middle East peace negotiations, and other concerns?

~~Top Secret~~   – Committee Sensitive

3. Did Intelligence Community agencies ask for NSC assistance in getting foreign governments to take action against terrorist cells? Did the NSC take any specific actions to support the Intelligence Community? What did the NSC do? Did the NSC ask or instruct the State Department or the Department of Defense to assist the Intelligence Community in this regard?

4. Prior to September 11, was there any discussion of increasing information sharing and/or counterterrorism cooperation with the Sudan?

## Use of Force/Overt and Covert

1. Prior to September 11, did the National Security Council consider the use of military force against al-Qa'ida in Afghanistan? How? In what form? Why was it not pursued? Was there sufficient intelligence to support military options? Was there tasking to gain further intelligence to support military operations?

2. Prior to September 11, did the National Security Council issue any tasking to the CIA or the U.S. military to develop plans involving the covert or overt use of force?

3. Prior to September 11, did the National Security Council ever review the CIA's authorities to conduct covert action against Bin Ladin or al-Qa'ida? What problems were identified regarding existing authorities, [_____] [_____]? Were there any proposals to change those authorities before September 11th? What steps were taken?

4. Prior to September 11, was the *unarmed* Predator flown in Afghanistan after the Bush Administration came into office? Were proposals made to the NSC to fly it? Which participants favored flying it? If it was not flown, why not?

5. Did the National Security Council support the development of the *armed* Predator? Did any administration official try to expedite the process? Were any discussions held on this issue at the NSC? Who participated?

6. Did you consider [_____]? Why or why not? What impact did you expect?

7. Why was there no military response to the attack on the *USS Cole*? Was this considered?

## Recommendations

1. What recommendations would you make to improve the intelligence community's performance?

Congress of the United States
Washington, D.C.

~~Top Secret~~

August 12, 2002

Mr. John Bellinger
Senior Associate Counsel to the President &
    National Security Council Legal Advisor
The White House
Washington, DC 20504

Dear John:

We have been engaged, for several weeks now, in a discussion regarding Joint Inquiry Staff (JIS) access to a variety of types of documents and information relating to the President's Daily Brief (PDB). Rather than continuing to rely on periodic oral exchanges, I thought it would be helpful to describe in writing the specific areas of JIS interest in this regard and to solicit your written response as to each in order to illuminate the JIS and the relevant Intelligence Community personnel who must implement your instructions.

First, the JIS seeks access to information relating to the <u>process by which the PDB is created</u>. This would include questions such as: By whom is it prepared? How? When? What standards are applied? What source quality is required? With whom and how is it coordinated? How are analytic disagreements handled? What is its relation to the Senior Executive Intelligence Brief and other intelligence publications? By what means is it presented to the President? Who else reads it? Etc.

In addition, the JIS would like to know the <u>specific genesis of the August    2001</u> PDB item relating to Usama Bin Ladin (UBL) and terrorism threats to the United States. As I have told you, we have received very different versions of how this item came to be published. This is especially significant in light of the timing and content of that particular item in reference to the September 11 attacks and the substantial public interest in how well the Intelligence Community was serving the President at the time. Thus, we believe it important to establish a clear and complete record in that regard, and suggest that the National Security Council (NSC) should share that goal.

Finally, as I have told you, I believe there is a significant case to be made that the JIS should be provided with special access in some form to the <u>complete record of the numbers and contents of any PDB items regarding UBL, al-Qa'ida, and the terrorism threat to U. S. interests</u> that appeared from January 1998 – the year the Director of Central Intelligence declared we were at war with UBL – to September 11, 2001. Again, the public has a compelling interest in the circumstances in understanding how well the Intelligence Community was performing its principle function of advising the President and the NSC of threats to U.S. national security. There must be a way to recognize and

~~Top Secret~~

Mr. John Bellinger
August 12, 2002
Page 2

accommodate this interest without waiving the Executive's prerogatives in this regard in other circumstances. In the absence of such access, we will have no choice but to extrapolate the number and content of PDB items on these subjects from the items that appeared on these subjects in the Senior Executive Intelligence Brief and other lower level intelligence products during the same period. This may result, however, in dangerously skewed and misleading conclusions regarding what the President was being told about the threat during the months preceding the September 11 attacks.

I appreciate your efforts on behalf of the JIS in the weeks and months since we began this effort. Please let me have your response by August 26, 2002.

Sincerely,

R. R. Cinquegrana
Acting Director, Joint Inquiry Staff

# Congress of the United States
## Washington, D.C.

~~Top Secret~~

August 12, 2002

Mr. John Bellinger
Senior Associate Counsel to the President &
    National Security Council Legal Advisor
The White House
Washington, DC 20504

Dear John:

As I have explained, the Central Intelligence Agency continues to deny Joint Inquiry Staff (JIS) access to a broad range of documents and information relating to covert action, "National Security Council (NSC) programs," etc., on the grounds that these materials relate to NSC proceedings and are thereby precluded from JIS access by virtue of NSC instructions. Based on my discussions with you, my understanding is that the only documents and information the NSC intends to have withheld from the JIS relate to direct advice to, and discussions with, the President. In order to clarify this access issue in a timely and definitive manner, I request your written response as soon as possible regarding whether my understanding is correct. Only in this way, I believe, will we be able to break this particular logjam with the Agency.

I would appreciate your response before August 23, 2002. Thanks very much for your continued cooperation and assistance in this regard.

Sincerely,

A. R. Cinquegrana
Acting Director, Joint Inquiry Staff

~~Top Secret~~

# Exhibit C-17



# Congress releases secret '28 pages' on alleged Saudi 9/11 ties

By Jim Sciutto, Ryan Browne and Deirdre Walsh, CNN
Updated 10:44 PM EDT, Fri July 15, 2016



🖵 Video Ad Feedback

Classified 9/11 documents detail link to Saudi Arabia

00:56 - Source: CNN

**STORY HIGHLIGHTS**

The secret document was part of a 2002 congressional investigation of the Sept. 11 attacks

The Saudi government has long called allegations of involvement unfounded

**Washington (CNN) —** A long-classified U.S. report released Friday found that some of the 9/11 hijackers were in contact with and received support from individuals likely connected to the Saudi government.

Known as the "28 pages," the secret document was part of a 2002 Congressional Joint Inquiry into the Sept. 11 attacks and has been classified since the report's completion, despite repeated calls for its release. The document, which the administration finally delivered to Congress earlier Friday, actually contains 29 pages of material, plus a letter from then-CIA Director George Tenet.

"While in the United States, some of the September 11 hijackers were in contact with, and received support or assistance from, individuals who may be connected to the Saudi Government," the document says.

The pages also say that the inquiry obtained information "indicating that Saudi Government officials in the United States may have other ties to al-Qa'ida and other terrorist groups," but the commission that authored the document acknowledged that much of the info "remains speculative and yet to be independently verified."

Saudi Ambassador to the United States Abdullah Al-Saud put out a statement after the document's release Friday welcoming its publication, though he didn't address the details it contains.

"Several government agencies, including the CIA and the FBI, have investigated the contents of the '28 Pages' and have confirmed that neither the Saudi government, nor senior Saudi officials, nor any person acting on behalf of the Saudi government provided any support or encouragement for these attacks," he said. "We hope the release of these pages will clear up, once and for all, any lingering questions or suspicions about Saudi Arabia's actions, intentions, or long-term friendship with the United States."

"It should be clear that this Joint Inquiry has made no final determinations as to the reliability or sufficiency of the information," the report says.



28 pages full document

On the one hand, the report notes, it is possible that these kinds of connections could suggest "incontrovertible evidence that there is support for these terrorists within the Saudi Government. On the other hand, it is also possible that further investigation of these allegations could reveal legitimate, and innocent, explanations for these associations."

The report also criticizes the lack of effective intelligence-sharing in the U.S. government, highlighting an episode where a CIA memorandum "which discusses alleged financial connections between the September 11 hijackers, Saudi Government officials, and members of the Saudi Royal Family" was placed into an FBI case file and never forwarded to FBI headquarters until the memo was discovered by the inquiry.

It also says there was a lack of emphasis on intelligence-gathering directed at Saudis in the U.S. in the time before the attacks.

"Prior to September 11th, the FBI apparently did not focus investigative resources on [redacted] Saudi nationals in the United States due to Saudi Arabia's status as an American 'ally.'"

