**UNITED STATES DISTRICT COURT**
**DISTRICT OF COLUMBIA**

| | |
|---|---|
| LIV GOLF, INC., <br><br> Movant, <br><br> v. <br><br> CLOUT PUBLIC AFFAIRS, LLC, <br><br> Respondent. | Misc. Case No. 1:22-mc-00126-CJN <br><br> Underlying Case, *LIV Golf, Inc., et al. v. PGA Tour, Inc.*, pending in the United States District Court for the Northern District of California: <br><br> Case No. 5:22-cv-04486-BLF |

**LIV GOLF INC.'S REPLY IN SUPPORT OF MOTION TO COMPEL CLOUT PUBLIC**
**AFFAIRS, LLC TO COMPLY WITH SUBPOENA TO PRODUCE DOCUMENTS**

## PRELIMINARY STATEMENT

Clout's 45-page response to LIV's 18-page motion reads like it was written by a public relations specialist to create sensational sound bites for the media, not by a member of the bar constrained to avoid scandalous allegations wholly bereft of support.  Clout's allegations that LIV and its counsel seek to discover information about groups affiliated with 9/11 victims so the Kingdom of Saudi Arabia can spy on and harass them is an affront to this Court, to LIV, and to its counsel.  It lacks any conceivable merit.  In a word, it is shameful.

To the extent Clout makes cognizable legal arguments, its central contention is that the motion should be denied as irrelevant and unduly burdensome because LIV is obtaining responsive documents from Clout's client, Defendant the PGA Tour, Inc. (the "Tour").  The Federal Rules of Civil Procedure allow appropriate third party discovery, especially where there are sound reasons to believe party discovery will be incomplete.  That rationale is particularly applicable in this case, because—as Clout acknowledges, *see* Response in Opposition ("Rspn.") at 29—the Tour engaged Clout to execute an anti-LIV campaign designed to hide the Tour's "████████"  Given that deliberately surreptitious strategy, discovery only from the Tour and not from Clout will be incomplete; it will hide the Tour's "████████" and thereby deny LIV and the court crucial information regarding a central aspect of the Tour's defense: its contention that it cannot be associated with LIV golfers for reasons of policy and reputation, rather than because it seeks to suppress competition.  The need for information from Clout is especially acute in light of the Tour's modus operandi of interrupting texts, emails, and chats, and switching to undiscoverable telephone calls.  And there are a number of reasons to suspect the Tour's production is incomplete.

Clout's main strategy is to change the topic from the Tour/Clout's campaign to foment and fund opposition to the new competition offered by *LIV* to a cherrypicked canvas of inadmissible hearsay news reports about *Saudi Arabia* going back twenty years, ostensibly to show that anti-

Saudi bias in the United States preexisted the creation of LIV.  But that is a non sequitur.  LIV's position is not that Saudi Arabia had a "pristine" (Rspn. at 3) reputation in the United States.  LIV's position is that the Tour adopted anticompetitive measures to preserve its monopoly by invoking specific, *anti-LIV* opposition that the Tour itself secretly fomented through its agent, Clout.  That is the directly relevant evidence that LIV's subpoena seeks, and generalized sentiment about Saudi Arabia in the United States has nothing to do with it.

Another key Clout sleight-of-hand is to modestly, but dishonestly, downplay its role.  According to Clout, it only advised the Tour on public statements, press releases, and related "brand" building.  False.  Clout developed a strategy that the Tour implemented to preserve its monopoly by threatening, maligning, and attacking any Tour member who had signed with LIV or was thinking of doing so.

Clout's venom in doing so is startling.  In May 2022, LIV was close to signing top-rated golfer, Dustin Johnson. ███████████████████████████████████████

████████████████████████████████████████████████████████████

Ex. 41 at 10. ███████████████████████████████████████

██████████████████████ *Id*. ████████████████████████████████████

████████████████████████████████████████████████████████████

██████████████████████████ *Id*. at 12. ████████████████████████████

████████████████████████████████████████████████████████████

████████████████████████████████████████████████████████████

██████████████████████████ *Id*. at 14. ████████████████████████████

████████ *Id*. at 15. ███████████████████████████████████████

████████████████████████████████████████████████████████

████████████████████████████████████████████████  *Id.*

Public statements and internal Tour documents in the following weeks show that the Tour dutifully executed on Clout's vicious strategy. In short, while hiding the Tour's "██████████" Clout was the architect of an all-out attack on LIV and any golfer who dared to sign (or even think of signing) with LIV, thereby helping the Tour maintain its monopoly. LIV is entitled to that evidence, which is central to its antitrust claims.

In sum, Clout's arguments on relevance and burden fail badly, and its First Amendment defense is entirely misplaced. LIV's motion should be granted in full.

## ARGUMENT

I. **Clout's Sensational Assertion That LIV and Its Counsel Seek Information About 9/11-Victim Associations so the Kingdom of Saudi Arabia Can Spy on and Harass Their Members Is a Baseless PR Stunt**

Without a shred of evidence or any coherent (or even speculative) line of inference, Clout broadly and repeatedly asserts that LIV *and* LIV's *counsel*, including the undersigned, are egregiously misusing discovery by seeking to obtain evidence so that non-party Saudi Arabia can covertly track the movements of 9/11-victim families and associations for the purpose of their harassment or worse. *See* Rspn. at 1, 25-26, 32-34. This argument is a scandalous affront designed solely for consumption by the press, who unfortunately have bitten.[1]

---

[1] Rex Hoggard, *LIV Golf accused of using lawsuit with Tour to 'build intelligence file' on 9/11 families*, Golf Channel (Jan. 5, 2023, 2:20 PM), https://www.golfchannel.com/news/liv-golf-accused-using-lawsuit-tour-build-intelligence-file-911-families; Erik Larson, *Saudi-backed LIV Golf is using PGA suit to get data on 9/11 families, court told*, Bloomberg Law, (Jan. 4, 2023, 1:44 PM), https://news.bloomberglaw.com/antitrust/liv-golf-using-pga-suit-to-get-data-on-9-11-families-court-told.