But the report also references instances where the Saudi government was "uncooperative" in counterterrorism investigations before and after 9/11.

"A number of FBI agents and CIA officers complained to the Joint Inquiry about a lack of Saudi cooperation in terrorism investigations both before and after the September 11 attacks," citing one New York FBI agent who said "the Saudis have been useless and obstructionist for years."

The report details one post-9/11 episode in which an FBI agent couldn't get the Saudi government to provide information on Saudi nationals despite providing copies of the subjects' Saudi passports.

Under pressure from the victims' families and lawmakers, President Barack Obama said in April his administration would declassify the 28 pages.

Sources told CNN ahead of the report's release that intelligence and law enforcement agencies and the State Department had all reviewed and approved the release of the pages with "minimal redactions." But the report Congress put out had multiple inked-out sections.

Still, the release of the pages on Friday was welcomed by New York Sen. Charles Schumer, who has co-sponsored a bill that opens the door for families of 9/11 victims to sue foreign states and financial partners of terrorism.

"Preliminary readings show that there may well have been Saudi involvement in the terror of 9/11 both in the Saudi government and within the Saudi country, within Saudi Arabia," he told reporters in New York.

"The families who I have fought for long and hard now will be able to go to court, and soon, and if the Saudi government was complicit in 9/11 they should pay the price to the families who deserve justice," he continued. "And they should pay the price so no other government will think of playing footsie with terrorists the way the Saudi government may well have done in 2001."

RELATED: Saudis warn of economic reprisals if Congress passes 9/11 bill

Jerry Goldman, a lawyer who represents families of victims in a class-action suit seeking to sue Saudi Arabia, said ahead of the report's release that his clients were pleased the pages were being made public. "The families are happy just as the American people should be happy that information that has been kept hidden for well over a decade is finally coming to light," he said.

One of those who looked forward to reading the pages is Terry Strada, who has been pushing for the right to sue Saudi Arabia over its alleged involvement in the attack. Her husband, Tom, was working on the 104th floor of the North Tower when the planes struck. The couple's third child had been born just four days earlier.

"The American people deserve this just as much as the 9/11 families deserve it, but we're the ones that are suffering by not having them released," Strada said.

Also welcoming the report's release was former Senate Intelligence Chairman Bob Graham, who has long called for the documents to be made public.

"The information in the 28 pages reinforces the belief that the 19 hijackers – most of whom spoke little English, had limited education and had never before visited the United States – did not act alone in perpetrating the sophisticated 9/11 plot," Graham said in a statement. "It suggests a strong linkage between those terrorists and the Kingdom of Saudi Arabia, Saudi charities, and other Saudi stakeholders. The American people should be concerned about these links."

The Saudi government itself had repeated called for the pages to be made public so that it could respond to any allegations, which it has long called unfounded.

"We've been saying since 2003 that the pages should be released," said Nail Al-Jubeir, director of communications for the Saudi Embassy, ahead of Friday's developments. "They will show everyone that there is no there there."

After the pages were posted online Friday afternoon, the U.S. Office of the Director of National Intelligence released a statement saying that their declassification and release did not constitute a national security risk.

But it noted that the decision to authorize the release "does not indicate the Intelligence Community's agreement" with the report's "accuracy or

concurrence with any information it contains."

In the wake of the release, the chairman and ranking member of the House Intelligence Committee issued a joint statement endorsing the declassification of the pages.

Chairman Devin Nunes added, however, that "it's important to note that this section does not put forward vetted conclusions, but rather unverified leads that were later fully investigated by the Intelligence Community."

Sens. Richard Burr and Dianne Feinstein, the chair and top Democrat of the Senate Intelligence Committee, issued a statement that they agreed with the decision to declassify the report. But they cautioned, "These pages include unconfirmed allegations and raw reporting and have been the subject of conspiracy theories for years."

They called on the public to review related documents from the director of national intelligence that "debunk many of the allegations contained in the declassified section of the report."

The concluded, "We need to put an end to conspiracy theories and idle speculation that do nothing to shed light on the 9/11 attacks."

**Paid Links**

Search CNN...

Log In

Live TV

Audio

World

US Politics

Business

Health

Entertainment

Tech

Style

Travel

Sports

Videos

Features

Weather

More





**FOLLOW CNN POLITICS**

Terms of Use   Privacy Policy   Cookie Settings   Ad Choices   Accessibility & CC   About   Newsletters   Transcripts

© 2022 Cable News Network. A Warner Bros. Discovery Company. All Rights Reserved.
CNN Sans ™ & © 2016 Cable News Network.

**The New York Times** | https://www.nytimes.com/2022/12/11/sports/golf/liv-saudi-pga.html

## Confidential Records Show a Saudi Golf Tour Built on Far-Fetched Assumptions

McKinsey documents suggest the Saudi league is far off-track for success. Experts say the analysis shows it was never just about profits.

 

**By Alan Blinder and Sarah Hurtes**

Dec. 11, 2022                                                                                           7 MIN READ

Early in 2021, consultants working for Saudi Arabia's sovereign wealth fund studied an audacious idea: The desert kingdom wanted to become the world leader in the hidebound realm of men's professional golf.

If the idea seemed unlikely, records show that the benchmarks for success bordered on the fantastical. A new Saudi league would need to sign each of the world's top 12 golfers, attract sponsors to an unproven product and land television deals for a sport with declining viewership — all without significant retaliation from the PGA Tour it would be plundering.

The proposal, code-named Project Wedge, came together as Saudi officials worked to repair the kingdom's reputation abroad, which hit a low after the 2018 assassination of the Washington Post columnist Jamal Khashoggi by Saudi agents. The plan was the foundation for what became LIV Golf, the series whose debut this year provoked accusations that Saudi Arabia was trying to sanitize its human rights record with its deep pockets, former President Donald J. Trump's country clubs and a handful of big-name golfers. Some of those golfers have publicly played down Saudi abuses, as has Mr. Trump.

The league's promoters say they are trying to revitalize the sport and build a profitable league. But hundreds of pages of confidential documents obtained by The New York Times show that Saudi officials were told that they faced steep challenges. They were breaking into a sport with a dwindling, aging fan base — if one with plenty of wealthy and influential members — and even if they succeeded, the profits would be a relative pittance for one of the world's richest sovereign wealth funds. Experts say that these make clear that Saudi Arabia, with a golf investment of least $2 billion, has aspirations beyond the financial.



12/19/22, 11:31 AM    Confidential Records Show a Saudi Golf Tour Built on Flawed Financial Assumptions - The New York Times

Case 1:22-mc-00126-CJN-MAU   Document 11-3   Filed 01/03/23   Page 989 of 1028

An unidentified man trying to hold back the press as Saudi investigators arrived at the Saudi consulate in Istanbul in April 2019 amid a growing international backlash to the disappearance of Jamal Khashoggi.  Chris Mcgrath/Getty Images

"The margins might be thin, but that doesn't really matter," said Simon Chadwick, a professor of sport and geopolitical economy at Skema Business School in Paris. "Because subsequently you're establishing the legitimacy of Saudi Arabia — not just as an event host or a sporting powerhouse, but legitimate in the eyes of decision makers and governments around the world."

The documents represent the most complete account to date of the financial assumptions underpinning LIV Golf. One of the most significant was prepared by consultants with McKinsey & Company, which has advised the kingdom's leaders since the 1970s. McKinsey, which has worked to raise the stature of authoritarian governments around the world, was key to Vision 2030, Crown Prince Mohammed bin Salman's plan to diversify the kingdom's economy and turn it into a powerful global investor. Worldwide sports have become a pillar in that plan, with Saudi officials even discussing the possibility of someday hosting the World Cup.

The wealth fund did not comment.

McKinsey, which declined to comment, analyzed the finances of a potential golf league, but pointedly said in its report that it was not examining whether it was a strategically viable idea. And many of Saudi Arabia's rosy assumptions, McKinsey added, "have been taken for granted and not been challenged in our assessment."

Indeed, LIV Golf appears far from meeting the goals that the Project Wedge documents laid out. After an inaugural season that cost in excess of $750 million, the league has not announced major broadcasting or sponsorship deals. And its hopes for a surrender by, or an armistice with, the PGA Tour have instead collapsed into an acrimonious court battle.