As an initial matter, Clout's headline-seeking claim that Saudi Arabia has tracked members of 9/11-victim associations is bereft of evidentiary support.  Clout purports to support it by misrepresenting a single sentence from a single hearsay news article which does not cite sources and two declarations offering conclusory hearsay.[2]  Rspn. at 5, 19, 43; Dkt. 11-1 ¶ 13; 11-2 ¶ 17.

Moreover, Clout offers nothing as to LIV or its counsel's supposed involvement in the nefarious scheme that Clout imagined out of whole cloth.  Clout's casual assumption that LIV's counsel would egregiously violate their professional obligations is offensive and disconcerting.  While innuendo and smear may be business as usual for Clout as a PR and opposition-research firm, it should not be when Clout and its counsel present arguments to the Court governed by Rule 11.  Clout and its counsel have not even attempted to show that its sensational assertions "have evidentiary support or, if specifically so identified, will likely have evidentiary support after a reasonable opportunity for further investigation or discovery."  Fed. R. Civ. P 11(b)(3).  Clout does not attempt to satisfy that standard because it could not possibly do so.

The supposed hook for Clout's smear campaign is Request No. 7.  It requests communications between the 9/11-victim associations and Clout "related to Saudi Arabia, the PGA Tour, LIV Golf, the September 11, 2001 terrorist attacks, Phil Mickelson, protests, or this lawsuit." To obviate any even feigned concern of the sort Clout raises, LIV hereby amends Request No. 7 by removing "Saudi Arabia" and "the September 11, 2001 terrorist attacks."  In addition, Clout may propose that any responsive information be designated Attorneys' Eyes Only under the protective order governing the underlying case.  To the extent such information genuinely

---

[2] The hearsay news article says that LIV hired a firm that "helped LIV with monitoring and tracking the advocacy of families of 9/11 victims." Dkt. 11-3 at 138.  Even if this were cognizable evidence, "tracking" "advocacy"—e.g., protests coordinated by Clout and the Tour to interrupt LIV golf events and foment anti-LIV sentiment—is much different from "tracking" individuals.

implicates concerns about the privacy or safety of 9/11 victims, LIV will not object to such designations.  There was never the slightest substance to Clout's smear argument against LIV and its counsel.  There is even less now.

## II.    Clout's Relevance Arguments Fail

When it eventually turns to legal arguments, Clout contends that the information sought by LIV's subpoena is irrelevant for several reasons.  None is persuasive.

### A.    The Clout/Tour Smear Campaign Against LIV Is Relevant to the Anticompetitive Conduct Underlying LIV's Antitrust Claims

Clout's broadest argument (Rspn. at 25-30) is that the information sought by LIV's subpoena—detailing Clout's campaign on behalf of the Tour to foment opposition to LIV—is irrelevant because anti-Saudi sentiment in the United States predated that campaign.  That argument is logically and legally flawed on multiple levels.

1.     Clout initially acknowledges (Rspn. at 20) that the relevance standard applicable here "is identical to that stated in [Federal] Rule [of Civil Procedure] 26"—i.e., that the information sought must "appear[] reasonably calculated to lead to the discovery of admissible evidence," but "need not be admissible at *the trial*."  Fed. R. Civ. P. 26(b)(1) (emphasis added).  Yet Clout then argues (Rspn. at 27) that LIV's requests for information about Clout's efforts to foment opposition to LIV on behalf of the Tour are subject to the narrower *admissibility* standard of Federal Rule of Evidence 104(b), which provides that a court "may admit" proposed conditionally relevant evidence under certain circumstances.

Clout's reliance on the Rules of Evidence in this discovery dispute is fundamentally misplaced.  Evidentiary rules "govern the admissibility of evidence at trial, not the establishment of the processes whereby such evidence will be created."  *Edison Elec. Institute v. E.P.A*, 391 F.3d 1267, 1269 n.2 (D.C. Cir. 2004).  Rule 104(b)'s text makes that clear by referring expressly to

when a "court may *admit* the proposed evidence."   Fed. R. Evid. 104(b) (emphasis added); *see, e.g.*, *U.S. v. Burnett*, 890 F.2d 1233, 1240 (D.C. Cir. 1989) ("Admissibility is governed by Rule 104(b)…."). The Court would be entitled to reject Clout's relevance argument at the threshold on the basis that Clout applies the wrong (and much narrower) standard.

    2.    In any event, Clout ignores most of LIV's arguments demonstrating the relevance of the subpoenaed information to the underlying antitrust action.

    In its motion, LIV quoted its allegations that the Tour's monopoly was illegally maintained via threats of and by banning Tour members for competing in LIV events.  LIV's moving papers ("Mot.") at 4 (quoting the Amended Complaint).  LIV has shown that Clout was an integral part of the strategy and messaging behind these threats and bans.  *Id.* at 10 (citing Ex. 3 at 2; Ex. 24; Ex. 25); *see also* Ex. 41 at 14-15 (

); Ex. 42 at 5 (

).

    LIV also quoted its allegations that the Tour's monopoly was illegally maintained via its threats to sponsors, broadcasters, and business partners.  Mot. at 4 (quoting the Amended Complaint).  LIV identified the Tour's defenses "that Saudi Arabia's reputation—not [the Tour's] anticompetitive conduct—is the reason why sponsors, broadcasters, and others have distanced themselves from LIV."  Mot. at 5.  LIV also showed that Clout strategized with the Tour and then participated in these illegal threats.  *See* Mot. at 9; *see also* Ex. 25 at 2 (

); Ex. 43 at 5, 10 (

████████████████████████████████████

████████████████████████████████████

████████████████████████████████████

██████).