Mr. Trump with Yasir Al-Rumayyan, the governor of Saudi Arabia's Public Investment Fund, right, at a LIV tournament at Trump National Golf Club Bedminster in July.
Seth Wenig/Associated Press

Moreover, the league is nowhere near having signed all of the elite players who Saudi advisers said were required for success. In one presentation slide, as McKinsey projected one of its more optimistic financial forecasts, the participation of Tiger Woods, Phil Mickelson and Rory McIlroy — who have combined to win 25 major championships — was included under the headline "What you need to believe."

Of those stars, only Mr. Mickelson joined LIV, with a deal that is reportedly worth at least $200 million.

Case 1:22-mc-00126-CJN-MAU Document 1-3 Filed 01/03/23 Page 990 of 1028

Mr. Woods, with his ability to attract fans and sponsors, was seen as essential. Even though the league offered Mr. Woods a long-term plan that could have made him "in the neighborhood" of $700 million to $800 million, according to Greg Norman, LIV's chief executive, the league has found Mr. Woods to be one of its greatest public antagonists.

"I don't know what their end game is," Mr. Woods said of LIV last month in the Bahamas, where he was hosting a tournament on the PGA Tour schedule. Mr. Woods acknowledged that the PGA Tour "can't compete dollar for dollar" with the Saudis, but he said that "an endless pit of money" was not a surefire means to "create legacies."

Saudi soccer fans celebrating during a World Cup match against Argentina in Qatar last month. Worldwide sports have become a pillar in the plan to raise Saudi Arabia's global stature. Tasneem Alsultan for The New York Times

Not long after Mr. Woods spoke, LIV announced details for several of the 14 tournaments it expects to be the proving grounds for $405 million in prize money next year, in addition to the guaranteed payouts it has promised players. It has said it will release its full schedule "in the coming weeks."

The season will unfold as LIV's business evolves toward its planned franchise model. Although professional golf has some signature team events like the Ryder Cup, the PGA Tour generally relies on players competing for themselves. LIV, whose music-blasting gatherings feel little like traditional tournaments, is betting that fans will prefer to watch a dozen four-player teams competing against one another.

**Sign up for the Sports Newsletter**  Get our most ambitious projects, stories and analysis delivered to your inbox every week. Get it sent to your inbox.

"LIV has repeatedly made clear that our stakeholders take a long-term approach to our business model," Jonathan Grella, a spokesman for LIV, said in a statement. "Despite the many obstacles put in our path by the PGA Tour, we're delighted with the success of our beta test year. And we're confident that over the next few seasons, the remaining pieces of our business model will come to fruition as planned. Our business plan is built upon a path to profitability. We have a nice, long runway and we're taking off."

Case 1:22-mc-00126-CJN-MAU Document 1-3 Filed 01/03/23 Page 991 of 1028

Prince Mohammed, the kingdom's 37-year-old de facto ruler, often gravitates toward splashy ventures and has repeatedly said that he sets sky-high targets in hopes of motivating officials to achieve a fraction of them. In its analysis, McKinsey called the golf league "a high-risk high-reward endeavor."

The consultants detailed three possible outcomes for a franchise-driven league: languishing as a start-up; realizing a "coexistence" with the PGA Tour; or, most ambitiously, seizing the mantle of dominance.

In the most successful scenario, McKinsey predicted revenues of at least $1.4 billion a year in 2028, with earnings before interest and taxes of $320 million or more. (Federal records show that the PGA Tour, a tax-exempt nonprofit, logged about $1.5 billion in revenue and posted a net income of almost $73 million for 2019.)

By contrast, a league mired in start-up status — defined as attracting less than half of the world's top 12 players, navigating a "lack of excitement from fans," reeling from limited sponsorships and confronting "severe response from golf society" — stood to lose $355 million, before interest and taxes, in 2028.

The American golfer Phil Mickelson, right, at LIV Golf's inaugural event in St. Albans, England, in June.  Adrian Dennis/Agence France-Presse — Getty Images

For now, LIV's standing tilts sharply that way. Its tournaments have not commanded large crowds, and its broadcasts are largely limited to YouTube. The PGA Tour suspended players who defected, and it is not yet clear whether the organizers of the four major men's tournaments will allow LIV golfers to participate.

Of the top 12 players on a roster in the McKinsey report, LIV has attracted four: Sergio Garcia, Dustin Johnson, Mr. Mickelson and Henrik Stenson.

McKinsey's work on the golf project is part of a longstanding pattern of foreign consultants providing rationales for Gulf States' multibillion-dollar projects, some of which become white elephants. When the crown prince announced plans to build a futuristic city called Neom, McKinsey was among the companies that helped envision proposals for robotic dinosaurs, flying taxis and a ski resort that officials say will host the Asian Winter Games in 2029.

The Project Wedge analysis was conducted for Saudi's sovereign wealth fund, which is led day to day by its governor, Yasir al-Rumayyan. Mr. al-Rumayyan, a longtime golf enthusiast, is also chairman of the Saudi Arabian Golf Federation. In 2019, he hosted a "Golf Means Business" tournament at the crown prince's annual investment conference in Riyadh. The PGA Tour describes Mr. al-Rumayyan in court

12/19/22, 11:31 AM
Case 1:22-mc-00126-CJN-MAU Document 1-3 Filed 01/03/23 Page 992 of 1028
Confidential Records Show a Saudi Golf Tour Built on Fear-Fueled Assumptions - The New York Times

documents as a micromanager whose "daily involvement and influence bears on everything from LIV's global strategy to the tiniest detail."



Tiger Woods at the Hero World Challenge at Albany Golf Course in Nassau, Bahamas, this month. Mike Ehrmann/Getty Images

One document obtained by The Times shows that LIV organizers considered assembling an all-star board of business, sports, legal and political titans. But nine of the people who were identified as possible board members, including Ginni Rometty, the former IBM chief executive, and Randall Stephenson, the former AT&T chairman, said they had never been approached about joining.

"I didn't know I was on the list, and I have never been approached," Mr. Stephenson, who is a member of the PGA Tour's board, said in an interview. If asked, he said, he would decline. "It would be a quick conversation," he said.

Most others listed in the document, including the basketball legend Michael Jordan; former Secretary of State Condoleezza Rice; and Mark Parker, the executive chairman of Nike, did not respond to requests for comment. McKinsey did not appear to prepare the document, which carries the logo of Golf Saudi, which Mr. al-Rumayyan leads.

Mr. Grella, the LIV spokesman, did not answer inquiries about the current composition of a board, which a player handbook said would initially have up to 10 members, including Mr. al-Rumayyan and Mr. Norman.

Despite its struggles, LIV is making plans for tournament venues years into the future and is trying to sign more stars. Mr. Norman said in November that a television deal was "a priority," and as the new season nears, golf fans and executives alike have debated what boost the new league might get if one of its players captured a major championship in 2023.

That, Mr. Norman has suggested, would be proof of "how we work within the ecosystem."

It would also be a sign that an outright ban of LIV players from the sport's biggest stages, one of the gravest hazards that McKinsey flagged, had so far been avoided.



Greg Norman, center, the chief executive of LIV Golf, has said that a television deal is "a priority." Glyn Kirk/Agence France-Presse — Getty Images

Kevin Draper and Justin Scheck contributed reporting.

# Exhibit C-19



By using this website, you consent to our use of cookies. For more information, visit our Privacy Policy

**WORLD**  **SPORTS**  **SAUDI ARABIA**

# Everybody Has a Price: Ari Fleischer, the LIV Golf Tour, and the House of Saud

*The launch of Saudi Arabia's LIV golf tour was a public relations disaster. So the Saudis hired someone with firsthand knowledge of PR disasters: Ari Fleischer.*

*By Dave Zirin*

SEPTEMBER 13, 2022



Ari Fleischer, media consultant and former White House press secretary, at the Centurion Club, Hertfordshire, in June ahead of the LIV Golf Invitational Series. *(Steven Paston / PA Images via Getty Images)*

Ari Fleischer is a bought man. The former press secretary under George W. Bush, best known for threatening post-9/11 dissenters from the White House press podium and laundering the lie about weapons of mass destruction in Iraq, is now a PR flack for the LIV Golf Tour, the "sportswashing" fig leaf of the House of Saud.