As LIV explained in its motion, the anti-LIV scheme orchestrated by the Tour through Clout is also directly relevant to the underlying antitrust action because it illustrates an attempt "to block the entry of the Tour's most significant competitor"—a paradigmatic violation of the antitrust laws.  Mot. at 16; *see id*. (citing *E. R.R. Presidents Conference v. Noerr Motor Freight, Inc.*, 365 U.S. 127, 144 (1961) (recognizing that the Sherman Act applied to "a publicity campaign … [that is] an attempt to interfere directly with the business relationships of a competitor"); *Trucking Unlimited v. Cal. Motor Transp. Co.*, 432 F.2d 755, 757 (9th Cir. 1970); *Int'l Wood Processors v. Power Dry*, 593 F. Supp. 710, 721-22 (D.S.C. 1984)).  At minimum, the evidence sought by LIV is probative of the Tour's intent to illegally maintain its monopoly.  *See Nexstar Broad., Inc. v. Granite Broad. Corp.*, 2012 WL 2838547, at *8 (N.D. Ind. July 9, 2012) (accepting the argument that "allegations of denigrating speech … show [the defendant's] intent to monopolize the [relevant] market and destroy competition") (citation omitted); *Caldon v. Advanced Measurement Analysis Grp.*, 515 F. Supp. 2d 565, 572, 577 (W.D. Pa. 2007) (finding the defendant's alleged "campaign of disparagement" was sufficient in part to allege a "specific intent to destroy [the plaintiff] as [the defendant's] only competitor in the [relevant] market").

Clout's failure to meaningfully address these straightforward arguments should settle the issue of whether the subpoena seeks relevant information.  *See, e.g.*, *Phrasavang v. Deutsche Bank*, 656 F. Supp. 2d 196, 201 (D.D.C. 2009) (where party fails to respond to it adversary's argument, the court may treat that failure as conceding the point).

7

3.      Clout instead devotes most of its argument on relevance to an extended effort (largely through hearsay newspaper accounts)[3] to demonstrate that general anti-Saudi sentiment in the United States predated the anti-LIV campaign that it launched on behalf of the Tour.  As explained above, that is a non sequitur.  The claim at issue is that the Tour used Clout to create specific public opposition to *LIV* (while hiding the Tour's " ▋▋▋▋▋ ") so the Tour could pretextually point to *that* public opposition as justification for its lifetime bans and related anticompetitive activity.  Saudi Arabia's general reputation in the US (which is vastly more nuanced than Clout's portrayal in light of, e.g., the billions of dollars of business the Tour's principal sponsors do annually with Saudi Arabia) has little or nothing to do with this motion.

At most, Clout's assertions go to the merits of LIV's pretext argument, not the relevance of the discovery sought.  Clout argues that LIV cannot prove its theory of pretext because the Tour had good reason for its surreptitious Clout campaign.  *See* Rspn. at 29, 30 & 27-28.  The Tour is free to make that argument to the jury or the court in the underlying antitrust action.  But the pertinent question here is whether the information that LIV seeks from Clout meets the "broadly" construed standard of relevance for purposes of discovery, which "encompass[es] any matter that bears on, or that reasonably could lead to other matter that could bear on, any issue that is or may be in the case."  *Wall v. Reliance Standard Life Ins.*, 341 F.R.D. 1, 5 (D.D.C. 2022) (quoting *Oppenheimer Fund, Inc. v. Sanders*, 437 U.S. 340, 351 (1978)).  Because the anti-LIV campaign orchestrated and carried out by Clout on behalf of the Tour pertains directly to LIV's claims that the Tour attempted to exclude LIV from the relevant markets, the subpoena readily

---

[3] *See, e.g.*, *Roberts v. City of Shreveport*, 397 F.3d 287, 295 (5th Cir. 2005) ("The plaintiffs provide only newspaper articles—classic, inadmissible hearsay.").

satisfies the relevance standard.  *See, e.g.*, *Cobell v. Norton*, 226 F.R.D. 67, 79 (D.D.C. 2005) (information is relevant if it relates to "the nature of the claims that the parties have asserted").

In any event, Clout's merits arguments fail.  LIV has shown that Clout—as an agent of the Tour—targeted localities hosting LIV events, *see* Mot. at 6-7;[4] enlisted local and national elected officials to do the Tour's bidding, *see id.* at 7-8; and targeted players' and tournaments' sponsors,[5] *see id.* at 9.  In other words, the Tour fomented and amplified public sentiment against LIV and its golfers, while arguing that any connection with LIV golfers (many of whom are prominent former PGA Tour members) harms the Tour because of the very public sentiment the Tour and Clout fomented.  That is the definition of pretext.  *See* PRETEXT, Black's Law Dictionary (11th ed. 2019) ("A false or weak reason or motive advanced to hide the actual or strong reason or motive.").  Clout concedes that if LIV "establishe[s] that the Tour's publicity effort did indeed 'manufacture' anti-Saudi and anti-LIV sentiment," then "all of Clout's materials [are] relevant."  Rspn. at 30.  LIV has so established.

---

[4] Clout's President swears that "Clout did not … assist in the … circulation … of a letter from eleven mayors in opposition to LIV playing in Portland, Oregon ." Dkt. 11-1 ¶ 8.  The letter at issue was widely circulated via an online news article. ███████████████████████████████ ████████████████████████████████████████████████████████████████████████ ███████████████████████  Ex. 41 at 19.  Despite its protestations to the contrary, Clout was directly involved with the circulation (and likely creation) of the letter.  *See* Ex. 44 at 12 (██████████████████████ ████████████████████████████████████████████████████████████████).  Notably, Clout's President does not deny any of the other acts LIV has shown are attributable to Clout and the Tour to manufacture Tour defenses in the underlying litigation.

[5] The "outrage" that Clout manufactured in Portland was used by Clout to threaten player's sponsors (thereby threatening players themselves).  Ex. 45 at 5 (██████████████████████████ ████████████████████████████████████████████████████████████████████████ ███████████████████████); Ex. 44 *passim* (███████████████████████████ ████████████████████████).

**B.**     **The Internal Clout Documents and Communications Sought by LIV Are Relevant**

As a separate ground for resisting the subpoena, Clout contends (Rspn. 30-32) that its internal documents and communications (i.e., communications not shared with the Tour or other third-parties) are irrelevant and therefore not discoverable.  That is mistaken.