There is a great deal of toxicity in the sports landscape, but the LIV Golf Tour might be the most poisonous. Posing, and perhaps succeeding, as a competitor to the PGA Tour, its slogan is "Golf, but louder." That's extremely inaccurate. It should be "Golf, but (somehow) uglier." Already, golf is a sport of exclusivity and restriction that takes an incredible toll on the environment, and in much of the United States and most of the less-verdant world, it constitutes an inexcusable waste of water resources. One of these places is Saudi Arabia, where the ruling House of Saud is many things: autocratic, repressive, violent… and golf-obsessed. To both quench their duffer's thirst and sportswash their horrific international reputation, the Saudis have created their own golf league,

signing some of the biggest names in the game to contracts worth hundreds of millions of dollars. This is just one part of their "Vision 2030" program by which they hope to host both the World Cup and the Olympics and to present a shiny, sportswashed face to the world.

Unfortunately, the new face is basically the old face with a PR firm, which is where Fleischer comes in. Hired several months ago, he organized a recent LIV tour press conference, where a reporter was forcibly ejected for asking the wrong kinds of questions, as his colleagues tried to get players to answer fun queries for the whole family like, "Would you also play a tournament owned by Vladamir Putin?" Yet Fleischer gushed about it all, calling the disaster "incredibly accessible, open, and reporters got what they wanted, which was access to the players." He also praised the House of Saud as some kind of sporting rebel force, saying that it was "seeking to bring change to the sport, which not everybody wants," but "it's one of the best opportunities for players and an opportunity for fans to see golf in a different, more entertaining light."



**How Democrats Beat Arizona's Extremist Republicans**

Then, amid months of debasing himself for his new owners (sorry, "clients"), Fleischer decided on Sunday, September 11, to retire his long-standing Twitter tradition of "live tweeting," moment by moment, what he experienced on September 11, 2001. He tweeted, "I'm still amazed by the reaction my tweets have gotten. But now it's time to let it rest. There is nothing new to say or reveal. Thank you for reading and for caring about our nation's history. May God Bless America." Immediately, Twitter users and sites like *HuffPost* and *Media-ite* pointed out that perhaps it was awkward for Fleischer to take part in his annual "9/11! Look at me" tradition given that his new clients rule the country of most of the attackers, or perhaps someone frightening told him to stop. Unsurprisingly, Trump has also gotten on the Saudi gravy train by hosting LIV tournaments at his courses in Doral and Bedminster, pooh-poohing any criticism. One wonders if access to his golf course was all he was selling.

It must be said that the golfers aren't babes in the woods here. The LIV tour's biggest grab thus far was multi-time Grand Slam champion Phil Mickelson. All it took was a nine-figure paycheck. Mickelson said after his signing, "Saudis are scary motherfuckers to get involved with. We know they killed [Jamal] Khashoggi and have a horrible record on human rights. They execute people over there for being gay. Knowing all of this, why would I even consider it? Because this is a once-in-a-lifetime opportunity to reshape how the PGA Tour operates." Phil Mickelson then apologized. Not to the families of the executed but to the Saudi royal family.

Fleischer's job will be familiar to him: a hatchet man keeping the Phil Mickelsons of his world and the media in line so the House of Saud and its American enablers can get this tour off the ground in the face of widespread disgust. For the quislings like Fleischer and lickspittles like the Trumps, this is about profit. But the House of Saud is hunting much greater game: the future. It craves global

leadership and a sheen of respectability. It sees sports as a bridge to get there, and it sees Ari Fleischer as just the guide to help it during this journey. The Saudis were successful in finding someone for sale. But they erred, because when it comes to Fleischer, everyone already knows he has a price.

You've read 1 of 3 free articles.

**Subscribe for unlimited access.**

Already a subscriber? Log in.

SUBSCRIBE

**Dave Zirin**   Dave Zirin is the sports editor of *The Nation* and the author of *The Kaepernick Effect: Taking a Knee, Changing the World.*

To submit a correction for our consideration, click *here*.
For Reprints and Permissions, click *here*.

## COMMENTS (5)



# Exhibit C-20

# LIV Golf hires Fleischer Communications

Former White House press secretary Ari Fleischer recently moderated the sports organization's opening news conferences.

by Ewan Larkin    June 09, 2022

  



Photo credit: Getty Images

NEW YORK: The LIV Golf Invitational Series has hired Fleischer Communications as a communications consultant.

The agency started work in February and is assisting on everything under "the comms consulting umbrella," said Ari Fleischer, former White House press secretary and president at Fleischer Communications.

Access the leading resource for the PR and communications industry.   Join Free

Fleischer said that "almost all" of his work is on a retainer-basis but declined to get into the length of specific contracts.

"[LIV Golf] is seeking to bring change to the sport, which not everybody wants," Fleischer told PRWeek. "On the other hand, it's one of the best opportunities for players and an opportunity for fans to see golf in a different, more entertaining light."

On Tuesday, LIV Golf hosted press conferences ahead of its inaugural tournament at the Centurion Club outside London.

The second conference ended with AP reporter Rob Harris being led out by security after arguing with an LIV official. Harris was then allowed back into the media center.

"[The conferences] were incredibly accessible, open, and reporters got what they wanted, which was access to the players," said Fleischer, who helped moderate the opening news conferences.

The second round of press conferences, which took place on Wednesday, featured more awkwardness. According to *Sports Illustrated*, one media member asked Ian Poulter and Lee Westwood whether or not they would participate in a Vladimir Putin-backed tournament, alluding to LIV's controversial ties to Saudi Arabian Public Investment Fund. Both golfers refused to answer the question.

On Thursday, commissioner Jay Monahan sent a memo to the PGA Tour's membership announcing suspensions for all players involved in the LIV Golf event, according to a company statement. The suspensions include the Presidents Cup, as well as the Korn Ferry Tour, PGA Tour Champions, PGA Tour Canada and PGA Tour Latinoamérica.

Monahan cited the players' participation in the Saudi-backed golf league as a violation of PGA's tournament regulations and promised future suspensions for the players who follow suit.

**Subject Tags:**   Ari Fleischer   LIV Golf

Have you registered with us yet?

Register now to enjoy more articles and free email bulletins

Register

Already registered?

Sign in

Access the leading resource for the PR and communications industry.  Join Free

Get our email newsletters

Crisis Comms Conference

Best Places to Work

PRWeek Awards US

Hall of Fame

Women of Distinction

Salary Survey

Health Influencer 30

Healthcare Conference + Awards

Purpose Awards

PRDecoded

Bellwether Survey

Changemakers

Access the leading resource for the PR and communications industry.   Join Free

# The Power List

# Pride in PR

# Brand Film Awards

# Agency Business Report

# Dashboard 25

# Webinars

# Find a Job

# Podcasts

# Subscribe to PRWeek

RESOURCES

**Up next:**                                                          **1-3 of 10**

Access the leading resource for the PR and communications industry.   Join Free



Text size    

## JOIN, SHARE, LIKE, FOLLOW US ON:

**About PRWeek**

About Us

Contact Us

Editorial Calendar

Advertise

**Subscribe**

Subscribe to PRWeek

Newsletters

FAQ

**Global**

PRWeek UK

Campaign Asia

Access the leading resource for the PR and communications industry.   Join Free

© Haymarket Media Group Ltd. | Terms & Conditions | Cookie Notice | Privacy Notice | Do Not Sell My Personal Information



# Exhibit C-21

## The Washington Post

*Democracy Dies in Darkness*

# Greg Norman to lobby Congress on behalf of LIV Golf

By Matt Bonesteel and Rick Maese
September 19, 2022 at 1:17 p.m. EDT

Greg Norman, the chief executive and commissioner of the LIV Golf Invitational Series, will travel to Washington this week to discuss the new organization with members of Congress.

"LIV Golf is coming to the Hill this week to meet with lawmakers from both parties," a LIV spokesperson told The Washington Post in a statement. "Given the PGA Tour's attempts to stifle our progress in reimagining the game, we think it's imperative to educate members on LIV's business model and counter the Tour's anti-competitive efforts."

The PGA Tour banned the golfers who defected to LIV, which is funded by Saudi Arabia's Public Investment Fund. The U.S. Justice Department reportedly is investigating the PGA Tour for potential antitrust violations over its reaction to LIV, a probe that could determine the tour's ability to control where and when its golfers play. Plus, LIV has joined a federal antitrust lawsuit filed by some of its players against the PGA Tour, arguing their careers were hurt when the tour suspended them after they joined LIV.