1.     As an initial matter, Clout does not deny—in its motion or declarations—that it possesses notes and other documents memorializing oral instructions from the Tour.  Mot. at 13 ("Clout's internal communications will also reflect its oral communications with the Tour.").  Such information is plainly discoverable, even if it appears in Clout's files rather than the Tour's.  And there is reason to believe that significant amounts of such information exist in this case.  As elaborated further below, *see infra* Section II.B.2, the Tour consciously avoided written communications to hide its anticompetitive conduct.  For example, LIV has shown that Clout and the Tour regularly met, but the only product from these meetings the Tour has provided LIV are meeting agendas with high-level bullet points.  *See, e.g.*, Exs. 5, 6, 11, 12.  The details of these meetings—solely in Clout's possession—are more probative than generalized agenda topics.  Clout also shared links to documents with the Tour but did not provide the Tour the documents themselves; hence the Tour accessed but does not possess certain relevant documents.  Mot. at 13; *see also* Ex. 51 (███████████████████████████████████████ ███████ ).  Only Clout possesses these documents, and discovery of them from Clout is accordingly necessary.

2.     Production of Clout's relevant internal communications is especially warranted given that Clout followed the Tour's instructions to hide the Tour's "███████" in executing its attacks on LIV.  *See* Mot. at 14 ("Clout's internal documents are also necessary because Clout and the Tour attempted to conceal the Tour's participation in the scheme").

Clout acknowledges the smear campaign's goal of hiding the Tour's fingerprints but asserts that "LIV never explains why this common operational tactic in public relations somehow converts the PGA Tour's legitimate concerns into anticompetitive conduct."  Rspn. at 29.  Clout again seeks to change the topic.  The issue is not whether PR firms commonly create a message without telling the public they are doing so at the behest of their clients.  The issue is the Tour secretly using Clout to *manufacture evidence* which it then *invokes as a defense* to LIV's antitrust claims.  That evidence is highly relevant, to both the merits of the claims and the Tour's credibility.

Relatedly, neither the court nor LIV will be able to understand the scope of the Clout/Tour smear campaign without Clout's internal communications in light of the Tour's practice of using perforce undiscoverable phone calls to hide its anticompetitive conduct.  *See, e.g.*, Ex. 46 at 2 (███████

███████████████████████████████████████████████████████

███████████████████████████████████████████████████

██████████████████████████████████████████); Ex. 47 at 2 (███████

███████████████████████████████████████████████████████

███████████████████████████████████████████████).  Indeed, the Tour has—after the filing of the motion—produced additional evidence confirming that Clout hiding the Tour's role was central to the scheme.  *See* Ex. 37 (████████████████████

███████████████████████████████████████████████████████

███████████████████████████████████████████); Ex. 48 at 16 ██████████

███████████████████████████████████████████████████████; Ex. 43 at 8 (█████████████████████████████████████████████████████████

███████████████████████████).  The Tour's practices only further underscore the need for discovery from Clout.

3.      In addition, LIV argued in its moving papers that Clout's internal communications were discoverable because Clout could be found to be an agent of the Tour.  *See* Mot. at 16 ("Clout's internal documents are discoverable for this purpose [of determining Clout's agency] because they will confirm whether the Tour controlled Clout's actions and whether Clout viewed itself as an agent of the Tour.").  Clout attempts to side-step the issue by arguing that Clout was not a *press* agent of the Tour.[6]  Whether Clout was in fact an agent of the Tour goes to the merits, but the issue now is whether Clout's internal communications satisfy the *relevance* standard of discovery.[7]  In any event, if Clout is not an agent of the Tour, Clout is the Tour's co-conspirator, and its internal documents, which are part-and-parcel to the conspiracy, are relevant.

Finally, as yet another basis supporting the discovery request, LIV is entitled to Clout's internal communications because Clout took relevant actions—whether as an agent or co-conspirator—without informing the Tour.[8]  *See* Ex. 49 at 25-26 (█████████████████████ ███████████████████████████████████████████████ ███████████████████████); Ex. 50 at 9 (████████████████████████ █████████████████████████████████); Ex. 41 at 19 (██████████████

---

[6] Clout artificially attempts to limit the agency issue to whether Clout was a press agent.  Rspn. at 15, 16, 22, 31.  Clout's agency is much broader than that: planting news stories and otherwise amplifying anti-LIV sentiment, and threatening sponsors, broadcasters, and players.

[7] The jury could find that Clout was an agent of the Tour; Clout even identifies a category of responsive documents as "communications to third parties on behalf of the PGA Tour."  Rspn. at 2, 26; *Henderson v. Charles E. Smith Mgmt., Inc.*, 567 A.2d 59, 62 (D.C. 1989) ("[A]n agency relationship results when one person authorizes another to act on his [or her] behalf subject to his [or her] control, and the other consents to do so.").

[8] Clout states that "Clout necessarily communicated its work, research, and advice to the Tour."  Rspn. at 22.  This is false—as shown.  And Clout cites to Mr. Polyansky's declaration in support of this statement, but the declaration states no such thing.

█████████████████████████████████████████████████████████

████████████████████████████████████████████████████ ).

### C.    Clout's Use of Third Parties To Execute the Anti-LIV Scheme Is Relevant

Clout's final relevance argument (Rspn. 32-34) is that the subpoena should be limited to exclude Clout's communication with third parties, including groups with a connection to 9/11. That argument lacks merit.  One of the most potent weapons in the Tour and Clout's scheme to destroy LIV—and therefore a highly relevant aspect of the claims at issue—was coordination with (and, at times, apparent displays of control over) 9/11 organizations, including both 9/11 Families United and 9/11 Justice.  A few examples suffice.

***Charles Barkley***.   The Tour and Clout apparently directed two separate 9/11 groups to pressure Charles Barkley—the former NBA star turned primetime sports analyst—from joining LIV as a broadcaster (Barkley in fact turned down LIV's offer after initially speaking approvingly of it). ███████████████████████████████████████

█████████████████████████████████████████████████

███████████████████████████ Ex. 52 at 3. ████████████████████████████

█████████████████████████████████████████████████

█████████████████████████████████████████████████

███████████████████████████████████████████████ *Id*. at 4

(emphases added). ██████████████████████████████████████

█████████████████████████████████████████████████

████████████████████████████████████ *Id*. at 5; *see also* Ex. 53 at 3 (██

█████████████████████████████████████████████████

██████████████████████ ).  Eight days later, ███████████████████████████

█████████████████████████████ Ex. 54 at 4.