Politico on Monday was first to report Norman's meeting with members of Congress. Last month, it also reported LIV hired Hobart Hallaway & Quayle Ventures to lobby on its behalf in Washington. Former U.S. Rep. Benjamin Quayle (R-Ariz.), the son of former U.S. vice president Dan Quayle, is a partner at Hobart Hallaway & Quayle. Ari Fleischer, former press secretary for President George W. Bush, also has done public relations work for LIV, which has played one tournament at a course owned by former president Donald Trump and will play another at a different Trump course in October.

Politico added that the PGA Tour also hired a lobbying firm, in this case DLA Piper, in its battle against LIV, which reportedly has paid out hundreds of millions of dollars to lure big-name stars such as Phil Mickelson, Dustin Johnson, Cameron Smith, Brooks Koepka and Bryson DeChambeau away from the PGA Tour.

Those golfers and others have cited a more relaxed schedule and bigger paydays as reasons they have left the PGA or European tours for LIV, which has been accused of being Saudi Arabia's attempt to "sportswash" its human rights violations, including the 2018 killing of Washington Post journalist Jamal Khashoggi. LIV tournaments are only 54 holes — compared with 72 for most PGA Tour events — and have much smaller fields and no cuts, meaning every golfer in the field is guaranteed to win money no matter where they finish on the leader board.

LIV's viability may depend on whether the Official World Golf Ranking begins to recognize its tournaments. LIV has petitioned the OWGR for recognition; without it, many of its golfers will be unable to qualify for major championships because of declining world rankings.

The fifth tournament of LIV's inaugural season ended Sunday outside Chicago, with the British Open champion Smith winning. The series has yet to secure an over-the-air television deal, and its tournaments are being streamed on YouTube and on its website. According to one analysis, this past weekend's LIV tournament — the first in which the final round went up against spotlight-hogging NFL games on Sunday — garnered the fewest views of any of LIV's first five events.

# Exhibit C-22

# CFP Media Consultant Ari Fleischer's Bad Publicity Tour Continues

The former White House press secretary's moderation of Saudi-backed LIV Golf's presser was just his latest of a string of stunts garnering negative publicity.

**PAT FORDE** • JUN 7, 2022

With Ari Fleischer on the payroll of the College Football Playoff, the group never has to wait long for its next burst of negative feedback. They have a publicist consultant who specializes in generating negative publicity. Pretty much the opposite of what should be desired.

Fleischer's appearance as the moderator at Saudi-backed LIV Golf's press conference Tuesday was just the latest eye-rolling moment from a guy who has never failed to fail while working for the CFP. He's also made regular appearances as a political commentator on Fox News, which has created some discomfort for a college athletics organization that tries to stay apolitical. And then there is just about everything he's touched in his role as a college football propagandist.

Fleischer was part of the doomed PR effort to save the Bowl Championship Series and stave off a playoff—that should have been enough to cut him loose from any role in the next iteration of the sport, but no. Fleischer remained on board as a consultant for the CFP, proving magically malleable on the issue of the sport's postseason.

(It seems really hard to get fired from the Old Boys Club that runs college football.)

Whatever impact the former White House press secretary under George W. Bush made in the first seven years of the playoff seemed negligible. It wasn't until the botched rollout of the plans to expand the playoff from four to 12 teams last year, when the June leak caught several conference commissioners unhappily off guard, that anyone remembered the CFP had a media consultant. The mess surrounding that expansion plan was sufficient to derail expansion for the foreseeable future.

The CFP is inherently controversial enough—four teams chosen subjectively by a selection committee out of 130 get a chance to win the national championship. The playoff makes matters worse for itself with a weekly television show releasing its rankings as the latter third of the season unfolds, with its work subject to lampooning every Tuesday night. The list of aggrieved parties is lengthy and vocal every season.

Why add to the accumulated criticism by creating an in-house problem for yourself with a consultant like Fleischer? Why have *that guy* in the room with the most powerful people in college football when they're making the big decisions?

CFP executive director Bill Hancock confirmed to *Sports Illustrated* Tuesday that Fleischer is still a consultant to the group. Hancock noted that Fleischer consults with a number of other entities outside the CFP, and is not beholden to apprise it about every gig he takes on. Neither Hancock nor several other CFP leaders seemed to have any idea about this particular Fleischer job.

Taking Saudi Arabian government money has led to major blowback for a number of the world's most prominent golfers, from major winners Phil Mickelson to Dustin Johnson to Graeme McDowell to Sergio Garcia to Martin Kaymer and beyond. They're willing to take the criticism for linking arms with a brutally repressive regime in exchange for massive paydays, and Tuesday in the Fleischer-led press conference they did their level best to pretend no controversy existed.

When LIV golfer Talor Gooch was hit with a question about Saudi Arabia "sportswashing" its unseemly global image for human-rights abuses, he answered, "I don't think that assertion is fair." Then he sought to get out of that political sand trap by describing himself as, essentially, just a dumb golfer. "I'm not that smart," Gooch said. "I try to hit a golf ball into a small hole. Golf is hard enough. I try to worry about golf, and I'm excited bout this week."

Fleischer apparently did his part to provide cover for the poor multimillionaires being asked questions about something other than hitting a golf ball into a small hole. Rob Harris, an Associated Press reporter, was reportedly cut off and escorted out of the press conference after trying to ask a follow-up question about reconciling the Saudi sportswashing attempts to buy favorable impressions via buying golfers. He was later allowed back in.

**Harig: A Disruptor to the PGA Tour Is Here, and Professional Golf May Never Be the Same**

It's all a feel-good enterprise. Just good people trying to "grow the game" of golf.

Like the golfers, Fleischer seems to have a price at which he can relinquish his convictions. Per ESPN's Kevin Van Valkenberg, Fleischer was asked at the LIV press conference, "how he squared his current relationship with LIV Golf with his past tweets claiming Saudi Arabia was spending billions to ensure Mohammed bin Salman wasn't overthrow(n), and wasn't this an example of that. Fleischer said that tweet was 'a long long time ago.'"

And many dollars ago, one would assume.

The mix of Ari Fleischer and sports has seemed to yield very little other than embarrassments, missteps and forehead slaps. Why the College Football Playoff wants to continue paying that nincompoop to help it form strategy is as mystifying as the reluctance to expand the playoff.

More games are better. Less Ari is also better. No Ari is best.

**More College Football Coverage:**

- **TV Revenue, CFP Expansion Keeps SEC Deadlocked on Scheduling Model**

- **Jimbo Fisher Backs Off, and College Football Must Move on**

- **Saban Yields on Fisher, but SEC's NIL Debate Still Simmering**

- **The Farmer's Daughter Who Helped Keep SEC Football in Motion**

# Exhibit C-23



*Democracy Dies in Darkness*

THE DAILY **202**

A lunchtime newsletter featuring political
analysis on the stories driving the day.

**Subscribe to the newsletter** 

# Greg Norman, pitching LIV golf, gets rough Congress welcome

Analysis by Olivier Knox

with research by Caroline Anders

September 22, 2022 at 11:44 a.m. EDT

*Welcome to The Daily 202! Tell your friends to sign up here. On this day in 1776, the British hanged Continental Army Capt. Nathan Hale for spying. On his way to the gallows, the 21-year-old schoolteacher from Connecticut purportedly declared "I only regret that I have but one life to lose for my country."*

## The big idea

## Greg Norman, pitching LIV Golf, gets rough Congress welcome

**Greg Norman visited Congress this week** seeking allies for his Saudi-funded, Donald Trump-connected LIV Golf operation, locked as it is in a legal war with the PGA Tour. But instead of a gimme putt, the famous linksman **found himself in something of a sand trap.** Sorry.

My colleague Rick Maese reported on Norman's visit to the Capitol, where he met with senators like **Joe Manchin III** (D-W.Va.) on Tuesday and members of the Republican Study Committee (RSC) on the House side on Wednesday.

"While some lawmakers posed for selfies and seemed receptive to Norman, others **questioned LIV Golf's Saudi financing and said Congress shouldn't spend time intervening in a business dispute** between LIV Golf and the PGA Tour. LIV Golf and seven of its golfers have sued the PGA Tour, saying the tour violated antitrust laws, allegations that the Department of Justice is also reportedly probing," Rick explained.