**David Feherty**.  Feherty is one of the top golf broadcasters and commentators.  Clout and the Tour directed 9/11 groups to pressure him not to join LIV.  ████████████████████ ████████████████████████████████████████████████████████████████████ ██████████████████████████████████████████████ Ex. 52 at 4.  Eight days later, █████████████████████████████████████████████████████████████ ████████████████████████████████ Ex. 54 at 3.

**Press Efforts**.  The Tour and Clout have repeatedly been involved with and controlled press leaks and messaging by 9/11 groups:



Ex. 40 (emphasis added); *see also* Ex. 38 (████████████████████████████████ ████████████████████████████████████████████); Ex. 9 at 2 █████████████████ █████████████████████████████████████████████); Ex. 50 at 9 (██████████ ████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████ ████████████████████████████████████████████████████████████ ██████████████████████████).

***501(c)(4) Funding of 9/11 Organizations.*** Evidence produced by the Tour shows that Clout and the Tour planned to utilize a 501(c)(4) entity to secretly further their scheme, i.e., an

███████████████████████████████████████████████████████████████

███████████████████████████████████████████████████████  Ex. 37

at 8.  In a carefully worded sentence, Clout's President declares that "there was some initial discussion of the creation of a 501(c)(4) in order to assist PGA Tour *with **global messaging***, [but that] ***this*** *never came to fruition* and the idea was abandoned."  Dkt. 11-1 ¶ 5 (emphasis added). What Clout's President does not address is whether the Tour created or funded any 9/11 organizations, including Clout client 9/11 Justice, Inc., which is a 501(c)(4) organization incorporated on June 27, 2022, that has purchased over a hundred thousand dollars' worth of anti-LIV advertisements (that can be publicly traced).  Surprenant Decl. ¶¶ 22-24 and Exs. 55-57.

Clout's failure to address those actions—funding and creation of 9/11 Justice, Inc. or any other 501(c)(4) not meant "to assist the PGA Tour with global messaging"—underscores the need for the requested evidence.  *See* Mot. at 3 ("The Tour has produced evidence in the underlying lawsuit of its scheme, including evidence that it organized and likely funded 9/11 protests at LIV Golf tournaments and ran adjacent media campaigns against LIV."); *id*. at 5 ("The Tour's Defense Is Based on Protests and Opposition It Funded and Fomented"); *id*. at 7 ("These efforts apparently included Clout orchestrating the involvement of others through 501(c)(4) entities."); *id*. at 18 ("LIV is entitled to the evidence showing this effort, including organizing 501(c)(4) entities to conceal and funnel resources to wage this campaign.").

The Court should reject Clout's attempt to wall off 9/11 organizations from discovery when Clout and the Tour used such organization to threaten others and amplify the anti-LIV smear

campaign.  Clout put these organizations into the center of the dispute; it cannot now keep them out.  These documents and communications are discoverable.

### III.    Clout Cannot Show Undue Burden

In addition to its relevance objections, Clout asserts (Rspn. 21-25) that compliance with the subpoena imposes an undue burden.  A Rule 45 subpoena must "be relevant and proportional, considering the importance of the issues and of the discovery in resolving them, the amount at stake, the parties' access to information, the parties' resources, and whether the burden or expense of the proposed discovery outweighs its likely benefit."  *Servis One, Inc. v. OKS Grp. Int'l Pvt. Ltd.*, 2022 WL 605439, at *7 (E.D. Pa. Feb. 28, 2022).  LIV's subpoena readily meets that standard.

1.    The discovery sought by LIV from Clout is relevant and proportional.  Clout has devised and implemented a campaign to harm if not destroy LIV and its players so that the Tour can maintain its five-decade monopoly over elite men's professional golf.  Clout's conduct is therefore at the core of LIV's underlying claims.  *See In re Denture Cream Products Liab. Litig.*, 292 F.R.D. 120, 127 (D.D.C. 2013) (rejecting undue burden given "plaintiffs' indication that they will rely on the [subpoenaed documents] as evidence" of a claim); *Fairholme Funds, Inc. v. Fed. Hous. Fin. Agency*, 2019 WL 5864595, at *4 (D.D.C. Nov. 8, 2019) (rejecting undue burden argument where the nonparty "was substantially involved in the underlying transaction and could have anticipated that such transaction could potentially spawn litigation or discovery").  The subject matter is sufficiently serious that the Department of Justice has launched an investigation and obtained documents from not only the Tour, but also the sponsors of professional golf's "Major" tournaments in the United States (Augusta National/the Masters, the United States Golf Association/the US Open, and the PGA of America/PGA Championship).  *See* Exs. 33, 34.  And

Plaintiffs are seeking hundreds of millions of dollars in damages, which would be trebled.[9]  *Stati v. Republic of Kazakhstan*, 2020 WL 3259244, at *8 (D.D.C. June 5, 2020) (finding an amount-in-controversy of over $500 million "high" and counseling against an undue burden).[10]

Given Clout's unique access to information and ample resources, Clout's burden and expense do not outweigh the discovery's likely benefit.  Clout touts itself as a top-of-the-line, full-service public affairs firm.  *See generally* Ex. 2.  The Tour has paid Clout ███████ from November 2021 to November 2022.  Ex. 56 at 13.  And Clout noticeably does not state that it will be responsible for its own attorneys' fees or production costs.  Clout's conclusory statement that it will take "hundreds of hours" to review the documents at issue is unsupported and insufficient.  *See Fairholme Funds*, 2019 WL 5864595, at *3 ("Treasury broadly asserts that complying with plaintiffs' subpoena 'would take hundreds of hours,' but Treasury fails to specify how many hundreds of hours. Will it be 100? Will it be 900? How many attorneys will be required?").  Clout has pointed to no complicating factors that makes the review burdensome or difficult.  Cost is not a reason to deny the motion.  *See In re Denture Cream Products Liab. Litig.*, 292 F.R.D. at 127 (rejecting undue burden where "record is otherwise devoid of evidence that the [non-parties] are suffering financially or are otherwise unable to comply with the subpoena").  What is more, LIV stipulates that it will reimburse Clout for its costs (not attorneys' fees) for its production.