- Because so few lawmakers talked after the meetings, it's not easy to get a full picture of the sort of welcome Norman received. But **as a general rule, if you're working with the Saudis and someone brings up 9/11, things aren't going flawlessly.**

And that's what happened after **Politico**'s Andrew Desiderio reported Rep. **Tim Burchett** (R-Tenn.) walked out of the RSC meeting with Norman complaining of "**propaganda**," saying he struggled with the golfer's Australian accent, and that the group should not waste time on "billionaire oil guys" and the Saudis.

Burchett quote-tweeted Andrew and added this:



Rep. **Chip Roy** (R-Tex.), who has urged the Justice Department to investigate LIV Golf for not registering under the Foreign Agents Registration Act, was also unimpressed, Rick reported.

"Don't sell us 'this is just about competition' when they won't answer about a billion dollars to buy off PGA Tour players ... resulting in **a billion dollars of PR for the Kingdom of Saudi Arabia** (quoting President Trump) in likely violation of FARA," Rick quoted Roy as saying in a statement.

A LIV spokesman told Rick that Norman was "very well received, even if a couple members of Congress say otherwise."

## Sportswashing

Saudi Arabia's critics see in LIV a blatant attempt at "sportswashing," **the practice of repressive regimes using athletic competitions to polish their image** — think the 1936 Olympic Games in Nazi Germany, or subsequent games in places like China or Russia. (Moscow first invaded Ukraine shortly after hosting the 2014 Olympic Games.)

"The Olympics and the World Cup in 2018 weren't just ways to showcase Russia to the rest of the world, but were also ways for Putin to consolidate internal support from Russians for his leadership," said **Jane McManus**, the executive director of Seton Hall's Center for Sports Media.

**"The internal approval is more impactful sometimes than the external rewards," McManus told The Daily 202.**

- Athletes can be in a tough spot. Some have trained their whole lives and may never see another Olympics. And wasn't it worth seeing **Jesse Owens** collect four gold medals and ruin **Adolf Hitler**'s garbage race theories in front of the fuhrer himself?

Perhaps mindful of this — and of the fact that Olympic boycotts have never worked — **President Biden** let American athletes compete in the winter games in China but kept U.S. officials away in what amounted to a "diplomatic boycott."

## Saudi Arabia and human rights

With Saudi Arabia, the question is whether some of the golf world's brightest stars are lending their popularity indirectly to a government the State Department accuses of "significant" human rights abuses, while the U.S. intelligence community says Saudi Crown Prince **Mohammed bin Salman** ordered the assassination of Washington Post journalist Jamal Khashoggi.

**Tiger Woods** reportedly turned down a payday of up to $700 million if he agreed to join LIV.

- Norman's visit to Congress came as **LIV has yet to land a deal to televise its tournaments**, which would increase its earnings and broaden its influence. **(If people can't sports-watch, you can't sports-wash?)**

In a November 2021 interview with **Golf Digest**, just a week after he became CEO of LIV Golf Investments, Norman bristled at the suggestion he was effectively doing PR for the regime in Riyadh but also tried to get some daylight between his funding and the crown prince.

The Saudi Arabia's Public Investment Fund "invested in major U.S. corporations because of commercial reasons. They invested in LIV Golf Investments for a commercial opportunity. **They're passionate about the game of golf**," he said.

Norman told Golf Digest it was unfair to criticize the regime in Riyadh "unless you actually go there" before extolling progress on women's rights: "**You walk into a restaurant and there are women**. They're not wearing burkas. They're out playing golf."

That prompted an editor's note that quoted from a **Human Rights Watch** report: "Saudi women still must obtain a male guardian's approval to get married, leave prison, or obtain certain health care. **Women also continue to face discrimination in relation to marriage, family, divorce, and decisions relating to children, including child custody**."

Still, whatever happened on Norman's visit to Washington, he can still count on support from Trump. The former president's New Jersey golf club hosted one event earlier this summer with plans for more events at the former president's properties. **It usually doesn't take long for Republicans to follow Trump's lead.** Even if that means landing in the rough.

# What's happening now

## Central banks raise rates again as Fed drives global inflation fight

"**A host of central banks from across the world raised interest rates again on Thursday**, following the U.S. Federal Reserve in a global fight against inflation that is sending shockwaves through financial markets and the economy," **Reuters'** Francesco Canepa reports.

## Senate Democrats to press doomed procedural vote on Disclose Act

"Democrats in the Senate will try — and probably fail — to advance legislation to provide disclosure of donors to super PACs. None of the bills is expected to reach President Biden's desk before the midterm elections, but party leaders think that considering them sends an important message," John Wagner and Azi Paybarah report.

## The war in Ukraine

## No let-up in hostilities in Ukraine despite prisoner swap

"Russian and Ukrainian forces exchanged missile and artillery barrages that killed at least six people Thursday **as both sides refused to concede any ground despite recent military setbacks for Moscow and the toll on the invaded country** after almost seven months of war," the **Associated Press** reports.

# Lunchtime reads from The Post

## Inside the civil rights campaign to get Big Tech to fight the 'big lie'

"A coalition of five dozen civil rights organizations is blasting Silicon Valley's biggest social media companies for not taking more aggressive measures to counter election misinformation on their platforms in the months leading up to November's midterm elections," Naomi Nix reports.

"**Through memos and meetings, the Change the Terms coalition for months had pleaded with Facebook parent Meta, Twitter, TikTok and YouTube to bolster the content moderation systems that it says allowed Trump's baseless claims about election rigging to spread**, setting the groundwork for the Jan. 6, 2021, riot at the U.S. Capitol, according to interviews and private correspondence viewed by The Washington Post. Now, with less than two months before the general election, coalition members say they've seen little action from the platforms."

## Black Out

## How the NFL blocks Black coaches

"In 1989, the Los Angeles Raiders hired **Art Shell,** who became the first Black head coach in the modern history of the NFL. He is one of 191 people who have been head coaches in the three-plus decades since. **A brief uptick of Black coaching hires in the mid-2000s provided hope that racial equity was within reach. But that glimmer of progress was a mirage.** In the 33 years since Shell's hiring, just 24 other head coaches have been Black," Dave Sheinin, Michael Lee, Emily Giambalvo, Artur Galocha and Clara Ence Morse report.

## ... and beyond

## Watchdog group accuses Senate GOP campaign arm of breaking the law

"A campaign watchdog group has filed a formal complaint with the Federal Election Commission against the campaign arm of Senate Republicans, **accusing the group of breaking federal law by using money that is supposed to be earmarked for legal expenses on campaign ads instead**," the **New York Times'** Shane Goldmacher and Reid J. Epstein report.

# The Biden agenda

## Biden declares major disaster in Puerto Rico to energize Fiona recovery

"President Biden issued a major disaster declaration on Wednesday for Puerto Rico, unlocking additional federal assistance as island residents navigate the aftermath of Hurricane Fiona," **Politico**'s Gloria Gonzalez reports.

"**The major disaster declaration allows FEMA to directly help individuals pay for temporary housing and home repairs, provide low-cost loans to cover uninsured property losses and pay for other programs** to help individuals and business owners recover from the storm."

## How the gas industry capitalized on the Ukraine war to change Biden policy

"**The Russian tanks and armored vehicles had barely begun to roll into Ukraine before the fossil fuel industry in the US had swung into action**. A letter was swiftly dispatched to the White House, urging an immediate escalation in gas production and exports to Europe ahead of an anticipated energy crunch," the **Guardian**'s Oliver Milman reports.

"The letter, dated 25 February, just one day after Vladimir Putin's forces launched their assault on Ukraine, noted the 'dangerous juncture' of the moment before segueing into **a list of demands: more drilling on US public lands; the swift approval of proposed gas export terminals; and pressure on the Federal Energy Regulatory Commission, an independent agency, to green-light pending gas pipelines**."

## Hurricane Fiona's destruction of Puerto Rico, in maps and photos

Our colleagues Marisa Iati and Daniel Wolfe walk you through the destruction in Puerto Rico, from the initial blackouts to flooding to landslide risks.