---

[9] Surprenant Decl. ¶ 7.

[10] That this is an antitrust case is of particular relevance when considering the needs of the case. *See, e.g.*, *Callahan v. A.E.V. Inc.*, 947 F. Supp. 175, 179 (W.D. Pa. 1996) ("Discovery in an antitrust case is necessarily broad because allegations involve improper business conduct. Such conduct is generally covert and must be gleaned from records, conduct, and business relationships.") (citations omitted).

2.      Clout suggests (Rspn. 21-22) that requiring it to comply with the subpoena is unduly burdensome because LIV can instead get the relevant information from the Tour.  That assertion misunderstands both the law and the record.[11]

As an initial matter, seeking discovery from a third-party even if it can ostensibly be obtained via party discovery can be, as it is here, permissible.  *See Pearson v. Univ. of Chicago*, 2021 WL 194725, at *6 (D. Conn. Jan. 20, 2021) ("Using discovery from a non-party to vet the fulsomeness of a party's discovery is permissible under the Federal Rules"); *State Farm Mut. Auto. Ins. v. Accurate Med., P.C.*, 2007 WL 2993840, at *1 (E.D.N.Y. Oct. 10, 2007) ("Critically, it is unlikely that the moving defendants would, in fact, possess all the documents sought by plaintiff in the subpoenas… Moreover, nothing in the Federal Rules of Civil Procedure requires a litigant to rely solely on discovery obtained from an adversary instead of utilizing subpoenas."); *New Park Entm't L.L.C. v. Elec. Factory Concerts, Inc.*, 2000 WL 62315, at *5 (E.D. Pa. Jan. 13, 2000) (refusing to quash a subpoena where the plaintiff claimed it needed "the third parties' documents, not only as a supplement to defendants' productions, but also to test the veracity of defendants' assertions that they have produced all the documents they were required to produce").

---

[11] Clouts argues that because LIV did not expressly address the discoverability of its communication with the Tour in its moving papers, LIV has waived the request for such documents in its subpoena.  Rspn. at 23 n.67.  Clout is wrong; its authority regarding "sandbagging" is inapplicable.  *See Bd. of Regents of Univ. of Wash. v. EPA*, 86 F.3d 1214, 1221 (D.D.C. 1996) (finding that a petitioner could not in its reply raise new arguments on an issue *for which it has the burden*).  Clout complains that LIV did not preemptively address an issue for which Clout has the burden; the opposite of the posture in *EPA*.  LIV is not required to predict which objections Clout will rely upon.  It is not feasible nor logical for a party moving to compel to address all possible objections a party responding to a Rule 45 subpoena might make.  *See, e.g., Ehrlich v. Union Pac. R.R.*, 302 F.R.D. 620, 623-24 (D. Kan. 2014) ("it is contrary to well-established law" to place "the initial burden on the party filing the motion to compel to substantively address each and every boilerplate objection asserted by the party resisting discovery").

In any event, as explained above, LIV cannot obtain many of the relevant communications at issue here from the Tour.  After all, the admitted goal of the Clout/Tour smear campaign was to hide the Tour's "███████" and the Tour systematically interrupted email, text and chat conversation midstream in favor of telephone conversations.  *See supra* Section II.B.2.

The discovery information already available underscores the significance of the information available only to Clout.  Clout claims there are "upwards of 40,000" potentially responsive documents.   Dkt. 11-3 ¶ 3.  As of this filing, the Tour has produced less than 600 communications (emails, texts, and WhatsApp messages) involving a Clout employee at any point on the thread, and less than 400 additional documents containing the term "clout."  Surprenant Decl. ¶ 3.  Making *very* conservative assumptions that only 10,000 are actually responsive, over 90 percent of the responsive documents would be uniquely in Clout's possession as compared to the Tour.  *See, e.g.*, *Buzzfeed, Inc. v. U.S. Dep't of Justice*, 318 F. Supp. 3d 347, 360 (D.D.C. 2018) (finding no undue burden where "the requested discovery is not 'unreasonably cumulative or duplicative.'  Nor can it be obtained from some other source" (quoting Fed. R. Civ. P. 26)).

The Tour's productions, moreover, have been insufficient.  To take just one example, the Tour refuses to add as a custodian Tour employees Allison Keller (Chief Administrative Officer) and Joel Schuchmann (SVP of Communications).  Ms. Keller has been involved in approximately one hundred emails with Clout that the Tour has produced, and Mr. Schuchmann has been involved in over a hundred such emails.  Surprenant Decl. ¶ 4.  LIV requested the Tour add Ms. Keller and Mr. Schuchmann as custodians, but the Tour refused.   *Id*.  There have been dozens of other discovery disputes between LIV and the Tour, and it is uncertain whether the underlying court will order the Tour to add these individuals as custodians ahead of the fast-approaching March 2023

document discovery deadline. At a minimum, Clout's communications with these two individuals should be produced.[12]

## IV.     The First Amendment Does Not Bar the Discovery Sought by LIV

Clout's last-ditch argument (Rspn. 34-45) is that the First Amendment precludes enforcement of the subpoena with respect to its communications with 9/11 Justice. That argument (which in any event applies to only a limited aspect of the subpoena) is badly misguided.