"**The southeast part of the large island was deluged by rain, with many areas getting more than 20 inches and some areas receiving over 25 inches.** Fiona dumped more than 32 inches on the Ponce region, where the island's second-largest city is located, and prompted emergency crews to rescue 400 people from flooding in Salinas, on the southern coast."

"San Juan, the capital, was spared the storm's worst effects, and parts were among the first to get power back. Departures from the international airport there resumed Monday afternoon. **But some nearby areas were hit hard by flooding. In Toa Baja, about 16 miles west, water flowed over the top of La Virgencita bridge and made it impassible**."

"**Landslides broke out in mountainous regions as waterways breached their banks.** The Puerto Rico National Guard rescued 21 elderly and bedridden people from a care facility in the mountain town of Cayey on Monday as landslides threatened the home, said **Patrick Ryder,** the Pentagon's press secretary."

# Hot on the left

## Trump says presidents can declassify docs 'even by thinking about it'

"In his first TV appearance since a court-authorized search of his Florida home last month, **Donald Trump** reasserted Wednesday that any documents taken from the White House to Mar-a-Lago were declassified while he was in office, **adding that a president can carry that out 'even by thinking about it,'**" Julian Mark reports.

- **Context**: "**Presidents do have the authority to declassify information — though typically there's a process for doing so**, which can include coordinating with the agencies or Cabinet members from which the information originated to prevent possible national-security risks."

# Hot on the right

## GOP hopes 'crime talk' is a golden ticket for midterm candidates

"On his Fox News show in August, **Tucker Carlson** concluded a segment with this advice: "If every Republican office-seeker, every Republican candidate in the United States focused on law and order and equality under the law, there would be a red wave' in the November midterm elections," Bill Lueders writes for the **Bulwark**.

"Since then, writes **Matt Gertz**, a senior fellow at Media Matters who tracks Fox News and other right-wing outlets, 'Republican strategy appears to have fallen in line with Carlson's suggestion.' **GOP candidates are increasingly using the golden-oldie issue of crime to quite literally scare up votes, making sweeping claims about skyrocketing lawlessness that, outside of the Trump Organization, is not actually occurring**."

# Today in Washington

The president is in New York City today.

At 2:15 p.m., Biden will get a hurricane briefing at Federal Emergency Management Agency's office at One World Trade.

He will then participate in a Democratic National Committee event at 4:40 p.m.

At 5:55 p.m., Biden will leave New York. He will arrive at the White House at 7:45 p.m.

# In closing

## On Trump's latest predicament

Thanks for reading. See you tomorrow.

# Exhibit C-24

# UNITED STATES DISTRICT COURT
# FOR THE SOUTHERN DISTRICT OF NEW YORK

| In re Terrorist Attacks on September 11, 2001 | 03 MDL 1570 (GBD) (SN) ECF Case |
|---|---|

*This document relates to*:
All Actions

## DECLARATION OF ANDREW J. MALONEY III

I, Andrew J. Maloney, III hereby declare under the penalty of perjury that the following is true and correct and in my personal knowledge:

1.       I am a partner at the law firm of Kreindler & Kreindler LP and currently serve as Co-Liaison Counsel on the PEC for death and injury claims in the above captioned case.

2.       Prior to joining the firm, I served as an Assistant U.S. Attorney in the S.D.N.Y. Criminal Division.  During my years as a federal prosecutor I had occasion to work with many confidential witnesses (CW), some of whom were threatened by defendants or people associated with those defendants to prevent their testimony, and in at least one case, the witness was murdered.

3.       During the past year, I have spoken with several third party witnesses with personal knowledge relevant to the 9/11 terror litigation who have expressed to me their fears of testifying against the Saudi government.  In addition, during the past year, investigators hired by my firm have spoken with other third party witnesses with personal and relevant knowledge to this case.  The investigators advised me that the witnesses had expressed their fears of testifying against the Saudi government.  The third party witnesses specifically mentioned not only to me but our investigators that a basis for their fears of the Saudi government was the well-publicized

murder of Saudi Washington Post journalist Jamal Khashoggi inside the Saudi Consulate in Istanbul, Turkey in October 2018.

4.      Within the last year, I was personally advised by a third party witness (CW1) that his/her family in the Middle East had been approached in person and directly threatened by Saudi government officials and/or their employees/agents within the past several months. More specifically, they were advised that if CW1 were to testify against the Saudi government, that there would be "serious consequences" for him/her and his/her family. CW1 understood that this meant that he/she and/or his/her family would be murdered.

5.      On two other occasions within the last year, I spoke with another third party witness, CW2, who advised me that his/her family in Saudi Arabia had urged CW2 not to cooperate with the 9/11 investigation against the Saudi government and that they feared for their lives living inside the Kingdom. No specific person or threat was identified.

6.      A third witness (CW3) within the last several months advised one of our investigators that he/she believed Saudi agents had been stalking him/her outside his/her residence shortly after his/her name surfaced during the litigation discovery. He/she indicated that he/she believed the Saudis were not only watching, but sending a message that they could get to him/her at any time and make him/her disappear.

7.      A fourth witness (CW4) told one of our investigators that he/she was so afraid of the Saudis' reach, that he/she was considering buying a bulletproof vest to prevent harm.

8.      Several additional witnesses agreed to speak to our investigators only if their identities were kept secret for fear of Saudi retribution.

9.      On October 26, 2017, an investigator working for the PECs concerning the 9/11 terror investigation met with and interviewed Saudi National and Washington Post journalist Jamal Khashoggi in the Washington D.C. area.

10.     Attached as Exhibit 1 is a true and accurate copy of a Twitter posting of the then Saudi Ambassador to the United States, Prince Khalid bin Salman (brother to current Crown Prince Mohamed bin Salman), that his last contact with Jamal Khashoggi was on October 26, 2017, the same day he met with the PECs' investigator in Washington.  The Twitter posting by Ambassador Salman reads:

> As we told the Washington Post the last contact I had with Mr. Khashoggi was via text on Oct 26 2017. I never talked to him by phone and certainly never suggested he go to Turkey for any reason. I ask the US government to release any information regarding this claim.  Posted Nov. 16, 2018 @ 6:45pm

11.     Attached as Exhibit 2 is a true and accurate copy of the June 19, 2019 United Nations Office of the High Commissioner for Human Rights Press Release, entitled "Khashoggi killing: UN human rights expert says Saudi Arabia is responsible for 'premeditated execution.'" That press release summarizes the findings of the Report attached as Exhibit 3 as follows:

> Saudi journalist Jamal Khashoggi was the victim of a premeditated extrajudicial execution, for which the State of Saudi Arabia is responsible.

> His killing was the result of elaborate planning involving extensive coordination and significant human and financial resources. It was overseen, planned and endorsed by high-level officials. It was premeditated.

12.     Attached as Exhibit 3 is a true and accurate copy of the June 19, 2019 United Nations Office of the High Commissioner for Human Rights Report entitled "Annex to the Report of the Special Rapporteur on extrajudicial, summary or arbitrary executions: Investigation into the unlawful death of Mr. Jamal Khashoggi."

3

13.     Attached as Exhibit 4 is a true and correct copy of a March 17, 2019 article

published in the New York Times entitled "It Wasn't Just Khashoggi: A Saudi Prince's Brutal

Drive to Crush Dissent" which reports that:

> Crown Prince Mohammed bin Salman of Saudi Arabia authorized a secret campaign to
> silence dissenters — which included the surveillance, kidnapping, detention and torture
> of Saudi citizens — over a year before the killing of Jamal Khashoggi, according to
> American officials who have read classified intelligence reports about the campaign.

> At least some of the clandestine missions were carried out by members of the same team
> that killed and dismembered Mr. Khashoggi in Istanbul in October, suggesting that his
> killing was a particularly egregious part of a wider campaign to silence Saudi dissidents,
> according to the officials and associates of some of the Saudi victims.

> Members of the team that killed Mr. Khashoggi, which American officials called the
> Saudi Rapid Intervention Group, were involved in at least a dozen operations starting in
> 2017, the officials said.

14.     Attached as Exhibit 5 is a true and correct copy of an May 9, 2019 article in Time

Magazine entitled "The CIA Sent Warnings to at Least 3 Khashoggi Associates About New

Threats From Saudi Arabia" and published online at https://time.com/5585281/cia-warned-

jamal-khashoggi-associates/ which reports that "[t]he CIA and foreign security services are

warning friends and colleagues of Jamal Khashoggi that their efforts to continue the pro-

democracy work of the slain Saudi journalist has made them and their families the targets

of potential retaliation from Saudi Arabia. . . ."