### A.     The Premise of Clout's First Amendment Argument Is Wholly Unsupported

Clout's First Amendment claim is premised on the notion that the "true purpose of the Subpoena is to build intelligence against" political opponents of Saudi Arabia. Rspn. at 34. As discussed above, that assertion is sanctionably absurd. Saudi Arabia is not a party to this case. It is not seeking any information in this case. LIV is seeking information for purposes centrally germane to its antitrust lawsuit. LIV is a corporate entity based in the US, whose main connection to Saudi Arabia is its receipt of funding from the country's sovereign wealth fund. That puts it in the same category as Uber, Lucid, Meta, Microsoft, and dozens of other US companies that receive funding from the same sovereign wealth fund. Clout is assuming the truth of its own breathless PR in arguing that LIV is an "agent" of Saudi Arabia without any evidence to support the claim. Just as the Tour used Clout to manufacture its antitrust defenses, Clout in turn is attempting to manufacture its own "associational chill" to flee from discovery.

---

[12] In addition, due to an apparent vendor error, the Tour did not produce approximately two months' worth of documents by the substantial completion deadline of November 18, 2022. Surprenant Decl. ¶ 5. After LIV uncovered the error, the Tour began the time-consuming process of reviewing and producing these documents, which has yet to be completed such that LIV cannot determine gaps in the Tour's productions. *Id.* ¶ 6. Exhibits 38-45 and 47-54 were produced by the Tour to LIV on December 20, 2022; Exhibit 58 was served by the Tour on December 19, 2022; and Exhibit 37 was produced on December 15, 2022—all after the motion to compel was filed. *Id.*

Putting aside the fabrication at the core of Clout's First Amendment claim, the underlying action has a protective order in place that amply protects third-party confidentiality.  *See Jones, et al. v. PGA Tour, Inc.*, Case No. 5:22-cv-04486-BLF, Dkt. No. 111.  The protective order allows parties (and nonparties) to designate material as "attorneys eyes only" to limit its disclosure to outside counsel and—by necessity only—to two members of a party's in-house counsel.  *Id*. at 2, 9.  Even material with lesser designation cannot freely be shared with non-parties, leave the US or the UK, or be used for any purpose other than the lawsuit.  *Id*. at 8.  Clout's privilege defense casually assumes two well-reputed national law firms who represent LIV would violate their ethical obligations and a court order to disclose Clout's documents to a foreign state.  Even in the paranoid world of public strategy, this theory is an embarrassment.

### B.    Clout Failed to Carry Its Burden of Establishing a Prima Facie Case That the Privilege Applies

Clout fails to make a prima facie case that it has a First Amendment interest to protect here. A party asserting a First Amendment privilege bears the initial burden to make "a prima facie showing of arguable first amendment infringement."  *Perry v. Schwarzenegger*, 591 F.3d 1126, 1140 (9th Cir. 2009).  Only after the proponent makes this showing does the burden shift to the subpoenaing party to show a "sufficient need for the discovery to counterbalance that infringement."  *In re Anonymous Online Speakers*, 661 F.3d 1168, 1174 (9th Cir. 2011).

The First Amendment association privilege presumes a protected form of association.  *See Roberts v. U.S. Jaycees*, 468 U.S. 609, 617-23 (1984).  Not every form of association is protected. *See id.*  In particular, "there is only minimal constitutional protection of the freedom of commercial association."  *Id.* at 634 (O'Connor J., concurring).  Courts distinguish between "associations that are primarily expressive" and "those that are primarily commercial."  *IDK, Inc. v. Clark Cty.*, 836 F.2d 1185, 1195 (9th Cir. 1988); *see, e.g.*, *U.S. v. Bell*, 414 F.3d 474, 485 (3d Cir. 2005) (finding

that the defendant was "primarily a commercial enterprise" whose "commercial transactions do not entail the same rights of association as political meetings").

Clout relies on cases like *NAACP v. Alabama*, 357 U.S. 449 (1958), in which state officials in the segregated South sought the membership list of a civil rights organization that was the subject of brutal racial harassment. But Clout is not the NAACP or its remote equivalent; Clout is a PR firm that engages in commercial relationships with its clients. Rather than associating out of shared goals or common beliefs, Clout states it can "help *any industry, association or company*." Ex. 2 at 2. That concededly commercial tie is fundamentally different from the "political association" that Clout claims (Rspn. at 39) or that the First Amendment protects.

All of Clout's cited authorities involve voluntary associations, like political groups and public unions. While Clout claims that *Yohn v. California Teachers Association*, 2017 WL 11635459 (C.D. Cal. Oct. 3, 2017), involved a public relations firm, it actually concerned teachers unions, a classic form of protected association. *See id.* at *2; *Am. Fed. of State, Cty., & Mun. Emp., AFL-CIO v. Woodward*, 406 F.2d 137, 139 (8th Cir. 1969). Commercial relationships, by contrast, are routinely held to not be covered by the First Amendment's associational protections. *See Bean LLC v. John Doe Bank*, 291 F. Supp. 3d 34, 46 (D.D.C. 2018).

Commercial associations, moreover, do not become protected merely because they involve political actors. *See FEC v. Automated Bus. Servs.*, 888 F. Supp. 539, 542 (S.D.N.Y. 1995). In *Automated Business Services*, a presidential campaign that allegedly misused public campaign funds sought to hide its expenditures by purchasing goods and services from political supporters. *Id.* at 541-42. The court rejected a First Amendment privilege, explaining that the "mere vending of goods or services to a political association neither evinces support for that association, nor makes the vendor a member of that association." *Id.* at 542. Nor do commercial relationships

become protected when the commercial services are "political in nature." *Bean*, 291 F. Supp. 3d at 46.  In *Bean*, Congress sought the identity of a Fusion GPS client that commissioned political opposition research.  *Id*. at 38.  Fusion claimed that clients would refuse to engage with it if their identities were revealed, but the court rejected a First Amendment privilege because "commercial transactions do not give rise to associational rights, even where the subjects of those transactions are protected by the First Amendment." *Id.* at 46.  Clout distinguishes *Bean* on the ground that it involved bank records, rather than internal communications, but that misses the point.  It is not the subject matter of the communications but who holds the privilege.  Clout does not have a protected "political association" with its clients; Clout is a hired gun.

The asserted harms laid out in Clout's declarations underscore this point.  Clout's President, David Polyansky, claims that providing discovery would "discourage Clout associates from freely and openly communicating ideas" and "brainstorming." ECF No. 11-1 ¶¶ 11-12.  But the same could be said for virtually all discovery.  In every commercial dispute, revealing employee communications discourages employees from talking to each other and associating with the employer.  If Clout's arguments were adopted, every case would involve a First Amendment privilege, and the privilege would swallow the rule allowing broad discovery.