15.     Attached as Exhibit 6 is a true and correct copy of an article in the Middle East

Eye entitled "Exclusive: Saudi dissidents in US warned by the FBI after Khashoggi killing" and

published online at https://www.middleeasteye.net/news/exclusive-saudi-dissidents-us-warned-

fbi-after-khashoggi-killing which states that "[t]he FBI visited Saudi dissidents in the United

States and others connected to Jamal Khashoggi in the weeks after the journalist's murder to

warn them of a potential threat to their lives from the Kingdom."

4

16.    On November 15, 2018, the U.S. Treasury Department sanctioned seventeen Saudi government officials for the killing of Jamal Khashoggi. The team of assassins was led by Saud al-Qahtani, "a senior official of the Government of Saudi Arabia who was part of the planning and execution of the operation." Attached as Exhibit 7 is a true and correct copy of the Treasury Department press release published online at https://home.treasury.gov/news/press-releases/sm547.

17.    Lobbyists for Saudi Arabia actively worked against the passage of the Justice Against the Sponsors of Terrorism Act (JASTA) to stop the 9/11 terror litigation. The lobby effort was managed by Saad al-Qahtani, the purported mastermind of the Khashoggi execution. Attached as Exhibit 8 are true and correct copies of Foreign Agent Registration Act filings. After JASTA became law, the Saudi lobby used deceptive activity in an attempt to repeal and undermine JASTA.  Attached as Exhibit 9 is a true and correct copy of the transcript of an interview on National Public Radio published online at https://www.npr.org/2018/12/15/this-is-crossing-the-line-saudis-co-opted-veterans-voices-to-lobby-congress.  In 2016-2017, unregistered foreign agents attempted to dupe U.S. military veterans into advocating against JASTA and paid all travel expenses, including stays at the Trump Hotel in Washington and set up meetings for them with members of Congress in an effort to repeal JASTA, while failing to reveal to the veterans that it was the Saudi government that was behind this lobbying effort to stop the 9/11 families.  Attached as Exhibit 10 is a true and correct copy of a Complaint filed by various 9/11 Families (who are Plaintiffs in this case) with the Department of Justice.

18.    Attached as Exhibit 11 is a true and correct copy of a November 6, 2019 press release of the United States Attorney's Office for the Northern District of California entitled "Two Former Twitter Employees And A Saudi National Charged In Plot To Provide Saudi

Government With Information About Users" and "Defendants Allegedly Acted as Illegal Agents of a Foreign Government by Providing Information About Twitter Users to Representatives of the Kingdom of Saudi Arabia" published online at https://www.justice.gov/usao-ndca/pr/two-former-twitter-employees-and-saudi-national-charged-plot-provide-saudi-government which states that the criminal complaint (attached as Exhibit 12) shows that "Saudi agents mined Twitter's internal systems for personal information about known Saudi critics and thousands of other Twitter users" and that

> representatives of the Kingdom of Saudi Arabia and the Saudi Royal Family sought the private information of Twitter users, including their email addresses, IP addresses, and dates of birth, of persons some of whom published posts deemed by the Saudi Royal Family to be critical of the regime. This information could have been used to identify and locate the Twitter users who published these posts. The complaint alleges that Alzabarah and Abouammo were compensated for their illicit conduct, including the provision of a luxury watch, cash, and other benefits in exchange for their agreement to violate Twitter policies by accessing and providing the information. Almutairi is alleged to have arranged meetings, acted as a go-between, and facilitated communications between the Saudi government and the other defendants.

19.     Attached as Exhibit 12 is a true and accurate copy of the November 5, 2019 Criminal Complaint filed in the case *United States of America v. Ahmad Abouammo; Ahmed Almutairi, a/k/a Ahmed Aljbreen; and Ali Alzabarah*, 3:19-mj-71824-MAG (N.D.C.A. Nov. 5, 2019).

20.     Attached as Exhibit 13 is a true and correct copy of a 2019 report entitled "Freedom on the Net 2019 – Saudi Arabia" published online by the U.S. Department of Justice at https://www.justice.gov/eoir/page/file/1234871/download. The report states that:

> Surveillance is rampant in Saudi Arabia. The government justifies the pervasive monitoring of nonviolent political, social, and religious activists by claiming that they are protecting national security and maintaining social order. The authorities regularly monitor websites, blogs, chat rooms, social media sites, emails, and text messages.

21.     Attached as Exhibit 14 is a true and correct copy of a January 22, 2020 press release of the United Nations High Commissioner for Human Rights entitled "UN experts call for investigation into allegations that Saudi Crown Prince involved in hacking of Jeff Bezos' phone."

22.     Attached as Exhibit 15 is a true and correct copy of a report of the United Nations High Commissioner for Human Rights entitled "Analysis of the Evidence of Surveillance of Mr. Bezos' personal phone – Key Technical Elements" published online at https://www.ohchr.org/Documents/Issues/Expression/SRsSumexFreedexAnnexes.pdf, which presents a "Brief Timeline of Key Events" including the following:

| | |
|---|---|
| **November 2017** | Pegasus-3 spyware is acquired from NSO Group by the Saudi regime, specifically the Saudi Royal Guard. |
| **April 4, 2018** | Mr. Bezos attends dinner with the Crown Prince, in the course of which they exchange phone numbers that correspond to their WhatsApp accounts. |
| **May, 2018** | The phone of Saudi human rights activist Yahya Assiri is infected with malicious code. Yahya Assiri was in frequent communication with Mr. Khashoggi. |
| **June, 2018** | The phone of Saudi political activist Omar Abdulaziz is infected with malicious code, via a texted link on Whats App. Omar Abdulaziz was in frequent communication with Mr. Khashoggi. |
| **June, 2018** | The phone of an Amnesty International official working in Saudi Arabia is targeted for infection via a WhatsApp link that it is determined leads to an NSO Group-controlled website. |
| **June 23, 2018** | The phone of Saudi dissident Ghanem al-Dosari is targeted via a text link leading to NSO infrastructure. |
| **June 23, 2018** | A second phone of Saudi dissident Ghanem al-Dosari is targeted via a text link leading to NSO infrastructure. |
| **December 20, 2019** | Twitter suspends 88,000 accounts linked to Saudi spying case, saying that the accounts were associated with "a significant state-backed information operation" originating in Saudi Arabia. |

23.     Attached as Exhibit 16 is true and correct copy of a January 17, 2020 letter from the Federal Bureau of Investigation (FBI) to Senator Ron Wyden attaching an August 29, 2019 FBI Intelligence Bulletin entitled "Saudi Officials Almost Certainly Assist Saudi Citizens Flee the United States To Avoid Legal Issues, Undermining the US Judicial Process" published online at http://www.documentcloud.org/documents/6661439-FBI-Saudi-Declassified.html . The Bulletin states that with "high confidence" the FBI made the assessment that Saudi government officials "almost certainly assist U.S. based Saudi citizens in fleeing the United States to avoid legal issues" including "rape, child pornography and manslaughter. . . ."

24.     A U.S. citizen doctor has been imprisoned in Saudi Arabia on unspecified charges since 2018.  Saudi Arabia seized the family's passports, tortured the doctor and refused to respond as to the reasons for his detention.  Attached as Exhibit 17 is a true and correct copy of a New York Times article published online at

https://www.nytimes.com/2019/03/13/world/middleeast/saudi-arabia-torture-walid-fitaihi.html.

25.     At least three other U.S. citizens have complained to the Secretary of State that their family members are currently imprisoned in Saudi Arabia on unspecified charges. Attached as Exhibit 18 is a true and correct copy of a NBC News piece published online on February 20, 2020 at https://www.nbcnews.com/think/opinion/saudi-arabia-imprisoning-our-relatives-while-mike-pompeo-u-s-ncna1140116 .  That article states that "[a]s long as this culture of impunity persists, no American in Saudi Arabia is safe."

Pursuant to 28 U.S.C. § 1746, I declare under penalty of perjury under the laws of the United States of America that the foregoing is true and correct.

Executed: New York, NY
            February 21, 2020

Andrew J. Maloney III

8