Clout's other purported harm—fear of retaliation from Saudi Arabia—is wild speculation. *Id*. ¶¶ 13-14.  Mr. Polyansky claims Clout employees fear harm, but both their identities and their work on behalf of 9/11 groups are public and well-known.[13]  If harassment was realistic, Clout would have submitted—under seal and *ex parte*—a declaration to "describe harassment and intimidation of a group's known members." *In re Motor Fuel Temp. Sales Practices Litig.*, 641 F.3d 470, 491 (10th Cir. 2011).  Instead, Clout **in a public filing** points only to vague and

---

[13] Clout, Who We Are, https://cloutpublicaffairs.com/who-we-are/.

unsubstantiated "fear" without describing how revealing communications would chill association beyond Clout employees' known work for 9/11 groups. *See id.* (rejecting prima facie case of First Amendment privilege based on vague statements).

### C.      Clout Cannot Assert Its Clients' Privilege

If anyone may have a First Amendment privilege, it is Clout's clients. But they have not asserted a privilege, and Clout cannot do so on their behalf. Under the prudential standing doctrine, a litigant wishing to assert the rights of another must show "some hinderance to the third party's ability to protect his or her own interest." *Powers v. Ohio*, 499 U.S. 400, 411 (1991). The hinderance "must present a genuine obstacle beyond a lack of sufficient individual economic stake in the outcome or motivation." *Viceroy Gold Corp. v. Aubry*, 75 F.3d 482, 488 (9th Cir. 1996).

There is no hinderance here. Clout's clients, such as 9/11 Justice, could have intervened or filed a new suit, as Fusion did in *Bean*. 291 F. Supp. 3d at 39. They chose not to, even though, in Clout's telling, the Tour has produced in the underlying litigation communications with 9/11 groups, including 9/11 Justice. Rspn. at 23. The Court should not address a non-party's potential constitutional rights "when the most effective advocates of those rights are [not] before [it]." *Singleton v. Wulff*, 428 U.S. 106, 114 (1976). Accordingly, Clout's attempt to assert its client's rights—including its reliance on the Eagleson declaration, Dkt. 11-2—should be disregarded.

### D.      Discovery Is Warranted Even if the First Amendment Privilege Applies

Even if the Court finds that the First Amendment privilege applies, discovery should still be compelled. The First Amendment association privilege is not absolute. *Roberts*, 468 U.S. at 623. Even when the privilege applies, courts balance it against the "significance of the interest in disclosure." *Perry*, 591 F.3d at 1161 (simplified and citation omitted). "[T]he nature of the speech should be a driving force in choosing a standard by which to balance the rights of anonymous speakers in discovery disputes." *Anonymous Online Speakers*, 661 F.3d at 1177.

Courts in this district have applied a modified balancing test that considers "(1) whether the information goes to the 'heart of the lawsuit,' (2) whether the party seeking discovery sought the information through alternative sources, and (3) whether the party seeking discovery made reasonable attempts to obtain it elsewhere." *Wyoming v. U.S. Dept. of Agric.*, 208 F.R.D. 449, 455 (D.D.C. 2002). *But see In re Braden*, 344 F. Supp. 3d 83, 93 (D.D.C. 2018) (applying the *Perry* standard). Under this standard, discovery from Clout should be required.

First, Clout's work for 9/11 groups goes to the "heart" of this case, a significant antitrust lawsuit that promises to break up a monopoly in a multi-billion dollar market and benefit elite professional golfers and sports consumers, broadcasters, and advertisers everywhere. The "heart" of the lawsuit includes the Tour's pressure and threats to members of the golf "ecosystem" (players, sponsors, broadcasters, etc.) to exclude LIV from the relevant markets. *See* ECF No. 1-1 at 2. The Tour has shamelessly used 9/11 groups as part of this exclusion campaign, adding a veneer of third-party neutrality and political advocacy to its blatantly anticompetitive conduct. *See supra* Part II.C.

LIV has sought and failed to obtain the discovery through alternative means. As explained at length above, LIV has gone out of its way to obtain the information from the Tour. *See supra* Part III. But it has been unable to, not least because the Tour deliberately commissioned Clout to conduct these campaigns surreptitiously. In these circumstances, where Clout has deliberately hidden the relevant information from discovery in tandem with the Tour—and where the discovery relates to purely commercial relationships and is subject to an appropriate protective order—there is no constitutional infringement.

## CONCLUSION

For these reasons and those in LIV's opening brief, the motion to compel should be granted.

Dated: January 10, 2023

*/s/ Keith Forst*
KEITH H. FORST (DC Bar No. 478775)
CHRISTOPHER G. MICHEL (DC Bar No.1034557) *pro hac vice pending*
QUINN EMANUEL URQUHART & SULLIVAN LLP
1300 I Street NW, Suite 900
Washington, District of Columbia 20005
Tel: (202) 538-8000
Fax: (202) 538-8100
keithforst@quinnemanuel.com
christophermichel@quinnemanuel.com

JOHN B. QUINN *pro hac vice pending*
DOMINIC SURPRENANT *pro hac vice pending*
QUINN EMANUEL URQUHART & SULLIVAN LLP
865 South Figueroa Street, 10th Floor
Los Angeles, California 90017
Telephone: (213) 443-3000
johnquinn@quinnemanuel.com
dominicsurprenant@quinnemmanuel.com

RYAN SWINDALL *pro hac vice pending*
QUINN EMANUEL URQUHART & SULLIVAN LLP
1200 Abernathy Road, Suite 1500
Atlanta, GA 30328
Telephone: (404) 482-3502
ryanswindall@quinnemmanuel.com

*Attorneys for LIV Golf, Inc.*

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on January 10, 2023, a true and correct copy of the foregoing were served upon all counsel of record by filing the same with the Court's ECF system.

_/s/ Keith Forst_____
Keith H. Forst